HARRIS M. MUFSON, *pro hac vice forthcoming*
hmufson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000

MATTHEW D. MCGILL, *pro hac vice forthcoming*
mmcgill@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8500

ILISSA SAMPLIN, SBN 314018
isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000

CHRISTINE DEMANA, *pro hac vice forthcoming*
cdemana@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2923
Telephone: 214.698.3100

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN, a Delaware corporation,

Plaintiff,

v.

PROTON MANAGEMENT LTD., a British Virgin Islands corporation; THOMAS PATRICK FURLONG; ILIOS CORP., a California corporation; MICHAEL ALEXANDER HOLMES; RAFAEL DIAS MONTELEONE; SANTHIRAN NAIDOO; ENRIQUE ROMUALDEZ; and LUCAS VASCONCELOS,

Defendants.

Case No. 2:24-cv-8280

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan") complains and alleges the following against Defendants Proton Management Ltd. ("Proton"), Thomas Patrick Furlong, Ilios Corp., Michael Alexander Holmes, Rafael Dias Monteleone, Santhiran Naidoo, Enrique Romualdez, and Lucas Vasconcelos (collectively, "Defendants").

## NATURE OF THE ACTION

1. Over a period of several weeks in July and August, Defendants and other agents hatched and executed a "rain and hellfire" plan to steal Swan's billion-dollar Bitcoin mining business.

2. The individual Defendants (all former Swan consultants) conspired to steal Swan's highly proprietary and confidential Bitcoin mining business, technology, trade secrets, property and personnel, and then resigned near-simultaneously on the evening of August 8, 2024, to join Defendant Proton—a copycat company Defendant Holmes created for the sole purpose of using Swan's stolen technology and trade secret techniques and methods to usurp its mining business. Defendant Naidoo is now Proton's Chief Investment Officer, and virtually all the consultants and employees who worked in Swan's Bitcoin mining business—including Swan's former executives and General Counsel—currently work for Defendant Proton with Swan's confidential information and trade secrets.

3. The evidence of Defendants' brazen theft is overwhelming. In the days and weeks before—and in the time surrounding—the individual Defendants' departure from Swan, Defendant Monteleone cloned and exfiltrated highly proprietary code from Swan's Bitcoin mining monitoring software—the Bitcoin Network Operating Center ("BNOC")—directly from the secured coding platform GitHub and downloaded a copy of this Bitcoin mining "dashboard" outside of Swan's secure systems. Others involved in the conspiracy who now work with Proton (including Proton's current CEO—ex-Swan Chief Investment Officer and Head of Mining Raphael Zagury) also downloaded Swan's BNOC.

4. In all, Defendants misappropriated thousands of documents and files containing Swan's proprietary and confidential information and trade secrets: mining processes developed through testing, mining performance data, data related to Swan's mining inventory, mining operations and machine performance and configuration, financial modeling and information, weekly reports of all operations, ongoing deals with Swan business partners, and pricing information. And they attempted to cover their tracks—Defendant Monteleone, for example, attempted to delete his Swan email address from his GitHub account.

5. At the same time Defendants were stealing the crown jewels from Swan's Bitcoin mining business, they executed their pre-planned scheme to solicit Swan's mining personnel; usurp Swan's funding arrangement; use Swan's financing partner, cryptocurrency giant Tether, for "legal cover" for their misdeeds; and irreparably harm Swan's ability to compete in the market. All of this is laid bare in Zagury's notes, which also confirm Defendant Holmes was a ringleader.

Call with Bill, Max, Alex, San

R raphael@swanbitcoin.com
To

---

Better together or Alex leaves first?
. Send list of points
. Post - termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.

Tether needs to send default notice.

---

6. The scheme from Zagury's notes came to pass as planned: Defendant Holmes, Defendant Naidoo, and Zagury coordinated their resignations from Swan on August 8, 2024. Shortly thereafter, Holmes sent a message to Defendant Furlong, Defendant Monteleone, Defendant Romualdez, Defendant Vasconcelos, and other Swan conspirators signaling them that it was time to resign and join him, Defendant Naidoo, and Zagury at Defendant Proton. Over the next few hours, they did.

7. Four days later, Tether, Swan's funding partner in its mining operation, notified Swan that Defendant Proton would be taking over "day-to-day" Bitcoin mining management in their joint venture, citing the departure of a [redacted]

8. Since then, Defendants have continued to use the proprietary data, information, and resources they stole to operate Defendant Proton's copycat Bitcoin mining business and have continued to work with Swan's business partners and vendors while trading on Swan's name. Defendants Furlong, Holmes/Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos have also ignored Swan's repeated demands—under their binding contracts with Swan—that they return Swan's devices and confidential, proprietary, and trade secret information.

9. Swan has now been left with no choice: it has come to this Court to hold Defendants to account for their willful and unlawful misconduct, including trade secret misappropriation, breach of contractual obligations to Swan, conversion, and unfair competition; to immediately stop Defendants from continuing to irreparably harm Swan by possessing and using Swan's stolen proprietary, confidential, and trade secret information; and to recover the enormous economic damages it has lost and the attorneys' fees it has incurred because of Defendants' willful and unlawful theft of

Swan's Bitcoin mining business.[1]

**PARTIES**

10. Plaintiff Swan is an industry leading Bitcoin financial services company that helps individuals and businesses purchase, save, and invest Bitcoin through its platform, and a leader in the field of Bitcoin mining. Swan is a Delaware corporation with its headquarters located at 26565 W. Agoura Road, Suite 200, Calabasas, California 91302, which is in Los Angeles County in the Central District of California.

11. Defendant Proton is a British Virgin Islands Business Company with its headquarters at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands. Its registered agent is Brittney Fahie, SHRM Trustees (BVI) Limited, Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands.

12. Defendant Furlong is a former Investment Director of Swan. On information and belief, Defendant Furlong resides in Western Australia.

13. Defendant Holmes is a former Head of Business Development of Swan. On information and belief, Defendant Holmes resides in Los Angeles, California, which is located in Los Angeles County in the Central District of California.

14. Defendant Ilios is a California corporation with its headquarters located at 664 South Mansfield Avenue, Los Angeles, California 90036, which is located in Los Angeles County in the Central District of California. Defendant Holmes contracted through Ilios to provide services to Swan.

---

[1] Swan seeks monetary damages in this action only against Defendant Proton. In contracts with Swan, Defendants Furlong, Holmes/Ilios, Monteleone, Naidoo, Romualdez, and Vasconcelos agreed to arbitrate claims related to their consulting relationships with Swan. . However, those agreements state that Swan may seek injunctive relief in court for violations of any agreement regarding intellectual property, confidential information, or noninterference. Swan anticipates pursuing additional claims against Defendants Furlong, Holmes/Ilios, Monteleone, Naidoo, Romualdez, and Vasconcelos in arbitration and reserves all rights associated with doing so, without waiver.

15.     Defendant Monteleone is a former Investment Analyst of Swan.    On information and belief, Defendant Monteleone resides in São Paolo, Brazil.

16.     Defendant Naidoo is a former Investment Director of Swan.    On information and belief, Defendant Naidoo resides in London, United Kingdom.

17.     Defendant Romualdez is a former Junior Investment Analyst of Swan.    On information and belief, Defendant Romualdez resides in Toronto, Ontario, Canada.

18.     Defendant Vasconcelos is a former Software Engineer of Swan.    On information and belief, Defendant Vasconcelos resides in Ceilândia, Brazil.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*., and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims pleaded herein pursuant to 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Defendant Furlong pursuant to the forum-selection clause in his consulting agreement with Swan, dated May 21, 2024, through which Furlong irrevocably submitted to the exclusive jurisdiction and venue of the state and federal courts located in this District.  That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."

21.     This Court has personal jurisdiction over Defendants Ilios and Holmes pursuant to the forum-selection clause in Ilios's consulting agreement with Swan, dated December 6, 2023, through which Holmes, on behalf of Ilios, irrevocably submitted to the exclusive jurisdiction and venue of the state and federal courts located in this District.

That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."

22. This Court has personal jurisdiction over Defendant Monteleone pursuant to the forum-selection clause in his consulting agreement with Swan, dated May 10, 2024, through which Monteleone irrevocably submitted to the exclusive jurisdiction and venue of the state and federal courts located in this District. That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."

23. This Court has personal jurisdiction over Defendant Naidoo pursuant to the forum-selection clause in his consulting agreement with Swan, dated July 26, 2023, through which Naidoo irrevocably submitted to the exclusive jurisdiction and venue of the state and federal courts located in this District. That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a

violation of any agreement regarding intellectual property, confidential information or noninterference."

