# EXHIBIT B

Electronically FILED by
Superior Court of California,
County of Los Angeles
11/22/2024 12:04 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Tarasyuk, Deputy Clerk

1  DAVID H. WOLLMUTH (*pro hac vice forthcoming*)
        dwollmuth@wmd-law.com
2  TIMOTHY A. DELANGE (CA State Bar No. 190768)
        tdelange@wmd-law.com
3  500 Fifth Avenue
   New York, NY 10110
4  Telephone: (212) 382-3300

5  *Attorneys for Plaintiff*
   *ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN,<br><br>Plaintiff,<br><br>vs.<br><br>GIBSON, DUNN & CRUTCHER LLP<br><br>Defendant. | Case No. 24STCV30895<br><br>**COMPLAINT FOR PROVISIONAL INJUNCTIVE RELIEF IN AID OF ARBITRATION** |

Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan") complains and alleges the following against Defendant Gibson, Dunn & Crutcher LLP ("Gibson").

**NATURE OF THE ACTION**

1. This case is about a lawyer betraying a client to make more money representing the client's adversary. Gibson wooed and won Swan as a client with promises that it would loyally represent Swan against its former-partner-turned-adversary in a Bitcoin mining venture – a multibillion-dollar behemoth known as Tether. Only weeks later, Gibson embraced Tether as a client and told Swan to get lost. In short, Gibson betrayed its client for Tether's billions.

2. Swan files this action for provisional injunctive relief pending resolution of an arbitration that Swan is simultaneously commencing against Gibson for breach of fiduciary duty and attorney malpractice. Swan asks this Court to enjoin Gibson during the pendency of the arbitration from (i) withdrawing as Swan's counsel in a related action in California federal court without Swan's consent and (ii) taking on the representation of Tether, against whom Swan specifically retained Gibson to bring claims. Gibson's engagement letter with Swan refers to its retention as being for the "Tether Litigation."

3. The related federal court action in which Swan is Gibson's current client is captioned *Electric Solidus, Inc. d/b/a Swan Bitcoin v. Proton Management, Ltd. et al.*, Case No. 2:24-cv-8280 (C.D. Cal., Western Div., filed September 25, 2024) (hereinafter the "Tether Litigation"). A redacted copy of the complaint publicly filed by Gibson on Swan's behalf is annexed hereto as Exhibit A.

4. Briefly summarized, Swan formed a joint venture with Tether for Bitcoin mining. Tether provided the financing. Swan contributed its services, know-how, and valuable intellectual property in the form of its mining infrastructure. Tether and Swan agreed to a split of future profits. Tether became dissatisfied with the agreed split of profits and saw an opportunity to try to steal the whole Bitcoin mining business. Swan's complaint in the Tether Litigation alleges a "rain and hellfire" scheme in which Swan's former employees, with support from Tether, quit Swan as a group to form a new company financed by Tether, Proton Management, Ltd. ("Proton"), and stole Swan's trade secrets and other proprietary assets for

1   Bitcoin mining. The complaint is replete with allegations relating to Tether's direct
2   involvement in the employees' scheme.

3        5.     On October 25, 2024, one of Swan's Gibson lawyers in the Tether Litigation,
4   Matthew D. McGill, telephoned the CEO of Swan, Cory Klippsten, to state in words or
5   substance that Gibson was about to hire a lateral attorney whose current client presented a
6   conflict with the Firm's representation of Swan and that the Firm's "senior management" had
7   directed him to urge Swan to find replacement counsel in the Tether Litigation.

8        6.     On October 30, 2024, Gibson issued a press release reporting that it had hired a
9   group of attorneys laterally from another law firm, Kramer Levin Naftalis & Frankel LLP
10  ("Kramer Levin"), headed by a prominent litigator named Barry Berke. *See*
11  https://www.gibsondunn.com/gibson-dunn-grows-its-powerhouse-litigation-practice-with-
12  acclaimed-trial-lawyer-barry-berke-elite-team/. It is a matter of public record in court dockets
13  that Tether was a current client of Mr. Berke at that time.

