# EXHIBIT C

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Electric Solidus, Inc.**

**CONSULTING AGREEMENT**

This Consulting Agreement (this "***Agreement***") is made and entered into as of December 6, 2023, (the "***Effective Date***"), by and between Electric Solidus, Inc., a Delaware corporation (the "***Company***"), and Ilios Corp ("***Consultant***") (each herein referred to individually as a "***Party***," or collectively as the "***Parties***").

The Company desires to retain Consultant as an independent contractor to perform consulting services for the Company, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

1.      **Services and Compensation**

- Consultant shall perform the services and fulfill the obligations described in **Exhibit A** (the "***Services***") for the Company (or its designee), and the Company agrees to pay Consultant the compensation described in **Exhibit A** for Consultant's performance of the Services.

2.      **Confidentiality**

A.      ***Definition of Confidential Information.*** "***Confidential Information***" means any information (including any and all combinations of individual items of information) that relates to the actual business and/or products, research or development of the Company, its affiliates or subsidiaries, or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of Company, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records; or (iv) is independently developed by Contractor with no reference to the Confidential Information. Notwithstanding anything in this Section 2.A, the following are explicitly excluded from the definition of Confidential Information: (i) all of Consultant's involvement, relationship, and dealings with Daniel Tuzzio ("Tuzzio") and all of Tuzzio's affiliated entities, whether in existence prior to or after the Effective Date; (ii) all of Consultant's relationships, network, and goodwill, and all extensions thereof (collectively, "Consultant's Network") existing prior to and after the Effective Date, regardless of any use of, or applicability to, Consultant's Network to the Services performed by Consultant.

B.      ***Nonuse and Nondisclosure.*** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) subject to Consultant's right to engage in Protected Activity (as defined

below), disclose the Confidential Information to any third party without the prior written consent of an authorized representative of the Company, except that Consultant may disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section 2.B shall continue after the termination of this Agreement.

C.    ***Other Client Confidential Information.*** Consultant agrees that Consultant will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or current employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D.    ***Third Party Confidential Information.*** Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes the Company and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for the Company consistent with the Company's agreement with such third party.

3.    **Ownership**

A.    ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "***Inventions***"), are the sole property of the Company. Consultant also agrees to promptly make full written disclosure to the Company of any Inventions and to deliver and assign (or cause to be assigned) and hereby irrevocably assigns fully to the Company all right, title and interest in and to the Inventions.

B.    ***Pre-Existing Materials.*** Subject to Section 3.A, Consultant will provide the Company with prior written notice if, in the course of performing the Services, Consultant incorporates into any Invention or utilizes in the performance of the Services any invention, discovery, idea, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by Consultant or in which Consultant has an interest, prior to, or separate from, performing the Services under this Agreement ("***Prior Inventions***"), and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such

Invention, and to practice any method related thereto. Consultant will not incorporate any invention, discovery, idea, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by any third party into any Invention without Company's prior written permission.

C.      **Moral Rights.** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.      **Maintenance of Records.** Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by Consultant (solely or jointly with others) during the term of this Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by the Company. Such records are and remain the sole property of the Company at all times and upon Company's request, Consultant shall deliver (or cause to be delivered) the same.

E.      **Further Assurances.** Consultant agrees to assist Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that the Company may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns and nominees the sole and exclusive right, title, and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Consultant further agrees that Consultant's obligations under this Section 3.E shall continue after the termination of this Agreement.

F.      **Attorney-in-Fact.** Consultant agrees that, if the Company is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in Section 3.A, then Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

4.      **Conflicting Obligations**

- Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement. Notwithstanding the foregoing representations and warranties and subject to the confidentiality requirements contained herein, nothing in this Section 4 shall be deemed (i)_to restrict Consultant's ability enter

into any other engagement or obtain and ownership interest in any business that may be deemed to be competitive with Company's current or anticipated business, (ii) to act as a restrictive covenant of any kind whatsoever, including a covenant not to compete with the Company; and (iii) to limit Consultant's business opportunities, or create any duty of loyalty to Company in any way whatsoever. For the avoidance of doubt, nothing in this Agreement shall limit or restrict Consultants ability to operate, own, or otherwise manage any business venture of any kind, including a business that may compete with the Company's business, nor shall anything in this Agreement require Consultant to bring any business opportunity to Company for any reason whatsoever.

**5.      Return of Company Materials**

- Upon the termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 3.D and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.

**6.      Representations and Warranties**

- Consultant represents and warrants to the Company that Consultant (i) has the right to enter into this Agreement, to grant the rights granted herein, and to perform all of its obligations under this Agreement; (ii) has the required skill, experience, and qualifications to perform the Services; (iii) will perform the Services in a professional and workmanlike manner, and will devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and (iv) will perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services.

**7.      Term and Termination**

A.      ***Term.*** The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) the completion of the Services, or (ii) termination as provided in Section 7.B.

B.      ***Termination.*** Either Party may terminate this Agreement upon giving the non-terminating Party thirty (30) days prior written notice of such termination pursuant to Section 13.G of this Agreement. Either Party may terminate this Agreement immediately and without prior notice if the non-terminating Party refuses to or is unable to perform its obligations under this Agreement or is in breach of any material provision of this Agreement.

C.      ***Survival.*** Upon any termination, all rights and duties of the Company and Consultant toward each other shall cease except:

(1)      The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by the Company prior to the termination date and related reimbursable expenses, if any, submitted in accordance with the Company's policies and in accordance with the provisions of Section 1 of this Agreement; and

(2)    Section 2 (Confidentiality), Section 3 (Ownership), Section 4 (Conflicting Obligations), Section 5 (Return of Company Materials), Section 6 (Term and Termination), Section 8 (Independent Contractor; Benefits), Section 9 (Indemnification), Section 10 (Nonsolicitation), Section 11 (Limitation of Liability), Section 12 (Arbitration and Equitable Relief), and Section 13 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

8.    **Independent Contractor; Benefits**

A.    ***Independent Contractor.*** It is the express intention of the Company and Consultant that Consultant perform the Services as an independent contractor to the Company. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of the Company. Without limiting the generality of the foregoing, Consultant is not authorized to bind the Company to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse the Company for) all tools and materials necessary to accomplish this Agreement and shall incur all expenses associated with performance; provided, however, that Company shall reimburse Consultant for all out-of-pocket expenses incurred in the performance of the Services. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement. Consultant agrees to and acknowledges the obligation to pay all self-employment and other taxes on such income.

B.    ***Benefits.*** The Company and Consultant agree that Consultant will receive no Company-sponsored benefits from the Company where benefits include, but are not limited to, paid vacation, sick leave, medical insurance and 401k participation. If Consultant is reclassified by a state or federal agency or court as the Company's employee, Consultant will become a reclassified employee and will receive no benefits from the Company, except those mandated by state or federal law, even if by the terms of the Company's benefit plans or programs of the Company in effect at the time of such reclassification, Consultant would otherwise be eligible for such benefits.

9.    **Indemnification**

- Each Party agrees to indemnify and hold harmless the other and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of a Party or a Party's assistants, employees, contractors or agents, (ii) any breach by the a Party or a Party's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information, (iv) any failure of a Party to perform the obligations herein in accordance with all applicable laws, rules and regulations, or (v) any violation or claimed violation of a third party's rights resulting in whole, or in part, from the Company's use of the Inventions or other deliverables of Consultant under this Agreement.

10.    **Nonsolicitation**

- To the fullest extent permitted under applicable law, during the Term of this Agreement (the "***Restricted Period***"), Consultant will not, without the Company's prior written consent, directly or indirectly, (a) solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, (b) solicit any of the Company's independent contractors to terminate their services as independent contractors, or attempt to solicit any independent contractors of the Company, or (c) solicit any of the Company's customers for purposes of offering or accepting goods or services competitive

with those offered by the Company, or attempt to do the foregoing. Consultant agrees that nothing in this Section 10 shall affect Consultant's continuing obligations under this Agreement during and after the Restricted Period, including, without limitation, Consultant's obligations under Section 2.

11. **Limitation of Liability**

- IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

12. **Arbitration and Equitable Relief**

A. ***Arbitration.*** IN CONSIDERATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH THE COMPANY, CONSULTANT PROMISES TO ARBITRATE ALL DISPUTES RELATED TO CONSULTANT'S CONSULTING RELATIONSHIP WITH THE COMPANY AND CONSULTANT'S RECEIPT OF THE COMPENSATION AND OTHER BENEFITS PAID TO CONSULTANT BY COMPANY. AT PRESENT AND IN THE FUTURE, CONSULTANT AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM CONSULTANT'S CONSULTING OR OTHER RELATIONSHIP WITH THE COMPANY OR THE TERMINATION OF CONSULTANT'S CONSULTING OR OTHER RELATIONSHIP WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION PURSUANT TO CALIFORNIA LAW. **CONSULTANT AGREES TO ARBITRATE ANY AND ALL COMMON LAW AND/OR STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER THE CALIFORNIA STATE LABOR LAW, CLAIMS RELATING TO EMPLOYMENT OR INDEPENDENT CONTRACTOR STATUS, CLASSIFICATION, AND RELATIONSHIP WITH THE COMPANY, AND CLAIMS OF BREACH OF CONTRACT, EXCEPT AS PROHIBITED BY LAW. CONSULTANT ALSO AGREES TO ARBITRATE ANY AND ALL DISPUTES ARISING OUT OF OR RELATING TO THE INTERPRETATION OR APPLICATION OF THIS AGREEMENT TO ARBITRATE, BUT NOT TO DISPUTES ABOUT THE ENFORCEABILITY, REVOCABILITY OR VALIDITY OF THIS AGREEMENT TO ARBITRATE OR ANY PORTION HEREOF OR THE CLASS, COLLECTIVE AND REPRESENTATIVE PROCEEDING WAIVER HEREIN. WITH RESPECT TO ALL SUCH CLAIMS AND DISPUTES THAT CONSULTANT AGREES TO ARBITRATE, CONSULTANT HEREBY EXPRESSLY AGREES TO WAIVE, AND DOES WAIVE, ANY RIGHT TO A TRIAL BY JURY.** CONSULTANT FURTHER UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH CONSULTANT.

B.    ***Procedure.*** CONSULTANT AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("*JAMS*") PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "*JAMS RULES*"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/. CONSULTANT AGREES THAT THE USE OF THE JAMS RULES DOES NOT CHANGE CONSULTANT'S CLASSIFICATION TO THAT OF AN EMPLOYEE. TO THE CONTRARY, CONSULTANT REAFFIRMS THAT CONSULTANT IS AN INDEPENDENT CONTRACTOR. CONSULTANT AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY WHERE PROVIDED BY APPLICABLE LAW. CONSULTANT AGREES THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. CONSULTANT FURTHER AGREES THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA MONICA, CALIFORNIA.

C.    ***Remedy.*** EXCEPT AS PROVIDED BY THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN CONSULTANT AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THIS AGREEMENT, NEITHER CONSULTANT NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D.    ***Availability of Injunctive Relief.*** THE PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF ANY AGREEMENT REGARDING INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION OR NONINTERFERENCE. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E.    ***Administrative Relief.*** CONSULTANT UNDERSTANDS THAT, EXCEPT AS PERMITTED BY LAW, THIS AGREEMENT DOES NOT PROHIBIT CONSULTANT FROM PURSUING CERTAIN ADMINISTRATIVE CLAIMS WITH LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODIES OR GOVERNMENT AGENCIES SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE CONSULTANT FROM BRINGING ANY ALLEGED WAGE CLAIMS WITH THE DEPARTMENT OF LABOR STANDARDS ENFORCEMENT. LIKEWISE, THIS AGREEMENT DOES PRECLUDE CONSULTANT FROM PURSUING COURT ACTION REGARDING ANY ADMINISTRATIVE CLAIMS, EXCEPT AS PERMITTED BY LAW.

F.    ***Voluntary Nature of Agreement.*** CONSULTANT ACKNOWLEDGES AND AGREES THAT CONSULTANT IS EXECUTING THIS AGREEMENT VOLUNTARILY AND

WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE.
CONSULTANT FURTHER ACKNOWLEDGES AND AGREES THAT CONSULTANT HAS
CAREFULLY READ THIS AGREEMENT AND THAT CONSULTANT HAS ASKED ANY
QUESTIONS NEEDED FOR CONSULTANT TO UNDERSTAND THE TERMS, CONSEQUENCES
AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING
THAT *CONSULTANT IS WAIVING CONSULTANT'S RIGHT TO A JURY TRIAL*. FINALLY,
CONSULTANT AGREES THAT CONSULTANT HAS BEEN PROVIDED AN OPPORTUNITY TO
SEEK THE ADVICE OF AN ATTORNEY OF CONSULTANT'S CHOICE BEFORE SIGNING THIS
AGREEMENT.

13.    **Miscellaneous**

A.    ***Governing Law; Consent to Personal Jurisdiction***. This Agreement shall be
governed by the laws of the State of California, without regard to the conflicts of law provisions of any
jurisdiction. To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly
consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Santa
Monica, California.

B.    ***Assignability***. This Agreement will be binding upon Consultant's heirs, executors,
assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its
successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as
expressly stated. Except as may otherwise be provided in this Agreement, the Parties may not sell, assign
or delegate any rights or obligations under this Agreement without prior written consent. Notwithstanding
anything to the contrary herein, Company may assign this Agreement and its rights and obligations under
this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger,
consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

C.    ***Entire Agreement***. This Agreement constitutes the entire agreement and
understanding between the Parties with respect to the subject matter herein and supersedes all prior written
and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants
that Consultant is not relying on any statement or representation not contained in this Agreement. To the
extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the
terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or
schedule.

D.    ***Headings***. Headings are used in this Agreement for reference only and shall not
be considered when interpreting this Agreement.

E.    ***Severability***. If a court or other body of competent jurisdiction finds, or the Parties
mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such
provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and
the remainder of this Agreement will continue in full force and effect.

F.    ***Modification, Waiver.*** No modification of or amendment to this Agreement, nor
any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties.
Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any
other or subsequent breach.

G.    ***Notices***. Any notice or other communication required or permitted by this
Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally
or by commercial messenger or courier service, (ii) when sent by confirmed electronic mail, or (iii) if

mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's physical or electronic address set forth below his, her or its signature block or at such other address as the Party may have previously specified by like notice. If notice or other communication is required or permitted to Consultant and no address is provided under the signature block, then to the last address of Consultant provided by Consultant to the Company or of which the Company is aware. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section 13.G.

H.    ***Attorneys' Fees.*** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

I.    ***Signatures.*** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

J.    ***Applicability to Past Activities.*** Consultant agrees that if and to the extent that Consultant provided any services or made efforts on behalf of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with the Company, that would have been "Services" if performed during the term of this Agreement (the "***Prior Consulting Period***") and to the extent that during the Prior Consulting Period: (i) Consultant received access to any information from or on behalf of Company that would have been "Confidential Information" if Consultant received access to such information during the term of this Agreement; or (ii) Consultant (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with Company, that would have been an Invention if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a Prior Invention if incorporated into such item during the term of this Agreement; then any such information shall be deemed Confidential Information hereunder and any such item shall be deemed an Invention or Prior Invention hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement. Consultant further acknowledges that Consultant has been fully compensated for all services provided during any such Prior Consulting Period.

K.    ***Protected Activity Not Prohibited.*** Consultant understands that nothing in this Agreement shall in any way limit or prohibit Consultant from engaging in any Protected Activity. For purposes of this Agreement, "***Protected Activity***" shall mean filing a charge, complaint, or report with, or otherwise communicating, cooperating, or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission ("***Government Agencies***"). Consultant understands that in connection with such Protected Activity, Consultant is permitted to disclose documents or other information as permitted by law, and without giving notice to, or receiving authorization from, the Company. Notwithstanding the foregoing, Consultant agrees to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company confidential information to any parties other than the Government Agencies. Consultant further understands that "***Protected Activity***" does not include the disclosure of any Company attorney-client privileged communications.

*[Signature Page Follows]*

4839-4998-1851, v. 2

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**COMPANY**

Electric Solidus, Inc.

By:

Cory Klippsten (Dec 6, 2023 12:42 PST)

Name: Cory Klippsten

Title: Chief Executive Officer

Address for Notice:

26565 W. Agoura Suite 200

Calabasas, CA 91302

Email: cory@swanbitcoin.com


**CONSULTANT**

Ilios Corp

By:

Alex Holmes (Dec 6, 2023 12:25 PST)

Name: Alex Holmes

Title: Chief Executive Officer

Address for Notice:

███████████ .

Los Angeles, CA ████

Email: ████████

**EXHIBIT A**

**SERVICES AND COMPENSATION**

1.   *Contact*. Consultant's principal Company contact:

Name: Cory Klippsten

Email: cory@swanbitcoin.com

Phone: (805) 285-2735

2.   *Services*. The Services will include, but will not be limited to, the following:

With respect to the Bitcoin mining operations conducting through the Company and/or its affiliated entities (with all mining related operations being referred to as that of the "Mining Company"), Consultant will act as an "Operating Manager", responsible for the following duties and tasks in relation to the ongoing operation of the Mining Company:

- ○ Equipment Sourcing and Analysis: Operating Manager shall assist in, but not be solely responsible for, (i) diligently research and identify reputable vendors and suppliers of Bitcoin mining equipment, and (ii) evaluate the quality, specifications, and reliability of the equipment, negotiate favorable terms, and oversee the procurement process. Operating Manager shall provide the Mining Company with the right of first refusal to take on any inventory through any such identified vendors and suppliers.

- ○ Power Provider Sourcing: Operating Manager shall assist in, but not be solely responsible for, (i) identify and assess potential power providers offering cost-effective electricity rates around the globe, in particular outside of the United States, and (ii) shall analyze the reliability and sustainability of power sources and negotiate contracts to secure various stable, affordable, and long term power supply sources to support the activities and operation of the Mining Company. Operating Manager shall provide the Mining Company with the right of first refusal to take on all available power through any such identified power providers.

- ○ Deployment of Mining Equipment: Operating Manager shall assist in, but not be solely responsible for, (i) developing a comprehensive plan for the full deployment of mining equipment available to the Mining Company for

A-1

deployment, and (ii) coordinating logistics, including transportation and setup, to ensure proper installation and configuration of the mining hardware for efficient operation at all sites at which the Mining Company mines, or seeks to do so (each a "Mining Facility").

Similarly, the Operating Manager shall continue to engage with Mining Facilities with whom the Mining Company has already begun deploying mining equipment to ensure the full deployment of miners and maximum uptime are achieved at each such Mining Facility. To the extent the Mining Company seeks to enter into agreements with additional Mining Facilities, the Operating Manager shall assist in, but not be solely responsible for, identifying, assess and screen potential hosting service providers and their respective Mining Facilities,  and subsequently engage with such contracted providers to ensure successful deployment and maximum uptime of deployed miners.

o  <u>Maintenance and Facility Operation</u>: Operating Manager shall assist in, but not be solely responsible for, overseeing the day-to-day operations of each Mining Facility. This includes assisting in, but not be solely responsible for, monitoring equipment performance, troubleshooting technical issues, implementing maintenance and repair protocols, and ensuring compliance with safety regulations and protocols.

o  <u>Maintenance Financial Management:</u> Operating Manager shall assist in, but not be solely responsible for, collaborating with relevant stakeholders in support of Mining Company's efforts to manage its operating budget. Operating Manager shall assist in providing support to Mining Company in regard to monitoring expenses, revenue, and profitability, as well as implementing cost-saving strategies and identifying areas for optimization to achieve financial objectives.

o  <u>Support for Ongoing Reporting</u>: In connection with Mining Company's ongoing reporting requirements concerning performance of its operations, Operating Manager shall assist in, but not be solely responsible for, collaborating with Company's personnel as necessary to provide and/or confirm various data points, including but not limited to hash rate, energy consumption, and profitability metrics. Operating Manager shall, upon Mining Company's request, assist in providing analysis and insights on any requested key performance indicators to

optimize mining efficiency, and in general, providing support to Mining Company's management as may be needed in furtherance of its ongoing reporting requirements.

○ <u>Investment Opportunities</u>. In addition to the above described duties, with respect to any other investment or other commercial opportunities encountered by Operating Manager related to Bitcoin mining or the Bitcoin ecosystem during the term of this Agreement, Operating Manager shall provide the Mining Company with the right of first refusal to make that investment before introducing that opportunity to any other investor.

The Operating Manager shall perform these responsibilities diligently and in a professional manner, using best efforts to ensure the successful operation of the Mining Company and each Mining Facility, as applicable. Further, Operating Manager shall disclose any additional compensation arrangement with any vendor or counterparty that the Mining Company contracts with.

3.    ***Compensation and Related Details***

A.    The Company will pay Consultant $15,000 per month, payable monthly and retroactive to July 1, 2023. Within 15 days following the Effective Date, the Company will issue a lump sum payment of $90,000 to the Consultant, covering the period from July through December 2023.

B.    In recognition of the Consultant's contributions to the Mining Company, the Company will include the Consultant in a bonus pool tied to the Mining Company's net profits, with quarterly distributions beginning on or about January 2024. This bonus is calculated after deducting all expenses and applying appropriate depreciation and amortization. Consultant's share of the bonus pool will be the highest in the pool through December 31, 2026.

C.    With respect to Consultant's primary operator, Mr. Alex Holmes will be provided with:

(1)    a to-be-agreed upon Company title;

(2)    a Company computer to facilitate the Mining Company's operations; and

(3)    access to Company email.

D.    In the event that Company's affiliate, Swan Ventures Ltd, makes an investment into Epic Blockchain Technologies Inc., Consultant (or an affiliated entity designated by Consultant) will be entitled to seven (7%) percent of the net profits of such investment. In this regard, Consultant, through the efforts of its operator Mr. Holmes, along with his associates, is expected to be highly engaged in driving

the value of this investment by applying the appropriate expertise and leveraging of commercial relationships, etc.

E.      For future deals sourced, engaged, managed, and in which Consultant's operator, Mr. Holmes, and its associates, are key players in driving the value of a related investment, Consultant (or an affiliated entity designated by Consultant) will be entitled to five (5%) percent of the net profits of such investment in a liquidity event, subject to an cumulative "net profit share mechanism". Under this mechanism, the Consultant's share is based on the net accumulated profits from all such investments, including Epic Blockchain Technologies Inc., after adjusting for any accumulated losses. For illustration, if the first investment sourced by Consultant yields a profit of $20 million, Consultant would earn $1 million. Should the second such investment result in a $10 million loss, the Consultant's share from future profits will be adjusted by $500k to account for this loss. For instance, if the third investment generates a profit of $100 million, the Consultant's share would be calculated as $5 million minus the prior $500k loss, or a net of $4.5 million. The Company and Consultant acknowledge that this incentive is expressly intended for exceptional circumstances where Mr. Holmes' direct business development efforts lead to substantial value for such investment.

F.      As additional compensation, the Company intends to grant to Consultant, or to any entity designated bv Consultant,  an option to purchase 150,000 shares of Common Stock of the Company, with a per share exercise price equal to the fair market value of the Common Stock as of the Effective Date of this Agreement. Such options will be subjected to the approval of the Board and will be evidenced by, and subject to, the terms and conditions of the Company's standard stock option agreement and equity compensation plan. The options will vest incrementally in equal monthly shares over a period of 48 months, with this vesting schedule taking effect retroactively as of July 1, 2023.

G.      All payments and benefits provided for under this Agreement are intended to be exempt from or otherwise comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance thereunder (together, "**Section 409A**"), so that none of the payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities or ambiguous terms herein will be interpreted to be exempt or so comply. Each payment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations. In no event will the Company reimburse Consultant for any taxes that may be imposed on Consultant as a result of Section 409A.

A-4

This **Exhibit A** is accepted and agreed upon as of December 6, 2023.

**COMPANY**

Electric Solidus, Inc.

By:

_____
Cory Klippsten (Dec 6, 2023 12:42 PST)

Name: Cory Klippsten

Title: Chief Executive Officer

**CONSULTANT**

Ilios Corp

By:

_____
Alex Holmes (Dec 6, 2023 12:25 PST)

Name: Alex Holmes

Title: Chief Executive Officer

A-5

**ELECTRIC SOLIDUS, INC.**
**2022 EQUITY INCENTIVE PLAN**

**STOCK OPTION AGREEMENT**

| | |
|---|---|
| **Optionee:** | **ADUV LLC** |
| **Award Date:** | July 1, 2023 |
| **Exercise Price per Share[1]:** | USD $0.79 |
| **Total Exercise Price[1]:** | USD $118,500 |
| **Number of Shares[1]:** | 150,000 |
| **Expiration Date[2]:** | July 1, 2033 |
| **Type of Option[3]:** | _____ Incentive Stock Option (ISO) |
| | __X__ Nonstatutory Stock Option (NSO) |
| **Vesting Commencement Date:** | July 1, 2023 |
| **Exercise/Vesting Schedule[2]:** | The options will vest incrementally in equal monthly amounts (3,125 options per month) over a period of 48 months, effect retroactively as of July 1, 2023. |

This STOCK OPTION AGREEMENT (this "Agreement") is by and between Electric Solidus, Inc., a Delaware corporation (the "Company"), and the Optionee named above (the "Optionee"). The right to purchase the number of shares of the Company's Class A Common Stock (the "Common Stock") identified above (the "Option") is granted pursuant to and subject to the terms and conditions set forth in the Electric Solidus, Inc. 2022 Equity Incentive Plan (the "Plan"). Capitalized terms used herein and not otherwise defined herein shall have the meaning assigned by the Plan.

**WHEREAS**, pursuant to the Plan, the Company desires to grant to the Optionee with reference to services rendered and to be rendered to the Company, effective as of the Award Date, an Option upon the terms and conditions set forth herein and in the Plan:

---

[1] Subject to adjustment under Section 4.4 of the Plan.
[2] Subject to early termination if the Optionee's employment or other service relationship terminates or in certain other circumstances. See Section 6.8 and Article 11 of the Plan for exceptions and additional details regarding possible adjustments, acceleration of exercisability and/or vesting and/or early termination of the Option.
[3] Subject to Section 6.10(b) of the Plan.

**NOW THEREFORE,** in consideration of services rendered and to be rendered prior to exercise by the Optionee and the mutual promises made herein and the mutual benefits to be derived therefrom, the parties agree as follows:

1.      <u>Grant of Option</u>. The Company hereby grants to the Optionee, and the Optionee hereby accepts, the Option to purchase the total number of shares of Common Stock set forth above, at the Exercise Price per Share subject to the terms, definitions and provisions of the Plan and this Agreement.

2.      <u>Type of Option</u>. If the Company has designated the Option as an ISO above, the Company intends that the Option will be treated as an Incentive Stock Option within the meaning of Section 422 of the Code (an "<u>ISO</u>") to the maximum extent permissible under all of the ISO rules and restrictions. Any shares acquired upon exercise of the Option without compliance with all applicable ISO rules will be treated as acquired upon exercise of a Nonstatutory Stock Option (a "<u>NSO</u>"). If the Company has designated the Option as a NSO above, the Company intends that the Option will be treated in its entirety as a NSO and not as an ISO.

3.      <u>Exercisability of Option</u>.  The Option shall vest and become exercisable during its term following the Vesting Commencement Date in accordance with the Exercise/Vesting Schedule as set forth above, and with and subject to the applicable provisions of the Plan and this Agreement. The Option may be exercised only to the extent the Option is vested and exercisable, and, subject to <u>Section 6.9</u> of the Plan, during the Optionee's lifetime, only by the Optionee.  In no event may the Optionee exercise the Option after the Expiration Date as provided above.

4.      <u>Exercise of Option</u>.  To exercise the Option (to the extent vested and exercisable and for whole numbers of shares only), the Optionee (or in the case of exercise after the Optionee's death or disability, the Optionee's guardian or legal representative, as the case may be) must deliver to the Company an executed Option Exercise Agreement in the form attached hereto as <u>Annex A</u>, as may be amended or modified by the Committee from time to time, along with any other agreement reasonably requested by the Company, or of any other form of written notice approved for such purpose by the Company which shall state the number of shares to be purchased pursuant to the Option, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required by the Company. The Option Exercise Agreement or written notice shall be accompanied by payment of the aggregate Exercise Price of the shares to be purchased and the payment or provision for any applicable employment or other taxes or withholding for taxes thereon.  Subject to <u>Sections 15.3</u>, <u>16.3</u> and <u>16.4</u> of the Plan, the Option shall be deemed to be exercised upon receipt and approval by the Company of such Option Exercise Agreement or written exercise notice accompanied by the Aggregate Exercise Price and any other payments so required.

5.      <u>Method of Payment</u>.  Payment of the Aggregate Exercise Price shall be by any of the methods permitted under <u>Section 6.6</u> of the Plan, or a combination thereof, at the election of the Optionee.

6.      <u>Continuance of Service Required</u>.  The Exercise/Vesting Schedule requires continued Service through each applicable vesting date as a condition to the vesting of the applicable installment and rights and benefits under this Agreement.  Partial Service, even if

substantial, during any vesting period will not entitle the Optionee to any proportionate vesting or avoid or mitigate a termination of rights and benefits upon or following a termination of Service.

7.    <u>Effect of Termination of Service on Exercise Period</u>.

(a)    If the Optionee's Service terminates, the Option and all other rights and benefits under this Agreement terminate, except that the Optionee, at any time within the applicable period specified in <u>Section 6.8</u> of the Plan, may exercise the Option to the extent the Option is exercisable on the date of termination of Service and has not otherwise expired or terminated.

(b)    Notwithstanding the foregoing exercise periods after termination of Service, to the extent the Option otherwise is an ISO, the Option will qualify as an ISO only if it is exercised within the applicable exercise periods for ISOs and meets all other requirements of the Code for ISOs. If the Option is not exercised within the applicable exercise periods or does not meet such other requirements, the Option will be rendered a NSO.

8.    <u>Adjustments Upon Specified Events</u>.  As provided in <u>Section 4.4</u> of the Plan, upon the occurrence of certain events relating to or affecting the Company's stock contemplated by <u>Section 4.4</u> of the Plan, the Board shall, in such manner, to such extent (if any) and at such times as it deems appropriate and equitable in the circumstances, make adjustments in the number, amount and type of shares (or other securities or property) subject to the Option, the Exercise Price and the securities delivered upon exercise of the Option (or any combination thereof), and the Committee may under <u>Article 11</u> of the Plan provide for a cash payment and cancellation or the assumption, substitution or exchange of the Option or the shares or other securities subject to the Option in connection with a Change in Control of the Company. All rights of the Optionee hereunder are subject to such adjustments and other provisions of the Plan.

9.    <u>Optionee not a Stockholder</u>.  Neither the Optionee nor any other person entitled to exercise the Option shall have any of the rights or privileges of a stockholder of the Company as to any shares of Common Stock until exercise of the Option and the issuance and delivery to him or her of a certificate evidencing the Shares registered in his or her name, or upon request in the case of uncertificated securities, a notice of issuance, for the Shares. No adjustment will be made for dividends or other rights as a stockholder as to which the record date is prior to such date of delivery.

10.    <u>Non-Transferability of Option</u>.  The Option and any other rights of the Optionee under this Agreement or the Plan are nontransferable except as expressly provided in <u>Section 6.9</u> of the Plan.

11.    <u>Notices</u>.  Any notice to be given under the terms of this Agreement shall be in writing and addressed to the Company at 26565 Agoura Rd, Suite 200, Calabasas, CA 91302, to the attention of the Board and to the Optionee at the address given beneath the Optionee's signature hereto, or at such other address as either party may hereafter designate in writing to the other.

12.    <u>Electronic Delivery</u>.  The Company may, in its sole discretion, decide to deliver any documents related to Optionee's current or future participation in the Plan, this Option, the Shares subject to this Option, any other Company securities or any other Company-related documents, by

Page 3

electronic means. By accepting this Option, whether electronically or otherwise, the Optionee hereby (i) consents to receive such documents by electronic means, (ii) consents to the use of electronic signatures, and (iii) if applicable, agrees to participate in the Plan and/or receive any such documents through an on-line or electronic system established and maintained by the Company or a third party designated by the Company, including but not limited to the use of electronic signatures or click-through electronic acceptance of terms and conditions.

13.    <u>No Acquired Rights or Employment Rights</u>. In accepting the Option, the Optionee acknowledges that the Plan is established voluntarily by the Company, is discretionary in nature, and may be modified, amended, suspended or terminated by the Company at any time. The grant of the Option is voluntary and occasional and does not create any contractual or other right to receive future grants of Options, other Awards or benefits in lieu of Options, even if Options have been granted repeatedly in the past, and all decisions with respect to future grants of Options or other Awards, if any, will be at the sole discretion of the Company. The Option and the Shares subject to the Option are extraordinary items that do not constitute regular compensation for services rendered to the Company or any Subsidiary or Affiliate.

Nothing contained in this Agreement is intended to constitute or create a contract of employment, nor shall it constitute or create the right to remain associated with or in the employ of the Company or any Subsidiary or Affiliate for any particular period of time. This Agreement shall not interfere in any way with the right of the Company or any Subsidiary or Affiliate to terminate the Optionee's employment or service at any time, subject to applicable laws.

14.    <u>Effect of Award Agreement</u>. This Agreement shall be binding upon and inure to the benefit of any successor or successors of the Company, except to the extent the Committee determines otherwise.

15.    <u>Entire Agreement; Governing Law</u>. The Plan is incorporated herein by reference. The Plan and this Agreement (including any Addendum attached hereto) constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Optionee with respect to the subject matter hereof. Except in accordance with the terms of the Plan, this Agreement may not be modified except by means of a writing signed by the Company and the Optionee. The construction, interpretation, performance and enforcement of this Agreement and the Option shall be governed by the internal substantive laws, but not the choice of law rules, of the State of Delaware. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of Delaware and agree that any such litigation shall be conducted only in the courts of Delaware or the federal courts of the United States located in Delaware and no other courts.

16.    <u>Plan</u>. The Option and all rights of the Optionee with respect thereto are subject to, and the Optionee agrees to be bound by, all of the terms and conditions of the provisions of the Plan, incorporated herein by reference, to the extent such provisions are applicable to Awards granted thereunder. The Optionee acknowledges receipt of a copy of the Plan, which is made a part hereof by this reference, and agrees to be bound by the terms thereof. Unless otherwise expressly provided in other Sections of this Agreement, provisions of the Plan that confer discretionary authority on the Committee do not (and shall not be deemed to) create any rights in

the Optionee unless such rights are expressly set forth herein or are otherwise in the sole discretion of the Committee specifically so conferred by appropriate action of the Board under the Plan after the date hereof.

17.    <u>Severability</u>.   If one or more provisions of this Agreement are held to be unenforceable under applicable Law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

18.    <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.   Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*<u>Signatures on Following Page</u>*

IN WITNESS WHEREOF, the parties have executed this Stock Option Agreement as of the Award Date.

AGREED AND ACKNOWLEDGED:

**COMPANY:**                                      **OPTIONEE:**

**ELECTRIC SOLIDUS, INC.**                  **ADUV LLC**
a Delaware corporation

By: _Cory Klippsten (Dec 6, 2023 12:42 PST)_____    By: _Alex Holmes (Dec 6, 2023 12:25 PST)_____

Name: Cory Klippsten                         Name: Alex Holmes

Title:  Chief Executive Officer              Title:  Managing Partner

*Signature Page to Stock Option Agreement*

## **Annex A**

## **Option Exercise Agreement**

[*See attached*]

# Consulting Agreement - Electric Solidus _Alex Holmes_execution copy_11_6_23

**Final Audit Report**        2023-12-06

| | |
|---|---|
| Created: | 2023-12-06 |
| By: | Bill Belitsky (bill@swanbitcoin.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAP0ACAegXfzk76BUdMFLtkPguCRDKxMOz |

## "Consulting Agreement - Electric Solidus _Alex Holmes_execution copy_11_6_23" History

Document created by Bill Belitsky (bill@swanbitcoin.com)
2023-12-06 - 6:31:46 PM GMT

Document emailed to ▮▮▮▮▮▮▮ for signature
2023-12-06 - 6:33:13 PM GMT

Email viewed by ▮▮▮▮▮▮▮
2023-12-06 - 6:39:58 PM GMT

Signer ▮▮▮▮▮▮▮ entered name at signing as Alex Holmes
2023-12-06 - 8:25:46 PM GMT

Document e-signed by Alex Holmes ▮▮▮▮▮▮▮
Signature Date: 2023-12-06 - 8:25:48 PM GMT - Time Source: server

Document emailed to Cory Klippsten (cory@swanbitcoin.com) for signature
2023-12-06 - 8:25:50 PM GMT

Email viewed by Cory Klippsten (cory@swanbitcoin.com)
2023-12-06 - 8:42:04 PM GMT

Document e-signed by Cory Klippsten (cory@swanbitcoin.com)
Signature Date: 2023-12-06 - 8:42:20 PM GMT - Time Source: server

Agreement completed.
2023-12-06 - 8:42:20 PM GMT

Adobe Acrobat Sign