# EXHIBIT H

RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:    (213) 443-3145
Facsimile:    (213) 443-3100

STACYLYN M. DOORE (admitted *pro hac vice*)
stacylyndoore@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:    (617) 712-7100
Facsimile:    (617) 712-7200

RACHEL E. EPSTEIN (admitted *pro hac vice*)
rachelepstein@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

HARRIS M. MUFSON, *pro hac vice forthcoming*
hmufson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
MATTHEW D. MCGILL, *pro hac vice forthcoming*
mmcgill@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8500
ILISSA SAMPLIN, SBN 314018
isamplin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
CHRISTINE DEMANA, *pro hac vice forthcoming*
cdemana@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2923
Telephone: 214.698.3100

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### ~~WESTERN DIVISION~~

| | |
|---|---|
| ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN, a Delaware corporation, | Case No. 2:24-cv-8280 |
| Plaintiff, | **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| PROTON MANAGEMENT LTD., a British Virgin Islands corporation; THOMAS PATRICK FURLONG; ILIOS CORP., a California corporation; MICHAEL ALEXANDER HOLMES; RAFAEL DIAS MONTELEONE; SANTHIRAN NAIDOO; ENRIQUE ROMUALDEZ; and LUCAS VASCONCELOS, | **UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| Defendants. | |

# **TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ................................................................1

PARTIES .......................................................................~~4~~8

JURISDICTION AND VENUE .......................................................~~5~~10

FACTS .........................................................................~~8~~15

I.      BITCOIN, THE BLOCKCHAIN, AND BITCOIN MINING. ....................15

~~II~~I.   ENTREPRENEURS CORY KLIPPSTEN AND YAN PRITZKER
        FOUND SWAN. ..........................................................~~8~~18

~~II~~III.  SWAN ~~BUILDS~~ESTABLISHES A SUCCESSFUL BITCOIN
        MINING BUSINESS ..............~~9~~ BUILT ON EXTENSIVE CONFIDENTIAL,
        PROPRIETARY MATERIAL THAT SWAN DEVELOPED. ....................19

IV.     THE INDIVIDUAL DEFENDANTS CONTRACT TO PROVIDE
        SERVICES TO SWAN. ....................................................36

~~III~~V.   SWAN PROTECTS THE SECRECY OF ITS PROPRIETARY
        INFORMATION. ......................................................~~15~~37

~~IV~~VI.   SWAN ~~FORMS~~EXPANDS 2040 ENERGY, A FINANCING
        ARRANGEMENT TO RAISE CAPITAL FOR BITCOIN MINING. ......~~18~~42

~~V~~VII.   THE DEFENDANTS PLOT TO STEAL SWAN'S BUSINESS,
        CONFIDENTIAL AND PROPRIETARY INFORMATION, AND
        TRADE SECRETS. ....................................................~~19~~43

~~VI~~VIII. ......................................................THE DEFENDANTS EXECUTE THEIR
        SCHEME. ..........................................................~~24~~50

~~VII~~IX. .........SWAN INVESTIGATES, TRIES TO MITIGATE DISRUPTION, AND
        RESERVES RIGHTS. ................................................~~30~~63

X.      SWAN BRINGS THIS SUIT, AND THE DEFENDANTS PROVIDE
        FALSE EXCUSES FOR THEIR MISCONDUCT. ...........................67

XI.     DEFENDANTS CONTINUE TO USE SWAN'S CONFIDENTIAL
        INFORMATION AND TRADE SECRETS AND THEIR
        REPRESENTATIONS TO THE COURT PROVE HOLLOW. ..................68

~~VIII~~XII. ..............SWAN HAS BEEN, AND CONTINUES TO BE, IRREPARABLY
        HARMED BY DEFENDANTS AND THEIR COCONSPIRATORS'
        MISCONDUCT. ....................................................~~36~~74

CAUSES OF ACTION ........................................................~~37~~77

PRAYER FOR RELIEF ......................................................~~48~~89

JURY DEMAND ..............................................................~~49~~90

-i-

Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan") complains and alleges the following against Defendants Proton Management Ltd. ("Proton"), Thomas Patrick Furlong, Ilios Corp., Michael Alexander ("Alex") Holmes, Rafael Dias Monteleone, Santhiran Naidoo, Enrique Romualdez, and Lucas Vasconcelos (the "Individual Defendants," and, collectively with Proton, "Defendants").

## NATURE OF THE ACTION

1. Over a period of several weeks in July and August, Defendants and other agents hatched and executed a "rain and hellfire" plan to steal Swan's billion-dollar Bitcoin mining business.

2. The individual Defendants (all former Swan consultants) conspired to steal Swan's highly proprietary and confidential Bitcoin mining business, technology, trade secrets, property and personnel, and then resigned near-simultaneously on the evening of August 8, 2024, to join Defendant Proton—a copycat company Defendant Holmes created for the sole purpose of using Swan's stolen technology and trade secret techniques and methods to usurp its mining business. Defendant Naidoo is now Proton's Chief Investment Officer, and virtually all the consultants and employees who worked in Swan's Bitcoin mining business—including Swan's former executives and General Counsel—currently work for Defendant Proton with Swan's confidential information and trade secrets.

1. This action stems from a coordinated effort by Defendants—former consultants of Swan—to steal Swan's entire billion-dollar Bitcoin mining business. Over the course of six weeks, Defendants devised and executed a brazen plan—described in their contemporaneous call notes as "rain and hellfire" by which Defendants "would be exposed" on "Confidentiality and IP." In connection with their plan, Defendants downloaded over 1,300 documents, including those containing confidential Swan information and source code files that outlined every step of Swan's proprietary Bitcoin mining strategies. Defendants also recruited senior Swan employees to join them in resigning *en masse*. Thirteen Swan consultants and

employees resigned over the course of two days, many within minutes of one another. They all went to the new company Defendant Holmes had incorporated six days before they resigned—Defendant Proton. Swan seeks injunctive relief against all of the Defendants, and damages against Proton, to put an end to Defendants' misconduct and to compensate Swan for this egregious theft.

2. Founded in 2019, Swan is widely recognized as a leader in Bitcoin services and operations. In 2023, Swan sought to expand its operations to Bitcoin mining. "Bitcoin mining" refers to the process of generating Bitcoin, the first and most widely-known digital, decentralized currency. If done efficiently at scale, Bitcoin mining can be extremely profitable. At the time of this filing, a single Bitcoin is worth approximately *$100,000*. But as attractive as the rewards from Bitcoin mining can be, mining operations are notoriously difficult to scale profitably. Achieving profitably is a challenge, and minor gains in price, power efficiency, and a host of other variables can be the difference between a profitable quarter and a business going under.

3. Surveying the Bitcoin mining industry landscape in early 2023, Swan saw a sector filled with companies that struggled first with identifying the best locations to deploy Bitcoin mining equipment, and then with managing any mining operations they did establish. Swan saw an opportunity to do better. After extensive research into the market and its would-be competitors, Swan entered the Bitcoin mining industry in earnest in mid-2023. Through a combination of proprietary techniques and operational trade secrets that Swan developed and continuously refined, Swan grew its Bitcoin mining operations at a breakneck and unprecedented speed and scale. In less than one year, Swan was able to surpass what established competitors had needed a half-decade to accomplish. In the first half of 2024, Swan's mining operations generated over ███████ revenue, and were on pace to continue to grow. But it all came to an abrupt halt on August 8, 2024, when Defendants executed what they dubbed a "rain and hellfire" plan to steal Swan's

-2-

1    Bitcoin mining business.

2        4.    3. The evidence of Defendants' brazen theft is overwhelming. In Swan's

3    system logs show that in the days and weeks before—and in the time surrounding—

4    the individualIndividual Defendants' departure from Swan, DefendantDefendants

5    Furlong, Naidoo, Monteleone cloned and , Romualdez, and Vasconcelos together

6    with Swan employee co-conspirators collectively exfiltrated over 1,300 documents

7    from Swan's databases, including hundreds of highly confidential Swan files and a

8    copy of the highly proprietary source code from Swan's Bitcoin mining monitoring

9    software—the Bitcoin Network Operating Center ("BNOC")— directly from the

10   secured coding platform GitHub and downloaded a copy of this Bitcoin mining

11   "dashboard" outside of Swan's secure systems. Others involved in the conspiracy who

12   now work with Proton (including Proton's current CEO — ex Swan Chief Investment

13   Officer and Head of Mining Raphael Zagury) also downloaded Swan's BNOC.

14   Among other things, these files included detailed and comprehensive information on

15   Swan's proprietary mining optimizations and a blueprint to operating the ▮ Bitcoin

16   mining sites Swan managed, as well as operational blueprints for new sites that Swan

17   was preparing for deployment.

18        5.    4. In all, based purely on what Swan has been able to uncover to-date,

19   Defendants have misappropriated thousands of documents and files containing

20   Swan's proprietary and confidential information and trade secrets, including: mining

21   processes developed through testing, to optimize mining operations, mining

22   performance data, data related to Swan's mining inventory, mining operations and

23   machine performance and configuration, financial modeling and information, weekly

24   and monthly reports of all operations, ongoing deals with Swan business partners, and

25   pricing information. And they attempted to cover their tracks Defendant

26   Monteleone, for example, attempted to delete his Swan email address from his GitHub

27   account. Taken together, the stolen information provides a complete roadmap for the

28   success behind Swan's mining business. Proton's now-CEO Raphael Zagury himself

-3-

valued Swan's financial interest in the mining business at over ████████ during his time as Swan's Chief Investment Officer and Head of Mining, less than two months before Defendants stole that business.[1]

~~5. At the same time Defendants were stealing the crown jewels from Swan's Bitcoin mining business, they executed their pre-planned scheme to solicit Swan's mining personnel; usurp Swan's funding arrangement; use Swan's financing partner, cryptocurrency giant Tether, for "legal cover" for their misdeeds; and irreparably harm Swan's ability to compete in the market. All of this is laid bare in Zagury's notes, which also confirm Defendant Holmes was a ringleader.~~

6.    Virtually all the consultants and employees who worked in Swan's Bitcoin mining business—including Swan's former Bitcoin mining executives and General Counsel—currently work for Defendant Proton with Swan's confidential information and trade secrets.  Defendant Naidoo is now Proton's Chief Investment Officer.  Others involved in the conspiracy who now work with Proton include, as noted above, Proton's current CEO (ex-Swan Chief Investment Officer and Head of Mining) Raphael Zagury, as well as Swan's former Vice President of Institutional Operations & Research Brett Hiley, former General Counsel Bill Belitsky, former Financial Controller Tyler Effertz, former Technical Researcher Kartheek Sola, and former outside counsel Maxwell Berg.

7.    Contemporaneous notes taken of a call Defendants had on August 6— just two days before Defendants executed on their plan—show the elaborate steps Defendants took to plan and hide their theft of Swan's trade secrets and employees. These notes, taken by Zagury, and (perhaps inadvertently) saved to Swan's email system, detail his conversation with Defendants Holmes and Naidoo.  These notes

---

[1] As detailed below, Swan and cryptocurrency giant Tether entered into a joint venture under which Tether would provide capital for certain mining operations that Swan wholly managed.  That agreement entitled Swan to a share of the proceeds generated from those operations. Zagury valued ***Swan's*** share of that mining business profits ***alone*** at over ████████

-4-

document the conspirators' decision that the "rain and hell fire need to start" because it was becoming "dangerous to [the] team to stay around" and "Bill [Belitsky, then Swan's General Counsel and a co-conspirator, now at Proton] is being put at risk." The notes also detail that the "[t]eam resignation and move with Tether needs to be on *[sic]* tandem" and that the Defendants will need to "bring the heat" because with the breaches of confidentiality and theft of "IP- we would be exposed.  Legal cover from Tether."

     8.     All of this is laid bare in Zagury's August 6, 2024 notes, excerpted on the following page.



Call with Bill, Max, Alex, San

raphael@swanbitcoin.com
To

_____

Better together or Alex leaves first?
. Send list of points
. Post – termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.

Tether needs to send default notice.
____

**From:** raphael@swanbitcoin.com
**Subject:** Call with Bill, Max, Alex, San
**Date: To:** August 6, 2024 at 03:08

— — — — —
Better together or Alex leaves first?
. Send list of points
. Post - termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.
Tether needs to send default notice.
— —
Team is getting to a point where is getting untenable. Bill is being put at risk. Dangerous to team to stay around. Team resignation and move with Tether needs to be on tandem. Fortress is looming.
Last week you said you'd unleash hell on this guy.
. Alex leaves
. Breach
. Proton is assigned manager of 2040 assets
. All communications go to new management company
. ROFR gone if Alex resigns
. Written communications. Alex terminated his agreement. We don't need a board resolution.
. Bring the heat
. Giancarlo side convs. ?
Bill took himself out of Fortress situation. Cory interrogating him now. Trying to ruin Rapha's reputation. Sling a lot of shit. 10% will stick.
They cannot go and say we didn't do it by the book.
Rain and hell fire needs to start. Needs to be an exit, not a nice transaction.
███████████ is moot when Alex leaves. Already moot now. Double covered the second Alex leaves.
Bill interrogated if anyone asked him to join mining.
— — — — — — —
> 10% deposit to Taras
Status of Proton - update - formed, formalizing docs.

9.      The notes confirm that Defendant Alex Holmes was a ringleader. Holmes incorporated Defendant Proton just six days before the resignations, and, per the plan, he resigned first.  Recognizing that their plan would violate the conspirators' "non-solicit; non-compete" obligations to Swan, they plotted to stage their resignations to give the false impression that Proton was an organic, "new opportunity," rather than a copycat company built on Swan's "Confidentiality and IP" and formed solely to usurp Swan's mining business.

10.      Zagury's notes confirm that the Individual Defendants were well aware that their theft of Swan's mining business and trade secrets would "expose" them to further liability and breach their "Confidentiality and IP" obligations to Swan.  The solution was to secure "Legal cover from Tether," whereby the cryptocurrency giant would threaten Swan with legal action to deter the company from seeking to enforce its rights against the Defendants.[2]

11.      6. The scheme from Zagury's notes Defendants' scheme that Zagury laid out in writing came to pass as planned: Defendant Michael "Alex" Holmes, Defendant Naidoo, and Zagury coordinated their resignations from Swan on August 8, 2024. Shortly thereafter, Holmes sent a message to Defendant Furlong, Defendant Monteleone, Defendant Romualdez, Defendant Vasconcelos, and other Swan conspirators signaling them that it was time to resign and join him, Defendant Naidoo, and Zagury at Defendant Proton.  Holmes made clear he wanted "to continue the incredible work [the conspirators] ha[d] accomplished" at Swan, writing, "I don't expect us to skip a beat," and inviting them to resign from Swan.  Over the next few hours, they did.  That email and the resignations that followed were a preplanned fig leaf, intended to leave behind a supposedly innocuous paper trail.  But Defendants'

_____

[2]  Following the plan, Tether has initiated sham litigation against Swan in the United Kingdom, initially attempting to schedule a hearing on January 23 where Tether would seek to have this entire litigation stayed—days before the scheduled filing of this Amended Complaint, in an obvious attempt to intimidate Swan.  The High Court of Justice in the Business and Property Courts of England and Wales rejected Tether's request for immediate relief and has set a hearing for the second half of February.

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

machinations to create this façade were all too obvious—video conference logs from Swan's system reveal that the scheme's ringleaders, including Defendant Michael "Alex" Holmes and Defendant Naidoo, were on near-constant calls for over six hours on the day of the mass resignations, joined one-by-one by the other conspirators, at least one of whom began a mass download of documents shortly after joining a call with Defendants.

12. ~~7.~~ Four days later, Tether~~, Swan's funding partner in its mining operation,~~ notified Swan that Defendant Proton would be taking over "day-to-day" Bitcoin mining management in their joint venture~~, citing~~. Tether tried to excuse its actions by pointing to the departure of a "███████████████████████ ██████████████████████████████████████████"—the very same employees whose exit Defendants had coordinated with the expectation that Tether would provide them "Legal cover" for all their misdeeds.

13. Since then, Defendants have continued to use the proprietary data, information, and resources they stole to operate Defendant Proton's copycat Bitcoin mining business and have continued to work with Swan's business partners and vendors while trading on Swan's name~~.~~ and the goodwill that Swan built with those partners. Swan is left with no choice but to bring this action.

14. ~~8.~~ Defendants Furlong, Holmes/Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos have also ignored Swan's repeated demands—under their binding contracts with Swan—that they return Swan's devices and confidential, proprietary, and trade secret information, despite previous representations to the Court that they were willing to do so.

15. The Individual Defendants initially defended their actions by emphatically claiming—in papers before this Court—that Defendant Proton's "sole" business was managing the operations of the joint venture between Swan and Tether. *See* Dkt. 29-1 at 12 ("Proton and the Individual Defendants are working ***only*** for 2040 Energy.") (emphasis added). That representation appears now to be (or always to

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1  have been) false. Indeed, when asked directly if that representation is still true,
2  Defendants refused to answer.

3  16.   9. Swan has now been left with no choice: it has comecomes to this Court
4  to hold Defendants to account for their willful and unlawful misconduct, including
5  trade secret misappropriation, breach of contractual obligations to Swan, conversion,
6  and unfair competition; to immediately stop Defendants from continuing to
7  irreparably harm Swan by possessing and using Swan's stolen proprietary,
8  confidential, and trade secret information; and to recover the enormous economic
9  damages it has lost and the attorneys' fees it has incurred because of Defendants'
10  willful and unlawful theft of

11      Swan's Bitcoin mining business.[1]

12                                    **PARTIES**

13  17.   10. Plaintiff Swan is an industry leadingindustry-leading Bitcoin
14  financial services company that helps individuals and businesses purchase, save, and
15  invest in Bitcoin through its platform, and. Prior to Defendants' scheme, Swan was
16  also a leader in the field of Bitcoin mining. Swan is a Delaware corporation with its
17  headquarters located at 26565 W. Agoura Road, Suite 200, Calabasas, California
18  91302, which is in Los Angeles County in the Central District of California.

19  18.   11. Defendant Proton is a British Virgin Islands Business Company with
20  its headquarters at Trinity Chambers, PO Box 4301, Road Town, Tortola, British
21  Virgin Islands. Its registered agent is Brittney Fahie, SHRM Trustees (BVI) Limited,
22  Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands. On

23

24  _____
[1]  Swan seeks monetary damages in this action only against Defendant Proton. In
25  contracts with Swan, Defendants Furlong, Holmes/Ilios, Monteleone, Naidoo,
     Romualdez, and Vasconcelos agreed to arbitrate claims related to their consulting
26  relationships with Swan. However, those agreements state that Swan may seek
     injunctive relief in court for violations of any agreement regarding intellectual
27  property, confidential information, or noninterference. Swan anticipates pursuing
     additional claims against Defendants Furlong, Holmes/Ilios, Monteleone, Naidoo,
28  Romualdez, and Vasconcelos in arbitration and reserves all rights associated with
     doing so, without waiver.

information and belief, Defendant Holmes founded Proton on August 2, 2024, while residing in California.  While Proton was incorporated in the British Virgin Islands, on information and belief, none of its employees or consultants resides or works in that jurisdiction.  On information and belief, agents of Proton, including the Individual Defendants and former Swan employees, have conducted business on Defendant Proton's behalf under the name "Elektron Energy."[3]

19.    12. Defendant Furlong is a former Investment Director of Swan.  On information and belief, Defendant Furlong resides in Western Australia.  Pursuant to his consulting agreement with Swan, Furlong agreed that, in any lawsuit brought against him related to the services he provided Swan, he would consent to the personal jurisdiction and venue in this District.

20.    13. Defendant Holmes is a the former Head of Business Development of for Swan Mining.  On information and belief, Defendant Holmes resides in Los Angeles, California, which is located in Los Angeles County in the Central District of California.

21.    14. Defendant Ilios is a California corporation with its headquarters located at 664 South Mansfield Avenue, Los Angeles, California 90036, which is located in Los Angeles County in the Central District of California.  Defendant Holmes contracted through Ilios to provide services to Swan.  Pursuant to that consulting agreement, Holmes (on behalf of Ilios) agreed that, in any lawsuit brought related to the services he provided Swan, he would consent to the personal jurisdiction and venue in this District.

22.    15. Defendant Monteleone is a former Investment Analyst of Swan.  On

---

[3] It is unclear, based on information presently available to Swan, whether "Elektron Energy" refers to a separate corporate entity created and managed by the Individual Defendants and former Swan employees or whether Defendant Proton simply does business as "Elektron Energy."  As described below, the Individual Defendants and former Swan employees have sometimes held themselves out to Swan's business partners as agents of an "Elektron Energy," and utilized "elektron-energy.com" email addresses.  Swan expressly reserves the right to add Elektron Energy as a party to this action, as appropriate following discovery.

information and belief, Defendant Monteleone resides in São Paolo, Brazil. Pursuant to his consulting agreement with Swan, Monteleone agreed that, in any lawsuit brought against him related to the services he provided Swan, he would consent to the personal jurisdiction and venue in this District.

23.    16. Defendant Naidoo is a former Investment Director of Swan.  On information and belief, Defendant Naidoo resides in London, United Kingdom. Pursuant to his consulting agreement with Swan, Naidoo agreed that, in any lawsuit brought against him related to the services he provided Swan, he would consent to the personal jurisdiction and venue in this District.

24.    17. Defendant Romualdez is a former Junior Investment Analyst of Swan.  On information and belief, Defendant Romualdez resides in Toronto, Ontario, Canada. Pursuant to his consulting agreement with Swan, Romualdez agreed that, in any lawsuit brought against him related to the services he provided Swan, he would consent to the personal jurisdiction and venue in this District.

25.    18. Defendant Vasconcelos is a former Software Engineer of Swan.  On information and belief, Defendant Vasconcelos resides in Ceilândia, Brazil. Pursuant to his consulting agreement with Swan, Vasconcelos agreed that, in any lawsuit brought against him related to the services he provided Swan, he would consent to the personal jurisdiction and venue in this District.

**JURISDICTION AND VENUE**

26.    19. This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*., and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other claims pleaded herein pursuant to 28 U.S.C. § 1367.

27.    20. This Court has personal jurisdiction over Defendant Furlong pursuant to the forum-selection clause in his consulting agreement with Swan, dated May 21, 2024, through which Furlong irrevocably submitted and "expressly consent[ed] to the personal and exclusive jurisdiction and venue of the state and

-11-

federal courts located in ~~this District.~~Santa Monica, California."  That agreement provides that, while "all controversies, claims or disputes . . .  arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."  In this case, Swan only seeks preliminary injunctive relief against Furlong, and alleges and claims Furlong violated his agreements regarding Swan's intellectual property, confidential information, and noninterference.  On information and belief, at all times when Furlong agreed to commit and did commit the wrongdoing described below, he knew that Swan was located in California.

28.   ~~21.~~ This Court has personal jurisdiction over Defendants Ilios and Holmes because, on information and belief, Holmes resides in California.  Ilios is a California company, headquartered and with its principle place of business in that state.  On information and belief, at all times when Holmes agreed to commit and did commit the wrongdoing described below, he was located in California, and knew that Swan was located in California.  Moreover, pursuant to the forum-selection clause in Ilios's consulting agreement with Swan, dated December 6, 2023, ~~through which~~ Holmes, on behalf of Ilios, irrevocably ~~submitted~~and "expressly consent[ed] to the personal and exclusive jurisdiction and venue of the state and federal courts located in ~~this District.~~ Santa Monica, California."  That agreement provides that, while "all controversies, claims or disputes . . .  arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges

or claims a violation of any agreement regarding intellectual property, confidential information or noninterference." In this case, Swan only seeks preliminary injunctive relief against Ilios and Holmes, and alleges and claims Ilios and Holmes violated their agreement regarding Swan's intellectual property, confidential information, and noninterference.

29. ~~22.~~ This Court has personal jurisdiction over Defendant Monteleone pursuant to the forum-selection clause in his consulting agreement with Swan, dated May 10, 2024, through which Monteleone irrevocably ~~submitted~~and "expressly consent[ed] to the personal and exclusive jurisdiction and venue of the state and federal courts located in ~~this District.~~Santa Monica, California." That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference." In this case, Swan only seeks preliminary injunctive relief against Monteleone, and alleges and claims Monteleone violated his agreements regarding Swan's intellectual property, confidential information, and noninterference. On information and belief, at all times when Monteleone agreed to commit and did commit the wrongdoing described below, he knew that Swan was located in California.

30. ~~23.~~ This Court has personal jurisdiction over Defendant Naidoo pursuant to the forum-selection clause in his consulting agreement with Swan, dated July 26, 2023, through which Naidoo irrevocably ~~submitted~~and "expressly consent[ed] to the personal and exclusive jurisdiction and venue of the state and federal courts located in ~~this District.~~Santa Monica, California." That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from

-13-

Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference." In this case, Swan only seeks preliminary injunctive relief against Naidoo, and alleges and claims Naidoo violated his agreements regarding Swan's intellectual property, confidential information, and noninterference. On information and belief, at all times when Naidoo agreed to commit and did commit the wrongdoing described below, he knew that Swan was located in California.

31. 24. This Court has personal jurisdiction over Defendant Romualdez pursuant to the forum-selection clause in his consulting agreement with Swan, dated December 14, 2023, through which Romualdez irrevocably submitted and "expressly consent[ed] to the personal and exclusive jurisdiction and venue of the state and federal courts located in this District. Santa Monica, California." That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference." In this case, Swan only seeks preliminary injunctive relief against Romualdez, and alleges and claims Romualdez violated his agreements regarding Swan's intellectual property, confidential information, and noninterference. On information and belief, at all times when Romualdez agreed to commit and did commit the wrongdoing described below, he knew that Swan was located in California.

32. 25. This Court has personal jurisdiction over Defendant Vasconcelos

-14-

pursuant to the forum-selection clause in his consulting agreement with Swan, dated September 29, 2023, through which Vasconcelos irrevocably ~~submitted~~and "expressly consent[ed] to the personal and exclusive jurisdiction and venue of the state and federal courts located in ~~this District.~~Santa Monica, California." That agreement provides that, while "all controversies, claims or disputes . . . arising out of, relating to, or resulting from Consultant's consulting or other relationship with [Swan] or the termination of Consultant's consulting or other relationship with [Swan], including any breach of this agreement, shall be subject to binding arbitration pursuant to California law," "any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference." In this case, Swan only seeks preliminary injunctive relief against Vasconcelos, and alleges and claims Vasconcelos violated his agreements regarding Swan's intellectual property, confidential information, and noninterference. On information and belief, at all times when Vasconcelos agreed to commit and did commit the wrongdoing described below, he knew that Swan was located in California.

33.    ~~26.~~This Court has personal jurisdiction over Defendant Proton because Proton has purposefully directed unlawful activities towards California. Proton was formed for the sole purpose of facilitating the theft of Swan's mining business in California while attempting to avoid any scrutiny from United States courts. Proton's employees and agents unlawfully stole Swan's confidential and proprietary information, including trade secrets.~~This was an~~ in California. The scheme to leave for Proton with Swan's confidential information and trade secrets began while Proton's employees and agents were employed by and/or contracted with Swan. As alleged below, and on information and belief, Proton continues to use that confidential information and those trade secrets to this day. These are intentional ~~act that was~~acts expressly aimed at California, the effects of which ~~were~~continue to be felt in California because the stolen confidential and proprietary information were located

-15-

in California, Swan is headquartered in California, and Swan's principal place of business is in California. ~~On information and belief,~~ Proton, through its agents and employees, was aware of these facts~~, and thus~~. At the time the Defendants conspired to and did steal Swan's confidential information and trade secrets, most if not all of Defendant Proton's agents and employees were employees or consultants of Swan, all of whom had signed agreements with Swan that identified Swan's address in Calabasas, CA, and provided for venue in this district.  Defendant Michael "Alex" Holmes—who is Proton's founder, one of its most senior executives, and the ringleader of Defendants' scheme—knew that Swan was headquartered in California and that Swan's Chief Executive Officer resided in California (whose home Holmes has visited).  Thus Proton caused harm that it knew was likely to be suffered in California.

34.    Moreover, on information and belief, Holmes~~, who founded Proton and is one of Proton's senior leaders,~~ resides in California, and was physically located in California during the period in which he formed Proton and, as an agent of Proton, breached his contractual obligations with Swan and made decisions and participated in calls and other communications with respect to the events giving rise to this lawsuit. On information and belief, Defendant Holmes founded Proton on August 2, 2024, from California, just six days before terminating his engagement with Swan and encouraging other former Swan consultants and employees to do the same and to steal Swan's confidential material, and now operates Proton from California.  Swan is unaware of any ties Alex Holmes has to the British Virgin Islands, and is not aware of any Proton employees or consultants—all of whom, on information and belief, are former Swan consultants and employees—who reside or work in that jurisdiction.  It was foreseeable to Proton that the harm to Swan would be inflicted in California. Plaintiffs' claims against Proton arise out of Proton's actions that harmed Swan in California.

35.    ~~27.~~ Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b),

-16-

because a substantial portion of the events giving rise to the claims occurred in this judicial district, the intellectual property that is the subject of this dispute is situated in this judicial district, Defendants Ilios and Holmes reside in this District for purposes of 28 U.S.C. § 1391, and nearly all of the Defendants expressly consented to this venue pursuant to the contract terms excerpted above.

# FACTS

## I.        Bitcoin, the Blockchain, and Bitcoin Mining.

36.     Bitcoin is a decentralized cryptocurrency, invented in 2008. Unlike traditional currencies, Bitcoin can be transferred without relying on third parties like governments or banks. In a traditional banking system, for example, third-party banks act as ledgers, recording customers' debits and credits and verifying that money can move from one account to another. In that system, customers must rely on the bank to approve and verify every payment. By contrast, Bitcoin is based on a decentralized ledger, wherein every transaction in the Bitcoin network is recorded and verified, not by a single entity like a bank, but by tens of thousands of nodes on a network. Anyone in the world can join the Bitcoin network by connecting their computer to the network and tracking transactions in the ledger.

37.     Bitcoin is based on and implemented with several widely used cryptographic tools. One such tool is the hash (sometimes called cryptographic hash). A hash is a digital equivalent of a fingerprint for a piece of data, and is used in a wide variety of cryptographic applications to verify the integrity of that data. The hash of a piece of data is generated by inputting that data into what is called a cryptographic hash function. The generated hash is unique to the input set of data but, critically, cannot be used to reverse engineer the data (even with access to the cryptographic hash function). Generating hashes is foundational to Bitcoin mining.

38.     The tracking of Bitcoin transactions is accomplished through a specialized distributed ledger called a blockchain. The blockchain is implemented as a chronologically ordered list of blocks. Each block contains a hash of the previous

-17-

1  block, thus chaining the blocks together in chronological order.

2  39. Each block contains the record of roughly 2400 Bitcoin transactions.

3  When a Bitcoin user completes a transaction, the transaction is broadcast to other

4  network members with a digital signature (a cryptographic measure to prevent forged

5  transactions). A transaction does not become part of the blockchain until it is

6  successfully added to a block, via a process called "Bitcoin mining."

7  40. Bitcoin mining is the process of adding blocks to the blockchain and, in

8  doing so, verifying and securing Bitcoin transactions. The process is essential to

9  Bitcoin's functioning as a decentralized ledger. The network incentivizes members

10  to verify transactions by holding a "contest" to determine who wins the right to add

11  the next block, and the corresponding transactions, into the blockchain. Miners enter

12  the contest by repeatedly trying different inputs to produce a hash that meets the

13  network's difficulty target, validating transactions and securing the blockchain in the

14  process. The winning miner receives fees from the added transactions and is issued

15  Bitcoin as a reward.[4] A new block is added (and thus a new "contest" happens)

16  roughly every ten minutes.

17  41. The contest is essentially a lottery, that miners expend significant time

18  and resources entering. The faster a miner can produce more hashes (*i.e.*, the higher

19  the "hash-rate"), the more entries they have in each ten-minute lottery, and the more

20  likely they are to win the contest. Once the winning hash is submitted, other Bitcoin

21  users will add the block corresponding to the winning hash to their blockchain ledgers

22  and the contest begins again.

23  42. While the basic method for generating hashes is known to anyone

24  seeking to mine Bitcoin, the many complex strategies for mining Bitcoin effectively

25

26  [4] The amount of Bitcoin issued to a winning miner decreases over time.
Approximately every four years, the amount of Bitcoin generated is halved. At
27  present, a winning miner receives 3.125 Bitcoin. That amount will be the payout until
the next "Bitcoin halving," which is expected to be in 2028. This built-in mechanism
28  to decrease the supply of Bitcoin acts as a pressure on the price of Bitcoin.

-18-

(and profitably) are not, and require much more than simply plugging in a computer and producing hashes. Mining is extremely expensive and requires deep expertise, as well as data-driven testing, to participate profitably at scale. Miners use application-specific integrated circuits ("ASICs"), specialized computerized devices used for the sole purpose of mining. In addition to the cost of these machines, Bitcoin mining consumes significant amounts of energy, and mining operations must be constantly monitored to ensure efficient energy use, to prevent the equipment from overheating, and to optimize the deployed equipment. The more computational resources an operation has, the higher its chances to secure Bitcoin through the contest. Minimizing electricity costs means that with a given amount of money, one can do more mining, generate higher output, and achieve greater profitability. If energy and mining operations are not managed efficiently, the hardware, electricity and other costs necessary for Bitcoin mining can exceed the value of the mined Bitcoin.

43.    Bitcoin miners also often work together in mining "pools"—groups of miners who share their computing power over a network. When one miner in the pool generates a winning hash, all miners in the pool are rewarded based on the amount of hashing power each contributes.. Mining pools help make revenue for miners more predictable in what is an extremely volatile market.

44.    Given the high costs of entry, intense competition, and volatile market conditions, companies that mine Bitcoin generally operate on thin profit margins. Small gains in cost or energy efficiency are crucial to securing an edge over competitors, maximizing profits, and weathering swings and crunches in the market.

45.    If done well, however, Bitcoin mining can be extremely lucrative. The value of a single Bitcoin on the date of this filing (January 27, 2025) is approximately $100,000 (up from approximately $63,000 when this action was first filed on September 25, 2024). At the current market rate, the 3.125 Bitcoin awarded with the creation of each new block equates to over $300,000 awarded to miners *every ten minutes*.

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**II.**     ~~I.~~ **Entrepreneurs Cory Klippsten and Yan Pritzker Found Swan.**

46.     ~~28.~~ Cory Klippsten founded Electric Solidus, LLC—what is now Electric Solidus, Inc., doing business as Swan Bitcoin—in June 2019, with Yan Pritzker joining the ~~Company~~company later that year.

47.     ~~29.~~ Klippsten, Swan's Chief Executive Officer, has always been passionate about technology.  Before receiving an MBA from the University of Chicago, Klippsten worked at Microsoft and Morgan Stanley, and later worked at ~~Google and McKinsey~~McKinsey and Google.  Klippsten entered the world of early-stage tech in 2013 as an investor and advisor to venture-backed startups, experiencing significant success.  He began deep research into Bitcoin in 2017, resulting in a desire to shift all of his professional efforts toward promoting adoption of the currency. Klippsten is a partner, investor, and advisor of multiple Bitcoin-focused venture capital firms, and over the years has served as an investor and advisor to more than 60 ~~early stage~~early-stage tech companies.  ~~He originally founded Electric Solidus, LLC (now Electric Solidus, Inc. d/b/a Swan Bitcoin) as a Bitcoin gifting service; its first product was called "GiveBitcoin."~~

48.     ~~30.~~ Pritzker, Swan's Chief Technology Officer, is a ~~serial~~ tech entrepreneur and ~~remains~~founder of multiple successful software start-ups.  He has over two decades of experience in software development and product direction, and is one of the most trusted authorities on Bitcoin.

49.     ~~31.~~ The last startup Pritzker co-founded, Reverb, was sold to Etsy in 2019. ~~He then~~ That same year, he authored "*Inventing Bitcoin*," an introductory text for persons new to Bitcoin.  Pritzker's chapters explaining Bitcoin mining are oft-praised and shared by industry insiders.  Bitcoin represents much more to Pritzker than an online currency; it represents freedom.  Pritzker grew up in the Soviet Union, where prices were fixed, capital was controlled, and the economy failed to supply basic goods.   Those experiences spurred his interest in Bitcoin as a portable, decentralized currency.

50. 32. In January 2020, Klippsten and Pritzker rebranded the Company company as Swan Bitcoin and set out to offer customers a truly user-focused product that combined Klippsten's passion for Bitcoin and expertise for in building tech companies with Pritzker's engineering experience and deep knowledge and belief in the currency.  Over the next few years, Klippsten and Pritzker grew Swan into an industry-leading industry-leading Bitcoin financial services company that educates and helps individuals, businesses, and retail traders purchase, save, and invest in Bitcoin and related products and services through an accessible and user-friendly interface with lauded client service.

51. Today, Swan has over ███████████████████████████████.  Bitcoin worth more than ██████████ has been purchased through Swan, and Swan currently has about ██████████ assets under management ("AUM").

**III. II. Swan BUILDS Establishes a Successful Bitcoin Mining Business Built on Extensive Confidential, Proprietary Material that Swan Developed.**

52. 33. After several years of success, Swan planned to pursue opportunities in the Bitcoin "mining" space to further supplement its Bitcoin financial services business.  Klippsten and Prizker Pritzker had served as Board Advisors for Riot Platforms, a Bitcoin mining and digital infrastructure company, from 2019 through 2022, and shared a keen interest in playing a role in the mining space over time. They had monitored and grown familiar with the industry, which they felt was largely filled with companies who were either unable to scale their Bitcoin mining operations or otherwise failing to develop business at potential mining sites. Swan created a new "Institutional" division in January 2023, with a primary focus on developing financial services for investors and operators in Bitcoin mining.

34. Bitcoin mining is the computerized process by which individuals and entities verify and secure Bitcoin transactions and obtain Bitcoin. Unlike traditional currencies, Bitcoin can be transferred between people or computers without relying

on trusted third parties like governments or banks. In a traditional banking system, for example, third-party banks act as ledgers, recording customers' debits and credits and verifying that money can move from one account to another. In that system, customers must rely on the bank to approve and verify every payment. But Bitcoin is based on a decentralized ledger, wherein every transaction in the Bitcoin network is recorded and verified, not by a single entity like a bank, but by hundreds of thousands of members on a network. Anyone in the world can join the Bitcoin network by connecting their computer to the network and tracking transactions in the ledger.

35. For this network to function, members must verify the transactions. Bitcoin incentivizes network members to verify transactions by holding a "contest" to determine (a) who wins the right to enter these transactions into the ledger and (b) who has the chance to obtain new Bitcoin. Each "miner" seeking to participate attempts to solve a puzzle on the network. Every ten minutes, one miner is chosen at random and that miner wins the right to record all Bitcoin transactions into the decentralized ledger that took place since the last contest. That miner also gets to present its solution to the puzzle, and, if it provides the correct answer, the miner announces that answer to the rest of the network along with the input the miner used and the transactions it has recorded. If the miner completes this full process correctly, it is paid a fee, and the transactions it has announced are called a "block." Every other computer on the Bitcoin network validates the block by confirming that the solution to the puzzle is correct, that the block does not contain any invalid transactions, and that the history within it does not conflict with prior blocks. Those computers then all write the block into their copy of the ledger, appending it into the existing chain of blocks, producing a "blockchain." The successful miner gets the Bitcoins on the block, and the process repeats ten minutes later.

36. Bitcoin mining can be extremely lucrative; the value of a single Bitcoin on the date of this filing (September 25, 2024) is approximately $63,000. But

-22-

1  mining is also extremely expensive and requires deep expertise, as well as data-
2  driven testing  through trial and error, to participate profitably at scale. Mining
3  requires highly advanced computers that are specially designed to continuously run
4  the computations needed to enter the "contest" multiple times. In addition to the cost
5  of these machines, Bitcoin mining consumes significant amounts of energy, and
6  mining operations must be constantly monitored to ensure efficient energy use,
7  prevent overheating of the equipment, and optimize the equipment deployed. The
8  more computers an operation has (and therefore, the more energy it uses), the higher
9  its chances to secure Bitcoin through the contest. Lower electricity cost means more
10  mining, higher output, and greater profitability. If this energy and the mining
11  operations are not managed efficiently, the hardware, electricity and other costs
12  associated with Bitcoin mining can easily exceed the value of the mined Bitcoin.

13      53.    37. To start Swan's Bitcoin mining business, it brought on several of the
14  largest Bitcoin miners as sponsors of its Pacific Bitcoin conferences in November
15  2022 and October 2023, and of Swan's media properties from 2022 to the present. In
16  May 2023,  Swan had begun planning what would become an incredibly
17  successfulalso hosted a "VIP Mining Industry VIP event the day prior to its Pacific
18  BitcoinDay" at its annual conference in October 2023. With the addition, attended by
19  CEOs and senior executives of most of the top 10 mining companies, along with
20  numerous Wall Street bankers and analysts.  With the hiring of Guilherme Gomes
21  (laterwho eventually became Swan's President, and was previously employed by Ray
22  Dalio's famed investment manager Bridgewater) in May 2022 and Raphael Zagury
23  (laterwho eventually became Swan's Chief Investment Officer), and was previously
24  a long-tenured Wall Street investment banker) in December 2022, Swan began
25  planning in earnest to serve large Bitcoin miners in early 2023 as clients of its Swan
26  Institutional unit.

27      54.    38. On June 1, 2023, Klippsten learned of the DAMEa Bitcoin mining
28  site in Tasmania, Australia, from a Swan employee who had invested in the project in

-23-

2021. At the time, the site was operated by an Australian-based Bitcoin mining company, DAME. Klippsten immediately recognized the project's DAME site's great potential: to build a large new Bitcoin mining operation site in a jurisdiction with a favorable regulatory and financing regime and extremely low energy costs. That evening, Klippsten mentioned the company site to his friend Defendant Holmes, who told Klippsten that he was aware of the company DAME and that he was working to secure a Series A round of funding for DAME the site. Klippsten and Holmes agreed that Swan would work to source investment for the deal fundraise.

55. 39. Early the next day, Klippsten spoke with Giancarlo Devasini of Tether, a cryptocurrency company, early the next day and they agreed that Tether would provide funding for Swan to expand operations at the site, with Swan managing the mining investment. Swan and Tether, through Tether's subsidiary Zettahash Inc., entered into a joint venture (along with a third-party individual who originally helped to facilitate the relationship) known as 2040 Energy (a reference to the jersey numbers of Klippsten's favorite basketball players, Gary Payton and Shawn Kemp), which would govern the arrangement at that site, as memorialized in a Shareholders Agreement dated July 28, 2023. With years of experience and contacts in the Bitcoin industry, and now a foothold deal and a financial backer, the Swan team quickly set about exploring additional opportunities in the mining space.

56. 40. Within a month, Swan was aggressively purchasing as many Bitcoin mining machines as it could find, and it through a new initiative it named "Project Corner" (as in, "corner the market"). After analyzing and researching potential locations to deploy those machines—including assessing what types of and how many machines to deploy where, and modeling deployment scenarios to maximize electricity gains—Swan began contracting with host sites to plug them in and start mining. Defendant Holmes consulted to Swan for the sourcing of both machines and

1    sites.[25]

2    57. 41. Swan also started hiring and building out its mining team—, who
3    would manage the day-to-day operations at mining sites. Those interested and
4    working in the Bitcoin space ("Bitcoiners") were eager to join—the Swan brand was
5    highly respected and the CompanySwan had established itself as a trusted authority
6    on Bitcoin and among the most desirable places to work in the industry. Job postings
7    for Swan often resulted inattracted hundreds of applications from highly qualified
8    individuals both inside and outside of the industry, heavily aided by Swan's
9    ownership of the dominant Bitcoin industry job board, Bitcoinerjobs.com (created by
10    Klippsten in 2021).

11    58. 42. Swan's then-Chief Investment Officer, Raphael Zagury, also was at
12    the forefront of the operation. Swan had originally hired Zagury in December 2022,
13    and he served on the Company'sSwan's executive team. As Chief Investment
14    Officer, Zagury believed Swan could grow its investment in Bitcoin mining
15    substantially.

16    59. 43. In July 2023, Zagury started managing the Tasmanian mining
17    operations for Swan, and Swan's mining team grew from approximately five to twelve
18    dedicated employees and independent contractors—eventually including Vice
19    President of Institutional Operations & Research Brett Hiley, Financial Controller
20    Tyler Effertz, Technical Researcher Kartheek Sola, and Staff Accountant Aleksander
21    Dozic, and consultants (and other individual Defendants) Investment Director
22    Thomas Patrick Furlong, Special Situations Analyst Santhiran Naidoo, Investment
23    Analyst Rafael Dias Monteleone, Junior Investment Analyst Enrique Romualdez,
24    and Software Engineer Lucas Vasconcelos. Defendant Holmes consulted (Operating
25    Manager) through his personal company, Defendant Ilios, and Swan retained

26

27    [2 5] Swan and Holmes would negotiate and reduce to writing their relationship with a
      consulting agreement Defendant Holmes signed on behalf of his personal company
28    Defendant Ilios before the end of the year that included backpay.

Maxwell Berg, of MB Law LLC, to serve as Swan's external Associate General
Counsel tasked with assisting in various corporate and commercial matters. Swan's
executive team, including CEO Klippsten, then-President Gomes, and then-General
Counsel Bill Belitsky also oversaw the new mining team.

60. 44. At the same time, Swan built out the proprietary aspects of its
business and mining operations that would distinguish the Company Swan from its
competitors.[6]

61. *First*, Swan developed, utilized, and refined methods to rapidly
investigate and identify potential mining sites. Few locations offer even the potential
for a successful Bitcoin mining datacenter. In the mining industry, it is not uncommon
to take months or longer to identify even *one* site with realistic potential, followed by
even more time to negotiate the necessary agreements to operate. Swan grew its
overall mining capacity and hash-rate at an unprecedent rate because ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

62. 45. *First,* Swan also spent significant time and money developing its
Bitcoin Network Operating Center ("BNOC"), a complex proprietary platform for
managing mining data and analytics. ████████████████████

────────────────────
[6] Swan will further identify the specific trade secrets that it has reason to believe
Defendants misappropriated in a trade secret identification statement pursuant to the
Court's January 7, 2025 Order Setting Scheduling Conference. *See* Dkt. 95 at 6-7.

-26-



1 ███████████████████████████████████████

2 ███████████████████████████████████████

3 ███████████████████████████████████████

4 ███████████ ~~It can provide a real time detailed look into mining operations and~~

5 ~~can quickly pinpoint problems.~~ advantageous relationships with vendors that it

6 contracted with to service its mining sites, building upon its existing strong reputation

7 in the Bitcoin community. ████████████████████

8 ███████████████████████████████████████

9 ███████████████████████████████████████

10 ████████████████████████████████

11 ~~46. Swan developed and owns BNOC, quickly making the Company an~~

12 ~~industry leader in Bitcoin mining in two primary ways:~~ ██████████████

13 ████████████████████████████████████

14 ████████████████████████████████████

15 ██████████████████████████████████

16 ████████████████████████████████████

17 ██████

18     63.    Swan derived value from keeping the methods and processes it uses to

19 identify and qualify potential mining sites secret in several ways. First, Swan's ability

20 to intelligently select sites at which to run mining operations carried immense value

21 and represented a competitive advantage to Swan.    Each site enabled Swan to

22 effectively mine Bitcoin and contributed to Swan's overall growth and success in the

23 Bitcoin mining industry.  If others knew of the sites that Swan learned of, and how

24 Swan identified and qualified those sites, others could have competed with Swan to

25 set up mining operations at those sites, which may have forced Swan to execute less

26 favorable agreements at those sites or caused Swan to lose sites altogether to its

27 competitors.

28     64.  ~~47. Second,~~ Swan developed~~,~~ through extensive testing~~,~~ proprietary

1  hash-rate optimization techniques for Bitcoin mining.[a] ██████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████

8  65. ████████████████████████████████████

9  ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████

14 66. ~~48. Swan's~~ Swan also developed techniques related to "overclocking and

15 underclocking" ~~methods are one of these techniques~~ its Bitcoin-mining machines.

16 "Overclocking and underclocking" refers to specialized procedures that safely alter

17 the performance of mining hardware to optimize its power beyond manufacturer

18 specifications, without compromising stability. ████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████ — Giancarlo Devasini of Tether

22 recognized that Swan's overclocking methods were unique and held significant value,

23 describing the results of those methods to others as "amazing."

24 67. Swan also rigorously tested and documented analysis of various cooling

25 techniques. Heat is a significant byproduct of Bitcoin mining. As such, mining

26 centers require significant efforts to keep facilities cool. ████████████████

27 ─────────────────

28 [a]  ~~"Hash-rate" refers to the computational power of mining hardware, measured by the number of calculations ("hashes") it performs per second.~~

-28-

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 █████████████████████████████

4     68.    <u>Other optimization techniques include</u> ███████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7 ████████████████████████████████████████

8 ████████████████████████████████████████

9 ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████  ████

13     <u>69.</u>    ~~49.~~  ***Third***, Swan <u>also</u> developed proprietary financial modeling, data

14 analytics, and financial monitoring tools. ████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ███████████ ~~marketing~~ █████████████████

18 ~~analyze market trends~~ ███████████████████

19     <u>70.</u>    <u>All of these techniques and methods were proprietary to Swan as it had</u>

20 <u>uniquely developed them through its own extensive and non-public experimentation,</u>

21 <u>analysis, and testing.</u>

22     <u>71.</u>    <u>Swan maintained comprehensive spreadsheets and other documentation</u>

23 <u>detailing its use of these techniques, as exemplified by the following screenshots of</u>

24 <u>documents that the Defendants and their conspirators stole prior to their resignation</u>

25 <u>from Swan.</u>

26

27 ~~⁴  A mining "pool" is a group of cooperating miners who agree to share the fees and~~
~~new Bitcoin associated with winning a "block," as outlined in paragraph 35 above.~~

28 ~~Swan and other Bitcoin miners at times enter into these pools with other miners.~~

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

72.    Swan derived value from keeping these optimization techniques and modeling methods secret.  Each of these optimizations, individually and especially when used in tandem, enabled Swan to tailor its operational decisions to the unique circumstances of each mining site.  These optimizations provided Swan with a competitive edge and helped Swan to grow its overall hash rate relative to other competing miners

73.    **Fourth**, Swan spent significant time and money developing and writing the source code for its Bitcoin Network Operating Center (as above, "BNOC"), a complex proprietary platform for managing mining data and analytics.  Swan decided to develop its own platform after concluding that no comparable platform was commercially available.  ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████  The future product roadmap for BNOC prior to the resignation of the conspirators included significant input from current and former Swan employees.

-33-

74.    As reflected in exemplary screenshots from BNOC's interface, the scope of the software's analytical tools are expansive:



AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



75.    BNOC provides a real-time, detailed look into Swan's mining operations, allowing Swan to quickly pinpoint problems, make necessary corrections or optimizations, and ensure profitability.

76.    Swan developed and owns BNOC, which was created by Swan employees and consultants, and named by Klippsten. BNOC quickly made Swan an industry leader in Bitcoin mining in two primary ways:

77.    BNOC was sufficiently valuable that Giancarlo Devasini, Tether's Chief Financial Officer, repeatedly expressed his keen interest in acquiring Swan's BNOC technology, telling others in as early as November 2023 that he (Devasini) "couldn't stop looking at it," saying "***I want to own this***."    Devasini viewed the platform's dashboard constantly.[7]    Praising BNOC, Devasini juxtaposed the comprehensive nature of Swan's tool with Tether's other Bitcoin mining experiences, noting that one mining company Tether had funded provided updates regarding mining activity via just one spreadsheet cell of information per day.

78.    Indeed, Raphael Zagury, one of Swan's former employees who helped lead the raid of Swan's mining business and is now the CEO of Proton, said of BNOC shortly after its initial deployment in January 2024: "We've developed a whole new tool just for analytics called B:NOC.  Best in class according to everyone who saw it (a group that includes Bitcoin developers, public miners and others)."  Zagury also

---

[7] Swan provided Tether with access to the BNOC ***interface***, subject to a confidentiality agreement that required Tether to keep any information it received through that platform confidential.  Swan never provided Tether with BNOC's underlying source code or other under-the-hood functionalities.

stressed the importance of keeping BNOC confidential to Swan, saying "***We need to be super careful on what we share externally***." He concluded his message by reiterating: "***FINALLY ⚠ just being a bit repetitive but it's important to say again: KEEP EVERYTHING ABOUT SWAN MINING internal only.***" Consistent with that, while Swan occasionally showed outsiders aspects of the BNOC interface, Swan would only reveal Swan's actual mining data subject to confidentiality agreements, and never shared the source code.

79. Swan derived value from keeping BNOC's data and source code secret. BNOC enabled Swan to grow its hash-rate in a cost-effective manner, including by ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████ These monitoring and testing capabilities gave Swan an advantage over its competitors. If competitors had access to BNOC's capabilities and data, they would be able to mine Bitcoin more effectively, and therefore reduce Swan's hash-rate share of the overall Bitcoin network, thus lowering the amount of Bitcoin Swan could mine (and, in turn, the profits from Swan's mining operations).

80. All of these techniques were developed by Swan employees and consultants for Swan, while those employees and consultants were employed or engaged by Swan, and within the scope of their employment or consultancy.

81. Indeed, prior to stealing Swan's mining business, the Individual Defendants and their co-conspirators frequently referred to the techniques, methods, software, and other intellectual property that Swan developed—including BNOC—as belonging to Swan.

82.     For example, on November 9, 2023, Swan's then-CIO Zagury referred to BNOC in internal Swan messages over Slack as "our [Swan's] proprietary analytics tool that gives realtime data on our mining sites."



83.     As another example, on January 4, 2024, when onboarding Defendant Romualdez to Swan, Zagury introduced BNOC to Romualdez as "our mining dashboard," providing Romualdez with login credentials to his Swan-issued email address:



Swan's efforts to make a cheaper and faster operation—and Swan maintaining its methods as secret—paid dividends, setting it apart from others in the industry. As Zagury put it in a Slack message on January 9, 2024: "Swan deployed hash rate faster than any other company in Bitcoin. We can show that in numbers. It's a killer metric that speaks volumes on the power of our brand and people." Indeed, as laid out in contemporary Swan documents from June 2024—mere months before the Defendants stole Swan's mining business—Swan's unique approach to Bitcoin mining drove unmatched growth in its mining operations:

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



84.    Swan fleet efficiency was an impressively low <span style="background-color: yellow">████████</span>██, soundly  beating  other  efficiencies  published  by  major  competitors,  whose  rates ranged from 25 to 38 Joules per terahash.   As a result, while these same mining competitors often saw mining costs of more than $50,000 per Bitcoin, Swan's costs

-39-

1    were closer to ████████████.

2    85.    As a result of Swan's techniques, efficiency, and ability to scale, the

3    company controlled over 1.44% of total **global** Bitcoin hash rate as of April 2024.  In

4    the first half of 2024, Swan generated ██████████████████████

5    ████████ from its mining operations alone.  This degree of success was only

6    possible with the competitive edge that Swan gained from keeping its proprietary

7    methods and tools confidential, as summarized above.

8    86.    By July 2024, Swan had developed and was managing ██ mining sites

9    worldwide, ███████████████████████████████████

10    ████████████████    Swan's rapid ability to scale its mining

11    operations from virtually nothing to match or exceed more-established competitors'

12    mining capacity in less than a year was unheard of in the industry.

13    87.    Indeed, in June 2024, as Swan began the process of raising investment

14    through a Series C fundraising round, Swan tasked Zagury (its then-Chief Investment

15    Officer) with determining the value of Swan's mining business.  As reflected in Slack

16    messages from Zagury to Swan in early June, Zagury valued Swan's share of its

17    mining operations at over ████████    He repeatedly emphasized the accuracy of

18    that projection ("It's the right number") and even suggested that number *undervalued*

19    Swan's mining business: "This exercise made me even more bullish. ████ is low."

20    88.    Given his position at Swan, Zagury also engaged directly with potential

21    investors, including taking on a role in Swan's direct negotiations with Tether,

22    meeting several times in June and July with Zach Lyons (a founder and principal of

23    Marlin Capital Partners, Tether's investment manager) to negotiate fundraising from

24    Tether.  Validating Zagury's assessment of Swan's potential profitability, on June 28,

25    2024, Lyons and Tether confirmed to Swan that Tether was offering to lead Swan's

26    Series C fundraising round with a $25 million investment that would value Swan's

27    business at $1 billion.

28

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## IV.    The Individual Defendants Contract to Provide Services to Swan.

89.    Each of the Individual Defendants contracted with Swan to provide consulting services, pursuant to substantially similar consulting agreements (the "Consulting Agreements").

90.    Defendant Naidoo entered into a Consulting Agreement with Swan on July 26, 2023.  *See* Ex. A.  Naidoo agreed to act as a Special Situations Analyst for Swan, responsible for, among other things, monitoring and evaluating the performance of Bitcoin mining operations.

91.    Defendant Vasconcelos entered into a Consulting Agreement with Swan on October 1, 2023.  *See* Ex. B.  Vasconcelos agreed to act as a Software Engineer for Swan.

92.    Defendant Holmes entered into a Consulting Agreement with Swan on December 6, 2023, on behalf of Defendant Ilios, the entity through which Defendant Holmes contracted to provide his consulting services.  *See* Ex. C.  Holmes agreed to provide Swan with a variety of services related to the company's mining operations. Recognizing that Defendant Holmes's engagement with the company had begun earlier that year, Swan agreed to pay, and did pay, Defendant Holmes backpay retroactive to July 1, 2023.

93.    Defendant Romualdez entered into a Consulting Agreement with Swan on December 14, 2023.  *See* Ex. D.  Romualdez agreed to act as a Junior Investment Analyst for Swan, responsible for, among other things, monitoring and evaluating the performance of Bitcoin mining operations.

94.    Defendant Monteleone entered into a Consulting Agreement with Swan on May 13, 2024.  *See* Ex. E.  Monteleone agreed to act as an Investment Analyst for Swan, and provide Swan with a variety of services related to the company's mining operations, including monitoring and assessing Swan's Bitcoin mining sites and developing tools and metrics to assess site performance, pinpoint potential bottlenecks, and streamline the mining process for enhanced efficiency.

-41-

95.     Defendant Furlong entered into a Consulting Agreement with Swan on May 21, 2024.  *See* Ex. F.  Furlong agreed to act as an Investment Director for Swan, and provide Swan with a variety of services related to the company's mining operations.

96.     Each of the Individual Defendants also agreed under his consulting agreement that any inventions or trade secrets he purportedly developed while working for Swan would be Swan's property:

> ***Assignment of Inventions***.  Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement, including Services provided to the Company before the date hereof, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "Inventions"), are the sole property of the Company.[8]

97.     The Individual Defendants also agreed in their consulting agreements to provide prior written notice if, during the course of their consultancies, they incorporated any inventions, trade secrets, or other proprietary information or intellectual property owned by the consultant into their work for Swan.  None ever did so.

98.     Other Swan employees and consultants working on Swan's mining team—including those that conspired with the Individual Defendants to steal Swan's mining business—signed agreements containing similar provisions.

**V.** ~~III.~~ **Swan Protects the Secrecy of Its Proprietary Information.**

99.     ~~50.~~ To protect the competitive advantage Swan's proprietary and trade

---

[8]  *See* Exs. A-F (Section 3(A)).

secret mining information conferred on its business, Swan's mining employees and consultants (including each of the individual Defendants) agreed to hold all of Swan's confidential and proprietary information and trade secrets in the strictest confidence.

100. 51. Defendants Furlong, Holmes (on behalf of Defendant Ilios), Monteleone, Naidoo, Romualdez, and Vasconcelos specifically agreed in their consulting agreements that:

> During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use of disclosure of Confidential Information,[5][9] and Consultant will not (i) use the Confidential Information for any purposes whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) subject to Consultant's right to engage in Protected Activity (as defined below [*i.e.*, filing a charge with the Government]), disclose the Confidential Information to any third party without the prior written consent of an authorized representative of the Company, except that Consultant may disclose Confidential Information to the extent compelled by applicable law; provided however, prior to such disclosure, Consultant shall provide prior written notice to [the] Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing,

---

[5][9] "Confidential Information" is defined as "any information (including any and all combinations of individual items of information) that relates to the actual or anticipated business and/or products, research or development of the Company, its affiliates or subsidiaries, or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment or other property of [the] Company, its affiliates or subsidiaries." "Confidential Information" does not include information that was publicly available through no wrongful act of the consultant or was independently developed "with no reference to the Confidential Information." Defendant Ilios's consulting agreement also excludes from the definition of "Confidential Information" "all of Consultant's involvement, relationship, and dealings with Daniel Tuzzio [], and all of Tuzzio's affiliated entities, whether in existence prior to or after the Effective Date" of the Agreement. Tuzzio was a preexisting business associate of Defendant Holmes who Swan and Holmes agreed would perform services for Swan through Holmes.

-43-

Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party.  Consultant agrees that Consultant's obligations under this Section [] shall continue after the termination of this Agreement.[6][10]

101.  52. Swan also reiterated the necessity of maintaining the confidentiality of Swan's information to its consultants in its "Contractor Playbook," which it provides to all consultants and contractors, including the Individual Defendants.  The Contractor Playbook explains that "[i]t is crucial to maintain confidentiality regarding company information and client discussions."  The Contractor Playbook directs consultants and contractors to "assume anything Swan-related is confidential – including company, employee/contractor/staff, and client information." ( Swan's "Employee Playbook" contains similar guidance.)

102.  53. To bolster these protections, Swan also supplemented the mining employeeemployee and contractor agreements with a robust infrastructure of agreements, policies, and technological safeguards to maintain the secrecy of its confidential and proprietary information and trade secrets.

103.  54. Swan's Information Security Policy, for example, "ensures that Swan's information assets are properly identified, recorded, and afforded suitable security measures at all times."  The Policy provides that access to Swan documents must be limited to the "most restrictive level possible that still enables the user to perform their job effectively," explains that "[e]mployees and contractors are required to maintain the confidentiality of information to them by Swan, its customers, and suppliers," and cautions that "[u]nauthorized use or distribution of proprietary information violates  Swan's Policy and may be illegal and result in civil and/or

---

[6][10] *See* Exs. A-F to the Declaration of Cory Klippsten in Support of Plaintiff's Ex Parte Application for Temporary Restraining Order Without Notice, Evidence Preservation and Limited Seizure Order, Expedited Discovery Order, Protective Order, and OSC re: Preliminary Injunction ("Klippsten Decl."), filed concurrently.

criminal penalties." It identifies seventeen activities that are "strictly prohibited, with no exceptions," including:

- Violations of the rights of any person or company protected by copyright, trade secret, patent, or other intellectual property, or similar laws or regulations. . . .

- Accessing data, a server, or an account for any purpose other than conducting Swan Bitcoin business, even if you have authorized access; and

- Providing information about or lists of Swan Bitcoin employees, contractors, partners, or customers to parties outside Swan Bitcoin without authorization.

104. 55. Swan's Security Agents Policy also requires two security applications to be present "on all devices that interact with Swan or company-wide data," which the Policy advises "is crucial for ensuring the integrity and protection of our Swan assets." One application "is used in enforcing Swan security policies . . . contributing significantly to the overall security posture of [Swan's] systems." The other application "serves as an additional layer of defense, boosting [Swan's] cybersecurity measures to safeguard against external threats."

105. 56. And toTo access the system that houses Swan's confidential and proprietary information and trade secrets, Swan's mining employees and consultants must enter a password that must meet certain complexity requirements, as well as engage in a multi factormulti-factor authentication process that requires the user to successfully present multiple pieces of evidence to prove their identity.

106. Swan also engages a third-party "white hat" hacker service provider to identify potential vulnerabilities in Swan's cybersecurity infrastructure that outside actors might seek to exploit, so that Swan can secure those vulnerabilities before malicious actors find them. The security protections surrounding BNOC are among the cybersecurity infrastructure that vendor analyzes.

-45-

107.  57. Swan undertook even further protections for BNOC, securely storing the software code on a developer platform called GitHub and restricting access to authorized users with valid credentials.  To access BNOC, Swan's Information Security team must approve access for specific Swan personnel.  In accordance with Swan's policies, the Information Security team tightly restricts permissions to access BNOC, limited to only those personnel who are directly involved in managing BNOC (such as software developers, security engineers, and platform engineers).  Even for personnel with permissions to access GitHub, users must first access Swan's suite of software tools by entering a unique username to which Swan grants rights to access the code.  Users must then correctly enter an SSH Key, a secure, cryptographic key pair used to access remote servers withoutin a manner that is even more secure than using a password, before they can access Swan's code.  Swan took further steps to protect BNOC through ███████████████████████████████████████████████████████████████.

108.  Like Swan's employment and consultant agreements, the 2040 Energy Shareholders Agreement with Tether contains a broad confidentiality provision, which provides that: ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**VI.    IV. Swan FORMSExpands 2040 Energy, a Financing Arrangement to Raise Capital for Bitcoin Mining.**

109.    58. To fulfillAs alleged above, to support Swan's goal of expanding further into the Bitcoin mining industry, Klippsten had contacted Tether about providing capital for a mining project with DAME.  Tether had invested in Swan before under the namethrough an entity named "BFX Ventures Limited."   The funding arrangement that Tether and Swan ultimately entered into regarding DAME was called 2040 Energy.

59. On July 28, 2023, Swan and Tether, through Tether's subsidiary Zettahash Inc., entered into a Shareholders Agreement (along with a third party individual who originally helped to facilitate the relationship) that would govern the arrangement — known as 2040 Energy.

110.    Swan's successful operation of the DAME site served as early proof that Swan's site-selection strategies could be used to source and quickly develop successful mining operations elsewhere.  Swan used those techniques to identify and evaluate mining sites that showed potential for success.  After Swan identified such sites, it frequently prepared confidential memoranda for Tether to solicit funding to develop those sites.  Tether opted to fund some sites and declined to fund others, not unlike how a venture capital firm might selectively choose to invest in potential portfolio companies.  Tether was under no obligation to provide funding for Swan's proposals, and Swan was under no obligation to provide Tether with those proposals.

111.    60. The parties used 2040 Energy was a funding vehicle; itas a special purpose investment vehicle—i.e., a "Venture Capital"-style funding arrangement whereby funds would be used for specific investment opportunities.  2040 Energy did not contract with employees or consultants, and Swan was solely responsible for managing the mining operations funded under 2040 Energy.  Swan's mining employees and consultants operated—who entered into contractual agreements with Swan, not 2040 Energy—managed mining operations for 2040 Energy projects and

-47-

engaged with business vendors and partners (including equipment vendors and datacenter mining hosts) using the Swan brand. Klippsten served as 2040 Energy's CEO (as well as Swan's CEO), overseeing Swan's mining team and operations. Swan consultants and employees managed all aspects of those operations, negotiating agreements with potential mining sites and third-party vendors, and monitoring and directing operations at those sites.

112. 61. Tether funded 2040 Energy investment opportunities identified by Swan and ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

62. Like Swan's employment and consultant agreements, the 2040 Energy Shareholders Agreement contains a broad confidentiality provision, which provides that: ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

113. ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ███████████████████

3   114.   Swan's employees and consultants engaged with the mining sites Swan

4 managed under Swan's brand, in their capacities as Swan employees or consultants.

5 Vendors and site operators frequently referred to Swan's consultants and employees

6 as the "Swan team," or similar.  Tether did as well, with Devasini repeatedly referring

7 to the mining operations as "Swan's" mining strategy and team.

8 **VII.**  ~~V.~~  **The Defendants Plot to Steal Swan's Business, Confidential and Proprietary Information, and Trade Secrets.**

10   115.   ~~63.  By~~  By ~~2024, 2040 Energy mining was a runaway success by any~~

11 ~~measure. On information and belief, 2040 Energy's value had soared. By~~ July 2024,

12 Swan's hard work had expanded its mining operation's capacity to just under twelve

13 exahashes, meaning that it was performing nearly twelve quintillion computations per

14 second to ensure secure processing of transactions on the Bitcoin network. ~~By July~~

15 ~~2024, 2040 Energy~~ —and to put it in the best position to obtain Bitcoin "rewards" as

16 a result.  Swan was mining approximately one of every fifty Bitcoins worldwide and

17 Swan and Tether were discussing plans to expand the mining operation's capacity to

18 30 exahashes by the end of 2024.  Tether CFO Devasini told Klippsten on multiple

19 occasions that ~~in his opinion~~ Devasini believed Swan was the best mining company

20 and Klippsten was the best CEO in the space.

21   116.   ~~64. By~~ With Swan's mining operation growing, by February 2024, Tether

22 and Swan had agreed in principle to enter into a new funding agreement, known as

23 2140 Energy, which would further invest in the Tasmania site and other Bitcoin

24 mining opportunities.   The terms the parties negotiated for 2140 Energy were

25 markedly more favorable to Swan, and granted Swan a greater share of the profits

26 from the mining operations, more quickly, than Swan received under the 2040 Energy

27 arrangement.

28   117.   ~~65. But before the 2140 Energy deal was finalized~~ Although Tether and

-49-

Swan continued to engage in their joint venture throughout 2024 based on their agreed-upon terms for 2140 Energy, before they committed their agreement to a signed contract, Defendants and their other Swan conspirators[7.1] decided to enrich themselves at Swan's expense. They hatched a plan to steal Swan's mining business from the inside, usurp Swan's role, and cut Swan out from the Tether joint venture. They dubbed ittheir plan "rain and hellfire."

118. 66. Upon information and belief, Defendants and their Swan conspirators'co-conspirators executed their "rain and hellfire" plan by: (a) downloading all of Swan's confidential and proprietary business information and trade secrets necessary to operate aSwan's Bitcoin mining business, including BNOC source code and other material they would need to operate 2040 Energya competing mining business; (b) creating a new company, Defendant Proton, which Swan's then-CIO Zagury would operate as CEO with Swan's then-Investment Director Defendant Naidoo as CIO, and which would employ other Defendants and Swan conspirators; and (c) soliciting "legal cover" from Tether to claim that Swan—following their departure—could no longer manage mining for 2040 Energy, push Swan out of its funding agreementjoint venture with Tether, and insert Defendant Proton as Swan's replacement. Throughout this process, the Individual Defendants were no longer acting for Swan's benefit; they were acting exclusively for Proton as its agents, in order to enrich Proton and the other Defendants at Swan's expense.

119. 67. Swan did not uncover the "rain and hellfire" plan until it was

---

[7] These[11] Defendants' conspirators constituted nearly all of Swan's mining personnel, including Raphael Zagury (Swan's then-Chief Investment Officer), Bill Belitsky (Swan's then- General Counsel), Brett Hiley (Swan's then-Vice President of Institutional Operations & Research), Tyler Effertz (Swan's then-Financial Controller), Kartheek Sola (Swan's then-Technical Researcher), and Aleksander Dozic (Swan's then-Accountant). Swan is not pursuing claims against them Those conspirators are not defendants in this action because their agreements with Swan provided for—unlike the Individual Defendants' Consulting Agreements—provide for a different dispute resolution procedures outside this Courtprocedure. Swan anticipatesis currently pursuing claims against thesethose individuals pursuant to the procedures provided byconsistent with their agreements.

1   ~~blindsided by~~after the individual Defendants and ~~Swan~~their conspirators blindsided

2   Swan with their coordinated resignations on August ~~8   9~~8-9, 2024. ~~In the weeks~~

3   ~~following~~ Since that time, Swan ~~has been~~was able to retrieve and review electronic

4   data and forensic activity logs associated with departing employees' and consultants'

5   accounts and reconstruct at least some of their treachery. ~~Those logs   —~~though Swan

6   continues to learn new to this day, and much of the story and relevant evidence

7   remains in Defendants' sole possession.  The logs that Swan has been able to recover

8   show that Swan's former employees and consultants—including Zagury, Defendant

9   Furlong, Defendant Monteleone, Defendant Naidoo, Hiley, and Dozic—accessed,

10  downloaded, and collectively took large volumes of Swan's confidential and

11  proprietary information and trade secrets in the weeks and days preceding their

12  coordinated resignations, without Swan's knowledge and in violation of their Swan

13  contracts and Swan's policies.  They did so at least by exporting that information to

14  personal devices, sharing files with non-Swan email accounts, and absconding with

15  their Swan-issued laptops.

16      120.   ~~68.~~Swan was also able to review electronic communications—including

17  emails and ~~Zoom~~video call logs—from Defendants' and the other ~~Swan~~ conspirators'

18  business accounts, together with detailed notes they kept and saved to the Swan

19  system as they made plans to implement their conspiracy.  While Swan's investigation

20  is ongoing, this much is now clear:

21      ~~69. Beginning in June 2024, Swan began the process of raising investment~~

22  ~~into Electric Solidus Inc. through a Series C fundraising round.~~

23      121.   ~~70.~~In late June 2024, and unbeknownst to Swan, Zagury secretly met

24  with ~~Tether's~~ outside counsel for Tether and 2040 Energy at the EAST Miami hotel.

25  ~~Shortly thereafter, Zagury drafted a sham document entitled "Cory Thoughts," which~~

26  ~~included a poison pill recommendation to Swan's CEO to focus solely on~~ Swan's

27  mining business and ~~to split off the other aspects of its Bitcoin business, including~~

28  ~~Swan's original financial services.~~ Zagury did not relay any details from that meeting

-51-

1    to Swan, even though he was a Swan officer and owed fiduciary duties to Swan. Swan
2    only learned of the meeting after Zagury's sudden resignation, as part of Swan's
3    investigation into Zagury's messaging and calendar history.

4        71. On June 28, 2024, Zach Lyons (a founder and principal of Marlin Capital
5    Partners, one of Tether's advisors) told Swan that Tether was offering to lead
6    Swan's Series C fundraising round with a $25 million investment that would value
7    Swan's business at $1 billion.

8        122.    72. On Meanwhile, on July 23, 2024, Zagury relayed privately to Swan's
9    then-President, Guilherme Gomes, a summary of a discussion Zagury had with Lyons,
10    explaining that Lyons apparently believed Swan's Bitcoin mining business was "in a
11    good position" and was "crushing it," while the remainder of Swan's business
12    (including its financial services operation with approximately 170 of employees) was
13    "a venture capital bet." Zagury (while he was employed as an executive (CIO) with
14    Swan) also told Gomes that Lyons "thinks it is the right [decision] now" to spin
15    Swan's mining business off as an independent entity." Zagury then floated the
16    Defendants' and Swan conspirators' double-cross—he discussed with Gomes the
17    possibility of forming a new company that would replace Swan as the operator of
18    2040 Energy. Zagury would be the new company's CEO, Swan's then-
19    Investment then-Investment Director Naidoo would be the COO, and Defendant
20    Holmes would be the Head of Operations and Procurement.: "It's easy. I [Zagury]
21    keep playing. I would be CEO. [Defendant] San [Naidoo] could be the COO,
22    [Defendant Michael] Alex [Holmes] the head of operations and procurement." Under
23    this proposed arrangement, after the Defendants usurped Swan's mining operations,
24    Tether would receive 50% of profits from their continued mining operations, the
25    Defendants and their co-conspirators would receive 40%, and Swan's share would be
26    reduced to 10%. Of course, Zagury, the Defendants, and the other conspirators knew
27    that simply swapping out Swan for Proton as the manager and operator of 2040
28    Energy's mining operations would destroy 2040 Energy's mining business, because

-52-

for Proton to independently develop a mining operation comparable to Swan's would require years of work—if Proton could achieve it at all.  And so a central part of Defendants' plot was to steal Swan's confidential information and trade secrets and deploy it for Proton.  Defendants ultimately opted to steal Swan's mining business outright, and cut Swan out entirely.

123. 73. On July 11, 2024, Zagury and Defendant Naidoo met with Lyons to plot an "unwind" of Swan's involvement in 2040 Energy. Lyons' motivation is laid bare in. According to Zagury's contemporaneous notes of this meeting. He said that Swan had "no value" to Tether and, the group discussed the possibility of certain Swan employees and consultants leaving Swan and going to Tether or another operator to "[k]eep doing what [they're] doing."  Lyons told Zagury and Defendant Naidoo that Klippsten "has to realize they [Tether] can take away [Swan's mining business] tomorrow."

74. On July 12, 2024, Zagury sent Klippsten what Zagury claimed were "recommendations" based on a document he had initially drafted on June 28, 2024, including that Swan focus solely on mining —i.e., the only aspect of Swan's business that would advance the Defendants' new business interests.

75. On July 15, 2024, Zagury spoke with Lyons. During the meeting, Zagury messaged to Gomes the prospect of suing Swan and forcing a wind down of Swan's business unless Swan agreed with Tether to accept "wind down capital," force Klippsten to resign as CEO of Swan, and turn over Swan's mining business to Tether.

76. Around that same time, Zagury tried to sow dissent and chaos at Swan, undermine Klippsten, and influence Swan's employees and consultants to leave Swan. He repeatedly told Klippsten and other Swan employees and consultants that Tether was planning to pull out of the new arrangement, sue Swan based on supposed breaches of the 2040 Energy Shareholders Agreement, and renege on an offer it had made to invest in Swan in a separate, ongoing round of fundraising. On

-53-

1  information and belief, Zagury did so because he knew that he, Defendants, and
2  other Swan conspirators would replace Swan in operating 2040 Energy if they
3  successfully obtained Swan's confidential and proprietary material and the trade
4  secrets and enough Swan employees and/or contractors.

5      124.  77. Zagury and Tether CFO Devasini met on July 20, 2024.  Later that
6  day, Zagury told Klippsten —who was under the misimpression that Zagury was
7  acting consistent with his fiduciary obligations to Swan—that Devasini wanted to
8  appoint Zagury as a board member of 2040 Energy (ostensibly for Swan) and transfer
9  custody of 2040 Energy's Bitcoins to an account controlled by Zagury.  Zagury also
10  contacted members of Swan's Board of Directors—who also did not know Zagury
11  was a double-agent—and recommended that they agree to givesell Swan's mining
12  business to Tether at a significantly lower valuation than a valuation Tether had
13  proposed weeks earlier.  That valuation was also considerably lower than the
14  valuation that Zagury himself gave Swan's mining business before his meetings with
15  Lyons in June.

16      125.  78. On information and belief, Defendant Holmes, Defendant Naidoo,
17  Zagury, and Lyons met again on Zoom on July 27, 2024. On information and belief,
18  the purpose of the meeting was to discuss (i) how Defendant Holmes, Defendant
19  Naidoo, and Zagury (with others inside Swan) would steal Swan's confidential
20  information and trade secrets; so they could use them for Proton; (ii) the simultaneous
21  resignations of virtually all Swan employees and contractors servicing the mining
22  business;, so that Swan would not learn of Defendants' scheme until it was too late;
23  (iii) Defendant Holmes' formation of a new entity (Defendant Proton) on whose
24  behalf Defendants would execute their scheme; and (iv) how 2040 Energy would
25  retain that new entity to take over thehave Proton, armed with Swan's confidential
26  information and trade secrets that Defendants stole, take over 2040 Energy's
27  operations of 2040 Energy from Swan.

28      126.  On information and belief, while Defendant Holmes, Defendant Naidoo,

Zagury, and Lyons planned the details of their heist, they simultaneously began reaching out to other Swan consultants and employees to recruit them into the scheme. The Individual Defendants and their conspirators appear to have taken steps to conceal these communications from Swan, including by using ephemeral messaging applications or discussing issues over non-written channels of communication.  For example, on July 21, 2024, Defendant Naidoo sent Defendant Romualdez a message over Slack, asking him, "Can you send me your signal number please."  Signal is an encrypted messaging application that can automatically delete messages after they are read.  On information and belief, Defendants were communicating about their scheme on Signal or by other methods whereby relevant evidence would be destroyed, even though they fully anticipated—and expressly discussed—the likelihood of litigation arising from their scheme.  Romualdez responded by providing his Signal contact number.  Two days later, Naidoo messaged Romualdez again over Slack, asking, "you doing ok? anything i can help with?"  Romualdez replied, "Doing good man - battle ready haha.  How about you?"  Naidoo responded, "trying to be chilled… trying to just work," then "big picture still in place."

127.   79.  Contemporaneous notes from meetings between Zagury, Defendant Alex Holmes, Defendant Naidoo, then-Swan General Counsel Belitsky, and then-Swan outside counsel Berg (MB Law LLC) detail Defendants' and their conspirators' resultant "rain and hellfire" scheme on behalf of Proton to "bring the heat" and through a "staged walk out" that would "blow everything up" at Swan.

From: raphael@swanbitcoin.com
Subject: Call with Bill, Max, Alex, San
Date: To: August 6, 2024 at 03:08

— — — — —
Better together or Alex leaves first?
. Send list of points
. Post - termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.
Tether needs to send default notice.
— —
Team is getting to a point where is getting untenable. Bill is being put at risk. Dangerous to team to stay around. Team resignation and move with Tether needs to be on tandem. Fortress is looming.
Last week you said you'd unleash hell on this guy.
. Alex leaves
. Breach
. Proton is assigned manager of 2040 assets
. All communications go to new management company
. ROFR gone if Alex resigns
. Written communications. Alex terminated his agreement. We don't need a board resolution.
. Bring the heat
. Giancarlo side convs. ?
Bill took himself out of Fortress situation. Cory interrogating him now. Trying to ruin Rapha's reputation. Sling a lot of shit. 10% will stick.
They cannot go and say we didn't do it by the book.
Rain and hell fire needs to start. Needs to be an exit, not a nice transaction.
███████████ is moot when Alex leaves. Already moot now. Double covered the second Alex leaves.
Bill interrogated if anyone asked him to join mining.
— — — — — —
> 10% deposit to Taras
Status of Proton - update - formed, formalizing docs.

**VIII.** ~~VI.~~ **The Defendants Execute Their Scheme.**

128. ~~80.~~ As July turned into August, the Defendants and the Swan conspirators executed on their "rain and hellfire" plan. They kept all of this secret from Swan, leaving Swan to piece things together after Defendants were already out the door.

129. ~~81.~~ On July 25, 2024, Defendant Monteleone downloaded a component of Swan's BNOC source code ("bnoc-cron") within GitHub.

130. ~~82.~~ On July 29, 2024, Defendant Proton, through an agent, filed a document in the British Virgin Islands seeking to reserve the name "Proton Management" for a new corporation. On information and belief, Defendant Holmes caused this document to be filed from California.

131. On July 30, 2024, the website domain "Elektron-Energy.com" was registered. On information and belief, one or more of the Individual Defendants caused that domain name to be registered.

132. ~~83. On~~ Also on July 30, 2024, Defendant Monteleone added a "personal access token" labeled "Elektron" to his GitHub account, as reflected in emails sent to Monteleone's Swan email account. That personal access token provided access to Swan's GitHub source code files to an entity or individual with access to that "Elektron" token. That same day, Defendant Monteleone downloaded a copy of Swan's BNOC core mining dashboard source code and, prior to August 8, 2024, exfiltrated this proprietary source code into a source code repository outside of Swan's systems, in violation of Swan policy.

133. ~~84.~~ Also on July 30, 2024, Swan's then-Vice President of Institutional Operations & Research Hiley downloaded approximately 319 documents from Swan's Google Drive. This included, for example, highly confidential monthly mining performance data, data related to mining inventory, operations and machine performance and configuration by site, meeting notes, and Swan policies and procedures. Of particular note, Hiley downloaded a log of weekly reports to Klippsten

-57-

that provide in-depthin-depth analysis and details about all of Swan's mining sites and operations.  The specific files that Hiley downloaded on July 30, 2024 included but were not limited to (i) hundreds of documents reflecting operational processes and comprehensive day-to-day details across Swan's mining sites; (ii) documents reflecting Swan internal mining testing results (*e.g.*, "████████████████"); and (iii) Swan internal mining policies and procedures (*e.g.*, "████████████████████ ████████████████████████████████████████████████████" "████████████████████████████████████████████ ████").

134. 85. On August 2, 2024, Defendant Proton, through an agent, filed a Certification of Incorporation in the British Virgin Islands.  On information and belief, Defendant Holmes caused this document to be filed. from California.  On information and belief, Proton's senior management in the lead-up to and at the time of the conspirators' coordinated theft of Swan's information consisted almost if not entirely of some combination of Defendant Holmes, Defendant Naidoo, Zagury, and potentially other of their conspirators.

135. 86. During the first week of August, Zagury, on behalf of Proton, exported data off Swan's "Notion" platform, an internal tool for recording business and operational data.    That data included confidential business information concerning ongoing deals with a Swan partner.

136. 87. That same week, Defendant Naidoo and Defendant Furlong, tooalso on behalf of Proton, downloaded numerous documents from Swan's Google Drive. Defendant Naidoo downloaded, for example, 47 documents, including highly confidential monthly mining performance data, proprietary financial records, contracts, and earnings reports. One of the documents that Defendant Naidoo downloaded is a "██████████████" spreadsheet that houses all Swan's proprietary information related to its hash-rate optimization techniques.:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

137. 88. Also that same week, Defendant Furlong, on behalf of Proton, downloaded roughly 100 documents, including modeling files containing proprietary formulas and logic that support Swan's BNOC, which on information and belief, he would not have downloaded had no legitimate reason to download in connection with his day-to- day day-to-day role at Swan.

138. 89. On August 4, 2024, Zagury, on behalf of Proton, cloned (*i.e.*, downloaded) all of Swan's BNOC source code from GitHub. When Zagury did so, he utilized an SSH key[12] with a different hash, indicating that he was downloading the data to a device other than his Swan laptop.

139. 90. And between August 6-8, 2024, Zagury, on behalf of Proton, downloaded approximately 1,750 files from Swan's computer systems to an external hard drive named "G-Tech External HDD." These files included, for example, Swan's proprietary financial records, strategic development records, contracts, term sheets, Bitcoin mining operating models, Bitcoin wallet information regarding Swan and its partners within 2040 Energy, Slack communications, email correspondence and attachments, and Bitcoin code. Zagury, on behalf of Proton, also downloaded the "█████████" spreadsheet that houses all contains information related to many of Swan's proprietary hash-rate optimization techniques information. This mass download also included virtually all of the email messages stored in Zagury's Swan email account, which included extensive correspondence between Swan's mining team, on the one hand, and third-party vendors and mining site operators, on the other hand, much of which would have included extensive confidential details regarding Swan's management of site operations. Zagury, on behalf of Proton, downloaded an additional 15 files on August 7 and 8 from Swan's Google Drive.

140. 91. August 8, 2024 was the culmination of Defendants' and their Swan

---

[12] An SSH key is a secure, cryptographic key pair used for authentication in Secure Shell (SSH) protocol connections. SSH keys are an alternative to password-based logins, providing stronger security by utilizing public-key cryptography.

1  conspirators' efforts up to that point.

2      141. 92. That morning, Defendant Holmes, Defendant Monteleone,

3  Defendant Naidoo, then Swan Junior Investment Analyst Defendant Romualdez,

4  Zagury, Belitsky, Berg, then Swan Staff Accountant Dozie, and Lyons met on Zoom

5  for several hours Lyons, and Zagury spent the morning of August 8, 2024, on

6  videoconference calls amongst themselves, other Individual Defendants, and their co-

7  conspirators.  On information and belief, they coordinated the culmination of their

8  plan to continue pilfering final steps of stealing Swan's trade secrets and confidential

9  information; resign resigning from Swan *en masse*; and pivot to inserting Defendant

10  Proton to complete the takeover of take over Swan's mining business and its place

11  with within 2040 Energy.

12      142.  Specifically, the conspirators conferred over the course of two video

13  calls, the first of which began at approximately 4:10 a.m.[13]

14      *First Call* – August 8, 2024, 4:10 a.m. – 7:55 a.m.

15      ▪  4:10 a.m. – Defendant Naidoo and Zagury begin call.

16      ▪  4:45 a.m. – Marlin Capital's Zachary Lyons joins.

17      ▪  5:10 a.m. – Lyons leaves.

18      ▪  5:45 a.m. – Swan's then-outside counsel Max Berg joins.

19      ▪  5:56 a.m. – Swan's then-General Counsel Belitsky joins.

20      ▪  6:30 a.m. – Defendant Alex Holmes joins.

21      ▪  7:02 a.m. – Berg leaves.

22      ▪  7:17 a.m. – Belitsky leaves.

23      ▪  7:23 a.m. – Defendant Furlong joins.

24      ▪  7:44 a.m. – Defendant Furlong leaves.

25      ▪  7:55 a.m. – Defendant Holmes, Defendant Naidoo, and Zagury end call.

26      143.  Defendant Holmes, Defendant Naidoo, Lyons, and Zagury reconvened

27  _____

[13]  Throughout, all times refer to Pacific Standard Time and are approximate, unless
28  otherwise noted.

at approximately 8:40 a.m.  One-by-one, and in close succession, almost all of the remaining conspirators joined and left that call.

*Second Call* – August 8, 2024, 8:40 a.m. – 10:20 a.m.

- 8:40 a.m. – Defendants Holmes and Naidoo, Lyons, and Zagury begin call.
- 8:46 a.m. – Defendant Naidoo and Lyons leave call.
- 8:52 a.m. – Swan Financial Controller Effertz joins.
- 9:18 a.m. – Effertz leaves.
- 9:19 a.m. – Swan Staff Accountant Dozic joins.
- 9:39 a.m. – Dozic leaves.
- 9:41 a.m. – Swan Technical Researcher Kartheek Sola joins.
- 9:52 a.m. – Sola leaves.
- 9:54 a.m. – Defendant Monteleone joins.[14]
- 10:14 a.m. – Defendant Monteleone leaves.
- 10:20 a.m. – Defendant Holmes and Zagury end call.

144.   On information and belief, Defendants ~~Furlong and~~ Vasconcelos and Romualdez were part of this group and were actively involved in Defendants' schemes and misappropriation.  All told, these calls lasted over five hours, as illustrated below:

---

[14]  Swan's call logs identify this participant as "Rafael."  On information and belief, "Rafael" refers to Defendant Monteleone.  Similarly, the logs discussed above identify a "Tom" and "Karl"; Swan believes those names refer to Defendant Furlong and Kartheek Sola, respectively.



145. ~~93. Sometime that day, Dozic downloaded~~Approximately twenty minutes after speaking with Defendant Naidoo and Zagury, Dozic, on behalf of Proton, began downloading approximately 616 files to an external hard drive named "\Device\HarddiskVolume 7\~~.~~"~~.~~" These files included, for example, economic modeling related to Swan's mining and general business operations, Swan budgets, general ledgers, customer invoices related to Bitcoin mining, mining inventories, contracts, Bitcoin wallet information regarding Swan and its partners within 2040 Energy, energy reports, banking information, and ~~earnings~~"Earnings and BTC Distribution" reports broken down by individual mining sites.

146. ~~94.~~ Later that day, Dozic, on behalf of Proton, also downloaded a document off Swan's Notion's platform entitled "Invoice and Payments Tracker," which includes Swan's confidential and proprietary customer and pricing information.

147. ~~95.~~ That same day, Defendant Monteleone, on behalf of Proton,

1   duplicated Swan's BNOC source code and exfiltrated it to the GitHub organization,
2   "elektron-tech," and a repository named "nxt" that is unassociated with Swan.
3   Evidencing this theft, Defendant Monteleone received an alert from his GitHub
4   account to his Swan work email address that day, informing him of an error in
5   building a version of BNOC software that appeared identical to Swan's, indicating
6   that Swan's BNOC source code had been cloned and stolen. Defendant Monteleone
7   duplicated Swan's code and exfiltrated it to the GitHub organization, "elektron-tech,"
8   and repository named "nxt" unassociated with Swan.  When he realized that alerts of
9   his suspicious GitHub activity were being sent to a Swan email address, Defendant
10  Monteleone immediately took action to remove his Swan work email address from
11  his GitHub account to evade further detection.  Four minutes after the first alert,
12  GitHub sent another alert to Defendant Monteleone's Swan work email address
13  confirming he had removed his Swan work email address from his GitHub account.

14      148.   All told, the Individual Defendants and their conspirators, all on behalf
15  of Proton, collectively downloaded thousands of files in their last weeks with Swan—
16  right up to hours before they left—without any legitimate business reasons to do so.
17  Indeed, these downloads represented massive spikes compared to the conspirators'
18  previous download activity.

19
20
21
22
23
24
25
26
27
28

-64-

1    149.    For example, all of Hiley's downloads from Swan's Google Drive
2    between June 1 through his resignation on August 8 occurred on July 30. On that day,
3
4
5
6
7
8
9
10
11
12
13
14    he downloaded ***319 files*** from Swan's Google Drive:



15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

150.    Similarly, all of Dozic's downloads from Swan's Google Drive from June 1 through his resignation occurred in August, as shown below:

151.    The documents Defendants stole include:





AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL



22    Exhibit G includes a listing of the files that Swan currently has reason to believe

23    Defendants and their conspirators stole prior to their resignations.[15]

24

25    _____

26    [15]  This list reflects files that the conspirators either downloaded from Swan's Google Drive systems or exported to non-Swan devices or accounts in the lead-up to their resignations.  In many cases, the conspirators downloaded multiple copies of the same file.  Several files—such as the "████████████████" file referenced above—were downloaded by multiple conspirators.  Exhibit G removes these two categories of duplicate files.  This exhibit also does not include the entire set of over 1,750 files that Zagury exported to an external hard drive between August 6 and August 8, as that set

152.   The conspirators stole Swan's confidential and proprietary information and trade secrets on behalf of Proton, and solely for the purpose of using Swan's information for Defendant Proton's benefit—which they immediately began doing after their resignations, as described below.

153.   96. After the conspirators securedWith Swan's confidential and proprietary information and trade secrets, Defendant in hand, Defendants started resigning.  At 3:32 p.m. on August 8, Alex Holmes (for his personal company Defendant Ilios) sent a notice of resignation fromto Swan and.  Meanwhile, Zagury began drafting his own notice of resignation.

154.   97. Defendant Holmes also tried to manufacture a cover-up to their preexisting scheme   heof Defendants' long-planned scheme, as he, Defendant Naidoo, and other Swan conspirators had discussed during their planning calls.  Alex Holmes wrote Zagury and Defendant Naidoo,: "I want to let you both know that I have made the decision to terminate my contractor agreement with Swan, effective as of an hour ago.  I am in the process of making arrangements to manage the fleet that we have built together and want you both with me."  Holmes was trying to create a falsified paper trail that he was notifying Zagury and Naidoo of his resignation for the first time in this letter, when in fact they had all been conspiring on this subject for weeks.  Zagury sent his notice of resignation from Swan approximately eight minutes after Defendant Holmes sent his message, and Defendant Naidoo sent a notice of resignation approximately one minute laterafter that.

155.   98. Shortly thereafter, Defendant Holmes sent a message to Defendant Furlong, Defendant Monteleone, Defendant Romualdez, Defendant Vasconcelos, Belitsky, Berg, Dozic, Effertz, Hiley, and Sola stating that "Arrangements are under way" for a new entity (the already existing and long-discussed Defendant Proton) and "I don't expect us to skip a beat."  The message further stated that Zagury and

includes apparently all of Zagury's Swan email account.  Exhibit G thus understates the scope of Defendants' theft of Swan information.

1  Defendant Naidoo would be joining Defendant Holmes at the new entity.

2       156.  99. With that assurance, the Swan conspirators sent quick-succession

3  notices of resignation—something they surely had planned and discussed during their

4  hours-long marathon video call earlier that morning:

5       • Enrique Romualdez: Aug. 8, 2024, 5:25 p.m. "*Immediate*

6         *Resignation Notice: Enrique Romualdez*"

7       • Aleksander Dozic: Aug. 8, 2024, 6:31 p.m5:31 p.m., "*Resignation*

8         *Notice*"

9       • Rafael Monteleone: Aug. 8, 2024, 6:43 p.m5:43 p.m.,

10        "*Resignation Notice*"

11      • Katheek Sola: Aug. 8, 2024, 6:53 p.m5:53 p.m., "*Official*

12        *resignation*"

13      • Brett Hiley: Aug. 8, 2024, 7:26 p.m6:26 p.m., "*Letter of*

14        *Resignation – Brett Hiley*"

15      • Lucas Vasconcelos: Aug. 8, 2024, 7:35 p.m6:35 p.m.,

16        "*Resignation Notice: Lucas Vasconcelos*"

17      • Max Berg: Aug. 8, 2024, 7:51 p.m6:51 p.m., "*MB Law LLC –*

18        *Termination of Representation*"

19      • Tom Furlong: Aug. 8, 2024, 8:18 p.m7:18 p.m., "*Resignation*

20        *notice*"

21      • Enrique Romualdez: Aug. 8, 2024, 8:25 p.m., "*Immediate Resignation*

22        *Notice: Enrique Romualdez*"

23      • Tyler Effertz: Aug. 8, 2024, 9:25 p.m8:25 p.m., "*Notice of*

24        *Resignation – Tyler Effertz – 8/9/24*"

25      • Bill Belitsky: Aug. 9, 2024, 9:14 a.m8:14 a.m., "*Resignation*

26        *Notice*"

27      157. On information and belief, Defendants Furlong, Romualdez,

28  Monteleone, and Vasconcelos, as well as Effertz, and other Swan conspirators, began

-69-

1  ~~working~~immediately accepted formal positions to work with Defendants Holmes and
2  Naidoo for Defendant Proton~~.~~—although all of them had been working on Proton's
3  behalf throughout their scheme.  All told, based on Swan's current understanding and
4  belief, each of the 13 consultants and employees who engaged in the coordinated
5  resignations now works for Defendant Proton.

6        158.  ~~100.~~Early on August 9, 2024, within three hours of the final conspirator
7  sending his resignation email to Swan,  Tether's counsel sent an unprompted (and
8  ~~self- serving~~self-serving) email to Swan saying that "I understand that most or all of
9  the Swan Mining employees have resigned this morning.  I have spoken with Tether
10  and confirmed that these former employees were not encouraged to resign and have
11  no existing arrangements with Tether."  Of course, this was false, given that
12  contemporaneous call notes and other records show that the Defendants had been
13  coordinating with Tether all along.

14        159.  ~~101.~~Also on August 9, 2024, as the Defendants and Swan conspirators
15  had planned ~~and~~, on information and belief ~~orchestrated~~, Tether's counsel served upon
16  Swan's counsel a carefully timed and detailed "███████████████," ~~dated~~
17  ~~that same day,~~baselessly claiming ████████████████████████
18  ████████████ This was, evidently, the first step of the planned "legal cover"
19  ████████████████████████████████████████
20  ████████████that Defendants knew they would need—and receive—from Tether
21  for their "expos[ure]" on "Confidentiality and IP."  Tether's "████████████
22  ████" was a sham.  For example, ████████████████████████
23  ████████████████████████████████████████
24  ████████████████████████████████████████
25  ████████████████████████████████████████
26  ████████████████████████████████████████ Of
27  course, no such assurances would be necessary had Defendants and ~~the Swan~~their
28  conspirators not been conspiring for weeks to coordinate ~~the~~their theft and mass

-70-

resignation less than a day prior.

160. ~~102.~~ On August 12, 2024, Klippsten was forced to resign as CEO of 2040 Energy because it was clear Swan (his company) was being pushed out of that funding arrangement~~;~~, and that ████████████████████████████████████ ████████████████████████ ~~; and based on his conclusion that Devasini and van der Velde,~~ ██████████████████████ ~~, had played a role in stealing Swan's mining team and business and were not acting in good faith.~~ ████ ███████████

161. ~~103.~~ Also on August 12, 2024, Tether's counsel sent Swan ███████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████

162. ~~104.~~ In that August 12, 2024 notice, Tether's counsel wrote further: "████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████" With that, as Swan would later learn, Defendants' and the Swan conspirators' coup was complete—Defendant Proton, created by Defendant Holmes, and led by CEO Zagury and CIO Defendant Naidoo had created an illegal facsimile of Swan's Bitcoin mining business using the reams of information and relationships they stole from Swan, rather than create their own legitimate business.

163. ~~105.~~ As a further result of Defendants' "rain and hellfire" plan, Swan's plans for a Series C fundraising round and an IPO were scuttled. Because Swan was ~~unable to count on the 2040 Energy continued funding relationship for Bitcoin~~ kicked out and shut off from its mining operation, it was forced to withdraw its Series C

1   round and go back to the market several weeks later seeking investment at a much

2   lower valuation.

3   ~~106. Swan is still~~ in the market ~~seeking funding for its Series C fundraising~~

4   ~~round.~~

5   **IX.** ~~VII.~~ **Swan Investigates, Tries to Mitigate Disruption, and Reserves**

6        **Rights.**~~.~~

7        164. ~~107.~~ Swan acted quickly to assert its rights and protect the ability of 2040

8   Energy to conduct its mining business, mindful that Klippsten was still formally a

9   director of 2040 Energy and that Swan may still technically own a stake in the venture.

10       165. ~~108.~~ On August 13, 2024, Swan, through counsel, responded to

11  ~~the~~ Tether's manufactured August 9 ████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19       166. ~~109.~~ Also on August 13, 2024, Swan demanded that Defendants Holmes

20  and Romualdez, along with Swan conspirators Zagury, Belitsky, Dozic, Effertz,

21  Hiley, and Sola, return their Company-issued laptops and equipment to Swan ~~as~~. To

22  facilitate their consultancies and employment with Swan, Swan purchased and issued

23  company laptops for each of the Individual Defendants and their conspirators to use

24  for the purposes of performing services for Swan. Each was required by their

25  individual employment or consulting agreements to return those laptops upon

26

27  ~~*. Swan does not currently bring this lawsuit against Tether or its subsidiary~~
    ~~Zettahash while Swan continues to investigate their precise involvement, but Swan~~

28  ~~reserves its rights to do so without waiver.~~

-72-

termination of their work for Swan. Defendant Holmes' agreement (through Defendant Ilios), for instance, provided that:

> Upon the termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically[] stored information and passwords to access such property, [certain records,] and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.[9][16]

To date, not a single Individual Defendant has returned his Swan laptop. None were returned.[10]

110. On August 14, 2024, Tether's counsel responded to Swan's letter, requesting that Swan provide information concerning ██████████ ███████████████████████████████████████████████ █████████████████████████.

111. Although Klippsten had been forced to resign from his position as CEO of 2040 Energy, he believed he had fiduciary duties to the entity from his position as a director. While Swan was sorting out whether the Shareholders Agreement was still in effect, Swan knew it also technically had a number of obligations to 2040 Energy under the Shareholders Agreement. And Swan understood Defendants were still collecting ammunition for Tether to use to sue Swan under the Shareholders Agreement to deflect from their wrongdoing. Swan also was exploring its legal options.

---

[9][16] The other individual Defendants' agreements are identical, *see* Klippsten Decl. Exs. A-F, with one exception—Defendant Ilios's Agreement excludes from the definition of "Confidential Information" "all of Consultant's involvement, relationship, and dealings with Daniel Tuzzio [], and all of Tuzzio's affiliated entities, whether in existence prior to or after the Effective Date" of the Agreement. Id. Ex. B. Tuzzio was a preexisting business associate of Defendant Holmes whom Swan and Holmes agreed would perform services for Swan through Holmes.

[10] Defendant Romualdez responded with his address, but then fell silent (and his laptop was not returned with subsequent requests).

-73-

112. Accordingly, on August 19, 2024, Swan (through counsel) described to Tether's counsel ███████████████████████████████ while retaining all rights to pursue any claims Swan may have at law or in equity." Swan reiterated that, ████████████ ████████████████████████. ████████████████████████ ████████████████████████ It reserved all rights and stated clearly that Defendant "Proton Management is using intellectual property Proton's employees stole from Swan before resigning their positions with Swan," and requested "that the board of 2040 immediately notify [Defendant] Proton Management to seek proper licenses to any intellectual property that may belong to Swan." Neither 2040 Energy nor Defendant Proton ever did so.

167. ~~113.~~ On August 22, 2024, and again on August 27, 2024, Swan repeated its request that Defendants Holmes and Romualdez, along with Swan conspirators Zagury, Belitsky, Dozic, Effertz, Hiley, and Sola, return their ~~Company issued~~Swan-issued laptops and equipment to Swan as required by their individual employment or consulting agreements. It made the same request of Defendants Furlong, Monteleone, Naidoo, and Vasconcelos. Again, none did so.

168. ~~114.~~ At the same time, Swan continued to investigate the former-Swan personnel's departures and conspiracy with the Defendants. As a GitHub member, Swan is able to view obscured versions of private activity on GitHub, including that of its former employees and contractors, including the former Swan conspirators. Defendant Monteleone (username: RDMEC), Defendant Vasconcelos (username: lucasvm8), and Zagury (username: pxsocs) ~~have been~~were highly active on GitHub following their resignations from Swan, during the weeks of August and September 2024, as indicated by the concentration of bright green dots in each GitHub account's "heat map":

1  *Screenshot of Defendant Monteleone's GitHub activity (as of September 2024)*







*Screenshot of Defendant Vasconcelos's GitHub activity (as of September 2024)*

169.   Zagury's contribution activity in particular indicates that he ~~has been~~was more active on GitHub in August than the preceding months when he was a Swan employee.







*Screenshot of Zagury's GitHub activity (as of September 2024)*

170. —On information and belief, Defendant Monteleone, Defendant Vasconcelos, and Zagury's high GitHub activity levels following their resignations of Swan ~~are~~were the result of their continued access to and use of Swan's BNOC.[17]

171. ~~115.~~On September 13, 2024, Tether's counsel proposed written resolutions of the Board of Directors of 2040 Energy ████████████ ████, nominally asking for Klippsten's review and approval as a director.  Among other things, the resolutions:

- ████████████████████████████
████████████████████████████
████████████████████████████
██████████████

- ████████████████████████████
████████████████████████████
████████████

- ████████████████████████████
████████████████████████████

_____
[17]  As of January 27, 2025, Defendant Vasconcelos's and Zagury's GitHub activity is not publicly-viewable.



172. 116. Swan responded that Klippsten could not sign the resolutions because they were misleading.

—Again, Swan reserved, reserving all rights.

173. 117. Defendants also sought, and continue to seek, to whitewash their conduct, trade on Swan's name, and mislead third parties. In an email to a Swan vendor on September 14, 2024, for example, Tether's counsel stated: "2040 Energy [] *has experienced a nominal change in management. Some of the team from Swan Bitcoin now provides day-to-day management services to 2040 through an independent management company.* I expect that Tyler Effertz and Bill Belitsky (copied) will be familiar to you." Tether's counsel did not, of course, disclose the Defendants' scheme to steal Swan's Bitcoin business, personnel, and confidential and proprietary information and trade secrets for this "independent management company."

**X.    Swan Brings This Suit, and the Defendants Provide False Excuses for**

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**Their Misconduct.**

174.   Swan filed its original Complaint against Defendants on September 25, 2024.  At the same time, Swan filed an application for a temporary restraining order against Defendants, seeking to enjoin Proton and the Individual Defendants from, among other things, disclosing or using any Swan proprietary and confidential material or trade secrets.

175.   In opposing Swan's request for relief, the Individual Defendants did not deny that they were using Swan's proprietary information and trade secrets.  Instead, they repeatedly represented that, to the extent Proton and the Individual Defendants were using Swan's proprietary information and trade secrets, Proton and the Individual Defendants were using that information "***solely for the benefit of 2040 Energy … and no others***."  Dkt. 29-1 at 4.  "[T]his case is particularly unique because of Swan's continued interest in 2040 Energy… Proton and the Individual Defendants are working only for 2040 Energy.  Therefore, to the extent the Individual Defendants are using purported trade secrets, it is for the sole benefit of 2040 Energy—and thus Swan too.  Therefore, there is no actual, let alone irreparable, harm to Swan."  *Id.* at 12.

176.   The Court denied Swan's request for relief on October 4, 2024.

177.   Meanwhile, the parties met and conferred regarding a process through which the Individual Defendants would return their Swan laptops.  The Individual Defendants represented to the Court that the parties "ha[d] agreed to share all the laptops," which were in the possession a third-party vendor, and that the Individual Defendants "just wanted to have a process which we propose to ensure that [Swan] got what they needed but [the Individual Defendants'] interests were also protected."  In response, the Court noted that the issue appeared "easily solvable," suggesting that "we just turn the vendor into effectively a special master, that if [Defendants are] going to withhold files, that they create a log that shows the other side what files are

being withheld. … in the immediate time both sides will have access to images of, you know, at least relevant portions of the laptops."

178.    On October 25, 2024, the Court denied Swan's motion for an order compelling the Individual Defendants to return the laptops at issue to Swan, while ordering "the Individual Defendants to continue to store the laptops in discovery vendors' facilities in the meantime until either the parties reach a stipulation regarding their treatment or further order of Court." Dkt. 63.

179.    Also on October 25, Gibson, Dunn & Crutcher LLP ("Gibson")—Swan's then lead and only counsel on this case—informed Swan that the firm was on the verge of hiring a lateral attorney whose current client presented a conflict with Gibson's representation of Swan.  Gibson identified that client as Tether.

180.    On November 24, 2024, Gibson moved to withdraw as counsel for Swan. That motion was granted on January 6, 2025.

**XI.    Defendants Continue to Use Swan's Confidential Information and Trade Secrets and Their Representations to the Court Prove Hollow.**

181.    In the months since the Defendants represented that they were using Swan's proprietary information and trade secrets "solely for the benefit of 2040 Energy[,] and no others," Swan has uncovered evidence that strongly suggests those representations were either false when made or, at a minimum, are no longer true.

182.    On information and belief, and for the reasons laid out below, Defendants have used Swan's proprietary information and trade secrets to further Bitcoin mining operations *outside of 2040 Energy*.

183.    As noted above, Swan's mining operations generated ███████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

184. ████████████████████████████████████████
████████████████████████████████████████
███ ██ ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

185. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████

186.    On information and belief, Defendant Proton has diverted the Bitcoin mining proceeds ███████████████████████████ to wallets solely controlled by Proton or some other third party. Either Defendant Proton is continuing to manage operations at Swan's former mining sites—using Swan's proprietary information and trade secrets to do so—but directing those proceeds to non-2040 Energy wallets, which are controlled by Proton, Tether, or some other third party; *or* Proton has withdrawn operations and equipment from Swan's former mining sites, and is deploying that equipment at new mining sites—using Swan's proprietary

information and trade secrets to identify and grow those new sites. Both courses of conduct would constitute clear misuse of Swan's proprietary information and trade secrets.

187. The other possible—though illogical—explanation would be that Defendants have ceased mining Bitcoin altogether. But other recently-discovered evidence indicates this is not the case. As described above, shortly after the Individual Defendants resigned from Swan, they continued to do business with vendors Swan had previously engaged to support its mining operations. Indeed, almost immediately after the Individual Defendants and their co-conspirators resigned, they continued to actively manage operations at Swan's mining sites, under the name "Elektron Energy," which, at present, Swan understands to be an alias of Defendant Proton. Indeed, for a period of time after the resignations, Swan continued to receive communications between the Individual Defendants and the on-site operators of some of its mining sites, either via email chains that the Individual Defendants apparently did not realize still included Swan email addresses or in Telegram channels that Swan had established and that the Individual Defendants apparently did not realize Swan could still monitor.

188. For example, on August 17, 2024, Brett Hiley—Swan's former Vice President of Institutional Operations & Research—exchanged emails with mining operators at a mining site ▮▮▮▮▮ regarding a power outage at the site. Hiley, emailing from a ▮▮▮@elektron-energy.com email address, provided details on power usage at the mining site—likely using a copy of the BNOC source code and information that the Individual Defendants and their conspirators had downloaded before their resignations. Hiley signed his emails as "VP, Institutional Operations & Research," the same title he held at Swan, but now with his Elektron Energy email address under the position.

189. As another example, through October 2024, Swan continued to receive Telegram messages between certain Individual Defendants, their co-conspirators, and

operators at ███████████████████████████.  Swan had set up the Telegram chat thread so that its consultants and employees directing the ██████ mining operations could easily send instructions to and field questions from personnel operating that site.  The day before their resignations, Defendant Romualdez and co-conspirator Kartheek Sola exchanged messages with the ████████ site reflecting just that.  Then, on August 9, before resigning from Swan with the rest of his co-conspirators, Defendant Romualdez messaged the ██████ site: "Hi team – we'd like to cancel this week's meeting.  Please let us know if you need anything from our end." Just days later, on August 13, Defendant Romualdez, Defendant Holmes, and co-conspirator Sola—now officially at Proton—picked up messaging right where they had left off, asking for updates on ████████ Bitcoin mining performance and directing the site's operations.

190.    As late as January 17, 2025, the conspirators were continuing to exchange messages with ████████ site regarding its mining operations.  On January 17, Hiley sent a Telegram message to operators of that site, sharing a document assessing the site's performance, which was labeled ████████ ██████ ████████  Hiley appears to have deleted that message shortly after sending it, presumably in an attempt to conceal from Swan Defendants' continued mining operations at these mining sites.  This correspondence, coupled with ████████ ███████████████████████████████████████████.  ███████████████████████, suggests that Defendants are continuing to operate the ██████ site, but no longer transferring the Bitcoin generated by those mining activities to 2040 Energy.

191.    Defendant Holmes and co-conspirator Kartheek Sola similarly continued to message with operators at a mining site in ████████, after the pair had resigned from Swan, using a Telegram chat thread that they had previously used to communicate with the site while working for Swan.

192.    Even this small smattering of communications that Defendants have inadvertently sent in a way that allows Swan to see them indicates that Defendants continue to manage at least some of Swan's former mining sites and have entirely coopted the proceeds.  On information and belief, around the end of October 2024, Defendant Proton decided to drop any façade, and simply diverted the proceeds from former Swan mining sites that it continued to manage away from the 2040 Energy wallets.

193.    Recent evidence also shows that Defendants have ceased operations at other of Swan's former mining sites, removing extremely valuable mining infrastructure from those sites so that Proton can deploy that mining equipment elsewhere, for its own benefit or that of third parties (not 2040 Energy, and much less Swan).  According to a person who works at one of these mining sites, shortly after the Individual Defendants and their co-conspirators resigned from Swan, some of them reached out to this mining site, directing the site to cease operations and return all of the mining equipment to the conspirators.

194.    Additional communications between Defendant Proton and Tether from around this time—which Swan received due to Defendants' inadvertence—further show that Proton was providing Bitcoin mining-related services to Tether outside any supposed relationship with 2040 Energy.

195.    On December 5, 2024, a representative of Marlin Capital Partners, Jared Stein, emailed Raphael Zagury and Defendant Naidoo.  Stein used Zagury's "elektron-energy.com" email address, but inadvertently emailed Defendant Naidoo using his "█@swanbitcoin.com" email address.  Mr. Stein included Tether's Christopher Cowell on that email, and arranged a call between the four of them that day, to discuss an opportunity Tether had to invest in a supplier of Bitcoin mining machines.  After that call, Mr. Stein followed up on the same email chain, writing, "Chris and I were discussing how we can refine the valuation a bit and were

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

wondering if you have a model for the opportunity cost of deploying hash rate sooner vs later (I recall this is a topic we discussed back around the inception of 2040)."

196.    Zagury responded to Stein's email (again including the Swan email address): "I'm not sure if we have shared this one with you before.  But the attached ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████  In other words, based on current market conditions, if given the choice to invest in Bitcoin or purchase ASICs to mine Bitcoin, the smart choice was to accumulate as many ASICs as possible, and use them to start mining Bitcoin as soon as possible.

197.    Zagury's sharing of the ████████████ spreadsheet with Tether also strongly suggests that Proton has shared Swan's proprietary information and trade secrets with Tether (and potentially others).  While the ████████████ spreadsheet is not an exact copy of any file that the Individual Defendants and their co-conspirators stole before resigning from Swan, the tools and functions in that spreadsheet closely mirror those that Swan created during the Individual Defendants and their co-conspirators' time with the company.

198.    Indeed, on June 21, 2024, while still employed at Swan, Zagury asked Swan's mining team to work on ████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████.  Zagury appears to have sent this message while working from Zachary Lyons' office.

199.    █████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████

4 ████████████████████████████████████

5 ███

200.    On December 23, 2024, Defendant Proton and the Individual Defendants moved to dismiss Swan's original Complaint.  Notably, and in contrast to the representations the Individual Defendants made when opposing Swan's requests for *ex parte* relief, those motions were silent on whether or not Defendant Proton and the Individual Defendants were using Swan's proprietary information and trade secrets for the benefit of any entity other than 2040 Energy.

201.    In January 2025, consistent with the parties' prior conferrals and the Defendants' representations to the Court last October, Swan attempted to confer with the Individual Defendants to reach agreement on a proposal for the inspection and return of the laptops Swan purchased for the Individual Defendants as well as any other Swan Confidential Information in the Individual Defendants' possession, pursuant to the Individual Defendants' contracts with Swan.  Despite the Individual Defendants' earlier representations, they are now refusing to engage in the compromise proposal that they previously offered to the Court.  And when Swan asked Defendants directly during a conferral whether Defendants are presently engaged in mining activities outside of 2040 Energy, Defendants refused to answer.

**XII.** ~~VIII.~~**Swan Has Been, and Continues to Be, Irreparably Harmed by Defendants and Their Coconspirators' Misconduct.**

202. ~~118.~~ Swan has suffered irreparable harm because of Defendants' misconduct, and it will continue to suffer irreparable harm if Defendants are not enjoined from continuing their misdeeds.

203. ~~119.~~ On information and belief, ~~Defendant Proton is~~Defendants are currently using and integrating ~~(changing)~~in Proton's business Swan's confidential

and proprietary information, including its trade secrets like BNOC, and details about every minutiae for the operation and management of Swan's mining sites, that Defendants and the Swan conspirators stole in Defendant Proton's copycat Bitcoin mining business.  Put simply, Defendant Proton is an unlawful enterprise with no legitimate grounds for existence, operating each day using Swan Bitcoin's Swan's confidential and proprietary information and intellectual property—including insider know how knowledge of the same from Swan's former personnel.  Every day that goes by, for example, makes it more and more difficult for Swan to trace and recover its trade secrets, or to recover from the damage that has been done and continues to multiply from Swan being shut out of its own business while its most important assets are deployed for Defendants' benefit rather than Swan's.  Defendants' theft of Swan's confidential information and trade secrets and raid of Swan's mining business has crippled Swan's mining operations.  Even if Swan were able to replace the individual consultants and employees following their resignations, Proton's continued use of Swan's confidential information and trade secrets to manage Swan's former mining sites and develop potential new mining sites essentially eliminates the competitive edge that Swan had established by developing the extensive confidential and proprietary material that Defendants stole.

204.  The danger to Swan is particularly acute if Defendants are using Swan's confidential information and proprietary trade secrets to deploy and manage Bitcoin mining operations *outside* of 2040 Energy, as evidence uncovered since Swan filed its initial Complaint strongly suggests (and Defendants' recent refusal to answer basic, direct questions about any such non-2040 Energy mining operations seems to confirm).  Defendants' continued use of Swan's confidential information and trade secrets outside of 2040 Energy creates a serious, incalculable risk that Swan will lose complete control over who has access to its trade secrets, how those trade secrets are used, and the business opportunities that come with such use (to the extent Swan has not already lost such control as a result of Defendants' actions).

205. 120. The individual Defendants have also blatantly refused (three four times) to return Swan's physical and intellectual property containing this and other Swan information (including their Swan devices).   Swan's confidential and proprietary information and trade secrets are at serious risk of being further disclosed and used for purposes detrimental to Swan and for Defendants' benefit from these devices, and Defendants are preventing Swan has been prevented from even investigating the full extent of Defendants' theft and misconduct, and therefore the real, ongoing irreparable harm it has incurred and continues to incur.

121. Defendants' misconduct has also dealt a critical blow to Swan's current ability to raise investment capital, which is vital to the future of its business. Swan finds itself in the untenable position of searching for financing partners for its Series C fundraising round while its valuable, sensitive, and proprietary information and trade secrets are compromised.

206. 122. The ongoing and irreparable harm to Swan goes further.   As outlined above, Swan invested significant time and effort developing its vendor relationships and reputation.  Defendants have attempted to capitalize on Swan's reputation by falsely implying to vendors and others that "Swan" is still responsible for the day-to-day operations of 2040 Energy.   For example, Defendants have represented to third parties that 2040 Energy has "experienced a nominal change in management" and that "[s]ome of the team from Swan Bitcoin now provides day-to-day management services to 2040 through an independent management company."

207. 123. Though Defendants have thrown up every roadblock they can, Swan has already had to expend still made every effort and expended significant resources to identify and investigate and try to identify even a sliver of Defendants' egregious misconduct and prepare to redress their misdeeds, and its investigation is ongoing (for which.  As appalling as the current record is, it is likely only the tip of the iceberg.  Swan expects that discovery will demonstrate even more misconduct, and so Swan reserves all rights to amend its allegations, defendants, and claims). But

-88-

1  ~~the current and ongoing risks to Swan are real~~ as it learns more information.  The
2  harm to Swan's business and long-term prospects are—and, if Defendants are not
3  enjoined to cease their misconduct, will continue to be—irreparable.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Trade Secret Misappropriation under the Defend Trade Secrets Act**

**(18 U.S.C. § 1836, *et seq.*)**

*(Against All Defendants)*

208.  ~~124.~~ Each of the foregoing paragraphs is incorporated into this First
Cause of Action, as if set forth herein.

209.  ~~125.~~ Swan possesses and owns trade secrets related to its Bitcoin mining
business as defined by 18 U.S.C. § 1839(3).

~~126. Swan's BNOC ("Bitcoin Network Operating Center") is a trade secret.~~
~~BNOC is a software platform for managing mining data and analytics.~~ ████████
████████████████████████████████████████████████████████████.
████████████████████████████████████████████████████████████.
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.
████████████████████████████████████████████.

210.  Swan's mining site- and vendor-selection methods and techniques
constitute trade secrets. ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████ ███ ████ ████ ██ ███ ████ ██ These methods and
techniques were not generally known to, and not readily ascertainable through proper
means by, the public.

-89-

211. ~~127.~~ Swan's hash-rate optimization techniques also constitute trade secrets. Swan's proprietary techniques, ███████████████████████

███████████████████████████████████████

███████████████████████████████████████

These techniques include, for example, ████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ Swan's specific use, deployment, and combination of these techniques in Bitcoin mining are unique. These techniques were not generally known to, and not readily ascertainable through proper means by, the public.

212. ~~128.~~ Swan's proprietary financial modeling, data analytics and monitoring tools also constitute trade secrets. ████████████████

███████████████████████████████████████

██ ~~marketing~~ ██████████████████████ These methods and tools were not generally known to, and not readily ascertainable through proper means by, the public.

213. Swan's BNOC ("Bitcoin Network Operating Center") is a trade secret. BNOC is a software platform for managing mining data and analytics. ███████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ . BNOC was not generally known to, and not readily ascertainable through proper means by, the public.

214. ~~129.~~ Swan ~~has taken~~used reasonable ~~precautions~~efforts to protect its trade secrets, including but not limited to implementing confidentiality policies and procedures concerning Swan's trade secrets, granting limited access to Swan's trade secrets, and requiring individuals provided access to enter into confidentiality agreements and take strict security measures when accessing Swan's trade secrets.

215. ~~130.~~ Swan derives independent economic value from its trade secrets not being generally known to, and not being readily ascertainable through proper means by, the public.  Swan's trade secrets are proprietary techniques and methodologies that allow Swan to successfully and efficiently mine Bitcoin.  Swan's ~~trade secrets drove 2040 Energy to its recent ten-figure valuation~~former-Chief Investment Officer—who is now working for Defendant Proton—recognized that Swan's trade secrets had allowed Swan to "deploy[] hashrate faster than any other company in Bitcoin," and accordingly valued *just Swan's share* of its mining operations at over ████████  Having access to such information would give a competitor a tremendous head-start on prospective new Bitcoin mining operations and a roadmap for how to immediately and effectively compete with Swan's operation and reduce or eliminate Swan's competitive edge.

216. ~~131.~~ Defendants have improperly acquired, used and/or disclosed Swan's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

217. ~~132. On information and belief, if~~If Defendants are not enjoined, they will continue to access, use, disclose, or otherwise misappropriate Swan's trade secrets to benefit themselves ~~(with Defendant Proton)~~ to Swan's detriment.  As detailed in paragraphs 187-191, Defendants are using Swan's trade secrets to manage Swan's former mining sites, for the benefit of unidentified third parties (including, potentially, Tether or "Elektron Energy").  Additionally, as detailed in paragraph ~~114~~168-170, for example, Defendant Monteleone (and Defendant Proton's current CEO Raphael Zagury) has been highly active on GitHub following his resignation in

-91-

August and September; on information and belief, that activity is due to his access to and use of Swan's BNOC with and for Defendant Proton.

218. ~~133.~~ Defendants' misappropriation of Swan's trade secrets has caused and continues to cause substantial injury to Swan's business, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution of the value of its trade secrets. Defendants have been unjustly enriched by their misappropriation of Swan's trade secret information.

219. ~~134.~~ Swan seeks ~~temporary,~~ preliminary~~, and permanent~~ injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) against all Defendants to protect the secrecy of its trade secret documents and information and to remedy injury to Swan's business interests and reputation. Swan will continue to suffer irreparable harm absent the requested injunctive relief.

220. ~~135.~~ Swan also seeks a permanent injunction against Defendant Proton, as well as an award of actual damages ~~from Defendant Proton~~ in an amount to be proven at trial under 18 U.S.C. § 1836(b)(3)(B).

221. ~~136.~~ Because Defendants' misappropriation and use of Swan's trade secrets was intentional, knowing, willful, and oppressive, Swan also seeks exemplary damages from Defendant Proton up to two times the award of actual damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## SECOND CAUSE OF ACTION

### Breach of Contract (Consulting Agreement)

*(Against Defendants Holmes, Ilios, Naidoo, Monteleone, Romualdez, Furlong, and Vasconcelos)*

222. ~~137.~~ Each of the foregoing paragraphs is incorporated into this Second Cause of Action, as if set forth herein.

223. ~~138.~~ The consulting agreements Defendants Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong signed are valid and binding contractual agreements.

1    139. Swan fully performed its obligations under the consulting agreements.

2    224.    140. The consulting agreements were made for valid consideration,

3    including the compensation each of these Defendants received from Swan.

4    225.    Swan fully performed its obligations under the consulting agreements

5    (including by paying Defendants their agreed-upon compensation), or else Swan was

6    excused from performance.

7    226.    141. As detailed in paragraph 51100 and footnote 59 above, Defendants

8    Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong

9    agreed to safeguard Swan "Confidential Information," promising in their respective

10   consulting agreements that they each would "hold in the strictest confidence, and take

11   all reasonable precautions to prevent any unauthorized use or disclosure of

12   Confidential Information."

13   227.    142. These Defendants further agreed not to "(i) use the Confidential

14   Information for any purpose whatsoever other than as necessary for the performance

15   of the Services on behalf of the Company, or (ii) subject to Consultant's right to

16   engage in Protected Activity [], disclose the Confidential Information to any third

17   party without the prior written consent of an authorized representative of the

18   Company."

19   228.    143. Defendants Holmes (on behalf of Defendant Ilios), Naidoo,

20   Monteleone, Romualdez, and Furlong further agreed that they would "not use or

21   disclose any Company property, intellectual property rights, trade secrets or other

22   proprietary know-how know-how of the Company to invent, author, make, develop,

23   design, or otherwise enable others to invent, author, make, develop, or design identical

24   or substantially similar designs as those developed under this Agreement for any third

25   party."

26   229.    144. These Defendants agreed that their obligations to safeguard Swan's

27   confidential information "shall continue after the termination of [their]

28   Agreement[s]."

230. ~~145.~~ Defendants Holmes (on behalf of Defendant Ilios), Naidoo, Monteleone, Romualdez, and Furlong breached the foregoing provisions of their respective consulting agreements by stealing Swan's confidential and proprietary information—including but not limited Swan's mining performance data, data related to Swan's mining inventory, mining operations and machine performance and configuration, financial modeling and information, weekly reports of all operations, and ongoing deals with Swan business partners—to use for Defendant Proton's benefit.

231. ~~146.~~ On information and belief, Defendants have disclosed and used and are continuing to disclose and use Swan's confidential and proprietary information to operate ~~and for~~ Defendant Proton.

232. ~~147.~~ Swan has suffered and will suffer irreparable harm as a direct and proximate result of the individual Defendants' past and ongoing breaches of their respective consulting agreements—including the further loss of its confidential and proprietary information and trade secrets—for which there is no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Tortious Interference with Contractual Relations**

*(Against Defendants Proton, Holmes, and Naidoo)*

233. ~~148.~~ Each of the foregoing paragraphs is incorporated into this Third Cause of Action, as if set forth herein.

234. ~~149.~~ As part of their employment and for valid consideration, including compensation from Swan, Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky signed "Confidentiality and Proprietary Information and Inventions Agreements" with Swan ("Employee Confidentiality Agreements").

235. ~~150.~~ Swan fully performed its obligations under the Employee Confidentiality Agreements, or else its performance was excused.

229.    None of Zagury, Dozic, Effertz, Hiley, Sola, or Belitsky lived or worked in California. Their agreements were subject to the laws of Florida (Zagury, Effertz), Pennsylvania (Dozic), Washington (Hiley), Alabama (Sola), and Indiana (Belitsky).

236.    151. As part of those contracts, Zagury (now Defendant Proton's CEO), Dozic, Effertz (now Defendant Proton's Chief Financial Officer), Hiley, Sola, and Belitsky agreed that, "at any and all times during my service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company and in furtherance of the Company business." For the "term of my service only, prohibited acts of competition" included: "performing any services for a Competing Business[11][18];" "hiring, recruiting or soliciting any employee of the company;" and "disclosing, misappropriating, or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business."

237.    152. Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky also agreed that, "for a period of twelve months following termination of my Service, I will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business."

238.    Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky also agreed that they would "not at any time, other than in the performance of [their] Service for the Company or any affiliate, both during and after [their] Service with the Company,

---

[11] [18] "Competing Business" is defined in the Employee Confidentiality Agreements as "any person or entity that engages in a commercial business that is the same or substantially similar to the Company Business, and only that portion of the business that is in competition with the Company Business." "Company Business" is defined, in part, as any "business in which the Company engages during my Services with the Company"— in this case, Bitcoin mining.

communicate or disclose to any person or entity, or use for my benefit, or for the benefit of any other person or entity, either directly or indirectly, any Trade Secrets and/or Proprietary Information."[19]

239. ~~153.~~ Swan had a contractual expectancy that Zagury, Dozic, Effertz, Hiley, and Belitsky[1][20] would abide by the Employee Confidentiality Agreements.

240. ~~154.~~ Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky breached the foregoing provisions of the Employee Confidentiality Agreements by planning, coordinating, and conspiring with and through Defendant Proton and others, including but not limited to Defendants Holmes and Naidoo, to compete with Swan during their employment by working on behalf of Proton's competing mining business and soliciting Swan's employees to leave their employment and of Swan's independent contractors to terminate their services as independent contractors during the time period prohibited by the Employee Confidentiality Agreements to work for Proton.

241. ~~155.~~ Several of the ~~then Swan~~ Swan employees and contractors that Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky~~, __~~ with Defendants' help~~, __~~ unlawfully solicited then resigned from Swan and started working for Proton ~~shortly~~ thereafter. On information and belief, that solicitation may be ongoing as to at least certain individuals whom Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky solicited from Swan and who have already resigned from Swan, but who have not yet surfaced publicly as working with or for Defendant Proton.

---

[19] "Proprietary Information" is defined in the Employee Confidentiality Agreements to include "all technical and non-technical data, compilations, programs and methods, techniques, drawings, processes, financial data, actual and prospective customer lists, customer route books and materials, documents containing names and addresses of current or former customers that includes their past or present buying patterns or habits, sales reports, service reports, price lists and discount lists, methods and/or procedures regarding pricing, product cost and profit strategies or structures, product formulae, methods and/or procedures related to sales or services, methods and/or procedures of operation, special training of sales representatives, continuous market updates and merchandising strategies relating to the Company, any affiliate of the Company, and the Company Business."

[12][20] Swan reserves its rights based on Defendants Holmes/Ilios, Naidoo, Monteleone, Romualdez, and Furlong's breaches of their ~~nonsolicitation~~ non-solicitation obligations.

156.   Defendants Proton, Holmes, and Naidoo had knowledge of Swan's contractual relationship with Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky at all material times., including knowledge that those agreements contained confidentiality, non-competition, and non-solicitation provisions.  For example, in calls leading up to the Individual Defendants' resignations from Swan, Defendants Holmes and Naidoo met, along with Belitsky, and discussed "non-solicit; non-compete" and "Confidentiality and IP" concerns, noting that they "would be exposed," and likely did not have any "leverage" to secure releases upon departure.

242.   157. Defendants Proton, Holmes, and Naidoo intentionally interfered with the Employee Confidentiality Agreements by planning, coordinating, and conspiring with Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky to compete with Swan and solicit Swan's employees and contractors to work for Proton.

243.   158. Based on these Defendants' interference with the Employee Confidentiality Agreements, Swan has had its contractual relationship and expectancies with Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky diverted, disrupted, damaged, and threatened by the actions of Defendants Proton, Holmes, and Naidoo as described herein.

244.   159. Swan has suffered and will suffer damages as a direct and proximate result of the Defendants Proton's interference— including but not limited to actual and potential further loss of its personnel—for which there is no adequate remedy at law.

245.   160. Swan has suffered and will suffer irreparable harm as a direct and proximate result of the Defendants Proton, Holmes, and Naidoo's interference— including but not limited to actual and potential further loss of its personnel — for which there is no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Breach of Duty of Loyalty

*(Against Defendant Proton)*

246.   161. Each of the foregoing paragraphs is incorporated into this Fourth

-97-

1  Cause of Action, as if set forth herein.

2  247. 162. Swan's employees and executives, including but not limited to

3  Zagury, Dozic, Effertz, Hiley, Sola, and Belitsky, owed a duty of loyalty to Swan

4  during their employment. At least Zagury, as Swan's Chief Investment Officer, and

5  Belitsky, as Swan's General Counsel, owed Swan fiduciary duties.

6  248. 163. Defendant Proton was aware of these duties.

7  249. 164. Defendant Proton knowingly and intentionally interfered with and

8  induced Swan's employees, including but not limited to Zagury, Belitsky, Dozic,

9  Effertz, Sola, and Hiley, to breach their duties of loyalty by planning, coordinating,

10  and conspiring with and through others, including but not limited to Defendants

11  Holmes and Naidoo, to, while employed by Swan, assist Defendant Proton in

12  preparing to compete with Swan's mining business and to solicit (a) Swan's

13  employees to leave their employment and (b) Swan's independent contractors to

14  terminate their services as independent contractors.

15  250. 165. Defendant Proton's aiding and abetting of the Swan employees'

16  disloyalty has caused and continues to cause substantial harm to Swan's business.

**FIFTH CAUSE OF ACTION**

**Unfair Competition Under Business & Professions Code § 17200**

*(Against All Defendants)*

20  251. 166. Each of the foregoing paragraphs is incorporated into this Fifth

21  Cause of Action, as if set forth herein.

22  252. 167. California Business & Professions Code § 17200 prohibits any

23  "unlawful, unfair or fraudulent business act or practice."

24  253. 168. Defendants' business acts and practices as alleged herein constitute

25  ongoing unlawful and unfair activity in violation of California's Unfair Competition

26  Law ("UCL"), as codified in California Business and Professions Code § 17200 *et*

27  *seq.*

28  254. 169. Specifically, Defendants acted and are acting unlawfully and

-98-

unfairly under California's UCL by orchestrating and carrying out a course of conduct to disrupt, divert, and steal Swan's entire Bitcoin mining business by, for example and without limitation:

- Misappropriating, and/or planning, coordinating, and conspiring with the other Defendants and other Swan employees and consultants to misappropriate, documents and files containing Swan's proprietary and confidential information;

- Planning and executing a scheme to lift out the entirety of Swan's Bitcoin mining personnel to accept roles at Defendant Proton, a counterfeit competitor created for the sole purpose of using Swan's stolen technology, resources, and trade secret techniques and methods to usurp its mining business and irreparably harm Swan's ability to compete in the Bitcoin mining market, and doing so in a manner calculated to inflict maximum damage to Swan with a funding partner;

- Using the proprietary data, information, and resources Defendants stole to operate Defendant Proton's copycat Bitcoin mining business and continuing to work with Swan's vendors while trading on Swan's name; and

- Other conduct which is presently unknown but will be proven at trial.

255. 170. Defendants' unlawful and unfair actions allowed Defendant Proton to effectively steal Swan's Bitcoin mining business and set up an illegal copycat, bypassing all the investment of time and resources that Swan undertook to grow its full Bitcoin mining business. This is the epitome of unfair competition, as it disincentivizes the very sort of investment that Swan undertook in the first place.

256. 171. Swan has suffered and will suffer harm—including irreparable harm for which there is no adequate remedy at law—as a direct and proximate result

-99-

of Defendants' unlawful and unfair business practices.  Swan is entitled to recover restitution from Defendant Proton, including without limitation, all benefits that Defendant Proton received because of its unlawful and unfair business acts and practices.  Swan is further entitled to an injunction restraining ~~Defendants from engaging in~~ further acts of unfair competition.

### SIXTH CAUSE OF ACTION

### Conversion

*(Against Defendants Furlong, Holmes, Ilios,*

*Naidoo, Monteleone, Romualdez, and Vasconcelos)*

257. ~~172.~~ Each of the foregoing paragraphs is incorporated into this Sixth Cause of Action, as if set forth herein.

258. ~~173.~~ Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos have no right of possession of Swan-issued laptops and equipment following the termination of their consulting agreements.

259. ~~174.~~ Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos intentionally and wrongfully exercised control or dominion over Swan's property, and conducted a scheme of wrongful acts with the intention to appropriate the property and deprive Swan of its property.

260. ~~175.~~ Swan retained at the time of the conversion, and still retains, ownership in the property.

261. ~~176.~~ Swan has suffered and will suffer irreparable harm for which there is no adequate remedy at law as a direct and proximate result of Defendants Furlong, Holmes, Ilios, Naidoo, Monteleone, Romualdez, and Vasconcelos's conversion of Swan's property.

### SEVENTH CAUSE OF ACTION

### Civil Conspiracy

*(Against All Defendants)*

262. ~~177.~~ Each of the foregoing paragraphs is incorporated into this Seventh

-100-

Cause of Action, as if set forth herein.

263. ~~178.~~ Defendants (between them and with others) formed and operated a malicious combination with a common design to injure Swan by (a) performing unlawful acts in stealing and misappropriating Swan's confidential and proprietary information and trade secrets as described above for the unlawful purpose of diverting business and economic gain from Swan, and/or (b) performing the lawful acts of competing with Swan and hiring certain of Swan personnel, but doing so through the unlawful means of violating Swan's contractual, statutory, and common-law rights as described above.

264. ~~179.~~ The foregoing conduct of the Defendants was malicious, was performed with intent to injure Swan, and was without justification or privilege. Defendants' conduct was undertaken in furtherance of their own personal interests and benefit.

265. ~~180.~~ One, some, or all the Defendants engaged in overt unlawful acts and conduct violative of Swan's contractual, common law and statutory rights as described above, and did so with the knowledge, aid, agreement, and support of the other Defendants, causing actual harm to Swan.

266. ~~181.~~ By virtue of the formation and operation of this conspiracy by Defendants, and because of the above-described wrongful acts and conduct and the harm and injury caused to Swan thereby, each Defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each Defendant/coconspirator.

267. ~~182.~~ Swan has suffered and will suffer damages and irreparable harm as a direct and proximate result of the Defendants' conspiracy for which there is no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants, as follows:

-101-

A.  For a temporary injunction requiring Defendants to immediately take steps to preserve all evidence relevant to the Complaint;

B.  For a temporary ~~and permanent~~ injunction against Defendants, and as well as a permanent injunction against Defendant Proton, including enjoining Defendants, and their agents, servants, employees, successors, and assigns, and all other people acting in concert or conspiracy with any of them or who are affiliated with them, from disclosing, using, accessing, distributing, modifying, moving, altering, deleting, or otherwise disposing of any files, documents, and digital media that contain any Swan proprietary and confidential material or trade secrets, and/or that are derived from such information;

C.  For ~~a temporary and permanent~~an injunction requiring Defendants to immediately turn over to counsel for Swan all laptops and any other Swan-issued devices or hard drives in their possession;

D.  For a ~~permanent~~temporary injunction enjoining Defendants Proton, Holmes, and Naidoo, and a permanent injunction enjoining Defendant Proton, from soliciting Swan's employees to leave their employment ~~during~~for the duration of time ~~period~~ prohibited by the Employee Confidentiality Agreements (including as extended to account for the fact that Defendants have been in breach of, or interfering with, those provisions);

E.  For a ~~permanent~~temporary injunction enjoining Defendants, and a permanent injunction enjoining Defendant Proton, from carrying out a course of conduct to disrupt, divert, and steal Swan's entire Bitcoin mining business;[13]

F.  For other temporary and permanent injunctive relief as further discovery

---

[13] ~~Swan reserves the right to seek additional preliminary or injunctive relief without waiver.~~

1          may show necessary, or that this Court deems proper;

2 ~~F~~G.    For damages and other relief against Defendant Proton as described in

3          each of the above causes of action, including:

4       i.      For restitution and/or disgorgement against Defendant Proton;

5       ii.     For punitive damages against Defendant Proton in an amount to

6             be determined at trial;

7       iii.    For actual damages against Defendant Proton for

8             misappropriation of trade secrets and for the other unlawful and

9             tortious conduct described herein, including in the form of lost

10           profits resulting from the loss of the Swan's personnel, customers,

11           and the loss of Swan's economic or prospective economic

12           relationships, in an amount to be proven at trial;

13       iv.    For costs, attorney's fees, and other expenses incurred in this

14             action;

15       v.      For pre-judgment and post-judgment interest at the maximum

16             legal rate, as applicable, as an element of damages that ~~Sawn~~Swan

17             has suffered as a result of Defendant Proton's wrongful acts; and

18       vi.    For such other relief as the Court may deem just and proper.

19                       **JURY DEMAND**

20     Swan respectfully requests a jury trial on all claims for relief.

21

22

23

24

25

26

27

28

AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1   DATED: ~~September 25, 2024~~ January 27, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19   */s/ Iissa Samplin*

20

21

22

23

24

25

26

27

28

Respectfully submitted,

*/s/ Stacylyn M. Doore*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:   (213) 443-3145
Facsimile:    (213) 443-3100

STACYLYN M. DOORE (admitted *pro hac vice*)
stacylyndoore@quinnemanuel.com
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:   (617) 712-7100
Facsimile:    (617) 712-7200

RACHEL E. EPSTEIN (admitted *pro hac vice* )
rachelepstein@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone:   (212) 849-7000
Facsimile:    (212) 849-7100

~~GIBSON, DUNN & CRUTCHER LLP~~

~~By~~

~~*Attorneys for Plaintiff*~~
*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC.*
*d/b/a SWAN BITCOIN*

-104-