RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:   (213) 443-3145
Facsimile:    (213) 443-3100

STACYLYN M. DOORE (admitted *pro hac vice*)
stacylyndoore@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:   (617) 712-7100
Facsimile:    (617) 712-7200

RACHEL E. EPSTEIN (admitted *pro hac vice*)
rachelepstein@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
Telephone:   (212) 849-7000
Facsimile:    (212) 849-7100

*Attorneys for Plaintiff ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ELECTRIC        SOLIDUS,        INC. d/b/a        SWAN        BITCOIN, a Delaware corporation,<br><br>              Plaintiff,<br><br>       v.<br><br>PROTON       MANAGEMENT       LTD., a British Virgin Islands corporation; THOMAS       PATRICK       FURLONG; ILIOS CORP., a California corporation; MICHAEL     ALEXANDER     HOLMES; RAFAEL      DIAS      MONTELEONE; SANTHIRAN            NAIDOO; ENRIQUE       ROMUALDEZ;       and LUCAS VASCONCELOS,<br><br>              Defendants. | Case No. 2:24-cv-8280-MWC-E<br><br>**SWAN'S       OPPOSITION       TO INDIVIDUAL     DEFENDANTS' MOTION TO STAY**<br><br>Hearing Date:       March 28, 2025<br>Time:              1:30 P.M.<br>Place:              Courtroom 6A, 6th Fl.<br>Judge:             Hon. Michelle<br>                     Williams Court<br><br>Complaint Filed:  Sept. 25, 2024<br>Am. Complaint Filed:  Jan. 27, 2025<br>Trial Date:  May 4, 2026 |

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

I.  PRELIMINARY STATEMENT ..................................................1

II.  BACKGROUND ......................................................................3

III.  LEGAL STANDARD.................................................................5

IV.  ARGUMENT..............................................................................6

    A.  The Forum Selection Clause in the SHA Does Not Warrant A Stay ...............................................................6

    B.  The Court Should Not Stay This Case Based on the UK Action.......................................................................7

        1.  Colorado River Is The Applicable Framework For A Stay...................................................7

        2.  A Stay Is Not Warranted Under Colorado River ....................9

        3.  The Landis Factors Do Not Apply, and Regardless, They Counsel Against a Stay .................................13

        4.  Trade Secret Ownership Is Not A "Threshold Issue" To Swan's Claims .......................................14

        5.  A Stay Will Prejudice Swan...................................20

        6.  Defendants' Collateral Estoppel Argument Fails ..................22

V.  CONCLUSION ........................................................................23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page**

### Cases

*Accretive Specialty Insurance Solutions, LLC v. XPT Partners, LLC,*
    2023 WL 9019017 (C.D. Cal. Oct. 13, 2023)...................................................22

*Aldini AG v. Silvaco, Inc.,*
    21-CV-06423-JST, 2022 WL 20208930 (N.D. Cal. May 17, 2022) ........7, 8, 10

*Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.,*
    843 F.2d 1253 (9th Cir. 1988)....................................................................10

*Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas,*
    571 U.S. 49 (2013)......................................................................................11

*BCS Bus. Consulting Servs. Pet. Ltd. v. Baker,*
    No. 2:19-CV-06914-JWH-JPR, 2024 WL 4848789 (C.D. Cal.
    Nov. 4, 2024).............................................................................................16

*Beluca Ventures LLC v. Einride Aktiebolag,*
    660 F. Supp. 3d 898 (N.D. Cal. 2023).......................................................16

*Biomet Biologics, LLC v. Bio Rich Med., Inc.,*
    SACV 10-1582 DOC, 2011 WL 4448972 (C.D. Cal. Sept. 26,
    2011) ...........................................................................................................21

*BladeRoom Grp. Ltd. v. Facebook, Inc.,*
    219 F. Supp. 3d 984 (N.D. Cal. 2017).......................................................15

*Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.,*
    2019 WL 12521480 (C.D. Cal. Aug. 9, 2019)............................................15

*Chrome Hearts, LLC v. Old Sch. Fairfax, Inc.,*
    216CV09080ABJPRX, 2018 WL 1942766 (C.D. Cal. Feb. 26,
    2018) ...........................................................................................................21

*Clark v. Bear Stearns & Co., Inc.,*
    966 F.2d 1318 (9th Cir. 1992).....................................................................23

*Clinton v. Jones,*
    520 U.S. 681 (1997)......................................................................................5

*Colorado River Water Conservation Dist. v. U. S.,*
    424 U.S. 800 (1976).................................................. 1, 2, 5, 7, 8, 9, 10

i

*Conway v. City of Palm Desert,*
2022 WL 19237935 (C.D. Cal. Sept. 6, 2022) ..................................................5

*Cullum v. Manheim Invs., Inc.,*
No. SACV 16-01126-CJC(KESx), 2016 WL 11809110 (C.D. Cal.
Dec. 6, 2016) ..................................................8

*Cummins-Allison Corp. v. SBM Co.,*
2013 WL 12205188 (D. Haw. Oct. 7, 2013) ..................................................8, 9, 10

*Dependable Highway Exp., Inc. v. Navigators Ins. Co.,*
498 F.3d 1059 (9th Cir. 2007)..................................................8, 9

*E. & J. Gallo Winery v. Instituut Voor Landbouw-En
Visserijonderzoek,*
2018 WL 2463869 (E.D. Cal. June 1, 2018) ..................................................16

*ESG Capital Partners LP v. Stratos,*
22 F. Supp. 3d 1042 (C.D. Cal. 2014) ..................................................21

*Farhang v. Indian Inst. of Tech., Kharagpur,*
C-08-02658 RMW, 2010 WL 2228936 (N.D. Cal. June 1, 2010)...............9, 11

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
485 U.S. 271 (1988) ..................................................9

*Intel Corp. v. Advanced Micro Devices, Inc.,*
12 F.3d 908 (9th Cir. 1993)..................................................5, 9

*InteliClear, LLC v. ETC Glob. Holdings, Inc.,*
978 F.3d 653 (9th Cir. 2020)..................................................16

*Jackson v. Marten Transp., Ltd. et al.,*
No. 5:24-CV-02368-AH-(DTBX), 2025 WL 342083 (C.D. Cal.
Jan. 30, 2025)..................................................8, 16, 22

*Landis v. North American Co.,*
299 U.S. 248 (1936)..................................................7, 13, 20

*Lee v. Fisher,*
70 F.4th 1129 (9th Cir. 2023)..................................................6

*Lockyer v. Mirant Corp.,*
398 F.3d 1098 (9th Cir. 2005)..................................................7, 13

*Masimo Corp. v. Apple Inc.*,
  2023 WL 2633961 (C.D. Cal. Feb. 10, 2023)....................................14, 15, 17

*Morton v. Rank America, Inc.*,
  812 F. Supp. 1062 (C.D. Cal. 1993)................................................17

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)....................................................................5

*Mujica v. Occidental Petroleum Corp.*,
  381 F. Supp. 2d 1134 (C.D. Cal. 2005)...........................................22

*Neuchatel Swiss General Ins. Co. v. Lufthansa Airlines*,
  925 F.2d 1193 (9th Cir. 1991).............................................7, 9, 11

*Philips North America LLC v. Advanced Imaging Services*,
  2021 WL 2593291 (E.D. Cal. Jun. 24, 2021) ...................................22

*In re Prime Healthcare ERISA Litigation*,
  2022 WL 2102992 (C. D. Cal. Jan. 7, 2022) ...................................13

*Pyro Spectaculars North, Inc. v. Souzam*,
  2012 WL 13220023 (E.D. Cal. Feb. 8, 2012)...................................22

*R.R. St. & Co. Inc. v. Transp. Ins. Co.*,
  656 F.3d 966 (9th Cir. 2011)..........................................9, 10, 11, 12

*Sluimer v. Verity, Inc.*,
  606 F.3d 584 (9th Cir. 2010).....................................................16

*StrikePoint Trading, LLC v. Sabolyk*,
  No. SACV 07-1073-DOC-MLGx, 2008 WL 11334084 (C.D. Cal.
  Dec. 22, 2008) ......................................................................17

*Valentino S.p.A. v. Mario Valentino S.p.A.*,
  2020 WL 7382765 (C.D. Cal. Nov. 4, 2020)...................................13

*VFD Consulting, Inc. v. 21st Servs.*,
  425 F. Supp. 2d 1037 (N.D. Cal. 2006).........................................15

*Williams-Sonoma Direct, Inc. v. Arhaus, LLC*,
  304 F.R.D. 520 (W.D. Tenn. 2015)..............................................17

## **Rules & Statutes**

ERISA ..................................................................................................16

Defend Trade Secrets Act ....................................................................12

UTSA ..................................................................................................17

## **Other Authorities**

Federal Rule of Civil Procedure 1 .......................................................20

Federal Rule of Civil Procedure 26(a)...............................................2, 3

Federal Rule of Civil Procedure 26(f) ...................................................3

Trade Secrets Practice in California § 2.1 (2d Ed. Nov. 2018) ............14

I.    **PRELIMINARY STATEMENT**

Defendants' motion is a contrived attempt to avoid, or at least forestall as long as possible, having to provide discovery that is sure to further reveal and confirm the details of their wholesale theft of Swan's Bitcoin mining operation. The premise of Defendants' motion—that a foreign proceeding will decide a "threshold" issue and thereby streamline this action—is wrong on the facts and the law. Staying this action is improper under the Supreme Court's governing *Colorado River* framework that applies to motions to stay federal District Court actions in view of foreign proceedings—a framework that Defendants erroneously do not address.

Defendants ask this Court to stay this case based on a pending proceeding that third parties have filed in the United Kingdom (the "UK Action"). There, claimants Tether Investments Ltd. ("Tether") and 2040 Energy Ltd. ("2040 Energy" and with Tether, the "UK Claimants") contend that 2040 Energy "owns" any or whatever assets or property Swan might put at issue in this action. *See* Dkt. 114-1 at 7-8. This "ownership" claim the UK Claimants are pursuing in the UK Action— and desperately trying to use as cover to prevent discovery in this action—has no merit. The Shareholders Agreement ("SHA") defining rights and responsibilities of Swan and 2040 Energy—and which forms the basis of the UK Claimants' assertion that 2040 Energy "owns" the trade secrets—does not contain any provision granting any intellectual property rights to 2040 Energy. Tether used 2040 Energy as a funding vehicle to invest in Bitcoin mining operations identified by and managed by Swan. The UK Action is thus transparently part of Defendants' self-described effort to get "legal cover from Tether" for their "rain and hell fire" plan to steal Swan's intellectual property, which they recognized would leave them legally "exposed." Dkt. 101, ¶ 8. Further, the UK Claimants asked the UK Court to require a stay of discovery in this action, and the UK Court stated that it would not issue an order "that would restrain [Swan] from taking steps in relation to discovery in California." Ex. 3 at 52:8-16.

Moreover, the UK Action will not address the "ownership" issue until September 2025, and also has not yet determined what standard it will use to determine "ownership." Ex. 1 (Order 16) ¶ 6. Present indications, however, are that the UK Action will not render a decision under any standard that governs Swan's claims in this action. Under the standard that applies here, Swan does not need to show exclusive "ownership" of the trade secrets to assert its trade secret claim; "possession" of a trade secret is enough. Defendants never argue that Swan did not at least "possess" the asserted trade secrets, and the record is clear that Swan's employees and consultants (several of whom are Individual Defendants here) ran Swan's day-to-day operations of Bitcoin mining, and signed agreements assigning to *Swan* (not to 2040 Energy) all intellectual property they developed in connection with their work with Swan. Thus, Swan can show the "ownership" or possessory interest sufficient to pursue its trade secret claims in this action. Trade secret "ownership" as decided in the UK Action is therefore not a "threshold" issue to any claim that Swan asserts in this action.

Not only do Defendants confuse the law on "ownership," they also ignore the Supreme Court's governing *Colorado River* test for whether a federal District Court may stay a case in favor of a foreign litigation. That test permits a stay only under "exceptional circumstances" that are not present here because the UK Action will not even litigate the claims that Swan brings in this action, much less fully resolve them as required to justify a stay. And even under the (wrong) *Landis* framework that Defendants apply, a stay still is not warranted because a stay would impose hardship on Swan with no countervailing benefits.

This Court, too, has already ruled that discovery in this action should proceed, notwithstanding Defendants' protests. Although Defendants have been pressing their "ownership" arguments from the beginning, *see* Dkt. 29-1 at 9, this Court has twice ordered that discovery proceed. Dkt. 95 at 2 ("The Court encourages counsel to agree to begin to conduct discovery actively before the Scheduling Conference.

At the very least, the parties shall comply fully with the letter and spirit of Federal Rule of Civil Procedure 26(a) and thereby obtain and produce most of what would be produced in the early stages of discovery, because at the Scheduling Conference the Court will impose strict deadlines to complete discovery."); Dkt. 119 at 3 (setting the close of fact discovery as November 7, 2025 and not providing any relief based on Defendants' arguments that discovery should be stayed). Defendants ignore this. The Court should deny Defendants' motion to stay.

## II.    **BACKGROUND**

Swan filed its Amended Complaint on January 27, 2025. Dkt. 101 ("AC"). In that Complaint, Swan details how the Defendants committed wholesale theft of Swan's Bitcoin mining operation. AC ¶¶ 118, 141. Swan asserts claims for Defendants' misappropriation of Swan's trade secrets, but Swan's claims are broader than just that. For instance, several Defendants agreed by contract "not to engage in any acts of competition against the interests of [Swan]," but then—***while they were working for Swan***—orchestrated and executed a "rain and hellfire" plan to resign *en masse* from Swan, and pursue a competing entity, Proton, which Defendants were working for, against Swan's interest. AC ¶¶ 236, 240 (Count III); *id.* ¶ 249 (Count IV); *id.* ¶ 254 (Count V); *id.* ¶ 265 (Count VII).

The Court's January 7, 2025 Order setting the scheduling conference directed the parties to "begin to conduct discovery actively before the Scheduling Conference" and required that the parties "comply fully with the letter and spirit of Federal Rule of Civil Procedure 26(a)." Dkt. 95 at 2. On February 14, 2025, the parties submitted their Rule 26(f) report. Dkt. 114-1. There, as here, Defendants noted that "2040 Energy and Tether are seeking an anti-suit injunction in the UK to prevent this action from proceeding until the threshold question of ownership is decided there," *id.* at 6, urged that "no discovery should proceed in this action," *id.* at 10, and argued that "this action should be stayed pending the resolution of a

3

threshold issue in a dispute filed" in the UK Action, *id.* at 10, 12.[1] The Court entered its Civil Trial Order on February 18, 2025, largely adopting Swan's proposed schedule and rejecting Proton's request to stay proceedings or defer holding a scheduling conference until after decision on the pleadings motions. Dkt. 119; Dkt. 114-1 at 31. Nevertheless, since the entry of the Scheduling Order, Defendants have refused to participate in any discovery in this case, including by refusing to serve initial disclosures. *See* Dkt. 129.

Meanwhile, on February 25 and 26, there was a two-day hearing in the UK Action. There, the UK Claimants asked the UK Court to issue an anti-suit injunction against this action and argued for an order that no discovery should proceed here until the UK Action resolves. Ex. 3 at 33:10-14, 36:7-9. The UK Court would not issue an anti-suit injunction, nor any "more focused or limited interim injunction" "that would restrain [Swan] from taking steps in relation to discovery in California." Ex. 3 at 52:8-16.

That hearing centered around proceedings to determine who "owns" the "Business Assets" as between Swan and 2040 Energy, which the UK Claimants have circularly defined to include whatever trade secrets or confidential information Swan might claim to own in this case.[2] The UK Court has not yet determined "the precise formulation of the [ownership] issue," Ex. 1 ¶ 6, but it appears that "ownership" in the UK Action will be determined based on the UK Court's interpretation of the SHA under English law. For example, the UK Claimants contend that 2040 Energy owns the Business Assets based on the "SHA on its true

---

[1] Although Defendant Proton did not file its own motion to stay, it too has refused to participate in any discovery in this action. It filed a "joinder" to the Individual Defendants' stay motion, but added no substantive argument. Dkt. 126.

[2] 2040 Energy has not served any identification of any trade secrets or identified any specific intellectual property it claims to have developed or "own," other than pointing to this case and asserting "ownership" over all intellectual property claimed by Swan here.

4

construction." Dkt. 122-2 ¶ 38.2; *see also* Ex. 4 (SHA) ¶ 30.1 (SHA to be "construed in accordance with the law of England and Wales"). At the hearing, Justice Bright stated that he envisioned that ownership would "be a question about the construction of the contract." Ex. 2 at 52:2-4. The UK Court scheduled a six-day hearing on the merits of the "ownership" dispute between September 8 and 19, 2025. Ex. 1 ¶¶ 4(a), 6.

## III.  <u>LEGAL STANDARD</u>

"The proponent of a stay bears the burden of establishing its need." *Conway v. City of Palm* Desert, 2022 WL 19237935, at *5 (C.D. Cal. Sept. 6, 2022) (quoting *Clinton v. Jones*, 520 U.S. 681, 708 (1997)). Defendants ask this Court to abstain from exercising federal jurisdiction and proceeding with this case, but "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. V. U. S.*, 424 U.S. 800, 813 (1976). "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it," and is justified "only in the exceptional circumstances where . . . [abstention] would clearly serve an important countervailing interest." *Id.* (quotation omitted).

If there is "*any substantial doubt*" as to whether the foreign proceeding "will be an adequate vehicle for the complete and prompt resolution of the issues between the parties," then "it would be a serious abuse of discretion to grant the stay." *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 (9th Cir. 1993) (emphasis in original) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)). Granting a stay under *Colorado River* "necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case." *Moses H. Cone*, 460 U.S. at 28.

IV.    **ARGUMENT**

    A.    **The Forum Selection Clause in the SHA Does Not Warrant A Stay**

    Defendants devote several pages (Mot. 13-17) to a forum selection clause in the SHA between Swan, Tether, and 2040 Energy.  But the forum selection clause has no direct relevance to this case because the clause does not cover disputes between Swan and Defendants.  That provision provides: "Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Agreement or its subject matter or formation."  Ex. 4, Section 30.2.  It does not include reference to third parties to the agreement or in any way extend to cover disputes between Swan and the Defendants.

    Likely recognizing the limitations in their position, Defendants do not argue that the forum selection clause directly warrants a stay here.  That argument would not make sense anyway, because a court enforces a forum selection clause by transferring or dismissing an action, not by staying it, and Defendants have not moved to dismiss on these grounds.  *See Lee v. Fisher*, 70 F.4th 1129, 1155 (9th Cir. 2023).  Thus Defendants' references to the doctrine of *forum non conveniens*, and the authority they cite regarding that doctrine, has no applicability here.

    Although Defendants contend that the "ownership" issue must be decided in the UK, they do not contend that the forum selection clause requires Swan to litigate its claims against Defendants (who are not parties to the SHA) in the UK, or that the forum selection clause requires this Court to dismiss or transfer this action.  The UK Claimants also conceded in the UK Action that the SHA does ***not*** "compel[] Swan . . . to sue for its claim against these California defendants in England. . . .  We're not saying that." Ex. 2 (Day 1 UK transcript) at 49:13-19; *id.*

at 81:13-82:1.[3]  Defendants' entire argument regarding the forum selection clause is a red herring.

### B.    The Court Should Not Stay This Case Based on the UK Action

#### 1.    *Colorado River Is The Applicable Framework For A Stay*

Where a request for a stay is premised on pending foreign proceedings, *Colorado River* provides the applicable framework.  *Colorado River*, 424 U.S. at 800.  Defendants ignore the controlling *Colorado River* doctrine and instead argue that the Court should consider their stay request under the test from *Landis v. North American Co.,* 299 U.S. 248, 254 (1936).  *See* Mot. 18 (citing *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109-10 (9th Cir. 2005) (articulating factors from *Landis*)).  Defendants are wrong.  Although *Colorado River* involved parallel proceedings in state court, its holding applies to federal courts in the Ninth Circuit considering whether to stay an action based on proceedings in a foreign court.  *Neuchatel Swiss General Ins. Co. v. Lufthansa Airlines,* 925 F.2d 1193, 1195 (9th Cir. 1991) (applying *Colorado River* and explaining that "the fact that the parallel proceedings are pending in a foreign jurisdiction rather than in a state court is immaterial").

Instructive on the application of *Colorado River* or *Landis* is *Aldini AG v. Silvaco, Inc.*, 21-CV-06423-JST, 2022 WL 20208930 (N.D. Cal. May 17, 2022).  There, Judge Tigar addressed at length "whether a *Landis* stay is available when the parallel proceeding is pending in a foreign court as opposed to another federal

---

[3]    A heading in Defendants' Motion states that "Swan Agreed to Adjudicate ***All*** Disputes in the UK."  Mot. 13 (emphasis added).  This may be a typo or a relic of a discarded argument from an earlier draft.  Defendants do not contend that Swan agreed to litigate "all" disputes in the UK.  Defendants argue that Swan agreed to litigate the issue of IP ownership with 2040 Energy and Tether.  *See* Mot. 13 (referencing the "binding venue clause that governs the threshold issue in this case—whether or not Swan owns the alleged trade secrets and confidential information"); *id.* at 14 ("Within this valid and enforceable forum selection clause falls squarely the issue of ownership of the alleged trade secrets and confidential information at issue in this case."); *id.* at 15 ("The SHA's forum selection clause thus expressly governs resolution of the fundamental issue of ownership here.").

7

court," and concluded that courts must follow *Colorado River* when evaluating a stay based on a foreign proceeding:  "[T]here is no reason the Court should rely on *Landis* to yield to a foreign proceeding."  *Id.* at *4-5; *see also Cummins-Allison Corp. v. SBM Co.*, 2013 WL 12205188, at *5 (D. Haw. Oct. 7, 2013) ("The Ninth Circuit Court of Appeals . . . appl[ies] the *Colorado River* doctrine when evaluating a motion to stay a federal district court case when there are concurrent proceedings in a foreign court.").

Since Defendants ignore *Colorado River* altogether, they never justify applying *Landis* instead, much less cite authority supporting that proposition.  It is therefore unsurprising that none of the authority they cite (Mot. 20) holds that a federal court should stay proceedings based on foreign litigation between different parties.  *See Cullum v. Manheim Invs., Inc.*, 2016 WL 11809110, at *2 (C.D. Cal. Dec. 6, 2016) (granting a stay pending the determination of a dispositive issue by the California Supreme Court); *Jackson v. Marten Transp., Ltd. et al*., 2025 WL 342083, at *4-5 (C.D. Cal. Jan. 30, 2025) (granting a stay "pending resolution of various parallel state and federal court actions").

Defendants cite *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007), but that case comes out the wrong way for them. The district court there granted a stay under *Landis* based on a foreign arbitration; the Ninth Circuit ruled that the district court abused its discretion in granting the stay under *Landis* and thus did not need to decide whether the district court should have considered the stay under the more stringent *Colorado River* test instead.  *Id.* And the Ninth Circuit in *Dependable* frowned on the exact gamesmanship Defendants and the UK Claimants are attempting here.  The plaintiff in *Dependable*, like Swan here, "filed suit in a U.S. forum before [defendant] brought its anti-suit injunction action in the English court," and the *Dependable* court observed that "the clear thrust of [the] English action was to halt [plaintiff's] domestic proceedings— a tactic frowned upon" by the Ninth Circuit.  *Id.* at 1068.  "Indeed, the express

8

purpose of an anti-suit injunction, be it offensive or defensive, is to block litigation in a separate forum.  Comity is not required where the British action was filed after the U.S. action for the sole purpose of interfering with the U.S. suit." *Id.* at 1069.[4] Defendants' scheming does not entitle them to a stay.

### 2.    *A Stay Is Not Warranted Under Colorado River*

Under the test set out by the Supreme Court in *Colorado River*, there must be "exceptional circumstances" for this Court to stay this case in deference to the UK Action.  *Colorado River*, 424 U.S. at 813.  The Supreme Court recognized the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* at 817.  To determine whether the *Colorado River* "exceptional circumstances" are present, this Court may consider eight factors.  *R.R. St. & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 978-79 (9th Cir. 2011).  However, "if there is substantial doubt as to whether the foreign proceeding will resolve the federal action, there is no need to even undertake this multi-factor analysis." *Farhang v. Indian Inst. of Tech., Kharagpur*, C-08-02658 RMW, 2010 WL 2228936, at *2 (N.D. Cal. June 1, 2010).  A stay order is permitted **only if** the Court has "full confidence" that the UK Action "will end" this litigation.  *Intel*, 12 F.3d at 913 (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 277 (1988)).  Here, Defendants cannot show that the UK Action will end this action; as discussed below, the UK Action will not materially alter proceedings in this case.

Further, a stay under *Colorado River* is not appropriate where the issues in the foreign proceeding are not "substantially similar," such as where the domestic

---

[4]    Any argument that *Dependable Highway* suggests that *Landis* is the proper framework when a stay is requested pending foreign proceedings would be incompatible with the Ninth Circuit's holding in *Neuchatel*, 925 F.2d at 1195, that federal courts do not owe "greater deference to foreign courts than to our own state courts."  As one District Court observed, "[i]t appears that the *Dependable* court's failure to acknowledge *Neuchatel* may have been oversight."  *Cummins-Allison Corp.*, 2013 WL 12205188, at *5.

defendants "are not parties to the [foreign] proceedings" and where the claims in the domestic case "differ significantly from those pending in [the foreign action]." *Aldini AG*, 2022 WL 20208930, at \*3. That is the case here. Defendants are not parties to the UK Action. There are *no* overlapping claims between this action and the UK Action. Thus, Defendants' motion to stay, properly considered under *Colorado River*, fails at the threshold.

Even the eight-factor test, which the Court need not reach to deny Defendants' motion, strongly disfavors a stay. The factors are: "(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court." *R.R. St. & Co. Inc.*, 656 F.3d at 978-79. Defendants' motion does not attempt to establish any of these factors, and therefore Defendants, as the moving party, failed to carry their burden for a stay. And all eight factors weigh against a stay.

**Which Court First Assumed Jurisdiction over Any Property at stake.** This factor does not apply, because intellectual property is "not the sort of tangible physical property referred to in *Colorado River*." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988). Even if this factor did apply, it would weigh against a stay because this Court assumed jurisdiction long before the UK Court.

**Convenience.** Defendants cannot show that "the inconvenience of the federal forum is so great that this factor points toward abstention." *Cummins-Allison Corp.*, 2013 WL 12205188, at \*5. The agreements between the Individual Defendants and Swan each contain forum selection provisions requiring litigation to proceed in this

District.  *See* Dkt. 101 Exs. A-F, Section 13(A).  The Individual Defendants have therefore waived any argument that this District is inconvenient.  *See Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 64 (2013) ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves."). Moreover, Swan is located in the United States, as are most of the Bitcoin mining sites at issue.  *See* Dkt. 111-1.

*Piecemeal litigation.*  There is little prospect of "piecemeal" litigation because the UK Action will not adjudicate any claims that Swan asserts here.  The UK Action might decide "ownership"—but there is no indication it will use the same "possessory" test that applies here, because the UK Claimants and the UK Court have both indicated that the UK Action will decide "ownership" based on an interpretation of the SHA under English law.  Dkt. 122-2¶ 38.2; Ex. 2 at 52:2-4. Further, the "mere possibility of piecemeal litigation does not constitute an exceptional circumstance." *R.R. St. & Co. Inc.*, 656 F.3d at 979.  That is particularly true here because any piecemeal litigation exists only because the UK Claimants have manufactured it with a later-filed action.

*Case order.*  This case was first-filed, with the UK Action coming months later.  Defendants claim that the UK Action "has already substantively progressed past this case," Mot. 4, but the "Ninth Circuit has rejected the idea that federal courts should abstain simply because parallel proceedings are taking place in a foreign court, even if more progress has been made in the foreign proceeding." *Farhang*, 2010 WL 2228936, at *2 (citing *Neuchatel*, 925 F.2d at 1195).

Also, it is nonsense to say that the UK Action has substantively progressed. Swan has not yet pleaded its defense.  The hearing of the "ownership" issue is scheduled for September 2025, close to the time that fact discovery will close in this case.  Ex. 1 ¶ 5.  Indeed, the only meaningful hearing that has happened to date in the UK Action was the one where the UK court made it clear that ***discovery in this***

***action should not be restrained*** notwithstanding the UK Action. In any case, Defendants should not be rewarded for their own foot-dragging here, such as their refusal even to serve initial disclosures or otherwise participate in discovery. *See* Dkt. 129.

***Applicable law***. As discussed, all of Swan's asserted claims will be decided under either the federal Defend Trade Secrets Act or under California law, and this Court has more knowledge of those laws than the UK Court. Other than commenting that this appears to be a question as to construction of the SHA, Ex. 2 at 52:2-4, the UK Court has not yet determined which law it will apply to determine the "ownership" dispute that the UK Claimants have manufactured. Ex. 1 ¶ 6 (explaining that the "precise formulation of the preliminary [ownership] issue" has not yet been determined).

***Adequate protection of parties***. "A district court may not stay or dismiss the federal proceeding if the [foreign] proceeding cannot adequately protect the rights of the federal litigants. For example, if there is a possibility that the parties will not be able to raise their claims in the [foreign] proceeding, a stay or dismissal is inappropriate." *R.R. St.*, 656 F.3d at 981. Here, no party contends that the UK Action is adequate to protect Swan's rights. Swan asserts no substantive causes of action there, and the Defendants are not parties there (nor could they be, given their forum selection agreements requiring suits be litigated here).

***Forum shopping***. This factor weighs against a stay. The UK Action is no more than a satellite litigation, initiated by Defendants' ally Tether, as part of a plan to stop or delay this case consistent with Defendants' plan to obtain "Legal cover from Tether." AC ¶ 8.

***Resolution of all issues***. The UK Action will not resolve all of Swan's claims in this Court. Swan has not filed any claims in the UK Action. To the extent that the UK Court decides the "ownership" issue (which the UK Court will itself define), that decision will not resolve Swan's claims here, as discussed further below.

**3.    The Landis Factors Do Not Apply, and Regardless, They Counsel Against a Stay**

Although *Landis* does not apply here, the *Landis* factors—(i) possible damage to Swan resulting from a stay; (ii) hardship on Defendants without a stay; and (iii) the orderly course of justice—also do not support a stay.  Under *Landis*, if there is "even a fair possibility that the stay . . . will work damage to someone else," the party seeking the stay "must make out a clear case of hardship or inequity." *Landis*, 299 U.S. at 255 (internal quotation marks omitted).  Defendants have not met this burden.

On the first *Landis* factor, there is more than a "fair possibility" that a stay will harm Swan.  Stay means delay, and delay is harmful to Swan.  *In re Prime Healthcare ERISA Litigation*, 2022 WL 2102992, at *2 (C. D. Cal. Jan. 7, 2022) (denying a motion to stay where "[p]laintiffs will be prejudiced if they cannot expeditiously pursue their case").  The harm to Swan is discussed further below at section IV.B(4).

On the second factor, Defendants cannot show a "clear case of hardship" because their only alleged hardship is the "burden of defending" against Swan's claims.  *See* Mot. 19-21.  That is not cognizable as a hardship for purposes of deciding whether to stay a case.  *See Lockyer*, 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*."); *Valentino S.p.A v. Mario Valentino S.p.A.,* 2020 WL 7382765, at *10 (C.D. Cal. Nov. 4, 2020) (party "has not identified any particular damage, hardship, or inequity that would result if this action proceeds, only the burden of defending it").

Finally, on the third factor, Defendants have not shown that a stay will serve the orderly course of justice.  Although Defendants argue (Mot. 21) that a ruling by the UK court on "ownership" could resolve Swan's First Second, Fifth, and Seventh Causes of Action "in their entirety," that is not the case.  Swan's claims do not hinge

on "ownership" as the UK Claimants or Defendants hope to apply it.  The UK Action has not yet determined the "formulation" it will use to determine "ownership," Ex. 1 ¶ 6, but the UK Court has expressed the view that the issue should be decided based on interpretation of the SHA under English law.  Ex. 2 at 52:2-4.  The UK Court's indication was no doubt informed by the UK Claimants' pleaded case that 2040 Energy owns the "Business Assets" based on the "true construction" of the SHA. Dkt. 122-2 ¶ 38.2.  Whatever the UK Court decides about "ownership" under the SHA has no bearing on whether Swan can establish that it "possesses" the trade secrets alleged here, which is the applicable test and one that Swan easily meets, as discussed below.

### 4. *Trade Secret Ownership Is Not A "Threshold Issue" To Swan's Claims*

*First Cause of Action (Trade Secret Misappropriation).*  Trade secret ownership, particularly the way that the UK Action appears poised to decide it, is not a "threshold" issue to Swan's trade secret claim because a party does not need to "own" a trade secret "in a traditional sense" to assert a trade secret claim. *Masimo Corp. v. Apple Inc.*, 2023 WL 2633961, at *2 (C.D. Cal. Feb. 10, 2023).  Rather, "the general principle of trade secret ownership is that the one who discovers, develops, or compiles a trade secret is the owner of the trade secret." *Id.* (quoting Trade Secrets Practice in California § 2.1 (2d Ed. Nov. 2018)).

Swan's development of its trade secrets and confidential information resembles the facts in *Masimo*.  There, "each trade secret at issue was developed by . . . employees who assigned intellectual property rights to Plaintiffs," and that sufficed to show that the plaintiffs had sufficient "possession" to assert trade secret claims. *Masimo*, 2023 WL 2633961, at *2.  Similarly here, Defendants concede that Swan's employees and consultants (its "mining team") ran the "day-to-day operations" of the mining operation, and that Swan's "sweat equity" in this regard entitled Swan to an ownership stake in the 2040 Energy joint venture.  Mot. 4.

Swan's mining team routinely discussed the alleged trade secrets in confidential internal conversations, and developed and referenced the trade secrets in confidential internal documents. *See* generally Dkt. 111-1.

And importantly, each member of Swan's mining team (i.e., the Individual Defendants) agreed to assign all intellectual property rights from their work to Swan. AC ¶ 96 ("Consultant agrees that all right, title, and interest in and to any . . . inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement, . . . and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, 'Inventions'), are the sole property of [Swan].");  *see VFD Consulting, Inc. v. 21ˢᵗ Servs.*, 425 F. Supp. 2d 1037, 1049 (N.D. Cal. 2006) (at summary judgment, finding the contract "specifically state[d]" that the proprietary system at issue belonged to a party). Each Individual Defendant and member of Swan's mining team also expressly agreed that "no ownership of Confidential Information is conveyed to the Consultant," i.e., to the Individual Defendant. AC ¶ 100. These agreements could not be clearer that *Swan* always owned the intellectual property (including any trade secrets) that resulted from Defendants' work for Swan. Defendants (and the UK Claimants) do not present any valid reason to disregard this clear assignment of trade secret ownership to Swan.

Further, in regard to trade secrets, "possession is often sufficient to show ownership." *Masimo*, 2023 WL 263391, at *2; *see also*, *e.g.*, *Cedars Sinai Med. Ctr. V. Quest Diagnostic Inc.*, 2019 WL 12521480, at *5 (C.D. Cal. Aug. 9, 2019) (citing approvingly to decision holding that "possession is sufficient as long as secrecy is maintained"); *BladeRoom Grp. Ltd. V. Facebook, Inc.*, 219 F. Supp. 3d 984, 990 (N.D. Cal. 2017) ("[T]the better focus for determining whether a party can

assert a misappropriation claim is on that party's possession of secret knowledge, rather than on the party's status as a true 'owner.'").

As such, to "plausibly allege ownership of a trade secret," it suffices for a party to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge." *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, 2018 WL 2463869, at *3 (E.D. Cal. June 1, 2018) (quotation omitted). "To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist." *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal. 2023) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020)). Swan has thus already proven its ownership under the applicable standard by filing its Identification of Asserted Trade Secrets. Dkt. 111-1.

By contrast, there is no provision in the SHA, which governs the rights of 2040 Energy, that assigns any of Swan's intellectual property rights to 2040 Energy. Indeed, Defendants cite no provision in their Motion that they even contend would assign Swan's rights. And the UK Court indicated at the hearing that took place on February 25-26, 2025 that whether 2040 Energy "owns" intellectual property under the SHA would be an assessment of contractual construction under English law. Ex. 2 at 51:16-52:4. That is not at all the same question as whether Swan "owns" intellectual property for purposes of asserting its trade secret and other claims here.

Defendants' authority (Mot. 20-21) has nothing to do with whether "ownership" is required to assert a trade secret claim, let alone whether a factual dispute about "ownership" would provide a basis for staying an entire action. *See Jackson,* 2025 WL 342083, at *4 (involving wage-and-hour class action claims); *BCS Bus. Consulting Servs. Pet. Ltd. v. Baker*, 2024 WL 4848789, at *7 (C.D. Cal. Nov. 4, 2024) (involving the ownership of assets in a trust dispute); *Sluimer v. Verity, Inc.*, 606 F.3d 584, 592 (9th Cir. 2010) (entitlement to ERISA benefits).

Even if the UK Court were to find that 2040 Energy *also* had an ownership or possessory interest in the trade secrets, and even if that finding were somehow binding in this action, that still would not defeat Swan's trade secret claims because Swan owns a stake in 2040 Energy.  Joint ownership does not defeat one joint owner's right to assert claims for trade secret misappropriation.  *See, e.g.*, *StrikePoint Trading, LLC v. Sabolyk*, 2008 WL 11334084, at *6 (C.D. Cal. Dec. 22, 2008) ("trade secrets can be jointly owned and, in fact, joint owner can bring a claim for trade secret misappropriation against the other owner"); *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D. 520, 527-28 (W.D. Tenn. 2015) (holding that two entities "possessed" the trade secrets and therefore both "ha[d] a substantive right to relief" under the Tennessee trade secrets statute, which is a UTSA statute analogous to DTSA).  Swan's claims thus do not hinge on whether Swan has an "exclusive" ownership interest because Swan can assert trade secrets even if 2040 Energy also has ownership rights, as long as Swan possessed those trade secrets.  *Masimo*, 2023 WL 263391, at *2; *see also Morton v. Rank America, Inc.*, 812 F. Supp. 1062, 1074 (C.D. Cal. 1993).

Whether Swan is ultimately found to be a sole or concurrent owner of the trade secrets will make no difference during the discovery phase.  In fact, the UK Court considered whether discovery in this case could proceed prior to its determination of the "ownership" question, and confirmed it ***could***.  Ex. 3 at 52:8-16.  Defendants have not identified any discovery that will occur if Swan is deemed the sole owner of the trade secrets that will not occur if another entity is an "owner" too.  Either way, the focus of discovery will be the development of Swan's Bitcoin mining business, the circumstances surrounding Defendants' mass resignation and theft of Swan's trade secrets for Proton, Defendants' Bitcoin mining activities

following their formation of Proton, and the damages caused by Defendants' misconduct.[5]

**Second Cause of Action (Breach Of Consulting Agreement).** Swan accuses the Individual Defendants of breaching their agreements with Swan, including promises not to misuse confidential information and trade secrets. AC ¶¶ 100, 226. Those Agreements clearly define Swan's confidential information as including "technical data, trade secrets, or knowhow, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers . . . software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information." *Id.* ¶ 100. Defendants have never identified any subsequent agreement or operation of law— including the SHA—that would deprive Swan of its ownership of that confidential information or that would preclude Swan from seeking relief against Defendants for breaching that provision.

The Individual Defendants agreed not to use that information "for any purpose whatsoever other than as necessary for the performance of the Services on behalf of [Swan]," AC ¶ 227, but the Individual Defendants breached those provisions by using Swan's confidential information (as defined in the Defendants' agreements) to mine Bitcoin for Proton (and potentially others). As Swan explained in its Complaint, even though the Defendants previously claimed to be mining Bitcoin only for the benefit of 2040 Energy, Defendants are actually sending their mining profits elsewhere, to the detriment of Swan's interest. *See* AC ¶¶ 13, 33, 125, 170, 181-205. Swan has served targeted discovery to determine the extent to

---

[5]  Swan intends to take plenary discovery from Proton, but take discovery from the Independent Defendants only in connection with a preliminary injunction.

which Defendants are sending mining proceeds outside of 2040 Energy.  Dkts. 114-2, 114-3.

*Third Cause of Action (Tortious Interference) and Fourth Cause of Action (Aiding and Abetting Breach of Duty of Loyalty)*.  The allegations under the Third Cause of Action are similar to the allegations underlying the Second Cause of Action for breach of contract.  Swan alleges that Swan's former employees and consultants warranted not to "engage in any acts of competition against the interests of [Swan]," yet interfered with the other Defendants' agreements "by working on behalf of Proton's competing mining business."  AC ¶¶ 236, 240.  Likewise, the Fourth Cause Of Action for aiding and abetting breach of duty of loyalty is based on Proton's inducing Swan's employees to "assist Defendant Proton in preparing to compete with Swan's mining business."  *Id.* ¶ 249.

Defendants concede this claim is "not tied specifically to Swan's alleged trade secrets or confidential information claims."  Mot. 22.  This concession—that this claim does not rely on the trade secret or confidential information claims, and thus clearly does not rise or fall with any decision about intellectual property "ownership"—is fatal to Defendants' motion because it confirms that the discovery that Defendants seek to avoid will occur independent of any decision on trade secret "ownership."  And the discovery on these claims will significantly overlap with the discovery Swan seeks on its other claims.  Litigating these claims, including damages as to Proton, requires discovery into the development and value of the Swan Bitcoin mining operation, Defendants' resignation from Swan, and the formation of Proton and the Bitcoin mining activities occurring there.[6]

*Fifth Cause of Action (Unfair Competition)*.  Likewise here, Swan alleges that Defendants "effectively [stole] Swan's Bitcoin mining business and set up an illegal copycat, bypassing all the investment of time and resources that Swan

---

[6]  Again, plenary discovery will be focused on Proton while discovery from the Individual Defendants will be in support of a preliminary injunction.

undertook to grow its full Bitcoin mining business." AC ¶ 255. Regardless who "owns" the trade secrets in the (legally irrelevant) sense that Defendants are pursuing, this cause of action stands because Swan alleges that Defendants acted "unlawfully and unfairly under California's UCL by orchestrating and carrying out a course of conduct to disrupt, divert, and steal Swan's entire Bitcoin mining business." *Id.* ¶ 254. Again, resolving this claim requires discovery into the development and value of the Swan Bitcoin mining operation, Defendants' resignation from Swan, and the formation of Proton and the Bitcoin mining activities occurring there.[7]

**Seventh Cause of Action (Civil Conspiracy).** Here as well, Swan accuses Defendants of "performing the lawful acts of competing with Swan and hiring certain of Swan personnel, but doing so through the unlawful means of violating Swan's contractual, statutory, and common-law rights." AC ¶ 263. By its plain language, this allegation does not hinge on any misappropriation of trade secrets, let alone their ownership. And again, this claim requires discovery into Defendants' work at Swan, resignation from Swan, and post-resignation activities at Proton.[8]

## 5.    *A Stay Will Prejudice Swan*

Because Swan's claims and discovery will go forward no matter how the UK Court rules on the narrow and almost entirely irrelevant "ownership" issue that the UK Claimants have presented in the context of the UK Action, there is no benefit to staying this case while the UK Action plays out. But any further delay will be prejudicial to Swan. Given that a stay benefits no parties but causes harm to Swan, Defendants' motion should be denied. *See Landis*, 299 U.S. at 255 (movant must "make out a clear case of hardship or inequity in being required to go forward, if

---

[7]    Again, plenary discovery will be focused on Proton while discovery from the Individual Defendants will be in support of a preliminary injunction.

[8]    Again, plenary discovery will be focused on Proton while discovery from the Individual Defendants will be in support of a preliminary injunction.

1   there is even a fair possibility that the stay . . . will work damage to someone else.").

2       Defendants argue (Mot. 18-19) that a stay would not harm Swan.  But it is

3   fundamental that "a civil plaintiff has an interest in having her case resolved

4   quickly."  *ESG Capital Partners LP v. Stratos*, 22 F. Supp. 3d 1042, 1046 (C.D.

5   Cal. 2014); *see also* Fed. R. Civ. P. 1  (promoting the "just, speedy, and inexpensive

6   determination of every action").  Indeed, in considering the UK Claimants' request

7   to have the UK Court stay discovery in this action, the UK Court recognized that

8   "[t]he prejudice to [Swan] is delay."  Ex. 2 at 50:23.  And although the UK Court is

9   scheduled to hold a hearing on the ownership issue in September 2025, the losing

10  party may appeal and thus the length of Defendants' requested stay is indeterminate.

11  *See Chrome Hearts, LLC v. Old Sch. Fairfax, Inc.*, 2018 WL 1942766, at *3 (C.D.

12  Cal. Feb. 26, 2018) (noting that a "stay for an indeterminate period of time

13  prejudices the plaintiff").

14      Delay is especially prejudicial here given the nature of Defendants' prior and

15  ongoing misconduct.  Swan's damage is severe: Defendants stole Swan's entire

16  Bitcoin mining business and are using essentially all of Swan's trade secrets and

17  intellectual property to operate a competing business.  *See* AC ¶ 254; *see also*

18  *Biomet Biologics, LLC v. Bio Rich Med., Inc.*, SACV 10-1582 DOC, 2011 WL

19  4448972, at *2 (C.D. Cal. Sept. 26, 2011) (denying stay because, *inter alia*, in

20  competitor cases, "a delay has the potential to cause severe prejudice").  Swan is

21  largely in the dark about the extent of Defendants' misappropriation or the harm

22  they continue to do.  Swan does not know, for instance, about the status of its old

23  Bitcoin mining sites, whether its former employees have expanded Swan's Bitcoin

24  mining operation to new locations (without including Swan), where or to whom

25  Defendants have disclosed Swan's trade secrets, or what happened to the flow of

26  Bitcoin from Swan's mining operations.  *See* AC ¶ 184.

27      The Court should not condone Defendants' scheme to stay this litigation

28  based on a later-filed litigation by the UK Claimants, especially where the UK Court

already refused that very request.  To grant a stay here would signal that any defendant could achieve a stay by filing an action in a different jurisdiction (or by causing co-conspirators to file an action), which would surely ***increase*** the amount of "concurrent foreign proceedings."  *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1158 n. 12 (C.D. Cal. 2005) ("if the existence of a concurrent foreign proceeding were sufficient to bar federal court jurisdiction, that would frustrate the ability of federal courts to adjudicate cases involving American law").

Finally, Defendants argue (Mot. 19) that a stay is not harmful because Swan is required to pursue its claims against the Individual Defendants through arbitration.  Defendants are fundamentally wrong about the scope of the arbitration requirement, as set forth in Defendants' concurrently-filed opposition to Defendants' motion to compel arbitration.  Moreover, Defendants' argument is misplaced because Defendants concede that Swan is entitled to seek a preliminary injunction, and Swan intends to seek that relief pending the results of early discovery served on Defendants. *See* Dkt. 114-1, at 4; *see Pyro Spectaculars North, Inc. v. Souzam*, 2012 WL 13220023, at *3 (E.D. Cal. Feb. 8 , 2012) (allowing discovery "tailored to a potential motion for a preliminary injunction."); *Accretive Specialty Insurance Solutions*, *LLC v. XPT Partners, LLC*, 2023 WL 9019017, at *2 (C.D. Cal. Oct. 13, 2023) (allowing discovery for the "purposes of the evidence to be presented to the Court at the preliminary injunction hearing."); *Philips North America LLC v. Advanced Imaging Services*, 2021 WL 2593291, at *5 (E.D. Cal. Jun. 24, 2021) (allowing discovery "directly related to a pending motion for a preliminary injunction").

### 6.    *Defendants' Collateral Estoppel Argument Fails*

Defendants argue (Mot. 20-21) that the UK Action may collaterally estop Swan from litigating ownership.  Courts sometimes stay proceedings to allow parallel proceedings to play out where a stay will serve judicial efficiency, such as where the two proceedings are "substantially similar." *Jackson*, 2025 WL 342083,

22

at *2.  But that is not the case here.  The scope of the hearing set for September 2025 in the UK Action has not yet been determined. However, Justice Bright indicated that he sees the dispute primarily as a question about construction of the SHA (a different standard that would not even govern Swan's trade secret claims here).  In this case, Swan alleges seven causes of action and none will be streamlined to any material extent by decision in the UK Action about SHA interpretation.

Indeed, it is doubtful any ruling from the UK Court would bind this Court. Collateral estoppel applies only if the UK Court decides an issue "identical" to an issue in dispute in this case.  *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1322 (9th Cir. 1992).  Defendants have not made this showing.  Defendants have not stated what law the UK court will apply in determining "ownership," or even what definition of "ownership" might govern.  Ex. 1 ¶ 6.  If the UK Action decides ownership under the SHA as interpreted under English law, that is irrelevant to the "possession" framework that applies under the DTSA.  Accordingly, the decision from the UK Action would not be binding due to a lack of identicality.  *Clark*, 966 F.2d at 1322.

Given the uncertainty (indeed, unlikelihood) of whether the UK Action will apply the same law applicable to trade secrets at issue in this case, Defendants and this Court can only speculate as to whether the UK Action would have estoppel effect here.  That is not sufficient to grant a stay.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to stay.

1    DATED:  March 7, 2025            QUINN EMANUEL URQUHART &
2                                     SULLIVAN, LLP

3

4
                                     By  /s/ Ryan S. Landes
5                                         RYAN S. LANDES (State Bar No. 252642)
                                          ryanlandes@quinnemanuel.com
6                                         865 S Figueroa Street, Floor 10
                                          Los Angeles, CA 90017-5003
7                                         Telephone: (213) 443-3145
                                          Facsimile: (213) 443-3100
8

9                                         STACYLYN M. DOORE (*pro hac vice*)
                                          stacylyndoore@quinnemanuel.com
10                                        111 Huntington Avenue, Suite 520
                                          Boston, MA 02199
11                                        Telephone: (617) 712-7100
                                          Facsimile: (617) 712-7200
12

13                                        RACHEL E. EPSTEIN (*pro hac vice*)
                                          rachelepstein@quinnemanuel.com
14                                        295 Fifth Avenue
                                          New York, NY 10016
15                                        Telephone: (212) 849-7000
                                          Facsimile: (212) 849-7100
16

17                                        *Attorneys for Plaintiff*
                                          *ELECTRIC SOLIDUS, INC. d/b/a SWAN*
18                                        *BITCOIN*

19

20

21

22

23

24

25

26

27

28