RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:  (213) 443-3145/Fax: (213) 443-3100

STACYLYN M. DOORE (admitted pro hac vice)
stacylyndoore@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:  (617) 712-7100/Fax: (617) 712-7200

RACHEL E. EPSTEIN (admitted pro hac vice)
rachelepstein@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
Telephone:  (212) 849-7000/Fax:  (212) 849-7100

[*Additional counsel on signature page*]

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN, a Delaware corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>PROTON MANAGEMENT LTD., a British Virgin Islands corporation; THOMAS PATRICK FURLONG; ILIOS CORP., a California corporation; MICHAEL ALEXANDER HOLMES; RAFAEL DIAS MONTELEONE; SANTHIRAN NAIDOO; ENRIQUE ROMUALDEZ; and LUCAS VASCONCELOS,<br><br>          Defendants. | Case No. 2:24-cv-8280-MWC-E<br><br>**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL**<br><br>**DISCOVERY MATTER**<br><br>Hearing Date:        May 16, 2025<br>Time:                       9:30 a.m.<br>Place:        Courtroom 750, 7th Fl.<br>Judge:        Hon. Charles F. Eick<br><br>Discovery Cutoff:        11-7-2025<br>Pre-Trial Conf. Date:  4-26-2026<br>Trial Date:                5-4-2026 |

1

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................1

      A.    Swan's Introductory Statement ...........................................1

      B.    Defendants' Introductory Statement.....................................4

II.   JOINT SPECIFICATION OF ISSUES IN DISPUTE ......................9

III.  SWAN'S CONTENTIONS AND REQUEST FOR RELIEF ...................14

      A.    Factual and Procedural Background...................................14

      B.    Legal Standard .........................................................18

      C.    Argument................................................................20

            1.    Swan's Trade Secret Identification Complies With the
                  Court's January 7 Order......................................21

            2.    Swan's RFPs and Interrogatories Seek Discoverable
                  Information. ................................................40

IV.   DEFENDANTS' CONTENTIONS.......................................47

      A.    Factual And Procedural Background.................................47

            1.    The Shareholder Agreement And Creation Of 2040
                  Energy. .....................................................47

            2.    Due To Swan's Mismanagement And Liquidity Crises,
                  Individual Defendants Resign. .............................48

            3.    After Swan Fails To Cure Its Material Breaches Of The
                  SHA, 2040 Energy Engages Defendant Proton. .........48

            4.    Swan Files Suit. ............................................48

            5.    Swan Makes Trade Secret Disclosures...................50

            6.    Defendants' Meet And Confer Efforts. .................51

      B.    Legal Standard ........................................................52

      C.    Argument................................................................54

            1.    Swan's Motion Is Moot Because Defendants Have
                  Supplemented Their Responses And Agreed To Produce
                  Documents....................................................54

            2.    Swan's Trade Secret Identification Is Inadequate...................55

1
2
            3.    Defendants Have Provided Supplemental Reponses To
                  The Discovery Demands At Issue Notwithstanding
                  Defendants' Well-Founded Objections. ................................86

3    V.    CONCLUSION ...........................................................................86

4          A.    Swan's Conclusion ...........................................................86

5          B.    Defendants' Conclusion....................................................87

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan") and Defendants Proton Management Ltd. ("Proton"), Thomas Patrick Furlong, Ilios Corp., Michael "Alex" Holmes, Rafael Dias Monteleone, Santhiran Naidoo, Enrique Romualdez, and Lucas Vasconcelos (the "Individual Defendants," collectively with Proton, the "Defendants") submit this joint stipulation regarding Swan's motion to compel.

# I.  INTRODUCTION

## A.  Swan's Introductory Statement

Swan moves for an order compelling Defendants to respond to targeted discovery requests that seek to determine the extent to which Defendants are continuing to operate Swan's former Bitcoin mining sites, and whether they are doing so solely for the benefit of 2040 Energy. This Court has already ruled that these "targeted requests are narrowly aimed at discovery relevant to Swan's requests for a preliminary injunction, that is, whether the Individual Defendants are using Swan's trade secrets outside of 2040 Energy." Dkt. 164 (April 9, 2025 Order) at 13.

In particular, the four requests for production and five interrogatories at issue seek to test Defendants' previous representations that they are mining "solely for the benefit of 2040 Energy . . . and no others." *See* Dkt. 164. at 8. Despite their previous representations, Defendants have repeatedly refused to confirm whether they are mining Bitcoin outside of that venture. Defendants cannot now avoid discovery that would confirm the extent of such activity. Especially now that the Court has reviewed these specific requests and expressly ruled that this it is relevant for Swan's forthcoming motion for a preliminary injunction. *Id.* at 13.

So far, Defendants have refused to respond to any of this discovery—or any discovery at all, or even to serve initial disclosures—largely on the basis of general objections that the Court has now conclusively rejected. Defendants objected that they need not respond to this discovery because (1) this action should be dismissed, (2) this action should be stayed, and (3) this action should be sent to arbitration.

The Court's Order of April 9 resolved each of these objections in Swan's favor. *See generally* Dkt. 164. And as to this discovery in particular, the Court acknowledged that Swan's discovery is "to aid the Court to analyze" a forthcoming motion for injunctive relief." *Id.* at 13. But Defendants have stonewalled that discovery. The Court's Order should have put a stop to Defendants' stonewalling, but unfortunately they are undeterred, and so this motion is necessary.

Defendants also continue to assert that they are under no obligation to participate in discovery because Swan's Identification of Asserted Trade Secrets is inadequate. *See* Dkt. 111-1 (sealed version of "Swan's Trade Secret Identification"); Dkt. 112 (public version of Swan's Trade Secret Identification) *see also* Dkt. 95 (Jan. 7, 2025 Order Setting Scheduling Conference, or "January 7 Order") (requiring identification).[1] Defendants have made clear that they will refuse to participate in *any* discovery until Swan serves an amended trade secret list with "such an exacting level of specificity that even [Defendants] are forced to agree the designation is adequate," but as the California Court of Appeal has recognized, "[w]e question whether any degree of specificity would satisfy that lofty standard." *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 836 (2005).

Indeed, the Court already rejected Defendants' objection to Swan's Trade Secret Identification, too. When Defendants raised the purported insufficiency of Swan's identification of its trade secrets as a basis to dismiss Swan's claims, *see* Dkt. 122-1 at 18-20, 20 n.17 (Individual Defendants' Memorandum in Support of Motion to Dismiss), the Court confirmed that Swan's First Amended Complaint ("FAC") "describes the four general categories of [Swan's] trade secrets with particularity and cites to exemplary documents." Dkt. 164 at 23. The Court further

---

[1]    In accordance with the Court's recent order, Dkt. 168, Swan will cite to both the sealed and public version of each document in the first instance but will cite to the sealed document in the citations that follow.

held that Swan's subsequent Trade Secret Identification "further identifies the trade secrets and shows that they exist." *Id.* at 23.  At this point, Defendants' continued refusal to respond to Swan's discovery is essentially open defiance of a Court order.

Indeed, Swan's Trade Secret Identification goes far above and beyond what courts have found sufficient.  That identification enumerates twenty asserted trade secrets, provides nearly thirty pages of narrative description explaining those trade secrets, and cites to documents (which Defendants stole) that contain Swan's trade secrets.  *See generally* Dkt. 111-1.

Even if Swan's Trade Secret Identification was not sufficiently specific, that is no reason to block Swan's initial targeted discovery.  The Court's January 7 Order makes clear:  "Discovery ***into trade secrets*** shall not commence until the identification has been served and filed, but the plaintiff may commence discovery ***on any other subject prior to the identification***."  Dkt. 95 at 7.  The discovery at issue here goes to Swan's other tort claims, and "discovery will be pertinent to moving those claims along."  Dkt. 164 at 32.  Finally, the handful of ticky-tack objections Defendants have raised to a subset of the discovery requests are also meritless.

Following the Court's Order denying Defendants' triple-headed effort to stop this case from progressing, and rejecting all of the excuses Defendants have used to avoid their discovery obligations, Swan asked Defendants whether they would withdraw their remaining objections and finally respond to this targeted discovery.  Ex. A (correspondence memorializing conferrals regarding discovery requests).  Defendants refused, stating vaguely that they would "provide supplemental responses," but stating expressly that they were "reserving all rights and objections" and that ***further*** Court intervention would be necessary before Defendants would respond to any discovery at all.  *Id.*  The parties are clearly at impasse, so Swan once again asks this Court to break through Defendants' stonewall.

Fact discovery closes on November 7, 2025. *See* Dkt. 119 at 3 (Civil Trial Order). Because all motions to compel "must be filed and heard *before*" that cutoff, *id.* at n.3, as a practical matter Swan must obtain and review the lion's share of discovery before the end of September. As it stands, Defendants have not produced a single document. Based on Defendants' conduct to date, Swan has every expectation that Swan will have to file further motions to compel compliance with all additional document requests and interrogatories that Swan serves.[2] It is therefore urgent that discovery proceed without further delay.

Swan respectfully requests that the Court enter an order overruling Defendants' objections to Swan's discovery and ordering Defendants to respond in full within seven days.

### B.    Defendants' Introductory Statement

The entirety of Swan's Motion is moot. Defendants have already amended their discovery responses in light of the Court's recent rulings on their previously pending motions.[3] To be sure, while reserving all rights and in an effort to move

---

[2]    Defendants have sought to avoid any and all discovery and Swan expects the Defendants to continue to do so. This Court has already granted in part Swan's motion to compel initial disclosures, which Defendants have yet to serve. *See* Dkt. 156; *see also* Dkt. 164 at 13 (noting that Swan has "even" needed to move to compel initial disclosures). Further, this Court has already rejected Defendants' *ex parte* application for a protective order continuing the return dates of Swan's third-party subpoenas. Dkt. 142. And the Court has rejected Defendants' motion to stay. Dkt. 164. These repeated attempts at obstructionism have violated this Court's express orders that discovery proceed. In its January 7 Order, the Court directed the parties "to begin to conduct discovery actively before the [March 21] Scheduling Conference," and to "obtain and produce most of what would be produced in the early stages of discovery, because at the Scheduling Conference the Court will impose strict deadlines to complete discovery." Dkt. 95 at 2. Defendants refused, and instead asked in the parties' Joint Rule 26(f) Report that the Court stay the case—requests that the Court denied on February 18, setting a full discovery schedule and a May 2026 trial date. *See* Dkt. 119 at 3.

[3]    On April 9, 2025, the Court denied, in relevant part, three pending motions by

4

discovery forward on Plaintiffs' threatened future motion for a preliminary injunction (discussed more below), Defendants have now provided substantive responses in connection with Swan's first sets of discovery requests that are at issue in this Motion and have agreed to produce responsive documents. Yet, Swan has refused to take this Motion off-calendar or to meet and confer on Defendants' supplemental responses.

Swan goes on for pages and pages trying to paint Defendants as stonewalling in discovery. This is simply not true, and surely the Court is getting tired of the blame game. The delays in this case lie squarely with Swan. It filed suit on September 25, 2024—about seven weeks after Individual Defendants resigned from Swan and almost seven months from today. Shortly after it filed its Complaint, Swan sought a temporary restraining order ("TRO"), and lost. The Court denied the TRO, stating "plaintiff has failed to establish *at least three of the four Winters factors.*"[4] At the same time it moved for a TRO, Swan also sought expedited discovery, and lost. Swan then moved again for expedited discovery, and once again, it lost. Swan then voluntarily withdrew its then-pending motion for preliminary injunction, which was set to be heard on November 8, 2024. In doing so, Swan represented that it anticipated filing a regular noticed motion for expedited discovery, but then filed nothing. In fact, Swan did not serve any discovery on

_____

Defendants that would have either been dispositive of or stayed the current case (Dkt. 164), including the Individual Defendants' motion to compel arbitration or, in the alternative, motion to dismiss; the Individual Defendants' motion to stay the case pending related litigation, in which Defendant Proton joined; and Defendant Proton's motion to dismiss for lack of personal jurisdiction and, in the alternative, motion to dismiss.

[4] To obtain interim injunctive relief, the plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Swan ignores the fact that the Court denied its request for a TRO on multiple grounds.

5

1  Defendants until months later on February 14, 2025.  To the extent there has been

2  any delay in this case it is by Swan; it has no one to blame for its delays but itself.

3        Indeed, Swan's grievance here appears to be that Defendants exercised their

4  rights by filing their motions, as they were well entitled to do.  These were not

5  frivolous or dilatory tactics, but appropriate (and necessary) legal arguments

6  concerning jurisdiction and arbitration that were raised early and consistently, and

7  are routinely filed in litigation.  Notably, Defendants filed their motions back in

8  December, but instead of fighting the issues head on, Swan amended its complaint,

9  which forced Defendants to refile their motions, thus delaying the resolution of

10  these threshold issues for a few months.[5]  As a result, it was Swan's strategic choice

11  to amend its complaint that has protracted this timeline—not Defendants' exercise

12  of their rights.

13        Setting all of this aside, there is no live discovery dispute over Defendants'

14  responses to the discovery at issue in this Motion, including in connection with the

15  inadequacy of Swan's Section 2019.210 Trade Secret Disclosure.  Just one day after

16  the Court ruled on Defendants' pending motions, on April 10, 2025, Defendants

17  advised Swan that they intended to amend their discovery responses based on the

18  Court's rulings.  Ex. A.  Rather than wait for Defendants' amended responses, Swan

19  instead prematurely served its portion of its joint statement in support of a motion

20  to compel the very next day.  But Defendants have now already provided

21  supplemental responses and agreed to produce documents.  And as noted,

22  Defendants have agreed not to withhold any documents in connection with the

23  discovery at issue here on the grounds of Swan's inadequate trade secret

24  disclosures—that issue will be fought separately and is simply not relevant to the

25  issues raised in this Motion here.  As a result, the relief Swan seeks—for this Court

26  _____

27  [5] Notably, Swan asked for additional time to respond to Defendants' motions, which
    Defendants granted.  Swan did not advise Defendants at that time that it intended to
28  amend its complaint, as opposed to opposing the motions on their merits.

to compel Defendants to respond to its discovery requests—is moot, and Swan's Motion should be denied.

In the event the Court is inclined to read through this now mooted and certainly vastly outdated joint statement to address Swan's arguments in support of its trade secret disclosures on this Motion, Swan has not met its burden under Section 2019.210.[6]  The Court gave specific instructions that Swan must serve detailed, specific disclosures about each alleged trade secret.  ECF No. 95 at 6-7. Instead, Swan served vague and conclusory disclosures that provide Defendants with little idea of the boundaries of Swan's claimed trade secrets.  ECF No. 111-1.

At bottom, Swan's Trade Secret Identification consists of generic industry concepts dressed in technical-sounding language, with no particularity as to what is actually protectable or distinguishable from what is generally known in the mining industry.  It is clear Swan made these bare disclosures as "strategy, not an accident." *Masimo Corp. v. Apple Inc.*, 2022 WL 1599841, at *2 (C.D. Cal. 2022) (internal citations omitted) ("trade secret plaintiffs rarely provide a precise and complete identification of the alleged trade secrets at issue" as "a strategy, not an accident."). In doing so, Swan seeks maximum flexibility to change its trade secrets later on in this action—which directly contradicts the purpose of the Court's order and policies underlying Section 2019.210.  *E.g.*, *M/A COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 U.S. Dist. LEXIS 228417, at *5-6 (N.D. Cal. Sept. 3, 2019) (inadequate descriptions "are not sufficiently concrete, leaving room for the designating party to change the meaning of the trade secret after the completion of discovery"); *Brescia v. Angelin*, 172 Cal. App. 4th 133, 144 (2009) (internal citations omitted) (citing *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 833-34 (2005)) (discussing several policies, including ensuring that defendants can

---

[6] Defendants separately intend to submit a motion to compel an adequate Section 2019.210 disclosure in accordance with the Court's Standing Order.

7

1    effectively defend against charges of trade secret appropriation before the eve of
2    trial). But, ultimately, Swan's trade secret disclosures are inadequate. Indeed,
3    Swan's Motion demonstrates that its disclosures are inadequate, by attempting to
4    import limitations that are not in the trade secret descriptions provided in the
5    disclosure.

6         Swan's strategic gamesmanship has been displayed throughout this brief and
7    throughout the meet and confer process about the inadequacy of the trade secret
8    disclosures. After the parties met and conferred, Swan said that it was considering
9    amending its disclosures. But instead of giving Defendants an answer one way or
10   the other, Swan cut off discussions and served its portion of this joint stipulation.
11   Swan included legal arguments it never raised on the meet and confer and more than
12   400 pages of exhibits, many of which Swan claims support its Trade Secret
13   Identification which Defendants received for the very first time, providing it only a
14   few days to review before Defendants' portion of this Joint Statement was due.

15        Recognizing that Swan intended to supplement its Trade Secret Identification
16   with statements made in and documents attached to this Motion, to avoid
17   unnecessary motion practice, Defendants sent Swan correspondence identifying
18   what it understood to be Swan's revised trade secret designations, to form a basis
19   for an amendment that would allow Swan's disclosure to conform to Section
20   2019.210. Ex. Q (April 15, 2025 letter). Swan still flatly refused to consider any
21   changes to its trade secret disclosure. It is unclear if the trade secret disclosure Swan
22   is defending is its original February 14, 2025 disclosure or as supplemented by this
23   Motion.

24        And as with its misleading factual narrative, Swan incorrectly asserts that the
25   Court concluded that Swan's disclosures are adequate in adjudicating Individual
26   Defendants' motion to dismiss (*see* Section I.A, *supra*). Swan mischaracterizes the
27   Court's April 9, 2025 order, in which the Court, in assessing whether Swan had met
28   its pleading burden evaluated the adequacy of Swan's allegations about the ***four***

8

trade secrets it alleged in the Amended Complaint. ECF No. 164 at 23. The Court did not discuss nor rule on whether Swan's trade secret disclosure met the Section 2019.210 standards. Further, and in contrast, Swan's Trade Secret Identification includes *twenty* separate disclosures, none of which match up with the trade secrets in the Amended Complaint. Simply, the Court has not weighed in on this issue. The adequacy of Swan's twenty trade secrets disclosures has yet to be determined.

For these reasons, Swan's current Motion should be denied.

## II.    JOINT SPECIFICATION OF ISSUES IN DISPUTE

The discovery requests at issue consist of four RFPs and five interrogatories. *See* Dkt. 114-3 (sealed version of Swan's Targeted RFPs) (the "RFPs"); Dkt. 115-3 (public version of Swan's Targeted RFPs); Dkt. 114-2 (sealed version of Swan's Targeted Interrogatories) (the "Interrogatories"); Dkt. 115-2 (public version of Swan's Targeted Interrogatories).[7] Those requests are reproduced in full below.

REQUEST FOR PRODUCTION NO. 1:

Documents sufficient to show, for all Bitcoin mined by Proton (to include Bitcoin mined by mining pools Proton is a member of):

    a) the wallet address(es) to which that Bitcoin has been deposited, the Persons with access to or control over each wallet, and the corporate ownership of each Person; and

    b) the amount of Bitcoin deposited in each wallet, and when deposited.

For the avoidance of doubt, this includes the Bitcoin wallets referenced in paragraphs 183-185 of the Amended Complaint, as well as any Bitcoin wallets to which Proton has redirected the proceeds from the wallets described in those

---

[7] Swan attached unredacted copies of the RFPs and Interrogatories to the parties' Joint Rule 26(f) Report. Those unredacted copies have been sealed, because the RFPs and Interrogatories reference material that remains under seal. Those portions of the RFPs and Interrogatories that remain under seal are highlighted in Dkt. 114-3 and Dkt, 114-2, and throughout this stipulation.

paragraphs of the Amended Complaint. *See* Dkt. 100-1 ¶¶ 183-185 (sealed version of Swan's Amended Complaint) (████████████████████████████████████████████████████████████████████████████████████████████████████████); Dkt. 101 ¶¶ 183-185 (public version of Swan's Amended Complaint).

REQUEST FOR PRODUCTION NO. 2:

Documents sufficient to identify every Site that Proton is using or ever has used or plans to use to mine Bitcoin, including for each site (on a weekly basis, where applicable):

a)  its location

b)  number and type of ASICS deployed;

c)  average hash rate;

d)  downtime reports;

e)  curtailment periods;

f)  operational costs;

g)  the amount of Bitcoin mined;

h)  proceeds resulting from Bitcoin mining; and

i)  all agreements with or relating to the Site.

REQUEST FOR PRODUCTION NO. 3:

Documents sufficient to identify any Person for whom You have offered any management or services relating to Bitcoin mining, including all agreements between You and each such entity. For the avoidance of doubt, this request includes Documents sufficient to identify any Person for whom Elektron Energy has offered any management or services relating to Bitcoin mining, as well as any agreements between Elektron Energy and each such Person.

REQUEST FOR PRODUCTION NO. 4:

Documents sufficient to show Your relationship with Elektron Energy, including but not limited to Documents sufficient to show Your involvement in the formation of Elektron Energy, Your involvement in the creation of Elektron-Energy.com, any email addresses associated with Elektron Energy that You maintain or control, and any GitHub accounts or repositories maintained by Elektron Energy that relate to Bitcoin mining (including but not limited to the "elektron-tech" GitHub organization and repository named "nxt").

INTERROGATORY NO. 1:

From the time period beginning August 2, 2024 through present, identify all Bitcoin wallets to which Proton has deposited mined Bitcoin and the amounts deposited, including:

   a) each wallet address to which mined Bitcoin has been deposited and the individuals with access to or control over each wallet; and

   b) the amount of Bitcoin deposited in each wallet, and when deposited.

For the avoidance of doubt, this includes the Bitcoin wallets referenced in paragraphs 183-185 of the Amended Complaint, as well as any Bitcoin wallets to which Proton has redirected the proceeds from the wallets described in those paragraphs of the Amended Complaint.

INTERROGATORY NO. 2:

Identify all Sites at which Proton has mined Bitcoin, and for each Site, describe on a weekly basis:

   a) its location

   b) number and type of ASICs deployed;

   c) average hash rate;

   d) downtime reports;

   e) curtailment periods;

   f) operational costs;

g) the amount of Bitcoin mined;

h) proceeds resulting from Bitcoin mining; and

i) all agreements with or relating to the Site, including any agreements or updates to agreements entered into since August 2, 2024.

INTERROGATORY NO. 3:

Explain why ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████.

INTERROGATORY NO. 4:

Identify and describe any management or services relating to Bitcoin mining that You have offered to any Person, including all agreements between You and each such Person. For the avoidance of doubt, this interrogatory encompasses any management or services relating to Bitcoin mining that Elektron Energy has offered to any Person, as well as agreements between Elektron Energy and each such Person.

INTERROGATORY NO. 5:

Describe Your relationship with Elektron Energy, including but not limited to describing Your involvement in the formation of Elektron Energy, describing Your involvement in the creation of Elektron-Energy.com, identifying any email addresses associated with Elektron Energy that You maintain or control, and identifying any GitHub accounts or repositories maintained by Elektron Energy that relate to Bitcoin mining.

\* \* \*

Defendants initially served only objections to these RFPs and Interrogatories on March 17, 2025. *See* Ex. B (Proton's Objs. to RFPs); Ex. C (Proton's Objs. to

12

Interrogs.); Ex. D (Individual Defs.' Objs. to RFPs); Ex. E (Individual Defs.' Objs. to Interrogs.).

Pursuant to L.R. 37-1, Swan served Defendants with a letter request to confer regarding Defendants' objections on March 18, 2025. *See* Ex.F (Mar. 18, 2025 Letter). The parties conferred on March 26, April 1, and April 3, 2025. *See* Ex. A; Ex. G (correspondence regarding Swan's Trade Secret Identification). Defendants stated at the time that they would not produce documents in response to any RFP or answer any Interrogatory, on the basis of specific objections as well as their general objections that there were pending dispositive motions and that Swan is not permitted to engage in discovery because its Trade Secret Identification is inadequate.

After the court issued its order on April 9, 2025, denying in large part the pending dispositive motions, Defendants agreed, reserving all rights, to supplement their discovery responses by April 18, 2025. Defendants supplemented their discovery responses on April 18, 2025. Ex. K (Proton Am. RFP Resps.); Ex. L (Proton Am. Interrog. Resps.); Ex. M (Individual Defs.' Am. RFP Resps.); Ex. N (Individual Defs.' Am. Interrog. Resps.). Defendants assert that they are not withholding any documents or information on the basis of Swan's inadequate Trade Secret Identification in response to these discovery requests. Ex. K at 6-7, 9-10; Ex. L at 6-10; Ex. M at 5-6; Ex. N at 5-6.

Defendants believe that any dispute regarding Swan's individual discovery responses is moot and the only remaining dispute concerns the sufficiency of Swan's Trade Secret Identification (which is the subject of Defendants' separate forthcoming motion). Swan believes that disputes remain regarding each of its individual discovery requests.

13

III.    **SWAN'S CONTENTIONS AND REQUEST FOR RELIEF**

    A.    **Factual and Procedural Background**

The Court is familiar with certain background of this case from Swan's prior filings. *See, e.g.*, Dkt. 100-1; Dkt.129-1 (Joint Stipulation Regarding Plaintiff's Motion to Compel Initial Disclosures); *see also* Dkt. 164 at 2-9. Most pertinent here, this case centers on Defendants' theft of Swan's Bitcoin mining business and the proprietary information and trade secrets underlying that business. Or, as the Court put it, the "coordinated effort by Proton and the Individual Defendants— former consultants of Swan—to steal Swan's entire Bitcoin mining business." *Id.* at 2.

The Individual Defendants worked on Swan's Bitcoin mining team as paid consultants. Dkt. 100-1 at ¶¶ 89-98. Each executed consulting agreements with Swan, in which they agreed, among other things, to assign to Swan all right, title, and interest to the intellectual property at issue in this case, *id.* at ¶ 96; that they would provide prior written notice if they incorporated any prior works they owned into trade secrets they developed or worked on while at Swan (none did so), *id.* at ¶ 97; and that they would keep confidential all Swan proprietary information and trade secrets that they developed or used in their work for Swan, *id.* at ¶¶ 99-100. And while Swan entered into a joint venture with cryptocurrency company Tether to fund certain of Swan's mining activities, dubbed 2040 Energy Ltd. ("2040 Energy"), none of the Individual Defendants contracted with 2040 Energy to provide any services to that entity, much less to assign it ownership over any intellectual property they developed. *See id.* ¶ 111.

Swan's Bitcoin mining business grew at unprecedented rates in the year before Defendants stole it. *See* Dkt. 100-1 at ¶¶ 85-87. A key driver of that success were the trade secrets at issue in this litigation, which include a set of proprietary methods for identifying opportune mining sites, advantageous relationships with vendors, proprietary techniques for optimizing Bitcoin hash rate, financial modeling

and analytical tools, and a proprietary platform for managing mining data and analytics which Swan dubbed its Bitcoin Network Operating Center ("BNOC"). *Id.* at ¶¶ 61-79.

In July and August of last year, the Individual Defendants, in coordination with other Swan employees and representatives of Tether, engaged in what they dubbed a "rain and hell fire" plan to steal Swan's Bitcoin mining business and trade secrets. *See* Dkt. 100-1 at ¶ 8 (contemporaneous notes taken by conspirators). The Individual Defendants and their co-conspirators understood their plan would violate their "non-solicit; non-compete" obligations with Swan and that "[they] would be expose[d]" for breaches of their "Confidentiality and IP" obligations to Swan. *Id.* By the time the conspirators resigned en masse on August 8-9, they had (i) formed a copycat company (Proton), on whose behalf they (ii) collectively downloaded over 1,300 documents from Swan's databases, including  hundreds of highly confidential Swan files and a copy of the source code for BNOC. *Id.* ¶¶ 128-152.

Swan commenced this action on September 25, 2024. Swan also moved for a temporary restraining order, seeking to enjoin Defendants from, among other things, disclosing or using Swan confidential material or trade secrets. In defense, the Individual Defendants did not deny that they were using Swan's proprietary information and trade secrets. Nor have they since. Instead, they repeatedly asserted that, to the extent Defendants were using Swan's trade secrets, they were using that information "***solely for the benefit of 2040 Energy … and no others***." Dkt. 29-1 at 2, 4 (sealed version of Individual Defendants' Opp. to Swan's App. for a TRO) (emphasis added); Dkt. 30 (public version of Individual Defendants' Opp. to Swan's App. for a TRO). Thus, they claimed, "because of Swan's continued interest in 2040 Energy… there is no actual, let alone irreparable, harm to Swan." Dkt. 29-1. at 12. The Court denied Swan's request for relief in a minute order issued on October 5, 2024.

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1   Swan amended its complaint on January 27, 2025. Since filing its original

2   complaint, Swan uncovered evidence that strongly suggests Defendants are not

3   using Swan's trade secrets "solely for the benefit of 2040 Energy." Instead, after

4   the Court denied Swan's motion for a temporary restraining order, Bitcoin mining

5   proceeds that had been flowing into 2040 Energy fell sharply to virtually nothing,

6   *see* Dkt. 100-1 at ¶¶ 183-86, while the Individual Defendants and their Proton co-

7   conspirators appeared to continue to operate the mining sites that they formerly

8   managed on behalf of Swan, using Swan's trade secrets, *see id*. ¶¶ 187-93.

9   Swan asked Defendants multiple times whether their prior representations to

10  the Court that they were mining "solely" for 2040 Energy remained true, and

11  whether they were engaged in mining activities outside of 2040 Energy. *See* Dkt.

12  100-1 at ¶ 201. Defendants refused to answer.

13  Swan served the targeted discovery at issue in this motion on February 14.

14  Those requests seek to confirm whether Defendants are engaged in Bitcoin mining

15  activities outside of 2040 Energy, and the extent to which Defendants are using

16  Swan's trade secrets to do so. Also on February 14, Swan served and filed its Trade

17  Secret Identification. *See* Dkt. 111-1.

18  On March 17, Defendants served blanket objections to Swan's targeted

19  discovery requests. *See* Exs. B-E. Those blanket objections included repeated,

20  boilerplate assertions that Swan was not entitled to any discovery at all because its

21  claims were subject to arbitration, the Court lacked personal jurisdiction over

22  Proton, the case should be stayed pending resolution of litigation in the UK, and

23  Swan's Trade Secret Identification was inadequate. *See, e.g.*, Ex. B at 8

24  ("Propounding Party has failed to comply with Cal. Civ. Proc. Code § 2019.210");

25  Ex. D at 8 ("Individual Defendants object to these Requests on the grounds that

26  Swan has failed to serve proper Section 2019.210 disclosures regarding the trade

27  secrets that are purportedly the subject of its claims. Under the Court's standing

28  order and applicable law, discovery is thus premature and should not proceed.").

16

Those boilerplate objections referenced Defendants' then-pending motions that the
Court has now denied essentially in full, but failed to explain why Swan's Trade
Secret Identification was purportedly inadequate, much less explain why any such
inadequacy hindered Defendants' ability to respond to the specific requests at issue.
Swan promptly sent Defendants a letter request to confer regarding their objections.
*See* Ex. F.

Defendants waited until March 26, just 17 minutes before the parties were
scheduled to confer regarding Swan's targeted discovery requests, to serve a letter
outlining their purported objections to Swan's Trade Secret Identification, having
waited almost six weeks from the date Swan filed that statement to raise any issue
with it. *See* Ex. G. In total, the letter included 35 objections, although many
objections were repeated verbatim with respect to multiple trade secrets. *See
generally id.* (*e.g.*, objecting to nearly every asserted trade secret for "fail[ing] to
specify whether it is the combination of public elements together that make the
unified combination of approaches and/or information that makes the combination
a protectable secret"). In addition to their laundry list of objections in the letter,
Defendants purported to reserve the right to raise further challenges to the same
Trade Secret Identification in the future. *Id.* at 8.

The parties met and conferred about Defendants' March 26 letter on April 3,
2025. At the April 3 meet-and-confer, it became clear that Defendants would not
be satisfied with Swan's trade secret identification no matter what Swan did to
amend it. Defendants asserted, for example, that any use of the word "including"
automatically renders a trade secret description insufficient. Defendants also
unreasonably asserted that any trade secret that references a contractual agreement
is insufficient unless the trade secret parses through the agreement, term-by-term,
and explains which terms are proprietary and which are not. These objections were
completely at odds with established law regarding sufficiency of a trade secret
disclosure under 2019.210, while other objections focused entirely on the merits of

17

1  Swan's trade secret case and had no bearing at all on the sufficiency of Swan's
2  disclosure.

3      On April 9, the Court denied in substantial part Defendants' motions to
4  dismiss the case, the Individual Defendants' motion to compel arbitration, and the
5  Defendants' motion to stay proceedings pending resolution of a foreign lawsuit that
6  Tether has brought against Swan. *See* Dkt. 164. In that Order, the Court also found
7  that "Swan describes the four general categories of its trade secrets with
8  particularity and cites to exemplary documents within the [Amended Complaint,]"
9  and that "Swan also filed an identification of asserted trade secrets that further
10  identifies the trade secrets and shows that they exist." *Id.* at 23. Thus, "Swan
11  demonstrated that the information is not 'readily ascertainable through proper
12  means,' it 'derives independent economic value,' and that it took 'reasonable
13  measures to keep such information secret.'" *Id.*

14      Following that Order, Swan asked Defendants to confirm they would drop
15  their objections to Swan's targeted discovery requests and produce the requested
16  documents and information, which was very clearly the Court's intention given its
17  multiple express orders that discovery, including this specific discovery, proceed.
18  *See* Ex. A. Defendants did not agree to drop ***any*** objections, stated that they were
19  "***reserving*** all rights and objections," and said they would "provide supplemental
20  responses" to Swan's discovery requests, *see id.*, which Swan expects will contain
21  the same (and potentially new, untimely and improper) meritless excuses to avoid
22  discovery. Meanwhile, Defendants made it abundantly clear that they were refusing
23  to provide any substantive response absent yet another Court order deeming Swan's
24  Trade Secret Identification sufficient.

25      **B.**    <u>**Legal Standard**</u>

26      A party may "obtain discovery regarding any nonprivileged matter, that is
27  relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Relevancy is

28

construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on any issue that is or may be in the case." *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 2011 WL 13128180, at *2 (C.D. Cal. July 8, 2011) (alteration in original).[8]  "The party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections."  *Duran v. Cisco Sys., Inc.*, 258 F.R.D. 375, 378 (C.D. Cal. 2009).  "[U]nexplained and unsupported boilerplate objections are improper."  *Id.* at 379 (collecting cases).

The Court's January 7 Order required Swan to serve and file "a trade secret identification statement" "akin to the disclosure required by California law [Cal. Civ. Proc. Code § 2019.210]."  Dkt. 95 at 6.  Under that order, while "[d]iscovery into trade secrets shall not commence until the identification has been served and filed," Swan "may commence discovery on any other subject prior to the identification."  *Id.* at 7.  California Code of Civil Procedure section 2019.210 provides that "[i]n any action alleging the misappropriation of a trade secret . . . before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity."  A trade secret has been identified with "reasonable particularity" if the plaintiff describes it in a way "that is reasonable, i.e., fair, proper, just and rational." *Advanced Modular Sputtering, Inc.*, 132 Cal. App. 4th at 836.  Any doubts about the sufficiency of Swan's Trade Secret Identification are to be "liberally construed in favor of [Swan]" so that discovery can proceed.  *Id.* at 835.  A trial court may not take an overly "stingy view" of a trade secret designation.  *Id.*

---

[8]  Unless otherwise noted, emphasis in citations is added and internal quotations and citations omitted.

19

C.    **Argument**

The Court should compel Defendants to produce documents responsive to RFPs 1-4 and provide full answers to Interrogatories 1-5.  The RFPs and Interrogatories seek relevant information (as the Court already confirmed in its recent order, Dkt. 164 at 13); Defendants have largely failed to object in any meaningful way to the scope and relevance of the specific requests, instead relying upon boilerplate, generalized objections.  The Court should overrule those, and order Defendants to comply with Swan's targeted discovery requests.

At the outset, Defendants' continued reliance on their objections regarding their motions to compel arbitration, to dismiss for lack of personal jurisdiction or on the merits, and to stay—all of which have now been denied—borders on contempt.  The Court should dismiss these objections out of hand.  As to Defendants' objection based on the purported insufficiency of Swan's Trade Secret Identification, the Court resolved that issue in Plaintiff's favor too, and Defendants' objection lacks merit.  Dkt. 164 at 23.

Further, none of Swan's targeted discovery requests reference "Swan's Trade Secrets."  It is therefore not even necessary for Defendants to understand the precise boundaries of Swan's asserted trade secrets in order to fully respond to these requests.  The Court's January 7 Order provides that while "[d]iscovery *into trade secrets* shall not commence until the identification has been served and filed . . . . discovery *on* ***any other subject prior to the identification***" may commence.  Dkt. 95 at 7.  The Court has recognized that Swan has asserted tort claims "that do not necessarily involve the trade secrets," and that "discovery will be pertinent to moving those claims along."  Dkt. 164 at 32-33.  But in any event, Swan's Trade Secret Identification is sufficient.

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1.    **Swan's Trade Secret Identification Complies With the Court's January 7 Order.**

Section 2019.210 requires the plaintiff to "identify its alleged trade secret[s] in a manner that will allow the trial court to control the scope of subsequent discovery, protect all parties' proprietary information, and allow them a fair opportunity to prepare and present their best case or defense at a trial on the merits." *Advanced Modular Sputtering, Inc.*, 132 Cal. App. 4th at 836. It does ***not*** require the plaintiff to "define every minute detail of its claimed trade secret at the outset of the litigation," and does ***not*** require the "trial court to conduct a miniature trial on the merits of a misappropriation claim before discovery may commence." *Id.* at 835-36. "Any doubt about discovery is to be resolved in favor of disclosure." *Id.* at 837.

"Absent a showing that the details alone, without further explanation, are inadequate to permit the defendant to discern the boundaries of the trade secret so as to prepare available defenses, or to permit the court to understand the identification so as to craft discovery, the trade secret claimant need not particularize how the alleged secret differs from matters already known to skilled persons in the field. Further, consistent with precedent, the trade secret designation is to be liberally construed, and reasonable doubts regarding its adequacy are to be resolved in favor allowing discovery to go forward." *Brescia v. Angelin*, 172 Cal. App. 4th 133, 143 (2009).

Swan's asserted trade secrets center around the contract terms and configurations of components for Bitcoin mining (including, for example, the specialized computers (called ASICs) used to mine, the firmware running on those computers, and cooling systems). Swan developed a successful combination or "recipe" of these components at ten different mining sites. Swan also claims trade secrets relating to its BNOC software tool, and relating to research that Swan performed to predict electricity prices (TS 17) and its research and data used to

assess performance of Bitcoin mining pools, ASIC configuration, and firmware (TS 18-20).  Dkt. 111-1 at 25-29.  Swan's trade secret identification consists of twenty asserted trade secrets, detailed in over thirty pages of narrative explanation that far surpasses the "sufficient particularity" requirements of Section 2019.210 and the Court's January 7 Order.  *See generally* Dkt. 95.  Each trade secret description clearly outlines the trade secret by describing in detail the components of each trade secret and additionally providing the specific elements that define the "boundaries" of each trade secret.

Finally, although Defendants purport to object to the "sufficiency" of Swan's Trade Secret Identification under the standard of section 2019.210, many of Defendants' objections have nothing to do with sufficiency of description. Defendants clearly know what trade secrets Swan is referencing; they just object that Swan will not succeed in proving that those are Swan's trade secrets, or that Defendants misappropriated them.  All of those arguments are misplaced here (and also wrong).  Objections to the *merits* of Swan's trade secrets are out of place because a litigant "need not prove at the discovery stage that each trade secret qualifies for trade secret protection. If the defendant contends that the plaintiff has identified a trade secret which the undisputed facts show [do not meet one element of a trade secret claim], then the defendant should file a motion for summary judgement." *Pinkerton Tabacco v. Kretek Int'l*, 2021 WL 4928024, at *2 (C.D. Cal. Jul. 14, 2021); *see STEMCELL Techs. Canada Inc. v. StemExpress, LLC,* 2022 WL 585668, at *1 (N.D. Cal. Feb. 24, 2022) ("The current discovery dispute is about the sufficiency of StemExpress's designation of its trade secrets. STEMCELL's main argument is that the alleged trade secrets are not actually trade secrets. That is a merits challenge to the designations"); *Brescia*, 172 Cal. App. 4th at 149 ("[Section 2019.210], however, does not create a procedural device to litigate the ultimate merits of the case—that is, to determine as a matter of law on the basis of evidence presented whether the trade secret actually exists. The statutory method is

22

more modest—it requires only that the trade secret claimant *identify* the trade secret with reasonable particularity" before obtaining discovery.) (quotations omitted, emphasis in original).

For example, Defendants repeatedly object that Swan has not sufficiently explained "what *independent economic value* there exists in the secrecy of" the asserted trade secrets. *See* Ex. G at 4, 5, 7. The Court here has already concluded that Swan demonstrated that its alleged trade secrets "derive[] independent economic value," rejecting Defendants' same argument that they raised in their motions to dismiss. Dkt. 164 at 23. But in any event, the existence of "independent economic value" is a merits element of a trade secret claim under the DTSA, *see* 18 U.S.C. §1839(3), unrelated to whether Swan has defined its trade secrets with the "sufficient particularity" required by section 2019.210. Whether Swan's asserted trade secrets meet the "independent value" limitation is a question Defendants are welcome to raise at summary judgment. *Pinkerton Tabacco*, 2021 WL 4928024, at *2. Indeed, the cases cited in Defendants' letter to support their arguments regarding the need to establish this element of a trade secret claim involve discussions of this element at the motion to dismiss, summary judgment, or post-judgment stage. *Buffets, Inc. v. Klinke*, 73 F.3d 965, 966 (9th Cir. 1996) (affirming an appeal from summary judgment); *Yield Dynamics, Inc. v. TEA Sys. Corp.,* 154 Cal. App. 4th 547, 551, 66 Cal. Rptr. 3d 1, 20 (2007), as modified on denial of reh'g (Sept. 21, 2007) (affirming the judgment "[a]fter a nonjury trial"); *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1031 (N.D. Cal. 2020) (involving a motion to dismiss); *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336, at *1 (C.D. Cal. Aug. 16, 2017) (same); *Attia v. Google LLC*, 983 F.3d 420, 422-23 (9th Cir. 2020) (affirming the district court's dismissal); *Acrisure of Ca. v. So. Cal. Commc'l Ins. Servs., Inc.*, 2019 WL 4137618, at *1 (C.D. Cal. Mar. 27, 2019) (granting a motion to dismiss).

1    Additionally, Defendants make multiple objections to Swan's trade secret
2    identification based on Defendants' allegations that Swan does not "own" the trade
3    secrets. Ex. G at 3, 6. Like the objections regarding "independent economic value,"
4    Defendants' assertions that 2040 Energy owns the trade secrets, not Swan, do not
5    speak to the sufficiency of Swan's trade secret identification.  And here too, the
6    Court held that "for purposes of alleging ownership under DTSA at the pleadings
7    stage, Swan has done so…." Dkt. 164 at 23.

8    In the following trade secret-by-trade secret analysis, Swan further
9    demonstrates the sufficiency of Swan's disclosure:

10         (a)    TS 1, 4-13

11    Trade Secrets 1 and 4-13 relate to Swan's allegation that Defendants effected
12    a wholesale takeover of Swan's Bitcoin mining operations.  Trade Secret 1 lays out
13    the specific factors that contribute to Swan's successful Bitcoin mining, and each
14    of Trade Secrets 4-13 covers the way that Swan optimized those factors in unique
15    ways to optimize hashrate (essentially, the amount of Bitcoin mining that can be
16    done) and profitability at ten different Bitcoin mining sites. *See* Dkt. 111-1 at 4-7.
17    Defendants ran the day-to-day operations at each site while still working for Swan,
18    and still run each site today.  Thus, there is no ambiguity regarding what these sites
19    are or how they are operated.

20    TS 1 lays out the overall blueprint that Swan developed to mine Bitcoin
21    profitably.  Dkt. 111-1 at 4-8.

24



By providing these details, Swan has gone beyond the requirements of 2019.210 and has complied with the Court's January 7 Order. Swan's Trade Secret Identification provides more than "sufficient particularity" and not only allows the Defendants to "ascertain at least the boundaries within which the secret lies," but has provided more than "adequate detail to allow the defendant to investigate how it might differ from matters already known and to allow the court to craft relevant discovery." *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *9 (N.D.Cal. Aug. 24, 2021) (quoting *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, 2018 WL 2117424, at *4 (N.D. Cal. May 8, 2018); *Brescia*, 172 Cal. App. 4th at 147.

Trade Secrets 4-13 describe the unique combination of these inputs that Swan used at each of ten different mining sites. Dkt. 111-1 at 10-22. Consistent with the Court's January 7 Order, sub-paragraph (a) of each Trade Secret, entitled "Background," explains the choices Swan made to make each site successful. *Id*. These choices map onto the factors identified as valuable in TS 1, including ███████. Swan cites specific documents that contain the day-to-day details of mining operations at each site. *Id*. at 11, 13, 14, 15, 17, 18, 19, 20, 21. Subparagraph (b) explains why the factors described in subparagraph (a) are valuable due to secrecy. *Id*. Subparagraph (c)

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1   lists Swan's reasonable efforts to maintain secrecy.  *Id.*  Subparagraph (d) lists the
2   specific elements claimed for each trade secret.  *Id.*  Said another way, these trade
3   secrets describe the proprietary details of the hash rate optimization techniques that
4   Swan implemented.

5         Swan took different approaches to optimize the TS 1 factors at each different
6   mining site, and each Trade Secret describes the site-specific "recipe" Swan used to
7   make each site successful.



25         In sum, each of Trade Secrets 4-13 claims Swan's unique "recipe" for mining
26   at each site.  At each site, the claimed components as laid out in subparagraph (d)
27   are (1) Swan's selection of each site, without which no site would exist, (2) the key
28   terms of the contracts governing each site, and (3) the "site-specific optimizations"

described in subparagraph (a) of each trade secret. Dkt. 111-1 at 15-16. Even if this level of detail did not contain "such an exacting level of specificity that even [Defendants] are forced to agree the designation is adequate" (because it is obvious given Defendants' obstructionism that no level of specificity ever would), *see Advanced Modular Sputtering*, 132 Cal. App. at 836, Swan's Trade Secret Identification more than suffices under section 2019.210.

Defendants manufacture a series of complaints that Swan's claimed trade secrets are too ambiguous for Defendants to understand. *See generally* Ex. G. Any claimed lack of understanding should be greeted with skepticism based on the specific facts of this case. Defendants implemented the specific mining operations that Swan claims as trade secret. Dkt. 100-1 at ¶¶ 168-170, 181-201. Defendants still work at each site today. *Id.* at 157. Notwithstanding their feigned confusion, Defendants know exactly what Swan's Trade Secret Identification is describing. Indeed, unable to claim a lack of understanding as to any detail of the mining sites that Swan claims as trade secrets, Defendants launch only hyper-technical objections that are misplaced here.

*First*, Defendants complain (Ex. G at 4-5) that Trade Secrets 4-13 do not refer to "tangible trade secret material," citing to *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998). In *Imax*, a case involving a projector system, the plaintiff used only vague terms to describe its trade secrets. For instance, it claimed "the design of the cam unit, including every dimension and tolerance that defines or reflects that design," but did not specify the actual dimensions or tolerances. *Id.* at 1166. It claimed "the manner of operation of the cam unit" without describing what that manner was. *Id.* The Court of Appeals deemed this insufficient *to survive summary judgment*. *Id.* at 1167. *Imax* therefore addressed a different question than whether a plaintiff sufficiently identified its trade secrets with sufficient particularity to start discovery. This distinction is important. In the context of section 2019.210, a plaintiff's trade secret identification is "to be liberally

construed in favor of the pleader and doubts about the permissible scope of discovery are to be resolved in favor of disclosure." *Advanced Modular Sputtering*, 132 Cal. App. 4th at 835. "Any doubt about discovery is to be resolved in favor of disclosure." *Id.* at 837. Indeed, the fact that *Imax* went all the way to summary judgment confirms that the plaintiff's trade secret identification in that case—while ultimately being deficient on the merits—was nonetheless adequate to allow discovery to begin. Defendants' reliance on *Imax* at this stage is therefore misplaced.[9]

Moreover, Swan has provided the specific details that were absent in *Imax*. For each specific site, Swan has provided ██████████████████ ████████████████████. Swan has not claimed a trade secret over "every possible configuration of ASIC miners," which would parallel the ultimately unsuccessful approach of *Imax*. Rather, Swan's trade secrets are akin to a specific "blueprint" for successfully mining at each site, which is sufficient. *See Imax*, 152 F.3d at 1167 (finding it sufficient to claim a trade secret based on "engineering drawings and blueprints"); Dkt. 111-1 at 10-22.

*Second*, Defendants complain that "the claimed trade secrets are made up of several elements each, but Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret." Ex. G at 5 (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089 (N.D. Cal. 2006)). This argument ignores subparagraph (d), which states explicitly that the trade secret claimed is a combination of elements comprising ██

---

[9] Defendants make the same complaint as to Trade Secret 1 (Ex. G at 2) but instead cite *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 664 (9th Cir. 2020), for this proposition. However, *InteliClear*, like *Imax*, is a *summary judgment* case. *Id.* (*reversing* the district court's grant of summary judgment, and finding that the trade secret identification *was sufficient* to create a triable issue of fact). Once again, Swan's Trade Secret Identification here is far more detailed even than the identification that the court found *sufficient* in *InteliClear*.

28

1   ████████████████████████████████████████

2   described in subparagraph (a).  Dkt. 111-1 at 8.

3       This approach is endorsed by *O2*, the very authority Defendants cite.  420 F.

4   Supp. 2d  at 1089.  That case **upheld** the jury's verdict in favor of a plaintiff who

5   had asserted trade secrets involving a "combination of transformer characteristics

6   that was optimal and secret." *Id.*[10]  The trial court recognized that it "does not matter

7   if a portion of the trade secret is generally known, or even that every individual

8   portion of the trade secret is generally known, as long as the combination of all such

9   information is not generally known." *Id.* at 1089-90.  Such is the case here.  Swan

10  does not contend, for example, ████████████████.  It is a well-known

11  cooling technique.  Nor does Swan contend that ████████████████

12  are unknown; these are publicly available machines.  As laid out in subparagraph

13  (d) of each of Trade Secrets 4-13, Swan claims a trade secret over the ***site-specific***

14  ***combination*** at each site, which consists of a combination of ████████████

15  ████████████████████████.  Dkt. 111-1 at 8.

16      **Third**, Defendants assert that Swan has not identified how the secrecy of the

17  contract terms carry economic value.  Ex. G at 5.  However, Swan explains the

18  economic value in subparagraph (b):  "If other Bitcoin miners learned of ██████

19  ████████████████████████████████████████

20  ████████████████████████  without having to invest the time and

21  resources that Swan invested.  Those competitors would thereby be able to similarly

22  increase their own hashrate, which would diminish Swan's share of hashrate and

23  therefore diminish Swan's expected earnings." Dkt. 111-1 at 7.  This is more than

24  section 2019.210 requires.  *See Wisk*, 2021 WL 8820180, at *13 (rejecting argument

25  that "the 2019.210 Disclosure was required to . . . illustrate the measures taken to

26  _____

27  [10]  Here too, *O2* involved the sufficiency of a trade secret identification ***at trial***, not

28  whether a trade secret identification as detailed as Swan's is sufficient to ***start***
    ***discovery***.

29

1  maintain the trade secrets' secrecy and how they derive independent economic value
2  from that secrecy"); *Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, 2017 WL 10543565,
3  at \*6 (C.D. Cal. Mar. 13, 2017) ("[f]or purposes of complying with section 2019.210
4  or FRCP 26, a plaintiff need not prove at the [pre-]discovery stage that each trade
5  secret identified qualifies for trade secret protection").  Besides, the Court has
6  already held that Swan has sufficiently explained how its trade secrets derive
7  economic value.  Dkt. 164 at 23.

8      ***Finally***, Defendants complain that Swan has not established that its ███████
9  ████████████ are "superior to other bitcoin miners." Ex. G at 5.[11] Section
10  2019.210 does not require Swan to assert specific evidence that its claimed "recipe"
11  for each site is more valuable than the configurations at other Bitcoin mining sites;
12  that is not even a requirement to prevail on a trade secret claim on the merits.  The
13  purpose of the trade secret disclosure is to "require the trade secret claimant to
14  identify the alleged trade secret with adequate detail to allow the defendant to
15  investigate how it might differ from matters already known and to allow the court
16  to craft relevant discovery." *Brescia*, 172 Cal. App. 4th at 147.  This does not
17  require Swan to ***prove*** "that each trade secret identified qualifies for trade secret
18  protection." *Bal Seal Eng'g, Inc*, 2017 WL 10543565, at \*6.  The "superiority" of
19  Swan's asserted trade secrets is unrelated to whether Swan's disclosure provides
20  "sufficient particularity" for Defendants to "ascertain at least the boundaries within
21  which the secret lies." *Wisk*, 2021 WL 8820180, at \* 9 (quoting *Openwave*
22  *Messaging, Inc. v. Open-Xchange, Inc.*, 2018 WL 2117424, at \*4 (N.D. Cal. May
23  8, 2018).

24
25
26  [11]    Defendants claim in passing that Swan "does not even identify what ████████
27  ████████████████ make up [Trade Secrets 4-13]." Ex. G at 5.  The key
28  ████████████ those described in TS 1 and in subparagraph (a), with ████████
    ████████████. Dkt. 111-1 at 4-7.

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

(b)    TS 2

TS 2 is a list of mining sites that Swan considered, but decided not to pursue. Dkt. 111-1 at 8-9. This is a "negative trade secret." It is valuable because it allows others to avoid wasting time and money to develop those mining sites, based on the knowledge that Swan considered and passed on the site. *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2018 WL 466510, at *2 (N.D. Cal. Jan. 18, 2018) ("[A] defendant might *use* a negative know-how trade secret by taking its lesson to *avoid* developing apparently fruitless technology.").

Defendants argue that Swan has not explained why its decision not to pursue the specified sites is not a matter of general knowledge. Ex. G at 3. But Swan "is not required to convince defendants or the court in its section 2019.210 statement that its alleged trade secrets are not generally known to the public." *Perlan Therapeutics, Inc. v. Superior Ct.*, 178 Cal. App. 4th 1333, 1351 (2009).

In the case that Defendants cite, the key finding was that the trade secret identification did not "come[] close to providing a basis for understanding the boundaries or nature of the alleged Trade Secret." *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D. Cal. 2011). That case does not impose a requirement that a trade secret plaintiff must specifically parse out which elements of every asserted trade secret are public knowledge and which are independently proprietary. Here, the boundaries of TS 2 are clear: it comprises Swan's decision not to pursue mining at a specified list of sites. Dkt. 111-1 at 8-9. Nothing in *Agency Solutions*, or in any other case, indicates this is insufficient.

Defendants also suggest that TS 2 is all but "impossible to not use." Ex. G at 3. This challenge goes too far; if correct, it would negate every claim based on a negative trade secret. To "use" TS 2 requires Defendants to **use their knowledge** that Swan did not pursue the identified sites. Defendants' assertion that **every single one** of the billions of people and companies on Earth that do not engage in Bitcoin

31

mining at those sites is therefore guilty of misappropriation—regardless whether they have ever worked for Swan, heard of Swan, or even heard of Bitcoin—is ludicrous. At any rate, this challenge goes to the merits, and has nothing to do with whether Swan has described TS 2 with the required specificity. *STEMCELL Techs. Canada Inc.,* 2022 WL 585668, at *1 (noting that challenges to the existence of a trade secret is a merits challenge, not a challenge to the sufficiency of a trade secret identification).

Finally, Defendants complain (Ex. G at 3) that Swan's disclosure uses the word "including," and that Swan has not sufficiently explained its "reasoning" for declining to pursue such sites without further detailing those reasons. Defendants' reliance on *E. & J. Gallo Winery v. Instituut Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *5 (E.D. Cal. Jun. 19, 2018), for the proposition that the use of the term "including" makes Swan's trade secret identification insufficient is without merit. In *E. & J. Gallo Winery*, the court explained that the use of "'catch-all' descriptions such as 'including'" are insufficient "because it does not clearly refer to tangible trade secret material." *Id.* But, the word "including" is not improper here, because Swan lists the specific sites that it is currently aware of. Dkt. 111-1 at 8-9. And Swan explains that its "reasoning" for avoiding each site is that each site "did not satisfy Swan's proprietary site selection criteria described in Trade Secret 1." *Id.* at 8. Swan, unlike the plaintiffs in *E. & J. Gallo Winery* has not repeatedly used "catch-all phrases" in an attempt to "expan[d] [the] alleged trade secrets at a later time," but instead provided additional details that allow the defendants with the ability to "ascertain at least the boundaries of the alleged trade secrets." 2018 WL 3062160, at *5 (internal quotations omitted). This usage is proper. *See Wisk,* 2021 WL 8820180 at *12 (approving of the use of "'catchall' phrases like 'including'" where it was used simply to state "that the *example documents* are non-exhaustive lists"). Swan is not required, at this stage, to give every detail underlying its decision not to pursue each site listed in TS 2. *Advanced*

*Modular Sputtering, Inc.*, 132 Cal. App. 4th 826 at 836-37 (defining a trade secret with sufficient particularity does not require the plaintiff to "define every minute detail of its claimed trade secret at the outset of the litigation").

(c)    TS 3

TS 3 describes a secret initiative ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████. Dkt. 111-1 at 9-10. Swan then deployed these miners to mining sites. Per subparagraph (d), the trade secret comprises ██████████████████████████████████ ████████████████████████████████████████ ██████████. *Id.* at 10.

First, Defendants complain that 2040 Energy, not Swan, purchased the ASICs—but this is a challenge to the merits, unrelated to sufficiency of description. Ex. G at 4.

Second, Defendants complain that with respect to the three investment memos, Swan has not specified "whether the trade secret element consists of the entirety of each of each document or whether it is simply a portion of the document (and what portion)." Ex. G at 4. This ignores the language of subparagraph (d), which specifies that the trade secret involves only the portions of those documents that ████████████████████████████. Dkt. 111-1 at 10. Defendants cite to *Loop AI Labs, Inc. v. Gatti*, to support their assertion that citing to documents without explaining whether the trade secret consists of the entirety or a portion of the document makes the trade secret identification insufficient, but the case says no such thing. 195 F. Supp. 3d 1107, 1116 (N.D. Cal. Jul. 6, 2016). In *Loop AI*, the court took issue with plaintiff citing generally to information "disclosed to Defendants in discovery" and citing to Bates numbers of documents that they alleged contained a trade secret. *Id.* The court held that a simple statement

that the trade secret was "provided in discovery" is not sufficient because it "does not identify *where* in the discovery the alleged trade secret can be found." *Id.* Here, Swan has referenced three short documents and cited the portions of the documents ███████████████████████ as part of the claimed trade secret.

Third, Defendants complain that Swan "fails to specify whether it is the combination of elements together that make the unified combination a protectable secret." Ex. G at 4. Again, subparagraph (d) explicitly lists the elements of the claimed trade secret, which are ████████████████████████████ ██████████████████████. Dkt. 111-1 at 10.

Finally, Defendants advance a merits challenge that there is no value in "keeping this secret from others going forward." Ex. G at 4. As discussed above, those merits challenges are misplaced here (and wrong anyways). *STEMCELL Techs. Canada Inc.,* 2022 WL 585668, at *1.

(d)    TS 14

Developing a mining site does not happen overnight. Before Swan can bring a site online to mine Bitcoin, Swan must negotiate the site's contract, perform any necessary configurations to make the site workable, and physically deliver the miners to the site and install them. At the time of Defendants' mass resignation from Swan, Swan was in various phases of this development and deployment cycle for ████████ sites, separate from and additional to the already-operational sites described at TS 4-13. Dkt. 111-1 at 10-22. Swan has reason to believe that after their mass resignation and theft, Defendants carried on Swan's efforts to bring at least some of these sites online, thereby usurping for themselves the value that Swan had begun to create by working to build out each site. Ex. H (March 18, 2025 Email).

In TS 14, Swan claims its development and plans for each site, with each site being a trade secret sub-part labeled (a) through (i). Dkt. 111-1 at 22-23.

Defendants complain that Swan has not sufficiently detailed its "plans" for each site. Ex. G at 6. The plans for each site are detailed in the Trade Secret Identification. They vary by site, and include details such as ███████████ ███████████████████████████████████████████. These details are proprietary, even if final contract terms and the specific "recipe" for miner configuration at each site had not been deployed or finalized in a signed agreement at the time of the Defendants' mass resignation and theft. Under these facts, Swan's description of TS 14 is sufficient.

(e)    TS 15

As described in its complaint, Swan developed a proprietary software tool for Bitcoin mining called BNOC (Bitcoin Network Operating Center). Dkt. 100-1 at ¶ 213. TS 15 claims ████████████████████████████████████, as a trade secret. Dkt. 111-1 at 23-24.

Defendants complain that Swan failed to specify "what aspects of BNOC are the trade secret." Ex. G at 6. As described in subparagraph (d), Swan claims ██ ███████████████████████████████████████████. Dkt. 111-1 at 24. Accordingly, there is no uncertainty as to the "boundaries" of the claimed trade secret.

Second, Defendants repeat their rote complaint that Swan fails to specify which "elements" make up the trade secret. Ex. G at 6. Again, the elements are described in subparagraph (d), and are ██████████████████████. Dkt. 111-1 at 24.

Third, Defendants contend that Swan bears the burden of describing the specific elements of BNOC that are proprietary as opposed to matters of public knowledge. Ex. G at 6. Again, Defendants are wrong on the law. For purposes of a sufficient section 2019.210 disclosure, the plaintiff does not bear the burden of parsing out which elements of a claimed trade secret are proprietary and which are

35

generally known.  As Defendants' own authority explains, the burden on the plaintiff is to describe "the boundaries or nature of the alleged Trade Secret." *Agency Solutions.Com*, 819 F. Supp. 2d at 1019.  By doing so, the plaintiff provides enough disclosure for the trial court to control the scope of discovery and for the defendant to develop its merit-based defenses, including a defense that the claimed trade secrets were matters of public knowledge or not. *Id.*

         (f)    <u>TS 16</u>

TS 16 claims as a trade secret ████████████████████ ███████████████████████████████████████████ ████████████. Dkt. 111-1 at 24-25.  Swan claims the entire document as a trade secret. *Id.*  Defendants are familiar with this spreadsheet, and Defendant Naidoo downloaded the spreadsheet shortly before leaving Swan.  Dkt. 100-1 at ¶ 136.  Thus, Defendants have no credible argument that they are unfamiliar with the spreadsheet or its contents.

Defendants claim that Swan's identification is insufficient because Swan has not explicitly parsed out which information in the spreadsheet is public versus non-public, or explained why the non-public information has independent value.  Ex. G at 7.  Swan did explain this.  As described at subparagraph (a), ██████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████. Section 2010.219 does not require a plaintiff to pick the blueprint apart, element-by-element, and explain which portions are proprietary and which are public.  *See Imax*, 152 F.3d at 1167 (finding it sufficient to claim a trade secret based on "engineering drawings and blueprints").  If Defendants believe that some isolated components of this spreadsheet are matters of public knowledge or that they did not misappropriate

1    them, they are welcome to make that argument to the jury.  But Swan does not need

2    to prove it to Defendants' (unattainable) satisfaction in order for discovery to begin.

          (g)    TS 17

4          As explained in TS 17 at subparagraph (a),



15         Defendants complain first that Swan fails to disclose whether it claims an

16   "approach" or "criteria," and fails to describe "a specific model or criteria."  Ex. G

17   at 7.  This challenge fails because Swan named a model, and the criteria used by

18   that model are contained within that model, and cited to a document containing one

19   such model.  Dkt. 111-1 at 25-26.

20         Defendants also repeat their challenge that Swan has failed to expressly

21   define the elements of this trade secret or distinguish which elements of the claimed

22   trade secret are proprietary versus public.  Ex. G at 7.  As discussed, the elements

23   are expressly delineated in subparagraph (d), and section 2019.210 does not impose

24   upon Swan the burden to label every part of its models and every contractual term

25   as either proprietary or public.  Dkt. 111-1 at 26.  In any event, in this instance,

26   ████████████████████████ is confidential to Swan, as are its models.

27

28

                                    37

(h)    TS 18

As explained in subparagraph (a) of TS 18, Bitcoin miners often join shared mining pools. Dkt. 111-1 at 27. When any member of a pool successfully mines Bitcoin, that Bitcoin is distributed to members of the pool. *Id.* ████████

████████████████████████████████████████

████████████████████████████████████████

██████ . *Id.* As TS 18, Swan claims ████████████████████

████████████████████████ as a trade secret. *Id.*

Defendants objected (Ex. G at 7) to the word "including" as used in the description of this trade secret. TS 18 refers specifically to the "█████████" and not to any other research by Swan, so there is nothing wrong with the use of that word here. Dkt. 111-1 at 27; *see Wisk*, 2021 WL 8820180 at *12 (approving of the use of "'catchall' phrases like 'including'" where it was used simply to state "that the *example documents* are non-exhaustive lists").

Defendants also challenge (Ex. G at 7) that 2040 Energy, not Swan, joined mining pools, but this is a challenge to the merits of the claim that has nothing to do with the sufficiency of Swan's description. *STEMCELL Techs. Canada Inc.*, 2022 WL 585668, at *1

Defendants' only remaining challenge, is that "Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret." Ex. G at 7. This challenge, which Defendants raise generically as a challenge to every asserted trade secret, *see id.* at 2-8, is ineffective. The boundaries of Swan's claimed trade secret—an internal Swan research operation and the pools that Swan decided to join based on that research—are laid out in subparagraph (d). Dkt. 111-1 at 27.

(i)    <u>TS 19</u>

TS 19 is directed specifically to ███████████████████
███████████████████████. Dkt. 111-1 at 28. As explained in subparagraph (a), Swan ████████████████████████████
███████████████████████████████████████. *Id.* The records live primarily in a running series of Slack conversations and weekly call updates. *Id.* They are numerous and diffuse, and it is impractical to explicitly include ████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████ ██ █████ ███████████████
███████████████████████████████████████
████████████████.

To limit the boundaries of TS 19, Swan claims only ███████████
███████████████████████████. Dkt. 111-1 at 28; *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) ("[A] plaintiff need not 'spell out the details of the trade secret'" (quoting *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015)).

Defendants complain that despite this explicit limitation, Swan has not sufficiently identified "██████████████████████████." Ex. G at 8. But Defendants' examples show the impossible and inapplicable standard they are seeking to impose on Swan's Trade Secret Identification. █████████████
███████████████████████████████████████
██ █ ██████████████████████████████████████
███████████████████████████████████████
██████████████. Dkt. 111-1 at 28; *see also Advanced Modular Sputtering*, 132 Cal. App. 4th at 835 ("'Reasonable particularity' mandated by section 2019.210

1  does not mean that the party alleging misappropriation has to define every minute

2  detail of its claimed trade secret at the outset of the litigation.").

3              (j)    TS 20

4      TS 20 is narrowly tailored to a specific component of Swan's configuration

5  at each mining site: ███████████████  Dkt. 111-1 at 28-29.  As explained in

6  TS 1, and reiterated in TS 20, ███████████████████████████████████████

7  ██████████████████████████████████████████████████████████████████

8  ██████████████████        ███████████████████████████████████████████

9  ███████████   *Id.*

10     Defendants make no complaint about TS 20 other than the boilerplate

11  allegations repeated throughout their March 26 letter:  that Swan fails to specify

12  whether the trade secret covers an "approach" or "results," that Swan has not used

13  sufficient particularly, and that "Swan fails to specify whether it is the combination

14  of public elements together that make the unified combination of approaches and/or

15  information that makes the combination a protectable secret."  Ex. G at 8.  These

16  challenges fail for reasons already described.

17           **2.    Swan's RFPs and Interrogatories Seek Discoverable**
                     **Information.**
18

19     The RFPs and Interrogatories seek targeted documents and information

20  concerning Defendants' past and ongoing use of Swan's trade secrets.  *See* Dkt.

21  114-3; Dkt. 114-2.  The Court confirmed as much in its April 9 Order: "Swan's

22  targeted requests are narrowly aimed at discovery relevant to Swan's requests for a

23  preliminary injunction, that is, whether the Individual Defendants are using Swan's

24  trade secrets outside of 2040 Energy."  Dkt. 164 at 13.  Indeed, Defendants

25  themselves seem to agree—while they generally objected to these discovery

26  requests, Defendants generally confirmed during conferrals that they would produce

27  documents and information in response to each request if the Court overruled their

28

general objections, which it now has. *See generally* Dkt. 114-3 at 2; Dkt. 114-2 at 2; Ex. B at 5-7; Ex. C at 6-8.

Notably, Defendants have not articulated any reason why searching for the requested documents or responding to the Interrogatories would be burdensome (much less unduly so). *See, e.g.*, *Celestron Acquisition, LLC v. Nextar, Inc.*, 2008 WL 11422125, at *3 (C.D. Cal. Oct. 3, 2008) (granting motion to compel where "no evidence ha[d] been presented to the court to substantiate defendants' contention that the requested production would be burdensome"); *3Com Corp. v. D-Link Sys., Inc.*, 2007 WL 949596, at *5 (N.D. Cal. Mar. 27, 2007) (granting motion to compel production of financial information where defendant only "mention[ed] in passing that producing such financial information would be 'unduly burdensome,'" but "it [did] not substantiate its claim"). And while Defendants have raised minor purported concerns with particular discovery requests, those purported concerns are either meritless or have been adequately addressed by Swan during the conferral process. The Court should order Defendants to comply with Swan's discovery requests.

*RFP 1 and Interrogatory 1.* These discovery requests seek documents and information concerning the amount of Bitcoin generated by Defendants' mining activities and the ultimate beneficiaries of those mining activities.[12] Dkt. 100-1 at ¶ 203. Swan alleges that Defendants are using its trade secrets to manage Bitcoin mining activities. Discovery into the amount of Bitcoin generated by those

---

[12] RFP 1 seeks "[d]ocuments sufficient to show, for all Bitcoin mined by Proton (to include Bitcoin mined by mining pools Proton is a member of): a) the wallet address(es) to which that Bitcoin has been deposited, the Persons with access to or control over each wallet, and the corporate ownership of each Person; and b) the amount of Bitcoin deposited in each wallet, and when deposited." *See* Dkt. 114-3 at 10. Interrogatory 1 asks Defendants to identify "all Bitcoin wallets to which Proton has deposited mined Bitcoin and the amounts deposited," as well as associated wallet addresses, the individuals who control those wallets, and the amount of Bitcoin deposited." *See* Dkt. 114-2 at 7.

41

activities is relevant to Swan's claim for damages against Proton. Such discovery is also necessary to test Defendants' representations to this Court that they are engaged in Bitcoin mining "solely for the benefit of 2040 Energy … and no others." Dkt. 29-1 at 4. Swan expressly alleges that Defendants' use of Swan's trade secrets outside of 2040 Energy will cause it irreparable harm, *see, e.g.*, Dkt. 100-1 at ¶ 205, and the Court's April 9 Order confirmed that those allegations "are sufficient to establish irreparable harm," Dkt. 164 at 24, and thus are relevant to Swan's forthcoming motion for a preliminary injunction as well.

During the parties' conferrals, Proton generally did not object to the scope of this request, or its relevance.[13] And while the Individual Defendants have challenged the relevance of some of the sought-after discovery—asserting that information about wallets associated with 2040 Energy (rather than those outside of 2040 Energy) and the *amount* of Bitcoin generated by their mining activities are irrelevant to whether they are working only for 2040 Energy—they have not offered any other reason to relieve them from complying with these requests. *See* Ex. A at 2.

The Individual Defendants' relevance arguments are misplaced. The Individual Defendants have not disputed and cannot dispute that discovery that would reveal whether the Individual Defendants are working for entities or individuals other than 2040 Energy is relevant to Swan's claims, including its forthcoming motion for a preliminary injunction. *See* Ex. F at 5; *see also* Dkt. 164

_____

[13] Proton's sole specific objection to these requests concerned the meaning of the phrase "mined by Proton," on the basis that Proton claims it does not "mine" Bitcoin itself, but rather provides services related to Bitcoin mining. *See* Ex. A at 4, 7. Swan clarified that the requests seek information related to Bitcoin "mined in connection with services that Proton, or its employees, agents, subsidiaries, or other affiliates, provide related to Bitcoin mining—for example, Bitcoin mined at Proton's direction or Bitcoin mined using infrastructure that Proton manages or oversees." *See id.* Proton stated that such clarification addressed its concerns.

42

at 24.  The amount of Bitcoin generated by those activities is probative of the scope of those non-2040 Energy activities, which Swan's forthcoming motion will seek to enjoin.  Moreover, even if the Individual Defendants claim that proceeds of their mining activities are still flowing to wallets controlled by 2040 Energy (rather than those outside of 2040 Energy), Swan has alleged facts that strongly indicate this is false, and that Defendants are not depositing Bitcoin into wallets controlled by 2040 Energy.  *See* Dkt. 100-1 at ¶¶ 183-85.  Discovery concerning wallets purportedly controlled by 2040 Energy is directly relevant to these allegations.

_RFP 2 and Interrogatory 2._  These discovery requests seek documents and information that would identify the sites at which Defendants are managing Bitcoin mining operations and elucidate the techniques Defendants are using to manage those operations.[14]  Documents reflecting trends in the specific sub-categories of information enumerated in these requests, when compared with similar trends at mining sites the Individual Defendants formerly managed on behalf of Swan, may be probative of whether Defendants are using the same trade secrets they deployed while at Swan to manage operations for Proton.

Defendants have stated that they do not object to producing documents and information concerning mining sites that Proton is currently managing or has managed, or concerning sites which Proton has reached agreement to manage.  *See* Ex. A at 8.  Defendants are however refusing to produce documents and information concerning or identifying sites that Proton "plans to use" to mine Bitcoin (other than

---

[14]  RFP 2 seeks "[d]ocuments sufficient to identify every Site that Proton is using or ever has used or plans to use to mine Bitcoin, including for each site (on a weekly basis, where applicable): its location; number and type of ASICs deployed;  average hash rate; downtime reports; curtailment periods; operational costs; the amount of Bitcoin mined; proceeds resulting from Bitcoin mining; and all agreements with or relating to the Site."  Dkt. 114-3 at 10.  Interrogatory 2 asks Defendants to "[i]dentify all Sites at which Proton has mined Bitcoin, and for each Site, describe on a weekly basis:" the same sub-categories of information enumerated in RFP 2. Dkt. 114-2 at 7.

43

documents such as term sheets, draft contracts, or contracts), on the basis that the phrase "plans to use" is too vague to permit them to search for other kinds of documents.  *See id.* But there is nothing ambiguous about the term "plans"— Defendants cannot rely on generalized allegations of vagueness to limit these requests.  *See, e.g.*, *Bryant v. Armstrong*, 285 F.R.D. 596, 606 (S.D. Cal. 2012) ("The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity… The responding party should exercise common sense and attribute ordinary definitions to terms in discovery requests.").  Moreover, Swan has provided examples of the kinds of "plans" at issue and the types of documents encompassed by the request—for example, "communications reflecting negotiations with potential mining sites, or documents analyzing whether to develop operations at a potential mining site." Ex. A at 8.  Defendants should be ordered to search for and produce such documents.[15]

*Interrogatory 3.*  Swan alleges in its Amended Complaint that in October 2024, proceeds from Defendants' Bitcoin mining operations that they had apparently been depositing into wallets controlled by 2040 Energy sharply decreased.  *See* Dkt. 100-1 at ¶¶ 183-85.  That drop-off began less than a month after the Court denied Swan's request for a temporary restraining order, after Defendants represented to the Court that they were engaged in Bitcoin mining solely for 2040 Energy.  *See id.*  Despite this sharp decrease, Defendants continue to

---

[15]   Defendants do not dispute that such documents and information are relevant. *See* Ex. A at 4, 8. Defendants' planned use of Swan's trade secrets is relevant to, at least, the scope of Swan's forthcoming motion for a preliminary injunction.  *See* 18 U.S.C.A. § 1836(b)(3)(A)(i) (permitting an injunction to "prevent any actual or threatened misappropriation").  Additionally, Swan alleges that Defendants stole and are using trade secrets techniques that Swan developed to identify and qualify potential mining sites.  See Dkt. 100-1 at ¶ 61; Dkt. 111-1(Trade Secrets 1 and 2). Documents and information concerning contemplated Bitcoin mining operations are directly relevant to these allegations of actual or planned use of Swan's trade secrets.

1    manage Bitcoin mining operations at sites formerly managed by Swan, *see id.*

2    ¶¶ 186-93, with the proceeds of that mining apparently being directed somewhere

3    other than 2040 Energy.  Interrogatory 3 asks Defendants to explain this shift.[16]

4        Defendants have failed to substantively respond to this Interrogatory or raise

5    any specific objection that would relieve them from answer it.  Indeed, the Court

6    repeatedly cited Defendants' potential mining outside 2040 Energy—and even

7    these specific allegations about the steep drop-off in mining proceeds—as directly

8    relevant to Swan's forthcoming motion for preliminary injunction.  *See, e.g.*, Dkt.

9    164 at 8 ("Swan has uncovered evidence that suggests Proton and the Individual

10   Defendants have used Swan's proprietary information and trade secrets to further

11   Bitcoin mining operations outside of 2040 Energy"; citing the allegations at issue

12   in this interrogatory), 13 (explaining that Swan's requests are "narrowly aimed at

13   discovery" relevant to a preliminary injunction on this issue).  Defendants should

14   be ordered to answer this interrogatory.

15       *RFP 3 and Interrogatory 4.*  These discovery requests seek documents and

16   information concerning the scope of Bitcoin mining services that Defendants have

17   offered to any person, as well as any agreements related to such services.[17]  Such

18   documents are relevant to, at least, whether Defendants have attempted to or are in

19   ———————————————

20   [16] Specifically, Interrogatory 3 asks Defendants to "[e]xplain why the amount of
21   Bitcoin received by Bitcoin wallets owned or controlled by 2040 Energy dropped
     from approximately 3 Bitcoin per day in October 2024 to approximately 0.005
22   Bitcoin per day by November 3, 2024, as described in paragraphs 183-185 of the
23   Amended Complaint, including identifying any wallet address(es) to which Bitcoin
     proceeds that had previously been directed to Bitcoin wallets owned or controlled
24   by 2040 Energy has since been redirected."  Dkt. 114-2 at 7-8.

25   [17] RFP 3 seeks "[d]ocuments sufficient to identify any Person for whom You have
26   offered any management or services relating to Bitcoin mining, including all
     agreements between You and each such entity."  Dkt. 114-3 at 11.  Interrogatory 4
27   asks Defendants to "[i]dentify and describe any management or services relating to
     Bitcoin mining that You have offered to any Person, including all agreements
28   between You and each such Person."  Dkt. 114-2 at 8.

fact engaged in mining activities for the benefit of entities or individuals outside of 2040 Energy. The terms of any such offers and contracts are also probative of how Proton and the Individual Defendants may value the trade secrets they stole, and thus relevant to Swan's claim for damages against Proton. They are also relevant to determining the appropriate and necessary scope for injunctive relief, including determining which entities or individuals are working "in active concert" with Defendants. Fed. R. Civ. P. 65(d)(2)(C).

Defendants' sole specific objection to these requests concerns the scope of the word "offered," which Defendants claim is vague and ambiguous. *See* Ex. A at 8. But Defendants have failed to explain why the phrase "offered any management or services relating to Bitcoin mining" is vague or ambiguous. It is not, and Defendants can "exercise common sense and attribute ordinary definitions" to search for and locate documents regarding "offers." *Bryant*, 285 F.R.D. at 606. Such documents would include, for example, communications among Defendants or between Defendants and third parties that discuss Defendants' potentially providing services related to Bitcoin mining to third parties, even if Defendants ultimately did not agree (or have not yet agreed) to provide the services in question. Defendants should be compelled to produce those and any other documents concerning "offers" Defendants have made to provide Bitcoin mining services.[18]

*RFP 4 and Interrogatory 5.* These discovery requests seek documents and communications concerning Defendants' relationship with and involvement in the actions of Elektron Energy, an entity through which Swan alleges Defendants are conducting Bitcoin mining activities using Swan's trade secrets. *See, e.g.*, Dkt. 100-

---

[18] Defendants confirmed after the parties' first conferral that they are not arguing that these requests are unduly burdensome. *See* Ex. A at 4. Nor have Defendants argued that such offers are irrelevant. As explained above, plans or attempts by Defendants to offer services using Swan's trade secrets are relevant to multiple issues in dispute. *See supra* n. 15.

1 at ¶¶ 132, 187-88, 190. Defendants confirmed that they would produce documents

and information responsive to these requests if the Court overruled their generalized

objections to all discovery, which it now has. *See* Ex. A at 4. Defendants should

be ordered to respond.

**IV.    DEFENDANTS' CONTENTIONS**

    **A.    Factual And Procedural Background**

        **1.    The Shareholder Agreement And Creation Of 2040
Energy.**

In 2023, Swan entered into a Shareholder Agreement ("SHA") with non-

party Tether Investments Ltd. ("Tether"), through its subsidiary Zettahash Inc., to

create a new Bitcoin mining joint venture called 2040 Energy. ECF No. 101 ¶ 55.

Tether agreed to fund this venture, and Swan, in exchange for its minority "sweat

equity" interest in 2040 Energy, agreed to run the day-to-day operations of 2040

Energy, in consultation with Tether. Ex. O (Particulars of Claim) ¶¶ 9, 15.2, 15.3,

19-37. Because Swan had no prior experience in mining Bitcoin, Swan engaged

independent consultants (*e.g.*, the Individual Defendants) to run 2040 Energy's

operations. 2040 Energy signed contracts for mining sites through its own affiliated

entities, ███████████████████████████████████████████████████

ECF No. 111-1 at 5 n.1.[19]

Under the SHA, the parties agreed not to use or divulge or communicate any

"Confidential Information" outside of 2040 Energy. Ex. O ¶ 15.8. The SHA defines

Confidential Information to include any information "in relation to the customers,

suppliers, business, assets or affairs or plans, intentions or marketing opportunities

---

[19] According to Swan, ██████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████ ECF No. 111-1 at 5 n.1. In the Trade Secret Identification, Swan
refers to those contracting parties "as 'Swan'"; however, those entities are affiliated
with 2040 Energy not Swan. *Id.*

of [2040 Energy]." Tether and 2040 Energy claim that all assets generated by and for 2040 Energy in its operation of the mining business were and are owned by and the property of 2040 Energy. *See id.* ¶¶ 38-39, 42.

### 2. Due To Swan's Mismanagement And Liquidity Crises, Individual Defendants Resign.

Since at least August 2023, Swan was struggling with cashflow issues, which required cash infusions by Tether and other investors. In July 2024, Swan publicly announced significant layoffs and that it was shutting down its managed Bitcoin mining operations. *See* Ex. O ¶ 52. Seventy to eighty Swan employees were laid off around this time. *Id.* By August 2024, Swan was teetering on the edge of financial collapse. On August 8, 2024, fearing bankruptcy and concerned about Swan's mismanagement of its business and ongoing cash crisis, as well as its lack of transparency to 2040 Energy and third parties, the Individual Defendants resigned from Swan. *See* ECF No. 101 ¶ 11.

### 3. After Swan Fails To Cure Its Material Breaches Of The SHA, 2040 Energy Engages Defendant Proton.

Tether sent two notices to Swan advising them that they are in breach of the SHA, and requested Swan to cure its breaches. Ex. O ¶¶ 15.2, 58, 59. After receiving these notices, Swan refused to cure its breaches and failed to provide assurances concerning Swan's ability to operate 2040 Energy's business. *Id.* ¶ 57. In order to mitigate damages and preserve the value of 2040 Energy's mining business for the benefit of the shareholders, including Swan, 2040 Energy appointed Defendant Proton to take over the daily management of 2040 Energy. *Id.* ¶¶ 59.

### 4. Swan Files Suit.

On September 25, 2024, approximately seven weeks after the Individual Defendants resigned, Swan filed this action seeking preliminary and permanent injunctive relief and alleging that the Individual Defendants misappropriated and/or improperly used Swan's alleged trade secrets or confidential information. ECF No.

48

1.   Plaintiff contemporaneously filed an Ex Parte Application for Temporary Restraining Order and OSC Re: Preliminary Injunction.  ECF No. 8.  The next day, Swan filed an Ex Parte Application for Expedited Discovery Order.  ECF No. 9.

On October 4, 2024, the Court (i) denied the TRO motion "as plaintiff ha[d] failed to establish at least three of the four *Winter* factors," (ii) denied the request for expedited discovery, and (iii) set an expedited hearing on Swan's preliminary injunction motion.  ECF No. 40.  On October 9, Swan moved again for expedited discovery, which also was denied.  ECF No. 54.  On October 15, Swan filed a "motion to compel" the return of the Individual Defendants' laptops, which was denied, too.  ECF No. 63.

On October 18, 2024, Swan withdrew its preliminary injunction motion; to date, it has not rescheduled the hearing nor filed any similar motions.  ECF No. 55. On December 23, the Individual Defendants filed a Motion to Compel Arbitration and, in the Alternative, Motion to Dismiss the Complaint.  ECF No. 80.  The same day, Proton specially appeared to file its motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.  ECF No. 79.  These motions were to be heard on February 21, 2025.  Swan, however, requested an extension to oppose these motions, to which the Defendants agreed.  ECF No. 92.  In lieu of opposing these motions, on January 27, 2025, four months after initiating this action, Swan decided to amend its Complaint.  ECF No. 101.  Because of the amendment, the February 21, 2025 hearing date was taken off calendar.

In the meantime, on January 14, 2025, 2040 Energy and Tether filed a lawsuit (the "2040 Energy v. Swan Litigation") in the King's Bench Division of the High Court of Justice's Business and Property Courts of England and Wales against Swan, alleging breaches of the SHA.  Ex. O.  The 2040 Energy v. Swan Litigation involves the same joint venture entity—2040 Energy—Tether and Swan, and their respective rights with respect to the same trade secrets and confidential information at issue in this case.  *Id.*  2040 Energy and Tether allege, among other things, that

49

"Swan wrongfully lays claim to the Business Assets in the hands of the [Individual Defendants] and Proton in the California Proceedings" and that proprietary materials that Swan identifies in this litigation are "owned by 2040 Energy." *Id.* ¶¶ 89, 90. Notably, 2040 Energy and Tether assert that, through Swan's claims in this action, it "seeks to assert ownership over business assets belonging to 2040 Energy for its own unilateral purposes." *Id.* ¶¶ 71.2. The issue of who owns these business assets, the trade secrets at issue here, is scheduled to be heard by the UK court in a six-day evidentiary hearing between September 8-19, 2025.

On February 25, 2025, Defendants filed a motion to dismiss the claims against Proton for lack of personal jurisdiction, a motion to compel arbitration of claims against Individual Defendants, motions to dismiss on Rule 12(b)(6) grounds, and a motion to stay while the 2040 Energy v. Swan Litigation is pending. ECF Nos. 121, 122, 124, and 126. On April 9, 2025, the Court denied in substantial part the Individual Defendants' motion to compel arbitration and Defendants' motions to stay, and denied the Individual Defendants' motion to stay. ECF No. 164.

### 5.    Swan Makes Trade Secret Disclosures.

Defendants had requested that Swan serve its trade secret disclosure since Swan filed its Complaint, but for months Swan refused. The Court then issued an order requiring Swan to serve a trade secret disclosure that identifies Swan's trade secrets with "sufficient particularity" to distinguish the trade secrets from "matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." ECF No. 95 at 6-7.

Swan finally disclosed its Trade Secret Identification on February 14, 2025, nearly five months after it filed this lawsuit. *See generally*, ECF No. 111-1. The disclosure includes 20 claimed trade secrets (as opposed to the four generally discussed in the Amended Complaint), with the discussion of each trade secret divided into four sections: (a) Background; (b) Value From Not Being Generally Known; (c) Reasonable Secrecy Measures; and (d) Trade Secret Elements. *Id.*

1    Defendants sent a letter detailing the deficiencies of Swan's Trade Secret
2    Identification on March 26, 2025, as it became clear that the lack of clarity in
3    Swan's Trade Secret Identification made it difficult for Defendants to respond to
4    Swan's first set of discovery requests.  Ex. G.

5              **6.        Defendants' Meet And Confer Efforts.**

6              The parties met and conferred on April 3, 2025.  During that meet and confer,
7    Swan represented that it would consider amending its Trade Secret Identification.
8    The day that the Court issued its order on the pending motions on April 9, 2025
9    (ECF No. 164), Swan emailed asking Defendants if they would withdraw their
10   objections to Swan's discovery requests, including to the Trade Secret Identification
11   (Ex. A).  Defendants responded the very next day, making very clear that they would
12   provide supplemental responses to Swan's discovery requests, and that while they
13   were not withdrawing their objections to the Trade Secret Identification, their
14   supplemental responses would not withhold documents or information on the basis
15   of Defendants' objections to the Trade Secret Identification.  Defendants also asked
16   Swan if it had decided to stand by its disclosures and stated that Defendants planned
17   to raise the adequacy of the Trade Secret Identification with the Court if the parties
18   could not reach an agreement.  Ex. A.

19             On April 11, 2025, instead of responding to Defendants' questions, Swan sent
20   its portion of this Motion, including a lengthy discussion of the adequacy of its
21   Trade Secret identification.    Ex. P (discovery correspondence).    Defendants
22   responded on April 13, 2025, explaining they were surprised by Swan's service of
23   the joint stipulation because Swan had represented that it was considering
24   Defendants' objections to the Trade Secret Identification and would get back to
25   Defendants, and that the discovery disputes were moot because Defendants would
26   be providing supplemental responses by April 18, 2025.  *Id.*  Swan responded on
27   April 14, 2025 that it would not withdraw its joint stipulation, and when Defendants
28   replied the same day, Defendants made clear that they had "agreed not to withhold

any documents responsive to this set of discovery based on Swan's failure to serve an adequate 2019.210 disclosure." *Id.* The parties exchanged further emails on April 15 and 16, 2025. *Id.*

On April 15, 2025, given many of the arguments made in Swan's Motion, Defendants also sent Swan a letter asking Swan to confirm that it was importing limitations into the elements from the background section of each trade secret and to confirm which elements Swan intended to import. Ex. Q. If so, Defendants requested Swan modify its elements to make clear what portions of the narrative it was claiming as trade secret elements. In a meet and confer on April 18, 2025, Swan again refused to make any changes to its disclosure.

**B.** **Legal Standard**

Before a party may commence discovery related to any trade secret, this Court requires a party asserting misappropriation under the Defend Trade Secrets Act ("DTSA," 18 U.S. Code §§ 1836-39) to file and serve an identification of trade secrets with particularity akin to the disclosure required by California Code of Civil Procedure Code section 2019.210. ECF No. 95 at 6. The Court's order requires that Swan's Trade Secret Identification include "(1) a numbered list of each trade secret at issue, including a summary of each trade secret, and specific elements that define each trade secret (and if appropriate, elements that distinguish the claimed trade secret from similar and more broadly known technologies); (2) the background of the trade secret and a description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public; and (3) a description of how each secret has been the subject of reasonable efforts to maintain its secrecy." *Id.* The Court further ordered that the identification must also comply with the requirements of California law for trade secret identifications pursuant to Section 2019.210. *Id.*

Section 2019.210 in turn requires a plaintiff to identify the trade secrets with "sufficient particularity" to distinguish the trade secrets from "matters of general

knowledge in the trade or of special knowledge of those persons skilled in the trade." *See, e.g.*, *Advanced Modular*, 132 Cal. App. 4th at 836. This requires "adequate detail to allow the *defendant* to *investigate* how [each asserted trade secret] might differ from matters already known and to allow the court to craft relevant discovery." *Alta Devices, Inc., v. LG Elecs., Inc.*, 2019 WL 176261, at *2 (N.D. Cal. Jan. 10, 2019) (emphases in original) (internal citation omitted). A proper identification must also permit the defendant to ascertain at least the boundaries in which the alleged secrets lie. *See M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *5-6 (inadequate descriptions "are not sufficiently concrete, leaving room for the designating party to change the meaning of the trade secret after the completion of discovery").

The purpose of Section 2019.210 is as follows:

> First, it promotes well-investigated claims and dissuades the filing of meritless trade secret complaints. Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets. Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope. Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation.

*Brescia*, 172 Cal. App. 4th at 144 (internal citations omitted) (citing *Advanced Modular*, 132 Cal. App. 4th at 833-34).

Section 2019.210 "limit[s] the permissible scope of discovery by distinguishing the trade secrets from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade[.]" *Id.* at 145 (internal citations omitted) (citing *Advanced Modular*, 132 Cal. App. 4th at 835). The statute also aims to protect a trade secret defendant from "potentially costly litigation and discovery" and to "give both the court and the defendant reasonable notice of the issues which must be met at the time of trial and to provide reasonable guidance in ascertaining the scope of appropriate discovery." *Id.* at 144 (internal citations

53

omitted) (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)).

Where, as here, "the alleged trade secrets constitute incremental variations on preexisting technology in a highly specialized technical field, 'a *more exacting level of particularity* may be required to distinguish the alleged trade secrets from matters already known to persons skilled in that field.'" *Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at *4 (N.D. Cal. Oct. 31, 2022) (emphases added) (citing *Advanced Modular*, 132 Cal. App. 4th at 836 (granting defendant's motion to stay discovery pending a more detailed trade secret disclosure pursuant to Section 2019.210); *see also Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1113-16 (N.D. Cal. 2016) (applying "more exacting level of particularity" standard); *Perlan Therapeutics, Inc. v. Superior Ct.*, 178 Cal. App. 4th 1333, 1350-52 (2009) (same); *Brescia*, 172 Cal. App. 4th at 148 (same). Among other things, this requires "some explanation of *how* such processes or products are distinct from other advancements in the field," and "technical surplusage is no substitute for such descriptions of functionality." *Alphonso*, 2022 WL 17968081, at *4 (emphasis in original).

C.  **Argument**

1.  **Swan's Motion Is Moot Because Defendants Have Supplemented Their Responses And Agreed To Produce Documents.**

Swan's Motion is moot and is a waste of the Court's and the parties' time and resources. Defendants asserted objections to Swan's discovery requests on the basis of the pending motions to stay and dismiss, the inadequate Trade Secret Identification, as well as specific objections to vagueness, ambiguity, and overbreadth, among others. As Swan concedes (*see* Section III.C.2, *supra*), however, Defendants repeatedly stated that if the Court were to deny their motions to stay and dismiss, Defendants would respond to Swan's discovery. The Court issued its ruling on April 9 at approximately 1:10 PM. At approximately 8:03 PM, Swan wrote counsel for Defendants asking for Defendants' position on their

54

pending objections to Swan's discovery requests. Ex. A. The next day on April 10, consistent with Defendants' prior representations, Defendants responded that they would be supplementing their responses by the end of the next week on April 18, 2025.

Swan ignored Defendants' response. Instead, the very next day, Swan started a new email chain (for obvious reasons) and served a forty-one page motion to compel with 447 pages of exhibits (across twenty-two separate exhibits). Ex. P. Three of Swan's exhibits, including materials cited in their Trade Secret Identification that they rely on in this motion, *were disclosed for the very first time*. Exs. H, I, J. The Motion was also replete with new arguments and legal authorities that Swan had not previously conveyed to Defendants in any correspondence or meet and confer. As Defendants promised, they served amended discovery responses on April 18, 2025. Exs. K, L, M, N. In those amended responses, while reserving all rights, Defendants make clear that they are not withholding any documents or information on the basis of Defendants' objections to the sufficiency of Swan's Section 2019.20 disclosures.

Because Defendants have already supplemented their discovery responses and agreed in good faith to produce documents and answer each interrogatory they understand to be responsive, Swan's Motion and the relief it seeks is moot. *See, e.g.*, *S. Cal. Edison Co. v. Greenwich Ins. Co.*, 2023 WL 5506018, at *11 (C.D. Cal. July 17, 2023) (supplemental discovery responses prior to hearing moots motion to compel); *Charter Oak Fire Ins. Co. v. Sodexho Marriot*, 2006 WL 1752296, at *3 (N.D. Cal. June 23, 2006) (agreement to supplement moots motion to compel further interrogatory responses).

## 2.    Swan's Trade Secret Identification Is Inadequate.

Though Defendants believe that the relief Swan seeks in this motion is moot because they have agreed not to withhold any responsive information based on the

1    inadequacy of the trade secret disclosure, and have already responded, agreed to and

2    have begun producing discovery, Defendants address the inadequacy of Swan's

3    Trade Secret Identification in the event the Court chooses to address Swan's

4    arguments in this Motion.

5          While the Court's order directs Swan to include background information in

6    its Section 2019.210 disclosure, the Court's Order specifically requires that the

7    substance of Swan's *actual trade secrets* be set forth in a "numbered list of each

8    trade secret at issue, including a summary of each trade secret, and specific elements

9    that define each trade secret (and if appropriate, elements that distinguish the

10   claimed trade secret from similar and more broadly known technologies)."

11   Consistent with the Court's order, at the parties' meet and confer, Swan confirmed

12   that the description and boundaries of its alleged trade secrets were set forth

13   specifically in subsection (d), "Trade Secret Elements," of each of the twenty trade

14   secrets—and that Defendants' criticisms of statements in the background and

15   summary sections of the Trade Secret Identification were therefore misplaced.

16         However, Swan has since changed positions.  This is because it has realized

17   that the statements of "Trade Secret Elements" contained in the Trade Secret

18   Identification are too general and vague to constitute an identification of trade

19   secrets satisfying the Court's order and Section 2019.210.  Swan's Motion

20   recognizes this, for in defending the specificity of its disclosure, Swan

21   impermissibly relies on statements Swan makes in the background sections.  Swan

22   also characterizes its trade secrets in its Motion in ways that narrow and clarify the

23   trade secrets from the nebulous and vague disclosures that were previously made.

24   Swan should be held to these more concrete formulations of its trade secrets in order

25   to carry out the purpose of this Court's order and Section 2019.210.

26         As a preliminary matter, Swan's assertion that the Court's April 9, 2025

27   Order has already concluded that Swan's disclosures are adequate is incorrect.  To

28   begin, as already discussed, the Court did not have before it a motion addressing the

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

adequacy of the trade secret disclosures—it was a motion to dismiss the Amended Complaint. In her order on the motion to dismiss, she evaluated the general descriptions of four trade secrets alleged in Swan's Amended Complaint. She in no way ruled on the adequacy of the trade secret disclosures. The four she discussed do not match up to the 20 trade secrets at issue here. Moreover, Swan's reliance on the Court's prior order is misplaced because, "in denying defendants' motion to dismiss, the court was required to determine whether the complaint stated a trade secrets claim—not whether the complaint's trade secret allegations satisfied § 2019.210." *Albert's Organics, Inc. v. Holzman*, 2020 WL 4368205, at *3 (N.D. Cal. July 30, 2020) (citing *Gatan, Inc. v. Nion Co.*, 2018 U.S. Dist. LEXIS 77735, at *6 (N.D. Cal. May 8, 2018)); *Gatan*, 2018 U.S. Dist. LEXIS 77735, at *5-6 (explaining that court's order on motion to dismiss "did not prejudge whether plaintiff's trade secret allegations satisfied § 2019.210").

Moreover, Swan's assertion that Defendants rely upon caselaw that involves the motion to dismiss, summary judgment, or post-judgment stage is misleading and irrelevant. Defendants previously cited, and have added yet more citations here, to many cases holding that disclosures similar to Swan's are inadequate specifically at the pre-discovery stage. *E.g.*, *Alphonso*, 2022 WL 17968081, at *4; *M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *5-6; *Perlan*, 178 Cal. App. 4th at 1350-52; *Advanced Modular*, 132 Cal. App. 4th at 836. That Defendants *also* cite decisions at other stages of cases to provide additional color is unremarkable, as Courts frequently cite summary judgment and other sorts of decisions in evaluating the adequacy of trade secret disclosures under Section 2019.210. *E.g.*, *Swarmify, Inc. v. Cloudflare, Inc.*, No. C 17-06957 WHA, 2018 WL 2445515, at *2 (N.D. Cal. May 31, 2018) (citing *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998)) ("[W]hile *Imax* did not explicitly discuss Section 2019.210, it applied the core principle codified therein."); *Gatan*, 2018 U.S. Dist. LEXIS 77735, at *8-9 (explaining court had discussed Section 2019.210 as providing guiding

1    principles for motion to dismiss and relying on *Imax*, which concerned summary

2    judgment, in concluding that disclosures were insufficient).

3         With that said, Defendants address each claimed trade secret in turn below.

4              (a)    Trade Secret 1.

5         Swan claims its first purported trade secret regarding "Site Selection and

6    Optimizations" to be ███████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████    ECF No. 111-1 at 8.

10   Swan's identification of its "Site Selection and Optimizations" trade secret suffers

11   from numerous flaws.

12        First, Swan fails to specify whether this trade secret consists of ████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████ ████████ █ ████████████████████████ ████ ████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████ ██ █ ██ ███ █ ███████ █████ ████████████████

25   ███████   that would allow Swan to backfill its actual trade secrets after

26   discovery.

27        Given this lack of specificity, it is not possible to distinguish the alleged trade

28   secrets from matters of general knowledge in the trade or of special knowledge of

58

1    those persons skilled in the trade.  *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
2    978 F.3d 653, 658 (9th Cir. 2020) (citing *Imax*, 152 F.3d at 1167) ("Plaintiffs must
3    'clearly refer to tangible trade secret material'"); *Imax*, 152 F.3d at 1167 (emphases
4    in original) (finding insufficient specificity in trade secret description because "it
5    does not *clearly refer* to tangible trade secret material"); *Glob. Protein Prods., Inc.*
6    *v. Le*, 42 Cal. App. 5th 352, 367 (2019) ("[W]idespread publication of a purported
7    trade secret extinguishes the trade secret."); *see also Perlan*, 178 Cal. App. 4th at
8    1351-52 (finding trade secret identification insufficient because it did not clearly
9    segregate the trade secrets from information available to the public by explaining
10   "'how' its alleged trade secrets were novel").  Swan fails to identify this alleged
11   trade secret with sufficient particularity because it only describes well-known
12   Bitcoin mining concepts and nothing more.

13       To the extent that Swan seeks to incorporate the background sections into its
14   disclosure of elements, the background section of Trade Secret 1 uses open-ended
15   language (*i.e.*, using the word "including")—that Swan optimized several variables
16   at each site.  But Swan does not state whether its optimizations consist of any, some,
17   or all of those optimizations.  Nor does Swan explain whether it is the *fact* that Swan
18   optimizes some or all of those variables or whether it is *specific optimizations* that
19   Swan used that make up its trade secrets.

20       Swan's lack of specificity is significant because, for example, if Swan's trade
21   secret consists of the simple fact that Swan optimizes variables, the fact that such
22   variables are important in Bitcoin mining is well-known by persons skilled in the
23   art.  But it is impossible to determine if that is all Swan is claiming, if Swan intends
24   to claim the specific variables it mentions in the background section, or if Swan
25   intends to claim specific variables it has chosen for specific sites.

26       Second, while this trade secret appears to be made up of several "elements,"
27   Swan states each element with insufficient particularity such that it is impossible to
28   distinguish between them and matters of general knowledge in the trade or of special

knowledge of those persons skilled in the trade. *See Brescia*, 172 Cal. App. 4th at 144 (citing *Diodes*, 260 Cal. App. 2d at 253). For example, Swan fails to explain the alleged ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ █████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ *Imax*, 152 F.3d at 1167 (catchall phrase "including every dimension and tolerance that defines or reflects that design" rendered description insufficient).

Swan's description simply states that its employees took steps to optimize sites, but never explains what those steps are or how they are different from publicly available information. It states that it obtains "████████████████████" but never explains what those █████ are or how they can constitute a trade secret—or if Swan had some kind of proprietary process for obtaining ████████████ that it claims is a trade secret. And it references a ██████████████████████████ *without providing the document* or explaining how that document contains the alleged trade secrets.

Third, to the extent that some or all of the elements are in the public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1090 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007).

---

[20] To the extent the list of terms is non-exhaustive, the disclosure fails to provide the bounds of the trade secret, and therefore it is insufficient. *E. & J. Gallo Winery v. Instituut Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *5 (E.D. Cal. June 19, 2018).

1    In the end, it is Swan's own Motion that shows that the elements of its first
2    trade secret are insufficient.  In Section III.C.1.a above, Swan asserts that its Trade
3    Secret Identification "lays out the overall blueprint that Swan developed to mine
4    Bitcoin profitably."  However, all of the portions of this purported "blueprint" come
5    exclusively from Swan's "Background" section for Trade Secret 1.  *Compare supra*
6    Section III.C.1.a *with* ECF No. 111-1 at 1(a).  And nothing in the Disclosure
7    identifies which items or information mentioned in that Background, if any,
8    constitute part of Trade Secret 1.  Because Swan failed to specify which statements
9    in its Background section are part of its disclosure of trade secret elements, it is
10   impossible to glean what exactly from that Background section is part of the trade
11   secret and what are just general statements about the technology.[21]

12   For example, Swan identifies various documents and categories of documents
13   that allegedly "capture" Swan's proprietary techniques for ███████████████
14   ████████████████████.  *See* ECF No. 111-1 at 6-7.  But Swan does not
15   provide a full list of those documents, much less describe what is in them that
16   constitutes a trade secret.  Further, Swan cryptically states that the "███████████
17   ████████████████████" (*id.* at 7) is secret but never explains
18   what those supposedly secret and valuable strategies are.  Simply claiming to have
19   provided details in the Background Section of the trade secret is insufficient because
20   those details are not incorporated or indicated as actually being encompassed within
21   the trade secret itself.  And, where it is unclear what parts of a disclosure constitute
22   the claimed trade secret, a disclosure is inadequate.  *E.g.*, *Alphonso*, 2022 WL
23   17968081, at *3-4 (staying discovery and finding disclosures inadequate in part
24   because it was unclear what portions of the disclosure constituted the trade secret);
25   *M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *5-6 (finding a disclosure

26   _____

27   [21] Even if Swan's so-called "blueprint" was made up of the items addressed in the
28   Background Section, the parameters of this alleged trade secret would still be
     insufficiently disclosed.

1    inadequate because it "includes large amounts of surplusage[ and] broad and vague
2    descriptions of trade secrets"). For these reasons, the identification of Trade Secret
3    1 is not sufficiently particular.

4         Notably, in defense of its Disclosure, Swan recognizes that it must provide a
5    more concrete definition of its trade secrets than what it had disclosed. Based on
6    its Motion, Swan appears to claim the trade secret is a "combination" trade secret
7    and is not claiming any particular ███████████████████████████████████████
8    █████████████████████████ within Trade Secret 1. Nor does
9    Swan appear to be claiming as a trade secret a particular ████████████████████
10   ████████████████████████████████████████████████████████
11   ███████████. To the extent Swan does, in fact, claim any particular aspects of
12   a ███████, such information must be identified in its Trade Secret Identification as
13   part of the "specific elements that define [the] trade secret." ECF No. 111-1 at 6.

14        And Swan's attempts to undermine the cases Defendants rely upon fails.
15   Swan first contends that the *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d
16   653, 664 (9th Cir. 2020), and *Imax Corporation v. Cinema Technologies, Inc.*, 152
17   F.3d 1161, 1167 (9th Cir. 1998), are inapposite because they are summary judgment
18   cases and involved less detailed disclosures. Section III.C.1.a, *supra*. But in fact,
19   Swan's trade secret elements—"███████████████████████████████████████
20   ████████████████████████████████████████████████████████
21   ████████████████████████████████████████████████████████
22   █████████████████████████"—are much less detailed than the disclosures
23   at issue in those cases. *See InteliClear*, 978 F.3d at 658-59 (emphasis added)
24   (explaining the disclosure "outlined the *specific* tables, table columns, account
25   identifiers, codes, and methodologies InteliClear claimed as trade secrets"); *Imax*,
26   152 F.3d at 1166 (emphases in original) (internal citation omitted) (explaining the
27   disclosure included "the design of the cam unit, *including every dimension and
28   tolerance that defines or reflects that design*"). And the fact that those cases were

1    summary judgment decisions does not make them irrelevant.  Courts evaluating the
2    adequacy of disclosures pre-discovery often look to opinions from other case stages
3    for guidance.  *E.g.*, *Swarmify*, 2018 WL 2445515, at *2 (citing *Imax*, 152 F.3d at
4    1164-65) ("[W]hile *Imax* did not explicitly discuss Section 2019.210, it applied the
5    core principle codified therein."); *Gatan*, 2018 U.S. Dist. LEXIS 77735, at *8-9
6    (relying on *Imax*, a summary judgment decision, in concluding that disclosures were
7    insufficient).

8        Swan next argues that *O2 Micro International Ltd. v. Monolithic Power*
9    *Systems, Inc.*, 420 F. Supp. 2d 1070, 1089 (N.D. Cal. 2006), supports Swan's
10   position that the combination of elements it alleges is a trade secret.  Section
11   III.C.1.a, *supra*.  Swan misunderstands Defendants' objection.  Defendants do not
12   contest that, under *O2*, a unified combination of elements can make a trade secret.
13   But Swan's trade secret elements as written did not make clear whether it is claiming
14   a unified combination of elements as the trade secret or some other permutation of
15   the elements.

16       Finally, Swan contends that it is not required to establish independent
17   economic value and that this court's decision already held that Swan satisfied this
18   requirement.  Section III.C.1.a, *supra*.  But, as already discussed, this Court's order
19   does not dispose of this issue.  Section IV.C.2, *supra*.  And in arguing that it is not
20   required to establish independent economic value, Swan misleadingly excerpts a
21   portion of *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *13 (N.D.
22   Cal. Aug. 24, 2021), that explains under Section 2019.210 that a disclosure need
23   not illustrate how the plaintiff derives independent economic value from secrecy.
24   But Swan conveniently failed to include the *Wisk* court's far more relevant language
25   providing that independent economic value must be established in the disclosure
26   where the court has issued an order requiring such as a matter of case management,
27   as is the case here.  *Id.*

28

63

(b)    Trade Secret 2.

Swan claims its "Site Rejection" trade secret is ██████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████." ECF No. 111-1 at 9.  This, too, is insufficient.

Swan's disclosure does not describe what is the "████████" behind any ████████████████████████████  At Section III.C.1.b above, Swan tries to assert that Trade Secret 2 "████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████" and "█████ ███████████████████████████████████████████████ ██████" Swan thus recognizes that it must provide a more concrete definition of its trade secrets than what it previously disclosed.  Accordingly, based on Swan's Motion, Defendants understand that Swan is not claiming as a trade secret any particular "████████" behind its[22] alleged ████████████████████████ ████████████████████████.  Swan identifies its decision alone as a "negative trade secret."  It is questionable whether a decision to ███████████ ███████████████ alone could qualify as a trade secret.[23]

_____

[22] Swan did not actually ███████████████████████████████████████, as 2040 Energy was the ███████████████████████████████████████████████ ██████████.  Defendants reserve all of their rights and defenses with respect to Swan's lack of ownership of this and any of the alleged trade secrets.

[23] Courts recognize "negative know-how" as a trade secret, but that does not appear to be what Swan is claiming here.  *Calendar Rsch. LLC, v. StubHub, Inc*., 2020 U.S. Dist. LEXIS 112361, at *26-28 (C. D. Cal. May 13, 2020).

1    To the extent Swan claims any "███████" underlying those decisions is a

2    trade secret, Swan fails to specify what that "███████" is, and why it would not

3    be a matter of general knowledge in the trade or of special knowledge of those

4    persons skilled in the trade. *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819

5    F. Supp. 2d 1001, 1018-19 (E.D. Cal. 2011) (concluding a Section 2019.210

6    disclosure describing "process flows and interfaces that would be needed to built"

7    was not specific enough to discern the nature of the trade secret). Any such

8    information must be disclosed in the Trade Secret Identification as a specific

9    element of the trade secret.

10    Swan argues that it is not required to show that its alleged trade secrets are

11    not generally known to the public, citing *Perlan Therapeutics, Inc. v. Superior*

12    *Court*, 178 Cal. App. 4th 1333, 1351 (2009), and *Agency Solutions.Com, LLC v.*

13    *TriZetto Group, Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D. Cal. 2011). Section

14    III.C.1.b, *supra*. It mischaracterizes both cases. To begin, Swan quotes *Perlan*'s

15    statement that in the typical trade secret case, a plaintiff is not required to

16    demonstrate that trade secrets are not generally known to the public. But Swan fails

17    to include the more relevant portion of *Perlan* that expressly acknowledges that,

18    under *Advanced Modular*, in a "highly specialized technical field" this "more

19    exacting level of particularity may be required to distinguish the alleged trade

20    secrets from matters already known to persons skilled in that field." *Perlan*, 178

21    Cal. App. 4th at 1351. Notably, Swan did not mention that the *Perlan* court went

22    on to conclude that the trial court had properly required this more exacting level of

23    particularity and upheld the determination that plaintiff's disclosure was

24    "conclusory on the question of what *precisely* was not known to the public." *Id.*

25    (emphasis added).

26    Next, Swan says that *Agency Solutions.Com* does not impose a requirement

27    that a trade secret plaintiff parse out which elements are public knowledge. But

28    again, Swan is wrong. *Agency Solutions.Com*, citing long-standing caselaw, held

that plaintiff's disclosure was inadequate in part because it did not "provide any basis for a determination that the alleged secret is not a matter 'of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade.'" *Agency Solutions.Com*, 819 F. Supp. 2d at 1019; *see also Gatan*, 2018 U.S. Dist. LEXIS 77735, at *6-8 (finding trade secret designation insufficient under § 2019.210 where "many of Gatan's designations could include not only any of Nion's spectrometer data but also any company's spectrometer data" while "other designations are so vague that they could apply to any spectrometer").

Swan also contends that *E. & J. Gallo Winery v. Instituut Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *5 (E.D. Cal. Jun. 19, 2018), which found that trade secret disclosures that use "catch-all phrases" like "including" were inadequate, is distinguishable because Swan uses "including" followed by ███ ████████████████████. Section III.C.1.b, *supra*. But Swan did not specify in its Trade Secret Identification that its list is currently exhaustive, as it apparently does now in its motion; it simply used "including" prior to a list of Bitcoin mining sites. Ex. B at 9. Swan also cites *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *12 (N.D. Cal. Aug. 24, 2021), for the notion that it is acceptable to use "including" to state that example documents are non-exhaustive lists. Swan, however, fails to include the very next sentence in *Wisk*: "But the documents are examples of embodiments of the trade secret; they are always preceded by the substantive description of each trade secret." *Id.* at *12. Here, in contrast, "including" is not preceded by a substantive description of the trade secret, but instead a sort of general summary or category of the trade secret. Ex. B at 9 ("██████████████████████████████████████████████████ ████████████████████").

(c)    Trade Secret 3.

Swan claims its so-called "Project Corner" trade secret is "████████ ████████████████████████████████████████████████████

1 █████████████████████████████████████████

2 █████████████████████████████████████████

3 █████████████████████████████████████████

4 █████████████████████████████████████████

5 █████████████████████████████████████████

6 █████████████████████████████████████████

7 █████████████████████████████████████████

8 ███████████" ECF No. 111-1 at 10. This disclosure is also inadequate.

9    First, Swan's scope for this trade secret is unclear as to whether Swan claims

10 it is the ████████████████████████████████████

11 ████████████████████████████████████████[24]

12 That is because Swan seems to claim that this purported trade secret is valuable

13 from not being known because it ██████████████████. ECF No. 111-

14 1 at 10 ("███████████████████████████████████

15 ████████████████████████"). A trade secret constitutes

16 "information [that] derives independent economic value, actual or potential, from

17 not being generally known to, and not being readily ascertainable through proper

18 means by, another person who can obtain economic value from the disclosure or

19 use of the information." 18 U.S.C. §1839(3)(B).

20    But █████████████████████ is irrelevant to any value to Swan from

21 keeping this secret from others going forward. *See, e.g.*, *Buffets, Inc. v. Klinke*, 73

22

23 ─────────────────────

24 [24] While Swan uses complex Bitcoin mining jargon related to ██████████
██████████████ that is a red herring; the ████████████████
25 ███████████████ are not, themselves, trade secrets. *See, e.g.*, *Swan Bitcoin*
*Unveils Mining Unit*, Swan, https://www.swanbitcoin.com/industry/swan-bitcoin-
26 unveils-mining-unit/ (last visited Apr. 18, 2025) (discussing hashing capacity and
ASICs pricing) (Ex. R); Bitfarms Ltd. 2023 Annual Information Form at 34
27 (discussing ASICs purchasing practices) (Ex. S); Marathon Digital Holdings, Inc.
2023 Form 10-K at 9 (discussing ASICs purchasing strategy) (Ex. T).
28



F.3d 965, 969 (9th Cir. 1996) (no trade secret where manuals had little value from being kept secret); *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 568, 66 Cal. Rptr. 3d 1, 20 (2007), *as modified on denial of reh'g* (Sept. 21, 2007) (emphases in original) ("In other words, the core inquiry is the value to the owner in *keeping the information secret* from persons who could *exploit it to the relative disadvantage of the original owner*.").  Indeed, Swan seems to agree, as it publicly announced this ▮▮▮▮▮▮ in January 2024: "Zagury said that Swan Mining launched in stealth mode to avoid causing disruption in ASIC pricing and to develop a strategy of partnering with some of the best operators in the space." *Swan Bitcoin Unveils Mining Unit*, Swan, https://www.swanbitcoin.com/industry/swan-bitcoin-unveils-mining-unit/ (last visited Apr. 18, 2025) (Ex. R).  The questionable merits of this alleged trade secret aside, if Swan contends that it is simply the fact of the ▮▮▮▮▮ that is Swan's trade secret, it must identify that in the disclosure.

Second, at Section III.C.1.b above, Swan asserts that Trade Secret 3 "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"  Swan thus recognizes that it must provide a more concrete definition of its trade secrets than what it previously disclosed.  Based on Swan's Motion, Defendants understand that Swan is not claiming as a trade secret any particular "▮▮▮▮▮▮▮▮▮▮."  To the extent that Swan contends that its trade secrets do include specific "▮▮▮▮▮▮▮▮▮▮" in certain "▮▮▮▮▮▮ ▮▮▮▮," Swan must describe the actual "▮▮▮▮▮▮ ▮▮▮▮" in sufficient detail to allow Defendants to know what Swan believes is a trade secret as distinguished from publicly available information and commonly ▮▮▮▮▮▮.

As such, based on its Motion, Defendants understand that Swan is not claiming as a trade secret any particular "▮▮▮▮▮▮▮▮▮▮."  To the extent that Swan contends that its trade secrets do include specific "▮▮▮▮▮▮▮▮▮▮" in

1  certain "███████ ███████," Swan must describe the actual "█████████

2  █████████" in sufficient detail to allow Defendants to know what Swan believes is a

3  trade secret as distinguished from publicly available information and commonly

4  ██████████ *Alta Devices*, 2019 WL 176261, at *2 (emphases in original)

5  (internal citation omitted) (plaintiff must include "adequate detail to allow the

6  *defendant* to *investigate* how [each asserted trade secret] might differ from matters

7  already known and to allow the court to craft relevant discovery"); *Perlan*, 178 Cal.

8  App. 4th at 1351-52 (finding trade secret identification insufficient because it did

9  not clearly segregate the trade secrets from information available to the public by

10 explaining "'how' its alleged trade secrets were novel"). And while Swan can and

11 should attach the █████████████ to its Trade Secret Identification, it cannot

12 simply point to those documents and must instead describe the trade secrets

13 contained within them. *See Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*, 2021

14 U.S. Dist. LEXIS 216806, at *12-13 (N.D. Cal. Nov. 9, 2021) (while a party "is free

15 to cite to and incorporate portions of documents in its trade secrets disclosure

16 without reproducing the text of those documents, it may not simply refer to a

17 document in its entirety as 'including' trade secrets, without specifying what the

18 trade secret is"). At bottom, Swan fails to specify whether the Trade Secret

19 Elements consist of the entirety of each document or simply a portion of each

20 document (and what portion), rendering it not sufficiently particular. *See Loop AI

21 Labs*, 195 F. Supp. 3d at 1116.

22      Third, Swan also claims that the trade secret consists of "█████████

23 █████████████" presumably referring to some unspecified █████████

24 somewhere in the remainder of Swan's Trade Secret Identification. This open-

25 ended language, too, makes it impossible to determine the scope of what Swan

26 claims to be Trade Secret 3.

27      Fourth, this trade secret is assertedly made up of several elements and

28 documents (or portions of documents), but Swan fails to specify whether it is the

combination of elements together that make the unified combination a protectable secret. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

Swan argues that it has cited sufficiently specific portions of three short ██████████████ because it specifies that the trade secret involves only the portions of those documents that describe Swan's "███████████████████" for the miners. Section III.C.1.c, *supra*. Swan's argument is circular and illogical. Swan did not attach the memos to its disclosure, so Defendants do not know the length of these memos, nor can they review them to attempt to identify the portions regarding Swan's "█████████████████." Furthermore, Swan does not adequately describe its ████████████████ in the disclosure, so it is unclear how Defendants could possibly identify the relevant portions of the memos. Swan cannot make vague disclosures that rely on documents and then not only fail to attach the documents but fail to identify the relevant portion of the documents. *See Carl Zeiss X-Ray Microscopy*, 2021 U.S. Dist. LEXIS 216806, at *12-13 (party must identify what portion of a document is the trade secret and cannot simply cite it in its entirety); *M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *9-11 (finding disclosures inadequate where they cited more than 100 pages of documents without referring to any specific pages).

(d)    Trade Secrets 4-13.

Swan claims certain aspects of ten mining sites make up Trade Secrets 4 through 13—roughly half of all of Swan's alleged trade secrets. In each case, Swan claims the ██████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████. ECF No. 111-1 at 10-22. Any such Trade Secrets are not alleged with sufficiently particularity.

First, while Swan generally claims that "████████████████████ ███████████████████████████████" (Ex. ECF No. 111-1 at Trade Secret 1(c)), Swan only asserts that ████████████████████████ actually

70

1   contained any sort of ███████████████. *See id.* at Trade Secret 5(c)

2   (██████████████████████████████████████), 7(c)

3   (same), 8(c) (same), 10(c) (same), 12(c) (same), 13(c) (same)).  The other ██

4   ████ apparently do not contain any sort of ██████████████████

5   ████████. *Compare, for example*, *id.* at Trade Secret 5(c) *with id.* at TS 4(c), 6(c),

6   9(c), 11(c); *see also, e.g.*, Ex. U (████████████████████) (Trade Secret

7   4); Ex. V (█████████████████████) (Trade Secret 6).

8       Second, for each, Swan fails to specify or describe whether the elements of

9   its trade secrets are made up of a specific approach to ████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████ *See Imax*, 152 F.3d at

12  1167 (emphasis in original) (trade secret description must "*refer to tangible trade

13  secret material*").  Nor does Swan identify the specific information in any of these

14  categories—such as the steps or information assertedly used to ████████████

15      Third, Swan similarly does not identify what specific █████████████

16  ████████████████████████████ make up the elements of these

17  Trade Secrets. *Id.*

18      Fourth, as with the others, the claimed trade secrets are made up of several

19  elements each, but Swan fails to specify whether it is the combination of elements

20  together that make each unified combination a protectable secret.  *O2 Micro Int'l*

21  *Ltd.*, 420 F. Supp. 2d at 1090.

22      Fifth, Swan fails to identify what *independent economic value* there exists in

23  the secrecy of ███████████████████████, such that they

24  provide an actual or potential economic advantage to Swan over others.  *See Cisco*

25  *Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (citing *Calendar*

26  *Rsch. LLC, v. StubHub, Inc.*, 2020 U.S. Dist. LEXIS 112361, at \*22 (C. D. Cal. May

27  13, 2020)) ("To have independent economic value, a trade secret must be

28  sufficiently valuable and secret to afford an actual or potential economic advantage



over others."). Rather, the only value Swan purports to describe is its hope to be free from competition: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (Section III.C.1.a, *supra* (quoting Trade Secret Identification).

That is to say, Swan asserts that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are superior to other Bitcoin miners. But why or how that is the case (in other words, what makes them proprietary and unique to Swan and derive value from not being known by other Bitcoin miners) is not described in the Trade Secret Identification. Swan assumes that, because it took Swan some (undescribed) effort to develop those ▮▮▮▮▮▮▮▮▮▮▮ for 2040 Energy, that somehow renders them trade secrets. But if any effort to develop ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ would create a trade secret, then there would be no end to trade secret protection and lead to absurd results. For example, a car dealer who pushes its salespeople to negotiate favorable car sale terms and tries to do so at the least cost could impede the mobility of its employees in the car market by simply arguing that the negotiation of favorable terms itself was a trade secret.

Here, given that Swan does not even identify what ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ make up this trade secret, it is impossible to conclude from Swan's description—devoid from comparison to competition—that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ are valuable due to their secrecy. *See, e.g., Cisco Sys.*, 462 F. Supp. 3d at 1054 (considering lengthy description of economic value claiming that plaintiff invested significant resources in a platform, but concluding that it failed to adequately allege independent economic value because it was not specific to the

72

1    particular information claimed to be a trade secret); *Calendar Rsch*, 2020 U.S. Dist.

2    LEXIS 112361, at *22 (C.D. Cal. Aug. 16, 2017) (internal citation omitted) (the

3    court could not determine "independent economic value, actual or potential, from

4    not being generally known" or "reasonable measures to keep such information

5    secret" without a sufficiently defined trade secret); *cf. Attia v. Google LLC*, 983

6    F.3d 420, 425–26 (9th Cir. 2020) (citing *United States v. Chung*, 659 F.3d 815, 826

7    (9th Cir. 2011)) (evaluating independent economic value most often considers "the

8    degree to which the secret information confers a competitive advantage on its

9    owner"); *Acrisure of Cal. v. SoCal Com. Ins. Servs., Inc.*, 2019 WL 4137618, at *4

10   (C.D. Cal. Mar. 27, 2019) (dismissing complaint where it offered mere recitation

11   independent economic value element).

12        To the extent that Swan is claiming "███████████████" as part of the

13   trade secret, the only ████████████████████████████████████████████

14   ███████████████████████████████████   ████████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████. Swan must

17   identify all of the information for the categories that it contends constitutes its

18   combination trade secret for each of Trade Secrets 4-13 as part of the elements of

19   those trade secrets. In the absence of these specific disclosures, Swan would have

20   impermissible flexibility to later claim or disclaim any particular details as part of

21   its trade secrets. *See M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *5-6

22   (inadequate descriptions "are not sufficiently concrete, leaving room for the

23   designating party to change the meaning of the trade secret after the completion of

24   discovery"). Furthermore, Swan should be limited to the choice of particular ████

25   ██████████████████████████████████████████ in each case that it

26   purports to claim those choices as trade secrets, instead of the general verbiage

27   contained in its disclosure.

28

As with its other trade secrets, Swan's Motion defending its disclosure recognizes that it must provide a more concrete definition of its trade secrets than what it discloses.  Based on its Motion, Defendants understand that, as with Trade Secret 1, Swan is claiming a "combination" trade secret and that Swan is not claiming as a trade secret any particular ████████████████████████ ████████████████████████████████ within Trade Secret 1.  Nor is Swan claiming as a trade secret a particular ████████████████████ ██████████████████████████████.  To the extent that is incorrect, and Swan is claiming any particular aspects of a process, such information must be disclosed in its Trade Secret Identification by identifying that information as the "specific elements that define [the] trade secret."  ECF No. 111-1 at 6.

Swan's discussion of caselaw as to Trade Secrets 4-13 is misplaced for the same reason as its discussion of caselaw as to Trade Secret 1.   Section IV.C.2.a, *supra*.  Further, Swan argues that Defendants know exactly what Swan's Trade Secret Identification is describing because they still work at the sites at issue, but Swan is mistaken. Section III.C.1.a, *supra*.  Even if correct, this does not adequately discharge Swan's burden.  *See Perlan*, 178 Cal. App. 4th at 1339, 1352 (finding that the trial court did not err by rejecting plaintiff's arguments that defendants "know what they took" and thus were "clearly on notice of what it is that [plaintiff was] claiming is a trade secret" and ordering plaintiff to produce a clear, non-evasive trade secret statement); *Zunum Aero, Inc. v. Boeing Co.*, 2022 WL 17904317, at *5 n.12 (W.D. Wash. Dec. 23, 2022) (rejecting as meritless plaintiff's argument that its disclosures were adequate because defendant already knew the contents of the trade secret); *Alta Devices*, 2019 WL 176261, at *3-6 (ordering plaintiff to amend trade secret identifications that did not meet the particularity requirement).

(e)     Trade Secret 14.

Swan claims that its purported "█████████████" trade secret is "██ ██████████ ███████ ██ ██ ████████████ ████████

1 ████████████████████████████████████████████████████████
2 ████████████████████████████████████████████████████.”    ECF No.
3 111-1 at 23.  This is insufficient.
4          First, Swan fails to specify and describe what the specific "trade secret"
5 approach to ██████████████████████████████████████████████████
6 ███████████████████████████ that makes up elements of the trade
7 secrets.  *See Imax*, 152 F.3d at 1167 (emphasis in original) (trade secret description
8 must "*refer* to tangible trade secret material").  As with its claimed Trade Secret 3
9 for Site Rejection, the mere █████████████████████—without more—
10 does not sufficiently describe any trade secret information.  To the extent there is
11 any criteria used in the ███████████████████ that is unique and
12 proprietary to Swan, Swan must identify that in the elements of Trade Secret 14.  It
13 does not.
14          Second, while Swan further claims its "████" for each site as part of this
15 Trade Secret, Swan similarly does not identify what any such "███" consisted of.
16 As with Swan's trade secret "██████████████" criteria, Defendants are
17 left to simply guess what Swan claims as a trade secret in this regard. In defense of
18 its trade secret disclosure, Swan attempts to claim that it "includes details such as
19 ██████████████████████████████████████████████████████" for
20 each planned site.  But Swan's use of technical jargon here does not fix the fact that
21 it has not provided any details as to what the actual "trade secret" information is.
22 save the inadequate disclosure.  *See Perlan*, 178 Cal. App. 4th at 1339 ("Despite the
23 highly technical language used, it is apparent that this description does not provide
24 specific identifications of the [alleged trade secret]."). The information that Swan
25 identifies for each site is merely *factual and objectively observable information*
26 about the identified sites. For instance, the fact that Swan "█████████████████
27 ██████████████" from a different mining site cannot credibly be claimed
28 as "trade secret" information.  Nor can what is disclosed in Swan's Trade Secret

Identification be legitimately claimed to be a "'██████████████████" as Swan tries to claim (Section at III.C.1.f, *supra*)—it is the basic foundation for any mining operations at any mining site. To the extent it does claim a "██████," Swan needs to disclose it.

Third, to the extent that Swan asserts its ██████████████████ as a trade secret, it fails to identify what aspects of the ██████████████████, in particular, constitute a trade secret. As with its other trade secrets, Swan fails to point to ████████████████████████ ██████ that it could claim as a trade secret. *See Carl Zeiss X-Ray Microscopy*, 2021 U.S. Dist. LEXIS 216806, at *12-13 (party must identify what portion of a document is the trade secret); *M/A COM Tech.*, 2019 WL 8108729, at *4 (finding disclosures inadequate where they cited documents without referring to specific pages).

Fourth, the claimed Trade Secret is once again apparently made up of several elements each, but Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

(f)    Trade Secret 15.

Swan claims that its alleged "BNOC" trade secret is the "██████████████ ████████████████" ECF No. 111-1 at 24. This disclosure fails to identify the alleged Trade Secret with sufficient particularity for several reasons.

First, Swan fails to specify what specific aspects of BNOC consist of the trade secret. Indeed, its Disclosure does not even attempt to explain which elements or portions of the BNOC "████████████" or "████████" constitute its trade secrets, as opposed to generally available programming techniques or matters of general knowledge in the trade. Notably, Swan appears to double down in its Motion defending its disclosure, and purports to claim "████████████████

76

1    ███████████████████████████████████" as its Trade Secret.  Section at

2    III.C.1.f, *supra*.

3            But this fails to acknowledge that BNOC consists of publicly available code

4    and thus necessarily incorporates at least some non-trade secret information.  As

5    Swan knows, BNOC was built on top of a publicly available open source software

6    Warden, but its Disclosure does nothing to account for that fact or to appropriately

7    delineate what code Swan claims for itself.  To sufficiently comply with the Court's

8    Order, Swan must identify what it believes is a trade secret that (by definition)

9    cannot be found in Warden or any other open source software or information that is

10   common knowledge.  Ex. W (Zagury witness statement) ¶ 20.  Indeed, Swan must

11   describe the particular design features, architecture, or algorithms that it claims

12   constitute the trade secrets contained within BNOC.  While Swan inaccurately (and

13   without support) claims that it need not "pars[e] out" which elements are proprietary

14   and which are public knowledge (Section III.C.1.f, *supra*), that is wrong.  To the

15   contrary, Swan's failure to segregate what portions of BNOC it claims are unique

16   and proprietary to it is an insufficient identification.  *See Agency Solutions*, 819 F.

17   Supp. 2d at 1018-19; *see also Alta Devices*, 2019 WL 176261, at *2 (emphases in

18   original) (internal citation omitted) (plaintiff must include "adequate detail to allow

19   the *defendant* to *investigate* how [each asserted trade secret] might differ from

20   matters already known and to allow the court to craft relevant discovery"); *Perlan*,

21   178 Cal. App. 4th at 1351-52 (finding trade secret identification insufficient because

22   it did not clearly segregate the trade secrets from information available to the public

23   by explaining "'how' its alleged trade secrets were novel").   In light of this, Swan

24   fails to identify even the "boundaries or nature" of its alleged Trade Secret.  *Agency*

25   *Solutions*, 819 F. Supp. 2d at 1019.

26           Second, because Swan's disclosure uses the word "including," this trade

27   secret is apparently not limited to ███████████████████.   Such

28   language is an impermissible "catch-all" description that is "so vague and unspecific

as to constitute no disclosure at all" since Individual Defendants cannot ascertain the boundaries of the alleged trade secret. *See E. & J. Gallo Winery*, 2018 WL 3062160, at *5 (citing *Loop AI Labs*, 195 F. Supp. 3d at 1116); *see also Imax*, 152 F.3d at 1167; *cf. InteliClear*, 978 F.3d at 658-59 (identifying uniquely designed tables, columns, account number structures, methods of populating table data, and combination or interrelation thereof could be trade secrets); *Calendar Rsch.*, 2020 U.S. Dist. LEXIS 112361, at *15 ("Trade secrets cannot be vague concepts, and Plaintiff fails to identify the specific set of 'methods, techniques, processes, procedures, programs, or codes' that could establish . . . [the] trade secret."). Illustrating the problem with Swan's open-ended definition, during the meet-and-confer process, Swan claimed that this trade secret referred to BNOC "███████" as a whole.  When asked by Defendants whether this included ███████, Swan claimed that the trade secret <u>would</u> include ███████████████████████████████████ it must identify that in the elements of its Trade Secret Identification.

Third, to the extent that Swan claims the "BNOC" trade secret is made up of multiple elements—which it appears to do—Swan fails to specify whether it is the combination of those elements all together that make up the trade secret, or whether there are subsets of those elements that make up the trade secret.  This is not sufficient under Section 2019.210.  *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

(g)    Trade Secret 16.

Swan claims that its "████████████████████████████████████████████." ECF No. 111-1 at 25.

As an initial matter, by its name, the document indicates that it is a 2040 Energy document, not a Swan document and, much less, a Swan trade secret.  And Swan provides no explanation as to how this information is owned by or a trade



78

secret of Swan, as opposed to 2040 Energy.   Swan's references to ██████
██████████ " "████████████████," and "████████████" are thus, at best,
misleading.

Setting that issue aside, Swan has not produced or identified the specific
spreadsheet it claims is the trade secret here.  *See Alphonso*, 2022 WL 17968081, at
*4 ("[T]he failure to identify specific documents that contain trade secrets is
impermissibly vague and prevents defendants from preparing their defenses."). 
And Swan's unsupported contention that "Defendants are familiar with this
spreadsheet" (Section III.C.1.f, *supra*) does not relieve Swan from its Section
2019.210 disclosure obligations under Order of the Court.  *See Perlan*, 178 Cal.
App. 4th at 1339 (finding that the trial court did not err by rejecting plaintiff's
arguments that defendants "know what they took" and thus were "clearly on notice
of what it is that [plaintiff was] claiming is a trade secret" and ordering plaintiff to
produce a clear, non-evasive trade secret statement); *Alta Devices*, 2019 WL
176261, at *3-6 (ordering plaintiff to amend trade secret identifications which did
not meet the particularity requirement).

In addition, contrary to Swan's assertions, it is not sufficient to simply
indicate that the spreadsheet is ████████████████████████████████████
Section III.C.1.f, *supra*.  Swan claims that this spreadsheet contains a "wealth of
non-public information," but does not identify what specific information is non-
public versus what information is public, or why the non-public information
purportedly has independent value.  The trade secrets need to be described in
Swan's disclosure, and while a party "is free to cite to and incorporate portions of
documents in its trade secrets disclosure without reproducing the text of those
documents, it may not simply refer to a document in its entirety as 'including' trade
secrets, without specifying what the trade secret is."  *Carl Zeiss X-Ray Microscopy*,
2021 U.S. Dist. LEXIS 216806, at *12-13.

1    To extent the spreadsheet consists of both public and non-public information,

2    Swan fails to specify whether it is the combination of those elements all together

3    that make up the trade secret, or whether there are subsets of those elements that

4    make up the trade secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

5    Swan argues that it is not required to pick apart the spreadsheet to explain

6    which portions of the spreadsheet are public and which are private. Section

7    III.C.1.f, *supra*. But the only case it cites in support of this assertion, *Imax*

8    *Corporation v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998),

9    says nothing of the sort. *Imax* simply said that engineering drawings and blueprints

10    had been adequate disclosures in another case, saying nothing about circumstances

11    in which components of the claimed trade secret are public. *Id.* And under *Perlan,*

12    Swan must indeed parse out which portions of the spreadsheet and public and which

13    are private. *Perlan,* 178 Cal. App. 4th at 1351-52 (finding trade secret identification

14    insufficient because it did not clearly segregate the trade secrets from information

15    available to the public by explaining "'how' its alleged trade secrets were novel");

16    *see also Alta Devices*, 2019 WL 176261, at *2 (emphases in original) (internal

17    citation omitted) (plaintiff must include "adequate detail to allow the *defendant* to

18    *investigate* how [each asserted trade secret] might differ from matters already

19    known and to allow the court to craft relevant discovery").

20    Further, Swan has not produced or identified the specific spreadsheet it

21    claims is the trade secret. *Alphonso*, 2022 WL 17968081, at *4 ("[T]he failure to

22    identify specific documents that contain trade secrets is impermissibly vague and

23    prevents defendants from preparing their defenses.").

(h)    Trade Secret 17.

25    Swan claims its "  " trade secret is

26    "

27

28    " ECF No. 111-1 at 26. Specifically, it identified

1 ████████████████████████████████████████████████

2 ████████."[25]

3     As an initial matter, "███████" and "████████████████" are

4 generally accepted concepts, not just in the Bitcoin mining industry but in

5 connection with general electricity usage; they are certainly not unique to Swan.

6 Indeed, these practices are well accepted in the mining industry and commonplace

7 to ensure cost effective and efficient use of energy while mining.[26] To distinguish

8 from what's publicly available, Swan explains only that its █████████████

9 ████████████████████████████████████████████████

10 ██████." But this is insufficient. Other than vaguely referencing ████

11 █████████, Swan fails to describe how *any* model works to allegedly

12 "██████████████████████████████" (Section III.C.1.g,

13 *supra*). And while Swan claims, "█████████████████████████

14 █████████," it provides no information as to what that criteria is—the

15 very purpose of the Trade Secret Identification.

16     Moreover, based on Swan's disclosure, this alleged trade secret purports to

17 be made up of several elements. But given Swan's failure to state each element

18 with sufficient particularity, it is impossible to distinguish between them and

19 matters of general knowledge in the trade or of special knowledge of those persons

20 skilled in the trade.

---

[25] To be clear, this document was not identified in Swan's 2019.210, but was only recently disclosed to Individual Defendants' counsel in connection with Swan's Joint Stipulation. Now that Swan has identified this model, Defendants assume that this is the only "████████████ that Swan is claiming as its trade secret. Swan identifies no other models.

[26] *E.g.*, Riot Platforms, Inc. 2022 Form 10-K at 9-10, 37-43 (discussing Congressional interest in curtailment, Riot's curtailment practices, and financial details of Riot's power curtailment credits) (Ex. X).

81

And as with various of the other trade secrets, to the extent that some or all of the elements are in the public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

With respect to the claimed ████████████████████████, Swan generally asserts that "████████████████████████" is its trade secret. Section III.C.1.g, *supra*. Again, this is insufficient for the same reasons identified above. Section III.C.1.e, *supra*. Swan fails to identify the specific aspects of these ████████ that it asserts are trade secrets and what about them makes them trade secret. While it provides, as one example, "████████████████████ ████████," it provides no information as to how this is proprietary to Swan and not something generally done in the industry (or other industries for that matter).

(i)    Trade Secret 18.

Swan claims its so-called "████████████████" trade secret is "████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████." ECF No. 111-1.

First, other than referring to the "████████████," Swan does not identify what "████████████████" it is referring to. Swan also does not explain whether ████ ████████ is a document (and if it is, Swan does not identify and has not produced that document). Swan also does not explain what "████████████" it claims is proprietary to Swan as opposed to being public knowledge. *See also, e.g., Alta Devices*, 2019 WL 176261, at *2 (emphases in original) (internal citation omitted) (plaintiff must include "adequate detail to allow the *defendant* to *investigate* how [each asserted trade secret] might differ from matters already known and to allow the court to craft relevant discovery"); *Perlan*, 178 Cal. App. 4th at 1351-52 (finding

trade secret identification insufficient because it did not clearly segregate the trade secrets from information available to the public by explaining "'how' its alleged trade secrets were novel"). And similar to Trade Secrets 3 and 14, the mere decision by Swan as to whether or not to ████████████████████████ do not— alone—sufficiently describe any trade secret. To the extent that Swan claims any particular "████████████" or related criteria as its trade secret, Swan must identify such in its Trade Secrets Identification.

Second, Swan uses the word "including," which is an impermissible "catch-all" description that is "so vague and unspecific as to constitute no disclosure at all" since Individual Defendants cannot ascertain the boundaries of the alleged trade secret. *E. & J. Gallo Winery*, 2018 WL 3062160, at *5 (citing *Loop AI Labs*, 195 F. Supp. 3d at 1116); *see also Imax*, 152 F.3d at 1167. Swan's use of catch-all language is particularly problematic because it is not preceded by a specific, substantive disclosure of the trade secret, but instead a non-substantive and general one. *Cf. Wisk Aero LLC*, 2021 WL 8820180, at *12 (finding disclosures were adequate despite use of "including" where non-exhaustive list of examples is "always preceded by the substantive description of each trade secret").

Third, to the extent that some or all of the claimed elements are in the public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

                 (j)    Trade Secret 19.

Swan claims its "Generation And Use Of Testing Data" trade secret is "█ ██████████████████████████████████████ ██████████████" ECF No. 111-1 at 28. Swan fails to identify ██████████████████████████ ██████████████████████████

For example, Swan does not identity what type of ███████████████

████████████████████████. *See Imax*, 152 F.3d at 1167 (emphasis in original) (trade secret description must "*refer* to tangible trade secret material"). Without this information, Defendants cannot possibly be put on notice as to the boundaries of this claimed Trade Secret.

Recognizing this deficiency, in its Motion defending its Disclosure, Swan tries to provide a more concrete definition of this Trade Secret, claiming that it constitutes "████████████████████████████████████ ████████████████." Section III.C.1.i, *supra*. This is still insufficient as it fails to make even a basic identification of what that ███████████████ even is. Swan complains that its records "are numerous and diffuse, and it is impractical it explicitly include" such data. *Id.* Swan cites no authority for the proposition that a plaintiff is relieved of its obligation to identify trade secrets because it feels they are too voluminous. To the extent that Swan claims as its trade secret ████████████████, it must identify that data and explain what the trade secret is within that data.

(k)    Trade Secret 20.

Swan claims its "███████████████████████████" trade secret is "██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████" ECF No. 111-1 at 29. Swan asserts that Trade Secret 20 is "narrowly tailored" to "the ███████ ████████████" and "████████████████." Section III.C.1.j, *supra*. In effect, Swan tries to claim its ████████████████████████████████████████ as a trade secret, as well as claim its ██████████████████████████████ as a trade secret. Nothing about what is disclosed identifies anything proprietary or a trade secret. The lack of merits of this trade secret aside, if Swan claims the ███████████

1    ████████████████████████ as its trade secret, it must specify those choices before

2    taking discovery.

3        In addition, Swan fails to specify whether its trade secret consists of ████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████. *See Imax*, 152 F.3d

6    at 1167 (emphasis in original) (trade secret description must "*refer* to tangible trade

7    secret material"). Presumably, Swan is not asserting that ████████████████

8    ██████████████████████████, itself is its trade secret. Yet, Swan

9    does nothing to identify ████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████.

12       Second, this trade secret is made up of numerous elements, but Swan fails to

13   state each element with sufficient particularity making it impossible to distinguish

14   between them and matters of general knowledge in the trade or of special knowledge

15   of those persons skilled in the trade. For example, Swan fails to identify what

16   techniques or results Swan considers to be part of its trade secret. *Id.*

17       Third, again, to the extent that some or all of the elements are public domain,

18   Swan fails to specify whether it is the combination of public elements together that

19   make the unified combination of approaches and/or information that makes the

20   combination a protectable secret. This is insufficient under Section 2019.210. *See*

21   *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

22       (a)    <u>**Swan Refused To Clarify Its Trade Secret**</u>

23              <u>**Identification.**</u>

24       Swan used this Motion to supplement its Trade Secret Identification in order

25   to attempt to comply with this Court's order and Section 2019.210. To avoid

26   unnecessary motion practice, Defendants sent Swan correspondence identifying

27   what it understood to be Swan's revised trade secret designations. Ex. Q. Swan,

28   however, refused to confirm this, leaving the content and boundaries of Swan's

claimed trade secrets more uncertain than ever. It is unclear even whether the trade secret disclosure at issue is Swan's original February 14, 2025 disclosure or as supplemented by this Motion.

> ### 3.    Defendants Have Provided Supplemental Reponses To The Discovery Demands At Issue Notwithstanding Defendants' Well-Founded Objections.

Defendants are entitled to raise objections such as vagueness, overbreadth, burden and the like, and to provide substantive responses to those requests subject to and without waiving those objections. Defendants have in good faith provided supplemental responses and have agreed to produce responsive documents. Defendants provided substantive answers to the interrogatories and agreed to produce documents to the best of their understanding of the discovery requests. Though Defendants believe they have fully responded to the discovery requests, they are compelled to reserve their objections, given Swan's refusal to postpone this Motion and engage in further meet and confers regarding Defendants' supplemental responses. To the extent that Swan believes that Defendants have not fully responded to the requests or provided all responsive documents, the parties should meet and confer over any outstanding issues (if there are any). This is particularly appropriate here given Swan's requests for Defendants to produce "documents sufficient" to establish certain things. Whatever issues remain will not relate to the trade secret disclosures objection, nor will it be about the refusal to respond to the discovery demands—which of course is the focus of this unnecessary joint statement.

## V.    CONCLUSION

### A.    Swan's Conclusion

The Court should grant Swan's motion to compel, and order that Defendants produce documents responsive to RFPs 1-4 and respond fully to Interrogatories 1-5. More generally, the Court should overrule all of Defendants' general objections to

discovery, including the objection that Swan's Trade Secret Identification is insufficient.

### B.    **Defendants' Conclusion**

Defendants have already agreed to produce documents responsive to RFPs 1-4 and responded to Interrogatories 1-5. Swan's request that the Court compel the Defendants to take those very actions is moot and should be denied as such. Swan's apparent request for an advisory opinion regarding the adequacy of its Trade Secret Identification, which is fatally insufficient, should likewise be denied.

1  | DATED:  April 23, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:   */s/ Ryan S. Landes*

RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone: (213) 443-3145
Facsimile: (213) 443-3100

STACYLYN M. DOORE (*pro hac vice*)
stacylyndoore@quinnemanuel.com
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Facsimile: (617) 712-7200

RACHEL E. EPSTEIN (*pro hac vice*)
rachelepstein@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

AUSTIN BUSCHER
austinbuscher@quinnemanuel.com
555 Twin Dolphin St., Fifth Floor
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

JEFFREY WILLIAM NARDINELLI
jeffnardinelli@quinnemanuel.com
50 California Street 22nd Floor
San Francisco, CA 94111
Telephone:  415-875-6600
Facsimile: 415-875-6700

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC.*
*d/b/a SWAN BITCOIN*

88

1   DATED:  April 23, 2025                      GOODWIN PROCTER LLP

2

3

4                                        By  /s/ Matthew P. Kanny
5                                           MATTHEW P. KANNY (SBN 167118)
                                            MKanny@goodwinlaw.com
6                                           GRANT P. FONDO (SBN 181530)
                                            GFondo@goodwinlaw.com
7                                           AMANDA H. RUSSO (SBN 319617)
                                            ARusso@goodwinlaw.com
8                                           AARON S. THOMPSON (SBN 272391)
                                            AThompson@goodwinlaw.com
9                                           GOODWIN PROCTER LLP

10                                          Attorneys for Defendants Thomas Patrick
11                                          Furlong, Ilios Corp., Michael Alexander
                                            Holmes, Rafael Dias Monteleone,
12                                          Santhiran Naidoo, Enrique Romualdez,
13                                          and Lucas Vasconcelos

14

15

16  DATED:  April 23, 2025                      BERGESON, LLP

17

18

19                                       By  /s/ Daniel J. Bergeson
20                                          DANIEL J. BERGESON (SBN 105439)
                                            dbergeson@be-law.com
21                                          ADAM C. TRIGG (SBN 261498)
                                            atrigg@be-law.com
22                                          JAIDEEP VENKATESAN (SBN 211386)
                                            jvenkatesan@be-law.com
23                                          REBECCA KAUFMAN (SBN 199534)
                                            rkaufman@be-law.com
24
                                            Attorneys for Specially Appearing
25                                          Defendants Proton Management Ltd.

26

27

28

                                        89

# **ATTORNEY ATTESTATION**

Pursuant to Local Rule 5-4.3.4, I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Ryan S. Landes*_____
RYAN S. LANDES

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL