# EXHIBIT G

**Goodwin**

Matt Kanny
+1 424 436 3001
MKanny@goodwinlaw.com

Goodwin Procter LLP
520 Broadway, Suite 500
Santa Monica, California  90401

goodwinlaw.com
+1 424 252 6400

March 26, 2025

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**VIA E-MAIL - *ryanlandes@quinnemanuel.com***

Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Re:     ***Electric Solidus, Inc. d/b/a Swan Bitcoin v. Proton Management Ltd. et al.***
        **(C.D. Cal. Case No. 2:24-cv-8280): Deficiencies In Swan's 2019.210 Disclosure**

Dear Mr. Landes:

We write in regards to Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin's ("Swan") trade secret identification, which Swan served and filed pursuant to the Court's Order Setting Scheduling Conference (ECF No. 95).[1]  Swan's Identification of Asserted Trade Secrets (ECF No. 111-1) is inadequate and fails to comply with the requirements of California law for trade secret identifications pursuant to Section 2019.210.  *See, e.g.*, *Advanced Modular Sputtering, Inc. v. Sup. Ct.*, 132 Cal. App. 4th 826, 836 (2005) (plaintiff must identify the trade secrets with "sufficient particularity" to distinguish the trade secrets from "matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." (internal alterations omitted)).  As described in greater detail below, Swan fails to provide sufficient detail to allow Individual Defendants to understand what it is Swan claims are its trade secrets.  In many cases, Swan uses impermissible catch-all language that fails to provide Individual Defendants notice of the scope of Swan's trade secrets.

As a preliminary matter, Swan's introductory comments are irrelevant.  Individual Defendants reserve the right to object to and/or dispute these assertions in future proceedings, and do not believe they are pertinent to any disclosure of the specific alleged trade secrets identified by Swan.

Individual Defendants address each of the trade secret identifications below.[2]

---

[1] The Court's Order Setting Scheduling Order requires an identification of trade secrets "akin to the disclosure required by [California Code of Civil Procedure Section 2019.210]."  ECF No. 95 at 6.  Individual Defendants write this letter to preserve all of their rights relating to Swan's inadequate trade secret identification.  Nothing in this letter shall be deemed a waiver of any of the Individual Defendants' rights, remedies, and defenses (including their right to compel arbitration and have all disputes and claims be heard in arbitration), all of which are specifically reserved.

[2] As noted below, Individual Defendants' objections contained herein and are non-exhaustive, and, particularly given the AEO designation of Swan's trade secret identification, reserve all rights to make additional objections at a later time.



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 2

<u>**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**</u>

<u>**Trade Secret #1.  Site Selection and Optimizations.**</u>

Swan claims its "Site Selection and Optimizations" trade secret is "Swan's [1] proprietary site
identification and [2][a] selection criteria and analysis of potential mining sites, [b] selection of effective
hosts to run the miners at each site, [c] contractual agreements and terms therein governing each site,
and [d] post-deployment optimizations at each site."  ECF No. 111-1 at 8.

Swan's identification of its "Site Selection and Optimizations" trade secret suffers from numerous flaws
that require Swan to amend it before discovery can proceed.

First, Swan fails to specify whether its trade secret consists of (i) an approach (*i.e.* certain steps Swan
takes) to identifying sites, (ii) specific criteria (*i.e.* the qualities that Swans requires) that Swan uses in
its approach to identifying sites, (iii) whether its analysis of potential mining sites differs from the
aforementioned approach and criteria, (iv) whether the alleged trade secret includes a selection
approach or selection criteria for selecting hosts, (v) whether the contractual agreements are part of its
trade secret because of the existence of specific agreements for specific sites or because the terms of
those agreements are somehow unique, and/or (vi) whether there are any specific post-deployment
optimizations that make up this trade secret.  Given this lack of specificity, it is not possible to
distinguish the alleged trade secrets from matters of general knowledge in the trade or of special
knowledge of those persons skilled in the trade.  *See InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978
F.3d 653, 658 (9th Cir. 2020) ("Plaintiffs must 'clearly refer to tangible trade secret material'"); *Imax
Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1167 (9th Cir. 1998) (finding insufficient specificity in
trade secret description because "it does not *clearly refer* to tangible trade secret material").

Second, while this trade secret appears to be made up of several "elements," Swan states each
element with insufficient particularity such that it is impossible to distinguish between them and matters
of general knowledge in the trade or of special knowledge of those persons skilled in the trade.  For
example, Swan fails to explain the alleged unique process for how it selects sites, what specific
selection criteria it uses for either sites or hosts, what specific contractual terms it requires in its
contracts (or whether the few provisions its mentions are exhaustive),[3] what so-called optimizations it
requires to be deployed at each site (and whether the few optimizations it mentions in the background
are exhaustive), and whether each of these is somehow proprietary or unique to Swan.  *Id.* (catchall
phrase "including every dimension and tolerance that defines or reflects that design" rendered
description insufficient).  Swan's description simply states that its employees took steps to optimize
sites, but never explains what those steps are or how they are differ from publicly available information.
It states that it obtains "favorable contract terms" but never explains what those terms are or how they
can constitute a trade secret—or if Swan had some kind of proprietary process for obtaining favorable
terms that it claims is a trade secret.  It references a 2040 Site Database spreadsheet file without
providing the document or explaining how that document contains the alleged trade secrets.

Third, to the extent that some or all of the elements are in public domain, Swan fails to specify whether
it is the combination of public elements together that make the unified combination of approaches

---

[3] To the extent the list of terms is non-exhaustive, the disclosure fails to provide the bounds of the trade secret, and therefore
it is insufficient.  *E. & J. Gallo Winery*, 2018 WL 3062160, at *5.



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 3

<u>**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**</u>

and/or information that makes the combination a protectable secret. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1090 (N.D. Cal. 2006), *aff'd,* 221 F. App'x 996 (Fed. Cir. 2007).

Finally, in a footnote, Swan refers to other "various parties" who actually signed the site contracts, but does not specify why Swan claims it owns or has an interest those contracts as a non-signatory, or why the contracts or the terms therein are somehow purported trade secrets of Swan. And it is obvious that each of the signatories of the contracts had access to the contract and the terms contained therein, so the terms and contracts are not confidential or proprietary to just Swan. In fact, the contracting parties have access to those contracts and their terms, as well.

<u>**Trade Secret #2. Site Rejection.**</u>

Swan claims its "Site Rejection" trade secret is "Swan's reasoning and decision not to pursue mining operations at particular sites, including these sites listed on the 'sites' tab of a confidential Swan document called the 2040 Financial Model: Oman - Exahertz, Iceland, Finland, Wibaux Montana, Bitdeer, Florence South Carolina, Kaboomracks, Digihost Phase 2, Gtherm, GainHash, US Bitcoin, Canada, GBM, GBM (Phase 2), ND, ND (Phase 2), Oman - Green Data City."

First, Swan fails to specify what "reasoning and decision[s]" make up the trade secret, and why such reasoning and decisions are not matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade. *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1018–19 (E.D. Cal. 2011) (2019.210 as describing "process flows and interfaces that would be needed to built" insufficient to be specific enough to discern the nature of the trade secret).

Second, Swan uses open-ended language "including" that does not specify whether it is the exclusion of just the specific list of sites it identifies that constitute its trade secret, or whether there are additional sites it contends are part of it excluded sites. Accordingly, the disclosure fails to provide Individual Defendants notice of what Swan considers its trade secret. *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, No. 117CV00808DADEPG, 2018 WL 3062160, at \*5 (E.D. Cal. June 19, 2018) (citing *Loop AI Labs, Inc. v. Gatti*, 195 F.Supp.3d 1107, 1116 (N.D. Cal. Jul. 6, 2016)). *See also Imax Corporation*, 152 F.3d at 1167.

Third, Swan again fails to specify whether it is the combination of all of these particular excluded sites together that make up its trade secret, whether certain factors have more significance than others, or whether a subset also make up its trade secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

Fourth, depending on the scope of what Swan claims is its trade secret, Swan's "negative" trade secret is written in a way that seems impossible to not use unless Individual Defendants were to affirmatively select the purportedly eliminated sites for use with their business.

<u>**Trade Secret #3. ASIC Acquisition ("Project Corner").**</u>

Swan claims its so-called "Project Corner" trade secret is "Swan's stealth purchase of 77,821 ASICs providing 8.4 EH/s hashing capacity at an average acquisition cost of $12.54/TH between June 2023 and January 15, 2024, including its acquiring them secretly (using multiple straw purchasers who maintained the confidentiality of their relationship to Swan, using unaffiliated email addresses, spacing out purchases and using multiple vendors) so as not to raise the market price, as well as its deployment



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 4

<u>**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**</u>

strategies as outlined below and in the following documents: Investment Memo [2040, Jun2023].pdf; Investment Memo [Project Corner Phase 2, Jul2023].pdf; and Investment Memo [Project Corner Phase 3, Jul2023].pdf."

First, Swan claims that it purchased ASICs, but it is clear that Swan did not purchase anything, and that any purchase of ASICs was done by 2040 Energy, not Swan.

Second, Swan claims that its trade secret consists of several elements including "deployment strategies" in particular documents. However, Swan fails to specify whether the trade secret element consists of the entirety of each of each document or whether it is simply a portion of the document (and what portion), which means it is not sufficiently particular. *See Loop AI Labs Inc.*, 195 F. Supp. 3d at 1116.

Third, this trade secret is assertedly made up of several elements and documents (or portions of documents), but Swan fails to specify whether it is the combination of elements together that make the unified combination a protectable secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

Fourth, it appears that Swan alleges that the sole justification for making this purported trade secret valuable is from it (the purchasing of ASICs) not being known is that Swan avoided price hikes. ECF No. 111-1 at 10 ("By keeping its ASIC purchases secret, Swan avoided price hikes and therefore purchased ASICs at advantageous prices.") A trade secret constitutes "information [that] derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. §1839(3). But avoiding in price hikes in the past is irrelevant to any value to Swan from keeping this secret from others going forward. *See, e.g.*, *Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) (no trade secret where manuals had little value from being kept secret); *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 568, 66 Cal. Rptr. 3d 1, 20 (2007), *as modified on denial of reh'g* (Sept. 21, 2007) ("In other words, the core inquiry is the value to the owner in *keeping the information secret* from persons who could *exploit it to the relative disadvantage of the original owner.*").

<u>**Trade Secret #4 to #13.  Various existing mining sites of 2040 Energy.**</u>

Swan claims certain aspects of less than ten mining sites make up different trade secrets. In each case, Swan claims the identification and selection of the identified mining site, the terms of the contractual agreements governing that site, and the site specific optimizations that Swan implemented to improve performance.

First, as noted above, Swan did not "execute" any of these Hosting Agreements (or alleged related subsequent agreements), and therefore it is not clear how Swan can claim a proprietary interest in them.

Second, Swan fails to specify or describe whether it is a specific approach to identification and selection of the site, the particular information used to identify and select the site, or the simple knowledge that Swan selected the site that makes up elements of the trade secrets. *See Imax Corp.*, 152 F.3d at 1167 (trade secret description must "*refer* to tangible trade secret material"). Nor does



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 5

<u>**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**</u>

Swan identify the specific information in any of these categories—such as the steps or information assertedly used to identify the site.

Third, Swan does not identify what specific terms and what specific optimizations make up those elements of the trade secrets. *Id.*

Fourth, the claimed trade secrets are made up of several elements each, but Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

Fifth, Swan fails to explain identify what *independent economic value* there is exists in the secrecy of contract terms in agreements it did not sign such that they provide an actual or potential economic advantage to Swan over others; rather, the only value Swan describes is its hope to be free from competition. *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) ("To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others.").

Swan asserts that its contract terms and optimizations are superior to other bitcoin miners. But how that is the case is not described in the 2019.210 disclosure. Swan then assumes that, because it took Swan some (undescribed) effort to develop those contract terms and optimizations for 2040 Energy, that somehow renders them Swan's trade secrets that should be free from competition from its former consultants. But if any effort to develop contract terms and maximize cost efficiency in production would create a trade secret, then there would be no end to trade secret protection. For example, a car dealer who pushes its sales people to negotiate favorable car sale terms and tries to do so in the least amount of cost could impede the mobility of its employees by arguing that they are encumbered with trade secrets that prevent them from operating in the same market. Here, given that Swan does not even identify what contract terms and optimizations make up this trade secret, it is impossible to conclude from Swan's description—devoid from comparison to competition—that mere development effort related to these agreements means that any trade secrets resulting from that development effort are valuable due to their secrecy. *See, e.g., Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1054 (N.D. Cal. 2020) (considering lengthy description of economic value claiming that plaintiff invested significant resources in a platform, but concluding that it failed to adequately allege independent economic value because it was not specific to the particular information claimed to be a trade secret); *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017) ("To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others."). *Cf. Attia v. Google LLC*, 983 F.3d 420, 425–26 (9th Cir. 2020) (evaluating independent economic value most often considers "the degree to which the secret information confers a competitive advantage on its owner"); *Acrisure of Ca. v. So. Cal. Commc'l Ins. Servs., Inc.*, 2019 WL 4137618, at *4 (C.D. Cal. Mar. 27, 2019) (dismissing compliant where it offered mere recitation independent economic value element).

<u>**Trade Secret #14. Planned mining sites.**</u>

Swan claims that its purported "planned mining sites" trade secret is the identification, selection of, and plans for, the following mining sites: (a) GeoBitmine, (b) Rockdale-Bitdeer, (c) Poolin, (d) Acrohash, (e)



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 6

<u>**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**</u>

Iowa, (f) Merkle Standard, (g) 2140 Tasmania expansion, (h) Oklahoma, (i) Ethiopia.

First, Swan fails to specify and describe whether it is a specific approach to identification and selection of these sites, the particular information used to identify and select the site, or the simple knowledge that Swan selected the site that makes up elements of the trade secrets. *See Imax Corp.*, 152 F.3d at 1167 (trade secret description must "*refer* to tangible trade secret material").

Second, Swan does not identify what "plans" consists of; Swan does not explain whether these refer to anticipated terms for contract negotiations, anticipated optimizations, or other unspecified "plans." *Id.*

Third, the claimed trade secret is made up of several elements each, but Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

<u>**Trade Secret #15.  Bitcoin Network Operating Center (BNOC).**</u>

Swan claims that its alleged "BNOC" trade secret is the "BNOC software solution, including its source code."

First, Swan fails to specify what aspects of BNOC are the trade secret, and because Swan uses the word "including" this trade secret is not limited to the source code Swan has identified, which is an impermissible "catch-all" description that is "so vague and unspecific as to constitute no disclosure at all" since Individual Defendants cannot ascertain the boundaries of the alleged trade secret. *E. & J. Gallo Winery*, 2018 WL 3062160, at *5 (citing *Loop AI Labs, Inc.*, 195 F.Supp.3d at 1116). *See also Imax Corp.*, 152 F.3d at 1167. *Cf. InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 659 (9th Cir. 2020) (identifying uniquely designed tables, columns, account number structures, methods of populating table data, and combination or interrelation thereof could be trade secrets).

Second, to the extent that the source code Swan claims is the trade secret is made up of multiple elements, Swan fails to specify whether it is the combination of those elements all together that make up the trade secret, or whether there are subsets of those elements that make up the trade secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

Third, Swan does not describe which elements of the "software solution" or "source code" is unique and proprietary to Swan and/or are not matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade. *Agency Solutions,* 819 F. Supp. 2d at 1018–19. Nor does Swan explain which portions of the BNOC source code constitute its trade secrets, as opposed to generally available programming techniques.

<u>**Trade Secret #16.  2040 Site Database Spreadsheet.**</u>

Swan claims that its "2040 Site Database" trade secret is "the 2040 Site Database spreadsheet file, downloaded by departing Swan employees as 2040_site_database.xlsx."

By its name, the document refers to a 2040 Energy document, and Swan does not explain how this information is owned by or a trade secret of Swan, as opposed to 2040 Energy. In addition, Swan's references to "Swan's optimizations," "Swan's hashrate share," and "Swan's profits" is, at best, misleading. All of the referenced mining activities are 2040 Energy's, not Swan's.



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 7

<u>**HIGHLY CONFIDENTIAL –**</u>
<u>**ATTORNEYS' EYES ONLY**</u>

In addition, Swan claims that this spreadsheet contains a "wealth of non-public information," but does not identify what specific information is non-public versus what information is public, and why the non-public information purportedly has independent value.

To extent the spreadsheet consists of both public and non-public public information, Swan fails to specify whether it is the combination of those elements all together that make up the trade secret, or whether there subsets of those elements that make up the trade secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

Further, Swan has not produced the spreadsheet it claims is the trade secret.

<u>**Trade Secret #17.  Curtailment Models And Contract Terms.**</u>

Swan claims its "Curtailment Models And Contract Terms" trade secret is "Swan's site-specific negotiated curtailment terms, and Swan's models and criteria to determine when and for how long to curtail with respect to Demand Response curtailment."

First, Swan fails to specify whether its trade secret consists of an approach (*i.e.* certain steps Swan uses in the model) to conduct curtailment analysis, specific criteria (*i.e.* the qualities that Swan uses), or both.  *See Imax Corp.*, 152 F.3d at 1167 (trade secret description must "*refer* to tangible trade secret material").  Other than referencing "[o]ne such model," Swan also does not describe a specific model or criteria it claims is part of this alleged trade secret.  It refers to "Swan's site-specific information" without describing what that information is—the very purpose of the 2019.210 disclosure.  And other than referring to "one example," Swan also does not identify which "curtailment terms" it negotiated in contracts for 2040 Energy it claims are part of its alleged trade secrets.

Second, this trade secret appears to be made up of several elements, but Swan states each element with insufficient particularity such that it is impossible to distinguish between them and matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade.  For example, Swan fails to identify what curtailment terms or criteria Swan considers to be part of its trade secret.  *Id.*

Third, to the extent that some or all of the elements are in the public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.  *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

<u>**Trade Secret #18.  Mining Pool Selection.**</u>

Swan claims its so-called "Mining Pool Selection" trade secret is "Swan's research and data regarding mining pools, including specifically the "Pool Bake-Off", and Swan's choice to join certain pools (Foundry, Ocean) and not to join other pools (Luxor, F2Pool, ViaBTC)."

First, other than referring to the "Pool Bake-Off," Swan does not identify what "research and data" it is referring to.  Swan also does not claim what "research and data" it claims is proprietary to Swan as opposed to being public knowledge.  Relatedly, Swan uses the word "including," which is an impermissible "catch-all" description that is "so vague and unspecific as to constitute no disclosure at all" since Individual Defendants cannot ascertain the boundaries of the alleged trade secret.  *E. & J.*



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 8

<u>**HIGHLY CONFIDENTIAL –
ATTORNEYS' EYES ONLY**</u>

*Gallo Winery*, 2018 WL 3062160, at *5 (citing *Loop AI Labs, Inc.*, 195 F.Supp.3d at 1116).  *See also Imax Corp.*, 152 F.3d at 1167.

Second, to the extent that some or all of the elements are public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.  *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

Third, Swan refers to it joining certain mining pools, but Swan did not join any mining pools, 2040 Energy did, and Swan does not explain how 2040 Energy's decision to join or not join mining pools is a trade secret of Swan.

**<u>Trade Secret #19.  Generation And Use Of Testing Data.</u>**

Swan claims its "Generation And Use Of Testing Data" trade secret is "the testing data generated by Swan relating to hardware, firmware, cooling methods, clock rate, and mining pools."

Swan fails to identify what testing data consists of the trade secret, including the sources of the data and that type of data that Swan considers its trade secret.  For example, Swan does not identity what type of hardware or firmware it considers to be part of the data.  *See Imax Corp.*, 152 F.3d at 1167 (trade secret description must "*refer* to tangible trade secret material").

**<u>Trade Secret #20.  Firmware Optimization Testing And Data.</u>**

Swan claims its "Firmware Optimization Testing And Data" trade secret is "techniques for firmware optimization, including the results of Swan's firmware testing on ASICs at its mining sites and the resulting choices made by Swan of which firmware to run on which ASICs."

First, Swan fails to specify whether its trade secret consists of a specific approach (*i.e.* certain steps Swan uses) to optimize, specific results (*i.e.* the qualities that Swan considers), or both.  *See Imax Corp.*, 152 F.3d at 1167 (trade secret description must "*refer* to tangible trade secret material").  Presumably, Swan is not asserting that the use of publicly available firmware itself is its trade secret.

Second, this trade secret is made up of numerous elements, but Swan states each element with insufficient particularity such that it is impossible to distinguish between them and matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade.  For example, Swan fails to identify what techniques or results Swan considers to be part of its trade secret.  *Id.*

Third, to the extent that some or all of the elements are public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.  *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d 1070 at 1090.

* * * * *

The above list of deficiencies is non-exhaustive, and Individual Defendants continue to evaluate Swan's 2019.210 disclosure.  Accordingly, Individual Defendants reserve all rights.



Ryan S. Landes                                              **<u>HIGHLY CONFIDENTIAL –</u>**
Quinn Emanuel Urquhart & Sullivan, LLP                     **<u>ATTORNEYS' EYES ONLY</u>**
March 26, 2025
Page 9


Please confirm by March 28 that Swan will correct these deficiencies.  If Swan is unwilling to do so, please identify when Swan is available for a meet-and-confer pursuant to L.R. 37-1 on these issues.  If we are unable to resolve these issues, and should the Court deny the Individual Defendants' motion to compel arbitration and stay and motion to stay pending resolution of a threshold issue in the UK litigation, the Individual Defendants anticipate filing a motion to stay discovery and/or for a protective order re trade secrets-related discovery pending Swan's service and filing of an adequate trade secret identification consistent with Section 2019.219 and the Court's Order Setting Scheduling Conference.

Very truly yours,

*/s/ Matt Kanny*

Matt Kanny

MK



Ryan S. Landes
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2025
Page 10

**HIGHLY CONFIDENTIAL –**
**ATTORNEYS' EYES ONLY**

cc:   David H Wollmuth
      Wollmuth Maher & Deutsch LLP
      Email: *dwollmuth@wmd-law.com*

      Jeffrey William Nardinelli
      Quinn Emanuel Urquhart & Sullivan LLP
      Email: *jeffnardinelli@quinnemanuel.com*

      Rachel E Epstein
      Quinn Emanuel Urquhart & Sullivan LLP
      Email: *rachelepstein@quinnemanuel.com*

      Ryan S. Landes
      Quinn Emanuel Urquhart & Sullivan LLP
      Email: *ryanlandes@quinnemanuel.com*

      Stacylyn M. Doore
      Quinn Emanuel Urquhart & Sullivan, LLP
      Email: *stacylyndoore@quinnemanuel.com*

      Timothy Alan DeLange
      Wollmuth Maher & Deutsch LLP
      Email: *tdelange@wmd-law.com*

      Adam C. Trigg
      Bergerson LLP
      Email: *atrigg@be-law.com*

      Daniel Joseph Bergeson
      Bergeson LLP
      Email: *dbergeson@be-law.com*

      Jaideep Venkatesan
      Bergerson LLP
      Email: *jvenkatesan@be-law.com*

      Rebecca N. Kaufman
      Bergeson LLP
      Email: *rkaufman@be-law.com*