# EXHIBIT O

IN THE HIGH COURT OF JUSTICE                    Claim No.  _____

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)


B E T W E E N :-


(1) TETHER INVESTMENTS LIMITED

(2) 2040 ENERGY LIMITED

<u>Claimants</u>


– and –


ELECTRIC SOLIDUS, INC t/a SWAN BITCOIN

<u>Defendant</u>


_____

PARTICULARS OF CLAIM

_____


A.    INTRODUCTION

(i)    The Parties

1.    The First Claimant, Tether Investments Limited ("**TINV**") is a company incorporated under the laws of the British Virgin Islands ("**BVI**"). Its registered office is at Trinity Chambers, P.O. Box 4301, Road Town, Tortola, BVI.

2.    TINV is a dedicated vehicle for proprietary investments into sustainable energy, Bitcoin mining, data, AI infrastructure, P2P telecommunications technology and other long term proprietary investments such as funds and other entities. It is part of a larger corporate group, of which the parent company is Tether Holdings Limited (TINV together with the corporate group, "**Tether**").

3.  The Second Claimant, 2040 Energy Limited ("**2040 Energy**") is a company incorporated under the laws of the BVI. Its registered address is Trinity Chambers, P.O. Box 4301, Road Town, Tortola, BVI. 2040 Energy is a joint venture company which was incorporated in the circumstances described at ¶¶6-13 below. It specialises in Bitcoin mining. 79% of 2040 Energy's shares are held by the First Claimant, 20% by the Defendant, and 1% by a third-party individual, Mr Keiser.

4.  The Defendant, Electric Solidus, Inc., trading as Swan Bitcoin ("**Swan**") is a company incorporated under the laws of Delaware. Its registered address is 26565 W. Agoura Road, Suite 200, Calabasas, California 91302. Swan claims to be a Bitcoin financial services company that purports to help individuals and businesses purchase, save, and invest Bitcoin through its platform. It was founded in 2019 by two individuals, Mr Yan Pritzker and Mr Cory Klippsten ("**Mr Klippsten**"), the latter of whom became its CEO. Swan is a well-known Bitcoin brand with a high social media presence.

**(ii)  The Claims**

5.  TINV and 2040 Energy bring claims for damages as well as declaratory and injunctive relief against Swan as particularised herein and summarised below:

5.1.  2040 Energy brings claims for declarations, injunctive relief and damages in respect of the BitGo Accounts and their contents defined at ¶40.1 below) and the Business Assets (defined at ¶23 below). These claims comprise:

5.1.1.  Declarations that (i) 2040 Energy is the beneficial owner of the BitGo Accounts and their contents, alternatively (ii) that the contents of the BitGo Accounts are held by Swan on trust for 2040 Energy;

5.1.2.  A declaration that the Business Assets currently held by the Swan Employees and Proton, are beneficially owned by 2040 Energy;

5.1.3.  A final injunction compelling Swan to transfer/deliver up the assets in the BitGo Accounts; and/or

5.1.4.   A direction that Swan must account and/or distribute to 2040 Energy the BitGo Accounts and their contents; and/or

5.1.5.   An order that Swan be required, as trustee, to account to 2040 Energy in respect of the BitGo Accounts, including to provide information to facilitate 2040 Energy's access to the BitGo Accounts, and accounting for any loss suffered as a result of its inability to access the BitGo Accounts since August 2024.

5.1.6.   If Swan retains the BitGo Accounts and/or the Business Assets, restitution for unjust enrichment for the value of those assets.

5.2.   Further, TINV and 2040 Energy bring claims for damages and final injunctive relief for Swan's breaches of the Exclusive Jurisdiction Clause (set out at ¶15.11 below) in the SHA (see ¶¶14-15) between it and TINV and 2040 Energy by attempting to outflank and circumvent TINV and 2040 Energy's right to determine the above disputes in the English Courts through the California Proceedings (see ¶¶69-80 below) in the circumstances set out below. In particular, TINV and 2040 Energy:

5.2.1.   claim injunctive relief restraining Swan from taking any of the steps set out at ¶¶91-93 below in relation to the Business Assets and/or the California Proceedings; and

5.2.2.   claim damages for losses caused by the breaches of the Exclusive Jurisdiction Clause.

5.3.   Further, TINV and 2040 Energy bring claims for damages for losses caused by Swan's failure to manage the business of 2040 Energy properly, in breach of clause 2.2 of the SHA, which has not been remedied within 21 business days.

**B.    THE JOINT VENTURE AGREEMENT**

**(i)    Background**

6.    In early June 2023, Tether and Swan were both interested in expanding into the field of Bitcoin mining.

7.    Mr Giancarlo Devasini, the CFO and largest shareholder of Tether, together with Mr Zachary Lyons, a principal in Marlin Capital Partners, Tether's *de facto* financial advisor, were put in touch about this opportunity with Mr Klippsten by Mr Keiser, who had connections in the Bitcoin mining sector.

8.    Mr Klippsten discussed creating a joint venture arrangement together to acquire a stake in the Digital Asset Mining Enterprise, a Bitcoin mining site in Tasmania ("**DAME**"), through an equity investment in DAME Technologies Pty Ltd.

9.    It was agreed that Tether and Swan would incorporate a joint venture company ("**JVC**") for this purpose. Tether would provide  the funding for the venture and, as a result, would initially have majority control over the JVC. Swan would be responsible for developing the proprietary and other technology aspects of the business, and the day-to-day management of the JVC and, in return, would receive a small "sweat equity" stake. No dividends or distributions would be paid to the shareholders until the financing provided by Tether was repaid (the "**Repayment Date**"). Once this was done, it was intended that Tether would transfer a quantity of shares to Swan so that Swan would hold a greater (but still minority) stake in the JVC.

10.    In line with its role in the joint venture, Swan began hiring personnel, including from within existing Swan functions, to comprise its mining team.

11.    On 22 June 2023, 2040 Energy was incorporated in the BVI as the JVC. Its 10,000 shares were held as to 7,900 by TINV's then subsidiary, Zettahash Inc. ("**Zettahash**"), 2000 by Swan and 100 by Mr Keiser for his role in facilitating the relationship between Tether and Swan.

12.   On incorporation, Mr Klippsten was appointed as a statutory director of 2040 Energy. Two directors were appointed from TINV: Mr Ludovicus Jan van der Velde and Mr Giancarlo Devasini.

13.   In order to provide the funding for the joint venture, on 28 July 2023, Zettahash and 2040 Energy entered into a 'Senior Tranche Instrument' pursuant to which Zettahash granted 2040 Energy a secured term loan facility of USD 95 million (the "**Senior Tranche Instrument**"). This was subsequently amended as set out at ¶17 below and ultimately novated to TINV.

**(ii)   The SHA**

14.   Also on 28 July 2023, Zettahash, 2040 Energy, Swan and Mr Keiser entered into a 'Shareholders Agreement relating to 2040 Ltd' to govern the relationship between the parties (the "**SHA**").

15.   Insofar as material to this dispute, the SHA provided as follows:

15.1.   Section 2 of the SHA set out the Business of the Company. Clause 2.1 described the original business of 2040 Energy as being "*to serve as a funding vehicle through which investments in Bitcoin mining opportunities in Tasmania are facilitated (the **Business**)".* However, in circumstances described at ¶¶21-37 below, 2040 Energy's business evolved to include the operative aspects of the Bitcoin mining business.

15.2.   Clause 2.2 set out Swan's obligation to manage 2040 Energy:

"*Swan* [i.e., the Defendant] *shall, for so long as it holds Shares, procure that the business of the Group is conducted in accordance with the Investment Memos and sound business practice and commercial principles and in accordance with this Agreement and the Articles. If Swan breaches this clause 2.2 it shall:*

*2.2.1 immediately notify the Investor* [i.e., the First Claimant] *of such breach, and provide any details of the breach required by the Investor; and*

*2.2.2 if the breach is curable, attempt to remedy such breach (and shall not be liable under this clause 2.2 if such breach is remedied within 21 Business Days without cost to the Group)".*

15.3.   Clause 2.3 provided that, prior to the Repayment Date, the Group (being 2040 Energy and any subsidiaries it may incorporate) "*shall not… conduct*

*any business other than as specified in Investment Memos and shall not deploy any cash or undertake any project that has not been approved by the Investor* [i.e. Zettahash, and subsequently Tether] *in an Investment Memo".*

15.4.     Clause 2.4 provided that certain activities would be Reserved Matters, which Swan undertook no Group Company would carry out without Investor consent.

15.5.     By clause 7.1, Swan was prevented from competing with 2040 Energy at any time during which Swan was a shareholder of 2040 Energy and for six months afterwards, "*in any business which would be in competition with any part of the Business (which, for the avoidance of doubt, includes the purchase of chips for Bitcoin mining anywhere in the world), including any developments in the Business after the date of this Agreement)*". In fact, as set out further at ¶¶21-37 below, the Business did develop to include Bitcoin mining operations more widely.

15.6.     Clause 8 set out 'Information Obligations' on Swan, including to provide to Zettahash (and subsequently Tether) audited annual accounts of 2040 Energy or the Group, a monthly information pack comprising monthly management accounts, and quarterly management accounts together with 12-month forecasts. By Clause 8.5, Swan undertook that it would procure that 2040 Energy would keep Zettahash (and subsequently Tether) informed of the progress of 2040 Energy's business and affairs, and promptly provide "*written details of any circumstances or occurrence which will or might reasonably be expected to cause any actual or prospective material adverse change in the financial position, prospects, business or reputation of any Group Company*".

15.7.     By clause 9, titled 'good faith':

15.7.1.     each of the shareholders undertook "*to do all things reasonably within his or its power which are necessary or desirable to give effect to the spirit and intent of this Agreement*" (clause 9.1) , and to exercise all voting

rights and powers to give full effect to the terms of the Agreement (clause 9.2); and

15.7.2. the minority shareholders (including Swan) undertook to the other shareholders that, "*in relation to any matter to which an Investor Consent has been obtained or given pursuant to this Agreement or the Articles, he or it shall not take or refuse to omit to take any action as a Shareholder which would frustrate or otherwise prevent or impair the doing or happening of such matter*."

15.8. By clause 16.3, subject to the exceptions in clause 16.4, the parties undertook not at any time to use or divulge any Confidential Information of 2040 Energy, which included any information "*in relation to the customers, suppliers, business, assets or affairs or plans, intentions or market opportunities of the Group*".

15.9. By clause 29 the parties contractually agreed, without prejudice to any other rights or remedies that a party may have, that damages alone would not be an adequate remedy for any breach of the terms of clause 7 or 16, and that the other party shall be entitled to the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach.

15.10. By clause 30.1, the SHA is governed by the laws of England and Wales.

15.11. Clause 30.2 provides for the English Courts' exclusive jurisdiction in the following terms (the "**Exclusive Jurisdiction Clause**"):

> "*Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Agreement or its subject matter or formation.*"

**(iii)  Subsequent funding**

16. As set out further below, a number of increases to the Senior Tranche Instrument were made such that by June 2024, the facility represented USD 408,222,825 million of funding by Zettahash (and subsequently TINV) to 2040 Energy.

17. On 31 March 2024, Zettahash assigned its rights under the SHA and transferred its shares in 2040 Energy to TINV pursuant to a Deed of Adherence of that date (the "**Deed of Adherence**"). By the Deed of Adherence, Tether replaced Zettahash as party to the SHA and acquired all its rights thereunder, including those now sought to be enforced against Swan.

## C.    SWAN'S MANAGEMENT OF THE BUSINESS

### (i)    The Business of 2040 Energy as contemplated by the SHA

18. Swan's obligations in the SHA were drafted to apply to the 'Group', defined as "*the Company* [i.e. 2040 Energy] *and its subsidiaries from time to time and Group Company means any member of the Group*".

19. Around the time that the SHA was drafted, it was initially contemplated that 2040 Energy would act as the funding vehicle for the investment in DAME and for purchasing ASICs. However, due to delays in DAME becoming operational and market opportunities that presented themselves, 2040 Energy was used for other Bitcoin mining activities. The SHA contemplated that other companies might be incorporated as part of the 2040 'Group' with TINV's consent. In the event, (without TINV's knowledge) a group company Corner Energy Limited, was incorporated in the BVI on 2 August 2023 for the purpose of holding certain contracts, and a further company (Corner Norway AS) was incorporated in Norway in February 2024 for importing and exporting computer services (and holding an equivalent Norwegian contract).

20. Accordingly, although the 'Business' of 2040 Energy was defined by clause 2.1 SHA as being to serve as a funding vehicle for the Tasmania investment, as a matter of the proper construction of the SHA as a whole, the parties understood and agreed that that definition of the 'Business' of 2040 Energy was not intended to be restrictive or static, that it included other matters which may be the subject of an Investment Memo, and that it may evolve over time. Swan's obligations under the SHA were intended to, and did, apply in respect of 2040 Energy's entire business as it evolved from time to time:

20.1. Section 2 of the SHA, the 'Business of the Company', contemplated activities broader than 2040 Energy merely acting as a funding vehicle:

20.1.1. The SHA contemplated that 2040 Energy might expand as a Group;

20.1.2. Swan's obligation in clause 2.2 was manage the business of the Group "*in accordance with the Investment Memos and sound business practice and commercial principles and in accordance with this agreement and the Articles*". The Investment Memos (as set out below) and Articles contemplated activities broader than simply acting as a funding vehicle.

20.1.3. Likewise, clause 2.3 contemplated that the Group business may be wider than the Business as defined in clause 2.1, in providing that the Group shall not "*conduct any business other than as specified in Investment Memos*".

20.1.4. The Reserved Matters provided for in clause 2.4 and Schedule 2 to the SHA (being the activities which 2040 Energy could only carry out with TINV's consent) contemplated 2040 Energy carrying on a wider business, insofar as they included:

i. Adopting an Investment Memo;

ii. Making any substantial payment or carrying out any business other than as set out in an Investment Memo and/or entering into any project or line of business other than as set out in an Investment Memo;

iii. Making loans or borrowing monies; and

iv. Acquiring or disposing of shares, businesses and/or assets other than in the ordinary course of business.

20.2. Clause 7 of the SHA expressly contemplated that there may be "*developments to the Business*" post-dating the SHA, and specifically provided that Swan's non-compete obligations would apply to the

Business so enlarged and, expressly, the purchase of chips for Bitcoin mining anywhere in the world.

**(ii)    Development of the Business of 2040 Energy during 2023 and early 2024**

*2040 Energy and its subsidiaries*

21.    Following the provision of funding by TINV in or around July 2023, 2040 Energy thereafter acquired a 33.3% equity stake in the DAME mining business. However, as above, there were delays in the DAME mining business becoming operational and as a result, the joint venture developed such that 2040 Energy's Business was not simply to act as a funding vehicle for the investment in the DAME mining business. Rather, it very quickly developed to become a successful Bitcoin mining company in its own right, including the operational aspects of that business.

22.    Consistently with the structure set out in the SHA, the operations of 2040 Energy were entirely run by a team of employees, consultants and/or independent contractors within Swan who served as a dedicated team for fulfilling Swan's obligations under the SHA to manage 2040 Energy (the "**Mining Team**"). Whilst Tether would receive a broad overview of activities, Swan was largely in control of 2040 Energy's day-to-day operations and opportunities, including sourcing, negotiating and executing any new investments and agreements.

23.    The Mining Team developed the proprietary and other aspects of the business, including a 'Bitcoin Network Operating Center' ("**BNOC**"), a bitcoin mining monitoring platform, as well as the financial modelling, data analytics and monitoring tools necessary for the JVC's Bitcoin mining business (together, the "**Business Assets**"). It was understood and agreed that the Business Assets, although developed by Swan, were assets of the joint venture and intended to be owned by the JVC and exploited by Swan solely on the JVC's behalf in the pursuit of the joint venture business.

24.    As the business of 2040 Energy developed, Mr Klippsten wanted to improve the optics of Swan's financial standing so that he could represent to investors that Swan's revenues were greater than they were. He attempted to consolidate the revenue from 2040 Energy into Swan's own financials and referred to this

accounting construct as "Swan Mining". In fact, Swan did not have any mining business (and was prohibited from doing so by clause 7 of the SHA) and its auditors prevented it from consolidating the revenue in this way. Mr Klippsten regularly represented to Mr Lyons that Swan was struggling with cashflow issues as a result of the structure of the SHA which meant that Swan was not yet receiving dividends or distributions.

25. As a result, Mr Klippsten also proposed incorporating a separate entity called '2140', or 'Swan Managed Mining', which would also hold Bitcoin mining operations, and which would have a structure that allowed Mr Klippsten and Swan to obtain earlier cashflow than they expected to receive from the business of 2040 Energy as structured in the SHA. This proposal arose in the context of several other proposals made to Tether, through which Mr Klippsten hoped to improve Swan's cashflow. Out of respect for their joint venture partnership, Tether acquiesced to this proposal in principle, albeit on specific terms. However, this was never done. Although references to "2140" appear in the Investment Memos (as discussed below), no separate entity was ever incorporated and all projects relating to the joint venture's Bitcoin mining business remained within 2040 Energy, and references in the Investment Memos to "2140" are in fact references to the business of 2040 Energy.

26. As noted above and in breach of clause 15 and Schedule 2 of the SHA, Swan incorporated at least two entities for the purposes of the joint venture without TINV's knowledge: (i) Corner Energy Ltd in the BVI in August 2023 and Corner Norway AS in Norway in February 2024 (the latter remained under the ownership of local counsel in Norway until 2040 Energy took steps to purchase the shares in December 2024). These companies nevertheless comprised part of the Group and were subject to Swan's obligations in respect of the Group business in the SHA.

*Expansion of 2040 Energy's Business*

27. From August 2023, Corner Energy Ltd and Corner Norway AS entered into a number of hosting agreements for mining services provided at locations other than Tasmania, including Norway, Texas, Montana, Ohio and New York.

28. Through the coming months, in accordance with the SHA, when it identified a new business opportunity or investment, on behalf of the Second Claimant, Swan prepared Investment Memos which Zettahash and, subsequently, TINV would review and, if approved, the Senior Tranche Instrument would be amended to reflect the additional financing for these projects.

29. For example, on 3 November 2023, Swan prepared an Investment Memo for Zettahash regarding an investment of USD 37 million for an acquisition by 2040 Energy of a bundle of 20,000 'S19K Pro' ASICs. That Investment Memo recorded that 2040 Energy:

    29.1. had "*now established itself as an industry leader, earning a reputation for one of the fastest hashrate deployments ever recorded*". 'Hashrate deployment' refers to the act of putting computational power (measured in 'hash rate') onto a blockchain network by a miner, i.e. 2040 Energy was itself actively participating in the mining process at this time.

    29.2. was "*primed for growth*" with the "*capacity to expand our reach and scale*".

30. On 9 January 2024, Swan prepared an Investment Memo for Zettahash regarding an investment of USD 10.8 million for 2040 Energy to acquire a further 5,000 'S19K Pro' ASICs.

31. On 16 February 2024, Swan prepared an Investment Memo for Zettahash regarding an investment of USD 2.3 million to acquire 540 new 'Antminer T21' ASICs.

32. On 4 March 2024, Swan prepared an Investment Memo for Zettahash regarding an investment of USD 176.8 million for an acquisition by 2040 Energy of a further 53,233 ASICs to expand its fleet. This was later updated on 29 March 2024 as "*2140 is securing two plug-and-play-ready hosting facilities, adding a total of 22,000 slots to our infrastructure*" which required a further USD c.96 million investment.

33. On 9 April 2024, Swan prepared an Investment Memo for Zettahash (despite the fact that its shares had been transferred to TINV, who had acceded to the SHA, on 31 March 2024). The Investment Memo concerned an opportunity to begin

deployment in Australian with a proposed USD 29.5 million investment for building infrastructure and a collaboration with DAME.

34.  As and when Bitcoin were successfully mined, they were transferred into and held in wallets on the cryptocurrency exchange, BitGo, as set out in ¶40.1 below.

35.  Swan provided three monthly reports as to its mining operations, as follows:

35.1.  In April 2024, Swan reported the achievements and performances of 2040 Energy under the label of 'Swan Mining' (an accounting construct for Swan's benefit, as described at ¶24 above), including referring to several sites governed by Hosting Agreements to which 2040 Energy's subsidiary, Corner, was party. It recorded mining 288 Bitcoin, with a net result (deducting for energy costs) of USD 6.1 million;

35.2.  In May 2024, 128 Bitcoin were mined, with a 'net result' of USD 2.6 million. The May report also referred to developments in BNOC, explaining "*we continue to expand BNOC's reporting and analysis capabilities. This month, we began testing and developing a new audit function designed to automate many of our financial checks related to pool payouts and energy bills*"; and

35.3.  In June 2024, 157 Bitcoin were mined, with a 'net result' of USD 3,477,429. The June report again referred throughout to the performance of 2040 Energy as that of 'Swan Mining', e.g. opining that "*It's hard to believe it's only been a year since our first ASIC acquisition and deployment. In just 12 months, we've built one of the largest mining operations in the world*".

36.  The Investment Memos and Monthly Mining Reports confirm that the achievements and activities referred to as "Swan Mining" were carried out exclusively as part of the joint venture and as the Business of 2040 Energy.

37.  By July 2024, 2040 Energy's Business had expanded significantly, and its Business then comprised, in addition to its investment in DAME, many active Bitcoin mining projects spread globally (and not limited to Tasmania) as well as a significant quantity of ASIC inventory. The revenue from this Business was transferred to and held in the BitGo Accounts (defined at ¶40.1 below).

### (iii)  Assets of the Business

38.  At all material times, the assets generated by and/or on behalf of 2040 Energy in the furtherance of its business assets formed part of the joint venture business, and were beneficially owned by 2040 Energy and intended to be dealt with according to the terms of the SHA and 2040 Energy's constitutional documents:

38.1.  2040 Energy's Memorandum expressly permits property-holding in its own name (reg. 5);

38.2.  The SHA on its true construction, expressly or by necessary implication contemplated that 2040 Energy would own the assets generated in the course of its Business (as expanded from time to time). In that regard, the Claimants rely on the matters pleaded at ¶20 above;

38.3.  The Investment Memos, which were the contractually agreed mechanism by which 2040 Energy's Business was defined and expanded, expressly provided for the ASICs to be acquired 'by' 2040 Energy;

38.4.  The overall structure and scheme of the SHA was a joint venture in which the fruits of the joint venture would not accrue to either party but be shared according to its terms and the rights associated with each party's shareholding in 2040 Energy;

38.5.  BNOC was presented to Mr Lyons as the dashboard and monitoring system which was exclusively for use by 2040 Energy;

38.6.  Swan had no prior Bitcoin mining business and was not permitted to operate a Bitcoin mining business in competition with 2040 Energy.

38.7.  The corollary was that it was no part of the SHA, or the joint venture contemplated and agreed by the parties, that Swan would acquire ownership of any asset acquired for or generated in the course of the joint venture business.

39.  The Business Assets were, as set out at ¶21 above, developed exclusively for the Bitcoin mining business of 2040 Energy and belonged to 2040 Energy.

40.  The Bitcoin mined as a result of 2040 Energy's activities, using its assets, was likewise 2040 Energy's revenue and were beneficially owned by 2040 Energy:

40.1.  2040 Energy's activities were Bitcoin mining, and so its revenue was earned in Bitcoin. 2040 Energy held several Bitcoin wallets that collected the Bitcoin earned by the business of 2040 Energy. These wallets were held with a cryptocurrency exchange provider, BitGo Inc. ("**BitGo**"), and were made up of collection and treasury wallets. Each hosting site transferred the Bitcoin which it earned into a particular collection wallet and those collection wallets transferred their Bitcoin into one of the treasury wallets. 2040 Energy additionally had additional accounts with BitGo which contained USD fiat amounts and Tether tokens (these accounts and the wallets together are referred to as the "**BitGo Accounts**").

40.2.  The BitGo Accounts therefore held three types of assets: Bitcoins, Tether tokens and USD. The USD and Tether tokens were used to pay invoices and operating expenses on 2040 Energy's behalf, while the Bitcoin were simply held as an asset by the 2040 Energy. The BitGo Accounts hold approximately USD 5 million in Tether tokens and USD, in addition to the Bitcoin.

41.  TINV understood until July 2024 that the BitGo Accounts were held in 2040 Energy's name as they contained 2040 Energy's assets. In fact, unbeknownst to TINV, the BitGo Accounts had been opened for 2040 Energy as a separate 'instance' of Swan's contract with BitGo and, for some of the wallets, the only authorised signatories were Swan representatives. However, in the 19 August Letter (see ¶61 below) Swan agreed that "*the entirety of the funds in the BitGo 2040 Energy Ltd account* [i.e. the BitGo Accounts] *belong to 2040 Energy Ltd. As such, the board of 2040 Energy Ltd controlled by Tether, has sole discretion on how to move and administer such funds, acting in good faith to preserve and maximise shareholder value*".

42.  Further, the parties' conduct underlines their understanding and intention that 2040 Energy would be the beneficial owner of operational capital and assets generated by exploitation of that capital in the course of the Business. On one

occasion in late 2023, Swan used a payment made to 2040 Energy as operating capital and reimbursed this two days later. Mr Lyons made clear to Swan that this must not happen again, and they agreed that clear protocols had to be put in place to separate 2040 Energy's assets from Swan's.

43.    In the premises of the foregoing:

43.1.    Mr Klippsten, as director of 2040 Energy, owed fiduciary duties to 2040 Energy under BVI law, including as to the stewardship of its assets;

43.2.    To the extent that Mr Klippsten caused, permitted or procured that Swan held joint venture assets in its own legal name rather than in the name of 2040 Energy, Swan held those assets on trust for 2040 Energy (and Mr Klippsten's acts and knowledge are to be attributed to Swan for that purpose);

43.3.    Further or alternatively, when Swan opened the BitGo Accounts for 2040 Energy and gained access to them (it is to be inferred under the direction of Mr Klippsten, whose acts and knowledge are to be attributed to Swan for this purpose), Swan was obliged to use those assets solely in the best interests and for the benefit of 2040 Energy as its agent and in accordance with the SHA (including pursuant to clause 2) and a relationship of trust and confidence arose in respect of Swan's dealings with such assets, such that Swan assumed and owed fiduciary duties to 2040 Energy in respect of such assets, which were held by Swan on trust for 2040 Energy.

**(iv)    Deterioration of the relationship**

44.    In around August 2023, Mr Klippsten informed Mr Lyons that he was struggling with cashflow issues and was therefore looking to engage in a round of post-Series B financing. Mr Klippsten informed Mr Lyons that he wanted Tether to make an investment via a high value convertible bond so that he could tell the market that he had received a high valuation from Tether, which would boost confidence among other investors. Mr Lyons informed Mr Klippsten that Tether would be prepared to invest, but that he believed Swan was not worth as much as he

thought it was and that the only valuable business vertical Swan had was the joint venture. Nevertheless, to preserve the business relationship, Tether agreed to finance a convertible note of USD 16.25 million in October 2023. Shortly afterwards, Mr Klippsten asked for an additional USD 9.75 million to which, again out of respect for their joint venture partnership, Mr Lyons agreed on behalf of Tether to provide the funds for the additional tranche which was completed in November 2023.

45. On 28 March 2024, without informing Tether and in breach of clauses 2.2.1, 2.2.2, 8.5.1, 8.5.3 and 10.1 and 10.2 of the SHA, Swan entered into an unconditional secured guaranty with Ripple Labs Inc ("**Ripple**", the "**Ripple Guaranty**"), pursuant to which Ripple obtained a first priority continuing security over Swan's 2000 shares in 2040 Energy, and was authorised to file financing statements to protect its interest in those shares. Ripple has a cryptocurrency and, in April 2024, announced its intention to launch a stablecoin. Its business was therefore in direct competition with Tether, who would not have, and did not, consent to Swan encumbering the 2040 Energy shares with Ripple.

46. Ripple filed a UCC-1 and UCC-3 financing statement against Swan on/around 1 April 2024, thereby encumbering the shares. The Ripple Guaranty was subsequently amended on 31 July 2024.

47. In March or April 2024, Swan formally began the process of raising investment into Swan through its Series C financing round. Mr Klippsten wanted to raise a sum in the region of USD 100-125 million, out of which he asked Tether to commit the vast majority. Tether expressed its reservations about Mr Klippsten's valuation of Swan and the Series C financing more generally and indicated that it would only be prepared to consider financing on arms-length terms. Tether therefore carried out its own more fulsome due diligence.

48. From that exercise, Tether formed the view and informed Mr Klippsten that it considered that Swan was significantly overvalued and inflated and that Tether would decline to invest in the financing round.

49. However, Mr Klippsten indicated that he would nevertheless go to the market with the inflated valuation and falsely state to the market that Tether had agreed to lead the Series C financing round. From this point, the relationship between Tether and Swan deteriorated rapidly. The financing round subsequently failed.

50. In or around late June 2024, Tether found out about the Ripple Guaranty from one of the Mining Team, who subsequently informed Mr Lyons that Swan was running of money. Swan subsequently directed its employees (including Mr Guilherme Gomes and Mr Zagury) not to communicate with representatives of Tether with respect to 2040 Energy, its business and assets. That was a breach of clause 8.5.1 (information obligations) and 9.1 (good faith) of the SHA.

51. Around this time, TINV learnt from members of the Mining Team that Swan was in a very poor financial situation, were unhappy with Mr Klippsten's management of Swan and in light of this, the employees and contractors were contemplating resigning *en masse*.

52. On 2 July 2024, without informing TINV, Mr Klippsten published a 'tweet' on social media stating that Swan "*is unlikely to continue with our Managed Mining business in the near term*" and would cut staff across many functions, which was subsequently reported by CoinDesk (a cryptocurrency market information and news reporting website). 70-80 individuals were made redundant at around this time.

53. TINV therefore became very concerned about Swan's continued ability to conduct the business of 2040 Energy in accordance with the Investment Memos and sound business and commercial practice, as it was required to under clause 2 of the SHA.

54. Given the imminent threat that the Mining Team would resign, TINV decided to put in a place a contingency plan whereby the Mining Team could be hired to continue to provide services to 2040 Energy if they were no longer employed by Swan, as it was in the best interests of 2040 Energy to be managed by the team who had built up experience and knowledge of its business.

55.   On 9 August 2024, TINV sent to Swan a Notice of Breach of the SHA (the **"First Notice of Breach"**) and in respect of the Senior Tranche Instrument (the "**First Default Notice**") citing the breaches of the SHA occasioned by Swan's entry into the Ripple Guaranty.

56.   Very soon thereafter, substantially all of the Mining Team with responsibility for performing Swan's obligations as regards 2040 Energy's Business, resigned from Swan (the "**Swan Employees**") and joined a separate BVI company, Proton Management Ltd ("**Proton**").

57.   On 12 August 2024, Mr Klippsten resigned as CEO of 2040 Energy. He has subsequently alleged in documents filed before the California Court that he did so because TINV's "*directors of 2040 Energy were not acting in good faith. Swan was forced to halt its process for securing Series C funding at the time and return to the market seeking investment at a much lower valuation."*

58.   On 12 August 2024, TINV sent a Notice of Beach of the SHA (the "**Second Notice of Breach**"), citing the resignation of Swan employees responsible for managing 2040 Energy's Business as further breaches of clause 2.1, 2.2, 8.5.1 and 8.5.3 of the SHA.

**(v)   Engagement of Proton**

59.   Under clause 2.2.2 of the SHA, Swan had a 21-day period to cure its breach, but TINV was concerned that it would not do so and could not risk interruption to 2040's business. Accordingly, on or around 12 August 2024, as a result of the Swan Employees resigning and, as recorded in the Second Notice of Breach, "*in an effort to mitigate the damages caused by Swan's several breaches*", TINV engaged the services of Proton to perform the day-to-day management services which, under the SHA, Swan was obliged to, but would no longer, provide. The Swan Employees continued to manage the operations of 2040 Energy from Proton.

60.   In response, on 13 August 2024, Swan's legal representatives, Pillsbury, wrote to deny the claims and alleged there had been a 'conspiracy' by Tether and the Swan Employees to obtain control of the mining business and force the wind down of

Swan as a whole. Pillsbury requested contact information for Proton to 'ensure a smooth transition'.

61.     On 19 August 2024, Pillsbury wrote to TINV's US legal representatives, Winston & Strawn, to notify them that Swan would not interfere with the handover to the Proton team and would resign its obligations under the SHA (the "**19 August Letter**").

## D.     SWAN'S MISAPPROPRIATION OF THE BUSINESS ASSETS

### (i)     Failure to transfer the BitGo Accounts into 2040 Energy's name

62.     On 14 August 2024, TINV, via its counsel, wrote to Swan's counsel, with questions about the BitGo Accounts which Swan held for and on behalf of 2040 Energy.

63.     In the 19 August Letter, Swan via its legal representatives, provided responses to these questions. Swan stated that it had 'frozen' the BitGo Accounts and resigned as manager of the account pending the appointment of a new account manager by a proper resolution of the 2040 Energy Board.

64.     On 13 September 2023, Winston & Strawn wrote to Pillsbury to note that the TINV-nominated members of the 2040 Energy Board intended to adopt written resolutions to replace 2040 Energy's BitGo Accounts with different bitcoin wallets, and with new authorised signatories. In response, Pillsbury stated that Mr Klippsten would cooperate in transitioning the BitGo Accounts "*if in the best interests of the company*" but would only sign an amended version of the resolutions as it considered the recitals to be inaccurate.

65.     On 17 September 2024 the 2040 Energy Board, acting by its two TINV-appointed directors, adopted the resolutions, which were therefore validly passed in accordance with Article 70 of 2040 Energy's Articles of Association.

66.     To date, for wallets which were multi-signatory (i.e. a TINV or Proton employee also had signatory rights) TINV has managed to arrange a transfer of those wallets from BitGo to a separate platform, Bitfinex. However, a number of the wallets were single signatory wallets, in respect of which Swan has sole signing authority.

TINV has been unable to instruct BitGo, or otherwise to arrange to transfer the assets in those wallets notwithstanding the signed board resolution, as the contract with BitGo was in Swan's name and not in the name of 2040 Energy. Swan has not cooperated to procure that transfer.

67. Accordingly, 322.46 Bitcoin belonging to 2040 Energy remain in the BitGo Accounts, as well as approximately USD 5 million in Tether tokens and USD.

68. On 7 October 2024, Winston & Strawn responded to Pillsbury's 13 August letter dismissing Swan's claims of a conspiracy as 'baseless' and noting that:

68.1. Swan has consistently refused to provide transparency regarding its management of 2040 Energy's resources despite repeated unanswered requests, in breach of the SHA;

68.2. Swan's breach of the SHA by entering into the Ripple Guaranty remained unaddressed;

68.3. Swan's failure to be responsible for the day-to-day management of the joint venture business was a further unremedied breach of the SHA; and

68.4. the conspiracy claims were unfounded as Tether did not encourage the resignation of any of the Swan Employees, has not utilised any software or information belonging to Swan and saw no indication that Proton had breached the confidentiality covenants.

**(ii)    The California Proceedings**

69. On or around 13 August 2024, at the same time as Pillsbury wrote to assure TINV it would not interfere with the smooth handover of operations to Proton, it wrote to certain of the Swan Employees to demand that they return their laptops. It repeated those requests on 22 and 27 August 2024.

70. On 25 September 2024, Swan filed in the United States District Court for the Central District of California Western Division (the "**Californian Court**") a complaint against Proton and certain of the Swan Employees under Case No. 2:24-cv-8280 and two *ex parte* applications for (i) a temporary restraining order,

preliminary injunction, and related relief, and (ii) an order for expedited discovery. Swan alleged seven causes of action under California law, namely (i) trade secret misappropriation; (ii) breach of contract; (iii) tortious interference with contractual relations; (iv) aiding and abetting breach of duty of loyalty; (v) unfair competition; (vi) conversion; and (vii) civil conspiracy (the "**California Proceedings**"). The substance of the complaint in the California Proceedings was Swan's allegation that there was an alleged conspiracy by Proton and the Swan Employees by which those employees unlawfully appropriated Swan's trade secrets and proprietary information. However, the subject matter of the complaint is BNOC and the other proprietary information comprising the Business Assets of 2040 Energy. As part of its complaint, Swan sought to compel the Swan Employee defendants to hand over their laptops on the basis that those devices were Swan's property and may contain its trade secrets or proprietary information.

71.   The California Proceedings constitute a breach of the Exclusive Jurisdiction Clause of the SHA:

71.1.   On its proper construction, the Exclusive Jurisdiction Clause covers all disputes arising out of or in connection with the SHA. That includes all disputes concerning ownership or title to any tangible or intangible property, or any confidential or proprietary information (including but not limited to that defined in clause 16) created or acquired through the conduct of the Business, as defined in and contemplated by the SHA and as it evolved over time, as set out at ¶¶18-37 above.

71.2.   By its claims in the California Proceedings, Swan seeks to assert ownership over business assets belonging to 2040 Energy for its own unilateral purposes.

72.   On 30 September 2024, the Swan Employee defendants entered a special appearance to oppose the *ex parte* applications, including on the basis that Swan had failed to demonstrate that any of the defendants were using trade secrets and/or that Swan owned the alleged trade secrets. They noted that the parties to the SHA had always contemplated that any information developed by Swan for

the mining business was owned by and for the exclusive use of 2040 Energy, and to the extent that the defendants were using that information, it was being used solely for the benefit of 2040 Energy.

73.   Likewise, on 30 September 2024, Proton entered a special appearance to oppose the *ex parte* applications on grounds of lack of jurisdiction of the California Court over Proton, and that Swan had not provided any evidence that there had been any trade secret misappropriation.

74.   On 4 October 2024 the California Court denied the *ex parte* applications (for reasons which did not adjudicate upon the ownership of the alleged trade secrets and confidential information). Swan renewed its motion for expedited discovery on 9 October 2024, which was denied on 16 October 2024.

75.   On 22 October 2024 the Swan Employee defendants responded to oppose the motion compelling a return of the laptops, noting that (i) they had preserved their laptops with discovery vendors for litigation and (ii) to the extent that any information other than personal information was contained on the laptops (if any), it was owned by 2040 Energy rather than Swan. In reply, on 24 October 2024, Swan opposed that submission in terms "*But 2040 Energy is a "funding vehicle" that did not contract with any of the Individual Defendants*".

76.   The California Court denied the motion to compel return of the laptops on 25 October 2024. Nevertheless, it appears that unless restrained, Swan will continue to assert its ownership of 2040 Energy's confidential and proprietary information and business assets before the California Courts, on the spurious basis that 2040 Energy is a mere 'funding vehicle'.

77.   On 13 December 2024, Swan sent a further series of letters to six additional Proton employees who were not named as Individual Defendants in the California Proceedings (the "**Demand Letters**"):

77.1.   Notifying four of them that it was commencing a dispute resolution process with them under the terms of an Alternative Dispute Resolution Policy and

Agreement they had executed with Swan as part of their Swan employment agreements;

77.2.  Informing four of them that if they failed to agree on a potential mediator within 30 days of notice, the Defendant intended to initiate arbitration proceedings against each of them;

77.3.  Notifying them all that, under the terms of a Confidentiality and Proprietary Information and Inventions Agreement they had executed as part of their conditions of employment with Swan, that they were obliged to return Swan's property to Swan. This was said to require the individuals to send their laptops to Swan by 20 December 2024 and confirm they had searched for an identify any Swan documents and property in their possession.

77.4.   It is the Claimants' position that the California Proceedings have been brought with the aim of extracting a monetary settlement form Tether, under threat of appropriation of 2040 Energy's assets, all in circumvention of the Exclusive Jurisdiction Clause. Although not directly commenced against Tether: Swan implicates Tether in the alleged 'conspiracy';

78.  At its core, Swan uses the California Proceedings to assert ownership over the Business Assets, and to compel its former employees to turn over the Business Assets to Swan, to which Swan is not entitled. By the Demand Letters, Swan again asserts a right to the Business Assets which are owned by 2040 Energy.

79.  The issue of the ownership of the Business Assets is one which is properly within the scope of the Exclusive Jurisdiction Clause and falls to be determined before the English Courts.

80.  Accordingly, Swan has breached the Exclusive Jurisdiction Clause.

### E.   CLAIMS

### (i)   The BitGo Accounts

81.   The BitGo Accounts, and the Bitcoin, Tethers and USD contained therein, although held in Swan's name, are beneficially owned by 2040 Energy. Swan has admitted the same (see ¶41 above).

82.   2040 Energy is entitled to, and claims, a declaration that it is the beneficial owner of 322.46 Bitcoin, as well as Tether tokens and USD contained in the BitGo Accounts and a final injunction compelling Swan to transfer/deliver up the assets therein.

83.   2040 Energy will seek to protect its claim by interim proprietary relief.

84.   Further or alternatively, 2040 Energy seeks a declaration that the Assets in the BitGo Accounts are held by Swan on trust for 2040 Energy, as to which ¶43 above is repeated.

85.   2040 Energy is entitled to, and claims, a direction that Swan must account and/or distribute the BitGo Accounts and their contents to 2040 Energy.

86.   Further or alternatively, as trustee Swan is required to account to 2040 Energy in respect of the BitGo Accounts, including to provide information to facilitate 2040 Energy's access to the BitGo Accounts, and accounting for any loss suffered as a result of its inability to access the BitGo Accounts since August 2024.

87.   Pending determination of its claims, 2040 Energy seeks a proprietary injunction restraining Swan from any dealing with the BitGo Accounts pending trial.

88.   Further or alternatively, to the extent that Swan retains 2040 Energy's Business Assets and the BitGo Accounts, Swan has been unjustly enriched at the expense of 2040 Energy by those assets or their value, which it is liable to return as restitution for unjust enrichment.

**(ii)   Declaratory relief as to the Business Assets over which Swan lays claim in the California Proceedings**

89.   Swan wrongfully lays claim to the Business Assets in the hands of the Swan Employees and Proton in the California Proceedings.

90.   In the premises of ¶¶23 and 38-39 above, the Business Assets are beneficially owned by 2040 Energy. 2040 Energy is entitled to, and claims, a declaration that it is the beneficial owner of the Business Assets currently held by the Swan Employees and Proton.

**(iii)   Breach of exclusive jurisdiction clause**

91.   In the premises of ¶¶71-80 above, Swan has breached the Exclusive Jurisdiction Clause and attempted to outflank and circumvent TINV and 2040 Energy's right to determine the above disputes in the English Courts.

92.   TINV and 2040 Energy are entitled to, and claim, interim and final injunctive relief restraining Swan from taking any steps:

92.1.   To obtain control of any of the Business Assets, including through the California Proceedings;

92.2.   To pursue or prosecute or progress any of its existing claims in respect of the Business Assets in the California Proceedings;

92.3.   To commence or pursue any other proceedings involving a claim or seeking a remedy affecting control of any of the Business Assets other than in accordance with the Exclusive Jurisdiction Clause; or

92.4.   To deal with or dispose of any of the Business Assets other than in accordance with the written direction of 2040 Energy, acting through its properly constituted Board.

93.   Further, as a result of Swan's breach of the Exclusive Jurisdiction Clause, TINV and 2040 Energy have suffered loss and damage in the form of wasted costs which they reserve the right to further particularise at trial. The Claimants are entitled to, and claim such losses from, Swan.

**(iv)    Other breaches of the SHA**

94.    In the premises of the foregoing, Swan has failed properly to manage the business of 2040 Energy in accordance with the Investment Memos, sound business practice and commercial principles and in accordance with the SHA. Such failure constitutes a breach of clause 2.2 of the SHA.

95.    Swan has further failed to attempt to remedy its breach within 21 business days, as required under clause 2.2.2, and its breach is continuing.

96.    Swan's breach has caused loss and damage to TINV and 2040 Energy, including, but not limited to:

96.1.    2040 Energy's losses caused by interruption in the operation of its Business, and denial of access to the BitGo Accounts. In particular, without access to the USD and USD Tether in the BitGo Accounts, Proton has had to liquidate some of 2040 Energy's Bitcoin, at a much lower price than current market prices, to fund operating expenses that would typically have been funded with USD or USD Tether;

96.2.    TINV's costs of engaging Proton to provide the services Swan was required to provide under the SHA, in order to mitigate the loss to 2040 Energy.

97.    The Claimants will particularise their losses further in due course.

**AND THE CLAIMANTS CLAIM:**

(1) Interim and final injunctive relief;

(2) Declaratory relief;

(3) An order for the transfer, delivery up and/or distribution of the BitGo Accounts to 2040 Energy, alternatively;

(4) An account;

(5) Damages;

(6) Interest;

(7) Such further or other relief as the Court sees fits; and

(8) Costs.

**STEPHEN HOUSEMAN KC**

**SOPHIA HURST**

**BIBEK MUKHERJEE**

**<u>Statement of Truth</u>**

The First Claimant believes that the facts stated in these Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed……….…………/……….………….    Position…………………………………

Director

Name………………………………………    Date………………………………..

JL van der Velde

13 January 2025

29

**Statement of Truth**

The Second Claimant believes that the facts stated in these Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed……………………………………    Position……………………………………

Name…………………………………………    Date……………………………………..

JL van der Velde

13 January 2025

Director

30