# EXHIBIT T

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2023

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934

For the transition period from _____ to _____

# MARATHON DIGITAL HOLDINGS, INC.
(Exact name of registrant as specified in charter)

| Nevada | 001-36555 | 01-0949984 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S Employer Identification No.) |

| 101 NE Third Avenue, Suite 1200, Fort Lauderdale, FL | 33301 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: 800-804-1690

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | MARA | The Nasdaq Capital Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer,"

"accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes☐ No ☒

The aggregate market value of the common stock, par value $0.0001 per share, held by non-affiliates of the registrant, based on the closing sale price of registrant's common stock as quoted on The Nasdaq Capital Market on June 30, 2023 (the last business day of the registrant's most recently completed second fiscal quarter) and the number of shares held by non-affiliates of the registrant as of that date, was approximately $2.4 billion. Accordingly, the registrant qualifies under the SEC's revised rules as a "large accelerated filer." This calculation does not reflect a determination that persons are affiliates for any other purpose.

As of February 21, 2024, the number of outstanding shares of the registrant's common stock, par value $0.0001 per share, was 267,639,590.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement on Schedule 14A relating to the registrant's 2024 annual meeting of stockholder, to be filed with the Securities and Exchange Commission within 120 days following the end of the fiscal year covered by this Annual Report on Form 10-K, are incorporated by reference in Part III within this Annual Report on Form 10-K. With the exception of the portions of the Proxy Statement specifically incorporated herein by reference, the Proxy Statement and related solicitation materials are not deemed to be filed as part of this Annual Report on Form 10-K.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I.** |  |  |
| Item 1. | Business | 7 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 1C. | Cybersecurity | 35 |
| Item 2. | Properties | 36 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Mine Safety Disclosures | 38 |
|  |  |  |
| **PART II.** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 39 |
| Item 6. | Reserved | 39 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8. | Financial Statements and Supplementary Data | F-1 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 54 |
| Item 9A. | Controls and Procedures | 54 |
| Item 9B. | Other Information | 57 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 57 |
|  |  |  |
| **PART III.** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 58 |
| Item 11. | Executive Compensation | 58 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 58 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 58 |
| Item 14. | Principal Accountant Fees and Services | 58 |
|  |  |  |
| **PART IV.** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 59 |
| Item 16. | Form 10-K Summary | 61 |

**MARATHON DIGITAL HOLDINGS, INC.**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K for our fiscal year ended December 31, 2023 (this "Annual Report") and the information and documents incorporated by reference within this Annual Report, contain "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which statements are subject to considerable risks and uncertainties. These forward-looking statements are intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. Forward-looking statements include all statements other than statements of historical fact contained in, or incorporated by reference within, this Annual Report. We have attempted to identify forward-looking statements by using words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "predict," "project," "should," "will," or "would," and similar expressions or the negative of these expressions. Specifically, this Annual Report, and the information and documents incorporated by reference within this Annual Report, contain forward-looking statements relating to, among other things:

- our ability to achieve profitability, and to maintain profitability in the future;

- high volatility in the volume attributable to our business;

- the rapidly changing regulatory and legal environment in which we operate, may lead to unknown future challenges to operating our business or may subject our business to added costs or uncertainty regarding our ability to operate;

- the availability of financing opportunities due to the volatility in the trading price of our common stock and the price of bitcoin;

- economic dependence on regulated terms of service and power rates;

- dependency on continued growth in blockchain and bitcoin usage;

- our ability to keep pace with technology changes and competitive conditions;

- security and cybersecurity threats and hacks;

- changes in bitcoin mining difficulty;

- our reliance on limited number of key employees;

- changes in network and infrastructure;

- our ability to successfully integrate our newly acquired operations;

- our transition away from our "asset-light" capital strategy;

- our ability to execute on our business and growth strategy, including by successfully managing the execution of our international joint ventures;

- our plans to commence sales under a new at-the-market offering program;

- our ability to remediate the material weakness identified in our internal control over financial reporting;

- our ability to resolve our unresolved comments issued by the staff (the "Staff") of the Securities and Exchange Commission (the "SEC"); and

- other risks and uncertainties discussed under the caption "*Risk Factors*" in this Annual Report.

Forward-looking statements represent management's current expectations and predictions about trends affecting our business and industry and are based on information available at the time such statements are made. Although we do not make forward-looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy or completeness. Forward-looking statements involve numerous known and unknown risks, uncertainties, and other factors that may cause our actual results, performance, or achievements to be materially different from any future results, performance or achievements predicted, assumed, or implied by the forward-looking statements. Some of the risks and uncertainties that may cause our actual results to materially differ from those expressed or implied by these forward-looking statements are described in Part I, Item 1A, "*Risk Factors,*" and Part II, Item 7, "*Management's Discussion and Analysis of Financial Condition and Results of Operations,*" within this Annual Report, as well as in our other filings with the SEC. You should read this Annual Report, including the information and documents incorporated by reference herein, in its entirety and with the understanding that our actual future results may be materially different from the results expressed or implied by these forward-looking statements. Moreover, new risks and uncertainties emerge occasionally, and it is not possible for management to predict all risks and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause our actual future results to be materially different from any results expressed or implied by any forward-looking statements. Except as required by applicable law or the listing rules of The Nasdaq Capital Market ("Nasdaq"), we expressly disclaim any intent or obligation to update any forward-looking statements. We qualify all our forward-looking statements with these cautionary statements.

As used in this Annual Report, the terms "Company," "Marathon Digital Holdings, Inc.," "Marathon" and "MARA" mean Marathon Digital Holdings, Inc. and its subsidiaries, unless otherwise indicated.

**ITEM 1. BUSINESS**

**CORPORATE OVERVIEW**

Marathon is a digital asset technology company that is principally engaged in producing or "mining" digital assets with a focus on the Bitcoin ecosystem. Our strategic initiatives primarily focus on mining and holding bitcoin as a long-term investment. Bitcoin is seeing increasing adoption, and, due to its limited supply, we believe it offers opportunity for appreciation in value and long-term growth prospects for our business.

In addition to mining and holding bitcoin, from time to time we have explored, and we may in the future explore, opportunities to become more involved in businesses that expand or supplement those directly related to the self-mining of bitcoin as favorable market conditions and opportunities arise. For example, we have considered or engaged in owning and operating bitcoin mining facilities or data centers, selling proprietary software or technology to third parties operating in the Bitcoin ecosystem, offering advisory and consulting services to support bitcoin mining ventures in domestic and international jurisdictions, and generating electricity from renewable energy resources or methane gas capture to power bitcoin mining projects. The Company is committed to carbon neutrality and growing operations through predominately renewable energy sources. Our business is also active in Bitcoin-related projects related to the technological development of immersion, hardware, firmware, mining pools and side chains that use the blockchain cryptography.

As used throughout this Annual Report, the term "Bitcoin" with a capital "B" is used to denote the Bitcoin protocol which implements a highly available, public, permanent, and decentralized ledger. The term "bitcoin" with a lower case "b" is used to denote the token, bitcoin.

**BITCOIN BLOCKCHAIN**

**Bitcoin and Bitcoin Mining**

Bitcoin is a decentralized digital asset that operates on a peer-to-peer network, allowing users to send and receive payments without the need for banks and other intermediaries. Bitcoin is not linked to any fiat currency or country's monetary policy, therefore serves as a store of value outside of government control. This is possible by using blockchain technology, which is a distributed ledger that records and verifies all transactions on the network.

The Bitcoin blockchain is a public, transparent, and unalterable record of all transactions that have ever occurred on the peer-to-peer network. When a user sends a transaction on the Bitcoin network, it is broadcast to the network and added to a pool of unconfirmed transactions known as the "mempool." Mining rigs then compete in a sort of lottery to "solve a block," which confirms a transaction and adds it to the blockchain, and the mining rig receives a reward in the form of newly minted bitcoin. Each confirmed transaction is cryptographically signed and permanently recorded in the blockchain as a new block, and cannot be altered or deleted.
The block chain is maintained by a robust and public open-source architecture consisting of a network of computers, known as nodes, that work together to verify and validate new transactions. Because the blockchain is decentralized and transparent, all users can verify the legitimacy of a transaction without having to rely on a third party. This eliminates the need for intermediaries, which can be slow and expensive, and makes the network resistant to censorship and fraud.

Bitcoin mining plays a key role in the maintenance and growth of the Bitcoin network by providing the computational power needed to verify transactions and add new blocks to the blockchain. As consumers increasingly become interested in mining bitcoin, the network becomes more secure and efficient.

As of December 31, 2023, we operated approximately 210,000 mining rigs globally, with an installed and energized hash rate of approximately 25.2 and 24.7 exahashes per second, respectively. During the year ended December 31, 2023, we mined 12,852 bitcoin, an increase of 8,708 bitcoin, or 210.1%, over the prior year. We remain focused on maximizing our chances of successfully solving blocks on the Bitcoin blockchain by growing our hash rate, or the amount of computational power we devote to supporting the bitcoin blockchain, to enhance our ability to successfully solving blocks. Generally, the greater the share a single mining rig can capture of the blockchain's total network hash rate, or the aggregate hash rate deployed to solving a block on the Bitcoin blockchain, the greater the rig's chances of solving a block and therefore earning the reward. Currently, the reward for each solved block is equal to 6.25 bitcoin plus transaction fees and, as of December 31, 2023, the price of a bitcoin was $42,288. As additional mining operators enter the market in response to increased demand for bitcoin, the blockchain's network hash rate grows. As we expect this trend to continue, we will need to continue to grow our hash rate to compete in our dynamic and highly competitive industry.

Table of Contents

**Bitcoin "Halving" Events**

Bitcoin halving is a phenomenon that has historically occurred approximately every four years on the Bitcoin network. Halving is a key part of the Bitcoin protocol and serves to control the overall supply and reduce the risk of inflation in digital assets using a Proof-of-Work consensus algorithm. At a predetermined block, the mining reward is cut in half, hence the term "halving." For example, the reward for adding a single block to the blockchain was initially set at 50 bitcoin currency rewards. The Bitcoin blockchain has undergone halving three times since its inception as follows: (1) on November 28, 2012 at block height 210,000; (2) on July 9, 2016 at block height 420,000; and (3) on May 11, 2020 at block height 630,000, when the reward was reduced to its current level of 6.25 bitcoin per block. The next halving for the Bitcoin blockchain is anticipated to occur around April 2024 at block height 840,000. This process will recur until the total amount of bitcoin currency rewards issued reaches 21.0 million, and the theoretical supply of new bitcoin is exhausted, which is expected to occur around 2140. Many factors influence the price of Bitcoin, and potential increase or decrease in prices in advance of or following the future halving is unknown.

**Factors Affecting Profitability**

*Market Price of Bitcoin*

Our business is heavily dependent on the price of bitcoin. The prices of digital assets, including bitcoin, have historically experienced substantial volatility, and digital asset prices have in the past and may in the future be driven by speculation and incomplete information, subject to rapidly changing investor sentiment, and influenced by factors such as technology, macroeconomic conditions, regulatory void or changes, fraudulent actors, manipulation, and media reporting. Further, the value of bitcoin and other digital assets may be significantly impacted by factors beyond our control, including consumer trust in the market acceptance of bitcoin as a means of exchange by consumers and producers.

*Halving*

The halving is an important part of the Bitcoin ecosystem, and it is closely watched by miners, investors, and other participants in the digital asset market. Each halving event has historically been associated with significant price movements in the value of bitcoin.

*Network Hash Rate and Difficulty*

Generally, a bitcoin mining rig's chance of solving a block on the Bitcoin blockchain and earning a bitcoin reward is a function of the mining rig's hash rate, relative to the global network hash rate (i.e., the aggregate amount of computing power devoted to supporting the Bitcoin blockchain at a given time). As demand for bitcoin increases, the global network hash rate rapidly increases, and as more adoption of bitcoin occurs, we expect the demand for new bitcoin will likewise increase as more mining companies are drawn into the industry by this increase in demand. Further, as more and increasingly powerful mining rigs are deployed, the network difficulty for Bitcoin increases. Network difficulty is a measure of how difficult it is to solve a block on the Bitcoin blockchain, which is adjusted every 2,016 blocks, or approximately every two weeks, so that the average time between each block is approximately ten minutes. A high difficulty means that it will take more computing power to solve a block and earn a new bitcoin reward, which, in turn, makes the Bitcoin network more secure by limiting the possibility of one miner or mining pool gaining control of the network. Therefore, as new and existing miners deploy additional hash rate, the global network hash rate will continue to increase, meaning a miner's share of the global network hash rate (and therefore its chance of earning bitcoin rewards) will decline if it fails to deploy additional hash rate at pace with the industry.

**STRATEGIC FOCUS**

Our focus in 2023 was on growth execution and transition into a more mature organization with diversified portfolio of bitcoin mining technologies and assets. This focus consisted of both the expansion of operations of our core bitcoin mining business (operating mining rigs at third-party owned and operated data centers), acquiring and operating bitcoin mining sites to host our own bitcoin mining rigs, and operating MaraPool, our proprietary bitcoin mining pool which orchestrates the operation of our fleet of mining rigs. Key activities and milestones throughout 2023 included the following:

- In December 2023, we entered into a definitive agreement to acquire two currently operational bitcoin mining sites, totaling 390 megawatts of capacity, in Granbury, Texas and Kearney, Nebraska, to reduce the cost per coin of our current operations at these sites and further transition from the asset-light organization to one that manages a diversified and resilient portfolio of bitcoin mining operations. The transaction closed on January 12, 2024;

- We deployed capital to secure the most efficient Application Specific Integrated Circuit mining rigs ("ASICs") through contracts that included price protection clauses which benefited the Company as ASICs prices declined throughout the second and third quarters of 2023;

- We continued operations at a wind-powered site in McCamey, Texas and other smaller sites, which have increased our use of renewable sources of energy;

- We secured additional hosting services to further our planned expansion of operations, entering into third-party hosting relationships with Applied Digital Corporation ("APLD") to host S19XP mining rigs at sites in Texas and North Dakota; and

- We increased our hash rate from 7.0 and 7.0 installed and energized exahashes per second, respectively, as of December 31, 2022 to 25.2 and 24.7 installed and energized exahashes per second, respectively, as of December 31, 2023.

The year ended December 31, 2023 was a year of adaptation, as we overcame several operational and financial headwinds that occurred during 2022, including:

- Our primary mining facility in Hardin, Montana went offline after being damaged by a storm in mid-2022;

- Delays in the energization of the McCamey, Texas site during the second and third quarters of 2022;

- Compute North, our largest hosting partner, entered bankruptcy proceedings in September 2022;

- A significant decline in the price of bitcoin, which resulted in impairments of our bitcoin holdings throughout 2022 and an impairment charge related to the value of our mining rigs and certain contracts during the fourth quarter of 2022; and

- Challenging financial markets and macroeconomic conditions throughout 2022.

Our primary focus in 2024 is to keep our current fleet of over 210,000 bitcoin mining rigs energized and running optimally while increasing our total operational hash rate. Our operational hash rate was 7.0 exahashes per second as of December 31, 2022 and was more than 24.7 exahashes per second as of December 31, 2023. We anticipate further growth of our operational hash rate in 2024 as we bring newly acquired bitcoin miners into operation. We expect to increase our operational hash rate to approximately 35 to 37 exahashes per second in 2024. By December 31, 2025, we plan to reach 50 exahashes per second in operational hash rate. To support this growth, we have placed orders with multiple manufacturers for approximately 22 exahashes per second and hold the option to purchase an additional 23 exahashes per second. Additionally, we expect to expand our data center capacity through a portfolio approach with a healthy mix of asset-light, asset-heavy, and joint venture partnerships.

Historically, we have grown quickly to become one of the world's largest publicly traded bitcoin mining companies. We achieved this milestone through an asset-light strategy, which involved deploying our bitcoin miners at third-party hosted sites. This approach saved us significant amounts of capital that would have otherwise been invested in data center infrastructure and allowed us to allocate more capital into revenue-generating assets, including bitcoin miners. During the year ended December 31, 2023 we shifted our strategy from an asset-light business model to a diversified and resilient portfolio approach directly supporting our bitcoin mining operations. This approach involves managing a strategic mix of third-party hosted sites and self-owned and operated sites, which we believe will help the business weather market downturns by optimizing its cost structure. In January 2024, we acquired two data centers totaling 390 megawatts. Following this acquisition, our operations are moving towards being more evenly split between third-party hosted and self-owned and operated sites.

In 2023, we launched a joint venture in Abu Dhabi, United Arab Emirates, which operates two sites with a total capacity of 250 megawatts, of which we own 20%. These sites operate in one of the world's most challenging environments, with summertime temperatures of approximately 115 degrees Fahrenheit and 98% humidity. We believe our state-of-the-art immersion technology deployed at these sites has resulted in the bitcoin mining rigs operating with minimal human intervention and need for repairs. In addition, in November 2023 we launched a joint venture project in Paraguay to support 20 megawatts and expect operations to commence at the site during the quarter ending June 30, 2024. We intend to continue our international expansion efforts into 2024.

To support this shift in strategy and to capitalize on opportunities for international expansion and industry consolidation, we strengthened our liquidity position – a priority that we intend to continue focusing on in 2024. Our combined cash and cash equivalents and bitcoin reserve totaled nearly $1.0 billion as of December 31, 2023. Refer to the "Liquidity and Capital Resources" section, for further information.

We also expect to deploy several technological innovations developed by our technology team and partners. These innovations include new immersion-cooling systems, hardware, and software solutions that are designed to optimize mining rig performance and the reliability of our operations. Moreover, we are exploring novel sources of underutilized or wasted energy sources, which may reduce bitcoin production costs.

### Research and Development

Our research and development ("R&D") efforts play a critical role in driving our innovation and growth. Our R&D process is designed to support the creation and development of new tools and processes intended to serve an integral part of our overall business strategy and enhance our market position as an advanced and sustainable bitcoin miner.

The first step in the R&D process is ideation, which is the process of generating and evaluating new ideas. We encourage our team members to come up with creative and innovative ideas, and then we provide them with the resources and support they need to explore these ideas further.

Once we have identified a promising idea, the next step is to develop a prototype. This typically involves creating a small-scale version of the product or service, which can be tested and evaluated in order to identify potential issues and improve the design. We conduct market research to understand the potential market for the product or service.

The final step in our R&D process is testing and validation. This involves conducting thorough testing of the prototype to identify any issues or flaws, and to ensure that it meets our rigorous quality standards. We also conduct market testing to gather feedback from real-world users, and use this feedback to refine and improve the product or service.

Overall, our R&D process is designed to support the creation and development of innovative technology advancements that ensure we maintain our competitive advantages and improve its position as a leading bitcoin miner. We believe that this process is essential for driving growth, staying ahead of the competition, and achieving success.

### Strategic Investments

We are committed to pursuing strategic investments that align with our vision and values. Our strategic focus is to identify and partner with companies that we believe will generate synergies to create long-term value for our stockholders.

One key element of our investment strategy is to focus on companies that are at the forefront of emerging technologies and industries. We believe targeted companies have the potential to drive significant innovation and growth, and we are committed to supporting the development through investments in both hardware and software companies.

Another key aspect of our strategy is to prioritize investments in companies that are aligned with our values and mission. We believe our stockholders expect us to support businesses that operate in a responsible and sustainable manner, and we are committed to making investments that reflect these values.

Overall, our investment strategy is designed to support our growth and success, while propelling our business to be the most advanced, agile, and efficient bitcoin miner. We are committed to making strategic investments that align with both our vision and values, and believe this approach will help us achieve long-term success.

### OPERATIONS

We deploy miners at sites throughout the United States, as well as in the United Arab Emirates and Paraguay. In the United States, with the exception of the sites in Granbury, Texas and Kearney, Nebraska, which we acquired in January 2024 and are currently operated by a third party, all of our sites are currently hosted by third parties to

Table of Contents

whom we pay a fee. The follow map represents our site locations, with additional information to follow summarizing our current and anticipated operating sites in the United States and internationally:



| Site Location | Host | Mega-watts | Energized Exahash | Fleet [1] |
|---|---|---|---|---|
| McCamey, Texas | Hut 8 Mining Corp. ("Hut 8") affiliate | 216 | 7.7 | 43,000 S19j Pros and 25,000 S19 XPs |
| Ellendale, North Dakota | APLD affiliate | 180 | 7.8 | 57,000 S19 XPs |
| Garden City, Texas | APLD affiliate | 100 | 4.5 | 30,000 S19 XPs and 4,200 S19j Pros |
| Granbury, Texas [2] | Hut 8 affiliate | 53 | 1.9 | 12,000 S19j Pros, 5,000 S19 XPs and 7,000 S19 K Pros |
| Jamestown, North Dakota | APLD affiliate | 40 | 1.4 | 10,000 S19 XPs, with another 768 units of immersion |
| Kearney, Nebraska [2] | Hut 8 affiliate | 12 | 0.3 | 2,300 S19j Pros, 1,000 S21s and 1,300 MicroBTs |
| Other [3] | Various | 10 | 0.3 | 2,590 S19j Pros, 2,800 S19 Pros and 600 S19s |
| Abu Dhabi, United Arab Emirates | Zero Two | 25 | 0.6 | 4,370 XPs |
| Paraguay | Penguin Infrastructure S.A. | 4 | 0.2 | 1,688 XPs |
| **Total** | | 640 | 24.7 | |

[1] Notes the approximate deployed and operational fleet at each site location or the anticipated scope of the fleet to be deployed at those sites not yet operational.

[2] On January 12, 2024, the Company, through its wholly owned subsidiary MARA USA Corporation, acquired two operational bitcoin mining sites.

(3) Includes site locations of Hopedale, Ohio, Murray, Kentucky and Layton, Utah. An additional 4,700 j Pros are anticipated to be energized in 2024.

**COMPETITION**

In digital asset mining, companies and individuals use computing power to solve cryptographic algorithms to record and publish transactions to blockchain ledgers or provide transaction verification services to the Bitcoin network in exchange for digital asset rewards. The current reward for verifying a block on the Bitcoin blockchain is 6.25 bitcoin. Miners can range from individual enthusiasts to professional mining operations with dedicated data centers. Miners may organize themselves in mining pools. We compete or may in the future compete with other companies that focus all or a portion of their activities on owning or operating digital asset exchanges, developing programming for the blockchain, and mining activities. Currently, the information concerning the activities of these enterprises is not readily available as the vast majority of the participants in this sector do not publish information publicly or the information may be unreliable.

While there is limited available information regarding non-public competitors, several public companies (traded in the United States and internationally), such as the following, may be considered to compete with us:

- Argo Blockchain plc;

- Bitfarms Ltd.;

- Bit Digital, Inc.;

- Cipher Mining Inc.;

- Cleanspark, Inc.;

- Core Scientific, Inc.;

- Greenidge Generation Holdings Inc.;

- Hive Digital Technologies Ltd.;

- Hut 8 Corp.;

- Iris Energy Limited;

- Riot Platforms, Inc.;

- Stronghold Digital Mining, Inc.; and

- TeraWulf Inc.

We believe our recent acquisition of two currently operational bitcoin mining sites, totaling 390 megawatts of capacity, in Granbury, Texas and Kearney, Nebraska and our ongoing deployment of miners positions us well among the publicly traded companies involved in the digital asset mining industry. The digital asset mining industry is a highly competitive and evolving industry and new competitors and/or emerging technologies could enter the market and affect our competitiveness in the future.

**INTELLECTUAL PROPERTY**

We actively use specific hardware and software for digital asset mining operations. In certain cases, source code and other software assets may be subject to an open-source license, as much of the technology development underway in our sector is open source.

We currently own five patents in the United States and have six patent applications pending. The expiration dates of our patents range from March 2036 and November 2043. Our patents improve efficiency to decrease settlement risk and expand server and radio functionalities. In the future, we may seek to register additional patents in connection with our existing and planned blockchain and digital asset operations.

We rely upon the following to protect and enforce our proprietary information and intellectual property:

- trade secrets;

- trademarks;

- service marks;

- trade names;

- copyrights; and

- other intellectual property rights.

Additionally, we expect to license the use of intellectual property rights owned and controlled by others. We also have developed, and may further develop, certain proprietary software applications for purposes of its digital asset mining operation and may license proprietary software application to third parties.

**REGULATORY LANDSCAPE**

We operate within a complex and rapidly evolving regulatory environment and are subject to a wide range of laws and regulations enacted by U.S. federal, state, and local governments, governmental agencies, and regulatory authorities, including the SEC, the Commodity Futures Trading Commission (the "CFTC"), the Federal Trade Commission (the "FTC"), and the Financial Crimes Enforcement network of the U.S. Department of Treasury, as well as similar entities in other countries. Other regulatory bodies have demonstrated an interest in regulating or investigating companies engaged in blockchain or cryptocurrency businesses.

Regulations may substantially change in the future and it is presently not possible to know how regulations will apply to our business, or when they may be effective. While we anticipate that bitcoin mining will be an area of focus for regulators in 2024 and beyond, we cannot predict with certainty the impact regulations may have on our business or operations. As the regulatory and legal environment evolves, we may become subject to new laws and regulations by the SEC and other agencies, which may affect our mining operations and other activities. Additionally, state and local regulation of bitcoin mining is important with respect to where we conduct our mining operations. A substantial number of our bitcoin miners are located in Texas and North Dakota, which are generally favorable regulatory environments for bitcoin miners as compared to other states. However, we may also become subject to additional regulatory requirements on a state and local level in the geographies in which we operate, and as we strategically expand our operations into new areas.

For additional discussion regarding our belief about the potential risks existing and future regulation pose to our business, see Part I, Item 1A. "*Risk Factors*" of this Annual Report.

**HUMAN CAPITAL AND DIVERSITY, EQUITY AND INCLUSION**

As of December 31, 2023, we had a total workforce of approximately 60 employees across our entire organization, all of whom were employed full-time, including professionals in accounting, communications, engineering, finance, growth, human resources, information and technology, investor relations, legal, and operations.

Our strategy with human capital resources is to align the interests of our employees with our key long-term success drivers. In execution of this strategy, we adopted an equity incentive plan, under which all eligible employees can be granted options, restricted stock, preferred stock, restricted stock units or warrants. We believe our performance plan is a key incentive for our employees that aligns their long-term interests with our long-term objectives as an organization.

We also compare salary and wages against quantitative benchmarks and adjust monetary compensation to ensure wages are competitive and consistent with employee positions, skill levels, experience, and geographic location. We maintain a robust process for ensuring pay equity across the Company and increases in incentives and compensation based on merit and performance. In addition, we provide a comprehensive range of benefits options, including medical, dental and vision insurance for employees and family members, paid and unpaid leaves, and life and disability/accident coverage.

At Marathon, we seek to attract a pool of diverse, best-in-class candidates and foster their career growth by hiring the best talent available, rather than relying solely on educational background. In support of such initiative, we look for candidates in local communities and large cities alike, and from a variety of backgrounds. Our goal is a long-term, growth-oriented career for each employee. We also believe that our ability to retain our workforce is dependent on our ability to foster an environment that is sustainably safe, respectful, fair, and inclusive of everyone, and promotes diversity, equity, and inclusion both inside and outside of our business.

Table of Contents

**RECENT DEVELOPMENTS**

On October 24, 2023, we commenced a new at-the-market offering program (the "2023 ATM") with H.C. Wainwright & Co., LLC, acting as sales agent ("Wainwright"), pursuant to an at-the-market offering agreement (the "ATM Agreement"), under which we may offer and sell shares of our common stock from time to time through the sales agent having an aggregate offering price of up to $750.0 million. As of December 31, 2023, we sold 19,591,561 shares of common stock under the 2023 ATM for an aggregate purchase price of $248.1 million, net of commissions and expenses. Subsequent to December 31, 2023, we sold additional shares of common stock under the 2023 ATM such that the aggregate offering price of shares sold under the 2023 ATM is approximately $750.0 million. In February 2024, we intend to commence a new at-the-market offering program with Wainwright acting as sales agent (the "2024 ATM") pursuant to the ATM Agreement, under which we may offer and sell shares of our common stock from time to time through Wainwright having an aggregate offering price of up to $1.5 billion.

On January 12, 2024, we consummated an acquisition of 100% of the issued and outstanding equity interests (the "Transaction") of GC Data Center Equity Holdings, LLC, through our wholly owned subsidiary MARA USA Corporation, pursuant to which we acquired two operational bitcoin mining sites for an aggregate 390 megawatts of operational capacity in exchange for $179.0 million cash consideration, subject to customary working capital adjustments. We hope to realize synergies from this transaction through the integration of our technology stack, which we expect will improve efficiencies and scale our operating capacity.

In November 2023, we launched a joint venture in Paraguay with 1,170 miners energized. The operations at this facility are powered entirely by hydroelectricity. We expect operations at this facility to commence during the quarter ending June 30, 2024 and to generate 1.1 exahashes.

We completed the installation and energization of approximately 28,000 S19 XPs to commence operations at a Garden City, Texas site during the quarter ended December 31, 2023.

**CORPORATE HISTORY AND INFORMATION**

We were incorporated in the State of Nevada on February 23, 2010 under the name Verve Ventures, Inc. On December 7, 2011, we changed our name to American Strategic Minerals Corporation, and in October 2012 we changed our name to Marathon Patent Group, Inc. We operated as Marathon Patent Group, Inc. until March 1, 2021, when we changed our name to Marathon Digital Holdings, Inc. Our corporate headquarters are located at 101 SE Third Avenue, Suite 1200, Fort Lauderdale, Florida 33301. We also maintain a West Coast office at 300 Spectrum Center Drive, Suite 950, Irvine, California 92618. Copies of our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, proxy statements and any amendments to those reports filed or furnished pursuant to Sections 13(a) or 15(d) of the Exchange Act, as well as other filings made with the SEC, are available free of charge through our website (www.mara.com under the "Investors" section).

**ITEM 1A. RISK FACTORS**

*Certain factors may have a materially adverse effect on our business, financial condition, and results of operations, including the risk, factors, and uncertainties described under this Part I, Item 1A, and elsewhere in this Annual Report. This is not an exhaustive list, and there are other factors that may be applicable to our business that are not currently known to us or that we currently do not believe are material. Any of these risks could have an adverse effect on our business, financial condition, operating results, or prospects, which could cause the trading price of our common stock to decline, and you could lose part or all of your investment. You should carefully consider the risks, factors, and uncertainties described below, together with the other information contained in this Annual Report, as well as the risk, factors, uncertainties, and other information we disclose in other filings we make with the SEC before making an investment decision regarding our securities.*

**Risk Factor Summary**

Below is a summary of the principal factors that make an investment in our common stock speculative or risky. This summary does not address all of the risks we face. Additional discussion of the risks summarized in this risk factor summary, and other risks that we face, can be found below and should be carefully considered, together with other information included in this Annual Report.

***Risks Related to Our Business***

- Bitcoin prices are very volatile and this may affect our ability to effectively manage growth plans and our profitability;

- If we fail to grow our hash rate, we may be unable to compete, and our results of operations could suffer.

- Fluctuations in the price of bitcoin may significantly influence the market price of our bitcoin holdings and therefore the price of our common stock;

- Further significant disruptions in the crypto asset markets, such as those experienced in the second half of 2022, may cause further material impairment of the value and use of our mining rigs;

- Political or economic crises may motivate large-scale sales of digital assets, which could result in a reduction in some or all digital assets' values and adversely affect an investment in our securities;

- Bitcoin is subject to halving and as such the reward for successfully solving a block will halve several times in the future and its value may not adjust to compensate us for the reduction in the rewards we receive from our mining efforts, which could cause us to cease our mining operations altogether and investors could suffer a complete loss of their investment;

- Security threats to our business could result in a loss of our digital assets, or damage to our reputation and brand, each of which could adversely affect an investment in our securities;

- The limited rights of legal recourse against us, and our lack of insurance protection exposes us and our stockholders to the risk of loss of our digital assets for which no person is liable;

- We rely on third-party hosting, and as such, our operations could be adversely affected by the actions or inactions of such third-parties. Additionally, third-party hosting, among other things, often requires us to give the hosting company a first lien on the mining rigs installed on the site and creates business risk for us.

- We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our financial statements or cause us to fail to meet periodic reporting obligations; and

- We have unresolved Staff comments which could result in restated financial statements.

*Risks Related to Governmental Regulation and Enforcement*

- Regulatory changes or actions may restrict the use of bitcoins or the operation of the Bitcoin network in a manner that adversely affects an investment in our securities;

- Due to the unregulated nature and lack of transparency surrounding the operations of many bitcoin trading venues, they may experience fraud, security failures or operational problems, which may adversely affect the value of our bitcoin;

- If regulatory changes or interpretations require the regulation of bitcoins under the Securities Act and the Investment Company Act of 1940, as amended (the "Investment Act") by the SEC, we may be required to register and comply with such regulations. To the extent we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors. This would likely have a material adverse effect on us and investors may lose their investment; and

- Changing environmental regulation and public energy policy may expose our business to new risks.

*Risks Related to Our Common Stock*

- Our stock price is volatile; and

- Because there has been limited precedent set for financial accounting of bitcoin and other cryptocurrency assets, the determination that we have made for how to account for cryptocurrency assets transactions may be subject to change.

**Risks Related to Our Business**

***Bitcoin prices are highly volatile, which may affect our ability to effectively manage growth plans and our profitability.***

The price of bitcoin is extremely volatile and in fiscal 2023 the price range of bitcoin was between approximately $16,600 and $42,300. The cost to mine a bitcoin is independent of the then current price of bitcoin, so when prices are low, the cost per coin to mine may consume much of our available cash, which means that there is less capital with which to invest in future company growth. Similarly, when prices are low, our profitability is decreased on a dollar-for-dollar basis correlated to the then price of bitcoin. Given the volatility of bitcoin, these factors render us unable to accurately predict in advance what our growth plans may be and accurately forecast any revenue and profitability projections for any reporting period.

***The price of bitcoin may be influenced by regulatory, commercial, and technical factors that are highly uncertain.***

Bitcoin and other digital assets are relatively novel and are subject to various risks and uncertainties that may adversely impact their price. For example, the application of securities laws and other regulations to such assets is unclear in certain respects, and it is possible that regulators in the United States or foreign countries may create new regulations or interpret laws in a manner that adversely affects the price of bitcoin. The growth of the digital assets industry in general, and the use and acceptance of bitcoin in particular, may also impact the price of bitcoin and is subject to a high degree of uncertainty. The pace of worldwide growth in the adoption and use of bitcoin could depend on the following:

- public familiarity with digital assets;

- ease of buying and accessing bitcoin;

- institutional demand for bitcoin as an investment asset;

- consumer demand for bitcoin as a means of payment; and

- the availability and popularity of alternatives to bitcoin.

Even if growth in bitcoin adoption occurs in the near or medium-term, there is no assurance that bitcoin usage will continue to grow over the long-term. Because bitcoin has no physical existence beyond the record of transactions on the Bitcoin blockchain, a variety of technical factors related to the Bitcoin blockchain could also impact the price of bitcoin. For example, malicious attacks by "miners" who validate bitcoin transactions, inadequate mining fees to incentivize validating of bitcoin transactions, "hard forks" of the Bitcoin blockchain, and advances in quantum computing could undercut the integrity of the Bitcoin blockchain and negatively affect the price of bitcoin. The liquidity of bitcoin may also be reduced and damage to the public perception of bitcoin may occur, if financial institutions were to deny banking services to businesses that hold bitcoin, provide bitcoin-related services or accept bitcoin as payment, which could also decrease the price of bitcoin.

***Fluctuations in the price of bitcoin may significantly influence the market price of our bitcoin holdings and therefore, the price of our common stock.***

To the extent investors view the value of our common stock as linked to the value or change in the value of our bitcoin holdings, fluctuations in the price of bitcoin may significantly influence the market price of our common stock.

***If we fail to grow our hash rate, we may be unable to compete, and our results of operations could suffer.***

Generally, a bitcoin miner's chance of solving a block on the Bitcoin blockchain and earning a bitcoin reward is a function of the miner's hash rate (i.e., the amount of computing power devoted to supporting the Bitcoin blockchain), relative to the global network hash rate. As greater adoption of Bitcoin occurs, we expect the demand for Bitcoin will increase further, drawing more mining companies into the industry and thereby increasing the global network hash rate. As new and more powerful miners are deployed, the global network hash rate will continue to increase, meaning a miner's chance of earning bitcoin rewards will decline unless it deploys additional hash rate at pace with the industry.

Accordingly, to maintain our chances of earning new bitcoin rewards and remaining competitive in our industry, we must seek to continually add new miners to grow our hash rate at pace with the growth in the Bitcoin global network hash rate. However, as demand has increased and scarcity in the supply of new miners has resulted, the price of new

16

Table of Contents

miners has increased sharply, and we expect this process to continue in the future as demand for bitcoin increases. Therefore, if the price of bitcoin is not sufficiently high to allow us to fund our hash rate growth through new miner acquisitions and if we are otherwise unable to access additional capital to acquire these miners, our hash rate may stagnate and we may fall behind our competitors. If this happens, our chances of earning new bitcoin rewards would decline and, as such, our results of operations and financial condition may suffer.

***Further significant disruptions in the crypto asset markets, such as those experienced in the second half of 2022, may cause further material impairment of the value and use of our mining rigs.***

During the fourth quarter of 2022, the per coin price of bitcoin reached a low of approximately $15,500 from a high of almost $21,500 earlier in the quarter. This decrease in the price of bitcoin, combined with general market sentiment caused in large part by the collapse of FTX Trading Ltd. ("FTX") in November 2022 and various bitcoin company-related bankruptcies and restructurings, led to a material decline in the fair value of our mining rigs and deposits for future mining rig purchases during that period. As a result, we recorded an impairment charge of $332.9 million on these assets during the quarter ended December 31, 2022, although operations were unaffected and continued throughout the period. Any future decrease in the value of bitcoin could cause us to record additional impairments in the value of our current and future assets.

In addition, if bitcoin prices dropped to levels below that experienced in 2022 and held at those levels for a significant period of time, it could impact our profitability such that we would possibly need to consider whether it would be prudent to leave certain of our mining rigs idle until the price of bitcoin recovered.

Theoretically, there is a minimum bitcoin price that is so low that we would be incentivized to cease our mining operations, particularly where our operating costs exceed our revenues. However, this is a complex projection involving multiple ever-changing, dynamic variables. We have multiple mining sites and hosting partners, all with different hosting prices, electricity prices, and contract structures. These costs would need to be compared to the current revenue being produced by our mining rigs.

***Geopolitical or economic crises may create increased uncertainty and price changes, or motivate large-scale sales of digital assets, which could result in a reduction in some or all digital assets' values and adversely affect an investment in our securities.***

As an alternative to fiat currencies that are backed by central governments, digital assets such as bitcoin, which are relatively new, are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services. It is unclear how such supply and demand will be impacted by geopolitical events. Nevertheless, geopolitical or economic crises may motivate large-scale acquisitions or sales of digital assets either globally or locally. Large-scale sales of digital assets would result in a reduction in their value and could adversely affect an investment in our securities.

In addition, we are subject to price volatility and uncertainty due to geopolitical crises and economic downturns. Such geopolitical crises and global economic downturns may be a result of invasion, or possible invasion, by one nation of another, leading to increased inflation and supply chain volatility. Such crises, as well as inflation, will likely continue to have an effect on our ability to do business in a cost-effective manner.

***The sale of our digital assets to pay expenses at a time of low digital asset prices could adversely affect an investment in our securities.***

We may sell our digital assets to pay expenses on an as-needed basis, irrespective of then-current prices. Consequently, our digital assets may be sold at a time when the prices on the respective digital asset exchange market are low, which could adversely affect an investment in our securities.

***The development and acceptance of digital asset networks and other digital assets, which represent a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of digital asset systems may adversely affect an investment in our securities.***

Digital assets such as bitcoin, that may be used, among other things, to buy and sell goods and services are a new and rapidly evolving industry. The growth of the digital asset industry in general, and the digital asset networks of bitcoin in particular, are highly uncertain. The factors affecting the further development of the digital asset industry, as well as the digital asset networks, include:

- continued worldwide growth in the adoption and use of bitcoins and other digital assets;

- government and quasi-government regulation of bitcoins and other digital assets and their use, or restrictions on or regulation of access to and operation of the digital asset network or similar digital assets systems;

- the maintenance and development of the open-source software protocol of the Bitcoin network;

- changes in consumer demographics and public tastes and preferences;

- the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;

- general economic conditions and the regulatory environment relating to digital assets;

- the impact of regulators focusing on digital assets and digital securities and the costs associated with such regulatory oversight; and

- a decline in the popularity or acceptance of the digital asset networks of bitcoin, or similar digital asset systems, could adversely affect an investment in our securities.

***The open-source structure of the Bitcoin network protocol means the contributors to the protocol are generally not directly compensated for their contributions in maintaining and developing the protocol. A failure to properly monitor and upgrade the protocol could damage the Bitcoin network and an investment in our securities.***

Digital asset networks are open-source projects and, although there is an influential group of leaders in, for example, the Bitcoin network community known as the "Core Developers," there is no official developer or group of developers that formally controls the Bitcoin network. As an open-source project, Bitcoin is not represented by an official organization or authority. The Bitcoin network protocol is not sold and contributors are generally not compensated for maintaining and updating the Bitcoin network protocol. The lack of guaranteed financial incentive for contributors to maintain or develop the Bitcoin network and the lack of guaranteed resources to adequately address emerging issues with the Bitcoin network may reduce incentives to address the issues adequately or in a timely manner. Changes to a digital asset network in which we are directing our mining efforts may adversely affect an investment in our securities.

***The acceptance of digital asset network software patches or upgrades by a significant, but not overwhelming, percentage of the users and miners in any digital asset network could result in a "fork" in the respective blockchain, resulting in the operation of two separate networks until such time as the forked blockchains are merged. The temporary or permanent existence of forked blockchains could adversely impact an investment in our securities.***

Due to Bitcoin's open-source project, any individual can download the Bitcoin network software and make any desired modifications, which are proposed to users and miners on the Bitcoin network through software downloads and upgrades, and typically posted to the Bitcoin development forum on GitHub.com. A substantial majority of miners and Bitcoin users must consent to those software modifications by downloading the altered software or upgrade that implements the changes. If not, the changes do not become a part of the Bitcoin network.

Since the Bitcoin network's inception, changes to the Bitcoin network have been accepted by the vast majority of users and miners, ensuring that the Bitcoin network remains a coherent economic system. However, a developer or group of developers could potentially propose a modification to the Bitcoin network that is not accepted by a vast majority of miners and users, but that is nonetheless accepted by a substantial population of participants in the Bitcoin network. In such a case, and if the modification is material and/or not backwards compatible with the prior version of Bitcoin network software, a fork in the blockchain could develop and two separate Bitcoin networks could result with one running the pre-modification software program and the other running the modified version (i.e., a second "Bitcoin" network).

Such a fork in the blockchain is typically addressed by community-led efforts to merge the forked blockchains, and several prior forks have been so merged. This kind of split in the Bitcoin network could materially and adversely impact an investment in our securities and harm the sustainability of the Bitcoin network's economy.

***As the number of digital assets awarded for solving a block in the blockchain decreases, the incentive for miners to continue to contribute processing power to the respective digital asset network will transition from a set reward to transaction fees. Either the requirement from miners of higher transaction fees in exchange for recording transactions in the blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for digital assets and prevent the expansion of the digital asset networks to retail merchants and***

18

Table of Contents

***commercial businesses, resulting in a reduction in the price of digital assets that could adversely impact an investment in our securities.***

In order to incentivize miners to continue to contribute processing power to any digital asset network, such network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. This transition could be accomplished either by miners independently electing to record in the blocks they solve only those transactions that include payment of a transaction fee or by the digital asset network adopting software upgrades that require the payment of a minimum transaction fee for all transactions. If transaction fees paid for digital asset transactions become too high, the marketplace may be reluctant to accept digital assets as a means of payment and existing users may be motivated to switch from one digital asset to another digital asset or back to fiat currency. Decreased use and demand for bitcoins that we have accumulated may adversely affect its value and may adversely impact an investment in it.

***To the extent that any miners cease to record transactions in solved blocks, transactions that do not include the payment of a transaction fee will not be recorded on the blockchain until a block is solved by a miner who does not require the payment of transaction fees. Any widespread delays in the recording of transactions could result in a loss of confidence in that digital asset network, which could adversely impact an investment in our securities.***

To the extent that any miners cease to record transaction in solved blocks, such transactions will not be recorded on the blockchain. Currently, there are no known incentives for miners to actively not record transactions in solved blocks. However, to the extent that any such incentives arise (e.g., a collective movement among miners or one or more mining pools forcing bitcoin users to pay transaction fees as a substitute for or in addition to the award of new bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the blockchain. Any systemic delays in the recording and confirmation of transactions on the blockchain could result in greater exposure to double-spending transactions and a loss of confidence in certain or all digital asset networks, which could adversely impact an investment in our securities.

***If a malicious actor or botnet obtains control in excess of 50% of the processing power active on any digital asset network, including the Bitcoin network, it is possible that such actor or botnet could manipulate the blockchain in a manner that adversely affects an investment in our securities.***

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on any digital asset network, it may be able to alter the blockchain by constructing alternate blocks if it is able to solve for such blocks faster than the remainder of the miners on the blockchain can add valid blocks. Within the alternate blocks, the malicious actor or botnet could control, exclude or modify the ordering of transaction. However, it could not generate new digital assets or transactions using such control. Using alternate blocks, the malicious actor or botnet could "double-spend" its own digital assets (i.e., spend the same digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintains control. To the extent that such malicious actor or botnet does not yield its majority control of the processing power or the digital asset community does not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible. Such changes could adversely affect an investment in our securities.

The approach towards and possible crossing of the 50% threshold indicates a greater risk that a single mining pool could exert authority over the validation of digital asset transactions. To the extent that the digital assets ecosystems do not act to ensure greater decentralization of digital asset mining processing power, the feasibility of a malicious actor obtaining in excess of 50% of the processing power on any digital asset network (e.g., through control of a large mining pool or through hacking such a mining pool) will increase, which may adversely impact an investment in our securities.

***Bitcoin is subject to halving, and as such the reward for successfully solving a block will halve several times in the future and its value may not adjust to compensate us for the reduction in the rewards we receive from our mining efforts, which could cause us to cease our mining operations altogether and investors could suffer a complete loss of their investment.***

Halving is a process designed to control the overall supply and reduce the risk of inflation in digital assets using a Proof-of-Work consensus algorithm. In an event referred to as bitcoin "halving," the bitcoin reward for mining any block is cut in half. For example, the mining reward for bitcoin declined from 12.5 to 6.25 bitcoin on May 11, 2020. This process is scheduled to occur once every 210,000 blocks. It is estimated that bitcoin will next halve in April 2024 and then approximately every four years thereafter, until the total amount of bitcoin rewards issued reaches 21.0 million, and the theoretical supply of new Bitcoin is exhausted, which is expected to occur around 2140. Once 21.0 million bitcoin are generated, the network will stop producing more. Currently, there are more than 19.0 million bitcoin in circulation. While bitcoin prices have had a history of price fluctuations around halving events, there is no

Table of Contents

guarantee that any such price change will be favorable or would compensate for the reduction in mining reward. If a corresponding and proportionate increase in the price of bitcoin does not follow these anticipated halving events, the revenue from our mining operations would decrease, and we may not have an adequate incentive to continue mining and may cease mining operations altogether, which may adversely affect an investment in our securities and investors could suffer a complete loss of their investment.

Furthermore, such reductions in bitcoin rewards for uncovering blocks may result in a reduction in the aggregate hash rate of the bitcoin network as the incentive for miners decreases. Miners ceasing operations would reduce the collective processing power on the network, which would adversely affect the confirmation process for transactions and make the bitcoin network more vulnerable to malicious actors or botnets obtaining control in excess of 50% of the processing power active on the blockchain. Such events may adversely affect our activities and an investment in our securities.

***To the extent that the profit margins of digital asset mining operations are not high, operators of digital asset mining operations are more likely to immediately sell their digital assets earned by mining in the digital asset exchange market, resulting in a reduction in the price of digital assets that could adversely impact an investment in our securities.***

Over the past two years, digital asset mining operations have evolved from individual users mining with computer processors, graphics processing units and first-generation mining rigs. Currently, new processing power brought onto the digital asset networks is predominantly added by "professionalized" mining operations. Professionalized mining operations may use proprietary hardware or sophisticated machines.

Professionalized mining operations require:

- the investment of significant capital for the acquisition of such hardware;

- the leasing of operating space (often in data centers or warehousing facilities);

- incurring of electricity costs; and

- the employment of technicians to operate the mining farms.

As a result, professionalized mining operations are of a greater scale than prior miners and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining operations to more immediately sell digital assets earned from mining operations on the digital asset exchange market. To the contrary, it is believed that past individual miners were more likely to hold mined digital assets for more extended periods. The immediate selling of newly mined digital assets greatly increases the supply of digital assets on the digital asset exchange market, creating downward pressure on the price of each digital asset.

The extent to which the value of digital assets mined by a professionalized mining operation exceeds the allocable capital and operating costs determines the profit margin of such operation. A professionalized mining operation may be more likely to sell a higher percentage of its newly mined digital assets rapidly if it is operating at a low profit margin—and it may partially or completely stop operations if its profit margin is negative.

In a low profit margin environment, a higher percentage could be sold into the digital asset exchange market more rapidly, potentially reducing digital asset prices. Lower digital asset prices may result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a network effect that may further reduce the price of digital assets until mining operations with higher operating costs become unprofitable and remove mining power from the respective digital asset network. The network effect of reduced profit margins resulting in greater sales of newly mined digital assets could result in a reduction in the price of digital assets that could adversely impact an investment in our securities.

***Our reliance on immersion-cooling exposes us to additional risks.***

Our business is also active in Bitcoin-related projects related to the technological development of immersion-cooling, an emerging technology in bitcoin mining, which is not in wide-spread use in the bitcoin mining industry, and has yet to be deployed in large scale. As such, there is a risk we may not succeed in developing or deploying immersion-cooling at such a large scale to achieve sufficient cooling performance. Our bitcoin miners that utilize immersion-cooling technology do not primarily rely on the use of water. All Bitcoin mining infrastructure, including immersion-cooling and air-cooling, is an evolving study. Cooling of bitcoin miners in general is a risk to achieving full potential from our hash rate.

Table of Contents

***The loss or destruction of a private key required to access a digital asset may be irreversible. Our loss of access to our private keys or a data loss relating to our digital assets could adversely affect an investment in our securities.***

Digital assets are controllable only by the possessor of both the unique public key and private key relating to the local or online digital wallet which hold the digital assets. We are required by the operators of digital asset networks to publish the public key relating to a digital wallet in use once we first verify a spending transaction from that digital wallet and broadcast such information into the respective network. We safeguard the private keys relating to our digital assets by relying on three custody providers, including New York Digital Investment Group LLC's ("NYDIG"), relying on 100% cold-storage custody solutions held in purpose-built physically-secure environments based on established, industry best practices to safeguard digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. To the extent a private key is lost, destroyed or otherwise compromised and no backup of the private key is accessible, we will be unable to access the digital assets and the private key will not be capable of being restored by the respective digital asset network. Any loss of private keys relating to digital wallets used to store our digital assets could adversely affect an investment in our securities.

***Security threats to our business could result in, a loss of our digital assets, or damage to our reputation and our brand, each of which could adversely affect an investment in our securities.***

Security breaches, computer malware and computer hacking attacks have been a prevalent concern in the digital asset exchange markets. A security breach caused by hacking, could include, but is not limited to:

- efforts to gain unauthorized access to information or systems;

- efforts to cause intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment; and

- the inadvertent transmission of computer viruses.

A security breach by hacking could harm our operations or result in loss of our digital assets. Any breach of our and our partners' infrastructure could result in reputational harm and erode the trust of our partners and stockholders, which could adversely affect an investment in our securities. Furthermore, as our assets grow, we may become a more appealing target for security threats such as hackers and malware.

We rely on third-party custody providers' 100% cold-storage custody solutions held in a purpose-built physically secure environments based on established, industry best practices to safeguard digital assets from theft, loss, destruction or other issues relating to hackers and technological attack. Notwithstanding the safeguards implemented to protect our assets, the third-party security systems may not be impenetrable or free from defect, and any loss due to a security breach, software defect or event outside of our control will be borne by us.

The security system and operational infrastructure may be breached due to the actions of outside parties, error or malfeasance of an employee, or otherwise, and, as a result, an unauthorized party may obtain access to our private keys, data or bitcoins. Additionally, outside parties may attempt to fraudulently induce our employees to disclose sensitive information in order to gain access to our infrastructure.

Despite our efforts, we may be unable to anticipate these techniques or implement adequate preventative measures since the hacking techniques used are often not recognized until launched against a target. If an actual or perceived breach of our security system occurs, the market perception of the effectiveness of our controls could be harmed, which could adversely affect an investment in our securities.

Further, in the event of a security breach, we may be subject to litigation forced to cease operations, or suffer a reduction in assets, the occurrence of each of which could adversely affect an investment in our securities.

***Our ability to adopt technology in response to changing security needs or trends and our reliance on, third-party custody providers, poses a challenge to the safekeeping of our digital assets.***

The history of digital asset exchanges has shown that exchanges and large holders of digital assets must adapt to technological change in order to secure and safeguard their digital assets. We rely on third-party custody providers' 100% cold-storage custody solutions held in a purpose-built physically secure environment based on established, industry best practices to safeguard digital assets from theft, loss, destruction or other issues relating to hackers and technological attack.

We believe we may become a more appealing target of security threats as the size of our bitcoin holdings grow. To the extent that we, or any of our third-party custody providers, are unable to identify, mitigate or stop new security threats, our digital assets may be subject to theft, loss, destruction or other attack, which could adversely affect an

investment in our securities. To the extent that our third-party custody providers are no longer able to safeguard our assets due to the current banking crisis, we would be at risk of loss if safeguarding protocols fail.

***Digital asset transactions are irrevocable and stolen or incorrectly transferred digital assets may be irretrievable. As a result, any incorrectly executed digital asset transactions could adversely affect an investment in our securities.***

Digital asset transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction or, in theory, control or consent of a majority of the processing power on that digital asset network. Once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer of digital assets or a theft of digital assets generally will not be reversible, and we may not be capable of seeking compensation for any such transfer or theft.

Although we regularly transfer digital assets to or from vendors, consultants, services providers, it is possible that, through computer or human error, or through theft or criminal action, such assets could be transferred in incorrect amounts or to unauthorized third parties.

To the extent we are unable to seek a corrective transaction to identify the third party which has received our digital assets through error or theft, we will be unable to revert or otherwise recover the impacted digital assets, and any such loss could adversely affect an investment in our securities.

***The limited rights of legal recourse against us, and our lack of insurance protection expose us and our stockholders to the risk of loss of our digital assets for which no person is liable.***

Our digital assets are not insured. If our digital assets are lost, stolen or destroyed under circumstances rendering a party liable to us, the responsible party may not have the financial resources sufficient to satisfy our claim. For example, as to a particular event of loss, the only source of recovery for us might be limited to the extent identifiable, other responsible third parties (e.g., a thief or terrorist), any of which may not have the financial resources (including liability insurance coverage) to satisfy a valid claim. Furthermore, bitcoin is not subject to Federal Deposit Insurance Corporation ("FDIC") or Securities Investor Protection Corporation protection, which is the protection afforded to depositors at banking institutions. Therefore, a loss may be suffered with respect to our digital assets for which no recourse is available, which could adversely affect our operations and, consequently, an investment in our securities.

***If we or our third-party service providers experience a security breach or cyberattack and unauthorized parties obtain access to our bitcoin, we may lose some or all of our bitcoin and our financial condition and results of operations could be materially adversely affected.***

Security breaches and cyberattacks are of particular concern with respect to our bitcoin. Bitcoin and other blockchain-based digital assets have been, and may in the future be, subject to security breaches, cyberattacks, or other malicious activities. A successful security breach or cyberattack could result in a partial or total loss of our bitcoin in a manner that may not be covered by insurance or indemnity provisions of the custody agreement with a custodian who holds our bitcoin. Such a loss could have a material adverse effect on our financial condition and results of operations.

***We rely on third-party hosting, and as such, our operations could be adversely affected by the actions or inactions of such third-parties. Additionally, third-party hosting, among other things, often requires us to give the hosting company, a first lien on the mining rigs installed on the site and creates business risk for us.***

We do not self-host our mining rigs and rely upon third-party hosting facilities to power our mining rigs. Our third-party hosting operators host approximately 193,000 of our bitcoin miners or 23.91 of our operational hash rate capacity. Our operations and ability to mine bitcoin could be adversely affected if operators we rely on to operate our bitcoin miners experience general incompetence in performing their duties, experience financial difficulties or bankruptcy, or otherwise cannot operate our bitcoin miners in accordance with their contractual obligations.

We are dependent upon the financial viability of our third-party hosting operators, and in 2022, several large publicly traded hosting companies met severe financial issues, including bankruptcies. For example, our largest hosting partner, Compute North, filed for bankruptcy in 2022, and as a result, we recorded an impairment charge in the amount of $55.7 million. Currently, about 90% of our third-party hosting is operated by APLD and Hut 8. As a result, our operations are highly dependent on these third-parties and could be adversely affected by the actions or inactions of our third-party hosting operators.

Furthermore, in most hosting contracts, there is a requirement that the miner agrees to permit the hosting company to place a lien on the actual mining machines being hosted. If the hosting company files for bankruptcy, it may take

months for the liens to be lifted, while the bankruptcy court and parties litigate these contracts and resolves issues as to ownership of assets and related areas. In these contracts, we are often required to make significant deposits against future mining fees. If the hosting party utilizes the deposits, we could risk loss of the deposits and be left with an unsecured claim in the bankruptcy. Lastly, as the bankruptcy process includes an automatic stay in favor of the debtor company, until the stay is lifted or a bankruptcy plan approved, we may not be able to move our mining rigs to a different location, even if the debtor rejects our hosting contract.

***Intellectual property rights claims may adversely affect the operation of some or all digital asset networks.***

Third parties may assert intellectual property claims relating to the holding and transfer of digital assets and their source code. Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in some or all digital asset networks' long-term viability or the ability of end-users to hold and transfer digital assets may adversely affect an investment in our securities. Additionally, a meritorious intellectual property claim could prevent us and other end-users from accessing some or all digital asset networks or holding or transferring our digital assets. As a result, an intellectual property claim against us or other large digital asset network participants could adversely affect an investment in our securities.

***Variability in intellectual property laws may adversely affect our intellectual property position.***

Intellectual property laws, and patent laws and regulations in particular, have been subject to significant variability either through administrative or legislative changes to such laws or regulations or changes or differences in judicial interpretation, and it is expected that such variability will continue to occur. Additionally, intellectual property laws and regulations differ among states, and countries. Variations in patent laws and regulations or in interpretations of patent laws and regulations in the United States and other countries may diminish the value of our intellectual property and may change the impact of third-party intellectual property on our business. Accordingly, we cannot predict the scope of patents that may be granted to us, the extent to which we will be able to enforce our patents against third parties, or the extent to which third parties may be able to enforce their patents against us.

***We may seek to internally develop additional new inventions and intellectual property, which would take time and be costly. Moreover, the failure to obtain or maintain intellectual property rights for such inventions would lead to the loss of our investments in such activities.***

We may in the future seek to engage in commercial business ventures or seek internal development of new inventions or intellectual property. These activities would require significant amounts of financial, managerial and other resources and would take time to achieve. Such activities could also distract our management team from our present business initiatives, which could have a material and adverse effect on our business. There is also the risk that such initiatives may not yield any viable new business or revenue, inventions or technology, which would lead to a loss of investment in such activities.

In addition, even if we are able to internally develop new inventions, in order for those inventions to be viable and to compete effectively, we would need to develop and maintain a proprietary position with respect to such inventions and intellectual property. However, there are significant risks associated with any such intellectual property we may develop principally including the following:

- patent applications we may file may not result in issued patents or may take longer than we expect to result in issued patents;

- we may be subject to interference proceedings;

- we may be subject to opposition proceedings in the United States or foreign countries;

- any patents that are issued to us may not provide meaningful protection;

- we may not be able to develop additional proprietary technologies that are patentable;

- other companies may challenge patents issued to us;

- other companies may have independently developed and/or patented (or may in the future independently develop and patent) similar or alternative technologies, or duplicate our technologies;

- other companies may design around technologies we have developed; and

- enforcement of our patents would be complex, uncertain and very expensive.

We cannot be certain that patents, once issued, will provide us with adequate protection from competing products. For example, issued patents may be circumvented or challenged, declared invalid or unenforceable or narrowed in scope. In addition, since publication of discoveries in scientific or patent literature often lags behind actual discoveries, we cannot be certain that we will be the first to make our additional new inventions or to file patent applications covering those inventions. It is also possible that others may have or may obtain issued patents that could prevent us from commercializing our products or require us to obtain licenses requiring the payment of significant fees or royalties in order to enable us to conduct our business. As to those patents that we may acquire, our continued rights will depend on meeting any obligations to the seller and we may be unable to do so. Our failure to obtain or maintain intellectual property rights for our inventions would lead to the loss of our investments in such activities, which would have a material adverse effect on our securities.

Moreover, patent application delays could cause delays in recognizing revenue from our internally generated patents and could cause us to miss opportunities to license patents before other competing technologies are developed or introduced into the market. We are not actively pursuing any commercialization opportunities or internally generated patents.

***Our future success depends on our ability to expand our organization to match the growth of our activities.***

As our operations grow, the administrative demands and scaling demands upon us will grow, and our success will depend upon our ability to meet those demands. Both Marathon and each of our subsidiaries require certain financial, managerial and other resources, which could create challenges to our ability to successfully manage our subsidiaries and operations and impact our ability to assure compliance with our policies, practices and procedures. These demands include, but are not limited to, increased executive, accounting, management, legal services, staff support and general office services. We may need to hire additional qualified personnel to meet these demands, the cost and quality of which is dependent in part upon market factors outside of our control. Further, we will need to effectively manage the training and growth of our staff to maintain an efficient and effective workforce, and our failure to do so could adversely affect our business and operating results. Currently, we have limited personnel in our organization to meet our organizational and administrative demands.

***We are highly dependent on the continued services of our small team of executives.***

We are dependent upon the efforts and services of our small executive team. While we have a preliminary plan for succession of certain key executive, the loss of any one of our key executives could have an adverse effect on our operations.

***We have engaged in, and in the future may engage in, strategic acquisitions and other arrangements that could disrupt our business, cause dilution to our stockholders, reduce our financial resources and harm our operating results.***

We have previously engaged in strategic transactions, including acquisitions of companies, miners, and bitcoin mining sites, such as our recent business acquisitions of two currently operational Bitcoin mining sites, totaling 390 megawatts of capacity, located in Granbury, Texas and Kearney, Nebraska, and, as part of our growth strategy, in the future, we may seek additional opportunities to grow our mining operations, including through purchases of miners, data centers and other facilities from other operating companies, including companies in financial distress. Our ability to grow through future acquisitions will depend on the availability of, and our ability to identify, suitable acquisition and investment opportunities at an acceptable cost, our ability to compete effectively to attract those opportunities and the availability of financing to complete acquisitions. Future acquisitions may require us to issue common stock that would dilute our current stockholders' percentage ownership, assume or otherwise be subject to liabilities of an acquired company, record goodwill and non-amortizable intangible assets that will be subject to impairment testing on a regular basis and potential periodic impairment charges, incur amortization expenses related to certain intangible assets, incur large acquisition and integration costs, immediate write-offs, and restructuring and other related expenses and become subject to litigation.

The benefits of an acquisition or our expansion into may also take considerable time to develop, and we cannot be certain that any particular acquisition will produce the intended benefits in a timely manner or to the extent anticipated at all. We may experience difficulties integrating the operations, technologies and personnel of an acquired company or be subjected to liability for the target's pre-acquisition activities or operations as a successor in interest. Such integration may divert management's attention from normal daily operations of our business. Future acquisitions may also expose us to potential risks, including risks associated with entering markets in which we have no or limited prior experience, especially when competitors in such markets have stronger market positions, the possibility of insufficient revenues to offset the expenses we incur in connection with an acquisition and the potential loss of, or harm to, our relationships with employees and suppliers as a result of integration of new businesses.

Table of Contents

Additionally, we may be unable to pursue our current acquisition strategy in the future. In addition to mining and holding bitcoin, and such related acquisitions, we have explored, and we may in the future explore, opportunities to become more involved in businesses that expand or supplement those directly related to the self-mining of bitcoin as favorable market conditions and opportunities arise. We cannot be certain that such opportunities will produce the intended benefits in a timely manner or to the extent anticipated or at all. These opportunities could also expose us to similar risks associated with our strategic acquisitions, as discussed above.

***Increased scrutiny and changing expectations from stockholders with respect to our environmental, social and governance ("ESG") practices and the impacts of climate change may result in additional costs or risks.***

Companies across many industries are facing increasing scrutiny related to their ESG practices. Investor advocacy groups, certain institutional investors, investment funds and other influential investors are also increasingly focused on ESG practices and in recent years have placed increasing importance on the non-financial impacts of their investments. In May 2021, the SEC proposed rule changes that would require public companies to include certain climate-related disclosures in their periodic reports, including information about climate-related risks that are reasonably likely to have a material impact on their business, results of operations, or financial condition, and certain climate-related financial statement metrics in a note to their audited financial statements. The SEC noted that such rule changes were proposed in response to investor demands for consistent and comparable data on climate change. Furthermore, increased public awareness and concern regarding environmental risks, including global climate change, may result in increased public scrutiny of our business and our industry, and our management team may divert significant time and energy away from our operations and towards responding to such scrutiny and reassuring our employees.

In addition, the physical risks of climate change may impact the availability and cost of materials and natural resources, sources and supplies of energy, and demand for bitcoin and other cryptocurrencies, and could increase our insurance and other operating costs, including, potentially, to repair damage incurred as a result of extreme weather events or to renovate or retrofit facilities to better withstand extreme weather events. If environmental laws or regulations or industry standards are either changed or adopted and impose significant operational restrictions and compliance requirements on our operations, or if our operations are disrupted due to physical impacts of climate change, our business, capital expenditures, results of operations, financial condition and competitive position could be negatively impacted.

***Our business could be harmed by prolonged power and internet outages, shortages, or capacity constraints.***

Our operations require a significant amount of electrical power and access to high-speed internet to be successful. If we are unable to secure sufficient electrical power, or if we lose internet access for a prolonged period, we may be required to reduce our operations or cease them altogether. If this occurs, our business and results of operations may be materially and adversely affected.

***We may have further restrictions on our liquidity due to unique risks which we could face in 2024.***

The risks to our liquidity outlook would include the following:

- deteriorating macroeconomic conditions such as the impact of inflation and increased interest rates and the corresponding impact on our ability to borrow funds or refinance existing indebtedness;

- additional challenges arising from catastrophic events (such the FTX collapse and multiple bankruptcies of bitcoin mining companies in 2022 and 2023) that would adversely affect the credibility of, and therefore investor confidence in, companies engaged in the digital assets space;

- additional declines in bitcoin prices and/or production, and increases in electricity costs which could adversely impact both the value of our bitcoin holdings and our ongoing profitability; and

- further instability in the banking system and the possible collapse of more banking institutions which could put the liquidity and cash assets of third parties with which we do business such as miner hosting entities and suppliers and us, if we bank in the future with an institution which subsequently collapses.

The termination of the $200.0 million in loan facilities with Silvergate Bank did not have a material impact on our operations or forecasts with regard to liquidity. The loans were fully collateralized by our holdings of bitcoin and as such, we were only permitted to borrow up to 65% of the value of the bitcoin held as collateral. Specific percentages and conditions are set forth in the section entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" under the caption, *Bitcoin held as collateral for loans ("Digital assets, restricted").*

Table of Contents

In response to the disruptions in the crypto markets and rising interest rates during the fourth quarter of 2022, we decided to move away from leverage and instead chose to rely on increased levels of cash and higher balances of unrestricted bitcoin holdings, which as of January 2023, we are now selling periodically as a means of generating cash for our operations. By selling bitcoin outright, we can realize 100% of the then value of our bitcoin when addressing liquidity needs. Refer to the disclosure under the caption "*Liquidity and Capital Resources Outlook*" in the section entitled ("*Management's Discussion and Analysis of Financial Condition and Results of Operations*") for further disclosure regarding our liquidity analysis.

In measuring our prospective liquidity forecasts, we did not include loan availability given the loans were collateralized. In addition, we believe that with the consistently higher bitcoin mining levels which we have achieved, selling bitcoin is a more conservative and sustainable methodology for providing liquidity given current market conditions and interest rates.

We believe that with the increased cash, access to our 2023 ATM and our intended 2024 ATM, as needed, our bitcoin holdings, and with periodic access to capital markets, we will have sufficient liquidity to fund operations and growth initiatives, including our investment in the ADGM Entity.

In response to the closure of Signature Bank, we moved all of our cash to other FDIC insured institutions and did not suffer any loss of funds from this event. In order to help mitigate and avoid concentration risk with a single bank, we have diversified our cash holdings and now maintain cash management relationships at four commercial banking institutions. In addition, as a result of the current elevated risk of possible insolvency of banks, we have implemented a policy of purchasing short-term U.S. treasury bills as an additional means of risk mitigation for periods when our cash balances are higher than our near-term anticipated and planned operating cash flow needs.

**We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our financial statements or cause us to fail to meet periodic reporting obligations.**

We are required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act. Section 404 requires that we document and test our internal control over financial reporting and issue management's assessment of our internal control over financial reporting. We assessed the effectiveness of our internal controls over financial reporting as of December 31, 2023. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control — Integrated Framework. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Based on our assessment, as of December 31, 2023, we concluded that our internal control over financial reporting contained material weaknesses. To remediate these material weaknesses, our management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated, such that these controls are designed, implemented, and operating effectively.

We believe that these actions will remediate such material weaknesses. However, the remediation cannot be deemed successful until the applicable controls operate for a sufficient period of time and our management has concluded, through testing, that these controls are operating effectively. If we fail to comply with the requirements of Section 404 of the Sarbanes-Oxley Act, there may be materially adverse effects as to the accuracy and timeliness of the filing of our annual and quarterly reports, and it could cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock. In addition, a material weakness in the effectiveness of our internal control over financial reporting could result in an increased chance of fraud and the loss of customers, reduce our ability to obtain financing and require additional expenditures to comply with these requirements, each of which could have a material adverse effect on our business, results of operations and financial condition.

**We have unresolved Staff comments.**

As stated in Item 1B of this Annual Report, we have unresolved Staff comments. For example, the Staff commented on our revenue recognition policy in our capacity as a pool operator and as a pool participant, with specific attention on our previous net recognition of revenue as an operator of a pool. In our restated financial results, we have revised our revenue to include gross revenue earned as a pool operator with any amounts remitted to third-party pool participants as cost of revenue. The Staff further commented on our accounting convention to recognize our noncash (bitcoin) revenue using fair value that is not at contract inception. We have evaluated the difference between our current accounting policy and fair value at contract inception and have determined that any differences in revenue are not material for all periods stated. We also received Staff comments relating to impairment of bitcoin, accounting for investment fund, statements of comprehensive income (loss) presentation, embedded leases in hosting and power

Table of Contents

arrangements, investments, risk factors, and bitcoin as collateral. While we have restated our financial statements based on comments received to date and determinations reached with our auditors, these comments remain unresolved and are subject to further review and comment by the Staff. While we believe we have addressed all of the Staff's concerns, until the Staff has completed its review, we have no assurance that unresolved comments, or additional comments from the Staff, will not result in the need for additional restatements of our previously issued financial statements. While we do not believe this is a likely result, if this were the case, we could be subject to a further restatement, which could result in loss of investor confidence in the accuracy and completeness of our financial reports, an adverse effect on the price of our common stock, and we could become subject to private litigation or to investigations or enforcement actions by the SEC or other regulatory authorities, all of which could require our expenditure of additional financial and management resources and could have a material adverse effect on our business, financial condition and results of operations and our ability to raise capital.

**Risks Related to Governmental Regulation and Enforcement**

***Regulatory changes or actions may restrict the use of bitcoins or the operation of the Bitcoin network in a manner that adversely affects an investment in our securities.***

Until recently, little or no regulatory attention has been directed toward bitcoin and the Bitcoin network by U.S. federal and state governments, foreign governments and self-regulatory agencies. As bitcoin has grown in popularity and in market size, the Federal Reserve Board, U.S. Congress and certain U.S. agencies (e.g., the CFTC, the SEC, FinCEN and the Federal Bureau of Investigation) have begun to examine the operations of the Bitcoin network, bitcoin users and the bitcoin exchange market.

Digital assets currently face an uncertain regulatory landscape in not only the United States but also in many foreign jurisdictions such as the European Union, China and Russia. While certain governments such as Germany, where the Ministry of Finance has declared bitcoin to be "*Rechnungseinheiten*" (a form of private money that is recognized as a unit of account, but not recognized in the same manner as fiat currency), have issued guidance as to how to treat bitcoin, most regulatory bodies have not yet issued official statements regarding intention to regulate or determinations on regulation of bitcoin, the Bitcoin network and bitcoin users. The effect of any future regulatory change on us, bitcoins, or other digital assets is impossible to predict, but such change could be substantial and adverse to us and could adversely affect an investment in our securities.

Furthermore, one or more countries such as China and Russia may take regulatory actions in the future that severely restricts the right to acquire, own, hold, sell or use digital assets or to exchange digital assets for fiat currency. Such an action may also result in the restriction of ownership, holding or trading in the Company's securities.

***Due to the unregulated nature and lack of transparency surrounding the operations of many bitcoin trading venues, they may experience fraud, security failures or operational problems, which may adversely affect the value of our bitcoin.***

Bitcoin trading venues are relatively new and, in some cases, unregulated. Furthermore, there are many bitcoin trading venues which do not provide the public with significant information regarding their ownership structure, management teams, corporate practices and regulatory compliance. As a result, the marketplace may lose confidence in bitcoin trading venues, including prominent exchanges that handle a significant volume of bitcoin trading.

Negative perception, a lack of stability in the broader bitcoin markets and the closure or temporary shutdown of bitcoin trading venues due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in bitcoin and result in greater volatility in the prices of bitcoin. To the extent investors view our common stock as linked to the value of our bitcoin holdings, such a negative perception of bitcoin trading venues could have a material adverse effect on the market value of our common stock.

***If regulatory changes or interpretations require the regulation of bitcoins under the Securities Act and Investment Company Act by the SEC, we may be required to register and comply with such regulations. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors. This would likely have a material adverse effect on us and investors may lose their investment.***

Current and future legislation and the SEC rulemaking and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins are treated for classification and clearing purposes. The SEC's July 25, 2017 Report expressed its view that digital assets may be securities depending on the facts and circumstances. As of the date of this Annual Report, the Company is not aware of any rules that have been proposed to regulate bitcoins as securities. We cannot be certain as to how future regulatory

27

Table of Contents

developments will impact the treatment of bitcoins under the law. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in our common stock. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain of our operations. Any such action may adversely affect an investment in our securities.

To the extent that digital assets including bitcoins and other digital assets we own or may own are deemed by the SEC to fall within the definition of a security, we may be required to register and comply with additional regulation under the Investment Act, including additional periodic reporting and disclosure standards and requirements and our registration as an investment company.

Additionally, although we are not engaged in the business of investing, reinvesting, or trading in securities, and we do not hold ourselves out as being engaged in those activities, we could inadvertently be deemed an investment company under the Investment Act. If we inadvertently are deemed an investment company and cannot rely on one of the exclusions under the Investment Act, then we would be required to register with the SEC.

Furthermore, one or more states may conclude bitcoins and other digital assets we own or may own are a security under state securities laws which would require registration under state laws including merit review laws which would adversely impact us since we would likely not comply. As stated earlier in this Annual Report, some states including California define the term "investment contract" more strictly than the SEC.

Such additional registrations, whether from regulatory developments or an inadvertent classification as an investment company, may result in extraordinary, non-recurring expenses for us, thereby materially and adversely impacting an investment in our securities. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease all or certain parts of our operations. Any such action would likely adversely affect an investment in our securities and investors may suffer a complete loss of their investment.

***Our bitcoin holdings could subject us to regulatory scrutiny.***

Several bitcoin investment vehicles have attempted to list their shares on a U.S. national securities exchange to permit them to function in the manner of an ETF with continuous share creation and redemption at NAV. To date, the SEC has declined to approve any such listing, citing concerns over the surveillance of trading in markets for the underlying bitcoin as well as concerns about fraud and manipulation in bitcoin trading markets. Even though we do not function in the manner of an ETF, nor do we offer continuous share creation and redemption at NAV, it is possible that we could nevertheless face regulatory scrutiny from the SEC, as a company with securities traded on Nasdaq.

In addition, as digital assets, including bitcoin, have grown in popularity and market size, there has been increasing focus on the extent to which digital assets can be used to launder the proceeds of illegal activities or fund criminal or terrorist activities, or entities subject to sanctions regimes. While we continue to maintain policies and procedures reasonably designed to promote compliance with applicable anti-money laundering and sanctions laws and regulations and take care to only acquire our bitcoin through entities subject to anti-money laundering regulation and related compliance rules in the United States, if we are found to have purchased any of our bitcoin from bad actors that have used bitcoin to launder money or persons subject to sanctions, we may be subject to regulatory proceedings and further transactions or dealings in bitcoin may be restricted or prohibited.

***If regulatory changes or interpretations of our activities require us to register as a money services business ("MSB") under the regulations promulgated by FinCEN under the authority of the U.S. Bank Secrecy Act, we may be required to register and comply with such regulations. If regulatory changes or interpretations of our activities require the licensing or other registrations as a money transmitter (or equivalent designation) under state law in any state in which we operate, we may be required to seek licensure or otherwise register and comply with such state law. In the event of any such requirement, to the extent we decide to continue, the required registrations, licensure and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease our operations. Any termination of certain of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.***

To the extent that any of our activities cause us to be deemed an MSB, we may be required to comply with FinCEN regulations, including those that would mandate us to implement anti-money laundering programs, make certain reports to FinCEN and maintain certain records.

To the extent that our activities cause us to be deemed a "money transmitter" ("MT") or equivalent designation, under state law in any state in which we operate, we may be required to seek a license or otherwise register with a state regulator and comply with state regulations that may include the implementation of anti-money laundering programs, maintenance of certain records and other operational requirements. Currently, the NYSDFS has finalized its "BitLicense" framework for businesses that conduct "virtual currency business activity," the Conference of State

Table of Contents

Bank Supervisors has proposed a model form of state level "virtual currency" regulation and additional state regulators including those from California, Idaho, Virginia, Kansas, Texas, South Dakota and Washington have made public statements indicating that virtual currency businesses may be required to seek licenses as money transmitters. In July 2016, North Carolina updated the law to define "virtual currency" and the activities that trigger licensure in a business-friendly approach that encourages companies to use virtual currency and blockchain technology. Specifically, the North Carolina law does not require miners or software providers to obtain a license for multi-signature software, smart contract platforms, smart property, colored coins and non-hosted, non-custodial wallets. Starting January 1, 2016, New Hampshire requires anyone who exchanges a digital asset for another currency must become a licensed and bonded money transmitter. In numerous other states, including Connecticut and New Jersey, legislation is being proposed or has been introduced regarding the treatment of bitcoin and other digital assets. We will continue to monitor for developments in such legislation, guidance or regulations.

Such additional federal or state regulatory obligations may cause us to incur extraordinary expenses, possibly affecting an investment our securities in a material and adverse manner. Furthermore, we and our service providers may not be capable of complying with certain federal or state regulatory obligations applicable to MSBs and MTs. If we are deemed to be subject to such obligations, and determine not to comply with such additional regulatory and registration requirements, we may act to dissolve and liquidate. Any such action may adversely affect an investment in our securities or result in a complete loss for our investors.

***Current interpretations require the regulation of bitcoins under the CEA by the CFTC, we may be required to register and comply with such regulations. To the extent that we decide to continue operations, the required registrations and regulatory compliance steps may result in extraordinary, non-recurring expenses to us. We may also decide to cease certain operations. Any disruption of our operations in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.***

Current and future legislation, CFTC and other regulatory developments, including interpretations released by a regulatory authority, may impact the manner in which bitcoins are treated for classification and clearing purposes. In particular, bitcoin derivatives are not excluded from the definition of "commodity future" by the CFTC. We cannot be certain as to how future regulatory developments will impact the treatment of bitcoins under the law.

Bitcoins have been deemed to fall within the definition of a commodity, and we may be required to register and comply with additional regulations under the CEA, including additional periodic reports and disclosure standards and requirements. Moreover, we may be required to register as a commodity pool operator and to register the Company as a commodity pool with the CFTC through the National Futures Association. Such additional registrations may result in extraordinary, non-recurring expenses, thereby materially and adversely impacting an investment in our securities. If we determine not to comply with such additional regulatory and registration requirements, we may seek to cease certain aspects of our operations. Any such action may adversely affect an investment in our securities.

***If federal or state legislatures or agencies initiate or release tax determinations that change the classification of bitcoins as property for tax purposes (in the context of when such bitcoins are held as an investment), such determination could have a negative tax consequence on us or our stockholders.***

Current IRS guidance indicates that digital assets such as bitcoin should be treated and taxed as property, and that transactions involving the payment of bitcoin for goods and services should be treated as barter transactions. While this treatment creates a potential tax reporting requirement for any circumstance where the ownership of a bitcoin passes from one person to another, usually by means of bitcoin transactions (including off-blockchain transactions), it preserves the right to apply capital gains treatment to those transactions which may adversely affect an investment in our securities.

***Our interactions with the bitcoin network may expose us to specially designated nationals ("SDN") or blocked persons or cause us to violate provisions of law that did not contemplate distributed ledger technology.***

The Office of Financial Assets Control ("OFAC") of the U.S. Department of Treasury requires us to comply with its sanction program and not conduct business with persons named on its SDN list. However, because of the pseudonymous nature of blockchain transactions we may inadvertently and without our knowledge engage in transactions with persons named on OFAC's SDN list. Our policy prohibits any transactions with such SDN individuals, and we take all commercially reasonable steps to avoid such transactions, but we may not be adequately capable of determining the ultimate identity of the individual with whom we transact with respect to selling cryptocurrency assets. Moreover, there is a risk that some bad actors will continue to attempt to use cryptocurrencies, including bitcoin, as a potential means of avoiding federally imposed sanctions, such as those imposed in connection with the Russian invasion of Ukraine.

Table of Contents

We are unable to predict the nature or extent of new and proposed legislation and regulation affecting the cryptocurrency industry, or the potential impact of the use of cryptocurrencies by SDN or other blocked or sanctioned persons, which could have material adverse effects on our business and our industry more broadly. Further, we may be subject to investigation, administrative or court proceedings, and civil or criminal monetary fines and penalties as a result of any regulatory enforcement actions, all of which could harm our reputation and affect the value of our common stock.

***Changing environmental regulation and public energy policy may expose our business to new risks.***

Our bitcoin mining operations require a substantial amount of power and can only be successful, and ultimately profitable, if the costs we incur, including for electricity, are lower than the revenue we generate from our operations. As a result, any mine we establish can only be successful if we can obtain sufficient electrical power for that mine on a cost-effective basis, and our establishment of new mines requires us to find locations where that is the case. For instance, our plans and strategic initiatives for expansion are based, in part, on our understanding of current environmental and energy regulations, policies and initiatives enacted by federal and state regulators. If new regulations are imposed, or if existing regulations are modified, the assumptions we made underlying our plans and strategic initiatives may be inaccurate, and we may incur additional costs to adapt our planned business, if we are able to adapt at all, to such regulations.

In addition, there continues to be a lack of consistent climate legislation, which creates economic and regulatory uncertainty for our business because the bitcoin mining industry, with its high energy demand, may become a target for future environmental and energy regulation. New legislation and increased regulation regarding climate change could impose significant costs on us and our suppliers, including costs related to increased energy requirements, capital equipment, environmental monitoring and reporting, and other costs to comply with such regulations. Further, any future climate change regulations could also negatively impact our ability to compete with companies situated in areas not subject to such limitations.

For example, some bitcoin miners operating primarily in the State of Texas have recently received a mandatory survey from the U.S. Energy Information Administration (the "EIA"), seeking extensive information regarding our facilities' use of electricity, and certain information regarding operations. It is possible that mandatory surveys such as this will be used by the EIA to generate negative reports regarding the bitcoin mining industry's use of power and other resources, which could spur additional negative public sentiment and adverse legislative and regulatory action against us or the Bitcoin mining industry as a whole. Surveys and other regulatory actions could increase our cost of operations or otherwise make it more difficult for us to operate are our current locations.

Given the political significance and uncertainty around the impact of climate change and how it should be addressed, we cannot predict how legislation and regulation will affect our financial condition and results of operations. Further, even without such regulation, increased awareness and any adverse publicity in the global marketplace about potential impacts on climate change by us or other companies in our industry could harm our reputation. Any of the foregoing could result in a material adverse effect on our business and financial condition.

***We have commenced doing business overseas, and different countries have differing degrees of political, legal and fiscal stability. This exposes us to a wide range of political developments that could result in changes to contractual terms, laws and regulations. In addition, we, and our joint arrangements and associates, face the risk of litigation and disputes worldwide.***

Developments in politics, laws and regulations can and do affect our operations. Potential impacts include:

- forced divestment of assets;

- expropriation of property;

- cancellation or forced renegotiation of contract rights;

- additional taxes including windfall taxes;

- restrictions on deductions and retroactive tax claims;

- antitrust claims;

- changes to trade compliance regulations;
- price controls;

30

- local content requirements;

- foreign exchange controls;

- changes to environmental regulations;

- changes to regulatory interpretations and enforcement; and

- changes to disclosure requirements.

Any of these, individually or in aggregate, could have a material adverse effect on our earnings, cash flows and financial condition.

From time to time, social and political factors play a role in unprecedented and unanticipated judicial outcomes that could adversely affect our business. Non-compliance with policies and regulations could result in regulatory investigations, litigation and, ultimately, sanctions. Certain governments and regulatory bodies have, in our opinion, exceeded their constitutional authority by:

- attempting unilaterally to amend or cancel existing agreements or arrangements;

- failing to honor existing contractual commitments; and

- seeking to adjudicate disputes between private litigants.

Additionally, certain governments have adopted laws and regulations that could potentially force us to violate other countries' laws and regulations, therefore potentially subjecting us to both criminal and civil sanctions. Such developments and outcomes could have a material adverse effect on our earnings, cash flows and financial condition.

***We are subject to an extensive, highly evolving and uncertain regulatory and business landscape and any adverse changes to, or our failure to comply with, any laws and regulations, and adverse business reactions from counterparties could adversely affect our brand, reputation, business, operating results, and financial condition.***

Our business is subject to:

- extensive laws;

- rules, regulations;

- policies;

- orders;

- determinations;

- directives;

- treaties;

- legal and regulatory interpretations and guidance; and

- counterparty risk in the markets in which we operate.

Counterparty risk in the markets in which we operate includes:

- regulatory aspects from financial services;

- federal energy and other regulators;

- the SEC;

31

Table of Contents

- the CFTC;

- credit, crypto asset custody;

- exchange, and transfer;

- cross-border and domestic money and crypto asset transmission;

- consumer and commercial lending;

- usury;

- foreign currency exchange;

- privacy;

- data governance;

- data protection;

- cybersecurity;

- fraud detection;

- antitrust and competition;

- bankruptcy;

- tax;

- anti-bribery;

- economic and trade sanctions;

- anti-money laundering, and counter-terrorist financing;

- the same regulatory risks applicable to counterparties which are most notably hosting businesses; and

- the recent economic issues and bankruptcies befalling some in this industry.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the crypto economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the crypto economy requires us to exercise our judgment as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect our business, operating results, and financial condition.

Additionally, various governmental and regulatory bodies, including legislative and executive bodies, in the United States and in other countries may adopt new laws and regulations, the direction and timing of which may be influenced by changes in the governing administrations and major events in the crypto economy. For example, following the failure of several prominent crypto trading venues and lending platforms, such as FTX, Celsius Networks, Voyager and Three Arrows Capital in 2022 (even though these do not directly affect our business), the

U.S. Congress expressed the need for both greater federal oversight of the crypto economy and comprehensive cryptocurrency legislation. In the near future, various governmental and regulatory bodies, including in the United States, may introduce new policies, laws, and regulations relating to crypto assets, the crypto economy, and crypto asset platforms. The failures of risk management and other control functions at other companies that played a role in these events could accelerate an existing regulatory trend toward stricter oversight of crypto asset platforms and the crypto economy.

Due to our business activities, we may be subject to ongoing examinations, oversight, and reviews and currently are, and expect to be, subject to investigations and inquiries, by U.S. federal and state regulators, many of which have broad discretion to audit and examine our business. Moreover, new laws, regulations, or interpretations may result in additional litigation, regulatory investigations, and enforcement or other actions, including preventing or delaying it from offering certain products or services offered by our competitors or could impact how we offer such products and services. Adverse changes to, or our failure to comply with, any laws and regulations have had, and may continue to have, an adverse effect on our reputation, brand, business, operating results, and financial condition.

### Risks Relating to Our Common Stock

***Our stock price is volatile.***

The market price of our common stock is likely to be highly volatile and could fluctuate widely in price in response to various factors, many of which are beyond our control, including the following:

- changes in our industry including changes which adversely affect bitcoin and other digital assets;

- changes in bitcoin pricing;

- competitive pricing pressures;

- our ability to obtain working capital financing;

- additions or departures of key personnel;

- sales of our common stock;

- our ability to execute our business plan;

- operating results that fall below expectations;

- loss of any strategic relationship;

- regulatory developments; and

- economic and other external factors.

In addition, the securities markets have from time to time experienced significant price and volume fluctuations that are unrelated to the operating performance of particular companies. These market fluctuations may also materially and adversely affect the market price of our common stock.

***Exercise or conversion of warrants and other convertible securities, along with new issuances of our common stock, will dilute our stockholder's percentage of ownership.***

We have issued convertible securities, options and warrants to purchase shares of our common stock to our officers, directors, consultants and certain stockholders. In the future, we may grant additional options, warrants and convertible securities. The exercise, conversion or exchange of options, warrants or convertible securities, including for other securities, will dilute the percentage ownership of our stockholders. The dilutive effect of the exercise or conversion of these securities may adversely affect our ability to obtain additional capital. The holders of these securities may be expected to exercise or convert such options, warrants and convertible securities at a time when it would be able to obtain additional equity capital on terms more favorable than such securities or when our common stock is trading at a price higher than the exercise or conversion price of the securities. The exercise or conversion of outstanding warrants, options and convertible securities will have a dilutive effect on the securities held by our

Table of Contents

stockholders. We have in the past, and may in the future, exchange outstanding securities for other securities on terms that are dilutive to the securities held by other stockholders not participating in such exchange.

Additionally, our stockholders have experienced dilution through the issuance of our common stock under the 2022 ATM and the 2023 ATM, and in the event we sell any shares of our common stock under the 2024 ATM, our stockholders will continue to experience dilution.

***Because there has been limited precedent set for financial accounting of bitcoin and other cryptocurrency assets, the determination that we have made for how to account for cryptocurrency assets transactions may be subject to change.***

Because there has been limited precedent set for the financial accounting of cryptocurrencies and related revenue recognition, it is unclear how companies may in the future be required to account for cryptocurrency transactions and assets and related revenue recognition. A change in regulatory or financial accounting standards could result in the necessity to change our accounting methods and restate our financial statements. Such a restatement could adversely affect the accounting for our newly mined cryptocurrency rewards and more generally negatively impact our business, prospects, financial condition and results of operations. Such circumstances would have a material adverse effect on our ability to continue as a going concern or to pursue our new strategy at all, which would have a material adverse effect on our business, prospects or operations as well as and potentially the value of any cryptocurrencies we hold or expect to acquire for our own account and harm our investors.

***We have never paid nor do we expect in the near future to pay cash dividends.***

We have never paid cash dividends on our capital stock and do not anticipate paying any cash dividends on our common stock for the foreseeable future. While it is possible that we may declare a dividend after a large settlement, investors should not rely on such a possibility, nor should they rely on an investment in our securities if they require income generated from dividends paid on our capital stock. Any income derived from our common stock would only come from rise in the market price of our common stock, which is uncertain and unpredictable.

***Offers or availability for sale of a substantial number of shares of our common stock may cause the price of our common stock to decline.***

If our stockholders sell substantial amounts of our common stock in the public market upon the expiration of any statutory holding period or lockup agreements, under Rule 144, or issued upon the exercise of outstanding warrants or other convertible securities, it could create a circumstance commonly referred to as an "overhang" and in anticipation of which the market price of our common stock could fall. The existence of an overhang, whether or not sales have occurred or are occurring, also could make more difficult our ability to raise additional financing through the sale of equity or equity-related securities in the future at a time and price that it deems reasonable or appropriate. The shares of our restricted common stock will be freely tradable upon the earlier of:

(i) effectiveness of a registration statement covering such shares; and

(ii) the date on which such shares may be sold without registration pursuant to Rule 144 (or other applicable exemption) under the Securities Act of 1933.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

We received Staff comments during the year ended December 31, 2022, many of which we have worked with the Staff to address in 2023, but which remain unresolved. In addition, we have received certain Staff comments during the year ended December 31, 2023 and the year ending December 31, 2024, some of which are related to certain restated items in this Annual Report.

- **Revenue Recognition.** The Staff commented on our revenue recognition policy in our capacity as a pool operator and in our capacity as a pool participant, with specific attention to our previous net recognition of revenue as an operator of a pool. We have restated our financial results in response to the comment, and revised our revenue to include gross revenue earned as pool operator with any amounts remitted to third party pool participants as cost of revenue. The Staff further commented on our accounting convention to recognize our noncash (bitcoin) revenue using fair value that is not at contract inception. We evaluated the difference between our current accounting policy and fair value at contract inception and determined that any differences in revenue are not material for all periods stated.

- **Impairment of Bitcoin.** The Staff objected to our calculation of impairment of bitcoin using a daily closing price. We have, in our restated financial results, revised our calculation to calculate impairment of bitcoin using the intraday low price of bitcoin.

Table of Contents

- **Accounting for Investment Fund.** The Staff commented on whether we should have consolidated the NYDIG Fund, an investment fund in which we were the sole limited partner and, if so, whether our accounting for the income and expenses of the investment fund were appropriately classified within our Statements of Comprehensive Income (Loss). We agreed to consolidate the NYDIG Fund and updated our classification of income and expenses of the investment fund within the Statements of Comprehensive Income (Loss) as part of our restated financial results.

- **Statements of Comprehensive Income (Loss) Presentation.** The Staff commented on the classification and inclusion of certain items in loss from operation versus in other income (expense). These items include realized gain (loss) on sales of digital assets, interest income, impairment on digital assets and patents, and gain on sale of equipment. We have revised our presentation prospectively and in the restated financial results.

- **Embedded Leases in Hosting and Power Arrangements.** The Staff requested we disclose a comprehensive analysis assessing whether each of our server hosting arrangements contains embedded leases. We provided such analysis in the Notes to our Consolidated Financial Statements.

- **Investments.** The Staff requested fulsome analysis of our accounting for various Simple Agreements on Future Equity and our investment in equity of certain investees. We have provided such analysis and have included impacts of any change in accounting for such investments in the restated financial results.

- **Risk Factors.** The Staff has requested further disclosure on material risks due to regulations, ability to obtain financing, reputational harm, and depreciation of digital assets prices. We considered such risks and updated our disclosures accordingly.

- **Bitcoin as Collateral.** The Staff has raised several comments regarding our accounting for bitcoin used as collateral within our lending arrangements. We continue to cooperate with and respond to the Staff's comments based on our application of U.S. GAAP, and we have not changed our classification of such bitcoin used as collateral as digital assets, restricted.

## ITEM 1C. CYBERSECURITY

### Information Security Program

The mission of our information security organization is to design, implement, and maintain an information security program that protects our systems, services, and data against unauthorized access, disclosure, modification, damage, and loss. The information security organization is comprised of internal and external security and technology professionals. We continue to make investments in information security resources to mature, expand, and adapt our capabilities to address emerging cybersecurity risks and threats. The information security organization is overseen by the Information Security Advisory Team, further detailed under the caption "Cybersecurity Governance" below.

**Cybersecurity Risk Management and Strategy**

Cybersecurity risk management is one component of our information security program that guides continuous improvement to, and evaluates the confidentiality, integrity, and availability of our critical systems, data, and operations.

Our approach to controls and risk management is based on guidance from the National Institute of Standards and Technology ("NIST") and the CryptoCurrency Security Standard ("CCSS"). This does not mean that we meet any particular technical standards, specifications, or requirements, but rather that we use the NIST and CCSS as a guide to help us identify, assess, and manage cybersecurity controls and risks relevant to our business.

Our cybersecurity risk management program includes:

- Identifying cybersecurity risks that could impact our facilities, third-party vendors/partners, operations, critical systems, information, and broader enterprise IT environment. Risks are informed by threat intelligence, current and historical adversarial activity, and industry specify threats;

- Performing a cybersecurity risk assessment to evaluate our readiness if the risks were to materialize; and

- Ensuring risk is addressed and tracking any necessary remediation through an action plan.

While we face a number of ongoing cybersecurity risks in connection with our business, such risks have not materially affected us to date, including our business strategy, results of operations, or financial condition.

**Cybersecurity Governance**

Our Board considers cybersecurity risk as part of its risk oversight function and has delegated the oversight of cybersecurity and other information technology risks to the Board's Audit Committee. As part of this oversight, we created the Information Security Advisory Team (the "Task Force"). The Task Force is comprised of senior managers and executives from multiple departments within the Company, including the IT, finance, legal and operations departments. The Task Force oversees our information security program and our strategy, including management's implementation of cybersecurity risk management.

The Task Force meets at least quarterly to discuss matters involving cybersecurity risks.

The Task Force ultimately provides information to our Audit Committee regarding its activities, including those related to cybersecurity risks. The Audit Committee also receives a briefing and continuing education from a member of the Task Force relating to our cyber risk management program at least annually. The Task Force is responsible for notifying the Audit Committee of material cybersecurity incidents.

**ITEM 2. PROPERTIES**

Our corporate headquarters are located in Fort Lauderdale, Florida, where we lease office space. As of December 31, 2023, we leased additional office space at locations throughout the United States.

We also lease facilities throughout the United States to support our bitcoin mining operations and have recently entered into definitive agreements to acquire two currently operational bitcoin mining sites in Granbury, Texas and Kearney, Nebraska. The following table provides details regarding our most significant properties as of December 31, 2023, all of which are leased:

| Site Location | Mega-watts | Energized Exahash | Lease Expiration |
|---|---|---|---|
| McCamey, Texas | 216 | 7.7 | August 2027 |
| Garden City, Texas | 100 | 4.5 | July 2027 |
| Ellendale, North Dakota | 180 | 7.8 | July 2027 |
| Jamestown, North Dakota | 40 | 1.4 | December 2027 |

**ITEM 3. LEGAL PROCEEDINGS**

**Compute North Bankruptcy**

On September 22, 2022, Compute North Holdings, Inc. (currently doing business as Mining Project Wind Down Holdings, Inc.) and certain of its affiliates (collectively, "Compute North") filed for Chapter 11 bankruptcy protection with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). Compute North provided operating services to us and hosted our mining rigs at multiple facilities. We delivered miners to Compute North, which then installed the mining rigs at those facilities, operated and maintained the mining rigs, and provided energy to keep the miners operating. During the course of the Chapter 11 cases, Compute North sold substantially all of its assets in a series of 363 sale transactions, including Compute North's ownership interests in non-debtor entities that own or partially-own facilities that house our miners.

On November 23, 2022, we and certain of our affiliates timely filed proofs of claim asserting various claims against Compute North, including:

(i)    claims arising under hosting agreements between us and Compute North LLC;

(ii)   claims arising under that certain Senior Promissory Note, dated as of July 1, 2022, by and between us, as Lender, and Compute North LLC, as Borrower;

(iii)  claims arising from the breach of a letter of intent between us and Compute North LLC; and

(iv)   claims for daily lost revenue, profits and other damages against Compute North.

Table of Contents

On February 9, 2023, the Bankruptcy Court approved a settlement stipulation between us and Compute North, pursuant to which the proofs of claim filed by us and certain of its affiliates were resolved, and we received a single allowed unsecured claim against Compute North LLC in the amount of $40.0 million and its preferred equity interests in Compute North in the amount of 39,597 shares of Series C Preferred Stock was confirmed. In exchange, we agreed to vote in favor of Compute North's Chapter 11 plan.

On February 16, 2023, the Bankruptcy Court confirmed Compute North's Chapter 11 plan (the "Plan"), pursuant to which Compute North will liquidate its remaining assets and distribute proceeds arising therefrom in accordance with the waterfall provision set forth in the Plan. In a disclosure statement filed on December 19, 2022, Compute North projected that holders of allowed general unsecured claims could recover anywhere between 8% to 65% on their claims, while holders of preferred equity interests are expected to recover nothing on their interests. The Plan became effective March 31, 2023. At this time, we cannot predict the quantum of its potential recovery on account of its allowed general unsecured claim and preferred equity interests or the timing of when it would receive any distributions under the Plan on account of its claims and interests.

**Derivative Complaints**

On February 18, 2022, a shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of our board of directors (the "Board") and senior management. The complaint is based on allegations substantially similar to the allegations in the December 2021 putative class action complaint, related to our disclosure of an SEC investigation we previously made on November 15, 2021. On March 4, 2022, we were served the complaint. On April 4, 2022, the defendants moved to dismiss the complaint.

On May 5, 2022, a second shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of our Board and senior management. The second shareholder derivative complaint is based on allegations substantially similar to the allegations in the February 18, 2022 derivative complaint. On May 11, 2022, the defendants moved to dismiss the second shareholder derivative complaint.

On June 1, 2022, the Court entered an order consolidating the two derivative actions. A June 13, 2022, scheduling order provided for plaintiffs to file a consolidated complaint and for renewed motions to dismiss the consolidated shareholder derivative complaint. On November 22, 2022, before a consolidated complaint was due, plaintiffs voluntarily dismissed both actions without prejudice. On November 23, 2022, both actions were closed.

On June 22, 2023, a shareholder derivative complaint was filed in the Circuit Court of the 17th Judicial Circuit for Broward County, Florida, against current members of our Board and senior management, alleging claims for breach of fiduciary duty and unjust enrichment based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.

On July 8, 2023, a second shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of our Board and senior management, alleging claims under Sections 14(a), 10(b), and 21D of the Exchange Act, and for breach of fiduciary duty, unjust enrichment, and waste of corporate assets, based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.
On July 12, 2023, a third shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of our Board and senior management, alleging claims under Section 14(a) of the Exchange Act and for breach of fiduciary duty, based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.
On July 13, 2023, a fourth shareholder derivative complaint was filed in the Circuit Court of the 17th Judicial Circuit for Broward County, Florida, against current members of our Board and senior management, alleging claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets, based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.
On August 14, 2023, the two derivative actions pending in the United States District Court for the District of Nevada were consolidated (the "Nevada Derivative Action"). On October 10, 2023, the parties to the derivative actions pending in the Circuit Court of the 17th Judicial Circuit for Broward County, Florida filed an agreed order to stay both actions pending completion of the Nevada Derivative Action.

**Putative Class Action Complaint**

Table of Contents

On March 30, 2023, a putative class action complaint was filed in the United States District Court for the District of Nevada, against us and present and former senior management, alleging claims under Section 10(b) and 20(a) of the Exchange Act arising out of our announcement of accounting restatements on February 28, 2023. The defendants' time to respond has been extended until after the appointment of a lead plaintiff.

**Information Subpoena**

On October 6, 2020, we entered into a series of agreements with multiple parties to design and build a data center for up to 100-megawatts in Hardin, Montana. In conjunction therewith, we filed a Current Report on Form 8-K on October 13, 2020, which discloses that, pursuant to a Data Facility Services Agreement, we issued 6,000,000 shares of restricted common stock, in transactions exempt from registration under Section 4(a)(2) of the Securities Act. During the quarter ended September 30, 2021, we, and certain of our executives, received a subpoena to produce documents and communications concerning the Hardin, Montana data center facility described in our Current Report on Form 8-K dated October 13, 2020. We understand that the SEC may be investigating whether or not there may have been any violations of the federal securities law. We are cooperating with the SEC.

**Ho v. Marathon**

On January 14, 2021, Plaintiff Michael Ho ("Plaintiff" or "Ho") filed a Civil Complaint for Damages and Restitution (the "Complaint") against us and ten Doe Defendants. The Complaint alleges six causes of action against us:

1) Breach of Written Contract;

2) Breach of Implied Contract;

3) Quasi-Contract;

4) Services Rendered;

5) Intentional Interference with Prospective Economic Relations; and

6) Negligent Interference with Prospective Economic Relations, which is the one plead against "all Defendants" and is most likely to involve later named defendants.

The claims arise from the same set of facts where Ho alleges that we profited from commercially sensitive information he shared with us and then we refused to compensate him for his role in securing the acquisition of a supplier of energy for us. On February 22, 2021, we responded to the Complaint with a general denial and the assertion of applicable affirmative defenses. Then, on February 25, 2021, we removed the action to the United States District Court in the Central District of California, where the action remains pending. We filed a motion for summary judgment/adjudication of all causes of action. On February 11, 2022, the Court granted the motion and dismissed Ho's 2nd, 5th and 6th causes of action. Discovery is substantially closed. The Court held a pre-trial conference on February 24, 2022, where it vacated the March 3, 2022 trial date and ordered the parties to meet and confer on a new trial date. The Court discussed the various theories of damages maintained by the parties. In its ruling on the summary judgment motion and at the pre-trial conference on February 24, 2022, the Court noted that a jury is more likely to accept $0.2 million as an appropriate damages amount if liability is found, as opposed to the various theories espoused by Ho that result in multi-million-dollar recoveries. Due to outstanding issues of fact and law, it is impossible to predict the outcome at this time; however, after consulting legal counsel, we are confident that we will prevail in this litigation, since we did not have a contract with Mr. Ho, and he did not disclose any commercially sensitive information under any mutual nondisclosure agreement that was used to structure any joint venture with energy providers. The trial is likely to commence on or around April 8, 2024.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is currently listed on Nasdaq under the symbol "MARA."

**Holders**

As of December 31, 2023, there were 49 holders of record of 242,829,391 shares of our common stock.

**Dividends**

We have never paid cash dividends on our capital stock and have no current plans to do so in the foreseeable future.

**Issuer Repurchases of Equity Securities**

None.

**ITEM 6. [RESERVED]**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis is intended as a review of significant factors affecting the Company's financial condition and results of operations for the periods indicated. The discussion should be read in conjunction with Marathon's Consolidated Financial Statements and the notes presented herein. In addition to historical information, the following Management's Discussion and Analysis of Financial Condition and Results of Operations contains forward-looking statements that involve risks and uncertainties. The Company's actual results could differ significantly from those expressed, implied, or anticipated in these forward-looking statements as a result of certain factors discussed herein and any other periodic reports filed and to be filed with the SEC.*

**BUSINESS OVERVIEW**

Marathon Digital Holdings, Inc. is one of the world's largest publicly traded bitcoin mining companies with operations in North America, the Middle East, and Latin America. The Company's core business is utility-scale Bitcoin mining, which produces or "mines" bitcoin using one of the industry's largest and most energy-efficient fleets of specialized computers. The Company is also committed to carbon neutrality and growing operations through predominately renewable energy sources. As of December 31, 2023, the Company had approximately 210,000 energized and operational mining rigs, capable of producing 24.7 exahashes per second with an efficiency of 25 joules per terahash. The Company believes it has one of the most efficient bitcoin mining fleets in the industry. As of December 31, 2023, sustainable energy sources accounted for 55% of the fleet's power usage.

Historically, the Company has grown quickly to become one of the world's largest publicly traded bitcoin mining companies. The Company achieved this milestone through an asset-light strategy, which involved deploying its bitcoin miners at third-party hosted sites. This approach saved the Company significant amounts of capital that would have otherwise been invested in data center infrastructure and allowed it to allocate more capital into revenue-generating assets, like Bitcoin miners. The Company has shifted its strategy from an asset-light business model to a diversified and resilient portfolio approach to bitcoin mining operations. This approach involves managing a strategic mix of third-party hosted sites and self-owned and operated sites, which the Company believes can help the business weather market downturns by optimizing its cost structure. In January 2024, the Company acquired two data centers totaling 390 megawatts. Following this acquisition, the Company's operations are moving towards being more evenly split between third-party hosted and self-owned and operated sites.

In 2023, the Company launched a joint venture in Abu Dhabi, United Arab Emirates, that operates two sites with a total capacity of 250 megawatts, of which the Company owns 20%. The Company believes that these sites operate in one of the world's most challenging environments, with summertime temperatures of approximately 115 degrees Fahrenheit and 98% humidity. The Company believes its state-of-the-art immersion technology deployed at these sites has resulted in the bitcoin mining rigs operating with minimal human intervention and need for repairs. The Company also has a 20 megawatts joint venture project in Paraguay that is currently underway. The Company intends to continue its international expansion efforts into 2024.

To support this shift in strategy and to capitalize on opportunities for international expansion and industry consolidation, the Company strengthened its liquidity position – a priority that will continue in 2024. The Company's combined cash and cash equivalents and bitcoin reserve totaled nearly $1.0 billion as of December 31, 2023. Refer to the "Liquidity and Capital Resources" section, for further information.

The Company also expects to deploy several technological innovations developed by its technology team and partners. These innovations include new immersion-cooling systems, hardware, and software solutions that are designed to optimize mining rig performance and the reliability of its operations. Moreover, the Company is exploring novel sources of underutilized or wasted energy sources, which may reduce bitcoin production costs.

**RECENT DEVELOPMENTS**

The Company has continued its recent focus on expanding its operational capabilities globally. Recent efforts include the following:

- On January 12, 2024, the Company, through its wholly owned subsidiary MARA USA Corporation, completed the acquisition of 100% of the issued and outstanding equity interests (the "Transaction") of GC Data Center Equity Holdings, LLC, pursuant to which, the Company acquired two operational bitcoin mining sites, for an aggregate 390 megawatts of operational capacity for $179.0 million cash consideration plus customary working capital adjustments. The Company hopes to realize synergies from this transaction through the integration of its technology stack, which the Company expects will improve efficiencies and scale its operating capacity.

- In November 2023, Marathon launched a joint venture in Paraguay with 1,170 miners energized. The operations at this facility are powered entirely by hydroelectricity. The Company expects 1.1 exahashes at this facility to be online during the quarter ending June 30, 2024.

- The Company completed the installation and energization of approximately 28,000 S19 XPs to commence operations at a Garden City, Texas site during the quarter ended December 31, 2023.

In addition to its focus on scaling its operational capacity, the Company has improved its liquidity position and balance sheet during and subsequent to the year ended December 31, 2023.

- On October 24, 2023, the Company commenced the 2023 ATM with Wainwright, acting as sales agent, under which it may offer and sell shares of its common stock from time to time through the sales agent having an aggregate offering price of up to $750.0 million. As of December 31, 2023, the Company had sold 19,591,561 shares under this program for an aggregate purchase price of $248.1 million, net of commissions and expenses. Subsequent to December 31, 2023, we sold additional shares of common stock under the 2023 ATM such that the aggregate offering price of shares sold under the 2023 ATM is approximately $750.0 million. In February 2024, Marathon intends to commence a new at-the-market offering program with Wainwright acting as sales agent pursuant to the ATM Agreement, under which the Company may offer and sell shares of its common stock from time to time through Wainwright having an aggregate offering price of up to $1.5 billion.

- Bitcoin prices rebounded significantly during the year ended December 31, 2023, following the volatility and decrease in value in 2022. The price of a bitcoin increased from $16,458 per bitcoin as of December 31, 2022 to $42,288 per bitcoin as of December 31, 2023, and increase of 157.0% benefiting the value of the Company's bitcoin holdings as of December 31, 2023, compared to the prior year period. From time to time, the Company sells bitcoin to offset its monthly cash operating costs. During the year ended December 31, 2023, the Company sold 9,482 bitcoin for total proceeds of $264.9 million. There were no comparable sales in the prior period.

Effective January 1, 2023, the Company early adopted ASU No. 2023-08, Intangibles - Goodwill and Other - Crypto Assets (Topic 350-60): Accounting for and Disclosure of Crypto Assets (ASU 2023-08), which requires entities to measure crypto assets at fair value (the "fair value model") with changes recognized in income each reporting period. During the year ended December 31, 2023, the Company recognized a gain on digital assets of $331.5 million under the new fair value model. Refer to Note 4 - Digital Assets, for further information.

**TRENDS AND UNCERTAINTIES IMPACTING OUR BUSINESS AND INDUSTRY**

**Bitcoin Value**

Our revenues are generally comprised of block rewards earned in bitcoin as a result of successfully solving blocks, and transaction fees earned for verifying transactions in support of the blockchain. Currently the reward for each solved block is equal to 6.25 bitcoin plus transaction fees. However, Marathon expects the block rewards to halve again to 3.125 bitcoin around April 2024, which could have a negative impact on the Company's revenues as the reward for each block solved is reduced. Further, the impacts of halving on the Company's results of operations and financial condition may be exacerbated by changes in the market value of bitcoin, which has historically been subject to significant volatility. For example, as of December 31, 2023, the price of a bitcoin was $42,288, compared to $16,458 as of December 31, 2022. The Company held approximately 15,126 bitcoin on its Consolidated Balance Sheets with a carrying value of $639.7 million as of December 31, 2023, which value may be materially impacted as the market value of bitcoin fluctuates. In addition, as a result of the relatively lower market value of bitcoin in 2022, several companies operating within the Bitcoin ecosystem initiated bankruptcy proceedings, while others sought to consolidate their operations or seek debt financing to provide adequate capital to continue as a going concern. The various Bitcoin company-related bankruptcies and restructurings, coupled with general market sentiment caused in large part by the FTX collapse, led to a material decline in the fair value of the Company's mining rigs and deposits for future mining rig purchases. As the market has settled the Company has invested in and deployed its efficient bitcoin mining fleet domestically and internationally through strategic ventures. Management believes, given the Company's recent investments, coupled with its relative position and liquidity, the Company is well-positioned to continue capturing market share and executing its long-term growth strategy.

**Mining Rig Capacity, Efficiency, and Hash Rate**

The number of mining rigs Marathon deploys and the efficiency of such rigs directly impacts the number of bitcoin the Company is able to mine.Generally, the greater the share a single mining rig can capture of the blockchain's total network hash rate, or the aggregate hash rate deployed to solving a block on the Bitcoin blockchain, the greater the rig's chances of solving a block and therefore earning the reward. In response to an increased demand for

bitcoin, the Company anticipates additional mining operators entering the market and existing competitors scaling their operations, which will grow the blockchain's network hash rate and difficulty associated with solving a block. As the overall hash rate and difficulty of the Bitcoin network increases, the Company will need to continue growing its hash rate to retain its market share and remain competitive. During 2023, the Company mined 12,852 bitcoin, an increase of 8,708 bitcoin, or 210.1%, over the prior year, and as of December 31, 2023, it operated approximately 210,000 mining rigs globally, with installed and energized hash rate of approximately 25.2 and 24.7 exahashes per second, respectively. To stay competitive, the Company remains focused on strategically deploying additional mining rigs and scaling its operations, while managing its fleet as it ages along the obsolescence curve. In addition, Marathon continuously evaluates strategic opportunities to support its growth strategy, and seeks to enhance operational efficiencies by utilizing efficient mining rigs and securing contracts with price protection clauses.

**NON-GAAP FINANCIAL MEASURES**

In addition to the Company's results determined in accordance with GAAP, throughout this Annual Report the Company provides adjusted EBITDA and total margin excluding depreciation and amortization, which are non-GAAP financial measures. The Company provides investors with reconciliations from net loss to adjusted EBITDA and total margin to total margin excluding depreciation and amortization as components of Management's Discussion and Analysis. The Company defines adjusted EBITDA as (a) GAAP net income (loss) plus (b) adjustments to add back the impacts of (1) depreciation and amortization, (2) interest expense, (3) income tax expense (benefit) and (4) adjustments for non-cash and non-recurring items which currently include (i) stock compensation expense, (ii) impairments of patents and (iii) gains and losses on extinguishment of debt. The Company defines total margin excluding depreciation and amortization as (a) GAAP total margin less (b) depreciation and amortization.

The Company provides non-GAAP financial measures to provide information that may assist investors in understanding the results of operations and assessing the prospect of future performance. However, adjusted EBITDA and total margin excluding depreciation and amortization, as we present such information, may not necessarily be comparable to similarly titled measures presented by other companies. Non-GAAP financial measures are not intended to represent, and should not be considered to be more meaningful measures than, or alternatives to, measures of financial or operating performance prepared in accordance with GAAP. These non-GAAP measures are not meant to be considered in isolation and should be read only in conjunction with the Company's Quarterly Reports on Form 10-Q and its Annual Reports on Form 10-K as filed with the SEC. Management uses adjusted EBITDA, total margin excluding depreciation and amortization, and the supplemental information provided herein as a means of understanding, managing, and evaluating business performance and to help inform operating decision making. The Company relies primarily on its Consolidated Financial Statements to understand, manage, and evaluate its financial performance and use the non-GAAP financial measures only supplementally.

**RESULTS OF OPERATIONS**

**Year ended December 31, 2023 compared to December 31, 2022**

| *(dollars in thousands)* | Years ended December 31, | | | | | Favorable (Unfavorable) | |
|---|---|---|---|---|---|---|---|
| | | 2023 | | 2022 | | | |
| **Total revenues** | $ | 387,508 | $ | 117,753 | $ | 269,755 | |
| | | | | | | | |
| **Costs and expenses** | | | | | | | |
| **Cost of revenues** | | | | | | | |
| Cost of revenues - energy, hosting and other | | (223,338) | | (72,715) | | (150,623) | |
| Cost of revenues - depreciation and amortization | | (179,513) | | (78,709) | | (100,804) | |
| Total cost of revenues | | (402,851) | | (151,424) | | (251,427) | |
| **Operating expenses** | | | | | | | |
| General and administrative expenses | | (95,230) | | (56,739) | | (38,491) | |
| Gains (losses) on digital assets and digital assets loan receivable | | 331,484 | | (14,460) | | 345,944 | |
| Legal reserves | | — | | (26,131) | | 26,131 | |
| Impairment of deposits due to vendor bankruptcy filing | | — | | (24,661) | | 24,661 | |
| Impairment of digital assets | | — | | (182,891) | | 182,891 | |
| Impairment of patents | | — | | (919) | | 919 | |
| Impairment of mining equipment and advances to vendors | | — | | (332,933) | | 332,933 | |
| Gain on sale of equipment, net of disposals | | — | | 83,879 | | (83,879) | |
| Gains (losses) on digital assets held within investment fund | | — | | (85,017) | | 85,017 | |
| Total operating expenses | | 236,254 | | (639,872) | | 876,126 | |
| **Operating income (loss)** | | 220,911 | | (673,543) | | 894,454 | |
| Net gain from extinguishment of debt | | 82,267 | | — | | 82,267 | |
| Loss on hedge instruments | | (17,421) | | — | | (17,421) | |
| Equity in net earnings of unconsolidated affiliate | | (617) | | — | | (617) | |
| Impairment of loan and investment due to vendor bankruptcy filing | | — | | (31,013) | | 31,013 | |
| Interest expense | | (10,350) | | (14,981) | | 4,631 | |
| Other non-operating income | | 2,809 | | 1,283 | | 1,526 | |
| **Income (loss) before income taxes** | | 277,599 | | (718,254) | | 995,853 | |
| Income tax benefit (expense) | | (16,426) | | 24,232 | | (40,658) | |
| **Net income (loss)** | $ | 261,173 | $ | (694,022) | $ | 955,195 | |
| | | | | | | | |
| **Supplemental information:** | | | | | | | |
| bitcoin ("BTC") production during the period, in whole BTC [1] | | 12,852 | | 4,144 | | 8,708 | |
| Average bitcoin per day, in whole BTC | | 35.2 | | 11.4 | | 23.8 | |
| Total margin (total revenues less total cost of revenues) | $ | (15,343) | $ | (33,671) | $ | 18,328 | |
| Total margin excluding the impact of depreciation and amortization | $ | 164,170 | $ | 45,038 | $ | 119,132 | |
| General and administrative expenses excluding stock-based compensation | $ | (62,586) | $ | (32,144) | $ | (30,442) | |
| Total impairments due to vendor bankruptcy filing | $ | — | $ | (55,674) | $ | 55,674 | |
| Installed Hash Rate (Exahashes per second) - at end of period [2] | | 25.2 | | 7.0 | | 18.2 | |
| Energized Hash Rate (Exahashes per second) - at end of period [2] | | 24.7 | | 7.0 | | 17.7 | |
| Average operational Hash Rate (Exahashes per second) [3] | | 19.4 | | N/A | | N/A | |
| Share of available miner rewards | | 3.6 % | | 1.2 % | | 2.4 % | |
| Number of blocks won | | 1,725 | | 621 | | 1,104 | |
| Transaction fees as a percentage of total | | 7.7 % | | 1.3 % | | 6.4 % | |

| Reconciliation to Adjusted EBITDA: | | | | | | |
|---|---|---|---|---|---|---|
| Net income (loss) | $ | 261,173 | $ | (694,022) | $ | 955,195 |
| Exclude: Interest expense | | 10,350 | | 14,981 | | (4,631) |
| Exclude: Income tax expense (benefit) | | 16,426 | | (24,232) | | 40,658 |
| EBIT | | 287,949 | | (703,273) | | 991,222 |
| Exclude: Depreciation and amortization [4] | | 181,590 | | 78,709 | | 102,881 |
| EBITDA | | 469,539 | | (624,564) | | 1,094,103 |
| Exclude: Stock compensation expense | | 32,644 | | 24,595 | | 8,049 |
| Exclude: Net gain from extinguishment of debt | | (82,267) | | — | | (82,267) |
| Exclude: Total impairments due to vendor bankruptcy filing | | — | | 55,674 | | (55,674) |
| Exclude: Impairment of patents | | — | | 919 | | (919) |
| Adjusted EBITDA | $ | 419,916 | $ | (543,376) | $ | 963,292 |

[1] Includes 112 bitcoin representing the Company's share of the equity method investee for the year ended December 31, 2023.

[2] The Company defines Energized Hash Rate as the total hash rate that could be generated if all installed and energized machines were running at 100% of manufacturers specifications. The Company uses this metric only as an indicator of progress in bringing mining rigs online. The Company defines Installed Hash Rate as the total hash rate that could be generated if all installed machines were running at 100% of manufacturers specifications. The Company uses this metric only as an indicator of progress in deploying mining rigs at its production sites. The Company believes that these metrics are useful as an indicator of potential bitcoin production. However, these metrics cannot be tied directly to any production level expected to be actually achieved as (a) there may be delays in the energization of Installed Hash Rate (b) the Company cannot predict when installed and energized mining rigs may be offline for any reason, including curtailment or machine failure and (c) the Company cannot predict Global Hash Rate (and therefore the Company's share of the Global Hash Rate), which has a significant impact on the Company's ability to generate bitcoin in any given period.

[3] Defined as the daily Average Operational Hash Rate online during the period. Data not available for prior periods.

[4] Includes approximately $2.1 million of depreciation and amortization as the Company's share in the results of its equity method investee reported in Equity in net earnings of unconsolidated affiliate for the year ended December 31, 2023.

**Revenues**: The Company generated revenues of $387.5 million for the year ended December 31, 2023, compared to $117.8 million in the prior year period. The $269.8 million, or approximately 229.1% increase in revenues was primarily driven by an increase in bitcoin production year-over-year of $244.3 million and a $25.5 million increase from primarily higher bitcoin prices in the current year period, as the average price of bitcoin mined was 6.1% higher than the average price of bitcoin mined in the prior year period. Average daily bitcoin production was 35.2 bitcoin in the current year period compared with 11.4 in the prior year period, reflecting the increased scale of the Company's operations.

**Cost of revenues – energy, hosting and other** during the year ended December 31, 2023, totaled $223.3 million compared to $72.7 million in the prior year period. The $150.6 million, or approximately 207.1% increase was primarily driven by the growth in the Company's hash rate as a result of the deployment and energization of mining rigs in existing and new hosting facilities, which increased hosting and energy costs, as well as improvements in uptime of our mining rigs compared to the significant delays in the energization of our mining rigs the Company experienced in the prior year period. Offsetting the increase in cost of revenue - energy, hosting and other in the current year was the absence of accelerated costs associated with the closure of the Hardin, Montana facility in the prior year period of $18.2 million.

**Cost of revenues – depreciation and amortization** during the year ended December 31, 2023 totaled $179.5 million compared to $78.7 million in the prior year period. The $100.8 million or approximately 128.1% increase was primarily due to the deployment of mining rigs in the current year period as a result of the increased scale of the business, partially offset by the absence of accelerated depreciation of $36.0 million recorded in the prior year period related to the closure of the Hardin, Montana facility.

**Total Margin** was a loss of $15.3 million in the current year period compared to a loss of $33.7 million in the prior year period, an improvement of $18.3 million or approximately 54.4%. The following table summarizes the factors that impacted the increase in total margin for the year ended December 31, 2023 as compared to the prior year period:

Table of Contents

| Revenue: | | (in thousands) |
|---|---|---|
| • Impact of higher amount of bitcoin produced | $ | 244,258 |
| • Impact of higher average price of bitcoin produced and other revenue | | 25,497 |
| Cost of revenue – energy, hosting and other: | | |
| • Prior year impact of accelerated costs related to the closure of Hardin facility | | 18,218 |
| • Impact of higher costs due to growth in hash rate and improvements to uptime | | (168,841) |
| Cost of revenue – depreciation and amortization: | | |
| • Prior year impact of accelerated costs related to the closure of Hardin facility | | 36,032 |
| • Increased due to deployment of mining rigs | | (136,836) |
| | $ | 18,328 |

***General and administrative expenses***: General and administrative expenses were $95.2 million for the year ended December 31, 2023, compared to expenses of $56.7 million in the prior year period, an increase of $38.5 million or approximately 67.8%. The Company's general and administrative expenses included stock-based (non-cash) compensation expense of $32.6 million in the current year period and $24.6 million in the prior year period. The increase in stock-based compensation expense was primarily due to additional restricted stock unit awards granted as a result of an increase in the Company's headcount, which grew from 30 employees as of December 31, 2022 to approximately 60 employees as of December 31, 2023. General and administrative expenses excluding stock-based compensation was $62.6 million in the current year period compared with $32.1 million in the prior year period primarily due to the increasing scale of our operations. This $30.4 million or approximately 94.7% increase in expenses was primarily due to the increased scale of the business and headcount, including payroll and benefits, professional fees, and other third-party costs associated with growth.

***Total change in carrying value of digital assets:***

- Gains (losses) on digital assets and digital assets loan receivable The Company recognized a gain on digital assets of $331.5 million in the current period primarily related to the new fair value model of ASU 2023-08. The Company recognized a loss of $14.5 million during the prior year period primarily due to the decrease in fair value of a digital asset loan receivable that was repaid in September 2022.

- Impairment of digital assets: The Company incurred impairments of digital assets during the year ended December 31, 2022 of $182.9 million. Under the new fair value model of ASU 2023-08, the Company measures crypto assets at fair value with changes recognized within "Gains (losses) on digital assets and digital assets loan receivable." Therefore, there were no such impairments of digital assets during the year ended December 31, 2023.

- Gains (losses) on digital assets held within investment fund:The Company exited the investment fund with NYDIG in June 2022 and as such, there were no such gains or losses in the current year period. The changes in the fair value of the Company's investment fund during the year ended December 31, 2022 resulted in a realized loss of $85.0 million. Refer to Note 4 – Digital Assets, for further information.

***Legal reserves:*** During 2022, the Company recorded a reserve of $26.1 million in connection with a dispute concerning the settlement of certain restricted stock unit awards granted to the Company's former Chief Executive Officer and Chairman and seven other recipients. There were no such costs incurred during the year ended December 31, 2023.

***Total impairments due to vendor bankruptcy filing:*** The Company recorded impairment charges of $55.7 million in the prior year period related to the Compute North bankruptcy filing.

***Impairment of patents:*** The Company recorded an impairment of $0.9 million in the prior year period related to certain patents no longer utilized in its business operations.

***Impairment of fixed assets and advances to vendors:*** In accordance with ASC 360-10 – *Impairment and Disposal of Long-Lived Assets*, any long-lived asset group that is held and used must be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the long-lived asset group might not be recoverable. Due to the significant decrease in fair values of bitcoin mining rigs during the fourth quarter ended December 31, 2022, the Company assessed the need for an impairment write-down of both bitcoin mining rigs (held as fixed assets) and advances to vendors (a long-term asset) representing deposits associated with the future delivery of mining rigs. In accordance with ASC 360-10, the Company determined that both of these asset categories had

45

Table of Contents

carrying values in excess of fair value, and accordingly, the Company recognized impairment charges for both the bitcoin mining rigs and advances to vendors for a total impairment of approximately $332.9 million for the year ended December 31, 2022. There were no such impairments for the year ended December 31, 2023.

*Gain on sales of equipment, net*: In late 2021, the Company entered into an agreement with DCRBN Ventures Development and Acquisition LLC ("DCRBN") to sell certain mining rigs to DCRBN in conjunction with the development of commercial activities at the McCamey, Texas facility. In conjunction with the closure of the Hardin, Montana facility in 2022, the Company sold bitcoin mining rigs to various third parties. Gains resulting from the asset sales totaled $83.9 million for the year ended December 31, 2022. There were no such sales in 2023.

*Net gain from extinguishment of debt:* During the year ended December 31, 2023, the Company recorded a $82.3 million net gain on extinguishment of debt primarily due to an exchange transaction of Convertible Senior Notes due 2026 (the "Notes").

On September 7, 2023, the Company entered into agreements with certain holders of the Notes to exchange an aggregate $416.8 million principal amount of Notes for 31,722,417 shares of the Company's common stock and recorded a gain on extinguishment of debt in the amount of $82.6 million.

In March, 2023, the Company prepaid the outstanding balance on its term loan facility with Silvergate Bank and terminated the term loan facility. The Company and Silvergate agreed to also terminate the RLOC facility. In connection with the termination of the credit facility, the Company recorded a loss in the amount of $0.3 million to "Net gain from extinguishment of debt" on the Consolidated Statements of Comprehensive Income (Loss).

*Loss on hedge instruments:* During the year ended December 31, 2023, the Company recorded a $17.4 million realized loss related to bitcoin hedging activities. The Company has significant bitcoin holdings on its balance sheet and from time to time will evaluate as part of its risk management and treasury management process, short-term hedging or yield enhancing opportunities. The Company has an Investment Committee composed of members of its senior executive team, that evaluates market conditions to set hedging, investments, and monetization of bitcoin strategies. During the year, the Company purchased cost-less collars to protect against the downside price risk of bitcoin while keeping the upside potential. The Company believed this hedging strategy provided short-term protection from the downside price risk of bitcoin. However, bitcoin price increased during the hedge period but overall the increase in the price of bitcoin enhanced the overall fair value of its bitcoin holdings. The Company may, from time to time, evaluate and deploy low-cost hedging strategies to a portion of its bitcoin holdings. There were no outstanding hedging transactions as of the year ended December 31, 2023 and there were no such activities in the prior year period.

*Equity in net earnings of unconsolidated affiliate:* During the year ended December 31, 2023, the Company recorded its share of net losses for its 20% interest in the ADGM Entity in the amount of $0.6 million, which began mining operations during the third quarter of 2023. The Company's share of the ADGM Entity's operating results included earnings from the production of 112 bitcoin and approximately $2.1 million of depreciation and amortization during the year ended December 31, 2023.

*Interest expense*: Interest expense was $10.4 million for the year ended December 31, 2023 compared to $15.0 million in the prior year. The $4.6 million, or approximately 30.9% decrease was primarily a result of lower interest costs following the exchange of $416.8 million aggregate principal amount of Notes for shares of the Company's common stock during the year ended December 31, 2023 compared to the prior year period. Additionally, the Company prepaid and terminated its revolving line of credit and term loan facilities during March 2023.

*Other non-operating income (loss)*: Other non-operating income was $2.8 million during the year ended December 31, 2023 compared to income of $1.3 million in the prior year period. The $1.5 million, or approximately 118.9% increase was primarily due to the higher balance of cash and cash equivalents and an increase in interest rates in the current year period.

*Income tax benefit (expense)*: The Company recorded income tax expense of $16.4 million for the year ended December 31, 2023 compared to an income tax benefit of $24.2 million in the prior year period. The $40.7 million, or approximately 167.8% unfavorable tax variance was primarily due to federal limitations on net operating loss carryforwards, which due to the limitation, could not fully offset the amount of the Company's future tax liabilities.

*Net income (loss)*: The Company recorded net income of $261.2 million for the year ended December 31, 2023 compared to a net loss of $694.0 million in the prior year period. The $955.2 million, or approximately 137.6%, increase in earnings was primarily driven by the favorable mark-to-market adjustment of digital assets related to the early adoption of the new fair value accounting guidance, gain on extinguishment of debt, and favorable variances related to an absence of impairment of digital assets, mining equipment and advances to vendors, losses on digital assets held within the investment fund, partially offset by a net gain on sale of equipment in the prior year period.

***Adjusted EBITDA***: Adjusted EBITDA was $419.9 million for the year ended December 31, 2023 compared to an adjusted EBITDA loss of $543.4 million in the prior year period. The $963.3 million increase was primarily driven by a favorable adjustment to digital assets under the new cryptocurrency fair value model of $331.5 million, higher production of bitcoin, gain from extinguishment of debt of $82.3 million, and higher average price of bitcoin mined. Adjusted EBITDA also benefited from the absence of several expenses recorded in the prior year period: the impairment of digital assets of $182.9 million; impairment of mining equipment and advances to vendors of $332.9 million; losses on digital assets held within investment fund of $85.0 million; legal reserves of $26.1 million; and losses on digital assets loan receivable of $14.5 million, partially offset by the net gain on sale of equipment of $83.9 million.

**Year ended December 31, 2022 compared to December 31, 2021**

| (dollars in thousands) | | Years ended December 31, | | | Favorable (Unfavorable) | |
|---|---|---|---|---|---|---|
| | | 2022 | | 2021 | | |
| Total revenues | $ | 117,753 | $ | 159,163 | $ | (41,410) |
| | | | | | | |
| **Costs and expenses** | | | | | | |
| **Cost of revenues** | | | | | | |
| Cost of revenues - energy, hosting and other | | (72,715) | | (27,492) | | (45,223) |
| Cost of revenues - depreciation and amortization | | (78,709) | | (14,904) | | (63,805) |
| Total cost of revenues | | (151,424) | | (42,396) | | (109,028) |
| **Operating expenses** | | | | | | |
| General and administrative expenses | | (56,739) | | (174,356) | | 117,617 |
| Legal reserves | | (26,131) | | — | | (26,131) |
| Impairment of deposits due to vendor bankruptcy filing | | (24,661) | | — | | (24,661) |
| Impairment of digital assets | | (182,891) | | (22,252) | | (160,639) |
| Impairment of patents | | (919) | | — | | (919) |
| Impairment of mining equipment and advances to vendors | | (332,933) | | — | | (332,933) |
| Gains (losses) on digital assets loan receivable and gains on digital assets | | (14,460) | | 2,157 | | (16,617) |
| Gain on sale of equipment, net of disposals | | 83,879 | | — | | 83,879 |
| Gains (losses) on digital assets held within investment fund | | (85,017) | | 74,696 | | (159,713) |
| Total operating expenses | | (639,872) | | (119,755) | | (520,117) |
| **Operating loss** | | (673,543) | | (2,988) | | (670,555) |
| Impairment of loan and investment due to vendor bankruptcy filing | | (31,013) | | — | | (31,013) |
| Interest expense | | (14,981) | | (1,569) | | (13,412) |
| Other non-operating income (loss) | | 1,283 | | (288) | | 1,571 |
| **Loss before income taxes** | | (718,254) | | (4,845) | | (713,409) |
| Income tax benefit (expense) | | 24,232 | | (24,968) | | 49,200 |
| **Net loss** | $ | (694,022) | $ | (29,813) | $ | (664,209) |
| | | | | | | |
| **Supplemental information:** | | | | | | |
| bitcoin ("BTC") production during the period, in whole BTC | $ | 4,144 | $ | 3,197 | $ | 947 |
| Total margin (total revenues less total cost of revenues) | | (33,671) | | 116,767 | | (150,438) |
| General and administrative expenses excluding stock-based compensation | | (32,144) | | (13,570) | | (18,574) |
| Total impairments due to vendor bankruptcy filing | | (55,674) | | — | | (55,674) |
| Total change in carrying value of digital assets | | (282,368) | | 54,601 | | (336,969) |
| | | | | | | |
| **Reconciliation to Adjusted EBITDA:** | | | | | | |
| Net loss | $ | (694,022) | $ | (29,813) | $ | (664,209) |
| Exclude: Interest expense | | 14,981 | | 1,569 | | 13,412 |
| Exclude: Income tax expense (benefit) | | (24,232) | | 24,968 | | (49,200) |
| **EBIT** | | (703,273) | | (3,276) | | (699,997) |
| Exclude: Depreciation and amortization | | 78,709 | | 14,904 | | 63,805 |
| **EBITDA** | | (624,564) | | 11,628 | | (636,192) |
| Stock compensation expense | | 24,595 | | 160,786 | | (136,191) |
| Impairment of assets due to vendor bankruptcy filing | | 55,674 | | — | | 55,674 |
| Impairment of patents | | 919 | | — | | 919 |
| **Adjusted EBITDA** | $ | (543,376) | $ | 172,414 | $ | (715,790) |

***Revenues***: The Company generated revenues of $117.8 million for the year ended December 31, 2022, compared to $159.2 million in 2021. The $41.4 million, or approximately 26.0%, decrease in revenue was primarily driven by a $77.3 million decrease in revenue resulting from lower bitcoin prices in 2022, partially offset by increased revenues of $44.6 million related to a 30% increase in production year-over-year. Revenues also declined by $8.7 million in 2022 as the Company ceased operation of a mining pool that included third-parties. Despite the overall increase in production for the year, the Company experienced significant production downtime in the second and third quarters of 2022 as a result of the closure of the Hardin, Montana facility and delays in energization at the McCamey, Texas facility. Production during the third quarter of 2022 was down 50% from the prior year period. The Company's best production quarters of 2022 were the first quarter and the fourth quarter.

***Cost of revenues – energy, hosting and other*** during the year ended December 31, 2022, totaled $72.7 million compared to $27.5 million in the prior year period. The $45.2 million, or approximately 164.5%, increase was driven by an increase in hash rate from the deployment of mining rigs that increased hosting and energy costs. Cost of revenues – energy, hosting and other also increased in 2022 due to accelerated costs associated with the closure of the Hardin, Montana facility of $18.2 million. Partially offsetting these increased costs was an $8.7 million decline in cost of revenues related to the discontinuation of the third party mining pool in 2022.

***Cost of revenues – depreciation and amortization*** was $78.7 million in the current year period compared to $14.9 million in the prior year period. The $63.8 million, or approximately 428.1%, increase was primarily due to the acceleration of depreciation of $36.0 million related to the closure of the Hardin, Montana facility and increased depreciation costs of $27.8 million associated with a higher number of mining rigs in operation.

***Total Margin***: Total margin was a loss of $33.7 million in the current year period compared with income of $116.8 million in the prior year period, a decline of $150.4 million. This decline was driven by the factors discussed above, which are summarized in the table below:

| Revenue: | | (in thousands) |
|---|---|---:|
| • Impact of higher amount of bitcoin produced | $ | 44,570 |
| • Impact of lower average price of bitcoin produced | | (77,286) |
| • Impact of discontinuation of third party mining pool vs prior year | | (8,694) |
| Cost of revenue – energy, hosting and other: | | |
| • Impact of higher costs due to growth in hash rate | | (35,699) |
| • Impact of accelerated costs related to the closure of Hardin facility | | (18,218) |
| • Impact of discontinuation of third party mining pool vs prior year | | 8,694 |
| Cost of revenue – depreciation and amortization: | | |
| • Impact of accelerated costs related to the closure of Hardin facility | | (36,032) |
| • Increased due to deployment of mining rigs | | (27,773) |
| | $ | (150,438) |

***General and administrative expenses***: General and administrative expenses were $56.7 million for the year ended December 31, 2022, compared to $174.4 million in the prior year period, a decrease of $117.6 million, or approximately 67.5%. The Company's general and administrative expenses included stock-based (non-cash) compensation expense of $24.6 million in the current year period and $160.8 million in the prior year period. The significant decrease from 2021 to 2022 was primarily related to stock-based incentive compensation payments made to the former Chairman and CEO in 2021, as further described under "Legal reserves." General and administrative expenses excluding stock-based compensation was $32.1 million in the current year period compared with $13.6 million in the prior year period. This $18.6 million increase in expense was primarily due to the increase in the scale of the business, including higher payroll and benefits costs of $7.2 million, increased professional fees of $3.6 million, increased insurance costs of $3.8 million, higher travel and conference costs of $2.2 million and higher costs in various other areas related to the increased scale of the business, including higher property taxes, banking fees, rent expense, computer costs and equipment repairs.

***Legal reserves:*** In connection with a dispute concerning the settlement of certain restricted stock unit awards previously granted to the Company's former Chief Executive Officer and Chairman, the Company entered into a settlement agreement pursuant to which the Company agreed to pay $24.0 million during the year ended December 31, 2022. The Company also entered into agreements in respect to seven other recipients of the same restricted stock unit awards. Payments related to these agreements during the year ended December 31, 2022, totaled approximately $2.1 million in the aggregate.

***Total impairments due to vendor bankruptcy filing:*** On September 22, 2022, Compute North filed for restructuring under Chapter 11 of the U.S. Bankruptcy Code. During the year ended December 31, 2022, the Company assessed the impairment of assets associated with Compute North due to the bankruptcy proceedings. As a result, the Company recorded impairment charges of approximately $24.7 million in operating expenses (related to deposits) and approximately $31.0 million (related to certain loans and preferred stock investments) as non-operating expenses.

***Total change in carrying value of digital assets:***

- Impairment of digital assets: The Company incurred impairments of digital assets during the year ended December 31, 2022 of $182.9 million compared with impairments of $22.3 million in the prior year period. The Company's impairment of digital assets for the years ending December 31, 2022 and 2021 includes the impact of the Company's voluntary change in accounting principle to account for the disposition of digital assets on a first-in-first-out ("FIFO") basis, of $9.7 million and $8.1 million, respectively.

- Gains (losses) on digital assets loan receivable and gains on digital assets The Company incurred a loss of $14.5 million during the year ended December 31, 2022 compared with a gain of $2.2 million in the prior year period. The loss in the current year period was primarily a result of the decline in fair value of digital asset loan receivable prior to the repayment of the loan in June, 2022. The gain in the prior year period includes the impact of the Company's voluntary change in accounting principle to account for the gains (losses) on digital assets on a FIFO basis of $1.6 million.

- Change in fair value of digital assets held in fund On June 10, 2022, the Company withdrew all remaining bitcoin from its investment fund. Total changes in the fair value of investment fund from January 1, 2022 through the June 10, 2022 withdrawal date resulted in a realized loss of $85.0 million in the current year period. During the prior year period, the change in fair value of the bitcoin held in the investment fund was an unrealized gain of $74.7 million.

***Impairment of patents:*** The Company recorded an impairment of $0.9 million in the current year period related to certain patents no longer utilized in its business operations.

***Impairment of fixed assets and advances to vendors:*** In accordance with ASC 360-10 – *Impairment and Disposal of Long-Lived Assets*, any long-lived asset group that is held and used must be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the long-lived asset group might not be recoverable. Due to the significant decrease in fair values of bitcoin mining rigs during the fourth quarter ended December 31, 2022, the Company assessed the need for an impairment write-down of both bitcoin mining rigs (held as fixed assets) and advances to vendors (a non-current asset) representing deposits associated with the future delivery of mining rigs. In accordance with ASC 360-10, the Company determined that both of these asset categories had carrying values in excess of fair value, and accordingly, the Company recognized impairment charges for both the bitcoin mining rigs of $208.6 million and the advances to vendors of $124.3 million – a total impairment of approximately $332.9 million for the year ended December 31, 2022. In addition, as part of its periodic review of its fixed asset groups, the Company changed the estimated useful life for its asset group of mining rigs from 5 years to 3 years, effective January 1, 2023.

***Gain on sales of equipment, net***: In late 2021, the Company entered into an agreement with DCRBN in which the Company agreed to sell certain mining rigs to DCRBN in conjunction with the development of commercial activities at the McCamey, Texas facility. In conjunction with its closure from the Hardin, Montana facility, the Company also sold bitcoin mining rigs to various third parties. Total cash proceeds from the sale of assets for the year ended December 31, 2022 were $178.4 million and gains resulting from the asset sales totaled $83.9 million in the current year period. There were no such sales in 2021.

***Other non-operating income (loss)***: Other non-operating income was $1.3 million during the current year period compared to a loss of $0.3 million in the prior year period. The $1.6 million, or approximately 545.5% increase was primarily due to the absence of warrant expense of $1.0 million recorded in the prior year period and to a lesser extent, increased interest and other income.

***Interest expense***: Interest expense increased $13.4 million from the prior year as a result of higher interest related to the convertible notes issued in November 2021 of $6.6 million, amortization of debt issuance costs of $3.7 million and other interest costs primarily related to the Term loan and revolving credit ("RLOC") facilities.

***Income tax (expense) benefit***: The Company recorded an income tax benefit of $24.2 million for the year ended December 31, 2022, compared to an income tax expense of $25.0 million in the prior year period. The primary drivers of the $49.2 million, or approximately 197.1% favorable tax variance were favorable federal impacts versus the prior year period of $145.7 million, favorable state tax impacts versus the prior year period of $18.7 million,

beneficial impacts of changes in executive compensation deduction limitations of $22.9 million, and the impact of the Company's voluntary change in accounting principle to account for digital assets on a FIFO basis of $4.8 million, partially offset by the unfavorable impact of changes in the valuation allowance of $145.0 million.

*Net loss*: The Company recorded a net loss of $694.0 million in the current year period compared to a net loss of $29.8 million in the prior period. The $664.2 million decline in earnings was primarily driven by declines in the carrying value of digital assets of $317.6 million, the impairment of mining rigs and advances to vendors of $332.9 million, lower total margins of $150.4 million, impairments of $55.7 million related to the Compute North bankruptcy, legal reserves of $26.1 million, increased interest expense of $13.4 million, and the Company's voluntary change in accounting principle impacts. Partially offsetting these unfavorable variances was a significant reduction in general and administrative expenses of $117.6 million primarily associated with lower stock-based compensation, gains on sales of mining rigs of $83.9 million, a $49.2 million favorable income tax variance and a slight increase in other non-operating income.

*Adjusted EBITDA*: Adjusted EBITDA was a loss of $543.4 million for the year ended December 31, 2022 compared to a positive adjusted EBITDA of $172.4 million in the prior year period. The $715.8 million decline was primarily driven by declines in the carrying value of digital assets of $337.0 million, the impairment of mining rigs and advances to vendors of $332.9 million, lower total margin excluding depreciation and amortization of $86.6 million, legal reserves of $26.1 million, and higher general and administrative expenses, excluding non-cash stock-based compensation costs of $18.6 million, and the Company's voluntary change in accounting principle impacts. Partially offsetting these unfavorable variances were gains on the sales of mining rigs of $83.9 million and increases in non-operating income of $1.6 million.

## Financial Condition and Liquidity

The following table presents a summary of the Company's cash flow activity for the year ended December 31, 2023 and 2022:

|  | For the year ended December 31, | |
|---|---|---|
| *(in thousands)* | **2023** | **2022** |
| Net cash used in operating activities | $ (315,651) | $ (176,478) |
| Net cash provided by (used in) investing activities | 4,595 | (390,228) |
| Net cash provided by financing activities | 555,864 | 410,655 |
| Net increase (decrease) in cash, cash equivalents and restricted cash | 244,808 | (156,051) |
| Cash, cash equivalents and restricted cash — beginning of period | 112,505 | 268,556 |
| Cash, cash equivalents and restricted cash — end of period | $ 357,313 | $ 112,505 |

*Cash flows for the year ended December 31, 2023:* Cash and cash equivalents totaled $357.3 million at December 31, 2023, an increase of $244.8 million from December 31, 2022. There was no restricted cash as of December 31, 2023 as the Company replaced cash-collateralized letters of credit with cash deposits during March 2023, as a result of the closure of Signature Bank.

Cash flows from operating activities resulted in a use of funds of $315.7 million, as net income, adjusted for non-cash and non-operating items, in the amount of $96.6 million was more than offset by the use of cash of $412.2 million from changes in operating assets and liabilities. When the Company produces and holds bitcoin on its Consolidated Balance Sheets, it excludes such produced and held bitcoin from its operating cash flows. As the Company monetizes bitcoin in the future, those proceeds are reported as cash flows from investing activities. Changes in cash flows from operating assets and liabilities were driven by a use of funds associated with changes in digital assets of $386.0 million due to the non-cash adjustment for bitcoin mining revenues, deposits of $23.8 million resulting from increased deposits associated with hosting agreements and prepaid expenses of $1.9 million.

Cash flows from investing activities resulted in a source of cash of $4.6 million, primarily resulting from proceeds from the sale of digital assets of $264.9 million, which were offset by investments made as part of the establishment of the ADGM Entity of $71.8 million, advances to vendors of $158.9 million, capital expenditures of $27.6 million, and the payments on hedge settlements of $2.0 million.

Cash flows from financing activities resulted in a source of cash of $555.9 million, primarily from the periodic issuance of common stock under the Company's 2022 ATM of $608.4 million, partially offset by the repayment of the Company's term loan facility of $50.0 million. On March 8, 2023, the Company terminated both its term loan and its RLOC facilities with Silvergate Bank.

Table of Contents

***Cash flows for the year ended December 31, 2022:*** Cash, cash equivalents and restricted cash totaled $112.5 million at December 31, 2022, a decrease of $156.1 million from December 31, 2021.

Cash flows from operating activities resulted in a use of funds of $176.5 million, primarily due to a $176.6 million use of cash from changes in operating assets and liabilities driven by bitcoin mining revenues, and, to a lesser extent prepaid expenses associated with new hosting arrangements (a $48.9 million use of funds) and deposits associated with new hosting arrangements (a $24.5 million use of funds). These uses of funds were partially offset by a source of funds from changes in accounts payable and other accrued expenses.

Cash flows from investing activities resulted in a use of funds of $390.2 million, primarily resulting from advances of $483.8 million to vendors related to orders of ASICs miners for future deployment, a $44.0 million use of funds for investment purposes primarily due to an investment in Auradine, Inc. ("Auradine"), to secure certain rights to future purchases by the Company from Auradine and capitalized costs of $41.1 million associated with purchases of equipment, partially offset by proceeds of $178.4 million from the sales of bitcoin mining rigs.

Cash flows from financing activities resulted in a source of cash of $410.7 million, primarily from proceeds from the periodic issuance of common stock under the Company's ATM and proceeds from borrowings outstanding under the term loan agreement of $49.3 million.

The maximum borrowings outstanding under the Company's revolving credit facilities during the year ended December 31, 2022, was $70.0 million. Total borrowings and repayments under the RLOC facilities were $120.0 million during the year ended December 31, 2022, and there were no borrowings outstanding under the RLOC facility at December 31, 2022.

***Bitcoin holdings as of December 31, 2023:*** At December 31, 2023, the Company held approximately 15,126 bitcoin on its Consolidated Balance Sheets with a carrying value of $639.7 million. The Company's holdings as of December 31, 2023 excluded 448 bitcoins owned by the Company's equity method investee, the ADGM Entity, but allocable to the Company, and pending distribution to the Company. At December 31, 2023, the fair value of a single bitcoin was approximately $42,288. As a result, the fair market value of the Company's bitcoin holdings at December 31, 2023, was approximately $639.7 million. The Company expects that its future bitcoin holdings will generally increase but will fluctuate from time to time, both in number of bitcoin held and fair value in US dollars, depending upon operating and market conditions. The Company intends to add to its bitcoin holdings primarily through its production activities and will also continue to sell bitcoin as a means of generating cash to fund monthly operating costs and for general corporate purposes. The Company does not intend to make any significant purchases of bitcoin on the open market as means of increasing its bitcoin holdings, although it may buy and sell bitcoin from time to time (separately from what is outlined above) for treasury management purposes.

During the third quarter of 2023, the Company hedged a portion of its bitcoin holdings to mitigate near-term volatility while maintaining a long-term strategy of maximizing the size and value of the Company's treasury. Gains and losses on hedging activity will impact earnings; however, the Company believes the strategy provides resiliency to the organization and downside risk during volatile market conditions due to the upcoming halving while maximizing the Company's bitcoin valuation potential.

***Bitcoin holdings outlook:*** The Company expects that its future bitcoin holdings will generally increase but will fluctuate from time to time, both in number of bitcoin held and fair value in US dollars, subject to market conditions and other factors outside of the Company's control. For example, the Company would expect:

- The Company's bitcoin holdings and the value of those holdings will increase most significantly in periods where it experiences both higher production and higher bitcoin prices;

- The Company's bitcoin holdings and value of those holdings will be mixed in periods with either (1) higher production combined with lower bitcoin prices, or (2) lower production combined with higher bitcoin prices; and

- The Company's bitcoin holdings and the value of those holdings will most likely decrease in periods where it experiences both lower production and lower bitcoin prices.

The Company intends to add to its bitcoin holdings primarily through its production activities and it also intends to sell bitcoin as a means of generating cash to cover monthly operating costs and for general corporate purposes. The Company does not intend to make any significant purchases of bitcoin on the open market as means of increasing its bitcoin holdings, although it may buy and sell bitcoin from time to time (separately from what is outlined above) for treasury management purposes.

***Company's At-the-Market Offering Programs and Proceeds:*** In October 2023, the Company commenced the 2023 ATM with Wainwright, acting as a sales agent, which allowed the Company to sell and issue shares of its common stock from time to time with an aggregate offering price up to $750.0 million. As of December 31, 2023, the Company had sold 19,591,561 shares of common stock under the 2023 ATM for an aggregate purchase price of $248.1 million, net of commissions expenses. Subsequent to December 31, 2023, we sold additional shares of common stock under the 2023 ATM such that the aggregate offering price of shares sold under the 2023 ATM is approximately $750.0 million. In February 2024, Marathon intends to commence the 2024 ATM with Wainwright acting as sales agent pursuant to the ATM Agreement, under which the Company may offer and sell shares of its common stock from time to time through Wainwright having an aggregate offering price of up to $1.5 billion.

In February 2022, the Company commenced the 2022 ATM with Wainwright, as sales agent, which allowed it to sell and issue shares of up to approximately $750.0 million of its common stock from time to time (the "2022 ATM"). As of October 23, 2023, the Company sold 86,822,000 shares of common stock under the 2022 ATM for an aggregate purchase price of $727.9 million, net of commissions and other offering related expenses, completing the 2022 ATM.

***Liquidity and Capital Resources:*** Cash and cash equivalents totaled $357.3 million and the fair value of bitcoin holdings was $639.7 million at December 31, 2023. The combined value of cash and cash equivalents and bitcoin, as of December 31, 2023, was $997.0 million.

The Company expects to have sufficient liquidity, including cash on hand, cash received from sales of its bitcoin holdings, and access to public capital markets to support ongoing operations. The Company will continue to seek to fund its business activities, and especially its growth opportunities, through the public capital markets, primarily through periodic equity issuances using its at-the-market facilities.

The risks to the Company's liquidity outlook would include events that materially diminish its access to capital markets and/or the value of its bitcoin holdings and production capabilities, including:

- Failure to effectively execute the Company's growth strategies;

- Challenges in the bitcoin mining space and/or additional contagion events (such as the FTX collapse and subsequent bankruptcies of bitcoin mining companies in 2022 and 2023) which could damage the credibility of, and therefore investor confidence in, companies engaged in the digital assets space including Marathon;

- Declines in bitcoin prices and/or production, which would impact both the value of the Company's bitcoin holdings and its ongoing profitability;

- Significant increases in electricity costs if these cost increases were not accompanied by increases in the price of bitcoin, as this would also reduce profitability; and

- Deteriorating macroeconomic conditions, including the impacts of inflation and increased interest rates, as well as instability in the banking system.

## CONTRACTUAL OBLIGATIONS AND COMMITMENTS

The Company contracts with service providers for hosting its equipment and operational support in data centers where the Company's equipment is deployed. Under these arrangements, the Company expects to pay at a minimum approximately (i) $920.8 million in total payments during the calendar years 2024 through 2026, and (ii) $139.0 million in total payments during the calendar years 2027 through 2028. Under certain of these arrangements, the Company is required to pay variable pass-through power and service fees in addition to these estimated minimum amounts.

Assuming the Notes 2026 are not converted into common stock, repurchased or redeemed prior to maturity, (i) annual interest payments of approximately $3.3 million in each calendar year from 2024 through 2026, and (ii) principal in the amount of $330.7 million upon the maturity in November 2026, will be payable under the Notes due 2026. Refer to Note 14 – Debt, for further information.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The following accounting policies relate to the significant areas involving management's judgments and estimates in the preparation of the Company's financial statements, and are those that it believes are the most critical to aid the understanding and evaluation of this management discussion and analysis:

Table of Contents

- Digital assets

- Digital assets loan receivable

- Revenues

- Long-lived assets

- Income taxes

**Digital assets**

Digital assets (bitcoin) are included in current and other assets in the accompanying Consolidated Balance Sheets due to the Company's ability to sell bitcoin in a highly liquid marketplace and the selling of bitcoin to fund operating expenses to support operations. Digital assets awarded to the Company through its mining activities are accounted for in accordance with the Company's revenue recognition policy below.

Effective January 1, 2023, the Company early adopted ASU 2023-08, which requires entities to measure crypto assets at fair value with changes recognized in the Consolidated Statement of Comprehensive Income (Loss) each reporting period. The Company's digital assets are within the scope of ASU 2023-08 and the transition guidance requires a cumulative-effect adjustment as of the beginning of the current fiscal year for any difference between the carrying amount of the Company's digital assets and fair value.

Prior to the adoption of ASU 2023-08, Digital assets were accounted for as intangible assets with indefinite useful lives and are recorded at cost less impairment in accordance with ASC 350 – *Intangibles-Goodwill and Other*. An intangible asset with an indefinite useful life is not amortized but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Whenever the exchange-traded price of digital assets declines below its carrying value, the Company has determined that it is more likely than not that an impairment exists and records impairment equal to the amount by which the carrying value exceeds the fair value at that point in time. The Company has deemed the price of digital assets to be a Level 1 input under the ASC 820 - *Fair Value Measurement* hierarchy as these were based on observable quoted prices in the Company's principal market for identical assets. Subsequent reversal of impairment losses is not permitted.

Additionally, during the quarter ended March 31, 2023 and effective January 1, 2023, the Company enacted a voluntary change in accounting principle from last-in-first-out ("LIFO") to FIFO in order to more accurately reflect the disposition of its digital assets. The change in accounting principle resulted in an increase in gain on digital assets for the year ended December 31, 2021 and resulted in an impairment of digital assets for the years ending December 31, 2022 and 2021. The voluntary change in accounting principle has been reflected in the Consolidated Financial Statements.

Digital assets awarded to the Company through its mining activities are included as a reconciling item within operating activities on the accompanying Consolidated Statements of Cash Flows. The sales of digital assets are included within investing activities in the accompanying Consolidated Statements of Cash Flows and any gains or losses from such sales are included in operating expenses in the Consolidated Statements of Comprehensive Income (Loss).

**Digital assets loan receivable**

When the Company loans digital assets to a third-party entity, the Company first evaluates whether to derecognize such digital assets based on an evaluation of relevant control and asset derecognition considerations that include whether:

- The Company has transferred present rights to the economic benefits associated with the digital asset for a different right to receive digital assets in the future;

- The Company cannot sell, pledge, loan, or otherwise use the lent digital assets while the loan is outstanding, as those rights have been transferred to the borrower;

- Inherent in the realization of the economic benefits associated with the digital asset loan receivable is exposure to credit risk of the third-party entity; and

- The third-party entity that holds the digital assets can deploy those assets at its discretion for the duration of the lending arrangement and bears the risk of loss or theft of those assets, and otherwise has the ability to direct the use of the assets transferred.

If the Company concludes derecognition is appropriate, the Company derecognizes the loaned digital assets that it no longer controls and recognizes a right to receive back in the future such loaned digital assets.

The digital asset loan receivable is recorded at the fair value of the underlying digital assets. Throughout the period that the digital asset loan receivable is outstanding, the receivable will be measured at the fair value of the underlying loaned digital asset with changes recorded in operating income (loss) in current period earnings.

At loan commencement and throughout the loan period, the Company considers and accounts for the credit risk of the borrower using the principles in Topic 326 –*Financial Instruments - Credit Losses* ("Topic 326") to measure any credit impairment. The digital asset loan receivable is presented net of any allowance for credit losses. The Company utilizes the probability of default ("PD") loss given default ("LGD") approach to estimating the allowance for credit loss ("ACL") at origination and subsequent reporting periods. In order to apply the PD LGD approach, management considers the lifetime of the digital asset loan receivable, the reasonable and supportable forecast period, and the PD LGD. The Company uses each instrument's life of loan period for estimating current expected credit losses, unadjusted by any prepayment risk as any risk would be immaterial to either the repayment in kind or the accrued loan fee receivable.

### Revenues

The Company recognizes revenue in accordance with ASC 606. The core principle of the revenue standard is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services. The following five steps are applied to achieve that core principle:

- Step 1: Identify the contract with the customer;

- Step 2: Identify the performance obligations in the contract;

- Step 3: Determine the transaction price;

- Step 4: Allocate the transaction price to the performance obligations in the contract; and

- Step 5: Recognize revenue when the Company satisfies a performance obligation.

In order to identify the performance obligations in a contract with a customer, an entity must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met:

- The customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct); and

- The entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

If a good or service is not distinct, the good or service is combined with other promised goods or services until a bundle of goods or services is identified that is distinct.

The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The consideration promised in a contract with a customer

Table of Contents

may include fixed amounts, variable amounts, or both. When determining the transaction price, an entity must consider the effects of all of the following:

- Variable consideration

- Constraining estimates of variable consideration

- The existence of a significant financing component in the contract

- Noncash consideration

- Consideration payable to a customer

Variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized under the accounting contract will not occur when the uncertainty associated with the variable consideration is subsequently resolved.
The transaction price is allocated to each performance obligation on a relative standalone selling price basis.

The transaction price allocated to each performance obligation is recognized when that performance obligation is satisfied, at a point in time or over time, as appropriate.

***Application of the five-step model to the Company's mining operations***

The Company's ongoing major or central operation is to provide bitcoin transaction verification services to the transaction requestor, in addition to the bitcoin network through a Company-operated mining pool as the operator ("Operator") (such activity, "mining") and to provide a service of performing hash calculations to third-party pool operators alongside collectives of third-party bitcoin miners (such collectives, "mining pools") as a participant ("Participant").
*Operator*
As Operator, the Company provides transaction verification services to the transaction requestor, in addition to the bitcoin network. Transaction verification services are an output of the Company's ordinary activities; therefore, the Company views the transaction requestor as a customer and recognizes the transaction fees as revenue from contracts with customers under ASC 606. The bitcoin network is not an entity such that it may not meet the definition of a customer; however, the Company has concluded that it is appropriate to apply ASC 606 by analogy to block rewards earned from the bitcoin network. The Company is currently entitled to the block reward of 6.25 bitcoin from the bitcoin network upon each successful validation of a block. The Company is also entitled to the transaction fees paid by the transaction requester payable in bitcoin for each successful validation of a block. The Company assessed the following factors in the determination of the inception and duration of each individual contract to validate a block and satisfaction of its performance obligation as follows:

- For each individual contract, the parties' rights, the transaction price, and the payment terms are fixed and known as of the inception of each individual contract.

- The transaction requestor and the bitcoin network each have a unilateral enforceable right to terminate their respective contracts at any time without penalty.

- For each of these respective contracts, contract inception and completion occur simultaneously upon block validation; that is, the contract begins upon, and the duration of the contract does not extend beyond, the validation of an individual blockchain transaction; and each respective contract contains a single performance obligation to perform a transaction validation service and this performance obligation is satisfied at the point-in-time when a block is successfully validated.

From September 2021 until May 2022, the Company engaged unrelated third-party mining enterprises ("pool participants") to contribute hash calculations, and in exchange, remitted transaction fees and block rewards to pool participants on a pro rata basis according to each respective pool participant's contributed hash calculations. The MaraPool wallet (owned by the Company as Operator) is recorded on the distributed ledger as the winner of proof of work block rewards and assignee of all validations and, therefore, the transaction verifier of record. The pool participants entered into contracts with the Company as Operator; they did not directly enter into contracts with the network or the requester and were not known verifiers of the transactions assigned to the pool. As Operator, the Company delegated mining work to the pool participants utilizing software that algorithmically assigned work to each individual miner. By virtue of its selection and operation of the software, the Company as Operator controlled

56

delegation of work to the pool participants. This indicated that the Company directed the mining pool participants to contribute their hash calculations to solve in areas that the Company designated. Therefore, the Company determined that it controlled the service of providing transaction verification services to the network and requester. Accordingly, the Company recorded all of the transaction fees and block rewards earned from transactions assigned to MaraPool as revenue, and the portion of the transaction fees and block rewards remitted to MaraPool participants as cost of revenues.

In accordance with ASC 606-10-32-21, the Company measures the estimated fair value of the non-cash consideration (block reward and transaction fees) at contract inception, which is at the time the performance obligation to the requester and the network is fulfilled by successfully validating a block. The Company measures the non-cash consideration which is fixed as of the inception of each individual contract using the quoted spot rate for bitcoin determined using the Company's primary trading platform for bitcoin at the time the Company successfully validates a block.

Expenses associated with providing bitcoin transaction verification services, such as hosting fees, electricity costs, and related fees are recorded as cost of revenues. Depreciation on digital asset mining equipment is also recorded as a component of cost of revenues.

*Participant*

The Company participates in third-party operated mining pools. When the Company is a Participant in a third-party operated mining pool, the Company provides a service to perform hash calculations to the third-party pool operators. The Company considers the third-party mining pool operators to be its customers under Topic 606. Contract inception and our enforceable right to consideration begins when we commence providing hash calculation services to the mining pool operators. Each party to the contract has the unilateral right to terminate the contract at any time without any compensation to the other party for such termination. As such, the duration of a contract is less than a day and may be continuously renewed multiple times throughout the day. The implied renewal option is not a material right because there are no upfront or incremental fees in the initial contract and the terms, conditions, and compensation amount for the renewal options are at the then market rates.

The Company is entitled to non-cash compensation based on the pool operator's payout model. The payout methodologies differ depending on the type of third-party operated mining pool. Full-Pay-Per-Share ("FPPS") pools pay block rewards and transaction fees, less mining pool fees and Pay-Per-Share ("PPS") pools pay block rewards less mining pool fees but no transaction fees. For FPPS and PPS pools, the Company is entitled to non-cash consideration even if a block is not successfully validated by the mining pool operators. Success-based mining pools pay a fractional share of the successfully mined block and transaction fees, reduced by pool operator expenses only if a block is successfully validated.

During 2023, the Company primarily participated in FPPS mining pools and, to a lesser extent, success-based mining pools. During 2022 and 2021, the Company primarily participated in success-based mining pools and, to a lesser extent, PPS mining pools.

*FPPS Mining Pools*

The Company primarily participates in mining pools that use the FPPS payout method for the year ended December 31, 2023. The Company is entitled to compensation once it begins to perform hash calculations for the pool operator in accordance with the operator's specifications over a 24-hour period beginning mid-night UTC and ending 23:59:59 UTC on a daily basis. The non-cash consideration that we are entitled to for providing hash calculations to the pool operator under the FPPS payout method is made up of block rewards and transaction fees less pool operator expenses determined as follows:

- The non-cash consideration in the form of a block reward is based on the total blocks expected to be generated on the Bitcoin Network for the daily 24-hour period beginning midnight UTC and ending 23:59:59 UTC in accordance with the following formula: the daily hash calculations that we provided to the pool operator as a percent of the Bitcoin Network's implied hash calculations as determined by the network difficulty, multiplied by the total Bitcoin Network block rewards expected to be generated for the same daily period.

- The non-cash consideration in the form of transaction fees paid by transaction requestors is based on the share of total actual fees paid over the daily 24-hour period beginning midnight UTC and ending 23:59:59 UTC in accordance with the following formula: total actual transaction fees generated on the Bitcoin Network during the 24-hour period as a percent of total block rewards the Bitcoin Network actually generated during the same 24-hour period, multiplied by the block rewards we earned for the same 24-hour period noted above.

- The block reward and transaction fees earned by the Company is reduced by mining pool fees charged by the operator for operating the pool based on a rate schedule per the mining pool contract. The mining pool fee is only incurred to the extent we perform hash calculations and generate revenue in accordance with the pool operator's payout formula during the same 24-hour period beginning mid-night UTC daily.

The above non-cash consideration is variable in accordance with paragraphs ASC 606-10-32-5 to 606-10-32-7, since the amount of block reward earned depends on the amount of hash calculations we perform; the amount of transaction fees we are entitled to depends on the actual Bitcoin Network transaction fees over the same 24-hour period; and the operator fees for the same 24-hour period are variable since it is determined based on the total block rewards and transaction fees in accordance with the pool operator's agreement. While the non-cash consideration is variable, the Company has the ability to estimate the variable consideration at contract inception with reasonable certainty without the risk of significant revenue reversal. The Company does not constrain this variable consideration because it is probable that a significant reversal in the amount of revenue recognized from the contract will not occur when the uncertainty is subsequently resolved and recognizes the non-cash consideration on the same day that control is transferred, which is the same day as contract inception.

The Company measures the non-cash consideration based on the simple average daily spot rate of bitcoin determined using the Company's primary trading platform for bitcoin over a 24-hour period beginning mid-night UTC and ending 23:59:59 UTC on the day of contract inception. The Company recognizes non-cash consideration on the same day that control of the contracted service is transferred to the pool operator, which is the same day as the contract inception.

*PPS Mining Pools*

The Company participates in PPS pools that provide non-cash consideration similar to the FPPS pools except PPS pools do not include transaction fees, therefore, the non-cash consideration received by the Company is made up of block rewards less mining pool fees. While the non-cash consideration is variable, the Company has the ability to estimate the variable consideration at contract inception with reasonable certainty. The Company does not constrain this variable consideration because it is probable that a significant reversal in the amount of revenue recognized from the contract will not occur when the uncertainty is subsequently resolved and recognizes the non-cash consideration on the same day that control is transferred, which is the same day as contract inception.

The Company measures the non-cash consideration based on the simple average daily spot rate of bitcoin determined using the Company's primary trading platform for bitcoin over a 24-hour period beginning mid-night UTC and ending 23:59:59 UTC on the day of contract inception. The Company recognizes non-cash consideration on the same day that control of the contracted service is transferred to the pool operator, which is the same day as the contract inception.

*Success-based Mining Pools*

The Company also participates, to a lesser extent, in third-party mining pools that pay rewards only when the pool successfully validates a block. For these pools, the Company only earns a reward when the third-party pool successfully mines a block and its reward is the fractional share of the successfully mined block and transaction fees, reduced by pool operator expenses, based on the proportion of hash calculations the Company performed for the mining pool operator to the total hash calculations performed by all mining pool participants in validating the block during the 24-hour period beginning at midnight UTC and ending 23:59:59 UTC daily.

Contract inception and our enforceable right to consideration begins when the Company commences the performance of hash calculations for the mining pool operator. The non-cash consideration is variable in accordance with paragraphs ASC 606-10-32-5 to 606-10-32-7 as it depends on whether the third-party mining pool successfully validates a block during each 24-hour period. In addition, other inputs such as the amount of hash calculations and our fractional share of consideration earned by the pool operator also cause variability. The Company does not have the ability to estimate whether a block will be successfully validated with reasonable certainty at contract inception. The Company constrains the variable consideration at contract inception because it is not probable that a significant reversal in the amount of revenue recognized from the contract will not occur when the uncertainty is subsequently resolved. Once a block is successfully validated, the constraint is lifted. The Company recognizes the non-cash consideration on the same day that control is transferred, which is the same day as contract inception.

The Company's policy was to measure non-cash consideration based on the spot rate of bitcoin at the time the pool successfully validates a block, which was not in accordance with ASC 606-10-32-21 which requires measurement to coincide with contract inception. Additionally, this measurement was not consistent with the measurement of non-cash consideration for FPPS and PPS pools. During the three months ended December 31, 2023, the Company corrected this error and changed its measurement of non-cash consideration to the simple average daily spot rate of

Table of Contents

bitcoin determined using the Company's primary trading platform for bitcoin on the date of contract inception, which is the same day that control of the contracted service (hash calculations) is transferred to the pool operator. The change in measurement did not have a material impact to the results of operations for any of the periods presented.

Expenses associated with providing hash calculation services to third-party operated mining pools, such as hosting fees, electricity costs, and related fees, are recorded as cost of revenues. Depreciation on digital asset mining equipment is also recorded as a component of cost of revenues.

**Long-lived assets**

The Company has long-lived assets that consist primarily of property and equipment stated at cost, net of accumulated depreciation and impairment, as applicable. The depreciation charge is calculated on a straight-line basis and depends on the estimated useful lives of each type of asset and, in certain circumstances, estimates of fair values and residual values. The Company's property and equipment is primarily composed of bitcoin mining rigs, which are largely homogeneous and have approximately the same useful lives. Accordingly, the Company utilizes the group method of depreciation for its bitcoin mining rigs. The Company updates the estimated useful lives of its asset group of bitcoin mining rigs periodically as information on the operations of the mining rigs indicates changes are required. The Company assesses and adjusts the estimated useful lives of its mining rigs when there are indicators that the productivity of the mining assets are higher or lower than the assigned estimated useful lives.

Management reviews the Company's long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset (asset group) may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of their carrying amount to the undiscounted future cash flows expected to be generated thereby. If such assets are not recoverable based on that test, impairment is recorded in the amount by which the carrying amount of the assets exceeds their fair value as determined in accordance with ASC 820.

**Income taxes**

The primary objectives of accounting for income taxes are to recognize the amount of income taxes payable or refundable for the current year, and to recognize deferred tax liabilities and assets for the future tax consequences of events that have been recognized in the Company's financial statements or tax returns. The Company accounts for income taxes in accordance with ASC 740 - Income Taxes, using the asset and liability method. Under this method, deferred tax assets and liabilities are calculated based on enacted tax rates and are recognized for the expected future tax consequences of temporary differences between the financial reporting and tax basis of assets and liabilities and for operating losses and tax credit carryforwards. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in operations in the period that includes the enactment date. Management must make assumptions, judgments and estimates to determine the Company's income tax benefit or expense and deferred tax assets and liabilities. The Company recognizes tax positions when they are more likely than not of being sustained. Recognized tax positions are measured at the largest amount of benefit greater than 50% likely of being realized. Each period, the Company evaluates tax positions and adjust related tax assets and liabilities in light of changing facts and circumstances.

The Company recorded a valuation allowance to reduce deferred tax assets to the net amount that the Company believes is more likely than not to be realized. Accordingly, the need to establish such allowance is assessed periodically by considering matters such as future reversals of existing taxable temporary differences, projected future taxable income, tax planning strategies and results of recent operations.

**RECENT ACCOUNTING PRONOUNCEMENTS**

See Note 2 – Summary of Significant Accounting Policies to the Company's Consolidated Financial Statements for a discussion of recent accounting standards and pronouncements.

**OFF-BALANCE SHEET ARRANGEMENTS**

None.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The following discussion about our market risk exposures involves forward-looking statements. Actual results could differ materially from those projected in the forward-looking statements.

**Market Price Risk of Bitcoin.** We hold a significant amount of bitcoin, as such, we are exposed to the impact of market price changes in bitcoin on its bitcoin holdings. This exposure would generally manifest itself in the following areas:

- Declines in the fair market value of bitcoin will impact the cash value that would be realized if we were to sell our bitcoin for cash, therefore having a negative impact on our liquidity.

- We occasionally enter into derivative financial instruments to manage our exposure resulting from fluctuations in the price of bitcoin.

At December 31, 2023, we held approximately 15,126 bitcoin and the fair value of a single bitcoin was approximately $42,288, meaning that the fair value of our bitcoin holdings on that date was approximately $639.7 million.

Table of Contents

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY**

**Index to Consolidated Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID No. 688) | 2 |
| Consolidated Balance Sheets as of December 31, 2023 and 2022 | 4 |
| Consolidated Statements of Comprehensive Income (Loss) for the years ended December 31, 2023, 2022 and 2021 | 5 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2023, 2022 and 2021 | 6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2023, 2022 and 2021 | 7 |
| Notes to the Consolidated Financial Statements | 9 |

The accompanying notes are an integral part to these audited Consolidated Financial Statements.

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and Board of Directors of Marathon Digital Holdings, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Marathon Digital Holdings, Inc. (the "Company") as of December 31, 2023 and 2022, the related consolidated statements of comprehensive income (loss), stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2023, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023, and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2023, based on the criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in 2013. Our report dated February 28, 2024 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting because of the existence of material weaknesses.

**Changes in Accounting Principle**

As discussed in Notes 2 and 4 to the financial statements, the Company changed its method of accounting for digital assets during the year ended December 31, 2023 by:

- making a voluntary change in accounting principle from last-in-first-out to first-in-first-out to reflect the disposition of its digital assets, effective January 1, 2023 using the full retrospective method; and

- early adopting ASU 2023-08, *Intangibles - Goodwill and Other - Crypto Assets (Topic 350-60): Accounting for and Disclosure of Crypto Assets,* effective January 1, 2023 using the modified retrospective method.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion

The accompanying notes are an integral part to these audited Consolidated Financial Statements.

F-2

on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Revenue Recognition*

As disclosed in Note 3 to the financial statements, the Company's ongoing major or central operation is to provide bitcoin transaction verification services to the transaction requestor, in addition to the bitcoin network through a Company-operated mining pool as the operator, and to provide a service of performing hash calculations to third-party pool operators alongside collectives of third-party bitcoin miners as a participant.

The principal consideration for our determination that performing procedures related to revenue recognition is a critical audit matter is due to the nature and extent of audit effort required to perform audit procedures over the completeness, and occurrence of revenue recognized.

Addressing this matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the financial statements. These procedures included, among others:

- We performed site visits at the Company's facilities where the mining hardware is located, which included observations of the physical controls and mining equipment inventory.

- We independently traced certain financial and performance data directly to the blockchain network to test the occurrence and accuracy of mining revenue as the operator.

- We independently confirmed with the third-party mining pool operator the significant contractual terms utilized in the determination of mining revenue, total mining rewards earned, and the digital asset wallet addresses in which the rewards are deposited to test the occurrence and accuracy of mining revenue as the participant.

- We performed certain analytical procedures over the completeness and accuracy of revenue recognized by the Company.

- We confirmed the year-end digital asset balances directly with the custodians of the Company's wallets.

/s/ Marcum LLP

Marcum LLP

We have served as the Company's auditor since 2021.

Costa Mesa, CA
February 28, 2024

The accompanying notes are an integral part to these audited Consolidated Financial Statements.

F-3

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| (in thousands, except share and per share data) | | December 31, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 357,313 | $ | 103,705 |
| Restricted cash | | — | | 8,800 |
| Digital assets | | 639,660 | | 121,842 |
| Other receivables | | 2,091 | | 18 |
| Deposits | | 7,240 | | 2,350 |
| Prepaid expenses and other current assets | | 23,499 | | 40,833 |
| Total current assets | | 1,029,803 | | 277,548 |
| | | | | |
| Property and equipment, net | | 671,772 | | 273,026 |
| Advances to vendors | | 95,589 | | 488,299 |
| Investments | | 106,292 | | 37,000 |
| Long-term deposits | | 59,790 | | 40,903 |
| Long-term prepaids | | 27,284 | | 8,317 |
| Right-of-use assets | | 443 | | 1,276 |
| Digital assets, restricted | | — | | 68,875 |
| Total long-term assets | | 961,170 | | 917,696 |
| **TOTAL ASSETS** | $ | **1,990,973** | $ | **1,195,244** |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 11,343 | $ | 1,312 |
| Accrued expenses | | 22,015 | | 22,295 |
| Legal reserve payable | | — | | 1,171 |
| Operating lease liabilities | | 124 | | 326 |
| Accrued interest | | 276 | | 1,011 |
| Total current liabilities | | 33,758 | | 26,115 |
| Long-term liabilities: | | | | |
| Notes payable | | 325,654 | | 732,289 |
| Term loan | | — | | 49,882 |
| Operating lease liabilities | | 354 | | 1,017 |
| Deferred tax liabilities | | 15,286 | | — |
| Total long-term liabilities | | 341,294 | | 783,188 |
| **Commitments and Contingencies** | | | | |
| Stockholders' Equity: | | | | |
| Preferred stock, par value $0.0001 per share, 50,000,000 shares authorized and no shares issued and outstanding at December 31, 2023 and December 31, 2022, respectively | | — | | — |
| Common stock, par value $0.0001 per share, 500,000,000 shares authorized; 242,829,391 shares and 145,565,916 shares issued and outstanding at December 31, 2023 and December 31, 2022, respectively | | 24 | | 15 |
| Additional paid-in capital | | 2,183,537 | | 1,226,267 |
| Accumulated deficit | | (567,640) | | (840,341) |
| Total stockholders' equity | | 1,615,921 | | 385,941 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ | **1,990,973** | $ | **1,195,244** |

The accompanying notes are an integral part to these audited Consolidated Financial Statements.

F-4

Table of Contents

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

| *(in thousands, except share and per share data)* | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2023** | **2022** | **2021** |
| **Total revenues** | $ 387,508 | $ 117,753 | $ 159,163 |
| | | | |
| **Costs and expenses** | | | |
| **Cost of revenues** | | | |
| Cost of revenues - energy, hosting and other | (223,338) | (72,715) | (27,492) |
| Cost of revenues - depreciation and amortization | (179,513) | (78,709) | (14,904) |
| Total cost of revenues | (402,851) | (151,424) | (42,396) |
| **Operating expenses** | | | |
| General and administrative expenses | (95,230) | (56,739) | (174,356) |
| Gains (losses) on digital assets and digital assets loan receivable | 331,484 | (14,460) | 2,157 |
| Legal reserves | — | (26,131) | — |
| Impairment of deposits due to vendor bankruptcy filing | — | (24,661) | — |
| Impairment of digital assets | — | (182,891) | (22,252) |
| Impairment of patents | — | (919) | — |
| Impairment of mining equipment and advances to vendors | — | (332,933) | — |
| Gain on sale of equipment, net of disposals | — | 83,879 | — |
| Gains (losses) on digital assets held within investment fund | — | (85,017) | 74,696 |
| Total operating expenses | 236,254 | (639,872) | (119,755) |
| **Operating income (loss)** | **220,911** | **(673,543)** | **(2,988)** |
| Net gain from extinguishment of debt | 82,267 | — | — |
| Loss on hedge instruments | (17,421) | — | — |
| Equity in net earnings of unconsolidated affiliate | (617) | — | — |
| Impairment of loan and investment due to vendor bankruptcy filing | — | (31,013) | — |
| Interest expense | (10,350) | (14,981) | (1,569) |
| Other non-operating income (loss) | 2,809 | 1,283 | (288) |
| **Income (loss) before income taxes** | **277,599** | **(718,254)** | **(4,845)** |
| Income tax benefit (expense) | (16,426) | 24,232 | (24,968) |
| **Net income (loss)** | $ **261,173** | $ **(694,022)** | $ **(29,813)** |
| Series A preferred stock accretion to redemption value | (2,121) | — | — |
| **Net income (loss) attributable to common stockholders** | $ **259,052** | $ **(694,022)** | $ **(29,813)** |
| | | | |
| Net income (loss) per share of common stock - basic | $ 1.41 | $ (6.12) | $ (0.30) |
| Weighted average shares of common stock - basic | 183,855,570 | 113,467,837 | 99,337,587 |
| | | | |
| Net income (loss) per share of common stock - diluted | $ 1.06 | $ (6.12) | $ (0.30) |
| Weighted average shares of common stock - diluted | 192,293,277 | 113,467,837 | 99,337,587 |
| | | | |
| **Other comprehensive income (loss)** | | | |
| Series A preferred stock accretion to redemption value | 2,121 | — | — |
| Foreign currency translation adjustments | — | — | (451) |
| **Comprehensive income (loss)** | $ **261,173** | $ **(694,022)** | $ **(30,264)** |

The accompanying notes are an integral part to these audited Consolidated Financial Statements.

F-5

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| (in thousands, except share data) | Common Stock Number | Common Stock Amount | | Additional Paid-in Capital | | Accumulated Deficit | | Accumulated Other Comprehensive Loss | | Total Stockholders' Equity | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2020** | **81,974,619** | $ | **8** | $ | **428,243** | $ | **(116,055)** | $ | **(451)** | $ | **311,745** |
| Stock-based compensation, net of tax withholding | 7,671,317 | | 1 | | 156,072 | | — | | — | | 156,073 |
| Issuance of common stock, net of offering costs/At-the-Market offering | 12,500,000 | | 1 | | 237,428 | | — | | — | | 237,429 |
| Options exercised on cashless basis | 23,500 | | — | | — | | — | | — | | — |
| Warrant exercised for cash | 221,946 | | — | | 1,445 | | — | | — | | 1,445 |
| Common stock issued for cashless exercise of warrants | 29,797 | | — | | 1,371 | | — | | — | | 1,371 |
| Common stock issued for service and license agreements | 312,094 | | — | | 11,135 | | — | | — | | 11,135 |
| Net income (loss) | — | | — | | — | | (30,264) | | 451 | | (29,813) |
| **Balance at December 31, 2021** | **102,733,273** | $ | **10** | $ | **835,694** | $ | **(146,319)** | $ | **—** | $ | **689,385** |
| Stock-based compensation, net of tax withholding | 490,910 | | 1 | | 24,514 | | — | | — | | 24,515 |
| Issuance of common stock, net of offering costs/At-the-Market offering | 42,141,733 | | 4 | | 361,482 | | — | | — | | 361,486 |
| Common stock issued for service and license agreements | 200,000 | | — | | 4,577 | | — | | — | | 4,577 |
| Net loss | — | | — | | — | | (694,022) | | — | | (694,022) |
| **Balance at December 31, 2022** | **145,565,916** | $ | **15** | $ | **1,226,267** | $ | **(840,341)** | $ | **—** | $ | **385,941** |
| Stock-based compensation, net of tax withholding | 1,269,230 | | — | | 32,264 | | — | | — | | 32,264 |
| Issuance of common stock, net of offering costs/At-the-Market offering | 64,271,828 | | 6 | | 608,359 | | — | | — | | 608,365 |
| Series A preferred stock accretion to redemption value | — | | — | | (2,121) | | — | | — | | (2,121) |
| Exchange of convertible notes for common stock | 31,722,417 | | 3 | | 318,768 | | — | | — | | 318,771 |
| Cumulative effect of the adoption of ASU 2023-08 | — | | — | | — | | 11,483 | | — | | 11,483 |
| Other | — | | — | | — | | 45 | | — | | 45 |
| Net income | — | | — | | — | | 261,173 | | — | | 261,173 |
| **Balance at December 31, 2023** | **242,829,391** | $ | **24** | $ | **2,183,537** | $ | **(567,640)** | $ | **—** | $ | **1,615,921** |

The accompanying notes are an integral part of these audited Consolidated Financial Statements.

F-6

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| (in thousands) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2023** | | **2022** | | **2021** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | | |
| Net income (loss) | $ | 261,173 | $ | (694,022) | $ | (29,813) |
| **Adjustments to reconcile net income (loss) to net cash used in operating activities:** | | | | | | |
| Depreciation and amortization | | 179,513 | | 78,709 | | 14,904 |
| Amortization of prepaid service contract | | — | | 22,781 | | — |
| Gain on sale of equipment, net of disposals | | — | | (83,879) | | — |
| Deferred tax expense (benefit) | | 15,286 | | (24,968) | | 24,968 |
| (Gains) losses on digital assets held within investment fund | | — | | 85,017 | | (74,696) |
| (Gains) losses on digital assets and digital assets loan receivable | | (331,484) | | 14,460 | | (2,157) |
| Impairment of digital assets | | — | | 182,891 | | 22,252 |
| Impairment of mining equipment and advances to vendors | | — | | 332,933 | | — |
| Loss on hedge instruments | | 17,421 | | — | | — |
| Stock-based compensation | | 32,644 | | 24,595 | | 160,786 |
| Amortization of debt issuance costs | | 3,168 | | 3,945 | | — |
| Equity in net earnings of unconsolidated affiliate | | 617 | | — | | — |
| Impairment of patents | | — | | 919 | | — |
| Impairment of deposits due to vendor bankruptcy filing | | — | | 55,674 | | — |
| Gain on extinguishment of debt, net | | (82,267) | | — | | — |
| Other adjustments from operations, net | | 484 | | 1,030 | | 1,069 |
| **Changes in operating assets and liabilities:** | | | | | | |
| Revenues from digital assets production | | (385,959) | | (117,747) | | (150,513) |
| Deposits | | (23,777) | | (24,469) | | — |
| Prepaid expenses and other assets | | (1,881) | | (48,887) | | 987 |
| Accounts payable and accrued expenses | | 146 | | 13,225 | | 12,382 |
| Legal reserve payable | | — | | 1,171 | | — |
| Accrued interest | | (735) | | 144 | | 867 |
| **Net cash used in operating activities** | | (315,651) | | (176,478) | | (18,964) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | | |
| Advances to vendors | | (158,940) | | (483,840) | | (435,065) |
| Loan receivable | | — | | — | | (30,000) |
| Purchase of property and equipment | | (27,611) | | (41,108) | | (273,851) |
| Sale of property and equipment | | — | | 178,371 | | — |
| Proceeds from sale of digital assets | | 264,945 | | — | | — |
| Payments on hedge settlements | | (2,004) | | — | | — |
| Purchase of digital assets in investment fund | | — | | — | | (150,000) |
| Investment in joint venture | | (71,795) | | — | | — |
| Purchase of equity investments | | — | | (44,000) | | (3,000) |
| Deconsolidation of fund | | — | | (500) | | — |
| Sale of digital assets in investment fund | | — | | 849 | | 780 |
| **Net cash provided by (used in) investing activities** | | 4,595 | | (390,228) | | (891,136) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | | |
| Proceeds from issuance of common stock, net of issuance costs | | 608,365 | | 361,486 | | 312,196 |
| Proceeds from issuance of Series A preferred stock, net of issuance costs | | 13,629 | | — | | — |
| Redemption of Series A preferred stock | | (15,750) | | — | | — |
| Proceeds from term loan borrowings, net of issuance costs | | — | | 49,250 | | — |

The accompanying notes are an integral part of these audited Consolidated Financial Statements.

F-7

| | | | |
|---|---|---|---|
| Proceeds from issuance of convertible debt, net of issuance costs | — | — | 728,406 |
| Borrowings from revolving credit agreement | — | 120,000 | 77,500 |
| Repayments of revolving credit agreement | (50,000) | (120,000) | (77,500) |
| Value of shares withheld for taxes | (380) | (81) | (4,714) |
| Proceeds received on exercise of options and warrants | — | — | 1,445 |
| **Net cash provided by financing activities** | 555,864 | 410,655 | 1,037,333 |
| | | | |
| **Net increase (decrease) in cash, cash equivalents and restricted cash** | 244,808 | (156,051) | 127,233 |
| **Cash, cash equivalents and restricted cash — beginning of period** | 112,505 | 268,556 | 141,323 |
| **Cash, cash equivalents and restricted cash — end of period** | $ 357,313 | $ 112,505 | $ 268,556 |

The accompanying notes are an integral part to these audited Consolidated Financial Statements.

F-8

Table of Contents

**MARATHON DIGITAL HOLDINGS, INC. AND SUBSIDIARIES**
**Notes to Consolidated Financial Statements**

**NOTE 1 – ORGANIZATION AND DESCRIPTION OF BUSINESS**

**Organization**

Marathon is a digital asset technology company that is principally engaged in producing or "mining" digital assets with a focus on the Bitcoin ecosystem. Marathon's strategic initiatives primarily focus on mining and holding bitcoin as a long-term investment. Bitcoin is seeing increasing adoption, and, due to its limited supply, the Company believes it offers opportunity for appreciation in value and long-term growth prospects for its business.

In addition to mining and holding bitcoin, from time to time Marathon has explored, and may in the future explore, opportunities to become more involved in businesses that expand or supplement those directly related to the self-mining of bitcoin as favorable market conditions and opportunities arise. For example, Marathon has considered or engaged in owning and operating bitcoin mining facilities or data centers, selling proprietary software or technology to third parties operating in the Bitcoin ecosystem, offering advisory and consulting services to support bitcoin mining ventures in domestic and international jurisdictions, and generating electricity from renewable energy resources or methane gas capture to power bitcoin mining projects. Marathon's business is also active in Bitcoin-related projects related to the technological development of immersion, hardware, firmware, mining pools and side chains that use the blockchain cryptography.

The term "Bitcoin" with a capital "B" is used to denote the Bitcoin protocol which implements a highly available, public, permanent, and decentralized ledger. The term "bitcoin" with a lower case "b" is used to denote the token, bitcoin.

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Presentation and Principles of Consolidation**

The accompanying Consolidated Financial Statements include the accounts of the Company and its wholly owned and controlled subsidiaries. Intercompany balances and transactions have been eliminated in consolidation. The Company consolidates the financial results of the following 100% owned entities:

| Subsidiaries |
| --- |
| MARA USA Corporation |
| MARA Tech, Inc. |
| Marathon Digital International, Inc. |
| Marathon Digital Leasing, LLC |
| Crypto Currency Patent Holding Company, LLC |
| MARA Pool LLC |
| Marathon Crypto Mining, Inc. |
| Soems Acquisition Corp. |

**Use of Estimates and Assumptions**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant accounting estimates inherent in the preparation of the Company's financial statements include estimates associated with the useful lives of property and equipment, realization of long-lived assets, deferred income taxes, unrealized tax positions, and measurement of digital assets. Actual results could differ from those estimates.

Table of Contents

**Reclassifications**

Certain prior period amounts have been reclassified to conform to the current period presentation. These reclassifications have no effect on the reported financial position, results of operations, or cash flows. The impact on any prior period disclosures were immaterial.

**Segment Information**

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision–making group, in deciding how to allocate resources and assess performance. The Company's chief operating decision–making group ("CODM") is composed of the chief executive officer and chief financial officer. The Company currently operates in the Digital Currency Blockchain segment. The CODM has determined that the Company operates as one operating segment as the CODM reviews financial information on a consolidated basis in making decisions regarding resource allocation and performance assessment.

**Cash and Cash Equivalents**

The Company considers all highly liquid investments and other short-term investments with a maturity of three months or less, when purchased, to be cash equivalents. The Company maintains cash and cash equivalent balances at financial institutions that are insured by the Federal Deposit Insurance Corporation ("FDIC"). During March 2023, the Company began to participate, to the extent practicable, in insured cash sweep programs which "sweep" its deposits across multiple FDIC insured accounts, each with deposits of no more than $250.0 thousand. For the year ended December 31, 2023, the Company had a cash and cash equivalent balance of $357.3 million, of which $225.0 million was FDIC insured, and approximately $95.7 million was invested in treasury bills and other government backed securities. For the year ended December 31, 2022, the Company had a cash balance of $103.7 million, all held at one financial institution.

**Restricted Cash**

Restricted cash as of December 31, 2022, principally represented those cash balances that support commercial letters of credit and are restricted from withdrawal. During March 2023, the Company eliminated its outstanding letters of credit.

**Digital Assets**

Digital assets are included in current assets in the Consolidated Balance Sheets due to the Company's ability to sell bitcoin in a highly liquid marketplace and the sale of bitcoin to fund operating expenses to support operations. In addition, digital assets provided as collateral for long-term loans were reported as Digital assets, restricted at December 31, 2022 and classified as long-term assets in the Consolidated Balance Sheets. The proceeds from the sale of digital assets are included within investing activities in the accompanying Consolidated Statement of Cash Flows. Following the adoption of ASU 2023-08 effective January 1, 2023, the Company measures digital assets at fair value with changes recognized in operating expenses in the Consolidated Statement of Comprehensive Income (Loss). The Company tracks its cost basis of digital assets by-wallet in accordance with the first-in-first-out ("FIFO") method of accounting. Refer to Note 4 – Digital Assets, for further information regarding the Company's impact of the adoption of ASU 2023-08.

Additionally, during the quarter ended March 31, 2023 and effective January 1, 2023, the Company enacted a voluntary change in accounting principle from last-in-first-out ("LIFO") to FIFO in order to more accurately reflect the disposition of its digital assets. The change in accounting principle resulted in an increase in gain on digital assets for the year ended December 31, 2021 and resulted in an impairment of digital assets for the years ending December 31, 2021 and 2022. The voluntary change in accounting principle has been reflected in the Consolidated Financial Statements.

**Deposits**

The Company contracts with other service providers for hosting of its equipment and operational support in data centers where the Company's equipment is deployed. These arrangements typically require advance payments to vendors pursuant to the contractual obligations associated with these services. The Company classifies these payments as "Deposits" or "Long-term deposits" on the Consolidated Balance Sheets.

As of December 31, 2023 and 2022, such deposits totaled approximately $67.0 million and $43.3 million, respectively.

**Derivatives**

The Company occasionally enters into derivative financial instruments to manage its exposure to fluctuations in the price of bitcoin. During the third and fourth quarters of 2023, the Company entered into fixed strike option collar contracts with financial institutions to mitigate Bitcoin short-term market pricing volatility risk. In addition, the Company evaluates its financing and service arrangements to determine whether certain arrangements contain features that qualify as embedded derivatives requiring bifurcation in accordance with Accounting Standard Codification ("ASC") 815 - *Derivatives and Hedging*. Embedded derivatives that are required to be bifurcated from the host instrument or arrangement are accounted for and valued as separate financial instruments.

Derivatives are initially recorded at fair value with subsequent changes in fair value recognized as gains or losses on hedge instruments in the Consolidated Statements of Comprehensive Income (Loss). The Company classifies derivative assets or liabilities in the Consolidated Balance Sheets as current or non-current based on whether settlement of the instrument could be required within 12 months of the date of the Consolidated Balance Sheets. During the year ended December 31, 2023, the Company recorded a $17.4 million loss on hedge contracts, which contracts were settled through payments of $15.4 million in bitcoin and $2.0 million in cash. The Company had no open derivative contracts as of December 31, 2023 and 2022.

**Property and Equipment**

Property and equipment are stated at cost, net of accumulated depreciation and impairment, as applicable. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. The Company's property and equipment is primarily composed of bitcoin mining rigs, which are largely homogeneous and have approximately the same useful lives. Accordingly, the Company utilizes the group method of depreciation for its bitcoin mining rigs. The Company will update the estimated useful lives of its bitcoin mining server group periodically as information on the operations of the mining equipment indicates changes are required. The Company will assess and adjust the estimated useful lives of its mining equipment when there are indicators that the productivity of the mining assets is longer or shorter than the assigned estimated useful lives.

**Investments**

Investments, which may be made from time to time for strategic reasons, are included in non-current assets in the Consolidated Balance Sheets. Investments without a readily determinable fair value are recorded at cost minus impairment, plus or minus changes from observable price changes in orderly transactions for identical or similar investments of the same issuer, in accordance with the measurement alternative described in ASC 321 - *Investments – Equity Securities.*

As part of the Company's policy to maximize return on strategic investment opportunities, while preserving capital and limiting downside risk, the Company may at times enter into equity investments or Simple Agreements for Future Equity ("SAFE"). The nature and timing of the Company's investments will depend on available capital at any particular time and the investment opportunities identified and available to the Company. However, we generally do not make investments for speculative purposes and do not intend to engage in the business of making investments.

As of December 31, 2023 and 2022, the Company has one remaining SAFE investment with a carrying value of $1.0 million, with no noted impairments or other adjustments.

During September 2023, the Company entered into an agreement with Auradine, Inc. ("Auradine") to secure certain rights to future purchases by the Company from Auradine for which the Company paid $15.0 million and recorded to "Long-term prepaids" in the Consolidated Balance Sheets. The purchase rights that the Company secured do not expire, do not require minimum purchases and include most favored nation and right of first refusal provisions.

On September 27, 2022, the Company purchased additional shares of Auradine preferred stock with a purchase price of $30.0 million, bringing the total carrying amount of its investment in Auradine preferred stock to $35.5 million, with no noted impairments or other adjustments. Refer to Note 17 – Related Party Transactions, for further information.

On May 3, 2022, the Company converted $2.0 million from its prior Auradine SAFE investment into preferred stock while purchasing additional Auradine preferred stock with a purchase price of $3.5 million. At the same time, the Company entered into a commitment to acquire additional shares of Auradine preferred stock with a purchase price of $30.0 million. This forward contract was accounted for under ASC 321 as an equity security.

On February 3, 2022, the Company purchased convertible preferred stock of Compute North Holdings, Inc. with a purchase price of approximately $10.0 million. The Company impaired this investment by approximately

F-11

Table of Contents

$10.0 million following Compute North's chapter 11 bankruptcy filing during September 2022. Refer to Note 11 – Compute North Bankruptcy, for further information.

**Equity Method Investments**

The Company accounts for investments in which it owns between 20% and 50% of the common stock or has the ability to exercise significant influence, but not control, over the investee using the equity method of accounting in accordance with ASC 323 - *Equity Method Investments and Joint Ventures*. Under the equity method, an investor initially records an investment in the stock of an investee at cost and adjusts the carrying amount of the investment to recognize the investor's share of the earnings or losses of the investee after the date of acquisition.

On January 27, 2023, the Company and Zero Two (formerly known as FS Innovation, LLC) entered into a Shareholders' Agreement regarding the formation of an Abu Dhabi Global Markets company (the "ADGM Entity") in which the Company has a 20% ownership interest. The ADGM Entity started mining operations during September 2023. The Company's share of net losses was $0.6 million for the year ended December 31, 2023. As of December 31, 2023, the Company's investment in the ADGM Entity was $69.3 million and which is reflected in "Investments" in the Consolidated Balance Sheets.

**Stock-based Compensation**

The Company expenses stock-based compensation to employees and non-employees over the requisite service period based on the grant date fair value of the awards. Refer to Note 12 – Stockholders' Equity, for further information.

**Impairment of Long-lived Assets**

Management reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to undiscounted future cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

**Revenues**

The Company recognizes revenue under ASC 606 – *Revenue from Contracts with Customers*. The core principle of the revenue standard is that a reporting entity should recognize revenues to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. Refer to Note 3 – Revenues, for further information.

**Income Taxes**

The Company accounts for income taxes under the asset and liability method, in which deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in operations in the period that includes the enactment date. A valuation allowance is required to the extent any deferred tax assets may not be realizable.

ASC 740 - *Income Taxes*, also clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements and prescribes a recognition threshold and measurement process for financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. ASC 740 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure, and transition.

**Recently Issued Accounting Pronouncements**

The Company continually assesses any new accounting pronouncements to determine their applicability. When it is determined that a new accounting pronouncement may affect the Company's financial reporting, the Company undertakes an analysis to determine any required changes to its Consolidated Financial Statements.

On December 14, 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2023-09, Income Taxes (Topic 740): Improvements to Income Tax Disclosures. ASU 2023-09

requires entities to disclose specific rate reconciliations, amount of income taxes separated by federal and individual jurisdiction, and the amount of income (loss) from continuing operations before income tax expense (benefit) disaggregated between federal, state, and foreign. The new standard is effective for the Company for its fiscal year beginning January 1, 2025, with early adoption permitted. The Company is currently evaluating the impact of adopting the standard.

On December 13, 2023, the FASB issued ASU No. 2023-08, Intangibles - Goodwill and Other - Crypto Assets (Topic 350-60): Accounting for and Disclosure of Crypto Assets. ASU 2023-08 requires entities to measure crypto assets that meet specific criteria at fair value with changes recognized in net income each reporting period. Additionally, ASU 2023-08 requires an entity to present crypto assets measured at fair value separately from other intangible assets in the balance sheets and record changes from remeasurement of crypto assets separately from changes in the carrying amounts of other intangible assets in the income statement. The new standard is effective for the Company for its fiscal year beginning January 1, 2025, with early adoption permitted. The Company early adopted ASU 2023-08 effective as of January 1, 2023, which had a material impact on the Consolidated Financial Statements. Refer to Note 4 – Digital Assets, for further information.

On November 27, 2023, the FASB issued ASU No. 2023-07, Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures. ASU 2023-07 is designed to improve the reportable segment disclosure requirements, primarily through enhanced disclosures about significant segment expenses that are regularly provided to the CODM. The new standard is effective for the Company for its fiscal year beginning January 1, 2025, with early adoption permitted. The Company is currently evaluating the impact of adopting the standard.

On August 23, 2023, the FASB issued ASU No. 2023-05, *Business Combinations - Joint Venture Formations* (Subtopic 805-60): *Recognition and Initial Measurement*. ASU 2023-05 addresses the accounting for contributions made to a joint venture and requires contributions received by the joint venture to be measured at fair value upon formation. ASU 2023-05 is designed to provide useful information to investors and reduce diversity in practice. The new standard is effective for the Company for its fiscal year beginning January 1, 2025, with early adoption permitted. The Company is currently evaluating the impact of adopting the standard.

On March 28, 2023, the FASB issued ASU No. 2023-01, Leases (Topic 842): Common Control Arrangements. ASU 2023-01 is designed to clarify the accounting for leasehold improvements associated with common control leases, thereby reducing diversity in practice. The new standard is effective for the Company for its fiscal year beginning January 1, 2024, with early adoption permitted. The Company is currently evaluating the impact of adopting the standard.

On June 30, 2022, the FASB issued ASU No. 2022-03, Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions. ASU 2022-03 clarifies that a contractual sale restriction prohibiting the sale of an equity security is a characteristic of the reporting entity holding the equity security and should not be included in the equity security's unit of account. The new standard is effective for the Company for its fiscal year beginning January 1, 2024, with early adoption permitted. The Company adopted ASU 2022-03 on July 1, 2023, which did not have a material impact on the Consolidated Financial Statements.

**NOTE 3 – REVENUES**

The Company recognizes revenue in accordance with ASC 606. The core principle of the revenue standard is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services. The following five steps are applied to achieve that core principle:

- Step 1: Identify the contract with the customer;

- Step 2: Identify the performance obligations in the contract;

- Step 3: Determine the transaction price;

- Step 4: Allocate the transaction price to the performance obligations in the contract; and

- Step 5: Recognize revenue when the Company satisfies a performance obligation.

In order to identify the performance obligations in a contract with a customer, an entity must assess the promised goods or services in the contract and identify each promised good or service that is distinct. A performance obligation meets ASC 606's definition of a "distinct" good or service (or bundle of goods or services) if both of the following criteria are met:

• The customer can benefit from the good or service either on its own or together with other resources that are readily available to the customer (i.e., the good or service is capable of being distinct); and

• The entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract (i.e., the promise to transfer the good or service is distinct within the context of the contract).

If a good or service is not distinct, the good or service is combined with other promised goods or services until a bundle of goods or services is identified that is distinct.

The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both. When determining the transaction price, an entity must consider the effects of all of the following:

• Variable consideration

• Constraining estimates of variable consideration

• The existence of a significant financing component in the contract

• Noncash consideration

• Consideration payable to a customer

Variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized under the accounting contract will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

The transaction price is allocated to each performance obligation on a relative standalone selling price basis.

The transaction price allocated to each performance obligation is recognized when that performance obligation is satisfied, at a point in time or over time, as appropriate.

**Application of the five-step model to the Company's mining operations**

The Company's ongoing major or central operation is to provide bitcoin transaction verification services to the transaction requestor, in addition to the bitcoin network through a Company-operated mining pool as the operator ("Operator") (such activity, "mining") and to provide a service of performing hash calculations to third-party pool operators alongside collectives of third-party bitcoin miners (such collectives, "mining pools") as a participant ("Participant").

The following table presents the Company's revenues disaggregated for those arrangements in which the Company is the Operator and Participant:

| (in thousands) | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2021 | |
| **Revenues from contracts with customers** | | | | | | |
| Operator - Transaction fees | $ | 32,598 | $ | 5,231 | $ | 3,317 |
| Participant | | 25,101 | | 4,652 | | 20,903 |
| Total revenues from contracts with customers | | 57,699 | | 9,883 | | 24,220 |
| **Operator - Block rewards and other revenue** | | 329,809 | | 107,870 | | 134,943 |
| **Total revenues** | $ | 387,508 | $ | 117,753 | $ | 159,163 |

Table of Contents

**Operator**

As Operator, the Company provides transaction verification services to the transaction requestor, in addition to the bitcoin network. Transaction verification services are an output of the Company's ordinary activities; therefore, the Company views the transaction requestor as a customer and recognizes the transaction fees as revenue from contracts with customers under ASC 606. The bitcoin network is not an entity such that it may not meet the definition of a customer; however, the Company has concluded that it is appropriate to apply ASC 606 by analogy to block rewards earned from the bitcoin network. The Company is currently entitled to the block reward of 6.25 bitcoin from the bitcoin network upon each successful validation of a block. The Company is also entitled to the transaction fees paid by the transaction requester payable in bitcoin for each successful validation of a block. The Company assessed the following factors in the determination of the inception and duration of each individual contract to validate a block and satisfaction of its performance obligation as follows:

- For each individual contract, the parties' rights, the transaction price, and the payment terms are fixed and known as of the inception of each individual contract.

- The transaction requestor and the bitcoin network each have a unilateral enforceable right to terminate their respective contracts at any time without penalty.

- For each of these respective contracts, contract inception and completion occur simultaneously upon block validation; that is, the contract begins upon, and the duration of the contract does not extend beyond, the validation of an individual blockchain transaction; and each respective contract contains a single performance obligation to perform a transaction validation service and this performance obligation is satisfied at the point-in-time when a block is successfully validated.

From September 2021 until May 2022, the Company engaged unrelated third-party mining enterprises ("pool participants") to contribute hash calculations, and in exchange, remitted transaction fees and block rewards to pool participants on a pro rata basis according to each respective pool participant's contributed hash calculations. The MaraPool wallet (owned by the Company as Operator) is recorded on the distributed ledger as the winner of proof of work block rewards and assignee of all validations and, therefore, the transaction verifier of record. The pool participants entered into contracts with the Company as Operator; they did not directly enter into contracts with the network or the requester and were not known verifiers of the transactions assigned to the pool. As Operator, the Company delegated mining work to the pool participants utilizing software that algorithmically assigned work to each individual miner. By virtue of its selection and operation of the software, the Company as Operator controlled delegation of work to the pool participants. This indicated that the Company directed the mining pool participants to contribute their hash calculations to solve in areas that the Company designated. Therefore, the Company determined that it controlled the service of providing transaction verification services to the network and requester. Accordingly, the Company recorded all of the transaction fees and block rewards earned from transactions assigned to MaraPool as revenue, and the portion of the transaction fees and block rewards remitted to MaraPool participants as cost of revenues.

In accordance with ASC 606-10-32-21, the Company measures the estimated fair value of the non-cash consideration (block reward and transaction fees) at contract inception, which is at the time the performance obligation to the requester and the network is fulfilled by successfully validating a block. The Company measures the non-cash consideration which is fixed as of the inception of each individual contract using the quoted spot rate for bitcoin determined using the Company's primary trading platform for bitcoin at the time the Company successfully validates a block.

Expenses associated with providing bitcoin transaction verification services, such as hosting fees, electricity costs, and related fees are recorded as cost of revenues. Depreciation on digital asset mining equipment is also recorded as a component of cost of revenues.

**Participant**

The Company participates in third-party operated mining pools. When the Company is a Participant in a third-party operated mining pool, the Company provides a service to perform hash calculations to the third-party pool operators. The Company considers the third-party mining pool operators to be its customers under Topic 606. Contract inception and our enforceable right to consideration begins when we commence providing hash calculation services to the mining pool operators. Each party to the contract has the unilateral right to terminate the contract at any time without any compensation to the other party for such termination. As such, the duration of a contract is less than a day and may be continuously renewed multiple times throughout the day. The implied renewal option is not a material right because there are no upfront or incremental fees in the initial contract and the terms, conditions, and compensation amount for the renewal options are at the then market rates.

F-15

The Company is entitled to non-cash compensation based on the pool operator's payout model. The payout methodologies differ depending on the type of third-party operated mining pool. Full-Pay-Per-Share ("FPPS") pools pay block rewards and transaction fees, less mining pool fees and Pay-Per-Share ("PPS") pools pay block rewards less mining pool fees but no transaction fees. For FPPS and PPS pools, the Company is entitled to non-cash consideration even if a block is not successfully validated by the mining pool operators. Success-based mining pools pay a fractional share of the successfully mined block and transaction fees, reduced by pool operator expenses only if a block is successfully validated.

During 2023, the Company primarily participated in FPPS mining pools and, to a lesser extent, success-based mining pools. During 2022 and 2021, the Company primarily participated in success-based mining pools and, to a lesser extent, PPS mining pools.

### FPPS Mining Pools

The Company primarily participates in mining pools that use the FPPS payout method for the year ended December 31, 2023. The Company is entitled to compensation once it begins to perform hash calculations for the pool operator in accordance with the operator's specifications over a 24-hour period beginning mid-night UTC and ending 23:59:59 UTC on a daily basis. The non-cash consideration that we are entitled to for providing hash calculations to the pool operator under the FPPS payout method is made up of block rewards and transaction fees less pool operator expenses determined as follows:

- The non-cash consideration in the form of a block reward is based on the total blocks expected to be generated on the Bitcoin Network for the daily 24-hour period beginning midnight UTC and ending 23:59:59 UTC in accordance with the following formula: the daily hash calculations that we provided to the pool operator as a percent of the Bitcoin Network's implied hash calculations as determined by the network difficulty, multiplied by the total Bitcoin Network block rewards expected to be generated for the same daily period.

- The non-cash consideration in the form of transaction fees paid by transaction requestors is based on the share of total actual fees paid over the daily 24-hour period beginning midnight UTC and ending 23:59:59 UTC in accordance with the following formula: total actual transaction fees generated on the Bitcoin Network during the 24-hour period as a percent of total block rewards the Bitcoin Network actually generated during the same 24-hour period, multiplied by the block rewards we earned for the same 24-hour period noted above.

- The block reward and transaction fees earned by the Company is reduced by mining pool fees charged by the operator for operating the pool based on a rate schedule per the mining pool contract. The mining pool fee is only incurred to the extent we perform hash calculations and generate revenue in accordance with the pool operator's payout formula during the same 24-hour period beginning mid-night UTC daily.

The above non-cash consideration is variable in accordance with paragraphs ASC 606-10-32-5 to 606-10-32-7, since the amount of block reward earned depends on the amount of hash calculations we perform; the amount of transaction fees we are entitled to depends on the actual Bitcoin Network transaction fees over the same 24-hour period; and the operator fees for the same 24-hour period are variable since it is determined based on the total block rewards and transaction fees in accordance with the pool operator's agreement. While the non-cash consideration is variable, the Company has the ability to estimate the variable consideration at contract inception with reasonable certainty without the risk of significant revenue reversal. The Company does not constrain this variable consideration because it is probable that a significant reversal in the amount of revenue recognized from the contract will not occur when the uncertainty is subsequently resolved and recognizes the non-cash consideration on the same day that control is transferred, which is the same day as contract inception.

The Company measures the non-cash consideration based on the simple average daily spot rate of bitcoin determined using the Company's primary trading platform for bitcoin over a 24-hour period beginning mid-night UTC and ending 23:59:59 UTC on the day of contract inception. The Company recognizes non-cash consideration on the same day that control of the contracted service is transferred to the pool operator, which is the same day as the contract inception.

### PPS Mining Pools

The Company participates in PPS pools that provide non-cash consideration similar to the FPPS pools except PPS pools do not include transaction fees, therefore, the non-cash consideration received by the Company is made up of block rewards less mining pool fees. While the non-cash consideration is variable, the Company has the ability to estimate the variable consideration at contract inception with reasonable certainty. The Company does not constrain this variable consideration because it is probable that a significant reversal in the amount of revenue recognized from

Table of Contents

the contract will not occur when the uncertainty is subsequently resolved and recognizes the non-cash consideration on the same day that control is transferred, which is the same day as contract inception.

The Company measures the non-cash consideration based on the simple average daily spot rate of bitcoin determined using the Company's primary trading platform for bitcoin over a 24-hour period beginning mid-night UTC and ending 23:59:59 UTC on the day of contract inception. The Company recognizes non-cash consideration on the same day that control of the contracted service is transferred to the pool operator, which is the same day as the contract inception.

*Success-based Mining Pools*

The Company also participates, to a lesser extent, in third-party mining pools that pay rewards only when the pool successfully validates a block. For these pools, the Company only earns a reward when the third-party pool successfully mines a block and its reward is the fractional share of the successfully mined block and transaction fees, reduced by pool operator expenses, based on the proportion of hash calculations the Company performed for the mining pool operator to the total hash calculations performed by all mining pool participants in validating the block during the 24-hour period beginning at midnight UTC and ending 23:59:59 UTC daily.

Contract inception and our enforceable right to consideration begins when the Company commences the performance of hash calculations for the mining pool operator. The non-cash consideration is variable in accordance with paragraphs ASC 606-10-32-5 to 606-10-32-7 as it depends on whether the third-party mining pool successfully validates a block during each 24-hour period. In addition, other inputs such as the amount of hash calculations and our fractional share of consideration earned by the pool operator also cause variability. The Company does not have the ability to estimate whether a block will be successfully validated with reasonable certainty at contract inception. The Company constrains the variable consideration at contract inception because it is not probable that a significant reversal in the amount of revenue recognized from the contract will not occur when the uncertainty is subsequently resolved. Once a block is successfully validated, the constraint is lifted. The Company recognizes the non-cash consideration on the same day that control is transferred, which is the same day as contract inception.

The Company's policy was to measure non-cash consideration based on the spot rate of bitcoin at the time the pool successfully validates a block, which was not in accordance with ASC 606-10-32-21 which requires measurement to coincide with contract inception. Additionally, this measurement was not consistent with the measurement of non-cash consideration for FPPS and PPS pools. During the three months ended December 31, 2023, the Company corrected this error and changed its measurement of non-cash consideration to the simple average daily spot rate of bitcoin determined using the Company's primary trading platform for bitcoin on the date of contract inception, which is the same day that control of the contracted service (hash calculations) is transferred to the pool operator. The change in measurement did not have a material impact to the results of operations for any of the periods presented.

Expenses associated with providing hash calculation services to third-party operated mining pools, such as hosting fees, electricity costs, and related fees, are recorded as cost of revenues. Depreciation on digital asset mining equipment is also recorded as a component of cost of revenues.

**NOTE 4 – DIGITAL ASSETS**
**Adoption of ASU 2023-08, Accounting for and Disclosure of Crypto Assets**
Effective January 1, 2023, the Company early adopted ASU 2023-08, which requires entities to measure crypto assets at fair value with changes recognized in the Consolidated Statement of Comprehensive Income (Loss) each reporting period. The Company's digital assets are within the scope of ASU 2023-08 and the transition guidance requires a cumulative-effect adjustment as of the beginning of the current fiscal year for any difference between the carrying amount of the Company's digital assets and fair value. As a result of the Company's early adoption of ASU 2023-08, the Company recorded a $11.5 million increase to digital assets and a $11.5 million decrease to accumulated deficit on the Consolidated Balance Sheets as of the beginning of the fiscal year ended December 31, 2023.

Table of Contents

The following table presents the Company's significant digital asset holdings as of December 31, 2023:

| (in thousands, except for quantity) | Quantity | Cost Basis | Fair Value |
|---|---|---|---|
| Bitcoin | 15,126 | $ 515,315 | $ 639,660 |
| **Total digital assets held as of December 31, 2023** | | $ 515,315 | $ 639,660 |

At December 31, 2023, the Company had earned 48 bitcoin that were pending distribution from the Company's equity method investee, the ADGM Entity, which are excluded from the Company's holdings as of December 31, 2023.

The following table presents a roll-forward of total digital assets (including digital assets, restricted) for the year ended December 31, 2023, based on the fair value model under ASU 2023-08:

| (in thousands) | Fair Value |
|---|---|
| Digital assets and digital assets, restricted at December 31, 2022 | $ 190,717 |
| Cumulative effect of the adoption of ASU 2023-08 | 11,483 |
| **Beginning Balance: Digital assets and digital assets, restricted at January 1, 2023** | 202,200 |
| Addition of digital assets | 385,959 |
| Disposition of digital assets | (264,945) |
| Realized gain (loss) on digital assets | 28,738 |
| Unrealized gain (loss) on digital assets | 287,708 |
| **Digital assets at December 31, 2023** | $ 639,660 |

During the year ended December 31, 2023, the Company acquired $386.0 million of digital assets through mining activities and disposed of $264.9 million digital assets through the sale of digital assets. During the year ended December 31, 2023, the Company realized total gains on digital assets of $52.5 million and total losses on digital assets of $23.8 million.

During the first quarter of 2023, the term loan was terminated, and the restrictions lapsed on the digital assets that had previously been classified as digital assets, restricted. Refer to Note 14 – Debt, for further information.

**Prior to Adoption of ASU 2023-08, Accounting for and Disclosure of Crypto Assets**

*Digital assets and Digital assets, restricted*

Prior to the adoption of ASU 2023-08, digital assets were accounted for as indefinite-lived intangible assets and were initially measured in accordance with ASC 350 - *Intangible-Goodwill and Other*. Digital assets were not amortized, but were assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived intangible asset is impaired. Whenever the exchange-traded price of digital assets declined below its carrying value, the Company was required to determine if an impairment existed and to record an impairment equal to the amount by which the carrying value exceeded the fair value.

The following table presents a roll-forward of digital assets and digital assets, restricted for the year ended December 31, 2022, based on the cost-impairment model under ASC 350:

| | | (in thousands) |
|---|---|---|
| **Digital assets and digital assets, restricted at December 31, 2021** | $ | 95,226 |
| Additions of digital assets | | 117,557 |
| Transfer of digital assets from digital assets held in Fund | | 137,844 |
| Recognition of loaned digital assets | | 13,324 |
| Impairment of digital assets | | (173,214) |
| Disposition of digital assets | | (20) |
| **Digital assets and digital assets, restricted at December 31, 2022** | $ | 190,717 |

As of December 31, 2022, the Company held approximately 12,232 bitcoin, relating to digital assets and digital assets, restricted, with a carrying value of $190.7 million and a fair value of $202.4 million based on Level 1 inputs. Refer to Note 8 - Fair Value Measurement, for further information.

*Digital assets held in Fund*

On January 25, 2021, the Company entered into a limited partnership agreement with NYDIG Digital Assets Fund III, LP (the "Fund") pursuant to which the Fund purchased 4,813 bitcoin for an aggregate purchase price of $150.0 million. The Company owned 100% of the limited partnership interests and consolidated the Fund under a voting interest model. The consolidated assets in the Fund were included in the Consolidated Balance Sheets under the caption "Digital assets held in Fund".

The Fund qualified and operated as an investment company for accounting purposes pursuant to the accounting and reporting guidance under ASC 946 – *Financial Services – Investment Companies*, which requires fair value measurement of the Fund's investments in digital assets. The Company retains the Fund's investment company specific accounting principles under ASC 946 upon consolidation. The Company recorded changes in the fair value of the assets in the Consolidated Statements of Comprehensive Income (Loss) under the caption "Gains (losses) on digital assets held within investment fund."

On June 10, 2022, the Company redeemed 100% of its limited partnership interest in the Fund in exchange for approximately 4,769 bitcoin with a fair market value of approximately $137.8 million. This bitcoin was transferred from the Fund's custodial wallet to the Company's digital wallet. Upon redemption, the Company no longer had a majority voting interest in the Fund and therefore deconsolidated the Fund in accordance with ASC 810 – *Consolidation*. The Company did not record any gain or loss upon deconsolidation as the digital assets in the Fund were measured at fair value. Subsequent to the transfer, the bitcoin transferred to the Company's digital wallet was accounted for at cost less impairment in line with its digital assets measurement policy. The activity in the Fund for the year ended December 31, 2022, was as follows. There was no activity in the Fund as of December 31, 2023.

| | | (in thousands) |
|---|---|---|
| **Digital assets held in Fund at December 31, 2021** | $ | 223,916 |
| Unrealized appreciation on digital assets held in Fund | | (74,723) |
| Disposition of digital assets held in Fund | | (794) |
| Realized loss on in-kind distribution | | (10,555) |
| Digital assets transferred out of Fund | | (137,844) |
| **Digital assets held in Fund at December 31, 2022** | $ | — |

**NOTE 5 – ADVANCES TO VENDORS AND DEPOSITS**

The Company contracts with bitcoin mining equipment manufacturers to procure equipment necessary for the operation of its bitcoin mining operations. These agreements typically require a certain percentage of the value of the total order to be paid in advance at specific intervals, usually within several days of execution of a specific contract and periodically thereafter with final payments due prior to each shipment date. The Company accounts for these payments as "Advances to vendors" on the Consolidated Balance Sheets.

As of December 31, 2023 and 2022, such advances totaled approximately $95.6 million and $488.3 million, respectively.

In addition, the Company contracts with other service providers for the hosting of its equipment and operational support in data centers where the Company's equipment is deployed. These arrangements also typically require advance payments to be made to vendors in conjunction with the contractual obligations associated with these services. The Company classifies these payments as "Deposits" and "Long-term deposits" on the Consolidated Balance Sheets.

**NOTE 6 – PROPERTY AND EQUIPMENT**

The components of property and equipment as of December 31, 2023 and 2022 are:

| (in thousands, except useful life) | Useful life (Years) | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Mining rigs | 3 | $ 862,055 | $ 116,634 |
| Containers | 10 | 5,676 | 1,614 |
| Other | 7 | 242 | 206 |
| Construction in progress | — | — | 171,194 |
| Total gross property, equipment | | 867,973 | 289,648 |
| Less: Accumulated depreciation | | (196,201) | (16,622) |
| **Property and equipment, net** | | $ 671,772 | $ 273,026 |

The Company records mining rigs not yet placed into service as construction in progress. Upon energization of the mining rigs, the mining rigs are reclassified to "Mining rigs" and depreciated over the estimated useful life.

The Company's depreciation expense related to property and equipment for the years ended December 31, 2023 and 2022 was $179.5 million and $78.7 million, respectively.

In late 2021, the Company entered into an agreement with DCRBN Ventures Development and Acquisition LLC ("DCRBN") in which the Company agreed to sell certain mining rigs to DCRBN in conjunction with the development of commercial activities at the McCamey, Texas facility. In conjunction with its closure from the Hardin, Montana facility in September 2022 (the "Hardin Transaction"), the Company also sold bitcoin mining rigs to various third parties. Total cash proceeds from these sales of assets for the year ended December 31, 2022, were $178.4 million and gains resulting from the asset sales totaled $83.9 million. There were no such sales in 2023.

In connection with the Hardin Transaction, the Company recorded additional depreciation expense related to approximately 1,800 bitcoin mining rigs that were previously deployed and were no longer in operating condition based on inspections of the assets at the facility and experience with the assets formerly deployed at Hardin in the weeks following redeployment. In addition, the Company determined that the useful lives of the remaining mining rigs formerly deployed at Hardin should be reduced from 36 months to 24 months.

In accordance with ASC 360 - *Impairment and Disposal of Long-Lived Assets*, a long-lived asset (group) that is held and used must be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the long-lived asset (group) might not be recoverable. Due to the decrease in the cost of bitcoin mining rigs that was driven by the drop in bitcoin prices during the fourth quarter ended December 31, 2022, the Company assessed the need for an impairment write-down of its bitcoin mining rigs. In accordance with ASC 360-10, the Company initially determined that the carrying value of its bitcoin miners was not recoverable. As its bitcoin mining rigs had a carrying value in excess of fair value, the Company recognized an impairment charge of approximately $208.6 million for the year ended December 31, 2022. The fair value of the bitcoin miners determined primarily using observable prices for similar assets as of December 31, 2022 was $271.3 million.

As a result of the impairment charge of its bitcoin mining rigs, the Company re-evaluated and reduced the estimated useful life for its asset group of mining rigs from 5 to 3 years, effective January 1, 2023. No impairment indicators were identified during the year ended December 31, 2023.

**NOTE 7 – DIGITAL ASSET LOAN RECEIVABLE, NET OF ALLOWANCE**

The Company's digital asset loan receivable represents two separate digital asset loans made to NYDIG Funding, LLC ("NYDIG") in August 2021 and December 2021 under a master securities loan agreement, which was terminated at the point of full repayment in kind for both loans in June 2022. A total of 600 bitcoin were loaned to NYDIG. No collateral was posted to Marathon under the terms of the two loans. The digital assets loan receivables were initially and subsequently measured at the fair value of the underlying bitcoin lent at the time of the transfer, approximately $27.2 million, and adjusted for expected credit losses, with changes in fair value recorded as

unrealized gains and losses in the Consolidated Statements of Comprehensive Income (Loss). A loan fee was accrued daily, based on the daily closing price of the underlying bitcoin and a set percentage rate, and paid in cash on a monthly basis consistent with each loan's confirmation terms.

The loans were fully repaid by NYDIG in June 2022 at which time the 600 bitcoin were reclassified into digital assets at the carrying value of the digital assets loan receivable immediately prior to its derecognition at the end of loan. The Company did not have any digital asset loan receivables outstanding as of December 31, 2023 or 2022. As such, the Company recorded an allowance for loan losses as of December 31, 2021 with an initial provision expense of approximately $0.9 million. As of December 31, 2022, the Company recognized a corresponding provision benefit of approximately $0.9 million for the June 2022 repayment in full.

**NOTE 8 – FAIR VALUE MEASUREMENT**

The Company measures certain financial and non-financial assets and liabilities at fair value on a recurring or non-recurring basis. The Company uses a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, essentially an exit price, based on the highest and best use of the asset or liability.

The levels of the fair value hierarchy are:

Level 1:     Observable inputs such as quoted market prices in active markets for identical assets or liabilities

Level 2:     Observable market-based inputs or unobservable inputs that are corroborated by market data

Level 3:     Unobservable inputs for which there is little or no market data, which require the use of the reporting entity's own assumptions

The carrying amounts reported in the Consolidated Balance Sheets for cash and cash equivalents, restricted cash, other receivables, deposits, prepaid expenses and other current assets, property and equipment, advances to vendors, accounts payable, accrued expenses, and legal reserve payable, approximate their estimated fair market value based on the short-term maturity of these instruments. Additionally, the carrying amounts reported in the Consolidated Balance Sheets for the Company's term loan, operating lease liabilities and other long-term liabilities approximate fair value as the related interest rates approximate rates currently available to the Company.

Financial assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level of input that is significant to their fair value measurement. The Company measures the fair value of its marketable securities and investments by taking into consideration valuations obtained from third-party pricing sources. The pricing services utilize industry standard valuation models, including both income and market-based approaches, for which all significant inputs are observable, either directly or indirectly, to estimate fair value. These inputs included reported trades of and broker-dealer quotes on the same or similar securities, issuer credit spreads, benchmark securities and other observable inputs.

**Recurring measurement of fair value**

The following tables present information about the Company's assets measured at fair value on a recurring basis and the Company's estimated level within the fair value hierarchy of those assets and liabilities as of December 31, 2023 and December 31, 2022, respectively:

| (in thousands) | Recurring fair value measured at December 31, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Total carrying value | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| Assets: | | | | |
| Cash and cash equivalents [1] | $ 201,688 | $ 201,688 | $ — | $ — |
| Digital assets | 639,660 | 639,660 | — | — |

| (in thousands) | Recurring fair value measured at December 31, 2022 | | | |
| | Total carrying value | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Cash and cash equivalents [2] | $ 92,044 | $ 92,044 | $ — | $ — |

[1] Represents money market accounts, government backed securities, and investments. Excludes $ 155.6 million of cash and cash equivalents as of December 31, 2023.

[2] Represents money market accounts. Excludes $11.7 million of cash and cash equivalents as of December 31, 2022.

Effective January 1, 2023, the Company early adopted ASU 2023-08, measuring digital assets at fair value on a recurring basis. Refer to Note 4– Digital Assets, for further information. Additionally, during March 2023, the fair value of digital assets were transferred from Level 2 to Level 1, as a result of using the quoted price in the active market in accordance with ASC 820. There were no other transfers among Levels 1, 2 or 3 during the years ended December 31, 2023 and December 31, 2022.

On June 10, 2022, the Company withdrew approximately 4,769 bitcoin from its investment in NYDIG Digital Assets Fund III, LP and transferred the bitcoin directly into the Company's account.

**Non-recurring measurement of fair value**
The following tables present information about the Company's assets and liabilities measured at fair value on a non-recurring basis and are, therefore, not included in the tables above. These assets include (a) digital assets and digital assets, restricted that are initially recorded at cost and subsequently impaired as the fair value falls below its carrying value and (b) mining rigs and advances to vendors that are written down to fair value due to the decrease in the cost of bitcoin mining rigs that was driven by the drop in bitcoin prices during the fourth quarter ended December 31, 2022. These assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (e.g., impairment). The Company's estimated level within the fair value hierarchy for each of these assets and liabilities as of December 31, 2022 are as follows. As of December 31, 2023, the Company had no assets and liabilities that were measured on a non-recurring basis, due to the early adoption of ASU 2023-08 and the requirement to measure crypto assets at fair value. Refer to Note 4 – Digital Assets, for further information.

| (in thousands) | Non-recurring fair value measured at December 31, 2023 | | | |
| | Total carrying value | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| Liabilities: | | | | |
| Notes payable | $ 325,654 | $ 269,725 | $ — | $ — |

| (in thousands) | Non-recurring fair value measured at December 31, 2022 | | | |
| | Total carrying value | Quoted prices in active markets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Digital assets | $ 121,842 | $ — | $ 129,201 | $ — |
| Property and equipment, net [1] | 271,280 | — | 271,280 | — |
| Advances to vendors | 488,299 | — | 488,299 | — |
| Digital assets, restricted | 68,875 | — | 72,998 | — |
| Liabilities: | | | | |
| Notes payable | 732,289 | 173,200 | — | — |

Table of Contents

(1) Represents mining rigs. Excludes $1.7 million of property and equipment relating to containers, website, and leasehold improvements as of December 31, 2022.

There were no transfers among Levels 1, 2 or 3 during the years ended December 31, 2023 and December 31, 2022.

**NOTE 9 – INCOME TAXES**

The Company accounts for income taxes under ASC 740 - *Income Taxes*, which requires the recognition of deferred tax assets and liabilities for both the expected impact of differences between the financial statements and the tax basis of assets and liabilities, and for the expected future tax benefit to be derived from tax losses and tax credit carry-forwards. ASC 740 additionally requires the establishment of a valuation allowance to reflect the likelihood of realization of deferred tax assets.

Income tax expense (benefit) attributable to income from continuing operations was $16.4 million, $(24.2) million, and $25.0 million for the years ended December 31, 2023, 2022, and 2021, respectively, and differed from the amounts computed by applying the U.S. federal income tax rate of 21% to pretax income from continuing operations as a result of the following:

| *(in thousands, except percentage data)* | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Federal income tax expense (benefit) at the statutory rate | 21.0 % | $ 58,296 | (21.0)% | $ (150,785) | (21.0)% | $ (1,097) |
| State income taxes, net of federal tax expense | 0.9 % | 2,559 | (1.6)% | (11,495) | 150.7 % | 7,876 |
| Executive compensation deduction limitation | 0.9 % | 2,587 | 1.0 % | 7,358 | 578.1 % | 30,213 |
| Excess tax benefit related to share-based compensation | 0.2 % | 470 | — % | 285 | (36.5)% | (1,909) |
| Nondeductible other expenses | 0.6 % | 1,798 | — % | 14 | 4.3 % | 225 |
| Change in valuation allowance | (18.9)% | (52,502) | 18.2 % | 130,462 | (277.0)% | (14,477) |
| Prior year true-ups | 1.2 % | 3,346 | — % | 127 | 81.9 % | 4,281 |
| Other, net | — % | (128) | — % | (198) | (2.8)% | (144) |
| Income tax expense (benefit) from continuing operations | 5.9 % | $ 16,426 | (3.4)% | $ (24,232) | 477.7 % | $ 24,968 |

The components of the provision for income taxes are as follows:

| (in thousands) | December 31, 2023 | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| **Current income tax expense (benefit)** | | | |
| Federal | $ — | $ — | $ — |
| State | 1,140 | 733 | 2 |
| Total current income tax expense | 1,140 | 733 | 2 |
| | | | |
| **Deferred expense** | | | |
| Federal | 66,129 | (143,598) | 31,569 |
| State | 1,659 | (11,829) | 7,874 |
| Total deferred tax expense (benefit) | 67,788 | (155,427) | 39,443 |
| | | | |
| Change in valuation allowance | (52,502) | 130,462 | (14,477) |
| | | | |
| Net deferred tax expense after valuation allowance (benefit) | 15,286 | (24,965) | 24,966 |
| | | | |
| **Income tax provision (benefit)** | $ 16,426 | $ (24,232) | $ 24,968 |

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities at December 31, 2023 and 2022 are presented below:

| (in thousands) | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Deferred tax assets: | | |
| Tax credit carryforwards | $ 517 | $ 386 |
| Net operating loss carryforwards | 144,081 | 48,703 |
| Intangible assets | 1,602 | 1,727 |
| Stock compensation | 3,898 | 2,133 |
| Digital assets | — | 52,535 |
| Disallowed Interest | 3,093 | 2,215 |
| Bad debt reserve | 9,957 | 10,039 |
| Research and development costs | 1,619 | 541 |
| Accruals, reserves and other | 286 | 239 |
| Impairment loss | 36,100 | 36,397 |
| Capital losses | 11,950 | — |
| Gain on hedge instruments | 3,798 | — |
| Total gross deferred tax assets | 216,901 | 154,915 |
| Less valuation allowance | (77,960) | (130,462) |
| Net deferred tax assets | 138,941 | 24,453 |
| | | |
| Deferred tax liabilities: | | |
| Unrealized gains | — | (2,494) |
| Property and equipment, net | (117,094) | (21,959) |
| Digital assets | (37,133) | |
| Total gross deferred liabilities | (154,227) | (24,453) |
| **Net deferred tax liability** | $ (15,286) | $ — |

F-24

The valuation allowance for deferred tax assets as of December 31, 2023 and 2022 was $78.0 million and $130.5 million, respectively. The net change in the total valuation allowance was a decrease of $52.5 million in the year ended December 31, 2023.

At year ended December 31, 2023, the Company concluded, based upon all available evidence, it was more likely than not that it would not have sufficient future taxable income to realize the Company's federal and state deferred tax assets. As a result, the Company established a valuation allowance against deferred tax assets that are not supported by reversing deferred tax liabilities.

At December 31, 2023, the Company has federal and state net operating loss carryforwards of $772.1 million, which are available to offset future taxable income. In addition, the Company has interest expense carryforwards of $14.2 million.

The Company has the following attributes and credit carryforwards:

| (in thousands) | | Gross Amount | Expiring |
|---|---|---|---|
| Federal net operating loss carryforwards | $ | 3,314 | 2034-2035 |
| Federal net operating loss carryforwards | | 651,476 | Indefinite |
| State net operating loss carryforwards | | 117,286 | Various |
| Interest expense carryforwards | | 14,189 | Indefinite |
| Federal tax credit carryforwards | | 477 | 2040-2043 |
| State tax credit carryforwards | | 40 | Indefinite |

Section 382 and Section 383 of the Internal Revenue Code limit the utilization of U.S. tax attribute carryforwards following a change of control. Based on the Company's analysis under Section 382, approximately $85.5 million of tax attributes are limited by Section 382/383 as of December 31, 2023. The Section 382/383 limitation in conjunction with the twenty-year carryforward limitation caused $33.5 million of attributes to be deemed worthless, which resulted in a write-off of the related deferred tax assets in 2021.

A reconciliation of the beginning and ending amount of total unrecognized tax benefits for the tax years ended December 31, 2023 and 2022 is as follows:

| (in thousands) | | December 31, 2023 | | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|---|---|
| Balance, beginning of year | $ | 5,252 | $ | 44 | $ | — |
| Increase (decrease) related to prior year tax positions | | (31) | | 21 | | 25 |
| Increase related to current year tax positions | | 75 | | 5,187 | | 19 |
| Balance, end of year | $ | 5,296 | $ | 5,252 | $ | 44 |

The Company has established a reserve against its federal research and development ("R&D") tax credits generated in 2023 and previous years. The Company has also established a reserve related to its executive compensation deduction limitation in 2022.

As of December 31, 2023, the total amount of unrecognized tax benefits was $5.3 million, all of which was offset against deferred tax assets. If the unrecognized tax benefits were recognized as of December 31, 2023, there would be a $5.3 million favorable impact that would affect the effective rate on income from continuing operations. The Company also accrues for interest and penalties on its uncertain tax positions and includes such charges in its income tax provision in the Consolidated Statements of Comprehensive Income (Loss). The Company had no interest and penalty expenses in the years ended December 31, 2023 and 2022.
The Company did not accrue either interest or penalties for the years ended December 31, 2023 and 2022. The Company does not currently expect any of its remaining unrecognized tax benefits to be recognized in the next twelve months.

The Company files federal and state income tax returns. The 2019-2022 tax years generally remain subject to examination by the IRS and various state taxing authorities, although the Company is not currently under examination in any jurisdiction.

Table of Contents

**NOTE 10 – NET INCOME (LOSS) PER SHARE**

Net income (loss) per share is calculated in accordance with ASC 260 - *Earnings Per Share*. Basic income (loss) per share is computed by dividing net income (loss) by the weighted average number of shares of common stock outstanding during the period. For the year ended December 31, 2023, the Company recorded net income and as such, the Company calculated the impact of dilutive common stock equivalents in determining diluted earnings per share. For the year ended December 31, 2022, the Company recorded a net loss and as such, the computation of diluted net loss per share does not include dilutive common stock equivalents in the weighted average shares outstanding, as they would have been anti-dilutive.

The following table presents the securities that were not included in the computation of diluted income (loss) per share, as their inclusion would have been anti-dilutive:

|  | For the year ended December 31, | | |
|---|---|---|---|
|  | **2023** | **2022** | **2021** |
| Warrants | 324,375 | 324,375 | 326,779 |
| Restricted stock units | — | 1,255,648 | 642,094 |
| Convertible notes | — | 9,812,955 | 9,812,955 |
| Series A Preferred Stock | 322,654 | — | — |
| **Total dilutive shares** | 647,029 | 11,392,978 | 10,781,828 |

The following table sets forth the computation of basic and diluted income (loss) per share:

| *(in thousands, except share and per share data)* | For the year ended December 31, | | |
|---|---|---|---|
|  | **2023** | **2022** | **2021** |
| **Basic earnings per share of common stock:** |  |  |  |
| Net income (loss) per share of common stock - basic | $ 259,052 | $ (694,022) | $ (29,813) |
| Weighted average shares of common stock - basic | 183,855,570 | 113,467,837 | 99,337,587 |
| **Net income (loss) per share of common stock - basic** | $ 1.41 | $ (6.12) | $ (0.30) |
|  |  |  |  |
| **Diluted earnings per share of common stock:** |  |  |  |
| Net income (loss) per share of common stock - basic | $ 259,052 | $ (694,022) | $ (29,813) |
| Add: Notes interest expense, net of tax | 7,421 | — | — |
| Less: Gain from extinguishment of debt, net of tax | (62,909) | — | — |
| **Net income (loss) per share of common stock - diluted** | $ 203,564 | $ (694,022) | $ (29,813) |
| Weighted average shares of common stock - basic | 183,855,570 | 113,467,837 | 99,337,587 |
| Restricted stock units | 330,928 | — | — |
| Convertible notes | 8,106,779 | — | — |
| Weighted average shares of common stock - diluted | 192,293,277 | 113,467,837 | 99,337,587 |
| **Net income (loss) per share of common stock - diluted** | $ 1.06 | $ (6.12) | $ (0.30) |

**NOTE 11 – COMPUTE NORTH BANKRUPTCY**

On September 22, 2022, Compute North Holdings, Inc. (along with its affiliated debtors, collectively, "Compute North"), filed for chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Texas under chapter 11 of the U.S. Bankruptcy Code (11 U.S. Code section 101 et seq.). The Company's financial exposure to Compute North at the time of the bankruptcy filing included:

- Approximately $10.0 million in convertible preferred stock of Compute North Holdings, Inc.

- Approximately $21.0 million related to an unsecured Senior Promissory note with Compute North LLC.

- Approximately $50.0 million in operating deposits with Compute North primarily related to the King Mountain and Wolf Hollow hosting facilities.

The Company recorded an impairment charge of $39.0 million during the third quarter of 2022. During the fourth quarter of 2022, the company estimated that an additional $16.6 million in deposits had likely been impaired and as such recorded an additional impairment charge. On February 16, 2023, the Bankruptcy Court approved the Debtors Plan of Reorganization, pursuant to which Marathon's claim was fixed at $40.0 million as an unsecured claim to be paid out according to the timing and percentages within the approved Debtor's plan. The Company has yet to receive the settlement funds.

## NOTE 12 – STOCKHOLDERS' EQUITY

### Common Stock

On July 27, 2023, the Company's shareholders approved an amendment to the Company's articles of incorporation that increased the amount of common stock authorized for issuance to 500,000,000 with a par value of 0.0001 per share.

***Shelf Registration Statements on Form S-3 and At-the-Market Offering Agreements***
In February 2024, we intend to commence a new at-the-market offering program with H.C. Wainwright & Co., LLC ("Wainwright") acting as sales agent (the "2024 ATM") pursuant to the ATM Agreement, under which we may offer and sell shares of our common stock from time to time through Wainwright having an aggregate offering price of up to $1.5 billion.

On October 24, 2023, the Company entered into a new at-the-market offering program (the "2023 ATM") with Wainwright relating to shares of the Company's common stock. In accordance with the terms of the sales agreement, the Company may offer and sell shares of its common stock having an aggregate offering price of up to $750.0 million from time to time through Wainwright acting as its sales agent. As of December 31, 2023, the Company has sold 19,591,561 shares of common stock for an aggregate purchase price of $248.1 million, net of offering costs, pursuant to the 2023 ATM.

On February 11, 2022, the Company entered into an at-the-market Offering Agreement (the "2022 ATM"), or sales agreement, with Wainwright relating to shares of the Company's common stock. In accordance with the terms of the sales agreement, the Company may offer and sell shares of its common stock having an aggregate offering price of up to $750.0 million from time to time through Wainwright acting as its sales agent. As of October 23, 2023, the Company has sold 86,822,000 shares of common stock for an aggregate purchase price of $727.9 million, net of offering costs, pursuant to the 2022 ATM, completing the agreement.

### Common Stock Warrants
A summary of the Company's issued and outstanding common stock warrants and changes during the year ended December 31, 2023 and 2022 is as follows:

|  | Number of Warrants | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (in years) |
|---|---|---|---|
| Outstanding as of December 31, 2021 | 326,779 | $ 25.54 | 3.5 |
| Forfeited | (2,404) | 52.00 | — |
| Outstanding as of December 31, 2022 | 324,375 | 25.00 | 2.5 |
| Outstanding as of December 31, 2023 | 324,375 | $ 25.00 | 2.5 |

### Restricted Stock Units

On January 1, 2018, the Board adopted the 2018 Equity Incentive Plan (as amended, the "2018 Plan"), which was subsequently approved by the Company's shareholders on March 7, 2018, The 2018 Plan provides for the issuance of stock options, restricted stock, restricted stock units, preferred stock and other awards to employees, directors, consultants and other service providers.

The Company has granted restricted stock units ("RSU") to employees, which generally vest over a four-year period from the date of grant; however, in certain instances, all or a portion of a grant may vest immediately. RSUs granted to directors generally vest over a one-year period or, in certain instances, immediately. The Company measures the fair value of RSUs at the grant date and recognizes expense on a straight-line basis over the requisite service period from the date of grant for each separately-vesting tranche under the graded-vesting attribution method.

A summary of the Company's RSU activity for the years ended December 31, 2023 and 2022, is as follows:

| | Number of RSUs | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Nonvested at December 31, 2021 | 642,094 | $ | 35.93 |
| Granted | 1,167,339 | | 19.35 |
| Forfeited | (60,000) | | 42.19 |
| Vested | (493,785) | | 29.87 |
| Nonvested at December 31, 2022 | 1,255,648 | | 22.60 |
| Granted | 6,258,700 | | 8.73 |
| Forfeited | (309,337) | | 9.85 |
| Vested | (1,439,482) | | 17.90 |
| Nonvested at December 31, 2023 | 5,765,529 | | 9.40 |

As of December 31, 2023, there was approximately $43.1 million of aggregate unrecognized stock-based compensation related to unvested RSUs that is expected to be recognized over the next 2.5 years.

**Series A Preferred Stock**

On June 5, 2023, the Company entered into a securities purchase agreement for the offering of 15,000 shares of the Company's Series A redeemable convertible preferred stock. On June 8, 2023, upon closing of the offering, the Company issued 15,000 shares of Series A Preferred Stock for total gross proceeds of $14.3 million before deducting the placement agent's fees and other estimated offering expenses. Each share of Series A Preferred Stock had a purchase price of $952.38, representing an original issue discount of approximately 5% of the $1,000 stated value of each share. Each share of Series A Preferred Stock was convertible into shares of the Company's common stock at an initial conversion price of $14.52 per share, at the option of the holder, at any time following the Company's receipt of stockholder approval for an increase in its authorized shares of common stock.

The Series A Preferred Stock was recorded outside of stockholder's equity as mezzanine equity. At June 30, 2023, the Company increased the carrying value of Series A Preferred Stock to its redemption value and recorded the difference to additional paid-in capital.

As of December 31, 2023, all of the outstanding Series A Preferred Stock were redeemed at 105% of the $1,000 stated value per share for $15.8 million.

**NOTE 13 – ACCRUED EXPENSES**

As of December 31, 2023 and 2022, the Company's accrued expenses consisted of the following:

| (in thousands) | 2023 | | 2022 | |
|---|---|---|---|---|
| Interest | $ | 276 | $ | 1,011 |
| Non-income taxes | | 6,926 | | 14,509 |
| Payroll and related expenses | | 6,073 | | 2,345 |
| Other | | 8,740 | | 4,430 |
| **Total accrued expenses** | $ | 22,015 | $ | 22,295 |

**NOTE 14 – DEBT**

As of December 31, 2023 and 2022, the Company's debt consists of the following:

| (in thousands, except for interest rate data) | Maturity Date | Interest Rate | | December 31, 2023 | | December 31, 2022 |
|---|---|---|---|---|---|---|
| Convertible note | December 1, 2026 | 1% | $ | 330,707 | $ | 747,500 |
| Less: unamortized debt discount | | | | (5,053) | | (15,211) |
| Total convertible notes, net of discount | | | $ | 325,654 | $ | 732,289 |
| | | | | | | |
| Term loan [(1)] | August 5, 2024 | Variable | | — | | 50,000 |
| Less: unamortized deferred fees | | | | — | | (118) |
| | | | $ | — | $ | 49,882 |
| | | | | | | |
| Total | | | | 325,654 | | 782,171 |
| Less: current portion | | | | — | | — |
| Long-term portion | | | $ | 325,654 | $ | 782,171 |

[(1)] On March 8, 2023, the Company repaid the term loan, in full, and the Company's RLOC facilities with Silvergate Bank were terminated. The Company recorded a loss  in the amount of $0.3 million to "Net gain on extinguishment of debt" on the Consolidated Statements of Comprehensive Income (Loss).

During the years ended December 31, 2023 and December 31, 2022, the Company recorded amortization of debt issuance costs of $5.2 million and $3.9 million, respectively. Interest expense was $10.4 million and $15.0 million for the years ended December 31, 2023 and December 31, 2022, respectively.

The following summarizes the Company's required payments on the Convertible Note in each of the next five years, and thereafter:

| Year | | Repayment Amount (in thousands) |
|---|---|---|
| 2024 | $ | — |
| 2025 | | — |
| 2026 | | 330,707 |
| 2027 | | — |
| 2028 | | — |
| Thereafter | | — |

**Convertible Note**

On November 18, 2021, the Company issued $650.0 million principal of 1.0% Convertible Senior Notes due 2026 (the "Notes"). The Notes were issued pursuant to, and are governed by, an indenture (the "Indenture"), dated as of November 18, 2021, between the Company and U.S. Bank National Association, as trustee (the "Trustee").

On November 23, 2021, the initial purchasers of the Notes purchased an additional $97.5 million principal of Notes for an aggregate principal amount of $747.5 million.

The Notes are the Company's senior, unsecured obligations and are:

(i)    Equal in right of payment with the Company's existing and future senior, unsecured indebtedness;

(ii)    Senior in right of payment to the Company's existing and future indebtedness that is expressly subordinated to the Notes;

(iii)   Effectively subordinated to the Company's existing and future secured indebtedness, to the extent of the value of the collateral securing that indebtedness; and

(iv)   Structurally subordinated to all existing and future indebtedness and other liabilities, including trade payables, and (to the extent the Company is not a holder thereof) preferred equity, if any, of the Company's subsidiaries.

The Notes accrue interest at a rate of 1.0% per annum, payable semi-annually in arrears on June 1 and December 1 of each year, beginning on June 1, 2022. The Notes will mature on December 1, 2026, unless earlier repurchased, redeemed or converted. Before the close of business on the business day immediately before September 1, 2026, noteholders will have the right to convert their Notes only upon the occurrence of certain events. From and after September 1, 2026, noteholders may convert their Notes at any time at their election until the close of business on the second scheduled trading day immediately before the maturity date. The Company will settle conversions by paying or delivering, as applicable, cash, shares of its common stock or a combination of cash and shares of its common stock, at the Company's election. The initial conversion rate is 13.1277 shares of common stock per one thousand dollar principal amount of Notes, which represents an initial conversion price of approximately $76.17 per share of common stock. The conversion rate and conversion price will be subject to customary adjustments upon the occurrence of certain events. In addition, if certain corporate events that constitute a "Make-Whole Fundamental Change" (as defined in the Indenture) occur, then the conversion rate will, in certain circumstances, be increased for a specified period of time.

The Notes will be redeemable, in whole or in part (subject to certain limitations described below), at the Company's option at any time, and from time to time, on or after December 6, 2024, and on or before the 21st scheduled trading day immediately before the maturity date, at a cash redemption price equal to the principal amount of the Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date, but only if the last reported sale price per share of the Company's common stock exceeds 130% of the conversion price on (1) each of at least 20 trading days, whether or not consecutive, during the 30 consecutive trading days ending on, and including, the trading day immediately before the date the Company sends the related redemption notice; and (2) the trading day immediately before the date the Company sends such notice. However, the Company may not redeem less than all of the outstanding Notes unless at least $100.0 million aggregate principal amount of Notes are outstanding and not called for redemption as of the time the Company sends the related redemption notice. In addition, calling any Note for redemption will constitute a Make-Whole Fundamental Change with respect to that Note, in which case the conversion rate applicable to the conversion of that Note will be increased in certain circumstances if it is converted during the related redemption conversion period.

If certain corporate events that constitute a "Fundamental Change" (as defined in the Indenture) occur, then, subject to a limited exception for certain cash mergers, noteholders may require the Company to repurchase their Notes at a cash repurchase price equal to the principal amount of the Notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the fundamental change repurchase date. The definition of Fundamental Change includes certain business combination transactions involving the Company and certain de-listing events with respect to the Company's common stock.

The Notes have customary provisions relating to the occurrence of "Events of Default" (as defined in the Indenture), which include the following:

(i)   Certain payment defaults on the Notes (which, in the case of a default in the payment of interest on the Notes, are subject to a 30-day cure period);

(ii)   The Company's failure to send certain notices under the Indenture within specified periods of time;

(iii)   The Company's failure to comply with certain covenants in the Indenture relating to the Company's ability to consolidate with or merge with or into, or sell, lease or otherwise transfer, in one transaction or a series of transactions, all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, to another person;

(iv)   A default by the Company in its other obligations or agreements under the Indenture or the Notes if such default is not cured or waived within 60 days after notice is given in accordance with the Indenture;

(v)   Certain defaults by the Company or any of its subsidiaries with respect to indebtedness for borrowed money of at least $50.0 million; and

(vi)   Certain events of bankruptcy, insolvency and reorganization involving the Company or any of its significant subsidiaries.

If an Event of Default involving bankruptcy, insolvency or reorganization events with respect to the Company (and not solely with respect to a significant subsidiary of the Company) occurs, then the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding will immediately become due and payable without any further action or notice by any person. If any other Event of Default occurs and is continuing, then, the Trustee, by notice to the Company, or noteholders of at least 25% of the aggregate principal amount of Notes then outstanding, by notice to the Company and the Trustee, may declare the principal amount of, and all accrued and unpaid interest on, all of the Notes then outstanding to become due and payable immediately. However, notwithstanding the foregoing, the Company may elect, at its option, that the sole remedy for an Event of Default relating to certain failures by the Company to comply with certain reporting covenants in the Indenture consists exclusively of the right of the noteholders to receive special interest on the Notes for up to 270 days at a specified rate per annum not exceeding 0.50% on the principal amount of the Notes.

In September 2023, the Company entered into privately negotiated exchange agreements with certain holders of its Notes. In total, the Company exchanged $116.8 million principal amount of Notes for an aggregate 31,722,417 shares of Company common stock. The Company evaluated the exchange of debt to determine if it was an extinguishment or a modification of the debt. Due to the addition of a substantive conversion feature, the Company determined that the exchange was an extinguishment of debt. The Company measured the gain on extinguishment of debt based on the carrying value of the Notes, the fair value of the Company's common stock issued in the exchange and related transaction costs. The Company recorded a gain on the exchange of Notes for the Company's common stock in the amount of $82.6 million to "Net gain from extinguishment of debt" on the Consolidated Statements of Comprehensive Income (Loss).

The Company is permitted and may seek to repurchase additional Notes prior to the maturity date, whether through privately negotiated purchases, open market purchases, or otherwise.

As of December 31, 2023 and December 31, 2022, Notes outstanding, net of unamortized discounts of approximately $5.1 million and $15.2 million, respectively, were $325.7 million and $732.3 million, respectively.

**Term Loan and RLOC facilities**

On October 1, 2021, the Company entered into a Revolving Credit and Security Agreement with Silvergate Bank pursuant to which Silvergate agreed to loan the Company up to $100.0 million on a revolving basis.

On July 28, 2022, the Company entered into a new Revolving Credit and Security Agreement (the "Agreement" or "RLOC") with Silvergate Bank (the "Bank") pursuant to which Silvergate agreed to loan the Company up to $100.0 million on a revolving basis pursuant to the terms of the Agreement. This facility refinanced and replaced an existing $100.0 million facility the Company had in place with the Bank. On the same date the Company also entered into a $100.0 million principal term loan facility (the "Term Loan").

On February 6, 2023, the Company provided Silvergate Bank with the required 30 days' notice stating the Company's intent to prepay the outstanding balance on its term loan facility as well as the Company's intent to terminate the term loan facility. The Company and Silvergate subsequently agreed to also terminate the RLOC facility. On March 8, 2023, the term loan prepayment was completed, and the Company's term loan and RLOC facilities with Silvergate Bank were terminated and the Company recorded a loss in the amount of $0.3 million to "Net gain from extinguishment of debt" on the Consolidated Statements of Comprehensive Income (Loss).

**NOTE 15 – LEASES**

In February 2016, the FASB issued ASU No. 2016-02 - *Leases* ("ASC 842") related to the accounting for leases. ASC 842 establishes a right-of-use ("ROU") model, that requires a lessee to record a ROU asset and a lease liability on the Consolidated Balance Sheets for all leases with terms longer than 12 months. Leases will be classified as either finance or operating, with classification affecting the expense recognition in the Consolidated Statements of Comprehensive Income (Loss). Effective January 1, 2019, the Company adopted ASC 842. The Company determines if an arrangement contains a lease at inception based on whether or not the Company has the right to control the asset during the contract period and other facts and circumstances.

The Company leases office space in the United States under operating lease agreements. The Company also entered into an arrangement with Applied Blockchain for the use of energized cryptocurrency mining facilities under which the Company pays for electricity per megawatt based on usage. The Company has determined that it has embedded operating leases at two of the facilities governed by this arrangement that commenced in January and March 2023, and has elected not to separate lease and non-lease components. Payments made for these two operating leases are entirely variable and are based on usage of electricity, and the Company therefore does not record a ROU asset or lease liability associated with the leases. Variable lease cost during the year ended December 31, 2023 are disclosed

F-31

Table of Contents

in the table below. Office space and mining facilities comprise the Company's material underlying asset class under operating lease agreements. The Company has no material finance leases.

As of December 31, 2023, the Company's ROU assets and total lease liabilities were $0.4 million and $0.5 million, respectively. As of December 31, 2022, the Company's ROU assets and total lease liabilities were $1.3 million and $1.3 million, respectively. The Company has amortized the right-of-use assets totaling $0.3 million and $0.1 million for the year ended December 31, 2023 and 2022, respectively.

Operating lease costs are recorded on a straight-line basis within operating expenses. The Company's total lease expense is comprised of the following:

| (in thousands) | For the year ended December 31, | | | | | |
| | 2023 | | 2022 | | 2021 | |
| --- | --- | --- | --- | --- | --- | --- |
| Operating leases | | | | | | |
| Operating lease cost | $ | 315 | $ | 327 | $ | — |
| Operating lease expense | | 315 | | 327 | | — |
| Short-term lease rent expense | | 36 | | 29 | | 31 |
| Variable lease cost | | 80,108 | | — | | — |
| Total rent expense | $ | 80,459 | $ | 356 | $ | 31 |

Additional information regarding the Company's leasing activities is as follows:

| | For the year ended December 31, | | | | | |
| | 2023 | | 2022 | | 2021 | |
| --- | --- | --- | --- | --- | --- | --- |
| Operating cash flows from operating leases | $ | (32) | $ | 67 | $ | — |
| Weighted-average remaining lease term – operating leases | | 3.2 | | 3.9 | | 0 |
| Weighted-average discount rate – operating leases | | 5 % | | 5 % | | — % |

The following table presents the Company's future minimum operating lease payments as of December 31, 2023:

| Year | Amount (in thousands) | |
| --- | --- | --- |
| 2024 | $ | 166 |
| 2025 | | 143 |
| 2026 | | 147 |
| 2027 | | 63 |
| 2028 | | — |
| Thereafter | | — |
| Total | | 519 |
| Less: Imputed interest | | (41) |
| Present value of lease liability | $ | 478 |

## NOTE 16 - LEGAL PROCEEDINGS

### Compute North Bankruptcy

On September 22, 2022, Compute North Holdings, Inc. (currently d/b/a Mining Project Wind Down Holdings, Inc.) and certain of its affiliates (collectively, "Compute North") filed for chapter 11 bankruptcy protection. Compute North provided operating services to the Company and hosted its mining rigs at multiple facilities. The Company delivered miners to Compute North, which then installed the mining rigs at those facilities, operated and maintained the mining rigs, and provided energy to keep the miners operating. During the course of the chapter 11 cases,

Table of Contents

Compute North sold substantially all of their assets in a series of 363 sale transactions, including Compute North's ownership interests in non-debtor entities that own or partially own facilities that house the Company's miners.

On November 23, 2022, the Company and certain of its affiliates timely filed proofs of claim asserting various claims against Compute North, including: (i) claims arising under hosting agreements between the Company and Compute North LLC; (ii) claims arising under that certain Senior Promissory Note, dated as of July 1, 2022, by and between the Company, as Lender, and Compute North LLC, as Borrower; (iii) claims arising from the breach of a letter of intent between us and Compute North LLC; and (iv) claims for daily lost revenue, profits and other damages against Compute North.

On February 9, 2023, the Bankruptcy Court approved a settlement stipulation between the Company and Compute North, pursuant to which the proofs of claim filed by the Company and certain of its affiliates were resolved, and the Company received a single allowed unsecured claim against Compute North LLC in the amount of $40.0 million and its Preferred Equity Interests in Compute North Holdings, Inc. in the amount of 39,597 shares of Series C Preferred Stock was confirmed. In exchange, the Company agreed to vote in favor of Compute North's chapter 11 plan.

On February 16, 2023, the Bankruptcy Court confirmed Compute North's chapter 11 plan (the "Plan"), pursuant to which Compute North will liquidate its remaining assets and distribute proceeds arising therefrom in accordance with the waterfall set forth in the Plan. In its disclosure statement filed on December 19, 2022, the Compute North Debtors projected that holders of allowed general unsecured claims could recover anywhere between 8% to 65% on their claims, while holders of preferred equity interests are expected to recover nothing on their interests. The Plan became effective on March 31, 2023. At this time, the Company cannot predict the quantum of its potential recovery on account of its allowed general unsecured claim and preferred equity interests or the timing of when it would receive any distributions under the Plan on account of its claims and interests.

**Derivative Complaints**

On February 18, 2022, a shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of the Company's board of directors (the "Board") and senior management. The complaint is based on allegations substantially similar to the allegations in the December 2021 putative class action complaint, related to the Company's disclosure of an SEC investigation the Company previously made on November 15, 2021. On March 4, 2022, the Company was served the complaint. On April 4, 2022, the defendants moved to dismiss the complaint.

On May 5, 2022, a second shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of the Company's Board and senior management. The second shareholder derivative complaint is based on allegations substantially similar to the allegations in the February 18, 2022 derivative complaint. On May 11, 2022, the defendants moved to dismiss the second shareholder derivative complaint.

On June 1, 2022, the Court entered an order consolidating the two derivative actions. A June 13, 2022 scheduling order provided for plaintiffs to file a consolidated complaint and for renewed motions to dismiss the consolidated shareholder derivative complaint. On November 22, 2022, before a consolidated complaint was due, plaintiffs voluntarily dismissed both actions without prejudice. On November 23, 2022, both actions were closed.

On June 22, 2023, a shareholder derivative complaint was filed in the Circuit Court of the 17th Judicial Circuit for Broward County, Florida, against current members of the Company's Board and senior management, alleging claims for breach of fiduciary duty and unjust enrichment based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.

On July 8, 2023, a second shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of the Company's Board and senior management, alleging claims under Sections 14(a), 10(b), and 21D of the Securities Exchange Act of 1943 (the "Exchange Act"), and for breach of fiduciary duty, unjust enrichment, and waste of corporate assets, based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.

On July 12, 2023, a third shareholder derivative complaint was filed in the United States District Court for the District of Nevada, against current and former members of the Company's Board and senior management, alleging claims under Section 14(a) of the Exchange Act and for breach of fiduciary duty, based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.

On July 13, 2023, a fourth shareholder derivative complaint was filed in the Circuit Court of the 17th Judicial Circuit for Broward County, Florida, against current members of the Company's Board and senior management,

alleging claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets, based on allegations substantially similar to the allegations in the March 30, 2023 putative class action complaint.

On August 14, 2023, the two derivative actions pending in the United States District Court for the District of Nevada were consolidated (the "Nevada Derivative Action"). On October 16, 2023, the parties to the derivative actions pending in the Circuit Court of the 17th Judicial Circuit for Broward County, Florida filed an agreed order to stay both actions pending completion of the Nevada Derivative Action.

**Putative Class Action Complaint**

On March 30, 2023, a putative class action complaint was filed in the United States District Court for the District of Nevada, against the Company and present and former senior management, alleging claims under Section 10(b) and 20(a) of the Exchange Act arising out of the Company's announcement of accounting restatements on February 28, 2023. The defendants' time to respond has been extended until after the appointment of a lead plaintiff. To date, no lead plaintiff has been appointed.

**Information Subpoena**

On October 6, 2020, the Company entered into a series of agreements with multiple parties to design and build a data center for up to 100-megawatts in Hardin, Montana. In conjunction therewith, the Company filed a Current Report on Form 8-K on October 13, 2020. Such Current Report of Form 8-K discloses that, pursuant to a Data Facility Services Agreement, the Company issued 6,000,000 shares of restricted common stock, in transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933(the "Securities Act"). During the quarter ended September 30, 2021, the Company and certain of its executives received a subpoena to produce documents and communications concerning the Hardin, Montana data center facility described in the Company's Current Report on Form 8-K dated October 13, 2020. The Company received an additional subpoena from the SEC on April 10, 2023, relating to, among other things, transactions with related parties. The Company understands that the SEC may be investigating whether or not there may have been any violations of the federal securities law. The Company is cooperating with the SEC.

**Ho v. Marathon**

On January 14, 2021, Plaintiff Michael Ho ("Plaintiff" or "Ho") filed a Civil Complaint for Damages and Restitution (the "Complaint") against the Company. The Complaint alleges six causes of action against the Company:

1)   Breach of Written Contract;

2)   Breach of Implied Contract;

3)   Quasi-Contract;

4)   Services Rendered;

5)   Intentional Interference with Prospective Economic Relations; and

6)   Negligent Interference with Prospective Economic Relations, which is the one plead against "all Defendants" and is most likely to involve later named defendants.

The claims arise from the same set of facts where Ho alleges that the Company profited from commercially-sensitive information he shared with the Company and then it refused to compensate him for his role in securing the acquisition of a supplier of energy for the Company. On February 22, 2021, the Company responded to the Complaint with a general denial and the assertion of applicable affirmative defenses. Then, on February 25, 2021, the Company removed the action to the United States District Court in the Central District of California, where the action remains pending. The Company filed a motion for summary judgment/adjudication of all causes of action. On February 11, 2022, the Court granted the motion and dismissed Ho's 2nd, 5th and 6th causes of action. Discovery is substantially closed. The Court held a pre-trial conference on February 24, 2022, where it vacated the March 3, 2022 trial date and ordered the parties to meet and confer on a new trial date. The Court discussed the various theories of damages maintained by the parties. In its ruling on the summary judgment motion and at the pre-trial conference on February 24, 2022, the Court noted that a jury is more likely to accept $0.2 million as an appropriate damages amount if liability is found, as opposed to the various theories espoused by Ho that result in multi-million-dollar recoveries. Due to outstanding issues of fact and law, it is impossible to predict the outcome at this time; however, after consulting legal counsel, the Company is confident that it will prevail in this litigation, since it did not have a contract with Mr. Ho and he did not disclose any commercially-sensitive information under any mutual

F-34

nondisclosure agreement that was used to structure any joint venture with energy providers. The trial is likely to commence on or around April 8, 2024.

**NOTE 17 - RELATED PARTY TRANSACTIONS**

Parties are considered related to the Company if the parties, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with the Company. Related parties also include principal owners of the Company, its management, members of the immediate families of principal owners of the Company and its management and other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests. The Company discloses all related party transactions.

During September 2023, the Company entered into an agreement with Auradine to secure certain rights to future purchases by the Company from Auradine for which the Company paid $15.0 million. Said Ouissal, a director of the Company, currently owns approximately 5% of the issued and outstanding shares of Auradine, and Fred Thiel, the Company's Chairman and CEO, is a member of Auradine's Board of Directors.

**NOTE 18 – QUARTERLY FINANCIAL DATA (UNAUDITED)**

The following table presents summarized unaudited quarterly financial data from the Consolidated Statements of Comprehensive Income (Loss) for each of the quarters in the periods ended December 31, 2023, based on the Company's early adoption of ASU 2023-08, as described in Note 4 – Digital Assets. The operating results for any quarter are not necessarily indicative of the results for any subsequent quarter. Basic and diluted net income (loss) per share of common stock calculations for each quarter is based on the weighted average diluted shares outstanding for that quarter and may not sum to the full year total amount presented on our Consolidated Statements of Comprehensive Income (Loss).

| (in thousands, except per share data) | 2023 | | | |
| | March 31, | June 30, | September 30, | December 31, |
|---|---|---|---|---|
| Total revenues | $ 51,132 | $ 81,759 | $ 97,849 | $ 156,768 |
| Total margin (total revenues less total cost of revenues) | 22 | (10,738) | (15,327) | 10,700 |
| Operating income (loss) | 122,076 | (6,068) | (80,160) | 185,063 |
| Net income (loss) | 118,699 | (8,962) | (390) | 151,826 |
| Net income (loss) per share of common stock - basic | 0.75 | (0.07) | — | 0.67 |
| Net income (loss) per share of common stock - diluted | 0.72 | (0.05) | (0.34) | 0.66 |

Additionally, the following table presents summarized unaudited quarterly financial data from the Consolidated Statements of Comprehensive Loss for each of the quarters in the periods ended December 31, 2022, based on the Company's voluntary change in accounting principle from LIFO to FIFO. The operating results for any quarter are not necessarily indicative of the results for any subsequent quarter. Basic and diluted net loss per share calculations for each quarter is based on the weighted average diluted shares outstanding for that quarter and may not sum to the full year total amount presented on our Consolidated Statements of Comprehensive Loss.

| (in thousands, except per share data) | 2022 | | | |
| | March 31, | June 30, | September 30, | December 31, |
|---|---|---|---|---|
| Total revenues | $ 51,723 | $ 24,923 | $ 12,690 | $ 28,417 |
| Total margin (total revenues less total cost of revenues) | 25,324 | (16,473) | (27,378) | (15,144) |
| Operating loss | (20,216) | (198,151) | (44,025) | (410,925) |
| Net loss | (17,109) | (212,626) | (72,462) | (391,598) |
| Net loss per share - basic and diluted: | (0.17) | (1.94) | (0.62) | (3.12) |

**NOTE 19 – SUPPLEMENTAL CONSOLIDATED FINANCIAL INFORMATION**

The following table provides supplemental disclosure of Consolidated Statements of Cash Flows information:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Supplemental information** | | | |
| Cash paid during the year for: | | | |
| Income taxes | $ 723 | $ 7 | $ — |
| Interest | 7,392 | 11,432 | — |
| | | | |
| **Supplemental schedule of non-cash investing and financing activities:** | | | |
| Operating lease assets obtained in exchange for new operating lease liabilities | $ — | $ 1,539 | $ — |
| Collection of loan denominated in Bitcoin | — | 27,784 | — |
| Issuance of loan denominated in Bitcoin | — | — | (27,784) |
| Digital currencies transferred from fund | — | 137,844 | — |
| Reclassifications from advances to vendor to property and equipment upon receipt of equipment | 551,418 | 337,485 | — |
| Common stock issued for service and license agreements | — | 4,577 | 11,135 |
| Warrants exercised into common stock | — | — | 1,371 |
| Exchange of convertible notes for common stock | 318,771 | — | — |
| Dividends received from equity method investment | 2,161 | — | — |
| Series A preferred stock accretion to redemption value | 2,121 | — | — |

**NOTE 20 – SUBSEQUENT EVENTS**

On January 12, 2024, the Company, through its wholly owned subsidiary MARA USA Corporation, completed its acquisition of 100% of the issued and outstanding equity interests (the "Transaction") of GC Data Center Equity Holdings, LLC, pursuant to which the Company acquired two operational bitcoin mining sites, for an aggregate 390 megawatts of operational capacity for $179.0 million cash consideration, subject to customary working capital adjustments.

In February 2024, we intend to commence the 2024 ATM pursuant to the ATM Agreement, under which we may offer and sell shares of our common stock from time to time through Wainwright having an aggregate offering price of up to $1.5 billion.

Table of Contents

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Management's Conclusions Regarding Effectiveness of Disclosure Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

The Company's management, with the participation of its Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of its disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in the reports the Company files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures. Based on this evaluation, the Company's management concluded that its disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2023 due to the previously identified material weakness.

As further discussed below under "Management's Annual Report on Internal Control Over Financial Reporting," management has identified certain material weaknesses, as set forth below. The Company has developed a remediation plan for the weaknesses, which is described below under "Remediation." As a result of such material weaknesses, the report of the Company's independent registered public accounting firm for the fiscal year ended December 31, 2023, Marcum LLP, regarding its audit of the Company's internal control over financial reporting as of December 31, 2023, which is included below under the heading "Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting," expresses an adverse opinion on the Company's internal control over financial reporting as of December 31, 2023.

Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost benefit relationship of possible controls and procedures.

**Management's Annual Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of annual or interim Consolidated Financial Statements will not be prevented or detected on a timely basis.

Management utilized the criteria established in the Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) to assess the effectiveness of the Company's internal control over financial reporting as of December 31, 2023. Based on that assessment and the material weaknesses described below, Marathon's management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2023.

**Material Weaknesses in Internal Control and Plan for Remediation**

Based on its evaluation, management previously identified a material weakness in internal control over financial reporting that remained open as of year-end. The material weakness included:

- A material weakness related to the ineffective design or implementation of information technology general controls or an alternative key manual control to prevent or detect material misstatements in revenue.

The material weaknesses associated with the design and implementation of the manual control over revenue recognition did not result in a material misstatement to the Company's previously issued Consolidated Financial Statements, nor in the Consolidated Financial Statements included in this Annual Report on Form 10-K.

**Remediation**

The Company's Board of Directors and management take internal control over financial reporting and the integrity of its financial statements seriously. Management continues to work to improve its controls related to the material weaknesses described above. Management will continue to implement measures to remediate the material weaknesses, such that these controls are designed, implemented, and operating effectively. In order to achieve the timely implementation of the above, Management has commenced the following actions and will continue to assess additional opportunities for remediation on an ongoing basis:

- Continue the process that was started during 2022 of adding to the Company's internal resources to enhance its capabilities in the areas of technical accounting, financial reporting, and internal controls, including a full-time person dedicated to internal controls;

- Continue to utilize external third-party audit and SOX 404 implementation firms to enable the Company to improve the Company's controls related to its material weaknesses; and

- Continue to evaluate existing processes and implement new processes and controls where necessary in connection with remediating the Company's material weaknesses, such that these controls are designed, implemented, and operating effectively.

- Continue to work and guide our vendors in the industry that are not accustomed to SOX requirements to enhance and progress the industry forward to be full SOX compliant.

The Company recognizes that the material weaknesses in its internal control over financial reporting will not be considered remediated until the remediated controls operate for a sufficient period of time and can be tested and concluded by management to be designed and operating effectively. Because the Company's remediation efforts are ongoing, it cannot provide any assurance that these remediation efforts will be successful or that its internal control over financial reporting will be effective as a result of these efforts.

The Company continues to evaluate and work to improve its internal control over financial reporting related to the identified material weaknesses, and management may determine to take additional measures to address control deficiencies or determine to modify the remediation plan described above. In addition, the Company will report the progress and status of the above remediation efforts to the Audit Committee on a periodic basis.

As part of the Company's ongoing program to implement changes and further improve its internal controls and in conjunction with is Code of Ethics, the Company's independent directors have been working with management to include protocols and measures aimed at ensuring quality of its internal controls. Among those measures is the implementation of a whistle blower hotline, which allows third parties to anonymously report noncompliant activity. The hotline may be accessed as follows:

To file a report, use the Client Code "MarathonPG" and pick one of the following options:

- Call: 1-877-647-3335

- Click: http://www.RedFlagReporting.com

**Change in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the year ended December 31, 2023 that have materially affected, or are reasonably likely to materially affect, its internal controls over financial reporting other than the ongoing remediation efforts undertaken by management.

Table of Contents

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
ON INTERNAL CONTROL OVER FINANCIAL REPORTING

To the Stockholders and Board of Directors of Marathon Digital Holdings, Inc.

**Adverse Opinion on Internal Control over Financial Reporting**

We have audited Marathon Digital Holdings, Inc.'s (the "Company") internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, because of the effect of the material weaknesses described in the following paragraph on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in "Management's Annual Report on Internal Control Over Financial Reporting":

- The Company has not designed or implemented effective information technology general controls or an alternative manual control to prevent or detect material misstatements in revenue.

This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the fiscal December 31, 2023 consolidated financial statements, and this report does not affect our report dated February 28, 2024 on those financial statements.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets as of December 31, 2023 and 2022 and the related consolidated statements of comprehensive income (loss), stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2023, of the Company and our report dated February 28, 2024 expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Management Annual Report on Internal Control Over Financial Reporting." Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail,

Table of Contents

accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that degree of compliance with the policies or procedures may deteriorate.

/s/ Marcum LLP

Marcum LLP
Costa Mesa, California
February 28, 2024

**ITEM 9B. OTHER INFORMATION**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

57

Table of Contents

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item will be disclosed in the Company's definitive proxy statement on Schedule 14A for our 2024 annual meeting of stockholders (the "2024 Proxy Statement") and is incorporated herein by reference. Our 2024 Proxy Statement will be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2023 pursuant to Regulation 14A under the Exchange Act. We have adopted a code of business conduct and ethics (our "Code of Ethics") which is applicable to our directors, executive officers and employees, a copy of which is available on our website (https://ir.mara.com/corporate-governance/governance-documents). We intend to disclose future amendments to certain provisions of the Code of Ethics, or waivers of such provisions, at the same location on our website identified above. The inclusion of our website address in this Annual Report does not include or incorporate by reference the information on the website into this Annual Report.

**ITEM 11. EXECUTIVE COMPENSATION**

The information required by this item will be disclosed in our 2024 Proxy Statement and is incorporated herein by reference.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this item will be disclosed in our 2024 Proxy Statement and is incorporated herein by reference.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this item will be disclosed in our 2024 Proxy Statement and is incorporated herein by reference.

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required by this item will be disclosed in our 2024 Proxy Statement and is incorporated herein by reference.

PART IV

**ITEM 15. EXHIBITS**

The following exhibits are filed as part of this Annual Report.

| Exhibit Number | Exhibit Description | Form | Date of First Filing | Exhibit Number | Provided Herewith |
|---|---|---|---|---|---|
| 3.1 | Restated Articles of Incorporation of Marathon Digital Holdings, Inc. | | | | X |
| 3.2 | Amended and Restated Bylaws of Marathon Digital Holdings, Inc. | | | | X |
| 4.1 | Description of Capital Stock | | | | X |
| 4.2 | Indenture, dated November 18, 2021, by and between Marathon Digital Holdings, Inc. and U.S. Bank National Association | Form 8-K | 11/18/2021 | 4.1 | |
| 4.3 | Form of Common Stock Purchase Warrant | Form S-1 | 6/29/2020 | 4.5 | |
| 10.1# | Marathon Digital Holdings, Inc. Amended and Restated 2018 Equity Incentive Plan | | | | X |
| 10.2# | Form of Restricted Stock Unit Agreement | | | | X |
| 10.3 | At-the-Market Offering Agreement, dated October 24, 2023, by and between Marathon Digital Holdings, Inc. and H.C. Wainwright & Co., LLC | Form S-3 | 10/24/2023 | 4.12 | |
| 10.4# | Employee Employment Agreement, dated August 30, 2017, by and between Marathon Patent Group, Inc. and James Crawford | Form 8-K | 9/05/2017 | 10.3 | |
| 10.5# | Executive Employment Agreement, dated April 26, 2021, by and between Marathon Patent Group, Inc. and Fred Thiel | Form 8-K | 4/30/2021 | 99.1 | |
| 10.6# | Employment Agreement, dated December 20, 2021, by and between Marathon Digital Holdings, Inc. and Ashu Swami | Form 8-K | 1/03/2022 | 10.1 | |
| 10.7# | Executive Employment Agreement, dated November 21, 2022, by and between Marathon Digital Holdings, Inc. and John Lee | Form 8-K | 11/28/2022 | 10.1 | |
| 10.8# | Executive Employment Agreement, dated May 31, 2023, by and between Marathon Digital Holdings, Inc. and Salman Khan | Form 8-K | 6/06/2023 | 10.1 | |
| 10.9# | Executive Employment Agreement, dated July 29, 2022, by and between Marathon Digital Holdings, Inc. and Adam Swick | | | | X |
| 10.10 | NYDIG Digital Asset Custodial Terms and Conditions, dated July 27, 2021, by and between Marathon Digital Holdings, Inc. and NYDIG Execution LLC | Form 10-Q | 05/10/2023 | 10.1 | |
| 10.11 | Shareholders' Agreement, dated January 2023, by and between Marathon Digital Holdings, Inc. and FS Innovation LLC | Form 10-K | 3/16/2023 | 10.63 | |
| 19.1 | Marathon Digital Holdings, Inc. Statement of Policies and Procedures Governing Material Nonpublic Information and the Prevention of Insider Trading | | | | X |
| 21.1 | Subsidiaries of Marathon Digital Holdings, Inc. | | | | X |
| 23.1 | Consent of Marcum LLP | | | | X |

Table of Contents

| | | |
|---|---|---|
| 24.1 | Power of Attorney (included on the signature page) | X |
| 31.1 | Certificate of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | X |
| 31.2 | Certificate of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | X |
| 32.1* | Certification of the Chief Executive Officer and Chief Financial Officer pursuant to U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | X |
| 97.1 | Marathon Digital Holdings, Inc. Policy for the Recovery of Erroneously Awarded Compensation | X |
| 101.INS | Inline XBRL Instance Document | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | X |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | X |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) | X |

| | |
|---|---|
| # | Indicates management contract or compensatory plan. |
| * | This certification is not deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Securities Exchange Act of 1934, except to the extent that the registrant specifically incorporates it by reference. |

Table of Contents

**ITEM 16. FORM 10-K SUMMARY**

None.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:      February 28, 2024

**MARATHON DIGITAL HOLDINGS, INC.**

| | |
|---|---|
| By: | */s/ Fred Thiel* |
| Name: | Fred Thiel |
| Title: | Chief Executive Officer and Executive Chairman |
| | (Principal Executive Officer) |
| | |
| By: | */s/ Salman Khan* |
| Name: | Salman Khan |
| Title: | Chief Financial Officer |
| | (Principal Financial Officer) |

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each individual whose signature appears below hereby constitutes and appoints Salman Khan and Zabi Nowaid, and each or either of them, acting individually, as his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report, and to file the same, with all exhibits thereto and other documents in connection therewith, with the SEC, granting unto said attorney-in-fact and agent, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or any of them, or their or his or her substitutes, may lawfully do or cause to be done or by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Fred Thiel<br>Fred Thiel | Chief Executive Officer and Executive Chairman<br>(Principal Executive Officer) | February 28, 2024 |
| /s/ Salman Khan<br>Salman Khan | Chief Financial Officer<br>(Principal Financial Officer) | February 28, 2024 |
| /s/ Kevin DeNuccio<br>Kevin DeNuccio | Director | February 28, 2024 |
| /s/ Sarita James<br>Sarita James | Director | February 28, 2024 |
| /s/ Said Ouissal<br>Said Ouissal | Director | February 28, 2024 |
| /s/ Georges Antoun<br>Georges Antoun | Director | February 28, 2024 |
| /s/ Douglas Mellinger<br>Douglas Mellinger | Director | February 28, 2024 |

Exhibit 3.1

RESTATED

ARTICLES OF INCORPORATION

OF

MARATHON DIGITAL HOLDINGS, INC.,

A Nevada corporation

## ARTICLE I

### NAME

The name of the corporation is Marathon Digital Holdings, Inc. (the "Corporation").

## ARTICLE II

### RESIDENT AGENT AND REGISTERED OFFICE

The name and address of the Corporation's resident agent for service of process is VCORP SERVICES, LLC, 701 S. Carson Street, Suite 200, Carson City, NV, 89701, USA.

## ARTICLE III

### CAPITAL STOCK

3.01    *Authorized Capital Stock*. The total number of shares of stock this Corporation is authorized to issue shall be five hundred fifty million (550,000,000) shares. The stock is divided between two classes to be designated as "Common Stock" and "Preferred Stock".

3.02    *Common Stock*. The total number of authorized shares of Common Stock shall be five hundred million (500,000,000) shares with par value of $0.0001 per share.

3.03    *Preferred Stock*. The total number of authorized shares of Preferred Stock shall be fifty million (50,000,000) shares with par value of $0.0001 per share. The board of directors shall have the authority to authorize the issuance of the Preferred Stock from time to time in one or more classes or series, and to state in the resolution or resolutions from time to time adopted providing for the issuance thereof the following:

(a)    Whether or not the class or series shall have voting rights, full or limited, the nature and qualifications, limitations and restrictions on those rights, or whether the class or series will be without voting rights;

(b)    The number of shares to constitute the class or series and the designation thereof;

(c)    The preferences and relative, participating, optional or other special rights, if any, and the qualifications, limitations, or restrictions thereof, if any, with respect to any class or series;

(d)    Whether or not the shares of any class or series shall be redeemable and if redeemable, the redemption price or prices, and the time or times at which, and the terms and conditions upon which, such shares shall be redeemable and the manner of redemption;

(e)    Whether or not the shares of a class or series shall be subject to the operation of retirement or sinking funds to be applied to the purchase or redemption of such shares for retirement, and if such retirement or sinking funds be established, the amount and the terms and provisions thereof;

(f)    The dividend rate, whether dividends are payable in cash, stock of the Corporation, or other property, the conditions upon which and the times when such dividends are payable, the preference to or the relation to the payment of dividends payable on any other class or classes or series of stock, whether or not such dividend shall be cumulative or noncumulative, and if cumulative, the date or dates from which such dividends shall accumulate;

(g)    The preferences, if any, and the amounts thereof which the holders of any class or series thereof are entitled to receive upon the voluntary or involuntary dissolution of, or upon any distribution of assets of, the Corporation;

(h)    Whether or not the shares of any class or series are convertible into, or exchangeable for, the shares of any other class or classes or of any other series of the same or any other class or classes of stock of the Corporation and the conversion price or prices or ratio or ratios or the rate or rates at which such exchange may be made, with such adjustments, if any, as shall be stated and expressed or provided for in such resolution or resolutions; and

(i)    Such other rights and provisions with respect to any class or series as may to the board of directors seem advisable.

The shares of each class or series of the Preferred Stock may vary from the shares of any other class or series thereof in any respect. The Board of Directors may increase the number of shares of the Preferred Stock designated for any existing class or series by a resolution adding to such class or series authorized and unissued shares of the Preferred Stock not designated for any existing class or series of the Preferred Stock and the shares so subtracted shall become authorized, unissued and undesignated shares of the Preferred Stock.

### ARTICLE IV

### DIRECTORS

The number of directors comprising the board of directors shall be fixed and may be increased or decreased from time to time in the manner provided in the bylaws of the Corporation, except that at no time shall there be less than one director.

### ARTICLE V

### PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under Nevada Revised Statutes ("NRS").

### ARTICLE VI

### DIRECTORS' AND OFFICERS' LIABILITY

The individual liability of the directors and officers of the Corporation is hereby eliminated to the fullest extent permitted by the NRS, as the same may be amended and supplemented. Any repeal

or modification of this Article by the stockholders of the Corporation shall be prospective only, and shall not adversely affect any limitation on the personal liability of a director or officer of the Corporation for acts or omissions prior to such repeal or modification.

## ARTICLE VII

### INDEMNITY

Every person who was or is a party to, or is threatened to be made a party to, or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he, or a person of whom he is the legal representative, is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless to the fullest extent legally permissible under the laws of the State of Nevada from time to time against all expenses, liability and loss (including attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred or suffered by him in connection therewith. Such right of indemnification shall be a contract right which may be enforced in any manner desired by such person. The expenses of officers and directors incurred in defending a civil or criminal action, suit or proceeding must be paid by the Corporation as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the Corporation. Such right of indemnification shall not be exclusive of any other right which such directors, officers or representatives may have or hereafter acquire, and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any bylaw, agreement, vote of stockholders, provision of law, or otherwise, as well as their rights under this Article.

Without limiting the application of the foregoing. the board of directors may adopt bylaws from time to time with respect to indemnification, to provide at all times the fullest indemnification permitted by the laws of the State of Nevada, and may cause the Corporation to purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprises against any liability asserted against such person and incurred in any such capacity or arising out of such status, whether or not the Corporation would have the power to indemnify such person.

The indemnification provided in this Article shalt continue as to a person who has ceased to be a director, officer, employee or agent, and shall inure to the benefit of the heirs, executors and administrators of such person.

Dated: February 26, 2024       _/s/ Salman Khan_
                              Salman Khan, Treasurer and Chief Financial Officer

Exhibit 3.2

AMENDED AND RESTATED BYLAWS

OF

MARATHON DIGITAL HOLDINGS, INC.

(a Nevada corporation)

ARTICLE I

STOCKHOLDERS

1.    CERTIFICATES REPRESENTING STOCK. Certificates representing stock in the corporation shall be signed by, or in the name of, the corporation by the Chairperson or Vice-Chairperson of the Board of Directors, if any, or by the Chief Executive Officer or a President and by the Treasurer or an Assistant Treasurer or the Secretary or an Assistant Secretary of the corporation. Any or all the signatures on any such certificate may be a facsimile. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if such person were such officer, transfer agent, or registrar at the date of issue.

Whenever the corporation shall be authorized to issue more than one class of stock or more than one series of any class of stock, and whenever the corporation shall issue any shares of its stock as partly paid stock, the certificates representing shares of any such class or series or of any such partly paid stock shall set forth thereon the statements prescribed by the Chapter 78 of the General Corporation Law of Nevada (the "Private Corporations Law"). Any restrictions on the transfer or registration of transfer of any shares of stock of any class or series shall be noted conspicuously on the certificate representing such shares.

The corporation may issue a new certificate of stock or uncertificated shares in place of any certificate theretofore issued by it, alleged to have been lost, stolen, or destroyed, and the Board of Directors may require the owner of the lost, stolen, or destroyed certificate, or such owner's legal representative, to give the corporation a bond sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged loss, theft, or destruction of any such certificate or the issuance of any such new certificate or uncertificated shares.

2.    UNCERTIFICATED SHARES. Subject to any conditions imposed by the Private Corporations Law, the Board of Directors of the corporation may provide by resolution or resolutions that some or all of any or all classes or series of the stock of the corporation shall be uncertificated shares. Within a reasonable time after the issuance or transfer of any uncertificated shares, the corporation shall send to the registered owner thereof any written notice prescribed by the Private Corporations Law.

3.    FRACTIONAL SHARE INTERESTS. The corporation may, but shall not be required to, issue fractions of a share. If the corporation does not issue fractions of a share, it shall (1) arrange for the disposition of fractional interests by those entitled thereto, (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined, or (3) issue scrip or warrants in registered form (either represented by a certificate or uncertificated) or bearer form (represented by a certificate) which shall entitle the holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share. A certificate for a fractional share or an uncertificated fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to exercise voting rights, to receive dividends thereon, and to participate in any of the assets of the corporation in the event of liquidation. The Board of Directors may cause scrip or warrants to be issued subject to the conditions that they shall become void if not exchanged for certificates representing the full shares or uncertificated full shares before a specified date, or subject to the conditions that the shares for which scrip or warrants are exchangeable may be sold by the corporation and the proceeds thereof distributed to the holders of scrip or warrants, or subject to any other conditions which the Board of Directors may impose.

4.    STOCK TRANSFERS. Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, transfers or registration of transfers of shares of stock of the corporation shall be made only on the

stock ledger of the corporation by the registered holder thereof, or by the registered holder's attorney thereunto authorized by power of attorney duly executed and filed with the Secretary of the corporation or with a transfer agent or a registrar, if any, and, in the case of shares represented by certificates, on surrender of the certificate or certificates for such shares of stock properly endorsed and the payment of all taxes due thereon.

5.    <u>RECORD DATE FOR STOCKHOLDERS</u>. In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty nor less than ten days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting. In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date has been fixed by the Board of Directors, the record date for determining the stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by the Private Corporations Law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by the Private Corporations Law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action. In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion, or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

6.    <u>MEANING OF CERTAIN TERMS</u>. As used herein in respect of the right to notice of a meeting of stockholders or a waiver thereof or to participate or vote thereat or to consent or dissent in writing in lieu of a meeting, as the case may be, the term "share" or "shares" or "share of stock" or "shares of stock" or "stockholder" or "stockholders" refers to an outstanding share or shares of stock and to a holder or holders of record of outstanding shares of stock when the corporation is authorized to issue only one class of shares of stock, and said reference is also intended to include any outstanding share or shares of stock and any holder or holders of record of outstanding shares of stock of any class upon which or upon whom the articles of incorporation confers such rights where there are two or more classes or series of shares of stock or upon which or upon whom the Private Corporations Law confers such rights notwithstanding that the incorporation may provide for more than one class or series of shares of stock, one or more of which are limited or denied such rights thereunder; provided, however, that no such right shall vest in the event of an increase or a decrease in the authorized number of shares of stock of any class or series which is otherwise denied voting rights under the provisions of the articles of incorporation, except as any provision of law may otherwise require.

7.    <u>STOCKHOLDER MEETINGS</u>.

-    <u>TIME</u>. The annual meeting shall be held on the date and at the time fixed, from time to time, by the directors, provided, that the first annual meeting shall be held on a date within thirteen months after the organization of the corporation, and each successive annual meeting shall be held on a date within thirteen months after the date of the preceding annual meeting. A special meeting shall be held on the date and at the time fixed by the directors.

-    <u>PLACE</u>. Annual meetings and special meetings may be held at such place, either within or without the State of Nevada, as the directors may, from time to time, fix. Whenever the directors shall fail to fix such place, the meeting shall be held at the registered office of the corporation in the State of Nevada. The Board of Directors may also, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 78.320 of the Nevada Private Corporations Law. If a meeting by remote communication is authorized by the Board of Directors in its sole discretion, and subject to guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication participate in a meeting of stockholders and be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (a) the corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (b) the corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (c) if any stockholder or proxyholder votes or takes other action at the

meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation.

-    <u>CALL</u>. Annual meetings and special meetings may be called by the directors or by any officer instructed by the directors to call the meeting.

-    <u>NOTICE OR WAIVER OF NOTICE</u>. Written notice of all meetings shall be given, which shall state the place, if any, date, and hour of the meeting, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and in the case of a special meeting, the purpose or purposes for which the meeting is called. The notice of an annual meeting shall state that the meeting is called for the election of directors and for the transaction of other business which may properly come before the meeting, and shall (if any other action which could be taken at a special meeting is to be taken at such annual meeting) state the purpose or purposes. The notice of any meeting shall also include, or be accompanied by, any additional statements, information, or documents prescribed by the Private Corporations Law. Except as otherwise provided by the Private Corporations Law, the written notice of any meeting shall be given not less than ten days nor more than sixty days before the date of the meeting to each stockholder entitled to vote at such meeting. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the corporation. If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. Whenever notice is required to be given under the Private Corporations Law, articles of incorporation or bylaws, a written waiver signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a stockholder at a meeting of stockholders shall constitute a waiver of notice of such meeting, except when the stockholder attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the articles of incorporation or these bylaws.

-    <u>STOCKHOLDER LIST</u>. The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least ten days prior to the meeting on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting or during ordinary business hours at the principal place of business of the corporation. In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by this section or the books of the corporation, or to vote in person or by proxy at any meeting of stockholders.

-    <u>CONDUCT OF MEETING</u>. Meetings of the stockholders shall be presided over by one of the following officers in the order of seniority and if present and acting - the Chairperson of the Board, if any, the Vice-Chairperson of the Board, if any, the Chief Executive Officer, President, an Executive Vice-President, or, if none of the foregoing is in office and present and acting, by a chairperson to be chosen by the stockholders. The Secretary of the corporation, or in such Secretary's absence, an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present the chairperson of the meeting shall appoint a secretary of the meeting.

-    <u>PROXY REPRESENTATION</u>. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after 3 years from its date, unless the proxy provides for a longer period. A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature. A stockholder may also

authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of a telegram, cablegram, or other means of electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such telegram, cablegram or other means of electronic transmission must either set forth or be submitted with information from which it can be determined that the telegram, cablegram or other electronic transmission was authorized by the stockholder. If it is determined that such telegrams, cablegrams or other electronic transmissions are valid, the inspectors or, if there are no inspectors, such other persons making the determination shall specify the information upon which they relied. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to Section 78.355 of the Private Corporations Law may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission. A duly executed proxy shall be irrevocable if it states that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.

-    <u>INSPECTORS</u>. The directors, in advance of any meeting, may, but need not, appoint one or more inspectors of election to act at the meeting or any adjournment thereof. If an inspector or inspectors are not appointed, the person presiding at the meeting may, but need not, appoint one or more inspectors. In case any person who may be appointed as an inspector fails to appear or act, the vacancy may be filled by appointment made by the directors in advance of the meeting or at the meeting by the person presiding thereat. Each inspector, if any, before entering upon the discharge of duties of inspector, shall take and sign an oath faithfully to execute the duties of inspector at such meeting with strict impartiality and according to the best of such inspector's ability. The inspectors, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots, or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots, or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all stockholders. On request of the person presiding at the meeting, the inspector or inspectors, if any, shall make a report in writing of any challenge, question, or matter determined by such inspector or inspectors and execute a certificate of any fact found by such inspector or inspectors.

-    <u>QUORUM</u>. The holders of 33-1/3% of the outstanding shares of common stock shall constitute a quorum at a meeting of stockholders for the transaction of any business. The stockholders present may adjourn the meeting despite the absence of a quorum.

-    <u>VOTING</u>. Each share of stock shall entitle the holder thereof to one vote. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. Any other action shall be authorized by a majority of the votes cast except where the Private Corporations Law prescribes a different percentage of votes and/or a different exercise of voting power, and except as may be otherwise prescribed by the provisions of the articles of incorporation and these Bylaws. In the election of directors, and for any other action, voting need not be by ballot.

8.   <u>STOCKHOLDER ACTION WITHOUT MEETINGS</u>. Except as any provision of the Private Corporations Law may otherwise require, any action required by the Private Corporations Law to be taken at any annual or special meeting of stockholders, or any action which may be taken at any annual or special meeting of stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the corporation can determine that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper shall be delivered to the corporation by delivery to its principal place of business or an officer or agent of the corporation having custody of the book in which the proceedings of meetings of stockholders are recorded, to the extent and in the manner provided by resolution of the Board of Directors of the corporation. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who

have not consented in writing. Action taken pursuant to this paragraph shall be subject to the provisions of Section 78.320 of the Private Corporations Law.

ARTICLE II

DIRECTORS

1.    FUNCTIONS AND DEFINITION. The business and affairs of the corporation shall be managed by or under the direction of the Board of Directors of the corporation. The Board of Directors shall have the authority to fix the compensation of the members thereof. The use of the phrase "whole board" herein refers to the total number of directors which the corporation would have if there were no vacancies.

2.    QUALIFICATIONS AND NUMBER. A director need not be a stockholder, a citizen of the United States, or a resident of the State of Nevada. The number of directors constituting the whole board shall be at least one. Subject to the foregoing limitation and except for the first Board of Directors, such number may be fixed from time to time by action of the stockholders or of the directors, or, if the number is not fixed, the number shall be one. The number of directors may be increased or decreased by action of the stockholders or of the directors.

3.    ELECTION AND TERM. The directors shall be divided into three (3) classes. Each such class shall consist, as nearly as may be possible, of one-third of the total number of directors, and any remaining directors shall be included within such groups as the Board of Directors shall designate. The first such class of directors will be elected for a term which expires in 2015. The second class will be elected for a term which expires in 2016. The third class will be elected to a term which expires in 2017. At each annual meeting of stockholders, beginning in 2015, successors to the class of directors whose term expires at the annual meeting in that year shall be elected for a three-year term. If the number of directors is changed, any increase or decrease shall be apportioned among the classes so as to maintain the number of directors in each class as nearly equal as possible, but in no case shall a decrease in the number of directors shorten the term of any incumbent director. No alteration, amendment or repeal of this Section 3 of Article II shall be effective to shorten the term of any director holding office at the time of such alteration, amendment or repeal, unless such alteration, amendment or repeal of this Section 3 of Article II has been approved by the majority of the holders of the shares of stock entitled to vote thereon.

Any director may resign at any time upon notice given in writing or by electronic transmission to the corporation. Except as the Private Corporations Law may otherwise require, in the interim between annual meetings of stockholders or of special meetings of stockholders called for the election of directors and/or for the removal of one or more directors and for the filling of any vacancy in that connection, newly created directorships and any vacancies in the Board of Directors, including unfilled vacancies resulting from the removal of directors for cause or without cause, may be filled by the vote of a majority of the remaining directors then in office, although less than a quorum, or by the sole remaining director.

4. MEETINGS.

-    TIME. Meetings shall be held at such time as the Board of Directors shall fix, except that the first meeting of a newly elected Board of Directors shall be held as soon after its election as the directors may conveniently assemble.

-    PLACE. Meetings shall be held at such place within or without the State of Nevada as shall be fixed by the Board of Directors.

-    CALL. No call shall be required for regular meetings for which the time and place have been fixed. Special meetings may be called by or at the direction of the Chairperson of the Board, if any, the Vice-Chairperson of the Board, if any, of the President, or of a majority of the directors in office.

-    NOTICE OR ACTUAL OR CONSTRUCTIVE WAIVER. No notice shall be required for regular meetings for which the time and place have been fixed. Written, oral, or any other mode of notice of the time and place shall be given for special meetings in sufficient time for the convenient assembly of the directors thereat. Whenever notice is required to be given under the Private Corporations Law, articles of incorporation or bylaws, a written waiver signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of any such person at a meeting shall constitute a waiver of notice of such meeting, except when such person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the directors need be specified in any written waiver of notice.

-    QUORUM AND ACTION. A majority of the whole Board of Directors shall constitute a quorum except when a vacancy or vacancies prevents such majority, whereupon a majority of the directors in office shall constitute a quorum, provided, that such majority shall constitute at least one-third of the whole Board of Directors. A majority of

the directors present, whether or not a quorum is present, may adjourn a meeting to another time and place. Except as herein otherwise provided, and except as otherwise provided by the Private Corporations Law, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. The quorum and voting provisions herein stated shall not be construed as conflicting with any provisions of the Private Corporations Law and these Bylaws which govern a meeting of directors held to fill vacancies and newly created directorships in the Board of Directors or action of disinterested directors.

Any member or members of the Board of Directors or of any committee designated by the Board, may participate in a meeting of the Board, or any such committee, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.

-      CHAIRPERSON OF THE MEETING. The Chairperson of the Board, if any and if present and acting, shall preside at all meetings. Otherwise, the Vice-Chairperson of the Board, if any and if present and acting, or the President, if present and acting, or any other director chosen by the Board, shall preside.

5.      REMOVAL OF DIRECTORS. Except as may otherwise be provided by the Private Corporations Law, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

6.      COMMITTEES. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of any member of any such committee or committees, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation with the exception of any power or authority the delegation of which is prohibited by Section 78.125 of the Private Corporations Law, and may authorize the seal of the corporation to be affixed to all papers which may require it.

7.      WRITTEN ACTION. Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

ARTICLE III

OFFICERS

The officers of the corporation shall consist of a Chief Executive Officer, President, a Secretary, a Treasurer, and, if deemed necessary, expedient, or desirable by the Board of Directors, a Chairperson of the Board, a Vice-Chairperson of the Board, one or more Executive Vice-Presidents, one or more other Vice-Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and such other officers with such titles as the resolution of the Board of Directors choosing them shall designate. Except as may otherwise be provided in the resolution of the Board of Directors choosing such officer, no officer other than the Chairperson or Vice-Chairperson of the Board, if any, need be a director. Any number of offices may be held by the same person, as the directors may determine.

Unless otherwise provided in the resolution choosing such officer, each officer shall be chosen for a term which shall continue until the meeting of the Board of Directors following the next annual meeting of stockholders and until such officer's successor shall have been chosen and qualified.

All officers of the corporation shall have such authority and perform such duties in the management and operation of the corporation as shall be prescribed in the resolutions of the Board of Directors designating and choosing such officers and prescribing their authority and duties, and shall have such additional authority and duties as are incident to their office except to the extent that such resolutions may be inconsistent therewith. The Secretary or an Assistant Secretary of the corporation shall record all of the proceedings of all meetings and actions in writing of stockholders, directors, and committees of directors, and shall exercise such additional authority and perform such additional duties as the Board shall assign to such Secretary or Assistant Secretary. Any officer may be removed, with or without cause, by the Board of Directors. Any vacancy in any office may be filled by the Board of Directors.

ARTICLE IV

CORPORATE SEAL

The corporate seal shall be in such form as the Board of Directors shall prescribe.

ARTICLE V

FISCAL YEAR

The fiscal year of the corporation shall be fixed, and shall be subject to change, by the Board of Directors.

ARTICLE VI

CONTROL OVER BYLAWS

Subject to the provisions of the articles of incorporation and the provisions of the Private Corporations Law, the power to amend, alter, or repeal these Bylaws and to adopt new Bylaws may be exercised by the Board of Directors or by the stockholders.

ARTICLE VII

INDEMNIFICATION

A director or officer of the Corporation shall have no personal liability to the Corporation or its stockholders for damages for breach of fiduciary duty as a director or officer, except for damages for breach of fiduciary duty resulting from (a) acts or omissions which involve intentional misconduct, fraud, or a knowing violation of law, or (b) the payment of dividends in violation of the Nevada Revised Statutes as it may from time to time be amended or any successor provision thereto.

### DESCRIPTION OF CAPITAL STOCK

**General**

The following description of our capital stock is a summary of the rights of our capital stock and summarizes certain provisions of our Restated Articles of Incorporation (as amended, our "Articles of Incorporation") and Amended and Restated Bylaws (as amended, our "Bylaws"). This summary does not purport to be complete and is qualified in its entirety by the provisions of our Articles of Incorporation and Bylaws, copies of which have been filed as exhibits to our public filings with the Securities and Exchange Commission, as well as to the applicable provisions of Nevada law. References to "we," "our," "us," or the "Company" refer to Marathon Digital Holdings, Inc.

Certain provisions of our Articles of Incorporation and Bylaws and the Nevada Revised Statutes ("NRS") summarized below may have an anti-takeover effect. These provisions may have the effect of delaying, deferring or preventing a merger or other takeover or change-of-control attempt that a stockholder might consider in its best interests, including attempts that might result in a premium over the market price for the shares of our capital stock held by our stockholders.

**Common Stock**

Pursuant to our Articles of Incorporation, we are authorized to issue 500,000,000 shares of common stock, par value $0.0001 per share.

Holders of our common stock are entitled to one vote for each share on all matters submitted to a stockholder vote. Holders of common stock do not have cumulative voting rights. Holders of a third of the outstanding shares of our common stock are necessary to constitute a quorum at any meeting of stockholders. Directors are elected by a plurality of the votes of the shares of our common stock present in person or represented by proxy at a meeting of stockholders and entitled to vote on the election of directors. Any other action is authorized by a majority of the votes cast except where the NRS prescribes a different percentage of votes and/or a different exercise of voting power, and except as may be otherwise prescribed by the provisions of our Articles of Incorporation and our Bylaws. A vote of at least a majority of the voting power of all affected outstanding shares of our capital stock is required to amend provisions of our Articles of Incorporation. A majority of the voting power of our stockholders is required to effectuate a merger.

Subject to preferences that may apply to any shares of preferred stock outstanding at the time, holders of our common stock are entitled to receive such dividends that the board of directors, in its discretion, declares from legally available funds. In the event of a liquidation, dissolution or winding up, each outstanding share entitles its holder to participate pro rata in all assets that remain after payment of liabilities and after providing for each class of stock, if any, having preference over the common stock. Our common stock has no preemptive rights, no conversion rights and there are no redemption provisions applicable to our common stock. All of our outstanding shares of common stock are fully paid and nonassessable.

**Preferred Stock**

Pursuant to our Articles of Incorporation, we are authorized to issue 50,000,000 shares of "blank check" preferred stock, par value $0.0001 per share, in one or more series, subject to any limitations prescribed by law, without further vote or action by the stockholders. Each such series of preferred stock shall have such number of shares, designations, preferences, voting powers, qualifications, and special or relative rights or privileges as shall be determined by our board of directors, which may include, among others, dividend rights, voting rights, liquidation preferences, conversion rights and preemptive rights.

Preferred stock is available for possible future financings or acquisitions and for general corporate purposes without further authorization of stockholders unless such authorization is required by applicable law, the rules of The Nasdaq Capital Market or other securities exchange or market on which our stock is then listed or admitted to trading.

Our board of directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes could, under some circumstances, have the effect of delaying, deferring or preventing a change in control of the Company.

**Classified Board**

Under our Bylaws, our board of directors is divided into three classes of directors, divided as nearly as equal in number as possible. The directors in each class serve for a three-year term, one class being elected each year by our stockholders, with staggered three-year terms. Only one class of directors will be elected at each annual meeting of

our stockholders, with the other classes continuing for the remainder of their respective three-year terms. The existence of a classified board could delay a potential acquiror from obtaining majority control of our board of directors, and the prospect of that delay might deter a potential acquiror.

**Anti-Takeover Laws**

The NRS contain provisions governing the acquisition of a controlling interest in certain Nevada corporations. Nevada's "acquisition of controlling interest" statutes (NRS 78.378 through 78.3793, inclusive) contain provisions governing the acquisition of a controlling interest in certain Nevada corporations. These "control share" laws provide generally that any person that acquires a "controlling interest" in certain Nevada corporations may be denied voting rights, unless a majority of the disinterested stockholders of the corporation elect to restore such voting rights. These laws will apply to us as of a particular date if we were to have 200 or more stockholders of record (at least 100 of whom have addresses in Nevada appearing on our stock ledger at all times during the 90 days immediately preceding that date) and do business in the State of Nevada directly or through an affiliated corporation, unless our Articles of Incorporation or Bylaws in effect on the tenth day after the acquisition of a controlling interest provide otherwise. These laws provide that a person acquires a "controlling interest" whenever a person acquires shares of a subject corporation that, but for the application of these provisions of the NRS, would enable that person to exercise (1) one-fifth or more, but less than one-third, (2) one-third or more, but less than a majority, or (3) a majority or more of all of the voting power of the corporation in the election of directors. Once an acquirer crosses one of these thresholds, shares which it acquired in the transaction taking it over the threshold and within the 90 days immediately preceding the date when the acquiring person acquired or offered to acquire a controlling interest become "control shares" to which the voting restrictions described above apply. These laws may have a chilling effect on certain transactions if our Articles of Incorporation or Bylaws are not timely amended to provide that these provisions do not apply to us or to an acquisition of a controlling interest, or if our disinterested stockholders do not confer voting rights in the control shares.

Nevada's "combinations with interested stockholders" statutes (NRS 78.411 through 78.444, inclusive) provide that specified types of business "combinations" between certain Nevada corporations and any person deemed to be an "interested stockholder" of the corporation are prohibited for two years after such person first becomes an "interested stockholder" unless the corporation's board of directors approves the combination (or the transaction by which such person becomes an "interested stockholder") in advance, or unless the combination is approved by the board of directors and sixty percent of the corporation's voting power not beneficially owned by the interested stockholder, its affiliates and associates. Furthermore, in the absence of prior approval, certain restrictions may apply even after such two-year period. For purposes of these statutes, an "interested stockholder" is any person who is (1) the beneficial owner, directly or indirectly, of 10% or more of the voting power of the outstanding voting shares of the corporation, or (2) an affiliate or associate of the corporation and at any time within the two previous years was the beneficial owner, directly or indirectly, of 10% or more of the voting power of the then-outstanding shares of the corporation. The definition of the term "combination" is sufficiently broad to cover most significant transactions between a corporation and an "interested stockholder." These laws generally apply to Nevada corporations with 200 or more stockholders of record. However, a Nevada corporation may elect in its Articles of Incorporation not to be governed by these particular laws, but if such election is not made in the corporation's original Articles of Incorporation, the amendment (1) must be approved by the affirmative vote of the holders of stock representing a majority of the outstanding voting power of the corporation not beneficially owned by interested stockholders or their affiliates and associates, and (2) is not effective until 18 months after the vote approving the amendment and does not apply to any combination with a person who first became an interested stockholder on or before the effective date of the amendment. We have not made such an election in our Articles of Incorporation, and we have not amended our Articles of Incorporation to so elect.

Further, NRS 78.139 provides that directors may resist a change or potential change in control of a corporation if the board of directors determines that the change or potential change in control is opposed to or not in the best interest of the corporation upon consideration of any relevant facts, circumstances, contingencies or constituencies pursuant to NRS 78.138(4).

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is Equity Stock Transfer, Inc., New York, NY.

**Listing**

Our common stock is currently traded on The Nasdaq Capital Market under the symbol "MARA."

## MARATHON DIGITAL HOLDINGS, INC.
## AMENDED AND RESTATED
## 2018 EQUITY INCENTIVE PLAN

**1.**    **Purpose of the Plan**. This 2018 Equity Incentive Plan (the "Plan") is intended as an incentive, to retain in the employ of and as directors, officers, consultants, advisors and employees to Marathon Digital Holdings, Inc., a Nevada corporation (the "Company"), and any Subsidiary of the Company, within the meaning of Section 424(f) of the United States Internal Revenue Code of 1986, as amended (the "Code"), persons of training, experience and ability, to attract new directors, officers, consultants, advisors and employees whose services are considered valuable, to encourage the sense of proprietorship and to stimulate the active interest of such persons in the development and financial success of the Company and its Subsidiaries.

It is further intended that certain options granted pursuant to the Plan shall constitute incentive stock options within the meaning of Section 422 of the Code (the "Incentive Options") while certain other options granted pursuant to the Plan shall be nonqualified stock options (the "Nonqualified Options"). Incentive Options and Nonqualified Options are hereinafter referred to collectively as "Options."

The Company intends that the Plan meet the requirements of Rule 16b-3 ("Rule 16b-3") promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and that transactions of the type specified in subparagraphs (c) to (f) inclusive of Rule 16b-3 by officers and directors of the Company pursuant to the Plan will be exempt from the operation of Section 16(b) of the Exchange Act. Further, the Plan is intended to satisfy the performance-based compensation exception to the limitation on the Company's tax deductions imposed by Section 162(m) of the Code with respect to those Options for which qualification for such exception is intended. In all cases, the terms, provisions, conditions and limitations of the Plan shall be construed and interpreted consistent with the Company's intent as stated in this Section 1.

**2.**    **Administration of the Plan**. The Board of Directors of the Company (the "Board") shall appoint and maintain as administrator of the Plan a Committee (the "Committee") consisting of two or more directors who are (i) "Independent Directors" (as such term is defined under the rules of the NASDAQ Stock Market), (ii) "Non-Employee Directors" (as such term is defined in Rule 16b-3) and (iii) "Outside Directors" (as such term is defined in Section 162(m) of the Code), which shall serve at the pleasure of the Board. The Committee, subject to Sections 3, 5 and 6 hereof, shall have full power and authority to designate recipients of Options, restricted stock ("Restricted Stock"), preferred stock which may or may not be convertible ("Preferred Stock"), restricted share units ("RSUs"), and warrants which may qualify as Incentive Warrants or Non-Qualified Warrants (as such terms are defined herein, collectively, "Warrants"), and to determine the terms and conditions of the respective agreements (which need not be identical) and to interpret the provisions and supervise the administration of the Plan. The Committee shall have the authority, without limitation, to designate which Options granted under the Plan shall be Incentive Options and which shall be Nonqualified Options. To the extent any Option does not qualify as an Incentive Option, it shall constitute a separate Nonqualified Option.

In lieu of grants of Options and Restricted Stock, the Committee has the full power and to authority under the Plan to designate Participants to receive shares of the Company's Preferred Stock. Further, to the extent that the Committee shall determine that the issuance of Options, Restricted Stock, RSUs or Warrants to a Participant (as defined below) could cause the beneficial ownership by such Participant or its affiliates to exceed more than 9.99% of the total outstanding shares of Common Stock of the Company upon the exercise of the Option or Warrant or the vesting of the Restricted Stock or RSU, as applicable, the Committee shall also have the full power and authority under the Plan to designate Participants to receive shares of the Company's preferred stock in either a series of preferred that has already been authorized and designated by the Board or in a new series of preferred that shall be authorized and designated by the Board in accordance with the Company's Amended and Restated Articles of Incorporation. The Committee shall determine the

terms and conditions of the issuance of any Preferred Stock issued pursuant to the Plan (which terms and conditions may include standard equity blockers, conditions to issuance and the conversion price of the Preferred Stock) and any related agreements (which need not be identical) with respect to the issuance of the Preferred Stock and to interpret the provisions and supervise the administration of the Plan with respect to the issuance of any Preferred Stock.

Subject to the provisions of the Plan, the Committee shall interpret the Plan and all Options, Restricted Stock, RSUs, Preferred Stock and Warrants (collectively, the "Securities") granted under the Plan, shall make such rules as it deems necessary for the proper administration of the Plan, shall make all other determinations necessary or advisable for the administration of the Plan and shall correct any defects or supply any omission or reconcile any inconsistency in the Plan or in any Securities granted under the Plan in the manner and to the extent that the Committee deems desirable to carry into effect the Plan or any Securities. The act or determination of a majority of the Committee shall be the act or determination of the Committee and any decision reduced to writing and signed by all of the members of the Committee shall be fully effective as if it had been made by a majority of the Committee at a meeting duly held for such purpose. Subject to the provisions of the Plan, any action taken or determination made by the Committee pursuant to this and the other Sections of the Plan shall be conclusive on all parties.

In the event that for any reason the Committee is unable to act or if the Committee at the time of any grant, award or other acquisition under the Plan does not consist of two or more Non-Employee Directors, or if there shall be no such Committee, or if the Board otherwise determines to administer the Plan, then the Plan shall be administered by the Board, and references herein to the Committee (except in the proviso to this sentence) shall be deemed to be references to the Board, and any such grant, award or other acquisition may be approved or ratified in any other manner contemplated by subparagraph (d) of Rule 16b-3; provided, however, that grants to the Company's Chief Executive Officer or to any of the Company's other four most highly compensated officers that are intended to qualify as performance-based compensation under Section 162(m) of the Code may only be granted by the Committee.

**3.** **Designation of Optionees and Grantees**. The persons eligible for participation in the Plan as recipients of Options (the "Optionees"), Restricted Stock, Preferred Stock, RSUs or Warrants (the "Grantees" and together with Optionees, the "Participants") shall include directors, officers and employees of, and consultants and advisors to, the Company or any Subsidiary; provided that Incentive Options may only be granted to employees of the Company and any Subsidiary. In selecting Participants, and in determining the number of shares to be covered by each Option or Warrant or award of Restricted Stock, Preferred Stock or RSU granted to Participants, the Committee may consider any factors it deems relevant, including, without limitation, the office or position held by the Participant or the Participant's relationship to the Company, the Participant's degree of responsibility for and contribution to the growth and success of the Company or any Subsidiary, the Participant's length of service, promotions and potential. A Participant who has been granted an Option, Restricted Stock, Preferred Stock, RSU or Warrant, hereunder, may be granted additional Options, Restricted Stock, Preferred Stock, RSUs or Warrants, if the Committee shall so determine.

**4.** **Stock Reserved for the Plan**. Subject to adjustment as provided in Section 8 hereof, a total of 30,000 shares of the Company's common stock, par value $0.0001 per share (the "Common Stock"), shall be subject to the Plan. The shares of Common Stock subject to the Plan shall consist of unissued shares, treasury shares or previously issued shares held by any Subsidiary of the Company, and such number of shares of Common Stock shall be and is hereby reserved for such purpose. Any of such shares of Common Stock that may remain unissued and that are not subject to outstanding Options, Preferred Stock or Warrants at the termination of the Plan shall cease to be reserved for the purposes of the Plan, but until termination of the Plan, the Company shall at all times reserve a sufficient number of shares of Common Stock to meet the requirements of the Plan. Should any Securities expire or be canceled prior to its exercise, satisfaction of conditions or vesting in full, as applicable, or should the number of shares of Common Stock to be delivered upon the exercise or vesting in full of an Option or Warrant or award of Restricted Stock or RSU or conversion of

Preferred Stock be reduced for any reason, the shares of Common Stock theretofore subject to such Option, Warrant, Restricted Stock, RSU or Preferred Stock, as applicable, may be subject to future Options, Warrants, Restricted Stock, RSUs or Preferred Stock under the Plan, except where such reissuance is inconsistent with the provisions of Section 162(m) of the Code where qualification as performance-based compensation under Section 162(m) of the Code is intended.

**5.**     A.     **Terms and Conditions of Options**. Options granted under the Plan shall be subject to the following conditions and shall contain such additional terms and conditions, not inconsistent with the terms of the Plan, as the Committee shall deem desirable:

(a)     <u>Option Price</u>. The purchase price of each share of Common Stock purchasable under an Incentive Option shall be determined by the Committee at the time of grant, but shall not be less than 100% of the Fair Market Value (as defined below) of such share of Common Stock on the date the Option is granted; <u>provided</u>, <u>however</u>, that with respect to an Optionee who, at the time such Incentive Option is granted, owns (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or of any Subsidiary, the purchase price per share of Common Stock shall be at least 110% of the Fair Market Value per share of Common Stock on the date of grant. The purchase price of each share of Common Stock purchasable under a Nonqualified Option shall not be less than 100% of the Fair Market Value of such share of Common Stock on the date the Option is granted. The exercise price for each Option shall be subject to adjustment as provided in Section 8 below. "<u>Fair Market Value</u>" means the closing price on the final trading day immediately prior to the grant date of the Common Stock on the NASDAQ Capital Market LLC or other principal securities exchange or OTC Bulletin Board on which shares of Common Stock are listed (if the shares of Common Stock are so listed), or, if not so listed, the mean between the closing bid and asked prices of publicly traded shares of Common Stock in the over the counter market, or, if such bid and asked prices shall not be available, as reported by any nationally recognized quotation service selected by the Company, or as determined by the Committee in a manner consistent with the provisions of the Code. Anything in this Section 5A(a) to the contrary notwithstanding, in no event shall the purchase price of a share of Common Stock be less than the minimum price permitted under the rules and policies of any national securities exchange on which the shares of Common Stock are listed.

(b)     <u>Option Term</u>. The term of each Option shall be fixed by the Committee, but no Option shall be exercisable more than ten years after the date such Option is granted and in the case of an Incentive Option granted to an Optionee who, at the time such Incentive Option is granted, owns (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or of any Subsidiary, no such Incentive Option shall be exercisable more than five years after the date such Incentive Option is granted.

(c)     <u>Exercisability</u>. Subject to Section 5A(j) hereof, Options shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of grant; <u>provided</u>, <u>however</u>, that in the absence of any Option vesting periods designated by the Committee at the time of grant, Options shall vest and become exercisable as to one-third of the total number of shares subject to the Option on each of the first, second and third anniversaries of the date of grant; and provided further that no Options shall be exercisable until such time as any vesting limitation required by Section 16 of the Exchange Act, and related rules, shall be satisfied if such limitation shall be required for continued validity of the exemption provided under Rule 16b-3(d)(3).

Upon the occurrence of a "Change in Control" (as hereinafter defined), the Committee may accelerate the vesting and exercisability of outstanding Options, in whole or in part, as determined by the Committee in its sole discretion. In its sole discretion, the Committee may also determine that, upon the occurrence of a Change in Control, each outstanding Option shall terminate within a specified number of days after notice to the Optionee thereunder, and each such Optionee shall receive, with respect to each share of Common Stock subject to such Option, an amount equal to the

excess of the Fair Market Value of such shares immediately prior to such Change in Control over the exercise price per share of such Option; such amount shall be payable in cash, in one or more kinds of property (including the property, if any, payable in the transaction) or a combination thereof, as the Committee shall determine in its sole discretion.

For purposes of the Plan, unless otherwise defined in an employment agreement between the Company and the relevant Optionee, a Change in Control shall be deemed to have occurred if:

(i)    a tender offer (or series of related offers) shall be made and consummated for the ownership of 50% or more of the outstanding voting securities of the Company, unless as a result of such tender offer more than 50% of the outstanding voting securities of the surviving or resulting corporation shall be owned in the aggregate by the stockholders of the Company (as of the time immediately prior to the commencement of such offer), any employee benefit plan of the Company or its Subsidiaries, and their affiliates;

(ii)    the Company shall be merged or consolidated with another corporation, unless as a result of such merger or consolidation more than 50% of the outstanding voting securities of the surviving or resulting corporation shall be owned in the aggregate by the stockholders of the Company (as of the time immediately prior to such transaction), any employee benefit plan of the Company or its Subsidiaries, and their affiliates;

(iii)    the Company shall sell substantially all of its assets to another corporation that is not wholly owned by the Company, unless as a result of such sale more than 50% of such assets shall be owned in the aggregate by the stockholders of the Company (as of the time immediately prior to such transaction), any employee benefit plan of the Company or its Subsidiaries and their affiliates; or

(iv)    a Person (as defined below) shall acquire 50% or more of the outstanding voting securities of the Company (whether directly, indirectly, beneficially or of record), unless as a result of such acquisition more than 50% of the outstanding voting securities of the surviving or resulting corporation shall be owned in the aggregate by the stockholders of the Company (as of the time immediately prior to the first acquisition of such securities by such Person), any employee benefit plan of the Company or its Subsidiaries, and their affiliates.

Notwithstanding the foregoing, if Change of Control is defined in an employment agreement between the Company and the relevant Optionee, then, with respect to such Optionee, Change of Control shall have the meaning ascribed to it in such employment agreement.

For purposes of this Section 5A(c), ownership of voting securities shall take into account and shall include ownership as determined by applying the provisions of Rule 13d-3(d)(I)(i) (as in effect on the date hereof) under the Exchange Act. In addition, for such purposes, "Person" shall have the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof; provided, however, that a Person shall not include (A) the Company or any of its Subsidiaries; (B) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Subsidiaries; (C) an underwriter temporarily holding securities pursuant to an offering of such securities; or (D) a corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportion as their ownership of stock of the Company.

(d)    Method of Exercise. Options to the extent then exercisable may be exercised in whole or in part at any time during the option period, by giving written notice to the Company specifying the number of shares of Common Stock to be purchased, accompanied by payment in full of the purchase price, in cash, or by check or such other instrument as may be acceptable to the Committee. As determined by the Committee, in its sole discretion, at or after grant, payment in full or in part may be made at the election of the Optionee (i) in the form of Common Stock owned by the Optionee (based on the Fair Market Value of the Common Stock which is not the subject of any pledge or security interest, (ii) in the form of shares of Common Stock

or Preferred Stock withheld by the Company from the shares of Common Stock otherwise to be received with such withheld shares of Common Stock having a Fair Market Value equal to the exercise price of the Option, or (iii) by a combination of the foregoing, such Fair Market Value determined by applying the principles set forth in Section 5A(a), provided that the combined value of all cash and cash equivalents and the Fair Market Value of any shares surrendered to the Company is at least equal to such exercise price and except with respect to (ii) above, such method of payment will not cause a disqualifying disposition of all or a portion of the Common Stock received upon exercise of an Incentive Option. An Optionee shall have the right to dividends and other rights of a stockholder with respect to shares of Common Stock purchased upon exercise of an Option at such time as the Optionee (i) has given written notice of exercise and has paid in full for such shares, and (ii) has satisfied such conditions that may be imposed by the Company with respect to the withholding of taxes.

(e)  <u>Non-transferability of Options</u>. Options are not transferable and may be exercised solely by the Optionee during his lifetime or after his death by the person or persons entitled thereto under his will or the laws of descent and distribution. The Committee, in its sole discretion, may permit a transfer of a Nonqualified Option to (i) a trust for the benefit of the Optionee, (ii) a member of the Optionee's immediate family (or a trust for his or her benefit) or (iii) pursuant to a domestic relations order. Any attempt to transfer, assign, pledge or otherwise dispose of, or to subject to execution, attachment or similar process, any Option contrary to the provisions hereof shall be void and ineffective and shall give no right to the purported transferee.

(f)  <u>Termination by Death</u>. Unless otherwise determined by the Committee, if any Optionee's employment with or service to the Company or any Subsidiary terminates by reason of death, the Option may thereafter be exercised, to the extent then exercisable (or on such accelerated basis as the Committee shall determine at or after grant), by the legal representative of the estate or by the legatee of the Optionee under the will of the Optionee, for a period of one (1) year after the date of such death (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof) or until the expiration of the stated term of such Option as provided under the Plan, whichever period is shorter.

(g)  <u>Termination by Reason of Disability</u>. Unless otherwise determined by the Committee, if any Optionee's employment with or service to the Company or any Subsidiary terminates by reason of Disability (as defined below), then any Option held by such Optionee may thereafter be exercised, to the extent it was exercisable at the time of termination due to Disability (or on such accelerated basis as the Committee shall determine at or after grant), but may not be exercised after ninety (90) days after the date of such termination of employment or service (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof) or the expiration of the stated term of such Option, whichever period is shorter; <u>provided</u>, <u>however</u>, that, if the Optionee dies within such ninety (90) day period, any unexercised Option held by such Optionee shall thereafter be exercisable to the extent to which it was exercisable at the time of death for a period of one (1) year after the date of such death (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof) or for the stated term of such Option, whichever period is shorter. "Disability" shall mean an Optionee's total and permanent disability; <u>provided</u>, that if Disability is defined in an employment agreement between the Company and the relevant Optionee, then, with respect to such Optionee, Disability shall have the meaning ascribed to it in such employment agreement

(h)  <u>Termination by Reason of Retirement</u>. Unless otherwise determined by the Committee, if any Optionee's employment with or service to the Company or any Subsidiary terminates by reason of Normal or Early Retirement (as such terms are defined below), any Option held by such Optionee may thereafter be exercised to the extent it was exercisable at the time of such Retirement (or on such accelerated basis as the Committee shall determine at or after grant), but may not be exercised after ninety (90) days after the date of such termination of employment or service (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof) or the expiration of the stated term of such Option, whichever date is earlier; <u>provided</u>, <u>however</u>, that, if the

Optionee dies within such ninety (90) day period, any unexercised Option held by such Optionee shall thereafter be exercisable, to the extent to which it was exercisable at the time of death, for a period of one (1) year after the date of such death (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof) or for the stated term of such Option, whichever period is shorter.

For purposes of this paragraph (h), "Normal Retirement" shall mean retirement from active employment with the Company or any Subsidiary on or after the normal retirement date specified in the applicable Company or Subsidiary pension plan or if no such pension plan, age 65, and "Early Retirement" shall mean retirement from active employment with the Company or any Subsidiary pursuant to the early retirement provisions of the applicable Company or Subsidiary pension plan or if no such pension plan, age 55.

(i)    Other Terminations. Unless otherwise determined by the Committee upon grant, if any Optionee's employment with or service to the Company or any Subsidiary is terminated by such Optionee for any reason other than death, Disability, Normal or Early Retirement or Good Reason (as defined below), the Option shall thereupon terminate, except that the portion of any Option that was exercisable on the date of such termination of employment or service may be exercised for the lesser of ninety (90) days after the date of termination (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof) or the balance of such Option's term, which ever period is shorter. The transfer of an Optionee from the employ of or service to the Company to the employ of or service to a Subsidiary, or vice versa, or from one Subsidiary to another, shall not be deemed to constitute a termination of employment or service for purposes of the Plan.

(i)    In the event that the Optionee's employment or service with the Company or any Subsidiary is terminated by the Company or such Subsidiary for "cause" any unexercised portion of any Option shall immediately terminate in its entirety. For purposes hereof, unless otherwise defined in an employment agreement between the Company and the relevant Optionee, "Cause" shall exist upon a good-faith determination by the Board, following a hearing before the Board at which an Optionee was represented by counsel and given an opportunity to be heard, that such Optionee has been accused of fraud, dishonesty or act detrimental to the interests of the Company or any Subsidiary of Company or that such Optionee has been accused of or convicted of an act of willful and material embezzlement or fraud against the Company or of a felony under any state or federal statute; provided, however, that it is specifically understood that "Cause" shall not include any act of commission or omission in the good-faith exercise of such Optionee's business judgment as a director, officer or employee of the Company, as the case may be, or upon the advice of counsel to the Company. Notwithstanding the foregoing, if Cause is defined in an employment agreement between the Company and the relevant Optionee, then, with respect to such Optionee, Cause shall have the meaning ascribed to it in such employment agreement.

(ii)    In the event that an Optionee is removed as a director, officer or employee by the Company at any time other than for "Cause" or resigns as a director, officer or employee for "Good Reason" the Option granted to such Optionee may be exercised by the Optionee, to the extent the Option was exercisable on the date such Optionee ceases to be a director, officer or employee. Such Option may be exercised at any time within one (1) year after the date the Optionee ceases to be a director, officer or employee (or, if later, such time as the Option may be exercised pursuant to Section 14(d) hereof), or the date on which the Option otherwise expires by its terms; whichever period is shorter, at which time the Option shall terminate; provided, however, if the Optionee dies before the Options terminate and are no longer exercisable, the terms and provisions of Section 5A(f) shall control. For purposes of this Section 5A(i), and unless otherwise defined in an employment agreement between the Company and the relevant Optionee, Good Reason shall exist upon the occurrence of the following:

(A)    the assignment to Optionee of any duties inconsistent with the position in the Company that Optionee held immediately prior to the assignment;

(B)    a Change of Control resulting in a significant adverse alteration in the status or conditions of Optionee's participation with the Company or other nature of Optionee's responsibilities from those in effect prior to such Change of Control, including any significant alteration in Optionee's responsibilities immediately prior to such Change in Control; and

(C)    the failure by the Company to continue to provide Optionee with benefits substantially similar to those enjoyed by Optionee prior to such failure.

Notwithstanding the foregoing, if Good Reason is defined in an employment agreement between the Company and the relevant Optionee, then, with respect to such Optionee, Good Reason shall have the meaning ascribed to it in such employment agreement.

(j)    <u>Limit on Value of Incentive Option</u> . The aggregate Fair Market Value, determined as of the date the Incentive Option is granted, of Common Stock for which Incentive Options are exercisable for the first time by any Optionee during any calendar year under the Plan (and/or any other stock option plans of the Company or any Subsidiary) shall not exceed $100,000.

**B.    Terms and Conditions of Warrants** . Warrants may be issued under the Plan in the form of (a) warrants which qualify as Incentive Options ("<u>Incentive Warrants</u>") or (b) warrants that do not qualify as incentive stock options ("<u>Non-Qualified Warrants</u>"). Warrants issued under the Plan shall be subject to the following conditions and shall contain such additional terms and conditions, not inconsistent with the terms of the Plan, as the Committee shall deem desirable:

(a)    <u>Warrant Grants</u>. The Committee may grant Warrants to purchase shares of Common Stock from the Company, to such key persons, and in such amounts and subject to such vesting and forfeiture provisions and other terms and conditions, as the Committee shall determine, subject to the provisions of the Plan. The term "Incentive Warrant" means a Warrant that is intended to qualify for special federal income tax treatment pursuant to Sections 421 and 422 of the Code as now constituted or subsequently amended, or pursuant to a successor provision of the Code, and which is so designated in the applicable Award Agreement. Any Warrant that is not specifically designated as an Incentive Warrant shall under no circumstances be considered an Incentive Warrant. Any Warrant that is not an Incentive Warrant is referred to herein as a "Non-Qualified Warrant." The Committee may grant Incentive Warrants only to employees, and any grants of Warrants to any other key persons shall only be Non-Qualified Warrants.

(b)    <u>Warrant Exercise Price</u> . Each Award Agreement with respect to a Warrant shall set forth the amount (the " <u>Warrant Exercise Price</u>") payable by the Grantee to the Company upon exercise of the Warrant evidenced thereby. The Warrant Exercise Price per share shall be determined by the Committee; <u>provided</u>, <u>however</u>, that with respect to an Grantee who, at the time an Incentive Warrant is granted, owns (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or of any Subsidiary, the purchase price per share of Common Stock shall be at least 110% of the Fair Market Value per share of Common Stock on the date of issuance. The purchase price of each share of Common Stock purchasable under a Non-Qualified Warrant shall not be less than 100% of the Fair Market Value of such share of Common Stock on the date such Warrant is issued. The exercise price for each Warrant shall be subject to adjustment as provided in Section 8 below.

(c)    <u>Term</u>. Subject to Section 5B(i) hereof, the term of each Warrant shall be fixed by the Committee, but no Warrant shall be exercisable more than ten (10) years after the date such Warrant is issued.

(d)    <u>Exercisability</u>. Subject to Section 5B(i) hereof, Warrants shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at the time of issuance; <u>provided</u>, <u>however</u>, that in the absence of any Warrant vesting

periods designated by the Committee at the time of issuance, Warrants shall vest and become exercisable as to one-third of the total number of shares subject to the Warrant on each of the first, second and third anniversaries of the date of issuance; and, provided further, that no Warrants shall be exercisable until such time as any vesting limitation required by Section 16 of the Exchange Act, and related rules, shall be satisfied if such limitation shall be required for continued validity of the exemption provided under Rule 16b-3(d)(3).

Upon the occurrence of a "Change in Control" (as defined in Section 5A(c) hereof), the Committee may accelerate the vesting and exercisability of outstanding Warrants, in whole or in part, as determined by the Committee in its sole discretion. In its sole discretion, the Committee may also determine that, upon the occurrence of a Change in Control, each outstanding Warrant shall terminate within a specified number of days after notice to the Grantee thereunder, and each such Grantee shall receive, with respect to each share of Common Stock subject to such Warrant, an amount equal to the excess of the Fair Market Value of such shares immediately prior to such Change in Control over the exercise price per share of such Warrant; such amount shall be payable in cash, in one or more kinds of property (including the property, if any, payable in the transaction) or a combination thereof, as the Committee shall determine in its sole discretion.

For purposes of this Section 5B(d), ownership of voting securities shall take into account and shall include ownership as determined by applying the provisions of Rule 13d-3(d)(I)(i) (as in effect on the date hereof) under the Exchange Act. In addition, for such purposes, "Person" shall have the meaning given in Section 5A(c) hereof.

(e)    Method of Exercise. Warrants to the extent then exercisable may be exercised in whole or in part from time to time as to all or part of the shares as to which such award is then exercisable, by giving written notice to the Company specifying the number of shares of Common Stock to be purchased, accompanied by payment in full of the purchase price, in cash, or by check or such other instrument as may be acceptable to the Committee. As determined by the Committee, in its sole discretion, at or after issuance, payment in full or in part may be made at the election of the Grantee (i) in the form of Common Stock owned by the Grantee (based on the Fair Market Value of the Common Stock which is not the subject of any pledge or security interest), (ii) in the form of shares of Common Stock or Preferred Stock withheld by the Company from the shares of Common Stock otherwise to be received with such withheld shares of Common Stock having a Fair Market Value equal to the Warrant Exercise Price of the Warrant, or (iii) by a combination of the foregoing, such Fair Market Value determined by applying the principles set forth in Section 5B(b), provided that the combined value of all cash and cash equivalents and the Fair Market Value of any shares surrendered to the Company is at least equal to such exercise price and except with respect to (ii) above, such method of payment will not cause a disqualifying disposition of all or a portion of the Common Stock received upon exercise of an Incentive Warrant. A Grantee shall have the right to dividends and other rights of a stockholder with respect to shares of Common Stock purchased upon exercise of a Warrant at such time as the Grantee (i) has given written notice of exercise and has paid in full for such shares, and (ii) has satisfied such conditions that may be imposed by the Company with respect to the withholding of taxes.

(f)    Non-transferability of Warrants. Warrants are not transferable and may be exercised solely by the Grantee during his lifetime or after his death by the person or persons entitled thereto under his will or the laws of descent and distribution. The Committee, in its sole discretion, may permit a transfer of a Non-Qualified Warrant to (i) a trust for the benefit of the Grantee, (ii) a member of the Grantee's immediate family (or a trust for his or her benefit) or (iii) pursuant to a domestic relations order. Any attempt to transfer, assign, pledge or otherwise dispose of, or to subject to execution, attachment or similar process, any Warrant contrary to the provisions hereof shall be void and ineffective and shall give no right to the purported transferee.

(g)    Termination. Unless otherwise determined by the Committee at or after issuance, Warrants issued to the Grantee that have not vested shall be forfeited upon termination of the Grantee in accordance with Section 5A(f), (g), (h) and (i), as applicable. The Committee may

provide (on or after issuance) that restrictions or forfeiture conditions relating to the Warrants will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part restrictions or forfeiture conditions relating to the Warrants.

(h)    <u>Special Rules for Incentive Warrants</u>. No Warrant that remains exercisable for more than three months following a Grantee's termination of employment for any reason other than death (including death within three months after termination of employment or within one year after a termination of employment due to disability) or disability, or for more than one year following a Grantee's termination of employment as the result of his becoming disabled, may be treated as an Incentive Warrant.

(i)    <u>Limitations of Incentive Warrants</u>.

(i)    <u>Exercisability Limitation</u>. The aggregate Fair Market Value, determined as of the date the Incentive Warrant is issued, of Common Stock for which Incentive Warrants are exercisable for the first time by any Grantee during any calendar year under the Plan (and/or any other stock option plans of the Company or any Subsidiary) shall not exceed $100,000.

(ii)    <u>10% Owners</u>. Notwithstanding the provisions of this Section 5B(d), an Incentive Warrant may not be issued under the Plan to an individual who, at the time the Warrant is issued, owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or its Subsidiary (as such ownership may be determined for purposes of Section 422(b) (6) of the Code), unless (i) at the time such Incentive Warrant is issued the Warrant Exercise Price is at least 110% of the Fair Market Value of the shares subject thereto and (ii) the Incentive Warrant by its terms is not exercisable after the expiration of five (5) years from the date it is issuance.

**6.**    A.    **Terms and Conditions of Restricted Stock** . Restricted Stock may be granted under this Plan aside from, or in association with, any other award and shall be subject to the following conditions and shall contain such additional terms and conditions (including provisions relating to the acceleration of vesting of Restricted Stock upon a Change of Control), not inconsistent with the terms of the Plan, as the Committee shall deem desirable:

(a)    <u>Grantee rights</u>. A Grantee shall have no rights to an award of Restricted Stock unless and until Grantee accepts the award within the period prescribed by the Committee and, if the Committee shall deem desirable, makes payment to the Company in cash, or by check or such other instrument as may be acceptable to the Committee. After acceptance and issuance of a certificate or certificates, as provided for below, the Grantee shall have the rights of a stockholder with respect to Restricted Stock subject to the non-transferability and forfeiture restrictions described in Section 6(d) below.

(b)    <u>Issuance of Certificates</u>. The Company shall issue in the Grantee's name a certificate or certificates for the shares of Common Stock associated with the award promptly after the Grantee accepts such award.

(c)    <u>Delivery of Certificates</u>. Unless otherwise provided, any certificate or certificates issued evidencing shares of Restricted Stock shall not be delivered to the Grantee until such shares are free of any restrictions specified by the Committee at the time of grant.

(d)    <u>Forfeitability, Non-transferability of Restricted Stock</u>. Shares of Restricted Stock are forfeitable until the terms of the Restricted Stock grant have been satisfied. Shares of Restricted Stock are not transferable until the date on which the Committee has specified such restrictions have lapsed. Unless otherwise provided by the Committee at or after grant, distributions in the form of dividends or otherwise of additional shares or property in respect of shares of Restricted Stock shall be subject to the same restrictions as such shares of Restricted Stock.

(e)    <u>Change of Control</u>. Upon the occurrence of a Change in Control as defined in Section 5A(c), the Committee may accelerate the vesting of outstanding Restricted Stock, in whole or in part, as determined by the Committee, in its sole discretion.

(f)    <u>Termination of Employment</u>. Unless otherwise determined by the Committee at or after grant, in the event the Grantee ceases to be an employee or otherwise associated with the Company for any other reason, all shares of Restricted Stock theretofore awarded to him which are still subject to restrictions shall be forfeited and the Company shall have the right to complete the blank stock power. The Committee may provide (on or after grant) that restrictions or forfeiture conditions relating to shares of Restricted Stock will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part restrictions or forfeiture conditions relating to Restricted Stock.

**B.    Terms and Conditions of Preferred Stock** . In lieu of grants of Options, Warrants, Restricted Stock and RSUs, to the extent that the Committee shall determine that the issuance of Options, Warrants, Restricted Stock or RSUs to a Participant could cause the beneficial ownership by such Participant or its affiliates to exceed more than 9.99% of the total outstanding shares of Common Stock of the Company upon the exercise of the Option or Warrant or the vesting of the Restricted Stock or RSU, as applicable, Preferred Stock may be granted under this Plan aside from, or in association with, any other award and shall be subject to the following conditions and shall contain such additional terms and conditions (including provisions relating to the acceleration of vesting of Restricted Stock or RSU upon a Change of Control), not inconsistent with the terms of the Plan, as the Committee shall deem desirable:

(a)    <u>Grantee rights</u>. A Grantee shall have no rights to an award of Preferred Stock unless and until all of the following conditions have been met (A) the Committee designates an award of Preferred Stock in a series of Preferred Stock that has already been authorized and designated the Board, the Board passes a resolution authorizing and designating a new series of Preferred Stock on the terms and conditions determined by the Committee, (B) if applicable, the Company files a Certificate of Designation with the Secretary of State of the State of Nevada that sets forth the rights, preferences and other terms of any newly authorized and designated series of the Preferred Stock, and (C) Grantee accepts the award within the period prescribed by the Committee and, if the Committee shall deem desirable, executes an agreement that sets forth the terms and conditions of the issuance of the award of Preferred Stock as may be acceptable to the Committee. After acceptance and issuance of a certificate or certificates, as provided for below, the Grantee shall have the rights set forth in the applicable Certificate of Designation and any related agreement with respect to the Preferred Stock award. The Preferred Stock shall also be subject to the non-transferability and forfeiture restrictions described in Section 6B(d) below.

(b)    <u>Issuance of Certificates</u>. The Company shall issue in the Grantee's name a certificate or certificates for the shares of Preferred Stock associated with the award promptly after the Grantee accepts such award. The Company shall issue in the Grantee's name a certificate or certificates for the shares of Common Stock underlying the Preferred Stock associated with the award promptly after the Grantee converts the Preferred Stock in accordance with the terms and conditions set forth in the applicable Certificate of Designation and related agreement, if any.

(c)    <u>Delivery of Certificates</u>. Unless otherwise provided, any certificate or certificates issued evidencing shares of Preferred Stock and/or the underlying Common Stock issuable upon the conversion of the Preferred Stock shall not be delivered to the Grantee until such shares are free of any restrictions specified by the Committee at the time of grant.

(d)    <u>Forfeitability, Non-transferability of Preferred Stock</u> . Shares of Preferred Stock and any underlying shares of Common Stock issuable upon the conversion of the Preferred Stock are forfeitable until the terms of the Preferred Stock grant have been satisfied. Shares of Preferred Stock and any underlying shares of Common Stock issuable upon the conversion of the Preferred Stock are not transferable until the date on which the Committee has specified such

have lapsed. Unless otherwise provided by the Committee at or after grant, distributions in the form of dividends or otherwise of additional shares or property in respect of shares of Preferred Stock if the applicable Certificate of Designation provides for such distributions, shall be subject to the same restrictions as such shares of Preferred Stock.

(e)    Change of Control. Upon the occurrence of a Change in Control as defined in Section 5A(c), the Committee may waive any conditions and/or restrictions to the issuance of any contingent award of Preferred Stock, in whole or in part, as determined by the Committee, in its sole discretion.

(f)    Termination of Employment or Consulting Agreement. Unless otherwise determined by the Committee at or after grant, in the event the Grantee ceases to be, as applicable, an employee, a consultant or otherwise associated with the Company for any other reason, all shares of Preferred Stock theretofore awarded to him which are still subject to restrictions shall be forfeited and the Company shall have the right to complete the blank stock power. The Committee may provide (on or after grant) that restrictions or forfeiture conditions relating to shares of Preferred Stock will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part restrictions or forfeiture conditions relating to Preferred Stock.

(g)    Maximum Percentage. Notwithstanding anything to the contrary set forth herein, the Company shall not effect any conversion of Preferred Stock issued under the Plan, and no Participant shall have the right to convert any Preferred Stock, to the extent that after giving effect to such conversion, the beneficial owner of such shares (together with such Participant's affiliates) would have acquired, through conversion of such Preferred Stock or otherwise, beneficial ownership of a number of shares of Common Stock that exceeds 9.99% (the "Maximum Percentage") of the number of shares of Common Stock outstanding immediately after giving effect to such conversion. The Company shall not give effect to any voting rights of such Preferred Stock, and any Participant shall not have the right to exercise voting rights with respect to any Preferred Stock pursuant hereto, to the extent that giving effect to such voting rights would result in such Participant (together with its affiliates) being deemed to beneficially own in excess of the Maximum Percentage of the number of shares of Common Stock outstanding immediately after giving effect to such exercise, assuming such exercise as being equivalent to conversion. For purposes of the foregoing, the number of shares of Common Stock beneficially owned by a Participant and its affiliates shall include the number of shares of Common Stock issuable upon conversion of the Preferred Stock with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted shares of Preferred Stock beneficially owned by such Participant or any of its affiliates and (B) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any notes or warrants) subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 6B(g) beneficially owned by such Participant or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 6B(g), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. For purposes of this Section 6B(g), in determining the number of outstanding shares of Common Stock, a Participant may rely on the number of outstanding shares of Common Stock as reflected in (1) the Company's most recent Form 10-K, Form 10-Q, or Form 8-K, as the case may be, (2) a more recent public announcement by the Company, or (3) any other notice by the Company or its transfer agent setting forth the number of shares of Common Stock outstanding. For any reason at any time, upon the written request of any Participant, the Company shall within one (1) business day following the receipt of such notice, confirm orally and in writing to any such Participant the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including the Preferred Stock, by such Holder and its affiliates since the date as of which such number of outstanding shares of Common Stock was reported. By written notice to the Company, the Participant may from time to time increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99%

specified in such notice; provided, that (i) any such increase will not be effective until the sixty-first (61st) day after such notice is delivered to the Company, and (ii) any such increase or decrease will apply only to the Holder providing such written notice and not to any other Holder. In the event that the Company cannot pay any portion of any dividend, distribution, grant or issuance hereunder to a Participant solely by reason of this Section 6B(g) (such shares, the "Limited Shares"), notwithstanding anything to the contrary contained herein, the Company shall not be required to pay cash in lieu of the payment that otherwise would have been made in such Limited Shares, but shall hold any such Limited Shares in abeyance for such Holder until such time, if ever, that the delivery of such Limited Shares shall not cause the Participant to exceed the Maximum Percentage, at which time such Participant shall be delivered such Limited Shares to the extent as if there had been no such limitation. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 6B(g) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended beneficial ownership limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation.

   **C.  Terms and Conditions of Restricted Stock Units** . Restricted Stock Units, or RSUs, may be granted under this Plan aside from, or in association with, any other award and shall be subject to the following conditions and shall contain such additional terms and conditions (including provisions relating to the acceleration of vesting of RSUs upon a Change of Control), not inconsistent with the terms of the Plan, as the Committee shall deem desirable:

    (a)  <u>Grantee rights</u>. A Grantee shall have no rights to an award of RSUs unless and until Grantee accepts the award within the period prescribed by the Committee and, if the Committee shall deem desirable, makes payment to the Company in cash, or by check or such other instrument as may be acceptable to the Committee. After acceptance and issuance of a certificate or certificates, as provided for below, the Grantee shall have the rights of a stockholder with respect to the RSUs subject to the non-transferability and forfeiture restrictions described in Section 6C(d) below.

    (b)  Vesting. At the time of the grant of RSUs, the Committee may place restrictions on RSUs that shall lapse, in whole or in part, upon the passage of time. Unless otherwise provided in an Award Agreement, upon the vesting of a RSU, there shall be delivered to the Grantee, within 30 days of the date on which such Award (or any portion thereof) vests, the number of shares of common stock equal to the number of RSUs becoming so vested.

    (c)  <u>Non-transferability of RSUs</u>. Prior to the time that shares of common stock underlying RSUs have been delivered to the Grantee, RSUs are not transferable and may be exercised solely by the Grantee during his lifetime or after his death by the person or persons entitled thereto under his will or the laws of descent and distribution. The Committee, in its sole discretion, may permit a transfer of an RSU to (i) a trust for the benefit of the Grantee, (ii) a member of the Grantee's immediate family (or a trust for his or her benefit) or (iii) pursuant to a domestic relations order. Any attempt to transfer, assign, pledge or otherwise dispose of, or to subject to execution, attachment or similar process, any RSU contrary to the provisions hereof shall be void and ineffective and shall give no right to the purported transferee.

    (d)  <u>Change of Control</u>. Upon the occurrence of a Change in Control as defined in Section 5A(c), the Committee may accelerate the vesting of outstanding RSUs, in whole or in part, as determined by the Committee, in its sole discretion.

    (e)  <u>Dividend Equivalents</u>. To the extent provided in an Award Agreement, and subject to the requirements of Section 409A of the Code, an award of RSUs may provide the Grantee with the right to receive dividend equivalent payments with respect to common stock subject to such award, which payments may be settled in cash or common stock, as determined by the Committee. Any such settlements and any crediting of dividend equivalents may, at the time of grant of the RSU, be made subject to the transfer restrictions, forfeiture risks, vesting and

conditions of the RSUs and subject to such other conditions, restrictions and contingencies as the Committee shall establish at the time of grant of the RSU, including the reinvestment of such credited amounts in common stock equivalents, provided that all such conditions, restrictions and contingencies shall comply with the requirements of Section 409A of the Code.

(f)    Termination. Unless otherwise determined by the Committee at or after grant, RSUs awarded to the Grantee that have not vested shall be forfeited upon termination of the Grantee in accordance with Section 5A(f), (g), (h) and (i), as applicable. The Committee may provide (on or after grant) that restrictions or forfeiture conditions relating to the RSUs will be waived in whole or in part in the event of termination resulting from specified causes, and the Committee may in other cases waive in whole or in part restrictions or forfeiture conditions relating to the RSUs.

**7.    Term of Plan**. No Securities shall be granted pursuant to the Plan on or after the date which is ten years from the effective date of the Plan, but Options and Warrants and awards of Restricted Stock and/or Preferred Stock and/or RSUs theretofore granted may extend beyond that date.

**8.    Capital Change of the Company**. In the event of any merger, reorganization, consolidation, recapitalization, stock dividend, or other change in corporate structure affecting the Common Stock of the Company, the Committee shall make an appropriate and equitable adjustment in the number and kind of shares reserved for issuance under the Plan and (A) in the number and price of shares subject to outstanding Options or Warrants granted or issued under the Plan, to the end that after such event each Optionee's or Grantee's proportionate interest shall be maintained (to the extent possible) as immediately before the occurrence of such event and (B) in the number and conversion price of shares subject to outstanding Preferred Stock granted under the Plan, to the end that after such event each Participant's (who has received a grant of Preferred Stock) proportionate interest shall be maintained (to the extent possible) as immediately before the occurrence of such event. The Committee shall, to the extent feasible, make such other adjustments as may be required under the tax laws so that any Incentive Options or Incentive Warrants previously granted or issued shall not be deemed modified within the meaning of Section 424(h) of the Code. Appropriate adjustments shall also be made in the case of outstanding Restricted Stock or RSUs granted under the Plan.

The adjustments described above will be made only to the extent consistent with continued qualification of the Option or Warrant under Section 422 of the Code (in the case of an Incentive Option or Incentive Warrant) and Section 409A of the Code.

**9.    Purchase for Investment/Conditions**. Unless the Securities, and shares of Common Stock underlying such Securities, covered by the Plan have been registered under the Securities Act of 1933, as amended (the "Securities Act"), or the Company has determined that such registration is unnecessary, each person exercising or receiving Securities under the Plan may be required by the Company to give a representation in writing that he is acquiring the securities for his own account for investment and not with a view to, or for sale in connection with, the distribution of any part thereof. The Committee may impose any additional or further restrictions on awards of Securities as shall be determined by the Committee at the time of award.

**10.    Taxes**.

(a)    The Company may make such provisions as it may deem appropriate, consistent with applicable law, in connection with any Securities granted under the Plan with respect to the withholding of any taxes (including income or employment taxes) or any other tax matters.

(b)    If any Grantee, in connection with the acquisition of Restricted Stock, makes the election permitted under Section 83(b) of the Code (that is, an election to include in gross income in the year of transfer the amounts specified in Section 83(b)), such Grantee shall notify the

Company of the election with the Internal Revenue Service pursuant to regulations issued under the authority of Code Section 83(b).

(c)    If any Grantee shall make any disposition of shares of Common Stock issued pursuant to the exercise of an Incentive Option or Incentive Warrant under the circumstances described in Section 421(b) of the Code (relating to certain disqualifying dispositions), such Grantee shall notify the Company of such disposition within ten (10) days hereof.

**11.    Effective Date of Plan**. The Plan shall be effective on July 31, 2018; provided, however, that the Plan must subsequently be approved by majority vote of the Company's shareholders in accordance with the rules and regulations of the NASDAQ Stock Market LLC no later than July 31, 2019.

**12.    Amendment and Termination**. The Board may amend, suspend, or terminate the Plan, except that no amendment shall be made that would impair the rights of any Participant under Securities theretofore granted without the Participant's consent, and except that no amendment shall be made which, without the approval of the shareholders of the Company would:

(a)    materially increase the number of shares that may be issued under the Plan, except as is provided in Section 8;

(b)    materially increase the benefits accruing to the Participants under the Plan;

(c)    materially modify the requirements as to eligibility for participation in the Plan;

(d)    decrease the exercise price of an Incentive Option or Incentive Warrant to less than 100% of the Fair Market Value per share of Common Stock on the date of grant or issuance thereof or the exercise price of a Nonqualified Option or Non-Qualified Warrant to less than 100% of the Fair Market Value per share of Common Stock on the date of grant or issuance thereof;

(e)    extend the term of any Option or Warrant beyond that provided for in Section 5A(b) and Section 5B(c), respectively;

(f)    except as otherwise provided in Sections 5A(d), 5B(e) and 8 hereof, reduce the exercise price of outstanding Options or Warrants or effect repricing through cancellations and re-grants of new Options or Warrants;

(g)    increase the number of shares of Common Stock to be issued or issuable under the Plan to an amount that is equal to or in excess of 19.99% of the number of shares of Common Stock outstanding before the issuance of the stock or securities; or

(h)    otherwise require stockholder approval pursuant to the rules and regulations of the NASDAQ Stock Market LLC.

Subject to the forgoing, the Committee may amend the terms of any Option or Warrant theretofore granted, prospectively or retrospectively, but no such amendment shall impair the rights of any Optionee or Grantee without the Optionee's or Grantee's consent.

It is the intention of the Board that the Plan comply strictly with the provisions of Section 409A of the Code and Treasury Regulations and other Internal Revenue Service guidance promulgated thereunder (the "Section 409A Rules") and the Committee shall exercise its discretion in granting awards hereunder (and the terms of such awards), accordingly. The Plan and any grant of

an award hereunder may be amended from time to time (without, in the case of an award, the consent of the Participant) as may be necessary or appropriate to comply with the Section 409A Rules.

**13.** **Government Regulations**. The Plan, and the grant and exercise or conversion, as applicable, of Securities hereunder, and the obligation of the Company to issue and deliver shares under such Securities shall be subject to all applicable laws, rules and regulations, and to such approvals by any governmental agencies, national securities exchanges and interdealer quotation systems as may be required.

**14.** **General Provisions**.

(a)     Certificates. All certificates for shares of Common Stock or Preferred Stock delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations and other requirements of the Securities and Exchange Commission, or other securities commission having jurisdiction, any applicable Federal or state securities law, any stock exchange or interdealer quotation system upon which the Common Stock is then listed or traded and the Committee may cause a legend or legends to be placed on any such certificates to make appropriate reference to such restrictions.

(b)     Employment Matters. Neither the adoption of the Plan nor any grant or award under the Plan shall confer upon any Participant who is an employee of the Company or any Subsidiary any right to continued employment or, in the case of a Participant who is a director, continued service as a director, with the Company or a Subsidiary, as the case may be, nor shall it interfere in any way with the right of the Company or any Subsidiary to terminate the employment of any of its employees, the service of any of its directors or the retention of any of its consultants or advisors at any time.

(c)     Limitation of Liability. No member of the Committee, or any officer or employee of the Company acting on behalf of the Committee, shall be personally liable for any action, determination or interpretation taken or made in good faith with respect to the Plan, and all members of the Committee and each and any officer or employee of the Company acting on their behalf shall, to the extent permitted by law, be fully indemnified and protected by the Company in respect of any such action, determination or interpretation.

(d)     Registration of Stock. Notwithstanding any other provision in the Plan, no Option or Warrant may be exercised unless and until the Common Stock to be issued upon the exercise thereof has been registered under the Securities Act and applicable state securities laws, or are, in the opinion of counsel to the Company, exempt from such registration in the United States. The Company shall not be under any obligation to register under applicable federal or state securities laws any Common Stock to be issued upon the exercise of an Option or Warrant granted or issued hereunder in order to permit the exercise of an Option or Warrant and the issuance and sale of the Common Stock subject to such Option or Warrant, although the Company may in its sole discretion register such Common Stock at such time as the Company shall determine. If the Company chooses to comply with such an exemption from registration, the Common Stock issued under the Plan may, at the direction of the Committee, bear an appropriate restrictive legend restricting the transfer or pledge of the Common Stock represented thereby, and the Committee may also give appropriate stop transfer instructions with respect to such Common Stock to the Company's transfer agent.

**15.** **Non-Uniform Determinations**. The Committee's determinations under the Plan, including, without limitation, (i) the determination of the Participants to receive awards, (ii) the form, amount and timing of such awards, (iii) the terms and provisions of such awards and (iv) the agreements evidencing the same, need not be uniform and may be made by it selectively among Participants who receive, or who are eligible to receive, awards under the Plan, whether or not such Participants are similarly situated.

16.    **Governing Law**. The validity, construction, and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with the internal laws of the State of Nevada, without giving effect to principles of conflicts of laws, and applicable federal law.

17.    **Additional Issuance Restrictions**. If the Company has not obtained the approval of its stockholders in accordance with NASDAQ Listing Rule 5635(d), then the Company may not issue any Securities under this Plan that would upon the issuance of any Securities or upon the exercise on conversion of such Securities, as applicable, into shares of the Company's Common Stock, when aggregated with any other shares of Common Stock (i) held by a Participant, (ii) underlying any convertible security held by a Participant, and (iii) issuable upon prior exercise of any convertible security held by a Participant, would exceed 19.99% shares of the Company's Common Stock, subject to adjustment for reverse and forward stock splits, stock dividends, stock combinations and other similar transactions of the Common Stock that occur after the date of the adoption of this Plan (such number of shares, the "Issuable Maximum"). The Participant shall be entitled to a portion of the Issuable Maximum as reasonably determined by the Committee so as not to violate NASDAQ Listing Rule 5635(d). In addition, the Participant may allocate its pro-rata portion of the Issuable Maximum among Securities held by it in its sole discretion. Such portion shall be adjusted upward ratably in the event a Participant no longer holds any Securities and the amount of shares issued to such Participant pursuant to its Securities was less than such Participant's pro-rata share of the Issuable Maximum.

Participant: _____

Date: _____

**RESTRICTED STOCK UNIT AGREEMENT**

**MARATHON DIGITAL HOLDINGS, INC.**
**2018 EQUITY INCENTIVE PLAN**

You have been granted Restricted Stock Units (" *RSUs*") by Marathon Digital Holdings, Inc. (the " *Company*") under the 2018 Equity Incentive Plan (as amended, the " *Plan*"), subject to the terms, restrictions and conditions of the Plan, the Restricted Stock Unit Award Grant Notice or  Exhibit A thereto, as applicable (in either case, the " *Award Schedule*") and this Restricted Stock Unit Agreement (this " *RSU Agreement*"). Unless otherwise defined herein, the terms defined in the Plan shall have the same meanings in this RSU Agreement.

**1.**     **Settlement**. Subject to Section 19 below, settlement of RSUs shall be within 30 days of vesting with the actual date of settlement to be determined by the Company. Settlement of the RSUs shall be in shares of Common Stock ("*Shares*"). Settlement means the delivery of the Shares vested under an RSU. No fractional RSUs or rights for fractional Shares shall be created pursuant to this RSU Agreement.

**2.**     **Vesting Upon Change in Control**.

(a)     The provisions of this Section 2 shall apply notwithstanding the Vesting Schedule in the Award Schedule, if applicable, or, if not, such other vesting applicable to the RSUs; provided, however, that in the event your employment agreement, severance agreement, change in control agreement or other similar agreement (in any such case, "*Employment Agreement*") provides for vesting upon a Change in Control or similar terms, in each case that conflict with the provisions of this Section 2, such provisions of your Employment Agreement shall control.

(b)     To the extent the RSUs are unvested at the time a Change in Control occurs, and either (i) the Change in Control is not approved by a majority of the Continuing Directors (as defined below), or (ii) the acquiring or successor entity (or parent thereof) does not agree to provide for the continuance or assumption of this RSU Agreement or the substitution for this RSU Agreement of a new agreement of comparable value covering shares of a successor corporation ("*New Incentives*"), then the RSUs shall become immediately and unconditionally vested in full effective immediately prior to and conditioned upon the consummation of such Change in Control.

(c)     Notwithstanding Section 2(b) above, if pursuant to a Change in Control approved by a majority of the Continuing Directors, the acquiring or successor entity (or parent thereof) provides for the continuance or assumption of this RSU Agreement or the substitution for this RSU Agreement of a new agreement of comparable value covering New Incentives, then vesting of the RSUs shall not accelerate in connection with such Change in Control to the extent this RSU Agreement is continued, assumed or substituted for New Incentives; *provided*, *however*: if there is a Termination of Service (as defined below) with respect to you without "Cause" (as defined below) or "Good Reason" (as defined below) within 12 months following such Change in Control, the RSUs or New Incentives, as applicable, shall vest in full effective upon such termination.

(d)     For purposes of this RSU Agreement:

(i)     "*Affiliate*" has the definition set forth in Rule 405 issued under the Securities Act.

(ii)     "*Continuing Director*" means any member of the Board of the Company who was a member of the Board prior to the adoption of the Plan, and any person who is subsequently elected to the Board if such person is recommended or approved by a majority of the Continuing Directors.

(iii)    "***Cause***" as a reason for your Termination of Service shall have the meaning assigned such term in the Employment Agreement, if any, between you and the Company or applicable Subsidiary thereof. If you are not a party to an Employment Agreement with the Company or a Subsidiary thereof in which such term is defined, "Cause" shall mean a Termination of Service for any of the following reasons: (a) the continued, unreasonable refusal or omission by you to perform any material duties required of you by the Company or any Subsidiary thereof, as applicable, if such duties are consistent with duties customary for the position held with the Company or such other entity, as applicable; (b) any material act or omission by you involving malfeasance or gross negligence in the performance of your duties to, or material deviation from any of the policies or directives of, the Company or such other entity, as applicable; (c) conduct on your part which constitutes the breach of any statutory or common law duty of loyalty to the Company or such other entity, as applicable, including the unauthorized disclosure of material confidential information or trade secrets of the Company or such other entity, as applicable; or (d) any illegal act by you which materially and adversely affects the business of the Company or such other entity or any felony committed by you, as evidenced by conviction thereof, provided that the Company or such other entity, as applicable, may suspend you with pay while any allegation of such illegal or felonious act is investigated.

(iv)    "***Good Reason***" as a reason for your Termination of Service shall have the meaning assigned such term in the Employment Agreement, if any, between you and the Company or applicable Subsidiary thereof. If you are not a party to an Employment Agreement with the Company or a subsidiary of the Company in which such term is defined, then unless otherwise defined in the applicable Award Agreement, "Good Reason" shall mean (i) a material diminution in your base salary from the level immediately prior to the Change in Control; or (ii) a material change in the geographic location at which you must primarily perform your services (which shall in no event include a relocation of your current principal place of business to a location less than 50 miles away) from the geographic location immediately prior to the Change in Control; provided that no termination shall be deemed to be for Good Reason unless (a) you provide the Company with written notice setting forth the specific facts or circumstances constituting Good Reason within 90 days after the initial existence of the occurrence of such facts or circumstances, (b) to the extent curable, the Company has failed to cure such facts or circumstances within 30 days of its receipt of such written notice, and (c) the effective date of the termination for Good Reason occurs no later than one 180 days after the initial existence of the facts or circumstances constituting Good Reason.

(v)    "***Termination of Service***" means any termination of your employment with or service to the Company or any Subsidiary thereof; *provided*, *however*, that such termination shall be determined in accordance with Section 3 and, to the extent applicable, Section 19.

3.    **Termination**. Upon any Termination of Service with respect to you, all unvested RSUs shall be immediately forfeited to the Company, and all rights you have to such RSUs shall immediately terminate. In case of any dispute as to your Termination of Service, the Committee shall have sole discretion to determine whether such termination has occurred and the effective date of such termination.

4.    **No Stockholder Rights**. Unless and until such time as Shares are issued in settlement of vested RSUs, you shall have no ownership of the Shares allocated to the RSUs and shall have no right to dividends or to vote such Shares.

5.    **Dividend Equivalents**. Dividends, if any (whether in cash or Shares), shall not be credited to you.

6.    **No Transfer**. RSUs may not be sold, transferred, pledged, hypothecated or otherwise disposed of in any manner except as expressly provided for in the Plan, or as the Committee may otherwise determine on a case-by-case basis. Any attempt to sell, transfer, pledge,

2

hypothecate or otherwise dispose of any RSU contrary to the provisions of this RSU Agreement and the Plan shall be void and ineffective and shall give no right to the purported transferee.

**7.**    **Restrictions on Resale**.  You agree not to sell any Shares that have been issued pursuant to this RSU Agreement at a time when applicable laws, Company policies, or an agreement between the Company and its underwriters, or between you and the Company's underwriters, prohibit a sale. This restriction shall apply until your Termination of Service and for such period thereafter as the Committee may specify.

**8.**    **Tax Consequences**.  You acknowledge that you will recognize tax consequences in connection with the RSUs. You should consult a tax adviser regarding your tax obligations in the jurisdictions where you are subject to tax. In general, (i) under U.S. federal tax law, you will not recognize taxable income when you are granted or vest in the RSUs, and (ii) the RSUs will be taxed when they are settled and you will recognize ordinary income equal to the value of the Shares that you receive from the Company.

**9.**    **Withholding Taxes and Stock Withholding**.  Regardless of any action the Company or your actual employer (the "***Employer***") takes with respect to any or all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("***Tax-Related Items***"), you acknowledge that the ultimate liability for all Tax-Related Items legally required to be paid by you is and remains your responsibility and that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the award, including the grant, vesting or settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such settlement and the receipt of any dividends; and (ii) do not commit to structure the terms of the award or any aspect of the RSUs to reduce or eliminate your liability for Tax-Related Items. You acknowledge that if you are subject to Tax-Related Items in more than one jurisdiction, the Company and/or the Employer may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to the settlement of the RSUs, you shall pay or make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all withholding and payment on account obligations of the Company and/or the Employer. In this regard, you authorize the Company and/or the Employer to withhold all applicable Tax-Related Items payable by you from your wages or other cash compensation paid to you by the Company and/or the Employer. With the Company's consent, these arrangements may also include, if permissible under local law, (i) withholding Shares that otherwise would be issued to you when the RSUs are settled, provided that the Company only withholds the amount of Shares necessary to satisfy the minimum statutory withholding amount (the Fair Market Value of the Shares, determined as of the effective date when taxes otherwise would have been withheld in cash, shall be applied as a credit against the withholding taxes), (ii) having the Company withhold taxes from the proceeds of the sale of the Shares, either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf and you hereby authorize such sales by this authorization), (iii) your payment of a cash amount, or (iv) any other arrangement approved by the Company; all under such rules as may be established by the Committee and in compliance with the Company's insider trading policy in effect at such time; *provided, however*, that if you are subject to Section 16 of the Exchange Act, then the Committee shall establish the method of withholding from alternatives –i) - (iv) above, and the Committee shall establish such method prior to the Tax-Related Items withholding event. You shall pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of your participation in the Plan or your receipt of Shares that cannot be satisfied by the means previously described. Finally, you acknowledge that the Company has no obligation to deliver Shares to you until you have satisfied the obligations in connection with the Tax-Related Items as described in this Section 9.

**10.**    **Award Schedules**.  Any notice to be given under the terms of this RSU Agreement, the Plan or the Award Schedule or otherwise with respect to the RSUs shall be addressed to the Company in care of its principal office, and any notice to be given to you shall be addressed to you at

3

the address maintained by the Company for you or at such other address as you may specify in writing to the Company.

**11.    Construction**. This RSU Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this RSU Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

**12.    Acknowledgement**. The Company and you agree that the RSUs are granted under and governed by this RSU Agreement, the Plan and the Award Schedule. You: (i) acknowledge receipt of a copy of the Plan and, if applicable, the Plan prospectus, (ii) represent that you have carefully read and are familiar with their provisions, and (iii) hereby accept the RSUs subject to all of the terms and conditions set forth in this RSU Agreement, the Plan and the Award Schedule. You hereby agree to accept as binding, conclusive and final all decisions or interpretations of the Committee upon any questions relating to the RSUs, this RSU Agreement, the Plan and the Award Schedule.

**13.    Compliance with Laws and Regulations**. The issuance of the RSUs and the Shares shall be subject to and conditioned upon compliance by the Company and you with all applicable state, federal and foreign laws and regulations, and with all applicable requirements of any stock exchange or automated quotation system on which the Common Stock may be listed or quoted at the time of such issuance. The Shares issued pursuant to this RSU Agreement or otherwise pursuant to the RSUs shall be endorsed with appropriate legends, if any, as determined by the Company.

**14.    Severability**. If one or more provisions of this RSU Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (a) such provision shall be excluded from this RSU Agreement, (b) the balance of this RSU Agreement shall be interpreted as if such provision were so excluded and (c) the balance of this RSU Agreement shall be enforceable in accordance with its terms.

**15.    Governing Law**. This RSU Agreement, the Award Schedule, the Plan, the rights and obligations of the parties hereto, any RSUs, any other restricted stock units of the Company, and all matters concerning your employment with or other services provided to the Company or any Subsidiary or Affiliate(collectively, "***Employment Matters***") shall be governed, construed and interpreted in accordance with the laws of the State of Florida without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from any Employment Matter that is not otherwise required to be arbitrated pursuant to Section 19 of this RSU Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of Florida and agree that any such litigation shall be conducted only in the courts of the State of Florida and of the United States of America, in each case located in the State of Florida.

**16.    No Rights as Employee, Director or Consultant**. Nothing in this RSU Agreement or the Plan shall affect in any manner whatsoever the right or power of the Company, or a Subsidiary or Affiliate of the Company, to terminate your employment or other service, for any reason, with or without Cause.

**17.    Award Subject to Company Clawback or Recoupment**. The RSUs may be subject to clawback or recoupment pursuant to applicable law and/or any compensation clawback or recoupment policy adopted by the Board or a committee thereof. In addition to any other remedies available under such policy or applicable law, the RSUs may be subject to cancellation (whether vested or unvested) and any gains realized upon settlement of the RSUs and sale of the Shares may be subject to recoupment.

**18.    Consent to Electronic Delivery of All Plan Documents and Disclosures**. By your acceptance of this RSU and/or your signature below, you consent to the electronic delivery of the

4

Award Schedule, this RSU Agreement, the Plan, account statements, Plan prospectuses required by the Securities and Exchange Commission, and all other documents that the Company is required to deliver to its security holders (including, without limitation, annual reports and proxy statements) or other communications or information related to the RSUs. Electronic delivery may include the delivery of a link to a Company intranet or the internet site of a third party involved in administering the Plan, the delivery of the document via e-mail or such other delivery determined at the Company's discretion. You acknowledge that you may receive from the Company a paper copy of any documents delivered electronically at no cost if you contact the Company by telephone, through a postal service or electronic mail at legal@mara.com. You further acknowledge that you will be provided with a paper copy of any documents delivered electronically if electronic delivery fails; similarly, you understand that you must provide on request to the Company or any designated third party a paper copy of any documents delivered electronically if electronic delivery fails. Also, you understand that your consent may be revoked or changed, including any change in the electronic mail address to which documents are delivered (if you have provided an electronic mail address), at any time by notifying the Company of such revised or revoked consent by telephone, postal service or electronic mail at legal@mara.com.

**19.**    **Code Section 409A**. For purposes of this RSU Agreement, a termination of employment or other service shall be determined consistent with the rules relating to a "separation from service" as defined in Section 409A of the Internal Revenue Code and the regulations thereunder ("*Section 409A*"). Notwithstanding anything else provided herein, to the extent any payments provided under this RSU Agreement in connection with your termination of employment or other service constitute deferred compensation subject to Section 409A, and you are deemed at the time of such termination to be a "specified employee" under Section 409A, then such payment shall not be made or commence until the earlier of (a) the expiration of the six-month period measured from your separation from service or (b) the date of your death following such a separation from service; *provided, however*, that such deferral shall only be effected to the extent required to avoid adverse tax treatment to you including, without limitation, the additional tax for which you would otherwise be liable under Section 409A(a)(1)(B) in the absence of such a deferral. To the extent any payment under this RSU Agreement may be classified as a "short-term deferral" within the meaning of Section 409A, such payment shall be deemed a short-term deferral, even if it may also qualify for an exemption from Section 409A under another provision of Section 409A. Payments pursuant to this Section are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

**20.**    **Dispute Resolution**. To ensure the timely and economical resolution of disputes that may arise in connection with any Employment Matter, you and the Company agree that any and all disputes, claims, or causes of action arising from or relating to the enforcement, breach, performance, negotiation, execution, or interpretation of this RSU Agreement, the Plan, the Award Schedule, or otherwise to the RSUs, your employment, the termination of your employment, or any other Employment Matter including but not limited to statutory claims, will be resolved pursuant to Florida Law, including the Florida Arbitration Code, and the Federal Arbitration Act, 9 U.S.C. §1-16, and to the fullest extent permitted by law, by final, binding and confidential arbitration, held in Fort Lauderdale, Florida by a single arbitrator, conducted by JAMS, Inc. ("JAMS") under the then applicable JAMS Employment Arbitration Rules & Procedures (which can be found at the following web address: http://www.jamsadr.com/rules-employment-arbitration/english, and which will be provided to you on request). By agreeing to this arbitration procedure, both you and the Company waive the right to resolve any such dispute through a trial by jury or judge or administrative proceeding. The Company acknowledges that you will have the right to be represented by legal counsel at any arbitration proceeding. The arbitrator shall: (a) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law; and (b) issue a written arbitration decision, to include the arbitrator's essential findings and conclusions and a statement of the award. The arbitrator shall be authorized to award any or all remedies that you or the Company would be entitled to seek in a court of law. The Company shall pay all JAMS' arbitration fees in excess of the amount of filing fees that would be required of you if the dispute were decided in a court of law. Nothing in this Agreement is intended to prevent either

you or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Any awards or orders in such arbitrations may be entered and enforced as judgments in the federal and state courts of any competent jurisdiction.

**21.    Entire Agreement; Enforcement of Rights**. This RSU Agreement, the Plan and the Award Schedule constitute the entire agreement and understanding of the parties relating to the RSUs or otherwise to the subject matter herein and supersede all prior discussions between them. Any prior agreements, commitments or negotiations concerning the issuance of the RSUs or the Shares are superseded. No modification of or amendment to this RSU Agreement, nor any waiver of any rights under this RSU Agreement, shall be effective unless in writing and signed by the parties to this RSU Agreement. The failure by either party to enforce any rights under this RSU Agreement shall not be construed as a waiver of any rights of such party.

6

Participant: _____

Date: _____

BY ACCEPTING THIS RSU AND/OR BY YOUR SIGNATURE BELOW, YOU AGREE TO COMPLY WITH ALL OF THE TERMS AND CONDITIONS DESCRIBED IN THIS RSU AGREEMENT, THE PLAN AND THE AWARD SCHEDULE.

**PARTICIPANT:**                                   **MARATHON DIGITAL HOLDINGS, INC.**

Signature: _____                              By: _____

Name: _____                                  Name: _____

                                                  Its: _____

**MARATHON DIGITAL HOLDINGS, INC.**

**2018 EQUITY INCENTIVE PLAN**

**RESTRICTED STOCK UNIT AWARD GRANT NOTICE**

Marathon Digital Holdings, Inc., a Nevada corporation (the " **Company**"), pursuant to its 2018 Equity Incentive Plan (as amended, the " **Plan**"), hereby grants to the holder listed below ("**Participant**"), an award of restricted stock units (" **RSUs**"). Each vested RSU represents the right to receive one share of Common Stock ("**Share**"). This award of RSUs is subject to all of the terms and conditions set forth in this Restricted Stock Unit Award Grant Notice (the "**Grant Notice**"), the Plan and the Restricted Stock Unit Agreement (the " **RSU Agreement**") to which this Grant Notice relates.  Unless otherwise defined herein, capitalized terms shall have the meanings given to them in the Plan or the RSU Agreement, as applicable.

**Participant**: _____

**Grant Date**: _____

**Dollar Value of RSUs**: _____

**Total Number of RSUs**: _____

Subject to the limitations set forth in the Plan and the RSU Agreement, the RSUs shall vest in accordance with the vesting schedule set forth on  Exhibit A (the "**Vesting Schedule**"), subject to Participant not experiencing a Termination of Service prior to the applicable vesting date unless otherwise required by applicable law.

| | |
|---|---|
| **Termination of Service:** | Except as otherwise provided by the Committee or required by applicable law, if Participant experiences a Termination of Service, all RSUs that have not become vested on or prior to the date of such Termination of Service shall thereupon be automatically forfeited by Participant without payment of any consideration therefor. |

If the Company uses an electronic capitalization table system (such as Shareworks, Carta or Equity Edge) and the fields in this Grant Notice are blank or the information is otherwise provided in a different format electronically, the blank fields and other information shall be deemed to come from the electronic capitalization system and be considered part of this Grant Notice. In addition, the Company's signature below shall be deemed to have occurred by the Company's input of the RSUs in such electronic capitalization table system and Participant's signature below shall be deemed to have occurred by Participant's online acceptance of the RSUs through such electronic capitalization table system.

By Participant's signature below, Participant agrees to be bound by the terms and conditions of the Plan, the RSU Agreement, and this Grant Notice. Participant has (i) reviewed the Plan, the RSU Agreement, and this Grant Notice in their entirety, (ii) had an opportunity to obtain the advice of

counsel prior to executing the RSU Agreement and this Grant Notice, and (iii) fully understands all of the provisions of the Plan, the RSU Agreement, and this Grant Notice.

Participant acknowledges that the grant of RSUs by the Company is at the Company's sole discretion, and does not entitle Participant to any further grant(s) of RSUs or any other award(s) under the Plan or any other plan or program maintained by the Company.

Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Committee upon any questions arising under the Plan, the RSU Agreement, or this Grant Notice.

**MARATHON DIGITAL HOLDINGS, INC.:**                          **PARTICIPANT:**

By: _____                          By: _____

Name: _____                        Name: _____

Title: _____

Address: _____                     Address: _____

**EXHIBIT A**

**Vesting Schedule**

[_____]

Exhibit 10.9

## EXECUTIVE EMPLOYMENT AGREEMENT

This EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of July 29, 2022, and effective July 29, 2022, by and between Marathon Digital Holdings, Inc., a Nevada corporation headquartered at Tower 101, 101 NE Third Avenue, Fort Lauderdale, FL 33301 ("Company") and Adam Swick, an individual ("Executive").

W I T N E S S E T H :

WHEREAS the Executive desires to be employed by the Company as VP of Strategy and the Company wishes to employ the Executive in such capacity.

NOW, THEREFORE, in consideration of the foregoing and their respective covenants and agreements contained in this document, the Company and the Executive hereby agree as follows:

1.  <u>Employment and Duties</u>. The Company agrees to employ, and the Executive agrees to serve as the Company's Vice President of Strategy. The duties and responsibilities of the Executive shall include the duties and responsibilities as the Company's Chief Executive Officer may from time to time assign to the Executive and reasonably commensurate with those duties and responsibilities normally associated with and appropriate for someone in the position of Vice President of Strategy.

The Executive shall devote all of his business time and best efforts to the performance of his duties under this Agreement and shall be subject to, and shall comply with the Company policies, practices and procedures and all foregoing, the Executive shall be entitled to (i) serve as a member of the board of directors of a reasonable number of companies, subject to the advance approval of the Board, which approval shall not be unreasonably withheld, conditioned or delayed; (ii) serve on civic, charitable, educational, religious, public interest or public service boards, subject to the advance approval of the Board, which approval shall not be unreasonably withheld, and (iii) manage the Executive's personal and family investments, in each case, to the extent such activities do not materially interfere, as determined by the Board in good faith, with the performance of the Executive's duties and responsibilities hereunder.

2.  <u>Term</u>. The term of this Agreement shall commence on the Effective Date and shall continue for a period of one (1) following the date of this Agreement and shall be automatically renewed for successive one (1) year periods thereafter unless either party provides the other party with written notice of his or its intention not to renew this Agreement at least three (3) months prior to the expiration of the initial term or any renewal term of this Agreement. "<u>Employment Period</u>" shall mean the initial term plus renewals, if any.

3.  <u>Place of Employment</u>. The Executive's services shall be performed at the Company's offices located at the address stated above, or such other location(s) as mutually agreed upon in writing between the Company and the Executive.

4.  <u>Base Salary</u>. The Company agrees to pay the Executive a base salary ("<u>Base Salary</u>") of $225,000 per annum. The Base Salary shall be paid in periodic installments in accordance with the Company's regular payroll practices. The Base Salary may only be increased but not decreased without the written consent of the Executive.

(a)  Annual Bonus. The Executive shall be eligible to receive an annual bonus the ("<u>Annual Bonus</u>") of up to $112,500, to be paid in cash, as reasonably determined by the

Compensation Committee and/or the Board of Directors of the Company (the "Compensation Committee"). The Annual Bonus shall be paid by the Company to the Executive promptly after determination that the relevant targets, if any, have been met, it being understood that the attainment of any financial targets associated with any bonus shall not be determined until following the completion of the Company's annual audit and public announcement of such results and shall be paid promptly following the Company's announcement of earnings, subject to cash availability. In the event that the Compensation Committee is unable to act or if there shall be no such Compensation Committee, then all references herein to the Compensation Committee (except in the proviso to this sentence) shall be deemed to be references to the Board. Upon his termination from employment, the Executive shall be entitled to receive a pro-rata portion of the Annual Bonus calculated based upon the last day of the fiscal quarter in which his employment is terminated, regardless of whether he is employed by the Company through the conclusion of the fiscal quarter or year, as the case may be, on which the Annual Bonus is based. The Annual Bonus shall be paid no later than June 30th of the year following when the Annual Bonus is earned, subject to cash availability. Frederick Thiel, the Company's Chairman and Chief Executive Officer and the Compensation Committee will work to define a set of goals and objectives for the term of the Agreement as a basis for determining a bonus award(s). Such goals will be quantitative as well as qualitative in nature.

(b)    Equity Awards. The Company provides our Executive's with the opportunity to earn a grant of Restricted Stock Units (RSU's) which are convertible into common stock, for which Executive has been granted 46,000 RSUs (the "Compensating Shares") as approved by the Board of Directors ("Executive Award"), subject to the vesting schedule displayed below ("Vesting Schedule"):

Compensation Shares shall vest 11,500 shares on September 30, 2022, and then 2,875 shares on the last day of each calendar quarter through September 30, 2025.

(c)    Long Term Incentive Program. The Executive shall be eligible to participate in the Company's Long Term Incentive Program (the "LTIP"), as reasonably determined by the Compensation Committee and/or the Board of Directors of the Company (the "Compensation Committee").

5.    Severance Compensation.

(a)    Upon termination of employment for any reason, the Executive shall be entitled to:
(A) all Base Salary earned through the date of termination to be paid according to Section 4; (B) any Annual Bonuses, pro-rated, to be paid in accordance with Section 4(a) above.; (C) all accrued but unused vacation time, and (d) reimbursement of all reasonable expenses as set forth in Section 7.

(b)    Upon termination of employment by Company for any reason other than for cause ("Cause") as defined in Section 10(c), or upon termination of employment by Executive for good reason ("Good Reason") as defined in Section 10(d)(1), Executive shall be entitled to receipt of all vested and unvested shares contemplated in the Executive Award in accord with the Executive Vesting Schedule as if no termination occurred.

(c)    In the event of a termination by the Company without Cause, by the Executive for Good Reason or by the Executive within one hundred eighty days (180) days of the occurrence of a Change of Control (as defined below) and subject to the additional provisions of Section 10(d)(3), then in addition to the severance compensation set forth in Section 5(a) and 5(b), Executive shall also be entitled to the following enhanced separation benefits ("Enhanced Separation Benefits"): (i) the greater of Executive's continued Base Salary through the balance of the Employment Period, as renewed, or ) twelve (12) months of Executive's then Base Salary; (ii)

continued participation in Company welfare benefit plans (including health benefits) on the same terms as immediately prior to termination and to be paid in full by the Company for the period of time set forth in this Section 5(c) (not to be less than nine months of continuation of benefits) and (iii) immediate vesting of all stock options/equity awards.

(d) Upon termination of Executive's continued benefits (either pursuant to Section 5(a), 5(b) or 5(c) as the case may be), the Executive may continue coverage with respect to the Company's group health plans as permitted by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") for himself and each of his "Qualified Beneficiaries" as defined by COBRA ("COBRA Coverage"). The Company shall reimburse the amount of any COBRA premium paid for COBRA Coverage timely elected by and for the Executive and any Qualified Beneficiary of the Executive, and not otherwise reimbursed, during the period that ends on the earliest of (x) the date the Executive or the Qualified Beneficiary, as the case may be, ceases to be eligible for COBRA Coverage, (y) the last day of the consecutive eighteen (18) month period following the date of the Executive's termination of employment and (z) the date the Executive or the Qualified Beneficiary, as the case may be, is covered by another group health plan. To reimburse any COBRA premium payment under this paragraph, the Company must receive documentation of the COBRA premium payment within ninety (90) days of its payment.

6.  Clawback Rights. The Annual Bonus, and any and all stock based compensation (such as options and equity awards) (collectively, the "Clawback Benefits") shall be subject to "Clawback Rights" as follows: during the period that the Executive is employed by the Company and upon the termination of the Executive's employment and for a period of three (3) years thereafter, if there is a restatement of any financial results from which any metrics were determined to be achieved which were the basis of the granting and calculation of such Clawback Benefits to the Executive, the Executive agrees to repay any amounts which were determined by reference to any Company financial results which were later restated (as defined below), to the extent the Clawback Benefits amounts paid exceed the Clawback Benefits amounts that would have been paid, based on the restatement of the Company's financial information. All Clawback Benefits amounts resulting from such restated financial results shall be retroactively adjusted by the Compensation Committee to take into account the restated results, and any excess portion of the Clawback Benefits resulting from such restated results shall be immediately surrendered to the Company and if not so surrendered within ninety (90) days of the revised calculation being provided to the Executive by the Compensation Committee following a publicly announced restatement, the Company shall have the right to take any and all action to effectuate such adjustment. The calculation of the revised Clawback Benefits amount shall be determined by the Compensation Committee in good faith and in accordance with applicable law, rules and regulations. All determinations by the Compensation Committee with respect to the Clawback Rights shall be final and binding on the Company and the Executive. The Clawback Rights shall terminate following a Change of Control as defined in Section 10(f), subject to applicable law, rules and regulations. For purposes of this Section 6, a restatement of financial results that requires a repayment of a portion of the Clawback Benefits amounts shall mean a restatement resulting from material non- compliance of the Company with any financial reporting requirement under the federal securities laws and shall not include a restatement of financial results resulting from subsequent changes in accounting pronouncements or requirements which were not in effect on the date the financial statements were originally prepared ("Restatements"). The parties acknowledge it is their intention that the foregoing Clawback Rights as relates to Restatements conform in all respects to the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd- Frank Act") and require recovery of all "incentive-based" compensation, pursuant to the provisions of the Dodd-Frank Act and any and all rules and regulations promulgated thereunder from time to time in effect. Accordingly, the terms and provisions of this Agreement shall be deemed automatically amended from time to time to assure compliance with the Dodd-Frank Act and such rules and regulations as hereafter may be adopted and in effect.

7.    <u>Expenses</u>. The Executive shall be entitled to prompt reimbursement by the Company for all reasonable ordinary and necessary travel, entertainment, and other expenses incurred by the Executive while employed (in accordance with the policies and procedures established by the Company for its senior executive officers) in the performance of his duties and responsibilities under this Agreement; provided, that the Executive shall properly account for such expenses in accordance with Company policies and procedures. Reimbursement of such expenses shall be paid out even after Executive's termination for any reason, so long as the expenses were incurred during Executive's employment with the Company.

8.    <u>Other Benefits</u>. During the term of this Agreement, the Executive shall be eligible to participate in incentive, stock purchase, savings, retirement (401(k)), and welfare benefit plans, including, without limitation, health, medical, dental, vision, life (including accidental death and dismemberment) and disability insurance plans (collectively, "<u>Benefit Plans</u>"), in substantially the same manner and at substantially the same levels as the Company makes such opportunities available to the Company's managerial or salaried executive employees and/or its senior executive officer. The Company shall pay one hundred percent (100%) of the cost for any group medical, vision and/or dental coverage elected by and for the Executive.

9.    <u>Vacation</u>. During the term of this Agreement, the Executive shall be entitled to accrue, on a pro rata basis, thirty (30) paid vacation days per year. Vacation shall be taken at such times as are mutually convenient to the Executive and the Company and no more than fifteen (15) consecutive days shall be taken at any one time without Company approval in advance.

10.    <u>Termination of Employment</u>.

(a)    <u>Death</u>. If the Executive dies during the Employment Period, this Agreement and the Executive's employment with the Company shall automatically terminate and the Company's obligations to the Executive's estate and to the Executive's Qualified Beneficiaries shall be those set forth in Section 5(a) and 5(d) regarding severance compensation.

(b)    <u>Disability</u>. In the event that, during the term of this Agreement the Executive shall be prevented from performing his essential functions hereunder to the full extent required by the Company by reason of Disability(as defined below), this Agreement and the Executive's employment with the Company shall automatically terminate. The Company's obligation to the Executive under such circumstances shall be those set forth in Section 5(a) and 5(d) regarding severance compensation. For purposes of this Agreement, "<u>Disability</u>" shall mean a physical or mental disability that prevents the performance by the Executive, with or without reasonable accommodation, of his essential functions hereunder for an aggregate of ninety (90) days or longer during any twelve (12) consecutive months. The determination of the Executive's Disability shall be made by an independent physician who is reasonably acceptable to the Company and the Executive (or his representative), be final and binding on the parties hereto and be made taking into account such competent medical evidence as shall be presented to such independent physician by the Executive and/or the Company or by any physician or group of physicians or other competent medical experts employed by the Executive and/or the Company to advise such independent physician.

(c)    <u>Cause</u>.

(1)    At any time during the Employment Period, the Company may terminate this Agreement and the Executive's employment hereunder for Cause. For purposes of this Agreement, "<u>Cause</u>" shall mean: (a) the willful and continued failure of the Executive to perform substantially his material duties and responsibilities for the Company(other than any such failure resulting from the Executive's death or Disability) after a written demand by the Board for substantial performance is delivered to the Executive by the Company, which specifically

4

identifies the manner in which the Board believes that the Executive has not substantially performed his duties and responsibilities, which willful and continued failure is not cured by the Executive within thirty (30) days following his receipt of such written demand; (b) the conviction of, or plea of guilty or *nolo contendere* to, a felony, or (c) fraud, dishonesty or gross misconduct which is materially and demonstratively injurious to the Company. Termination under clauses (b) or (c) of this Section 10(c)(1) shall not be subject to cure.

(2) For purposes of this Section 10(c), no act, or failure to act, on the part of the Executive shall be considered "willful" unless done, or omitted to be done, by him in bad faith and without reasonable belief that his action or omission was in, or not opposed to, the best interest of the Company. Between the time the Executive receives written demand regarding substantial performance, as set forth in subparagraph (1) above, and prior to an actual termination for Cause, the Executive will be entitled to appear (with counsel) before the full Board to present information regarding his views on the Cause event. Under no circumstances shall Executive be terminated under Section 10(c)(1)(a) before the expiration of the 30-day cure period. After such hearing, termination for Cause must be approved by a majority vote of the full Board (other than the Executive). For terminations pursuant to Sections 10(c)(1)(b) and (c), the Board may suspend the Executive with full pay and benefits until a final determination by the full Board has been made.

(3) Upon termination of this Agreement for Cause, the Company shall have no further obligations or liability to the Executive or his heirs, administrators or executors with respect to compensation and benefits thereafter, except for the obligation to pay the Executive pursuant to Section 5(a). The Company shall deduct, from all payments made hereunder, all applicable taxes, including income tax, FICA and FUTA, and other appropriate deductions.

(d)  For Good Reason or a Change of Control or Without Cause.

(1) At any time during the term of this Agreement and subject to the conditions set forth in Section 10(d)(2) below, the Executive may terminate this Agreement and the Executive's employment with the Company for "Good Reason" or on account of a "Change of Control" (as defined in Section 10(f)). For purposes of this Agreement, "Good Reason" shall mean the occurrence of any of the following events without Executive's consent: (A) the assignment to the Executive of duties that are significantly different from, and/or that result in a substantial diminution of, the duties that he assumed on the Effective Date (including reporting to anyone other than solely and directly to the Board); (B) the assignment to the Executive of a title that is different from and subordinate to the title Vice President of Strategy, provided, however, for the absence of doubt following a Change of Control, should the Executive be required to serve in a diminished capacity in a division or unit of another entity (including the acquiring entity), such event shall constitute Good Reason regardless of the title of the Executive in such acquiring company, division or unit;
(C) material breach by the Company of this Agreement, or (D) a required relocation of the Executive's place of employment (as defined in Section 3) by more than a 50 mile radius.

(2) The Executive shall not be entitled to terminate this Agreement for Good Reason unless and until he shall have delivered written notice to the Company within ninety (90) days of the date upon which the facts giving rise to Good Reason occurred of his intention to terminate this Agreement and his employment with the Company for Good Reason, which notice specifies in reasonable detail the circumstances claimed to provide the basis for such termination for Good Reason, and the Company shall not have eliminated the circumstances constituting Good Reason within thirty (30) days of its receipt from the Executive of such written notice. In the event the Executive elects to terminate this Agreement for Good Reason in accordance with Section 10(d)(1), such election must be made within the twenty-four (24) months following the initial existence of one or more of the conditions constituting Good Reason as provided in Section 10(d)(1). In the event the Executive elects to terminate this Agreement for a Change in Controlin

5

accordance with Section 10(d)(1), such election must be made within one hundred eighty (180) days of the occurrence of the Change of Control.

(3)   In the event that the Executive terminates this Agreement and his employment with the Company for Good Reason or within one hundred eighty (180) days of the occurrence of a Change of Control, or the Company terminates this Agreement and the Executive's employment with the Company without Cause, the Company shall payor provide to the Executive (or, following his death, to the Executive's heirs, administrators or executors) the Enhanced Separation Benefits set forth in Sections 5(c) and 5(d); provided, that the Executive executes an agreement releasing Company and its affiliates from any liability associated with this Agreement (excepting any payment obligations) and such release is irrevocable at the time the separation payment is first payable under this Section 10 and the Executive complies with his other obligations under this Agreement. Subject to the terms hereof, one-half (1/2) of the compensation of the Enhanced Separation Benefits payment shall be paid within thirty (30) days of the Executive's termination of employment ("Initial Payment"), provided that the Executive has executed a release (excepting payment obligations) and that if the release execution period begins in one taxable year and ends in another taxable year, the Initial Payment shall not be made until the beginning of the taxable year immediately following termination. The balance of the compensation of the Enhanced Separation Benefits shall be paid in substantially equal installments on the Company's regular payroll dates beginning with the first payroll date coincident with or immediately following the Initial Payment and ending on the payroll date coincident with or immediately following the twelve (12) month anniversary of the Initial Payment. . The Company shall deduct, from all payments made hereunder, all applicable taxes, including income tax, FICA and FUTA, and other appropriate deductions.

(4)   The Executive shall not be required to mitigate the amount of any payment provided for in this Section 10(d) by seeking other employment or otherwise, nor shall the amount of any payment provided for in this Section 10(d) be reduced by any compensation earned by the Executive as the result of employment by another employer or business or by profits earned by the Executive from any other source at any time before and after the termination date. The Company's obligation to make any payment pursuant to, and otherwise to perform its obligations under, this Agreement shall not be affected by any offset, counterclaim or other right that the Company may have against the Executive for any reason.

(e)   Without "Good Reason" by the Executive. At any time during the term of this Agreement, the Executive shall be entitled to terminate this Agreement and the Executive's employment with the Company without Good Reason and other than for a Change of Control by providing prior written notice of at least thirty (30) days to the Company. Upon termination by the Executive of this Agreement or the Executive's employment with the Company without Good Reason and other than for a Change of Control, the Company shall have no further obligations or liability to the Executive or his heirs, administrators or executors with respect to compensation and benefits thereafter, except for the obligations set forth in Sections 5(a). The Company shall deduct, from all payments made hereunder, all applicable taxes, including income tax, FICA and FUTA, and other appropriate deductions.

(f)   Change of Control. For purposes of this Agreement, "Change of Control" shall mean the occurrence of any one or more of the following: (i) the accumulation (if over time, in any consecutive twelve (12) month period), whether directly, indirectly, beneficially or of record, by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended) of more than fifty percent (50%) or more of the shares of the outstanding Common Stock of the Company, whether by merger, consolidation , sale or other transfer of shares of Common Stock (other than a merger or consolidation where the stockholders of the Company prior to the merger or consolidation are the holders of a majority of the voting securities of the entity that survives such merger or consolidation) for purposes of clarity the Company expects to sell a number of shares and/or convert outstanding senior debt to either preferred or common stock not limited to the period of this contract to raise funds and

stabilize its balance sheet and any such sales shall not constitute a change of control for purposes of this section or Agreement, (ii) a sale of all or substantially all of the assets of the Company or (iii) during any period of twelve (12) consecutive months, the individuals who, at the beginning of such period, constitute the Board, and any new director whose election to the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the twelve (12) month period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the Board.

(g)   Any termination of the Executive's employment by the Company or by the Executive (other than termination by reason of the Executive's death) shall be communicated by written Notice of Termination to the other party of this Agreement. For purposes of this Agreement, a "Notice of Termination" shall mean a written notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated, provided, however, failure to provide timely notification shall not affect the employment status of the Executive.

11.   Confidential Information.

(a)   Disclosure of Confidential Information. The Executive recognizes, acknowledges and agrees that he has had and will continue to have access to secret and confidential information regarding the Company, its subsidiaries and their respective businesses ("Confidential Information"), including but not limited to, its products, methods, formulas, software code, patents, sources of supply, customer dealings, data, know-how, trade secrets and business plans, provided such information is not in or does not hereafter become part of the public domain, or become known to others through no fault of the Executive. The Executive acknowledges that such information is of great value to the Company, is the sole property of the Company, and has been and will be acquired by him in confidence. In consideration of the obligations undertaken by the Company herein, the Executive will not, at any time, during or after his employment hereunder, reveal, divulge or make known to any person, any information acquired by the Executive during the course of his employment, which is treated as confidential by the Company, and not otherwise in the public domain. The provisions of this Section 11 shall survive the termination of the Executive's employment hereunder.

(b)   The Executive affirms that he does not possess and will not rely upon the protected trade secrets or confidential or proprietary information of any prior employer(s) in providing services to the Company or its subsidiaries.

(c)   In the event that the Executive's employment with the Company terminates for any reason, the Executive shall deliver forthwith to the Company any and all originals and copies, including those in electronic or digital formats, of Confidential Information; provided, however, the Executive shall be entitled to retain (i) papers and other materials of a personal nature, including, but not limited to, photographs, correspondence, personal diaries, calendars and rolodexes, personal files and phone books, (ii) information showing his compensation or relating to reimbursement of expenses, (iii) information that he reasonably believes may be needed for tax purposes and (iv) copies of plans, programs and agreements relating to his employment, or termination thereof, with the Company.

12.   Section 409A.

The provisions of this Agreement are intended to comply with or are exempt from Section 409A of the Code ("Section 409A") and the related Treasury Regulations and shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A. The Company and the Executive agree to work together in good faith to consider

7

amendments to this Agreement and to take such reasonable actions necessary, appropriate or desirable to avoid imposition of any additional tax under Section 409A or income recognition prior to actual payment to the Executive under this Agreement.

It is intended that any expense reimbursement made under this Agreement shall be exempt from Section 409A. Notwithstanding the foregoing, if any expense reimbursement made under this Agreement shall be determined to be "deferred compensation" subject to Section 409A ("Deferred Compensation"), then (a) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit, (b) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year (provided that this clause (b)shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect) and (c) such payments shall be made on or before the last day of the taxable year following the taxable year in which the expense was incurred.

With respect to the time of payments of any amount under this Agreement that is Deferred Compensation, references in the Agreement to "termination of employment" and substantially similar phrases, including a termination of employment due to the Executive's Disability, shall mean "Separation from Service" from the Company within the meaning of Section 409A (determined after applying the presumptions set forth in Treasury Regulation Section 1.409A- 1(h)(1)). Each installment payable hereunder shall constitute a separate payment for purposes of Treasury Regulation Section 1.409A-2(b), including Treasury Regulation Section 1.409A- 2(b)(2)(iii). Each payment that is made within the terms of the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) is intended to meet the "short-term deferral" rule. Each other payment is intended to be a payment upon an involuntary termination from service and payable pursuant to Treasury Regulation Section 1.409A-1(b)(9)(iii), et. seq., to the maximum extent permitted by that regulation, with any amount that is not exempt from Code Section 409A being subject to Code Section 409A.

Notwithstanding anything to the contrary in this Agreement, if the Executive is a "specified employee" within the meaning of Section 409A at the time of the Executive's termination, then only that portion of the severance and benefits payable to the Executive pursuant to this Agreement, if any, and any other severance payments or separation benefits which may be considered Deferred Compensation (together, the "Deferred Separation Benefits"),which (when considered together) do not exceed the Section 409A Limit (as defined herein) may be made within the first six (6) months following the Executive's termination of employment in accordance with the payment schedule applicable to each payment or benefit. Any portion of the Deferred Separation Benefits in excess of the Section 409ALimit otherwise due to the Executive on or within the six (6) month period following the Executive's termination will accrue during such six (6) month period and will become payable in one lump sum cash payment on the date six (6) months and one (1) day following the date of the Executive's termination of employment. All subsequent Deferred Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if the Executive dies following termination but prior to the six (6) month anniversary of the Executive's termination date, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of the Executive's death and all other Deferred Separation Benefits will be payable in accordance with the payment schedule applicable to each payment or benefit.

For purposes of this Agreement, "Section 409A Limit" shall mean a sum equal to (x) the amounts payable within the terms of the "short-term deferral" rule under Treasury Regulation Section 1.409A-1(b)(4) plus (y) the amount payable as "separation pay due to involuntary separation from service" under Treasury Regulation Section 1.409A-1(b)(9)(iii) equal to the lesser of two (2) times: (i) the Executive's annualized compensation from the Company based upon his annual rate of pay during the Executive's taxable year preceding his taxable year when his employment

terminated, as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1); and (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Code for the year in which the Executive's employment is terminated.

13.   <u>Miscellaneous.</u>

(a)  Neither the Executive nor the Company may assign or delegate any of their rights or duties under this Agreement without the express written consent of the other; provided, however, that the Company shall have the right to delegate its obligation of payment of all sums due to the Executive hereunder, provided that such delegation shall not relieve the Company of any of its obligations hereunder.

(b)  During the term of this Agreement, the Company (i) shall indemnify and hold harmless the Executive and his heirs and representatives to the maximum extent provided by the laws of the State of Nevada and by Company's bylaws and (ii) shall cover the Executive under the Company's directors' and officers' liability insurance on the same basis as it covers other senior executive officers and directors of the Company.

(c)  This Agreement constitutes and embodies the full and complete understanding and agreement of the parties with respect to the Executive's employment by the Company, supersedes all prior understandings and agreements, whether oral or written, between the Executive and the Company, and shall not be amended, modified or changed except by an instrument in writing executed by the party to be charged. The invalidity or partial invalidity of one or more provisions of this Agreement shall not invalidate any other provision of this Agreement. No waiver by either party of any provision or condition to be performed shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or any prior or subsequent time.

(d)  This Agreement shall inure to the benefit of, be binding upon and enforceable against, the parties hereto and their respective successors, heirs, beneficiaries and permitted assigns.

(e)  The headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

(f)  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, sent by registered or certified mail, return receipt requested, postage prepaid, or by reputable national overnight delivery service (e.g., Federal Express) for overnight delivery to the party at the address set forth in the preamble to this Agreement, or to such other address as either party may hereafter give the other party notice of in accordance with the provisions hereof. Notices shall be deemed given on the sooner of the date actually received or the third business day after deposited in the mail or one business day after deposited with an overnight delivery service for overnight delivery.

(g)  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada, and each of the parties hereto irrevocably consents to the jurisdiction and venue of the federal and state courts located in the State of Nevada for any disputes arising out of this Agreement, or the Executive's employment with the Company. The prevailing party in any dispute arising out of this Agreement shall be entitled to his or its reasonable attorney's fees and costs.

(h)   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one of the same instruments. The parties hereto have executed this Agreement as of the date set forth above.

(i)   The Executive represents and warrants to the Company, that he has the full power and authority to enter into this Agreement and to perform his obligations hereunder and that the execution and delivery of this Agreement and the performance of his obligations hereunder will not conflict with any agreement to which the Executive is a party.

(j)   The Company represents and warrants to the Executive that it has the full power and authority to enter into this Agreement and to perform its obligations hereunder and that the execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with any agreement to which the Company is a party.

**[Signature page follows immediately]**

10

IN WITNESS WHEREOF, the Executive and the Company have caused this Executive Employment Agreement to be executed as of the date first above written.

MARATHON DIGITAL HOLDINGS, INC.

By: */s/ Fred Thiel*
Name: Fred Thiel
Title: Chief Executive Officer

*/s/ Adam Swick*
Adam Swick

**Exhibit 19.1**

**Marathon Digital Holdings, Inc.**

**Statement of Policies and Procedures Governing Material Nonpublic Information
and the Prevention of Insider Trading**

## 1. PURPOSE

The purchase or sale of securities while possessing material nonpublic ("*inside*") information or the disclosure of inside information ("*tipping*") to others who may trade in such securities is sometimes referred to as "*insider trading*" and is prohibited by federal and state securities laws. Illegal insider trading occurs when a person buys or sells a security when in possession of inside information in violation of a duty of trust or confidence. As an essential part of your work, you may have or obtain access to inside information about Marathon Digital Holdings, Inc. (including information about other companies with which the Company does, or may do, business such as customers, suppliers or partners). When we refer in this Policy to "*Marathon*" or the "*Company*," we are referring to Marathon Digital Holdings, Inc. and any of its current or future subsidiaries.

Marathon has adopted this Insider Trading Policy ("*Policy*") to assist the Company in preventing illegal insider trading and to avoid even the appearance of improper conduct on the part of any director, officer, employee or contractor of the Company. This Policy is designed to protect and further Marathon's reputation for integrity and ethical conduct. However, the ultimate responsibility for complying with the securities laws, adhering to this Policy and avoiding improper transactions rests with you. It is imperative that you use your best judgment and that you ask questions where you are uncertain how to handle a particular situation.

The Board of Directors (the "*Board*") has delegated to its Audit Committee (the "*Committee*") the responsibility of administering this Policy. The Committee may from time to time recommend to the Board changes to this Policy. All changes to this Policy must be approved by the Board. This Policy was adopted by the Board on December 12, 2023.

## 2. PENALTIES FOR INSIDER TRADING

The penalties for violating the insider trading laws are substantial and include imprisonment, disgorgement of profits gained or losses avoided, and substantial civil and criminal fines. As of the effective date of this Policy, an insider trading violation carries a maximum prison sentence of 20 years. Criminal fines can reach up to $5.0 million for individuals and $25.0 million for entities, and civil sanctions may include an injunction, industry bar, disgorgement and penalties of up to three times the profit gained or loss avoided. Individuals and entities considered to be "control persons" who knew or recklessly disregarded the fact that a "controlled person" was likely to engage in insider trading also may be civilly liable. As of the effective date of this Policy the civil liability of "control persons" can be the greater of $1.0 million, or three times the amount of the profit gained or loss avoided. For this purpose, a "control person" is an entity or person who directly or indirectly controls another person, and could include the Company, its directors and officers.

Under some circumstances, individuals who trade on inside information may also be subjected to private civil lawsuits. Moreover, as the inside information of Marathon is the property of the Company, trading on or tipping Marathon's confidential information could result in serious employment sanctions, up to and including termination of employment.

You should be aware that the Securities and Exchange Commission ("*SEC*"), the Financial Industry Regulatory Authority ("*FINRA*") and the Nasdaq Stock Market use sophisticated electronic surveillance techniques to investigate and detect insider trading, and the SEC and the U.S. Department of Justice pursue insider trading violations vigorously. Cases involving trading through foreign accounts, trading by family members and friends, and trading involving only a small number of shares have been successfully prosecuted.

## 3. SCOPE AND APPLICABILITY

3.1.  **Covered Persons.** This Policy applies to each member of the Board and to all directors, officers, employees and, where appropriate in the Company's determination, contractors, within all of Marathon's operations. All persons covered by this Policy are referred to as "***Covered Persons***." This Policy also applies to family members and domestic partners who share a household with a Covered Person.

3.2.  **Restricted Persons. Sections 8** through **10** of this Policy impose **additional** obligations and restrictions on individuals who are designated as "***Restricted Persons***." Restricted Persons include:

3.2.1.  Members of the Board;

3.2.2.  Executive Officers;

3.2.3.  Employees with the title of "Vice President" or above;

3.2.4.  Members of the Accounting, Finance, and Information Technology Departments with the title of "Director" or above;

3.2.5.  Designated positions or individual employees as determined by the Chief Executive Officer, Chief Financial Officer or General Counsel. Any such designated persons will be promptly notified that they are subject to this Policy;

3.2.6.  Family members and domestic partners who share a household with any of the persons listed above; and

3.2.7.  Any other individual whom the Compliance Officer (as defined below) may designate as a "***Restricted Person***" because they have, or may have, access to inside information concerning the Company (as determined in the sole discretion of the Compliance Officer).

Restricted Persons can be officers, directors, employees or contractors of the Company (or their respective family members or domestic partners). Any person designated as a Restricted Person by title or express designation as set forth above (i) must comply with this Policy (as a Restricted Person) until notified otherwise in writing by the Compliance Officer, and (ii) in the event of termination or separation from the Company, shall continue to be designated by the Company as a Restricted Person until such time as such person is no longer in possession of inside information.

3.3.  **Covered Securities and Transactions.** Subject to the specific exceptions set forth in **Section 5.2**, this Policy applies to all transactions in the Company's securities, including common stock and any other type of securities that are convertible into, exchangeable for or exercisable for common stock, such as preferred stock, convertible debt securities, options, warrants, and other derivative securities. This Policy applies to sales, purchases, gifts, exchanges, pledges, options, hedges, puts, calls and short sales, and any other transaction that purports to transfer the economic consequences of ownership.

This Policy applies to all investment decisions you make regarding transactions in Company securities. For example, if you have the power to direct the purchase or sale of Company securities by virtue of your position as a director or officer of a corporation or non-profit organization, as a general partner of a partnership, as a managing member of a limited liability company ("***LLC***"), as a trustee of a trust, or as executor of an estate, then all transactions in Company securities made on behalf of any such corporation, organization, partnership, LLC, trust or estate are covered by this Policy.

2

This Policy also applies to trading in securities of another company if you learn inside information about that company in the course of, or as a result of, your employment by or association with Marathon (including customers, suppliers, partners, licensors and other third-parties).

You are expected to comply with this Policy until such time as you no longer provide service to the Company **and** you no longer possess any inside information subject to this Policy. In addition, if you are subject to a trading blackout under this Policy at the time you cease to provide service to the Company, you are expected to abide by the applicable trading restrictions until at least the end of the relevant blackout period.

There may be instances where you suffer financial harm or other hardship or are otherwise required to forego a planned transaction because of the restrictions imposed by this Policy. In general, a personal financial emergency or other personal circumstances are not mitigating factors under securities laws and will not excuse a failure to comply with this Policy. Please refer to **<u>Section 9.4</u>** of this Policy for additional information about the circumstances under which you may be able to sell Company securities in connection with a financial hardship.

3.4. **Delivery of the Policy.** This Policy will be delivered to all new directors, officers, employees and, where appropriate in the Company's determination, contractors, at the commencement of their employment by or association with the Company.

# 4. DEFINITIONS

4.1. **Insider Trading.** In general, "**insider trading**" occurs when a person purchases or sells a security while in possession of inside information in breach of a duty of trust or confidence owed directly or indirectly to the issuer of the security, the issuer's stockholders or the source of the information. "**Inside information**" is information which is considered both "**material**" and "**nonpublic.**" Insider trading is a crime, may subject you to serious financial penalties and termination of employment, and is strictly prohibited by this Policy. Please refer to **Section 2** of this Policy for additional information.

4.2. **Materiality.** A fact is considered "*material*" if (i) there is a substantial likelihood that a reasonable investor would consider it important in making a decision to buy, hold or sell securities, or (ii) disclosure of the information would be expected to significantly alter the total mix of the information in the marketplace about the issuer of the security. Material information can reflect either good or bad news and is not limited to financial information. While it is impossible to list all types of information that might be deemed "*material*" under particular circumstances, information dealing with the following subjects affecting the Company would generally be considered material:

4.2.1. projections of future revenues, expenses, margins, earnings, losses or liquidity position;

4.2.2. anticipated or actual Company financial results for a quarter and/or year;

4.2.3. restatements of financial results, or material impairments, write-offs or restructurings;

4.2.4. commercial launch of new products by the Company or its competitors;

4.2.5. news of a pending or proposed merger, acquisition joint venture or similar transaction;

4.2.6. news of a significant sale, disposition, divestiture, or write-down of assets;

3

4.2.7.  news of the execution or termination of significant contracts or other commercial arrangements (including with customers, suppliers, partners, licensors or other third-parties);

4.2.8.  changes in dividend policies or amounts, recapitalizations or stock splits;

4.2.9.  offerings of securities or other financing developments;

4.2.10.  repurchases of securities;

4.2.11.  repayment or incurrence of indebtedness;

4.2.12.  changes or proposed changes in senior management or the Board, or other major personnel changes, labor disputes or negotiations;

4.2.13.  regulatory developments impacting the Company, or its business or products;

4.2.14.  developments in research and development or intellectual property; and

4.2.15.  news regarding significant litigation or government investigations.

4.3.  **Nonpublic Information.** Information is "***nonpublic***" if it has not been widely disclosed to the general public through major newswire services, national news services, financial news services, filings with the SEC, or other method that has been determined by the SEC to be compliant with Regulation FD. For purposes of this Policy, information will be considered public (i.e., no longer "***nonpublic***") after the close of trading on the full trading day following the Company's public release of the information.

4.4.  **Tipping.** "***Tipping***" is the disclosure of material nonpublic information concerning the Company or its securities to an outside person. Providing insider information to anyone who thereafter trades on the basis of that information may subject both you (the "***tipper***") and the other person (the "***tippee***") to insider trading liability.

## 5.  PROHIBITED ACTIVITIES

5.1.  **Prohibitions**. Except for the limited exceptions described below, the following shall apply to all transactions in Company securities:

5.1.1.  No Covered Person may purchase, sell, transfer or effectuate any other transaction in Company securities while in possession of inside information concerning the Company or its securities. This prohibition includes sales of shares received upon exercise of stock options or warrants, upon vesting of restricted stock, or upon settlement of restricted stock units.

5.1.2.  No Covered Person may "***tip***" or disclose inside information concerning the Company or its securities to any outside person (including family members, affiliates, analysts, investors, members of the investment community and news media). Should a Covered Person inadvertently disclose such information to an outside person, the Covered Person must promptly inform the Compliance Officer (or, in the absence of the Compliance Officer, the Chief Executive Officer or Chief Financial Officer) regarding this disclosure. In that event, the Company will either take steps necessary to (i) preserve the confidentiality of the information, including requiring the outside person to agree in writing to comply with the terms of this Policy and/or sign a confidentiality agreement, or (ii) disclose the information publicly in accordance with the requirements of Regulation FD.

4

5.1.3.   No Covered Person may purchase Company securities on margin, hold Company securities in a margin account, or otherwise pledge Company securities as collateral for a loan because, in the event of a margin call or default on the loan, the broker or lender could sell the shares at a time when the Covered Person is in possession of inside information, resulting in liability for insider trading. The Compliance Officer may make exceptions to this prohibition on a case-by-case basis.

5.1.4.   Short-term and speculative trading in Company securities, as well as hedging and other derivative transactions involving Company securities, can create the appearance of impropriety and may become the subject of an SEC or FINRA investigation. These types of transactions can also result in inadvertent violations of insider trading laws and/or liability for "**short-swing**" profits under Section 16(b) of the Securities Exchange Act of 1934 ("***Exchange Act***"). Therefore, it is the Company's policy to prohibit the following activities, even if you are not in possession of inside information:

5.1.4.1.   No Covered Person may trade in any interest or position relating to the future price of Company securities, such as put or call options, enter into any "***short sale***" of Company securities, or enter into any other derivative securities relating to Company securities.

5.1.4.2.   No Covered Person may hedge the value of Company securities. A "***hedge***" is a transaction designed to offset or reduce the risk of a decline in the market value of an equity security, and can include, but is not limited to, prepaid variable forward contracts, equity swaps, collars and exchange funds.

5.1.4.3.   No Covered Person may trade in securities of the Company on an active basis, including short-term speculation.

5.1.5.   No Covered Person may trade in securities of another company if the Covered Person is in possession of inside information about that other company which the Covered Person learned in the course of, or as a result of, his or her employment by or association with Marathon.

5.2.   **Exceptions to Prohibited Activities.** Prohibitions in trading securities under this Policy do not include:

5.2.1.   The acceptance or purchase of stock options, restricted stock, restricted stock units or other equity awards issued or offered by the Company, and the vesting, cancellation or forfeiture of stock options, restricted stock, restricted stock units or other equity awards in accordance with applicable plans and agreements.

5.2.2.   The exercise of vested stock options or warrants, either on a "***cash for stock***" or "***stock for stock***" basis, where no Company stock is sold (by the Covered Person, the Company or otherwise) to fund the option or warrant exercise. However, while vested stock options and warrants are not prevented from being exercised under this Policy, the sale of any stock acquired upon such exercise is subject to this Policy.

5.2.3.   The receipt of Company stock upon vesting of restricted stock or settlement of restricted stock units, as well as the withholding of Company stock by the Company in payment of tax obligations, provided that no Company stock is sold (by the Covered Person, the Company or otherwise) in connection with the payment of tax obligations.

5.2.4.   In the event the Company has adopted an employee stock purchase plan ("***ESPP***"), elections with respect to participation in the ESPP or to purchases of Company stock

5

under the ESPP, provided that the sale of any stock acquired through the ESPP is subject to this Policy.

5.2.5.    Company securities purchased or sold under a Rule 10b5-1 Trading Plan ("***Trading Plan***") that has been approved in advance by the Compliance Officer (see **Sections 8** and **10** of this Policy).

5.2.6.    Transfers of Company stock by a Covered Person into a trust for which the Covered Person is a trustee, or from the trust back into the name of the Covered Person.

5.2.7.    Transfers of Company securities by will or pursuant to the laws of descent and distribution.

5.2.8.    Bona fide gifts of Company securities following receipt of written approval by the Compliance Officer (provided that the Compliance Officer shall retain the discretion to require the recipient to certify that it will comply with the terms of this Policy as a "***Covered Person***").

5.2.9.    Bona fide charitable donations to an organization that has obtained 501(c)(3) tax exempt status under the Internal Revenue Code following approval by the Compliance Officer (provided that the Compliance Officer shall retain the discretion to require the organization to certify that it will comply with the terms of this Policy as a "***Covered Person***").

5.2.10.    Private securities transactions not expressly prohibited under **Section 5.1** of this Policy between a Covered Person and a sophisticated party provided that (i) if it is proposed by the Covered Person that inside information is to be provided to the sophisticated party, any such information shall only be provided by the Company in the Company's sole discretion, and then, if so disclosed, only after the party has entered into a non-disclosure agreement with the Company in form and substance satisfactory to the Company, and (ii) the party agrees to any restrictions under the federal securities laws that the Company may impose on the party's ability to effect transactions in any Company securities purchased by the party.

5.2.11.    Purchases and sales of mutual funds, exchange traded funds or other similar funds or investment vehicles that invest in securities of the Company and with respect to which the Covered Person is a passive investor and has no rights with respect to the voting or disposition of any Company securities, and purchases and sales of Company securities by any such entity.

## 6.    COMPANY COMPLIANCE OFFICER

By approving this Policy, the Board has delegated the General Counsel the responsibility of serving as the compliance officer for purposes of this Policy (the "***Compliance Officer***") with all attendant rights and obligations. The Board may from time to time change the Compliance Officer.

The duties and responsibilities of the Compliance Officer include the following:

6.1.    Administering and interpreting this Policy and monitoring and enforcing compliance with all of its provisions and procedures.

6.2.    Responding to all inquiries relating to this Policy and its procedures.

6.3.    Designating and announcing special trading blackout periods during which trading in Company securities is prohibited by specific persons (see **Section 9** of this Policy).

6.4.  Recommending revisions of this Policy (with the assistance of outside legal counsel as necessary) to reflect changes in applicable laws, regulations, stock exchange listing standards or governance practices, provided that all changes to this Policy must be approved by the Board.

6.5.  Ensuring the maintenance of records required by the provisions of this Policy.

6.6.  Such other duties and responsibilities as are consistent with the terms of this Policy.

Any questions arising under this Policy, including questions relating to whether information constitutes inside information, or whether a specific transaction is covered by this Policy, should be directed to the Compliance Officer by email to *compliance@mara.com*.

In the event that the Compliance Officer is not available, the Chief Executive Officer or Chief Financial Officer may perform the duties of the Compliance Officer hereunder. In addition, the Compliance Officer may designate one or more individuals to perform the Compliance Officer's duties (which may include, but are not required to be limited to, the Chief Executive Officer and Chief Financial Officer).

The determinations of the Compliance Officer (or any designated individual, as applicable) under this Policy are final.

## 7.  CONFIDENTIALITY OF INFORMATION RELATING TO THE COMPANY

7.1.  **Access to Information.** Risk of insider trading violations by individuals employed by or contracted with the Company can be substantially limited by restricting the pool of individuals with access to inside information to the greatest extent possible. Access to inside information about the Company should be limited to officers, directors, employees and contractors of the Company on a need-to-know basis. In addition, such information should not be communicated to anyone outside of the Company, unless such person has signed an appropriate non-disclosure agreement prior to dissemination of the information or is otherwise subject to obligations of confidentiality to the Company. When communication of inside information about the Company becomes necessary, all directors, officers, employees, and contractors must take care to emphasize the need for confidential treatment of such information and adherence to the Company's policies with regard to confidential information.

7.2.  **Disclosure of Information.** Inside Company information is the property of the Company and the confidentiality of this information must be strictly maintained within the Company. Only the Company's executive officers, as such are determined from time to time by the Board, or individuals delegated by such officers, are authorized to disclose inside information about the Company to the public, members of the investment community or stockholders, unless one of these officers has expressly authorized disclosure of such information by another employee in advance. All inquiries regarding the Company should be directed to the Chief Executive Officer, Chief Financial Officer or General Counsel and no other comment should be provided.

## 8.  PRE-CLEARANCE REQUIRED FOR TRADING BY RESTRICTED PERSONS AND FOR TRADING PLANS

All Restricted Persons must pre-clear all transactions in Company securities as provided below:

8.1.  The Restricted Person proposing to effectuate a trade or other transaction in Company securities must notify the Compliance Officer in writing of the proposed transaction prior to the proposed transaction date, in accordance with the instructions provided on **Exhibit A** (or as may otherwise be approved by the Compliance Officer and communicated to the Restricted Persons from time to time).

8.2.  The Compliance Officer must approve the proposed trade or other transaction in writing. If the proposed transaction is not completed within five trading days after the Restricted Person has received pre-clearance (or fewer trading days, if so designated as a condition to receiving

7

clearance), pre-clearance for the transaction (or any unfilled portion) must be re-requested since circumstances may have changed over that time period.

8.3.  The Compliance Officer's decision with respect to the pre-clearance of a particular trade or other transaction, whether approved or denied, shall be final and shall be kept confidential by the requestor.

All Covered Persons must pre-clear any Trading Plan as provided below:

8.4.  Any Covered Person who wishes to implement a Trading Plan must first pre-clear the Trading Plan, and any renewals, amendments or modifications of the Trading Plan, with the Compliance Officer (or, in the case of the Compliance Officer, with the Committee). To obtain pre-clearance, please email the Compliance Officer at *compliance@mara.com*.

8.5.  The Compliance Officer must approve the Trading Plan, or any renewals, amendments or modifications, in writing. If the proposed Trading Plan is not entered into, renewed, amended or modified within five trading days after the Covered Person has received pre-clearance (or fewer trading days, if so designated as a condition to receiving clearance), pre-clearance for the Trading Plan must be re-requested since circumstances may have changed over that time period.

For additional information regarding the adoption of a Trading Plan and the applicable requirements and limitations, please refer to **Section 10** of this Policy.

## 9.  BLACKOUT PERIODS

9.1.  **Regular Blackout Periods for Restricted Persons.** As a matter of good corporate governance, the Company institutes trading blackout periods during predetermined time periods. Restricted Persons may not trade or effectuate any other transactions in Company securities during the period that begins with the day that is the fifteenth calendar day before the end of the fiscal quarter and continues until the close of trading on the first full trading day after the Company's public release of quarterly or annual financial results. Trades or other transactions made pursuant to an approved Trading Plan (see **Section 10** of this Policy) and pursuant to a Hardship Trading Exemption (see **Section 9.4** of this Policy) are exempted from this restriction.

9.2.  **Special Blackout Periods.** From time to time, the Compliance Officer may determine that trading or transacting in Company securities is inappropriate during an otherwise open trading window due to the existence, or potential existence, of inside information. Accordingly, the Compliance Officer may prohibit trading or other transactions at any time by announcing a special blackout period and the scope of impacted personnel (which may include designated Restricted Persons and/or Covered Persons). The Compliance Officer will provide written notice of any modification of the trading blackout policy or any additional prohibition on trading during the period when trading or other transactions are otherwise permitted under this Policy. The existence of a special blackout period should be considered confidential information and any Covered Person to whom the special blackout period applies shall be prohibited from communicating the existence of the special blackout period to anyone to whom the special blackout period does not apply.

9.3.  **Hardship Trading Exemption.** The Compliance Officer may, on a case-by-case basis, authorize trading or transactions in Company securities during a trading blackout period due to financial or other hardship. Any Covered Person wanting to rely on this exception must first notify the Compliance Officer in writing of the circumstance of the hardship and the amount and nature of the proposed trade or transaction. Such person will also be required to certify to the Compliance Officer in writing no earlier than two trading days prior to the proposed trade or transaction that they are not in possession of inside information concerning the Company or its securities. Upon authorization from the Compliance Officer, the person may trade or transact, although such person will be responsible for ensuring that any such trade or transaction complies in all other respects with this Policy.

9.4.   **No Safe Harbors.** There are no unconditional "safe harbors" for trades or transactions made at particular times, and all persons subject to this Policy must exercise good judgment at all times. Even when a regular blackout period is not in effect, you may be prohibited from engaging in any transactions involving the Company's securities because you possess inside information concerning the Company or its securities, are subject to a special blackout period, or are otherwise restricted under this Policy.

## 10. RULE 10B5-1 TRADING PLANS

A Rule 10b5-1 Trading Plan is a contract to purchase, sell or otherwise transact securities according to a written instruction or plan established prior to effecting any transactions in the securities. In general, a Trading Plan must set forth a non-discretionary trading method by leaving the amount of securities to be purchased, sold or otherwise transacted and the price and date for each event to either (i) a written specification, (ii) a written formula, or (iii) a third party.

While adoption of a Trading Plan does not obviate the requirement to otherwise comply with insider trading laws, it does provide an affirmative defense to a claim that the insider acted on the basis of material, nonpublic information, even if an individual was aware of such information at the time of the transaction.

To be adopted in good faith, the Trading Plan must be adopted, renewed, amended or modified when the individual has no knowledge of inside information, and the plan must not be made as part of a scheme to fraudulently evade insider trading prohibitions.

In addition to obtaining pre-clearance of a Trading Plan (see **Section 8** of this Policy), a Trading Plan must meet the following requirements and specifications:

10.1.   **No Adoption During Blackout Period**. A Trading Plan involving the Company's securities may not be adopted, renewed, amended or modified by any Covered Person during any blackout period, even if the individual is not then in possession of any inside information.

10.2.   **90-Day Cooling-Off Period for Directors and Officers**: A Trading Plan adopted by any director or officer may not commence until <u>both</u> (i) the passage of at least 90 calendar days after the adoption, renewal, amendment, or modification of the Trading Plan, <u>and</u> (ii) the passage of at least two business days following the disclosure of the Company's financial results in a Form 10-Q or Form 10-K for the fiscal quarter in which the Trading Plan was adopted, renewed, amended or modified (but in any event, the required cooling-off period is subject to a maximum of 120 calendar days after adoption, renewal, amendment or modification of the Trading Plan).

10.3.   **Cooling-Off Period for Covered Persons Who are Not Directors and Officers**: The Trading Plan of a Covered Person who is not a director or officer may not commence until the passage of at least 30 calendar days following the adoption, renewal, amendment or modification of the Trading Plan.

10.4.   **Director and Officer Certifications**: Any Trading Plan adopted by a director or officer must include a representation certifying that, at the time of the adoption, renewal, amendment or modification, the director or officer is: (i) not aware of material, nonpublic information about the Company or its securities; and (ii) adopting, renewing, amending or modifying the Trading Plan in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1.

10.5.   **Prohibition on Multiple Overlapping Trading Plans**: No multiple overlapping Trading Plans will be permitted unless qualifying for one of the following exceptions and pre-cleared by the Compliance Officer (see **Section 8** of this Policy): (i) a later-commencing Trading Plan that is not authorized to begin until after all trades under the earlier-commencing Trading Plan are completed or expired; or (ii) an outstanding or additional Trading Plan qualifies as an eligible sell-to-cover transaction (i.e., a sale of securities for the purpose of generating funds to cover

the withholding taxes associated with equity vesting and elections under 401(K) plans or employee stock purchase plans that may be structured as Trading Plans).

Any amendments or modifications to a Trading Plan must meet each of the requirements of a new Trading Plan as described above. In addition, while this Policy does not limit the ability of a Covered Person to terminate a previously adopted Trading Plan, any new Trading Plan adopted following the termination of a previously adopted Trading Plan must meet each of the requirements of a new Trading Plan as described above.

Transactions effected under an approved Trading Plan will not require further pre-clearance at the time of the transaction and will typically not be subject to future trading blackout periods (regular or special) that may be in effect under this Policy at the time of the transaction (although the Compliance Officer retains the discretion to terminate a Trading Plan during any blackout period).

The Compliance Officer may, from time to time, institute additional parameters and requirements regarding Trading Plans.

Purchases, sales and other transactions made pursuant to a Trading Plan must still comply with all other applicable reporting requirements under federal and state securities laws, including filings pursuant to Section 16 of the Exchange Act.

SEC rules require the Company to make disclosures concerning the Trading Plans adopted, renewed, amended, modified or terminated by its officers and directors. Accordingly, you must timely provide such information regarding your Trading Plan to the Compliance Officer.

**EXHIBIT A**

**TRADING PRE-CLEARANCE INSTRUCTIONS**

Pre-clearance of any transactions in Company securities by Restricted Persons is mandatory. If you have questions about the process by which pre-clearance must be obtained, please email the Company's Compliance Officer at *compliance@mara.com*.

<u>**Instructions for Pre-Clearance of Purchase or Sale of Company Securities**</u>

To process your request to purchase or sell shares on the open market, please send an email request to the Compliance Officer at the email address above.

**If you are purchasing or selling shares on the open market, the Company requests that you place the following in the subject line of your email, as applicable: "Pre-Clearance Request - Purchase of Shares" <u>or</u> "Pre-Clearance Request - Sale of Shares"**

**The body of the email should contain the following:**

o    If a sale, the source and purchase date of the shares proposed to be sold; and
o    Estimated purchase or sale date.

<u>**Instructions for Pre-Clearance of Exercise of Company Stock Options / Warrants**</u>

To process your request to exercise stock options or warrants, please send an email request to the Compliance Officer at the email address above.

**If you are exercising options or warrants, the Company requests that you place the following in the subject line of your email: "Pre-Clearance Request - Exercise of Options / Warrants"**

**The body of the email should contain the following:**

o    Type of security being exercised (*e.g.*, stock option, warrant, etc.);
o    Estimated sale date; and
o    "Exercising and Selling" or "Exercising and Holding."

If you need any of the information requested above, or if you need to seek pre-clearance of any other transaction in Company securities, please contact the Compliance Officer at the email address above.

***Please note that the ultimate responsibility for compliance with federal and state securities laws rests with you, and that the clearance of any proposed transaction should not be construed as a guarantee that you will not later be found to have been in possession of inside information.***

11

**Exhibit 21.1**

## SUBSIDIARIES OF MARATHON DIGITAL HOLDINGS, INC.

The registrant's subsidiaries and affiliates as of December 31, 2023 are included in the list below.

| Legal Entity Name | Percentage of Voting Securities Owned Directly or Indirectly by Registrant | Jurisdiction of Organization |
|---|---|---|
| MARA Tech, Inc. | 100% | Delaware |
| Marathon Digital International, Inc. | 100% | Delaware |
| Marathon Digital Leasing, LLC | 100% | Nevada |
| Crypto Currency Patent Holding Company, LLC | 100% | Delaware |
| MARA Pool LLC | 100% | Nevada |
| Marathon Crypto Mining, Inc | 100% | Nevada |
| Soems Acquisition Corp. | 100% | Delaware |

**Exhibit 23.1**

<u>Independent Registered Public Accounting Firm's Consent</u>

We consent to the incorporation by reference in the Registration Statement of Marathon Digital Holdings, Inc. on Form S-3, (File Nos. 333-241688, 333-251309, 333-252053, 333-262656 and 333-275149), and Form S-8 (File Nos. 333-239565, 333-252950 and 333-258928) of our report dated February 28, 2024, with respect to our audits of the Consolidated Financial Statements of Marathon Digital Holdings, Inc. as of December 31, 2023 and 2022 and for each of the three years in the period ended December 31, 2023 and our report dated February 28, 2024 with respect to our audit of internal control over financial reporting of Marathon Digital Holdings, Inc. as of December 31, 2023, which reports are included in this Annual Report on Form 10-K of Marathon Digital Holdings, Inc. for the year ended December 31, 2023.

Our report on the Consolidated Financial Statements refers to changes in the method of accounting for digital assets effective January 1, 2023.

Our report on the effectiveness of internal control over financial reporting expressed an adverse opinion because of the existence of a material weakness.

/s/ Marcum LLP

Marcum LLP
Costa Mesa, CA
February 28, 2024

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302 OF THE**
**SARBANES-OXLEY ACT OF 2002**

I, Fred Thiel, certify that:

1.  I have reviewed this annual report on Form 10-K of Marathon Digital Holdings, Inc. for the period ended December 31, 2023;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly for the period in which this annual report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal controls which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Dated: February 28, 2024

By:    /s/ Fred Thiel

Fred Thiel
Chief Executive Officer (Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL AND ACCOUNTING OFFICER**
**PURSUANT TO SECTION 302 OF THE**
**SARBANES-OXLEY ACT OF 2002**

I, Salman Khan, certify that:

1.  I have reviewed this annual report on Form 10-K of Marathon Digital Holdings, Inc. for the period ended December 31, 2023;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly for the period in which this annual report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal controls which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

Dated: February 28, 2024

By:    /s/ Salman Khan

Salman Khan
Chief Financial Officer (Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each of the undersigned officers of Marathon Digital Holdings, Inc. (the "Company"), does hereby certify, that:

The Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "Form 10-K") of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and the information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: February 28, 2024          By:      /s/ Fred Thiel
                                           Fred Thiel
                                           Chief Executive Officer (Principal Executive Officer)


Dated: February 28, 2024          By:      /s/ Salman Khan
                                           Salman Khan
                                           Chief Financial Officer (Principal Financial Officer)

Exhibit 97.1

**MARATHON DIGITAL HOLDINGS, INC.**
**POLICY FOR THE RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

1.  OVERVIEW

  1.1.  In accordance with Nasdaq Rule 5608, Section 10D and Rule 10D-1 of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*") ("*Rule 10D-1*"), the Board of Directors (the "*Board*") of Marathon Digital Holdings, Inc. (the "*Company*") has adopted this Policy (the "*Policy*") to provide for the recovery of erroneously awarded Incentive-based Compensation from Executive Officers. All capitalized terms used and not otherwise defined herein shall have the meanings set forth below.

2.  RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION

  2.1  In the event of an Accounting Restatement, the Company will reasonably promptly recover the Erroneously Awarded Compensation Received in accordance with Rule 5608 and Rule 10D-1 as follows:

    2.1.1  After an Accounting Restatement, the Compensation Committee (the "Committee") shall determine the amount of any Erroneously Awarded Compensation Received by each Executive Officer and shall promptly notify each Executive Officer with a written notice containing the amount of any Erroneously Awarded Compensation and a demand for repayment or return of such compensation, as applicable.

      2.1.1.1  For Incentive-based Compensation based on (or derived from) the Company's stock price or total shareholder return, where the amount of Erroneously Awarded Compensation is not subject to mathematical recalculation directly from the information in the applicable Accounting Restatement:

      2.1.1.2  The amount to be repaid or returned shall be determined by the Committee based on a reasonable estimate of the effect of the Accounting Restatement on the Company's stock price or total shareholder return upon which the Incentive-based Compensation was Received. The Company shall maintain documentation of the determination of such reasonable estimate and provide the relevant documentation as required to Nasdaq.

      2.1.1.3  The Committee shall have discretion to determine the appropriate means of recovering Erroneously Awarded Compensation based on the particular facts and circumstances. Notwithstanding the foregoing, except as set forth in Section B(2) below, in no event may the Company accept an amount that is less than the amount of Erroneously Awarded Compensation in satisfaction of an Executive Officer's obligations hereunder.

      2.1.1.4  To the extent that the Executive Officer has already reimbursed the Company for any Erroneously Awarded Compensation Received under any duplicative recovery obligations established by the Company or applicable law, it shall be appropriate for any such reimbursed amount to be credited to the amount of Erroneously Awarded Compensation that is subject to recovery under this Policy.

      2.1.1.5  To the extent that an Executive Officer fails to repay all Erroneously Awarded Compensation to the Company when due, the Company shall take all actions reasonable and appropriate to recover such Erroneously Awarded Compensation from the applicable Executive Officer. The applicable Executive Officer shall be required to reimburse the Company for any and all expenses reasonably incurred (including legal fees) by the Company in recovering such Erroneously Awarded Compensation in accordance with the immediately preceding sentence.

2.2    Notwithstanding anything herein to the contrary, the Company shall not be required to take the actions contemplated above if the Committee determines that recovery would be impracticable *and* the following conditions are met:

2.3    The Committee has determined that the direct expenses paid to a third party to assist in enforcing the Policy would exceed the amount to be recovered. Before making this determination, the Company must make a reasonable attempt to recover the Erroneously Awarded Compensation, documented such attempt(s) and provided such documentation to Nasdaq; and

2.4    Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of Section 401(a)(13) or Section 411(a) of the Internal Revenue Code of 1986, as amended, and regulations thereunder.

3.    DISCLOSURE REQUIREMENTS

3.1    The Company shall file all disclosures with respect to this Policy required by applicable SEC rules.

4.    PROHIBITION OF INDEMNIFICATION

4.1    The Company shall not be permitted to insure or indemnify any Executive Officer against (i) the loss of any Erroneously Awarded Compensation that is repaid, returned or recovered pursuant to the terms of this Policy, or (ii) any claims relating to the Company's enforcement of its rights under this Policy. Further, the Company shall not enter into any agreement that exempts any Incentive-based Compensation that is granted, paid or awarded to an Executive Officer from the application of this Policy or that waives the Company's right to recovery of any Erroneously Awarded Compensation, and this Policy shall supersede any such agreement (whether entered into before, on or after the Effective Date of this Policy).

5.    ADMINISTRATION AND INTERPRETATION

5.1    This Policy shall be administered by the Committee, and any determinations made by the Committee shall be final and binding on all affected individuals. The Committee is authorized to interpret and construe this Policy and to make all determinations necessary, appropriate, or advisable for the administration of this Policy and for the Company's compliance with Nasdaq Rules, Section 10D, Rule 10D-1 and any other applicable law, regulation, rule or interpretation of the SEC or Nasdaq.

6.    AMENDMENT; TERMINATION

6.1    The Committee may amend this Policy from time to time in its discretion and shall amend this Policy as it deems necessary. Notwithstanding anything in this section to the contrary, no amendment or termination of this Policy shall be effective if such amendment or termination would (after taking into account any actions taken by the Company contemporaneously with such amendment or termination) cause the Company to violate any federal securities laws, SEC rule or Nasdaq rule.

7.    OTHER RECOVERY RIGHTS

7.1    This Policy shall be binding and enforceable against all Executive Officers and, to the extent required by applicable law or guidance from the SEC or Nasdaq, their beneficiaries, heirs, executors, administrators or other legal representatives. The Committee intends that this Policy will be applied to the fullest extent required by applicable law. Any employment agreement, equity award agreement, compensatory plan or any other agreement or arrangement with an Executive Officer shall be deemed to include, as a condition to the grant of any benefit thereunder, an agreement by the Executive Officer to abide by the terms of this Policy. Any right of recovery under this Policy is in addition to, and not in lieu of, any other remedies or rights of recovery that may be available to the Company under applicable law, regulation or rule or pursuant to the terms of any policy of the Company or any provision in any employment agreement, equity award agreement, compensatory plan, agreement or other arrangement.

8.  DEFINITIONS

For purposes of this Policy, the following capitalized terms shall have the meanings set forth below.

8.1   "*Accounting Restatement*" means an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements (a "Big R" restatement), or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period (a "little r" restatement).

8.2   "*Clawback Eligible Incentive Compensation*" means all Incentive-based Compensation Received by an Executive Officer (i) on or after October 2, 2023, (ii) after beginning service as an Executive Officer, (iii) who served as an Executive Officer at any time during the applicable performance period relating to any Incentive-based Compensation (whether or not such Executive Officer is serving at the time the Erroneously Awarded Compensation is required to be repaid to the Company), (iv) while the Company has a class of securities listed on a national securities exchange or a national securities association, and (v) during the applicable Clawback Period (as defined below).

8.3   "*Clawback Period*" means, with respect to any Accounting Restatement, the three completed fiscal years of the Company immediately preceding the Restatement Date (as defined below), and if the Company changes its fiscal year, any transition period of less than nine months within or immediately following those three completed fiscal years.

8.4   "*Erroneously Awarded Compensation*" means, with respect to each Executive Officer in connection with an Accounting Restatement, the amount of Clawback Eligible Incentive Compensation that exceeds the amount of Incentive-based Compensation that otherwise would have been Received had it been determined based on the restated amounts, computed without regard to any taxes paid.

8.5   "*Executive Officer*" means each individual who is currently or was previously designated as an "officer" of the Company as defined in Rule 16a-1(f) under the Exchange Act. For the avoidance of doubt, the identification of an executive officer for purposes of this Policy shall include each executive officer who is or was identified pursuant to Item 401(b) of Regulation S-K or Item 6.A of Form 20-F, as applicable, as well as the principal financial officer and principal accounting officer (or, if there is no principal accounting officer, the controller).

8.6   "*Financial Reporting Measures*" means measures that are determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and all other measures that are derived wholly or in part from such measures. Stock price and total shareholder return (and any measures that are derived wholly or in part from stock price or total shareholder return) shall, for purposes of this Policy, be considered Financial Reporting Measures. For the avoidance of doubt, a Financial Reporting Measure need not be presented in the Company's financial statements or included in a filing with the SEC.

8.7   "*Incentive-based Compensation*" means any compensation that is granted, earned or vested based wholly or in part upon the attainment of a Financial Reporting Measure.

8.8   "*Received*" means, with respect to any Incentive-based Compensation, actual or deemed receipt, and Incentive-based Compensation shall be deemed received in the Company's fiscal period during which the Financial Reporting Measure specified in the Incentive-based Compensation award is attained, even if the payment or grant of the Incentive-based Compensation to the Executive Officer occurs after the end of that period.

8.9    "***Restatement Date***" means the earlier to occur of (i) the date the Board, a committee of the Board or the officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare an Accounting Restatement, or (ii) the date a court, regulator or other legally authorized body directs the Company to prepare an Accounting Restatement.

9.    This policy is effective as of December 1, 2023.

**Exhibit A**

**ATTESTATION AND ACKNOWLEDGEMENT OF POLICY FOR THE RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

By my signature below, I acknowledge and agree that:

I have received and read the attached Policy for the Recovery of Erroneously Awarded Compensation (this "***Policy***"), and I agree that the Policy supersedes any clawback provision set forth in my existing employment agreement with the Company.

I hereby agree to abide by all of the terms of this Policy both during and after my employment with the Company, including, without limitation, by promptly repaying or returning any Erroneously Awarded Compensation to the Company as determined in accordance with this Policy.

Signature: __

Printed Name: __

Date: __