# EXHIBIT W

On behalf of: Claimants  
Witness: Raphael Sequerra Zagury  
No. of Witness Statement: First  
Exhibit: ZL2  
Date: 17 February 2025

**Claim No. CL-2025-000016**

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

COMMERCIAL COURT (KBD)

B E T W E E N:

**(1) TETHER INVESTMENTS LTD.**
**(2) 2040 ENERGY LTD**

<u>Claimants</u>

and

**ELECTRIC SOLIDUS, INC.**

<u>Defendant</u>

---

**FIRST WITNESS STATEMENT OF RAPHAEL SEQUERRA ZAGURY**

---

I, **Raphael Sequerra Zagury**, WILL SAY as follows:

1. I was CIO of the Defendant (or "**Swan**") and head of the Bitcoin mining team playing a key role in structuring and overseeing the mining operations within the 2040 joint venture arrangement between the Defendant and the First Claimant (the "**Second Claimant**" or "**Joint Venture**") (the "**Mining Team**").

2. I have extensive experience in leadership, finance, and entrepreneurship. Prior to my role at Swan, I founded and served as CFO of OpenCo, where I led capital raise rounds,

        including a Series D backed by SoftBank, IFC, and LTS Investments. I also founded One Partners, a boutique investment banking firm specializing in capital structuring and strategic advisory. Before that, I held senior positions at Deutsche Bank and Merrill Lynch (Managing Director) and at Goldman Sachs (Vice President), where I focused on structured finance, risk management, and capital markets.

3. I hold an MBA from Yale University and a Bachelor's degree in Economics from IBMEC (Brazilian Capital Markets Institute). Additionally, I have passed all three levels of the Chartered Financial Analyst (CFA) exam and successfully completed NASD Series 7, 9, 24, and 66 examinations while working on Wall Street. My career has been defined by a rigorous approach to financial analysis, investment strategy, and corporate governance.

4. My deep background in finance, investment banking, and risk management led me to take a strong interest in Bitcoin's role in global finance. Recognizing Bitcoin as a transformative asset class, I transitioned from traditional finance to the Bitcoin space. This led me to join Swan Bitcoin, where I aimed to contribute my expertise to fostering Bitcoin adoption, refining capital strategies, and ensuring sound financial management.

5. Insofar as the facts and matters in this witness statement are within my own direct knowledge, they are true to the best of my recollection and belief. Insofar as such facts and matters are not within my direct knowledge, they are true to the best of my information and belief, and I have stated the sources of such information in each case. Nothing in this witness statement is intended to be, or should be treated as, a waiver of any privilege belonging to the Claimants, or any other relevant party.

6. The exhibit marked "**RZ1**" to this statement is a paginated bundle of documents to which I refer in this statement. Except where stated otherwise, references to page numbers in this statement are to page numbers of **Exhibit RZ1**.

7. I make this witness statement in support of the Claimants' Business Assets Application (as defined at paragraph 4 of the Order of HHJ Pelling KC dated 13 January 2025), and in response to the First Affidavit of Cory Klippsten ("**Cory**") ("**Klippsten 1**") and the First Affidavit of Leo Kitchen ("**Kitchen 1**"), filed by the Defendant on 10 February 2025.

8. To assist the Court, this witness statement is structured as follows:

    (a) In **Section I: Introduction**, I set out my concerns about Klippsten 1;

    (b) In **Section II: Swan's Financial Position**, I address the Defendant's true financial position and the implications thereof;

    (c) In **Section III: Swan's Business**, I speak about the Defendant's business and services, and the timeline and nature of its foray into crypto-mining;

    (d) In **Section IV: Swan Managed Mining and 2140**, I describe the circumstances and nature of Swan Managed Mining and 2140;

    (e) In **Section V: Business Assets**, I speak about the circumstances and development of BNOC.

## I. INTRODUCTION

9. Many of the depictions in Klippsten 1 – of how the Defendant operated, its financial position, its relationship to the Joint Venture, and the development of BNOC – are inconsistent with the facts as I witnessed them. During my time as CIO at the Defendant, and within my role in the Joint Venture, I became increasingly concerned about Cory's mismanagement of Defendant, particularly in relation to financial controls, liquidity management, and capital raising. There was a clear discrepancy between the assurances and promises that Cory provided regarding Swan's financial health and the reality of its cash flow challenges and mismanagement. I detail below some of the key mischaracterisations in Klippsten 1.

## II. SWAN'S FINANCIAL POSITION

10. In summer 2024, I became aware of the extent of the Defendant's financial distress. I saw a spreadsheet of the Defendant's financials which showed what the Defendant had in terms of (high) expenses, as compared to its (limited) revenue and liquid assets positions, and indicated that the Defendant likely had only weeks of funds to operate the business, before it would reach a point of insolvency unless significant cuts were made. I strongly voiced my concerns and pointed this out to Cory and others in a Zoom call and in messages in Swan's internal messaging system. Cory tried to dismiss my alarm, and a heated conversation ensued. But I was genuinely concerned that the Defendant would not be able

to make payroll for all its staff. When, finally, Cory started to deal with the severity of situation, he decided to start cutting staff, and a week or so later, he publicly announced the layoffs "*across many functions*" (Klippsten 1, paragraph 88).

11. Cory suggests that the main reason for these cuts was "*Tether…continuing to stall in formalizing the 2140 structure*" or its "*reneging of the 2140 agreement*" (see paragraphs 88-89), *i.e.* that Cory had to make cuts because he had no visibility on whether he would get capital from the First Claimant, or that it was required to provide capital to Swan. This is a mischaracterization of the facts. First, as it relates to the Second Claimant, the shareholders' agreement dated 28 July 2023 (the "**SHA**") provided for no cashflow to the Defendant until the First Claimant's investment in the Joint Venture (over $400 million as of June 2024) had been fully repaid **[ZL1/28-56]**. That had always been the plan; it was as negotiated and agreed – the Defendant was not entitled to cashflow until the repayment date. Also, the Defendant was reimbursed for some of its Second Claimant-related expenses, from the funds invested by the First Claimant. Second, the 2140 structure was still under negotiation and was never intended as an immediate solution to Swan's short-term liquidity issues. Cory's attempt to shift blame onto the 2140 negotiations ignores the fact that Swan's financial troubles were the result of his own mismanagement — namely, reckless hiring and uncontrolled spending without secured funding. The reality is that since 2023, Cory had struggled to secure any institutional investment outside of the First Claimant and its parent/group companies ("**Tether**"). Cory had no viable path to external capital yet continued to expand operations without ensuring sufficient financial runway. The layoffs were not caused by delays in finalizing 2140—they were the inevitable result of irresponsible cashflow management, which left Swan without the necessary capital to sustain its business. Given this, I find Cory's claim that Swan was financially positioned to launch/sustain/grow any independent mining activities outside of the Joint Venture to be highly doubtful.

### III. SWAN'S BUSINESS

12. When I joined in 2023, the Defendant originally did two things: (1) it provided media and educational content on Bitcoin (mainly using YouTube, podcasts, and Twitter), and (2) it

acted as an exchange, such that customers would buy Bitcoin on its platform. When customers bought Bitcoin, the way the Defendant structured their business is that they would retain a qualified custodian to hold Bitcoin on trust for its clients. The first such custodian was Prime Trust, which went bankrupt around August 2023,[1] after which the Defendant migrated out the customers to Fortress Trust, another qualified custodian.[2]

13. Eventually, the Defendant considered mining as a potential business segment, though this lay outside the Defendant's two core functions and financial abilities. Cory implies that there was significant prior planning for mining (see "*in early 2023 Swan conducted an in-depth analysis of the industry landscape*" and "*[a]fter extensive research into the market and would-be competitors...*" at Klippsten 1, paragraphs 24-25), but this is simply not true. It is telling that he has not produced – nor, I believe, would be able to produce – any real evidence of such planning around crypto mining in early 2023. As I recall, there was no concrete business plan, feasibility study, or internal strategic framework beyond surface-level discussions. As far as I was aware of, Swan had no independent mining business to speak of.

14. Before forming the Joint Venture, the DAME investment opportunity in Tasmania was identified as a promising, potentially profitable company, and I substantially wrote the DAME Investment Memo for that purpose **[CK2/14-18]**. As that Investment Memo sets out, this was always intended to be a passive investment into "*DAME Technologies Ltd., an Australian-based company*" and "*__their__ mining operations*" (emphasis added) **[CK2/14]**. Cory inaccurately frames DAME as a mining "site" that Swan was expanding or managing, when in reality, Swan had no direct operational involvement in any mining site at that time. The Joint Venture was originally structured to provide funding to DAME, not to own, operate, or expand any mining facilities. It was not the case, as Cory tries to frame it in Klippsten 1, that he or anyone employed at/engaged by the Defendant "*oversaw the mining*

---

[1] See **[RZ1/3-6]**

[2] Fortress Trust also went on to face its share of troubles; it was the subject to a serious hack/phishing attack, which led to a theft of around $15 million of customers' cryptocurrency and thereby endangered the Defendant's customers' assets **([RZ1/7-14])**. This, and the Prime Trust bankruptcy, revealed a concerning lack of proper due diligence on the Defendant's part.

5

*team*" at the Tasmanian site (see paragraph 67). The Defendant was never actually involved in the mining process itself, and the intention was initially for the Joint Venture to invest passively into a structure within which DAME itself would conduct mining activities.

15. Swan Institutional, which Cory describes in Klippsten 1 as "*a new Institutional division in January 2023, with a primary focus on developing financial services for capital providers and operators in Bitcoin mining*" (paragraph 19), was an initiative that was announced but never materialized into a functioning business. While Cory did hire employees and attempt to pitch the concept, there was never any meaningful committed capital or operational fund management. Indeed, when Cory attempted to pitch the concept, including to Tether, these efforts failed to generate financial backing. This reflected Cory's wider tendency to name and 'launch' concepts, but without their being backed up by external capital or genuine commitments, and operation teams ready to execute. Thus the Defendant 'launched'[3] Swan Institutional, improperly advertising the First Claimant's mining capital (*i.e.* capital intended for the Joint Venture),[4] made hires, and tried pitching the concept to the First Claimant, who declined. There was therefore no substantive equity, credit, or hedge fund business to speak of. Additionally, at Swan's public announcement, the stated "$125M annualized revenue" was derived entirely from the top-line revenue of the Joint Venture before repayments to Tether. This figure did not represent independent revenue from Swan Institutional.

**IV.   SWAN MANAGED MINING AND 2140**

16. From my experience of working closely with Cory, I know that he would (deliberately) oscillate between different terms – alternating variously between "Swan Mining", "Swan Managed Mining", and "2040" – for marketing purposes. This appeared to be Cory's deliberate strategy to create the illusion of an independent Swan mining operation, despite

---

[3]   See **[RZ1/15-28]**

[4]   This is as evidenced by **[RZ1/19]**, in which at the 4:54-5:11 mark Cory said that "…*we have Swan institutional which does big deals in the nine figures uh with institutions and Miners and these are credit and debt deals uh* **_we will have raised and deployed a little over 400 million through that unit just in 2023_** *by the end of the year…*" (emphasis added). USD 400 million (or just north thereof) is precisely the amount that the First Claimant loaned to the Defendant in order to fund the Joint Venture.

the fact that Swan never had a standalone mining business. In Klippsten 1, Cory suggests that "Swan Managed Mining" was a separate entity (see paragraph 84). But, this is incorrect. "Swan Managed Mining" was merely a branding exercise—it was never incorporated as a legal entity, never had any funding, and did not have independent operations. He would use different terms at different times and in different places; none of these was reflective of real capital commitments.[5]

17. As regards the conception of 2140 – the key issue driving it was the Defendant's need for funds, and the lack of cashflow (by design, as I describe at paragraph 11 above) under the SHA. Cory pushed for 2140, and the structuring of cashflow that 2140 would enable was ultimately to benefit the Defendant, albeit not in the short term. The picture that Cory paints of the apparent motivations behind 2140 (*i.e.* that it was about "*the fact that Swan had proven its ability to effectively scale-up and succeed in operating a large Bitcoin mining operation*" – see Klippsten 1, paragraph 80) are untrue and unrealistic. When financial modelling for 2140 started, it was designed only for new opportunities, so it would grow gradually in terms of revenue – eventually, it would start seeing opportunities and cash flow, but this would take time, likely many months, due diligence and capital investments, and would not occur overnight.

## V. BUSINESS ASSETS

18. One of the tools we developed for the Second Claimant's mining business was BNOC. In paragraph 77 of Klippsten 1, Cory makes a series of claims about the creation of BNOC which entirely mischaracterize the development of this platform. He states that it was not developed by me and that in fact he himself "*directed significant development of BNOC*" (see paragraph 77.3). He further suggests that BNOC was a proprietary system into which the Defendant invested extensive resources and employees and that it was designed as a

---

[5] See **[RZ1/20-22]** - this article, which includes quotes provided by me and by Cory, provides a description for "Swan Mining" that is an exact match for the Joint Venture. It notes that Swan Mining "*[b]eg[an] operations in Summer 2023*", and that "*[t]he funding model for Swan's mining business uses no debt, and its entities are legally segregated from the rest of Swan's business*" (indeed, these were legally structured under the Joint Venture). Further, it quotes me as saying: "*We bring financial expertise and operational excellence, while our investors provide equity capital to our mining unit in exchange for priority on initial payouts and continued shared upside*" – this captures the Joint Venture setup.

7

19.     core component of the Defendant's own business (see paragraphs 77.1–77.3). The issue of BNOC's ownership was never formally discussed in any level of detail because it was never seen as a proprietary technology—it was simply a functional dashboard built to support mining operations.

19. In fact, the origins of BNOC lay in a simple Google Sheets spreadsheet that I created and eventually shared with the Claimant, so that we could track the ASICs which the Second Claimant was acquiring and selling. Soon afterwards, the Second Claimant expanded its activities and, rather than just hold the ASICs, the Second Claimant started deploying the ASICs. At this point, I updated the spreadsheet so that it would display real-time updates about how these machines were being used, with static information on where they were and real time data on how they were hashing. All the real time data coming from mining pool APIs, not any software developed by the Defendant. While BNOC evolved beyond a spreadsheet, it remained a tool designed for the Second Claimant's operational transparency rather than a proprietary technology developed in-house by Swan.

20. To develop the BNOC dashboard, I cloned Warden, an open-source Python-based platform which I had originally created in 2019, well before my time at Swan. Warden is published under an MIT License.[6] When cloned, and later developed into BNOC, the same MIT or similarly permissive open-source licenses were carried forward. The BNOC repository hosted one of these licenses for a significant period – potentially to this date. This clone was then modified into a dashboard that would have the features I wanted, such that we were able to track the Second Claimant's mining activities. This was how BNOC was born.

21. The messages that Cory cites at paragraph 77.6 of Klippsten 1 reflect internal discussions exploring and speculating on possibilities for BNOC's "*long-term*" and *"potential"* future, not an established company position or ownership structure (see [**CK2/244-245**]). While there were internal discussions about the potential commercial applications of BNOC, at no point was a decision made to transition BNOC into a proprietary product of the

---

[6]   The MIT License is a permissive open-source license that allows free use, modification, and distribution of software with minimal restrictions, requiring only attribution to the original author. Warden's MIT license can be seen here: https://github.com/pxsocs/warden/blob/master/LICENSE [**RZ1/23-24**]

Defendant's. At the time of these discussions, BNOC remained an operational tool serving <u>only</u> the Joint Venture's mining operations.

22. At paragraph 78 of Klippsten 1, Cory cites statements I made, but draws the wrong conclusion from these. When I described BNOC as "*[b]est in class*", I was making a subjective statement about its quality and usability, not a declaration of proprietary ownership **[CK2/246]**. In the Bitcoin mining industry, various mining dashboards and analytics tools exist, and calling something "best in class" simply does not equate to asserting exclusive intellectual property rights over it. Additionally, I note that my message about needing "*to be super careful on what we share externally*" (**[CK2/246]**) was primarily intended to caution everyone at the Defendant to keep things confidential in line with the SHA (and was also directed to Cory's habit of frequently oversharing about the Second Claimant's internal operations, *e.g.* on Twitter where multiple screenshots of the Second Claimant's hashrate and BNOC were shared – see **[RZ1/25-26]**). This was a broader issue, as Cory had previously shared the Second Claimant's mining details online without considering the consequences to the Second Claimant's mining activities. The intent of my message, then, was to manage how information relating to the Joint Venture at large was publicly communicated, not to assert that BNOC was a proprietary asset of the Defendant.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: *[signature]*

**Raphael Sequerra Zagury**

Date: 17 February 2025