# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                          Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Present: The Honorable:      Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: (IN CHAMBERS) Order DENYING IN SUBSTANTIAL PART Individual Defendants' motion to compel arbitration or, in the alternative, motion to dismiss for failure to state a claim (Dkt. 122); DENYING IN SUBSTANTIAL PART Proton's motion to dismiss for lack of personal jurisdiction or, in the alternative, motion to dismiss for failure to state a claim (Dkt. 121); and DENYING Individual Defendants' motion to stay (Dkt. 124).**

   Before the Court are three motions:  (1) motion to dismiss for lack of personal jurisdiction or, in the alternative, motion to dismiss for failure to state a claim filed by specially appearing Defendant Proton Management Ltd. ("Proton"); (2) motion to compel arbitration or, in the alternative, motion to dismiss for failure to state a claim filed by Defendants Thomas Patrick Furlong ("Furlong"), Ilios Corp., Michael Alexander Holmes ("Holmes"), Rafael Dias Monteleone ("Monteleone"), Santhiran Naidoo ("Naidoo"), Enrique Romualdez ("Romualdez"), and Lucas Vasconcelos ("Vasconcelos") (collectively, "Individual Defendants"); and (3) motion to stay case filed by the Individual Defendants.  Dkts. # 121 ("*MTD*"); 122 ("*MTC*"); 124 ("*MTS*").  Proton filed a joinder of Individual Defendants' motion to stay.  Dkt. # 126.  Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin's ("Swan") filed an opposition to each motion.  Dkts. # 130 ("*MTD Opp.*"); 134 ("*MTS Opp.*"); 137 ("*MTC Opp.*").  Proton and the Individual Defendants filed replies to their respective motions.  Dkts. # 149 ("*MTD Reply*"); 150 ("*MTC Reply*"); 153 ("*MTS Reply*").  Having considered the papers and oral argument on March 28, 2025, the Court **DENIES IN SUBSTANTIAL PART** Individual Defendants' motion to compel arbitration or, in the alternative, motion to dismiss for failure to state a claim, **DENIES IN SUBSTANTIAL PART** Proton's motion to dismiss for lack of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                                              Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

personal jurisdiction or, in the alternative, motion to dismiss for failure to state a claim, and **DENIES** Individual Defendants' motion to stay.

I.        Background

        A.        Factual Background

        This action stems from an alleged coordinated effort by Proton and the Individual Defendants—former consultants of Swan—to steal Swan's entire Bitcoin mining business.  Dkt. # 101 ("*FAC*"), ¶ 1.  The Court summarizes the facts below as gleaned from Swan's first amended complaint.  *See generally id.*

                i.        *Swan and its Bitcoin Mining Business*

        Cory Klippsten ("Klippsten") founded Electric Solidus, LLC—what is now Electric Solidus, Inc., doing business as Swan—in June 2019, with Yan Pritzker joining the company later that year.  *Id.* ¶ 46.  Swan, a Delaware corporation headquartered in California, is an industry-leading Bitcoin financial services company.  *Id.* ¶ 17.  Prior to the alleged scheme, Swan was also a leader in Bitcoin mining.  *Id.*

        On June 2, 2023, Klippsten and Giancarlo Devasini ("Devasini") of Tether agreed that Tether, a cryptocurrency company, would provide funding for Swan to expand operations at a Bitcoin mining site in Tasmania, Australia, with Swan managing the mining investment.  *Id.* ¶ 55.  Swan and Tether, through Tether's subsidiary Zettahash Inc., entered a joint venture (along with another third-party individual) known as 2040 Energy, which would govern the arrangement at that site, as memorialized in a Shareholders Agreement ("SHA") dated July 28, 2023.  *Id.*

        After analyzing and researching potential locations to deploy mining machines—including assessing what types of and how many machines to deploy where, and modeling deployment scenarios to maximize electricity gains—Swan began contracting with host sites.  *Id.* ¶ 56.  Swan started hiring and building out its mining team, which would manage the day-to-day operations at mining sites.  *Id.* ¶ 57.  Swan's then-Chief Investment Officer, Raphael Zagury ("Zagury"), was at the forefront of the operation.  *Id.* ¶ 58.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                           Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

In July 2023, Zagury started managing the Tasmanian mining operations for Swan, and Swan's mining team grew from approximately five to twelve dedicated employees and independent contractors—which included the Individual Defendants. *Id.* ¶ 59. Each of the Individual Defendants contracted with Swan to provide consulting services, pursuant to substantially similar consulting agreements (the "Consulting Agreements"). *Id.* ¶ 89. The Individual Defendants agreed to act as follows: Defendant Furlong as Investment Director for Swan; Defendant Holmes (who entered into a consulting agreement on behalf of Defendant Ilios Corp., the entity through which Defendant Holmes contracted to provide his consulting services) as Head of Business Development for Swan Mining; Defendant Monteleone as an Investment Analyst for Swan; Defendant Naidoo as Investment Director for Swan; Defendant Romualdez as a Junior Investment Analyst for Swan; and Defendant Vasconcelos as a Software Engineer for Swan. *Id.* ¶¶ 90–95. The Individual Defendants also agreed to a non-solicitation obligation. *See FAC*, Exs. A–F § 10 ("*Consulting Agreements*").

Each of the Individual Defendants agreed that any inventions or trade secrets that they purportedly developed while working for Swan would be Swan's property:

> **Assignment of Inventions.** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement, including Services provided to the Company before the date hereof, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "Inventions"), are the sole property of the Company.

*Id.* ¶ 96. The Individual Defendants also agreed to provide prior written notice if—during their consultancies—they incorporated any inventions, trade secrets, or other proprietary information or intellectual property owned by the consultant into their work for Swan. *Id.* ¶ 97. None ever did so. *Id.*

Swan developed and continuously refined a combination of proprietary techniques and operational trade secrets, which includes four categories of trade secrets. First, Swan developed, utilized, and refined methods to rapidly investigate and identify potential

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                   Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

mining sites. *Id.* ¶¶ 61–63. Second, Swan developed—through extensive testing—proprietary hash rate optimization techniques for Bitcoin mining. *Id.* ¶¶ 64–68. Third, Swan developed proprietary financial modeling, data analytics, and financial monitoring tools. *Id.* ¶¶ 69–72. Fourth, Swan expended significant time and money developing and writing the source code for its Bitcoin Network Operating Center ("BNOC"), a complex proprietary platform for managing mining data and analytics. *Id.* ¶¶ 73–79. All these techniques were allegedly developed by Swan employees and consultants for Swan, while those individuals were employed or engaged by Swan, within the scope of their employment or consultancy, and pursuant to contracts that expressly assigned ownership of those techniques and IP to Swan. *Id.* ¶¶ 80, 96–98.

Swan uses technological, legal, and other safeguards to protect the secrecy of its claimed trade secrets and proprietary information. *Id.* ¶¶ 99–108. For instance, the Individual Defendants specifically agreed in their consulting agreements to:

> During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use of disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purposes whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) subject to Consultant's right to engage in Protected Activity (as defined below [i.e., filing a charge with the Government]), disclose the Confidential Information to any third party without the prior written consent of an authorized representative of the Company, except that Consultant may disclose Confidential Information to the extent compelled by applicable law; provided however, prior to such disclosure, Consultant shall provide prior written notice to [the] Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section [] shall continue after the termination of this Agreement.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title       Electric Solidus, Inc. v. Proton Management LTD. *et al.*

*Id.* ¶ 100.  Through a combination of these trade secrets and proprietary techniques, Swan grew its Bitcoin mining operations at a "breakneck and unprecedented speed and scale." *Id.* ¶¶ 3, 85–87.

As part of their employment, the Co-Conspirators[1] signed "Confidentiality and Proprietary Information and Inventions Agreements" with Swan ("Employee Confidentiality Agreements").  *Id.* ¶ 234.  None of the Co-Conspirators lived or worked in California.  *Id.* ¶ 235.  The Co-Conspirators agreed that "at any and all times during my service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company and in furtherance of the Company business."  *Id.* ¶ 236.  Those acts of competition included "performing any services for a Competing Business;" "hiring, recruiting or soliciting any employee of the company;" and "disclosing, misappropriating, or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business."  *Id*. Additionally, the Co-Conspirators agreed that "for a period of twelve months following termination of my Service, I will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business."  *Id.* ¶ 237.  They further agreed that they would "not at any time, other than in the performance of [their] Service for the Company or any affiliate, both during and after [their] Service with the Company, communicate or disclose to any person or entity, or use for my benefit, or for the benefit of any other person or entity, either directly or indirectly, any Trade Secrets and/or Proprietary Information."  *Id.* ¶ 238.

---

[1]  Defendants' conspirators constituted nearly all of Swan's mining personnel, including Zagury (Swan's then-Chief Investment Officer), Bill Belitsky ("Belitsky") (Swan's then-General Counsel), Brett Hiley ("Hiley") (Swan's then-Vice President of Institutional Operations & Research), Tyler Effertz ("Effertz") (Swan's then-Financial Controller), Kartheek Sola  ("Sola") (Swan's then-Technical Researcher), and Aleksander Dozic ("Dozic") (Swan's then-Accountant) (collectively, the "Co-Conspirators").  *Id.* ¶ 117 n.11.  According to Swan, those conspirators are not defendants in this action because their agreements with Swan—unlike the Individual Defendants' Consulting Agreements—provide for a different dispute resolution procedure.  *Id.*  Swan is currently pursuing claims against those individuals consistent with their agreements.  *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                              Date: April 9, 2025

Title       Electric Solidus, Inc. v. Proton Management LTD. *et al.*

> ii.    *Defendants' Plots to Steal Swans' Business, Confidential and
>        Proprietary Information, and Trade Secrets*

The Individual Defendants and Co-Conspirators began their alleged scheme to
steal Swan's bitcoin mining business in late June 2024. *Id.* ¶¶ 121–25. Their
overarching plan is outlined in email notes taken by Zagury. *Id.* ¶ 8. The plan was
executed by: (a) downloading all of Swan's confidential and proprietary business
information and trade secrets necessary to operate Swan's Bitcoin mining business,
including BNOC source code and other material they would need to operate a competing
mining business; (b) creating a new company, Proton, which Swan's then-CIO Zagury
would operate as CEO with Swan's then-Investment Director Defendant Naidoo as CIO,
and which would employ other Defendants and Co-Conspirators; and (c) soliciting "legal
cover" from Tether to claim that Swan— following their departure—could no longer
manage mining for 2040 Energy, push Swan out of its joint venture with Tether, and
insert Defendant Proton as Swan's replacement. *Id.* ¶ 118. While they planned the
details, Defendant Holmes, Defendant Naidoo, Zagury, and Zach Lyons (a founder and
principal of Marlin Capital Partners, Tether's investment manager) simultaneously began
reaching out to other Swan consultants and employees to recruit them into the scheme.
*Id.* ¶¶ 88, 126. The final steps of the plan centered around Defendant Holmes, a
California resident, who would kick off the mass resignation and then Co-Conspirators
would flock to Proton after Defendant Holmes invited them to join Proton with Swan's
trade secrets. *Id.* ¶ 127.

On August 2, 2024, Proton, through Defendant Naidoo, filed a Certification of
Incorporation in the British Virgin Islands.[2] *Id.* ¶ 134. Proton's senior management, in
the lead-up to and at the time of the conspirators' coordinated theft of Swan's
information, consisted almost (if not) entirely of some combination of Defendant
Holmes, Defendant Naidoo, Zagury, and potentially other Co-Conspirators. *Id.* ¶¶ 134–
52. The Individual Defendants and Co-Conspirators, all on behalf of Proton, collectively

---

[2] The FAC alleges that Defendant Holmes caused this document to be filed from
California. *FAC* ¶ 134. Defendant Naidoo, however, has declared that SHRM Trustees
(BVI) Limited ("SHRM") incorporated Proton after he gathered, while outside of
California, the documentation necessary for SHRM to appoint him as the first director of
Proton. Dkt. # 121-2 ("*Naidoo Decl.*"), ¶ 2. Naidoo contends that any allegations that
Holmes played a part in Proton's incorporation are false. *Id.* Swan has since cited to
Defendant Naidoo's declaration. *MTD Opp.* 4:9–10.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                          Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

downloaded thousands of files in their last weeks with Swan—right up until hours before
they left—for the sole purpose of using the information for Proton's benefit.  *Id.*
¶¶ 148, 152.

After spending the morning of August 8, 2024 on conference calls to perfect the
final details, the Individual Defendants unveiled to Swan their plan of mass resignation.
*Id.* ¶¶ 141–44, 153–56.  Shortly after his resignation, Defendant Holmes sent messages to
Defendant Furlong, Defendant Monteleone, Defendant Romualdez, Defendant
Vasconcelos, Belitsky, Berg, Dozic, Effertz, Hiley, and Sola stating that "Arrangements
are under way" for a new entity and "I don't expect us to skip a beat." *Id.* ¶ 155.  The
message further stated that Zagury and Defendant Naidoo would be joining Defendant
Holmes at the new entity.  *Id.*  Immediately after their departures, Defendants Furlong,
Romualdez, Monteleone, and Vasconcelos, and other co-conspirators, formally accepted
positions to work with Defendants Holmes and Naidoo at Proton. *Id.* ¶¶ 155, 157, 162,
173.  Based on Swan's current understanding and belief, each of the thirteen consultants
and employees who engaged in the coordinated resignations now work for Proton.  *Id.*
¶ 157.

On August 9, 2024, Tether's counsel claimed that Swan breached the SHA by
failing to provide assurances that Swan would be able to maintain the personnel
necessary for Swan to procure the business of 2040 Energy.  *Id.* ¶ 159.  Swan claims that
Tether's assertion was a sham, and no assurances would have been necessary had there
not been a coordinated conspiracy that was executed in full less than a day prior.  *Id.*  On
August 12, 2024, Tether alleged an additional breach by Swan based on the resignations
of its employees that oversaw 2040 Energy, and further informed Swan that Tether had
engaged Proton to manage the business of 2040 Energy.  *Id.* ¶¶ 161–62.

     B.    <u>Procedural Background</u>

        i.    *The Instant Lawsuit*

On September 25, 2024, Swan filed its original complaint against Proton and the
Individual Defendants.  Dkt. # 1.  At the same time, Swan filed an application for a
temporary restraining order ("TRO") seeking to enjoin Proton and the Individual
Defendants from, among other things, disclosing or using any Swan proprietary and
confidential material or trade secrets.  Dkt. # 8.  Notably, in their opposition to the TRO,
Proton and the Individual Defendants represented that, to the extent they were using

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                    Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Swan's proprietary information and trade secrets, they were using that information "solely for the benefit of 2040 Energy . . . and no others."  Dkt. # 29-1, 4:26–28.  The Court denied Swan's request for relief on October 4, 2024, but nonetheless set a briefing schedule for preliminary injunction for November 8, 2024.  Dkts. # 40, 41.  On October 18, 2024, Swan withdrew its request for preliminary injunction without prejudice to being refiled after additional discovery.  Dkt. # 55.

In the months since Proton and the Individual Defendants represented that they were using Swan's proprietary information and trade secrets "solely for the benefit of 2040 Energy . . . and no others," Swan has uncovered evidence that suggests Proton and the Individual Defendants have used Swan's proprietary information and trade secrets to further Bitcoin mining operations outside of 2040 Energy.  *FAC* ¶¶ 181–99.  Swan maintains that it has been, and continues to be, irreparably harmed by Proton's and the Individual Defendants' misconduct.  *Id.* ¶¶ 202–07.

On January 27, 2025, Swan filed its first amended complaint ("FAC").  *See generally id.*  Swan alleges the following causes of actions:  (1) Trade Secret Misappropriation under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. §§ 1836 *et seq.*) against Proton and the Individual Defendants; (2) Breach of Contract against the Individual Defendants; (3) Tortious Interference with Contractual Relations against Defendants Proton, Holmes, and Naidoo; (4) Aiding and Abetting Breach of Duty of Loyalty against Proton; (5) Unfair Competition (California Business & Professions Code § 17200) against Proton and the Individual Defendants; (6) Conversion against the Individual Defendants; and (7) Civil Conspiracy against Proton and the Individual Defendants.  *See id.*  On February 14, 2025, Swan served Proton and the Individual Defendants with four targeted requests for production and five targeted interrogatories, *see* Dkts. # 114-2, 114-3, but Swan's efforts have been frustrated by Proton and the Individual Defendants.  Swan moved to compel initial disclosures, which was granted.  Dkts. # 129, 156.

####        ii.        UK Proceeding

On January 14, 2025, Tether and 2040 Energy filed a lawsuit in the King's Bench Division of the High Court of Justice's Business and Property Courts of England and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Wales (the "UK Court") against Swan, alleging breaches of the SHA.[3]  *See generally*
Dkt. # 122.  That litigation involves the same joint venture entity—2040 Energy—Tether
and Swan.  *Id.*  Tether and 2040 Energy allege, among other things, that "Swan
wrongfully lays claim to the Business Assets in the hands of the [Individual Defendants]
and Proton in the California Proceedings" and that proprietary materials that Swan
identifies in the instant litigation are "owned by 2040 Energy."  *Id.* ¶¶ 89–90.  Tether and
2040 Energy also sought, among other things, an interim injunction to restrain Swan from
taking steps to assert ownership, as well as an anti-suit injunction to prevent the instant
case from proceeding in light of the false allegations relating to the purported intellectual
property at issue.  *Id.* ¶ 92.

        After a two-day hearing on February 25 and 26, 2025, that centered around
"ownership of the Business Assets" and the request for injunctive relief, the UK Court
declined to issue an anti-suit injunction or any sort of interim relief.  Dkt. # 134-4, 52:8–
16.  The UK Court has scheduled a six-day hearing in September 2025 to resolve the
issue of which entity owns the alleged business assets (i.e., the trade secrets and
confidential information at issue here).  *See* Dkt. # 134-2, ¶ 5.  There, ownership will be a
question about the construction of contract under the law of England and Wales.  Dkt.
# 134-3, 52:2–4.

II.     Motion to Compel Arbitration

        A.      Legal Standard

        The Federal Arbitration Act ("FAA") "governs arbitration agreements in contracts
evincing 'a transaction involving commerce.'"  *Zoller v. GCA Advisors, LLC*, 993 F.3d
1198, 1201 (9th Cir. 2021) (quoting 9 U.S.C. § 2).  It "declares 'a liberal federal policy
favoring arbitration' and provides that such agreements 'shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity for the revocation of any
contract.'"  *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)
and 9 U.S.C. § 2).

---

[3]  As part of the SHA, Swan and Tether agreed that "any dispute or claim (including non-
contractual disputes or claims) arising out of or in connection with it or its subject matter
or formation shall be governed by and construed in accordance with the law of England
and Wales."  Dkt. # 133-1 ("*SHA*"), ¶ 30.1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*


The FAA allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  A district court's role is "limited to 'determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'"  *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "If the answer to both questions is yes, then the FAA requires a court 'to enforce the arbitration agreement in accordance with its terms.'"  *Id.* (quoting *Chiron Corp.*, 207 F.3d at 1130).  "In construing an arbitration agreement, courts must 'apply ordinary state-law principles that govern the formation of contracts.'"  *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  "[A]mbiguities about the scope of an arbitration agreement must be resolved in favor of arbitration."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418 (2019); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

B.    Analysis

Here, the Individual Defendants and Swan agreed to arbitrate "any and all controversies, claims, or disputes with [Swan], arising out of, relating to, or resulting from consultant's consulting or other relationship with the company or the termination of consultant's or other relationship with the company, including any breach of this agreement, shall be subject to binding arbitration pursuant to California law."  *See Consulting Agreements* § 12(A).  The Consulting Agreements provide that "except as provided by this agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between consultant and the company."  *Id.* § 12(C).  The Consulting Agreements then provide that "the parties agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding intellectual property, confidential information or noninterference."  *Id.* § 12(D).

The Individual Defendants argue that (1) Swan's request for a preliminary injunction is really a disguised request for permanent injunctive relief, and (2) all merits

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                  Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

determinations and related proceedings should be compelled to arbitration and stayed.[4]
*MTC* 11:4–15:24.  Swan avers that (1) it only seeks preliminary injunctive relief to
maintain the status quo in aid of arbitration; and (2) the request does not raise any
question of arbitrability.  *MTC Opp.* 8:18–19:6.  The Court agrees with Swan in
substantial part.

  While Swan is required to arbitrate the final determinations on the merits of its
claims, Swan may seek preliminary injunctive relief pursuant to the Consulting
Agreements.  *See Consulting Agreements* § 12.  To obtain a preliminary injunction, Swan
must establish "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to
suffer irreparable harm in the absence of preliminary relief, (3) that the balance of
equities tips in [its] favor, and (4) that an injunction is in the public interest." *Toyo Tire
Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010)
(citing *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7 (2008)).  The Court's analysis
of Swan's likelihood of success on the merits would not render Swan as the "prevailing
party" or prevent arbitration from proceeding to conclusively adjudicate the claims.  *See
Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025).  Thus, Swan's claims (except conversion)
against the Individual Defendants and its preliminary injunctive request is properly
before this Court.

  In its opposition, Swan describes its request as preliminary relief to temporarily
enjoin the Individual Defendants, "pending the resolution of the claims, from (i) using or
disclosing Swan's trade secrets or other confidential information, other than for the sole

---

[4]  Individual Defendants initially argued that the Consulting Agreements are limited to
interim injunctive relief.  *MTC* 13:12–15:24.  In opposition, Swan contends that the
injunctive relief carveout permits Swan to seek preliminary and permanent relief.  *MTC
Opp.* 17:1–19:6.  On reply, Individual Defendants argue that, because there is no claim
for permanent injunctive relief against the Individual Defendants in this action, the Court
should refrain from deciding the issue to avoid an improper advisory opinion.  *MTC
Reply* 3:18–4:4.  The Court agrees with Individual Defendants' latter position and will
not address the issue of permanent injunctive relief as it is not properly before the Court.
*See Preiser v. Newkirk,* 422 U.S. 395, 401 (1975) (stating that the judgments of federal
courts "must resolve a real and substantial controversy admitting of specific relief
through a decree of a conclusive character, as distinguished from an opinion advising
what the law would be upon a hypothetical state of facts") (internal quotations and
citations omitted).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                              Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

benefit of 2040 Energy; (ii) seeking the return of the Individual Defendants' Swan-issued laptops (or, in the alternative, barring Defendants from seeking the return of laptops or information thereon from the custody of a third-party vendor); and (iii) soliciting Swan's employees in violation of the Individual Defendants' non-solicitation obligations, or inducing former Swan employees from breaching their own non-solicitation obligations." *MTC Opp.* 9:26–10:6.  The Court finds that Swan's request seeking return of the Swan-issued laptops requires a conclusive determination.  Despite now framing the relief as temporary "pending the resolution of the claims," the FAC explicitly seeks "an injunction requiring Defendants to immediately turn over to counsel for Swan all laptops and any other Swan-issued devices or hard drives in their possession." *FAC* 89:15–17.  While the Court could infer that possession of the laptops by Swan's counsel is only intended to last during the pendency of this action, the FAC does not detail such, and the Court will not delve into the question of arbitrability.  In contrast, the other relief sought by Swan explicitly calls for a "temporary injunction" against the Individual Defendants. *Id.* 89:2–90:18.  Therefore, the Court **GRANTS** the Individual Defendant's motion to compel as to Swan's conversion claim.

Despite the ruling to compel arbitration as to the conversion claim against the Individual Defendants, Swan is entitled to subsequently pursue interim relief pending arbitration—assuming the requirements for a preliminary injunction are satisfied.  *See iTalk Glob. Commc'ns, Inc. v. Hanya Star Ltd.*, No. 2:12-CV-03469-SVW (FFM), 2012 WL 12887555, at *4 (C.D. Cal. May 22, 2012) (deciding whether a TRO is appropriate as an interim measure pending arbitration); *Pilot Inc. v. Tyc Brother Indus. Co.*, No. 2:20-cv-02978-ODW (RAOx), 2020 WL 3833597, at *4 (C.D. Cal. Jul. 8, 2020) (rejecting the argument that the Court may not grant a TRO once arbitration is compelled); *see also Parcel Pending, Inc. v. Johanides*, No. SACV 21-01165-CJC (JDEx), 2021 WL 5168646, at *4 (C.D. Cal. Jul. 22, 2021) (granting plaintiff's TRO request seizing its trade secrets and devices in defendant's possession because "[w]ithout a preliminary injunction, [plaintiff] will continue to suffer harm because [d]efendant is in possession of two of its computers as well as a clone of its network that allows [d]efendant to access confidential information about its employees").

Moving on to the remaining claims, the Individual Defendants highlight the procedural posture of this case to argue that Swan's requested relief will not be in aid of arbitration.  *MTC* 14:20–15:24.  Specifically, the Individual Defendants point out that Swan has yet to file any demand for arbitration or renew its preliminary injunction request. *Id.* 14:20–15:1.  "Swan cannot credibly argue that, through its [F]AC, it is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                                        Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

seeking *any* interim injunctive relief *in aid of arbitration*, or any relief that preserves the status quo until an arbitrator can be selected and can consider and decide whether to issue interim relief." *Id.* 15:1–4 (emphasis in original).  The Court is not persuaded.

At oral argument, Swan clarified that their delay centered around pursuing targeted discovery to aid the Court to analyze a forthcoming renewed TRO, but Proton and the Individual Defendants have stonewalled that discovery.  *See, e.g.*, Dkts. # 114-2, 114-3.  Swan's targeted requests are narrowly aimed at discovery relevant to Swan's requests for a preliminary injunction, that is, whether the Individual Defendants are using Swan's trade secrets outside of 2040 Energy.  *See id.*  Swan has even moved to compel initial disclosures.  Dkt. # 129.  Interestingly, Individual Defendants advocate that the arbitration agreement limits this Court's ability to conduct discovery because such discovery is merits-based and therefore JAMS discovery rules govern.  *Reply* 9:11–27.  But the Consulting Agreements explicitly allow Swan to petition this Court for preliminary injunctive relief (again, an analysis based on the likelihood of success) and, by extension, allow for limited discovery in this forum.  *See Consulting Agreements* § 12(D); *Olson v. World Fin. Grp. Ins. Agency, LLC*, No. 24-CV-00481-EJD, 2024 WL 3498245, at *4 (N.D. Cal. Jul. 19, 2024) (finding lack of waiver to arbitrate where the arbitration agreement allowed for the parties to seek preliminary injunctive relief and defendant engaged in "limited litigation" for the sole purpose of obtaining injunctive relief); *see also MedImpact Healthcare Sys., Inc. v. IQVIA Holdings, Inc.*, No. 19cv1865-GPC-LL, 2019 WL 6310554, at *3 (S.D. Cal. Nov. 25, 2019) (time-limited discovery requests seeking information on defendant's use of trade secrets were permissible discovery "tailored for a determination of whether to grant or deny a preliminary injunction" and not a "premature merits-based request").  Swan's limited discovery requests do not evince a decision to take advantage of a judicial forum or seek a merits determination.  *See Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023) (holding that defendant did not waive its right to arbitrate where defendant "did not actively litigate the merits of the case for a prolonged period to take advantage of being in court" as it never sought a ruling on the merits, waffled about whether to arbitrate, and limited discovery requests as to non-arbitrable claims).

Put simply, the remaining claims against the Individual Defendants do not raise any question of arbitrability.  Swan has tailored its remaining claims to pray for pure interim relief against the Individual Defendants, in which the Court will only analyze the likelihood of success of those claims.  If Swan—at any point in this action—insists on conclusive adjudication or mandatory relief, the Court may revisit the issue of compelling

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                           Date: April 9, 2025

Title       Electric Solidus, Inc. v. Proton Management LTD. *et al.*

arbitration.  Accordingly, the Court **DENIES** the Individual Defendant's motion to compel as to the remaining claims.

III.    Motion to Dismiss

A.    Personal Jurisdiction Over Proton

Federal Rule of Civil Procedure ("Rule") 12(b)(2) provides that a defendant may move to dismiss an action for lack of personal jurisdiction.  In exercising personal jurisdiction over nonresident defendants, California courts need only consider federal due process requirements because California's jurisdictional statute is coextensive with federal law.  *See* Cal. Civ. Proc. Code § 410.10; *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004); *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1286 (9th Cir. 1977).  Due process requires that nonresident defendants possess "certain minimum contacts with [the forum state] such that [maintaining] the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted).  Depending on the extent of the defendant's contacts, the forum state may exercise either general or specific personal jurisdiction.  *See Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001).

"In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper."  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).  "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  *Id.* (citation omitted).  "The plaintiff cannot simply rest on the bare allegations of its complaint, but uncontroverted allegations in the complaint must be taken as true."  *Id.* (citation omitted).  "We may not assume the truth of allegations in a pleading which are contradicted by affidavit, . . . but we resolve factual disputes in the plaintiff's favor."  *Id.* (citation omitted).  If only one party has a supporting affidavit, "[a court's] task [is] relatively easy," because it "may not assume the truth of allegations in a pleading which are contradicted by affidavit."  *Data Disc, Inc.*, 557 F.2d at 1284.

The only issue before the Court under Rule 12(b)(2) is whether this Court has specific jurisdiction over Proton as general jurisdiction is not disputed.  For a court to exercise specific jurisdiction, the lawsuit must arise out of or relate to the defendant's contacts with the forum.  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017).  The Ninth Circuit "ha[s] established a three-part test for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                     Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

specific personal jurisdiction." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024).  The three parts are:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Id.* (citing *Schwarzenegger*, 374 F.3d at 802).  "The plaintiff has the burden of proving the first two prongs."  *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (citing *CollegeSource*, 653 F.3d at 1076).  "If the plaintiff meets that burden, 'the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068–69 (9th Cir. 2017) (quoting *Schwarzenegger*, 374 F.3d at 802).  The Court finds that it can exercise specific jurisdiction over Proton for the reasons below.

### *1.     Purposeful Direction*

"The first prong of the specific-jurisdiction inquiry encompasses two separate concepts: 'purposeful availment' and 'purposeful direction.'"  *Herbal Brands*, 72 F.4th at 1090 (citing *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020)).  While the concepts are distinct, "[a]t bottom, both purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.'" *Glob. Commodities*, 972 F.3d at 1107 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  The purposeful availment analysis is generally used in suits sounding in contract and for unintentional tort claims, while the purposeful direction analysis applies when a case is sound in intentional tort claims.  *Herbal Brands*, 72 F.4th at 1090–91.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Here, Swan brings claims against Proton for trade secret misappropriation under DTSA, tortious interference with contractual relations, aiding and abetting breach of duty of loyalty, unfair competition, and civil conspiracy.  *See generally FAC*.  Because each of those claims requires an intentional tortious or "tort-like" act, this Court employs the purposeful direction test.  *Herbal Brands*, 72 F.4th at 1090–91 (applying purposeful direction test to plaintiff's claims for trademark infringement, false advertising, and tortious interference with business relationships).

To determine whether a defendant "purposefully directed" its activities toward the forum, courts employ the "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984).  The *Calder* test asks "whether the defendant: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Will Co. v. Lee*, 47 F.4th 917, 922 (9th Cir. 2022).  The test "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum."  *Herbal Brands*, 72 F.4th at 1091 (quotation marks and citations omitted).

Proton argues that (1) it could not have purposefully directed activities at California because it did not control the Individual Defendants (or Co-Conspirators); and (2) Swan is the only link between Proton and California.  *MTD* 8:10–13:25.  Swan argues that the Individual Defendants and Co-Conspirators, as agents of Proton—regardless of whether the employees were agents of Proton at the time of theft—purposefully directed their activities toward California, and that Proton knew that Swan was based in California.  *MTD Opp.* 9:10–13:13.  The Court finds that purposeful direction exists here.

As alleged, Proton committed an intentional act through its agent-employees that executed the scheme to steal Swan's Bitcoin mining business—which included trade secret misappropriation, tortious interference with contractual relations, aiding and abetting the breach of duty of loyalty, unfair competition, and civil conspiracy.  *See generally FAC*.  Proton contends that the jurisdictional allegation based on Proton's relationship to the Individual Defendants and the Co-Conspirators after their alleged misconduct cannot satisfy an agency theory because they were working for Swan at the time, not Proton.  *MTD* 9:16–10:7.  That argument misses the mark.  The FAC does not allege in conclusory fashion that the Individual Defendants and Co-Conspirators were engaged in a scheme with Proton, but rather the FAC lays out the scheme in detail.  *See generally FAC.  Cf. Stemcell Techs. Can. Inc. v. StemExpress, LLC*, No. 21-CV-01594-VC, 2022 WL 509673, at *3 (N.D. Cal. Feb. 21, 2022) (allegations that individual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

defendant merely "planned, schemed and conspired" with corporate entity were
insufficient to establish jurisdiction). Critically, the FAC alleges that the Individual
Defendants acted in concert to create Proton, that Swan's documents were downloaded
after Proton was created and before the "mass resignation" on August 8, 2024, and that
Defendant Naidoo carried out his role in the scheme through August 8, 2024. *See
generally FAC*. Defendant Naidoo declared that he was appointed as the First Director of
Proton as of August 2, 2024, while working at Swan. *Naidoo Decl.* ¶ 2. During that
"same week," Defendant Naidoo allegedly downloaded a spreadsheet that housed all of
Swan's proprietary information related to its hash-rate optimization techniques. *FAC*
¶ 136. Defendant Naidoo was also involved in executing the scheme—misappropriation
of trade secrets and solicitation—while still at Swan. *Id.* ¶¶ 141–45. Defendant Holmes,
on the day of his resignation, wrote to Zagury and Defendant Naidoo that he was "in the
process of making arrangements to manage the fleet that we have built together and want
you both with me." *Id.* ¶ 154. Defendant Holmes then messaged other conspirators
stating that arrangements were underway and that he did not expect them to miss a beat,
further stating that Zagury and Defendant Naidoo would be joining Defendant Holmes at
a new entity—meanwhile Defendant Naidoo was already a director at that new entity,
Proton. *Id.* ¶ 155. *Cf. Clerkin v. MyLife.com, Inc.*, No. C 11-00527 CW, 2011 WL
3607496, at *4 (N.D. Cal. Aug. 16, 2011) (finding no personal jurisdiction where the
plaintiffs "ma[d]e only broad, general allegations against [the corporate officer]," and
provided no specific facts to suggest that the corporate officer "controlled or directly
participated in the alleged fraudulent scheme").

        The facts of this case are similar to *Fluke Elecs. Corp*. There, the court found
personal jurisdiction over the defendant company where the ex-employee allegedly
worked behind the scenes for defendant during his employment with plaintiff. *Fluke
Elecs. Corp. v. CorDEX Instruments, Inc.*, No. C12-2082JLR, 2013 WL 566949, at *2,
*4 (W.D. Wash. Feb. 13, 2013). The facts are also similar to *Sojitz Corp*. There, the
court found an intentional act where plaintiff alleged that an individual defendant "joined
a conspiracy to intentionally interfere with contracts between [plaintiff] and its
customers, stole [plaintiff's] customers, and used confidential information to launch a
new company" and that the individual defendant "was involved in creating a business
plan based on the management of 6 jets which she knew were managed by [plaintiff]."
*W. Air Charter, Inc. v. Sojitz Corp.*, No. CV 18-7361 JGB (KSX), 2019 WL 4509304, at
*8 (C.D. Cal. May 2, 2019) (plaintiff alleged intentional interference of contractual
relations, intentional and negligent interference with prospective business advantage,
unfair business practices, and fraud). Despite Proton's contrary position, Swan has made

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

a prima facie showing that a relationship existed between Swan's ex-employees
(especially Defendant Naidoo) and Proton at the time of the alleged scheme, and
therefore the element of intentional act is satisfied here.  *See, e.g., Enertrode, Inc. v. Gen.
Capacitor Co. Ltd*, No. 16-CV-02458-HSG, 2016 WL 7475611, at *4 (N.D. Cal. Dec. 29,
2016) (finding an intentional act for purposes of purposeful direction where plaintiff's ex-
employee was concurrently working for the co-defendant's employer at the time of his
misdeeds); *Krypt, Inc. v. Ropaar LLC*, No. 19-CV-03226-BLF, 2020 WL 3639651, at *6
(N.D. Cal. Jul. 6, 2020) (finding that an ex-employee committed an intentional act when
they stole confidential information while he was employed by both plaintiff and
defendant, in which those actions were imputed on defendant company).  And Swan's
allegations that Proton benefits from its continued use of trade secrets further bolsters the
finding that it committed an intentional act.  *Way.com, Inc. v. Singh*, No. 3:18-CV-04819-
WHO, 2018 WL 6704464, at *2, *7–8 (N.D. Cal. Dec. 20, 2018) (finding defendant
company committed purposeful direction where plaintiff alleged that the company
intentionally used information provided by the ex-employee to illicit plaintiff's business
partners, and the ex-employee accessed highly confidential information prior to his last
date despite having no reason to access it).

        Proton expressly aimed its conduct toward California with knowledge that harm
was likely going to be suffered in California.  Proton was aware that Swan had its
principal place of business in California as the Individual Defendants knew that Swan
was in California by virtue of their Consulting Agreements.  *See generally Consulting
Agreements*.  Defendant Naidoo's knowledge of Swan's California location, as Proton's
Director, is imputed to Proton.  *See Krypt*, 2020 WL 3639651, at *6 (knowledge of harm
imputed to employer where its employee knew the plaintiff's principal place of business
was in California).  Clearly, Swan is not merely a "link" between Proton and California,
nor is the alleged scheme to demise Swan, a California corporation, a fruitless event.  *Cf.
Walden v. Fiore*, 571 U.S. 277 (2014) (holding that "the plaintiff cannot be the only link
between the defendant and the forum"); *Prevail Legal, Inc. v. Gordon*, No. 20-CV-
07173-BLF, 2021 WL 1947578, at *7 (N.D. Cal. May 14, 2021) (finding no express
aiming where plaintiff alleged "deletion of code on a third-party server randomly located
in California and fruitless negotiations that affected Prevail in California").  The express
aiming inquiry requires "something more" than a random or attenuated act with
foreseeable effects in the forum state, and that "something more" is present here.  *See
Glob. Commodities*, 972 F.3d at 1107 ("[P]urposeful direction ask whether defendants
have voluntarily derived some benefit from their interstate activities such that they 'will
not be haled into a jurisdiction solely as a result of "random," "fortuitous," or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                          Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

"attenuated" contacts.'"); *see also Enertrode*, 2016 WL 7475611, at *4 (defendant employer "expressly aimed their trade secret misappropriation at California" where its co-defendant employee "was aware that Plaintiff was a California corporation with its principal place of business in California"); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) ("[Defendant] engaged in a scheme to register [plaintiff's] trademarks as his domain names for the purpose of extorting money from [plaintiff]. [Defendant's] conduct, as he knew it likely would, had the effect of injuring [plaintiff] in California where [plaintiff] has its principal place of business and where the movie and television industry is centered.")  Proton's aimful conduct also reflects its knowledge that harm caused by its conduct would likely be felt in California. *See CollegeSource*, 653 F.3d at 1079 ("[A] corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business.")  Accordingly, the record properly shows that Proton purposefully directed its activities at California.

> 2.      *Arise Out of or Relate to Proton's Forum Related Activities*

Swan must show that this lawsuit arises out of or relates to Proton's alleged scheme that resulted in trade secret misappropriation and/or other torts.  The Ninth Circuit relies on "a 'but for' test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific jurisdiction." *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995).  "Under the 'but for' test, 'a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action.'" *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013) (citation omitted), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015).

Here, the test is easily satisfied as Swan would not have suffered economic damage but for Proton's involvement in the alleged scheme. *See, e.g.*, *Krypt*, 2020 WL 3639651, at *7 ("'But for' Robinson's actions to misappropriate Krypt's trade secrets, Krypt would not have suffered economic damage . . . . because Robinson's actions are imputed to Ropaar under the vicarious liability theory, the second prong is also satisfied as to Ropaar."); *Panavision*, 141 F.3d at 1322 (finding this requirement satisfied where "[plaintiff's] claims arise out of [defendant's] California-related activities").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title   Electric Solidus, Inc. v. Proton Management LTD. *et al.*

*3.      Reasonableness of Exercising Jurisdiction*

Because Swan has satisfied the first two prongs, Proton bears the burden of "present[ing] a compelling case" that the exercise of jurisdiction is not reasonable. *Schwarzenegger*, 374 F.3d at 802.  In determining whether the exercise of jurisdiction comports with "fair play and substantial justice" and is therefore reasonable, the Court must consider seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Dole Food Co. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002).

Taken together, the seven factors weigh in Swan's favor.  Factor one weighs in Swan's favor as Proton has purposefully interjected itself into California.  *See Enertrode*, 2016 WL 7475611, at *5.  Factor two weighs in Proton's favor as litigating this matter in California would likely impose a significant burden on Proton.  Factor three is neutral as neither party addresses it.  Factor four weighs heavily in Swan's favor as Proton allegedly harmed Swan in California and Proton schemed with Defendant Holmes, a California resident.  *See Fluke Elecs.*, 2013 WL 566949, at *8 ("[A] forum state has a strong interest in resolving the tort claims of its residents." (collecting Ninth Circuit authority)); *Way.com*, 2018 WL 6704464, at *9 ("California's interest in adjudicating the allegations that [defendant] worked with a California resident to knowingly misappropriate the trade secrets of a California company").  As to factor five, Swan recognizes that there is no perfect forum to minimize witness inconvenience in this action given that witnesses are located across the world, which weighs slightly against jurisdiction.  *See AirWair Int'l Ltd. v. Pull & Bear Espana SA*, No. 19-CV-07641-SI, 2020 WL 2113833, at *6 (N.D. Cal. May 4, 2020) ("evaluated by looking 'primarily at where the witnesses and the evidence are likely to be located'" (citation omitted)); *Proximo Spirits, Inc. v. Green Lake Brewing Co., LLC*, No. 2:22-CV-02879-SPG-SK, 2022 WL 17224545, at *9 (C.D. Cal. Sept. 9, 2022) (finding factor "only slightly disfavors the exercise of specific jurisdiction" where a Washington-based defendant would need to defend itself in California, away from its records and witnesses, but that this factor is no longer weighed heavily given

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

modern advances in communication and transportation). Factor six weighs slightly in favor of Swan. *See Ziegler v. Indian River Cnty.*, 64 F.3d 470, 476 (9th Cir. 1995) (finding this factor tips only slightly in plaintiff's favor as inconvenience to plaintiff is not given much weight). Finally, factor seven weighs against Swan as it has not demonstrated the unavailability of an alternative forum. *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993) ("[P]laintiff bears the burden of proving the unavailability of an alternative forum." (citation omitted)).

In the Ninth Circuit, courts "emphasize the heavy burden on both domestic and foreign defendants in proving a 'compelling case' of unreasonableness to defeat jurisdiction." *Dole*, 303 F.3d at 1117. Here, only three of the seven reasonableness factors weigh in Proton's favor. Consequently, the Court finds that Proton has not carried its "heavy burden" of proving the unreasonableness of the Court's jurisdiction.

### 4. Conclusion

The Court finds that it may exercise specific personal jurisdiction over Proton with respect to each of Swan's claims against Proton. Accordingly, the Court **DENIES** Proton's motion to dismiss for lack of personal jurisdiction.[5]

### B. Failure to State a Claim Against Proton

### i. Legal Standard

To survive a Rule 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cnty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, a cause of action's elements that

---

[5] Swan and Proton brief whether the Court has jurisdiction under Rule 4(k)(2). *See MTD* 18:10–19:15; *MTD Opp.* 17:10–18:20. Because the Court exercises traditional specific personal jurisdiction over Proton, it will not address any arguments under Rule 4(k)(2).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:24-cv-08280 MWC-Ex                    Date: April 9, 2025

Title    Electric Solidus, Inc. v. Proton Management LTD. *et al.*

are "supported by mere conclusory statements, do not suffice." *Id.* Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

      *ii.    Analysis*

      Both Proton and the Individual Defendants move to dismiss each of Swan's claims against them. *See MTC*; *MTD*. Although the Court stays the conversion claim against the Individual Defendants, the Court will analyze the remaining claims for purposes of limited litigation as to the interim relief. To reiterate, Swan can renew its preliminary injunctive request as to the conversion claim later, *see Pilot Inc.*, 2020 WL 3833597, at *4, but the Court will not analyze whether it has stated a conversion claim at this juncture. The Court will analyze each of the claims against Proton as the Court is exercising specific personal jurisdiction over Proton with respect to each claim.

      *a.    Count I:  DTSA against all Defendants*

      To state a DTSA claim, Swan must allege that (1) Swan owned a trade secret; (2) Proton/Individual Defendants acquired, disclosed, or used that trade secret through improper means; and (3) the actions by Proton/Individual Defendants damaged Swan. 18 U.S.C. § 1836.

      Here, Proton and the Individual Defendants argue that Swan fails to (1) plead it owns the claimed trade secrets, and (2) identify those trade secrets. *MTD* 19:26–21:9; *MTC* 17:23–20:16. The Individual Defendants also contend that Swan fails to allege that it has suffered irreparable harm. *MTC* 17:12–22. Swan asserts that Proton and the Individual Defendants are mistaken. *MTD Opp.* 19:16–20:24; *MTC Opp.* 19:7–23:17. The Court agrees with Swan.

      First, Swan has pleaded that it owns the claimed trade secrets by virtue of the Consulting Agreements and developments by Swan and the Individual Defendants. *See FAC* ¶¶ 96–97; 18 U.S.C. § 1836 (defining an "owner" as "the person or entity in whom

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                              Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

or in which rightful legal or equitable title to, or license in, the trade secret is reposed").[6]
As discussed in further detail in Section IV(B), there is a dispute as to whether Swan
indeed owns the trade secrets.  That said, for purposes of alleging ownership under DTSA
at the pleadings stage, Swan has done so, but the claim may be impacted depending on
the UK Court's determination of "ownership" under the SHA.

Second, Swan describes the four general categories of its trade secrets with
particularity and cites to exemplary documents within the FAC.  *See FAC* ¶¶ 61–85, 133,
151; *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal.
2023) ("Identifying trade secrets with sufficient particularity is important because
defendants need concrete identification to prepare a rebuttal." (citation omitted)); *id.*
(noting that "categories of information" are sufficient "for purposes of stating a claim
where the complaint alleges that these categories of information are contained within
specific documents").  Swan also filed an identification of asserted trade secrets that
further identifies the trade secrets and shows that they exist.  Dkt. # 112.  Swan
demonstrated that the information is not "readily ascertainable through proper means," it
"derives independent economic value," and that it took "reasonable measures to keep
such information secret."  18 U.S.C. § 1839(3); *see FAC* ¶¶ 99–108, 208–21.

Third, Swan's allegations are sufficient to establish irreparable harm by the
Individual Defendants.  In the FAC, Swan alleges that:

---

[6]  In its opposition to the motion to stay, Swan argues that trade secret ownership is not a
"threshold issue" to Swan's claims as it relates to the UK Court proceeding because the
mere possession of the trade secrets is often sufficient to show ownership as long as
secrecy is maintained.  *MTS Opp.* 15:23–16:02.  Two of the cases that Swan relies on,
however, interpret trade secret ownership under California law and not under DTSA,
where there is an express definition governing "owner."  *See Masimo Corp. v. Apple Inc.*,
No. 8:20-cv-00048 JVS (JDE), 2023 WL 2633961, at *2 (C.D. Cal. Feb. 10, 2023);
*Cedars Sinai Med. Ctr. V. Quest Diagnostic Inc.*, No. CV 17-5169-GW(FFMx), 2019
WL 12521480, at *5 n.7 (C.D. Cal. Aug. 9, 2019).  The other case that dealt with
possession of trade secrets involved a licensee, which is not present here.  *See
BladeRoom Grp. Ltd. v. Facebook, Inc.*, 219 F. Supp. 3d 984, 990–91 (N.D. Cal. 2017).
The Court highlights Swan's argument because ownership under DTSA is pertinent to the
Court's analysis in Section IV(B).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                          Date: April 9, 2025

Title       Electric Solidus, Inc. v. Proton Management LTD. *et al.*

The danger to Swan is particularly acute if Defendants are using Swan's confidential information and proprietary trade secrets to deploy and manage Bitcoin mining operations ***outside*** of 2040 Energy, as evidence uncovered since Swan filed its initial Complaint strongly suggests (and Defendants' recent refusal to answer basic, direct questions about any such non-2040 Energy mining operations seems to confirm). Defendants' continued use of Swan's confidential information and trade secrets outside of 2040 Energy creates a serious, incalculable risk that Swan will lose complete control over who has access to its trade secrets, how those trade secrets are used, and the business opportunities that come with such use (to the extent Swan has not already lost such control as a result of Defendants' actions).

*Id.* ¶ 204 (emphasis in original). Such allegations are sufficient to establish irreparable harm. *See, e.g.*, *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019) ("It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm"); *Waymo LLC v. Uber Techs., Inc*, No. C 17-00939 WHA, 2017 WL 2123560, at *10–11 (N.D. Cal. May 15, 2017) (finding irreparable harm where defendant "downloaded and retained possession of over 14,000 confidential []files . . . at least some of which likely contain Waymo's trade secrets" and that "[m]isuse of that treasure trove remains an ever-present danger wholly at [defendant's] whim").

Accordingly, the Court **DENIES** both Proton's and the Individual Defendants' motions to dismiss as to Count I.

> *b.     Count II:  Breach of Contract against the Individual Defendants*

"The essential elements of a claim of breach of contract, whether express or implied, are the contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and the resulting damages to the plaintiff." *Green Valley Landowners Assn. v. City of Vallejo*, 241 Cal. App. 4th 425, 433 (2015) (citations omitted). The Individual Defendants argue that Swan's request requiring compliance with the Consulting Agreements qualifies as specific performance and that specific performance is a disfavored remedy under California law. *MTC* 20:17–21:6. However, the Court reminds the Individual Defendants that Swan's request is one for preliminary relief, and that Swan alleges ongoing use of Swan's confidential information and trade

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

secrets, in violation of the Consulting Agreements.  *See FAC* ¶¶ 222–32; *Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1080 (N.D. Cal. 2021) (granting a preliminary injunction to prohibit defendants from disclosing or utilizing confidential recipes and related trade secrets where plaintiff alleged claims for trade secret misappropriation claim and breach of non-compete provision).  The Court finds that Swan has sufficiently alleged a breach of contract claim against the Individual Defendants for purposes of interim relief.

Accordingly, the Court **DENIES** the Individual Defendants' motion to dismiss Count II.

> c.      *Count III:  Tortious Interference with Contractual Relations against Defendants Proton, Holmes, and Naidoo*

Under California law, the elements for the tort of intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001).  "[T]o recover for a defendant's interference with an at-will employment relation, a plaintiff must plead and prove that the defendant engaged in an independently wrongful act—i.e., an act proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard—that induced an at-will employee to leave the plaintiff." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1152–53 (2004) (internal quotation marks and citations omitted).  *But see Power Integrations, Inc. v. De Lara*, No. 20-CV-410-MMA (MSB), 2020 WL 1467406, at *21 (S.D. Cal. Mar. 26, 2020) (under California law for an at-will employment contract, "[u]nlike the related tort of intentional interference with prospective economic advantage . . . intentional interference with contractual relations does not require that a defendant's conduct be independently wrongful" (internal quotation marks and citation omitted)).  "Under this standard, a defendant is not subject to liability for intentional interference if the interference consists merely of extending a job offer that induces an employee to terminate his or her at-will employment."  *Reeves*, 33 Cal. 4th at 1153.

Proton and the Individual Defendants argue (1) that Swan does not allege an independent wrong, (2) that Swan does not allege its employees breached any non-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:24-cv-08280 MWC-Ex                              Date: April 9, 2025

Title    Electric Solidus, Inc. v. Proton Management LTD. *et al.*

compete provision, and (3) that the non-solicitation clauses are unenforceable. *MTD* 21:10–22:23; *MTC* 21:7–22:14. Proton also forwards that, even if Swan's employees breached any non-compete provisions, Proton did not have knowledge of any purported competition. *MTD* 22:2–14. The Individual Defendants separately contend that Swan has not plausibly alleged any irreparable harm. *MTC* 22:15–23. The Court is unpersuaded.

Here, Swan does allege an independent wrong, namely that Defendants Proton, Holmes, and Naidoo engaged in a detailed schemed to induce breaches of contractual confidentiality obligations by Zagury, Dozic, Effertz, Hiley, Sola, and Belitzky. *See, e.g.*, *FAC* ¶¶ 4–11 (describing conspirators' general scheme to steal documents for Proton); *id.* ¶¶ 118–127 (detailing conspirators' plan to steal trade secrets for Proton); *id.* ¶¶ 128–163 (alleging execution of the conspirators' plan); *id.* ¶ 236 (agreeing to refrain from "disclosing, misappropriating, or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business"); *id.* ¶ 238 (agreeing to "not at any time, other than in the performance of [their] Service for the Company or any affiliate, both during and after [their] Service with the Company, communicate or disclose to any person or entity, or use for my benefit, or for the benefit of any other person or entity, either directly or indirectly, any Trade Secrets and/or Proprietary Information"). Swan's tortious interference claim is based on the same nucleus of facts as the trade secret misappropriation that took place in executing the general scheme, as discussed in Section III(B)(ii)(a). There are also sufficient allegations that the Co-Conspirators breached other provisions of their agreements in furtherance of the scheme. *See id.* ¶ 236 (agreeing that "at any and all times during my service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company and in furtherance of the Company business"); *id.* ¶ 237 (agreeing to "not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business" for a twelve-month period following termination). Swan also adequately alleges that Proton not only had knowledge of the non-compete provisions, but that it was an active participant in the scheme—specifically through Defendant Naidoo. *See generally id.* Indeed, while the scheming began before Proton was formed on August 2, 2024, the scheme continued to transpire after it was formed. *Id.* ¶¶ 134–58.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:24-cv-08280 MWC-Ex                                Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

---

Swan points out the Employee Confidentiality Agreements are enforceable under the laws of Florida (Zagury, Effertz), Pennsylvania (Dozic), Washington (Hiley), Alabama (Sola), and Indiana (Belitsky).  *Id.* ¶ 229; *see Avalon Legal Info. Servs., Inc. v. Keating*, 110 So. 3d 75, 81 (Fla. Dist. Ct. App. 2013) (Florida); *Metalico Pittsburgh Inc. v. Newman*, 160 A. 3d 205, 211 (Pa. 2017) (Pennsylvania); *A Place for Mom v. Perkins*, 475 F. Supp. 3d 1217, 1230–31 (W.D. Wash. 2020) (Washington); *Signature Utility Services, LLC v. Jernigan*, No. 2:21-cv-00102-AMM, 2021 WL 1318678, at *8–9 (N.D. Al. Feb. 8, 2021) (Alabama); *McGlothen v. Heritage Env't Services, L.L.C.*, 705 N.E. 2d 1069, 1071–72 (Ind. App. Ct. 1999) (Indiana).  Proton and the Individual Defendants attempt to void the Employee Confidentiality Agreements pursuant to California public policy, *MTD Reply* 11:15–23, but neither California law nor policy govern the enforceability of those agreements.

As to irreparable harm, Swan's tortious interference claim is based, in part, on interference with contractual confidentiality obligations.  *See FAC* ¶ 238.  The Court therefore finds that Swan adequately alleges that it will suffer irreparable harm if Proton and the Individual Defendants use and disclose Swan's trade secrets outside of 2040 Energy.  Thus, the Court concludes that Swan has alleged a claim for intentional interference with contractual relations against Defendants Proton, Holmes, and Naidoo.

Accordingly, the Court **DENIES** Proton's and the Individual Defendant's motions to dismiss Count III.

> d.    *Count IV:  Aiding and Abetting Breach of Duty of Loyalty against Defendant Proton*

Under California law, "to state a cause of action against a corporate entity for aiding and abetting a fiduciary's breach of his or her duty of loyalty, a plaintiff must allege (1) knowledge of the fiduciary's breach and (2) substantial participation in the breach."  *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014) (citing *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005)).  The test necessarily includes an element that the fiduciary in fact breached their duty.  *MicroTechnologies, LLC v. Autonomy, Inc.*, No. 15-CV-02220-JCS, 2017 WL 1848470, at *21 (N.D. Cal. May 8, 2017).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                              Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Here, Proton argues that Swan "fails to adequately plead that Belitsky or Zagury breached any duty to Swan, much less that Proton aided and abetted any such breach." *MTD* 23:3–5. Proton is wrong. The FAC details that Proton assisted Beltisky and Zagury in breaching their duty of loyalty by having them "prepar[e] to compete with Swan's mining business and to solicit (a) Swan's employees to leave their employment and (b) Swan's independent contractors to terminate their services as independent contractors." *FAC* ¶ 249. Zagury, as Swan's Chief Investment Officer, and Belitsky, as Swan's General Counsel, owed Swan fiduciary duties. *Id.* ¶¶ 6, 247. Both participated in the scheme—Zagury's involvement is strikingly clear. Both now work for Proton, with Zagury serving as the CEO. *Id.* ¶¶ 162, 173. Proton avers that "[t]he mere fact that the officer makes preparations to compete before he resigns his office is not sufficient to constitute a breach of duty." *MTD Reply* 11:25–12:2 (quoting *Hooked Media Group, Inc. v. Apple Inc.*, 55 Cal. App. 5th 323, 333–34 (2020)). The FAC does not allege mere preparations but significant involvement by Beltisky and Zagury in executing the scheme. *See generally FAC*. Also, the Court recalls that Defendant Naidoo was involved in the scheme while serving as Proton's director. *Naidoo Decl.* ¶ 2. Through Defendant Naidoo, the Court infers Proton's substantial participation. Therefore, Swan has sufficiently pleaded its aiding and abetting claim against Proton.

Accordingly, the Court **DENIES** Proton's motion to dismiss Count IV.

> e.    *Count V:  Unfair Competition against all Defendants*

To bring a UCL claim, Swan must show either an (1) "unlawful, unfair, or fraudulent business act or practice," or (2) "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Because the Court will not dismiss the claims that Swan's UCL claim derives from, the UCL claim also survives. *See Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 952 (S.D. Cal. 2016) (noting that the "UCL's 'unlawful' prong is essentially an incorporation-by-reference provision" and the "[v]iolation of almost any federal, state, or local law may serve as the basis for a UCL claim" (internal quotation marks and citations omitted)).

Accordingly, the Court **DENIES** Proton's and the Individual Defendants' motions to dismiss Count V.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                          Date: April 9, 2025

Title    Electric Solidus, Inc. v. Proton Management LTD. *et al.*

f.    *Count VII:  Civil Conspiracy against all Defendants*

Under California law, the elements of civil conspiracy are "(1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages."  *City of Industry v. City of Fillmore*, 129 Cal. Rptr. 3d 433, 450 (Cal. App. 2011).  Civil conspiracy is not an independent tort and only allows tort recovery against a party who already owes a duty.  *See In re PFA Ins. Mktg. Litig.*, 696 F. Supp. 3d 822, 864 (N.D. Cal. 2022).  "By participat[ing] in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy.  In this way, a coconspirator incurs tort liability coequal with the immediate tortfeasors."  *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1157 (N.D. Cal. 2013) (citations omitted).  "The essence of a civil conspiracy claim is that it is merely a mechanism for imposing vicarious liability."  12 Cal. Jur. 3d Civil Conspiracy § 2.

Because the claims against the Individual Defendants will not be conclusively adjudicated on the merits, the Court cannot impose any form of vicarious liability as to those claims in this action, and therefore Swan's claim for civil conspiracy against Proton must be dismissed.  The Court, however, finds that Swan sufficiently pleads a conspiracy claim against the Individual Defendants and allows the claim to go forward against the Individual Defendants for purposes of adjudicating the limited litigation.

Accordingly, the Court **GRANTS** Proton's motion to dismiss Count VII but **DENIES** the Individual Defendants motion to dismiss Count VII.

IV.    Motion to Stay

A.    *Landis* or *Colorado River*

The parties dispute the proper standard for a stay in these circumstances, where the request for the stay is premised on a pending foreign proceeding.  On the one hand, the Individual Defendants contend that the Court may stay this action under *Landis v. North American Co.*, 299 U.S. 248 (1936).  *MTS* 12:15–13:16.  Under *Landis*, the authority for a stay arises from a court's inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  299 U.S. at 254; *see also Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."). Swan, on the other hand, argues that the Court must apply the more restrictive abstention standard under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). *MTS Opp.* 7:3–9:4. Although *Colorado River* involved parallel proceedings in state court, the Ninth Circuit applies its holding when determining whether to stay an action based on proceedings in a foreign court. *Neuchatel Swiss General Ins. Co. v. Lufthansa Airlines,* 925 F.2d 1193, 1195 (9th Cir. 1991); *see also Aldini AG v. Silvaco, Inc.*, No. 21-CV-06423-JST, 2022 WL 20208930, at *5 (N.D. Cal. May 17, 2022) (concluding that *Colorado River* applies "in the federal foreign context as in the federal-state context"); *Cummins-Allison Corp. v. SBM Co.*, No. CV 12-00207 HG-KSC, 2013 WL 12198836, at *4 (D. Haw. Aug. 5, 2013) (same).

        The Court finds that *Colorado River* generally applies to stays pending a foreign proceeding, but *Colorado River*'s general application does not mean it *must* apply. *See Sanchez v. Green Messengers, Inc.*, 666 F. Supp. 3d 1047, 1052 (N.D. Cal. 2023) (analyzing Supreme Court cases and importing that "the purpose of *Colorado River*'s strict test is to safeguard the exercise of federal jurisdiction, and in the absence of concerns that a stay would effectively deprive the federal court of jurisdiction, a court may issue a stay under its power to control its docket and calendar") (applying test to stays pending state proceedings); *Neuchatel,* 925 F.2d at 1195 (applying *Colorado River* to stays pending foreign proceedings). That is, *Landis* is not categorically inapplicable whenever concurrent foreign proceedings are involved. *See Sanchez*, 666 F. Supp. 3d at 1052. The crucial question is whether the stay would effectively abdicate the federal court's jurisdiction. *Id.* at 1052–53. If the concurrent foreign proceeding addresses a threshold issue and there will be nothing more for this Court to do once a stay is entered, then *Colorado River* solely applies. *Id.* at 1053; *see also Moses H. Cone*, 460 U.S. at 28 (1983) ("When a district court decides to dismiss or stay under *Colorado River,* it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties."); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716–17 (1996) (recognizing federal court holdings that decline jurisdiction where the federal case is duplicative of a pending state proceeding); *Ernest Bock, LLC v. Steelman*, 76 F.4th 827, 836, 843 (9th Cir. 2023) (applying *Colorado River* where both cases turned on the same threshold question of New Jersey state law); *Mendocino Ry. v. Ainsworth*, 113 F.4th 1181, 1192–93 (9th Cir. 2024) (affirming district court's dismissal where "[a]lthough there is a theoretical possibility the State Action will not fully resolve the Federal Action, there does not appear to be a realistic probability that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:24-cv-08280 MWC-Ex                          Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

a federal controversy will remain after the state proceedings are complete"). However, in situations where the foreign proceeding will not fully resolve all the issues before the federal court, *Landis* applies, not *Colorado River*. *See Sanchez*, 666 F. Supp. 3d at 1053; *see also Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 665 (1978) ("[A] district court's decision to defer proceedings because of concurrent state litigation is generally committed to the discretion of that court.") (plurality opinion); *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 912–13 (9th Cir. 1993) (finding that when one of two possible state court rulings would necessitate additional litigation in a parallel federal case, a *Colorado River* stay could not issue); *United States v. State Water Res. Control Bd.*, 988 F.3d 1194, 1204 (9th Cir. 2021) ("We have repeatedly emphasized that a *Colorado River* stay is inappropriate when the state court proceedings will not resolve the entire case before the federal court.").

Here, the Court finds that the concurrent UK Court's proceeding will not deprive this Court of federal jurisdiction after that proceeding is complete, and therefore *Landis* applies. The UK Court will address whether 2040 Energy owns intellectual property (such as the trade secrets) under the SHA, which will be construed under English Law.[7] Although Swan's DTSA claim is not governed by a choice of law provision,[8] the UK

---

[7]  Swan highlights that there is no explicit provision in the SHA that governs the rights of Tether/2040 Energy in intellectual property. *MTS Opp.* 16:13–20. Swan points to the Consulting Agreements between Swan and the Individual Defendants that assigns all intellectual property rights from their work under 2040 Energy to Swan. *Id.* at 15:4–13; *FAC* ¶ 96. But the argument that such an assignment clause in the consulting agreements circumvents any dispute of ownership in the SHA is misplaced. As noted, Swan and Tether agreed that "any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales." *SHA* ¶ 30.1. The Court will not disrupt the settled expectations of that forum selection clause.

[8]  Plaintiff's trade secret misappropriation claim is not governed by any choice of law provisions. *See Vesta Corp. v. Amdocs Mgmt. Ltd.*, 80 F. Supp. 3d 1152, 1161 (D. Or. 2015) ("Plaintiff's trade secret misappropriation claim is not governed by the NDAs' choice of law provisions."). The Ninth Circuit has stated that, "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision" but "are decided according to the law of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections,*

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No.   2:24-cv-08280 MWC-Ex                                    Date: April 9, 2025

Title       Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Court's findings will certainly have some impact as to Swan's general ownership rights under DTSA.  However, even if Swan is not deemed an owner or partial owner, Swan maintains viable state claims against Proton that do not necessarily rely on the DTSA claim.  Accordingly, the Court shall analyze the Individual Defendant's motion to stay under *Landis*.

        **B.**    <u>Application of Landis</u>

      Under *Landis*, a court deciding whether to stay proceedings weighs three competing interests:  (1) "the possible damage which may result from the granting of a stay;" (2) "the hardship or inequity which a party may suffer in being required to go forward;" and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

      On the first *Landis* factor, the Court finds Swan may suffer damage from a stay.  Swan will be prejudiced if they cannot expeditiously pursue their case.  *See In re Prime Healthcare ERISA Litig.*, No. 8:20-cv-01529-JLS-JDE, 2022 WL 2102992, at *2 (C. D. Cal. Jan. 7, 2022) (denying a motion to stay where, after a year and a half, "[p]laintiffs will be prejudiced if they cannot expeditiously pursue their case"); *see also Vicious Brands, Inc. v. Face Co., LLC*, No. 24-CV-04996-LJC, 2025 WL 754068, at *8 (N.D. Cal. Mar. 10, 2025) ("It bears repeating that precedent calls for only a minimal showing on this factor[.]").  There is an allegation of ongoing violations and Swan is seeking injunctive relief.  *Cf. Sanchez*, 666 F. Supp. 3d at 1053 (granting motion to stay where there was no allegation of ongoing violations and plaintiff did not seek injunctive relief).  The Court recognizes that Swan may ultimately have no ownership over the trade secrets, which may render the "ongoing violations" moot, but allowing this case to go forward will avoid any potential prejudice to Swan.  For instance, the other tort claims arise out of a common nucleus of operative facts as the DTSA claim and therefore discovery will be pertinent to moving those claims along regardless of the outcome in the UK Court.  Accordingly, the first *Landis* factor weighs in favor of a stay.

_____

*Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (citing *Consolidated Data Terminals v. Applied Digital Data Systems,* 708 F.2d 385, 390 n. 3 (9th Cir. 1983)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.  2:24-cv-08280 MWC-Ex                        Date: April 9, 2025

Title        Electric Solidus, Inc. v. Proton Management LTD. *et al.*

Second, the Court finds that Proton would not suffer hardship absent a stay. Proton argues that it "would unfairly bear the burden and hardship of simultaneously litigating this case," leaving a "possibility that the two cases proceeding in parallel risks inconsistent outcomes, unnecessary duplication, and substantial cost for all involved." *MTS Reply* 6:18–22.  The Court disagrees.  That might have been the case if the DTSA claim was the only claim before this Court (or if many claims overlapped between the two proceedings), but Proton still needs to defend itself as to the other tort claims at issue in this action.  *See Lockyer*, 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*.").  The common nucleus of operative facts does not necessarily alter the remaining claims as there are allegations that do not necessarily involve the trade secrets, i.e. non-solicitation obligations of Swan's employees.  The Court emphasizes that "'if there is *even a fair possibility* that the stay . . . will work damage to some one else,' the party seeking a stay 'must make out a clear case of hardship or inequity in being required to go forward.'"  *In re PG&E Corp. Sec. Litig.*, 100 F.4th 1076, 1087 (9th Cir. 2024) (quoting *Landis*, 299 U.S. at 255) (emphasis added).  Proton has not made out a clear case of hardship or inequity.  Thus, the second *Landis* factor weighs against a stay.

Third, the Court finds that the orderly course of justice weighs against a stay because, although the foreign proceeding will likely simplify some of the issues before the Court, Swan's other tort claims will not be entirely disposed of.  Indeed, denying the stay allows the Court to promote judicial efficiency while still avoiding any potential inconsistent rulings.  Therefore, the third *Landis* factor weighs against a stay.

The Court finds in its discretion that a stay of this action pending resolution of the UK Court proceeding does not efficiently serve the use of judicial and party resources. Accordingly, the Court **DENIES** Individual Defendants' motion to stay.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:24-cv-08280 MWC-Ex                                Date: April 9, 2025

Title      Electric Solidus, Inc. v. Proton Management LTD. *et al.*

V.      Conclusion

      For the reasons set forth above, the Court **GRANTS** Individual Defendants'
motion to compel as to the conversion claim but **DENIES** the motion to compel as to the
remaining claims.  The Court **DENIES** Individual Defendants' motion to dismiss for
failure to state a claim.  The Court **DENIES** Proton's motion to dismiss for lack of
personal jurisdiction and **DENIES** Proton's motion to dismiss for failure to state a claim
as to all claims except civil conspiracy.  The Court **DENIES** Individual Defendants'
motion to stay.

      **IT IS SO ORDERED.**

                                                                                :

                                                     **Initials of Preparer**    TJ