RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:   (213) 443-3145
Facsimile:    (213) 443-3100

STACYLYN M. DOORE (admitted *pro hac vice*)
stacylyndoore@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:   (617) 712-7100
Facsimile:    (617) 712-7200

RACHEL E. EPSTEIN (admitted *pro hac vice*)
rachelepstein@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
Telephone:   (212) 849-7000
Facsimile:    (212) 849-7100

*[Additional counsel on signature page*]

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN, a Delaware corporation, <br><br> Plaintiff <br><br> v. <br><br> PROTON MANAGEMENT LTD., a British Virgin Islands corporation; THOMAS PATRICK FURLONG; ILIOS CORP., a California corporation; MICHAEL ALEXANDER HOLMES; RAFAEL DIAS MONTELEONE; SANTHIRAN NAIDOO; ENRIQUE ROMUALDEZ; and LUCAS VASCONCELOS, <br><br> Defendants. | Case No. 2:24-cv-8280-MWC-E <br><br> **MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER** <br><br> Judge:     Hon. Michelle Williams Court <br><br> Complaint Filed:        Sept. 25, 2024 <br> Am. Compl. Filed:     Jan. 27, 2025 <br> Trial Date:                 May 4, 2026 |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................1

II.   RELEVANT FACTUAL BACKGROUND .........................................4

III.  LEGAL STANDARD ..................................................................9

IV.   ARGUMENT..................................................................................9

    A.    This Motion Should Be Heard *Ex Parte.*...........................9

        1.    Swan Will Be Irreparably Harmed Absent a Freezing
Order................................................................................10

        2.    Swan Is Without Fault In Creating the Crisis. .........................14

    B.    The Court Should Partially Lift the Stay as to Proton.......................15

    C.    The Court Should Enter a TRO. ..................................................18

        1.    Swan Is Likely To Succeed on Its Claims Against
Proton. .............................................................................18

        2.    The Balance of Equities Favors and the Public Interest..........23

        3.    *Grupo Mexicano* Does Not Bar Swan's Requested
Relief. .............................................................................24

    D.    The Court Should Order Targeted Discovery. ...............................24

V.    CONCLUSION ......................................................................25

MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*,
2017 WL 10581085 (C.D. Cal. June 5, 2017) ...............................................16

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................9

*Bavly v. A2 Prods., LLC*,
No. CV 19-723 (C.D. Cal.) ...................................................................10

*Bavly v. A2 Productions, LLC*,
2019 WL 1883907 (C.D. Cal. 2019) .......................................................2, 14

*Castillo v. Johnson*,
2021 WL 75829 (D. Ariz. Jan. 8, 2021) ...............................................12, 24

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003) ...............................................................15

*Cool Runnings Int'l Inc v. Gonzalez*,
2021 WL 5331453 (E.D. Cal. Nov. 16, 2021) ......................................18, 20

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,
444 F. Supp. 3d 1198 (E.D. Cal. 2020) ...................................................20

*CW Baice Ltd. v. Wisdomobile Grp. Ltd.*,
2020 WL 13850729 (N.D. Cal. June 5, 2020) ...........................................11

*Datatech Enters. LLC v. FF Magnat Ltd.*,
2012 WL 4068624 (N.D. Cal. Sept. 14, 2012) ...........................................11

*Equal Emp. Opportunity Comm'n & Sanchez*,
2010 WL 11452034 (E.D. Wash. Nov. 30, 2010).......................................25

*In re Focus Media Inc.*,
387 F.3d 1077 (9th Cir. 2004)........................................................2, 12, 24

*Gaponyuk v. Alferov*,
2023 WL 4670043 (E.D. Cal July 20, 2023) .............................................16

*Goldwater Bank, N.A. v. Elizarov*,
 2021 WL 3265012 (C.D. Cal. Apr. 20, 2021) .................................................10

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
 527 U.S. 308 (1999)..........................................................................................24

*Johnson v. Couturier*,
 572 F.3d 1067 (9th Cir. 2009)........................................................ 2, 10, 13, 24

*Johnson v. JP Morgan Chase Bank, N.A.*,
 2019 WL 2004140 (C.D. Cal. Jan. 25, 2019) .................................................16

*Kremen v. Cohen*,
 2011 WL 6113198 (N.D. Cal. 2011) ................................ 2, 10, 13, 14, 24, 25

*Lackey v. Stinnie*,
 145 S. Ct. 659 (2025) ..................................................................................16, 19

*Landis v. N. Am. Corp.*,
 299 U.S. 248 (1936)..........................................................................................16

*Liu v. SEC*,
 591 U.S. 71 (2020)............................................................................................24

*May Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
 165 F. Supp. 3d 937 (S.D. Cal. 2016) .............................................................23

*Million Source Ltd v. Plastic-View A.T.C., Inc.*,
 2022 WL 1591721 (C.D. Cal. May 3, 2022) ........................................2, 9, 24

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,
 883 F. Supp. 488 (C.D. Cal. 1995)..............................................................9, 14

*Odyssey Reinsurance Co. v. Nagby*,
 2017 WL 4432453 (S.D. Cal. Oct. 4, 2017) .......................................11, 14, 23

*Pilot Inc. v. Tyc Brother Indus. Co.*,
 2020 WL 3833597 (C.D. Cal. July 8, 2020).....................................................17

*Revelry Grp. LLC v. Jobe*,
 2023 WL 2456287 (D. Idaho Mar. 10, 2023) ..................................................25

*RPB SA v. Hyla, Inc.*,
 2020 WL 3213737 (C.D. Cal. June 2, 2020) .................2, 10, 11, 12, 13, 23, 24

iii

*Safety PPE, LLC v. Skanda Grp. of Indus. LLC*,
  2022 WL 1592725 (C.D. Cal. Mar. 25, 2022)....................................................14

*Smagin v. Yegiazaryan*,
  2015 WL 12762270 (C.D. Cal. Sept. 18, 2015).................................................24

*Stirling Mortimer Glob. Prop. Fund PCC Ltd. v. Roberts*,
  No. 2:13-cv-00301 (D. Nev.) ............................................................10, 11, 23

*Thrailkill v. Gordon*,
  2010 WL 11552964 (C.D. Cal. July 27, 2010) ...................................10, 23, 24

*Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*,
  609 F.3d 975 (9th Cir. 2010)...........................................................................17

*WeRide Corp. v. Kun Huang*,
  379 F. Supp. 3d 834 (N.D. Cal. 2019)..............................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................9

**<u>Statutes</u>**

18 U.S.C. § 1839(3) ............................................................................18, 19

iv

## I.     <u>PRELIMINARY STATEMENT</u>

Swan brings this application for *ex parte* relief because it has just learned that Proton is dissipating its assets to put them out of the reach of a judgment entered by this Court. A recent third-party document production included the following message on the disappearing-message app Signal that was sent by Proton executive, Defendant Michael "Alex" Holmes, while this case was pending: ***"Between us moving assets so they are not encjnberee [encumbered] by the frivolous swan lawsuit."*** Ex. A. The same message string also directly implicated Proton executive Defendant San Naidoo as part of the scheme.



It is hard to imagine clearer evidence of intentional fraudulent transfer. Courts routinely issue emergency *ex parte* relief freezing defendants' assets based on much less direct evidence, recognizing the irreparable harm that would otherwise result. *See, e.g.*, *Million Source Ltd v. Plastic-View A.T.C., Inc.*, 2022 WL 1591721, at *5 (C.D. Cal. May 3, 2022) (granting TRO freezing assets and expedited discovery where "it is likely that without the freeze, the funds . . . will be dissipated"); *Kremen v. Cohen*, 2011 WL 6113198, at *6 (N.D. Cal. 2011) (granting *ex parte* TRO, finding "if such funds are dissipated, Plaintiff will incur irreparable harm"); *Bavly v. A2 Productions, LLC*, 2019 WL 1883907, *2 (C.D. Cal. 2019) (finding "further dissipation of []funds would irreparably harm Plaintiffs" and granting TRO against "withdrawing, diverting, charging, encumbering, or impairing funds"); *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) ("Couturier's own prior conduct establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed."); *RPB SA v. Hyla, Inc.*, 2020 WL 3213737, *12 (C.D. Cal. June 2, 2020) ("risk of dissipation and non-recovery" qualifies as "significant risk of irreparable harm"); *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004) ("[E]vidence in the record that in the past Rubin made away with Focus Media funds, suggesting that he may do the same with respect to the funds that Pringle seeks to recover[,] . . . raises the specter of irreparable harm to the bankruptcy estate if these funds are not frozen.").

The Court should lift the discretionary stay against Proton for the limited purpose of entering such an *ex parte* freezing order in this case. Other evidence produced by third-party mining sites shows that Proton continues to manage Bitcoin mining operations at those sites (including likely outside of 2040 Energy) and is likely generating substantial revenue from those operations. The circumstances here—a Proton executive openly discussing transferring assets to avoid a damages award, months into an active litigation—pose the grave risk that, should this motion

proceed through noticed motion procedures, Proton will have over a month to transfer away whatever additional assets it can while the motion is being considered.

Holmes's Signal message is all the more troubling in the context of Proton's history of other suspicious activity. Recently produced third-party documents have also revealed that, three weeks after the Court denied Swan's initial request for a TRO—in opposition to which Defendants represented to the Court that Proton was only mining for 2040 Energy, a joint venture Swan is a party to—Proton executives incorporated another company in Delaware, Strange-Quark Systems LLC. Two weeks later, ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██ ██ ██ ██ ████ ██ ██ ██ ████ ██ ██
████████████████████. And, contrary to their earlier representations to the Court, ████████████████
████████████ Tether, which recently redomiciled to El Salvador. In fact, at the same time that Holmes explained that Proton was busy transferring assets to avoid having to pay damages to Swan in this lawsuit, ████████████████████████████████████████████████
████████████████████. Proton could swiftly and easily transfer assets out of Swan's reach—well before any noticed motion could be heard and ruled upon.

Swan thus moves this Court *ex parte* to partially lift the discretionary stay (Dkt. 218, "Stay Order") as to Defendant Proton in order to: (1) enter a temporary restraining order ("TRO") freezing Proton's assets, (2) order Proton to respond on an expedited basis to targeted requests for documents, and (3) set an evidentiary hearing date for a preliminary injunction freezing Proton's assets, and order Proton executives Holmes and Naidoo to appear.

## II.    <u>RELEVANT FACTUAL BACKGROUND</u>

The Court is familiar with the facts underlying Proton's theft of Swan's mining business.  *See* Dkt. 164 at 2-7, 26 (recounting Defendants' "detailed scheme" to "steal Swan's entire Bitcoin mining business").  In brief, over the course of less than six weeks last summer, former Swan consultants and employees, in coordination with representatives of Tether, engaged in what they dubbed a "rain and hell fire" plan to steal Swan's Bitcoin mining business and trade secrets.  *See* Dkt. 100-1 (Amended Complaint, or "AC") ¶ 8.  By the time the former Swan consultants and employees resigned from Swan on August 8, 2024, the conspirators had formed a copycat company (Proton), for whom they collectively stole over 3,000 documents from Swan's databases, which detail the blueprint to Swan's mining business.  Within days, they had assumed Bitcoin mining operations that Swan previously managed at sites hosted by third-party operators.  *See id.* ¶¶ 168-73.  One of Proton's founders, Alex Holmes, predicted on the day of the mass resignations, "I don't expect us to skip a beat."  *See* Ex. B.  They did not.

Swan initiated this action on September 25, 2024, against Proton and several former Swan consultants (the "Individual Defendants").  *See* Dkt. 1.  Swan's Complaint sought damages and injunctive relief against Proton, as well restitution and disgorgement.  *See id.*  At the time it filed its Complaint, Swan also moved for a TRO, seeking to enjoin Defendants from using the information they stole.  *See* Dkt. 8.  In opposing the request for a TRO, the Individual Defendants did not deny that they and Proton were using Swan's trade secrets to mine Bitcoin.  Instead, they represented that, "to the extent any information from Swan is being used by any of the Defendants, it is being used solely for the benefit of [a joint venture,] 2040 Energy (in which Swan is a minority shareholder), and no others,"  Dkt. 29-1 at 4; *see also id.* at 12 ("Proton and the Individual Defendants are working only for 2040 Energy.").  The Court denied Swan's motion for a TRO on October 5, 2024.  *See* Dkt. 40.

Just three weeks after the Court denied Swan's request for a TRO, on October 25, 2024, Proton executives appear to have formed a new company in Delaware, Strange-Quark Systems LLC ("Strange-Quark").  *See* Ex. C (certificate of incorporation).  Two weeks later, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

On December 10, 2024, Holmes exchanged messages over Signal with Myles Watson (Chief Operating Officer at ACDC) regarding the draft contract.  *See* Ex. A.  Watson asked, "have you heard anything from san [Naidoo] regarding hosting agreement? Shot him a couple notes, really need to get this one signed up."  Holmes

---

[1] Swan received this email, and other correspondence with ACDC referenced in and attached to this brief, on May 1, in response to a subpoena Swan served on ACDC.  Swan did not complete its review of those materials and discover the facts discussed in this motion until after the Court's May 27 Stay Order.

[2] Proton appears to be doing business with Swan's former mining sites under the name "Elektron Energy."  *See* AC ¶¶ 131-32, 187-88, 190.  Proton has a wholly-owned subsidiary named Elektron Management LLC, and several individuals provide services to both Proton and Elektron Enterprises LLC, another entity.  *See* Ex. E at 10.  The conspirators appear to be using Proton and the Elektron entities as one business, to manage Bitcoin operations.  *See, e.g.*, Ex. F (referring to conspirators' new company as "Elektron Energy/Proton Management").

1  responded, "***Between us moving assets so they are not encjnberee [encumbered]***
2  ***by the frivolous swan lawsuit.***"

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF *EX PARTE* APPLICATION



Just days before sending this message, on December 7, 2024, ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████ As outlined in Swan's Amended Complaint, ████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Tether, which recently redomiciled to El Salvador, is not simply an arms-length third party.  It is a controlling shareholder of the 2040 Energy venture.  And a representative from Tether—Zachary Lyons—was involved in multiple calls that the conspirators (including Proton's current CEO, Raphael Zagury) held to plan their raid of Swan's Bitcoin mining business.  *See* AC ¶¶ 122, 141-44.  And in notes that Zagury took days before the conspirators resigned from Swan, Zagury wrote that the conspirators would need "Legal cover from Tether," as their plan would "expose[]" them for breaches of their "Confidentiality and IP" obligations to Swan, *See id*. ¶ 8.  Discovery has now also confirmed that, contrary to their earlier assertions that "Proton and the Individual Defendants are working only for 2040 Energy," Dkt. 29-1 at 12, █████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████[4]

_____

[3] ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

[4] █████████████████████████████████████████  In August 2024, cryptocurrency company Celsius Network LLC sued Tether in United States Bankruptcy Court

7

After Swan filed its Amended Complaint on January 27, 2025, Swan spent four months seeking discovery from Proton, which included multiple rounds of motion practice, while defending against attempts to dismiss or stay this case. Swan served targeted discovery requests aimed at Proton's mining activities outside of 2040 Energy, including a request for documents that would show where the proceeds from the mining operations Proton managed have been transferred. *See* Dkt. 114-3. Shortly before the Court entered its Stay Order, Magistrate Judge Eick had ordered Proton to fully comply with Swan's targeted discovery requests. *See* Dkt. 205. To date, Proton has not produced a single document in this case.

Despite this, Swan's investigation since filing the Amended Complaint confirms that Proton continues to manage Bitcoin mining operations at the former Swan mining sites. For example, ███████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████ As another example, information that one former Swan mining site provided indicates ████████████████████████████████████████████ ██████████████████████████ ████████████████████████████ ████████████████████████ Another former Swan mining site indicated to Swan, before entry of the stay, that operations at the site remained virtually unchanged after Proton's takeover.[5] And as late as March, ██████████████

_____

seeking to avoid and recover fraudulent transfers of 39,542 Bitcoin made by Tether. That complaint alleges that Tether engaged in these transfers—which, at the time, Tether represented were worth $816,822,948—to secure preferential treatment over Celsius's other creditors when the company went bankrupt. *See* Ex. H ¶¶ 1-9, 60.

[5] At the time of the stay, Swan had received document productions from five former Swan mining sites, though several of those productions were incomplete. Swan was also working cooperatively with several other mining sites regarding their responses to third-party subpoenas. Swan received all documents cited herein before the stay, and has discontinued discussions with the former mining sites since the stay. Swan

8

1 ████████████████████████████████████████████████

2 ████████████████████████████████ Proton's mining operations thus

3 have been ongoing since Swan filed the Amended Complaint, when Swan first

4 identified evidence that Proton was managing operations at former Swan mining

5 sites, including messages that Proton employees accidentally sent to Swan and later

6 deleted. *See* AC ¶ 190.

7 **III.    LEGAL STANDARD**

8         To justify a TRO, Swan must establish it (1) is likely to succeed on the

9 underlying merits, (2) is likely to suffer irreparable harm in the absence of

10 preliminary relief, (3) is favored by the balance of the equities, and (4) that the

11 requested relief is in the public interest. *See Million Source*, 2022 WL 1591721, at

12 *4 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).[6]  The Ninth

13 Circuit follows a "sliding scale approach" under which "a stronger showing on one

14 element may offset a weaker showing of another." *Alliance for the Wild Rockies v.*

15 *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

16 **IV.    ARGUMENT**

17         **A.    This Motion Should Be Heard *Ex Parte.***

18         Swan's motion should be heard *ex parte* because Swan "will be irreparably

19 prejudiced if the underlying motion is heard according to regular noticed motion

20 procedures," and "is without fault in creating the crisis that requires *ex parte* relief."

21 *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal.

22 1995).  Should the underlying motion be heard according to regular noticed motion

23 procedures, the earliest available hearing date is July 18—over five weeks from

24 today.  Proton's employees stole over three thousand documents and the full suite

25 of BNOC source code in a much shorter time frame.  And given the evidence that

26

27 ──────────────

had asked Defendants if they would agree to a reciprocal exchange of documents

28 produced by third parties.  Defendants did not respond to Swan's request.

[6]  Unless otherwise noted, emphasis is added and quotations and citations omitted.

1  Proton's employees have made misrepresentations to the Court, spoliated evidence,

2  created multiple shell companies, ████████████████████████████████████████

3  ████████████████████████, and openly discussed transferring Proton's

4  assets to avoid paying a judgment, there is significant risk that Proton would take

5  advantage of the timeframe before a freezing order could issue to further dissipate

6  its assets.  *See Couturier*, 572 F.3d at 1085 (history of misconduct related to

7  underlying claim showed defendant was "presumably more than capable of placing

8  assets in [its] personal possession beyond the reach of a judgment").

9        Swan's request for relief is thus appropriately heard on an *ex parte* basis.

10  *Bavly v. A2 Prods., LLC*, No. CV 19-723, (C.D. Cal.) Dkts. 62, 63, 65 (plaintiff

11  filed on March 21, defendants opposed on March 22, and the court issued an order

12  on March 25); *Stirling Mortimer Global Property Fund PCC Limited v. Roberts*,

13  No. 2:13-cv-00301 (D. Nev.), Dkts. 1, 3, 11 (granting request for TRO the day after

14  it was filed).  Indeed, where there is evidence of intent to dissipate assets, courts

15  often grant temporary freezing orders without notice to the defendants.  *See,*

16  *e.g.*, *Goldwater Bank, N.A. v. Elizarov*, 2021 WL 3265012, *2 (C.D. Cal. Apr. 20,

17  2021); *Hyla*, 2020 WL 3213737, *10; *Kremen*, 2011 WL 6113198, *3; *Thrailkill v.*

18  *Gordon*, 2010 WL 11552964 *1-*2 (C.D. Cal. July 27, 2010).

19              1.    <u>Swan Will Be Irreparably Harmed Absent a Freezing Order.</u>

20        Swan will suffer further irreparable harm if Proton is allowed to continue to

21  transfer funds from its ongoing mining activities outside the reach of any judgment.

22  To establish irreparable harm, "[a] party seeking an asset freeze must show a

23  likelihood of dissipation of the claimed assets, or other inability to recover monetary

24  damages, if relief is not granted."  *Couturier*, 572 F.3d at 1085; *see also Kremen*,

25  2011 WL 6113198, at *5 (analyzing question under irreparable harm prong).

26        That is clearly the case here.  The limited discovery Swan has received to

27  date demonstrates that Proton has already dissipated its assets in an attempt to avoid

28  a judgment.  Proton's co-founder has admitted as much.  Ex. A.  Holmes understood

that Naidoo's dissipating Proton's assets was wrongful, prefacing his admission with, "Between us." *Id.*  This is striking evidence of Proton's intent—and clearer than other evidence courts have found justified an asset freeze.  *See, e.g.*, *Odyssey Reinsurance Co. v. Nagby*, 2017 WL 4432453, at *4, 6 (S.D. Cal. Oct. 4, 2017) ("These emails"—"the money should get [distributed] quietly through CTS... this should be a private matter not a public one in the court house"—"raise the likelihood that the Nagbys acted with the intent to hinder or delay Plaintiff from recovering from Cal-Regent."); *Stirling Mortimer Glob. Prop. Fund PCC Ltd. v. Roberts*, 2013 WL 1874762, at *2 (D. Nev. May 3, 2013), *aff'd*, 545 F. App'x 640 (9th Cir. 2013) (highlighting "emails" to an attorney who plaintiff "believed to be retained" by the defendant); Ex. L at 12 (*Roberts* pleading, alleging existence of emails stating "assets in [the defendant's] name are naked, exposed, and subject to seizure in a lawsuit").  "[D]irect evidence of intent [to defraud a creditor] is uncommon." *Odyssey*, 2017 WL 4432453, at *4.  But it exists here.

While the recently-discovered Signal message from Holmes is the most clear-cut evidence of Proton's attempt to defraud Swan, it is hardly the sole example of suspicious conduct by Proton.  The same week that Naidoo was "moving assets so they are not [encumbered] by" this lawsuit, ███████████████████ ███████████████████████████████████████████████████ .  *See* AC ¶ 199.  Courts have found that circumstantial evidence suggesting a defendant was taking steps to engage in suspicious asset transfers bolsters the case for irreparable harm.  *See, e.g.*, *CW Baice Ltd. v. Wisdomobile Grp. Ltd.*, 2020 WL 13850729, at *3 (N.D. Cal. June 5, 2020) (evidence that defendants "transfer[red] approximately $1.25 million to a new company" supported conclusion that they were dissipating assets); *Datatech Enters. LLC v. FF Magnat Ltd.*, 2012 WL 4068624, at *5 (N.D. Cal. Sept. 14, 2012) (defendants' "efforts to move … profits overseas shortly after learning of impending copyright litigation establishes a likelihood of asset dissipation and irreparable harm"); *Hyla*, 2020 WL 3213737, at

11

*12 (ordering asset freeze even where "ultimately, the evidence may show that the payments… were part of legitimate commercial transactions"); *Castillo v. Johnson*, 2021 WL 75829, at *4 (D. Ariz. Jan. 8, 2021) ("evidence that [defendants] transferred tens of millions of dollars out of JU to themselves for no legitimate business purpose. . . suggests that Defendants have transferred assets to shield them from []creditors"); *Focus Media*, 387 F.3d at 1086 ("There is also evidence in the record that in the past [defendant] made away with [company] funds, suggesting that he may do the same with respect to the funds that [plaintiff] seeks to recover. This raises the specter of irreparable harm … if these funds are not frozen.").

Moreover, Proton utilizes a web of corporate entities to conduct its activities. It has repeatedly resisted providing fulsome discovery regarding the "Elektron" entities that Swan was aware of at the time of the stay.[7]  And Defendants' inconsistent representations regarding for whom they are mining Bitcoin are troubling.  Just weeks after representing that they were only mining Bitcoin on behalf of 2040 Energy, those same members of Proton set up a new entity, Strange-Quark, ████████████████████████████  And the Individual Defendants have since admitted ████████████ ████████████████████████████████ ████████████  The use of shell entities to transfer assets suggests additional

_____

[7] Even though Swan's original complaint included allegations that Proton was operating under an "Elektron" name, Dkt. 25-1 ¶ 95, Proton waited until February 2025 to reveal in the parties' Rule 26(f) report that it had "a subsidiary named Elektron Management LLC," Dkt. 114-1 at 20.  And it was not until April 18 that Proton revealed the existence of another entity, Elektron Enterprises LLC, who Proton claimed it "does not have a formal relationship with" but that "several [unnamed] individuals provide services to both Proton and Elektron Enterprises LLC." Ex. E at 10.  The purpose of these disparate entities remains entirely unclear, and the limited third-party discovery Swan received before the stay indicates Proton is effectively operating all these entities as one company. *See, e.g.*, Ex. F ("[W]e're no longer operating under Swan.  We've changed management and will not [sic] be operating under a co. – Elektron Energy/Proton Management.").

12

risk of dissipation. *See, e.g., Hyla*, 2020 WL 3213737, at *12 ("The record supports an inference that many of the entities to which the Funds were transferred are shell companies. This is further evidence to support the claim that there is a risk of dissipation and non-recovery.").

The underlying wrongdoing by Proton at the center of this lawsuit is yet further reason to enter a freezing order. Proton and its employees and officers engaged in a calculated, brazen scheme to steal Swan's mining business. As explained below, that scheme involved Proton stealing thirteen Swan employees (almost the entirety of Swan's mining team) and multiple Proton agents' downloading over 3,000 documents from Swan's systems, including all of the source code underlying BNOC. These are documented acts of theft that Defendants have never disputed, and Swan is likely to succeed on the merits of its underlying claims (*see infra* pp. 18-23). This is further indicia that Proton is "presumably more than capable of placing assets in [its] personal possession beyond the reach of a judgment." *Couturier*, 572 F.3d at 1085 (finding that likelihood of success on the underlying claim of breach of fiduciary duty "establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds"); *see also Kremen*, 2011 WL 6113198, at *6 ("Plaintiff here has shown that S. Cohen has a history of dishonest behavior."). Proton's willingness to destroy evidence also creates additional immediacy. Indeed, Swan has already identified chat messages that Proton agents accidentally sent to Swan, which were subsequently deleted. *See* AC ¶ 190.

There is every reason to believe that Proton continues to dissipate funds that it is generating—from its use of Swan's trade secrets—today. Proton continues to manage Bitcoin mining operations at the former Swan mining sites, likely at or above the levels that Swan was mining Bitcoin. *See supra* pp. 8-9. In the first half of 2024 alone, Swan's mining activities generated over ███████ dollars in revenue. Bitcoin prices have soared since then. At the time of this filing, Bitcoin

1    is worth approximately $109,000 (up from $42,000 on January 1, 2024). Thus, it is

2    reasonable to infer that Proton is continuing to substantially profit from its Bitcoin

3    mining operations and that it "likely may," as the Signal chat shows it has "done in

4    the past," continue to "transfer, convey, conceal, hypothecate, destroy, move or

5    otherwise make unavailable" those profits. *See Kremen*, 2011 WL 6113198, at \*7.

6    It defies belief that Proton would have fraudulently transferred assets six months

7    ago, self-confessedly to judgment-proof itself, but nonetheless be content to let the

8    substantial sums it has generated since remain within the Court's reach.

9         For all these reasons, it is likely that Proton will continue to transfer assets

10   absent an asset freeze—and will do so in a manner that renders those assets

11   unrecoverable, causing Swan irreparable harm. *See, e.g.*, *Bavly*, 2019 WL 1883907,

12   at \*2 ("further dissipation of these funds would irreparably harm Plaintiffs");

13   *Odyssey*, 2017 WL 4432453, at \*7 (irreparable harm factor "tips strongly in favor

14   of Plaintiff" where "Defendants may continue to transfer or dissipate the funds …

15   if the injunction were denied, resulting in denying recovery to Plaintiff"). This is

16   not a case where additional dissipation or transfers can be undone through corrective

17   measures in the "normal course of litigation." *Cf. Safety PPE, LLC v. Skanda Grp.*

18   *of Indus. LLC*, 2022 WL 1592725, at \*2 (C.D. Cal. Mar. 25, 2022). Tether— ███

19   ██████████████████████████████████████████████████ —recently

20   redomiciled to El Salvador. Absent an asset freeze, Proton will likely continue to

21   use its various entities, and the international presence and substantial resources of

22   Tether, to dissipate any recoverable assets completely.

23              2.    Swan Is Without Fault In Creating the Crisis.

24        Swan "is without fault in creating the crisis that requires *ex parte* relief."

25   *Mission Power*, 883 F. Supp. at 492. This is not a close call. Swan has been

26   aggressively pursuing discovery since the start of this case. *See* Dkt. 164 at 13.

27   Swan twice sought expedited discovery in connection with its first request for a

28   TRO, Dkts. 9 & 43, which Defendants opposed based on misrepresentations to the

Court concerning their mining activity, *compare* Dkt. 29-1 at 12 ("Proton and the Individual Defendants are working only for 2040 Energy.") *with* ████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████  Swan served discovery requests on Proton on February 14, to which Proton has yet to produce a single document.

Swan subpoenaed ACDC on March 26, 2025.  Swan diligently negotiated production with ACDC, and ACDC produced documents on May 1, 2025.  *See* Ex. M.  Between that date and when Swan was ultimately able to review the documents, on May 29, 2025, Swan had to respond to four motions from Defendants, and make several filings relating to its motion to compel targeted discovery.[8]  As such, Swan reviewed the third-party discovery from ACDC in a diligent manner within a month of its production.  ***Critically***, once Swan discovered the message and what it meant—that Proton is actively seeking to evade judgment by this Court—Swan immediately began investigating its rights and preparing the instant motion.  Swan has "acted promptly" by filing this motion less than two weeks from when it made the discovery.  *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003) (plaintiff "acted promptly" by seeking an injunction in January 2002 where it learned of "the irreparable injury" in December 2001).

### B.    The Court Should Partially Lift the Stay as to Proton.

Swan moves only to lift the discretionary stay against Proton, and only for the limited purpose of ensuring that Proton cannot continue to fraudulently transfer

---

[8] On May 2 and 5, 2025, Swan filed supplemental memoranda relating to its motion to compel targeted discovery.  Dkts. 191, 195, 201.  On May 16, Swan filed its opposition to Proton's motion to compel arbitration.  Dkt. 211.  On May 19, Swan filed its opposition to Defendants' *ex parte* application to stay the case.  Dkts. 212, 213.  Before the Court stayed the case on May 27, Swan was also preparing oppositions to Defendants' noticed motions to stay.  Dkts. 206, 207.

assets in an attempt to avoid any monetary judgment against it.[9]  A partial lift of the stay in these circumstances comports with *Landis v. N. Am. Corp.*, 299 U.S. 248, 254 (1936).  "That the Court granted the [Defendants'] prior motion to stay the case pending the Ninth Circuit appeal does not prevent the Court from lifting the stay … at any point."  *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 2017 WL 10581085, *4 (C.D. Cal. June 5, 2017).[10]

When entering the discretionary stay, the Court found that "damage and hardship are neutral at this juncture," as "any harm stemming from Swan's inability to expeditiously pursue its case is offset by the need to preserve the rights of the Individual Defendants and Proton."  May 27 Order at 7.  That is no longer true: Proton's moving of funds causes irreparable harm to Swan, as discussed above.

Additionally, Swan is not seeking to engage in merits discovery or otherwise pursue a final decision on the merits.  The narrow issue Swan seeks to remedy is Proton's "moving assets so they are not [encumbered]" by Swan's claims.  *See* Ex. A.  The key legal and factual issues that the Court must confront in ruling on Swan's instant request concern Proton's attempts to dissipate assets to avoid any award that Swan may ultimately secure against it.  That is distinct from the overlapping merits discovery and potential for conflicting rulings over which the Court expressed concern in its Stay Order.  Dkt. 164.  Moreover, any determinations that the Court may make will be preliminary, rather than conclusive.  *Lackey v. Stinnie*, 145 S. Ct.

---

[9]  While it is not required that Swan have pled a fraudulent transfer claim in its Amended Complaint to be awarded the relief it seeks here, *see, e.g.*, *Gaponyuk v. Alferov*, 2023 WL 4670043 (E.D. Cal July 20, 2023) (granting TRO), should the Court prefer, Swan would also request the stay be lifted so that Swan can amend its complaint to add a claim for fraudulent transfer, based on the facts described here.

[10]  Lifting a discretionary stay does not amount to reconsideration of the prior order granting the stay.  *See Agua Caliente*, 2017 WL 10581085, *4 (rejecting argument that motion to lift stay should be evaluated under Local Rule 7-18's standard for motions for reconsideration); *Johnson v. JP Morgan Chase Bank, N.A.*, 2019 WL 2004140, at *2 n. 2 (C.D. Cal. Jan. 25, 2019) (similar).

16

659, 667 (2025) ("Preliminary injunctions … do not conclusively resolve legal disputes."); *see also* Dkt. 164 at 11 ("The Court's analysis of Swan's likelihood of success on the merits would not render Swan as the 'prevailing party.'").

Swan anticipates that Proton may argue that Swan's request for emergency relief is barred by the arbitration provisions in the Consulting Agreements. Such argument would be frivolous. First, Proton has waived any claim to arbitration, as Swan outlined in its opposition to Proton's motion to compel arbitration. *See* Dkt. 211.[11] But regardless, Swan's request for an asset freeze aims to preserve Swan's ability to recover any final judgment. This is a quintessential example of "interim conservatory measures" in aid of arbitration that courts have inherent authority to order—even as to arbitrable claims. *See, e.g.*, *Toyo Tire Holdings Of Americas Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010). Moreover, the Individual Defendants have repeatedly conceded that the Consulting Agreements allow for that kind of interim relief. *See, e.g.*, Dkts. 81-1, 122-1.[12] Thus, Swan's instant request for relief does not implicate any of the potentially relevant arbitration provisions, much less any rights to arbitration Proton may have. And it would be appropriate for the Court to order such relief even if every claim and other request for relief that Defendants have sought to compel to arbitration were so compelled. *See Pilot Inc. v. Tyc Brother Indus. Co.*, 2020 WL 3833597, at *4 (C.D. Cal. July 8, 2020) (noting that courts have authority to "grant interim injunctive relief on arbitrable claims, even where it has compelled arbitration").

---

[11] Swan plans to also ask the Court lift the stay for the limited additional purpose of ruling on Proton's fully-briefed motion to compel arbitration. *See* Dkt. 194. Swan will bring that motion through regular noticed motion procedures.

[12] Moreover, as the Court noted in its Stay Order, the central question at issue in the Individual Defendants' pending appeal is whether the preliminary relief Swan intended to seek to enjoin the Individual Defendants' broader misconduct "was a disguised request for permanent injunction relief." Dkt. 218 at 5. There cannot be even a colorable argument that Swan's instant request for relief qualifies as such.

**C.    The Court Should Enter a TRO.**

Swan moves for the limited purposes of ensuring Proton cannot continue to fraudulently transfer assets.  Proton's co-founder (Holmes) explicitly explained that he and his colleague San Naidoo (Proton's sole director) were fraudulently transferring assets to avoid having to pay Swan damages.  *See* Ex. A.  It is hard to imagine more clear-cut evidence of intentional fraudulent transfer.  And based on facts obtained from third-party mining sites, Proton continues to mine Bitcoin, such that its ongoing fraudulent asset transfers will cause Swan irreparable harm.  Under these circumstances, each of the *Winter* factors weighs in favor of granting a TRO freezing Proton's assets.   Because the irreparable harm that Swan will suffer (outlined above) flows from Proton's attempts to prevent it from recovering damages when Swan prevails on its meritorious underlying claims, Swan next addresses the likelihood of success on those claims.

1.    Swan Is Likely To Succeed on Its Claims Against Proton.

**Trade Secret Misappropriation.**  To prevail on its misappropriation claim, Swan must prove "that (1) Swan owned a trade secret; (2) Proton[] acquired, disclosed, or used that trade secret through improper means; and (3) the actions by Proton[] damaged Swan." Dkt. 164 at 22.  Swan is likely to prevail on each element.

*First*, Swan is likely to succeed in showing that it owns protectible trade secrets.  To demonstrate a likelihood of success on this issue, Swan "must identify the trade secrets and carry the burden of showing they exist."  *Cool Runnings Int'l Inc. v. Gonzalez*, 2021 WL 5331453, at *5 (E.D. Cal. Nov. 16, 2021).  Swan has done so.  Swan has filed a Trade Secret Identification (Dkt. 111-1) which provides nearly thirty pages of detail on the specific trade secrets that Proton has misappropriated.  That identification "identifies the trade secrets and shows that they exist," demonstrating "that the information is not 'readily ascertainable through proper means,' it 'derives independent economic value,' and that it took 'reasonable measures to keep such information secret.'"  Dkt. 164 at 23 (quoting 18 U.S.C.

§ 1839(3)).  Indeed, while he worked at Swan, Proton's current CEO (Zagury) recognized the competitive edge that Swan derived from keeping its mining techniques confidential, writing in January 2024: "KEEP EVERYTHING ABOUT SWAN MINING internal only."  AC ¶ 78.

Proton has defended against Swan's trade secret claim by arguing that 2040 Energy, rather than Swan, owns the trade secrets at issue.  *See* Dkt. 164 at 31. Contrary to Proton's prior assertions, Swan—not 2040 Energy—own these trade secrets.  Under the 2040 Energy joint venture, all parties recognized that the venture would rely upon Swan's efforts, expertise, and know-how.  As Tether and Zagury recognized in December 2023, prior to the theft of Swan's trade secrets: "From the outset of the 2040's operations, all parties contemplated that Electric Solidus Inc. ('Swan') would run the entirety of the business from end to end. . .  Likewise, [Tether] would rely solely upon the collective efforts and expertise of Swan in driving the success of 2040's mining operations, with Swan being integral to 2040's ongoing viability and success."  Ex. N at 2.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████[13]  Conversely, each member of Swan's mining team agreed to assign all intellectual property rights from their work to Swan.  *See* AC Exs. A-F (consulting agreements); Dkts. 194-4, -7 (employment agreements entered

---

[13]  The fact that a court in the UK may rule on whether 2040 Energy has an interest in the trade secrets under "the construction of [the Shareholders Agreement] under the law of England and Wales," Dkt. 164 at 9, does not prevent this Court from ruling on Swan's likelihood of success.  The Supreme Court has "cautioned against improperly equat[ing] 'likelihood of success' with 'success' and treating preliminary injunctions as tantamount to decisions on the underlying merits." *Lackey*, 145 S. Ct. at 667; *see also* Dkt. 164 at 11 ("[A]nalysis of Swan's likelihood of success on the merits would not render Swan as the 'prevailing party.'").

into by former Swan employees who now work for Proton). All of the trade secrets were developed by these Swan consultants and employees, for the purposes of their work at Swan. *See* AC ¶¶ 89-108. For these reasons, Swan is likely to succeed in showing that it owns protectible trade secrets. *See, e.g.*, *Cool Runnings*, 2021 WL 5331453, at *5; *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020) (granting preliminary injunction where "at least some" claimed pricing and customer information qualified as trade secrets).

*Second*, Swan is likely to succeed in showing that Proton acquired and used Swan's trade secrets through improper means. Even at this early stage of discovery, the evidence of Proton's and its agents' theft of Swan's trade secrets is overwhelming. In the ten days before they resigned from Swan, at least six current Proton employees or agents downloaded confidential material from Swan's internal systems—several of them downloaded *hundreds or thousands of files*. *See* AC ¶¶ 129, 132 (Monteleone's downloading components of Swan's BNOC source code); ¶ 133 (Hiley's downloading of 319 documents from Swan's Google Drive); ¶¶ 135, 138-39 (Zagury's copying of over 1,750 files from Swan's internal systems, including all of the source code for BNOC); ¶ 136 (Naidoo's downloading of highly confidential monthly mining performance data and financial records); ¶ 136-37 (Furlong's downloading of roughly 100 documents, including modeling files with proprietary formulas and logic that support Swan's BNOC); ¶ 145 (Dozic's downloading of 616 files to an external hard drive). "Courts have recognized that similar behavior can be evidence of trade secret misappropriation supporting injunctive relief." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 848 (N.D. Cal. 2019) (finding likelihood of success where defendant downloaded confidential files and "copied them to a personal storage device") (collecting cases).

Moreover, early discovery has already confirmed that Proton is continuing to mine Bitcoin at mining sites that Swan had formerly engaged, including under terms that Swan secured. For example, documents from one former Swan mining site



1
2
3    Discovery that another former Swan mining
4 site provided
5
6    At another site,
7
8
9
10
11
12    And in at least one instance,
13
14
15
16
17    *See* Ex. O (Holmes to ACDC on June 17, 2024,
18 less than two months before the mass resignations: "Let's get our deal done ASAP
19 as well!"  ACDC: "Agreed.  We're just waiting to hear back from your team.").

20    *Finally*, Swan is likely to show that Proton's misappropriation of its trade
21 secrets, and related theft of Swan's Bitcoin mining business, damaged Swan.
22 Swan's Bitcoin mining operations generated over ▆▆▆▆▆ in revenue during the
23 first half of 2024 alone.  *See* AC ¶ 183.  At the time of Proton's theft, Proton's
24 current CEO—Raphael Zagury—valued just Swan's share of its mining operations
25 at over ▆▆▆▆▆ *See id*. ¶ 215.  Proton's misappropriation has destroyed Swan's
26 mining business and robbed Swan of this revenue and value.  And as recent
27 discovery has shown, Proton is using Swan's trade secrets to mine Bitcoin, likely
28

21

outside of 2040 Energy and to the detriment of that venture (and thus by extension Swan), for the benefit of third parties. *See infra* pp. 8-9.

***Tortious Interference.*** Swan is likely to prevail on each element of its tortious interference claims,[14] many of which are not or cannot be in dispute. Swan's Amended Complaint "allege[s] an independent wrong, namely that Defendants Proton, Holmes, and Naidoo engaged in a detailed scheme[] to induce breaches of contractual confidentiality obligations by" Swan's former employees. *See* Dkt. 164 at 25-26. Swan supported those allegations by pointing to evidence on its internal systems demonstrating a systematic plan to steal Swan documents (AC ¶¶ 4, 129, 132, 133, 135-39, 145-47, 149-52); records of videocalls and meetings during which the conspirators, including Naidoo, planned their theft (*id.* ¶¶ 121-27); records showing that at least one employee (Dozic) stole a large number of Swan documents immediately after these coordination calls (*id.* ¶¶ 141-44); and contemporaneous notes indicating that Holmes and Naidoo understood their planned theft would "expose" them to breaches of their "Confidentiality and IP" obligations to Swan (*id.* ¶ 8). During much of this time, including the planning and theft that occurred after August 2 (*id.* ¶¶ 127, 135-39, 141-47, 149-52), Naidoo served as Proton's sole director. *See* Dkt. 164 at 28; Dkt. 121-2.

***Aiding and Abetting Breach of Duty of Loyalty.*** Swan is likely to prevail on its claim that Proton aided and abetted Bill Belitksy and Raphael Zagury's breaches of their duties of loyalty to Swan.[15] "Zagury, as Swan's Chief Investment Officer, and Belitsky, as Swan's General Counsel, owed Swan fiduciary duties." Dkt. 164

---

[14] To prevail on this claim, Swan must demonstrate (1) valid contracts between Swan and its former employees; (2) Proton's knowledge of those contracts; (3) intentional acts by Proton to induce a breach or disruption of those contracts; (4) actual breach or disruption; and (5) resulting damage. *See* Dkt. 164 at 25.

[15] To prevail on this claim, Swan must show that Belitsky and Zagury breached duties of loyalty to Swan, that Proton was aware of those breaches, and that Proton substantially participated in those breaches. *See* Dkt. 164 at 28.

1  at 28.  Swan's Amended Complaint outlines both of their "significant involvement"

2  in "executing the scheme" to steal Swan's Bitcoin mining business.  *Id.*  Those

3  allegations are substantiated by significant evidence, including contemporaneous

4  notes that Zagury took detailing the two men's involvement in the plan to compete

5  with Swan's mining business and solicit Swan's employees and contractors to cease

6  providing services to Swan.  *See* AC ¶ 8.  Proton's sole director, San Naidoo,

7  participated in this plotting and "was involved in the scheme while serving as

8  Proton's director." Dkt. 164 at 28; *see also* Dkt. 121-2 (declaration of San Naidoo).

9       **Unfair Competition.** Swan is likely to prevail on this claim (at least) because

10  it is likely to succeed on the above claims.  *See, e.g.*, *May Obesity Rsch. Inst., LLC*

11  *v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 953 (S.D. Cal. 2016) ("Violation of

12  almost any federal, state, or local law may serve as the basis for a UCL claim.").

13          2.    The Balance of Equities Favors and the Public Interest.

14       The remaining factors favor Swan.  This application does not seek to enjoin

15  Proton from using the trade secrets at issue in this case or otherwise prevent Proton

16  from mining Bitcoin.  Swan seeks merely to ensure that, should Swan ultimately

17  prevail on its claims against Proton, any award Swan secures will not be (further)

18  compromised by Proton's attempts to dissipate assets in the meantime.  Courts

19  routinely find that the balance of equities favors the plaintiff under these

20  circumstances.  *See, e.g.*, *Roberts*, 2013 WL 1874762, at *5 (limiting the transfer or

21  other disposition of defendants' assets or large quantities of funds not inequitable

22  when balanced against interest in recovering misappropriated funds); *Odyssey*, 2017

23  WL 4432453, at *8 (finding that the "minimal harm" defendants might suffer from

24  "not immediately reaping the benefits" of their allegedly wrongful conduct was

25  outweighed by the risk that plaintiff would be unable to recover after any judgment).

26       "[T]he public interest suffers when individuals or entities are able to defraud

27  others out of substantial sums."  *Thrailkill*, 2010 WL 11552964, at *4; *see also*

28  *Hyla*, 2020 WL 3213737, at *13 ("[T]he public interest in preserving [ ] illicit

proceeds ... for restitution to ... victims is great."); *Castillo*, 2021 WL 75829, at *3 (injunction "protecting Plaintiffs' ability to recover a potential future judgment[] advances the public's interest in seeing the satisfaction of judgment debts").

3.    *Grupo Mexicano Does Not Bar Swan's Requested Relief.*

Because Swan seeks equitable and statutory relief in its Amended Complaint, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), does not bar the district court from entering an asset freeze against Proton. *See, e.g.*, *Couturier*, 572 F.3d at 1083 ("[B]y its very terms, the holding of *Grupo Mexicano* is limited to cases in which only monetary damages are sought."). Here, Swan seeks equitable relief in the form of a permanent injunction and disgorgement. *Liu v. SEC*, 591 U.S. 71, 80 (2020) ("[A] remedy tethered to a wrongdoer's net unlawful profits, whatever the name, has been a mainstay of equity courts."). *Grupo Mexicano* also exempts cases involving fraudulent conveyances from the general rule barring preliminary injunctions freezing assets. *Focus Media*, 387 F. 3d at 1084. Further, as Swan has asserted statutory claims under the Defend Trade Secrets Act, which provides the court with the power to enter such preliminary injunctive relief, *Grupo Mexicano* is inapplicable. *Cf.* 527 U.S. 308, 333 (1999) (emphasizing Congress's power to provide courts with the authority to issue a preliminary injunction preventing petitioners from disposing of their assets).

**D.    The Court Should Order Targeted Discovery.**

The Court should also order targeted document discovery and examinations of Holmes and Naidoo to determine what assets have been transferred and to whom and where. *Million Source*, 2022 WL 1591721, *6 (finding good cause "to permit MSL to conduct[] expedited discovery as to the status of the funds"); *Kremen*, 2011 WL 6113198, at *9-10; *Smagin v. Yegiazaryan*, 2015 WL 12762270, at *2 (C.D. Cal. Sept. 18, 2015) (granting discovery "narrowly tailored and necessary to prevent. . . further transferring or concealing [of] assets."). Swan attaches its targeted document requests to this motion. *See* Ex. P. Such requests are relevant

and not overly burdensome. Indeed, Magistrate Judge Eick already ordered Proton to provide wallet information associated with Proton's mining activities, Dkt. 205, after this Court noted that similar requests for that information were narrowly tailored, Dkt. 164 at 13. Such discovery will assist the Court in determining whether to grant a preliminary injunction continuing the asset freeze upon expiration of the TRO. *Kremen*, 2011 WL 6113198 at *9-10 (granting expedited discovery, including two depositions, and ordering document production within 72 hours, all to prepare "for the order to show cause hearing for preliminary injunction").

Finally, the Court should order Holmes (who resides in Los Angeles) and Naidoo to appear at the preliminary injunction hearing for examination. Such examinations would be the most efficient way to determine exactly what happened—and continues to happen—here, and to evaluate their credibility. *See, e.g.*, *Equal Emp. Opportunity Comm'n & Sanchez*, 2010 WL 11452034, at *1 n.1 (E.D. Wash. Nov. 30, 2010) ("Live testimony is appropriate on a preliminary injunction motion where facts are contested and credibility determinations must be made[.]"); *Revelry Grp. LLC v. Jobe*, 2023 WL 2456287, at *4 (D. Idaho Mar. 10, 2023) (noting it would be "helpful to hear from some witnesses" at hearing on preliminary injunction as "much of the merits will turn on witness creditability").

## V.    CONCLUSION

For the reasons outlined above, the Court should lift the discretionary stay as to Proton for the purposes of: (1) entering a TRO freezing Proton's assets, (2) ordering Proton to respond on an expedited basis to targeted document discovery requests, and (3) setting a hearing date after completion of this discovery for a preliminary injunction, and ordering Alex Holmes and San Naidoo to appear for examination.

DATED:  June 11, 2025        QUINN EMANUEL URQUHART &
                             SULLIVAN, LLP

                             By:    /s/ Stacylyn M. Doore
                                    RYAN S. LANDES (State Bar No. 252642)
                                    ryanlandes@quinnemanuel.com
                                    865 S Figueroa Street, Floor 10
                                    Los Angeles, CA 90017-5003
                                    Telephone: (213) 443-3145
                                    Facsimile: (213) 443-3100

                                    STACYLYN M. DOORE (admitted *pro hac vice*)
                                    stacylyndoore@quinnemanuel.com
                                    111 Huntington Avenue, Suite 520
                                    Boston, MA 02199
                                    Telephone: (617) 712-7100
                                    Facsimile: (617) 712-7200

                                    RACHEL E. EPSTEIN (admitted *pro hac vice*)
                                    rachelepstein@quinnemanuel.com
                                    295 Fifth Avenue
                                    New York, NY 10016
                                    Telephone: (212) 849-7000
                                    Facsimile: (212) 849-7100

                                    JEFFREY WILLIAM NARDINELLI (State Bar No. 295932)
                                    jeffnardinelli@quinnemanuel.com
                                    50 California Street 22nd Floor
                                    San Francisco, CA 94111
                                    Telephone:  415-875-6600
                                    Facsimile: 415-875-6700

                                    AUSTIN BUSCHER (State Bar No. 346456)
                                    austinbuscher@quinnemanuel.com
                                    555 Twin Dolphin St., Fifth Floor
                                    Redwood Shores, CA 94065
                                    Telephone:  (650) 801-5000
                                    Facsimile:  (650) 801-5100

                                    *Attorneys for Plaintiff*
                                    *ELECTRIC SOLIDUS, INC. d/b/a SWAN*
                                    *BITCOIN*

26