# EXHIBIT H

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Benjamin I. Finestone
Anil Makhjiani
Mario O. Gazzola
Arman Cuneo
51 Madison Avenue, 22nd Floor
New York, New York
Telephone: (212) 849-7000

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone:  (737) 667-6102

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and
Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>                          Debtors.<br><br>CELSIUS NETWORK LIMITED and<br>CELSIUS NETWORK LLC (POST-EFFECTIVE<br>DATE DEBTORS)<br><br>                        Plaintiffs.<br><br>             against<br><br>TETHER LIMITED;<br>TETHER HOLDINGS LIMITED;<br>TETHER INTERNATIONAL LIMITED; and<br>TETHER OPERATIONS LIMITED<br><br>                        Defendants. | **Complaint**<br><br>Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered)<br><br><br><br>Adversary Proceeding No.<br><br>_____  _____ |

---

[1]  The reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## COMPLAINT

Plaintiffs Celsius Network Limited and Celsius Network LLC (the Post-Effective Date Debtors) ("Post-Effective Date Debtors" or "Celsius" or "Plaintiffs" or "Debtors") bring this Complaint against Tether Limited, Tether Holdings Limited, Tether International Limited, and Tether Operations Limited ("Tether" or "Defendants"), and allege the following based on reasonable due diligence of the Debtors' books and records, on personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this case to avoid and recover preferential and fraudulent transfers of 39,542.42 Bitcoin[2] from Celsius to Tether, first intended to secure, and subsequently applied on account of, antecedent debt Celsius owed to Tether.  These transfers undoubtedly improved Tether's position, occurring at a time when Debtors were tumbling towards bankruptcy and the price of Bitcoin (and the value of Tether's pre-existing collateral) was collapsing violently.  Indeed, unlike so many other creditors who did not seek to dismember the Debtors during their slide into bankruptcy, as a result of these preferential transfers of Bitcoin, Tether insulated itself from the effect of Celsius's bankruptcy.  Tether's efforts, of course, are now subject to intervening federal bankruptcy law.  Thus, these preferential and fraudulent transfers of Bitcoin should be avoided, and the Bitcoin or its value should be recovered for the benefit of Celsius's estate.  This action also seeks to recover damages caused by Tether's below-market application of such Bitcoin on that same debt, in violation of the terms of the governing agreement.

---

[2]   Capitalized terms not immediately defined have the meanings ascribed to them below.  ECF document numbers in this Complaint refer to ECF document numbers from Case No. 22-10964-mg.

2.      In 2020, Plaintiff Celsius Network Limited entered into a loan agreement (the "Token Agreement") with Tether Limited, allowing Celsius to borrow stablecoins, Tether token ("USDT") and Euro Tether ("EURT"), from Tether Limited at an interest rate between 0.333-0.55% per month.  Like many of its peer cryptocurrency companies, Celsius relied in large part on "stablecoins" to operate certain critical aspects of its business.  "Stablecoins" are digital currencies whose prices are pegged to those of other assets (such as the dollar).  Stablecoins are typically backed by reserves of *non*-digital assets, like cash or marketable securities, to ensure price stability. The world's most popular stablecoin, USDT, has its price pegged to the United States dollar. USDT was created by Tether in 2014, and has been marketed and controlled by them since then.

3.      To provide security for the loan, Celsius posted collateral in one of several cryptocurrencies (*e.g.*, Bitcoin, Ethereum).  At the peak of its borrowing, Celsius would borrow nearly $2 billion in USDT from Tether, collateralized by tens of thousands of Bitcoin.

4.      The cryptocurrency market steeply declined in the summer of 2022, and the Debtors filed the above-captioned chapter 11 cases on July 13, 2022.  The Debtors' bankruptcy filing was harmful to many of its creditors.  But, during the ninety-day period prior to the bankruptcy filing (the "§ 547(b) Period"), Tether took steps to insulate itself from the effect of bankruptcy. Specifically, on several occasions, Tether demanded, and received, a significant amount of new, incremental collateral to improve its position in the impending bankruptcy.  That is, Plaintiffs transferred 15,658.21 Bitcoin to Defendants to satisfy these demands, each inherently on account of antecedent debt (defined below as the Preferential Top-Up Transfers).

5.      In addition to the Preferential Top-Up Transfers, also during the § 547(b) Period, Plaintiffs transferred 2,228.01 Bitcoin of excess collateral to Defendants in connection with $300,000,000 of new borrowings.   These transfers cross-collateralized Celsius's existing

borrowings from Tether (defined below as the Preferential Cross-Collateralization Transfers). These preferential transfers of Bitcoin are worth in excess of $800,000,000 in today's dollars, and are separate from and do not include over 7,000 additional Bitcoin transferred to Tether in connection with new advances of USDT and EURT to Celsius. Nor do they include 36,684,477.42 EURT and 18,556,675.01 USDT of interest and principal payments made by Celsius to Tether during the ninety-day period prior to Celsius's bankruptcy filing.

6.      Tether issued its final demand to Celsius for additional collateral on June 13, 2022. Pursuant to the terms of the Token Agreement between Celsius and Tether, Celsius was entitled to ten hours to deposit additional collateral with Tether to fulfill that demand. But rather than affording Celsius the contractually permitted time to post new collateral (or, at worst, allow for a more orderly disposition of collateral), on that same day, Tether forged ahead with an improper application of 39,542.42 Bitcoin—the entirety of collateral that Celsius had posted——using the pledged Bitcoin to cover its exposure in full, but destroying Celsius's residual interest in the collateral. This final preferential transfer (as defined below, the "Preferential Application Transfer"), worth in excess of $2 billion in today's dollars, also improved Tether's position because a substantial portion of the putative collateral was avoidable, and comprised of the Preferential Top-Up Transfers, which were commingled with the entirety of the posted Bitcoin.

7.      The Preferential Application Transfer also plainly breached the Token Agreement, and its effect was to purportedly dispose of Celsius's property (being held by Tether as collateral) at near the bottom of the Bitcoin market. This breach of contract caused billions of dollars in damages to Celsius as described below.

8.      Tether applied Celsius's property (39,542.42 Bitcoin) to pay itself back for Celsius's outstanding loan, doing so for less than reasonably equivalent value at a time when

Celsius was insolvent. As such, this application of collateral was a fraudulent transfer and should be avoided under the Bankruptcy Code and applicable state law.

9. These preferential and fraudulent transfers of Bitcoin should be avoided and recovered from Tether, and Tether should be ordered to pay damages for its unlawful application of collateral.

## THE PARTIES

10. Plaintiff Celsius Network Limited is a private limited company incorporated under the laws of England and Wales with a principal place of business in London, United Kingdom.

11. Plaintiff Celsius Network LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey.

12. Defendant Tether Holdings Limited is incorporated in, and is a citizen of, the British Virgin Islands. It owns Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.

13. Defendant Tether Limited is incorporated in, and is a citizen of, Hong Kong.

14. Defendant Tether Operations Limited is incorporated in, and is a citizen of, the British Virgin Islands.

15. Defendant Tether International Limited is incorporated in, and is a citizen of, the British Virgin Islands.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and the Standing Order of the United States District Court for the Southern District of New York referring to the Bankruptcy Judges of this District all cases and proceedings arising under the Bankruptcy Code. This court also has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' preference and

fraudulent transfer claims arise under federal law, and has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state and foreign law claims, which arise out of the same nucleus of operative facts.

17. This adversary proceeding is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2). In the event that this or any other Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

18. Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and relates to the above-captioned chapter 11 cases under the Bankruptcy Code already pending in this District. Venue is additionally proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19. This Court's *Findings of Fact, Conclusions of Law, and Order Confirming The Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* (the "Confirmation Order"), ECF Doc. No. 3972, in the above-captioned chapter 11 cases, approves the Debtors' chapter 11 plan, which, at Article XII (12), provides that this Court "shall retain exclusive jurisdiction" to "resolve any cases, controversies, suits, disputes, Causes of Action, or other matters," like this one, "that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator."[3]

20. The Court has personal jurisdiction over Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure because Plaintiffs' claims arise from and relate to

---

[3] In prosecuting this action, the Debtors are directed by the Blockchain Recovery Investment Consortium ("BRIC"), serving as Litigation Administrator (Complex Asset Recovery Manager). *See* ECF Doc. No. 4172.

Defendants' continuous and systematic contacts with the United States. Each Defendant transacted business in and maintained substantial contacts with the United States, including by maintaining relationships with United States entities. Each Defendant has purposefully availed itself of the privilege of doing business in the United States, and has invoked the benefits and protections of its laws. Defendants' actions were directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District. Indeed, Defendants have repeatedly submitted to the jurisdiction of courts in this District.

21. The Court also has quasi in-rem jurisdiction because of Defendants' maintenance of one or more bank accounts in New York.

## **FACTUAL BACKGROUND**

### A. **Plaintiffs' Business And Reliance On Loans From Tether To Operate**

22. Celsius was a consumer-facing cryptocurrency company that was founded in 2017 by Alex Mashinsky, Shlomi "Daniel" Leon, and Nuke Goldstein. Celsius's primary product was a platform that allowed customers to purchase and deposit various cryptocurrencies. Like a traditional bank, Celsius paid interest to customers who deposited cryptocurrency on its platform. Celsius was known to pay some of the highest interest rates in the market to its depositors.

23. In order to generate revenue, Celsius lent its customer-deposited cryptocurrencies to third parties, who in turn would pay Celsius interest. Celsius used revenue from those loans to pay its customers interest on their deposits. Celsius also operated a Bitcoin mining operation.

24. Like many other crypto companies, Celsius borrowed "stablecoins" to fund its day-to-day operations. "Stablecoins" are digital tokens whose price is pegged to another asset (*e.g.*, the United States dollar or gold) and are typically backed by reserves of *non*-digital assets (such as cash or marketable securities) to achieve price stability.

25.     Defendants control and market the world's most popular stablecoin, USDT.  Each USDT token is purportedly backed by assets (such as cash and commercial paper) such that one USDT is worth one United States dollar.  Defendants also control and market the EURT token, which is purportedly backed by assets such that one EURT is worth one Euro.  Celsius relied on USDT and EURT to operate critical parts of its business.

**B.     The Token Agreement**

26.     On February 1, 2020, Plaintiff Celsius Network Limited and Defendant Tether Limited entered into a "Token Agreement" (the "Initial Token Agreement") allowing Celsius to borrow USDT from Tether.  Celsius agreed to collateralize the borrowing by posting collateral to Tether in any of the following cryptocurrencies: (a) Ether (ETH) tokens; (2) Tether Gold (XAUt); or Bitcoin (BTC) tokens.  If Celsius posted collateral to Tether in Bitcoin, the value of the Bitcoin was initially required to be 140% of the value of the amount borrowed.  Celsius paid Tether interest between 0.333% and 0.55%, per month, depending on the type of collateral posted by Celsius.  For example, if Celsius posted collateral in Bitcoin, it would have to pay Tether monthly interest of 0.55% on its borrowings.

27.     Significantly, the Initial Token Agreement provided that no change or modification to the agreement would be valid unless made in writing and signed by the Parties—Celsius Network Limited and Tether Limited.

28.     The Initial Token Agreement was amended on January 20, 2022 (as amended, the "Token Agreement" or the "Amended Token Agreement"), and is attached as Exhibit A.  Like its predecessor, the Amended Token Agreement authorized Celsius to borrow USDT or EURT if Celsius posted collateral in the form of Ether, Tether Gold, or Bitcoin.

29.     Like the Initial Token Agreement, the Amended Token Agreement was negotiated between Tether's representatives and Celsius personnel located in the United States.  Many of the

principal terms of the Amended Token Agreement, for example, were agreed to during an all-hands call in December of 2021, just a few weeks before the amendment was signed. United States-based Celsius employees—such as Alex Mashinsky, Ron Deutsch, and Joseph Golding-Ochsner—were present at that meeting and negotiated with Tether's top executives, including Tether's CFO, Giancarlo Devasini, and its Chief Investment Officer, Silvano Di Stefano. Celsius's lead throughout the negotiations was Joseph Golding-Ochsner, a Celsius attorney based in the United States.

30.     The negotiations surrounding the Amended Token Agreement centered on several key terms. Among the most important issues discussed during the negotiations was the contract's provision regarding the timeframe that Tether had to wait before it could start liquidating Celsius's collateral following a demand for additional collateral. Tether wanted to maintain the terms of the original agreement, which Tether believed allowed it to commence liquidation immediately after the value of collateral dropped below a certain threshold. Celsius proposed that it be allowed two business days to deposit additional collateral after receiving a demand for additional collateral before Tether would have any right to liquidate collateral.

31.     Ultimately, the parties agreed to change the procedure by which Celsius would post additional collateral and the circumstances under which a liquidation could happen. Unlike the Initial Token Agreement, the Amended Token Agreement required Tether to send notice of a collateral demand to Celsius if the value of Celsius's posted collateral dropped below a specified threshold. After receiving such a notice, the Amended Token Agreement provided Celsius ten hours to satisfy the collateral demand. This is in contrast to the Initial Token Agreement, under which Tether was entitled, "*without further notice to the Recipient*, to sell, dispose of, and liquidate the Collateral." Now, if Celsius was unable to satisfy the collateral demand in that 10-hour window,

only then was Tether permitted to "sell, dispose of, and liquidate the Collateral." Celsius specifically negotiated for this 10-hour window, and regarded it as one of the "key changes in the amendment." This provision was important for the stability of Celsius's business and to protect Celsius's residual interest in its collateral, as discussed below.

32. The parties also extensively negotiated how Tether would deal with excess proceeds from Celsius's collateral in the event of a liquidation. Celsius wanted excess proceeds returned, and Tether wanted to keep the windfall for itself. This remained an open point through much of the negotiation of the Amended Token Agreement, and was only settled a few weeks later, following a meeting on or about January 12, 2022, between Mashinsky and Di Stefano. Mashinsky was in Hoboken, New Jersey when this critical open item in the negotiation was finally resolved.

33. The Amended Token Agreement reflects the agreement that they reached—an agreement expressly providing for and protecting Celsius's residual interest in collateral. It was made clear that collateral pledged to secure loans under the agreement was to be held "for the benefit of" Celsius. Moreover, the Amended Token Agreement expressly provided that, any "surplus" from an application of the collateral was to be returned to Celsius.

34. The Initial Token Agreement was signed on behalf of Celsius Network Limited by its CFO, Harumi Urata-Thompson, an employee based in the United States. The Amended Token Agreement was signed on behalf of Celsius Network Limited by two directors, Alexander Mashinsky and Shlomi "Daniel" Leon, both of whom were based in the United States at the time the agreement was negotiated and executed. Loans under the agreement were made for the benefit of Celsius Network, Inc. and Celsius Network LLC—both United States companies.

35. As stated above, Celsius borrowed USDT under the Amended Token Agreement. Celsius posted collateral for those loans in the form of Bitcoin or Ethereum. By the start of April

of 2022, Celsius had $512,330,000 in outstanding borrowings in USDT pursuant to the Amended Token Agreement.[4]  And as of the start of April 2022, Celsius had posted 16,505.17 Bitcoin to Tether as collateral to secure the 512,330,000 USDT in outstanding borrowing.  Transactions under the Amended Token Agreement were at times initiated and executed by Celsius employees based in the United States, and transfers under the agreement were often made from United States-based accounts.  In performing under the Amended Token Agreement, Defendants had continuous and systematic contact with Celsius's United States-based personnel.

### C.   The Preferential Top-Up And Cross-Collateralization Transfers

36.    The § 547(b) Period in this case began on April 14, 2022.  As of that date, Celsius had a balance of 512,330,000 USDT on its loan with Tether.  That USDT loan was collateralized by approximately 16,505.17 Bitcoin.

37.    Beginning at around the same time—April 2022—Bitcoin's price began a violent downward slide.  The price of Bitcoin continued to fall through early July 2022, around the time Debtors filed their voluntary Chapter 11 petitions.

38.    As Bitcoin's price started to fall, Tether became concerned that it, like all other creditors, would be exposed to Celsius's insolvency.  In response, Tether initiated a series of demands under the Amended Token Agreement to improve its security on the antecedent debt owed to it by Celsius.  In each case, Celsius responded to these demands by promptly depositing additional collateral with Tether.  Celsius made the following Bitcoin transfers to Tether—each on account of antecedent debt—during the § 547(b) Period:

---

[4]   Celsius also borrowed a small amount of EURT from Tether.  Those loans are not a subject of this Complaint.

39.     On or about May 3, 2022, Celsius transferred approximately 1,633.35 Bitcoin to Tether.

40.     On or about May 7, 2022, Celsius transferred approximately 2,044.00 Bitcoin to Tether.

41.     On or about May 9, 2022, Celsius transferred approximately 2,214.00 Bitcoin to Tether.

42.     On or about May 11, 2022, Celsius transferred  approximately 2,398.29 Bitcoin to Tether.

43.     On or about May 12, 2022, Celsius transferred  approximately 2,598.15 Bitcoin to Tether.

44.     On or about June 10, 2022, Celsius transferred  approximately 2,807.75 Bitcoin to Tether.

45.     On or about June 12, 2022, Celsius transferred  approximately 3,041.73 Bitcoin to Tether.

46.     In sum, Celsius transferred approximately 16,737.27 Bitcoin to Tether during the § 547(b) Period on account of antecedent debt.   This 16,737.27 Bitcoin—less approximately 1,079.06 Bitcoin released to Celsius on June 6, 2022, for which Celsius did not make an otherwise unavoidable transfer to or for the benefit of Tether—are avoidable as preferences (the "Preferential Top-Up Transfers").  The Bitcoin transferred from Celsius to Tether pursuant to the Preferential Top-Up Transfers was not held in segregated wallets or accounts.  To the contrary, this Bitcoin was commingled with the Bitcoin that Celsius had already transferred to Tether prior to the § 547(b) Period.  These transfers were not made in connection with contemporaneous extensions of USDT loans to Celsius.

47.    In addition to the Preferential Top-Up Transfers, Celsius borrowed additional USDT from Tether on three occasions throughout the § 547(b) Period.  On or about April 20, 2022, Celsius borrowed 100,000,000 USDT from Tether.  On or about May 5, 2022, Celsius borrowed 100,000,000 USDT from Tether.  On or about June 9, 2022, Celsius borrowed 100,000,000 USDT from Tether.  In each instance, Celsius posted Bitcoin in connection with the foregoing: 3,095.00 Bitcoin, 3,288.00 Bitcoin, and 4,317.00 Bitcoin, respectively.  This Bitcoin was commingled with Celsius's previous collateral postings and cross-collateralized Celsius's existing loan from Tether. Of this 10,700.00 new Bitcoin posted by Celsius, approximately 2,228.01 was excess collateral. Celsius's transfer of this excess—approximately 2,228.01 Bitcoin—to Tether (the "<u>Preferential Cross-Collateralization Transfers</u>") was, like the Preferential Top-Up Transfers, preferential and are subject to avoidance. During the § 547(b) Period, Celsius also made a series of principal and interest payments to Tether, on account of its loans.[5]  These transfers are separate and distinct from the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers on account of antecedent debt described above.

48.    The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers dramatically improved Tether's position as a creditor.  If Tether had not received the

---

[5]  On April 22, 2022, Celsius made a principal payment to Tether of approximately 13,000,000.00 EURT.  On May 2, 2022, Celsius made interest payments to Tether of approximately 97,581.02 EURT and 2,789,566.67 USDT.  On May 5, 2022, Celsius made a principal payment to Tether of approximately 7,451,552.00 EURT.  On May 10, 2022, Celsius made a principal payment to Tether of approximately 3,809,470.00 EURT.  On May 17, 2022, Celsius made a principal payment to Tether of approximately 5,332,296.00 EURT.  On May 19, 2022, Celsius made a principal payment to Tether of approximately 12,250,000.00 USDT.  On May 30, 2022, Celsius made interest payments to Tether of approximately 3,517,108.34 USDT and 34,692.40 EURT.  On June 13, 2022, Celsius made a principal payment to Tether of approximately 5,000,572.97 EURT. On June 14, 2022, Celsius made principal payment to Tether of approximately 1,958,886.00 EURT. In sum, Celsius made principal and interest payments to Tether totaling about 36,685,050.39 EURT and 18,556,675.01 USDT during the § 547(b) Period.

Preferential Top-Up Transfers (15,658.21 Bitcoin) and Preferential Cross-Collateralization Transfers (2,228.01 Bitcoin) during the § 547(b) Period, Tether would not have been able to come close to making itself whole on its $812,330,000 USDT loan to Celsius, which it ultimately was able to do with the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. Indeed, as of the Petition Date, without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had over $350 million less in collateral.

49. Celsius is presumed to be, and in fact was, insolvent at the time of each of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers. As of March of 2022, Celsius, by its own account, had a negative net capital position of $60 million, even giving Celsius full credit for CEL Token (Celsius's own cryptocurrency) that it held in its treasury at a value of over $700 million. As noted above, cryptocurrency prices started drastically dropping in April of 2022, and as a result, the value of Celsius's assets—which were primarily in Bitcoin, Ethereum, CEL Token, and other cryptocurrencies—dropped significantly.

50. Most notably, in April and May of 2022, CEL Token lost most of its value. Celsius's liabilities at the end of the third quarter of 2022 included over $14 billion of principal and interest payments owed to customers on their deposits, and billions owed to third-party lenders. Although those liabilities also declined, they did not do so at the same rate as Celsius's assets. As a result, in April, May, and June of 2022, the value of Celsius liabilities far exceeded the value of its assets.

51. In addition to being balance sheet insolvent, Celsius also was unable to pay its debts when they came due and did not have adequate capital to operate its business. The liquid assets that Celsius held during this time period were only a fraction of the liquid assets Celsius needed to

operate its business and meet its expected obligations, rendering it insolvent on a cash flow and adequacy of capital basis.

52.     Each time Celsius fulfilled a collateral demand, by making the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, it was transferring its own interest in property to Tether on account of antecedent debt.  Tether provided no contemporaneous value to Celsius in exchange for the transferred property.

53.     Several of these transfers were initiated from the United States by United States-based Celsius employees, and Celsius employees in the United States gave notice of these transfers to Tether.  Finally, on information and belief, each of these transfers was ultimately overseen and approved by Celsius CEO Alex Mashinsky, who was based in Hoboken, New Jersey at the time of the transfers.

### D.     The Improper Application of Collateral

54.     By June 2022, Bitcoin's dropping price had led to a dire situation for Celsius and the cryptocurrency market as a whole.  Celsius's customers began withdrawing deposits from Celsius at increasingly fast rates, putting it under immense financial distress.  Things became so bad for Celsius that on June 12, 2022, Celsius publicly announced that it was "pausing all withdrawals . . . [and] transfers between accounts."  This "pause" was never lifted before Celsius's bankruptcy filing, and, as a result, Celsius customers were never able to withdraw their assets.

55.     Tether, of course, knew of Celsius's vulnerable position—news of Celsius's "pause" was well known in the cryptocurrency market.  Moreover, on June 12, 2022, Celsius's CEO Alex Mashinsky reached out to Tether's CFO Giancarlo Devasini, asking for Tether's "help squeezing [Celsius] short sellers."  In the words of Rod Bolger—who served as Celsius's CFO at the time—Celsius was "desperate" for Tether's help.  Mashinsky and Devasini agreed to talk at nine in the morning on Monday, June 13, 2022.

15

56.     But Tether had no interest in helping, and instead was solely focused on improving its own position.  With the benefit of having received the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether embarked on a plan to first ask for additional collateral, and then apply Celsius's collateral to Celsius's entire outstanding loan balance.  This would ensure that Tether would extinguish its entire exposure to Celsius, at a time when other creditors (*e.g.*, customers) could not get access to any of their deposits held by Celsius.

57.     Tether set its plan in motion late at night (Eastern time) on June 12, 2022, when it issued a collateral demand to Celsius.  As noted above, Celsius satisfied that collateral demand promptly, transferring 3,041.73 Bitcoin to Tether early in the morning of June 13.  Several hours later, Tether made a second collateral demand to Celsius.  Celsius notified Tether that it was "working on preparing the BTC [Bitcoin]" to satisfy the collateral demand, and reminded Tether that it had ten hours to do so under the Amended Token Agreement.  However, Tether's representatives demanded immediate payment notwithstanding expressly acknowledging that Celsius *"have 10h in the [Agreement]*..."

58.     Celsius continued to assure Tether that it was working on providing collateral as soon as possible.  But Defendants decided to proceed with an immediate application of Celsius's collateral—regardless of the terms of the Amended Token Agreement, which required a 10-hour waiting period before Tether could initiate the application process.  Amidst the chaos of June 13, 2022, Celsius's CEO Alex Mashinsky allegedly gave Tether permission to liquidate Celsius's collateral in an "orderly" manner.  However, in contravention of the terms of the Amended Token Agreement, Tether never obtained a written agreement from Mashinsky (or anyone else at Celsius) to amend this contractually mandated 10-hour waiting period.

16

59.     Indeed, Celsius was never provided the full 10-hour period to which it was contractually entitled to.  With more than half of Celsius's ten-hour period to post additional collateral remaining, Tether purported to begin a fire sale of Celsius's collateral.  Tether performed this "fire sale" by purportedly selling Celsius's Bitcoin in a series of tranches over a period of several hours.  Within hours, all of Celsius's collateral (39,542.42 Bitcoin) had been applied by Tether against Celsius's outstanding indebtedness to Tether (the "Preferential Application Transfer").

60.     Tether represented to Celsius that it applied the entirety of Celsius's collateral, 39,542.42 Bitcoin, at a dollar value of $816,822,948.  The Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers were commingled among this collateral.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.  Without the benefit of the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers, Tether would have had only 21,656.20 Bitcoin in collateral.  At the same average price that Tether claims to have applied the 39,542.42 Bitcoin in satisfaction of the amounts owed Tether, Tether would have realized only $447,349,482.57, leaving a $364,980,517.43 deficiency.[6]  In other words, the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer clearly improved Tether's position as of the application date (just as it did as measured as of the Petition Date).

61.     Apart from the fact that these transfers were preferences under the Bankruptcy Code, Tether robbed Celsius of its contractually entitled 10-hour window to satisfy collateral demands.  At the time of Tether's last collateral demand on June 13, 2022, Celsius had sufficient

---

[6]  As noted above, at Petition Date prices, Tether would have faced a similar $374,616,278.28 shortfall.

Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days. This was especially true given that Celsius had instituted a "pause" on customer withdrawals, which Tether was well aware of, resulting in the retention of, and access to, a significant amount of Bitcoin. If Celsius had been given the opportunity to meet the collateral demand—which it had the contractual right to do—it could have been able to avoid the disposition of its Bitcoin at near the bottom of the cryptocurrency market. Instead, that disposition was carried out for the benefit of just one creditor: Tether. Moreover, Celsius could have endured through the Petition Date, at which point the automatic stay would have intervened, stopping any attempt by Tether to apply collateral against its claim. Celsius could have retained pledged Bitcoin worth more than $2 billion today. Tether's breach has thus caused Celsius billions of dollars of harm.

62. Tether's disposition of Celsius's collateral was also commercially unreasonable. Established market practice and commercially reasonable standards of good faith dictate that Tether should have liquidated such a large block of Bitcoin over a period longer than several hours. Liquidating this amount of collateral over a period longer than several hours would (a) minimize the price impact of the sale, especially during a time where buyers in the cryptocurrency market had fear about the direction of the market; and (b) allow time to market the assets to find buyers willing to transact at market prices. If Tether had followed established market practices, it would have ensured that the Bitcoin would have been sold at the full prevailing market price. Instead, Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39. In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, around the time when the collateral was allegedly liquidated.

63.     Upon information and belief, Tether's application of Celsius's collateral was accomplished through the use of United States intermediaries or counterparties, involved transactions routed through United States servers, involved contacts with Celsius's United States-based personnel, and/or involved the use of bank accounts, financial institutions, or cryptocurrency exchanges located in the United States.

### CAUSES OF ACTION

### COUNT ONE: PREFERENCE (11 U.S.C. § 547)
### (against all Defendants)

64.     The allegations in paragraphs 1 through 63 are incorporated by reference as if fully set forth below.

65.     Plaintiffs have conducted reasonable due diligence into the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, including, *inter alia*, by reviewing the books and records of Debtors and other information about these transfers.  Plaintiffs have also conducted reasonable due diligence into known or reasonably knowable affirmative defenses that Defendant Tether Limited could assert, including under 11 U.S.C. § 547(c).

66.     Celsius made the Preferential Top-Up Transfers described in paragraphs 39 through 45 within the ninety-day § 547(b) Period.  The Preferential Top-Up Transfers totaled 15,658.21 Bitcoin.

67.     Each of the Preferential Top-Up Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

68.     Each of the Preferential Top-Up Transfers was made to or for the benefit of Defendants.

69.     At the time of each Preferential Top-Up Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  Defendants received the Preferential Top-Up Transfers, or alternatively the Preferential Top-Up Transfers were made for their benefit.

70.     Each of the Preferential Top-Up Transfers was made on account of antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Top-Up Transfers related to that antecedent debt.

71.     Each of the Preferential Top-Up Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

72.     Each of the Preferential Top-Up Transfers was made on account of a demand by Tether, and as described above, was made outside the ordinary course of business.

73.     The Preferential Top-Up Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Top-Up Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

74.     Celsius made the Preferential Cross-Collateralization Transfers described in paragraph 47 within the ninety-day § 547(b) Period.  The Preferential Cross-Collateralization Transfers totaled 2,228.01 Bitcoin.

75.     Each of the Preferential Cross-Collateralization Transfers was a transfer of Celsius's property—namely, Celsius's Bitcoins.

76.     Each of the Preferential Cross-Collateralization Transfers was made to or for the benefit of Defendants.

77.     At the time of each Preferential Cross-Collateralization Transfers, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  Defendants received the Preferential Cross-Collateralization Transfers, or alternatively the Preferential Cross-Collateralization Transfers were made for their benefit.

78.     Each of the Preferential Cross-Collateralization Transfers cross-collateralized antecedent debt owed by Celsius to Defendant Tether Limited, and each of the Preferential Cross-Collateralization Transfers related to that antecedent debt.

79.     Each of the Preferential Cross-Collateralization Transfers was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

80.     Each of the Preferential Cross-Collateralization Transfers was made outside the ordinary course of business.

81.     The Preferential Cross-Collateralization Transfers, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Cross-Collateralization Transfers had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

82.     Celsius made the Preferential Application Transfer within the ninety-day § 547(b) Period.  The Preferential Application Transfer totaled 39,542.42 Bitcoin.

83.     The Preferential Application Transfer was a transfer of Celsius's property—namely, Celsius's Bitcoins.

84.     The Preferential Application Transfer was made to or for the benefit of Defendants.

85.     At the time of the Preferential Application Transfer, Defendant Tether Limited was a creditor of Celsius within the meaning of section 101(10) of the Bankruptcy Code.  At the time of the Preferential Application Transfer, Defendants received that transfer, or alternatively the Preferential Application Transfer was made for their benefit.

86.     The Preferential Application Transfer was made on account of antecedent debt owed by Celsius to Defendant Tether Limited.

87.     The Preferential Application Transfer was made within ninety days of the Petition Date, and was made while Plaintiffs were insolvent.

88.     The Preferential Application Transfer was made outside the ordinary course of business, including because it was made in violation of the terms of the Amended Token Agreement and while Celsius was under duress.

89.     In view of the facts that the Preferential Top-Up Transfers and Preferential Cross-Collateralization Transfers are avoidable transfers, the Preferential Application Transfer, if not avoided, would allow Defendant Tether Limited to receive more than it would have if (i) Debtors' chapter 11 case were a case under chapter 7 of the Bankruptcy Code, (ii) the Preferential Application Transfer had not been made, and (iii) Defendant Tether Limited received payment on account of the antecedent debt referenced herein, to the extent provided by the provisions of the Bankruptcy Code.

90.     As of the date of this Complaint, Defendants have not returned the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, or the Preferential Application Transfer to Celsius.

91.     Plaintiffs are entitled to an order and judgment under 11 U.S.C. § 547 avoiding the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer.

## COUNT TWO: RECOVERY OF PROPERTY (11 U.S.C. § 550)
### (against all Defendants)

92.     The allegations made in paragraphs 1 through 91 are adopted as if fully set forth herein.

93.     As alleged in paragraphs 64 through 91 above, Plaintiffs are entitled to avoid the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and Preferential Application Transfer under section 547 of the Bankruptcy Code.

94.     Defendants are the initial, immediate, or mediate transferees of the Preferential Top-Up Transfers, the Preferential Cross-Collateralization Transfers, and the Preferential Application Transfer, or the entities for whose benefit such transfers were made.  Accordingly, Plaintiffs are entitled to receive a return of their property—15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (without duplication), respectively, or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## COUNT THREE: BREACH OF CONTRACT (BVI LAW)[7]
### (against Tether Limited)

95.     The allegations made in paragraphs 1 through 94 are adopted as if fully set forth herein.

---

[7]     Plaintiffs hereby give notice pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure and Rule 44.1 of the Federal Rules of Civil Procedure of their intent to raise issues under the law of the British Virgin Islands ("BVI"), including but not limited to Defendants' liability for breach of contract and breach of the covenant of good faith and fair dealing.

96.     The Amended Token Agreement is a binding contract.

97.     Plaintiffs have fully performed their obligations and satisfied any conditions precedent under the Amended Token Agreement.

98.     Defendant Tether Limited has breached the Amended Token Agreement by improperly applying Plaintiffs' collateral to Plaintiffs' antecedent debt prior to the contractually required ten-hour waiting period after sending a notice of a demand.

99.     At the time of Defendant Tether Limited's last collateral demand on June 13, 2022, Celsius had sufficient Bitcoin on its balance sheet to post as collateral to Tether, including for, at least, the next 30 days.  If Celsius had been given its contractually entitled opportunity to meet the collateral demand, it could have avoided the disposition of its Bitcoin at near the bottom of the cryptocurrency market.  Celsius could have retained its pledged Bitcoin—worth more than $2 billion today.  Celsius has thus been harmed by billions of dollars as a result.

100.     At the very minimum, Plaintiffs have suffered $100 million in damages as a proximate result of Defendant Tether Limited's breaches of contract, corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether not breached the Agreement.  Plaintiffs have suffered additional expectation, reliance, and consequential damages as a result of Defendant Tether Limited's breaches of contract in an amount to be proven at trial.

## COUNT FOUR: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (BVI LAW)
### (against Tether Limited)

101.     The allegations made in paragraphs 1 through 100 are adopted as if fully set forth herein.

102.    The law of the British Virgin Islands implies a duty of good faith and fair dealing in the performance of the Amended Token Agreement.

103.    Defendant Tether Limited has breached its duty of good faith and fair dealing under the Amended Token Agreement by improperly liquidating Plaintiffs' collateral, by arbitrarily and irrationally exercising its discretion under the Amended Token Agreement, resulting in the minimization of amounts due to Plaintiffs, and by unfairly interfering with the Plaintiffs' right to receive the benefits of the Agreement.

104.    At the very minimum, Plaintiffs have suffered $100 million in damages as a proximate result of Defendant Tether Limited's breaches of the duty of good faith and fair dealing, corresponding to the difference between the average price for which Tether applied Plaintiffs' collateral and the price that would have been obtained had Tether liquidated Plaintiffs' collateral in good faith and in a commercially reasonable manner on or around June 13, 2022.  Plaintiffs have suffered additional expectation, reliance, and consequential damages as a proximate result of Defendant Tether Limited's breaches of the duty of good faith and fair dealing in an amount to be proven at trial.

### COUNT FIVE: FRAUDULENT TRANSFER (11 U.S.C. §§ 548(A)(1)(B) AND 550)
#### (against all Defendants)

105.    The allegations made in paragraphs 1 through 104 are adopted as if fully set forth herein.

106.    On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948.  That Bitcoin was property of the Debtors.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

107.    Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

108.    Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin.  Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39.   In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the three hour window during which the collateral was allegedly liquidated.

109.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.  *See* ECF Doc. Nos. 7, 974.

110.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent transfer avoidable under section 548(a)(1)(B) of the Bankruptcy Code.  Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

### COUNT SIX: FRAUDULENT TRANSFER (11 U.S.C. §§ 544(B) AND 550)
**(against all Defendants)**

111.    The allegations made in paragraphs 1 through 110 are adopted as if fully set forth herein.

112.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent or otherwise voidable transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the relevant fraudulent or voidable transfer laws as enacted in the states of New York, New Jersey, and Delaware.

113.     On June 13, 2024, Tether represented to Celsius that it applied the entirety of Celsius's collateral of 39,542.42 Bitcoin against Celsius's outstanding debt at a dollar value of $816,822,948.  That Bitcoin was property of the Debtors.  On the application date, Celsius's outstanding loan balance under the Amended Token Agreement was $812,333,000.

114.     Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding debt happened within two years of Celsius's bankruptcy petition, and while Celsius was (a) insolvent, (b) was engaged in a business or a transaction for which any property remaining with Celsius was an unreasonably small capital, or (c) intended to incur, or believed that it would incur, debts that would be beyond Celsius's ability to repay as such debts matured.

115.     Celsius received less than reasonably equivalent value in exchange for the application of its 39,542.42 Bitcoin.  Tether applied Celsius's Bitcoin against obligations owed to it for an average price of $20,656.88 each—considerably less than Bitcoin's market closing price on June 13th, $22,487.39.   In fact, Tether applied Celsius's Bitcoin at an average price considerably below Bitcoin's *low* price of $22,808 on Bitfinex, a crypto exchange controlled by Tether's parent company, during the time window during which the collateral was allegedly liquidated.

116.    Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers. *See* ECF Doc. Nos. 7, 974.

117.    By virtue of the foregoing, Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan was a constructive fraudulent or otherwise voidable transfer avoidable under section 544(b) of the Bankruptcy Code and applicable state law.  Accordingly, Plaintiffs are entitled to receive a return of their property—39,542.42 Bitcoin or, in the alternative, the value of such property—pursuant to 11 U.S.C. § 550 plus interest at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and against Defendants and grant the following relief:

(a)    Avoid the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer as preferential transfers under 11 U.S.C. § 547:

(b)    Direct Plaintiffs to return the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer, or the value thereof, under 11 U.S.C. § 550.

(c)    Avoid Tether's application of Celsius's 39,542.42 Bitcoin against Celsius's outstanding loan as a fraudulent or otherwise voidable transfer under 11 U.S.C. §§ 544, 548, and the law of New York, New Jersey, and Delaware.

(d)    Require Defendants to relinquish to Plaintiffs the 15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (subject to § 550(d) and without duplication) preferentially transferred by Plaintiffs to Defendants during the § 547(b) Period (plus any

additional avoidable transfers that Plaintiffs learn, through discovery or otherwise, were made to Defendants during the § 547(b) Period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) preferentially transferred to Defendants during the § 547(b) Period.[8]

(e)      Requiring Defendants to relinquish to Plaintiffs the 39,542.42 Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred by Plaintiffs to Defendants during the two-year period before filing of Celsius's bankruptcy petition (plus any additional avoidable transfers that Plaintiffs learn, through discovery or otherwise, were made to Defendants during the relevant period), or, in the alternative, award Plaintiffs the present value of all Bitcoin (subject to § 550(d) and without duplication) fraudulently or otherwise voidably transferred to Defendants.

(f)      Award Plaintiffs no less than $100,000,000.00 in damages for Defendant Tether Limited's breaches of contract and the covenant of good faith and fair dealing, plus additional damages to be determined at trial.

(g)      Award Plaintiffs their attorneys' fees, pre- and post-judgment interest, and costs; and

(h)      Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

---

[8]   Plaintiffs do not waive, and expressly reserve, any and all arguments with respect to the proper valuation date of the Preferential Top-Up Transfers, Preferential Cross-Collateralization Transfers, and Preferential Application Transfer and/or the form of recovery on any judgments.

DATED: August 9, 2024

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By _____/s/  Benjamin I. Finestone_____

Benjamin I. Finestone
Anil Makhjiani
Mario O. Gazzola
Arman Cuneo (*application for admission forthcoming*)
51 Madison Avenue, 22nd Floor
New York, New York
Telephone: (212) 849-7000
benjaminfinestone@quinnemanuel.com
anilmakhjiani@quinnemanuel.com
mariogazzola@quinnemanuel.com
armancuneo@quinnemanuel.com

-and-

Matthew Scheck
300 West 6th St., Suite 200
Austin, TX 78701
Telephone:  (737) 667-6102
matthewscheck@quinnemanuel.com

*Counsel to Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager, as Representative for the Post-Effective Date Celsius Debtors*

# EXHIBIT A

### Deed of Amendment

This deed (this "**Deed**") is dated and effective on ___January 20___, 2022 (the "**Amendment Date**"):

between:         **Tether Limited** ("**TLTD**"),

      a company incorporated pursuant to the laws of Hong Kong with incorporation number 2142570;

and              **Celsius Network Limited** (the "**Recipient**"),

      a company incorporated pursuant to the laws of England and Wales with incorporation number 11198050;

      (collectively, the "**Parties**"),

**WHEREAS** on February 1, 2020, each of the Parties entered into a token agreement, attached as Schedule 2 (*Original Agreement*) hereto (the "**Original Agreement**");

**WHEREAS** TLTD and the Recipient have agreed certain amendments to the Original Agreement, which the Parties wish to formalize pursuant to this Deed (the Original Agreement, as so amended pursuant to this Deed, the "**Amended Agreement**"). Capitalized terms used in this Deed but not otherwise defined shall have the meaning given to them in the Amended Agreement.

1.     **AMENDMENT.**

1.1     The Parties have agreed to amend the Original Agreement as follows, each amendment with effect from the Amendment Date:

(a)     By deletion of paragraph 1.1.6 (*Defined Terms*) in its entirety and by substituting the following paragraph in its place:

      "1.1.6     "**Termination Date**" means January 13, 2023 (subject to any extension pursuant to clause 14 (*Termination*) and unless terminated earlier pursuant to the terms of this Agreement);"

(b)     By deletion of paragraphs 3 (*Collateral*) to and including 7 (*Interest*) in their entirety and by substituting the following paragraphs in their place:

      "3.     **Collateral**: The collateral to be posted in consideration for making the Tokens available (the "**Collateral**") shall be equal to a percentage (the "**Initial Margin**") of the number of Tokens made available to the Recipient and payable in such digital tokens as may be agreed upon by TLTD and the Recipient, and the number of such digital tokens forming the Collateral shall be agreed upon by TLTD and the Recipient prior to TLTD making any Tokens available. The Initial Margin shall be as set out in Schedule 1 to this Agreement. In each instance of Tokens being made available, the Collateral shall be remitted to TLTD prior to the making available of any Tokens. The value of the Collateral shall be determined by reference to the average bid price of the relevant Collateral/USDT pair on the cryptocurrency exchanges set out in the row entitled 'Basket Exchanges' in Schedule 1 to this Agreement, where such Collateral/USDT pairs are available on such cryptocurrency exchanges (or such other cryptocurrency exchanges as the Parties may otherwise agree in writing from time to time), weighted equally amongst such exchanges.

      TLTD shall hold the Collateral in a segregated account (the "**Collateral Account**") for the benefit of the Recipient. The Parties shall make good faith efforts to agree, prior to February 28, 2022, on a designated third party (the "**Third Party Signatory**") to be appointed as a signatory to the Collateral Account. Following such designation, the Collateral Account shall be subject to multi-signature controls, whereby: (a) private keys to the Collateral Account shall be held by: (i) the Third Party Signatory; (ii) a person designated by TLTD in writing

from time to time (which may be by email); and (iii) a person designated by the Recipient in writing from time to time (which may be by email); and (b) consent shall be required by two of three such signatories to take actions regarding such Collateral Account.

4    **Fall in Value of Collateral**: Should the value of the Collateral fall below a percentage (the "**Margin Call Point**") of the number of Tokens made available to the Recipient at any time, TLTD shall provide Recipient notice of such occurrence ("**Margin Call Notice**") and the Recipient shall, within ten (10) hours of such Margin Call Notice, provide additional amounts to TLTD's satisfaction to increase the Collateral to an amount equal to or greater than a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient. The Margin Call Point shall be as set out in Schedule 1 to this Agreement. If the Recipient has not posted sufficient additional Collateral in accordance with the foregoing, should the value of the Collateral fall below a percentage (the "**Liquidation Point**") of the number of Tokens made available to the Recipient at any time following the time that is ten (10) hours from the delivery of the applicable Margin Call Notice, TLTD shall have the right, in its sole and absolute discretion, and without further notice to the Recipient, to sell, dispose of, and liquidate the Collateral. The Liquidation Point shall be as set out in Schedule 1 to this Agreement.

5.    **Rise in Value of Collateral**: Should the value of the Collateral increase to greater than a percentage (the "**Upper Limit**") of the number of Tokens made available to the Recipient at any time, TLTD shall, at Recipient's discretion (such election to be communicated to TLTD in writing, which may be by email or electronic messenger), either (i) on the next Monday or Thursday following such election being received by TLTD, return to the Recipient any such excess of the Collateral above a percentage, equal to the applicable Initial Margin, of the number of Tokens made available, or (ii) make available as soon as possible following such election being received by TLTD, additional Tokens to the Recipient such that the value of the Collateral is reduced to a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient. The Upper Limit shall be as set out in Schedule 1 to this Agreement.

6.    **Return of Tokens**: At any time, provided the value of the Collateral has not fallen below a percentage, equal to the applicable Initial Margin, of the number of Tokens made available to the Recipient, the Recipient may return all or any portion of the Tokens and receive, in consideration, its Collateral, or a portion thereof, in respect of such returned Tokens. In the case of any partial return of Tokens, TLTD shall on or prior to the following Monday or Thursday, return to the Recipient any excess Collateral, if any, above a percentage equal to the Initial Margin of the number of Tokens outstanding following such partial return.

7.    **Interest**: The Recipient shall pay TLTD simple, pro rata interest on all made available and unreturned Tokens equal to such interest rate per month as set out in Schedule 1 to this Agreement, in each case calculated on the basis of 30/360 per full calendar month. Any and all such interest shall be paid in a form and to a place or account as directed by TLTD."

(c)    By insertion of the following new paragraph 10A as follows:

"10A.    **Negative Pledge**. So long as any Tokens remain outstanding hereunder, the Recipient will not create or permit to exist any liens, claims, encumbrances or any nature or any kind on any of the Collateral, except in favour of TLTD pursuant to this Agreement."

(d)    By insertion of the following new paragraph 10B as follows:

"10B.    **Proceeds of Enforcement**. In the event that TLTD exercises its rights under this Agreement to sell, dispose of, and liquidate the Collateral (a "**Liquidation Event**"), any

proceeds of sale of Collateral shall be paid to, or at the direction of, TLTD and shall be applied in the following order (*provided that,* no proceeds will be applied in payment of any amounts specified in the paragraphs below until all amounts specified in such preceding paragraphs have been satisfied in full):

(a)  FIRST in payment of all fees, costs, charges, expenses, liabilities and other amounts (including any interest thereon pursuant to the terms of this Agreement) incurred or payable by or on behalf of TLTD and any receiver, attorney or agent in connection with the Liquidation Event and TLTD exercising its powers and discretions hereunder;

(b)  SECOND in payment to TLTD for application against all present and future monies, liabilities and obligations due, owing or incurred by the Recipient, whether actual or contingent, to TLTD under or in connection with the Agreement together with all interest (including, without limitation, default interest) accruing in respect of such monies or liabilities (including, without limitation, the obligation of the Recipient to return all Tokens and payment of all other amounts accrued and outstanding hereunder (including any interest accrued thereon)),

(the liabilities described in paragraphs (a) and (b) above, the "**Liabilities**"); and

(c)  THIRD, the payment of the surplus (if any) to the Recipient.

The obligations (including the Liabilities) of the Recipient under this Agreement are full recourse obligations enforceable against the Recipient and its assets and shall survive any Liquidation Event. In the event that the proceeds of sale of the Collateral are not sufficient to satisfy the Liabilities in full or TLTD is otherwise prevented from the enforcement of its rights hereunder in respect of some or all of the Collateral, the Recipient shall retain full liability for the payment and performance of all outstanding Liabilities and such Liabilities shall be immediately due and payable. The provisions of this paragraph 10B shall survive, notwithstanding the termination of this Agreement."

(e)  By deletion of paragraph 14 (*Term*) in its entirety and by substituting the following paragraph in its place:

"14.  **Term**: Save as expressly set out herein, this Agreement shall terminate on the Termination Date. At the Termination Date, if any Tokens are still made available and outstanding pursuant to this Agreement, they shall be returned to TLTD (including any interest accrued thereon and subject to any earlier return requirement pursuant to this Agreement) by the Recipient and, thereupon, all Collateral shall be returned to the Recipient by TLTD. Either Party may terminate this Agreement on 30 days' notice the other Party. Subject to the foregoing, the Parties may mutually agree to extend the term of this Agreement by for one year. There is no limit to the number of successive one year renewals permitted under this Agreement. In the event that: (i) the Recipient fails to return any Tokens when due and/or fails to pay any interest payable hereunder (whether by scheduled maturity, demand or otherwise); (ii) the Recipient breaches any covenant or condition of this Agreement; or (iii) any representation or warranty made on behalf of the Recipient pursuant to, or in connection with, this Agreement, shall have been incorrect or misleading in any material respect when made or deemed repeated, then TLTD may: (a) demand return of all Tokens (and payment of all other amounts accrued and outstanding hereunder (including any interest accrued thereon) with immediate effect; (b) terminate this Agreement; and/or (c) sell, dispose of, and liquidate the Collateral. The provisions of paragraph 8 (*Confidentiality*) shall continue in force for a period of two years after the Termination Date. Termination of this Agreement shall not affect or prejudice any rights or obligations which have accrued or

arisen under this Agreement prior to the time of termination and such rights and obligations shall survive such termination.

(f)    By the insertion of Schedule 1 (*Percentage Points*) hereto as Schedule 1 to the Amended Agreement.

1.2    With effect from the Amendment Date, every reference in the Original Agreement to that agreement (including any reference to "this Agreement" or similar effect) will be construed as a reference to the Amended Agreement. The provisions of the Original Agreement shall, subject only to this Deed, continue in full force and effect.

## 2.    PRE-EXISTING CLAIMS

2.1    Notwithstanding anything contained herein to the contrary, nothing in this Deed shall affect or prejudice any claim or demand whatsoever which either the Recipient or TLTD may have against the other under the Amended Agreement in relation to matters arising before the Amendment Date.

## 3.    SECURITY CONFIRMATION

3.1    The Recipient confirms that, with effect from (and including) the Amendment Date, the security interest created by the Amended Agreement shall remain in full force and effect and continue to secure the obligations set out therein, and extend to all new obligations under the Amended Agreement.

## 4.    REPRESENTATIONS

4.1    TLTD and the Recipient makes each of the representations and warranties in favour of TLTD under paragraph 9 (*Representations and Warranties of TLTD*) and paragraph 10 (*Representations and Warranties of the Recipient*), respectively, on: (i) the Amendment Date; (ii) any date upon which TLTD delivers Tokens to the Recipient; and (iii) any date upon which Collateral is provided to TLTD (each a "**Representation Date**"): (x) by reference to the facts and circumstances then existing; and (y) as if references to the "Agreement" include references to this Deed and the Amended Agreement.

4.2    The Recipient represents and warrants in favour of TLTD on each Representation Date by reference to the facts and circumstances then existing that the Recipient is: (i) able to pay its debts as they fall due, and: (ii) not otherwise insolvent under the terms of the laws of its jurisdiction of incorporation or continuation.

## 5.    INCORPORATION OF TERMS

5.1    The provisions of paragraphs 8 (*Confidentiality*), 11 (*No Representation or Warranty*), 15 (*Counterparts and Transmission by Facsimile*), 16 (*Independent Legal Advice*), 17 (*Assignment*) and 18 (*Severability*) of the Amended Agreement shall be incorporated into this Deed as if set out in full herein and as if references in those paragraphs to "this Deed" are references to this Deed.

## 6.    GOVERNING LAW

6.1    This Deed shall be governed by and is to be construed and interpreted in accordance with the laws of the British Virgin Islands. The Parties hereby irrevocably and unconditionally attorn to the non-exclusive jurisdiction and venue of the courts of the British Virgin Islands and all courts competent to hear appeals therefrom.

IN WITNESS WHEREOF, this Deed is executed and delivered by the Parties as a deed as of the Amendment Date.

**Tether Limited**

**Celsius Network Limited**

_____

Name: JL van der Velde

Position: Director

_I have authority to bind the company._

_____

Name:

Position:

_I have authority to bind the company._

_____

Name: Giancarlo Devasini

Position: Director

_I have authority to bind the company._

_____

Name:

Position:

_I have authority to bind the company._

IN WITNESS WHEREOF, this Deed is executed and delivered by the Parties as a deed as of the Amendment Date.

**Tether Limited**                              **Celsius Network Limited**

_____              _____

Name: JL van der Velde                        Name:

Position: Director                            Position:

_I have authority to bind the company._       _I have authority to bind the company._


_____              _____

Name: Giancarlo Devasini                       Name:

Position: Director                            Position:

_I have authority to bind the company._       _I have authority to bind the company._

IN WITNESS WHEREOF, this Deed is executed and delivered by the Parties as a deed as of the Amendment Date.

**Tether Limited**                              **Celsius Network Limited**

_____                         _____

Name: JL van der Velde                          Name: Alexander Mashinsky

Position: Director                              Position: Director

_I have authority to bind the company._         _I have authority to bind the company._


_____                         _____

Name: Giancarlo Devasini                        Name: Shlomi "Daniel" Leon

Position: Director                              Position: Director

_I have authority to bind the company._         _I have authority to bind the company._

**Schedule 1**

**Percentage Points**

| | Where Collateral is provided in XAUt | Where Collateral is provided in BTC | Where Collateral is provided in ETH |
|---|---|---|---|
| **Initial Margin** | 110% | 130% | 150% |
| **Margin Call Point** | 105% | 120% | 130% |
| **Liquidation Point** | 100% | 110% | 120% |
| **Upper Limit** | 120% | 150% | 170% |
| **Interest Rate** | 0.33% (recurring) per month | 6% per year applicable to all BTC collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are less than 2 Billion Tokens; <br><br> 5.5% per year applicable to all BTC collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are equal to or greater than 2 Billion Tokens | 6% per year applicable to all ETH collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are less than 2 Billion Tokens; <br><br> 5.5% per year applicable to all ETH collateralized borrowings when total outstanding Token borrowings under the Amended Agreement are equal to or greater than 2 Billion Tokens |
| **Basket Exchanges** | Bitfinex, FTX | Coinbase Pro, Kraken, Bitfinex, Binance, FTX | Coinbase Pro, Kraken, Bitfinex, Binance, FTX |

**Schedule 2**

**Original Agreement**

[*To be attached*]

Token Agreement

This token agreement (this "**Agreement**") is effective as of February 1, 2020 (the "**Effective Date**")

between:      Tether Limited ("**TLTD**"),

a company incorporated pursuant to the laws of Hong Kong, incorporation number 2142570; and,

and      Celsius Network Limited (the "**Recipient**"),

a company incorporated pursuant to the laws of England and Wales, incorporation number 11198050

(collectively, the "**Parties**")

whereas TLTD is engaged in the business of making digital tokens available to willing parties;

and whereas the Recipient wishes to borrow digital tokens from TLTD, all on and subject to the terms and conditions set out in this Agreement;

now, therefore, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. Interpretation:
   1.1. Defined Terms:
   In this Agreement, the following capitalized terms have the following meanings unless the context indicates otherwise:
      1.1.1. "**Agreement**" means this token agreement between TLTD and the Recipient, effective February 1, 2020;
      1.1.2. "**Collateral**" has the meaning set out in paragraph 3 of this Agreement;
      1.1.3. "**Effective Date**" means February 1, 2020;
      1.1.4. "**Parties**" means TLTD and the Recipient;
      1.1.5. "**Recipient**" means Celsius Network Limited, a company incorporated pursuant to the laws of England and Wales, incorporation number 11198050;
      1.1.6. "**Termination Date**" means February 1, 2021;
      1.1.7. "**TLTD**" means Tether Limited, a company incorporated pursuant to the laws of Hong Kong, incorporation number 2142570; and,
      1.1.8. "**Tokens**" means Tether tokens made available by TLTD or by TLTD's affiliates from time to time.
   1.2. Headings: The headings and sub-headings in this Agreement are for ease of reference only and are not to be taken into account in the construction or interpretation of any provision or provisions to which they refer.
   1.3. Extended Meanings: Unless specified in this Agreement, words importing the singular include the plural and vice versa and words importing gender include all genders.
   1.4. Amendments: No change or modification of this Agreement is valid unless it is in writing and signed by the Parties.

1.5.  Governing Law: This Agreement shall be governed by and is to be construed and interpreted in accordance with the laws of the British Virgin Islands. The Parties hereby irrevocably and unconditionally attorn to the non-exclusive jurisdiction and venue of the courts of the British Virgin Islands, and all courts competent to hear appeals therefrom.

2.  Provision of Tokens: TLTD agrees to make available tether tokens (the "**Tokens**") to the Recipient from time to time. Each instance of TLTD making the Tokens available shall be subject to the written request of the Recipient and to TLTD's written agreement to making the Tokens available. All instances of making Tokens available shall be contingent on the Recipient's adherence to TLTD's terms of service, available on and at https://tether.to/legal/, or in such other place as may be designated by TLTD to the Recipient in writing, and as may be amended or changed from time to time in TLTD's sole and absolute discretion. TLTD reserves the right to make Tokens available to the Recipient on and subject to any protocol in TLTD's sole and absolute discretion. The availability of any Tokens at any time shall be subject to TLTD's standard fees in effect and as may be amended or changed from time to time.

3.  Collateral: The collateral to be posted in consideration for making the Tokens available (the "**Collateral**") shall be equal to a percentage of the number of Tokens made available to the Recipient (the "**Initial Margin**") and payable in digital tokens as may be agreed upon by TLTD and the Recipient, and the number of such digital tokens forming the Collateral shall be agreed upon by TLTD and the Recipient prior to TLTD making any Tokens available. Where the Collateral is provided in: (1) Ether (ETH) tokens, the Initial Margin shall be equal to 170% of the Tokens made available to the Recipient, (2) Tether Gold (XAUt) tokens, the Initial Margin shall be equal to 110% of the Tokens made available to the Recipient, and (3) Bitcoin BTC tokens, the Initial Margin shall be equal to 140% of the Tokens made available to the Recipient. In each instance of Tokens being made available, the Collateral shall be remitted to TLTD prior to the making available of any Tokens. The value of the Collateral will be determined by using the spot price on Coinbase Pro.

4.  Fall in Value of Collateral: Should the value of the Collateral fall below a percentage of the number of Tokens made available to the Recipient (the "**Margin Call Point**") at any time, the Recipient shall immediately provide additional amounts to TLTD's satisfaction in order to increase the Collateral to an amount equal to or greater than a certain percentage (the "**Margin Recovery Point**") of the number of Tokens made available to the Recipient. Notwithstanding the foregoing provisions of this paragraph, should the value of the Collateral fall below a percentage of the number of Tokens made available to the Recipient (the "**Liquidation Point**") at any time, TLTD shall have the right, in its sole and absolute discretion, and without further notice to the Recipient, to sell, dispose of, and liquidate the Collateral, and shall have all right, title, and interest to the Collateral and all proceeds therefrom. Where the Collateral is provided in : (1) Ether (ETH) tokens: (a) the Margin Call Point will be 150%; (b) the Margin Recovery Point will be 170%; and (c) the Liquidation Point will be 120%;  (2) Tether Gold (XAUt) tokens: (a) the Margin Call Point will be 105%; (b) the Margin Recovery Point will be 110%; and (c) the Liquidation Point will be 100% and (3) BTC tokens: (a) the Margin Call Point will be 125%; (b) the Margin Recovery Point will be 140%; and (c) the Liquidation Point will be 115%;

5. Rise in Value of Collateral: Should the value of the Collateral increase to greater than a percentage of the number of Tokens made available to the Recipient (the "**Upper Limit**") at any time, TLTD shall immediately either (i) return to the Recipient any such excess of the Collateral above 180% of the number of Tokens made available, or (ii) make available additional Tokens to the Recipient such that the value of the Collateral is reduced to the Initial Margin, (i) or (ii) to be decided by TLTD in its sole and absolute discretion. Where the Collateral is provided in: (1) Ether (ETH) tokens the Upper Limit will be 200%; (2) Tether Gold (XAUt) tokens the Upper Limit will be 115% and (3) BTC tokens, the Upper Limit will be 180%.

6. Return of Tokens: At any time, provided the value of the Collateral has not fallen below a percentage of the number of Tokens made available to the Recipient (the "**Collateral Return Point**"), the Recipient may return all of the Tokens and receive, in consideration, its Collateral in respect of such Tokens. Where the Collateral is provided in: (1) ETH tokens: the Collateral Return Point will be 120%; (2) XAUt tokens: the Collateral Return Point will be 100% and (3) BTC tokens: the Collateral Return Point will be 115%. No partial return of Tokens is or shall be permitted pursuant to this Agreement.

7. Interest: The Recipient shall pay TLTD simple, *pro rata* interest on all made available and unreturned Tokens equal to a certain percentage per month, calculated on the basis of 30/360 per full calendar month; provided that, where the Collateral is provided in: (1) ETH tokens: the interest rate will be 0.55% in respect of Tokens issued pursuant to the deposit of such Collateral (2) XAUt tokens: the interest rate will be 0.333% in respect of Tokens issued pursuant to the deposit of such Collateral and (3) BTC tokens, the interest rate will be 0.55% in respect of Tokens issued pursuant to the deposit of such Collateral. Any and all such interest shall be paid in a form and to a place or account as directed by TLTD.

8. Confidentiality: The provisions of this Agreement shall be kept strictly confidential by the Parties. However, it shall not be a violation of this paragraph to disclose the terms of this Agreement: to duly retained and qualified lawyers and accountants acting as advisors to the Parties; pursuant to an order to comply issued by a properly-constituted court or administrative tribunal of competent jurisdiction; or, if necessary, to prosecute litigation among the Parties should any of the obligations of this Agreement be breached.

9. Representations and Warranties of TLTD: TLTD represents and warrants as follows:

   9.1. Valid Organization & Good Standing: That it is duly incorporated, validly existing, and in good standing under the laws of its jurisdiction of incorporation or continuation; and,

   9.2. Authority: That it has all requisite corporate power and authority to enter into this Agreement; to perform its obligations hereunder; to consummate the transactions herein; and that its corporate signatory herein is vested with the requisite authority to bind itself to this Agreement.

10. Representations and Warranties of the Recipient: The Recipient represents and warrants as follows:

    10.1. Unencumbered Collateral: That all Collateral given over to TLTD in consideration for the Tokens is free and clear of any and all liens, claims, or encumbrances of any nature or of any kind, and that the Recipient has the full rights and authority to deploy such Collateral pursuant to this Agreement, without restrictions;

10.2. Valid Organization & Good Standing: That it is duly incorporated, validly existing, and in good standing under the laws of its jurisdiction of incorporation or continuation; and,

10.3. Authority: That it has all requisite power, capacity, and authority to enter into this Agreement, to perform its obligations hereunder, and to consummate the transactions herein.

11. No Representation or Warranty: TLTD makes no other representation or warranty of any kind, and without limiting the generality of the foregoing, TLTD makes no representation or warranty of any kind about the Tokens, including with respect to their merchantability or fitness for any particular purpose. The Tokens are provided on an as-is, where-is basis only.

12. Perfection: The Recipient shall, at the request of TLTD, agree to all steps and shall sign such other and further documents as may be required to lodge and perfect TLTD's security interest in the Collateral.

13. Notice: Any notice, demand, or other communication required or permitted to be given to any Party to this Agreement shall be in writing and sent by electronic mail, receipt confirmed:

13.1. in the case of the Issuer, to silvano@tether.to; and,

13.2. in the case of the recipient, to legal@celsius.network and trading@celsius.network.

14. Term: This Agreement shall terminate on the Termination Date. At the Termination Date, if any Tokens are still made available and outstanding pursuant to this Agreement, they shall be returned to TLTD by the Recipient and, thereupon, all Collateral shall be returned to the Recipient by TLTD. Either Party may terminate this Agreement on 30 days' notice the other Party. The Parties may mutually agree to extend the term of this Agreement by for one year. There is no limit to the number of successive one year renewals permitted under this Agreement.

15. Counterparts and Transmission by Facsimile: This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which, when taken together, shall constitute but one and the same instrument. Signatures transmitted by electronic means (including electronic mail) shall be deemed to be originals.

16. Independent Legal Advice: The Parties each acknowledge having obtained their own independent legal advice with respect to the terms of this Agreement prior to its execution. No ambiguity or omission in this Agreement shall be construed or resolved against any Party on the ground that this Agreement or any of its provisions was drafted or proposed by that Party.

17. Assignment: Subject to all of the other provisions contained herein, this Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and permitted assigns. TLTD may assign, delegate, or otherwise transfer, in whole or in part, any or all of its rights or obligations under this Agreement without the consent of the Recipient. The Recipient may not assign, delegate, or otherwise transfer, in whole or in part, any or all of its rights or obligations under this Agreement without the express written consent of TLTD.

18. Severability: If any provision of this Agreement is held to be unenforceable or invalid in whole or in part by a court of competent jurisdiction, such unenforceability or invalidity attaches only to such provision and everything else in this Agreement continues in full force and effect.

**[The rest of this Page is blank.]**

IN WITNESS WHEREOF, this Agreement is executed by the Parties as of February 1, 2020.

**Tether Limited**      **Celsius Network Limited**

Per: _____  Per: _____
Name: JL van der Velde     Name: Harumi Urata-Thompson
Position: Director       Position: CFO
Date: _June 9, 2020_____ Date: June 9, 2020
I have authority to bind the company. I have authority to bind the company.

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Celsius Network Limited, Celsius Network LLC<br>(Post-Effective Date Debtors) | DEFENDANTS<br>Tether Limited, Tether Holdings Limited, Tether International Limited,<br>Tether Operations Limited |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Quinn Emanuel Urquhart & Sullivan<br>51 Madison Avenue, Floor 22, New York, NY 10010<br>Telephone: (212) 849-7000 | ATTORNEYS (If Known)<br>Kramer Levin Naftalis & Frankel LLP<br>2000 K Street NW, 4th Floor, Washington, DC 20006<br>Telephone: (202) 775-4510 |
| PARTY (Check One Box Only)<br>☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Plaintiffs bring this case to avoid and recover preferential and fraudulent transfers of 39,542.42 Bitcoin from Plaintiffs to Defendants, first intended to secure, and subsequently applied on account of, antecedent debt Celsius owe to Tether. This transfer was also a breach of contract and breach of the covenant of good faith and fair dealing by Defendants. Plaintiffs bring claims under 11 U.S.C. §§ 544, 547, 548 and 550.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
[1] 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
[2] 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
[3] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

15,658.21 Bitcoin, 2,228.01 Bitcoin, and 39,542.42 Bitcoin (subject to § 550(d) and without duplication)

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br><br>CELSIUS NETWORK LLC, et al. | BANKRUPTCY CASE NO.<br><br>Case No. 22-10964 (MG) | |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Southern District of New York | DIVISION OFFICE | NAME OF JUDGE<br>Chief Judge Martin Glenn |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>August 9, 2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Benjamin I. Finestone | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.