# EXHIBIT L

1
2   PARSONS BEHLE & LATIMER
    Michael R. Kealy, Bar No. 0971
3   David M. Bennion, Bar No. 5664 (Pro Hac Requested)
    Cory D. Sinclair, Bar No. 11158 (Pro Hac Requested)
4   50 W. Liberty Street, Suite 750
    Reno, Nevada 89501
5   Telephone: (775) 323-1601
    Facsimile: (775) 348-7250
6
    Attorneys for Plaintiff
7
8               IN THE UNITED STATES DISTRICT COURT
9                  FOR THE DISTRICT OF NEVADA
10
11  STIRLING MORTIMER GLOBAL          Case No. 2:13-cv-00301-GMN-NJK
    PROPERTY FUND PCC LIMITED,
12                                    **MEMORANDUM IN SUPPORT OF
              Plaintiff,              PLAINTIFF'S MOTION FOR
13                                    PRELIMINARY INJUNCTION**
    v.
14
    RICHARD NEILL TREVOR ROBERTS,
15  JANE SHERIDAN ROBERTS, and
    REGAL PROPERTY HOLDINGS, INC.,
16
              Defendants.
17



FILED
ENTERED                    RECEIVED
                    SERVED ON
COUNSEL/PARTIES OF RECORD

MAR - 5 2013

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:                    DEPUTY

18
19      Plaintiff Stirling Mortimer Global Property Fund PCC Limited (hereinafter referred to as
20  "Stirling" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this
21  Memorandum in Support of Plaintiff's Motion for Preliminary Injunction against Defendants
22  Richard Neill Trevor Roberts, Jane Sheridan Roberts, and Regal Property Holdings, Inc.,
23  (collectively referred to as "Defendants").

24                          **INTRODUCTION**
25      This motion concerns unique real property, personal property, and liquid assets located or
26  held in this jurisdiction that are the subject of equitable relief sought by Plaintiff in this action and
27  vital to the equitable and monetary relief sought by Plaintiff in a related action in England. As
28  described below and in the First Amended Verified Complaint, Defendants improperly and

PARSONS
BEHLE &
LATIMER        4849-2007-0675.2

1  illegally misappropriated funds from Plaintiff through outright theft and a dual pricing scheme
2  designed to embezzle Plaintiff's funds undetected. Using these misappropriated funds,
3  Defendants then purchased real and personal property located in this jurisdiction. Plaintiff is
4  seeking equitable relief in its First Amended Verified Complaint, including a constructive trust
5  and accounting. This Court should issue a preliminary injunction to preserve the status quo and
6  prevent Defendants from transferring, selling, disposing, pledging, assigning, or encumbering
7  their assets held in this jurisdiction to avoid liability and/or a damage award.

8       This action is one of at least two actions that have or will be filed to preserve Defendants'
9  assets held in different jurisdictions. The instant action only relates to Defendants' assets held in
10  this jurisdiction, believed to have been acquired by Defendants using Plaintiff's misappropriated
11  funds. Also, an action for fraud and other related claims has been filed in Commercial Court in
12  London, England. That court, upon hearing the evidence gathered to date, has issued a worldwide
13  freezing order on Defendants' assets. Plaintiff is concerned that Defendants will attempt to
14  disregard this order in this and other jurisdictions. Accordingly, Plaintiff has filed the instant
15  action to prevent Defendants from dissipating assets currently held in this jurisdiction in direct
16  violation of the worldwide freezing order and Nevada state and common law.

17       As established below, Plaintiff will suffer irreparable harm without an order freezing
18  Defendants' assets. Defendants have a documented history of transferring and hiding assets in
19  offshore accounts in an effort to avoid detection. Indeed, Defendants sought out and received tax
20  and legal advice concerning the most effective way to shield assets from a judgment in the United
21  States. Complete relief from the harm Defendants have caused Plaintiff will be unavailable
22  without the requested injunctive relief given Defendants' history of misappropriating and
23  concealing assets. The Ninth Circuit has expressly held that, in cases like this one where the
24  defendant has a history of concealing and dissipating assets to avoid detection and judgment, a
25  preliminary injunction freezing those assets is warranted.

26       All of the requirements in the Ninth Circuit for the Court to issue a temporary restraining
27  order and/or preliminary injunction are satisfied. Accordingly, this Court should grant Plaintiff's
28  motion to preserve Plaintiff's equitable and monetary remedies.

- 2 -

4849-2007-0675.2

# STATEMENT OF FACTS[1]

*The Parties*

1.     Plaintiff Stirling is a registered Protected Cell Company organized pursuant to the Companies (Guernsey) Laws 1994 and 1996 (as amended) and under the Protected Cell Companies Ordinance 1997 (as amended). Plaintiff was registered in Guernsey on March 9, 2007, for the purpose of establishing "cells" for the acquisition, development, and resale of real estate developments. (*See* First Amended Verified Complaint at ¶ 2.)

2.     Defendant Richard Roberts (hereinafter referred to as "Defendant Roberts") was a non-executive director of Plaintiff from its inception until May 7, 2010. Defendant Roberts has represented to this Court that he is a citizen of England and is currently a permanent resident of Nevada. Further, Defendant Roberts owns Defendant Regal Property Holdings, Inc., which owns millions of dollars in real property assets in this jurisdiction. (*Id.* at ¶ 4.)

3.     Defendant Jane Sheridan Roberts (hereinafter referred to as "Defendant Jane Roberts") has represented to this Court that she is a citizen of England and is currently a permanent resident of Nevada. Defendant Jane Roberts owns, either together with Defendant Roberts, or individually, real property in this jurisdiction that was acquired using funds that were fraudulently misappropriated from Plaintiff. (*Id.* at ¶ 5.)

4.     Defendant Regal Property Holdings, Inc., (hereinafter referred to as "Defendant Regal"), is a Nevada corporation incorporated on March 23, 2007, under company filing number E0206442007-1. On information and belief, Defendant Regal is an entity that was used to hide money misappropriated from Plaintiff in 2007 through 2010, and currently owns millions of dollars in real property assets in this jurisdiction. (*Id.* at ¶ 6.)

*Plaintiff Launches Funds to Invest in Real Estate Properties Based on Defendant Roberts' Representations*

5.     In or around September 2004, Timothy Clink, who is an officer and director of Plaintiff, attended a presentation given by an agent of an entity called Majestic Group. Majestic

---

[1] Plaintiff's Statement of Facts is supported by and relies upon the First Amended Verified Complaint, which is incorporated herein.

- 3 -

1  Group was a property development and marketing company focusing on real estate investment
2  opportunities in Spain. (*Id.* at ¶ 10.)

3       6.      Intrigued by the opportunity, Mr. Clink later visited Spain to further investigate.
4  During this visit, he first met Defendant Roberts, who claimed to be part of Majestic Group
5  Investments, an affiliate of Majestic Group.  Defendant Roberts described an opportunity to
6  invest in real estate developments in Spain. Specifically, investors would acquire undeveloped or
7  real estate projects in the first phase of construction. Defendant Roberts explained that Majestic
8  Group would identify prospective development sites, coordinate permitting, and oversee
9  development and resale to consumers. (*Id.* at ¶¶ 11, 12.)

10      7.      Defendant Roberts also introduced Mr. Clink to an attorney, Joe Ezaz, who was a
11  partner at a law firm called European Legal Solutions SL ("ELS Spain"). (*Id.* at ¶ 16.)

12      8.      At the conclusion of the presentation by Defendant Roberts, Mr. Clink (along with
13  his father) agreed in principle to purchase five properties. Based on the representations made by
14  Defendant Roberts, Mr. Clink and his father retained Joe Ezaz as their attorneys for the
15  transaction. (*Id.* at ¶ 17.)

16      9.      Based on the representations made by Defendant Roberts, Mr. Clink introduced
17  several individuals to Majestic Group, including Mr. Phil Bowman, who is now one of Plaintiff's
18  directors. (*Id.* at ¶ 18.)

19      10.     Ultimately, Mr. Clink and Mr. Bowman launched an investment fund that could be
20  listed on the Channel Islands Stock Exchange that would invest in Spanish property rights.  On
21  April 7, 2006, Messrs. Clink and Bowman incorporated the first structure fund, Stirling Mortimer
22  Property Fund Limited ("SMPF") as a Protected Cell Company under the laws of Guernsey. (*Id.*
23  at ¶ 20.)  SMPF launched two funds (referred to as the "No. 1 Fund" and the "No. 2 Fund") to
24  invest in real estate in Spain. (*Id.* at ¶¶ 22, 23.)

25      11.     Defendant Roberts was appointed Director of SMPF, in part, based on his
26  knowledge of the Spanish real estate market. (*Id.* at ¶ 21.)

27      12.     With the success of the No. 1 Fund and No. 2 Fund, SMPF explored opportunities
28  in markets outside of Spain. Plaintiff Stirling Mortimer Global Property Fund was incorporated

1  on March 9, 2007. The Board of Directors consisted of Mr. Clink, Mr. Bowman, Catherine

2  Walker, and Mark Huntley. Defendant Roberts was immediately appointed as a non-executive

3  Director of Plaintiff. Defendant Roberts' appointment was made pursuant to an agreement

4  between Defendant Roberts and Plaintiff dated March 9, 2007. (*Id.* at ¶ 24.)

5      13.     As set forth in the First Amended Verified Complaint, Plaintiff established five

6  funds (referred to as Fund Nos. 3 through 7) for investment in Spain, the Cape Verde Islands, and

7  Morocco. The funds were created starting in March 2007 (Fund No. 3) through May 2008 (Fund

8  No. 7). (*Id.* at ¶¶ 27, 28, 29, 30, 31).

9      14.     Although the general purpose of each fund remained the same, the entities

10  involved in the investment process changed over time, which is described below. These changes

11  were done at the request of Defendant Roberts and others and were later determined to be the

12  mechanism by which Defendants were able to successfully misappropriate millions of euros from

13  Plaintiff without detection for many years. (*Id.* at ¶ 32.)

14      15.     The investment objective of each of fund was to generate a return by entering into

15  Right to Purchase contracts with developers for undeveloped properties. In consideration for the

16  Right to Purchase contracts, Plaintiff would provide money to the developer that was intended to

17  be used to complete construction of the project. Plaintiff's rights to the properties were freely

18  assignable, and the intention was to assign the rights to a subsequent buyer as construction

19  progressed for a higher price than was paid to the developer. If the property had not been

20  assigned by the time construction was completed, Plaintiff was obligated to purchase the

21  property. Plaintiff would then attempt to resell the finished properties at a profit. (*Id.* at ¶ 33.)

22      16.     The Right to Purchase contracts set forth the purchase price that was to be paid by

23  Plaintiff to the developer. This purchase price was provided in two stages: (i) an initial deposit

24  due upon signing the Right to Purchase contract between 30-45% (less an agreed-upon sum

25  discussed below); and (ii) the remaining balance when the project was completed. (*Id.* at ¶ 34.)

26      17.     Additionally, and on the same date that the Right to Purchase contracts were

27  signed, Plaintiff also entered into an agency agreement with one of two entities—both of which

28  were controlled by Defendant Roberts. The agency agreements authorized the agent to identify

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

and secure a buyer to whom the Plaintiff's right to purchase the property would be assigned. With respect to each property acquired by Fund No. 3, the Plaintiff entered into an agency agreement with Majestic Investments. For properties acquired by all other funds, Plaintiff entered into an agency agreement with Stately.

18.    Once properties were identified and Plaintiff's board agreed to acquire them, money sufficient to pay the initial deposit (along with conveyancing fees and local taxes) was transferred from Plaintiff to Heritage and then to ELS Spain/UK (depending on the fund) to deposit the necessary funds into one or more client accounts. ELS Spain/UK was instructed to retain fifteen percent of the deposit amount to be held in an escrow account (hereinafter referred to as the "Escrow Percentage"). The Escrow Percentage was to be held by ELS Spain/UK for up to two years. If the properties were not sold within that two-year period, the Escrow Percentage was to be paid back to Plaintiff for repayment to the appropriate fund. However, as an incentive to sell the property quickly, if Majestic Group Investments or Stately (depending on the fund), resold the property prior to the expiration of the two-year period, the Escrow Percentage would be paid to them as compensation after the property was resold. The Escrow Percentage was not to be used or applied to any other purpose. (*Id.* at ¶ 37.)

19.    Stately also received a commission from the developer for locating a buyer of the undeveloped property. The commission, which was 10% of the purchase price, was divided among several parties. Seventy-five percent of the commission would go to the property advisor, which was SMGL or SMCI depending on the fund. SMCI would then receive an invoice from the promoter to pay commissions to independent financial advisors whose clients had invested in the particular fund. Stately retained the remaining 25% of the commission paid by the developer. (*Id.* at ¶ 38.)

20.    The flow of funds generally described above was established by Plaintiff's board and understood by all parties, including Defendant Roberts. (*Id.* at ¶ 39.)

21.    For Fund No. 3, the Property Manager that was designated by Plaintiff was Majestic Group Investments, a company controlled by Defendant Roberts. For Fund No. 4, Defendant Roberts explained to Plaintiff's board that Stately, a separate entity controlled by

- 6 -

Defendant Roberts, should be designated as the property manager for Fund No. 4. He requested this change because he did not want Majestic Group Investment associated with real estate investments made outside of Spain. Stately remained the property manager for all subsequent funds, including Fund Nos. 4, 5, 6, and 7. (*Id.* at ¶¶ 41, 42.)

22. Plaintiff also learned that the Escrow Percentage previously held by ELS Spain was going to be held by ELS UK for Fund No. 4. Plaintiff had no reason to believe this change would interfere with the ordinary operations of Fund No. 4 or subsequent funds. (*Id.* at ¶ 43.)

23. In our around September 2007, when Fund No. 4 had begun to enter into Right to Purchase contracts with developers, Defendant Roberts informed Plaintiff's board that any sales commissions being paid by the developer would be subject to a 15% tax, payable directly to the Cape Verde government. Defendant Roberts had never before informed the Plaintiff's board of this tax withholding. (*Id.* at ¶ 44.)

24. Plaintiff sought advice from KPMG, a well-known tax advisory firm, regarding the tax withholding described by Defendant Roberts. KPMG notified Plaintiff that no withholding tax was payable or necessary. At around the same time that KPMG offered its opinion of the tax withholding issue, Defendant Roberts then informed the board that no tax withholding would be necessary if the commissions from the developer would be paid to a separate entity controlled by Defendant Roberts—Tlalok Holdings Limited ("Tlalok"), which was incorporated in Cyprus— rather than Stately as was originally contemplated. Plaintiff's board agreed to Defendant Roberts' recommendation because the only change from the contemplated structure to the one proposed by Defendant Roberts was the name of the entity receiving the commission payment from developers. (*Id.* at ¶ 45.)

25. In or around early 2008, when Plaintiff launched Fund Nos. 6 and 7, Defendant Roberts convinced Plaintiff's board to allow the Escrow Percentage for these two funds to be held by Stately rather than ELS Spain/UK. Defendant Roberts informed Plaintiff's board that Stately's tax advisors were insisting that the Escrow Percentage be held by Stately rather than ELS Spain/UK. Defendant Roberts made this representation to Plaintiff's board in an email dated February 14, 2008. On the same day, Joe Ezaz offered his opinion to Plaintiff's board on this

- 7 -

change, claiming that any risk caused by the change in holder of the Escrow Percentage was negligible because the terms of repayment remained the same. On the advice of Joe Ezaz and the representations made by Defendant Roberts, Plaintiff's board agreed to this request. (*Id.* at ¶ 46.)

26.     Throughout 2007 and 2008, Messrs. Click and Bowman visited the proposed development sites in Spain on several occasions.  During these site visits, Messrs. Clink and Bowman observed that development was much slower than expected.  Defendant Roberts attempted to reassure Messrs. Click and Bowman that development would begin shortly and sales leads were being generated. (*Id.* at ¶ 48.)

27.     Plaintiff's board consistently questioned Defendant Roberts about the lack of sales. Defendant Roberts always had a reasonable explanation and assured the board that sales were forthcoming.  On one occasion, Defendant Roberts informed Plaintiff's board that he had a consortium of Chinese investors who wanted to buy 300 of the Right to Purchase contracts, and he indicated he had met with them in San Francisco and had planned another meeting in Shanghai. These buyers never materialized and no such sales were made. (*Id.* at ¶ 49.)

***Problems Emerge With Plaintiff's Funds***

28.     In September 2009, the No. 5 fund escrow percentage was due to be repaid to the fund because no sales had occurred within the eighteen-month window.  Despite repeated requests to ELS, who held the escrow percentage for Fund No. 5, the escrow amount of €946,660 was not returned to Plaintiff. (*Id.* at ¶ 52.)

29.     At a meeting on December 3, 2009, Plaintiff's board asked Defendant Roberts for an explanation of why the escrow percentage had not been returned to Plaintiff.  Defendant Roberts responded that the Spanish Tax Authority was investigating Majestic Group and that the escrow percentage could not be released because it was an asset of Majestic Group.  ELS assured Plaintiff that the funds were merely frozen, and that the Fund would not be disadvantaged by the delay in repayment. (*Id.* at ¶ 53.)

30.     During the same board meeting ELS Spain was represented at this meeting by Martina Frizsche and Richard Spector. Ms. Frizsche informed Plaintiff's board that the Escrow Percentage for Fund No. 5 would be released on December 18, 2009.  Plaintiff's board also

inquired about a much larger Escrow Percentage amount for Fund No. 4 of €9.8 million, which was due to be repaid to Fund No. 4 (due to a lack of sales) in January 2010. Mr. Spector informed Plaintiff's board that he did not anticipate any delays in returning the Escrow Percentage for Fund No. 4 on the due date. (*Id.* at ¶ 55.)

31. Despite Ms. Frizsche's assurances to Plaintiff's board, the Escrow Percentage for Fund No. 5 was not repaid on December 18, 2009. (*Id.* at ¶ 56.)

32. On January 29, 2010, Richard Spector, a partner with ELS, requested a conference call with Plaintiff's board. During the course of this call, which took place at 5:15 p.m. that day, Mr. Spector informed Plaintiff's board that the escrow percentage from Fund No. 4 had been misappropriated by Joe Ezaz. He further explained that the escrow percentage had not been in the ELS account for more than one year. (*Id.* at ¶ 57.)

33. After Plaintiff's board learned that Joe Ezaz had misappropriated the Escrow Percentage due back to Fund No. 4, totaling €9.8 million, and because the Escrow Percentage due back to Fund No. 5, totaling €946,660, had still not been paid back to the fund, Plaintiff's board began to investigate the business dealings of Defendant Roberts and Joe Ezaz in greater detail. As a result of this investigation, Plaintiff's board learned that Defendant Roberts and Joe Ezaz were engaged in a conspiracy to commit fraud and misappropriate millions of euros from Plaintiff. (*Id.* at ¶ 59.)

### *The Dual Pricing Fraudulent Scheme Is Revealed*

34. During a visit to Cape Verde to investigate the status of properties in which Plaintiff's funds were invested, Mr. Clink learned of Defendants' dual pricing fraudulent scheme designed to secretly misappropriate millions of euros from Plaintiff. (*Id.* at ¶¶ 61, 62.)

35. Specifically, for several investment properties, after Plaintiff was informed the price that it would have to pay for the unit by Defendant Roberts, Plaintiff would authorize the release of funds to cover the forty-five percent deposit of the agreed-upon price. However, Defendant Roberts was later re-negotiating the price to be paid with developers to a lesser amount, and then retaining the difference. Thus, Plaintiff believed one price was being paid,

- 9 -

4849-2007-0675.2

1    however, the developer was receiving a significantly lower amount, with the difference going

2    directly to Defendant Roberts or an entity that he and Joe Ezaz controlled. (*Id.* at ¶¶ 62-66.)

3        36.    Moreover, Defendant Roberts was only paying the developers an initial deposit of

4    thirty-percent, rather than the forty-five percent Plaintiff believed and understood was being paid.

5    This difference was also being improperly retained by Defendants. (*Id.* at ¶¶ 62-66.)

6        37.    Joe Ezaz's involvement in the dual pricing scheme is evidenced, among other

7    things, by an email sent to the board on July 5, 2009, by Darren Dale of ELS. Mr. Dale sent a

8    spreadsheet, which no one understood at the time, which likely provided an example of the dual

9    pricing scheme. The spreadsheet set forth the price the board agreed to pay along with the price

10   that was renegotiated with the developer. Within a matter of hours, Mr. Dale sent the board an

11   apology for sending a spreadsheet that contained only "internal workings." The apology email

12   was accompanied by an email by Joe Ezaz chastising Mr. Dale and attempting to explain the

13   contents of the spreadsheet. Because Plaintiff's board did not suspect or have knowledge of the

14   fraudulent scheme at that time, it was satisfied with Joe Ezaz's explanation. (*Id.* at ¶ 67.)

15       38.    After the board learned that the Escrow Percentage from Fund Nos. 4 and 5 were

16   misappropriated, the Escrow Percentages from Fund Nos. 6 and 7 were coming due. These

17   Escrow Percentages for Fund Nos. 6 and 7 were held by Stately. In a letter dated March 11,

18   2010, Kevin Smith of Heritage wrote to Defendant Roberts and other directors of Stately seeking

19   confirmation that the Escrow Percentages would be timely paid back to the fund. In response to

20   Mr. Smith's letter, Stately's counsel, DLA Piper, responded that it was unlikely that Stately

21   would be able to timely make the Escrow Percentage payments back to the respective funds.

22   DLA Piper continued that Stately's directors were considering some form of insolvency process,

23   and requested deferment of the payment dates. (*Id.* at ¶ 68.)

24       39.    Heritage again wrote to Stately on June 30, 2010, stating that a payment of

25   €1,434,261.60 was due on June 24, 2010, but had not been made. Heritage requested immediate

26   payment of the owed Escrow Percentage. In response, DLA Piper on behalf of Stately, indicated

27   that Stately was still unable to satisfy its obligation with respect to Fund Nos. 6 and 7, and again

28   requested a deferment. (*Id.* at ¶ 69.) Subsequent demands have gone unanswered.

- 10 -

40. Additionally, although the Escrow Percentage for Fund No. 2 was repaid, it now appears that the Escrow Percentage was repaid from funds from the Fund No. 6 client account. (*Id.* at ¶ 71.)

41. Based on a review of the ELS Client Bank Accounts used by Plaintiff for each fund, it appears that Stately received €4,057,826 in unauthorized distributions from Fund No. 4, €2,505,625 in unauthorized distributions from Fund No. 6, and €1,064,746 in unauthorized distributions from Fund No. 7. (*Id.* at ¶ 72.)

*Additional Monies Are Misappropriated*

42. In April 2010, Mr. Clink received a telephone call from Brian Thompson, an agent of the developers in Morocco, seeking a meeting with representatives of the funds that invested heavily in that area. Shortly thereafter, Mr. Clink and Mr. Bowman met with Mr. Thompson in Malaga. During that meeting, Mr. Thompson informed Messrs. Clink and Bowman that Plaintiff owed his company approximately €5.9 million in unpaid sums under the executed Right to Purchase contracts. This demand was in stark contrast to the information that ELS had earlier provided to Plaintiff, wherein ELS informed Plaintiff that all obligations in Morocco were satisfied. (*Id.* at ¶¶ 73, 74.)

43. A review of the client account for the Moroccan developers establishes that the fund paid €39,300,688 into the account. However, several unauthorized and fraudulent transactions establish the misappropriation of these funds by Defendant Roberts and Joe Ezaz.

*Defendants Receive Tax and Legal Advice on How to Shield Assets From a Judgment in the United States*

44. After the Escrow Percentage for Fund Nos. 4 and 5 were not returned without explanation, Plaintiff initiated proceedings in the Commercial Court in London, England on March 23, 2010 against ELS, the entity responsible for maintain those Escrow Percentages (Claim Number 2010 Folio 369). On November 19, 2010, Plaintiff's summary judgment motion was granted in those commercial proceedings against ELS in relation to the Escrow Percentage for Fund No. 4. Plaintiff received a judgment in the amount of €9.8 million, plus interest and costs, which represents the entire amount of the misappropriated escrow percentages from Fund

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

40. Additionally, although the Escrow Percentage for Fund No. 2 was repaid, it now appears that the Escrow Percentage was repaid from funds from the Fund No. 6 client account. (*Id.* at ¶ 71.)

41. Based on a review of the ELS Client Bank Accounts used by Plaintiff for each fund, it appears that Stately received €4,057,826 in unauthorized distributions from Fund No. 4, €2,505,625 in unauthorized distributions from Fund No. 6, and €1,064,746 in unauthorized distributions from Fund No. 7. (*Id.* at ¶ 72.)

*Additional Monies Are Misappropriated*

42. In April 2010, Mr. Clink received a telephone call from Brian Thompson, an agent of the developers in Morocco, seeking a meeting with representatives of the funds that invested heavily in that area. Shortly thereafter, Mr. Clink and Mr. Bowman met with Mr. Thompson in Malaga. During that meeting, Mr. Thompson informed Messrs. Clink and Bowman that Plaintiff owed his company approximately €5.9 million in unpaid sums under the executed Right to Purchase contracts. This demand was in stark contrast to the information that ELS had earlier provided to Plaintiff, wherein ELS informed Plaintiff that all obligations in Morocco were satisfied. (*Id.* at ¶¶ 73, 74.)

43. A review of the client account for the Moroccan developers establishes that the fund paid €39,300,688 into the account. However, several unauthorized and fraudulent transactions establish the misappropriation of these funds by Defendant Roberts and Joe Ezaz.

*Defendants Receive Tax and Legal Advice on How to Shield Assets From a Judgment in the United States*

44. After the Escrow Percentage for Fund Nos. 4 and 5 were not returned without explanation, Plaintiff initiated proceedings in the Commercial Court in London, England on March 23, 2010 against ELS, the entity responsible for maintain those Escrow Percentages (Claim Number 2010 Folio 369). On November 19, 2010, Plaintiff's summary judgment motion was granted in those commercial proceedings against ELS in relation to the Escrow Percentage for Fund No. 4. Plaintiff received a judgment in the amount of €9.8 million, plus interest and costs, which represents the entire amount of the misappropriated escrow percentages from Fund

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

No. 4.   An order freezing the assets of Joe Ezaz was entered immediately after Plaintiff discovered that amounts that were supposed to be in escrow had gone missing.  (*Id.* at ¶ 81.)

45.   ELS's primary insurers paid Plaintiff up to the limit of their indemnity, which equaled approximately €3.5 million.  The secondary insurer refused to pay any amount, and instead rejected the claim for reasons that Plaintiff disputes and has reserved the right to challenge.  (*Id.* at ¶ 82.)

46.   During discovery in the Commercial Court proceeding, Plaintiff learned that Joe Ezaz had intentionally tried to destroy documents and records.  However, his spoliation efforts were unsuccessful and certain records were recovered.  (*Id.* at ¶ 84.)

47.   Other documents obtained during discovery of the Commercial Court proceeding evidence Defendant Roberts and Joe Ezaz's attempts to shield and hide assets in the event of a lawsuit in the United States.  Plaintiff obtained several emails between Defendant Roberts, Joe Ezaz, and tax planners Kingston Smith LLP ("Kingston Smith"), an accounting firm, that provided personal tax advice to Defendant Roberts and Joe Ezaz and proposed using, among other companies, Stately, Tlalok, and Trelina as a means of "offshore tax planning."  (*Id.* at ¶ 91.)

48.   For example, in an email dated August 22, 2009, to Heather Powell, a partner at Kingston Smith, from Gary Fales, an attorney in Las Vegas believed to be retained by Defendant Roberts, Mr. Fales instructed Ms. Powell that any "assets in Joe's name are naked, exposed, and subject to seizure in a lawsuit.  Anything that Joe would miss if it was taken from him should be sheltered."  Mr. Fales continues that "hot" assets, such as Joe Ezaz's Connecticut home, cars, boats, and "toys" should be isolated within their own LLC.  (*Id.* at ¶ 96.)

49.   Furthermore, documents obtained during the Commercial Court proceeding evidences substantial sums of money being transferred from Plaintiff's funds directly to Defendants, or to related entities owned and managed by Defendants.  (*Id.* at ¶¶ 78-80, 92-93, 95.)

50.   The Tlalok ledger, obtained during the above-described proceeding, shows huge monthly sums being paid to Defendant Roberts and Joe Ezaz, using monies improperly obtained from Plaintiff's various funds.  (*Id.* at ¶ 78.)

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

51.     Subsequent investigation has revealed that Tlalok received substantial payments from the funds' client account held by ELS, whereas Tlalok was not entitled to receive any payments from ELS. As discussed above, the board agreed to allow commission payments from developers to be paid to Tlalok rather than Stately, but the board has never authorized ELS to release client funds directly to Tlalok. Specifically, based on a review of the ELS Client Bank Accounts used by Plaintiff for each fund, it appears that Tlalok received €21,517,756 in unauthorized distributions from Fund No. 4, €7,351,151 in unauthorized distributions from Fund No. 6, and €350,000 in unauthorized distributions from Fund No. 7. Tlalok is an entity owned and controlled by Defendant Roberts and Joe Ezaz. (*Id.* at ¶ 78.)

52.     Defendant Roberts told the board that Tlalok, and another entity controlled by Defendant Roberts—Trelina—were merely set up for tax planning. However, these entities, and others established by Defendant Roberts, including Taggia, were established and used purely for the purpose of disguising and hiding the fraudulent double pricing scheme referenced above. Specifically, based on a review of the ELS Client Bank Accounts used by Plaintiff for each fund, it appears that Trelina received €3,649,125 in unauthorized distributions from Fund No. 6, and €1,546,985 in unauthorized distributions from Fund No. 7. Trelina is an entity owned and controlled by Defendant Roberts and Joe Ezaz. (*Id.* at ¶ 80.)

53.     Defendant Roberts also knowingly misrepresented his relationship to Plaintiff and to another a related entity, Stirling Mortimer Guernsey Limited, on his visa application before entering the United States. Defendant Roberts represented that he owned a fifty percent interest in Stirling Mortimer Guernsey Limited on his application. However, Defendant Roberts has never owned any interest in this entity.

***Existing Actions Against Defendants***

54.     Plaintiff has very recently initiated a large Commercial action in London, England, to recover damages against Defendants in an amount presently believed to be in excess of €45,000,000, which was fraudulently misappropriated from Plaintiff by Defendants (Claim Number 2013 Folio 192). (*Id.* at ¶ 101.)

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

1    (f)    On information and belief, Defendant Regal owns parcel no. 138-21-419-
2    054, which is a single-family residence in Las Vegas located at 8212 Ruby Mountain Way, Las
3    Vegas, Nevada, 89128. Defendant Regal purchased this property in May 2008;

4    (g)    On information and belief, Defendant Regal owns parcel no. 163-03-210-
5    031, which is a single-family residence in Las Vegas located at 1704 Silver Oaks Street, Las
6    Vegas, Nevada, 89117. Defendant Regal purchased this property in September 2008;

7    (h)    On information and belief, Defendant Regal owns parcel no. 164-01-713-
8    008, which is a single-family residence in Las Vegas located at 2079 Desert Prairie Street, Las
9    Vegas, Nevada, 89135. Defendant Regal purchased this property in July 2008;

10    (i)    On information and belief, Defendant Jane Roberts has the following
11    vehicles registered in her name in the Las Vegas area: 2006 BMW M3, 2010 Utility trailer, 2009
12    ECCO ATV, and a 2011 Monaco Knight 40' motorhome;

13    (j)    On information and belief, Defendant Roberts has a BMW X5 registered in
14    his name in the Las Vegas area;

15    (k)    On information and belief, Defendants Roberts has a savings and checking
16    account with Wells Fargo Bank in Las Vegas, Nevada with a combined total of approximately
17    $2,000.00;

18    (l)    On information and belief, Defendant Jane Roberts has a savings and
19    checking account, with a combined total of approximately $228,000.00, with Wells Fargo Bank
20    in Las Vegas, Nevada;

21    (m)    On information and belief, Defendant Jane Roberts has a savings and
22    checking account, with a combined total of approximately $147,000.00, with Chase Bank in Las
23    Vegas, Nevada; and

24    (n)    On information and belief, Defendant Regal has a savings and checking
25    account, with a combined total of approximately $7,500.00, with Wells Fargo Bank in Las Vegas,
26    Nevada. (*Id.* at ¶ 103.)

27    57.    All of the above-referenced real property assets held by Defendant Roberts,
28    Defendant Jane Roberts, or Defendant Regal were acquired between 2007 through 2010, with the

PARSONS BEHLE & LATIMER

4849-2007-0675.2

- 15 -

1   majority being acquired in 2008. As described above, this directly coincides with when

2   Defendant Roberts and Joe Ezaz were participating in the dual pricing fraud and stealing Escrow

3   Percentage funds from client accounts at ELS. (*Id.* at ¶ 104.)

4   **ARGUMENT**

5   I.     **A PRELIMINARY INJUNCTION SHOULD ISSUE TO PREVENT DEFENDANTS FROM FURTHER HIDING OR DISPOSING OF ASSETS THEY WRONGFULLY ACQUIRED**

6

7         This Court should issue a preliminary injunction to enjoin Defendants (i) from executing

8   any disposition of the properties identified above until such time that the Court can determine the

9   rightful owner; (ii) from executing any further disposition of Defendants' assets presently

10   unknown to Plaintiff until such time that the Court can determine the rightful owner; (iii) freeze

11   Defendants' assets, both real and personal, including all bank accounts, that could be used to

12   satisfy the probable damage award to which Plaintiff is entitled. Plaintiff has and continues to

13   suffer irreparable harm because Defendants have a documented history of transferring assets

14   overseas, leaving insufficient assets to satisfy any damage award that will be awarded by the

15   Commercial Court in London, England. Indeed, Defendants have sought and received both legal

16   and tax advice on how best to shelter assets from a judgment against them in the United States—

17   advice that recommended dissipating assets overseas to avoid seizure. This alone necessitates a

18   preliminary injunction. As discussed in detail below, all of the requirements for issuance of

19   preliminary injunction are satisfied.

20         In the Ninth Circuit, a party is entitled to a preliminary injunction if (i) the party seeking

21   the order will likely suffer irreparable harm in the absence of preliminary relief; (ii) that party is

22   likely to prevail on the merits; (iii) the balance of equities tips in favor of preliminary relief; and

23   (iv) preliminary relief is in the public interest.[2] *Winter v. Natural Res. Defense Council, Inc.*, 555

24   U.S. 7, 22 (2008); *Johnson v. Corturier*, 572 F.3d 1067, 1078-79 (9th Cir. 2009). Alternatively,

25   the Ninth Circuit has held that district courts may issue an injunction if the first two elements are

26   established and there are "serious questions going to the merits and there is a hardship balance

27

28   [2] Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Quiroga v. Chen*, 735 F. Supp. 2d 1226, 1228 (D. Nev. 2010).

- 16 -

1   that tips sharply toward the plaintiff." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

2   1135 (9th Cir. 2011). Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to

3   issue preliminary relief of the type requested by Plaintiff when "specific facts in an affidavit or a

4   verified complaint" establish the four requirements. Fed. R. Civ. P. 65(b). As set forth herein

5   and in the First Amended Verified Complaint that has been filed concurrently with the instant

6   motion, Plaintiff has conclusively established each element. Accordingly, this Court should issue

7   the requested preliminary relief.

8         Plaintiff has pleaded several claimed based on the federal Racketeer Influenced and

9   Corrupt Organizations ("RICO") Act as its basis for subject matter jurisdiction in federal court.

10   *See* 18 U.S.C. §§ 1961-1968. The Ninth Circuit has previously held that an injunction based on

11   pendent state law claims is appropriate in a case where RICO claims allow the case to be heard in

12   federal court. *See Republic of the Phillipines v. Marcos*, 862 F.2d 1355, 1359-60 (9th Cir.

13   1988). The claims at issue in this case are very similar to those in *Marcos*, thus, the Court should

14   adhere to its earlier decision and issue a preliminary injunction freezing Defendants' assets for all

15   the reasons set forth below.

16      **A.**    **Plaintiff Has and Will Continue to Suffer Irreparable Harm**

17         Irreparable harm exists when there is a substantial chance that, upon final resolution of the

18   matter, the movant cannot be made whole. *Estate of Ferdinand Marcos, Human Rights Litig.*, 25

19   F.3d 1467, 1477 (9th Cir. 1994). A temporary restraining order and/or preliminary injunction is

20   appropriate when a plaintiff seeks equitable remedies in its complaint. *See e.g., Johnson v.*

21   *Couturier*, 572 F.3d 1067, 1083-84 (9th Cir. 2009). As in this case, the potential (and even

22   probable) loss of an interest in real property constitutes an irreparable injury. *Park Village Apt.*

23   *Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011).

24         In the instant case, Plaintiff seeks two forms of equitable relief—creation of a constructive

25   trust because the rightful ownership of the properties purchased in this jurisdiction remains at

26   issue; and an accounting to identify the full extent of Defendants' fraudulent scheme. *See Coto*

27   *Settlement v. Eisenberg*, 593 F.3d 1031, 1036 (9th Cir. 2010) (identifying constructive trust and

28   accounting as equitable remedies).

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

- 17 -

Defendants' efforts to misappropriate and then hide money from Plaintiff began almost immediately after the business relationship between Defendant Roberts, Joe Ezaz, and Plaintiff began in 2007. Defendants Roberts and Ezaz undertook a dual pricing scheme designed to secretly misappropriate Plaintiff funds. This dual pricing strategy was achieved by Defendant Roberts negotiating one price with Plaintiff, but then negotiating a separate, lower price with developers for the same parcel of property. The difference between the price Plaintiff believed it was paying and the price the developer agreed to accept was retained by Defendant Roberts and Joe Ezaz without Plaintiff's knowledge or authorization. This dual pricing scheme resulted in Defendants retaining millions of Plaintiff's euros—monies that were used to purchase properties in this and other jurisdictions. Accordingly, the rightful ownership of the properties purchased in this jurisdiction by Defendants remains in serious doubt.

Moreover, Defendants participated in a scheme to misappropriate Plaintiff's escrow percentage for Fund Nos. 4 through 7 without Plaintiff's knowledge or approval. The escrow percentage was to be retained in escrow until the properties purchased by the various funds were resold (in which case the escrow funds were given to the Property Manager as a commission). However, if the properties were not resold within the prescribed period, the escrow percentage was to be returned to the appropriate fund. Despite this clear structure and procedure, Defendants immediately misappropriated the escrow percentage from Fund Nos. 4 through 7 and used those monies to purchase real and personal properties in this and other jurisdictions.

Thus, without the entry of order immediately freezing Defendants' assets and preventing further disposition, these equitable remedies may not be available to Plaintiff because the status quo would not be preserved by court order. To preserve Plaintiff's future remedies and the status quo, this Court should order Defendants' assets frozen. *See, e.g., Couturier*, 572 F.3d at 1075, *Reebok Int'l., Ltd., v. Marnatech Enters., Inc.*, 970 F.2d 552, 559-62 (9th Cir. 1992); *St. Ventures, LLC v. KBA Assets and Acquisitions, LLC*, Case No. 1:12-cv-01058 2012 WL 3647656, at *4 (E.D. Cal. August 23, 2012).

Plaintiff's irreparable harm is further evidenced by Defendants' repeated efforts to hide and protect the misappropriated funds from detection and seizure, thereby increasing the

- 18 -

possibility that Plaintiff will have no remedy available to it without judicial intervention. As the Ninth Circuit held in *Estate of Ferdinand Marcos*,

> We join the majority of circuits in concluding that a district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment.

*Id.* at 1480. In the instant case Defendants have engaged in a pattern of secreting or dissipating assets to avoid judgment.

During discovery in earlier proceedings against ELS and Joe Ezaz, Plaintiff learned that Joe Ezaz had intentionally attempted to destroy documents contained on ELS servers evidencing the conspiracy to defraud Plaintiff. Documents from Stately, another entity involved in Plaintiff's investment and one owned by Defendant Roberts, also stored documents on this same server. Joe Ezaz's spoliation efforts were unsuccessful and certain records were recovered. Among those records recovered was an email dated August 22, 2009, sent to Heather Powell, a partner at Kinston Smith, by Gary Fales, an attorney in Las Vegas believed to be retained by Defendant Roberts. In that email, Mr. Fales wrote that any "assets in Joe's name are naked, exposed, and subject to seizure in a lawsuit. Anything that Joe would miss if it was taken from him should be sheltered." Mr. Fales continued that "hot" assets, such as Joe Ezaz's Connecticut home, cars, boats, and "toys" should be isolated within their own LLC. Defendant Roberts was copied on this email.

Then, in an email dated August 25, 2009, Joe Ezaz forwarded a message from Mr. Fales to sarah@statelyinvest.com. In that email, Mr. Fales sets forth a detailed asset protection plan for Joe Ezaz, including advice that the best way to protect assets owned by a United States citizen based overseas for a United States-based lawsuit was in an offshore trust located in a jurisdiction with favorable asset protection laws in relation to United States law. Mr. Fales recommended the Cook Islands as a suitable venue for these assets. This email was also copied to Defendant Roberts.

PARSONS BEHLE & LATIMER

4849-2007-0675.2

1   Finally, in an email dated September 13, 2009, between Mr. Fales and Kingston Smith
2   representatives, Mr. Ezaz is described to have asked about a tax and asset protection plan of
3   transferring all of his UK assets to his wife. The next day, Mr. Fales responded that UK courts
4   can look through recent transactions if there is a suspicion that the transfer has been made to
5   avoid a claim. Defendant Roberts was copied on this exchange.
6   As this and other evidence make clear, Defendants have researched and pursued a strategy
7   of hiding assets to protect them from seizure in a lawsuit. Precisely as the Ninth Circuit held in
8   *Estate of Ferdinand Marcos*, in cases where the defendant has a pattern of dissipating assets to
9   avoid judgment, a temporary restraining order and/or preliminary injunction freezing those assets
10  is warranted and necessary to protect the plaintiff's prospective remedies, both equitable and
11  monetary. *See also Caterpillar Inc. v. Jerryco Footwear, Inc.*, 880 F. Supp. 578, 587 (C.D. Ill.
12  1994) (finding irreparable harm where defendants' deceptive and bad faith acts evidence a "high
13  probability that, absent a preliminary injunction, the defendants would engage in further acts
14  designed to defraud [the plaintiff] and frustrate enforcement of any judgment"); *Kremen v.*
15  *Choen*, No. 5:11-cv-05411-LHK, 2011 WL 6113198, at *5-6 (N.D. Cal. Dec. 7, 2011) (holding
16  plaintiff will "incur irreparable harm in that he may not be able to execute on his Judgment"
17  where defendant made fraudulent conveyances through assistance of family and associates to
18  avoid judgment); *Dargan v. Ingram*, No. C08-1714RSL, 2009 WL 1437564, at *6 (W.D. Wash.
19  May 22, 2009) (finding plaintiff subject to irreparable harm based on defendant's concealment
20  and conveyances of assets indicating defendant's willingness to avoid execution of judgment).
21  **B.   There Is a Substantial Likelihood Plaintiff Will Prevail on the Merits**
22  In Plaintiff's First Amended Verified Complaint, Plaintiff alleges six causes of action
23  against Defendants. These causes of action all relate to Defendants' successful scheme to
24  misappropriate Plaintiff's funds and then use those ill-gotten funds to acquire real and personal
25  property in this and other jurisdictions.
26  For purposes of a temporary restraining order and/or preliminary injunction, Plaintiff must
27  establish that it has a substantial likelihood to prevail on the merits, or that there are "serious
28

- 20 -

PARSONS
BEHLE &
LATIMER       4849-2007-0675.2

1  questions going to the merits" raised and that the balance of hardships tips sharply in Plaintiff's

2  favor. Plaintiff can establish the requisite element under either standard.

3          **1.     Plaintiff is Substantially Likely To Prevail on Its Equitable Claims.**

4       Plaintiff has set forth detailed allegations describing the conspiracy between Defendant

5  Roberts and Joe Ezaz to misappropriate and then hide Plaintiff's assets, including a shareholder

6  agreement between the two identifying the entities through which funds would be funneled and

7  sheltered, email communications describing the most effective way to shield assets from a

8  judgment in the United States, and details contained in the Tlalok ledger, obtained during

9  discovery in a related lawsuit, which describes the payments made from Plaintiff's funds to

10  Defendants and related entities.

11       This Memorandum and Plaintiff's First Amended Verified Complaint sets forth detailed

12  and specific allegations illustrating how Defendants engaged in a fraudulent scheme to secretly

13  misappropriate Plaintiff's funds. Plaintiff describes how funds from the ELS trust accounts were

14  improperly transferred directly to Defendants or to several entities owned and controlled by

15  Defendants, including Tlalok. None of these transactions were authorized by Plaintiff. Indeed, in

16  April 2008, the Tlalok ledger shows a transfer from the ELS account to Tlalok, and then

17  immediately from Tlalok to Defendant Roberts, in an amount believed to be the purchase price of

18  one of Defendant Roberts' homes in Las Vegas acquired in 2008.

19       Furthermore, Plaintiff set forth detailed allegations demonstrating that Defendants also

20  misappropriated millions of euros from funds that were specifically intended to be tendered to

21  developers in Morocco, including:

22       i.    unauthorized payments to Defendant Roberts and Joe Ezaz's personal bank

23  accounts in the amount of €500,000 each;

24       ii.    an unauthorized payment to Defendant Regal on August 28, 2012, in the amount

25  of €171,046.48;

26       iii.    an unauthorized payment to Symbolic, a Nevada-based company that sells luxury

27  cars in Las Vegas, Nevada, on September 4, 2008, in the amount of €180,649.32; and

28

v.    an unauthorized payment to Trelina, another entity owned and controlled by Defendant Roberts, on September 5, 2008, in the amount of €750,000, among many others.

Furthermore, there can be no dispute that Plaintiff sought to have the escrow percentage from Fund Nos. 4 through 7 returned after no properties were sold during the prescribed period. After several demands, Defendants' representatives informed Plaintiff that no funds were available, despite the unequivocal fact that Defendant Roberts and Joe Ezaz maintained control over or had access to these escrow percentages at all relevant times. Moreover, Plaintiff has obtained documentary evidence of the dual pricing fraudulent scheme that establishes that Defendant Roberts negotiated a separate price for many units Plaintiff acquired and then improperly retained the difference.

Most significant is the simple fact that another court, when faced with similar allegations and evidence relating to the missing Escrow Percentages for Fund Nos. 4 and 5, awarded Plaintiff in excess of €9 million and ordered Joe Ezaz's assets held in that jurisdiction to be frozen on the basis that the defendants to the claim had no real prospect of successfully defending it and there was no other compelling reason why the claim should proceed to trial. On November 19, 2010, Plaintiff was granted summary judgment by a court in Europe related to the escrow percentage from Fund Nos. 4 and 5. Plaintiff is still attempting to collect on this judgment.

### 2.    Plaintiff is Substantially Likely to Prevail on Its RICO Claims.

Although Plaintiff's RICO's claims do not form the basis for its requested injunction, Plaintiff is substantially likely to prevail on the merits of those claims as well. RICO provides for criminal and civil liability. *See* 18 U.S.C. §§ 1961-1968. "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985)).

Defendants have violated three separate provisions of RICO. First, Defendants have violated section 1962(a), which makes it unlawful "for any person who has received any income derived … from a pattern of racketeering activity … in which such person has participated as a principal … to use or invest … any part of such income … in acquisition of any interest in, or the

- 22 -

1 establishment or operation of, any enterprise which is engaged in, or the activities of which affect,

2 interstate or foreign commerce." 18 U.S.C. § 1962(a).

3      Defendants have also violation section 1962(c). To state a claim under that section, a

4 plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

5 activity." *Odom*, 486 F.3d at 547. An enterprise includes any individual, association, or group of

6 individuals associated in fact, though not a legal entity. 18 U.S.C. § 1961(4). "An associated-in-

7 fact enterprise under RICO does not require any particular organizational structure, separate or

8 otherwise." *Odom*, 486 F.3d at 551. An associated-in-fact enterprise is "a group of persons

9 associated together for a common purpose of engaging in a course of conduct." *Id.* at 552. A

10 pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18

11 U.S.C. § 1961(5).

12      Finally, Defendants have violated section 1962(d), which makes it unlawful for any

13 person to conspire to violate any of the provisions of subsection (a), (b), or (c) of section 1962.

14 *Id.* at 547.

15      In the First Amended Verified Complaint, Plaintiff has alleged multiple racketeering

16 activities, engaged in by Defendants, which give rise to RICO liability. Six instances of predicate

17 activities by Defendant that violate RICO include laundering of monetary instruments in violation

18 of 18 U.S.C. § 1956(a)(1)(B)(i), laundering of monetary instruments in violation of 18 U.S.C. §

19 1956(a)(2)(B)(i), laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(3)(B),

20 engaging in monetary transactions in property derived from specified unlawful activities in

21 violation of 18 U.S.C. § 1957(a), receiving stolen monies in violation of 18 U.S.C. § 2315, and

22 knowingly providing false information on a United States visa application in violation of 18

23 U.S.C. § 1546(a). These predicate acts are described in detail and with particularity in the

24 Verified Amended Complaint.

25      Defendants' first three predicate acts all implicate the primary money laundering statute,

26 which makes it unlawful for a person to transfer "a monetary instrument or funds …to a place in

27 the United States from or through a place outside the United States" while knowing that the funds

28 "represent the proceeds of some form of unlawful activity and knowing that such … transfer is

- 23 -

4849-2007-0675.2

PARSONS
BEHLE &
LATIMER

1  designed ... to conceal or disguise the nature, the location, the source, the ownership, or the

2  control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(2). The statute also

3  makes it unlawful for a person to conduct a financial transaction involving property representing

4  the proceeds of unlawful activity with the intent of concealing the nature, source, or ownership of

5  the property. *Id.* § 1956(3).

6  Here, Defendants wrongfully misappropriated Plaintiff's Escrow Percentage funds

7  without authorization or approval. Defendant Roberts, through an entity he controlled, was only

8  entitled to a small commission *if and only if* the properties in which Plaintiff's funds were

9  invested were sold within an agreed-upon time. However, due to a lack of sales, the Escrow

10  Percentage funds were to return to the appropriate Fund, with Defendant Roberts (through his

11  entity) receiving no commission. Despite this arrangement, the Escrow Percentage funds were

12  taken without Plaintiff's knowledge or consent.

13  Additionally, Defendant Roberts negotiated a separate, lower price with developers, from

14  the one Plaintiff agreed to pay for the investment properties (referred to as the dual pricing

15  scheme above). The difference between the two prices was improperly retained by Defendant

16  Roberts without Plaintiff's knowledge or consent. These monies were then transferred to a

17  variety of unrelated entities controlled by Defendant Roberts and/or Joe Ezaz, including

18  Defendant Regal, and to individuals who were not entitled to receive Plaintiff's funds, including

19  Defendant Jane Roberts. These funds were then transferred several times by and between entities

20  controlled by Defendant Roberts, until some of those misappropriated funds were used to

21  purchase real and personal property in this jurisdiction. These transfers are established by the

22  Tlalok ledger and a review of ELS accounts, many of which Joe Ezaz (Defendant Roberts co-

23  conspirator) attempted to destroy after an earlier action in England was initiated. The Tlalok

24  ledger and the ELS accounts establish that several transfers were made directly from Plaintiff's

25  funds to Defendants or to unrelated entities in amounts equal to the purchase price of real

26  property purchased in Nevada.

27  Defendants were aware that their conduct was improper, established by the documentary

28  evidence showing that Defendants sought and received tax and legal advice on the best way to

- 24 -

1  shield assets from a judgment in the United States. Defendants received advice that the best way
2  to protect assets is to transfer them to limited liability companies and/or to other individuals,
3  including one's spouse. Defendant Roberts had followed this advice, and it is also believed that
4  he has transferred assets to offshore jurisdictions from which seizure is effectively impossible.

5  Defendants' fourth racketeering act relates to engaging in monetary transactions in
6  property derived from specified unlawful activities in violation of 18 U.S.C. § 1957(a). As
7  described above, Plaintiff have documentary evidence that Plaintiff's misappropriated funds were
8  transferred from ELS accounts directly to entities controlled by Defendant Roberts—monies that
9  were later used to purchase real property and personal property (including luxury automobiles) in
10  this jurisdiction.

11  Defendants' fifth racketeering act is receipt of stolen monies in violation of 18 U.S.C. §
12  2315. The Tlalok ledger and ELS accounts establish that monies were transferred directly to
13  Defendant Roberts, Defendant Jane Roberts, and Defendant Regal—none of which were
14  authorized or approved by Plaintiff. These funds were misappropriated and then improperly
15  retained by Defendants, and then used, among other things, to purchase real property in this
16  jurisdiction.

17  Finally, Defendants' sixth racketeering act relates to Defendant Roberts' knowing
18  misrepresentation on a United States visa application in violation of 18 U.S.C. § 1546(a). Here,
19  Roberts lied on his U.S. visa application by stating that he owned 50 percent of Stirling Mortimer
20  Guernsey Limited. (*See* First Amended Verified Complaint ¶ 100.) In reality, Roberts did not
21  own, nor has he ever had an ownership interest in this entity. Roberts then used his ill-gotten
22  entry into the United States to injure Plaintiff by moving Plaintiff's funds to accounts in this
23  jurisdiction, hiding the stolen money by acquiring real property, and taking other actions to
24  abscond with and hidden funds belonging to Plaintiff.

25  The facts supporting these predicate acts are well supported by documentary evidence and
26  testimony of Plaintiff's principal, Tim Clink. Although the basis for the preliminary injunction is
27  the equitable causes of action and not the RICO claims, Plaintiff nonetheless has a substantial
28  likelihood of prevailing on the merits of its RICO claims as well.

- 25 -

C.     **The Balance of Equities Tips Sharply in Favor of Plaintiff**

The balance of equities analysis further supports Plaintiff's motion for a preliminary injunction. Plaintiff is not seeking a "mandatory injunction," which requires Defendants to take some affirmative action. Rather, Plaintiff seeks only a "prohibitory injunction," or an order freezing Defendants' assets to preserve the status quo to secure the positions of each party until the merits are ultimately determined. *Marlyn Nutraceuticals, Inc., v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); *Timbisha Shoshone Tribe v. Kennedy*, 687 F. Supp. 2d 1171, 1189-90 (E.D. Cal. 2009). Accordingly, the purported impact on Defendant from the requested injunction is minimal.

In contrast, the impact on Plaintiff should the Court not freeze Defendants' assets to preserve the status quo is significant. Plaintiff has not yet determined the full scope of the fraudulent scheme, so it has no way to adequately monitor Defendants to verify that Plaintiff's misappropriated assets are not being dissipated out of the country. The advice that Defendants received concerning the most effective way to shelter assets from a judgment rendered in the United States strongly suggests that Defendants have contemplated the instant action and have already taken steps to shield the ill-gotten assets. Plaintiff simply requests an order preventing any further transfer of assets so that Plaintiff's equitable relief can be awarded and that Defendants have sufficient, sizeable assets to satisfy the probable damage award in this matter.

D.     **The Public Interest Is Protected by the Issuance of an Order Freezing Defendants' Assets**

When the scope of the requested injunction is narrow, such that it only affects the parties, the public interest analysis is generally neutral with little or no impact on the analysis. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009). However, courts that have evaluated the public interest element in the context of fraud allegations have generally concluded that the public interest is promoted when allegations of fraud or conversion are thwarted. *See St. Ventures*, 2012 WL 3647656, at *3 (E.D. Cal. August 23, 2012) ("Second, although the dispute in this case relates to a purely private transaction, the public interest is promoted, at least in a general way, when alleged fraud or conversion is thwarted.").

PARSONS
BEHLE &
LATIMER

4849-2007-0675.2

1    In this case, although the First Amended Verified Complaint is filed only on behalf of

2    Plaintiff, Defendants defrauded all of the investors in the individual funds as well as Plaintiff. As

3    described above, Plaintiff solicited investments from independent financial advisors to invest in

4    the individual funds. This is precisely why Plaintiff was established as a protected cell company

5    under the laws of Guernsey—so that separate cells could be created and marketed to independent

6    financial advisors. These investors are similarly the victims of Defendants' fraud and conversion.

7    Thus, the public interest is *promoted* by freezing Defendants' assets until such time that the Court

8    can determine the equitable owner of the properties purchased in this jurisdiction with the

9    misappropriated funds. Moreover, given Defendants' history of hiding and sheltering funds, the

10   public interest is further promoted by preserving these assets until the matter is resolved.

11   ## CONCLUSION

12   For the foregoing reasons, the Court should issue a preliminary injunction freezing

13   Defendants' assets to preserve the status quo until Plaintiff's equitable claims can be resolved by

14   the court and the equitable owner of the subject properties in this jurisdiction can be determined.

15   Without an order freezing and preventing Defendants from transferring, selling, disposing,

16   pledging, assigning, or encumbering their assets held in this jurisdiction, Plaintiff will be unable

17   to obtain the equitable relief it seeks and will be unlikely to recover the probable damages that

18   will be awarded. Further, without an order, the significant risk that Defendants will immediately

19   dissipate assets out of this jurisdiction remains high.

20   Dated: March 5, 2013.                        PARSONS BEHLE & LATIMER

21

22                                               By: /s/ Michael R. Kealy
                                                     Michael R. Kealy
23                                                   Bar No. 0971
                                                     David M. Bennion (Pro Hac Requested)
24                                                   Bar No. 5664
                                                     Cory D. Sinclair (Pro Hac Requested)
25                                                   Bar No. 11158
                                                     Attorneys for Plaintiff
26

27

28

PARSONS
BEHLE &
LATIMER

- 27 -

4849-2007-0675.2