RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:  (213) 443-3145/Fax: (213) 443-3100

STACYLYN M. DOORE (admitted pro hac vice)
stacylyndoore@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:  (617) 712-7100/Fax: (617) 712-7200

RACHEL E. EPSTEIN (admitted pro hac vice)
rachelepstein@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
Telephone:  (212) 849-7000/Fax:  (212) 849-7100

[*Additional counsel on signature page*]

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN, a Delaware corporation,<br><br>              Plaintiff,<br><br>       v.<br><br>PROTON MANAGEMENT LTD., a British Virgin Islands corporation; THOMAS PATRICK FURLONG; ILIOS CORP., a California corporation; MICHAEL ALEXANDER HOLMES; RAFAEL DIAS MONTELEONE; SANTHIRAN NAIDOO; ENRIQUE ROMUALDEZ; and LUCAS VASCONCELOS,<br><br>              Defendants. | Case No. 2:24-cv-8280-MWC-E<br><br>**JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL**<br><br>**DISCOVERY MATTER**<br><br>Hearing Date:       July 18, 2025<br>Time:                    9:30 a.m.<br>Place:       Courtroom 750, 7th Fl.<br>Judge:       Hon. Charles F. Eick<br><br>Discovery Cutoff:       11-7-2025<br>Pre-Trial Conf. Date:  4-26-2026<br>Trial Date:               5-4-2026 |

1

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ...................................................................................1

   A.   Swan's Introductory Statement ......................................................1

   B.   Proton's Introductory Statement ....................................................2

II.  JOINT SPECIFICATION OF ISSUES IN DISPUTE .........................5

III. SWAN'S CONTENTIONS AND REQUEST FOR RELIEF ..............12

   A.   Factual and Procedural Background..............................................12

      1.   Defendants' Theft of Swan's Bitcoin Mining Business..........12

      2.   Proton's  Repeated Attempts to Stall....................................13

   B.   Legal Standard...............................................................................15

   C.   Argument........................................................................................16

      1.   Swan's Disclosure Is Sufficiently Specific Under The Rationale Of Section 2019.210 .........................................17

      2.   Defendants' Merit-Based Objections Are Irrelevant .............18

      3.   Defendants' Authority On "Highly Specialized" Fields Is Misplaced................................................................19

      4.   Swan's Citation To Documents Is Proper..............................20

      5.   Defendants' April 15 Letter Confirms Defendants' Understanding Of Swan's Trade Secret Identification...........22

      6.   Defendants Have Repeatedly Sought To Delay Document Productions..........................................................24

      7.   Trade-Secret By Trade-Secret Discussion.............................24

      8.   RFPs 16-20, 23-26, 28-34, 39-48, 55, 57 & 58, and ROGs 6, 8 & 9 ...............................................................36

      9.   Proton Has No Other Basis To Refuse To Comply With These Requests........................................................37

IV.  PROTON'S CONTENTIONS ..........................................................40

   A.   Factual And Procedural Background..............................................40

      1.   The Shareholder Agreement And Creation Of 2040 Energy. ...................................................................40

      2.   Due To Swan's Mismanagement And Liquidity Crises, Individual Defendants Resign. ..............................41

3.    After Swan Fails To Cure Its Material Breaches Of The SHA, 2040 Energy Engages Defendant Proton. ...................42

4.    Swan Files this "Tether Litigation." ................................42

5.    Tether and 2040 Energy File a Lawsuit Against Swan in the UK for Breach of the SHA. ....................................44

6.    Swan Makes Trade Secret Disclosures. ...............................45

7.    Defendants' Meet And Confer Efforts. ...............................45

B.    Legal Standard ........................................................48

C.    Argument ................................................................51

1.    Swan's Trade Secret Identification Is Insufficient Under Section 2019.210. ....................................................51

2.    Swan Mischaracterizes Proton's Arguments in this Action. .................................................................55

3.    Swan Fails to Meet the Particularity Standard Required for Its Trade Secrets. ......................................57

4.    Swan's References to Entire Documents Do Not Cure Its Deficient Disclosure ..............................................59

5.    Swan Mischaracterizes Defendants' Attempts to Discern the Vaguely Disclosed Trade Secrets and Proton's Exercise of its Rights. ..............................................62

6.    Each of Swan's Trade Secrets Is Insufficiently Disclosed. ...............................................................64

7.    The Trade Secret Identification Requirement Applies to All the Discovery at Issue. ......................................101

V.    CONCLUSION ................................................................103

A.    Swan's Conclusion .......................................................103

B.    Proton's Conclusion .....................................................103

## TABLE OF AUTHORITIES

### Cases

*A. Farber & Partners, Inc. v. Garber*,
    234 F.R.D. 186 (C.D. Cal. 2006) ....................................................................37

*Acrisure of Cal. v. SoCal Com. Ins. Servs., Inc.*,
    2019 WL 4137618 (C.D. Cal. Mar. 27, 2019) ...............................................84

*Advanced Modular Sputtering, Inc. v. Superior Ct.*,
    132 Cal. App. 4th 826 (2005)
    ...........................................16, 17, 18, 19, 23, 24, 26, 49, 50, 55, 58, 102

*Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*,
    819 F. Supp. 2d 1001 (E.D. Cal. 2011) ............................. 28, 29, 33, 74, 75, 90

*Albert's Organics, Inc. v. Holzman*,
    2020 WL 4368205 (N.D. Cal. July 30, 2020).............................................54, 60

*Alphonso Inc. v. Tremor Video, Inc.*,
    2022 WL 17968081 (N.D. Cal. Oct. 31, 2022)
    ........................................................ 19, 50, 51, 52, 58, 68, 70, 75, 87, 93, 95

*Alta Devices, Inc. v. LG Elecs., Inc.*,
    2019 WL 176261 .........................23, 49, 60, 76, 79, 86, 90, 93, 94, 97, 98, 100

*Arthur J. Gallagher & Co. v. Tarantino*,
    498 F.Supp.3d 1155 (N.D. Cal. 2020)......................................................20, 21

*Attia v. Google LLC*,
    983 F.3d 420 (9th Cir. 2020).........................................................................84

*Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*,
    2017 WL 10543565 (C.D. Cal. Mar. 13, 2017) ........................................27, 28

*Barry Wilson v. Wavestream Corp. et al.*,
    2025 WL 1090154 (C.D. Cal. Mar. 11, 2025) ...............................................38

*Beluca Ventures LLC v. Einride Aktiebolag*,
    660 F. Supp. 3d 898 (N.D. Cal. 2023)...............................................20, 21, 60

*Bluprint Clothing Corp. v. Walmart Inc.*,
    2025 WL 1090164 (C.D. Cal. Apr. 2, 2025) .................................................37

*Brescia v. Angelin*,
   172 Cal. App. 4th 133 (2009)............................................. 17, 18, 50, 67

*Buffets, Inc. v. Klinke*,
   73 F.3d 965 (9th Cir. 1996)..........................................................78

*by Kwikset Corp. v. Superior Ct.*,
   51 Cal. 4th 310, 246 P.3d 877 (2011)........................................66, 67

*Calendar Rsch. LLC, v. StubHub, Inc*.,
   2020 U.S. Dist. LEXIS 112361 (C. D. Cal. May 13, 2020)
   ................................................................................. 77, 83, 84, 92

*Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*
   2021 WL 5197215 (N.D. Cal. Nov. 9, 2021)
   ..............................................21, 22, 31, 61, 80, 81, 88, 94

*Cisco Sys., Inc. v. Chung*,
   462 F. Supp. 3d 1024 (N.D. Cal. 2020)......................................83, 84

*Cisco Systems, Inc. v. Chung*,
   2020 WL 7495085 (N.D. Cal. Dec. 21, 2020).........................17, 52

*Citcon USA, LLC v. RiverPay Inc.*,
   No. 18-CV-02585-NC, 2019 WL 2603219 (N.D. Cal. June 25, 2019) ...........................................................................90, 91

*Coinbase, Inc. v. Bielski*,
   599 U.S. 736 (2023). ECF No. 180, 181 ..................................44

*Diodes, Inc. v. Franzen*,
   260 Cal. App. 2d 244 (1968).....................................................50, 67

*Duran v. Cisco Sys., Inc.*,
   258 F.R.D. 375 (C.D. Cal. 2009) ..................................................16

*E. & J. Gallo Winery v. Instituut Landbouw-En Visserijonderzoek*,
   2018 WL 3062160 (E.D. Cal. June 19, 2018) .......... 67, 76, 92, 97, 99

*Garcia v. Cnty. of Riverside Sheriff Dep't*,
   2024 WL 3512989 (C.D. Cal. July 2, 2024)..................................38

*Gatan, Inc. v. Nion Co.*,
   2018 U.S. Dist. LEXIS 77735 (N.D. Cal. May 8, 2018)
   ................................................................................. 54, 61, 72, 75

*Gatan, Inc. v. Nion Co.*,
    No. 15-CV-01862-PJH, 2018 WL 2117379 (N.D. Cal. May 8,
    2018) .................................................................................. 29, 57, 59

*Glob. Protein Prods., Inc. v. Le*,
    42 Cal. App. 5th 352 (2019) .......................................................... 66

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*,
    2011 WL 13128180 (C.D. Cal. July 8, 2011) ................................. 16

*Imax Corp. v. Cinema Techs., Inc.*,
    152 F.3d 1161 (9th Cir. 1998)
    .................................. 26, 36, 66, 67, 71, 72, 82, 83, 86, 92, 94, 97, 98, 100, 101

*Integral Development Corp. v. Tolat*,
    675 Fed. Appx. 700 (9th Cir. 2017) ........................................ 33, 91

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
    978 F.3d 653 (9th Cir. 2020) ........................................ 26, 71, 72, 92

*Jobscience, Inc. v. CVPartners, Inc.*,
    No. C 13-04519 WHA, 2014 WL 852477 (N.D. Cal. Feb. 28,
    2014) ....................................................................................... 58

*Loop AI Labs Inc. v. Gatti*,
    195 F. Supp. 3d 1107 (N.D. Cal. 2016) ...................... 19, 20, 50, 58, 80, 92, 97

*Lyman v. Greyhound Lines, Inc.*,
    2022 WL 772752 (D.S.C. Mar. 14, 2022) ..................................... 39

*M/A Com Tech. Solutions, Inc. v. Litrinium, Inc.*,
    2019 WL 8108729 (C.D. Cal. Sept. 3, 2019)
    .................................................................. 21, 49, 52, 61, 70, 71, 81, 85, 88

*M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*,
    No. SACV1900220JVSJDEX, 2019 WL 4284523 (C.D. Cal. June
    11, 2019) ........................................................................ 53, 54, 61

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    420 F. Supp. 2d 1070 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996
    (Fed. Cir. 2007) ...................... 27, 71, 81, 83, 88, 92, 94, 96, 97, 101

*Openwave Messaging, Inc. v. Open-Xchange, Inc.*,
    2018 WL 2117424 (N.D. Cal. May 8, 2018) ................................... 28

*Perlan Therapeutics, Inc. v. Superior Court*,
    178 Cal. App. 4th 1333 (2009)
    ..19, 28, 35, 50, 51, 52, 56, 57, 59, 60, 66, 74, 76, 80, 86, 87, 90, 93, 94, 97, 98, 100

*Pinkerton Tobacco v. Kretek Int'l*,
    2021 4928024 (C.D. Cal. Jul. 14, 2021) ...................................................... 18, 56

*Safeco Ins. Co. of Am. v. Rawstrom*,
    183 F.R.D. 668 (C.D. Cal. 1998) ...................................................................... 39

*Silvaco Data Sys. v. Intel Corp.*,
    184 Cal. App. 4th 210 (2010),
    *as modified on denial of reh'g* (May 27, 2010) .................................. 66, 69, 86

*SkinMedica, Inc. v. Histogen Inc.*,
    869 F. Supp. 2d 1176 (S.D. Cal. 2012) ...................................................... 33, 92

*Soc. Apps, LLC v. Zynga, Inc.*,
    No. 4:11-CV-04910 YGR, 2012 WL 2203063 (N.D. Cal. June 14, 2012) ....................................................................................................... 52, 89

*STEMCELL Techs. Canada Inc. v. StemExpress, LLC*,
    2022 WL 585668 (N.D. Cal. Feb. 24, 2022) ................................. 18, 19, 31, 57

*United States v. Chung*,
    659 F.3d 815 (9th Cir. 2011) .......................................................................... 84

*WeRide Corp. v. Kun Huang*,
    379 F. Supp. 3d 834 846 (N.D. Cal. 2019) ................................................. 33, 91

*Wisk Aero LLC v. Archer Aviation Inc.*,
    2021 WL 8820180 (N.D. Cal. Aug. 24, 2021) ................. 27, 28, 30, 72, 76, 97

*Yield Dynamics, Inc. v. TEA Sys. Corp.*,
    154 Cal. App. 4th 547, 66 Cal. Rptr. 3d 1 (2007),
    *as modified on denial of reh'g* (Sept. 21, 2007) ........................................... 78

*Zunum Aero, Inc. v. Boeing Co.*,
    2022 WL 17904317 (W.D. Wash. Dec. 23, 2022) ......................................... 86

## **Statutes**

18 U.S. Code §§ 1836-39 ...................................................................................... 48

California Code of Civil Procedure Section 2019.210
..2, 3, 5, 16, 17, 18, 23, 26, 27, 28, 31, 33, 34, 35, 49, 50, 51, 53, 54, 55, 56, 57, 59, 60, 61, 62, 63, 64, 72, 73, 74, 75, 92, 93, 101, 102

Defend Trade Secrets Act .................................................................48

## **Other Authorities**

Federal Rules of Civil Procedure 12(b)(2) .........................................43

Federal Rules of Civil Procedure 12(b)(6) .........................................43

Federal Rules of Civil Procedure 26.................................................27

Federal Rules of Civil Procedure 26(b)(1) .........................................15

Federal Rules of Civil Procedure 34(b)(2)(C) ....................................38

Federal Rules of Civil Procedure  34.................................................38

Local Rule 37-1 ................................................................ 11, 38, 39

Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan") and Defendant Proton Management Ltd. ("Proton") submit this joint stipulation regarding Swan's motion to compel.

## I. <u>INTRODUCTION</u>

### A. <u>Swan's Introductory Statement</u>

Swan moves for an order compelling Proton to respond completely to 32 of Swan's Second Set of Requests for Production ("RFPs") and Interrogatories that Proton is refusing to comply with solely on the basis of alleged insufficiencies with Swan's Trade Secret Identification. Proton maintains its objections even though the Court previously confirmed that Swan's First Amended Complaint ("FAC") "describes the four general categories of [Swan's] trade secrets with particularity and cites to exemplary documents." Dkt. 164 at 23. The Court also held that Swan's subsequent Trade Secret Identification "further identifies the trade secrets and shows that they exist." *Id.* And in fact Proton has agreed to produce documents and answer discovery requests based on the current version of Swan's Trade Secret Identification— clearly Proton is able to engage in discovery based on the Trade Secret Identification as is. Ex. 1 at 4-5 (May 8 email thread)); Dkt. 176-1 at 86 (sealed version of Joint Stipulation Regarding Swan's Motion to Compel Targeted Discovery); Dkt. 177 at 86 (public version of Joint Stipulation Regarding Swan's Motion to Compel Targeted Discovery); Dkt. 198 at 5. There is thus no question that Proton understands what Swan is claiming as its trade secrets, and Proton's discovery objections are purely another in a long string of attempts by Proton to delay document production.

Swan's Trade Secret Identification goes beyond what courts have found sufficient. It enumerates twenty asserted trade secrets, provides nearly thirty pages of narrative description explaining those trade secrets, and cites to documents (which Defendants stole) that contain Swan's trade secrets. *See generally* Dkt. 111-1 (sealed version of Swan's Trade Secret Identification); Dkt. 112-1 (public

version of Swan's Trade Secret Identification). This is more than sufficient detail to permit Proton to ascertain the boundaries of where the trade secrets lie and engage in discovery.

Fact discovery closes on November 7, 2025. *See* Dkt. 119 at 3 (Civil Trial Order). Because all motions to compel "must be filed and heard before" that cutoff, *id.* at n.3, as a practical matter Swan must obtain and review the lion's share of discovery before the end of September. As it stands, Proton has not produced ***a single document***. This is the fourth motion to compel that Swan has had to file since discovery began (the first three were all granted). Based on Proton's conduct to date, Swan has every expectation that Proton will continue to resist producing documents at every opportunity. It is therefore urgent that discovery proceed without further delay.

Swan respectfully requests that the Court enter an order overruling Proton's objections to Swan's Trade Secret Identification and ordering Proton to respond to the discovery at issue in full.

### B.    Proton's Introductory Statement

More than six months ago, Defendants asked Swan to provide an identification of the trade secrets it is alleging in this case. It was not until February 14, 2025—almost five months after filing its trade secrets complaint—that it finally did so. Indeed, the Court required Swan to serve a trade secret disclosure that identifies Swan's trade secrets with "sufficient particularity" to distinguish the trade secrets from "matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." But what Swan eventually provided is plainly insufficient to put Proton (and the other defendants) on notice as to the parameters of the alleged trade secrets at issue in this case. Accordingly, the Court should deny Swan's motion to compel and require Swan to provide a sufficient identification of trade secrets in compliance with the Court's January 8, 2025 Order (ECF No. 95 at 6) and California Code of Civil Procedure Section 2019.210.

1    Swan's trade secret disclosure is long on buzzwords and short on substance.

2  Swan attempts to cloak generic mining processes and commonplace industry

3  practices, tools, and considerations in a veil of industry jargon—presumably hoping

4  that labels like ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

5  ▉▉▉▉▉▉▉ and similar terms will distract from the reality that none of it is

6  meaningfully secret or proprietary to Swan. But Swan's disclosure fails to actually

7  identify any information that is truly proprietary, confidential, difficult to replicate,

8  and derives value from not being known outside of Swan. At best, Swan merely

9  claims that Swan's business operations took into account the typical business and

10  technological considerations that *any* Bitcoin mining company would have to

11  consider. It is no secret that lowering costs, improving the hash-rate or favorable

12  contract terms would benefit a business. What Swan *does not disclose* are the

13  *specific* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ that supposedly gave it a competitive

14  advantage and that derive benefit from being kept secret. For example, Swan should

15  not be able to claim wholesale ▉▉▉▉▉▉▉▉▉ as its trade secrets, without

16  identifying what ▉▉▉▉▉▉▉▉▉▉▉▉ at issue are proprietary, particularly

17  when Swan, itself, concedes they include standard, non-trade secret provisions (e.g.,

18  choice-of-law and merger clauses). Further particularity is necessary to Proton's

19  and the Court's understanding of any such designation. That is the purpose of

20  Section 2019.210, and that what the Court ordered. Instead, Swan dresses its

21  disclosure with technical-sounding language from the Bitcoin mining field to

22  sidestep the legal requirement that it "describe the subject matter of the trade secret

23  with sufficient particularity to separate it from matters of general knowledge in the

24  trade." In doing so, Swan's Trade Secret Identification leaves Defendants and the

25  Court in the dark as to what Swan considers to be its trade secrets.

26    Many of the trade secrets in Swan's 2019.210 disclosure suffer from similar

27  deficiencies.

28

- For all of Swan's Trade Secrets, Swan does not sufficiently (or at all) specify what elements of the trade secret are public domain (if any).
- For Trade Secrets 1 and 4-13, Swan's disclosure is vague as to whether the trade secrets consist of (a) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; or (b) Swan's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
- For Trade Secrets 1, 2, 4-13, 14, 17, and 20, Swan fails to specify in any meaningful way what particular ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it claims as elements of those trade secrets.
- For Trade Secrets 2, 3, 15, 18, and 20, Swan introduces elements of the trade secrets using the open-ended catch-all phrase "including."
- For Trade Secrets 1, 3, 4-13, 15, 16, 17, 18, and 20, to the extent that some or all of the elements are public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.
- For Trade Secrets 1 and 4-13, Swan fails to comply with the Court's order requiring a "description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public." Instead, Swan applies conclusory logic that knowing the trade secrets would allow a company to perform better and scale more quickly without explaining how.
- For Trade Secrets 1, 2, 4-13, 15, 16, 17, 18, 19, and 20, Swan claims that the trade secrets are identifiable in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In many cases, Swan

4

does not specify what documents contain information disclosing the trade secret, nor does Swan identify in what portion of those documents information disclosing the trade secret exists.

At bottom, Swan's Trade Secret Identification consists of generic industry concepts dressed in technical-sounding language, with no particularity as to what is actually protectable or distinguishable from what is generally known in the mining industry. In doing so, Swan seeks maximum flexibility to change its trade secrets later on in this action—which directly contradicts the purpose of the Court's Order and policies underlying Section 2019.210.

## II.    <u>JOINT SPECIFICATION OF ISSUES IN DISPUTE</u>

The discovery requests at issue consist of 29 RFPs and 3 interrogatories. *See* Ex. 2 (Swan's Second Set of RFPs) (the "RFPs"); Ex. 3 (Swan's Second Set of RFPs). Those requests are reproduced in full below. Proton objects to each discovery request on the basis that Proton contends Swan's Trade Secret Identification is insufficient. Swan contends there is no deficiency with its Identification.

## <u>REQUEST FOR PRODUCTION NO. 16:</u>

All Documents and Communications concerning Your assuming, taking over, being engaged to work on or otherwise working on responsibilities and/or roles related to Bitcoin mining that were previously maintained or held by Swan.

## <u>REQUEST FOR PRODUCTION NO. 17:</u>

All Documents and Communications concerning the specific methods, tools models, or techniques that you use to select sites for, manage, operate, monitor, or otherwise oversee Bitcoin mining operations.

## <u>REQUEST FOR PRODUCTION NO. 18:</u>

Documents sufficient to identify all Mining Sites at which You manage, operate, or otherwise oversee Bitcoin mining operations.

**REQUEST FOR PRODUCTION NO. 19:**

Documents sufficient to show Bitcoin mining operations that You considered or planned to manage, operate, or otherwise oversee, or that any other Person asked, suggested, or discussed Your managing, operating, or otherwise overseeing, including Documents and Communications concerning the specific methods, tools, models, or techniques that you considered or planned to use in connection with such mining operations.

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications concerning the decrease or cessation of Bitcoin mining operations at any Mining Sites that Swan previously managed, operated, or otherwise engaged with, including but not limited to Communications and Documents regarding the removal of Bitcoin mining hardware, such as ASICs, power supply systems, and cooling systems, from those sites.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents or Communications concerning or referencing Swan's Trade Secrets, including Documents and Communications concerning Your actual, considered, or planned use of Swan's Trade Secrets.

**REQUEST FOR PRODUCTION NO. 24:**

Documents that Your employees, consultants, and other agents downloaded, accessed, copied, were sent, or otherwise retained that relate to any of those persons' engagements with Swan, including but not limited to the files identified in Exhibit G to the Complaint.

**REQUEST FOR PRODUCTION NO. 25:**

Communications concerning Your employees, consultants, and other agents' downloading, accessing, copying, or otherwise retaining Documents that they had access to as a result of any of those persons' engagements with Swan, including but not limited to the files identified in Exhibit G to the Complaint.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents and Communications concerning any Proton employee, consultant, or other agent's obligations or potential obligations to Swan, including but not limited to those arising from such persons' employment or consulting agreements with Swan.

**REQUEST FOR PRODUCTION NO. 28:**

All Documents and Communications concerning any former or current Swan employee, consultant, or agent's development of Swan's Trade Secrets.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents and Communications concerning Your business plans, strategic plans, operating plans, marketing plans, financial plans, sales plans, investment plans, market studies, and target market, including projections for revenue generation and profitability, related to Bitcoin mining management and operation.

**REQUEST FOR PRODUCTION NO. 30:**

Documents and Communications sufficient to show Your total financial investment, including but not limited to employee time, purchase of capital equipment, and outside consultants, by quarter, into Your efforts to develop proprietary methodologies for Bitcoin mining operations including, but not limited to, the development of any dashboard or monitoring system related to Bitcoin mining operations.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents and Communications concerning Your actual, planned, or attempted development or use of any dashboard or monitoring system related to Bitcoin mining operations, including but not limited to any dashboard or monitoring system similar to Swan's BNOC or intended to serve as a replacement to Swan's BNOC.

7

**REQUEST FOR PRODUCTION NO. 32:**

All Documents and Communications concerning any comparison between any dashboard or monitoring system related to Bitcoin mining operations that You use to Swan's BNOC.

**REQUEST FOR PRODUCTION NO. 33:**

All Documents and Communications concerning any comparison between Swan's Trade Secrets and any techniques, methods, or tools You use to manage, operate, or otherwise engage in Bitcoin mining activities.

**REQUEST FOR PRODUCTION NO. 34:**

Documents and Communications concerning Your efforts to keep the techniques, methods, or tools You use to manage, operate, or otherwise engage in Bitcoin mining activities secret or confidential.

**REQUEST FOR PRODUCTION NO. 39:**

Documents and Communications concerning any valuation of Your business, including but not limited to any valuations of any subparts of that business, such as services You provide related to Bitcoin mining.

**REQUEST FOR PRODUCTION NO. 40:**

Financial statements, including but not limited to income statements, balance sheets, cash flow statements, statement of shareholders' equity, and other financial and/or accounting statements showing income and/or expenses, assets and liabilities, equity, cash flows, and capital accounts of any type related to services you provide related to Bitcoin mining.

**REQUEST FOR PRODUCTION NO. 41:**

All Communications between You and persons associated with the Mining Sites You manage, operate, or otherwise engage with related to Bitcoin mining activities, including but not limited to all Communications exchanged via Signal, Telegram, and WhatsApp.

**REQUEST FOR PRODUCTION NO. 42:**

Communications concerning Your actual, planned, inadvertent, or attempted efforts to delete, conceal, or spoliate evidence related to the subject matter of this Action.

**REQUEST FOR PRODUCTION NO. 43:**

Communications concerning the use of ephemeral messaging applications (such as Signal, Telegram, or WhatsApp) for You and/or Your employees, consultants, and other agents' communications, including but not limited to Communications concerning switching from non-ephemeral messaging applications to ephemeral ones.

**REQUEST FOR PRODUCTION NO. 44:**

Documents and Communications concerning Your involvement in the actual, planned, or attempted sale of ASICs or other hardware or infrastructure related to Bitcoin mining, including your valuation of any ASICs for the purpose of a sale or attempted or planned sale.

**REQUEST FOR PRODUCTION NO. 45:**

Documents and Communications concerning Your or Your employees, consultants, and other agents' concealment of assets, transfer of assets to third parties, or attempts to limit Swan's ability to recover assets in connection with this Action.

**REQUEST FOR PRODUCTION NO. 46:**

Documents sufficient to identify the amount and location of Your assets, including but not limited to identifying all Bitcoin owned or controlled by You and/or Your employees, consultants, and other agents.

**REQUEST FOR PRODUCTION NO. 47:**

All Documents and Communications concerning Your holding Yourself or Your employees, consultants, and other agents out as former Swan employees, consultants, or agents.

**REQUEST FOR PRODUCTION NO. 48:**

All Documents and Communications that You sent to actual or prospective customers, investors, vendors, business partners, funding sources, or other parties referencing or containing Swan's name, logo, or the names of Swan personnel.

**REQUEST FOR PRODUCTION NO. 55:**

Documents and Communications regarding business, customer, corporate, or other relationships between You and Ilios Corp.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to identify the GitHub repository or repositories used to store any source code used by You related to Bitcoin mining.

**REQUEST FOR PRODUCTION NO. 58:**

All Documents, including source code, maintained on GitHub by the GitHub organization "elektron-tech," including but not limited to all Documents housed in the repository named "nxt."

**INTERROGATORY NO. 6:**

Identify and describe all dashboards or monitoring systems that You use in connection with Your Bitcoin mining operations, including stating the basis for any contention that those systems differ from Swan's BNOC or were independently developed or created.

**INTERROGATORY NO. 8:**

For every occasion in which You and/or Your employees, consultants, or agents have accessed, disclosed, and/or used any Document reflecting or

1  incorporating Swan's Trade Secrets, identify the date, time, method of access,

2  disclosure, and/or use, and specific material accessed, disclosed, and/or used.

3  **INTERROGATORY NO. 9:**

4  Describe how You came to be in possession of any Swan Trade Secret,

5  including by identifying any Documents or Communications providing possession

6  to You.

7  * * *

8  Swan served these discovery requests on February 26, 2025.  Proton served

9  Swan with initial responses and objections to those requests on March 28.  *See* Ex.

10  4; Ex. 5.  Proton stated that it would not be producing documents in response to any

11  RFP or providing substantive answers to any Interrogatory until the Court ruled on

12  Proton's then-pending motion to dismiss.  Swan served Proton with a letter pursuant

13  to Local Rule 37-1 on April 7.  *See* Ex. 6.  On April 9, the Court largely denied

14  Proton's motion to dismiss.  Swan and Proton met and conferred regarding these

15  requests on April 18.  During that meeting Proton informed Swan that it expected

16  to begin producing documents within two weeks, meaning by May 2, 2025.  Ex. 1

17  at 5.  Proton served supplemental responses and objections on April 25.  *See* Ex. 7;

18  Ex. 8.  During this time, the parties also exchanged correspondence regarding

19  Swan's Trade Secret Identification, *see* Exs. 9 & 10, and met and conferred

20  regarding that Identification on April 3 and April 18.  On April 23, Swan moved for

21  an order compelling Defendants to comply with Swan's first sets of targeted

22  discovery requests, at which time it asked the Court to overrule Defendants'

23  objections to Swan's Trade Secret Identification.  *See generally* Dkt. 176-1.  In the

24  Defendants' portion of the joint stipulation, Defendants informed the court that they

25  had agreed to produce documents responsive to the subject requests.  *Id.* at 86.

26  Defendants reiterated this statement in their supplemental brief on the matter.  Dkt.

27  198 at 5.  On May 7, the Court determined that it did not need to rule on the adequacy

28  of Swan's Trade Secret Identification, given Defendants' representation that Swan's

targeted sets of discovery requests were unaffected by the parties' dispute over that identification. *See* Dkt. 205. During a conferral on May 9, Proton confirmed that it was maintaining its objections to the adequacy of Swan's Trade Secret Identification in response to the RFPs and Interrogatories at issue in this motion.

### III.    SWAN'S CONTENTIONS AND REQUEST FOR RELIEF

#### A.    Factual and Procedural Background

The Court is familiar with certain background of this case from Swan's prior filings, as this is Swan's fourth motion to compel in less than three months. *See, e.g.*, Dkt. 129 (Plaintiff's Motion to Compel Initial Disclosures); Dkt. 167 (Plaintiff's Motion to Compel Entry of a Protective Order); Dkt. 177 (Plaintiff's Motion to Compel Defendants to Comply with Targeted Discovery); *see also* Dkt. 100-1 (sealed version of Amended Complaint); Dkt. 101 (public version of Amended Complaint); Dkt. 164 at 2-9 (Court's April 9 Order, discussing background). Most pertinent here, this case centers on, as the Court put it, the "coordinated effort by Proton and the Individual Defendants—former consultants of Swan—to steal Swan's entire Bitcoin mining business." Dkt. 164 at 2.

##### 1.    Defendants' Theft of Swan's Bitcoin Mining Business

The Individual Defendants worked on Swan's Bitcoin mining team as paid consultants. Dkt. 100-1 at ¶¶ 89-98. Swan's Bitcoin mining business grew at unprecedented rates in the year before Defendants stole it. *See Id.* at ¶¶ 85-87. Swan's trade secrets drove that success. Those trade secrets include ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████. *Id.* at ¶¶ 61-79.

In July and August of last year, the Individual Defendants, in coordination with other Swan employees and representatives of Tether, engaged in what they dubbed a "rain and hell fire" plan to steal Swan's Bitcoin mining business and trade

secrets. *See* Dkt. 100-1 at ¶ 8 (contemporaneous notes taken by conspirators). The Individual Defendants and their co-conspirators understood their plan would violate their "non-solicit; non-compete" obligations with Swan and that "[they] would be expose[d]" for breaches of their "Confidentiality and IP" obligations to Swan. *Id.* By the time the conspirators resigned en masse on August 8-9, they had (i) formed a copycat company (Proton), on whose behalf they (ii) collectively downloaded over 1,300 documents from Swan's databases, including hundreds of highly confidential Swan files and a copy of the source code for BNOC. *Id.* ¶¶ 1, 128-152.

## 2.    Proton's  Repeated Attempts to Stall

Swan filed its Trade Secret Identification on February 14, 2025. *See* Dkt 111-1. It served the discovery at issue in this motion on February 26, 2025. Proton's initial responses and objections to the requests at issue in this motion included blanket objections to discovery on the basis of a motion to dismiss that the Court denied on April 9. *See* Dkt. 164. In that Order, the Court also found that "Swan describes the four general categories of its trade secrets with particularity and cites to exemplary documents within the [Amended Complaint,]" and that "Swan also filed an identification of asserted trade secrets that further identifies the trade secrets and shows that they exist." *Id.* at 23. Further, "Swan demonstrated that the information is not 'readily ascertainable through proper means,' it 'derives independent economic value,' and that it took 'reasonable measures to keep such information secret.'" *Id.*

After the Court's ruling, in response to Swan's request, Proton provided its "updated positions on the discovery requests" on April 17. Ex. 1 at 9 (Apr. 9 email) at 7, 9. In those updated positions, Proton stated that it was maintaining its specific objections to RFPs 35-38, 50, 53, and 54. *See id.* at 7. Proton stated further that it was maintaining its objections based on Swan's Trade Secret Identification for Interrogatories 6, 8, and 9, and RFPs 16-20, 23-26, 28-34, 39-48, 55, 57, and 58, *i.e.*, the requests at issue in this motion. *See id.* For all other requests, Proton stated

that it would not withhold responsive non-privileged documents or information on the basis of Swan's Trade Secret Identification. *Id.*.

The parties met and conferred again on April 18. Ex. 1 at 4-6 (Apr. 23 email memorializing call). Proton confirmed it was maintaining its objections to the RFPs and Interrogatories at issue in this motion based on Swan's Trade Secret Identification, but that Proton was not standing on any further objections and would produce documents in response to Swan's discovery requests. *See id.* at 5 ("[W]e understand that Proton generally intends to produce documents responsive to these RFPs and provide substantive supplemental responses to these Interrogatories should the Court find that Swan's Identification complies with the Court's January 7 Order."). Further, Proton informed Swan during the meet and confer that it expected to produce these documents within two weeks of the meeting, meaning by May 2. *Id.*

In the meantime, the parties have engaged in thorough discourse and briefing over Defendants' objections to Swan's Trade Secret Identification. On March 26, nearly six weeks after Swan served its Identification, Defendants served a long letter outlining their purported objections. *See* Ex. 9. In addition to their laundry list of objections in the letter, Defendants purported to reserve the right to raise further challenges to the same Trade Secret Identification in the future. *Id.* at 8. The parties met and conferred about Defendants' March 26 letter on April 3, 2025. On April 15, after the parties had briefed this issue in relation to Swan's prior motion to compel, Dkt. 176-1, Defendants sent a letter proposing to "amend" Swan's Trade Secret Identification based on "what Defendants understand to be the specific trade secrets identified by Swan." Ex. 10 at 3. Swan declined Defendants' self-serving wordsmithing of Swan's Trade Secret Identification, which led Defendants to serve Swan with their portion of a joint stipulation for a discovery dispute moving to compel Swan to amend its Identification on April 18. Defendants withdrew that motion hours before Swan's response was due. In the parties' briefing on Swan's

prior motion to compel, Proton informed the court that it was prepared to produce documents in response to Swan's targeted discovery requests. Dkt. 176-1 at 86; Dkt. 198 at 2.

On May 7, the Court granted Swan's motion to compel Defendants to comply with Swan's first sets of targeted discovery requests. *See* Dkt. 205. While the parties had submitted briefing on the adequacy of Swan's Trade Secret Identification, the Court declined to reach that issue, given Defendants' representation that "Defendants' responses to the subject [targeted] discovery have been, and will be, unaffected by this dispute." *Id.* at 1. That day, Swan informed Proton that it intended to move to compel Proton to comply with the discovery requests at issue here, asking whether, if Swan did so move, Proton would withdraw its objections to Swan's Trade Secret Identification in an attempt to moot any forthcoming motion to compel. *See* Ex. 1 at 1-2 (May 7 email). Swan also reiterated its understanding that Proton's objection to Swan's Trade Secret Identification was the sole basis upon which Proton is refusing to provide discovery in response to the aforementioned requests. *See id.* Despite having already conferred with Swan regarding these requests, and having engaged in substantial other discovery conduct, *see* Dkt. 211 at 4-9, Proton refused to engage further unless Swan would agree not to argue (in opposition to Proton's pending motion to compel arbitration) that Proton's discovery conduct supported waiver of its arbitration rights, *see* Ex. 1 at 1. Swan did not agree. Proton nevertheless confirmed during a conferral on May 9 that it would not, in an attempt to moot this motion, be withdrawing its objections based on the sufficiency of Swan's Trade Secret Identification.

## B. <u>Legal Standard</u>

A party may "obtain discovery regarding any nonprivileged matter, that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). "Relevancy is construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on any issue that is or may be in the case."

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 2011 WL 13128180, at *2 (C.D. Cal. July 8, 2011) (alteration in original).[1]  "The party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections."  *Duran v. Cisco Sys., Inc.*, 258 F.R.D. 375, 378 (C.D. Cal. 2009).  "[U]nexplained and unsupported boilerplate objections are improper."  *Id.* at 379 (collecting cases).

The Court's January 7 Order required Swan to serve and file "a trade secret identification statement" "akin to the disclosure required by California law [Cal. Civ. Proc. Code § 2019.210]."  Dkt. 95 at 6.  Under that order, while "[d]iscovery into trade secrets shall not commence until the identification has been served and filed," Swan "may commence discovery on any other subject prior to the identification."  *Id.* at 7.  California Code of Civil Procedure section 2019.210 provides that "[i]n any action alleging the misappropriation of a trade secret . . . before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity."  A trade secret has been identified with "reasonable particularity" if the plaintiff describes it in a way "that is reasonable, i.e., fair, proper, just and rational."  *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 836 (2005).  Any doubts about the sufficiency of Swan's Trade Secret Identification are to be "liberally construed in favor of [Swan]" so that discovery can proceed.  *Id.* at 835.  A trial court may not take an overly "stingy view" of a trade secret designation.  *Id.*

## C.    **Argument**

The Court should compel Defendants to produce the requested documents and provide substantive interrogatory responses.  Swan's Trade Secret

---

[1]  Unless otherwise noted, emphasis in citations is added and internal quotations and citations omitted.

Identification is sufficient for discovery in this matter to proceed.  The Court should reject Proton's latest attempt to stonewall document discovery by manufacturing alleged deficiencies with Swan's detailed Identification.

There are no other objections to address.  Proton previously confirmed that the only objections it intended to stand on in response to these discovery requests relate to Swan's Trade Secret Identification.  Indeed, despite multiple opportunities to identify, explain, or substantiate any other objections, Proton has offered nothing more than boilerplate assertions that fail to engage with the substance of these discovery requests.

### 1.   **Swan's Disclosure Is Sufficiently Specific Under The Rationale Of Section 2019.210**

Swan's Trade Secret Identification complies with California Code of Civil Procedure section 2019.210 and the Court's January 7 Order.  Civ. Proc. Code § 2019.210;  Dkt. 95 at 6.  Swan has identified "its alleged trade secret[s] in a manner that will allow the trial court to control the scope of subsequent discovery, protect all parties' proprietary information, and allow them a fair opportunity to prepare and present their best case or defense at a trial on the merits."  *Advanced Modular*, 132 Cal. App. 4th at 836; *see also Cisco Systems, Inc. v. Chung*, 2020 WL 7495085, at *10-11 (N.D. Cal. Dec. 21, 2020) (holding a trade secret disclosure sufficient under section 2019.210 where the plaintiff provided a description of the trade secret and then pointed to various specific documents that elaborate on the trade secret).

Swan's Trade Secret Identification is specific enough to allow Defendants to "discern the boundaries of the trade secret so as to prepare available defenses." *Brescia v. Angelin*, 172 Cal. App. 4th 133, 143 (2009).  Indeed, Defendants have already admitted that Swan's Trade Secret Identification is sufficiently specific for them to respond to discovery requests because they dropped their objections to Swan's initial discovery requests on the basis of the Trade Secret Identification

being insufficient.  *See* Dkt. 176-1 at 54-55 (explaining that Defendants could and would respond to Swan's targeted discovery requests despite their purported objections to Swan's trade secret disclosure).  Thus, Defendants have told this Court that they can respond to discovery requests in this case with the Trade Secret Identification as is.  The Court should declare Swan's Trade Secret Identification sufficient and overrule Defendants' objections.

Defendants raise a series of complaints that delve deep into the minutiae of Swan's Trade Secret Identification (e.g., as explained below, attempting to draw a material distinction between the phrases "selection approach" and "selection criteria").  These complaints fail because section 2019.210 does ***not*** require the plaintiff to "define every minute detail of its claimed trade secret at the outset of the litigation," and does ***not*** require the "trial court to conduct a miniature trial on the merits of a misappropriation claim before discovery may commence."  *Advanced Modular*, 132 Cal. App. 4th at 835-36.  Further, "[a]ny doubt about discovery is to be resolved in favor of disclosure."  *Id.* at 837.

## 2.    Defendants' Merit-Based Objections Are Irrelevant

Defendants have previously raised objections that Swan's asserted trade secrets fail on the merits—but these challenges have nothing to do with Section 2019.210.  Dkt. 176-1 at 71-73, 78-79; Ex. 9 at 4, 5, 7; *see*, *e.g.*, *STEMCELL Techs. Canada Inc. v. StemExpress, LLC,* 2022 WL 585668, at *1 (N.D. Cal. Feb. 24, 2022) (distinguishing between "sufficiency" of a trade secret disclosure and "merits challenge[s]"); *Brescia*, 172 Cal. App. 4th at 149  (same).  Thus, for example, Defendants' repeated challenges that Swan's alleged trade secrets lack "independent economic value" or that Swan does not own the alleged trade secrets miss the mark.  Ex. 9 at 4-5.  If anything, these challenges prove that Swan's Trade Secret Identification ***is*** sufficient, because clearly Defendants understand it well enough to present merits defenses.  *Pinkerton Tobacco v. Kretek Int'l*, 2021 4928024, at *2 (C.D. Cal. Jul. 14, 2021) ("Defendants seem to have quite a good

18

handle on Plaintiffs' contentions; they just dispute whether Plaintiffs have identified a true trade secret worthy of legal protection.").

### 3. Defendants' Authority On "Highly Specialized" Fields Is Misplaced

Defendants' non-merits-based arguments fail as well.  In the prior joint stipulation, Dkt. 176-1 at 54, Defendants argued that a higher standard of particularity is required because "the alleged trade secrets constitute incremental variations on preexisting technology in a highly specialized technical field." *Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at \*4 (N.D. Cal. Oct. 31, 2022) (citing *Advanced Modular*, 132 Cal. App. 4th at 836).  But the purported trade secrets in *Alphonso* were laughably vague, such as claiming "'proprietary framework for running digital advertising campaigns' without any descriptions to demarcate the boundaries of such practices."  *Id.*  *Advanced Modular* involved equipment for semiconductor manufacturing, a decades-old field.  132 Cal. App. 4th at 830.  Conversely, Swan's trade secrets are in the nascent field of Bitcoin mining.  To the extent there are established "preexisting" practices in that field, Swan's Identification identifies the specific optimizations applied to specific mining sites that distinguish its trade secrets from Bitcoin mining generally, thus meeting even a heightened standard.  *See STEMCELL Techs. Canada Inc.*, 2022 WL 585668, at \*6-7.

The other cases cited by Defendants that apply a heightened standard involve products with detailed technical specifications.  *See Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1114 (N.D. Cal. 2016) (AI technology); *Perlan Therapeutics, Inc. v. Superior Court*, 178 Cal. App. 4th 1333, 1338 (2009) ("a protein-based therapeutic").  These cases are inapposite because Swan's asserted trade secrets do not involve product design or technical engineering (aside from BNOC), but rather relate to Swan's research and decisions from among various Bitcoin mining parameters, like a recipe.

### 4.    Swan's Citation To Documents Is Proper

Defendants have complained that Swan's Trade Secret Identification relies on "various documents and categories of documents," stating that reference to these documents does not make the disclosure sufficient, "[w]here it is unclear what parts of a disclosure constitute the claimed trade secret." Dkt. 176-1 at 61; Ex. 9 at 2, 4. To be clear, Swan cites to only a handful of documents in its Trade Secret Identification and cites to them specifically by name, clearly identifying whether the complete document or some subsections contain trade secret information.  *See generally* Dkt. 111-1; *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023) (explaining that it is proper to list categories of trade secret information and state that "these categories of information are contained within specific documents.") (collecting cases).  Defendants do not claim not to know what these documents are.  Nor could they given that Defendants worked on these very documents while at Swan and stole them to use at Proton.

It is a commonly-accepted practice for plaintiffs to cite documents in a Trade Secret Identification.  Swan does not cite to documents to indefinitely expand the scope of its trade secrets; nor does Swan point indiscriminately to a large number of documents and leave Defendants guessing as to which portions of those documents contain the trade secrets.  Swan points to documents as illustrative examples of the trade secrets and as containing information relevant to its asserted trade secrets, describing and citing to specific portions of specific documents which are narratively described at length.  *Compare Arthur J. Gallagher & Co. v. Tarantino*, 498 F.Supp.3d 1155 at 1172 (N.D. Cal. 2020) (deeming a trade secret identification sufficient where plaintiff identified "nine specific documents"), *with Loops AI Labs Inc. v. Gatti*, 195 F. Supp.3d 1107, 1113-1114 (N.D. Cal. 2016) (rejecting a trade secret disclosure where a plaintiff pointed to over 500 documents).

Defendants' prior reliance, Dkt. 176-1 at 70, on *M/A Com Tech. Solutions, Inc. v. Litrinium, Inc.*, 2019 WL 8108729 (C.D. Cal. Sept. 3, 2019), is misplaced. There, the court disapproved of "broad and vague descriptions" that "could describe almost anything" and pointed to over 300 documents in place of actual trade secret descriptions. *Id.* at 3. Swan, unlike the plaintiff in *M/A Com Tech.*, has not put forth "catch-all" trade secret descriptions that attempt to claim "additional trade secrets based on unidentified combinations of trade secrets, public technology, and other non-confidential business information." *Id.* Rather, Swan has put forth clearly defined trade secrets and identified a small subset of documents that embody those trade secrets. *See Beluca*, 660 F.Supp.3d at 909 (trade secret was described with sufficient particularity where the description stated that the trade secret information can be "[f]ound within the [] report"); *Arthur J. Gallagher & Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1172 (N.D. Cal. 2020) (finding that defendants were "put on adequate notice" where the plaintiff identified "nine specific documents").

Defendants have cited, Dkt. 176-1 at 70, *Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.* 2021 WL 5197215 (N.D. Cal. Nov. 9, 2021), for a similar purpose. But again, the facts of *Carl Zeiss* are not comparable to the present facts. In *Carl Zeiss* the court recognized that it is proper to "include a reference to a specific document or portion of a document, so long as the trade secret is described with reasonable particularity." *Id.* at *4. The plaintiff there went awry by referencing a document without "specifying what the trade secret is," and in other instances, by identifying "other documents and records" without "specifying what those documents are and the contents that comprise the alleged trade secret." *Id.* Swan, however, has both described its trade secrets *and* identified specific documents and specific subsets of documents that are tied to each identified trade secret. Furthermore, Defendants are wrong that *Carl Zeiss* stands for the principle that a "party must identify what portion of a document is the trade secret." Dkt 176-1 at

70, 76.  The *Carl Zeiss* court specifically recognized that a party may reference **either** a "portion of a document" or "a specific document."  2021 WL 5197215, at *12.  That is what Swan has done here, as applicable.

> **5.** **Defendants' April 15 Letter Confirms Defendants' Understanding Of Swan's Trade Secret Identification**

Defendants' letter of April 15 purporting to "amend" Swan's Trade Secret Identification based on "what Defendants understand to be the specific trade secrets identified by Swan," Ex. 10 at 3, plainly shows that Defendants understand (in their words) "the specific trade secrets identified by Swan" sufficient to engage in discovery and prepare a defense, *id.* at 3.  It bears repeating that Defendants have already agreed to engage in discovery on the basis of the current Trade Secret Identification.

For an example of Defendants' proposed improper narrowing of Swan's trade secrets, Swan's TS 1 explains that the key "ingredients" to a successful mining site include ██████████████████████████████████████████, and further that Swan secured "██████████████" at mining sites, including ████████.  Dkt. 111-1 at 5.  Swan further explained that at each site, Swan ████████████████████████████.  *Id.* at 5-7.  Against that background, Swan claimed as TS 1 "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."  *Id.* at 8.  Defendants proposed an amended TS 1 that substantially mirrors Swan's existing disclosure, but wordsmiths it to transform Swan's specific claims into more generic concepts:  "████████████████████████████████████████████████████████████████████████████████████████

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1 ██████████████████████████████████████

2 ██████████████████████████████████ " Ex. 10 at

3  3-4.  Defendants repeat this same exercise for 17 of the 20 trade secrets in Swan's

4  Trade Secret Identification—making clear that they understand each one, and then

5  asking Swan to revise individual words or short phrases.

6         This was a strategic ploy.  For example, where Swan claimed the actual

7  ████████████████████████████ that Swan negotiated, Defendants sought to re-

8  write that claim into the mere concept of "████████████████████."  .

9  Thus, the April 15 letter should be taken as proof that Defendants understand

10  Swan's Identification sufficiently to defend against it—which is all that is required.

11  *Advanced Modular*, 132 Cal. App. 4th at 836 (explaining that section 2019.210 is

12  meant "allow the trial court to control the scope of subsequent discovery, protect all

13  parties' proprietary information, and allow them a fair opportunity to prepare and

14  present their best case or defense at a trial on the merits").  Of course, no authority

15  requires Swan to accept Defendants' preferred articulation.

16         The letter disproves Defendants' own argument that Swan has failed to

17  provide "adequate detail to allow the defendant to investigate how [each asserted

18  trade secret] might differ from matters already known and to allow the court to craft

19  relevant discovery."  *See Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 176261, at

20  *2 (emphasis removed); Dkt. 176-1 at 77, 80, 82.  In *Alta Devices*, the court

21  determined the trade secret description lacked "adequate detail" that would "allow

22  the defendant to investigate" because it was confusingly organized in a format that

23  provided multiple different descriptions of each trade secret.  2019 WL 176261, at

24  *2.  Swan has done nothing of the sort here and has instead provided an orderly and

25  clear description of each trade secret.  In fact, Swan's descriptions are so clear that

26  Defendants can analyze them in detail, as their April 15 letter underscores.

27

28

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

6.    **Defendants Have Repeatedly Sought To Delay Document Productions**

Defendants' objections to Swan's Trade Secret Identification lose force, also, because they represent only the latest of Defendants' never-ending efforts to avoid the production of documents that will further demonstrate their wrongdoing. Over Defendants' objections, this Court has already ordered Defendants to serve initial disclosures (Dkt. 156), denied Defendants' *ex parte* motion to block third party discovery (Dkt. 142), and ordered Defendants to comply with Swan's first set of written discovery requests (Dkt. 205). The Court should cut through this latest effort by Defendants to avoid producing documents. Clearly, Defendants are not confused as to the scope of Swan's trade secrets, but rather raise this objection as a roadblock. Swan "is not required, on pain of dismissal, to describe [its trade secrets] with the greatest degree of particularity possible, or to reach such an exacting level of specificity that even its opponents are forced to agree the designation is adequate. We question whether any degree of specificity would satisfy [defendant's] lofty standard." *Advanced Modular*, 132 Cal. App. 4th at 836.

7.    **Trade-Secret By Trade-Secret Discussion**

Swan explains here why its Trade Secret Identification is sufficient as to each asserted trade secret.

(a)    TS 1, 4-13

TS 1 lays out the overall criteria that Swan uses to evaluate and run Bitcoin mining sites, while TS 4-13 lay out the specific combination of factors that make up the "blueprint" or "recipe" that Swan uses at each site. Defendants recognize this. Their April 15 letter details some of the most important criteria of TS 1, such as relating to ▮▮▮▮▮▮▮▮▮▮▮. Ex. 10 at 3-4. It also details important elements of TS 4-13, such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. *Id.* at 7. However, Defendants' "amendment" lists these factors only in

the abstract, whereas Swan's Trade Secret Identification is more specific and lays out the specific choices that Swan made with respect to these (and other) factors at each site. █████████████████████████████████

████████████████████████████████████████████████

██████████  ████████████  ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

Defendants' specific challenges are sometimes so reaching that they are difficult to parse. Regarding TS 1, Defendants raise a series of challenges that appear to be based on some purported distinction between the words "approach" and "criteria." Defendants argue that Swan fails to specify whether TS 1 covers (i) a "███████████████" or (ii) a "██████████████", (iii) whether Swan's "██████████" is different from said "████████████████████████████," (iv) "████████████████████████████████████████████████ ███████," and whether the ████████████████ applies to ████████████. Dkt. 176-1 at 58; Ex. 9 at 2. As claimed in element (d), TS 1 claims "████████████████████ ██████████████████." Dkt. 111-1 at 8. That ██████████████████ includes the factors described in TS 1, as Defendants clearly recognize as shown by their April 15 letter. Ex. 10 at 3-5. Likewise, the claimed "██████████████████████████" are clear; even Defendants recognize that they include ██████████████████ ██████████████. *Id.*

Defendants' other complaints are trivial, manufactured, or both. Defendants complain, for example, that Swan does not lay out a complete and comprehensive list of "████████████████████████████████████████." Dkt. 176-1 at 60; Ex. 9 at 2. Setting aside that the ██████ vary from site-to-site, as is reflected in TS 4-13, Swan is not required to go line-by-line through every ██████████████ ██████████████ and detail which ██████████ is proprietary and which ██████████ is not.

*Advanced Modular Sputtering*, 132 Cal. App. 4th at 835 ("'Reasonable particularity' mandated by section 2019.210 does not mean that the party alleging misappropriation has to define every minute detail of its claimed trade secret at the outset of the litigation."). The entire ███████ are proprietary, even if they include some ██████████ that are not unique to Bitcoin mining, such as ███████████ ███████████.

Along similar lines, Defendants complain that Swan does not explain whether TS 1 includes "some kind of proprietary process for obtaining ███████████ that it claims is a trade secret." Dkt. 176-1 at 60. This is a manufactured complaint that is resolved by reading the Trade Secret Identification. TS 1, element (d), makes no reference to a "proprietary process for obtaining favorable ██████." Therefore, that is not part of TS 1. *See* Dkt. 111-1 at 8.

Swan has already addressed Defendants' other complaints, because again, Defendants raised these same complaints verbatim in their March 26 letter. *See* Ex. 9 at 2-3. In brief:

***First***, Defendants complain, Dkt. 176-1 at 71, Ex. 9 at 4, that Trade Secrets 4-13 do not refer to "tangible trade secret material," citing to *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998).[2] In *Imax*, after ***permitting*** the case to proceed through discovery, the court ruled ***at summary judgment*** that trade secrets lacked specificity. For example, one trade secret claimed "the manner of operation of the cam unit" without describing what that manner was. *Id.* at 1166.

---

[2] Defendants make the same complaint as to Trade Secret 1 (Dkt. 176-1 at 58-59) but instead cite *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 664 (9th Cir. 2020), for this proposition. However, *InteliClear*, like *Imax*, is a ***summary judgment*** case, and also found that the trade secret identification ***was sufficient***. *Id.* That *Imax* and *Inteliclear* advanced through discovery to summary judgment shows that they do not support the relief Defendants seek here, which is to prevent discovery from even beginning.

Conversely here, Swan has described its specific criteria for choosing and operating sites generally (TS 1), as well as the specific "recipe" used at each site (TS 4-13).

*Second*, Defendants complain that "Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret." Dkt. 176-1 at 71; Ex. 9 at 5. But subparagraph (d) of TS 1 states explicitly that the trade secret claimed is a combination of elements comprising ███████████ ██████████████████████████████████████████████████████ described in subparagraph (a). Dkt. 111-1 at 8. This approach is endorsed by *O2*, the very authority Defendants cite. 420 F. Supp. 2d at 1089 (upholding a jury's verdict regarding trade secrets involving a "combination of transformer characteristics that was optimal and secret").

*Third*, Defendants assert, Dkt. 176-1 at 71-72, Ex. 9 at 5, that Swan has not identified how the secrecy of the ████████████ carry economic value, but Swan explains the economic value of each trade secret in subparagraph (b), Dkt. 111-1 at 7, 11. Further, for purposes of section 2019.210, Swan is not required to "illustrate the measures taken to maintain the trade secrets' secrecy and how they derive independent economic value from that secrecy." *Wisk*, 2021 WL 8820180, at *13; *Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, 2017 WL 10543565, at *6 (C.D. Cal. Mar. 13, 2017) ("[f]or purposes of complying with section 2019.210 or FRCP 26, a plaintiff need not prove at the [pre-]discovery stage that each trade secret identified qualifies for trade secret protection"). Besides, the Court has already held that Swan has sufficiently explained how its trade secrets derive economic value. Dkt. 164 at 23. Defendants continue to ignore that the Court already ruled on these issues in Swan's favor.

*Finally*, Defendants complain that Swan has not established that its ████████ ████████████████████ are "superior to other bitcoin miners." Dkt. 176-1 at 72.[3]

---

[3]    Defendants claim in passing that Swan "does not even identify what ████████

1    Again, this is a merits challenge unrelated to section 2019.210, which does not

2    require Swan to show "that each trade secret identified qualifies for trade secret

3    protection." *Bal Seal Eng'g, Inc*, 2017 WL 10543565, at *6. Swan needs only to

4    give "sufficient particularity" for Defendants to "ascertain at least the boundaries

5    within which the secret lies." *Wisk*, 2021 WL 8820180, at * 9 (quoting *Openwave*

6    *Messaging, Inc. v. Open-Xchange, Inc.*, 2018 WL 2117424, at *4 (N.D. Cal. May

7    8, 2018)). Clearly here, Swan has already done so, because Defendants are already

8    arguing the merits of the claimed trade secrets, by challenging the value of the

9    ███████████████ that Swan negotiated.

10                    (b)    TS 2

11       As explained in both Swan's Trade Secret Identification and its Motion to

12   Compel Targeted Discovery (Dkt. 111-1 at 8-9; Dkt. 176-1 at 31), TS 2 is comprised

13   of a ████████████████████████████████████████. TS 2 is

14   an example of a "negative trade secret." Despite Defendants' protest otherwise,

15   they appear to understand the boundaries of this trade secret. *See* Ex. 10 at 5

16   (confirming that Defendants understand the specific sites that Swan passed on).

17       Regardless, Defendants advance the same complaints detailed in their March

18   26 letter and in their opposition to the prior Motion to Compel. Ex. 9 at 3-4; Dkt.

19   176-1 at 64-66. Defendants claim that Swan "fails to specify" how the "reasoning"

20   that Swan claims as a trade secret is not "a matter of general knowledge in the trade

21   or of special knowledge of those persons skilled in the trade." Dkt. 176-1 at 65;

22   *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D.

23   Cal. 2011). But as explained in Swan's Motion to Compel, Swan "is not required

24   to convince defendants or the court in its section 2019.210 statement that its alleged

25   trade secrets are not generally known to the public." *Perlan Therapeutics, Inc. v.*

26   ───────────────

27   ██████████████ make up [Trade Secrets 4-13]." Dkt. 176-1 at 72. The key

28   ████████████ those described in TS 1 and in subparagraph (a), with ███

     ████████████. Dkt. 111-1 at 4-7.

                                          28

*Superior Ct.*, 178 Cal. App. 4th 1333, 1351 (2009); Dkt. 176-1 at 31. Defendants'
cited case, *Agency Solutions.Com, LLC*, does not say otherwise, as it does not
impose a requirement that a trade secret plaintiff must specifically parse out which
elements of every asserted trade secret are public knowledge and which are
independently proprietary. Rather, the court there found that the asserted trade
secret was so poorly defined that it did not "come[] close to providing a basis for
understanding the boundaries or nature of the alleged Trade Secret." *Agency
Solutions.Com, LLC*, 819 F. Supp. 2d at 1019. Here, the boundaries of TS 2 are
clear: it comprises ███████████████████████████████████
███████. Dkt. 111-1 at 8-9.

Defendants also suggest that TS 2 is all but impossible not to use. Ex. 9 at 3.
As previously explained (Dkt. 176-1 at 31-32), Swan does not contend that ***every
single one*** of the billions of people and companies on Earth that do not engage in
████████████████████ is guilty of misappropriation; liability requires that
someone leveraged their knowledge of Swan's decision. Indeed, Defendants appear
to recognize the validity of such "negative" trade secrets because their attempted re-
wording of TS 2 in their April 15 letter is also a negative trade secret. Ex. 10 at 5.
Further, this objection challenges not the ***sufficiency*** of Swan's trade secret
disclosure but the ***merits*** of Swan's trade secret claim, and is therefore irrelevant.

Defendants cite *Gatan, Inc. v. Nion Co.*, but that case did not involve a
negative trade secret, and further there, the trade secret identification bore no
similarity to Swan's here. Dkt. 176-1 at 66. Specifically, the plaintiff in *Gatan*
claimed as a trade secret "[d]etails on how to improve . . . and how to adjust" certain
technology. 2018 WL 2117379, at *3 (N.D. Cal. May 8, 2018). The court stated
that "as currently drafted," the identification could capture "any company's" details,
especially since none of the "details" were described. *Id.* Swan on the other hand
has specifically limited TS 2 to just "████████████████████████████
████████████████████," and identified the ████████████ at issue—thus

avoiding the problem in *Gatan*.  Dkt. 111-1 at 9.  *Wisk Aero LLC* is instructive on this point as well, as defendants there raised a similar argument that asserted the trade secrets were insufficient because "any airplane would have modeling and studies."  2021 WL 8820180, at * 12 (N.D. Cal. 2021).  The court rejected this argument where the plaintiff claimed specifically only "the modeling and studies that *it* performed on *its* aircraft" and was "not trying to claim all such studied performed by anyone."  *Id.*  So too here.[4]

Finally, Defendants complain, Dkt. 176-1 at 64, that Swan's disclosure has not sufficiently explained its "███████████████████████████████, but Swan explains that each site "███████████████████████████████████████████████████████." Dkt. 111-1. at 8.  Of course, there is no real mystery here because Defendants were the ones that made the decisions, and thus know the ████████.  Swan is not required, at this stage, to further spell out every detail underlying its decision not to pursue each site listed in TS 2.  *IQE plc v. Newport Fab, LLC*, 2022 WL 6615775 at *3 (C.D. Cal. Sept. 28, 2022) ("A plaintiff need not 'define every minute detail of its claimed trade secret at the outset of the litigation.' . . . '[S]ome minimally plausible factual explanation for why trade secret protection applies is enough.'").

(c)    TS 3

TS 3 describes a secret initiative ███████████████████████ ████████████████████████████████████ ██████████ ████████████████████████████████. Dkt. 111-1 at 9-10.

---

[4]    Defendants also claim that "Swan [] recognizes that it must provide a more concrete definition of its trade secrets than what it previously disclosed" based on Swan's Motion to Compel. Dkt. 176-1 at 64. That is frivolous. In Swan's Motion, Swan argued that its Identification *is sufficient*; that is the opposite of a confession that it is *insufficient*.

1    Defendants spent nearly a full page in response to Swan's prior motion to

2    compel, Dkt. 176-1 at 67-68, contesting the "independent economic value" element,

3    but again, that goes to the merits, not sufficiency under section 2019.210.

4    *STEMCELL Techs. Canada Inc.*, 2022 WL 585668, at \*5.   Defendants then argue

5    that Swan's prior motion led them to believe that Swan "is not claiming as a trade

6    secret any particular ███████████████." Dkt. 176-1 at 68.   Swan is uncertain

7    where such confusion comes from, given that TS 3, element (d) lists Swan's

8    "████████████████."   Defendants then complain that if the "████████

9    ████████" are an element of the trade secret, Swan has failed to describe them, but

10   in TS 4-13, Swan describes in detail how it ████████████████████████

11   ████████████.   Dkt. 111-1 at 10-22.

12   Next, Defendants complain about Swan's citation to documents.   Dkt. 176-1

13   at 69.   However, their cited case, *Carl Zeiss*, says only that a party may not "refer

14   to documents *in lieu of* identifying its alleged trade secrets with reasonable

15   particularity." 2021 WL 5197215, at \*4  (emphasis added).   Swan has not done

16   this.   Swan described the claimed elements of TS 3 in subpart (d) of TS 3, and cited

17   to three specific documents in support of, not in lieu of, that description.   Dkt. 111-

18   1 at 10.   Defendants' April 15 letter confirms this, because it confirms Defendants'

19   "understanding" that TS 3 refers to ████████████. Ex. 10 at 6-7.

20   Finally, Defendants argue that Swan "fails to specify whether it is the

21   combination of elements together that make the unified combination a protectable

22   secret." Dkt. 176-1 at 69-70.   However, subparagraph (d) explicitly provides these

23   combination of claimed elements.   Dkt. 111-1 at 10.

(d)    <u>TS 14</u>

25   TS 14 is Swan's "████████████████████████ mining sites

26   that Swan had been working to develop and bring online, prior to the Defendants'

27   mass resignation and theft of Swan's trade secrets. Dkt. 111-1 at 22-23.   It is clear

28   that Swan has defined TS 14 with sufficient particularity to provide Defendants with

31

the details they require to mount a defense.  In fact, Defendants describe in detail their understanding of this trade secret in their April 15 Letter; that letter contains, for each site listed in TS 14, a description of the site and site-specific features such as relating to ██████████████████████████████████████████ ████████████  Ex. 10 at 8-10.

Defendants also complain that Swan "fails to point to any such protectable ██████████████, much less any actual agreements for these mining sites." Dkt. 176-1 at 76.  But that deliberately misconstrues this trade secret related to ██████████ ██████████, which in most cases did not yet have signed agreements. Defendants do not argue (and there is no authority supporting an argument) that a signed agreement is a prerequisite to asserting this trade secret.

Finally, Defendants ignore subparagraph (d) of this trade secret identification by asserting that "Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret."  Dkt. 176-1 at 76.  As with every trade secret, Swan explicitly listed the elements of TS 14 in subparagraph (d)); here, ██████████████████ is individually protectible as a trade secret, as indicated by their subpart labels (a) through (i).  Dkt. 111-1 at 23.

(e)    TS 15

Swan's TS 15 is BNOC (Bitcoin Mining Operating Center), a proprietary software tool for Bitcoin Mining that Swan developed.  Dkt. 111-1 at 23-24; Dkt. 100-1 at ¶ 213.  As explained in Swan's Trade Secret Identification, this software system, among other things, "██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████."  Dkt. 111-1 at 23.  When leaving Swan, Defendants stole all of the BNOC source code.  Dkt. 164 at 6.

Defendants take issue with the fact that Swan "fails to specify what aspects of BNOC consist of the trade secret."  Dkt. 176-1 at 76; Ex. 9 at 6.  This is nonsense: Swan claims the entirety of BNOC as its trade secret.  There is no rule that the

entirety of proprietary software and source code is disqualified from trade secret protection.

Defendants seek to require Swan to parse out which elements of BNOC are proprietary and which are public knowledge. Dkt. 176-1 at 77; Ex. 9 at 6. This is not the required standard and the cases Defendants cite do not support Defendants' argument. Rather, Swan must only describe "the boundaries or nature of the alleged Trade Secret" so that Defendants can prepare merit-based defenses—including (if Defendants wish to make it) a defense that claimed trade secrets are matters of public knowledge. *Agency Solutions.Com*, 819 F. Supp. 2d at 1019. Defendants' argument that because "BNOC was built on top of a publicly available open source software," Dkt. 176-1 at 77, actually proves that Swan's Trade Secret Identification *is* sufficient, because Defendants are plainly able to articulate their merits-based defenses. Nothing requires Swan at this stage to "segregate what portions of BNOC it claims are unique or proprietary," as Defendants insist. *Id*. Rather, Plaintiffs are "not required to identify the specific source code to meet the reasonable particularity standard." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834 846 (N.D. Cal. 2019); *Integral Development Corp. v. Tolat*, 675 Fed, Appx, 700, 703 (9th Cir. 2017) (noting that that "a fact finder could conclude that Tolat had previously copied all of Integral's source code" where plaintiff claimed all source code for its products as the trade secret). And although the charge that BNOC utilizes public source code is a merits challenge, not a sufficiency challenge under section 2019.210, it is proper for a claimed trade secret to incorporate publicly known elements: "a trade secret may consist of several elements, each of which is generally known, put together in a novel and previously unknown combination." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1196 (S.D. Cal. 2012). Finally, Defendants repeat their rote complaint that Swan fails to specify which "elements" make up the trade secret. Dkt. 176-1 at 78; Ex. 9 at 6. Again, the elements are described in subparagraph (d), and are the BNOC tool and its source code. Dkt. 111-1 at 24.

33

1                (f)     TS 16

2        As described in Swan's Trade Secret Identification and prior motion, TS 16

3 is "████████████████████████." Dkt. 111-1 at 25. The document

4 contains ███████████████████████████████████████████████

5 ██████████████. *Id.* at 24-25. Swan claims the entire document as a

6 trade secret. *Id.* Defendants are familiar with this spreadsheet; Defendant Naidoo

7 downloaded it on his way out the door from Swan. Dkt. 100-1 ¶ 136.

8        Defendants argue that the name of the document bears on "ownership"—this

9 argument goes to the merits, which is not relevant here. Dkt. 176-1 at 78-79; Ex. 9

10 at 6.

11        Defendants further object that Swan is required, under section 2019.210, to

12 parse out every cell in the spreadsheet that contains public information and every

13 cell that contains nonpublic information. Dkt. 176-1 at 79-80; Ex. 9 at 7. This is a

14 prime example of the lofty, unattainable standard that ***Defendants*** would like to

15 impose upon Swan, but which courts do not impose. Additionally, Defendants own

16 description of TS 16 merely cites to the spreadsheet. Ex. 10 at  11.

17                (g)     TS 17

18        TS 17 relates to Swan's ████████████████████████████

19 ████████████████████. Defendants claim "Swan fails to describe how

20 *any* ████████ works," Dkt. 176-1 at 81, but even if Swan were required to give that

21 level of detail (Swan is not), Swan has done so, because the model is self-describing.

22 As Swan has explained, the criteria used in the spreadsheet that Swan identified are

23 "contained within the model." Dkt. 176-1 at 37. In other words, the conditions and

24 operations of the model are expressly described within the spreadsheet itself. As

25 just one example, ████████████████████████████████████

26 ████████████████████████████████████████████

27 ██████████████████████████████████.

28

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1    Defendants have also complained that Swan has failed to expressly define the

2  elements of this trade secret or distinguish which elements of the claimed trade

3  secret are proprietary versus public. Dkt. 176-1 at 81-82; Ex. 9 at 7. As explained

4  above, section 2019.210 does not impose such a burden upon Swan, and in all events

5  Swan has, in subparagraph (d), delineated the elements of this trade secret. Dkt.

6  111-1 at 26. Regardless, ███████████████████ is confidential to Swan,

7  as are its models.

8            (h)    <u>TS 18</u>

9    TS 18 covers Swan's ████████████████████████████

10 █████████████████████. Dkt. 111-1 at 27. This was a

11 specific bit of research project that Swan did—to be more specific, that **Defendants**

12 **themselves** did while still working for Swan. For Defendants to argue that they do

13 not understand the scope of their own research project shows the unseriousness of

14 their objections. Defendants' in prior iterations of this dispute, Dkt. 176-1 at 82-83,

15 have relied on a citation to *Perlan* to support this point, but *Perlan* is inapposite.

16 Unlike the trade secrets in *Perlan*, TS 18 is not a an "incremental variation[] on

17 preexisting technology in a highly specialized technical field." 178 Cal. App. 4th

18 at 1350-52. It is a data-driven research project to ███████████████████

19 ███████████; it involved no product design or engineering.

20

21            (i)    <u>TS 19</u>

22    TS 19 is directed specifically to ██████████████████████

23 █████████████████. Dkt. 111-1 at 28. Defendants

24 complain that Swan has not identified "████████████████████

25 ██████." Dkt. 176-1 at 83; Ex. 9 at 8. But TS 19 is expressly limited to ████

26 ████████████████████████████████████████

27 Dkt. 111-1 at 28. Defendants' other arguments are specious. For example, they

28 ████████████████████████████████████████

1 [REDACTED]

2 [REDACTED]

3 [REDACTED]. Defendants know this, not least because

4 they were the ones generating this [REDACTED] while still at Swan, and they are the

5 ones who stole it when they left.

6       In their argument in the prior joint stipulation, Dkt. 176-1 at 83-84,

7 Defendants cite only one case, *Imax*, for the proposition that a trade secret

8 description must "*refer* to trade secret material." 152 F.3d at 1167 (emphasis in

9 original). But the portion of the case that Defendants cite to explains that the use of

10 a catch-all phrase "including every dimension and tolerance that defines or reflects

11 that design" was not sufficiently specific because it did not "clearly refer[] to trade

12 secret material, i.e., engineering drawings and blueprints." *Id.*  *Imax* does not in

13 any way require that, in the context of research and data, a plaintiff must list out

14 every single piece of data claimed as part of the trade secret.

15             (j)    TS 20

16       TS 20 is Swan's "[REDACTED]," with "[REDACTED]"

17 referring to [REDACTED]. Defendants claim only that

18 Swan's disclosure of this trade secret lacks "sufficient particularity" because the

19 description fails to specify whether the trade secret covers an "approach" or

20 "results,"  and that "Swan fails to specify whether it is the combination of public

21 elements together that make the unified combination of approaches and/or

22 information that makes the combination a protectable secret." Dkt. 176-1 at 84-85.

23 As explained in the preceding sections, these arguments fail, including because they

24 improperly go to the merits rather than the sufficiency of the disclosure.

25       **8.    RFPs 16-20, 23-26, 28-34, 39-48, 55, 57 & 58, and ROGs 6, 8**

26             **& 9**

27       Proton's objections are also improper because many of these 32 discovery

28 requests are not "into trade secrets." *See* Dkt. 95 at 7 (Court's order requiring a

36

trade secret disclosure in advance of discovery "into trade secrets"). Here, Proton has improperly refused to produce, for example, documents related to its use of ephemeral messaging apps (RFPs 42-43) based on its objections to Swan's Trade Secret Identification. But such requests clearly do not call for discovery "into trade secrets." Dkt. 95 at 7. Similarly, Swan has sought discovery into Proton's agreements with Swan (RFPs 24-26), Proton's finances (RFPs 29-30, 39-40), Proton's assets and asset concealment (RFPs 45-46), and Proton's holding itself out as Swan (RFPs 47-48). These requests do not implicate the Trade Secret Identification and are not seeking discovery "into trade secrets." Indeed, of the discovery requests challenged by Proton (listed above, *supra* Section II), only RFP Nos. 23, 28, and 33, and Interrogatories 8-9, reference Swan's Trade Secret Identification at all. At a minimum, the Court should order Proton to respond to respond to all of the discovery requests for which Proton's trade secret identification objections are not at issue.

## 9. Proton Has No Other Basis To Refuse To Comply With These Requests

The Court should also reject any belated attempt by Proton to rely on boilerplate or newly-raised objections.

***First***, Proton's responses and objections to these requests are facially inadequate. The only objection to these requests that Proton has ever attempted to explain or substantiate is that related to Swan's Trade Secret Identification. Courts routinely hold that the other unsupported, boilerplate objections that Proton has asserted in its responses—*e.g.*, that the requests are "overbroad, overly burdensome, and harassing," or "seek[] documents that are not relevant to the claims or defenses in this action," Ex. 4 at 13; Ex. 5 at 9; Ex. 7 at 9; Ex. 8 at 6—are an improper basis upon which to resist discovery, *see, e.g.*, *Bluprint Clothing Corp. v. Walmart Inc.*, 2025 WL 1090164, at *1 (C.D. Cal. Apr. 2, 2025) ("[B]oilerplate objections do not suffice and there is no ground upon which to reasonably argue otherwise."); *A.*

*Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006) ("[B]oilerplate relevancy objections, without setting forth any explanation or argument why the requested documents are not relevant, are improper."); *Garcia v. Cnty. of Riverside Sheriff Dep't*, 2024 WL 3512989, at *1 (C.D. Cal. July 2, 2024) (prohibiting "boilerplate objections").

**Second**, Proton's objections to the RFPs are independently inadequate because they fail to identify the specific basis upon which any documents are being withheld.   Under Rule 34, Proton was required to "state whether any responsive materials are being withheld on the basis of [each] objection."  Fed. R. Civ. P. 34(b)(2)(C).  Proton did not; its failure to do so is improper.  *See, e.g.*, *Barry Wilson v. Wavestream Corp. et al.*, 2025 WL 1090154, at *2 (C.D. Cal. Mar. 11, 2025) ("Defendant's responses to the contested RFPs reflect objections, but do not specify whether any documents are being withheld based on the objections.") (granting motion to compel).

**Third**, Proton indicated to Swan multiple times—in correspondence and during the parties' L.R. 37-1 conference on April 18—that the **only** objection it intended to stand on related to the at-issue requests concerned Swan's Trade Secret Identification.  Specifically, on April 9 after the Court denied (Dkt. 164) Proton's motion to dismiss for lack of personal jurisdiction, Swan asked Proton to identify any requests for which it intended to continue to withhold documents.  Swan noted that Proton's responses generally contain nothing more than boilerplate objections, leaving it "unclear whether Proton intends to withhold documents and information for reasons other than its general objections."  Ex. 1 at 9.  Proton provided what it referred to as "updated positions on the discovery requests," *id.*, on April 17, *see id.* at 7.  Proton (i) identified the requests for which it was "maintain[ing] its objections based on Swan's deficient trade secret disclosures" (those at issue here); (ii) identified the requests for which it was "maintain[ing] its objections ... on the grounds that they [the requests] are overbroad and seek documents that are not

relevant to Swan's claims;" and (iii) otherwise stated that it would not withhold documents or information in response to the remaining discovery requests.  *See id.* The parties met and conferred pursuant to L.R. 37-1 on April 18, during which they discussed the limited number of requests to which Proton continued to object on the basis of relevance or breadth.  *See id.* at 4-6 (memorializing discussion).[5]  During that call, Proton also confirmed that, for those requests at issue here, the only objection that Proton intended to stand on was its objection related to Swan's Trade Secret Identification.  *See id.*  To the extent Proton now seeks to backtrack on that commitment, the Court should not permit it to do so.  *Cf. Lyman v. Greyhound Lines, Inc.*, 2022 WL 772752, at *11 n.3 (D.S.C. Mar. 14, 2022) ("Greyhound indicated its intent to comply and thus avoided a written order from this court on the issue. Greyhound's about-face on its representation of compliance and attempt to later re-raise those objections were entirely inappropriate, a waste of party and judicial resources, and just one example of the undue delay it has effectuated on the discovery process.").[6]

_____

[5]  In its April 17 email, Proton identified seven RFPs to which it intended to stand on objections of relevance and overbreadth.  *See* Ex. 1 at 7 (identifying RFPs 35-38, 50, 53, and 54).  As reflected in the parties' follow-up correspondence and Proton's supplemental responses to those RFPs, Proton has since agreed to produce documents in response to six of those seven requests.  *See* Ex. 1 at 2-3; Exs. 7, 8..

[6]  Proton may argue that it should be excused from producing these documents on the basis of its recently-filed motions to compel arbitration and stay the case. However, those motions are being separately briefed and argued.  And they are no justification to excuse Proton's compliance with the discovery here, because Proton's initial and supplemental responses to this discovery did not include any objections relating to stay or arbitration.  Those objections are therefore waived as untimely.  *See Safeco Ins. Co. of Am. v. Rawstrom*, 183 F.R.D. 668, 671 (C.D. Cal. 1998) (overruling untimely objections, noting that if serial objections were allowed, the party seeking discovery "could be strung along indefinitely.").

## IV.    PROTON'S CONTENTIONS

### A.    Factual And Procedural Background[7]

#### 1.    The Shareholder Agreement And Creation Of 2040 Energy.

In 2023, Swan entered into a Shareholder Agreement ("SHA") with non-party Tether Investments Ltd. ("Tether"), through its subsidiary Zettahash Inc., to create a new Bitcoin mining joint venture called 2040 Energy.  ECF No. 100-1 ¶ 55.  Tether agreed to fund this venture, and Swan, in exchange for its minority "sweat equity" interest in 2040 Energy, agreed to run the day-to-day operations of 2040 Energy, in consultation with, and with the approval by, Tether.  ECF No. 122-2 (Particulars of Claim) ¶¶ 9, 15.2, 15.3, 19-37.  Tether not only had a majority interest in 2040 Energy, but it held a majority of the board seats.  ECF No. 100-1 at ¶ 112.  In other words, Tether, not Swan, owned and controlled 2040 Energy's mining business.  And because Swan had no prior experience in mining Bitcoin, to satisfy its part of the SHA, Swan was forced to engage independent consultants (*e.g.*, the Individual Defendants) to run 2040 Energy's operations.  While Swan likes to refer to 2040 Energy's mining business as Swan's, nothing could be further from the truth.  For example, 2040 Energy—not Swan— █████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████  ECF No. 111-1 at 5 n.1.[8]

---

[7] Needless to say, Proton disputes much of what Swan says in its factual and procedural background sections.  Proton reserves all rights to dispute these allegations and looks forward to setting the record straight in the appropriate forum (*i.e.*, arbitration) soon.  Proton references only the applicable background relevant to this motion.

[8] According to Swan, ████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████  ECF No. 111-1 at 5 n.1.  In the Trade Secret Identification, Swan

40



Under the SHA, the parties agreed ████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████. *See* ECF No. 122-

2 ¶ 15.8.  The SHA ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████     Tether, ████████████████

████████████████████████  and 2040 Energy claim that all assets generated

by and for 2040 Energy in its operation of the mining business were and are owned

by and the property of 2040 Energy.  *See id.* ¶¶ 38-39, 42.

### 2. <u>Due To Swan's Mismanagement And Liquidity Crises, Individual Defendants Resign.</u>

Since at least August 2023, Swan was struggling with cashflow issues, which

required cash infusions by Tether and other investors.  At first, as a new partner,

Tether was willing to invest in Swan to keep it up and running and to protect its

investment in 2040 Energy.  In or around June 2024, Tether discovered ██████

████████████████████████████████████████████████████████

████████████████████████████.  ECF No. 122-2 ¶¶ 45-46.  Around this

time, Tether decided not to further invest in Swan's struggling business operations,

which had a substantial impact on Swan's ability to continue to operate.  In July

2024, Swan publicly announced significant layoffs and that it was shutting down its

so-called managed Bitcoin mining operations.  *See* ECF No. 122-2 ¶ 52.  Seventy

to eighty Swan employees were laid off around this time.  *Id.*  By August 2024,

Swan was teetering on the edge of financial collapse.  On August 8, 2024, fearing

bankruptcy and concerned about Swan's mismanagement of its business and

ongoing cash crisis, as well as its lack of transparency to 2040 Energy and third

parties, the Individual Defendants resigned from Swan.  *See* ECF No. 100-1 ¶ 11.

---

refers to those contracting parties "as 'Swan'"; however, those entities are affiliated
with 2040 Energy, not Swan.  *Id.*

3.    **After Swan Fails To Cure Its Material Breaches Of The SHA, 2040 Energy Engages Defendant Proton.**

Tether ████████████████████████████████████████████
████████████████████████████████████. ECF No. 122-2 ¶¶ 15.2, 58, 59. After receiving these notices, ████████████████████████████████████
████████████████████████████████████. *Id.* ¶ 57. To be clear, if Swan truly had a mining business, Swan could have provided assurances to Tether and continued to run 2040 Energy. Instead, Swan's CEO, who was also the CEO of 2040 Energy, resigned. Swan then focused its efforts on litigation, in an obvious attempt to gain leverage in its negotiations with Tether. In order to mitigate damages and preserve the value of 2040 Energy's mining business for the benefit of the shareholders, including Swan, 2040 Energy appointed Defendant Proton to take over the daily management of 2040 Energy. *Id.* ¶¶ 59. Swan's response to this was notable—it merely asked Tether to ask Proton to pay a license fee for the use of the alleged trade secrets and confidential information at issue in this and the UK litigation, which Tether claims it owns. ECF No. 25-3 at 35.

4.    **Swan Files this "Tether Litigation."**

On September 25, 2024, approximately seven weeks after the Individual Defendants resigned, Swan filed this action seeking preliminary and permanent injunctive relief against all Defendants and damages against Proton, alleging that the Defendants misappropriated and/or improperly used Swan's alleged trade secrets or confidential information. ECF No. 1. According to the complaint Swan later filed against its prior counsel in this action, Swan internally dubbed this action the "Tether Litigation." ECF No. 194-11, ¶ 17.

With its initial Complaint in this action, Plaintiff contemporaneously filed an Ex Parte Application for Temporary Restraining Order and OSC Re: Preliminary Injunction. ECF No. 8. The next day, Swan filed an Ex Parte Application for

Expedited Discovery Order.  ECF No. 9.  Defendants opposed both applications, on multiple independent grounds.  On October 4, 2024, the Court (i) denied the TRO motion "as plaintiff ha[d] failed to establish at least three of the four *Winter* factors," (ii) denied the request for expedited discovery, and (iii) set an expedited hearing on Swan's preliminary injunction motion.  ECF No. 40.  On October 9, Swan moved again for expedited discovery, which also was denied.  ECF No. 54.  On October 15, Swan filed a "motion to compel" the return of the Individual Defendants' laptops, which was denied, too.  ECF No. 63.  Then, on October 18, 2024, Swan voluntarily withdrew its preliminary injunction motion;[9] and to date, Swan has not rescheduled the hearing nor filed any similar motions.  ECF No. 55.

On December 23, months before Swan served Defendants with any discovery, the Individual Defendants filed a Motion to Compel Arbitration and, in the Alternative, Motion to Dismiss the Complaint.  ECF No. 80.  The same day, Proton specially appeared to file its motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.  ECF No. 79.  These motions were set to be heard on February 21, 2025.  Throughout the litigation, Defendants have consistently maintained that discovery cannot proceed until these jurisdictional motions are decided.  Swan requested an extension to oppose these motions, to which the Defendants agreed.  ECF No. 92.  In lieu of opposing these motions, on January 27, 2025, four months after initiating this action, Swan decided to amend its Complaint.  ECF No. 100-1.  Because of the amendment, the February 21, 2025 hearing date was taken off calendar.  On February 25, 2025, Defendants refiled a motion to dismiss the claims against Proton for lack of personal jurisdiction, a motion to compel arbitration of claims against Individual Defendants, motions to dismiss on Rule 12(b)(6) grounds, and a motion to stay while the 2040 Energy v. Swan

---

[9] In so doing, Swan claimed that it anticipated filing a regular noticed motion for expedited discovery, but never did.

Litigation (defined and discussed below) is pending. ECF Nos. 121, 122, 124, and 126. On April 9, 2025, the Court denied in substantial part the Individual Defendants' motion to compel arbitration and Defendants' motions to stay, and denied the Individual Defendants' motion to stay. ECF No. 164.

On April 25, 2025, the Individual Defendants filed their Notice of Appeal and Notice of Automatic Stay, based on *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023). ECF No. 180, 181. On May 2, 2025, Proton filed its Motion to Compel Arbitration. ECF No. 194. On May 16, 2025, the Individual Defendants filed a motion to stay pending their appeal of the denial of their motion to compel arbitration. On May 16, 2025, Proton filed a motion for discretionary stay of the case against Proton, pending the appeal. ECF No. 206. On May 27, 2025, the Court granted the Individual Defendants' motion for stay, and *sua sponte* stayed the case against Proton pending the Individual Defendants' appeal. ECF No. 218. On June 17, 2025 the Court *sua sponte* lifted the discretionary stay as to Proton and put Proton's motion to compel arbitration back on calendar for July 25, 2025.

## 5. Tether and 2040 Energy File a Lawsuit Against Swan in the UK for Breach of the SHA.

On January 14, 2025, 2040 Energy and Tether filed a lawsuit (the "2040 Energy v. Swan Litigation") in the King's Bench Division of the High Court of Justice's Business and Property Courts of England and Wales against Swan, alleging breaches of the SHA. ECF No. 122-2. The 2040 Energy v. Swan Litigation involves the same joint venture entity—2040 Energy—Tether and Swan, and their respective rights with respect to the same trade secrets and confidential information at issue in this case. *Id.* 2040 Energy and Tether allege, among other things, that "Swan wrongfully lays claim to the Business Assets in the hands of the [Individual Defendants] and Proton in the California Proceedings" and that proprietary materials that Swan identifies in this litigation are "owned by 2040 Energy.*" Id.* ¶¶ 89, 90. Notably, 2040 Energy and Tether assert that, through Swan's claims in this

action, it "seeks to assert ownership over business assets belonging to 2040 Energy for its own unilateral purposes." *Id.* ¶¶ 71.2.  The issue of who owns these business assets, the trade secrets at issue here, is scheduled to be heard by the UK court in a six-day evidentiary hearing between September 8-19, 2025.

### 6.    Swan Makes Trade Secret Disclosures.

Since Swan filed its original Complaint, Defendants requested, on multiple occasions, for Swan to serve its trade secret disclosure, but for months Swan refused.  Then, on January 8, 2025, the Court issued an order requiring Swan to serve a trade secret disclosure that identifies Swan's trade secrets with "sufficient particularity" to distinguish the trade secrets from "matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade."  ECF No. 95 at 6-7.

Swan finally disclosed its Trade Secret Identification on February 14, 2025, nearly five months after it filed this lawsuit.  *See generally*, ECF No. 111-1.  The disclosure includes 20 claimed trade secrets (as opposed to the four generally discussed in the Amended Complaint), with the discussion of each trade secret divided into four sections: (a) Background; (b) Value From Not Being Generally Known; (c) Reasonable Secrecy Measures; and (d) Trade Secret Elements.  *Id*. Defendants sent a letter detailing the deficiencies of Swan's Trade Secret Identification on March 26, 2025, as it became clear that the lack of clarity in Swan's Trade Secret Identification made it difficult for Defendants to respond to Swan's first set of discovery requests.[10]  Ex. 9.

### 7.    Defendants' Meet And Confer Efforts.

The parties met and conferred on Swan's deficient Trade Secret Identification

---

[10] Defendants did not send the letter earlier, as their motions were pending.  But given Swan's refusal to put a hold discovery pending a hearing on the motions, reserving all rights, Defendants sent their letter to Swan objecting to Swan's inadequate trade secret disclosure.

on April 3, 2025. During that meet and confer, Swan represented that it would consider amending its Trade Secret Identification. The day that the Court issued its order on the pending motions on April 9, 2025 (ECF No. 164), Swan emailed asking Defendants if they would withdraw their objections to Swan's discovery requests, including to the Trade Secret Identification (Ex. A). Defendants responded the very next day, making very clear that they would provide supplemental responses to Swan's discovery requests, and that while they were not withdrawing their objections to the Trade Secret Identification and reserving all rights, their supplemental responses to this first set of discovery would not withhold documents or information on the basis of Defendants' objections to the Trade Secret Identification. Contrary to Swan's assertion, by doing so, Defendants did not acknowledge or agree that the disclosures were adequate. To the contrary, Defendants asked Swan if it had decided to stand by its disclosures and stated that Defendants planned to raise the adequacy of the Trade Secret Identification with the Court if the parties could not reach an agreement. ECF No. 177-2.

On April 11, 2025, instead of responding to Defendants' questions, Swan sent its portion of a motion to compel on Swan's first set of discovery requests, including a lengthy discussion of the adequacy of its Trade Secret identification. ECF No. 177-17. Defendants responded on April 13, 2025, explaining they were surprised by Swan's service of the joint stipulation because Swan had represented that it was considering Defendants' objections to the Trade Secret Identification and would get back to Defendants (including whether they were going to amend the disclosure), and that the discovery disputes were moot because Defendants would be providing supplemental responses by April 18, 2025. *Id.* Swan responded on April 14, 2025 that it would not withdraw its joint stipulation, and when Defendants replied the same day, Defendants made clear that they had "agreed not to withhold any documents responsive to this set of discovery based on Swan's failure to serve an adequate 2019.210 disclosure," making Swan's arguments regarding the adequacy

46

of its disclosure moot.  *Id.*  The parties exchanged further emails on April 15 and 16, 2025.  *Id.*

Also on April 15, 2025, given many of the arguments made in Swan's portion of the joint stipulation related to Swan's first set of discovery requests, Defendants sent Swan a letter in a further attempt to clarify Swan's vague trade secret disclosures so as to avoid any further dispute on this issue.  Ex. 10.  In the letter, Defendants asked Swan to confirm that it was importing limitations into the elements from the background section of each trade secret and to confirm which elements Swan intended to import.  Ex. 10 at 2.  If so, Defendants requested Swan to modify its elements to make clear what portions of the narrative it was claiming as trade secret elements.  In a meet and confer on April 18, 2025, Swan again refused to make any changes to its disclosure.

Although it is Swan's burden to provide a sufficient Trade Secret Identification, in an attempt to move past this issue, Defendants' April 15 letter proposed amendments to understand the trade secrets identified by Swan, to distinguish them from the more the general statements contained in the background, summary, and elements sections of Swan's Trade Secret Identification, which it continued to insist it was not claiming as trade secrets, and requested to further meet and confer on this issue.  Ex. 10 at 3-14.  Swan did not engage with Defendants on their April 15 letter.  Instead, Swan's counsel sent an email stating, "[f]or the avoidance of doubt, Swan disagrees with how Defendants' April 15 letter characterizes Swan's trade secret identification.  Swan's trade secret identification stands as filed at Dkt. 111-1."  Ex. 11 at 1.  At no point has Swan provided any further detail as to its alleged trade secrets..

Despite Defendants' attempts to come to an agreement on the Trade Secret Identification, and their agreement to remove their objections on the Trade Secret Identification for Swan's first set of discovery requests, which clearly mooted the issue, Swan insisted on filing its motion to compel on the first set of discovery

requests, with voluminous argument on the adequacy of the Trade Secret Identification.  This Court agreed with Defendants and determined it need not address the dispute in ruling on that motion.  ECF No. 205.

While Swan's motion on the first set of discovery was pending, the parties met and conferred on Swan's second set of discovery to Proton.  On April 17, 2025, Proton informed Swan that it was maintaining its objections to the definitions and instructions Swan's requests.  Also, in the interest of narrowing disputes, Proton stated it would not withhold documents or responses on the basis of Swan's deficient trade secret disclosures for 25 of the document requests, and all but three of Swan's interrogatories.  Ex 1 at 7.  The parties further met and conferred on April 18, 2025, during which Proton reiterated its objections to the definitions and instructions, and in particular the definition of "Proton."  Following the meet and confer, Proton served its supplemental objections and responses to the subject discovery on April 25, 2025.  Exs. 7, 8.  Those supplemental responses maintained the objections to Swan's definitions and instructions, and maintained its objections based on Swan's inadequate Trade Secret Identification for the requests subject to this motion.  *Id.*

While the meet and confer on the second sets of discovery requests were ongoing, Proton met and conferred with Swan regarding Proton's intended motion to compel arbitration.  In response, Swan asserted that Proton had waived its right to compel arbitration by "engaging in discovery."  Ex. 12 at 3.  Proton subsequently informed Swan that given its position, Proton could not continue to engage in the meet and confer process unless Swan agreed that any further engagement would not constitute a waiver of Proton's right to compel arbitration.  Ex. 1 at 1.  Swan did not agree.

B.    **Legal Standard**

Before a party may commence discovery related to any trade secret, this Court requires a party asserting misappropriation under the Defend Trade Secrets

48

Act ("DTSA," 18 U.S. Code §§ 1836-39) to file and serve an identification of trade secrets with particularity akin to the disclosure required by California Code of Civil Procedure Code section 2019.210.  ECF No. 95 at 6.  The Court's Order requires that Swan's Trade Secret Identification include "(1) a numbered list of each trade secret at issue, including a summary of each trade secret, and specific elements that define each trade secret (and if appropriate, elements that distinguish the claimed trade secret from similar and more broadly known technologies); (2) the background of the trade secret and a description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public; and (3) a description of how each secret has been the subject of reasonable efforts to maintain its secrecy."  *Id.*  The Court also ordered that the identification must comply with the requirements of California law for trade secret identifications pursuant to California Code of Civil Procedure Section 2019.210.  *Id.*

Section 2019.210 in turn requires a plaintiff to identify the trade secrets with "sufficient particularity" to distinguish the trade secrets from "matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade."  *See, e.g.*, *Advanced Modular*, 132 Cal. App. 4th at 836.  This requires "adequate detail to allow the *defendant* to *investigate* how [each asserted trade secret] might differ from matters already known and to allow the court to craft relevant discovery."  *Alta Devices, Inc., v. LG Elecs., Inc.*, 2019 WL 176261, at *2 (N.D. Cal. Jan. 10, 2019) (emphases in original) (internal citation omitted).  A proper identification must also permit the defendant to ascertain at least the boundaries in which the alleged secrets lie.  *See M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *5-6 (inadequate descriptions "are not sufficiently concrete, leaving room for the designating party to change the meaning of the trade secret after the completion of discovery").

The purpose of Section 2019.210 is as follows:

First, it promotes well-investigated claims and dissuades the filing of

meritless trade secret complaints. Second, it prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets. Third, the rule assists the court in framing the appropriate scope of discovery and in determining whether plaintiff's discovery requests fall within that scope. Fourth, it enables defendants to form complete and well-reasoned defenses, ensuring that they need not wait until the eve of trial to effectively defend against charges of trade secret misappropriation.

*Brescia*, 172 Cal. App. 4th at 144 (internal citations omitted) (citing *Advanced Modular*, 132 Cal. App. 4th at 833-34).

Section 2019.210 "limit[s] the permissible scope of discovery by distinguishing the trade secrets from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade[.]" *Id.* at 145 (internal citations omitted) (citing *Advanced Modular*, 132 Cal. App. 4th at 835). The statute also aims to protect a trade secret defendant from "potentially costly litigation and discovery" and to "give both the court and the defendant reasonable notice of the issues which must be met at the time of trial and to provide reasonable guidance in ascertaining the scope of appropriate discovery." *Id.* at 144 (internal citations omitted) (citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)).

Further, the level of reasonable particularity required will vary depending on the precise trade secrets at issue. "Simply labelling the alleged trade secrets as novel or unique is not sufficient without some explanation of *how* such processes or products are distinct from other advancements in the field." *Alphonso Inc. v. Tremor Video, Inc.*, 2022 WL 17968081, at *4 (N.D. Cal. Oct. 31, 2022) (emphases added) (citing *Advanced Modular*, 132 Cal. App. 4th at 836 (granting defendant's motion to stay discovery pending a more detailed trade secret disclosure pursuant to Section 2019.210); *see also Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1113-16 (N.D. Cal. 2016) (applying "more exacting level of particularity" standard); *Perlan Therapeutics, Inc. v. Superior Ct.*, 178 Cal. App. 4th 1333, 1350-52 (2009) (same); *Brescia*, 172 Cal. App. 4th at 148 (same). Among other things, this requires "some

explanation of *how* such processes or products are distinct from other advancements in the field," and "technical surplusage is no substitute for such descriptions of functionality." *Alphonso*, 2022 WL 17968081, at *4 (emphasis in original).

### C.    Argument

#### 1.    Swan's Trade Secret Identification Is Insufficient Under Section 2019.210.

Swan's trade secret disclosure fails to provide the level of particularity required under Section 2019.210.  As courts have repeatedly emphasized, "[t]he [2019.210] designation must be sufficient to allow the defendant to investigate possible defenses and to commence formulation of its own defense." *Perlan Therapeutics, Inc. v. Superior Ct.*, 178 Cal. App. 4th 1333, 1346 (2009).  The purpose of Section 2019.210 is not only to allow defendants the ability to prepare meaningful defenses, but to prevent fishing expeditions and plaintiffs' shifting theories of alleged trade secrets. *Id.* at 1343-44.  Swan's 2019.210 disclosure fails to give Defendants the ability to prepare a meaningful defense, and is intended to justify exactly the kind of fishing expeditions and shifting theories that section 2019.210 is intended to prevent.

Here, Swan provides only vague, high-level descriptions of purported trade secrets, without sufficient detail to allow Defendants to understand the precise boundaries of what Swan claims to own.[11]  In doing so, Swan makes no attempt to distinguish its purported trade secrets from what is generally known in the bitcoin mining industry.  Instead, it obfuscates its allegations in order maintain maximum flexibility to shift those allegations as discovery progresses.  Such disclosure is inadequate. *See, e.g.*, *Alphonso Inc. v. Tremor Video, Inc.*, No. 22-CV-03629-NC, 2022 WL 17968081, at *3 (N.D. Cal. Oct. 31, 2022) (explaining that Section 2019.210 is aimed "to prevent plaintiffs from engaging in a "shifting sands" strategy

---

[11] Proton's specific challenges to each trade secret are discussed below.

wherein they "allege secrets vaguely, discover what is in the defendant's possession, and claim it was a trade secret all along."); *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.,* No. 819CV00220JVSJDEX, 2019 WL 8108729, at 5-6 (C.D. Cal. Sept. 3, 2019) (inadequate descriptions "are not sufficiently concrete, leaving room for the designating party to change the meaning of the trade secret after the completion of discovery").  Moreover, Swan's use of vague, general and categorical terms does not transform its disclosure into a compliant one.  Courts have made clear that simply reciting buzzwords that seem to carry some specialized value does not satisfy the requirement to clearly delineate what, if anything, is protectable as a trade secret.  *See Perlan Therapeutics, Inc.*, 178 Cal. App. 4th at 1339 ("Despite the highly technical language used, it is apparent that this description does not provide [specific identification of the claimed trade secrets]."); *M/A-COM Tech. Sols.*, 2019 WL 8108729, at *3 (C.D. Cal. Sept. (same); *Soc. Apps, LLC v. Zynga, Inc.*, No. 4:11-CV-04910 YGR, 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012) (holding that a claimed trade secret of "server architecture," "including "memory utilization, storage utilization, server synchronization, scalability of all resources (including memory, network bandwidth, storage devices and CPU), operating system type, scripting engine, the number of servers, server functions and the ability and server architecture for multiple users to execute and save game functions in real time— ***adds little more than an elaborate categorization scheme for a variety of related concepts.***").  Vague, categorical descriptions "do[] not comply with the requirement to identify the actual matter that is claimed to be a trade secret." *Soc. Apps, LLC*, 2012 WL 2203063, at *4 *Alphonso Inc.*, 2022 WL 17968081, at *2 (explaining a plaintiff "must clearly refer to tangible trade secret material instead of referring to a system which potentially qualifies for trade secret protection.").[12]  Indeed, Swan's

---

[12] Swan quickly cites *Cisco Systems, Inc. v. Chung*, 2020 WL 7495085, seemingly to suggest that its disclosure is sufficient to merely because it refers to documents. But *Cisco* did not hold that citation to any documents relieves a plaintiff of its

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

Section 2019.210 disclosure leaves Proton no way to discern what are protectable trade secrets or what, in reality, may be part of run-of-the-mill mining operations.[13]

Further, Swan's claim in its Factual Background section that the Court has already concluded that Swan's disclosures are adequate in its April 9, 2025 Order is incorrect. As Swan well-knows, this Court has never evaluated the adequacy of Swan's disclosure of the 20 trade secrets identified in Swan's 2019.210 disclosure. The prior motions before the Court were Defendants' motions to dismiss the Amended Complaint (and not a discovery motion related to the 2019.210 disclosure). Swan's reliance on this prior order is misplaced because, "in denying defendants' motion to dismiss, the court was required to determine whether the complaint stated a trade secrets claim—not whether the complaint's trade secret

---

burden to disclose its trade secrets with reasonable particularity. And that is not the law. *See* Section III.C.4.

[13]    Notably, Swan publicly disclosed portions of its trade secrets on the public docket in this action, including the precise "list of mining sites that Swan considered, but decided not to pursue," which it claims comprises its Trade Secret 2. (*see* ECF No. 177-8). While Swan now claims this filing was inadvertent (despite moving to seal several other documents in that same filing) and has belatedly moved to seal the document after Proton sent Swan its sections of this joint statement, Proton will not formally oppose Swan's motion to seal in view of Swan's continuing position that Proton's participation in litigation waives its right to compel arbitration. However, Proton notes that regardless Swan must meet its burden to seal that document in whole or in part, and certainly most—if not all—of the information in the document does not meet the standard for sealing given the vague and general nature of the descriptions of the alleged trade secrets. The fact that the document has been public for more than two months further demonstrates that those specific portions of Swan's Trade Secret Identification are not "specific enough" to be deemed confidential trade secrets. *See, e.g., M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, No. SACV1900220JVSJDEX, 2019 WL 4284523, at *2 (C.D. Cal. June 11, 2019) ("Further, although not dispositive, "'[t]he fact that [the plaintiff] publicly filed its trade secret disclosure belies the proposition that it contains information specific enough to be considered 'confidential' trade secrets.' " (quoting *Gatan, Inc.*, 2018 WL 2117379, at * 4)).

allegations satisfied § 2019.210." *Albert's Organics, Inc. v. Holzman*, 2020 WL 4368205, at *3 (N.D. Cal. July 30, 2020) (citing *Gatan, Inc. v. Nion Co.*, 2018 U.S. Dist. LEXIS 77735, at *6 (N.D. Cal. May 8, 2018)); *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, No. SACV1900220JVSJDEX, 2019 WL 4284523, at *4 (C.D. Cal. June 11, 2019) ("[T]he inquiry on a motion to dismiss differs from the inquiry under Section 2019.210."); *Gatan*, 2018 U.S. Dist. LEXIS 77735, at *5-6 (explaining that court's order on motion to dismiss "did not prejudge whether plaintiff's trade secret allegations satisfied § 2019.210").

Swan also wrongly argues Defendants[14] somehow admitted its Trade Secret Identification was sufficient by withdrawing its objection on that basis to certain of Swan's discovery requests. That is baseless. Defendants withdrew that objection to an initially limited set of discovery requests—not because the Trade Secret Identification disclosure was sufficient, but because the initial set was more narrow than the broad discovery in the second set, and Defendants agreed to withdraw the 2019.210 objection in an effort to compromise. Swan's assertion that Defendants thereby conceded the sufficiency of the Trade Secret Identification is simply wrong. In fact, Defendants have consistently argued that the disclosure was inadequate and

---

[14] Notably, Swan's motion groups all Defendants together throughout its brief, which is improper given that this motion to compel is directed solely at Proton. Indeed, the Court has stayed the case against the Individual Defendants and also expressed concern as to any rulings that may impact the rights of those Defendants, as they are not currently active or able to respond. *See* Ex. 13, June 13, 2025 Hr'g Tr. at 5:9-17 ("With regard to the request for the temporary restraining order, Swan's claims against Proton -- specifically the trade secret misappropriation, tortious interference, aiding and abetting, breach of duty of loyalty, and unfair competition claims -- implicate the individual defendants' involvement and the claims against the individual defendants, and because of the mandatory stay that is in place pursuant to the *Coinbase* case, the Court cannot issue an order that affects the individual defendants' rights.") Swan appears to intentionally disregard that concern through this motion by addressing its Trade Secret Identification sufficiency arguments as to *all* Defendants—a ruling on which necessarily impacts Individual Defendants' rights.

reserved their right to challenge to the disclosure's adequacy throughout this case, including with respect to Swan's subsequent discovery sets.

And contrary to Swan's claims, Proton is not contending that Swan needs to "define every minute detail" of its purported trade secrets or that the court needs to hold a "miniature trial on the merits of a misappropriation claim." Proton merely seeks Swan to comply with the *basic* purpose and requirements of § 2019.210 and to define its trade secrets clearly before full discovery and any trial commences. Swan fails to do that here. *Cf. Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005) (while acknowledging "absolute precision" is not required, nonetheless requiring "reasonable particularity"; finding sufficiency where plaintiff "described how it believes the combination of [alleged trade secrets] distinguish the alleged trade secrets from the prior art, or matters within the general knowledge of persons in the [relevant] industry").

## 2. Swan Mischaracterizes Proton's Arguments in this Action.

Swan's attempt to dismiss Defendants' arguments as irrelevant "merits-based objections"—such as lack of independent economic value or ownership—mischaracterizes the record and misunderstands the purpose of Section 2019.210. For one, the Court's scheduling order in this case specifically requires Swan's Trade Secret Identification to provide a "description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public." ECF No. 95 at 6. It fails to do that, as described below. And as for any Section 2019.210 argument as to ownership, the only argument Proton previously made in connection with the Trade Secret Identification regarding ownership was that the name of one of Swan's documents (referencing third-party 2040 Energy) suggests the trade secret did not even belong to Swan; as such, Swan has not sufficiently identified how this is something that it derives value due to it being kept secret

Proton merely seeks a disclosure that meets the statutory purpose: to delineate the claimed trade secrets with enough clarity to allow meaningful discovery and enable Proton to prepare its defenses. *See Perlan Therapeutics, Inc.,* 178 Cal. App. 4th at 1343. That obligation exists independent of whether the asserted trade secret ultimately satisfies the elements of a misappropriation claim. Swan's failure to identify its trade secrets with sufficient specificity deprives Proton of the ability to understand what, exactly, it is accused of misappropriating—a threshold problem under Section 2019.210.

Plaintiff's contention that Defendants' ability to raise defenses somehow proves that its Trade Secret Identification is sufficient is both illogical and legally unsupported. As a general mater, what Swan has identified as "trade secrets" are a collection of broad categories and concepts. Recognition of these broad categories does not resolve the fact that they are devoid of actual, specifying detail to delineate the scope of the claimed trade secrets. That Proton is required to defend itself does not mean it has been given adequate notice of what it is defending against. And merely asserting merits-based defenses (which are not at issue in this motion and were raised to preserve Proton's rights) cannot possibly waive Proton's separate argument that Swan has failed to meet its burden under Section 2019.210. The one case Swan cites for that suggestion does not hold otherwise. In *Pinkerton Tobacco v. Kretek Int'l*, No. CV 20-8729 SB (MRWX), 2021 WL 4928024, at *2 (C.D. Cal. July 14, 2021), the Court explained that defendants appeared to understand one of plaintiff's alleged trade secrets where they argued only that the disclosure stated basic information recognized by the industry and made public by the plaintiff. Proton's argument that Swan fails to include the requisite elements of its 2019.210 disclosure as required by the court—and any separate merits-based arguments relating to ownership or economic value—indicates no such understanding.

At bottom, Swan must still delineate what is protectable from what is generally known or readily ascertainable. And its continued failure to do so leaves

1   Proton to guess at the scope of its claims—something California law expressly
2   prohibits.

3       **3.   Swan Fails to Meet the Particularity Standard Required**
4              **for Its Trade Secrets.**

5       Swan's attempt to downplay the required level of specificity under Section
6   2019.210 by claiming its trade secrets relate to a "nascent" field of bitcoin mining
7   is unavailing.  Bitcoin mining has been around for more than 15 years—it is only
8   nascent to Swan.  The suggestion that it is so new that there are not "established
9   'preexisting practices' in that field" from which Swan's must distinguish its alleged
10  trade secrets is disingenuous.  And Swan does not, as it asserts, disclose any
11  "███████████████████████████" in any meaningful way to
12  allow Proton to determine how is different from what may be publicly known or
13  done at any other bitcoin mining site in the ordinary course of business.  *See Gatan,*
14  *Inc. v. Nion Co.*, No. 15-CV-01862-PJH, 2018 WL 2117379, at *3 (N.D. Cal. May
15  8, 2018) (holding that trade secret designation was insufficient where, *inter alia*,
16  "many of [plaintiff's] designations could include not only any of [the] spectrometer
17  data [at issue] but also any company's spectrometer data.").[15]

18      Moreover, it cannot reasonably be argued that bitcoin mining is not a
19  specialized field.  And California courts have made clear that where trade secrets
20  involve incremental improvements in a specialized field—particularly where the
21  general subject matter is already publicly known—a heightened level of
22  particularity is required.  *See Perlan Therapeutics, Inc.*, 178 Cal. App. 4th at 1349;

23  _____

24  [15]  Swan's citation to *STEMCELL Techs. Canada Inc.*, 2022 WL 585668, does not
25  change the analysis here.  There, the court found that defendant's challenges were
    not to the sufficiency of the disclosure, but as to whether they were trade secrets at
26  all or other merits arguments.  *Id.* at * 5.  And, even in *STEMCELL*, the court
27  recognized that a plaintiff must provide adequate detail so that a defendant can
    ascertain how they might differ from what is already known in the field.  *Id.* at *6-
28  7.

*Loop AI Labs Inc.*, 2015 WL 5158639, at *2; *Alphonso*, 2022 WL 17968081, at *4.[16]  Swan's assertion that it need not provide further specificity because it is not claiming a "product design" or "technical engineering" is a red herring.  In particular, it purports to claim ████████████ (i.e., BNOC) in a blockchain mining environment, which unquestionably require particularized disclosure. In any event, Plaintiff cannot evade its burden to supply a sufficient disclosure by summarily characterizing its alleged secrets as a mere "recipe" of "████████████."  Notably, Swan's own 2019.210 disclosure does not identify which, if any, of its alleged trade secrets are considered part of this "recipe" or which are standalone trade secrets.  Its effort to now recast its trade secrets in this motion as one big combination trade secret does not render its 2019.210 disclosure sufficient. That Swan now feels compelled to clarify the scope of its trade secrets in this brief only further highlights the insufficiency of the original disclosure. *Accord Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-04519 WHA, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014) ("A true trade secret plaintiff ought to be able to identify, up front, and with specificity the particulars of the trade secrets without any discovery.").  Proton should not be forced to piece together the scope of Swan's

---

[16] Swan fails to distinguish *Alphonso* and *Advanced Modular*.  In *Alphonso*, the plaintiff similarly claimed general categories of "proprietary" business trade secrets that did not specify the actual details of what constitutes those trade secrets or rendered them unique and different than common business practices and goals. Notably, the court found three trade secrets *adequately* disclosed, including underlying algorithms for certain alleged tools, "field names and definitions" used in a claimed database, and "specifically listed approaches for using information stored in data fields. 2022 WL 17968081 at *5. Swan does not provide such specificity.  Moreover, *Advanced Modular* stands for the principle that "the degree of particularity that is reasonable will differ" depending on the "alleged trade secrets at issue."  While the court indicated that it dealing with a highly specialized field, And the sufficiency of the disclosure did not turn on the mere age of the industry at issue but on the fact that credible experts declared they were capable of understanding the designation. 132 Cal.App.4th. at 836. Swan has presented no such expert opinion here.

claims from scattered arguments in briefing.

Setting aside whether Swan must provide a heightened level of particularly for any or all of its alleged trade secrets, Swan effectively ignores the core requirement that a trade secret must be distinguished from general knowledge, not merely described in vague or high-level terms. As courts have repeatedly emphasized, the disclosure must delineate what is protectable from what is generally known or readily ascertainable. *Perlan Therapeutics, Inc.*, 178 Cal. App. 4th at 1351. For example, Swan appears to be asserting portions of 2040 Energy's hosting agreement are trade secrets (*see* Trade Secret Nos. 1, 4-13). Hosting contracts are readily available on the Internet, and bitcoin mining companies have been entering into contracts for years, data warehouse sites for much longer. Without question the vast majority of the "terms" of such contracts are known in the industry. Swan should be required to identify what portions of these contracts contain Swan's purported secret sauce.[17] The obligation to describe a trade secret with "reasonable particularity" applies regardless of whether the subject matter is highly technical, scientific, or rooted in business strategy. Swan's vague disclosure fails by any standard.

### 4.  Swan's References to Entire Documents Do Not Cure Its Deficient Disclosure.

Swan's reliance on citations to documents in its Section 2019.210 disclosure does not remedy its failure to describe the alleged trade secrets with reasonable particularity. Plaintiff claims it properly references a small number of documents that are "illustrative" of its trade secrets. But this "example" approach is, itself, problematic and introduces ambiguity and uncertainty, leading to inadequate identification of any purported trade secret. *Cf. Gatan, Inc.*, 2018 WL 2117379, at

---

[17] Swan appears to concede that the alleged contracts contain public elements (such as choice of law and merger provisions). Proton should not be expected to have to guess which clauses Swan claims are its proprietary trade secrets and which are not.

59

*4 (N.D. Cal. May 8, 2018) (holding that "[plaintiff's] use of catchall words such as 'including' weighs against a finding that the designation satisfies § 2019.210 because it does not <u>clearly refer</u> to tangible trade secret material." (emphasis in original)).  And, as described in more detail below, Swan does not describe what portion of any document contains protectable information.  Instead, it points to documents wholesale—many of which are inaccessible to Proton due to "Attorneys' Eyes Only" designations.  Proton cannot determine, and should not be expected to guess, what within these documents constitutes the claimed trade secret, or which elements are already publicly known.  Courts have consistently rejected this type of "just look at the documents" approach. *See Perlan*, 178 Cal. App. 4th at 1351 (disclosure improper where it required defendant to "cull through the documents and guess"); *Alta Devices, Inc. v. LG Elecs., Inc.*, No. 18CV00404LHKVKD, 2019 WL 176261, at *3 (N.D. Cal. Jan. 10, 2019)  ("[Plaintiff] must amend its disclosure to identify these trade secrets with reasonable particularity, with or without reference to a separate document.").  Plaintiff's attempt to further justify this by claiming that Defendants "must know what they stole" is circular and improper.  *Id.* (affirming trial court's rejection of plaintiff's conclusory arguments, inter alia, that defendants "know what they took" and thus were "clearly on notice of what it is that [plaintiff was] claiming is a trade secret").  Defendants are entitled to fair notice of the claims against them—not a reverse-engineering exercise based on materials they allegedly once handled.

Swan's reliance on *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898 (N.D. Cal. 2023), is misplaced.  In *Beluca*, the a court denied a motion to dismiss because a complaint sufficiently pled a trade secret claim.  660 F. Supp. 3d at 908.  As explained above, section 2019.210 is a much more exacting standard. *Albert's Organics, Inc,* 2020 U.S. Dist. Lexis 135492 at *6 (distinguishing motion to dismiss standard from whether allegations satisfy section 2019.210 and citing

*Gatan, Inc. v. Nion Co.*, No. 15-cv-01862-PJH, 2018 U.S. Dist. LEXIS 77735 (N.D. Cal. May 8, 2018)).

And Plaintiff's effort to distinguish *M/A-COM Tech. Solutions, Inc. v. Litrinium, Inc.*, No. 8:19-cv-00220, 2019 WL 8108729 (C.D. Cal. Sept. 3, 2019), fails. There, the court rejected plaintiff's attempt to rely on documents and broad descriptions to satisfy § 2019.210.  *Id*. at *4. The same is true here.  Swan tries to get around *M/A-COM* by claiming that they only cited a handful of documents versus "voluminous" documents.  But referring to the volume of documents cited— whether five or fifty—misses the point and ignores the rationale underlying the Central District's holding in *M/A-COM*.  By Proton's count, Swan cited to at least 35 separate documents or files as illustrative of the alleged trade secrets without identifying the specific protectable content in each such document or distinguishing it from public or non-proprietary information.  Swan also attached as an Exhibit to the Amended Complaint a purported list of thousands of files that Swan claims Defendants took, without identifying which specific documents or parts of documents it claims are trade secrets.  ECF No. 100-1 Ex. G.  These issues are precisely what *M/A-COM* was concerned about.  Such references "do[] not provide an adequate substitute for detailed information of the trade secrets, as a review of the documents may not provide Defendants sufficient information to identify what precisely Plaintiffs are asserting as a trade secret."  *Id.* at 4.

Likewise, Swan's attempt to distinguish *Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*, No. 21-cv-03752-VC, 2021 WL 5197215 (N.D. Cal. Nov. 8, 2021), fails. Swan notably ignores that the Court in *Carl Zeiss* explained that, while a [plaintiff] may "cite to and incorporate portions of documents in its trade secrets disclosure without reproducing the text of those documents," which Swan does not do, "it may not simply refer to a document in its entirety as 'including' trade secrets, without specifying what the trade secret is."  Swan fails to do the latter for the

reasons discussed throughout Proton's argument.  The issue is what within those documents is claimed as proprietary.  Simply pointing to a document and asserting that it contains a trade secret is not enough.

Finally, Swan's suggestion that it need not provide a sufficient disclosure because Defendants must somehow know what they allegedly "stole" is entirely improper.  It is Swan's burden—not Proton or the other Defendants'—to properly define the contours of `Swan's purported trade secret under Section 2019.210. This is particularly true here where the trade secrets at issue relate to a joint venture, 2040 Energy, that Proton continues to work for.  Simply alleging "everything you took" was a trade secret and you know what you stole, while never enough, is particularly insufficient here.  A sufficient disclosure must delineate the alleged trade secret Swan claims it owns—not assume Defendants already know what it is.  Defendants should not be forced to guess their scope.  In any event, Swan has never permitted access to Defendants to see the purported Trade Secret Identification or related documents.  So, defending its insufficient disclosure by claiming that "Defendants do not claim not to know what these documents are" is illogical.

### 5.   Swan Mischaracterizes Defendants' Attempts to Discern the Vaguely Disclosed Trade Secrets and Proton's Exercise of its Rights.

Throughout its portion of this brief, Swan repeatedly argues that Defendants' April 15 letter somehow demonstrates that Swan has defined its trade secrets with sufficient particularity.  Yet in response to the April 15 letter, Swan squarely told Defendants that their understanding of Swan's trade secrets was wrong, stating "Swan disagrees with how Defendants' April 15 letter characterizes Swan's trade secret identification." Ex. 11.  It makes no sense for Swan to contend that the April 15 letter demonstrates Defendants accurately understand what information Swan intends to claim as its trade secrets and that Defendants' characterizations in the

1  letter are wrong.

2          Indeed, the April 15 letter was a good faith attempt by Defendants to clarify

3  the vague trade secrets Swan claims in its Trade Secret Identification based on

4  Swan's arguments in the joint statement regarding Swan's first set of discovery

5  requests.  While the Court's order directs Swan to include background information

6  in its Section 2019.210 disclosure, the Court's Order specifically requires that the

7  substance of Swan's *actual trade secrets* be set forth in a "numbered list of each

8  trade secret at issue, including a summary of each trade secret, and specific elements

9  that define each trade secret (and if appropriate, elements that distinguish the

10 claimed trade secret from similar and more broadly known technologies)."

11 Consistent with the Court's order, at the parties' initial meet and confer on its Trade

12 Secret Identification, Swan confirmed that the description and boundaries of its

13 alleged trade secrets were set forth specifically in subsection (d), "Trade Secret

14 Elements," of each of the twenty trade secrets—and that Defendants' criticisms of

15 statements in the background and summary sections of the Trade Secret

16 Identification were therefore misplaced.

17         However, Swan later changed positions after realizing that the statements of

18 "Trade Secret Elements" contained in the Trade Secret Identification were too

19 general and vague to constitute an identification of trade secrets satisfying the

20 Court's order and Section 2019.210.  In an attempt to cure this defect (while

21 attempting to avoid being bound to narrower trade secrets by including them in the

22 "Trade Secret Elements" portion of the Section 2019.210 disclosure), in its initial

23 joint stipulation on this issue, Swan cherry-picked portions of Swan's background

24 sections to defend the specificity of its disclosure and even added more specificity.

25 ECF No. 176-1.  Swan also characterized its trade secrets in that motion in ways

26 that attempt to narrow and clarify the trade secrets from the nebulous and vague

27 disclosures that were previously made.  The Defendants' April 15 letter was an

28 attempt by Proton to confirm that Swan's trade secrets are narrowed as Swan has

represented them to the court. Swan squarely rejected this. Ex. 11. Swan should be held to these more concrete formulations of its trade secrets in order to carry out the purpose of this Court's order and Section 2019.210. And if Proton's attempt to clarify the trade secret disclosures was not accurate, Swan should have advised why such clarifications are not accurate. Swan instead did the opposite—it rejected Proton's attempt to clarify and relied instead on its vague and general descriptions in an effort to give it maximum flexibility later to morph its trade secret claims based on what it uncovers in discovery, in direct violation of the letter, spirit and intent of Section 2019.210.

Similarly, Swan attempts to twist Proton's exercise of its rights and conferral on discovery issues as delay that somehow relieves Swan of its requirement to describe its trade secrets with particularity. To narrow the disputes, Proton has supplemented its responses and agreed to produce documents in response to Swan's initial discovery requests, supplemented its responses to Swan's second set of requests and agreed to search for and produce documents in response to dozens of those requests, and attempted to clarify Swan's trade secret disclosures in hopes of resolving this dispute. Yet Swan has attempted to use Proton's engagement on Swan's discovery as evidence of waiver of Proton's right to compel arbitration and an excuse for insufficient trade secret disclosures. The Court should assess Swan's disclosures on their face, which as explained above and below are deficient.

### 6.    Each of Swan's Trade Secrets Is Insufficiently Disclosed.

Many of the trade secrets in Swan's 2019.210 disclosure suffer from similar deficiencies:

- For all of Swan's Trade Secrets, Swan does not sufficiently (or at all) specify what elements of the trade secret are public domain (if any).
- For Trade Secrets 1 and 4-13, Swan's disclosure is vague as to whether the trade secrets consist of Swan's ████████████████████████ ████████████████████████████████████████

- For Trade Secrets 1, 2, 4-13, 14, 17, and 20, Swan fails to specify what ████████████████████████████████████████ it claims as elements of those trade secrets.

- For Trade Secrets 2, 3, 15, 18, and 20, Swan introduces elements of the trade secrets using the open-ended catch-all phrase "including."

- For Trade Secrets 1, 3, 4-13, 15, 16, 17, 18, and 20, to the extent that some or all of the elements are public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.

- For Trade Secrets 1 and 4-13, Swan fails to comply with the Court's order requiring a "description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public." Instead, Swan merely applies conclusory logic that knowing the trade secrets would allow a company to perform better and scale more quickly without explaining how.

- For Trade Secrets 1, 2, 4-13, 15, 16, 17, 18, 19, and 20, Swan claims that the trade secrets are identifiable in ████████████████ ████████████████████████. In many cases, Swan does not specify what documents contain information disclosing the trade secret, nor does Swan identify in what portion of those documents information disclosing the trade secret exists.

In addition to the general deficiencies identified above, Defendants address the specific deficiencies of each claimed trade secret in turn below.

(a)    Trade Secret 1.

Swan claims its first purported trade secret regarding "Site Selection and Optimizations" to be " ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ." ECF No. 111-1 at 8 (elements section of Swan Trade Secret 1 disclosure).  Swan's disclosure for the "Site Selection and Optimizations" trade secret suffers from numerous flaws.

*First*, Swan's disclosure in the elements section is vague and ambiguous in numerous respects rendering it impossible to distinguish those elements from matters of general knowledge in the bitcoin mining industry or of special knowledge of those persons skilled in the trade.  *See Imax*, 152 F.3d at 1167 (emphases in original) (finding insufficient specificity in trade secret description because "it does not *clearly refer* to tangible trade secret material"); *Glob. Protein Prods., Inc. v. Le*, 42 Cal. App. 5th 352, 367 (2019) ("[W]idespread publication of a purported trade secret extinguishes the trade secret."); *see also Perlan*, 178 Cal. App. 4th at 1351-52 (finding trade secret identification insufficient because it did not clearly segregate the trade secrets from information available to the public by explaining "'how' its alleged trade secrets were novel").  Trade secrets cannot be simply characterized as ideas or facts without more; the "*information* tending to communicate (disclose) the idea or fact to another" must be identified.  *See, e.g.*, *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010), *as modified on denial of reh'g* (May 27, 2010), and *disapproved of on another ground by Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 246 P.3d 877 (2011).  For example, in *Silvaco*, the California Court of Appeal found that a trade secret disclosure describing a "proprietary method" of carrying out a function "apparently in an unusual way, which 'contribute[d] [to] performance and accuracy improvements'" failed to "describe a trade secret." *Id.*  Plaintiff attempted to characterize various

66

aspects of the underlying design as the trade secret.  *Id.*  The court held that the disclosure failed to identify *information* about the design, but instead identified the design itself, and therefore did not identify a protectable trade secret.  *Id.*

Here, while Trade Secret 1 appears to be made up of several "elements," Swan states each element with insufficient particularity such that it is impossible to distinguish between them and matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade.  *See Brescia*, 172 Cal. App. 4th at 144 (citing *Diodes*, 260 Cal. App. 2d at 253).  For example, with respect to the "███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████ and how each of these is somehow unique to Swan and not matters of general knowledge within the industry.  *Imax*, 152 F.3d at 1167 (catchall phrase "including every dimension and tolerance that defines or reflects that design" rendered description insufficient).  Moreover, as to the "████████████████ ██████" element, Swan does not make clear whether Swan claims that the trade secret is Swan's negotiation techniques for ████████████ (or what those techniques are), ██████████████████████, or a combination of ████████████ that should be included in its contracts.  Nor does Swan identify what specific ████████████ it requires in its contracts what actual ██████ it identifies to be trade secret (or whether the few provisions its mentions in the Background section are exhaustive),[18] or how

─────────────

[18] To the extent the list of ██████ is non-exhaustive, the disclosure fails to provide the bounds of the trade secret, and therefore it is insufficient.  *E. & J. Gallo Winery v. Instituut Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *5 (E.D. Cal. June 19, 2018).

those are different what was is generally done in hosting agreements.[19]    Proton cannot effectively challenge the validity of this trade secret without knowing what it even is that Swan is claiming here or how it differs from what any other mining company may do in ███████████████████████████████. —which are common mining business practices and goals.  *See, e.g.*, *Alphonso Inc.*, 2022 WL 17968081, at *4 (N.D. Cal. Oct. 31, 2022) (holding that trade secret disclosure surrounding advertising strategies to extend "reach and frequency" was insufficient as those were "likely common goals for most businesses, particularly those in the advertisement field, and it is unclear how [plaintiff's] technology achieves its goal of "identifying users" beyond what already exists."). And ultimately, such broad, general terms allow Swan to backfill its actual trade secrets following discovery.

> **Second**, Swan's own arguments show that the elements of Trade Secret 1 are insufficient.  Notably, in defense of its Disclosure, by importing description from the Background section, Swan implicitly recognizes that it must provide a more concrete definition of its trade secrets than what it had previously disclosed.  For example, in Section III.C.7.a above, Swan asserts that "TS 1 lays out the overall criteria that Swan uses to evaluate and run Bitcoin mining sites."  However, all of the criteria come exclusively from Swan's Background section for Trade Secret 1. *Compare supra* Section III.C.7.a *with* ECF No. 111-1 at 1(a). Nothing in the disclosure identifies which items or information mentioned in that Background, if any, constitute part of Trade Secret 1.  Because Swan failed to specify which statements in its background section are part of its disclosure of trade secret

---

[19] In the Background section of Trade Secret 1, Swan indicates that its favorable ████████████████████████████████████████████████████████████████ ██████████████████████████████."  Even assuming that material constitutes part of the claimed trade secret, as discussed below, Proton cannot possibly challenge the merits of this trade secret or distinguish this from what is generally known or done in similar hosting deals without further details here.

elements, it is impossible to glean what exactly from that background section is part of the trade secret and what information ultimately constitutes the trade secret. *See generally Silvaco*, 184 Cal. App. 4th at 221.

Regardless, even if incorporating such Background material, the Trade Secret Identification is insufficient. For example, the Background section of Trade Secret 1 uses open-ended language (*i.e.*, using the word "including") claiming that Swan ███████████████████████████████. But Swan does not specify in the Background or elsewhere in the disclosure whether its claimed ████████ consist of any, some, or all of those ████████. Nor does Swan make clear that the ████████ it discusses in the Background section are exhaustive. Swan's description simply states that its employees ████████████████, but never explains what those steps are or how they are different from publicly available information.[20] It also states that it obtains "████████████████" but never explains what those terms are or how they can constitute a trade secret—or if Swan had some kind of proprietary process for ████████████ that it claims is a trade secret.[21] This renders it impossible for Defendants to identify what information Swan claims is part of the trade secret.

Further obfuscating the scope of alleged Trade Secret 1, Swan claims that Background section identifies various documents and categories of documents that allegedly "capture" ██████████████████████████████████████ ████████████████. *See* ECF No. 111-1 at 6-7. But Swan does not provide

---

[20] Even if Swan's so-called "blueprint" was made up of the items addressed in the Background Section for any of the Trade Secret 1 elements, the parameters of this alleged trade secret would still be insufficiently disclosed.

[21] Above Swan argues "TS 1, element (d), makes no reference to a "proprietary process for obtaining favorable terms. . . , [t]herefore, that is not part of TS 1." But that again is the problem with using sections outside the elements to selectively supplement the elements section (as Swan has done); Proton has no way to identify the precise bounds based on the disclosure.

a full list of those documents, much less describe what is in them that constitutes a trade secret.  Further, Swan cryptically states that the ███████████████████ ████████████████████ (*id*. at 7) is secret[22] but never explains what those supposedly secret and valuable strategies are.  Simply claiming to have provided details in the Background section of the trade secret disclosure is insufficient because those details are not incorporated or indicated as actually being the trade secret information itself.   And, where it is unclear what parts of a disclosure constitute the claimed trade secret, a disclosure is inadequate.  *E.g.*, *Alphonso*, 2022 WL 17968081, at *3-4 (staying discovery and finding disclosures inadequate in part because it was unclear what portions of the disclosure constituted the trade secret); *M/A COM Tech.*, 2019 WL 8108729 at *3-4 (finding a disclosure inadequate because, *inter alia*, it "includes large amounts of surplusage[ and] broad and vague descriptions of trade secrets").[23]

Swan's argument above further exemplifies the problem with Swan's selective use of additional material to supplement the trade secret elements it identified.   For example, in defending Trade Secret 1, Swan argues that "[Defendants'] April 15 letter details *some* of the most important criteria of TS 1, *such as* ██████████████████████████████."  Section III.C.7.a (emphasis

---

[22] As explained above, to the extent that any of the trade secrets in the disclosure are purportedly Swan's information, that information was necessarily also disclosed to 2040 and Tether.

[23] Based on its argument, Swan appears to claim the trade secret is a "combination" trade secret and is not claiming any particular █████████████████████████ ██████████████████████ within Trade Secret 1.  But that does not save its disclosure for the reasons addressed.  Nor does Swan appear to be claiming as a trade secret a particular process for identifying the ████████████ ████████████████. To the extent Swan does, in fact, claim any particular aspects of a process, such information must be identified in its Trade Secret Identification as part of the "specific elements that define [the] trade secret."  ECF No. 111-1 at 6.

70

1  added).  But what are the other criteria and are those criteria limited only to what

2  appears in the background section?    Similarly, Swan argues that Defendants

3  recognize that the "███████████████████████" "████████████

4  ████████████████████████."  *Id.* (emphasis added).  But again, because

5  Swan uses the word "include," it is not possible to know whether Swan is limiting

6  the optimizations to just those four.    Swan's lack of specificity is similarly

7  exemplified by the fact that—above—its arguments defending Trade Secret 1 are

8  combined with its arguments defending Trade Secrets 4-13.  This appears to be a

9  clear strategy of attempting to insert specific facts about each site into Trade Secret

10  1 in order to further obfuscate the deficiencies of Trade Secret 1.

11     ***Third***, setting aside Proton's inability to identify how Swan's purported

12  Trade Secret 1 differs from what is generally known in the field, to the extent that

13  some or all of the elements are in the public domain (which is likely given the

14  generic categories Swan claims in the "Trade Secret Elements" section of Trade

15  Secret 1), Swan also fails to specify whether it is the combination of public elements

16  together that make the unified combination of approaches and/or information that

17  makes the combination a protectable secret.  *O2 Micro Int'l Ltd. v. Monolithic*

18  *Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1090 (N.D. Cal. 2006), *aff'd*, 221 F. App'x

19  996 (Fed. Cir. 2007). Swan previously argued that *O2 Micro International Ltd.*, 420

20  F. Supp. 2d 1070, supports Swan's position that the combination of elements it

21  alleges is a trade secret.  ECF No. 176-1 at 29.  Swan misunderstands Proton's

22  objection.    Proton does not contest that, under *O2*, a unified combination of

23  elements can make a trade secret.  But Swan's trade secret elements as written does

24  not identify whether it is claiming a unified combination of elements as the trade

25  secret or some other permutation of the elements.

26     Swan's attempts to undermine the other cases Proton relies upon fail.  ECF

27  No. 176-1 at n.9, 27-28.  Swan first contends that the *InteliClear, LLC v. ETC Glob.*

28  *Holdings, Inc.*, 978 F.3d 653, 664 (9th Cir. 2020), and *Imax Corporation v. Cinema*

*Technologies, Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998), are inapposite because they are summary judgment cases and involved less detailed disclosures. Section III.C.1.a, *supra*. But, in fact, Swan's trade secret elements—"██████████ ████████████████████████ ████████████████████████ ████████████████████████"—are even less detailed than the disclosures at issue in those cases. *See InteliClear*, 978 F.3d at 658-59 (emphasis added) (explaining the disclosure "outlined the *specific* tables, table columns, account identifiers, codes, and methodologies InteliClear claimed as trade secrets"); *Imax*, 152 F.3d at 1166 (emphases in original) (internal citation omitted) (explaining the disclosure included, e.g., "the design of the cam unit, *including every dimension and tolerance that defines or reflects that design*"). And the fact that those cases were summary judgment decisions does not make them irrelevant. Courts evaluating the adequacy of disclosures pre-discovery often look to opinions from other case stages for guidance. *E.g.*, *Swarmify*, 2018 WL 2445515, at *2 (citing *Imax*, 152 F.3d at 1164-65) ("[W]hile *Imax* did not explicitly discuss Section 2019.210, it applied the core principle codified therein."); *Gatan*, 2018 U.S. Dist. LEXIS 77735, at *8-9 (relying on *Imax*, a summary judgment decision, in concluding that disclosures were insufficient).

Swan also contends that it is not required to establish independent economic value and that this court's decision already held that Swan satisfied this requirement. ECF No. 176-1 at 29-30. But, as already discussed, the Court's order on Proton's motion to dismiss did not dispose of this issue. ECF No. 176-1 at Section IV.C.2. And in arguing that it is not required to establish independent economic value, Swan misleadingly excerpts a portion of *Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 8820180, at *13 (N.D. Cal. Aug. 24, 2021), that explains under Section 2019.210 that a disclosure need not illustrate how the plaintiff derives independent economic value from secrecy. But Swan conveniently failed to include the *Wisk* court's far

more relevant language which explains that independent economic value must be disclosed ***where the court has issued an order requiring such as a matter of case management*** (*id.*), as is the case here. *See* ECF No. 95 at 6 (requiring trade secret identification statement to provide a "description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public").

Here, Swan's disclosure addressing economic value is essentially conclusory. Swan states only that if its trade secrets were known, then other companies would be able to be successful because they would be able to produce more bitcoin. ECF No. 111-1 at 7. This does not explain how Swan's secrets allow it to produce more bitcoin, and therefore does not explain why competitors would be able to produce more bitcoin simply by knowing the information as opposed to not knowing it. To the extent Swan argues that the secrecy of the trade secrets is valuable because if known, they allow competitors to scale more quickly, that too is conclusory because Swan fails to describe why that would be the case (*i.e.* what amount of time or resources it took to develop the trade secrets or what amount of time or resources it would take competitors to scale with the trade secret versus without).

For all of these reasons, the identification of Trade Secret 1 is insufficient and non-compliant with this Court's Order.

(b)    Trade Secret 2.

Swan claims its "Site Rejection" trade secret is " ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ " ECF No. 111-1 at 9 (element section of Trade Secret 2 disclosure). This, too, is insufficient.

*First*, Swan's claims "████████" as an element, but the disclosure fails to identify any information detailing the actual ████████████████████████ ████████████████████████. At Section III.C.7.b., above, Swan again relies upon the background section to bootstrap detail into its elements arguing that ████████████████████████████████ ████████████████████. Swan thus recognizes that it must provide a more concrete definition of its trade secrets than what it previously disclosed by making explicit in its identification of elements what selection criteria make up that ████████. Accordingly, based on Swan's current argument, Defendants understand that Swan is claiming only the selection criteria it discusses for Trade Secret 1 as its ████████. (Even if permitted to incorporate Trade Secret 1 by reference, because Trade Secret 1 is insufficiently particular, Trade Secret 2 remains insufficient.)

To the extent Swan claims that any "████████" underlying those decisions is a trade secret, Swan fails to specify information explaining what that "████████" is, and why it would not be a matter of general knowledge in the trade or of special knowledge of those persons skilled in the trade inappropriate for trade secret protection. *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1018-19 (E.D. Cal. 2011) (noting that, when separated from information about them "[i]deas or concepts are not [in it of themselves]. . . trade secrets," noting that "[p]roprietary ways of doing the same thing that others in the same filed do are not trade secrets," and concluding a Section 2019.210 disclosure describing "process flows and interfaces that would be needed to built" was not specific enough to discern the nature of the trade secret). Any such information must be disclosed in the Trade Secret Identification as a specific element of the trade secret.

Swan argues that it is not required to show that the "████████" that makes up part of its alleged trade secrets is not generally known to the public, citing *Perlan Therapeutics, Inc.*, 178 Cal. App. 4th at 1351, and *Agency Solutions.Com,* 819 F. Supp. 2d at 1019. Section III.C.7.b., *supra*. It mischaracterizes both cases and

misses the point that in claiming "██████████" as an element of Trade Secret 2 without identifying the information that details what that ██████████ is, there is not enough disclosure to determine whether the information about that ██████████ is not generally known to the public. But Swan fails to ignore that Perlan recognized that "a more exacting level of particularity" may be required for certain trade secrets.

Next, Swan says that *Agency Solutions.Com* does not impose a requirement that a trade secret plaintiff parse out which elements are public knowledge. But again, Swan is wrong. *Agency Solutions.Com*, citing long-standing caselaw, held that plaintiff's disclosure was inadequate in part because it did not "provide any basis for a determination that the alleged secret is not a matter 'of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade.'" *Agency Solutions.Com*, 819 F. Supp. 2d at 1019; *see also Gatan*, 2018 U.S. Dist. LEXIS 77735, at *6-8 (finding trade secret designation insufficient under § 2019.210 where "many of Gatan's designations could include not only any of Nion's spectrometer data but also any company's spectrometer data" while "other designations are so vague that they could apply to any spectrometer").

Swan also attempts to distinguish *Gatan* on the basis that it did not involve a negative trade secret and that the disclosure was dissimilar to Swan's Trade Secret 2 disclosure. Specifically, Swan seems to argue that it is only claiming the ██████████ and therefore that ██████████ does not capture ██████████ that other companies might use to reject sites. The problem, however, is that there is not a discrete list of sites for this trade secret because Swan uses the open-ended "including" to introduce the sites, and therefore Swan's so-called ██████████ is not constrained by those particular sites. *See, e.g.*, <u>Alphonso Inc. v. Tremor Video, Inc.</u>, No. 22-CV-03629-NC, 2022 WL 17968081, at *3 (N.D. Cal. Oct. 31, 2022) ("These [catchall] statements are necessarily imprecise and incomplete because they suggest the existence of unenumerated trade secrets.").

1    Swan also argues it can be excused from having to explain what it meant by

2    the vague term "███████" because "Defendants were the ones that made the

3    decisions, and thus know the ████████." This "you know what you did"

4    justification does not excuse Swan of its burden to sufficiently identify its claimed

5    trade secrets. *See, e.g.*, *Perlan*, 178 Cal. App. 4th at 1339; *Alta Devices*, 2019 WL

6    176261, at *3-6 (ordering plaintiff to amend trade secret identifications which did

7    not meet the particularity requirement).

8    Second, Trade Secret 2 includes a list of sites that Swan purportedly ruled

9    out, but the list is introduced with the open-ended catch-all phrase "including."

10   This renders the disclosure inadequate because by preserving the ability to add sites

11   to the list, Swan has failed to adequately disclose (*i.e.* inform) Defendants of what

12   makes up the information it contends is protected as Trade Secret 2. *E. & J. Gallo*

13   *Winery v. Instituut Landbouw-En Visserijonderzoek*, 2018 WL 3062160, at *5 (E.D.

14   Cal. Jun. 19, 2018) (trade secret disclosures that use "catch-all phrases" like

15   "including" are inadequate). Swan contends that *E. & J. Gallo Winery* is

16   distinguishable because Swan uses "including" followed by the specific sites that it

17   is currently aware of. Section III.C.1.b, *supra*. But Swan did not specify in its

18   Trade Secret Identification that its list is currently exhaustive, as it apparently does

19   now in its motion; it simply used "including" prior to a list of Bitcoin mining sites.

20   Ex. B at 9. Swan also cites *Wisk Aero LLC*, 2021 WL 8820180, at *12, for the

21   proposition that it is acceptable to use "including" to state that example documents

22   are non-exhaustive lists. Swan, however, fails to include the very next sentence in

23   *Wisk*: "But the documents are examples of embodiments of the trade secret; they

24   are always preceded by the substantive description of each trade secret." *Id.* at *12.

25   Here, in contrast, "including" is not preceded by a substantive description of the

26   trade secret, but instead a sort of general summary or category of the trade secret.

27   Ex. B at 9 ("████████████████████████████████████████

28   ████████████████████████").

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1   Swan identifies its decision as a "negative trade secret."  It is questionable
2   whether a decision to not enter into a business relationship alone could qualify as a
3   trade secret.   While courts recognize "negative *know-how*" as a trade secret in
4   certain situations, that does not appear to be what Swan is claiming here.  *Calendar*
5   *Rsch. LLC, v. StubHub, Inc*., 2020 U.S. Dist. LEXIS 112361, at *26-28 (C. D. Cal.
6   May 13, 2020).  Such cases involve technical or scientific information where the
7   field is highly specialized and trade secrets are incremental variations.  For example,
8   "[a] clear case of negative know-how involves pharmaceutical manufacturing,
9   where avoiding previously failed formulas avoids the expense of costly research
10  and trials." *Id.* at *27.  For software, "negative know-how misappropriation require
11  specific examples of the failed code or product that defendants misappropriated."
12  *Id.*  Swan's trade secret—based on undisclosed ████████████████████████
13  ██████████████████████████████████████████████████████████
14  ██████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████████.
16  Unlike negative technical or scientific know-how that is based on concrete results,
17  these opinions could change over time for a variety of infinitely unidentifiable
18  factors, including changed economic environment, new risk tolerance, or increased
19  available capital for investment.
20              (c)    Trade Secret 3.
21  Swan claims its so-called "██████████████" trade secret is "████████████
22  ██████████████████████████████████████████████████████████
23  ██████████████████████████████████████████████████████████
24  ██████████████████████████████████████████████████████████
25  ██████████████████████████████████████████████████████████
26  ██████████████████████████████████████████████████████████
27  ██████████████████████████████████████████████████████████
28  ██████████████████████████████████████████████████████████

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1 ███████████████████████████████████████████████████████

2 ████████████" ECF No. 111-1 at 10 (elements section of Trade Secret 3 disclosure).

3 This disclosure is also inadequate.

4 　　*First*, Swan's asserted scope for this trade secret as identified in the elements

5 for the trade secret is unclear, as it does not state whether Swan claims it is the secret

6 ████████████████████████████████████████████████████████

7 ███████████████████████████████████████.[24]  It appears that

8 Swan intended it to mean the latter by asserting that the purported trade secret is

9 valuable from not being known because it helped Swan to avoid price hikes.  ECF

10 No. 111-1 at 10 ("████████████████████████████████████████████

11 ███████████████████████████████").

12 　　Swan's ambiguity matters because if it is the former and the secret purchase

13 itself that is the trade secret, this trade secret would not qualify for protection

14 because ███████████████████████ is irrelevant to any value to Swan from

15 keeping this secret from others going forward.  *See, e.g.*, *Buffets, Inc. v. Klinke*, 73

16 F.3d 965, 969 (9th Cir. 1996) (no trade secret where manuals had little value from

17 being kept secret); *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547,

18 568, 66 Cal. Rptr. 3d 1, 20 (2007), *as modified on denial of reh'g* (Sept. 21, 2007)

19 (emphases in original) ("In other words, the core inquiry is the value to the owner

20 in *keeping the information secret* from persons who could *exploit it to the relative*

21 *disadvantage of the original owner*.").  Indeed, Swan seems to agree that it is not

22

23 ────────────────

24 [24] While Swan uses Bitcoin mining jargon related to ASICs, hashing capacity, and
acquisition cost, that is a red herring; the hashing capacity and cost associated with

25 ASICs are not, themselves, trade secrets.  *See, e.g.*, *Swan Bitcoin Unveils Mining Unit*, SWAN, https://www.swanbitcoin.com/industry/swan-bitcoin-unveils-mining-

26 unit/ (last visited Apr. 18, 2025) (discussing hashing capacity and ASICs pricing)

27 (ECF No. 177-19); Bitfarms Ltd. 2023 Annual Information Form at 34 (discussing
ASICs purchasing practices) (ECF No. 177-20); Marathon Digital Holdings, Inc.

28 2023 Form 10-K at 9 (discussing ASICs purchasing strategy) (ECF No. 177-21).

the fact of the purchase itself that is secret, because it publicly announced this secret purchase in January 2024: "Zagury said that Swan Mining launched in stealth mode to avoid causing disruption in ASIC pricing and to develop a strategy of partnering with some of the best operators in the space." *Swan Bitcoin Unveils Mining Unit* (ECF No. 177-19).

The questionable merits of this alleged trade secret aside, if Swan contends that it is simply the fact of the purchases that is Swan's trade secret, it must identify that in the disclosure.

*Second*, in its various filings, Swan implicitly recognizes that using only the description it provided identifying the elements of Trade Secret 3 is ambiguous because it fails to specify whether it encompasses the fact of the purchase, the tactics used for the purchase, or both. For example, above Swan seems to try to fix its Trade Secret 3 disclosure by describing it with additional specificity than what is in its Trade Secret Identification; Swan states Trade Secret 3 "describes a secret initiative at Swan called "███████," which was ██████████████ ███████████████" allegedly using "██████████████ ███████████████" Swan thus now appears to be clarifying that it is indeed the fact of the purchase itself that is the trade secret and not any particular "███████████." Even with this clarification, Swan does not describe what "███████" it is referring to, and how those are not matters commonly known in the industry.

*Third*, to the extent that Swan contends that its trade secrets do include specific "███████████████," Swan must describe the actual "███████████" in sufficient detail to allow Defendants to know what Swan believes is a trade secret as distinguished from publicly available information and commonly ███████████. *Alta Devices*, 2019 WL 176261, at *2 (emphases in original) (internal citation omitted) (plaintiff must include "adequate detail to allow the *defendant* to *investigate* how [each asserted

trade secret] might differ from matters already known and to allow the court to craft relevant discovery"); *Perlan*, 178 Cal. App. 4th at 1351-52 (finding trade secret identification insufficient because it did not clearly segregate the trade secrets from information available to the public by explaining "'how' its alleged trade secrets were novel"). And while Swan can and should attach the ████████ to its Trade Secret Identification, it cannot simply point to those documents and must instead describe the trade secrets contained within them. *See Carl Zeiss*, 2021 U.S. Dist. LEXIS 216806, at *12-13 (while a party "is free to cite to and incorporate portions of documents in its trade secrets disclosure without reproducing the text of those documents, it may not simply refer to a document in its entirety as 'including' trade secrets, without specifying what the trade secret is"). At bottom, Swan fails to specify whether the Trade Secret Elements consist of the entirety of each document or simply a portion of each document (and what portion), rendering it not sufficiently particular. *See Loop AI Labs*, 195 F. Supp. 3d at 1116.

*Fourth*, Swan also claims that the trade secret consists of "████████ ████████" (ECF No. 111-1 at 10) presumably referring to some unspecified ████████ somewhere in the remainder of Swan's Trade Secret Identification, and Swan seems to verify this because above it points to Trade Secrets 4-13 as describing in detail it deployed its miners. This open-ended language, too, makes it impossible to determine the scope of what information it is that Swan claims to be Trade Secret 3 because it forces Defendants to search through pages of material to guess at what information Swan is claiming. (And nothing in Swan's identification for Trade Secret 3 specifies that the ████████ are limited to Trade Secrets 4-13. For example, Trade Secret 16 purportedly relates to ████████ and Trade Secret 19 relates ████████ ████████. One can only guess whether those too are ████████ that make up Trade Secret 3.)

*Fifth*, this trade secret is assertedly made up of several elements and documents (or portions of documents), but Swan fails to specify whether it is the combination of elements together that make the unified combination a protectable secret. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

*Sixth*, Swan previously argued that it has cited sufficiently specific portions of three short ████████████ because it specifies that the trade secret involves only the portions of those documents that describe Swan's "███████████████" for the miners. ECF No. 176-1 at 33. Swan's argument is circular and illogical. Swan did not attach the memos to its disclosure. Furthermore, Swan does not adequately describe its ██████████████ in the disclosure, so it is unclear how Defendants could possibly identify the relevant portions of the memos. Swan cannot make vague disclosures that rely on documents and then not only fail to attach the documents but fail to identify the relevant portion of the documents. *See Carl Zeiss*, 2021 U.S. Dist. LEXIS 216806, at *12-13 (party must identify what portion of a document is the trade secret and cannot simply cite it in its entirety); *M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *9-11 (finding disclosures inadequate where they cited more than 100 pages of documents without referring to any specific pages).

This is also why Swan's attempt to distinguish *Carl Zeiss* is inaccurate. The court there found fault with plaintiffs' disclosure that was "not limited to citations to particular portions of documents that disclose its trade secrets." *Carl Zeiss*, 2021 U.S. Dist. LEXIS 216806, at *12. Swan here argues that the "████████████████" are described in the ███████████████. To understand what Swan means by "██████████████," Swan says to look at the portions of the memo that describe the ██████████████. But if one does not know what "██████████████" means one does not know what portions of the memo describe ██████████████. This circular definition means Swan has not cited

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

the particular portions of the documents that disclose its trade secrets just like the plaintiff in *Carl Zeiss*.

(d)    Trade Secrets 4-13.

Swan claims certain aspects of ████████ make up Trade Secrets 4 through 13—roughly half of all of Swan's alleged trade secrets. In each case, Swan claims ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████. ECF No. 111-1 at 10-22. Any such Trade Secrets are not alleged with sufficiently particularity.

*First*, while Swan generally claims that "████████████████ ████████████ were kept confidential" (ECF No. 111-1 at Trade Secret 1(c)), Swan only asserts that ████████████████████ actually contained any sort of confidentiality provision. *See id.* at Trade Secret 5(c) (identifying provision requiring protection of confidential information), 7(c) (same), 8(c) (same), 10(c) (same), 12(c) (same), 13(c) (same)). The other four contracts apparently do not contain any sort of confidentiality provision or obligation. *Compare, for example*, *id.* at Trade Secret 5(c) *with id.* at TS 4(c), 6(c), 9(c), 11(c); *see also, e.g.*, ECF No. 176-9 (████████████████████) (Trade Secret 4); ECF No. 176-10 (████████████████████) (Trade Secret 6).

*Second*, Swan concedes that none of these contracts were signed by Swan. ECF No. 111-1 at n.1 (contracts were signed by ████████████████ ████████████).

*Third*, for each, Swan fails to specify or describe whether the elements of its trade secrets are made up of a ████████████████████████████ ████████████████████████████████████████████ ████████████████████████. *See Imax*, 152 F.3d at 1167 (emphasis in original) (trade secret description must "*refer* to tangible trade

secret material"). Nor does Swan identify the specific information in any of these categories—such as the steps or information assertedly used to identify the site.

**Fourth**, Swan similarly does not identify what ███████████████ ███████████████████████████ make up the elements of these Trade Secrets. *Id.*

**Fifth**, as with the others, the claimed trade secrets are made up of several elements each, but Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret. *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

**Sixth**, Swan fails to identify what *independent economic value* there exists in the secrecy of contract terms in agreements that it did not sign, such that they provide an actual or potential economic advantage to Swan over others. *See Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (citing *Calendar Rsch. LLC*, 2020 U.S. Dist. LEXIS 112361, at *22 ("To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others.")). Rather, the only value Swan purports to describe is its hope to be free from competition: "'If other Bitcoin miners learned of Swan's ███████████████, those competitors could emulate those ███████████████████████ without having to invest the time and resources that Swan invested. Those competitors would thereby be able to similarly increase their own hashrate, which would diminish Swan's share of hashrate and therefore diminish Swan's expected earnings.'" (ECF No. 111-1 at 12).

That is to say, Swan asserts that its ████████████████████████ are superior to other Bitcoin miners. But why or how that is the case (in other words, what makes them proprietary and unique to Swan and derive value from not being known by other Bitcoin miners) is not described in the Trade Secret Identification. Swan assumes that, because it took Swan some (undescribed) effort to develop those

1   contract terms and optimizations for 2040 Energy, that somehow renders them trade

2   secrets.  But if any effort to develop ████████████████████████████████

3   ████████ in production would create a trade secret, then there would be no end to

4   trade secret protection and lead to absurd results.  For example, a car dealer who

5   pushes its salespeople to negotiate favorable car sale terms and tries to do so at the

6   least cost could impede the mobility of its employees in the car market by simply

7   arguing that the negotiation of favorable terms itself was a trade secret.

8         Here, given that Swan does not even identify what ████████████████

9   ████████ make up this trade secret, it is impossible to conclude from Swan's

10  description—devoid from comparison to competition—that mere unspecified

11  development effort related to these agreements means that any trade secrets

12  resulting from that development effort are valuable due to their secrecy.  *See, e.g.*,

13  *Cisco Sys.*, 462 F. Supp. 3d at 1054 (considering lengthy description of economic

14  value claiming that plaintiff invested significant resources in a platform, but

15  concluding that it failed to adequately allege independent economic value because

16  it was not specific to the particular information claimed to be a trade secret);

17  *Calendar Rsch*, 2020 U.S. Dist. LEXIS 112361, at *22 (internal citation omitted)

18  (the court could not determine "independent economic value, actual or potential,

19  from not being generally known" or "reasonable measures to keep such information

20  secret" without a sufficiently defined trade secret); *cf. Attia v. Google LLC*, 983

21  F.3d 420, 425–26 (9th Cir. 2020) (citing *United States v. Chung*, 659 F.3d 815, 826

22  (9th Cir. 2011)) (evaluating independent economic value most often considers "the

23  degree to which the secret information confers a competitive advantage on its

24  owner"); *Acrisure of Cal. v. SoCal Com. Ins. Servs., Inc.*, 2019 WL 4137618, at *4

25  (C.D. Cal. Mar. 27, 2019) (dismissing complaint where it offered mere recitation

26  independent economic value element).

27        To the extent that Swan is claiming "████████████████████" as part of the

28  trade secret, the only ████████████ identified in Swan's Motion relate to ████████,

84

and only for the sites identified in Trade Secrets 4, 5, and 7. Swan also only identified the ███████████ used for Trade Secret 4, the ████████████ used for Trade Secret 4, and the ██████████ used at Trade Secrets 4 and 5. Swan must identify all of the information for the categories that it contends constitutes its combination trade secret for each of Trade Secrets 4-13 as part of the elements of those trade secrets. In the absence of these specific disclosures, Swan would have impermissible flexibility to later claim or disclaim any particular details as part of its trade secrets. *See M/A COM Tech.*, 2019 U.S. Dist. LEXIS 228417, at *5-6 (inadequate descriptions "are not sufficiently concrete, leaving room for the designating party to change the meaning of the trade secret after the completion of discovery"). Furthermore, Swan should be limited to the choice of ███████████ ████████████████████████████████████████ in each case that it purports to claim those choices as trade secrets, instead of the general verbiage contained in its disclosure.

    As with its other trade secrets, Swan's Motion defending its disclosure recognizes that it must provide a more concrete definition of its trade secrets than what it discloses. Based on its Motion, Defendants understand that, as with Trade Secret 1, Swan is claiming a "combination" trade secret and that Swan is not claiming as a trade secret any particular ████████████████████████ ████████████████████ within Trade Secret 1. Nor is Swan claiming as a trade secret a particular ████████████████████ ████████████████████████. To the extent that is incorrect, and Swan is claiming any particular aspects of a process, such information must be disclosed in its Trade Secret Identification by identifying that information as the "specific elements that define [the] trade secret." ECF No. 111-1 at 6.

    Swan's discussion of caselaw as to Trade Secrets 4-13 is misplaced for the same reason as its discussion of caselaw as to Trade Secret 1. Section IV.C.6.a., *supra*. Further, Swan argues that Defendants know exactly what Swan's Trade

Secret Identification is describing because they still work at the sites at issue, but Swan is mistaken. Section III.C.7.a, *supra*. Even if correct, this does not adequately discharge Swan's burden. *See Perlan*, 178 Cal. App. 4th at 1339, 1352; *Zunum Aero, Inc. v. Boeing Co.*, 2022 WL 17904317, at *5 n.12 (W.D. Wash. Dec. 23, 2022) (rejecting as meritless plaintiff's argument that its disclosures were adequate because defendant already knew the contents of the trade secret); *Alta Devices*, 2019 WL 176261, at *3-6 (ordering plaintiff to amend trade secret identifications that did not meet the particularity requirement).

(e)    Trade Secret 14.

Swan claims that its purported "planned mining sites" trade secret is "█████ ████████ ████ ███ ████ ██ ████ ████ ██ ████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ECF No. 111-1 at 23. This is insufficient.

*First*, Swan fails to specify and describe what the specific "trade secret" approach to ████████████████████ was, or the particular information used to ██████████████ that makes up elements of the trade secrets. *See Imax*, 152 F.3d at 1167 (emphasis in original) (trade secret description must "*refer* to tangible trade secret material"). As with its claimed Trade Secret 3 for Site Rejection, the mere ██████████████████—without more— does not sufficiently describe any trade secret information. To the extent there is any criteria used in the ██████████████ that is unique and proprietary to Swan, Swan must identify that in the elements of Trade Secret 14. It does not.

*Second*, while Swan further claims its "██████████ as part of this Trade Secret, Swan similarly does not identify what any such "████" consisted of. Trade secrets are fundamentally information. *Silvaco Data Sys.*, 184 Cal. App. 221, ("Trade secret law, in short, protects only *the right to control the dissemination of*

*information.*") (emphasis in the original).   And in order to meet the 2019.210 disclosure requirements, the disclosure must point to the information that plaintiff claims is the trade secret.  If the plaintiff does not point out that information, the disclosure requirement is not met because the defendant does not know what information the plaintiff claims is secret.  Here, Swan nowhere describes the "████" or points to anything that Defendants can look at the understand the ████.  As with Swan's trade secret "████████████████" criteria, Defendants are left to simply guess what Swan claims as a trade secret in this regard.

In defense of its trade secret disclosure, Swan attempts to claim that it "includes details such as ████████████████████████ ████████████" for each planned site.  But Swan's use of technical jargon here does not fix the fact that it has not provided any details as to what the actual "trade secret" information is. *See Perlan*, 178 Cal. App. 4th at 1339 ("Despite the highly technical language used, it is apparent that this description does not provide specific identifications of the [alleged trade secret]."); <u>*Alphonso Inc.*</u>, 2022 WL 17968081, at *4 ("[T]echnical surplusage is no substitute for such descriptions of functionality.").  The information that Swan identifies for each site is merely *factual and objectively observable information* about the identified sites. For instance, the fact that Swan "████████████████████████████ ████████████████ cannot credibly be claimed as "trade secret" information.  Nor can what is disclosed in Swan's Trade Secret Identification be legitimately claimed to be a "'recipe' for miner configuration" as Swan tried to claim (ECF No. 176-1 at 35)—it is the basic foundation for any mining operations at any mining site.  To the extent it does claim a "recipe," Swan needs to disclose it.

***Third***, to the extent that Swan asserts its negotiation of potential contracts as a trade secret, it fails to identify what aspects of the negotiation or negotiated terms, in particular, constitute a trade secret. As with its other trade secrets, Swan fails to

point to any such protectable terms, much less any actual agreements for these mining sites that it could claim as a trade secret. *See Carl Zeiss X-Ray Microscopy*, 2021 U.S. Dist. LEXIS 216806, at \*12-13 (party must identify what portion of a document is the trade secret); *M/A COM Tech.*, 2019 WL 8108729, at \*4 (finding disclosures inadequate where they cited documents without referring to specific pages).

 **Fourth**, the claimed Trade Secret is once again apparently made up of several elements each, but Swan fails to specify whether it is the combination of elements together that make each unified combination a protectable secret. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

 In its portion of the argument above, Swan mischaracterizes Defendants' April 15 Letter; that letter was Defendants' attempt to clarify the ambiguity of Swan's disclosure of trade secret elements and subsequent arguments that used the background sections to elaborate on the scope of Swan's claimed secret. In response, Swan rejected Defendants' attempt to clarify whether Swan was using certain portions of its disclosure to define the trade secrets with greater particularity and rejected Defendants' understanding of what Swan was attempting to claim as its Trade Secrets. *See* Ex. 11 at 1. Thus, Swan rejected—as an inaccurate characterization—Defendants' listing of certain site-specific features as elements of Trade Secret 14, and refused to confirm what potions of the disclosure Swan intended to constitute Trade Secret 14. A letter that Swan rejected as inaccurate cannot simultaneously be accurate enough to demonstrate Defendants understand of Trade Secret 14 is the same as Swan's.

 Swan also engages in further rewriting of its disclosure by now claiming "each of the ███████ is individually protectible as a trade secret, as indicated by their subpart labels (a) through (i)." No reader can definitively conclude that Swan intended the subpart labels to mean that each ███████ is a separate trade secret; Swan describes Trade Secret 14 in the singular "*[t]he* trade secret claimed

88

is. . . ." ECF No. 111-1 at 23.  Swan should be required to specify in its disclosure that it is claiming each as a separate trade secret.

(f)    Trade Secret 15.

Swan claims that its alleged "BNOC" trade secret is the "███████████ ███████████████████" ECF No. 111-1 at 24.  This disclosure fails to identify the alleged Trade Secret with sufficient particularity for several reasons.

First, the disclosure is inadequate because it fails to provide Defendants (and the Court) the ability to know what source code is part of the trade secret.  Swan has produced no source code in this matter and the disclosure does not identify any source code by file or folder names, storage locations,[25] or date.  Swan should identify what source code that it is claiming as part of this trade secret.

Second, Swan fails to specify what specific aspects of BNOC consist of the trade secret.  Indeed, its Disclosure does not even attempt to explain which elements or portions of the BNOC "█████████████████████" constitute its trade secrets, as opposed to generally available programming techniques or matters of general knowledge in the trade.  Notably, Swan appears to double down in its Motion defending its disclosure, and purports to claim "███████████████ ██████████████████████" as its Trade Secret.  Section at III.C.1.f, *supra*.  This is insufficient.  *See, e.g.*, *Social Apps*, 2012 WL 2203063, at *3-5 (identification of "computer source code for Revision 21 of the myFarm game" was insufficient under § 2019. 210, whereas "two instances where [plaintiff] identified a specific file name or source code line numbers" with the description of trade secret was sufficient).

Moreover, this fails to acknowledge that BNOC consists of publicly available code and thus necessarily incorporates at least some non-trade secret information.

---

[25] Swan mentions that the source code was stored on GitHub, but does not identify where it was stored or how to otherwise identify the source code at issue.

As Swan knows, BNOC was built on top of a publicly available open source software Warden, but its Disclosure does nothing to account for that fact or to appropriately delineate what code Swan claims for itself.  To sufficiently comply with the Court's Order, Swan must identify what it believes is a trade secret that (by definition) cannot be found in Warden or any other open source software or information that is common knowledge.  ECF No. 177-24 at ¶ 20.  Indeed, Swan must describe the particular design features, architecture, or algorithms that it claims constitute the trade secrets contained within BNOC.  While Swan previously inaccurately (and without support) claimed that it need not "pars[e] out" which elements are proprietary and which are public knowledge (ECF No. 176-1 at Section III.C.1.f,), that is wrong.  To the contrary, Swan's failure to segregate what portions of BNOC it claims are unique and proprietary to it is an insufficient identification.  *See Agency Solutions,* 819 F. Supp. 2d at 1018-19; *see also Alta Devices*, 2019 WL 176261, at *2 (emphases in original) (internal citation omitted) (plaintiff must include "adequate detail to allow the *defendant* to *investigate* how [each asserted trade secret] might differ from matters already known and to allow the court to craft relevant discovery"); *Perlan*, 178 Cal. App. 4th at 1351-52 (finding trade secret identification insufficient because it did not clearly segregate the trade secrets from information available to the public by explaining "'how' its alleged trade secrets were novel").  In light of this, Swan fails to identify even the "boundaries or nature" of its alleged Trade Secret.  *Agency Solutions,* 819 F. Supp. 2d at 1019.

For example, in *Citcon USA, LLC v. RiverPay Inc.*, No. 18-CV-02585-NC, 2019 WL 2603219 (N.D. Cal. June 25, 2019), a plaintiff moved for a preliminary injunction that "simply refer[ed] to the allegedly misappropriated trade secret as its 'source code.'"  *Id.* at *2.  While plaintiff "describe[d] a few specific categories of source code . . . [those appeared] to function primarily as exemplars to show instances of alleged misappropriation rather than to define comprehensively the source code at issue in the case."  (Notably Swan does not even identify any such

90

exemplars in its Trade Secret Disclosure (*see generally* Dkt. 111-1).)    After explaining that the same "particularity standard" applies to identifying a trade secret when moving for a preliminary injunction, the court denied the motion because a simple reference to the "source code" (as Swan does here) did not meet that standard.  *Citcon USA*, 2019 WL 2603219 at *2.

The *Citcon* court distinguished *WeRide Corp.*, 379 F. Supp. 3d at 846c, which Swan relies upon above to argue that plaintiffs are "not required to identify the specific source code to meet the reasonable particularity standard."  The *Citron* compared the generic claim that the *Citron* plaintiff's trade secret consisted of "source code" with exemplars of source code categories within the scope of the trade secret (which is more than what Swan does) to the *WeRide* plaintiffs who filed a "twenty-page identification of ten specific trade secrets and described the functionality of each, *along with named files from its code base reflecting the source code specific to each trade secret*."  *Citcon USA*, 2019 WL 2603219 at *2 (emphasis added).

*Integral Development Corp. v. Tolat*, 675 Fed. Appx. 700, 703 (9th Cir. 2017) (also cited by Swan above) is inapposite and mischaracterized by Swan as permitting Swan simply claim protection for all of BNOC.  Not so.  Swan asserts that in *Integral Development* "plaintiff claimed all source code for its products as the trade secret."  Section III.C.7.e.  However, the plaintiff in *Integral Development* did not claim all of its source code as misappropriated.  Rather "[plaintiff] identified specific key aspects of its source code that it claims [defendant] misappropriated."  *Integral Development*, 675 Fed. Appx. at 702.  Swan does not do that here.  *See also Id.* ("there is enough evidence in the record to raise a question of material fact as to whether Tolat misappropriated *those portions* of Integral's source code that qualify for trade secret protection") (emphasis added).

Second, because Swan's disclosure uses the word "including," this trade secret is not even limited to the entire BNOC source code.  Such language is an

impermissible "catch-all" description that is "so vague and unspecific as to constitute no disclosure at all" since Individual Defendants cannot ascertain the boundaries of the alleged trade secret. *See E. & J. Gallo Winery*, 2018 WL 3062160, at *5 (citing *Loop AI Labs*, 195 F. Supp. 3d at 1116); *see also Imax*, 152 F.3d at 1167; *cf. InteliClear*, 978 F.3d at 658-59 (identifying uniquely designed tables, columns, account number structures, methods of populating table data, and combination or interrelation thereof could be trade secrets); *Calendar Rsch.*, 2020 U.S. Dist. LEXIS 112361, at *15 ("Trade secrets cannot be vague concepts, and Plaintiff fails to identify the specific set of 'methods, techniques, processes, procedures, programs, or codes' that could establish . . . [the] trade secret."). Illustrating the problem with Swan's open-ended definition, during the meet-and-confer process, Swan claimed that this trade secret referred to BNOC "▮▮▮▮▮" as a whole. When asked by Defendants whether this included ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, Swan claimed that the trade secret <u>would</u> include the ▮▮▮▮, despite the fact that the trade secret disclosure expressly refers only to ▮▮▮▮. To the extent Swan purports to claim anything beyond source code as part of this trade secret, it must identify that in the elements of its Trade Secret Identification.

Third, to the extent that Swan claims the "BNOC" trade secret is made up of multiple elements—which it appears to do—Swan fails to specify whether it is the combination of those elements all together that make up the trade secret, or whether there are subsets of those elements that make up the trade secret. This is not sufficient under Section 2019.210. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

*SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1196 (S.D. Cal. 2012), cited by Swan above for the point that a trade secret may include publicly known elements, does not demonstrate otherwise. *SkinMedica* relates to protectability—not disclosure. Swan's disclosure is inadequate because in pointing to the entirety of the software and source code, Swan does not identify what is publicly known versus secret, and what form of combination of those two types of

1  elements are what Swan claims, which leaves Defendants in the dark about what

2  information Swan claims is secret non-public information.

3                  (g)    Trade Secret 16.

4        Swan claims that its "2040 Site Database" trade secret is "████████

5  ████████████████████████████████████████████████████████████

6  ████████████████████████" ECF No. 111-1 at 25.

7        As an initial matter, by its name, the document indicates that it is a 2040

8  Energy document, not a Swan document and, much less, a Swan trade secret. And

9  Swan provides no explanation as to how this information is owned by or a trade

10  secret of Swan, as opposed to 2040 Energy. Swan's references to ██████

11  ████████████████████████████████████████ are thus, at best,

12  misleading.

13        Setting that issue aside, Swan has not identified the specific spreadsheet it

14  claims is the trade secret here by pointing to it in Swan's production. *See Alphonso*,

15  2022 WL 17968081, at *4 ("[T]he failure to identify specific documents that contain

16  trade secrets is impermissibly vague and prevents defendants from preparing their

17  defenses."). And Swan's prior unsupported contention that "Defendants are

18  familiar with this spreadsheet" (ECF No. 176-1 at Section III.C.1.f) does not relieve

19  Swan from its Section 2019.210 disclosure obligations under Order of the Court.

20  *See Perlan*, 178 Cal. App. 4th at 1339; *Alta Devices*, 2019 WL 176261, at *3-6.

21        In addition, contrary to Swan's prior assertions, it is not sufficient to simply

22  indicate that the spreadsheet is a "blueprint" for its "entire mining operation." ECF

23  No. 176-1 at 36. Swan claims that this spreadsheet contains a "wealth of non-public

24  information," but does not identify what specific information is non-public versus

25  what information is public, or why the non-public information purportedly has

26  independent value, as required by the Court's order. The trade secrets need to be

27  described in Swan's disclosure, and while a party "is free to cite to and incorporate

28  portions of documents in its trade secrets disclosure without reproducing the text of

those documents, it may not simply refer to a document in its entirety as 'including' trade secrets, without specifying what the trade secret is." *Carl Zeiss X-Ray Microscopy*, 2021 U.S. Dist. LEXIS 216806, at *12-13.  Doing so leaves Defendants without any way of knowing what information Swan deems to be secret.

To extent the spreadsheet consists of both public and non-public information, Swan fails to specify whether it is the combination of those elements all together that make up the trade secret, or whether there are subsets of those elements that make up the trade secret.  *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

As it previously argued, Swan asserts that it is not required to pick apart the spreadsheet to explain which portions of the spreadsheet are public and which are private.  Section III.C.7.f., *supra.*; ECF No. 176-1 at 36.  But the only case it cites in support of this assertion, *Imax Corporation v. Cinema Technologies, Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998), says nothing of the sort.  *Imax* simply said that engineering drawings and blueprints had been adequate disclosures in another case, saying nothing about circumstances in which components of the claimed trade secret are public.  *Id.*  And under *Perlan,* Swan must indeed parse out which portions of the spreadsheet and public and which are private.  *Perlan*, 178 Cal. App. 4th at 1351-52 (finding trade secret identification insufficient because it did not clearly segregate the trade secrets from information available to the public by explaining "'how' its alleged trade secrets were novel"); *see also Alta Devices*, 2019 WL 176261, at *2 (emphases in original) (internal citation omitted) (plaintiff must include "adequate detail to allow the *defendant* to *investigate* how [each asserted trade secret] might differ from matters already known and to allow the court to craft relevant discovery").

(h)    Trade Secret 17.

Swan claims its "Curtailment Models And Contract Terms" trade secret is

"███████████████████████████████

███████████████████████████████

94

1  ████████" ECF No. 111-1 at 26. Specifically, it identified only one specific

2  model, which it claims is set forth in a document entitled "████████████

3  ████████"

4          As an initial matter, "█████████████████████" are

5  generally accepted concepts, not just in the Bitcoin mining industry but in

6  connection with general electricity usage; they are certainly not unique to Swan.

7  Indeed, these practices are well accepted in the mining industry and commonplace

8  to ensure cost effective and efficient use of energy while mining.[26]

9          To distinguish from what's publicly available, Swan explains only that its

10 models "are focused on specific sites where Swan was mining and based on Swan's

11 site-specific information." But this is insufficient.

12         First, other than vaguely asserting that one curtailment model is part of Trade

13 Secret 18, Swan fails to identify the other models that make up the trade secret. This

14 is a complete disclosure failure since it is impossible for Defendants to know what

15 information is within Swan's trade secret. *See Alphonso*, 2022 WL 17968081, at

16 *4 ("[T]he failure to identify specific documents that contain trade secrets is

17 impermissibly vague and prevents defendants from preparing their defenses.").

18         Second, Swan fails to describe what it is about *any* model that allegedly gives

19 Swan the ability to "█████████████████████████"

20 (Section III.C.7.f., *supra*). And while Swan claims, "the criteria used by that [one]

21 model are contained within that [one] model," it provides no information as to what

22 that criteria is—the very purpose of the Trade Secret Identification.

23         Third, based on Swan's disclosure, this alleged trade secret purports to be

24 made up of several elements. But given Swan's failure to state each element with

25 sufficient particularity, it is impossible to distinguish between them and matters of

26 

27 [26] *E.g.*, Riot Platforms, Inc. 2022 Form 10-K at 9-10, 37-43 (discussing

28 Congressional interest in curtailment, Riot's curtailment practices, and financial
   details of Riot's power curtailment credits) (ECF 177-25).

general knowledge in the trade or of special knowledge of those persons skilled in the trade.

And as with various of the other trade secrets, to the extent that some or all of the elements are in the public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret. *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

With respect to the claimed " ██████████████████████," Swan generally asserts that "every ████████████████" is its trade secret. Section III.C.1.g, *supra*. Again, this is insufficient as Swan does not specify which sites, which contracts, or which terms were the result of negotiation. Swan fails to identify the specific aspects of these contract terms that it asserts are trade secrets and what about them makes them trade secret. While it provides, as one example, "██████████████████████," it provides no information as to how this is proprietary to Swan and not something generally done in the industry (or other industries for that matter).

(i)    Trade Secret 18.

Swan claims its so-called "Mining Pool Selection" trade secret is "████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████" ECF No. 111-1.

First, Swan fails to provide an adequate disclosure because what Swan identifies is unbounded and it is impossible for Defendants to review it to find what Swan claims to be its secret. Other than referring to the "████████████," Swan does not identify what "████████████" it is referring to. Swan also does not explain whether ████████████ is a document (and if it is, Swan does not identify and does not seem to have produced that document). Swan also does not explain what "████████████" it claims is proprietary to Swan as opposed to being public

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

knowledge.  *See also, e.g.*, *Alta Devices*, 2019 WL 176261, at \*2 (emphases in original) (internal citation omitted) (plaintiff must include "adequate detail to allow the *defendant* to *investigate* how [each asserted trade secret] might differ from matters already known and to allow the court to craft relevant discovery"); *Perlan*, 178 Cal. App. 4th at 1351-52 (finding trade secret identification insufficient because it did not clearly segregate the trade secrets from information available to the public by explaining "'how' its alleged trade secrets were novel").  Defendants cannot begin to understand what information Swan claims for its Trade Secret 18.  And similar to Trade Secrets 3 and 14, the mere ███████████████████ ███████████████████████ do not—alone—sufficiently describe any trade secret.  To the extent that Swan claims any particular "████████████" or related criteria as its trade secret, Swan must identify such in its Trade Secrets Identification.

Second, Swan uses the word "including," which is an impermissible "catch-all" description that is "so vague and unspecific as to constitute no disclosure at all" since Individual Defendants cannot ascertain the boundaries of the alleged trade secret.  *E. & J. Gallo Winery*, 2018 WL 3062160, at \*5 (citing *Loop AI Labs*, 195 F. Supp. 3d at 1116); *see also Imax*, 152 F.3d at 1167.  Swan's use of catch-all language is particularly problematic because it is not preceded by a specific, substantive disclosure of the trade secret, but instead a non-substantive and general one.  *Cf. Wisk Aero LLC*, 2021 WL 8820180, at \*12 (finding disclosures were adequate despite use of "including" where non-exhaustive list of examples is "always preceded by the substantive description of each trade secret").

Third, to the extent that some or all of the claimed elements are in the public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.  *O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

1   Swan above argues it is relieved of its obligation identify its trade secret

2   because Defendants themselves worked to develop the alleged trade secret. *See*

3   Section III.C.7.h., *supra* ("For Defendants to argue that they do not understand the

4   scope of their own research project shows the unseriousness of their objections.").

5   This version of "you know what you did" is not and never has been the law, and if

6   it were, in the vast majority of cases, plaintiffs would not be required to serve

7   2019.210 disclosures since so many cases relate to employees accused of

8   misappropriating their own work *See, e.g., Perlan*, 178 Cal. App. 4th at 1339

9   (rejecting plaintiff's arguments that defendants "know what they took"); *Alta*

10  *Devices*, 2019 WL 176261, at *3-6 (ordering plaintiff to amend trade secret

11  identifications which did not meet the particularity requirement).   Regardless of

12  whether or not Defendants worked on some research project while at Swan in the

13  past, Defendants cannot know what Swan contends today is its claimed trade secret.

14                    (j)    Trade Secret 19.

15         Swan claims its "Generation And Use Of Testing Data" trade secret is "███

16  ████████████████████████████████████████████████████████████

17  ███████████████████" ECF No. 111-1 at 28.

18         Swan fails to identify what testing data consists of the Trade Secret, including

19  what the sources of the data are and that type of data that Swan considers its trade

20  secret.  For example, Swan does not identity what type of ████████████ it

21  considers to be part of the data. *See Imax*, 152 F.3d at 1167 (emphasis in original)

22  (trade secret description must "*refer* to tangible trade secret material").   Without

23  this information, Defendants cannot possibly be put on notice as to the boundaries

24  of this claimed Trade Secret.

25         Recognizing this deficiency, in its prior Motion defending its Disclosure,

26  Swan tried to provide a more concrete definition of this Trade Secret, ignoring that

27  the only way it describes this trade secret in the "elements" section of its document

28  is as "████████████████████████████████████████████████

1   ██████████████████████████," Swan instead claims that it constitutes "███

2   ████████████████████████████████████████████████████████

3   ███████." ECF No. 176-1 at 39.  This is still insufficient as it fails to make even a

4   basic identification of what that testing or optimization data even is.  Swan

5   complains that its records "are numerous and diffuse, and it is impractical it

6   explicitly include" such data.  *Id.*  Swan cites no authority for the proposition that a

7   plaintiff is relieved of its obligation to identify trade secrets because it feels they are

8   too voluminous or that it is somehow fair to a defendant to expect to guess at what

9   the trade secret is when the relevant records are too voluminous for the plaintiff to

10  parse.  To the extent that Swan claims as its trade secret specific testing data, it must

11  identify that data and explain what the trade secret is within that data.

12          Swan above argues its disclosure is sufficient because "███████████████

13  ████████████████████████████████████████████████████████

14  ████████." Section III.C.7.i, *supra*.  First, this is not part of the Trade Secret

15  Elements in Swan's disclosure.[27]  Even assuming the Background information

16  should be incorporated into the Trade Secret Elements, Swan only cites what it

17  deems to be "example[s]" of its Trade Secrets; this, in and of itself, improperly

18  broadens the scope of the Trade Secret and is insufficient.  *See, e.g.*, *E. & J. Gallo*

19  *Winery*, 2018 WL 3062160, at *5 (trade secret disclosures that use "catch-all

20  phrases" like "including" are inadequate).  Second, it fails to address vague the other

21  half of the claimed Trade Secret: "████████████████████████████████

22  ██████████████████████." Swan provides no details as to what actual

23  data it claims to be proprietary.

24          Swan again above argues that it is relieved of any obligation to identify its

25  trade secret because Defendants allegedly worked on it.  As explained above, this

26

27  ───────────

28  [27] Background information in Swan's disclosure cannot be used to define the trade secrets at issue, as noted above.

is not the law, and Defendants cannot know what Swan presently contends is its trade secret. *See, e.g.*, *Perlan*, 178 Cal. App. 4th at 1339; *Alta Devices*, 2019 WL 176261, at *3-6.

Swan further argues that "*Imax* does not in any way require that, in the context of research and data, a plaintiff must list out every single piece of data claimed as part of the trade secret." Even if Swan's interpretation were correct (it is not), Swan does not provide Proton a starting point to determine what data is part of this Trade Secret. Proton cannot reasonably defend itself in connection with this Trade Secret without any inkling as to the purported "testing data generated by Swan."

(k)    Trade Secret 20.

Swan claims its "Firmware Optimization Testing And Data" trade secret is "███████████████████████████████████████████████████████████████████████████████████████████████████████████." ECF No. 111-1 at 29. Swan previously asserts that Trade Secret 20 is "narrowly tailored" to "the choice of firmware" and "optimization of firmware." ECF No. 176-1 at 40. This is plainly insufficient.

In effect, Swan tries to claim its comparison of different types of firmware to see which performed better as a trade secret, as well as claim its *decision* about which firmware to use as a trade secret. But, as an initial matter, Swan fails to specify whether its trade secret consists of a specific approach (*i.e.*, certain steps Swan uses) to optimize firmware on ASICs, or the specific results (*i.e.*, the qualities that Swan considers), or both.   *See Imax*, 152 F.3d at 1167 (emphasis in original) (trade secret description must "*refer* to tangible trade secret material"). Presumably, Swan is not asserting that the use of publicly available third-party firmware, such as LuxOS and Vnish, itself is its trade secret. Yet, we have no details into any actual analyses or comparison conducted on any firmware or how Swan decides to choose any particular firmware based on such a comparison, much less how any such

firmware was "optimized" by Swan.  Swan does nothing to identify what exactly its "rigorous testing" of these or other firmware was.  Or what their resulting choices were with respect to which firmware to run.  Nor does Swan identify any tangible material to support its claimed "███████████████████████████████" *Id.*

Moreover, the choice of publicly available firmware for ASICs is not something unique to Swan; it is something all miners in the industry must do.  As such, the lack of further specificity in Swan's Trade Secret Identification makes it even impossible to distinguish between the claimed trade secrets and matters of general knowledge in the industry.  Proton cannot possibly prepare a defense to this particular trade secret without further particularity.

And, to the extent that some or all of the elements of the purported trade secret are public domain, Swan fails to specify whether it is the combination of public elements together that make the unified combination of approaches and/or information that makes the combination a protectable secret.  This is insufficient under Section 2019.210.  *See O2 Micro Int'l Ltd.*, 420 F. Supp. 2d at 1090.

### 7.    <u>The Trade Secret Identification Requirement Applies to All the Discovery at Issue.</u>

Swan argues that it is not required to produce a sufficient trade secret disclosure for "many" of the discovery requests at issue.  Swan is incorrect.  Swan attempts to read the Court's order that discovery "into trade secrets" cannot commence until an adequate trade secret identification has been served (ECF 95 at 7) narrowly to refer only to discovery requests that "reference Swan's Trade Secret Identification."  However, within the same sentence the order references discovery into "other *subjects*" (*id.* (emphasis added)), demonstrating that discovery into the *subject* of trade secrets cannot commence until an adequate trade secret identification is served.  Proton has agreed to produce documents in response to dozens of Swan's requests for production notwithstanding Swan's insufficient trade secret identification.  However, the requests at issue in this

101

1  motion are relevant because they are related to the subject of trade secrets, and

2  thus are prohibited until Swan serves an adequate trade secret disclosure.

3      The RFPs that Swan asserts are not covered by the Court's order restricting

4  discovery related to trade secrets, are related to the subject of trade secrets.  RFPs

5  24-26 relate to the alleged downloading and copying of documents and related

6  contractual provisions, which is central to Swan's trade secret claims.  RFPs 42

7  and 43 relate to the alleged concealment of information, which is integral to

8  Swan's trade secret claims, and RFP 42 in particular covers deletion of documents

9  "related to the subject matter of this action," which includes trade secrets.  RFPs

10  29-30, 39-40, and 45-46 seek information regarding Proton's business plans and

11  financial information, including "Proton's efforts to develop proprietary

12  methodologies for Bitcoin mining operations including," which is clearly

13  discovery into trade secrets.  Finally, RFPs 47-48 seek information regarding

14  Proton holding itself out as Swan or referencing Swan to customers, which is only

15  relevant to Swan's theory that Proton misappropriated Swan's purported trade

16  secrets to take over Swan's alleged mining business.  Because each of these

17  requests is on the subject of trade secrets, section 2019.210 applies.  *See Advanced*

18  *Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 834 (2005)

19  (recognizing section 2019.210 "is not cause of action specific," and "refers to any

20  'action,' i.e. the entire lawsuit, 'alleging misappropriation of a trade secret'").

21      Swan is incorrect that Proton's only objections to the discovery at issue is the

22  inadequacy of the trade secret disclosure.  In the correspondence regarding this set

23  of discovery, Proton clearly indicated it was maintaining its objections to Swan's

24  definitions and instructions.  Ex. 1 at 7.  In the subsequent meet and confer call

25  counsel for Proton reiterated these objections, in particular the objection to the

26  definition of "Proton."  Proton then served supplemental responses to these requests,

27  which again included objections, including objections to the definition of "Proton."

28  Proton maintains these objections.  Further meeting and conferring on these issues

102

was stifled due to Swan's position that any engaging in discovery by Proton would waive Proton's right to compel arbitration. Ex. 1 at 1. Should the Court determine that Swan's trade secret disclosure is adequate, the Court should allow such objections to stand.

## V. <u>CONCLUSION</u>

### A. <u>Swan's Conclusion</u>

The Court should grant Swan's motion to compel, overrule Proton's objections to Swan's Trade Secret Identification, and order Proton to respond to the discovery at issue (served on Feb. 26) in full within seven days.

### B. <u>Proton's Conclusion</u>

Because Swan's Trade Secret Identification does not describe Swan's alleged trade secrets with sufficient particularity, the Court should deny Swan's motion to compel. Should the Court should grant Swan's motion to compel, given the dozens of documents requests at issue, many of which seek "all documents and communications" on a number of topics, the Court should allow Proton to produce documents on a rolling basis beginning at least two weeks after the Court's scheduled July 25, 2025 hearing on Proton's Motion to Compel Arbitration, after which the Parties will have clarity on whether this action is ordered to arbitration, or, if there is a denial that Proton appeals, there is an automatic stay as to Proton pursuant to *Coinbase*.

DATED:  June 27, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Stacylyn M. Doore*

RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone: (213) 443-3145
Facsimile: (213) 443-3100

STACYLYN M. DOORE (*pro hac vice*)
stacylyndoore@quinnemanuel.com
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Facsimile: (617) 712-7200

RACHEL E. EPSTEIN (*pro hac vice*)
rachelepstein@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

JEFFREY WILLIAM NARDINELLI (State Bar No. 295932)
jeffnardinelli@quinnemanuel.com
50 California Street 22nd Floor
San Francisco, CA 94111
Telephone:  415-875-6600
Facsimile: 415-875-6700

AUSTIN BUSCHER (State Bar No. 346456)
austinbuscher@quinnemanuel.com
555 Twin Dolphin St., Fifth Floor
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1  DATED:  June 27, 2025              BERGESON, LLP

2

3

4                                     By  /s/ Adam C. Trigg

5                                        DANIEL J. BERGESON (SBN 105439)
                                         dbergeson@be-law.com
6                                        ADAM C. TRIGG (SBN 261498)
                                         atrigg@be-law.com
7                                        JAIDEEP VENKATESAN (SBN 211386)
                                         jvenkatesan@be-law.com
8                                        REBECCA KAUFMAN (SBN 199534)
                                         rkaufman@be-law.com
9

10                                       *Attorneys for Specially Appearing*
                                         *Defendants Proton Management Ltd.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL

1

## ATTORNEY ATTESTATION

2   Pursuant to Local Rule 5-4.3.4, I hereby attest that all other signatories listed,

3 and on whose behalf the filing is submitted, concur in the filing's content and have

4 authorized the filing.

5         */s/ Stacylyn M. Doore*

6         STACYLYN M. DOORE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STIPULATION REGARDING PLAINTIFF'S MOTION TO COMPEL