# EXHIBIT 13

```
 1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
 2                  WESTERN DIVISION - LOS ANGELES

 3

 4   ELECTRIC SOLIDUS, INC.,      )  Case No. CV 24-8280-MWC (Ex)
                                  )
 5        Plaintiff,              )  Los Angeles, California
                                  )  Friday, June 13, 2025
 6             v.                 )  9:00 A.M. to 9:53 A.M.
                                  )
 7   PROTON MANAGEMENT LTD.,      )
     et al.,                      )
 8                                )
          Defendants.             )
 9   _____)

10

11

12

13                     TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MICHELLE WILLIAMS COURT
14                  UNITED STATES DISTRICT JUDGE

15

16   Appearances:                 See Page 2

17   Deputy Clerk:                Teresa Jackson

18   Court Reporter:              Recorded; CourtSmart

19   Transcription Service:       JAMS Certified Transcription
                                  16000 Ventura Boulevard #1010
20                                Encino, California  91436
                                  (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1    APPEARANCES:

 2

 3    For the Plaintiff:        Quinn Emanuel Urquhart and Sullivan
                                LLP
 4                             By:  RYAN S. LANDES
                                865 South Figueroa Street, 10th Floor
 5                             Los Angeles, California  90017
                                (213) 443-3145
 6                             ryanlandes@quinnemanuel.com

 7

      For the Defendants:       Bergerson LLP
 8                             By:  ADAM C. TRIGG
                                111 North Mark Street, Suite 600
 9                             San Jose, California  95113
                                (408) 291-6200
10                             atrigg@be-law.com

11                             Goodwin Procter LLP
                                By:  AMANDA H. RUSSO
12                             601 South Figueroa Street, Suite 4100
                                Los Angeles, California  90017
13                             (213) 426-2500
                                arusso@goodwinlaw.com
14
                                Goodwin Procter LLP
15                             By:  GRANT P. FONDO
                                601 Marshall Street
16                             Redwood City, California  94063
                                (650) 752-3100
17                             gfondo@goodwinlaw.com

18

19

20

21

22

23

24

25
```

1    LOS ANGELES, CALIFORNIA, FRIDAY, JUNE 13, 2025, 9:00 A.M.

2        (Call to Order of the Court.)

3            THE COURT:  Thank you, Ms. Jackson.

4            Everyone can be seated.

5            THE CLERK:  Calling item No. 17, L.A. CV 24-08280,

6    *Electric Solidus, Inc. v. Proton Management LTD.*

7            Counsel, please state your appearances starting

8    with plaintiff.

9            RYAN S. LANDES:  Good morning, Your Honor.

10    Ryan Landes on behalf of the plaintiff.

11            THE COURT:  Good morning.

12            ADAM C. TRIGG:  Good morning, Your Honor.

13    Adam Trigg on behalf of Defendant Proton.

14            THE COURT:  Good morning.

15            AMANDA H. RUSSO:  Good morning, Your Honor.

16    Amanda Russo on behalf of the individual defendants.

17            THE COURT:  Good morning.

18            GRANT P. FONDO:  Good morning, Your Honor.

19    Grant Fondo also on behalf of the individual defendants.

20            THE COURT:  Good morning.

21            Okay.  So today we have Swan's ex parte application

22    for a temporary restraining order.  The request is to lift

23    the discretionary stay as to Defendant Proton Management and

24    temporarily freezing its assets, in addition to scheduling a

25    preliminary injunction hearing and ordering expedited

4

1   discovery in connection with that.  The requested TRO would

2   enjoin Proton and all persons who are in active concert or

3   participation with Proton in transferring, selling,

4   disposing, pledging, assigning, or encumbering the real and

5   personal property in their possession, custody, and control;

6   and spending or disposing of the monies held in any bank

7   account under their control.

8           I'm going to tell you where -- what my tentative is

9   and the reasoning for the tentative, and then I'll invite

10  oral argument.

11          My tentative is to sua sponte expand the request to

12  -- as a request to lift the full stay and to lift the

13  discretionary stay in its entirety.  I also tentatively have

14  decided to place Proton's motion to compel arbitration back

15  on calendar for July 25th, and all other requests are denied.

16          Regarding the stay, the Court has weighed the

17  possible damage which may result from granting of a stay, the

18  hardship or inequity which a party may suffer in being

19  required to go forward, and the orderly course of justice

20  measured in terms of the simplifying or complicating of

21  issues, proof, and questions of law which could be expected

22  to result from a stay.

23          When the stay -- the discretionary stay was

24  initially entered in this case, the Court found that damage

25  and hardship were neutral, but the Court has found, based on

1    the evidence that was presented in support of this

2    application, that circumstances have since changed.  There is

3    evidence of Proton moving funds which does cause irreparable

4    harm to Swan if they are not able to litigate their case

5    expeditiously.  And also, unlike with the case when we first

6    visited this issue, prejudice to plaintiff now outweighs

7    judicial economy in a way that, I believe, supports a lifting

8    of the discretionary stay.

9         With regard to the request for the temporary

10   restraining order, Swan's claims against Proton --

11   specifically the trade secret misappropriation, tortious

12   interference, aiding and abetting, breach of duty of loyalty,

13   and unfair competition claims -- implicate the individual

14   defendants' involvement and the claims against the individual

15   defendants, and because of the mandatory stay that is in

16   place pursuant to the *Coinbase* case, the Court cannot issue

17   an order that affects the individual defendants' rights.

18        So that is the reasoning for the tentative.

19        And, Mr. Landes, would you like to be heard?

20        MR. LANDES:  Yes, Your Honor.  Finishing up.  One

21   moment.

22        THE COURT:  Sure.

23        MR. LANDES:  Okay.

24        (Pause.)

25        MR. LANDES:  So good morning, Your Honor.

1    Ryan Landes on behalf of Plaintiff Swan.  I also want to

2    introduce Angel Mendez Flores, who is one of our summer

3    associates joining us today to see how the gears of justice

4    turn.  I know he'll be a wonderful lawyer one day.

5              So thank you for bringing us in so quickly.  Thank

6    you for your quick consideration of this matter.

7              We seek emergency relief to prevent Proton from

8    dissipating assets to avoid a potential judgment in this

9    case.  Now, given Your Honor's tentative, I'm not going to go

10   through again the evidence of fraud that -- maybe I could

11   revisit that on rebuttal, if Your Honor would preserve that,

12   but it sounds like Your Honor has a pretty good sense of what

13   we're dealing with here, which is, frankly, in my experience,

14   the most unequivocal, unambiguous confession of a fraudulent

15   transfer that I have ever seen.  It certainly greatly exceeds

16   anything in any of the authority that, I think, has been

17   cited in either party's motion.  We have a confession from a

18   Proton executive saying that he is -- that Mr. Naidoo is

19   preoccupied moving assets so they will not be encumbered by

20   this lawsuit.  That is essentially the definition of a

21   "fraudulent transfer."  But I'll move on unless the Court has

22   questions, and it might be better to respond to whatever the

23   defendants say.

24             I will note, Your Honor, that it was actually,

25   frankly, truly surprising when the opposition papers came in

1  and there was no submission from Mr. Holmes -- no denial, no

2  explanation, no innocent interpretation -- absolutely

3  nothing.  And I think the silence there was deafening.  If

4  there was some innocent explanation for that message, the

5  defendants unquestionably would have submitted it.

6  Mr. Holmes is a -- an executive at Proton.  He's represented

7  by the lawyers sitting at this table.  He lives in

8  Los Angeles.  There was no trouble at all to get something

9  from him.

10          All that we have is a denial from Mr. Naidoo, just

11  a cursory denial that says, "Proton isn't moving assets."

12  And I think the Court should give that denial no weight at

13  all, and I would refer the Court to the *Ark. v. Haf* -- H-a-f

14  -- case, which the defendants cited in their opposition but

15  actually, I think, very squarely supports Swan here, where

16  the court observed the obvious, which is that it's almost

17  always the case that a debtor will not admit to harboring

18  fraudulent intent.  However, a denial is not sufficient or

19  even persuasive evidence negating such intent.

20          So again, I will not expand too much on the

21  hallmark of fraud except to respond to points that the

22  defendants might raise.  I think Your Honor recognizes the

23  urgency of the situation.  I thank Your Honor for lifting the

24  discretionary stay.  I think that's appropriate as well.

25          I do want to speak, though, specifically and try to

1    clarify the issue where Your Honor did not grant the

2    requested relief, which was with the asset freeze.

3          So I want to be clear, and I apologize if there was

4    ambiguity in the order, but we are not seeking an asset

5    freeze of the individual defendants' accounts.  We are not

6    saying that their personal bank accounts need to be frozen,

7    that they can't pay rent or pay groceries.  We are not even

8    seeking discovery from the individual defendants.  We are

9    seeking discovery from Proton.  And the asset freeze applies

10   to Proton and this web of affiliated companies: Elektron

11   Management, Elektron Energy, Strange-Quark.  I think there's

12   another Elektron entity in there.  They're all sort of

13   subatomic particles.  Those are the accounts that we are

14   seeking to freeze -- Proton's.  And so let me just speak to a

15   couple of points on that specifically.

16         Your Honor recognized in the -- in its decision on

17   the pleadings motions that Swan can seek injunctive relief

18   and the Court can grant injunctive relief even if claims are

19   pending for arbitration, and this is at page 12 of

20   Your Honor's order at page [sic] 164.  I see you nodding, but

21   Your Honor said, "Despite the ruling to compel arbitration as

22   to the conversion claim against the Individual Defendants" --

23   this is where Your Honor said that one of the claims actually

24   did need to go to arbitration -- you said, "Swan is entitled

25   to subsequently pursue interim relief pending arbitration --

1  assuming the requirements for a preliminary injunction are

2  satisfied."

3          And Your Honor's tentative, I think, indicated that

4  you do believe the requirements for a preliminary injunction

5  are satisfied -- irreparable harm, likelihood of success on

6  the merits.  Your Honor didn't touch on balance of hardships

7  and public interest, but I think I could tell which way

8  Your Honor was leaning.

9          And then Your Honor cited the *iTalk Global* case,

10  the *Pilot* case, and the *Parcel* case, all of which granted TRO

11  requests.  The *Parcel* case actually granted a TRO request --

12  sorry -- a TRO request to seize assets even though there was

13  an arbitration -- even though claims had been compelled to

14  arbitration.

15          And I want to be clear.  The -- and Your Honor

16  recognized this -- there is no mandatory *Coinbase* stay as to

17  Proton.  Proton did not have a motion to compel arbitration

18  denied.  It did not subsequently appeal that.  In fact, as

19  Your Honor just recognized, that motion was vacated and now

20  has been put back on calendar -- or assuming Your Honor

21  adopts that portion of your tentative will be put back on

22  calendar.

23          So Proton is not implicated by *Coinbase*, but even

24  if we were in the *Coinbase* world -- and it's a very recent

25  decision so there hasn't been a lot of authority on this, but

1    I think the most significant case, which I think is closely

2    on point, is the *Columbia Gas Transmission* case.  That's

3    2024WL973114, and it was actually cited, I believe, in our

4    opposition to the -- I think it might have been the ex parte

5    application to stay the case.

6          But what happened in *Columbia Gas* was there was a

7    motion to compel arbitration, it was denied, there was an

8    appeal, a *Coinbase* stay was implemented, and then afterwards

9    the plaintiff moved for injunctive relief -- during the

10   *Coinbase* stay.  And the court said (reading): Although

11   *Coinbase* does call for a stay of any final adjudication of

12   the merits while the defendants' appeal is depending, it does

13   not forbid the court from granting the preliminary injunction

14   the plaintiff seeks.  And then it went on (reading): To that

15   end, a court may issue preliminary injunctive relief while an

16   appeal is pending, including an arbitration-related appeal

17   under the FAA, like defendants.

18         And then the court went on and concluded, it

19   explained the rationale for this rule (reading): Columbia's

20   request -- Columbia is the plaintiff -- Plaintiff's request

21   for a preliminary injunction falls squarely within these

22   authorities and their reasoning.  If defendants' appeal of

23   this court's arbitrability ruling proceeds in the ordinary

24   course and this court does not award the injunctive relief

25   the plaintiff seeks while the appeal is pending, any future

1    arbitration of plaintiff's time sensitive claims for

2    immediate access under the parties' agreement would be a

3    hollow formality.

4         And that is exactly the situation, Your Honor, that

5    we are facing here.  If a months-long discretionary stay --

6    we're not even dealing with a *Coinbase* stay here.  We're

7    dealing with a discretionary stay over Proton, and if a

8    months-long discretionary stay over Proton while the -- while

9    codefendants' appeal is pending deprives this Court of the

10   ability to freeze Proton's assets, when we have unrebutted

11   evidence of fraudulent transfers, then everything else we do

12   here, everything else we do in some hypothetical jurisdiction

13   -- if the Ninth Circuit reverses Your Honor -- all of that is

14   a hollow formality -- all of it -- because there will be

15   nothing left at the end of this exercise.  I mean, I think

16   you can see it in black and white in that text message.  If

17   there is six months that Proton has when it is not subject to

18   an injunction, those assets will be gone, and they will be

19   gone forever.

20        And I think we know that, Your Honor -- we can look

21   back -- we have seen this movie before, and I think Proton's

22   prior conduct is a very good indicator that, if the Court

23   denies the TRO here, Proton will take that as a blessing to

24   go and dissipate assets.  And the example -- this was -- I

25   know this was when the case was with a different judge, but

1    in the first TRO hearing, Proton opposed Swan's TRO by

2    representing to the court that it was only mining for 2040.

3    This is what they said at Docket 29-1, page 12, said, quote

4    (reading): Proton and the individual defendants are working

5    only for 2040 Energy.  Therefore, to the extent the

6    individual defendants are using purported trade secrets, it

7    is for the sole benefit of 2040 Energy.

8            That was a representation that Proton made to this

9    court.

10           Now, Mr. Naidoo's declaration on this TRO is, I

11   think, very careful -- very careful in its wording to avoid

12   making that representation again, and the brief, I think --

13   the opposition brief is also very careful to avoid making

14   that representation again even if it's attempting to give

15   that impression.  And the reason is because Proton can no

16   longer say that that's true.  It's not true.  Proton's

17   interrogatory responses, which we filed with our TRO

18   application -- that's at Docket 221-5 -- confirm that Proton

19   is mining for several other entities besides 2040, including

20   Proton's own affiliates and Tether's various affiliates such

21   as Elektron.  That's now admitted.

22           And the time line on that, Your Honor, is extremely

23   notable.  So three weeks after the Court -- after Proton

24   opposed the TRO by representing that it was only mining for

25   2040 and then the Court denied the TRO, three weeks later a

13

1   new entity gets incorporated called "Strange-Quark Systems"
2   -- three weeks later.  And you can see the pattern here,
3   Your Honor.  We have "Proton," "Elektron," "Quark," as I
4   mentioned.  Two weeks after that -- two weeks after Strange-
5   Quark gets incorporated, you have Max Berg, who used to be
6   Swan's counsel but then was instrumental in the "rain and
7   hellfire" scheme and now works with Proton -- we see him
8   sending an email over to Mr. Watson, who's at the ACDC mining
9   site -- that's the counterparty to Mr. Holmes's text message
10  -- and on that email he's copying Mr. Holmes, and he's
11  copying Mr. Naidoo -- this is at Docket 221-4.  That's where
12  that agreement is.
13          And I want to note this, Your Honor.  I'm going to
14  open to it because sometimes it can be a little hard to
15  follow, but you can see it's sent from Mr. Berg at Elektron
16  Energy.  Copied on this email are Mr. Naidoo and Alex Holmes
17  also at Elektron Energy.  If we go to the very next exhibit -
18  - or, I'm sorry -- two exhibits forward -- that's Exhibit F
19  -- we can see this is another text message from one of the
20  Proton employees where he says -- this is at Docket 222-8 --
21  "We've changed management and will not be operating under a
22  company" -- and "will not be operating under a company," and
23  then he says, "Elektron Energy/Proton Management."  These are
24  indistinguishable.  And if you look at Mr. Berg's signature
25  block, he says he's now deputy general counsel for

1    Elektron Energy.

2            And so what's going on in this email?  This is

3    November 2024.  This is very, very shortly after the Court

4    denies the TRO; very, very shortly after Strange-Quark gets

5    incorporated.  And what's happening here is Proton is trying

6    to negotiate a new agreement with this mining site where

7    2040 used to be mining -- or Swan used to be mining for 2040,

8    but you can see now in the attachment line the name of this

9    agreement is the "Strange-Quark Agreement," right.  So

10   Strange-Quark is getting swapped out here.  And if you look

11   at the attachment -- this is at ECF page 6 -- you can see

12   there's a footnote that says (reading): Termination of prior

13   agreement to be entered into simultaneously with this

14   agreement.

15           There's only one prior agreement.  That's the 2040

16   agreement.  So they're just going to switch out.  They're

17   going to say, "Strange-Quark is in.  2040 is out."

18           And what's really astonishing here, Your Honor, is

19   if you go to page 61, as though there were any doubt -- ECF

20   page 61 -- you can see who is --

21           THE COURT:  ECF -- I'm sorry.  ECF what?

22           MR. LANDES:  Oh.  ECF 221-4.

23           THE COURT:  Thank you.

24           MR. LANDES:  I'm sorry.

25           THE COURT:  That's okay.  I just want to --

1          MR. LANDES:  Page 61.

2          THE COURT:  I'm just wanting to follow you.

3          MR. LANDES:  Yeah.  Let me know when you get there.

4          THE COURT:  Which page?

5          MR. LANDES:  ECF page 61.

6          THE COURT:  Okay.  Go ahead.  I'm there.

7          MR. LANDES:  Down at the bottom there, do you see

8   the notice provision?  So if there's notice to be provided

9   under the agreement -- it's in red-line in the lower right-

10  hand corner at the very bottom?

11         THE COURT:  Let me see.  I'm on the wrong page.

12  64?

13         MR. LANDES:  61.  I'm sorry.

14         THE COURT:  Okay.

15         MR. LANDES:  So, if you see down there at the

16  bottom, this is the notice provision, who do you contact if

17  you have to get in touch with someone, and "customer" in this

18  version of the agreement is Strange-Quark, and who's the

19  contact for Strange-Quark?  San Naidoo at Elektron Energy.

20  That's the contact for Strange-Quark.  And yet now in

21  Proton's opposition papers, we have a declaration from

22  Mr. Naidoo -- which, by the way, is a draft that is not

23  signed so that's another reason not to give it any weight,

24  but in paragraph 6 of his declaration in opposition to this

25  TRO, he says there is no affiliation between Strange-Quark

1    and Proton.

2            And, Your Honor, I am befuddled.  I don't know how

3    that can possibly be.  I don't know how you can square it

4    with this contract, where Mr. Naidoo, the sole director of

5    Proton, is the designated contact on an agreement that he is

6    negotiating for Strange-Quark, an entity that was

7    incorporated about three weeks after Proton represented to

8    this Court that it was only mining on behalf of 2040 and no

9    one else.

10           And so I will say again: We have seen how this

11   movie ends, Your Honor.  Proton is liable to take Your

12   Honor's denial of a TRO as a blessing to continue fraudulent

13   transfers, and we will end in a situation where there is

14   nothing that anyone can do about it, the assets will be lost,

15   and the trial will be meaningless, or the arbitration will be

16   meaningless if the Ninth Circuit reverses, and Your Honor has

17   ample authority and far more than enough evidence to grant

18   the asset freeze.

19           And if there are questions about limitations that

20   need to be imposed or there need to be wordsmithing to

21   clarify that it does not apply to the personal bank accounts

22   of the individual defendants, that is certainly something

23   that we would be happy to red-line.  I will stand in the

24   attorney lounge right now and mark it up with a pen if

25   there's something unclear about that, but there is nothing,

1    Your Honor, I think, that would prevent you from ordering an

2    asset freeze on Proton's assets and the assets of these

3    constantly cropping-up affiliates, like Elektron and

4    Strange-Quark, and whoever else might be out there that we

5    don't know about yet.

6              So unless Your Honor has further questions, I'll

7    reserve for rebuttal.

8              THE COURT:  I don't have any other questions.

9    Thank you.

10             MR. LANDES:  Thank you.

11             THE COURT:  Okay.  Mr. Trigg, you want to go first?

12             MR. TRIGG:  Thank you, Your Honor.  Adam Trigg on

13   behalf of Defendant Proton.

14             To start, I want to make sure I have clarity on

15   Your Honor's tentative.  My understanding it was to lift the

16   stay to hear the motion to compel arbitration on July 25th --

17             THE COURT:  Well, it was to lift the stay as to

18   Proton in its entirety.  It's not just for the motion.

19             MR. TRIGG:  And then on the requested relief and

20   the ex parte application, other than lifting the stay, the

21   tentative is to deny that relief.

22             THE COURT:  Well, the ex parte application also

23   asked to put the motion back on calendar.  So I'm going --

24   the tentative is to grant that but deny everything else.

25             MR. TRIGG:  To put the motion to compel arbitration

1  back on calendar?

2  THE COURT:  Yes.

3  MR. TRIGG:  Thank you.  Just wanted to clarify.

4  With that, Your Honor, so last month Your Honor

5  issued an order staying this case in its entirety and to the

6  individual defendants under the *Coinbase* case and against

7  Proton discretionarily in order to not prejudice the

8  individual defendants --

9  THE COURT:  It was actually in the interest of

10  judicial economy.  It was not to not prejudice the

11  defendants, but just looking at -- the circumstances as a

12  whole, the Court at that time made a determination that it

13  was in the interest of judicial economy and that we issue the

14  discretionary stay and that there was -- that any prejudice

15  to plaintiff did not outweigh that.  And my tentative is that

16  the circumstances of this case have changed and now prejudice

17  to plaintiff does outweigh any judicial economy that we have

18  in having a discretionary stay, and so that's why the

19  tentative is to sua sponte lift the discretionary stay in its

20  entirety.

21  MR. TRIGG:  Thank you, Your Honor.

22  So since Your Honor issued that order last month,

23  my question is: So what has happened since then?  Swan hasn't

24  received any new document productions.  They haven't pointed

25  to any actions that defendant -- any of the defendants have

1  taken, including Proton.  What did happen is they got around

2  to reviewing a document production from a third party that

3  has this one text message in it from December from Mr. Holmes

4  that references moving assets.  Now, as Mr. Naidoo's

5  declaration -- and if it wasn't signed, it meant to be.

6  That's -- that was in the rush of getting this response on

7  file.  As his declaration notes, the important question here

8  is: What has Swan been doing with -- excuse me.  What has

9  Proton been doing with Proton's assets?  That's the question

10 here.  What has Proton been doing with Proton's assets?  And

11 --

12         THE COURT:  That's not before the Court.

13         MR. TRIGG:  I'm sorry?

14         THE COURT:  That's not an issue that is before the

15 Court.

16         MR. TRIGG:  In terms of -- they're trying to seek a

17 freeze of Proton's assets, and I think -- and the standard

18 shows that they're going to be irreparably harmed if the

19 Court doesn't issue that order.  I agree with your tentative.

20 We don't think the Court should issue an order, but in

21 response to Swan's counsel's argument, I would like to point

22 out that there is no evidence that Proton has been moving

23 Proton's assets.  These other entities as well -- there's no

24 evidence that -- you know, that any Elektron entities are

25 moving -- or assisting Proton in moving Proton's assets or

1  moving its own assets.  The only assets that the briefing

2  discusses is 2040's assets, and even then there's no evidence

3  that any assets were moved surreptitiously.  As we pointed

4  out in our brief, the only assets that have moved from 2040

5  were directed by 2040's board of directors -- which Proton is

6  not on 2040's board -- and was given notice to Swan's CEO as

7  another director of 2040 --

8          THE COURT:  So, if assets are not being moved, why

9  does -- why is there an opposition to this?  Why not just

10  stipulate that no assets will be moved?

11          MR. TRIGG:  Well, because the proposed order is

12  broader -- is broad.  If we're talking about limiting the

13  proposed order to Proton not using its assets except for its

14  routine business expenses -- to pay its employees, its

15  overhead, and its legal fees -- then we can discuss a

16  stipulation with counsel and try to enter into that.  We

17  obviously didn't have time to do that because, rather than

18  bringing the issue to us, counsel waited two weeks and filed

19  an ex parte application.  But if the Court's suggestion is

20  that we should do that and we can avoid the discovery

21  preliminary injunction question, then we'd be happy to meet

22  and confer right now and stipulate to that.  But as I said,

23  their proposal was broader than that.

24          So that's on the asset issue.  Again, Proton is not

25  moving assets, there's no evidence that it's doing so, and we

1    have the declaration from Mr. Naidoo to that effect.

2         And since Your Honor's inclined not to grant the

3    asset freeze, I won't go into it in much more detail, but

4    there is a question of whether the Court even has the

5    authority to do this under the Supreme Court's *Grupo Mexicano*

6    case and certainly shouldn't do it on an ex parte basis

7    without the opportunity to brief that question.

8         THE COURT:  So am I correct in my understanding

9    that there's a willingness to stipulate that Proton and any

10   Proton-related entities will not transfer assets?

11        MR. TRIGG:  I think we'd have to define what

12   "Proton-related entities" means.  Certainly, any entities

13   that Proton controls -- Elektron -- the Elektron entities can

14   stipulate to that.  I don't represent Strange-Quark.

15   Strange-Quark is not an affiliated entity of Proton or the

16   Elektron entities; so I can't speak to that issue.

17        And -- but to point out that -- the issue with the

18   Strange-Quark-ACDC agreement that they've latched onto, I'd

19   like to say a couple of things about that.  One, it was a

20   draft from November, I believe, and it's about mining -- it's

21   a hosting agreement, and so any assets related to that,

22   they're not Proton's.  Proton doesn't own -- and neither does

23   Elektron -- own mining equipment, mining sites -- any kind of

24   physical, tangible property.  So, if Strange-Quark were to be

25   a party, the reason Proton's listed as a contact -- or,

1    excuse me -- Mr. Naidoo is listed as a contact, I believe, is

2    because they -- they're the ones doing the management of the

3    operations, but it's not their property; so we can't agree to

4    not freeze anything.

5         And on this point, this is all based on a

6    production that Swan received from ACDC in -- on May 1st.

7    This draft was from November.  There's no additional evidence

8    put forward, and I'm not aware of any, showing that that

9    draft -- that that draft was entered into, that any change

10   was made to the ACDC-2040 arrangement, and indeed,

11   Mr. Naidoo's declaration says there hasn't been any change,

12   It's the same agreement that they signed, I think, back in

13   2023 between 2040 and ACDC, which is still in place and

14   operating on a month-to-month basis.  It hasn't been changed,

15   and there's no intention to change it.  But again, that's a

16   2040 asset.

17        So I would just reiterate that there isn't evidence

18   of Proton transferring assets.  The only evidence regarding

19   Proton's assets is Mr. Naidoo's declaration, which points out

20   that Proton receives payment and pays salary and legal

21   expenses.

22        THE COURT:  His declaration is unsigned.  It has no

23   evidentiary weight.

24        MR. TRIGG:  And again, that was a mistake on our

25   part in the rush to file.

1          THE COURT:  It's a very significant mistake.

2          (Pause.)

3          THE COURT:  Okay.  Anything else?

4          MR. TRIGG:  No, Your Honor.

5          THE COURT:  Okay.  Ms. Russo, Mr. Fondo, did you

6   want to be heard on behalf of the individual defendants?

7          MS. RUSSO:  Briefly, Your Honor.

8          So as a preliminary matter on the merits, we agree

9   with Proton's position as stated today and in our papers,

10  both Proton's and the individual defendants.  We understand

11  from Swan that they're not seeking an order to impact the

12  individual defendants' assets.  We did understand them to be

13  requesting examinations of certain of the individual

14  defendants.  It doesn't seem like Your Honor is inclined to

15  grant that request at this time, but if it is, we'd just --

16  we'd argue that that -- that given the mandatory *Coinbase*

17  stay, an order to that effect would be in violation of that

18  mandatory *Coinbase* stay.  But we had filed an opposition

19  based on their -- the broad proposed order in this case, and

20  given the concession here, we have nothing further.

21         THE COURT:  Okay.  Yes, I do have that one.  I did

22  see it.  Okay.  Thank you.

23         Okay.  Mr. Landes?

24         MR. LANDES:  Thank you, Your Honor.

25         So I will -- there's just a handful of points I'd

1  like to respond to.

2         I'll start with Ms. Russo's comment, which sounded

3  limited to the question about having Mr. Holmes and

4  Mr. Naidoo appear at a preliminary injunction hearing.  You

5  know, between the unsigned declaration and the silence from

6  Mr. Holmes, I think it's, frankly, remarkable that they're

7  not here today to sit in that witness box to explain

8  themselves.  I half thought that Mr. Holmes would show -- he

9  lives in Los Angeles.  I thought he would show up today to

10 try to explain himself.  And so, if they are not going to

11 appear, if they can't even be bothered to put in declarations

12 to offer an innocent explanation, I think Your Honor can and

13 should draw the appropriate inferences from those nondenials.

14 So that's what I'll say as to that piece.

15        As to Mr. Trigg's comment on behalf of Proton,

16 which echoes a statement that is throughout the opposition

17 brief that there is no evidence that Proton is moving assets,

18 I will refer Your Honor again to Mr. Holmes, who is an

19 executive at Proton -- his own words: "between us moving

20 assets so they are not" encumbered "by the frivolous swan

21 lawsuit."

22        That is evidence, Your Honor.  That is a

23 confession.  That is evidence.  And this is not a situation

24 where we have pored through bank records and all of those

25 bank records are exonerating and this lone text message

1    stands in contradiction to all of those.  That's not the

2    situation.  Those are the bank records we've been trying to

3    get, the information we've been trying to get that Magistrate

4    Judge Eick ordered Proton to produce before the stay -- still

5    haven't been produced.  They haven't produced a single page.

6    And so, yes, this is what we have in addition to other

7    circumstantial evidence, but to say that a completely

8    unambiguous, unrebutted confession is not evidence, I think,

9    pushes it a bit too far.

10         Mr. Trigg briefly referenced the *Grupo Mexicano*

11    decision.  It didn't come up in Your Honor's tentative.  I

12    don't know if you have questions about it.  I'll be very,

13    very brief unless Your Honor has questions, but

14    *Grupo Mexicano* has carve-outs for cases where parties are

15    seeking equitable relief -- which we are here in the form of

16    disgorgement, in the form of unjust enrichment; and it also

17    has carve-outs, unsurprisingly, for cases of fraudulent

18    transfer, which we have here in spades.  And so I would refer

19    Your Honor to the *In re Focus* case from the Ninth Circuit

20    which makes this point.

21         I would also refer Your Honor -- we didn't have --

22    we just found this case, we didn't cite it in our briefing,

23    but it's *Broadcom v. Magicomm*, case No. 8:04-cv-1284.  That's

24    out of the Central District of California, where the court

25    ordered an asset freeze on a trade secret claim because the

1  plaintiff was seeking equitable relief, including unjust

2  enrichment.  The court considered and expressly rejected the

3  *Grupo Mexicano* argument, and then the Ninth Circuit affirmed

4  in -- at 2005WL1111857, including on the *Grupo Mexicano*

5  issue.  So I, frankly, don't even think that one is a close

6  call.

7         I want to talk about the agreement again because

8  Mr. Trigg made the comment, "Oh, this is just an unsigned

9  draft from November.  We don't even know what happened here."

10  But, Your Honor, we do know.  We do know.  And so I want to

11  direct Your Honor again to the Signal message, which is

12  Docket 221-2.  This is Mr. Holmes's Signal message.

13         And, Your Honor, just for a little bit of context,

14  I feel compelled to mention this on behalf of the hardworking

15  associates at Quinn Emanuel.  This -- we were not sitting on

16  our hands.  We were not sitting on our hands.  Your Honor is

17  fully aware of the extremely busy calendar that we had in

18  this case in May.  I think there were six pending motions at

19  the same time, and also at the same time, we received

20  subpoena responses from five different mining sites,

21  thousands of documents collectively, which, by the way, the

22  -- Proton filed an ex parte application to prevent them from

23  producing.  Magistrate Judge Eick denied that.

24         But the way that this particular message was

25  produced -- it was not -- like, it wasn't how it appears on

1    this page, where it was just a bunch of documents that we

2    could potentially search.  It was actually produced --

3    Mr. Watson, who is the COO at ACDC, the mining site, he took,

4    like, a video recording of his phone as he was scrolling

5    through the Signal app, and he produced that video with the

6    entire text history, several minutes long, and so in order to

7    find this message, one of my colleagues was sitting at his

8    computer going frame by frame to try to read each message as

9    it was scrolling by.  So this was not -- this was not a --

10   there were not red flashing lights on this document.  This

11   was the proverbial "needle in the haystack."  So I appreciate

12   you indulging me on that context.

13          But let's go back to this text chain.  So I want to

14   direct Your Honor to that second chat at the top, that second

15   blue bubble.  Do you see that?  It starts "have you heard"?

16          THE COURT:  Yes.

17          MR. LANDES:  That -- so that's a message from

18   Mr. Watson at the mining site, and he's asking, "have you

19   heard anything from San" -- that's San Naidoo -- "have you

20   heard anything from San regarding" the hosting agreement?

21   That hosting agreement -- that's the agreement that we're

22   talking about.  The Strange-Quark agreement.  And Mr. Watson

23   continues, "Shot him a couple of notes" (reading) really need

24   to get this one signed up.

25          And I'll represent to Your Honor that there had

1  been a number of discussions about this.  They'd been going

2  back and forth with red-lines.

3          And if you go down two bullets, you see

4  Mr. Holmes's response to that.  You can tell he's responding

5  to that specific message because you see how it's embedded

6  there again?  I see Your Honor is nodding.  And so this is

7  where Mr. Holmes responds essentially to the question "What's

8  taking so long?" and he responds by saying, "between us" --

9  keep it secret but -- "between us moving assets so they are

10  not" encumbered "by the frivolous swan lawsuit."

11          And by the way, Mr. Trigg mentioned that these are

12  2040 assets that are being moved; Proton isn't involved.

13  2040 is not a party in this lawsuit.  It is a party in the

14  U.K. litigation, but that wasn't filed until about six weeks

15  after this message.  2040 was not a party in any lawsuit.

16          Okay.  So let's continues.  He says, "between us

17  moving assets so they are not" encumbered "by the frivolous

18  swan lawsuit."

19          And then Mr. Watson at the mining site responds,

20  "got you" -- so it was clear to him -- and then he asks, "how

21  does that impact our process in your mind."

22          And then this is what Mr. Holmes responds.  He

23  explains exactly what's going on.  He says (reading): We need

24  to get the agreement done and agreed to and operate off of

25  it.  If we need to wait and sign, that's fine.  I think we

1   trust each other.  And so it's clear what's happening here.

2   He's saying the fact that Proton wants to dissipate these

3   assets mean "We can't be signing this agreement as it is

4   right now.  We can't sign it, but we'll just operate under

5   it.  We'll just operate under it, and we'll trust each

6   other."

7           And I will tell you, Your Honor, in the production

8   from ACDC leading up to this time frame, like I said, there's

9   lots of discussion about negotiating this new agreement, and

10  you can see right here, probably just -- what is this? --

11  40 minutes earlier, Mr. Watson is saying, "What's taking so

12  long?  We really need to get this one signed."  And then

13  right around this time what happens?  The communications

14  about the agreement just go dark.  They just stop -- nothing.

15  They're still operating together, they're still doing

16  business, but the discussions about this just end.  And now

17  Proton is here arguing that the fact that this wasn't signed

18  is evidence that everything is on the up and up, but,

19  Your Honor, I think it's exactly the opposite.  It's just

20  more evidence of what's going on here, which is that they are

21  trying to conceal what is happening.

22          So let me come to the relief, and I was heartened

23  to hear that -- Mr. Trigg say that they would stipulate to

24  freezing certain entities' assets.  That is heartening.  I

25  think the devil may end up being in the details, and if we

1  can reach something right here that's a simple red-line, I'll

2  -- you know, I've got all morning, I know Your Honor has a

3  calendar, but if we can hammer something out, then great.

4  But otherwise, what I would recommend, Your Honor, is enter

5  the TRO -- enter the TRO with -- if Your Honor feels like you

6  need to make short red-lines to reflect the concessions that

7  I've -- or the clarifications that I've made today, you can

8  do so.  It's only for two weeks.  Over that two weeks, if we

9  need to carve something out, if we need to add something in,

10 we can do that, and if not, we'll be back here in front of

11 Your Honor.

12          This is not -- we're not asking for a permanent

13 injunction.  We're not asking for a preliminary injunction.

14 This is temporary.  So let's preserve the status quo.  Let's

15 make sure nothing is moving for two weeks and they're not

16 saying, "Well, there's this other entity, but we don't think

17 we're affiliated; so, yeah, we can move assets there," or

18 "Well, we can dissipate, you know, salaries," and what does

19 that mean?  "Well, we'll pay" -- "As a salary we'll pay

20 Mr. Naidoo $25 million tomorrow to a bank account in

21 South Africa" or "El Salvador."  That's just further

22 dissipation; right?

23          So there is a spot in our declaration -- or, I'm

24 sorry -- in our proposed order that leaves a blank -- I'm

25 sure Your Honor saw it -- for what the appropriate business

1    assets are that need to be distributed.  That is a standard

2    provision.  It's in the *Roberts* injunction.  I believe it was

3    also in the *Broadcom* injunction from the case that I just

4    cited.  Let -- they didn't put up any evidence of what those

5    are today, but this is the sort of thing that, I assume, they

6    would put together in the next two weeks.

7         But let's preserve the status quo.  Let's make sure

8    that this doesn't get away from us and that, you know, by

9    virtue of clever wordsmithing based on the better information

10   that the defendants have we're getting, you know, something

11   that's hollow.  So I would say enter the TRO, we will try to

12   work it out -- I assure you, Your Honor, we will try to work

13   it out in good faith, and if we can't, then Your Honor can

14   have an OSC hearing.

15        And so unless Your Honor has questions, I'll sit

16   back down.

17        THE COURT:  I don't have any questions, but I am --

18   I do want to take everybody up on your offer to meet and

19   confer to see if there's something that you can work out

20   because, if I take Mr. Trigg at his word that there's no

21   transfer happening and not contemplated, you should be able

22   to reach some kind of a stipulation on this.  So --

23        MR. TRIGG:  Your Honor, if I may --

24        THE COURT:  Yes.

25        MR. TRIGG:  Just briefly, Your Honor.

1        On the stipulation piece, we'd be happy to meet and

2   confer right after this hearing to try to hammer that out.

3        I'd like to point out that Your Honor's tentative

4   on the staying of the entire -- lifting the stay against

5   Proton in its entirety, that was based on this, I think,

6   newly raised concern about what Proton is potentially doing

7   with its assets.  If we enter into that stipulation and no

8   asset transferring other than, you know, for its routine

9   expenses is happening, then I think that the calculus that

10  Your Honor initially had regarding prejudice to Swan

11  essentially reverts back to what Your Honor found in its

12  order -- in your order issuing the discretionary stay.  And

13  so I would -- I just -- I would urge the Court to consider

14  keeping the stay in place subject to this stipulation that

15  we're discussing to limit the transfer of assets.

16       THE COURT:  Mr. Landes, if you're able to reach a

17  satisfactory stipulation, what is the -- what is Swan's

18  position concerning its request that the stay be lifted?

19       MR. LANDES:  Should I --

20       THE COURT:  You can -- that's fine.  You can stay

21  there.

22       MR. LANDES:  Okay.

23       I think that the -- two points here.  So the first

24  one is I think that the injunction needs to involve some

25  discovery -- or the TRO would need -- or the stipulation --

1   I'm sorry -- would need to involve the type of discovery that

2   we're seeking here to be able to confirm where these assets

3   have gone and where they are.  So I don't know if Mr. Trigg

4   is seeing that as inside or outside of the stay or the

5   stipulation.  Maybe it's, you know, a question of labeling,

6   but that's one issue I want to flag.

7        The other issue that I want to flag, Your Honor, is

8   the motion to compel arbitration.  It was filed by Proton, it

9   was fully briefed, and then it was vacated by Your Honor.  We

10  would ask that that -- at a minimum that that be -- that

11  Your Honor decide that.  If we need to come back in on

12  July 25th, we can argue on July 25th.  If we need to -- if

13  you want to decide it on the papers, obviously that's fine

14  with us.  The issues there are a little bit different and I

15  -- you know, we -- there was a brief that we were going to

16  file before Your Honor issued the stay to explain why there's

17  an issue here.

18       But our concern is that if that motion is not heard

19  now, we're going to be in a situation where there's just

20  iterations of delay, where the individual defendants' appeal

21  goes up -- whatever happens -- then it comes back down, and

22  Your Honor says, "Okay.  Finally," you dust off your binders,

23  "Let's get ready to go," and what's the first thing?  Proton

24  motion to compel arbitration.  Maybe it's denied, appeal, and

25  now you put your binder right back up on your shelf, and

 1    we're waiting another year, year and a half.

 2           And so our goal, Your Honor, is let's get this

 3    resolved, let's get it in front of the Ninth Circuit if

 4    they're going to appeal it -- or if Your Honor's going to

 5    grant the motion to compel arbitration, then we know we're in

 6    arbitration, but let's just -- let's get it resolved now.  I

 7    think that is actually -- I think judicial economy weighs

 8    very strongly in favor of that.  It's a fully briefed motion.

 9           THE COURT:  It is.

10           MR. LANDES:  And I'm -- I love coming down here,

11    Your Honor.

12           THE COURT:  Okay.

13           MR. LANDES:  I'm happy to argue.

14           So that would be my position on that.

15           THE COURT:  Okay.  Anything else from --

16           MR. TRIGG:   Just quick on the discovery issue.

17           THE COURT:  Yes?

18           MR. TRIGG:  I mean, if we get to an agreement on a

19    stipulation as to what's happening with Proton's assets, then

20    I don't see why discovery would be necessary to the extent --

21    where it should be limited to just documents sufficient to

22    show what's happened with Proton's assets.

23           But to the point about the full discretionary stay,

24    we don't -- we understand Your Honor's position on the motion

25    to compel arbitration, and hearing that, that's fine.

35

1    Otherwise, I would just reiterate that it would make sense to

2    keep that discretionary stay subject to this stipulation on

3    these issues about the assets.

4              THE COURT:  Okay.  So I'm -- and I'm sorry.  Does

5    anyone from the -- representing the individual defendants

6    want to be heard?

7              MS. RUSSO:  No, Your Honor.

8              THE COURT:  Okay.  So I'm going take the -- today's

9    motion application under submission to give you time to see

10   if you can work something out amongst yourselves, and then I

11   will issue a ruling.  Are you going to be able to meet and

12   confer today?

13             MR. TRIGG:  We're available, Your Honor.

14             MR. LANDES:  I have no plans.  If the lounge is

15   open, I'll sit right there.

16             THE COURT:  Okay.  So I'll wait until this

17   afternoon to see whether or not you're able to file something

18   before I issue the ruling.

19             MR. LANDES:  Thank you, Your Honor.

20             THE COURT:  Okay?  Thank you very much.  Have a

21   great weekend, everyone.

22             THE CLERK:  Court is in recess.

23        (Proceedings adjourned at 9:53 a.m.)

24   ///

25   ///

1

2

3

4                                      CERTIFICATE

5          I certify that the foregoing is a correct transcript

6    from the electronic sound recording of the proceedings in the

7    above-entitled matter.

8    /s/ Julie Messa                    June 13, 2025
     Julie Messa, CET**D-403            Date
9    Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25