RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone:   (213) 443-3145
Facsimile:   (213) 443-3100

STACYLYN M. DOORE (admitted pro hac vice)
stacylyndoore@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone:   (617) 712-7100
Facsimile:   (617) 712-7200

RACHEL E. EPSTEIN (admitted pro hac vice)
rachelepstein@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
Telephone:   (212) 849-7000
Facsimile:   (212) 849-7100

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ELECTRIC SOLIDUS, INC. d/b/a SWAN BITCOIN, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>PROTON MANAGEMENT LTD., a British Virgin Islands corporation; THOMAS PATRICK FURLONG; ILIOS CORP., a California corporation; MICHAEL ALEXANDER HOLMES; RAFAEL DIAS MONTELEONE; SANTHIRAN NAIDOO; ENRIQUE ROMUALDEZ; and LUCAS VASCONCELOS,<br><br>Defendants. | Case No. 2:24-cv-8280-MWC-E<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR VOLUNTARY DISMISSAL WITHOUT PREJUDICE AND WITHOUT CONDITIONS**<br><br>Judge: Hon. Michelle Williams Court<br><br>Complaint Filed:      Sept. 25, 2024<br>Am. Complaint Filed:    Jan. 27, 2025 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND .............................................................................................................. 3

    A.    Swan, 2040 Energy, and 2140 Energy ..................................................... 3

    B.    The Swan Walkout, Formation of Proton, and Filing of This Action .................................................................................................... 4

    C.    Defendants Oppose Injunctive Relief and Discovery ........................... 6

    D.    Tether and 2040 Energy File Suit in the UK ......................................... 6

    E.    Defendants Attempt to Dismiss This Action and Impede Discovery .............................................................................................. 7

    F.    The UK Court Sets a Course for Discovery and Trial ........................... 8

    G.    This Court Denies Defendants' Motions to Dismiss, Stay These Proceedings, and Compel Arbitration ...................................................... 9

    H.    Swan Again Tries to Obtain Discovery While Defendants Frustrate Those Efforts and Move to Stay and Compel Arbitration ......................................................................................... 10

    I.    Third-Party Discovery Reveals More Wrongdoing by Defendants ..... 11

    J.    UK Litigation Discovery Reveals the Extent of Wrongdoing by Zagury and Other Co-Conspirators....................................................... 12

    K.    Swan Makes Strategic Choices for Handling the UK Litigation and Pursuing Redress in Other Forums ................................................. 15

LEGAL STANDARD ..................................................................................................... 17

ARGUMENT .................................................................................................................. 17

    I.    Dismissal Will Not Result in Legal Prejudice ..................................... 17

    II.    No Costs or Legal Fees Should Be Awarded ....................................... 22

CONCLUSION................................................................................................................ 25

Case No. 2:24-cv-8280-MWC-E

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

# TABLE OF AUTHORITIES

## Cases

*Akira Techs., Inc. v. Conceptant, Inc.*,
  773 Fed. App'x 122 (4th Cir. 2019) ................................................................ 25

*BP West Coast Prods. LLC v. SKR Inc.*,
  989 F. Supp. 2d 1109 (W.D. Wash. 2013) ................................................ 18, 20

*Buchsbaum v. Digital Intel. Sys., LLC*,
  2021 WL 2826018 (S.D. Cal. Jul. 6, 2021) ............................................... 22, 23

*Cerciello v. Blackburn Truck Lines Holding Co.*,
  917 F.2d 27, 1990 WL 161724 (9th Cir. 1990) ............................................... 23

*In re Exxon Valdez*,
  102 F.3d 429 (9th Cir. 1996) .......................................................................... 20

*Hamilton v. Firestone Tire & Rubber Co., Inc.*,
  679 F.2d 143 (9th Cir. 1982) ..................................................................... 18, 19

*Herbalife Int'l of Am., Inc. v. Kamel*,
  2024 WL 5416968 (C.D. Cal. Apr. 11, 2024) ................................................. 24

*Kachian Indus. Inc. v. Elliott*,
  2020 WL 5657885 (E.D. Wash. Sept. 23, 2020) ................................. 19, 20, 25

*Kamal v. Eden Creamery, LLC*,
  88 F. 4th 1268 (9th Cir. 2023) ............................................................. 17, 18, 19

*Madsen v. Buffum*,
  2013 WL 12140168 (C.D. Cal. 2013) ....................................................... 19, 24

*Munoz v. City of Yakima*,
  2013 WL 1345079 (E.D. Wash. Apr. 2, 2013) ............................................... 25

*Puerto Rico Mar. Shipping Auth. v. Leith*,
  668 F.2d 46 (1st Cir. 1981) ...................................................................... 22, 24

*Punay v. PNC Mortgage*,
  2018 WL 2095770 (S.D. Cal. May 7, 2018) ................................................... 19

*Santa Rosa Mem. Hosp. v. Kent*,
  688 Fed. App'x 492 (9th Cir. 2017) ............................... 17, 18, 19, 20, 22, 24

*Smith v. Lenches*,
263 F.3d 972 (9th Cir. 2001) ..................................................................................19

*Stevedoring Servs. of Am. v. Armilla Int'l B.V.*,
889 F.2d 919 (9th Cir. 1989) .........................................17, 18, 21, 22, 23, 24, 25

*Terrovona v. Kincheloe*,
852 F.2d 424 (9th Cir. 1988) ..................................................................................20

*Westlands Water Dist. v. United States*,
100 F.3d 94 (9th Cir. 1996) ..............................................................17, 18, 19, 22

*Williams v. Peralta Cmty. Coll. Dist.*,
227 F.R.D. 538 (N.D. Cal. 2005) .......................................17, 18, 19, 20, 22, 24

## Statutes / Rules

Defend Trade Secrets Act .......................................................5, 7, 8, 9, 10, 16, 21, 25

Fed. R. Civ. P. 26(a)(1)................................................................................................8

Fed. R. Civ. P. 26(f)...............................................................................................7, 8

Fed. R. Civ. P. 41(a)(2)....................................................................................1, 17, 22

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

Pursuant to Fed. R. Civ. P. 41(a)(2), Plaintiff Electric Solidus, Inc. ("Swan") moves to voluntarily dismiss this action without prejudice to pursue claims in other forums, without awarding costs or legal fees to Defendants as a condition of dismissal.

**PRELIMINARY STATEMENT**

This action stems from a self-described "rain and hell fire" scheme plotted by 13 of Swan's now former personnel and the cryptocurrency company Tether in August 2024 to raid the Bitcoin mining operation Swan developed and to gut 2040 Energy, Swan's highly successful joint venture with Tether. Those 13 individuals quit Swan *en masse*, taking thousands of proprietary and confidential documents and software code with them. The following day, counsel for Tether claimed that "███ ████████████████████████████████████████ ████████." Ex. A (Aug. 9, 2024 Winston & Strawn Email). But Tether immediately installed a company the former employees had just created, Defendant Proton, to replace Swan and seize full control of their joint Bitcoin operation.

Swan filed suit against Proton and the individual Defendants here in September 2024, seeking, *inter alia*, injunctive relief and discovery. Defendants told the Court in opposition that the materials they covertly removed were being "used solely for the benefit of 2040 Energy," and that Proton and the individual Defendants (plus the other former Swan personnel) were "working only for 2040 Energy." Dkt. 29-1 at 4, 12.

That was all lies. Incontestable evidence now shows Defendants and their co-conspirators elaborately planned and executed an illegal diversion of part of Swan's business and the 2040 Energy joint venture through a web of deliberate deceptions.

Discovery in UK litigation brought by Tether has revealed that weeks before the raid, Defendants conspired with former Swan Chief Investment Officer Raphael Zagury and Tether executives Giancarlo Devasini, Paolo Ardoino, and Zachary Lyons in secret Telegram channels with the explicit goal of mining Bitcoin outside 2040 Energy. On July 30, 2024, while still Swan's CIO, Zagury presented Tether a plan to move mining operations out of 2040 Energy to Proton and an affiliate, Elektron:



Ex. B (Elektron Business Plan Overview at 3, July 30, 2024)

Discovery here also revealed Defendants pulled off their plan, ████████████████████████████████████████████████████:

████████████████████████████████████████

Screenshot to be kept under seal.

Ex. C, Mining Report Excel Spreadsheet at Tab "Month End Key Metrics Table"

Given this surfeit of new evidence—as well as this Court's order compelling arbitration against Proton, and UK litigation "undertakings" requiring dismissal of certain claims "without prejudice"—Swan sought agreement to voluntarily dismiss this action without prejudice to pursue: (1) arbitration claims against Defendants, Zagury, and others; (2) counterclaims in the UK against Tether; and (3) derivative claims on behalf of 2040 Energy against Tether in the British Virgin Islands.

This should have been a non-controversial stipulation by the parties, but, as part

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

of their ongoing attempts to avoid being held to task for their deceit, Defendants have refused.  They instead insist Swan must dismiss its trade secret and contract claims *with* prejudice so they can seek fees as prevailing parties, and threaten to move for sanctions if Swan does not do so.  Defendants' position is based on Swan's decision—after *finally* obtaining long-sought discovery shedding light on the duplicitous scheme—that the most efficient and straightforward way of obtaining relief was to agree in the UK litigation that certain trade secrets, a.k.a. the "Business Assets," belonged to 2040 Energy under English law, and to pursue redress via the arbitration claims, UK counterclaims, and derivative claims discussed above.

Defendants' attempt to leverage that decision into prevailing party status on its trade secret and contract claims *here* is baseless gaslighting: there is an entire trial coming up in the UK about the Business Assets and Swan's counterclaims, and Tether and 2040 Energy admit that the Business Assets do not include the full scope of trade secrets and confidential information at issue here.  There was also no adjudication of any contract claims here (or in the UK), which do not rest solely on theft of Swan's trade secrets.  And the issue of which entity "owns" trade secrets under English law—Swan or 2040 Energy—is no longer relevant here (to the extent it ever was) given the evidence demonstrating use of materials outside of 2040 Energy, and thus Swan's alternative paths to obtain relief against Defendants, Tether, and their co-conspirators.

Accordingly, Swan moves to voluntarily dismiss this action without prejudice—as set forth in the UK court's order—and without payment of costs and legal fees to Defendants.  Swan should not be prevented from pursuing its claims in other forums, and Defendants should not be rewarded with prevailing party status or fees they incurred attempting to prevent discovery that proves their malfeasance.

## BACKGROUND

### A.    Swan, 2040 Energy, and 2140 Energy

Swan is an industry leading Bitcoin financial services company.  Dkt. 100-1, Amended Complaint ¶¶ 17, 46, 50-51 (hereinafter, "AC").  In June 2023, Swan and

Tether entered into a Bitcoin mining joint venture called 2040 Energy.  *Id.* ¶¶ 54-55. The arrangement was that Tether (via a subsidiary) would provide capital for Bitcoin mining sites, and Swan would house and manage the mining operations, *i.e.*, provide the sweat equity.  *Id.* ¶ 55.  Swan and Tether entered into a Shareholder Agreement ("SHA") for 2040 Energy on July 28, 2023.  Dkt. 133-1.

At that time, Swan already had a mining team of twelve dedicated employees and contractors in place.  AC ¶ 59.  That included Mr. Zagury, a former Wall Street investment banker, who became Swan's CIO and Head of Mining.  *Id.* ¶¶ 6, 53, 58.

The Bitcoin mining operations developed by Swan, and thus the 2040 Energy joint venture, flourished.  Swan's mining team developed a multitude of proprietary methods and systems allowing Swan's mining operations for 2040 Energy to outperform entities that had been mining Bitcoin for years.  *Id.* ¶¶ 60-76.  Tether made additional capital investments, and Swan expanded operations from one to ██ mining sites across the globe, generating over ████████ in revenue.  *Id.* ¶¶ 85-86.

**B.    The Swan Walkout, Formation of Proton, and Filing of This Action**

2040 Energy's mining activities continued to grow under Swan's stewardship until August 8, 2024, when Zagury and 12 other Swan employees and independent contractors resigned *en masse* over a two-day period.  *Id.* ¶¶ 153-156.

An internal investigation revealed those individuals had been plotting to leave Swan for weeks, and had taken literally thousands of highly confidential, proprietary documents, as well as source code related to the mining platform, with them.  *Id.* ¶¶ 133, 135-139, 145-151.  That investigation and (self-serving) communications from Tether's counsel also revealed ████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████  *Id.* ¶¶ 158-162; Ex. D at 2 (████████████████).

Among other things, Swan's investigation revealed notes taken by Zagury from an August 6, 2024 call with Swan general counsel Bill Belitsky, outside counsel Max

Berg, and independent contractors Alex Holmes and San Naidoo two days before the mass resignation. AC ¶ 127; Ex. E (Aug. 6, 2024 Zagury Call Notes). These notes revealed what the conspirators called a "rain and hell fire" plot, including the "staged walk out" of employees and contractors, and a fake paper trail "announcing" the formation of the new Proton entity, and "inviting" the co-conspirators to "[j]oin Proton." Ex. E at 1. They planned to have all 2040 Energy assets be assigned to Proton, and that Tether would provide them with "[l]egal cover." *Id.* They also detailed their concerns about being "exposed" on confidentiality and intellectual property issues (*i.e.*, trade secrets). *Id.*[1]



Ex. E (Zagury Notes from Call with Belitsky, Berg, Holmes and Naidoo, Aug. 6, 2024)

Given this, Swan filed this action against Proton and the individual Defendants on September 25, 2024, alleging trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), breaches of the individual Defendants' consulting agreements, tortious interference, aiding and abetting, unfair competition, conversion, and civil conspiracy. Dkts. 1 & 25-1. The alleged trade secrets included hash-rate optimization techniques, mining site identification and selection methods, advantageous relationships with mining vendors, overclocking and underclocking techniques, cooling methods, optimizations for mining hardware and software, source code for its Bitcoin Network Operating Center ("BNOC"), and proprietary financial

---

[1] *See also* Dkt. 221-3 (Aug. 8, 2024 Holmes email to Swan mining team inviting them to join Zagury and Naidoo at a new entity).

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

modeling (*id.* ¶¶ 45-49), all of which had been developed by Swan personnel as part of their work in furtherance of 2040 Energy's mining business. Swan alleged the individual Defendants had breached their contracts by improperly sharing confidential and proprietary information, intellectual property, and trade secrets of both Swan and its affiliates (*i.e.*, 2040 Energy). *Id.* ¶¶ 51 & n.5, 137-147.

### C. Defendants Oppose Injunctive Relief and Discovery

In connection with filing its Complaint, Swan moved for injunctive relief to halt Defendants' illegal possession and use of the proprietary materials, and also attempted to obtain expedited discovery as to whether all the Swan personnel had taken jobs with Proton, whether and how the proprietary materials were being used and what for, if and how individuals were solicited to join Proton, and Proton's ownership structure. *See, e.g.*, Dkts. 9-1, 25-2, 43-1 (motion memoranda). It also filed a motion to compel Defendants to return their Swan-issued laptops. Dkt. 53.

Defendants opposed at every turn. *See, e.g.*, Dkts. 27, 29-1, 58 (oppositions to motions). Proton argued Swan was merely "speculat[ing] … that Proton itself is using, or plans to use, the information" that had been taken. Dkt. 27 at 9-10. The individual Defendants also told the Court that "Proton and the Individual Defendants are working only for 2040 Energy" and any trade secrets were being "used solely for the benefit of 2040 Energy." Dkt. 29-1 at 4, 12. Crediting Defendants' statements, the Court denied Swan's motions for injunctive relief, discovery, and return of laptops. Dkts. 40, 54, 63. Those statements were false, however. As set forth below, discovery now shows Defendants planned all along to use the stolen information outside of 2040 Energy and did exactly that.

On December 23, 2024, Defendants moved to dismiss the Complaint and compel arbitration. Dkts. 79, 80. On January 7, 2025, the Court set an initial scheduling conference and ordered the parties to confer on discovery. Dkt. 95.

### D. Tether and 2040 Energy File Suit in the UK

Just days after the Court's January 7, 2025 order, Defendants' co-conspirator

Tether and 2040 Energy (now managed by Proton) opened up a new litigation front.

On January 10, 2025, Tether and 2040 Energy sought injunctive relief in the High Court of Justice Business and Property Courts of England and Wales King's Bench Division Commercial Court. Ex. F (Jan. 10, 2025 Claim Form). They sought a declaration that 2040 Energy was the beneficial owner of certain BitGo Accounts and "Business Assets" under English law pursuant to the terms of the SHA. Ex. G at 25-26 (Jan. 13, 2025 Particulars of Claim). The Business Assets were defined to include "'Bitcoin Network Operating Center' (BNOC), a bitcoin mining monitoring platform, as well as the financial modeling, data analytics and monitoring tools necessary for the JVC's Bitcoin mining business." *Id.* at 10. Tether and 2040 Energy also contended that this action (*i.e.*, the "California Proceedings") violated the Exclusive Jurisdiction Clause of the SHA and sought to enjoin this suit. *Id.* at 22.

On January 14, 2025, the UK court ordered an expedited hearing on these issues. Ex. H (Jan. 14, 2025 UK Court Order).

**E.      Defendants Attempt to Dismiss This Action and Impede Discovery**

Back in United States, on January 27, 2025, Swan filed an Amended Complaint, again asserting its claims of trade secret misappropriation under the DTSA, breach of contract, tortious interference, aiding and abetting breach of the duty of loyalty, unfair competition, conversion, and civil conspiracy. AC ¶¶ 100 & n.9, 208-267. The Amended Complaint, *inter alia*, added factual allegations supporting Swan's claims that Defendants were not mining "solely" for 2040 Energy's benefit, including that: (1) ███████████████████████████████████ ███████████████████████████████████ ████████ and (2) ███████████████████████ ███████████████████████████. *Id.* ¶¶ 184-186, 199; Dkt. 29-1 at 4.

Swan also sought to move the case forward and obtain basic discovery, which Defendants opposed at every turn. For example, Defendants resisted holding a Rule 26(f) conferral, sought to stay this action in the Rule 26(f) Joint Report, and objected

even to filing initial disclosures. *See* Dkt. 137-2 at 4-5 (Feb. 3, 2025 M. Kanny Email); Dkt. 114-1 at 10-13, 22, 27, 30 (Rule 26(f) Report requesting stay); Dkts. 129-5, 129-6 (Defendants' Rule 26(a)(1) disclosures, consisting solely of objections).

On February 14, 2025, Swan served targeted discovery requests focused on obtaining a preliminary injunction, seeking information related to: for whom Defendants were mining Bitcoin; why Bitcoin received by 2040 Energy's digital wallets had dropped substantially; to whom Proton offered management services; and the relationship between Proton and an entity named "Elektron" (which individual Defendants now had email addresses from). Dkts. 114-2, 114-3.

On February 24, 2025, Defendants moved to dismiss the Amended Complaint, and also filed motions to compel arbitration and stay the action pending resolution of the UK litigation. Dkts. 121, 122, 124, 126 (notices of motions and joinder of motion to stay). Defendants argued in part that Swan was not the owner of trade secrets under the DTSA and that the trade secrets were instead owned by 2040 Energy. Dkt. 121-1 at 20-21; Dkt. 122-1 at 17-18. They also argued Swan had agreed to adjudicate all claims arising from the SHA in the UK, and that determination of who owned the Business Assets in the UK was a threshold issue for "resolving the claims of misappropriation and/or misuse of Swan's alleged trade secrets and confidential information in *this* case." Dkt. 124-1 at 13-14, 17-18 (emphasis in original).

### F.    The UK Court Sets a Course for Discovery and Trial

The following day, the UK court began its two-day hearing regarding the Business Assets and Tether and 2040 Energy's request for injunctive relief. Following the conclusion of that hearing, the UK court declined to issue an injunction or an order related to the Business Assets, and instead scheduled a September 2025 trial to determine ownership of the Business Assets. Dkt. 134-2 at 3-4 (Feb. 26, 2025 UK Court Order). It also declined to enjoin the California Proceedings, with the parties instead agreeing Swan would not move for summary judgment before the September 2025 UK trial, and would not move for a preliminary injunction here that

would restrain the Defendants from using the Business Assets, so long as they were used for the *sole benefit of 2040 Energy* in the meantime. *Id.* at 5.

### G.    This Court Denies Defendants' Motions to Dismiss, Stay These Proceedings, and Compel Arbitration

Swan continued to prosecute this action.  It moved to compel Defendants to serve initial disclosures (Dkt. 129), and opposed Defendants' motions to dismiss, stay proceedings, and compel arbitration (Dkts. 130, 134 & 137, respectively).   In opposing the motions to dismiss and to compel arbitration, Swan argued in part that trade secret ownership under the DTSA includes parties that helped develop a trade secret, and that its pleadings were thus sufficient to establish Swan was an owner of the trade secrets.  Dkt. 130 at 19-20; Dkt. 137 at 19-21.  Swan also argued it had adequately pled its other claims.  Dkt. 130 at 20-25; Dkt. 137 at 23-25.

In opposing the motion to stay, Swan also noted that the Defendants here were non-parties to the UK litigation and the SHA, and that the UK litigation would not resolve all issues or claims here.  Dkt. 134 at 3, 6-7, 14-20.  Swan further noted that the UK court's decision regarding the Business Assets would not fully resolve questions of ownership of the trade secrets in this action.  *Id.* at 14-17.  As Swan explained, Swan and its former employees and contractors developed all of the trade secrets, and the concept of "ownership" under the DTSA did not rest solely on whether Swan had "exclusive" ownership of the trade secrets under English law.  *Id.*

Having yet to receive substantive initial disclosures or responses to its targeted discovery requests regarding Bitcoin mining and who was benefiting, in the spring of 2025, Swan sought third-party discovery, which Defendants attempted to obstruct by filing an *ex parte* application to delay the return dates for Swan's third-party subpoenas. Dkt. 140.  The Court denied Defendant's application (Dkt. 142), and also ordered Defendants to serve revised initial disclosures by April 16, 2025 (Dkt. 156).

On March 17, 2025, Defendants responded to Swan's targeted discovery requests, objecting to every single one and refusing to substantively respond.  Dkts.

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

177-3, 177-4, 177-5, 177-6. Defendants' objections were primarily based on their pending motions to dismiss, compel arbitration, and stay this action.

On April 9, 2025, this Court denied Defendants' motion to compel arbitration and motion to stay, and denied in substantial part the motion to dismiss the Amended Complaint. Dkt. 164. In that order (*id.* at 31-32), the Court noted:

> Although Swan's DTSA claim is not governed by a choice of law provision, the UK court's findings will certainly have some impact as to Swan's general ownership rights under DTSA. However, even if Swan is not deemed an owner or a partial owner, Swan maintains viable state claims against Proton that do not necessarily rely on the DTSA claim.

**H.    Swan Again Tries to Obtain Discovery While Defendants Frustrate Those Efforts and Move to Stay and Compel Arbitration**

Swan again attempted to move this case forward and obtain discovery, and Defendants yet again obstructed at every turn. For example, after receiving the Court's order, Swan asked Defendants to serve substantive responses to Swan's targeted discovery requests. Defendants served supplemented but deficient responses, forcing Swan to once again move to compel. Dkt. 177. The Court ordered Defendants to "serve complete responses without objection." Dkt. 205 at 2.

Defendants also engaged in repeated further attempts to compel arbitration and stay this action. For example, on April 25, 2025, the individual Defendants appealed the denial of their motion to compel arbitration to the Ninth Circuit, coupled with a notice of a purported "automatic" stay. Dkts. 180, 181.[2] On April 30, 2025, Defendant Proton filed its own motion to compel arbitration. Dkt. 194-1. Shortly thereafter, Defendants filed motions to stay in light of the appeal (Dkts. 206, 207), as well as a motion to stay the order requiring Defendants to comply with and provide responses to Swan's targeted discovery requests (Dkt. 208).

On May 27, 2025, the Court stayed this case pending appeal. Dkt. 218.

---

[2]    Swan promptly filed a response noting that the purported "automatic" stay was another delay tactic by Defendants trying to avoid discovery obligations. Dkt. 182.

## I.    Third-Party Discovery Reveals More Wrongdoing by Defendants

Prior to the case being stayed, Swan received limited third-party discovery from a 2040 Energy mining site.  This included a text message by Defendant Holmes, now a Proton executive, stating that he was "moving assets so they are not [encumbered] by the frivolous [S]wan lawsuit."  Dkt. 221-2 (Dec. 10, 2024 Holmes Text Message).



Dkt. 221-2 (Holmes' Text Message, Dec. 10, 2024)

These documents also indicated Defendants were not mining "solely for the benefit of 2040 Energy" as they had previously told the Court (Dkt. 29-1 at 4, 12), including because the documents referenced creation of a new Proton-related entity, "Strange-Quark," and mining operations outside 2040 Energy.  Dkt. 222-5 (Strange-Quark Cert. of Form.); Dkt. 221-4 (Nov. 6, 2024 Mining Hosting Agreement Email).

Given this discovery—revealing exactly the sort of moving of assets and non-2040 Energy mining operations Swan had suspected from the start—Swan filed an *ex parte* motion for a temporary restraining order on June 11, 2025, seeking to "freez[e] Proton's assets," and asking that Defendants be ordered to respond to Swan's targeted discovery requests on an expedited basis and for the Court to set a briefing schedule for a preliminary injunction motion.  Dkt. 221-1 at 25.  Once again, Defendants lied to the Court, claiming at the TRO hearing that Strange-Quark was unrelated to Defendants—███████████████████████████████████████.  *See* Jun. 13, 2025 Hearing Tr. 21:11-16 (counsel stating Strange-Quark is "not an affiliated entity of Proton or the Elektron entities"); Ex. C ███████████████████████████████████).  On June 13, 2025, the Court denied Swan's motion but lifted the stay as to Defendant Proton.  Dkt. 235.

Having still not received any documents from Defendants, on June 27, 2025, Swan sought to re-initiate discovery by filing a motion to compel. Dkt. 243-1. The Court ordered Defendants to serve complete responses within 35 days. Dkt. 249. Defendants made two small productions of about 1,240 pages of documents on July 3, 2025. Those productions demonstrated that ███████████████████████████████████████████████████████████████████████████████████████████████████ On July 21, 2025, the Court granted Proton's motion to compel arbitration and re-stayed the case. Dkt. 250.

**J.    UK Litigation Discovery Reveals the Extent of Wrongdoing by Zagury and Other Co-Conspirators**

While all this was going on, in the summer of 2025, Swan engaged in discovery in the UK litigation. That discovery further revealed the extent of the conspiracy by Tether and the Defendants to gut the 2040 Energy mining joint venture and cut Swan out of the profits. It also revealed that Swan's former CIO, Zagury—now Proton's CEO—was one of the ringleaders in the scheme, along with Defendant Holmes.

Documents showed that on June 26, 2024, Zagury, who was then Swan's CIO, met with Tether's outside counsel at the East Miami hotel. Ex. I (June 26, 2024 Calendar Invite). A few days later, on July 2 and 3, 2024, Zagury told Swan's then-President, Guilherme Gomes, that Tether-affiliated executive Zachary Lyons believed Swan's mining operations should be spun off into an independent entity. Ex. J at 6-10 (July 3, 2024 Zagury & Gomes Slack Chain). Zagury then floated his plan to form a new company to replace Swan as the operator of 2040 Energy. *Id.* Zagury would be the new company's CEO, and Defendants Naidoo and Holmes would be the COO and Head of Operations and Procurement, respectively. *Id.* at 10.

Over the next several weeks Zagury, Naidoo, and Holmes recruited and solicited other Swan employees and consultants, including the remaining individual Defendants, to join their scheme. Documents show the co-conspirators plotted an "unwind" of Swan's involvement in 2040 Energy wherein the Swan employees and

consultants would leave for another operator.  Ex. K (July 11, 2024 Call Notes).

On July 19, 2024, while still acting as Swan's CIO, Zagury covertly established a secure channel on the Telegram messaging platform for himself and several Tether executives, including Devasini and Ardoino.  He circulated a draft business plan to create a new entity to "maximize value … while minimizing any associated challenges with remaining under Swan." Ex. L at 1 (July 19, 2024 Business Plan).  It also noted that the individual Defendants and other co-conspirators had verbally "confirmed their willingness and enthusiasm to transition" to the new entity. *Id.* at 8.



Ex. L (Zagury's Project NXT Business Plan, July 19, 2024)

Three days later, Zagury laid out risks in his plan for Tether leadership on Telegram, including Swan's potential contract-based claims for its contractors and employees, as well as the need to "[e]nsure an agreement that Swan forgoes all IP right related to mining to NewCo," including "any *mining technology, source code related to mining (including BNOC), and any other intellectual property* developed by the team moving to NewCo," *i.e.*, intellectual property and trade secrets in which Swan had an interest.  Ex. M (July 22, 2024 Telegram Chain) (emphasis added).

On July 30, 2024, Zagury met with Devasini, Lyons, and other Tether representatives on a plan to create two new interlocking entities, Proton and Elektron. Proton would replace Swan as the manager and operator of 2040 Energy's mining operations, and Elektron would replace 2040 Energy as holder of the mining assets and interests, setting the stage to gut 2040 Energy's mining operations.  Ex. N (July 30, 2024 Telegram Chain Circulating Plan); Ex. B at 1-3 (Elektron Plan).

Zagury, Tether, and their co-conspirators put their plan into action.  As Swan



Exs. N & B (Zagury Telegram Message Sending Electron Plan, July 30, 2024)

had previously discovered, prior to the mass resignation, the individual Defendants and others downloaded thousands of documents, incorporated their new entity, and plotted their mass exit from Swan. Ex. O (Proton Cert. of Inc.); *see also* AC ¶¶ 128-139, 145-151. On August 6, 2024, Zagury took the notes from the call detailing the "rain and hell fire" scheme and "staged walk out," as well as the plans to assign 2040 Energy's assets to Proton and get "legal cover from Tether." Ex. E (Zagury Notes).

On August 8, 2024, the conspirators commenced operation "rain and hell fire." Defendant Holmes submitted his resignation followed by a pre-planned and false email to Zagury and Defendant Naidoo, inviting them to join him at a new entity, explaining that he was "making arrangements to manage the fleet that we have built together." Ex. P (Aug. 8, 2024 First Holmes Email). Following this, Holmes sent a second email to the other co-conspirators purportedly "informing" them of his resignation and "inviting" them to join new "arrangements." Dkt. 221-3 (Aug. 8, 2024 Second Holmes Email). This false paper trail was followed by resignations of each of the individual Defendants and the other co-conspirators. AC ¶ 156.

Dkt. 221-3 (Second Holmes Email, Aug. 8, 2024)

Discovery also revealed that in the days following the mass resignations, Tether and Proton entered into a ███████████████████████████

14

Case No. 2:24-cv-8280-MWC-E

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

████████████████████████████████████████████████████████

████████████████████████████████. Ex. Q (Sept. 12, 2024 Statement of Work); Ex. R (Tether-Proton Task List).  Since then, ████████████████████ ████████████████████████████ further reducing the scale and profitability of 2040 Energy and harming Swan's interest as a shareholder.

It was only following this discovery that Swan became aware of the full extent of the plotting that had taken place to cut Swan out of the Bitcoin mining joint venture.

### K.    Swan Makes Strategic Choices for Handling the UK Litigation and Pursuing Redress in Other Forums

Having finally obtained the limited discovery in this action and in the UK showing the perfidy of Defendants and their co-conspirators, Swan determined in August 2025 that the most expedient and least wasteful course of action was to agree in the UK litigation that the Business Assets were owned by 2040 Energy, pursue claims directly against Tether and Proton both directly and derivatively on 2040 Energy's behalf, and initiate arbitrations against Holmes, Zagury, and others.

Accordingly, Swan entered into a stipulation in the UK litigation resulting in a September 9, 2025, order from the UK court, in which Swan agreed in "undertakings" not to seek to "obtain control of any of the Business Assets, including through the California Proceedings" or "pursue or prosecute or progress any of its existing claims in respect of the Business Assets currently being pursued in the California Proceedings." Ex. S at 4 (Sept. 2025 Undertakings).  As part of those undertakings, the UK court required Swan to "***dismiss or withdraw the California Proceedings … without prejudice to any right to pursue related arbitrations or claims, provided that such claims are not inconsistent with the Undertakings*.*" *Id.* (emphasis added).

Shortly after the UK court's order, Swan initiated conversations with Defendants' counsel about dismissing its claims in this action without prejudice, per the UK court's order.  Ex. T (Oct. 7, 2025 Email Chain) (showing Swan informed Defendants of intent to dismiss on Sept. 25, 2025).  Defendants have refused to

stipulate to a dismissal without prejudice.  Ex. U (Oct. 9, 2025 S. Doore Letter); Ex. V (Oct. 29, 2025 M. Kanny Letter); Ex. W(Jan. 8, 2026 S. Doore Letter); Ex. X (Mar. 26, 2026 M. Kanny Letter).  Instead, they have demanded that dismissal of Swan's trade secret and contract claims must be with prejudice so they can seek attorneys' fees as prevailing parties (Ex. X at 4-7), notwithstanding the facts that: (1) as this Court has recognized, trade secret rights differ under the DTSA, California state law, and English law; (2) the trade secrets at issue here are not coextensive with the Business Assets; (3) the UK court ordered claims be dismissed "without prejudice;" (4) there has been no final resolution of the UK litigation; and (5) there has been no adjudication whatsoever of any contract claims, which do not rest solely on theft of Swan's trade secrets.  Defendants have also threatened to move for sanctions, falsely claiming Swan never had a good faith basis to support its trade secret claim (*id.* at 8), despite, for example, this Court's motion to dismiss ruling on that claim and discovery evidencing the co-conspirators' repeated concerns in 2024 about addressing Swan's intellectual property interests in the Bitcoin mining operations.

Accordingly, Swan has been forced to spend money and to burden the Court by bringing this motion seeking voluntary dismissal of its claims without prejudice, and without imposition of costs of fees as a condition of dismissal.

In the meantime, Swan is prosecuting counterclaims in the UK litigation, and has applied for permission from the British Virgin Island's court to bring a shareholder derivative action in the name of 2040 Energy against Tether, Proton, Elektron, Strange-Quark, and a number of executives on claims including breach of fiduciary duties, conspiracy, and breach of contract (the "BVI action").  Ex. Y (Derivative Claim Pleading).  It also filed a JAMS arbitration against Zagury for, *inter alia*, breach of contract, breach of fiduciary duty, and tortious interference.  Ex. Z (Arbitration Demand).  It intends to file additional arbitrations (per this Court's order) against Proton as well as other Defendants, including on contract-related claims.

## LEGAL STANDARD

Federal Rule of Civil Procedure 41(a)(2) "permits a plaintiff, with the approval of the court, to dismiss an action without prejudice at any time." *Stevedoring Servs. of Am. v. Armilla Int'l B.V.*, 889 F.2d 919, 921 (9th Cir. 1989) ("*Stevedoring*"). Voluntary dismissal under Rule 41(a)(2) is "addressed to the district court's sound discretion." *Id.* Where the request is to dismiss without prejudice, the court "should grant a motion for voluntary dismissal under Rule 41(a)(2) unless a defendant can show that it will suffer some plain legal prejudice as a result." *Kamal v. Eden Creamery, LLC*, 88 F. 4th 1268, 1279 (9th Cir. 2023) (quotation omitted).

The court may, in its discretion, condition voluntary dismissal on "any terms and conditions the court deems proper," including, in certain circumstances, payment of a defendant's attorneys' fees and costs. *Westlands Water Dist. v. United States*, 100 F.3d 94, 96-97 (9th Cir. 1996) ("*Westlands*"). "Imposition of costs and fees as a condition for dismissing without prejudice is not mandatory however." *Id.* at 97; *see also Kamal*, 88 F.4th at 1286; *Stevedoring*, 889 F.2d at 921. In determining whether to award costs and fees as a condition of voluntary dismissal without prejudice, courts generally consider: "(1) any excessive and duplicative expense of a second litigation; (2) the effort and expense incurred by a defendant in preparing for trial; (3) the extent to which the litigation has progressed; and (4) the plaintiff's diligence in moving to dismiss." *Santa Rosa Mem. Hosp. v. Kent*, 688 Fed. App'x 492, 494 (9th Cir. 2017) ("*Santa Rosa*") (quoting *Williams v. Peralta Cmty. Coll. Dist.*, 227 F.R.D. 538, 540 (N.D. Cal. 2005)). "The merits of the plaintiff's case are also relevant." *Id.* (citing *Williams*, 227 F.R.D. at 540, and *Stevedoring*, 889 F.2d at 922).

## ARGUMENT

### I.    DISMISSAL WILL NOT RESULT IN LEGAL PREJUDICE

The Court should allow voluntary dismissal without prejudice because Defendants will not be legally prejudiced by doing so.

When a plaintiff moves to dismiss without prejudice under Rule 41(a)(2), "the

district court must determine whether granting [the] motion for dismissal without prejudice would result in legal prejudice to the defendant and, if not, the motion should be granted." *Kamal*, 88 F.4th at 1282 (citing, *inter alia*, *Westlands*, 100 F.3d at 96 and *Stevedoring*, 889 F.2d at 921). Legal prejudice is "prejudice to some legal interest, some legal claim, some legal argument." *Westlands*, 100 F.3d at 97. Legal prejudice "does not result merely because a dispute remains unresolved, there is a threat of future litigation, the defendant will be inconvenienced by having to defend in another forum, or the plaintiff would gain a tactical advantage by that dismissal." *Santa Rosa*, 688 Fed. App'x at 493 (citation omitted); *see also Williams*, 227 F.R.D. at 539; *Kamal*, 88 F.4th at 1280. Filing of responsive pleadings or motions or even engaging in trial preparations are likewise not a basis to deny voluntary dismissal without prejudice. *Hamilton v. Firestone Tire & Rubber Co., Inc.*, 679 F.2d 143, 146 (9th Cir. 1982); *Kamal*, 88 F.4th at 1280, 1282, 1285-86. Similarly, "expense incurred in defending against a lawsuit does not amount to legal prejudice." *Williams*, 227 F.R.D. at 539 (quoting *Westlands*, 100 F.3d at 97).

The question of whether a defendant would be legally prejudiced by voluntary dismissal "focus[es] on the rights and defenses available to a defendant in future litigation." *Westlands*, 100 F.3d at 97. Examples of legal prejudice include where voluntary dismissal would result in a defendant's loss of a statute-of-limitations defense, a federal forum, the right to a jury trial, a counterclaim, or the ability to conduct necessary discovery. *Id.* (surveying cases); *Kamal*, 88 F.4th at 1282-83 (same); *Santa Rosa*, 688 Appx. at 493 (same). Courts may also take into consideration: (1) whether a plaintiff is seeking to avoid a "near-certain" adverse ruling; (2) whether a plaintiff has been dilatory in seeking dismissal; (3) whether dismissal would lead to inconsistent rulings; and (4) the adequacy of a plaintiff's explanation for seeking dismissal. *BP West Coast Prods. LLC v. SKR Inc.*, 989 F. Supp. 2d 1109, 1116 (W.D. Wash. 2013). No legal prejudice will result here.

As a threshold matter, Defendants have already conceded they will not be

legally prejudiced by dismissal without prejudice. In correspondence with Swan's counsel, Defendants' counsel indicated Defendants' willingness to dismiss, but insisted that dismissal of Swan's trade secret and contract claims must be with prejudice so Defendants could seek fees. Ex. X at 6 (2026 Kanny Letter). But courts have repeatedly made clear that "expense incurred in defending against a lawsuit does not amount to legal prejudice." *Westlands*, 100 F.3d at 97; *see also Kamal*, 88 F.4th at 1282; *Hamilton*, 679 F.2d at 145-46; *Williams*, 227 F.R.D. at 539. Courts have also determined there is no legal prejudice where a party does not oppose dismissal, but instead seeks legal fees as a condition of dismissal. *See, e.g.*, *Kachian Indus. Inc. v. Elliott*, 2020 WL 5657885, at *2-3 (E.D. Wash. Sept. 23, 2020) (dismissing without prejudice and declining to condition dismissal on award of costs and fees); *Punay v. PNC Mortgage*, 2018 WL 2095770, at *3 (S.D. Cal. May 7, 2018) (same); *Madsen v. Buffum*, 2013 WL 12140168, at *2-3 (C.D. Cal. 2013) (same).

Voluntary dismissal without prejudice will also not result in Defendants losing a legal interest such as a defense or counterclaim, or the ability to conduct necessary discovery. There are no counterclaims at issue here, and Defendants repeatedly opposed all discovery. Instead, having had the factual and legal record clarified by discovery here and in the UK, as well as by this Court's order compelling arbitration, Swan is electing to pursue redress via the BVI action, counterclaims in the UK litigation, and arbitrations against Zagury, Proton, and others. As the Ninth Circuit and other courts have repeatedly held, legal prejudice does not result merely because a plaintiff makes tactical choices about where and how to pursue its claims or simply because a defendant will have to defend in another forum. *Kamal*, 88 F.4th at 1280, 1282 (citing *Smith v. Lenches*, 263 F.3d 972, 976 (9th Cir. 2001), and *Hamilton*, 679 F.2d at 145); *Santa Rosa*, 688 Fed. App'x at 493; *Williams*, 227 F.R.D. at 539. Indeed, Defendants repeatedly attempted to compel Swan's claims to arbitration; there can be no legal prejudice resulting from Swan now pursuing claims in such forums.

Nothing else suggests legal prejudice to Defendants. Swan is not seeking to

avoid a "near-certain" adverse ruling such as a pending summary judgment decision;[3] this case is still in its early stages given Defendants' repeated objections to discovery, and numerous motions to stay and to compel arbitration. Swan is also not improperly trying to avoid discovery;[4] to the contrary, it is Defendants who repeatedly obstructed discovery here. Dismissal will not lead to inconsistent rulings, and Swan has not been dilatory in seeking voluntary dismissal;[5] instead, Swan addressed the issue of voluntary dismissal with Defendants shortly after the UK court's order, and filed this motion shortly after the parties were unable to stipulate. Similarly, legal uncertainty or the fact that claims may be refiled elsewhere does not amount to legal prejudice. *Williams*, 227 F.R.D. at 539; *Kachian Indus.*, 2020 WL 5657885, at *1-2.

Nor will Defendants be "legally prejudiced" by dismissing Swan's trade secret and contract claims without prejudice, which were and always have been brought in good faith. As set forth above, Swan brought this action—including its trade secret claims—because 13 employees and consultants (including the individual Defendants) abruptly resigned from Swan in August 2024, taking proprietary source code and documents with them, and—along with their co-conspirator Tether—formed a new company, Proton, to replace Swan as the manager of the 2040 Energy mining operations. AC ¶¶ 128-157; Ex. E (Zagury Call Notes). Swan repeatedly attempted to get discovery about what had occurred, how those materials were being used, and

---

[3] *Compare Terrovona v. Kincheloe*, 852 F.2d 424, 426 (9th Cir. 1988) (affirming denial of voluntary dismissal when motion was filed when summary judgment had been pending for three months and magistrate had already issued report and recommendation) with *Santa Rosa*, 688 Fed. App'x at 494 (no error dismissing without prejudice where summary judgment motions were pending).

[4] *Compare with In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (affirming denial of motion to dismiss that was a "thinly-veiled [attempt] to avoid discovery" by movants whose failure to respond to discovery orders prejudiced defendants).

[5] *Compare with BP West Coast Prods.*, 989 F. Supp. 2d at 1116 (denying motion to voluntarily dismiss counterclaims where motion was brought nearly a year and a half after counterclaims were filed and after court ruled adversely to defendant on plaintiff motions related to the counterclaims, which would lead to inconsistent rulings).

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

whether they were being used for purposes outside 2040 Energy, only to be stymied by Defendants and their co-conspirators time and again (*see supra* Background §§ C-H), who lied to the Court that all activities were limited to and for the benefit of 2040 Energy (Dkt. 29-1 at 4, 12). After finally obtaining limited discovery here and in the UK revealing the falsity of these statements, Swan made the strategic decision to agree that certain (but not all) trade secret information—*i.e.*, the Business Assets at issue in the UK litigation—belonged to the 2040 Energy joint venture, and to pursue redress for the scheme as a shareholder of 2040 Energy in the BVI action, via counterclaims in the UK, and in arbitrations against Zagury, Proton, and others.

Now, Defendants are improperly trying to leverage Swan's decision—and the UK court's order—into prevailing party status on Swan's trade secret and contract claims. But Swan's claims are brought under the DTSA and California law, which differs from English law, and are also broader than the "Business Assets" addressed in the UK litigation. Dkt. 111-1 (Swan's Identification of Trade Secrets); AC ¶¶ 208-221. As this Court previously recognized, while findings by the UK court would "have some impact as to Swan's general ownership rights under DTSA," it was not dispositive of all issues here. Dkt. 164 at 31-32. Similarly, there was no final adjudication on Swan's contract claims. Those contracts were not at issue in the UK litigation (which did not involve the same parties as here), and Swan's contract claims are likewise broader here, resting on improper sharing of confidential and proprietary information, intellectual property rights, and trade secrets of both Swan and its affiliates (*i.e.*, 2040 Energy). AC ¶¶ 100 & n.9, 222-232. This is why the UK court's order stated claims should be dismissed "without prejudice" for refiling in other forums so long as they were "not inconsistent with the Undertakings." Ex. S at 4. Indeed, Swan intends to pursue its contract claims against Defendants elsewhere.

For all these reasons, there is no legal prejudice to Defendants in dismissing all claims—including Swan's trade secret and contract claims—without prejudice. *Stevedoring*, 889 F.2d at 922 (affirming dismissal without prejudice and without fees

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

after adverse decision on alter ego theory which "was resolved only after weeks of hearings"); *Buchsbaum v. Digital Intel. Sys., LLC*, 2021 WL 2826018, at *2 (S.D. Cal. Jul. 6, 2021) (granting motion to dismiss without prejudice and declining to award costs and legal fees where "[a]lthough the Court ultimately found in Defendant's favor on the issue of arbitration, Plaintiff raised legitimate claims").

## II.    NO COSTS OR LEGAL FEES SHOULD BE AWARDED

The Court should not award Defendants costs or attorneys' fees, or impose any other conditions on dismissal without prejudice of Swan's claims.

Courts may, in certain circumstances, condition voluntary dismissal without prejudice under Rule 41(a)(2) on payment of a defendant's costs and attorneys' fees. *Westlands*, 100 F.3d at 97.  Awards of costs and fees are discretionary, however, and can and should be denied where—as here—a plaintiff had a "realistic chance of prevailing" on the merits and moved for dismissal promptly.  *Stevedoring*, 889 F.2d at 922.  Costs and fees may also be denied when the court determines both parties should be held responsible for the expense of the action.  *Puerto Rico Mar. Shipping Auth. v. Leith*, 668 F.2d 46, 51 (1st Cir. 1981).  In determining whether to condition dismissal on an award of costs and fees, courts may consider factors including: the merits of a plaintiff's case; any excessive and duplicative expense of a second litigation; expense incurred by a defendant in preparing for trial; the extent to which the litigation has progressed; and plaintiff's diligence in moving to dismiss. *Williams*, 227 F.R.D. at 540 (applying factors and declining to award costs and fees as condition of dismissal without prejudice); *Santa Rosa*, 688 Fed. App'x at 494; *Stevedoring*, 889 F.2d at 922.  All factors weigh against an award of costs and legal fees here.

First, there can be no dispute that Swan brought potentially meritorious claims here, not only with regard to its tortious interference, aiding and abetting, and unfair competition claims, but also with regard to its trade secret and contract claims.  Swan filed this case after 13 of its employees and contractors quit in a "staged walkout," taking proprietary information and source code developed at Swan, and started a new

venture, Proton. Swan's claims—including its trade secret and contract claims—survived Defendants' motion to dismiss; in that ruling, this Court specifically recognized that Swan's trade secret claims were plausible and potentially meritorious *regardless of the outcome of the UK litigation* given differences in U.S. and UK law. Dkt. 164. at 31-32. Documents obtained in Swan's internal investigation and discovery also show Defendants and their co-conspirators were deeply concerned about Swan's potential IP interests in the Bitcoin mining trade secrets and assets. *See* Exs. E (Zagury Call Notes), M (Telegram Chain). Similarly, Swan's breach of contract claims did not and have never rested solely on the misuse of *Swan's* trade secrets (much less the Business Assets under English law). AC ¶¶ 100 n.9, 222-232.

Moreover, it was only after hard-won discovery in this litigation and in the UK that the record was clarified enough to show that—contrary to Defendants' misrepresentations, and consistent with Swan's suspicions— ███████████████ ███████████████████████████████████████. This discovery—which Swan had been seeking for nearly a year—was sufficient for Swan to determine that the most direct path to restitution was to agree in the UK litigation that the Business Assets were owned by 2040 Energy under English law, and to pursue redress for harms done to it via a derivative shareholder action in the BVI action, plus counterclaims in the UK litigation and arbitrations in other forums (which will include contract-related claims). None of that warrants fees. *See, e.g., Stevedoring*, 889 F.2d at 922 (no abuse of discretion to not award costs and fees where plaintiff sought dismissal promptly after losing "close question" regarding defendant's alter ego, which was "resolved only after weeks of hearings"); *Cerciello v. Blackburn Truck Lines Holding Co.*, 917 F.2d 27, 1990 WL 161724, at *4 (9th Cir. 1990) (affirming dismissal without prejudice without fees where suit raised "legitimate questions" about validity of a merger agreement and "advanced the resolution of those issues," which would be continued in state court action); *Buchsbaum*, 2021 WL 2826018, at *2 (declining to award fees, despite finding in favor of defendant on arbitration issue,

because plaintiff raised "legitimate claims"); *Santa Rosa*, 688 Fed. App'x at 494.

Second, it cannot be disputed that Swan promptly sought voluntary dismissal without prejudice after the September 2025 UK court order. Ex. T.  Defendants, however, insisted repeatedly that the trade secret and contract claims must be dismissed *with* prejudice, and threatened Swan with sanctions if it did not do so, necessitating this motion.  Exs. V at 5, X at 4-7, 8 (counsel correspondence).  Swan's prompt actions thus also weigh against fees.  *See Stevedoring*, 889 F.2d at 922.

Third, despite the parties having litigated since September 2024, this litigation is still in its early stages and Defendants have not expended any efforts in preparing for trial.  Instead, virtually all of the motion practice has been related to Defendants' efforts opposing Swan's requests for injunctive relief and discovery, plus their (rejected) attempt to dismiss this action and requests to stay this litigation.  *See supra* Background §§ C, E, G-H.  This too weighs against an award of fees.  *Williams*, 227 F.R.D. at 540 (dismissing without prejudice and declining to condition dismissal on award of costs and attorneys' fees where suit had not progressed); *Madsen v. Buffum*, 2013 WL 12140168, at *2-3 (C.D. Cal. 2013) (dismissing claims without prejudice and declining to award fees in part because defendants "delayed litigation at various points"); *Puerto Rico Mar. Shipping Auth.*, 668 F.2d at 51 (no abuse of discretion in not awarding fees given the parties' "mutual allegations of abuse of the discovery process"); *Herbalife Int'l of Am., Inc. v. Kamel*, 2024 WL 5416968, at *2 (C.D. Cal. Apr. 11, 2024) (dismissing without prejudice and declining to award fees where "the record suggests that Defendant contributed to the purported delay in this litigation").  Indeed, had Defendants simply told the truth at the outset that they were mining Bitcoin outside of 2040 Energy and produced Swan's requested discovery, Swan would likely have reached this decision point long ago.

Fourth, there is little risk of excessive expense due to duplicative additional litigation.  The matters litigated here (and in the UK) have clarified the issues and enabled Swan to pursue redress via the BVI action, counterclaims in the UK litigation,

and arbitrations elsewhere.  The issues litigated here (and in the UK) have also been and will continue to be useful for the BVI action and arbitrations in other forums, and there is little risk of Swan refiling its claims here, not least given this Court's order compelling arbitration with Proton and the undertakings it gave to the UK court in relation to the Business Assets. *Kachian Indus.*, 2020 WL 5657885 at *2-3 (declining to impose costs and fees where plaintiff voluntarily dismissed in light of ongoing litigation in state court, and noting "[w]hereas the purpose of such awards is generally to reimburse the defendant for litigation costs incurred, in view of the risk faced by the defendant that the same suit will be refiled, the Court finds that risk minimal here"); *Munoz v. City of Yakima*, 2013 WL 1345079, at *2 (E.D. Wash. Apr. 2, 2013) (dismissing without prejudice and declining to award fees in part because work done on issues in the case could potentially be useful in subsequent action).

Lastly, as explained above, it cannot be disputed that Swan has acted in good faith in pursuing its claims here, and also in seeking to dismiss this action without prejudice following the developments in the UK litigation and in this Court. Defendants should also not be rewarded for their conduct or permitted to leverage Swan's decisions and the UK court's undertakings into prevailing party status here. None of that warrants fees. *See, e.g.*, *Akira Techs., Inc. v. Conceptant, Inc.*, 773 Fed. App'x 122, 125-26 (4th Cir. 2019) (upholding denial of fees under DTSA where plaintiff amended complaint to drop DTSA claims after discovery because the "evidence showed [plaintiff] had at least some chance of success on these claims" and thus had brought claims in good faith); *see also Stevedoring*, 889 F.2d at 922 (affirming on other grounds decision to not award fees, which trial court based in part on finding that plaintiff had acted in good faith).

## **CONCLUSION**

For all these reasons, the Court should grant Swan's motion to voluntarily dismiss this action without prejudice and not impose any conditions on dismissal.

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL

DATED:  April 21, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ *Stacylyn M. Doore*
RYAN S. LANDES (State Bar No. 252642)
ryanlandes@quinnemanuel.com
865 S Figueroa Street, Floor 10
Los Angeles, CA 90017-5003
Telephone: (213) 443-3145
Facsimile: (213) 443-3100

STACYLYN M. DOORE (admitted *pro hac vice*)
stacylyndoore@quinnemanuel.com
111 Huntington Avenue, Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Facsimile: (617) 712-7200

RACHEL E. EPSTEIN (admitted *pro hac vice*)
rachelepstein@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

AUSTIN BUSCHER (State Bar No. 346456)
austinbuscher@quinnemanuel.com
555 Twin Dolphin St., Fifth Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Plaintiff*
*ELECTRIC SOLIDUS, INC.*
*d/b/a SWAN BITCOIN*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Stacylyn M. Doore, counsel of record for Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin, certify that this brief is 25 pages or less, which complies with the limits set by this Court.

Dated: April 21, 2026

/s/ *Stacylyn M. Doore*

Stacylyn M. Doore

MEMORANDUM IN SUPPORT OF SWAN'S MOTION FOR VOLUNTARY DISMISSAL