# EXHIBIT V



Matt Kanny
+1 424 436 3001
MKanny@goodwinlaw.com

Goodwin Procter LLP
520 Broadway, Suite 500
Santa Monica, California  90401

goodwinlaw.com
+1 424 252 6400

October 29, 2025

**VIA E-MAIL – *stacylyndoore@quinnemanuel.com***

Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave., Suite 520
Boston, MA 12199

**Re:**   ***Electric Solidus, Inc. d/b/a Swan Bitcoin v. Proton Management Ltd. et al.***
**(C.D. Cal. Case No. 2:24-cv-8280) – Response to October 9, 2025 Letter**

Dear Ms. Doore:

We are writing in response to your October 9, 2025 letter sent on behalf of your client Plaintiff Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan") (the "Letter"), which responded to questions raised in our call on September 25, 2025, and my follow up email on October 7, 2025, regarding Swan's request for Defendants to stipulate to a dismissal of the claims in the above-referenced action and seeking additional information to evaluate Swan's request.

As a preliminary matter, you claim that my email somehow suggests that Defendants "misunderstand[] or mischaracterize[] the positions Swan has taken in this action." Not so. To be clear, our position is based on the September 9, 2025 Order in the UK proceedings, in which the High Court declared that "[t]he Business Assets are exclusively owned by and/or exclusively for use by or with the consent of the Second Claimant." *See* Exhibit A (publicly filed Order). In that same Order, Swan also formally agreed as follows:

"1.   The Defendant, Swan, undertakes that it will not, now or in the future (and not in any proceeding in any jurisdiction) take any step(s) towards any of the actions set out in paragraphs 92.1 to 92.4 of the APOC [Amended Particulars of Claim], namely:

  a.   To obtain control of any of the Business Assets, including through the California Proceedings or any other proceeding;

  b.   ***To pursue or prosecute or progress any of its existing claims in respect of the Business Assets currently being pursued in the California Proceedings***;

  c.   ***To commence or pursue any other proceedings involving a claim or seeking a remedy affecting or concerning control or ownership of any of the Business Assets*** other than in accordance with the Exclusive Jurisdiction Clause (EJC); or



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
October 29, 2025
Page 2


> d.    To deal with or dispose of any of the Business Assets other than in accordance with the written direction of the Second Claimant, acting through its properly constituted Board."

*See id.* (Schedule A to Order; emphasis added).

Not surprisingly, your Letter attempts to obfuscate what Swan agreed to and to downplay these critical concessions and instead includes various arguments and mischaracterizations to deflect from their significance.  While we do not intend to use this response to address each and every argument or mischaracterization in your Letter, we will address a few.

First, your suggestion that Swan may still bring trade secret claims against Defendants based on alleged information that is separate from the Business Assets at issue in the UK proceedings is fundamentally misguided.  Swan cannot avoid the binding effect of the High Court's Order by pointing to purported vagueness in the definition of Business Assets.  As an initial matter, Swan seems to shift blame to Claimants in the UK proceeding for not defining Business Assets, but it is inconceivable that any party making such critical concessions, as Swan did here, would do so without a clear understanding of what it was agreeing to—unless, of course, the intention was to strategically maintain the ambiguity to try to preserve the option of pursuing similar claims in the future.  If Swan's intention was to maintain ambiguity, then please let us know immediately.

Regardless, the term "Business Assets" was, in fact, well understood and defined in the UK proceedings.  In the publicly filed APOC, Business Assets is broadly defined as "the proprietary and other aspects of the [mining] business, including a 'Bitcoin Network Operating Center' ('BNOC'), a bitcoin mining monitoring platform, as well as the financial modelling, data analytics and monitoring tools necessary for the JVC's Bitcoin mining business," and incorporates (as the APOC as a whole makes clear) all of the information and/or assets over which Swan claimed it owned in the California Proceedings. That the APOC defined Business Assets to include everything over which Swan claimed it owned in the California proceedings was then confirmed by Swan in its initial Defence at paragraph 22(1) ("Swan understands [Claimants'] case to be that the Business Assets comprise the intellectual property and trade secrets (developed entirely by Swan employees and consultants) which are the subject of certain of the relief claimed by Swan in the California Proceedings and which Swan has particularised in those Proceedings". This was then incorrectly defined as "Swan IP and Trade Secrets").  Thereafter, the English High Court reiterated the parties' understanding and definition of "Business Assets".  Specifically, in the High Court's publicly filed Order dated February 26, 2025, the High Court defined Business Assets to mean "the intellectual property and/or confidential information which is the subject of relief claimed by the Defendant in the California Proceedings or Arbitration Proceeding."  *See* Exhibit B (High Court's February 26, 2025 Order, paragraph 1(c)).  These definitions make clear that the Business Assets cover *everything* that is at issue in the California litigation—not only the materials specifically identified in Swan's 2019.210 Trade Secret Identification,[1] but also those

---

[1] In your letter, Swan remarkably still does not expressly acknowledge that the materials identified in its Trade Secret Identification in this action are Business Assets, despite Defendants' explicit request for you to confirm—further evidence of Swan's efforts to provide it "wiggle" room for subsequent litigation.  Defendants reject Swan's efforts and **again demand**



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
October 29, 2025
Page 3

identified in the Amended Complaint, including Exhibit G to the Amended Complaint and any other trade secret or confidential information Swan could conceivably have alleged in the federal action. Fundamentally, Swan has alleged that Defendants downloaded documents that relate to Swan's alleged "mining business" (which Swan has now confirmed really means 2040 Energy's mining business), including the documents Swan claims Defendants downloaded which are listed in Exhibit G to the Amended Complaint.  These documents therefore are squarely within the definition of Business Assets in the APOC, acknowledged as Business Assets in Swan's Defence, and the High Court's Orders.  Once again, if you disagree, we ask you to identify the specific items in Exhibit G that are allegedly not Business Assets, so that Defendants may fairly evaluate Swan's proposal for a stipulated dismissal and can avoid further litigation later.

We ask for clarity for another reason.  Given the potential of a forthcoming dismissal, Defendants are prepared to return and/or destroy materials or information that Swan claims it owns, subject to UK Claimants' agreement that such information is not a Business Asset.  At the beginning of the case, we asked Swan's predecessor counsel to discuss relevant issues related to the documents and relief sought by Swan, but they refused unless Defendants conceded to a broad injunction, which of course Defendants refused to do and Swan ultimately never sought following the denial of its initial TRO request.  Despite their refusal to discuss these issues in good faith, we nonetheless instructed our clients not to access or use *any* information they may have potentially downloaded and engaged a third-party vendor to collect Defendants' laptops and other sources of potential information for preservation purposes.  Thus, and reserving all rights and defenses, if there are particular documents you wish Defendants to return, to the extent they exist in the preserved materials (including Exhibit G), please so advise and we will confirm with UK Claimants that they do not claim an ownership interest in those materials.  For those materials UK Claimants do not claim an ownership interest in (if any), we will then work with our discovery vendor to create a protocol to return any such materials to Swan while at the same time creating a mechanism for preserving those materials to avoid any allegation of spoliation in potential future litigation.

Second, Defendants do not accept your attempts to simply brush off Swan's undertakings in the UK proceedings as mere legal strategy, particularly in light of how aggressively Swan has pursued its purported trade secrets claims against Defendants in this federal court action.  Indeed, over and over again, Swan claimed it owned the alleged trade secrets and that they had considerable value.  But now, after a year of intensive and expensive litigation, Swan is freely giving them up.  It makes no sense to do that if Swan truly believed its claims had any merit and it would prevail at trial.  Your attempt to flip the script once again by focusing on the Individual Defendants' single representation to the Court[2]—

---

**confirmation that all materials identified in and relating to its Trade Secret Identification in this action are Business Assets.  If this is not the case, then we demand that Swan specifically identify any and all materials identified in and relating to its Trade Secret Identification that Swan asserts are not Business Assets.**

[2] Swan has consistently mischaracterized and taken this statement of out of context, and none of the three documents you identify in your Letter establish otherwise.  In any event, it simply has no impact and is immaterial to Swan's concession of ownership and agreement to drop its claims in this case.  As such, we need not spend time belaboring that point.  Further, your Letter also makes reference to chat messages that were the subject of Swan's *ex parte* application for a temporary restraining



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
October 29, 2025
Page 4


and only a small part of the Individual Defendants' opposition to Swan's TRO request—is yet another example of Swan's blame-shifting strategy.  Swan did this when it tried to extort over $18 million from its prior counsel, arguing that counsel acted improperly when it had sought to withdraw due to a conflict.  Swan is now attempting to do this to Claimants in the UK proceedings by falsely claiming it is their fault for not defining the Business Assets, when Claimants clearly did.  Swan continues to do this when responding to recent X posts about Swan laying off 70-80 employees in July 2024, falsely blaming it on the theft of Swan's mining business, when in fact the Individual Defendants left weeks after these layoffs, the layoffs were due to Swan's mismanagement, and despite the fact that Swan has conceded it never had a mining business at all.  And Swan is again trying to do this here.  This is all further evidence of Swan's bad faith.  Defendants believe Swan's complete about-face on the ownership issue speaks for itself and speaks volumes of the veracity of Swan's allegations at the inception of and throughout the case.

But whatever Swan's motivations for its concessions in the UK proceedings, it cannot reasonably be disputed that those concessions were significant and impacted critical aspects of its case in California.  On dozens of occasions, Swan affirmatively represented to this Court—through its pleadings, declarations, oral argument and motion practice—that it owned the trade secrets and confidential information forming the basis of its primary claims.[3]  Swan has since admitted in sworn submissions before the High Court in the UK proceedings that 2040 Energy, and not Swan, is the owner of this information.  And it has agreed not to pursue trade secret claims in its own right and to use reasonable efforts to dismiss this federal court action.  The significance of that admission cannot be minimized by characterizing it as "pragmatic" or a simple litigation tactic.  It resolved a dispositive and primary issue in this federal court litigation that has far reaching impacts beyond just this case.  Swan's argument that Swan abandoned its trade secrets (including the "keys" to its alleged mining business) because it can now avoid the issue altogether and seek damages for work outside of 2040 Energy is, at best, disingenuous.  To be clear, Swan is abandoning its *direct* trade secret claims for the *mere possibility* of being able to bring a derivative action later on behalf of 2040 Energy (and only after court approval, which is far from guaranteed), in which all of any potential recovery (assuming there is any) would go to 2040 Energy, and then be used first to pay off Tether's loan to 2040 Energy, and then only thereafter, Swan would be entitled to, at most, 19% of any amount over that considerable amount of debt.  Obviously, if Swan truly believed in the merits of its claim, Swan would not freely abandon its direct

---

order against Proton (ECF No. 222-1) in June 2025, in which Swan attempted to obtain a freeze of Proton's assets on the basis of a single text message sent by Alex Holmes.  But the statement was taken out of context and does not evidence any actual or intended "fraudulent[] transfer" of assets to "escape liability" in this action.  To be sure, the Court denied Swan's *ex parte* application and did not grant Swan's requested relief.  (ECF No. 225.).

[3] For example, in *sworn* declarations from Swan's CEO, Cory Klippsten, and CTO, Yan Pritzker, in support of Swan's *ex parte* application for a temporary restraining order, they represented that Swan "built proprietary Bitcoin mining technologies and processes" (ECF No. 23-3, ¶ 10) and "developed and owns BNOC, quickly making it an industry leader in Bitcoin mining" (ECF No. 23-2, ¶ 7).  This is and always has been false, and Swan knew it.  Swan made further misrepresentations such as it signed (and owned) hosting agreements, which is demonstrably false.  And despite conceding in the UK proceedings that Swan owns none of the so-called trade secrets, Mr. Klippsten continues to falsely claim that Swan's trade secrets were stolen from Swan as a continued effort to smear our clients' reputations.  Defendants reserve all rights and remedies against Swan and Mr. Klippsten personally for his defamatory statements and smear campaign.



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
October 29, 2025
Page 5

claims (and its alleged rights in the trade secrets it claims it owned for all purposes) for the potential of a derivative claim at some point in the future where it potentially may recover some nominal damages. Your arguments to the contrary cannot avoid the reality of Swan's actual position.  The truth is obvious: Swan improperly used this federal court litigation (internally dubbed as the "Tether Litigation") to try to gain leverage over Tether in early settlement discussions and to "punish" Defendants in this case by tarnishing their reputation, and it all backfired.  Swan was forced to give in on the issue because, simply put, its claims that it owns the alleged trade secrets were false.  And rather than face cross examination on this and other material issues that would have exposed the truth, Swan caved.  Given its recent concessions, Swan has now made it abundantly clear that it intentionally filed this suit knowing that its trade secrets claim lacked any merit.  So it is now choosing to dump its claims just prior to having to defend itself on one of the primary issues in the UK action in hopes to gain some leverage to try to globally settle its disputes with all parties.  Swan's current strategy is as transparent as it is meritless.

In any event, the fact that Swan is abandoning its claims now, after Defendants have spent more than a year being forced to defend themselves in this action against those claims, is not well taken.  As we have already told you, Defendants have incurred substantial fees and costs in this litigation because of Swan's initiation of an action based on false premises of ownership, not to mention reputational damage, including through repeated public statements made by Swan's CEO.  While you suggest that Swan nonetheless had a legal basis to pursue its trade secrets claim based on a possessory interest (which Defendants dispute), that is not the legal theory on which Swan has consistently based its claims.  And it does not change the numerous times that Swan misrepresented the trade secrets as its own—a claim it has now abandoned.  Not to mention, since the beginning of this case, the Individual Defendants have repeatedly tried to get Swan to pursue its claims in arbitration, as required under the Individual Defendants' respective Consulting Agreements.  Swan vigorously opposed this effort, including telling the court—months after initiating the action and claiming that an arbitration was forthcoming—that they were still "considering what the appropriate arbitration to bring is" (March 28, 2025 Hr'g Tr. 15:20-21).  Only now (more than one year later) does Swan concede to arbitration.  And Defendants tried to stay the federal court action pending a decision on the ownership issues in the UK proceedings, which Swan opposed, resulting in more needless litigation, when the ownership question was in fact decided in the UK proceeding after all.  Swan's litigation tactics were improper, misguided and frivolous, and any agreement to dismiss this federal court action must include payment of reasonable attorneys' fees and costs, or at least Defendants' right to seek same upon dismissal.

<u>Finally</u>, to be clear, Defendants are not resisting a dismissal of Swan's claims in this case under Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  However, in order to fully evaluate this request, we have reasonably sought, and you have refused to provide, information that is necessary for Defendants to assess the implications of any dismissal.  *See* October 7, 2025 Email from M. Kanny.  We ask again for this information.  As you know, Defendants take issue with the fact that Swan has pursued this litigation (improperly) for as long as it has, and now simply expects Defendants to stipulate to dismissal without consequence, despite the substantial fees Swan's conduct has caused Defendants to incur.  This request also comes on the eve of oral argument on Individual Defendants' appeal in the Ninth Circuit, that Individual Defendants were forced to file, all for Swan to only recently decide that it may be



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
October 29, 2025
Page 6

better off in the forum it should have been in all along.  For these reasons, Defendants are not simply willing to allow Swan to abandon its claims without further clarity on the impact of the existing and any future proceedings.

* * * * *

Nothing in or omitted from this letter shall be deemed an admission or a waiver of any of Defendants' rights, remedies or defenses, including with respect to this matter or Defendants rights to seek the recovery of fees or pursue an award of sanctions for Swan's conduct in this litigation, all of which are expressly reserved.  Defendants remain open to further discussing these matters.  We will be responding to your other email separately.  Thank you.

Very truly yours,

Matt Kanny

# EXHIBIT A



**Claim No. CL-2025-000016**

CL-2025-000016

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**Before: The Honourable Mr Justice Henshaw**

**Dated: 9 September 2025**

**B E T W E E N:**

(1) TETHER INVESTMENTS, S.A. de C.V.

(2) 2040 ENERGY LIMITED

Claimants

- and -

ELECTRIC SOLIDUS INC.

<u>Defendant</u>

---

**ORDER**

---

**UPON** the Order of HHJ Pelling KC of 13 January 2025 providing, *inter alia*, for the expedition of these proceedings ("**Pelling Order**")

**AND UPON** the Order of Bright J of 26 February 2025 *inter alia* listing a trial of the claims pleaded in ¶¶89-92 of the Amended Particulars of Claim ("**APOC**") on an expedited basis beginning on 8 September 2025 ("**Business Assets Claim**" / "**Preliminary Issue Trial**")

**AND UPON** the Order of Waksman J of 23 May 2025 giving further directions to the Preliminary Issue Trial ("**CMC Order**")

**AND UPON** the Consent Order of Foxton J of 16 June 2025 providing, by consent, for a confidentiality ring regime in respect of all disclosure for the Preliminary Issue Trial pursuant to any Issue for Disclosure which contains (or which one party contends contains) Confidential Information as that term is defined in the Shareholders' Agreement dated 28 July 2023 ("**Confidentiality Ring Order**")

1

**AND UPON** the Defendant, by letters of its legal representatives Quinn Emanuel Urquhart and Sullivan UK LLP (i) dated 8 August 2025 conceding that the Business Assets (as defined in the APOC) are owned and/or for use by or with the consent of the Second Claimant, (ii) dated 13 August 2025 confirming that the Business Assets are "exclusively" owned and/or "exclusively" for use by or with the consent of the Second Claimant ("**Ownership Admission**"), offering in these letters to consent to the relief sought at APOC ¶¶90 & 90A and to provide undertakings in respect of the relief sought at APOC ¶¶90B & 92, and (iii) dated 18 August 2025 indicating the Defendant's intention shortly to dismiss or withdraw the California Proceedings (as defined in the APOC) and proceed with new claims against the some or all of the same defendants (or other parties) via arbitration and/or other means

**AND UPON** the Defendant giving the undertakings to the Court in the form at Schedule A to this Order (without prejudice to the Claimants' ability further to apply in relation to the same)

**AND UPON** the Claimants' application by notice dated 21 August 2025, supported by the Fourth Witness Statement of Kate Helen Davies KC dated 21 August 2025 ("**Application**")

**AND UPON** the parties agreeing the terms of paragraph 5 of this Order, without prejudice to (i) the Claimants' position that the Defendant's disclosure pursuant to the CMC Order has been non-compliant and reserving its rights in relation to the same, and (ii) the Defendant's position that the Claimants' disclosure pursuant to the CMC Order remains non-compliant but in any event that there can be no further disclosure pursuant to the CMC Order

**AND UPON** the Court hearing Leading Counsel for the Claimants and Leading Counsel for the Defendant at a one-day hearing on 9 September 2025 (the "**Hearing**")

**IT IS DECLARED THAT:**

1.    The Business Assets are exclusively owned by and/or exclusively for use by or with the consent of the Second Claimant.

2.    The Business Assets, insofar as they are proprietary, are held by the Defendant on trust for the Second Claimant.

**IT IS ORDERED THAT:**

Amended Defence

3.    The Defendant shall file and serve an Amended Defence to take account of the Ownership Admission by 4pm on 21 October 2025.

2

Disclosed Documents

4.  Pursuant to paragraph 6(a) of the Confidentiality Ring Order, the documents disclosed for the purposes of the Preliminary Issue Trial shall no longer be designated Confidentiality Ring Information, and the requirements of paragraphs 2 to 5 of the Confidentiality Ring Order shall cease to have effect.

5.  The parties have permission under CPR 31.22(1)(b) to use documents disclosed  (or required to be disclosed) pursuant to the CMC Order other than for the purposes of these proceedings.

Case management

6.  Save as provided in paragraphs 1 to 5 above, the Application be adjourned to a one-day hearing with one day judicial pre-reading at a date to be fixed.

7.  Paragraph 13 of the Pelling Order (providing for the expedition of these proceedings) be set aside.

Costs

8.  The Defendant shall pay the Claimants' costs of and occasioned by the Business Assets Claim and the Preliminary Issue Trial (save insofar as they are common costs which would have been incurred in any event in the pursuit of the remaining claims, and save as ordered in paragraph 9 below) on the standard basis, to be subject to detailed assessment at the conclusion of these proceedings if not agreed.

9.  The Claimants shall pay the Defendant's costs of the Hearing on the standard basis, such costs to be subject to detailed assessment at the conclusion of these proceedings if not agreed.

10.  Each party has liberty to apply for a payment on account in relation to the costs at paragraphs 8 and 9 above, without prejudice to the opposing party's liberty to contend (on any such application) that no such payment on account should be ordered.

11.  This Order shall be served by the Claimants' solicitors.

3

**SCHEDULE A: UNDERTAKINGS**

1. The Defendant, Swan, undertakes that it will not, now or in the future (and not in any proceeding in any jurisdiction) take any step(s) towards any of the actions set out in paragraphs 92.1 to 92.4 of the APOC, namely:

   a. To obtain control of any of the Business Assets, including through the California Proceedings or any other proceeding;

   b. To pursue or prosecute or progress any of its existing claims in respect of the Business Assets currently being pursued in the California Proceedings;

   c. To commence or pursue any other proceedings involving a claim or seeking a remedy affecting or concerning control or ownership of any of the Business Assets other than in accordance with the Exclusive Jurisdiction Clause (EJC); or

   d. To deal with or dispose of any of the Business Assets other than in accordance with the written direction of the Second Claimant, acting through its properly constituted Board.

2. The Defendant, Swan, further undertakes: (a) that it will forthwith take all steps required to dismiss or withdraw the California Proceedings (as defined in the APOC) without prejudice to any right to pursue related arbitrations or claims, provided that such claims are not inconsistent with the Undertakings in paragraph 1 above; and (b) that it will seek the consent of any respondent to such arbitrations or claims to share with the Claimants the request for arbitration, statement of claim and any other filing in which new claims or bases of claims are advanced (the "**Arbitration Pleadings**") and, upon receipt of such consent, shares the Arbitration Pleadings with the Claimants (subject at all times to the Claimants' position that the provision of such information may not be sufficient to monitor compliance with the undertakings in paragraph 1 above).

# EXHIBIT B



<u>Claim No. CL-2025-000016</u>

04 Mar 2025

CL-2025-000016

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BEFORE: Mr Justice Bright**

**DATED: 26 February 2025**

**B E T W E E N:**

**(1) TETHER INVESTMENTS LIMITED**

**(a Company incorporated under the laws of the British Virgin Islands)**

**(2) 2040 ENERGY LIMITED**

**(a Company incorporated under the laws of the British Virgin Islands)**

<u>Claimants</u>

**- and -**

**ELECTRIC SOLIDUS INC.**

**(a Company incorporated under the laws of Delaware, USA)**

<u>Defendant</u>

---

**ORDER**

---

**UPON HEARING** leading counsel for the Claimants and leading counsel for the Defendant upon the Claimants' application for interim injunctive relief in respect of the Business Assets (as defined below) made by application notice dated 10 January 2025 ("**Business Assets Application**").

**AND UPON** the Order of HHJ Pelling KC (sitting as a Judge of the High Court) dated 13 January 2025 ("**Pelling Order**") providing by paragraph 13 thereof that these proceedings be formally expedited.

13408-00001/15652333.3 1

**AND UPON** the Order of Mr Justice Henshaw dated 23 January 2025 providing that paragraph 13 of the Pelling Order be reconsidered at the hearing of the Business Assets Application.

**AND UPON** the Defendant having indicated by its Acknowledgment of Service dated 5 February 2025 that it intends to contest jurisdiction pursuant to CPR 11(1) and 58.7 ("**Jurisdiction Application**").

**AND UPON** the Consent Order of Mr Justice Bright dated 17 February 2025 modifying the time in which the Defendant's Jurisdiction Application may be issued ("**17 February Order**").

**AND UPON** the Court considering the evidence filed in relation to the Business Assets Application.

**AND UPON** the Defendant voluntarily giving the undertakings set out at Schedule A to this Order, without prejudice to its position that it owns and has the right to use the Business Assets.

**IT IS ORDERED AS FOLLOWS:**

Definitions

1.      The following definitions shall apply in this Order:

  (a)   "**California Proceedings**" refers to the legal proceedings commenced by the Defendant against various named defendants on 25 September 2024 in the United States District Court for the Central District of California Western Division with Case No. 2:24-cv-8280.

  (b)   "**Arbitration Proceedings**" means the arbitral proceedings initiated on 13 December 2024 by the Defendant against its former employees as described in paragraph 52 of the First Witness Statement of Leo Kitchen dated 10 February 2025 and any other arbitral proceedings against Swan's employees or consultants and which arise out of the same facts and matters.

  (c)   "**Business Assets**" refers to the intellectual property and/or confidential information which is the subject of relief claimed by the Defendant in the California Proceedings or Arbitration Proceedings.

  (d)   "**Particulars of Claim**" refers to the Claimants' Particulars of Claim dated 13 January 2025.

13408-00001/15652333.3 2

(e)    "**SHA**" refers to the shareholders' agreement entered into by the First Claimant and the Defendant on 28 July 2023.

Business Assets Application

2.    No order is made, and no injunction is granted, on the Business Assets Application, save that the Claimants have liberty to restore it in the event of a material change of circumstances.

3.    The costs of and occasioned by the Business Assets Application shall be reserved.

Jurisdiction Application

4.    Paragraph 1 of the 17 February Order be varied and replaced with the following directions, which shall apply in relation to the Jurisdiction Application:

(a)    The Jurisdiction Application shall be listed on 18 March 2025 with a time estimate of two days, including one day of judicial pre-reading.

(b)    The Defendant shall by 4.30pm on 4 March 2025 file and serve the Jurisdiction Application, including an appropriate explanation as to the legal basis for such application, together with any supporting evidence.

(c)    The Claimants shall file and serve any responsive evidence by 4:30pm on 11 March 2025.

(d)    The Defendant shall file and serve any reply evidence by 10:00am on 14 March 2025.

(e)    The hearing bundle shall be filed/lodged by 4:00pm on 14 March 2025.

(f)    The Defendant's skeleton argument shall be served and filed/lodged by 10:00am on 16 March 2025.

(g)    The Claimants' skeleton argument shall be served and filed/lodged by 10:00am on 17 March 2025.

Preliminary Issue Trial

5.    Subject to the outcome of the Jurisdiction Application, there shall be a trial of the claim pleaded in paragraphs 89–92 of the Particulars of Claim with a time estimate of six days

including one day of judicial pre-reading, to be listed on an expedited basis within a trial window of 8-19 September 2025 inclusive ("**Preliminary Issue Trial**").

6.    Further case management and directions as to the Preliminary Issue Trial, including as to the precise formulation of the preliminary issue (the drafting of which is not intended to be circumscribed by paragraph 5 above) shall be considered at or following the hand-down of judgment on the Jurisdiction Application.

7.    This Order shall be served on the Defendant by the Claimants' solicitors.

13408-00001/15652333.3 4

## SCHEDULE A: DEFENDANT UNDERTAKINGS

1. The Defendant will not file any summary judgment motion in the California Proceedings, or seek any summary dispositions or final rulings seeking declaratory relief in the Arbitration Proceedings, until after this Court has finally determined the Preliminary Issue Trial, subject to a long-stop date of 31 December 2025.

2. The Defendant will not seek a preliminary injunction from any court or tribunal (including any arbitral tribunal) restraining the defendants in the California Proceedings or Arbitration Proceedings from using any of the Business Assets for mining activities conducted on behalf of the Second Claimant and for the Second Claimant's sole benefit.

3. The Defendant will not use the Business Assets (or any other further intellectual property/proprietary information which the Defendant may obtain through discovery in the California Proceedings or Arbitration Proceedings) to exploit business opportunities otherwise than in accordance with the SHA, until the earlier of (i) the date on which the Jurisdiction Challenge is determined in its favour, or (ii) the date on which this Court has finally determined the Preliminary Issue Trial.