# EXHIBIT W

**quinn emanuel** trial lawyers | boston

ᴍ Huntington Ave., Suite 520, Boston, MA 12199 | ᴛᴇʟ (617) 712-7100 ꜰᴀx (617) 712-7200

ᴡʀɪᴛᴇʀ's ᴅɪʀᴇᴄᴛ ᴅɪᴀʟ ɴᴏ.
**(617) 712-7121**

ᴡʀɪᴛᴇʀ's ᴇᴍᴀɪʟ ᴀᴅᴅʀᴇss
**stacylyndoore@quinnemanuel.com**

January 8, 2026

**VIA EMAIL**

Matthew P. Kanny
Goodwin Procter LLP
520 Broadway, Suite 500
Santa Monica, CA 90401-2449
MKanny@goodwinlaw.com

Re:    *Electric Solidus, Inc. d/b/a Swan Bitcoin v. Proton Management Ltd., et al.*,
Case No. 2:24-cv-8280 (C.D. Cal.)

Counsel:

We write regarding Swan's request that Defendants stipulate to dismissal of the claims in the above-referenced action, including in response to your October 29, 2025 letter and email.[1]

We reiterate our request that Defendants stipulate to dismissal of Swan's claims without prejudice. We have previously explained why Swan is seeking to dismiss this action pursuant to Federal Rule 41(a)(1)(A)(ii). *See* Doore Oct. 9, 2025 Ltr. We will not retread that explanation here, other than to note, again, that Swan has determined that its time and resources are better spent, and its rights more likely to be expeditiously vindicated, pursuing other avenues of relief. *See id.* The assumptions in your October 29 letter regarding Swan's motivations for seeking dismissal—and related assumptions about Swan's reasons for bringing this action—are wrong.

Defendants do not appear to object to dismissal without prejudice of the majority of Swan's claims. *See* Kanny Oct. 29, 2025 Email. That said, Defendants continue to insist that any dismissal as to Counts I (trade secret misappropriation) and II (breach of contract) be made with

---

[1]  *See* Kanny Oct. 29, 2025 Ltr.; Kanny Oct. 29, 2025 Email. In the interests of moving towards resolution of this issue, we will not address each point raised in that letter or email, except as necessary in connection with the issues discussed herein.

quinn emanuel urquhart & sullivan, llp
ᴀᴛʟᴀɴᴛᴀ | ᴀᴜsᴛɪɴ | ʙᴏsᴛᴏɴ | ʙʀᴜssᴇʟs | ᴄʜɪᴄᴀɢᴏ | ᴅᴏʜᴀ | ʜᴀᴍʙᴜʀɢ | ʜᴏɴɢ ᴋᴏɴɢ | ʜᴏᴜsᴛᴏɴ | ʟᴏɴᴅᴏɴ | ʟᴏs ᴀɴɢᴇʟᴇs | ᴍᴀɴɴʜᴇɪᴍ |
ᴍɪᴀᴍɪ | ᴍᴜɴɪᴄʜ | ɴᴇᴜɪʟʟʏ-ʟᴀ ᴅᴇꜰᴇɴsᴇ | ɴᴇᴡ ʏᴏʀᴋ | ᴘᴀʀɪs | ᴘᴇʀᴛʜ | ʀɪʏᴀᴅʜ | sᴀʟᴛ ʟᴀᴋᴇ ᴄɪᴛʏ | sᴀɴ ꜰʀᴀɴᴄɪsᴄᴏ | sᴇᴀᴛᴛʟᴇ | sʜᴀɴɢʜᴀɪ |
sɪʟɪᴄᴏɴ ᴠᴀʟʟᴇʏ | sᴛᴜᴛᴛɢᴀʀᴛ | sʏᴅɴᴇʏ | ᴛᴏᴋʏᴏ | ᴡᴀsʜɪɴɢᴛᴏɴ, ᴅᴄ | ᴢᴜʀɪᴄʜ

prejudice. *See id.* This continued insistence is both unreasonable and legally and factually misplaced, for reasons outlined in our October 9, 2025 letter and those explained here.

In prior correspondence and calls, Defendants have emphasized the declaration in the September 9, 2025 order in the UK action ("September 9 Order") that the Business Assets are exclusively owned by and/or exclusively for use by or with the consent of 2040 Energy, and also focused on certain undertakings made by Swan in the UK action. *See, e.g.*, Kanny Oct. 29, 2025 Ltr. at 1-2. However, it is indisputable that Swan may bring claims (including for trade secret misappropriation and breach of contract) which are not inconsistent with that declaration and those undertakings.

As to the undertakings in particular, two points from the hearing on September 9, 2025 before the UK Court bear emphasis:

(1) The Claimants in the UK action sought (or at least appeared at one stage to be seeking) to restrict the "without prejudice" wording of the second undertaking such that it applied to arbitrations only, but were unsuccessful in doing so.  The Court agreed with Swan's position that it should be entitled to bring any arbitrations *or* claims provided that they were not inconsistent with the first undertaking. Thus, under the terms of the September 9 Order, Swan undertook to "take all steps required to dismiss or withdraw the California Proceedings (as defined in the APOC) **without prejudice** to any right to pursue related arbitrations **or claims**, provided that such claims are not inconsistent with the Undertakings in paragraph 1 above."  Sept. 9 Order at 4 (emphasis added).

(2) The Claimants in the UK action also sought specifically to expand the terms of Swan's undertakings so as to restrict Swan from bringing proceedings which were "*similar*" to Swan's claims before the California Court. That too was rejected, as is apparent from the terms of the September 9 Order.

It follows that Swan is able to bring trade secret or breach of contract claims which: (a) are not inconsistent with 2040 Energy's exclusive ownership of and/or right to use the Business Assets; and (b) do not seek a remedy affecting or concerning control or ownership of the Business Assets. As to this, Swan's position is as follows.

***First***, and although, given the manner in which this letter concludes (and assuming Swan's constructive proposal as to how to proceed is acceptable to Defendants), we see limited purpose in a prolonged debate over this issue, Swan is not precluded from bringing certain claims under the Defend Trade Secrets Act ("DTSA") or the California Uniform Trade Secrets Act ("CUTSA") against Defendants, since (among other things) ownership in the traditional sense is not a requirement for claims under either Act[2] and there are remedies available to Swan under these

---

[2] Your assertion that Swan has never pursued "its trade secret claim based on a possessory interest" in the information at issue, Kanny Oct. 29, 2025 Ltr. at 5, is inaccurate, *see,* e.g., Dkt. 134 at 2 ("Thus, Swan can show the 'ownership' or possessory interest sufficient to pursue its trade secret claims in this action."). The statutory text of DTSA is clear that "ownership" encompasses more than just legal title. "[T]he term 'owner', with respect to a trade secret, means the person or entity

Acts which do not or would not affect or concern control or ownership of the Business Assets.[3] For example, under CUTSA, it would be possible for Swan to pursue claims—for monetary damages rather than injunctive relief—which would not "involv[e] a claim or seek[] a remedy affecting or concerning control or ownership of any of the Business Assets." Sept. 9 Order at 4. In that regard, CUTSA contains no express requirement that a plaintiff "own" the trade secrets at issue. *See, e.g.*, *Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, 2019 WL 12521480, at \*5 & n.7 (C.D. Cal. Aug. 9, 2019) (contrasting DTSA's explicit use of the term "owner" with state law standard that "possession is sufficient as long as secrecy is maintained"). Despite this, your demand that Swan dismiss its DTSA claims against Defendants with prejudice risks hindering Swan's ability to bring appropriate claims under CUTSA.[4]

Additionally, as both you and counsel for 2040 Energy in the UK action have now acknowledged, there are information or documents contained within the files listed in Exhibit G to the Amended Complaint that qualify as Swan's, rather than 2040 Energy's, trades secret and / or confidential information. *See* Kanny Oct. 29, 2025 Email ("If there are a limited number of documents within Exhibit G that Swan believes is its own confidential information, and not Claimants in the UK proceedings, we are open to discussing limited carveouts."). We understand that evidence recently submitted in connection with the UK proceedings also makes a similar concession.

These concessions underscore why Defendants' repeated attacks on Swan's trade secret claims in this action are misplaced, and why Defendants' demand that Swan dismiss those claims in whole, with prejudice, are unjustified. Both the Claimants in the UK proceedings and Defendants here have acknowledged that some of the information upon which Swan's trade secret

---

in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4). The September 9 Order's determination that 2040 Energy exclusively owns the Business Assets thus does not preclude Swan from bringing a DTSA action premised on (for example) Swan having equitable title or a license to use the Business Assets.

[3] Defendants' October 29 email asks Swan to "stipulate as a condition of dismissal that 2040 Energy is the exclusive owner of the Business Assets under U.S. and state law, which encompasses, at minimum, all of the trade secrets and confidential information at issue in the federal court action, and that it will not assert any claim or seek adjudication of ownership or similar rights to the Business Assets under U.S. law in any forum." Kanny Oct. 29, 2025 Email. Such stipulation would be unnecessary if Swan's undertakings in connection with the UK action were as broad as you suggest. They are not, as even Defendants apparently realize.

[4] *See, e.g.*, *Boeken v. Philip Morris USA, Inc.*, 230 P.3d 342, 345 (2010) ("[A]fter filing that action, plaintiff dismissed it with prejudice. The record before us does not indicate the reason for the dismissal; for purposes of applying the doctrine of res judicata, however, a dismissal with prejudice is the equivalent of a final judgment on the merits, barring the entire cause of action."); *Franceschi v. Franchise Tax Bd.*, 205 Cal. Rptr. 3d 75, 82 (2016) (in state court, applying res judicata to bar claim where federal court action resolving different claims involved "same primary right"); *cf. Beijing Neu Cloud Oriental Sys. Tech. Co. v. Int'l Bus. Machines Corp.*, 110 F.4th 106, 115 (2d Cir. 2024) (finding DTSA claim barred by res judicata where state court had dismissed claims brought under state law).

3

claims rely, *e.g.*, certain documents identified in Exhibit G, are not encompassed under the UK Court's definition of "Business Assets."

Moreover, documents produced in the UK proceedings have confirmed that, at the time Defendants were planning their raid of Swan's mining team, *they believed* that Swan likely had rights to the intellectual property that Swan's Bitcoin mining team had developed; Mr. Zagury himself acknowledged the need to secure releases from Swan "*forgo[ing] all IP rights* related to mining to Newco…include[ing] any mining technology, source code related to mining (including BNOC) and any other intellectual property developed by the team moving to Newco."). Ex. A. Your continued assertions that Swan's claims for trade secret misappropriation against Defendants were and are wholly without merit are inaccurate, undercutting your demand that Swan dismiss those claims with prejudice.

*Second*, it is plainly unreasonable for Defendants to demand that Swan dismiss its claims for breach of contract with prejudice.

The Individual Defendants' consulting agreements with Swan define "Confidential Information" broadly to include "any information (including any and all combinations of individual items of information) that relates to the actual business and/or products, research or development of the Company, *its affiliates* or subsidiaries, or to the Company's, *its affiliates'* or subsidiaries' technical data, trade secrets, or know-how." Consulting Agreement § 2(A) (emphasis added). "Confidential Information" under the agreement may thus extend to confidential information that is, in the terms of the September 9 Order, "exclusively owned by" 2040 Energy, to the extent that 2040 Energy qualifies as an "affiliate" of Swan's under the Consulting Agreements. That interpretation would not, for the avoidance of doubt, (a) be inconsistent with 2040 Energy's exclusive ownership of and/or right to use the Business Assets; and (b) seek a remedy affecting or concerning control or ownership of the Business Assets.

Swan also maintains that the Individual Defendants have breached their obligations to Swan for reasons which have nothing to do with those defendants' misuse of the Business Assets outside of 2040 Energy. Each of the Individual Defendants has refused to return their Swan-issued laptops—and whatever Swan information remains on those laptops—to Swan, in breach of their obligations to return Swan property following termination of their Consulting Agreements. *See* Dkt. 100 ¶¶ 166-67; Consulting Agreements § 5 ("Return of Company Materials"). The Individual Defendants also failed to honor their promises to Swan that they would "not enter into any [] conflicting agreement[s that conflict with their obligations to the Company under this Agreement, and/or their ability to perform their Services] during the term of" their Consulting Agreements, Consulting Agreements § 4 ("Conflicting Obligations"), and further violated the nonsolicitation provisions of their Agreements, *see id.* § 10 ("Nonsolicitation"). There can be no question that the Individual Defendants violated these provisions of their Consulting Agreements: Defendants Naidoo and Holmes acknowledged as much during secret calls during which the conspirators planned their scheme, as reflected in Mr. Zagury's contemporaneous notes of those calls. *See* Dkt. 100 ¶¶ 8, 127 ("Walks away together - no solicitation? Resign en masse. Makes it easier for Alex… Over non-solicit; non-compete. Confidentiality and IP - we would be exposed").

For at least these reasons, Swan will not agree to dismissal with prejudice of its claims in this action.[5]

\* \* \*

Notwithstanding the foregoing, Swan would be willing to stipulate to dismissal of (only) the misappropriation of trade secrets claim in this action with prejudice, expressly conditioned on Defendants' reciprocal agreement that no party will pursue any further motion practice before this Court related to this action. In addition, Swan would be prepared to give, in such stipulation, the same undertakings to Defendants as are set out in the September 9 Order, thereby providing Defendants with a direct means of enforcing those undertakings should the need ever arise. This proposal is made in the interest of allowing the parties to move on without wasting further time or cost debating the terms of a dismissal of the instant action. However, if Defendants will not agree to this, we reiterate our request that Defendants agree to stipulate to dismissal of Swan's claims without prejudice.

Swan continues to reserve all rights.

Very truly yours,

Stacylyn Doore

cc:    Jaideep Venkatesan (jvenkatesan@be-law.com)
       Adam Trigg (atrigg@be-law.com)
       Grant P. Fondo (gfondo@goodwinlaw.com)

---

[5] For the reasons explained in this letter, Defendants' offer to stipulate to dismissal without prejudice of Swan's remaining claims (Counts III-VII) on the condition that Swan agrees to various external conditions—related to the Business Assets or otherwise—is similarly without justification.

5

# Exhibit A

**To:**        rapha <>, zachary lyons <>, giancarlo devasini <>, paolo ardoino <>, san <>, δισχ hωlmσs <>
**Attachments**:  rsmf.zip


Rapha
2024-07-22T05:25:43.0000000Z
Hey
@ZachLyons
-

I'm sure these are on your radar already but some points we've had in mind to consider when proposing the spin off to Swan:


- Release of Liability, non-compete and non-solicitation
:
  ◦ Release of liability for all team members joining NewCo to ensure no future legal claims from Swan. Release from non-competes (if applicable) and non-solicitation clauses.


- Employee Transition
:
  ◦ We will provide a list of employees moving to NewCo.
  ◦ Swan to ensure a smooth transition plan that minimizes business disruption
  ◦ 2040 and/or NewCo will assume their salaries and other compensation related costs.


- Intellectual Property (IP) Transfer
:
  ◦ Ensure an agreement that Swan forgoes all IP rights related to mining to NewCo. This includes any mining technology, source code related to mining (including BNOC) and any other intellectual property developed by the team moving to NewCo.


- Document Transfer
:
  ◦ Ensure that NewCo has unrestricted access documents post-transition. Including but not limited to hosting agreements, contracts and other documents related to mining.
  ◦ Allow NewCo to take over all documents related to mining activities. Regardless of current confidentiality clauses.


- Operational Continuity
:
  ◦ Establish clear timelines and responsibilities for both Swan and NewCo to avoid any operational disruptions.


- Communication Strategy
:
  ◦ Develop a joint communication strategy to inform stakeholders (employees, clients, vendors) about the spin-off.


- Future Parent Company Decisions
:
  ◦ Include clauses to protect NewCo from being impacted by future decisions made by Swan that could affect its operations.


- IT and Infrastructure
:
  ◦ Plan for the transfer of IT infrastructure, including software licenses, hardware, and data.


- Email and Slack Access
:
  ◦ Swan to provide continued access to Swan emails for NewCo team members until it is determined that such access is no longer needed.
  ◦ Ensure a clear process for transitioning email communications to NewCo's domain. Ensure a clear progress to move the mining channels from Slack into a new slack instance.

TETHER-002-0016944

I'll add as I think of other points.

Zachary Lyons
2024-07-22T12:21:10.0000000Z
Hey bud - yep these are all good. The key is going to be Future TopCo decisions, which is what bankruptcy team is working on

Zachary Lyons
2024-07-22T12:21:17.0000000Z
Let's grab a call later today/tom and we can discuss

Rapha
2024-07-22T12:22:11.0000000Z
Sure thing. I'm flying all day today back home. Let's plan for a call tomorrow morning. I'll ping you.

Zachary Lyons
2024-07-22T12:22:19.0000000Z
Cool perfect - safe flight man

Rapha
2024-07-22T17:30:47.0000000Z
Cory just couldn't help himself and tweeted this.


https://x.com/coryklippsten/status/1815429462210539706?s=46

Rapha
2024-07-22T17:31:21.0000000Z
All of this without telling any of us this was coming.

The biggest problem is that it makes it sound like mining failed. Which couldn't be far from reality.

Paolo Ardoino
2024-07-22T17:37:09.0000000Z
He did it to put pressure on Tether.
It was not disclosed how much we invested. I'll start working on a response to keep in our pockets if we need it. Not sure if media will pick up the narrative. But he could speak on background to throw us under the bus

Rapha
2024-07-22T17:40:09.0000000Z
Crazy. I'm not engaging with him.
But we are addressing 1:1 with mining partners reaching out.

Paolo Ardoino
2024-07-22T18:09:45.0000000Z
Ok journalists are contacting us already

Paolo Ardoino
2024-07-22T18:10:23.0000000Z
Asking if swan decision is affecting us.
Can we answer "Our hosted contracts will continue as normal, we don't expect issues or interruptions"?

Rapha
2024-07-22T18:10:47.0000000Z
I think it's important to mention that the mining business always ran as a segregated and independent unit of Swan and nothing has changed. Nothing changes. All contracts remain.

Rapha
2024-07-22T18:11:13.0000000Z
Just the opposite we are growing and the team is unaffected

Rapha
2024-07-22T18:11:28.0000000Z
This message is important to our partners I think

Zachary Lyons
2024-07-22T18:11:53.0000000Z
I think this is good - let's try not to talk too much about future in case it gets legally contentious @rapha_zagury

Zachary Lyons
2024-07-22T18:12:04.0000000Z
But we can say no issues/interruptions etc. easily

Rapha
2024-07-22T18:12:20.0000000Z
Member Action: invite_members

TETHER-002-0016945

Paolo Ardoino
2024-07-22T18:13:51.0000000Z
They don't know we have the majority.
I would reply like:

"Tether's hosted contracts with Swan are unaffected, we don't expect any interruption. The team running such operations is segregated and will continue operating normally."

Paolo Ardoino
2024-07-22T18:13:53.0000000Z
How's it?

Zachary Lyons
2024-07-22T18:14:26.0000000Z
perfect

ΔLΣX HΩLMΣS
2024-07-22T18:14:44.0000000Z
No concerns with any hosts or partners.

Rapha
2024-07-22T18:14:45.0000000Z
"Tether's hosted contracts with Swan's mining entity are unaffected, we don't expect any interruption. The team running such operations is segregated and will continue operating normally."

Rapha
2024-07-22T18:14:52.0000000Z
Small change

Paolo Ardoino
2024-07-22T18:15:51.0000000Z
Ok good

Paolo Ardoino
2024-07-22T18:15:54.0000000Z
We'll use that

Paolo Ardoino
2024-07-22T19:25:10.0000000Z
Coindesk and others have reached out

Rapha
2024-07-22T19:32:08.0000000Z
The piece from the Block is specially bad because it mentions "shuttering the mining unit"

https://x.com/theblock__/status/1815462041559106023?s=46&t=IiqpGCJGPsUn11811U2tyA

ΔLΣX HΩLMΣS
2024-07-22T19:33:07.0000000Z
im gonna reach out to contact there and ask them to revise the language. this is total bs

Paolo Ardoino
2024-07-22T19:34:22.0000000Z
If you need help on that let me know. I know well Frank Chaparro.
It needed I could tell him you guys will give them an exclusive

San
2024-07-22T19:47:13.0000000Z
Hi all - Bill drafted this Board resolution paper to move the coins from BitGo to Bitfinex. Please let us know if you have any changes or edits and then we can circulate for signature. Cory is receiving a copy to review as well. Happy to send over email if that's a better channel. 🙈

ΔLΣX HΩLMΣS
2024-07-22T19:47:30.0000000Z
I think if we could ask him to revise the article to make it clear that 2040 operations are unencumbered and operationally unaffeceted by the Swan announement. that is sufficient.

Paolo Ardoino
2024-07-22T19:47:56.0000000Z
He would want to talk to someone

ΔLΣX HΩLMΣS
2024-07-22T19:49:00.0000000Z
not sure how to navigate that while we are technically engaged with Swan still

Rapha

TETHER-002-0016946

2024-07-22T19:54:04.0000000Z
Paolo you could tell him that we're going a transition period and I'll give him and exclusive as soon as we're at the other side.

Paolo Ardoino
2024-07-22T19:54:32.0000000Z
Ok

Rapha
2024-07-22T19:55:40.0000000Z
It was nice of Cory of sending this while I'm at an 11hr flight with dial-up internet speeds 😂

Paolo Ardoino
2024-07-22T20:10:20.0000000Z
Hahahaha

TETHER-002-0016947