# EXHIBIT X



Matt Kanny
+1 424 436 3001
MKanny@goodwinlaw.com

Goodwin Procter LLP
520 Broadway, Suite 500
Santa Monica, California  90401

goodwinlaw.com
+1 424 252 6400

March 26, 2026

**VIA E-MAIL – *stacylyndoore@quinnemanuel.com***

Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave., Suite 520
Boston, MA 12199

**Re:**    **Response to January 8, 2026 Letter regarding *Electric Solidus, Inc. d/b/a Swan Bitcoin v. Proton Management Ltd., et al.*, Case No. 2:24-cv-8280 (C.D. Cal.) (the "California Proceeding")**

Dear Ms. Doore:

On behalf of all the defendants in this action ("Defendants"), we are writing in response to your January 8, 2026 letter sent on behalf of Electric Solidus, Inc. d/b/a Swan Bitcoin ("Swan"), which responded to certain of the issues raised in my email of October 7, 2025, and my letter and email from October 29, 2025, regarding Swan's request for Defendants to stipulate to a dismissal of the claims in the above-referenced action without prejudice. Unfortunately, your most recent letter mischaracterizes Defendants' positions, misunderstands Swan's legal obligations, and presents an offer that is untenable and that Defendants reject.

As you know, for over a year, in pleadings, motions, and at oral argument, Swan repeatedly represented to the Court that it owned the allegedly misappropriated intellectual property and confidential information that forms the basis for the California Proceedings.[1] Based on Swan's purported ownership of this

---

[1] Swan repeatedly asserted throughout the Complaint, that it owned a "highly proprietary and confidential Bitcoin mining business, technology, trade secrets, property and personnel" (Compl. ¶ 2) and that "Defendants misappropriated thousands of documents and files containing **Swan's** proprietary and confidential information and trade secrets" (Compl. ¶ 4 [emphasis added]). Swan's misrepresentations infected all the pleadings and motions in this action. *See, e.g.*, ECF No. 25-2 at 8 ("The Individual Defendants stole **Swan's** highly proprietary and confidential Bitcoin mining technology, trade secrets, property, and personnel" and they "stole—and continue to possess—the lifeblood of **Swan's** Bitcoin mining business." [emphasis added]); ECF No. 43-1 at 6 (Swan sought information for "[t]he basis for the Individual Defendants' unsupported representation to the Court in opposing expedited relief (*see* ECF No. 30) that Swan does not "own or control" the trade secrets alleged in its Complaint."); ECF No. 115 at 2 (Swan accused the defendants of "(i) stealing over 1,300 documents related to **Swan's** mining business, including trade secrets underlying every aspect of that business's operations.") (emphasis added); *id.* at 4 ("Swan intends to seek preliminary injunctive relief against all Defendants, following targeted discovery into the extent of their use of **Swan's** trade secrets.") (emphasis added); *id.* at 13 ("Defendants have improperly acquired, used, and disclosed **Swan's** trade secrets both inside and outside of the 2040 Energy mining operation.") (emphasis added); ECF No. 130 at 20 (Swan alleged that it "has also more than sufficiently pled ownership.") (citing AC ¶¶ 89-



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2026
Page 2

information, Swan pursued scorched-earth litigation tactics at every turn, including by seeking emergency injunctive relief in the form of a TRO application (ECF Nos. 8, 8-2), two requests for expedited discovery (ECF Nos. 9, 43), and a motion to compel the return of the Individual Defendants' laptops (ECF No. 53)—all of which were denied. Swan continued to perpetuate the false narrative that it owned the trade secrets and confidential information in dispute in further submissions to the Court, including in its Amended Complaint and Trade Secret Identification that identified all trade secrets that Swan claimed it owned and Defendants allegedly misappropriated. *See* ECF Nos. 101;111-1 (asserting 20 alleged trade secrets as Swan's property, including contracts that were not even in its name); *see also* ECF No. 176-1 (motion to compel discovery; arguing the adequacy of "Swan's" trade secrets disclosure).

Since the outset of the case, Defendants repeatedly argued that this case is improper because, among other reasons, Swan did not own any of the alleged trade secrets or confidential information in dispute—2040 Energy did. *See, e.g.*, ECF Nos. 30, § III B.1.a.i (asserting, mere days after the filing of the first complaint, that Swan had failed to demonstrate ownership given that Swan did not own the mining business of 2040 Energy); 80-1, § V.B.1.b (asserting, in their *first* motion to dismiss, that Swan failed to allege it, as opposed to 2040 Energy, owned the alleged trade secrets); 122-1, § V.B.2 (making the same argument in their *second* motion to dismiss). Defendants also argued, among other things, that Swan's Trade Secret Identification was plainly insufficient in light of the lack of ownership. ECF 176-1, § IV. Despite Defendants' challenges to ownership, Swan consistently and repeatedly claimed otherwise.[2]

Swan's litigation strategy was as obvious as it was improper—it misused this federal court litigation and pursued claims based on a false premise of ownership to try to gain a tactical advantage in discussions against its real target, Tether. This improper tactic came to light in Court documents when Swan's prior counsel requested to withdraw, at which time it was discovered that Swan, itself, dubbed **this** litigation as the "Tether Litigation." Swan also had a second objective in pursuing this baseless litigation: it arguably gave Swan and its CEO "cover" under the litigation privilege[3] to smear and defame Defendants publicly in federal court filings, and then to repeat those false claims in the media to try to damage Defendants' and Tether's reputations. Swan's strategy didn't work; indeed, it backfired. Tether and 2040 Energy filed

---

98); *id.* ("Swan's Amended Complaint **expressly . . . alleges that Swan, rather than 2040 Energy, owns Swan's trade secrets**.") (emphasis added); ECF No. 211 at 19-20 (claiming that Swan "can prove that it owns these trade secrets."). Swan also submitted declarations to "evidence" Swan's ownership. *See* Kanny Oct. 29 Ltr., p. 4 n. 3 (listing examples).

[2] Notably, Swan's false claim of ownership of the alleged trade secrets under the DTSA was Swan's sole basis to be in federal court in the first instance.  Similarly,  Swan's basis for its assertion  that California courts had jurisdiction over defendant Proton was Swan's purported ownership of the trade secrets.  ECF No. 130 at 1-2 ("California courts have consistently held that when ex-employees steal **trade secrets from a California company** for use by their new employer, California courts have jurisdiction over that new employer."), 5-7 ("Proton purposefully directed its activities into California—stealing **the trade secrets and employees of a California company**."), 13-15 ("Swan alleges that, but for Defendants' actions to misappropriate **Swan's trade secrets**, Swan would not have suffered economic damage." (emphasis added)).

[3] Defendants do not admit that the litigation or any other privilege is applicable to such statements here, and reserve all rights regarding same.



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2026
Page 3

claims in the UK Court seeking, among other things, a declaration of their rights with respect to the trade secrets and confidential information in dispute in the California Proceeding.[4] But rather than pressing the pause button in the California Proceeding to let dispositive issues be decided in the UK Court, the parties' chosen forum in the Shareholder Agreement, Swan doubled down, opposing Defendants' motion to stay, and continued to aggressively pursue this baseless litigation, again under the guise that it owned the disputed trade secrets and confidential information, forcing Defendants to expend considerable time and resources in defending themselves.

Now, after over a year of contentious litigation, Swan finally has conceded in the UK Litigation, as it must, that (i) it never owned the purported trade secrets or confidential information at issue in the first place, (ii) arbitration, in fact, is the appropriate forum for this dispute, and (iii) "it will not, now or in the future (and not in any proceeding in any jurisdiction)" … "pursue or prosecute or progress any of its existing claims in respect of the Business Assets currently being pursued in the California Proceeding[]" or "commence or pursue any other proceedings involving a claim or seeking a remedy affecting or concerning control or ownership of any of the Business Assets other than in accordance with the Exclusive Jurisdiction Clause (EJC)." *See* Exhibit A to Oct. 29, 2025 Letter (the "UK Order"); Schedule A to the UK Order (the "Undertakings"). The significance of this inevitable concession cannot be overstated and confirms what Defendants asserted  the entire time.  Swan's dumping of its direct claims relating to the Business Assets for *potential* indirect derivative claims cannot be chalked up to a mere "strategic" decision—such assertions are merely an effort to minimize the repercussions from its highly significant concessions, not a brilliant strategic move made after more than a year of highly contentious litigation. To be clear, Swan now may only recover on its indirect claims if (i) the BVI Court allows it to proceed on behalf of 2040 Energy, and (ii) it prevails on the merits in the UK Court. Both are highly uncertain. Even then, Swan can only potentially recover 20% of the judgment if and only *after* Tether's substantial investment in 2040 Energy is paid off, as compared to potentially recovering 100% of any judgment on its direct claims against Defendants. This is not a "strategic" decision that makes any sense if Swan truly believed it owned the alleged trade secrets; indeed; your letter's failure to address these indisputable facts only confirms that this was not a strategic decision but rather an eleventh hour move to avoid a public hearing and ruling that 2040 Energy owns the Business Assets.

Based on its Undertakings in the UK Litigation, Swan is precluded from pursuing *any of its existing claims relating to the Business Assets* against Defendants in this or any other forum. Consistent with Swan's Undertakings, the UK Court also ordered Swan to dismiss all of its claims in this Action. Undertaking 1.b. Despite that over four months have passed since the UK Order, Swan still refuses to dismiss *with prejudice* claims it may no longer legally pursue. In light of Swan's critical concessions in the UK Litigation, it is now obvious that its repeated assertions of ownership in the California Proceeding were false and without basis. This action never should have been brought in the first instance, and Swan's decision to do so (and to continue to aggressively prosecute it) could only have been intended to harass and annoy Defendants and to gain leverage in its related disputes with Tether.

---

[4] Tether Investments Ltd. and 2040 Energy Ltd. v. Electric Solidus, Inc. t/a Swan Bitcoin [filed January 14, 2025] EWHC (Comm), Claim No. CL-2025-000016 (High Court of England and Wales) (the "UK Litigation").



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2026
Page 4

In light of the binding UK Order and to fully remedy Swan's improper tactics, Defendants are entitled to dismissal *with prejudice* of all claims that relate to the Business Assets. That obviously and without question includes its trade secret misappropriation claim (Count I). That also includes Swan's claim for breach of the consulting agreements (Count II)—which, on their face, are limited to alleged misuse of Swan's alleged confidential information (which by Swan's own admission is the confidential information of 2040 Energy). To the extent that any of the other claims related in any way to or involve the Business Assets, they must be dismissed with prejudice, as well. Your arguments in your letter to the contrary are meritless.

**Swan's "Without Prejudice" Argument**

You argue that the UK Order and the Undertakings language contemplates dismissal "without prejudice" only and therefore have no obligation to dismiss any claim with prejudice. However, as Swan's own counsel represented to the UK Court, Swan undertook to "take all steps required to dismiss or withdraw the California Proceedings ... without prejudice to any right to pursue related arbitrations or claims, *provided that such claims are not inconsistent with the Undertakings in paragraph 1." See* Undertaking 2 (emphasis added). Notwithstanding the arguments in your letter that contradict that prior representation, this makes clear that the "without prejudice" language preserves only claims that are consistent with—*i.e.*, not prohibited by—the Undertakings. That, of course, does not include any existing claims relating in any way to the Business Assets.

**Swan's Count I Arguments**

In your January 8, 2026 letter, you contend that a dismissal with prejudice of Count I is not warranted, but your reasoning is meritless and off-base.

First, you assert that Swan "is not precluded from bringing certain claims under the Defend Trade Secrets Act ('DTSA') or the California Uniform Trade Secrets Act ('CUTSA') against Defendants." This is plainly wrong. As an initial matter, pursuant to Undertaking 1.b, Swan is entirely precluded from pursuing existing claims made in the California Proceeding relating to the Business Assets—*i.e.*, its DTSA claim. *See* Undertaking 1.b (forbidding Swan from "pursu[ing] or prosecut[ing] or progress[ing] any of its existing claims in respect of the Business Assets currently being pursued in the California Proceedings."). It is not disputed that Business Assets include **everything** that Swan included (or could have included) in its Trade Secret Identification filed in the California Proceedings. Swan does not explain (because it cannot) the basis you would have to bring any additional claim under the DTSA that the Undertakings would not preclude. And any attempt to bring a separate CUTSA claim at this point—which would seek to enforce the same purported primary right, and rely on the same underlying facts, as Swan's existing DTSA claim—would be an improper end run around Undertaking 1.b.

Moreover, Swan's argument that it may bring a CUTSA claim because it allegedly was not an "existing claim" is additionally wrong because such a claim would violate Undertaking 1.c and 1.d. A CUTSA claim



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2026
Page 5

would necessarily "involv[e] a ***claim*** … ***concerning control***" of the Business Assets" and/or "deal[] with the Business Assets" without 2040 Energy's authorization, which the UK Order prohibits. Swan cannot make any reasonable argument of injury or that it is owed damages under CUTSA without asserting a claim that concerns control over or deals with the Business Assets. Swan also cannot get around the fact that it expressly acknowledged that the Business Assets are only in its possession on trust for 2040 Energy. It cannot assert claims in relation to Business Assets it holds in trust for someone else.

Second, Swan's claim that dismissing the "DTSA claims against Defendants with prejudice risks hindering Swan's ability to bring appropriate claims under CUTSA" is irrelevant and beside the point. Swan is prevented from seeking a virtually identical claim under a different name and legal theory, and any attempt by Swan to do so would be in violation of its Undertakings.

Third, Swan's letter fails to explain why "ownership" under the DTSA (and CUTSA[5]) and "ownership" in the Undertakings should be defined differently. The Undertakings and resulting UK Order were plainly intended to resolve the issue of ownership and to delineate rights between the parties with respect to *who* could pursue claims relating to the Business Assets. In other words, they were intended to prevent Swan's continued prosecution of litigation regarding Business Assets it conceded it did not own, and to preclude Swan from taking the very position it tries to take now. Swan cannot now try to circumvent that Order and Undertakings by continuing to prosecute claims regarding 2040 Energy's assets. That flies in the face of reason when one looks at the Undertakings, and its purpose.

Finally, you note that Defendants and counsel for 2040 Energy have acknowledged information contained within files listed in Exhibit G to the Amended Complaint "qualify as Swan's, rather than 2040 Energy's, trade secrets and/or confidential information." Defendants have not made any such acknowledgement. Indeed, nowhere in the October 29, 2025 email you cite do we ever refer to any "trade secrets." We have only ever indicated Defendants' willingness to consider and evaluate any potential position by Swan that

---

[5] Defendants maintain that regardless of any differences that have been noted by the case law regarding "ownership" under the DTSA and CUTSA, Swan still cannot make a claim under CUTSA. The case that Swan cites is materially different to the case at bar. In *Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, 2019 WL 12521480, at *5 & n.7 (C.D. Cal. Aug. 9, 2019), the plaintiff sues to maintain the secrecy of the trade secrets that it arguably did own, as they were developed by plaintiff's employee during the course of employment and Plaintiff maintained control over them. Here, that is not the case. Particularly given the Undertaking, it cannot be reasonably disputed that all IP relating to mining was 2040 Energy's confidential information—not Swan's. Swan's allegations otherwise are false, and Swan has no colorable claim of ownership under CUTSA. Further, California courts state prima facie ownership must be pled under CUTSA. *Sargent Fletcher, Inc. v. Able Corp.*, 3 Cal. Rptr. 3d 279, 283 (Cal. Ct. App. 2003) ("Under [CUTSA], a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff."). Courts have found that possession often is strong prima facie evidence of ownership due to the nature of trade secrets, but that does not mean that *mere possession without rights to control*, is sufficient. *See, e.g.*, *Masimo Corp. v. Apple Inc.*, No. 8:20-CV-00048 JVS (JDE), 2023 WL 2633961, at *2 (C.D. Cal. Feb. 10, 2023). Here, Swan has no such rights and, therefore, possession is irrelevant.



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2026
Page 6

certain limited alleged "confidential information" may belong to Swan.[6]  Moreover, Swan expressly set forth each of the items it claimed to be its purported trade secrets, *as required by the Court*, in its Trade Secret Identification. To the extent that Exhibit G items were included in or covered by its Trade Secret Identification, Swan is now barred from asserting trade secret claims relating to those items. And with respect to potentially other Exhibit G items, there is simply no basis for Swan to attempt to assert these items are now a "trade secret" of Swan's when it did not assert this in the California Proceedings.[7]

In light of the above, your consistent refusal to dismiss the DTSA claim with prejudice <u>unless</u> Defendants' forfeit their right to seek substantial attorneys' fees is improper. It is clear that Swan has and had no trade secret claims to pursue. Swan's paper-thin attempt to gin up a trade secret claim under state law to avoid dismissal with prejudice does not disguise Swan's true objective—to try to avoid paying fees to which Defendants are reasonably entitled. The UK Order and Swan's Undertakings are clear: Swan can no longer assert that claim in any forum and is required to dismiss its DTSA claim with prejudice.

**Swan's Count II Arguments**

Swan's refusal to dismiss its breach of contract claims with prejudice is similarly misplaced. Swan's own letter demonstrates the reason why. Swan states that "'Confidential Information' under the Consulting Agreements extends to confidential information of "affiliates," which Swan argues includes 2040 Energy. Doore Jan. 8, 2026 Ltr. at 4. But this is precisely the "existing claim in respect of the Business Assets" that Undertaking 1.b. forecloses—indeed, Swan defined Confidential Information in its Complaint to include confidential information of "affiliates," so even if 2040 Energy qualifies as an "affiliate" (it does not), this is an existing claim Swan must dismiss with prejudice.[8]

Swan's argument, quite frankly, is ridiculous. Swan purports to assert third-party rights to 2040 Energy's confidential information based solely on a contractual provision in the Consulting Agreements to which 2040 Energy is not a party. But the notion that a reference to "affiliates" in a contract between two parties somehow grants one party enforceable rights against a non-party affiliate's proprietary information (particularly where that party expressly objects to Swan doing so) is fundamentally flawed and defies common sense. It would effectively allow Swan to unilaterally claim ownership or control over or to deal with 2040 Energy's confidential information without its consent or agreement—even where 2040 Energy

---

[6] To the extent there are limited carveouts from Exhibit G that Swan asserts as "Confidential Information" (as opposed to trade secrets) belonging to Swan and not 2040 Energy, as we previously indicated, please specifically identify those items so that they could be reviewed and assessed.

[7] Citing to Mr. Zagury's statements as any kind of concession regarding the legal definition of a trade secret holds no legal significance and misconstrues the statements. Noting the prudence of getting releases is not an admission of anything – it is an effort to minimize the risk of litigation regardless of the merits, and is routine in many types of agreements, including when parties part ways. Here, Swan's subsequent actions show that Mr. Zagury was prudent to want releases—Swan did, in fact, sue even though it did not own the alleged assets.

[8] To be sure, Swan did not frame this affiliates argument as a specific theory it was pursuing in its Complaint, although it should have done so if it believed it had a basis to assert such a claims.



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan, LLP
March 26, 2026
Page 7

would expressly object to such claims. Swan simply has no legal basis to assert control over 2040 Energy's confidential information. And if Swan truly believed it had legitimate, ongoing rights to enforce confidentiality provisions in connection with 2040 Energy Confidential Information, it should have disclosed this to the UK Court when making its Undertakings. It, of course, did not. Swan cannot now manufacture a purported exception to its Undertakings using this provision to assert rights to 2040 Energy's Confidential Information against 2040 Energy's wishes. Again, to the extent that Swan contends that certain items on Exhibit G could form a damages claim for Swan, it should specifically identify those items. Given the procedural context Swan now finds itself in, it cannot argue non-existent hypotheticals of theoretical breach of contract claims to avoid compliance of its Undertakings and a dismissal with prejudice of its breach of contract claims.

You also appear to argue that there are other breach of contract claims that Swan could allegedly assert (such as failure to return laptops and breaches of non-solicitation or conflict obligations) that purportedly have nothing to do with the Business Assets and that Swan has yet to assert against Individual Defendants. That is irrelevant. Swan's asserted breach of contract claim in the California Proceeding is not premised on any of these theories—Swan's breach of contract claim is premised on breach of confidentiality provisions in the Consulting Agreements only, not these other provisions or purported breaches that were never part of Swan's breach of contract claim. Thus, Individual Defendants are entitled to a dismissal with prejudice of the claims raised in this litigation.

Notwithstanding the above, in an effort to compromise as to Count II, Defendants are willing to stipulate to dismiss the breach of contract claim as to the Business Assets with prejudice, as determined in the UK Litigation by either agreement of parties or UK Court order. To the extent there are any documents listed on Exhibit G that are not Business Assets, Swan should so advise which forms a potential claim against the Individual Defendants, and the Individual Defendants may be willing to consider and stipulate to dismiss the breach of contract claim with respect to those limited documents that were never the gravamen of Swan's claims in the California Proceeding without prejudice.

**Defendants' Position Regarding Counts III – VII**

All of the other claims should also be dismissed with prejudice, to the extent they relate to or involve the Business Assets. With respect to remaining claims that do not relate to or involve Business Assets, Defendants are willing to agree to stipulate to dismiss these claims without prejudice, while reserving all rights.

* * * * *

In addition to the above, Swan has still not addressed the following other conditions which Defendants proposed. Please advise us as to Swan's position on the issues below.

1. Confirm that Swan will stipulate, as a condition of dismissal, that 2040 Energy is the exclusive owner of the Business Assets under U.S. and state law, which encompasses, at minimum, all of the trade secrets and confidential information at issue in the California Proceeding, and that it will



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan,
LLP March 26, 2026
Page 8

      not assert any claim or seek adjudication of ownership or similar rights to the Business Assets under U.S. law in any forum.

2. Confirm that Swan will agree, as a condition of dismissal, that Defendants may seek their reasonable attorneys' fees and costs incurred in this litigation, and the Court retains jurisdiction to hear Defendants' motions for attorneys' fees and costs, including but not limited to any motions for attorneys' fees as a prevailing party, under the DTSA, under 28 U.S.C. § 1927, and/or under Federal Rule 11.

3. Confirm that Swan will provide Defendants, now and going forward, with access to all disclosures and documents or information made by the parties or the Court in the UK Litigation and in any proceedings in the BVI against 2040 Energy, including any information which Swan (and not other parties) claims to be confidential in those proceedings and nonetheless subject to compliance with any confidentiality orders in those proceedings with respect to such information, and to not object to Defendants' access to any non-public pleadings or documents filed in those actions, to the extent not legally prevented from doing so.

* * * * *

As mentioned at the beginning of this letter, Defendants cannot accept Swan's unreasonable offer to dismiss Counts I and II without prejudice and that they forfeit their reasonable attorney's fees. Ultimately, Swan's refusal to dismiss its primary claims with prejudice is an attempt to do an end run around the UK Order and Undertakings, as well as to avoid paying fees caused by its own improper litigation conduct. Defendants simply cannot agree to forgo their ability and right to seek reasonable attorney's fees to which they are entitled. Further, as noted above, Defendants contend that Swan's remaining claims, Counts III-VII, should be dismissed with prejudice to the extent they relate to or involve the Business Assets. To the extent such claims do not pertain to the Business Assets, Defendants are willing to agree to stipulate to dismiss those claims, without prejudice.

Enclosed with this letter please find a draft of Defendants' Motion for Sanctions under Federal Rule of Civil Procedure 11.[9] We look forward to hearing from you soon regarding Swan's position regarding same.

Nothing in or omitted from this letter shall be deemed an admission or a waiver of any of the Defendants' rights, remedies or defenses, all of which are expressly reserved.

---

[9] If Defendants are forced to file this Motion, Defendant Proton will simultaneously seek to lift the stay in connection with Swan's claims against it in order to have the Motion heard and decided by the Court.



Stacylyn Doore
Quinn Emanuel Urquhart & Sullivan,
LLP March 26, 2026
Page 9


Very truly yours,

Matt Kanny