24.    This Court has personal jurisdiction over Defendant Romualdez pursuant to the forum-selection clause in his consulting agreement with Swan, dated December 14, 2023, through which Romualdez irrevocably submitted to the exclusive jurisdiction and venue of the state and federal courts located in this District. That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."

25.    This Court has personal jurisdiction over Defendant Vasconcelos pursuant to the forum-selection clause in his consulting agreement with Swan, dated September 29, 2023, through which Vasconcelos irrevocably submitted to the exclusive jurisdiction and venue of the state and federal courts located in this District. That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."

26.    This Court has personal jurisdiction over Defendant Proton because Proton has purposefully directed unlawful activities towards California. Proton's employees and agents unlawfully stole Swan's confidential and proprietary information, including trade secrets. This was an intentional act that was expressly aimed at California, the

effects of which were felt in California because the stolen confidential and proprietary information were located in California, Swan is headquartered in California, and Swan's principal place of business is in California.  On information and belief, Proton, through its agents and employees, was aware of these facts, and thus Proton caused harm that it knew was likely to be suffered in California.  Moreover, on information and belief, Holmes, who founded Proton and is one of Proton's senior leaders, resides in California, and was physically located in California during the period in which he formed Proton and, as an agent of Proton, breached his contractual obligations with Swan and made decisions and participated in calls and other communications with respect to the events giving rise to this lawsuit.  It was foreseeable to Proton that the harm to Swan would be inflicted in California.  Plaintiffs' claims against Proton arise out of Proton's actions that harmed Swan in California.

27.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial portion of the events giving rise to the claims occurred in this judicial district, the intellectual property that is the subject of this dispute is situated in this judicial district, Defendants Ilios and Holmes reside in this District for purposes of 28 U.S.C. § 1391, and nearly all of the Defendants expressly consented to this venue pursuant to the contract terms excerpted above.

## FACTS

### I.    Entrepreneurs Cory Klippsten and Yan Pritzker Found Swan

28.    Cory Klippsten founded what is now Swan in June 2019, with Yan Pritzker joining the Company later that year.

29.    Klippsten, Swan's Chief Executive Officer, has always been passionate about technology.  Before receiving an MBA from the University of Chicago, Klippsten worked at Microsoft and Morgan Stanley, and later worked at Google and McKinsey. Klippsten is a partner, investor, and advisor of multiple Bitcoin-focused venture capital firms, and over the years has served as an investor and advisor to more than 60 early-stage tech companies.  He originally founded Electric Solidus, LLC (now Electric

Solidus, Inc. d/b/a Swan Bitcoin) as a Bitcoin gifting service; its first product was called "GiveBitcoin."

30. Pritzker, Swan's Chief Technology Officer, is a serial tech entrepreneur and remains one of the most trusted authorities on Bitcoin.

31. The last startup Pritzker co-founded, Reverb, was sold to Etsy in 2019. He then authored "*Inventing Bitcoin*," an introductory text for persons new to Bitcoin. Bitcoin represents much more to Pritzker than an online currency; it represents freedom. Pritzker grew up in the Soviet Union, where prices were fixed, capital was controlled, and the economy failed to supply basic goods. Those experiences spurred his interest in Bitcoin as a portable, decentralized currency.

32. In January 2020, Klippsten and Pritzker rebranded the Company as Swan Bitcoin and set out to offer customers a truly user-focused product that combined Klippsten's passion and expertise for building tech companies with Pritzker's engineering experience and deep knowledge and belief in the currency. Over the next few years, Klippsten and Pritzker grew Swan into an industry leading Bitcoin financial services company that educates and helps individuals, businesses, and retail traders purchase, save, and invest in Bitcoin and related products and services through an accessible and user-friendly interface.

## II. Swan Builds a Successful Bitcoin Mining Business

33. After several years of success, Swan planned to pursue opportunities in the Bitcoin "mining" space to further supplement its Bitcoin business. Klippsten and Prizker had served as Board Advisors for Riot Platforms, a Bitcoin mining and digital infrastructure company, from 2019 through 2022, and shared a keen interest in playing a role in the mining space over time. Swan created a new Institutional division in January 2023, with a primary focus on developing financial services for investors and operators in Bitcoin mining.

34. Bitcoin mining is the computerized process by which individuals and entities verify and secure Bitcoin transactions and obtain Bitcoin. Unlike traditional

currencies, Bitcoin can be transferred between people or computers without relying on trusted third parties like governments or banks. In a traditional banking system, for example, third-party banks act as ledgers, recording customers' debits and credits and verifying that money can move from one account to another. In that system, customers must rely on the bank to approve and verify every payment. But Bitcoin is based on a decentralized ledger, wherein every transaction in the Bitcoin network is recorded and verified, not by a single entity like a bank, but by hundreds of thousands of members on a network. Anyone in the world can join the Bitcoin network by connecting their computer to the network and tracking transactions in the ledger.

35. For this network to function, members must verify the transactions. Bitcoin incentivizes network members to verify transactions by holding a "contest" to determine (a) who wins the right to enter these transactions into the ledger and (b) who has the chance to obtain new Bitcoin. Each "miner" seeking to participate attempts to solve a puzzle on the network. Every ten minutes, one miner is chosen at random and that miner wins the right to record all Bitcoin transactions into the decentralized ledger that took place since the last contest. That miner also gets to present its solution to the puzzle, and, if it provides the correct answer, the miner announces that answer to the rest of the network along with the input the miner used and the transactions it has recorded. If the miner completes this full process correctly, it is paid a fee, and the transactions it has announced are called a "block." Every other computer on the Bitcoin network validates the block by confirming that the solution to the puzzle is correct, that the block does not contain any invalid transactions, and that the history within it does not conflict with prior blocks. Those computers then all write the block into their copy of the ledger, appending it into the existing chain of blocks, producing a "blockchain." The successful miner gets the Bitcoins on the block, and the process repeats ten minutes later.

36. Bitcoin mining can be extremely lucrative; the value of a single Bitcoin on the date of this filing (September 25, 2024) is approximately $63,000. But mining is also extremely expensive and requires deep expertise, as well as data-driven testing

through trial and error, to participate profitably at scale. Mining requires highly advanced computers that are specially designed to continuously run the computations needed to enter the "contest" multiple times. In addition to the cost of these machines, Bitcoin mining consumes significant amounts of energy, and mining operations must be constantly monitored to ensure efficient energy use, prevent overheating of the equipment, and optimize the equipment deployed. The more computers an operation has (and therefore, the more energy it uses), the higher its chances to secure Bitcoin through the contest. Lower electricity cost means more mining, higher output, and greater profitability. If this energy and the mining operations are not managed efficiently, the hardware, electricity and other costs associated with Bitcoin mining can easily exceed the value of the mined Bitcoin.

37. To start Swan's Bitcoin mining business, it brought on several of the largest Bitcoin miners as sponsors of its Pacific Bitcoin conferences in November 2022 and October 2023, and of Swan's media properties from 2022 to the present. In May 2023, Swan had begun planning what would become an incredibly successful Mining Industry VIP event the day prior to its Pacific Bitcoin conference in October 2023. With the addition of Guilherme Gomes (later Swan's President) in May 2022 and Raphael Zagury (later Swan's Chief Investment Officer) in December 2022, Swan began planning in earnest to serve large Bitcoin miners in early 2023 as clients of its Swan Institutional unit.

38. On June 1, 2023, Klippsten learned of the DAME Bitcoin mining site in Tasmania, Australia, from a Swan employee who had invested in the project in 2021. Klippsten immediately recognized the project's great potential: to build a large new Bitcoin mining operation site in a jurisdiction with a favorable regulatory and financing regime and extremely low energy costs. That evening, Klippsten mentioned the company to his friend Defendant Holmes, who told Klippsten that he was aware of the company and that he was working to secure a Series A round of funding for DAME. Klippsten and Holmes agreed that Swan would work to source investment for the deal.

39. Klippsten spoke with Giancarlo Devasini of Tether, a cryptocurrency company, early the next day and they agreed that Tether would provide funding, with Swan managing the mining investment. With years of experience and contacts in Bitcoin, and now a foothold deal and a financial backer, the Swan team quickly set about exploring additional opportunities in the mining space.

40. Within a month, Swan was aggressively purchasing as many Bitcoin mining machines as it could find, and it began contracting with host sites to plug them in and start mining. Defendant Holmes consulted to Swan for the sourcing of both machines and sites.[2]

41. Swan also started hiring and building out its mining team. Bitcoiners were eager to join—the Swan brand was highly respected and the Company had established itself as a trusted authority on Bitcoin and among the most desirable places to work in the industry. Job postings for Swan often resulted in hundreds of applications from highly qualified individuals both inside and outside of the industry.

42. Swan's then-Chief Investment Officer, Raphael Zagury, also was at the forefront of the operation. Swan had originally hired Zagury in December 2022, and he served on the Company's executive team. As Chief Investment Officer, Zagury believed Swan could grow its investment in Bitcoin mining substantially.

43. In July 2023, Zagury started managing the Tasmanian mining operations for Swan, and Swan's mining team grew from approximately five to twelve dedicated employees and independent contractors—eventually including Vice President of Institutional Operations & Research Brett Hiley, Financial Controller Tyler Effertz, Technical Researcher Kartheek Sola, and Staff Accountant Aleksander Dozic, and consultants (other individual Defendants) Investment Director Thomas Patrick Furlong, Special Situations Analyst Santhiran Naidoo, Investment Analyst Rafael Dias

[2] Swan and Holmes would negotiate and reduce to writing their relationship with a consulting agreement Defendant Holmes signed on behalf of his personal company Defendant Ilios before the end of the year that included backpay.

Monteleone, Junior Investment Analyst Enrique Romualdez, and Software Engineer Lucas Vasconcelos. Defendant Holmes consulted (Operating Manager) through his personal company, Defendant Ilios, and Swan retained Maxwell Berg, of MB Law LLC, to serve as external Associate General Counsel tasked with assisting in various corporate and commercial matters. Swan's executive team, including then-President Gomes and then-General Counsel Bill Belitsky also oversaw the new mining team.

44. At the same time, Swan built out the proprietary aspects of its business and mining operations that would distinguish the Company from competitors.

45. *First*, Swan spent significant time and money developing its Bitcoin Network Operating Center ("BNOC"), a complex proprietary platform for managing mining data and analytics. BNOC allows Swan to track mining sites, weather, price of Bitcoin, hash-rate (the rate of attempts per second to solve the puzzle for the chance to obtain new Bitcoin), and other data concerning mining operations, including the specific combinations of factors that lead to the profitability of a specific mining location. It can provide a real-time detailed look into mining operations and can quickly pinpoint problems.

46. Swan developed and owns BNOC, quickly making the Company an industry leader in Bitcoin mining in two primary ways: (a) BNOC allowed Swan to track and maximize certain metrics to increase the speed at which the computers solve puzzles (and increasing their chances to obtain Bitcoin through the "contest") while minimizing energy usage and costs; and (b) BNOC operates as a highly valuable service that provides incredibly detailed, real-time visibility into mining operations.

47. *Second*, Swan developed, through testing, proprietary hash-rate optimization techniques for Bitcoin mining.[3] Those techniques likewise maximize the number of computations-per-second that mining hardware can perform, increasing the

[3] "Hash-rate" refers to the computational power of mining hardware, measured by the number of calculations ("hashes") it performs per second.

speed at which the computers solve puzzles (which, again, increases their chances to win Bitcoin) while minimizing costs.

48. Swan's "overclocking and underclocking" methods are one of these techniques. "Overclocking and underclocking" refers to specialized procedures that safely alter the performance of mining hardware to optimize its power beyond manufacturer specifications, without compromising stability. Other optimization techniques are Swan's geographic insights and modeling tools (proprietary methods for selecting optimal mining locations), latency optimization (strategies to reduce network latency and improve mining efficiency), cooling and software optimizations for mining hardware and software, and proprietary pool analytics (internal tools that analyze mining "pool" performance metrics to select the most profitable and reliable pools[4]).

49. *Third*, Swan developed proprietary financial modeling, data analytics, and financial monitoring tools. Swan's cost-benefit analysis models calculate the profitability of varying mining setups and strategies; real-time performance dashboards provide customized interfaces for immediate insights into operational efficiency; and marketing trend analysis tools analyze market trends to inform Bitcoin mining operations decisions.

## III. Swan Protects the Secrecy of Its Proprietary Information

50. To protect the competitive advantage Swan's proprietary and trade secret mining information conferred on its business, Swan's mining employees and consultants (including each of the individual Defendants) agreed to hold all of Swan's confidential and proprietary information and trade secrets in the strictest confidence.

51. Defendants Furlong, Holmes (on behalf of Defendant Ilios), Monteleone, Naidoo, Romualdez, and Vasconcelos specifically agreed in their consulting agreements that:

[4] A mining "pool" is a group of cooperating miners who agree to share the fees and new Bitcoin associated with winning a "block," as outlined in paragraph 35 above. Swan and other Bitcoin miners at times enter into these pools with other miners.

> During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use of disclosure of Confidential Information,[5] and Consultant will not (i) use the Confidential Information for any purposes whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) subject to Consultant's right to engage in Protected Activity (as defined below [*i.e.*, filing a charge with the Government]), disclose the Confidential Information to any third party without the prior written consent of an authorized representative of the Company, except that Consultant may disclose Confidential Information to the extent compelled by applicable law; provided however, prior to such disclosure, Consultant shall provide prior written notice to [the] Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is

---

[5] "Confidential Information" is defined as "any information (including any and all combinations of individual items of information) that relates to the actual or anticipated business and/or products, research or development of the Company, its affiliates or subsidiaries, or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment or other property of [the] Company, its affiliates or subsidiaries." "Confidential Information" does not include information that was publicly available through no wrongful act of the consultant or was independently developed "with no reference to the Confidential Information." Defendant Ilios's consulting agreement also excludes from the definition of "Confidential Information" "all of Consultant's involvement, relationship, and dealings with Daniel Tuzzio [], and all of Tuzzio's affiliated entities, whether in existence prior to or after the Effective Date" of the Agreement. Tuzzio was a preexisting business associate of Defendant Holmes who Swan and Holmes agreed would perform services for Swan through Holmes.

> conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section [] shall continue after the termination of this Agreement.[6]

52. Swan also reiterated confidentiality to its consultants in its "Contractor Playbook," which it provides to all consultants and contractors. The Contractor Playbook explains that "[i]t is crucial to maintain confidentiality regarding company information and client discussions." The Contractor Playbook directs consultants and contractors to "assume anything Swan-related is confidential – including company, employee/contractor/staff, and client information." (Swan's "Employee Playbook" contains similar guidance.)

53. To bolster these protections, Swan also supplemented the mining employe and contractor agreements with a robust infrastructure of agreements, policies, and technological safeguards to maintain the secrecy of its confidential and proprietary information and trade secrets.

54. Swan's Information Security Policy, for example, "ensures that Swan's information assets are properly identified, recorded, and afforded suitable security measures at all times." The Policy provides that access to Swan documents must be limited to the "most restrictive level possible that still enables the user to perform their job effectively," explains that "[e]mployees and contractors are required to maintain the confidentiality of information to them by Swan, its customers, and suppliers," and cautions that "[u]nauthorized use or distribution of proprietary information violates

---

[6] *See* Exs. A-F to the Declaration of Cory Klippsten in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order Without Notice, Evidence Preservation and Limited Seizure Order, Expedited Discovery Order, Protective Order, and OSC re: Preliminary Injunction ("Klippsten Decl."), filed concurrently.

Swan's Policy and may be illegal and result in civil and/or criminal penalties." It identifies seventeen activities that are "strictly prohibited, with no exceptions," including:

- Violations of the rights of any person or company protected by copyright, trade secret, patent, or other intellectual property, or similar laws or regulations. . . .
- Accessing data, a server, or an account for any purpose other than conducting Swan Bitcoin business, even if you have authorized access; and
- Providing information about or lists of Swan Bitcoin employees, contractors, partners, or customers to parties outside Swan Bitcoin without authorization.

55. Swan's Security Agents Policy also requires two security applications to be present "on all devices that interact with Swan or company-wide data," which the Policy advises "is crucial for ensuring the integrity and protection of our Swan assets." One application "is used in enforcing Swan security policies . . . contributing significantly to the overall security posture of [Swan's] systems." The other application "serves as an additional layer of defense, boosting [Swan's] cybersecurity measures to safeguard against external threats."

56. And to access the system that houses Swan's confidential and proprietary information and trade secrets, Swan's mining employees and consultants must enter a password that must meet certain complexity requirements, as well as engage in a multi-factor authentication process that requires the user to successfully present multiple pieces of evidence to prove their identity.

57. Swan undertook even further protections for BNOC, securely storing the software code on a developer platform called GitHub and restricting access to authorized users with valid credentials. To access BNOC, Swan's Information Security team must approve access for specific Swan personnel. In accordance with Swan's policies, the Information Security team tightly restricts permissions to access BNOC, limited to only those personnel who are directly involved in managing BNOC (such as software

developers, security engineers, and platform engineers). Even for personnel with permissions to access GitHub, users must first access Swan's suite of software tools by entering a unique username to which Swan grants rights to access the code. Users must then correctly enter an SSH Key, a secure, cryptographic key pair used to access remote servers without a password, before they can access Swan's code.

## IV. Swan Forms 2040 Energy, a Financing Arrangement to Raise Capital for Bitcoin Mining

58. To fulfill Swan's goal of expanding further into the Bitcoin mining industry, Klippsten had contacted Tether about providing capital for DAME. Tether had invested in Swan before under the name "BFX Ventures Limited."

59. On July 28, 2023, Swan and Tether, through Tether's subsidiary Zettahash Inc., entered into a Shareholders Agreement (along with a third-party individual who originally helped to facilitate the relationship) that would govern the arrangement—known as 2040 Energy.

60. 2040 Energy was a funding vehicle; it did not contract with employees or consultants. Swan's mining employees and consultants operated 2040 Energy and engaged with business vendors and partners (including equipment vendors and datacenter mining hosts) using the Swan brand. Klippsten served as 2040 Energy's CEO (as well as Swan's CEO), overseeing Swan's mining team and operations.

61. Tether funded 2040 Energy [redacted]

62. Like Swan's employment and consultant agreements, the 2040 Energy Shareholders Agreement contains a broad confidentiality provision, which provides that:

[redacted]

### V. The Defendants Plot to Steal Swan's Business, Confidential and Proprietary Information, and Trade Secrets

63. By 2024, 2040 Energy mining was a runaway success by any measure. On information and belief, 2040 Energy's value had soared. By July 2024, Swan's hard work had expanded its mining operation's capacity to just under twelve exahashes, meaning that it was performing nearly twelve quintillion computations per second to ensure secure processing of transactions on the Bitcoin network. By July 2024, 2040 Energy was mining approximately one of every fifty Bitcoins worldwide. Tether CFO Devasini told Klippsten on multiple occasions that in his opinion Klippsten was the best CEO in the space.

64. By February 2024, Tether and Swan had agreed in principle to enter into a new funding agreement, known as 2140 Energy, which would further invest in the Tasmania site and other Bitcoin mining opportunities.

65. But before the 2140 Energy deal was finalized, Defendants and other Swan conspirators[7] decided to enrich themselves at Swan's expense. They hatched a plan to

[7] These conspirators constituted nearly all of Swan's mining personnel, including Raphael Zagury (Swan's then-Chief Investment Officer), Bill Belitsky (Swan's then-General Counsel), Brett Hiley (Swan's then-Vice President of Institutional Operations & Research), Tyler Effertz (Swan's then-Financial Controller), Kartheek Sola (Swan's then-Technical Researcher), and Aleksander Dozic (Swan's then-Accountant). Swan is not pursuing claims against them in this action because their agreements with Swan provided for dispute resolution procedures outside this Court. Swan anticipates pursuing

steal Swan's mining business from the inside, usurp Swan's role, and cut Swan out from the Tether joint venture. They dubbed it "rain and hellfire."

66. Upon information and belief, Defendants and their Swan conspirators' executed their "rain and hellfire" plan by: (a) downloading all of Swan's confidential and proprietary business information and trade secrets necessary to operate a Bitcoin mining business, including BNOC and other material they would need to operate 2040 Energy; (b) creating a new company, Defendant Proton, which Swan's then-CIO Zagury would operate as CEO with Swan's then-Investment Director Defendant Naidoo as CIO, and which would employ other Defendants and Swan conspirators; and (c) soliciting "legal cover" from Tether to claim that Swan—following their departure—could no longer manage mining for 2040 Energy, push Swan out of its funding agreement with Tether, and insert Defendant Proton as Swan's replacement.

67. Swan did not uncover the "rain and hellfire" plan until it was blindsided by the individual Defendants and Swan conspirators coordinated resignations on August 8-9, 2024. In the weeks following, Swan has been able to retrieve and review electronic data and forensic activity logs associated with departing employees' and consultants' accounts and reconstruct their treachery. Those logs show that Swan's former employees and consultants—including Zagury, Defendant Furlong, Defendant Monteleone, Defendant Naidoo, and Dozic—accessed, downloaded, and collectively took large volumes of Swan's confidential and proprietary information and trade secrets in the weeks and days preceding their coordinated resignations, without Swan's knowledge and in violation of their Swan contracts and Swan's policies.

68. Swan was also able to review electronic communications—including emails and Zoom call logs—from Defendants' and the other Swan conspirators' business accounts. While Swan's investigation is ongoing, this much is now clear:

69. Beginning in June 2024, Swan began the process of raising investment into

---

claims against these individuals pursuant to the procedures provided by their agreements.

Electric Solidus Inc. through a Series C fundraising round.

70.    In late June 2024, Zagury met with Tether's outside counsel for 2040 Energy at the EAST Miami hotel.  Shortly thereafter, Zagury drafted a sham document entitled "Cory Thoughts," which included a poison pill recommendation to Swan's CEO to focus solely on Swan's mining business and to split off the other aspects of its Bitcoin business, including Swan's original financial services.

71.    On June 28, 2024, Zach Lyons (a founder and principal of Marlin Capital Partners, one of Tether's advisors) told Swan that Tether was offering to lead Swan's Series C fundraising round with a $25 million investment that would value Swan's business at $1 billion.

72.    On July 2, 2024, Zagury relayed to Swan's then-President, Gomes, a summary of a discussion Zagury had with Lyons, explaining that Lyons apparently believed Swan's Bitcoin mining business was "in a good position" and was "crushing it," while the remainder of Swan's business (including its financial services operation with approximately 170 of employees) was "a venture capital bet."  Zagury (while he was employed as an executive (CIO) with Swan) also told Gomes that Lyons "thinks it is the right [decision] now" to spin Swan's mining business off as an independent entity. Zagury then floated the Defendants' and Swan conspirators' double-cross—he discussed with Gomes the possibility of forming a new company that would replace Swan as the operator of 2040 Energy.  Zagury would be the new company's CEO, Swan's then-Investment Director Naidoo would be the COO, and Holmes would be the Head of Operations and Procurement.

73.    On July 11, 2024, Zagury and Defendant Naidoo met with Lyons to plot an "unwind" of Swan's involvement in 2040 Energy.  Lyons' motivation is laid bare in contemporaneous notes of this meeting.  He said that Swan had "no value" to Tether and the group discussed the possibility of certain Swan employees and consultants leaving Swan and going to Tether or another operator to "[k]eep doing what [they're] doing."

Lyons told Zagury and Defendant Naidoo that Klippsten "has to realize they [Tether] can take away [Swan's mining business] tomorrow."

74. On July 12, 2024, Zagury sent Klippsten what Zagury claimed were "recommendations" based on a document he had initially drafted on June 28, 2024, including that Swan focus solely on mining—*i.e.*, the only aspect of Swan's business that would advance the Defendants' new business interests.

75. On July 15, 2024, Zagury spoke with Lyons. During the meeting, Zagury messaged to Gomes the prospect of suing Swan and forcing a wind down of Swan's business unless Swan agreed with Tether to accept "wind down capital," force Klippsten to resign as CEO of Swan, and turn over Swan's mining business to Tether.

76. Around that same time, Zagury tried to sow dissent and chaos at Swan, undermine Klippsten, and influence Swan's employees and consultants to leave Swan. He repeatedly told Klippsten and other Swan employees and consultants that Tether was planning to pull out of the new arrangement, sue Swan based on supposed breaches of the 2040 Energy Shareholders Agreement, and renege on an offer it had made to invest in Swan in a separate, ongoing round of fundraising. On information and belief, Zagury did so because he knew that he, Defendants, and other Swan conspirators would replace Swan in operating 2040 Energy if they successfully obtained Swan's confidential and proprietary material and the trade secrets and enough Swan employees and/or contractors.

77. Zagury and Tether CFO Devasini met on July 20, 2024. Later that day, Zagury told Klippsten that Devasini wanted to appoint Zagury as a board member of 2040 Energy (ostensibly for Swan) and transfer custody of 2040 Energy's Bitcoins to an account controlled by Zagury. Zagury also contacted members of Swan's Board of Directors and recommended that they agree to give Swan's mining business to Tether at a significantly lower valuation than a valuation Tether had proposed weeks earlier.

78. On information and belief, Defendant Holmes, Defendant Naidoo, Zagury, and Lyons met again on Zoom on July 27, 2024, to discuss how Defendant Holmes,

Defendant Naidoo, and Zagury (with others inside Swan) would steal Swan's confidential information and trade secrets; the simultaneous resignations of virtually all Swan employees and contractors servicing the mining business; Defendant Holmes' formation of a new entity (Defendant Proton); and how 2040 Energy would retain that new entity to take over the operations of 2040 Energy from Swan.

79. Contemporaneous notes from meetings between Zagury, Defendant Holmes, Defendant Naidoo, then-Swan General Counsel Belitsky, and then-Swan outside counsel Berg (MB Law LLC) detail Defendants' and their conspirators' resultant "rain and hellfire" scheme to "bring the heat" and "blow everything up" at Swan.

Call with Bill, Max, Alex, San

raphael@swanbitcoin.com
To

Better together or Alex leaves first?
. Send list of points
. Post - termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.

Tether needs to send default notice.



Call with Bill, Max, Alex, San

R
raphael@swanbitcoin.com
To

Last week you said you'd unleash hell on this guy.

. Alex leaves
. Breach
. Proton is assigned manager of 2040 assets
. All communications go to new management company
. ROFR gone if Alex resigns
. Written communications. Alex terminated his agreement. We don't need a board resolution.

. Bring the heat
. Giancarlo side convs. ?

They cannot go and say we didn't do it by the book.

Rain and hell fire needs to start. Needs to be an exit, not a nice transaction.

[REDACTED] is moot when Alex leaves. Already moot now. Double covered the second Alex leaves.

Bill interrogated if anyone asked him to join mining.

---

## VI. The Defendants Execute Their Scheme

80. As July turned into August, the Defendants and the Swan conspirators executed on their "rain and hellfire" plan.

81. On July 25, 2024, Defendant Monteleone downloaded a component of Swan's BNOC ("bnoc-cron") within GitHub.

82. On July 29, 2024, Defendant Proton, through an agent, filed a document in the British Virgin Islands seeking to reserve the name "Proton Management" for a new corporation. On information and belief, Defendant Holmes caused this document to be filed.

83.    On July 30, 2024, Defendant Monteleone downloaded a copy of Swan's BNOC core mining dashboard code and, prior to August 8, 2024, exfiltrated this proprietary code into a code repository outside of Swan's systems, in violation of Swan policy.

84.    Also on July 30, 2024, Swan's then-Vice President of Institutional Operations & Research Hiley downloaded approximately 319 documents from Swan's Google Drive.  This included, for example, highly confidential monthly mining performance data, data related to mining inventory, operations and machine performance and configuration by site, meeting notes, and Swan policies and procedures.  Of particular note, Hiley downloaded a log of weekly reports to Klippsten that provide in-depth analysis and details about all mining sites and operations.

85.    On August 2, 2024, Defendant Proton, through an agent, filed a Certification of Incorporation in the British Virgin Islands.  On information and belief, Defendant Holmes caused this document to be filed.

86.    During the first week of August, Zagury exported data off Swan's "Notion" platform, an internal tool for recording business and operational data.  That data included confidential business information concerning ongoing deals with a Swan partner.

87.    That same week, Defendant Naidoo and Defendant Furlong, too, downloaded numerous documents from Swan's Google Drive.  Defendant Naidoo downloaded, for example, highly confidential monthly mining performance data, proprietary financial records, contracts, and earnings reports.  One of the documents that Defendant Naidoo downloaded is a "2040_site_database" spreadsheet that houses all Swan's proprietary information related to its hash-rate optimization techniques.

88.    Also that same week, Defendant Furlong downloaded modeling files containing proprietary formulas and logic that support Swan's BNOC, which on information and belief, he would not have downloaded in connection with his day-to-day role at Swan.

89.    On August 4, 2024, Zagury downloaded all of Swan's BNOC from GitHub.

90.    And between August 6-8, 2024, Zagury downloaded approximately 1,750 files from Swan's computer systems to an external hard drive named "G-Tech External HDD."    These files included, for example, Swan's proprietary financial records, strategic development records, contracts, term sheets, Bitcoin mining operating models, Bitcoin wallet information regarding Swan and its partners within 2040 Energy, Slack communications, email correspondence and attachments, and Bitcoin code.  Zagury also downloaded the "2040_site_database" spreadsheet that houses all Swan's proprietary hash-rate optimization techniques information.

91.    August 8, 2024 was the culmination of Defendants' and Swan conspirators' efforts.

92.    That morning, Defendant Holmes, Defendant Monteleone, Defendant Naidoo, then-Swan Junior Investment Analyst Defendant Romualdez, Zagury, Belitsky, Berg, then-Swan Staff Accountant Dozic, and Lyons met on Zoom for several hours. On information and belief, they coordinated the culmination of their plan to continue pilfering Swan's trade secrets and confidential information; resign from Swan *en masse*; and pivot to Defendant Proton to complete the takeover of Swan's mining business and place with 2040 Energy.   On information and belief, Defendants Furlong and Vasconcelos were part of this group and were actively involved in Defendants' schemes and misappropriation.

93.    Sometime that day, Dozic downloaded approximately 616 files to an external hard drive named "\Device\HarddiskVolume 7\".  These files included, for example, economic modeling related to Swan's mining and general business operations, Swan budgets, general ledgers, customer invoices related to Bitcoin mining, mining inventories, contracts, Bitcoin wallet information regarding Swan and its partners within 2040 Energy, energy reports, banking information, and earnings reports broken down by individual mining sites.

94.    Dozic also downloaded a document off Swan's Notion's platform entitled "Invoice and Payments Tracker," which includes Swan's confidential and proprietary customer and pricing information.

95.    Defendant Monteleone received an alert from GitHub to his Swan work email address that day, informing him of an error in building a version of BNOC software that appeared identical to Swan's, indicating that BNOC had been cloned and stolen.  Defendant Monteleone duplicated Swan's code and exfiltrated it to the GitHub organization, "elektron-tech," and repository named "nxt" unassociated with Swan. When he realized that alerts of his suspicious GitHub activity were being sent to a Swan email address, Defendant Monteleone immediately took action to remove his Swan work email address from his GitHub account to evade further detection.  Four minutes after the first alert, GitHub sent another alert to Defendant Monteleone's Swan work email address confirming he had removed his Swan work email address from his GitHub account.

96.    After the conspirators secured Swan's confidential and proprietary information and trade secrets, Defendant Holmes (for his personal company Defendant Ilios) sent a notice of resignation from Swan and Zagury began drafting his notice of resignation.

97.    Defendant Holmes also tried to manufacture a cover-up to their preexisting scheme—he wrote Zagury and Defendant Naidoo, "I want to let you both know that I have made the decision to terminate my contractor agreement with Swan, effective as of an hour ago.  I am in the process of making arrangements to manage the fleet that we have built together and want you both with me."  Zagury sent his notice of resignation from Swan approximately eight minutes after Defendant Holmes sent his message, and Defendant Naidoo sent a notice of resignation approximately one minute later.

98.    Shortly thereafter, Defendant Holmes sent a message to Defendant Furlong, Defendant Monteleone, Defendant Romualdez, Defendant Vasconcelos, Belitsky, Berg, Dozic, Effertz, Hiley, and Sola stating that "Arrangements are under way" for a new

entity (the already existing Defendant Proton) and "I don't expect us to skip a beat." The message further stated that Zagury and Defendant Naidoo would be joining Defendant Holmes at the new entity.

99. With that assurance, the Swan conspirators sent quick-succession notices of resignation:

- Aleksander Dozic: Aug. 8, 2024, 6:31 p.m., "*Resignation Notice*"
- Rafael Monteleone: Aug. 8, 2024, 6:43 p.m., "*Resignation Notice*"
- Katheek Sola: Aug. 8, 2024, 6:53 p.m., "*Official resignation*"
- Brett Hiley: Aug. 8, 2024, 7:26 p.m., "*Letter of Resignation – Brett Hiley*"
- Lucas Vasconcelos: Aug. 8, 2024, 7:35 p.m., "*Resignation Notice: Lucas Vasconcelos*"
- Max Berg: Aug. 8, 2024, 7:51 p.m., "*MB Law LLC – Termination of Representation*"
- Tom Furlong: Aug. 8, 2024, 8:18 p.m., "*Resignation notice*"
- Enrique Romualdez: Aug. 8, 2024, 8:25 p.m., "*Immediate Resignation Notice: Enrique Romualdez*"
- Tyler Effertz: Aug. 8, 2024, 9:25 p.m., "*Notice of Resignation – Tyler Effertz – 8/9/24*"
- Bill Belitsky: Aug. 9, 2024, 9:14 a.m., "*Resignation Notice*"

On information and belief, Defendants Furlong, Romualdez, Monteleone, and Vasconcelos, as well as Effertz, and other Swan conspirators, began working with Defendants Holmes and Naidoo for Defendant Proton.

100. Early on August 9, 2024, Tether's counsel sent an unprompted (and self-serving) email to Swan saying that "I understand that most or all of the Swan Mining employees have resigned this morning. I have spoken with Tether and confirmed that these former employees were not encouraged to resign and have no existing arrangements with Tether."

101. Also on August 9, 2024, as the Defendants and Swan conspirators had planned and, on information and belief orchestrated, Tether's counsel served upon Swan's counsel a carefully timed and detailed "[REDACTED]," dated that

same day, [redacted] Of course, no such assurances would be necessary had Defendants and the Swan conspirators not been conspiring for weeks to coordinate the mass resignation less than a day prior.

102. On August 12, 2024, Klippsten was forced to resign as CEO of 2040 Energy because it was clear Swan (his company) was being pushed out of that funding arrangement; [redacted]; and based on his conclusion that Devasini and van der Velde, [redacted], had played a role in stealing Swan's mining team and business and were not acting in good faith.

103. Also on August 12, 2024, Tether's counsel sent Swan [redacted]

104. In that August 12, 2024 notice, Tether's counsel wrote further: [redacted] With that, as Swan would later learn, Defendants' and the Swan conspirators' coup was complete—Defendant Proton, created by Defendant Holmes, led

by CEO Zagury and CIO Defendant Naidoo had created an illegal facsimile of Swan's Bitcoin mining business.

105. As a further result of Defendants' "rain and hellfire" plan, Swan's plans for a Series C fundraising round and an IPO were scuttled. Because Swan was unable to count on the 2040 Energy continued funding relationship for Bitcoin mining, it was forced to withdraw its Series C round and go back to the market several weeks later seeking investment at a much lower valuation.

106. Swan is still in the market seeking funding for its Series C fundraising round.

### VII. Swan Investigates, Tries to Mitigate Disruption, and Reserves Rights

107. Swan acted quickly to assert its rights and protect the ability of 2040 Energy to conduct its mining business, mindful that Klippsten was still formally a director of 2040 Energy and that Swan may still technically own a stake in the venture.

108. On August 13, 2024, Swan, through counsel, responded to the August 9 [redacted][8]

109. Also on August 13, 2024, Swan demanded that Defendants Holmes and Romualdez, along with Swan conspirators Zagury, Belitsky, Dozic, Effertz, Hiley, and Sola, return their Company-issued laptops and equipment to Swan as required by their

[8] Swan does not currently bring this lawsuit against Tether or its subsidiary Zettahash while Swan continues to investigate their precise involvement, but Swan reserves its rights to do so without waiver.

individual employment or consulting agreements. Defendant Holmes' agreement (through Defendant Ilios), for instance, provided that:

> Upon the termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically[] stored information and passwords to access such property, [certain records,] and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.[9]

None were returned.[10]

110. On August 14, 2024, Tether's counsel responded to Swan's letter, requesting that Swan provide information concerning [redacted]

111. Although Klippsten had been forced to resign from his position as CEO of 2040 Energy, he believed he had fiduciary duties to the entity from his position as a director. While Swan was sorting out whether the Shareholders Agreement was still in effect, Swan knew it also technically had a number of obligations to 2040 Energy under the Shareholders Agreement. And Swan understood Defendants were still collecting

---

[9] The other individual Defendants' agreements are identical, *see* Klippsten Decl. Exs. A-F, with one exception—Defendant Ilios's Agreement excludes from the definition of "Confidential Information" "all of Consultant's involvement, relationship, and dealings with Daniel Tuzzio [], and all of Tuzzio's affiliated entities, whether in existence prior to or after the Effective Date" of the Agreement. *Id.* Ex. B. Tuzzio was a preexisting business associate of Defendant Holmes whom Swan and Holmes agreed would perform services for Swan through Holmes.

[10] Defendant Romualdez responded with his address, but then fell silent (and his laptop was not returned with subsequent requests).

ammunition for Tether to use to sue Swan under the Shareholders Agreement to deflect from their wrongdoing. Swan also was exploring its legal options.

112. Accordingly, on August 19, 2024, Swan (through counsel) described to Tether's counsel [REDACTED] while retaining all rights to pursue any claims Swan may have at law or in equity." Swan reiterated that, on [REDACTED] It reserved all rights and stated clearly that Defendant "Proton Management is using intellectual property Proton's employees stole from Swan before resigning their positions with Swan," and requested "that the board of 2040 immediately notify [Defendant] Proton Management to seek proper licenses to any intellectual property that may belong to Swan." Neither 2040 Energy nor Defendant Proton ever did so.

113. On August 22, 2024, and again on August 27, 2024, Swan repeated its request that Defendants Holmes and Romualdez, along with Swan conspirators Zagury, Belitsky, Dozic, Effertz, Hiley, and Sola, return their Company-issued laptops and equipment to Swan as required by their individual employment or consulting agreements. It made the same request of Defendants Furlong, Monteleone, Naidoo, and Vasconcelos. Again, none did so.

114. At the same time, Swan continued to investigate the former-Swan personnel's departures and conspiracy with the Defendants. As a GitHub member, Swan is able to view obscured versions of private activity on GitHub, including that of its former employees and contractors, including the former Swan conspirators. Defendant Monteleone (username: RDMEC), Defendant Vasconcelos (username: lucasvm8), and Zagury (username: pxsocs) have been highly active on GitHub following their resignations from Swan, during the weeks of August and September 2024:







github.com/lucasvm8?tab=overview&from=2024-07-01&to=2024-08-30

lucasvm8

Overview Repositories 9 Projects Packages Stars 4

lucasvm8 / README.md

lucasvm8

Follow

Developer

6 followers · 8 following

Brasília

lucasvmpro@gmail.com

Achievements

Block or Report

Popular repositories

Projeto-Faculdade Public JavaScript 1

developer-challenge Public Implementação de um caso de uso TypeScript 1

dao-jdbc Public Java

estudo-spring-api Public Uma api para controle de estacionamento com Spring Boot, Spring JPA, Postgres, Postman.

ionic-study Public estudos relacionados a ionic/angular TypeScript

nestjs-queue Public study TypeScript

543 contributions in 2024

2024 2023 2022 2021

Zagury's contribution activity in particular indicates that he has been more active on GitHub in August than the preceding months when he was a Swan employee. On information and belief, Defendant Monteleone, Defendant Vasconcelos, and Zagury's high GitHub activity levels following their resignations of Swan are the result of their continued access to and use of Swan's BNOC.

115. On September 13, 2024, Tether's counsel proposed written resolutions of the Board of Directors of 2040 Energy [REDACTED], nominally asking for Klippsten's review and approval as a director. Among other things, the resolutions:

116. Swan responded that Klippsten could not sign the resolutions because they were misleading: Again, Swan reserved all rights.

117. Defendants also sought, and continue to seek, to whitewash their conduct, trade on Swan's name, and mislead third parties. In an email to a Swan vendor on September 14, 2024, for example, Tether's counsel stated: "2040 Energy [] ***has experienced a nominal change in management. Some of the team from Swan Bitcoin now provides day-to-day management services to 2040 through an independent management company.*** I expect that Tyler Effertz and Bill Belitsky (copied) will be familiar to you." Tether's counsel did not, of course, disclose the Defendants' scheme to steal Swan's Bitcoin business, personnel, and confidential and proprietary information and trade secrets for this "independent management company."

## VIII. Swan Has Been, and Continues to Be, Irreparably Harmed by Defendants and Their Coconspirators' Misconduct

118. Swan has suffered irreparable harm because of Defendants' misconduct, and it will continue to suffer irreparable harm if Defendants are not enjoined from continuing their misdeeds.

119. On information and belief, Defendant Proton is currently using and integrating (changing) Swan's confidential and proprietary information, including its trade secrets like BNOC, that Defendants and the Swan conspirators stole in Defendant Proton's copycat Bitcoin mining business. Put simply, Defendant Proton is an unlawful enterprise with no legitimate grounds for existence, operating each day using Swan Bitcoin's confidential and proprietary information and intellectual property—including insider know-how of the same from Swan's former personnel. Every day that goes by, for example, makes it more and more difficult for Swan to trace and recover its trade secrets.

120. The individual Defendants have also blatantly refused (three times) to return Swan's physical and intellectual property containing this and other Swan information (including their Swan devices). Swan's confidential and proprietary information and trade secrets are at serious risk of being further disclosed and used for purposes detrimental to Swan and for Defendants' benefit from these devices, and Swan has been prevented from investigating the full extent of Defendants' theft and misconduct, and therefore the real, ongoing irreparable harm it has incurred and continues to incur.

121. Defendants' misconduct has also dealt a critical blow to Swan's current ability to raise investment capital, which is vital to the future of its business. Swan finds itself in the untenable position of searching for financing partners for its Series C fundraising round while its valuable, sensitive, and proprietary information and trade secrets are compromised.

122. The ongoing and irreparable harm to Swan goes further. As outlined above, Swan invested significant time and effort developing its vendor relationships and reputation. Defendants have attempted to capitalize on Swan's reputation by falsely implying to vendors and others that "Swan" is still responsible for the day-to-day operations of 2040 Energy. For example, Defendants have represented to third parties that 2040 Energy has "experienced a nominal change in management" and that "[s]ome of the team from Swan Bitcoin now provides day-to-day management services to 2040 through an independent management company."

123. Swan has already had to expend significant resources to identify and investigate Defendants' misconduct and prepare to redress their misdeeds, and its investigation is ongoing (for which Swan reserves all rights to amend its allegations, defendants, and claims). But the current and ongoing risks to Swan are real. The harm to Swan's business and long-term prospects are—and, if Defendants are not enjoined to cease their misconduct, will continue to be—irreparable.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Trade Secret Misappropriation under the Defend Trade Secrets Act

### (18 U.S.C. § 1836, *et seq.*)

(*Against All Defendants*)

124. Each of the foregoing paragraphs is incorporated into this First Cause of Action, as if set forth herein.

125. Swan possesses trade secrets related to its Bitcoin mining business as defined by 18 U.S.C. § 1839(3).

126. Swan's BNOC ("Bitcoin Network Operating Center") is a trade secret. BNOC is a software platform for managing mining data and analytics. The software brings together multiple Application Programming Interface ("API") integrations and proprietary logic to assist Bitcoin mining operators with monitoring, analyzing, modeling, auditing, and optimizing activities across mining sites and hardware

configurations. With BNOC, Swan can remotely track the status of sites, weather, price of Bitcoin, hash-rate, and other data concerning mining operations. BNOC integrates advanced predictive monitoring tools, real-time data analytics, revenue tracking, and automated alert systems BNOC also provides for sophisticated scenario analyses to model site/energy assumptions.

127. Swan's hash-rate optimization techniques also constitute trade secrets. Swan's proprietary techniques, which it has developed through testing, maximize the number of computations-per-second that mining hardware can perform, increasing the speed at which the computers solve puzzles while minimizing costs. These techniques include, for example, overclocking and underclocking methods; geographic insights and modeling tools, which are proprietary methods for selecting optimal mining locations; latency optimization; cooling and software optimizations for mining hardware and software; and proprietary pool analytics. Swan's specific use, deployment, and combination of these techniques in Bitcoin mining are unique.

128. Swan's proprietary financial modeling, data analytics and monitoring tools also constitute trade secrets. Swan's specific use, deployment, and combination of its cost-benefit analysis models; real-time performance dashboards; and marketing trend analysis tools are unique.

129. Swan has taken reasonable precautions to protect its trade secrets, including but not limited to implementing confidentiality policies and procedures concerning Swan's trade secrets, granting limited access to Swan's trade secrets, and requiring individuals provided access to enter into confidentiality agreements and take strict security measures when accessing Swan's trade secrets.

130. Swan derives independent economic value from its trade secrets not being generally known to, and not being readily ascertainable through proper means by, the public. Swan's trade secrets are proprietary techniques and methodologies that allow Swan to successfully and efficiently mine Bitcoin. Swan's trade secrets drove 2040 Energy to its recent ten-figure valuation. Having access to such information would give

a competitor a tremendous head-start on prospective new Bitcoin mining operations and a roadmap for how to immediately and effectively compete with Swan's operation.

131. Defendants have improperly acquired, used and/or disclosed Swan's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

132. On information and belief, if Defendants are not enjoined, they will continue to access, use, disclose, or otherwise misappropriate Swan's trade secrets to benefit themselves (with Defendant Proton) to Swan's detriment. As detailed in paragraph 114, for example, Defendant Monteleone (and Defendant Proton's current CEO Raphael Zagury) has been highly active on GitHub following his resignation in August and September; on information and belief, that activity is due to his access to and use of Swan's BNOC with and for Defendant Proton.

133. Defendants' misappropriation of Swan's trade secrets has caused and continues to cause substantial injury to Swan's business, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution of the value of its trade secrets. Defendants have been unjustly enriched by their misappropriation of Swan's trade secret information.

134. Swan seeks temporary, preliminary, and permanent injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) against all Defendants to protect the secrecy of its trade secret documents and information and to remedy injury to Swan's business interests and reputation. Swan will continue to suffer irreparable harm absent the requested injunctive relief.

135. Swan also seeks an award of actual damages from Defendant Proton in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

136. Because Defendants' misappropriation and use of Swan's trade secrets was intentional, knowing, willful, and oppressive, Swan also seeks exemplary damages from Defendant Proton up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

**SECOND CAUSE OF ACTION**

**Breach of Contract (Consulting Agreement)**

(*Against Defendants Holmes, Ilios, Naidoo, Monteleone, Romualdez, Furlong, and Vasconcelos*)

137. Each of the foregoing paragraphs is incorporated into this Second Cause of Action, as if set forth herein.

138. The consulting agreements Defendants Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong signed are valid and binding contractual agreements.

139. Swan fully performed its obligations under the consulting agreements.

140. The consulting agreements were made for valid consideration, including the compensation each of these Defendants received from Swan.

141. As detailed in paragraph 51 and footnote 5 above, Defendants Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong agreed to safeguard Swan "Confidential Information," promising in their respective consulting agreements that they each would "hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information."

142. These Defendants further agreed not to "(i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) subject to Consultant's right to engage in Protected Activity [], disclose the Confidential Information to any third party without the prior written consent of an authorized representative of the Company."

143. Defendants Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong further agreed that they would "not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party."

144. These Defendants agreed that their obligations to safeguard Swan's confidential information "shall continue after the termination of [their] Agreement[s]."

145. Defendants Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong breached the foregoing provisions of their respective consulting agreements by stealing Swan's confidential and proprietary information—including but not limited Swan's mining performance data, data related to Swan's mining inventory, mining operations and machine performance and configuration, financial modeling and information, weekly reports of all operations, and ongoing deals with Swan business partners—to use for Defendant Proton's benefit.

146. On information and belief, Defendants have disclosed and used and are continuing to disclose and use Swan's confidential and proprietary information to operate and for Defendant Proton.

147. Swan has suffered and will suffer irreparable harm as a direct and proximate result of the individual Defendants' past and ongoing breaches of their respective consulting agreements—including the further loss of its confidential and proprietary information and trade secrets—for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Tortious Interference with Contractual Relations

(*Against Defendants Proton, Holmes, and Naidoo*)

148. Each of the foregoing paragraphs is incorporated into this Third Cause of Action, as if set forth herein.

149. As part of their employment and for valid consideration, including compensation from Swan, Zagury, Dozic, Effertz, Hiley, and Belitsky signed "Confidentiality and Proprietary Information and Inventions Agreements" with Swan ("Employee Confidentiality Agreements").

150. Swan fully performed its obligations under the Employee Confidentiality Agreements.

151. As part of those contracts, Zagury (now Defendant Proton's CEO), Dozic, Effertz (now Defendant Proton's Chief Financial Officer), Hiley, and Belitsky agreed that, "at any and all times during my service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company and in furtherance of the Company business." For the "term of my service only, prohibited acts of competition" included: "performing any services for a Competing Business[11];" "hiring, recruiting or soliciting any employee of the company;" and "disclosing, misappropriating, or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business."

152. Zagury, Dozic, Effertz, Hiley, and Belitsky also agreed that, "for a period of twelve months following termination of my Service, I will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business."

153. Swan had a contractual expectancy that Zagury, Dozic, Effertz, Hiley, and Belitsky[12] would abide by the Employee Confidentiality Agreements.

154. Zagury, Dozic, Effertz, Hiley, and Belitsky breached the foregoing provisions of the Employee Confidentiality Agreements by planning, coordinating, and conspiring with and through Defendant Proton and others, including but not limited to

---

[11] "Competing Business" is defined in the Employee Confidentiality Agreements as "any person or entity that engages in a commercial business that is the same or substantially similar to the Company Business, and only that portion of the business that is in competition with the Company Business." "Company Business" is defined, in part, as any "business in which the Company engages during my Services with the Company"—in this case, Bitcoin mining.

[12] Swan reserves its rights based on Defendants Holmes/Ilios, Naidoo, Monteleone, Romualdez, and Furlong's breaches of their nonsolicitation obligations.

Defendants Holmes and Naidoo, to compete with Swan during their employment by working on behalf of Proton's competing mining business and soliciting Swan's employees to leave their employment and of Swan's independent contractors to terminate their services as independent contractors during the time period prohibited by the Employee Confidentiality Agreements to work for Proton.

155. Several of the then-Swan employees and contractors that Zagury, Dozic, Effertz, Hiley, and Belitsky, with Defendants' help, unlawfully solicited resigned from Swan and started working for Proton shortly thereafter. On information and belief, that solicitation may be ongoing as to at least certain individuals whom Zagury, Dozic, Effertz, Hiley, and Belitsky solicited from Swan and who resigned from Swan, but who have not yet surfaced publicly as working with or for Defendant Proton.

156. Defendants Proton, Holmes, and Naidoo had knowledge of Swan's contractual relationship with Zagury, Dozic, Effertz, Hiley, and Belitsky at all material times.

157. Defendants Proton, Holmes, and Naidoo intentionally interfered with the Employee Confidentiality Agreements by planning, coordinating, and conspiring with Zagury, Dozic, Effertz, Hiley, and Belitsky to compete with Swan and solicit Swan's employees and contractors to work for Proton.

158. Based on these Defendants' interference with the Employee Confidentiality Agreements, Swan has had its contractual relationship and expectancies with Zagury, Dozic, Effertz, Hiley, and Belitsky diverted, disrupted, damaged, and threatened by the actions of Defendants Proton, Holmes, and Naidoo as described herein.

159. Swan has suffered and will suffer damages as a direct and proximate result of the Defendants Proton's interference—including but not limited to actual and potential further loss of its personnel—for which there is no adequate remedy at law.

160. Swan has suffered and will suffer irreparable harm as a direct and proximate result of the Defendants Proton, Holmes, and Naidoo's interference—

including but not limited to actual and potential further loss of its personnel—for which there is no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Aiding and Abetting Breach of Duty of Loyalty**

(*Against Defendant Proton*)

161. Each of the foregoing paragraphs is incorporated into this Fourth Cause of Action, as if set forth herein.

162. Swan's employees and executives, including but not limited to Zagury, Dozic, Effertz, Hiley, and Belitsky, owed a duty of loyalty to Swan during their employment.

163. Defendant Proton was aware of these duties.

164. Defendant Proton knowingly and intentionally interfered with and induced Swan's employees, including but not limited to Zagury, Belitsky, Dozic, Effertz, and Hiley, to breach their duties of loyalty by planning, coordinating, and conspiring with and through others, including but not limited to Defendants Holmes and Naidoo, to, while employed by Swan, assist Defendant Proton in preparing to compete with Swan's mining business and to solicit (a) Swan's employees to leave their employment and (b) Swan's independent contractors to terminate their services as independent contractors.

165. Defendant Proton's aiding and abetting of the Swan employees' disloyalty has caused and continues to cause substantial harm to Swan's business.

**FIFTH CAUSE OF ACTION**

**Unfair Competition Under Business & Professions Code § 17200**

(*Against All Defendants*)

166. Each of the foregoing paragraphs is incorporated into this Fifth Cause of Action, as if set forth herein.

167. California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

168. Defendants' business acts and practices as alleged herein constitute ongoing unlawful and unfair activity in violation of California's Unfair Competition Law ("UCL"), as codified in California Business and Professions Code § 17200 *et seq.*

169. Specifically, Defendants acted and are acting unlawfully and unfairly under California's UCL by orchestrating and carrying out a course of conduct to disrupt, divert, and steal Swan's entire Bitcoin mining business by, for example and without limitation:

- Misappropriating, and/or planning, coordinating, and conspiring with the other Defendants and other Swan employees and consultants to misappropriate, documents and files containing Swan's proprietary and confidential information;
- Planning and executing a scheme to lift out the entirety of Swan's Bitcoin mining personnel to accept roles at Defendant Proton, a counterfeit competitor created for the sole purpose of using Swan's stolen technology, resources, and trade secret techniques and methods to usurp its mining business and irreparably harm Swan's ability to compete in the Bitcoin mining market, and doing so in a manner calculated to inflict maximum damage to Swan with a funding partner;
- Using the proprietary data, information, and resources Defendants stole to operate Defendant Proton's copycat Bitcoin mining business and continuing to work with Swan's vendors while trading on Swan's name; and
- Other conduct which is presently unknown but will be proven at trial.

170. Defendants' unlawful and unfair actions allowed Defendant Proton to effectively steal Swan's Bitcoin mining business and set up an illegal copycat, bypassing all the investment of time and resources that Swan undertook to grow its full Bitcoin mining business. This is the epitome of unfair competition, as it disincentivizes the very sort of investment that Swan undertook in the first place.

171. Swan has suffered and will suffer harm—including irreparable harm for which there is no adequate remedy at law—as a direct and proximate result of Defendants' unlawful and unfair business practices. Swan is entitled to recover restitution from Defendant Proton, including without limitation, all benefits that Defendant Proton received because of its unlawful and unfair business acts and practices. Swan is further entitled to an injunction restraining Defendants from engaging in further acts of unfair competition.

## SIXTH CAUSE OF ACTION

## Conversion

(*Against Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos*)

172. Each of the foregoing paragraphs is incorporated into this Sixth Cause of Action, as if set forth herein.

173. Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos have no right of possession of Swan-issued laptops and equipment following the termination of their consulting agreements.

174. Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos intentionally and wrongfully exercised control or dominion over Swan's property, and conducted a scheme of wrongful acts with the intention to appropriate the property and deprive Swan of its property.

175. Swan retained at the time of the conversion, and still retains, ownership in the property.

176. Swan has suffered and will suffer irreparable harm for which there is no adequate remedy at law as a direct and proximate result of Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos's conversion of Swan's property.

## SEVENTH CAUSE OF ACTION

**Civil Conspiracy**

(*Against All Defendants*)

177. Each of the foregoing paragraphs is incorporated into this Seventh Cause of Action, as if set forth herein.

178. Defendants (between them and with others) formed and operated a malicious combination with a common design to injure Swan by (a) performing unlawful acts in stealing and misappropriating Swan's confidential and proprietary information and trade secrets as described above for the unlawful purpose of diverting business and economic gain from Swan, and/or (b) performing the lawful acts of competing with Swan and hiring certain of Swan personnel, but doing so through the unlawful means of violating Swan's contractual, statutory, and common-law rights as described above.

179. The foregoing conduct of the Defendants was malicious, was performed with intent to injure Swan, and was without justification or privilege. Defendants' conduct was undertaken in furtherance of their own personal interests and benefit.

180. One, some, or all the Defendants engaged in overt unlawful acts and conduct violative of Swan's contractual, common law and statutory rights as described above, and did so with the knowledge, aid, agreement, and support of the other Defendants, causing actual harm to Swan.

181. By virtue of the formation and operation of this conspiracy by Defendants, and because of the above-described wrongful acts and conduct and the harm and injury caused to Swan thereby, each Defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each Defendant/coconspirator.

182. Swan has suffered and will suffer damages and irreparable harm as a direct and proximate result of the Defendants' conspiracy for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants, as follows:

A. For a temporary injunction requiring Defendants to immediately take steps to preserve all evidence relevant to the Complaint;

B. For a temporary and permanent injunction against Defendants, including enjoining Defendants, and their agents, servants, employees, successors, and assigns, and all other people acting in concert or conspiracy with any of them or who are affiliated with them, from disclosing, using, accessing, distributing, modifying, moving, altering, deleting, or otherwise disposing of any files, documents, and digital media that contain any Swan proprietary and confidential material or trade secrets, and/or that are derived from such information;

C. For a temporary and permanent injunction requiring Defendants to immediately turn over to counsel for Swan all laptops and any other Swan-issued devices or hard drives in their possession;

D. For a permanent injunction enjoining Defendants Proton, Holmes, and Naidoo from soliciting Swan's employees to leave their employment during the time period prohibited by the Employee Confidentiality Agreements;

E. For a permanent injunction enjoining Defendants from carrying out a course of conduct to disrupt, divert, and steal Swan's entire Bitcoin mining business;[13]

F. For damages and other relief against Defendant Proton as described in each of the above causes of action, including:

i. For restitution and/or disgorgement against Defendant Proton;

ii. For punitive damages against Defendant Proton in an amount to be determined at trial;

[13] Swan reserves the right to seek additional preliminary or injunctive relief without waiver.

iii. For actual damages against Defendant Proton for misappropriation of trade secrets and for the other unlawful and tortious conduct described herein, including in the form of lost profits resulting from the loss of the Swan's personnel, customers, and the loss of Swan's economic or prospective economic relationships, in an amount to be proven at trial;

iv. For costs, attorney's fees, and other expenses incurred in this action;

v. For pre-judgment and post-judgment interest at the maximum legal rate, as applicable, as an element of damages that Sawn has suffered as a result of Defendant Proton's wrongful acts; and

vi. For such other relief as the Court may deem just and proper.

**JURY DEMAND**

Swan respectfully requests a jury trial on all claims for relief.

DATED: September 25, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Ilissa Samplin*

*Attorneys for Plaintiff*