14       7.     Mr. Berke is an extremely well-known attorney who Gibson touted as
15  "America's greatest trial lawyer." For its part, Gibson boasted that it is "the best litigation firm
16  on the planet" and that Mr. Berke's arrival would only grow its "powerhouse litigation
17  practice." Tether is undoubtedly a key part of this as it has a host of nettlesome ongoing legal
18  issues, including numerous government investigations, and stands to be a massive client for the
19  Gibson firm.

20       8.     Gibson has not, however, boasted about its client loyalty. Nor could it as Gibson
21  has attempted to dump Swan like the proverbial "Hot Potato." There is a per se ethical rule that
22  prohibits the abandonment of a current client (Swan) in favor of a more lucrative prospective
23  client (Tether) whose interests are directly adverse to that of the firm's current client. It is
24  professional misconduct for a lawyer to violate or attempt to violate the applicable rules of
25  professional conduct, and law firms that do are subject to disciplinary actions and sanctions.

26       9.     While one Gibson partner advised Swan that Tether had not yet been
27  "onboarded" at the Gibson firm, Mr. Berke had already changed the identity of his law firm
28  affiliation to Gibson on the docket of a litigation in which he previously appeared for Tether as

-2-
*COMPLAINT FOR PROVISIONAL INJUNCTIVE RELIEF IN AID OF ARBITRATION*

**Exhibit B**
**Page 11**

*PRINTED ON RECYCLED PAPER*

1  a Kramer Levin partner, and Gibson has told Swan that further representations of Tether by
2  Gibson are coming. Swan respectfully requests this Court to issue injunctive relief to maintain
3  the status quo pending arbitration.

## PARTIES AND INTERESTED THIRD PARTIES

5      10.    Plaintiff Swan is an industry-leading Bitcoin financial services company that
6  helps individuals and businesses purchase, save, and invest Bitcoin through its platform, and is
7  a leader in the field of Bitcoin mining. Swan is a Delaware corporation with its headquarters
8  located at 26565 W. Agoura Road, Suite 200, Calabasas, California 91302.

9      11.    Defendant Gibson is a multinational law firm with offices in many U.S. cities,
10 including several in the State of California, and in foreign countries.

11     12.    Interested third-party Tether controls the world's most traded cryptocurrency.
12 Tether "tokens" are sometimes referred to as "stablecoins" because their value is pegged to a
13 sovereign currency like the U.S. Dollar. As the Wall Street Journal has recently reported, Tether
14 tokens are often used as a financing vehicle by U.S.-sanctioned foreign governments, terrorist
15 groups and drug cartels in lieu of U.S. dollars. *See*
16 https://www.wsj.com/finance/currencies/federal-investigators-probe-cryptocurrency-firm-
17 tether-a13804e5?mod=Searchresults_pos1&page=1. According to that Journal article, Tether
18 is currently the subject of a criminal investigation by the U.S. Attorney's office in Manhattan
19 for possible violations of sanctions and anti-money laundering rules. Another industry
20 publication charts 19 times in which Tether has attracted U.S. government action. *See*
21 https://protos.com/chart-tether-has-attracted-us-government-action-19-times/. Because of its
22 high profile, wealth and multiple regulatory-litigation matters, Tether is a lucrative client for
23 any law firm that represents it.

## BACKGROUND

25     13.    The adversity between Swan and Tether is documented in the Gibson-authored
26 complaint in the Tether Litigation annexed hereto as Exhibit A (the "TL Cmplt.") and its
27 allegations are hereby incorporated by reference. Briefly summarized, Tether was Swan's
28 financing partner in a joint venture. One of Swan's businesses was to "mine" Bitcoin. Bitcoin

is the brand name of a form of cryptocurrency that is not tied or pegged to a sovereign currency. As of November 20, 2024, one Bitcoin was worth over $94,000.

14. Bitcoins are "mined" at great expense in terms of human labor, computer power and energy by teams of professionals overseeing millions of complex computerized calculations per second. TL Cmplt. ¶¶ 35-36. Tether financed Swan's Bitcoin mining through a joint venture vehicle called "2040 Energy," in which both were equity owners. TL Cmplt. ¶¶ 58-62. In the Summer of 2024, Swan's contractors and employees managing 2040 Energy conspired with Tether to steal Swan's business relationships globally, and the trade secrets, assets and employees Swan had contributed to the joint venture and to operate the joint venture through the new entity, Proton. TL Cmplt. ¶¶ 63-123.

15. In August and September 2024, Swan invited Gibson to compete against several law firms that Swan was interviewing to be its attorney to prosecute its trade secret theft and other legal claims against Tether and its associates. Swan ultimately selected Gibson based on its proposed strategy, reputation for competence and loyalty, and its willingness to work with Swan and its litigation funder to share risk in the matter.

16. The parties executed an engagement letter dated September 18, 2024 (also drafted by Gibson) that described the representation as follows: "to provide legal services to Swan in connection with a dispute with Tether and certain of its affiliates, and certain former employees and consultants of Swan arising from the theft of Swan's bitcoin mining business . . . (the 'Tether Litigation')." A copy of the engagement letter (the "Gibson EL") is annexed hereto as Exhibit B.[1] Gibson represented to Swan that it had checked its "computerized conflict of interest index" and was ethically positioned to represent Swan in the Tether Litigation. Thus began Gibson's betrayal in favor of Tether's billions.

17. Swan entered into an agreement with a third-party funder to pay Gibson's fees in the Tether Litigation, including preliminary injunction proceedings to enjoin the trade secret

---

[1] Page 4 of Gibson EL and the Terms of Retention attached thereto provide that disputes concerning the Gibson-Swan relationship be resolved by arbitration sited in the District of Columbia before JAMS pursuant to JAMS's Comprehensive Arbitration Rules and Procedures. JAMS Rule 24(e) provides that Swan's recourse to this Court for interim or provisional relief shall not be deemed to be incompatible with that arbitration agreement.

-4-

COMPLAINT FOR PROVISIONAL INJUNCTIVE RELIEF IN AID OF ARBITRATION

Exhibit B
Page 13
PRINTED ON RECYCLED PAPER

1  theft. Gibson also agreed to defer and contribute some of its attorney time toward a contingency
2  fee arrangement.
3      18.     Gibson filed the complaint in the Tether Litigation on September 25, 2024 and
4  began to prosecute the case on Swan's behalf on an expedited basis. Attached hereto as Exhibit
5  C is a copy of the docket entries in the Tether Litigation between the date of filing and October
6  25, 2024. As evidenced in the Gibson filed complaint, Tether was an integral part of the
7  conspiracy at the heart of the dispute in the Tether Litigation. *See*, *e.g.*, TL Cmplt. ¶¶ 5, 7-9,
8  73, 76. The complaint also states that Swan was actively investigating Tether's involvement in
9  the underlying dispute and may bring a lawsuit against Tether directly. *Id.* ¶ 108 n.8. Swan not
10 only relied on Gibson for strategy, financing and advocacy in the Tether Litigation, it shared
11 confidences with Gibson about Swan's interests in the joint venture and about a potential global
12 resolution of Swan's and Tether's differences. On or about October 16, 2024, one of Swan's
13 attorneys at Gibson, Harris Mufson, spoke with Tether's counsel at the Winston & Strawn law
14 firm about Swan's intent to sue Tether and its advisors in other venues "now or soon" if the
15 parties could not agree on a price fair to Swan in such a resolution.
16     19.     Unbeknownst to Swan, while it was interviewing, ultimately selecting and
17 strategizing with Gibson for the purposes of the Tether Litigation and other disputes against
18 Tether, Gibson itself was interviewing and making offers to Mr. Berke prior to his departure
19 from Kramer Levin. Mr. Berke, who was and is one of Tether's regular outside litigation
20 attorneys, was actively representing Tether in another matter as a current client at Kramer Levin
21 and, upon information and belief, intended to continue to represent Tether as a current client
22 once he joined Gibson. Attached hereto as Exhibit D is an article in The American Lawyer,
23 dated October 30, 2024, in which Mr. Berke reveals Gibson Dunn approached him "over time
24 to join them" and the Managing Partner of Gibson, Barbara Becker, describes the lengthy
25 interview process for Mr. Berke, including the fact that "Berke and his colleagues met with
26 more than 50 Gibson Dunn partners to ensure that everyone was mutually excited about the
27 move," presumably over a period that began prior to Gibson's engagement with Swan. Mr.
28

-5-
COMPLAINT FOR PROVISIONAL INJUNCTIVE RELIEF IN AID OF ARBITRATION

1  Berke told The American Lawyer, "We expect that all of our clients will continue to be
2  represented by us."

3      20.   On October 25, 2024 – less than ten days after Gibson had delivered to Tether's
4  counsel at Winston & Strawn the options of settlement or increased litigation – one of the
5  counsel for Swan in the Tether Litigation, Matthew D. McGill, telephoned the CEO of Swan,
6  Cory Klippsten, and told him in words or substance that Gibson was about to hire a lateral
7  attorney whose current client presented a conflict with the Firm's representation of Swan and
8  the Firm's "senior management" had directed him to urge Swan to find replacement counsel in
9  the Tether Litigation. Mr. McGill did not identify the lateral attorney or the new client that
10 caused the conflict.

11     21.   On October 30, 2024, Gibson announced that Mr. Berke and other partners of
12 Kramer Levin were joining Gibson as partners. As of this writing, Mr. Berke's biography
13 appears on the Gibson website: https://www.gibsondunn.com/lawyer/berke-barry-h/.
14 As demonstrated in Exhibit E hereto, Mr. Berke caused the docket in a case in which he was
15 representing Tether to reflect his new firm and address.

16     22.   Swan retained the law firm of Wollmuth Maher & Deutsch LLP ("WMD") to
17 advise it of its rights vis-à-vis Gibson. By letter dated November 6, 2024, WMD informed
18 Gibson that Swan does not consent to waive the conflict and would oppose any attempt by
19 Gibson to withdraw as its counsel in the Tether Litigation. The letter further demanded that
20 Gibson either disassociate itself from Mr. Berke and other laterals representing Tether or that
21 they and Gibson withdraw from representing Tether in other matters during the pendency of
22 Swan's Tether Litigation.

23     23.   Even though the November 6 letter requested a response by November 8, Gibson
24 stalled and delayed (in the face of repeated follow-up inquiries from WMD) in providing any
25 substantive response until two weeks later on November 20. By its letter dated November 20,
26 2024, Gibson made two main points.

27
28

24. First, Gibson asserted in its November 20 letter that the "Hot Potato" Rule does not apply because the Gibson EL limits the "scope" of its engagement with Swan to a preliminary injunction application that purportedly concluded on October 5, 2024.

25. However, the Gibson EL itself is directly to the contrary. The scope of the retention is defined on the first page of the Gibson EL as "a dispute with Tether and certain of its affiliates, and certain former employees and consultants of Swan arising from the theft of Swan's bitcoin mining business, employees, trade secrets, and intellectual property (the 'Tether Litigation')." *See* Exhibit B at 1. The subsequent language regarding the "first phase" and the preliminary injunction, on which Gibson relied in its letter, clearly relates *only* to Gibson's "Fees and Billing." *Id.* at 2. Indeed, the following paragraphs under that heading concern the Fees and Billing for the remainder of the Tether Litigation, up to and including its potential resolution through a "payment of money by Tether," confirming that the "scope" is the entire Tether Litigation.

26. Another plain fact puts the lie to Gibson's claim that the Swan engagement ended on October 5: on October 25, when Gibson first told Swan to look for replacement, the stated reason was a conflict with a new client, not that the Swan engagement had ended by its own terms. Contrary to its claim of the engagement being over, Gibson has in fact been representing Swan actively and continuously in the Tether Litigation since October 5.

27. Second, Gibson asserted in its November 20 letter that the Gibson EL contains a prospective conflict of interest waiver and, therefore, Swan waived any conflict of interest created by Berke's bringing Tether to Gibson as a client.

28. However, Gibson was aware of Mr. Berke's representation of Tether at the time it was inducing Swan to hire it for the purposes of the Tether Litigation. As the ethics rules discussed below make clear, Gibson was obligated to inform Swan of the potential conflict *at the time it asked Swan for the advance waiver*. Having failed to obtain Swan's informed consent, Gibson cannot rely upon that waiver now.

29. Gibson's November 20 response indicates that it has every intention of moving to withdraw from representing Swan so as to represent its adversary Tether. Accordingly, Swan commenced this action to enjoin Gibson from doing so pending arbitration.

## APPLICABLE LEGAL ETHICS

30. The common law causes of action alleged herein against Gibson are integrally related to Gibson's violations of several rules of professional conduct applicable to lawyer-client relations in its dealings with Swan and in its hiring of Mr. Berke as a lateral partner from Kramer Levin with the intent that Mr. Berke bring Tether as a client.[2] This is also the type of misconduct that subjects a firm like Gibson to severe consequences with the D.C. Bar. It is professional misconduct for a lawyer to violate or attempt to violate the D.C. Rules of Professional Conduct, *see* D.C. Rule 8.4, and misconduct is subject to disciplinary sanctions including suspension, censure, reprimand, and admonition. *See* Rules Governing the District of Columbia Bar, Rule XI. Disciplinary Proceedings.

31. D.C. Legal Ethics Opinion 273, entitled "Ethical Considerations of Lawyers Moving from One Private Law Firm to Another," is directly on point. It states that "[w]hen a lawyer departs one firm to affiliate with another, conflict of interest issues are raised for both firms." It continues that "with respect to clients who accompany a lawyer to a new firm[,]" – *i.e.*, in this case, Mr. Berke's bringing Tether to Gibson – "[t]he new firm must treat each of those representations as new ones for it, testing its ability to undertake those representations against the requirements of [conflict of interest] Rules 1.7 [for the new firm's current clients] and 1.9 [for the new firm's former clients]." See D.C. Legal Ethics Opinion 273, *available at* https://www.dcbar.org/for-lawyers/legal-ethics/ethics-opinions-210-present/ethics-opinion-273.

---

[2] Because the Gibson EL provides that disputes with Swan are governed under the substantive law of the District of Columbia, this complaint refers to the District of Columbia's Rules of Professional Conduct and to Opinions of the District of Columbia Bar regarding such Rules. We refer to the Professional Conduct Rules as the "D.C. Rules" and to Opinions of the Bar as "D.C. Legal Ethics Opinion" with the relevant Opinion number. Gibson is also subject to the California Rules of Professional Conduct because the Tether Litigation is pending in federal court in California. There is no conflict between California and District of Columbia ethics rules because they both prohibit what Gibson is doing here.

32.  Rules 1.7(b)(3) and (c)(1) of the D.C. Rules of Professional Conduct provide that, absent informed consent of each potentially affected client, a lawyer shall not represent a client with respect to a matter where "representation of another client will be or is likely to be adversely affected by such representation." Here neither Swan nor (upon information and belief) Tether has consented to Gibson's simultaneous representation of both Swan in the Tether Litigation and Tether in other matters. It is manifest from the Tether Litigation complaint, related settlement negotiations, and the likelihood of other proceedings involving Swan and Tether or its advisors, that Gibson's representation of Swan is not going to receive the zealous representation to which it is entitled if Gibson were also to owe Tether a duty of loyalty.

33.  A law firm that itself *created* the conflict by hiring a lateral partner with a lucrative new client adverse to a pre-existing and current firm client may not subsequently withdraw from its representation of the first-in-time client to escape the strictures of D.C. Rule 1.7 and avail itself of the more lenient conflict of interest provision of D.C. Rule 1.9 relating to former clients. This is known as the "Hot Potato" Rule. As stated in the D.C. Legal Ethics Opinion 272, entitled "Conflicts of Interests: 'Hot Potato,'" where the law firm "affirmatively undertake[s] action – such as initiating a law firm merger" (or in this case, hiring a partner from another firm) – "which create[s]" the conflict "we . . . strongly agree that the important values of client loyalty and confidence of the public in the bar preclude an interpretation of the rules that would enable a lawyer or a law firm to abandon a client during an active representation in anticipation of pursuing another, perhaps more lucrative, conflicting representation." *See* D.C. Legal Ethics Opinion 272, *available at* https://www.dcbar.org/for-lawyers/legal-ethics/ethics-opinions-210-present/ethics-opinion-272.

34.  California recognizes the same rule and does not permit a law firm to knowingly undertake a concurrent representation of an adverse client, while at the same time withdrawing from its first client without automatically being disqualified from representing the second adverse client. *See Truck Ins. Exchange v. Farmers Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1057 (1992). As recognized by the California Supreme Court, "[t]he reason for such a rule is evident,

-9-
COMPLAINT FOR PROVISIONAL INJUNCTIVE RELIEF IN AID OF ARBITRATION

Exhibit B
Page 18

*PRINTED ON RECYCLED PAPER*

1  even (or perhaps especially) to the nonattorney. A client who learns that his or her lawyer is
2  also representing a litigation adversary, even with respect to a matter wholly unrelated to the
3  one for which counsel was retained, cannot long be expected to sustain the level of confidence
4  and trust in counsel that is one of the foundations of the professional relationship." *Flatt v.*
5  *Superior Ct.*, 9 Cal. 4th 275, 285 (1994).

6  35. That Gibson is at fault for creating the conflict is apparent. There is no question
7  that Swan formally engaged Gibson as of September 18, 2024. Mr. Berke did not join Gibson
8  until October 30, 2024 at the earliest. Gibson, like most large law firms, has a department that
9  is "responsible for [the] daily review and analysis of conflicts and other issues related to [F]irm
10 acceptance of new clients, new matters and lateral attorneys . . . ." *See*
11 https://www.gibsondunn.com/job/director-conflicts-attorney/. As part of its lateral interview
12 process, under Rule 1.7 Gibson was required to inform itself of Mr. Berke's and his team's
13 current clients at Kramer Levin and, given Mr. Berke's express intention to bring those clients
14 to Gibson, to test them for conflicts against Gibson's current client list, including Swan.
15 Similarly, Mr. Berke was required to inform Tether while he was still at Kramer Levin of his
16 prospective new affiliation with Gibson and of "any conflict of interest matters affecting its
17 [Tether's] representation at the new firm [Gibson]." *See* D.C. Legal Ethics Opinion 273 (citing
18 Rule 1.4 on a lawyer's duty of communication with a client before moving to another law firm).

19 36. The only party *not* consulted was Swan. Instead, in Gibson's own violation of
20 D.C. Rule 1.4, it kept Swan in the dark about the looming conflict that it had created until five
21 days before Gibson announced Mr. Berke's joining the firm. Even then, Gibson did not give
22 Swan any specifics other than the existence of a conflict and that Gibson's management hoped
23 Swan would choose replacement counsel. Under the "Hot Potato" Rule, Gibson should be
24 enjoined from withdrawing from its representation of Swan in the Tether Litigation and from
25 taking Tether on as a current client.

26 37. D.C. Rule 1.4 and the "Hot Potato" Rule also prevent Gibson from relying upon
27 the "advance waiver" provisions of its engagement letter to force Swan either to consent to the
28

-10-
COMPLAINT FOR PROVISIONAL INJUNCTIVE RELIEF IN AID OF ARBITRATION

*Printed on Recycled Paper*

Exhibit B
Page 19

conflict or to allow Gibson to withdrawal from the Tether Litigation. As stated in D.C. Ethics Opinion 309 ("Advance Waivers of Conflicts of Interest"):

> [T]he lawyer must make full disclosure of facts of which she is aware, and hence cannot seek a general waiver where she knows of a specific impending adversity unless that specific instance also is disclosed. See D.C. Rule 1.7, comment [19]; *City of El Paso v. Salas-Porras*, 6 F. Supp. 2d 616, 625-26 (W.D. Tex. 1998). A corollary of this rule is that if the lawyer cannot disclose the adversity to one client because of her duty to maintain the confidentiality of another party's information, the lawyer cannot seek a waiver and hence may not accept the second representation. D.C. Rule 1.7, comment [19] ("If a lawyer's obligation to one or another client or to others or some other consideration precludes making . . . full disclosure to all affected parties, that fact alone precludes undertaking the representation at issue").

*See* D.C. Legal Ethics Opinion 309, *available at* https://www.dcbar.org/for-lawyers/legal-ethics/ethics-opinions-210-present/ethics-opinion-309. Having failed to disclose to Swan the likelihood of Mr. Berke's bringing Tether to Gibson, the firm is "preclude[d] from undertaking the representation" of Tether.

38. Finally, D.C. Rule 1.3 imposes a duty on Gibson to "represent a client [Swan] zealously and diligently" and not "[p]rejudice or damage a client during the course of a professional relationship." *See also* American Bar Association Rule 1.3, Comment 1 ("A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").

39. As Comment 9 to that Rule provides, "[u]nless the [attorney-client] relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters undertaken for a client. If a lawyer's employment is limited to a specific matter, the relationship terminates when the matter has been resolved." The Tether Litigation is in full swing and thus Gibson is not entitled to terminate its relationship with Swan until that matter has been "resolved."

40. Gibson satisfies none of the provisions of D.C. Rule 1.16 (Declining or Terminating Representation) with respect to its representation of Swan. In fact, D.C. Rule 1.16(a)(1) requires Gibson to terminate its new relationship with Tether because, as already

noted, the latter "result[s] in violation of [Rule 1.7] of the Rules of Professional Conduct" with respect to Swan. D.C. Rule 1.16(b) specifically prohibits a lawyer from permissive withdrawal from an existing client relationship unless "withdrawal can be accomplished without material adverse effect on the interests of the client," Swan. That is not the case here.

41.  While Swan began actively interviewing and onboarding replacement counsel after learning of Gibson's disloyalty, the substitution of counsel must take place on a timeline of Swan's choosing to minimize disruptions and prejudice to Swan.

## GIBSON'S MISCONDUCT WOULD IRREPARABLY HARM SWAN

42.  Gibson's planned termination of Swan as a client in favor of Tether would cause irreparable harm to Swan.

43.  Swan would be deprived of its counsel of choice in a complex, fast-paced, high-stakes litigation against Tether and its co-conspirators. Swan has already been deprived of the zealous advocacy to which it is entitled because, with Tether's knowledge (and, on information and belief, approval) Gibson has signaled that it would prefer to represent Tether over Swan.

44.  Gibson's withdrawal would jeopardize Swan's litigation strategy (devised by Gibson in consultation with Swan) that is already in motion. It would impair the ability of Swan's replacement counsel to execute the litigation strategy in a timely, efficient, and effective manner.

45.  Gibson's threatened withdrawal has already prejudiced – and continues to jeopardize – Swan's relationship with its litigation funder, who has already advanced substantial sums to pay Gibson's legal fees.

46.  If Gibson were permitted to drop Swan in favor of Tether, it would cause an unacceptable risk of leakage of Swan's confidential information. Tether has already successfully conspired with other Swan fiduciaries to steal competitively sensitive and proprietary information from Swan. The rules on concurrent client conflicts do not allow for screening as a remedy to disqualification." *See, e.g.*, D.C. Rule 1.7.

# FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

47. Swan repeats, realleges and incorporates by reference all the allegations set forth in the preceding paragraphs of this Complaint as if each were fully set forth herein.

48. The Gibson EL established an attorney-client relationship between Gibson and Swan. The attorney-client relationship is a fiduciary one.

49. Gibson's fiduciary duty includes, among other things, a duty to respect Swan's control of the goals of representation; a duty to initiate communication with Swan on matters of importance to the goals of representation in a timely manner; a duty to remain loyal; a duty to keep client confidences; a duty to provide competent legal services; and a duty to deal honestly.

50. Gibson has breached these fiduciary duties by acting to the detriment of the goals of the representation; failing to initiate necessary communications and to provide required disclosures in a timely manner; acting disloyally and for its own benefit in abandoning an existing client for a potentially more lucrative non-client; putting client confidences at risk; providing legal services that fall far below the standard promised by Gibson and required by the fiduciary duties owed by attorneys to their clients; and failing to deal honestly with Swan as to the facts and circumstances outlined in greater detail above.

51. If Gibson were allowed to withdraw from its representation of Swan in the Tether Litigation and to take on the representation of Tether in other matters, Swan will be irreparably harmed.

52. Swan has a likelihood of success on the merits of its claims against Gibson and the relative interim harm of issuing the injunction weighs in favor of Swan and against Gibson. Interested third-party Tether can continue to be represented by its long-term law firm, Kramer Levin, or other counsel of its choice that does not have a disabling conflict.

# SECOND CAUSE OF ACTION
**(Legal Malpractice)**

53. Swan repeats, realleges and incorporates by reference all the allegations set forth in the preceding paragraphs of this Complaint as if each were fully set forth herein.

54. As Swan's attorneys, Gibson owes Swan a duty of care that includes a duty to adhere to the standards of skill and care expected of lawyers acting under similar circumstances, including but not limited to an attorney's duty to adhere to the D.C. and California Rules of Professional Conduct.

55. Gibson has breached its duty of care and failed to adhere to the standards of skill and care expected of lawyers acting under similar circumstances, by, *inter alia*, threatening to abandon Swan in favor of its adversary, Tether; failing to zealously prosecute the Tether Litigation and related follow-on litigation or negotiations with Tether, due to the conflict; and putting Swan's confidential information at risk by associating with attorneys who represent and owe professional duties to Tether.

56. As a direct and proximate result of Gibson's breach of its duties of care, Swan has been and continues to be irreparably harmed.

57. Swan has a likelihood of success on the merits of its claims against Gibson and the relative interim harm of issuing the injunction weighs in favor of Swan and against Gibson. Interested third-party Tether can continue to be represented by its long-term law firm, Kramer Levin, or other counsel of its choice that does not have a disabling conflict.

## **PRAYER FOR RELIEF**

WHEREFORE: Swan prays that a preliminary injunction be entered in its favor against Gibson, enjoining Gibson during the pendency of an arbitration between them from:

1. Seeking to withdraw as Swan's counsel in *Electric Solidus, Inc. d/b/a Swan Bitcoin v. Proton Management, Ltd. et al.*, Case No. 2:24-cv-8280 (C.D. Cal., Western Div., filed September 25, 2024) without Swan's consent; and

2. Continuing or taking on any representation of Tether or its affiliates.

| | | |
|---|---|---|
| 1 | DATED: November 22, 2024 | Respectfully submitted, |
| 2 | | WOLLMUTH MAHER & DEUTSCH LLP |
| 3 | | By: */s/ Timothy A. DeLange* |
| 4 | | Timothy A. DeLange |
| 5 | | *Attorneys for Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin* |

## VERIFICATION

I have read the foregoing Verified Complaint for Provisional Injunctive Relief in Aid of Arbitration and know its contents. I am the CEO of Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan"), a party to this action. I am authorized to make this verification for and on behalf of Plaintiff Swan and make this verification for that reason. The matters stated in the foregoing Verified Complaint are true to my own knowledge, except as to the matters which are therein stated upon information or belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Calabasas, California this 22nd day of November, 2024.

Cory Klippsten
*CEO of Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin*