# EXHIBIT Z

# Redacted Version of Document Proposed To Be Filed Under Seal

**JAMS ARBITRATION**

| | |
|---|---|
| ELECTRIC SOLIDUS, INC., d/b/a SWAN BITCOIN<br><br>*Claimant,*<br><br><br>vs.<br><br><br>RAPHAEL ZAGURY,<br><br><br>*Respondent.* | **DEMAND FOR ARBITRATION**<br><br><br>**REF. NO.** _____ |

In accordance with Rules 5 and 9 of the JAMS Employment Arbitration Rules and Procedures, effective June 1, 2021, Claimant Electric Solidus Inc., d/b/a Swan Bitcoin ("Swan"), by and through its attorneys, submits this Demand for Arbitration against Respondent Raphael Zagury.

**PRELIMINARY STATEMENT**

1.      Raphael Zagury, Swan's former Chief Investment Officer, has flagrantly violated his fiduciary and contractual duties to Swan.  While serving as CIO, Zagury plotted and executed what he described as a "rain and hellfire" scheme to steal Swan's Bitcoin mining personnel and cut Swan out of a lucrative partnership with Tether, a cryptocurrency industry titan, under the flimsiest of pretexts.  Zagury documented his plan in detailed business proposals he sent to Tether leadership, repeatedly noting that there was legal risk.  He went through with it anyway.

2.      Zagury joined Swan in December 2022, and was initially hired to expand Swan's Bitcoin offerings to institutional investors.  In November 2023, Zagury officially took on the role

of Swan's CIO and the additional role of Swan's Head of Mining, and began working to assist Swan in expanding its Bitcoin mining operations. As a condition of his employment with Swan, Zagury agreed to be bound by a Confidentiality and Proprietary Information Agreement ("Confidentiality Agreement"), which included provisions designed to protect Swan's assets, including its proprietary information and its personnel. A true and correct copy of the Agreement is appended as Exhibit A.

3.      In July 2023, Swan and Tether (acting through a subsidiary), entered into a Shareholder's Agreement ("SHA") for the operation of a Bitcoin mining joint venture known as 2040 Energy. The idea behind the partnership was that Tether would provide most of the funding for the activities of 2040 Energy while Swan would provide the sweat equity of managing and operating Bitcoin mining sites, which involve managing complex calculations by high powered computer systems.

4.      In the months after the execution of the SHA, the Swan mining team, including Zagury, developed a number of proprietary strategies, tools, models and operating systems to assess and engage mining sites, to optimize mining performance at such sites, and to manage mining activities and operations with extraordinary efficiency.[1]

5.      As the mining operation that Swan managed for 2040 Energy grew to managing over ▮▮▮▮▮▮ worth of capital for mining operations, it became clear to all parties that the terms of the SHA did not match the new economic realities of the joint venture and that a change

---

[1]    Nothing in this Demand is intended to contrast or conflict with certain negotiated undertakings Swan has entered into with 2040 Energy and Tether in litigation in the United Kingdom, by which Swan has made negotiated representations that certain Business Assets related to Bitcoin mining operations belong exclusively to 2040 Energy. For ease of reference, this Demand at times refers to the mining operations that Swan managed for 2040 Energy as "Swan Mining"—as Zagury referred to those operations while planning to steal them.

in structure of the partnership was needed.  Under the 2040 Energy arrangement, Tether provided all funding for the venture's Bitcoin operations while Swan managed those operations; however, the agreement did not provide for dividends or distributions to Swan until Tether was fully repaid.  As the operation expanded rapidly and Tether invested more into the business, this structure made less financial sense.  As such, Tether executives (including Giancarlo Devasini) proposed a new structure for the partnership.  Swan and Tether then began to negotiate a new partnership based on Tether's proposal, which they planned to call 2140 Energy.  These negotiations began in early 2024 and by March 2024 the parties had agreed in principle to new terms for 2140 Energy, which would replace the parties' arrangement under 2040 Energy.

6.     Zagury, through his role as CIO of Swan, had insight into the lucrative business opportunity before Swan as well as its negotiations with Tether and Swan's finances and  strategy.

7.     As detailed herein, Zagury used that knowledge to undermine Swan and establish a competing business relationship with Tether himself.

8.     On July 19, 2024, while acting as Swan's CIO, Zagury covertly established a separate channel on ephemeral messaging platform Telegram[2] to discuss his competing business strategy with Tether leadership directly.  The channel included Giancarlo Devasini and Zachary Lyons (then a founder and principal of Marlin Capital Partners, Tether's investment manager and day-to-day contact for matters relating to funding for 2040 Energy, and now Tether's Deputy CIO):

---

[2]     Messages exchanged through ephemeral messaging platforms are designed to be temporary, and automatically disappear after being viewed or after a set period of time.

```
─────────────────────────────────────────────────────────────────

To:          rapha <>, zachary lyons <>, giancarlo devasini <>
Attachments:  rsmf.zip



Rapha
2024-07-19T21:30:47.0000000Z
Member Action: create_group Project NxT

Rapha
2024-07-19T21:31:18.0000000Z
G and Zach - creating this group to discuss items related to the mining project.

Rapha
2024-07-19T21:32:01.0000000Z

Rapha
2024-07-19T21:32:54.0000000Z
We've created a draft business plan of the current state of the business and potential next steps for
discussion.

Rapha
2024-07-19T21:33:24.0000000Z
This is of course very confidential and I would appreciate we keep within our circle.

Rapha
2024-07-19T21:33:53.0000000Z
I can tell you the team is eager to move ahead

Rapha
2024-07-19T21:34:13.0000000Z
Looking forward to seeing you in person tomorrow
@Merlinthewizard
```

9.      Zagury proceeded to send multiple detailed business proposals to Tether.  That same day, on July 19, 2024, Zagury sent a business plan pitching a spinout of Swan's mining team under the banner of "corporate evolution":

```
Corporate evolution often unlocks significant value by transforming divisions
into standalone entities. Swan's mining division has proven highly effective
and efficient, achieving a hashrate exceeding ██████████████████████
█████  by the end of 2024. Now is the time to unbundle this division into a new
independent   entity,   "MiningTeamCo."   This   will   enable   focused   capital
allocation,  maximize  hashrate  production,  and  improve  fleet  efficiency.  As a
standalone  business,  MiningTeamCo  will  benefit  from  aligned  incentives,  clear
accountability,  and  optimized  processes,  positioning  it  for  substantial  growth
and  value.  Additionally,  it  will  mitigate  risks  associated  with  Swan  and
benefit  from  a  clearer  capital  structure,  driving  greater  efficiency  and
returns  for  all  stakeholders.
```

10.     And despite having never discussed this plan with Swan's CEO, Cory Klippsten, Zagury boldly told Tether he expected Swan would cooperate with his scheme:

## TRANSITION PLAN AND TIMING

| Task | Timeframe | Status |
|------|-----------|--------|
| Secure Swan cooperation | 1-2 weeks | In progress |
| Setup entities | 1-2 weeks | In progress, seeking advice |
| Alignment with Tether on structure | 1-2 weeks | In progress |
| Asset transition plan / Tax structuring | 1 month | In progress |
| Technology setup/transition | 1 week | E-mails / documents, AWS, B:NOC |
| Employee contracting | 2-3 weeks | Verbal agreements to contract |
| Hosting contract reassignment | 1 month | In progress |
| Key stakeholder communications | 1 week | Drafting |

11. Zagury's transition plan stated that he had already obtained "verbal agreements to contract" with Swan employees. Zagury explained in his proposal that all the key Swan individuals who had "significantly contributed across various functions in the mining business" had "confirmed their willingness and enthusiasm to transition to NewMiningCo." Zagury stated: "The cap table and long-term incentive structure within NewMiningCo have been presented to and accepted by the team."

12. Zagury's proposed "team" included 14 individuals, 12 of whom were then Swan employees and consultants. One of whom, Jin Wen, was a vendor for Swan, contracted for servicing mining hardware. Another was Dan Tuzzio, a close associate of Alex Holmes, Swan's then Head of Business Development for Swan Mining. When breaking out the proposed new roles, Zagury put himself at the top—he would be the new CEO of NewMiningCo:

5



13.     On July 22, 2024, Zagury laid out to Tether leadership the various risks that accompanied his plan, including potential claims by Swan for violations of its employees' and consultants' non-competition and non-solicitation obligations:

**To:**          rapha <>, zachary lyons <>, giancarlo devasini <>, paolo ardoino <>, san <>, δισχ hωlmσs <>
**Attachments:**  rsmf.zip

Rapha
2024-07-22T05:25:43.0000000Z
Hey
@ZachLyons
-

I'm sure these are on your radar already but some points we've had in mind to consider when proposing the spin off to Swan:

- Release of Liability, non-compete and non-solicitation
:
  ◦ Release of liability for all team members joining NewCo to ensure no future legal claims from Swan. Release from non-competes (if applicable) and non-solicitation clauses.

- Employee Transition
:
  ◦ We will provide a list of employees moving to NewCo.
  ◦ Swan to ensure a smooth transition plan that minimizes business disruption
  ◦ 2040 and/or NewCo will assume their salaries and other compensation related costs.

- Intellectual Property (IP) Transfer
:
  ◦ Ensure an agreement that Swan forgoes all IP rights related to mining to NewCo. This includes any mining technology, source code related to mining (including BNOC) and any other intellectual property developed by the team moving to NewCo.

- Document Transfer
:
  ◦ Ensure that NewCo has unrestricted access documents post-transition. Including but not limited to hosting agreements, contracts and other documents related to mining.
  ◦ Allow NewCo to take over all documents related to mining activities. Regardless of current confidentiality clauses.

- Operational Continuity
:
  ◦ Establish clear timelines and responsibilities for both Swan and NewCo to avoid any operational disruptions.

- Communication Strategy
:
  ◦ Develop a joint communication strategy to inform stakeholders (employees, clients, vendors) about the spin-off.

- Future Parent Company Decisions
:
  ◦ Include clauses to protect NewCo from being impacted by future decisions made by Swan that could affect its operations.

- IT and Infrastructure
:
  ◦ Plan for the transfer of IT infrastructure, including software licenses, hardware, and data.

- Email and Slack Access
:
  ◦ Swan to provide continued access to Swan emails for NewCo team members until it is determined that such access is no longer needed.
  ◦ Ensure a clear process for transitioning email communications to NewCo's domain. Ensure a clear progress to move the mining channels from Slack into a new slack instance.

14.     On July 30, 2024, Zagury held a meeting with Devasini, Lyons, and other Tether representatives at which they planned the concept of two new interlocking entities, Proton and

7

Elektron. Proton would replace Swan as the manager and operator of 2040 Energy's mining operations (2040 was still the operating entity while the 2140 agreement was being finalized) while Elektron would then replace 2040 Energy as the entity that would hold the assets and interests of the mining operation—effectively transitioning 2040 Energy's mining operations away from 2040 Energy and Swan and to Proton and Elektron.



15.     His presentation detailed everything from the operating and vesting structure of this new company to its start-up costs and funding needs—all of which put Zagury in position to take over Swan Mining's operations and lead this new company.

16.     Specifically, Zagury outlined the plan to transfer 2040 Energy's mining activities to Elektron, completely cutting Swan out:

8

17.    The "New BVI entity being incorporated" was Proton, which was incorporated in the British Virgin Islands on August 6, 2024. Zagury participated in the formation of the new entity Proton, while still employed by Swan.

18.    It is clear from these documents alone that, by July 2024, Zagury, alongside Tether executives, had formulated a plan to transfer Swan Mining's operations out from under 2040 Energy and into the control of Proton and Elektron.[3]

19.    Zagury's July 30, 2024 pitch deck again indicated that he had received verbal commitments from Swan consultants and employees to join these new competing companies and

_____

[3]    Notably, despite outlining a plan in July 2024 to mine Bitcoin outside 2040 Energy, Defendants in Swan's lawsuit in the United States District Court for the Central District of California told the Court in October 2024 that Proton was mining Bitcoin only for 2040 Energy. *See* Certain Defs.' Special Appearance to Oppose Pl.'s Ex Parte Application at 12, Electric Solidus Inc. v. Proton Management Ltd., No. 2:24-cv-8280, Dkt. 30 (N.D. Cal.) ("In addition, Proton and the Individual Defendants are working only for 2040 Energy.")

to abandon their positions at Swan.  Zagury and his co-conspirators planned to resign "en masse"

and then create a false paper trail to make it appear as though the resignations were not coordinated.

20.     This entire plot was laid bare in Zagury's contemporaneous notes:



From: raphael@swanbitcoin.com
Subject: Call with Bill, Max, Alex, San
Date: To: August 6, 2024 at 03:08

———

Better together or Alex leaves first?
. Send list of points
. Post - termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.
Tether needs to send default notice.
——

Team is getting to a point where is getting untenable. Bill is being put at risk. Dangerous to team to stay around. Team resignation and move with Tether needs to be on tandem.
Fortress is looming.
Last week you said you'd unleash hell on this guy.
. Alex leaves
. Breach
. Proton is assigned manager of 2040 assets
. All communications go to new management company
. ROFR gone if Alex resigns
. Written communications. Alex terminated his agreement. We don't need a board resolution.
. Bring the heat
. Giancarlo side convs. ?
Bill took himself out of Fortress situation. Cory interrogating him now. Trying to ruin Rapha's reputation. Sling a lot of shit. 10% will stick.
They cannot go and say we didn't do it by the book.
Rain and hell fire needs to start. Needs to be an exit, not a nice transaction.
██████████ is moot when Alex leaves. Already moot now. Double covered the second Alex leaves.
Bill interrogated if anyone asked him to join mining.
———

> 10% deposit to Taras
Status of Proton - update - formed, formalizing docs.

10

21.    Zagury and his co-conspirator's scheme came to pass, just as planned.  On August 8, 2024, Swan Mining's operations were ripped out from underneath Swan when Zagury—alongside nearly all of Swan's mining team—resigned and launched a competing Bitcoin mining management company, Proton Management Ltd.—the "Proton" referred to in Zagury's presentations.  Every Swan employee and consultant that Zagury had promised Tether were committed to leave—all 12 of them—resigned over the course of a few hours on the evening of August 8, with the exception of Swan General Counsel Bill Bellitsky, who resigned the next morning.  Zagury and others downloaded thousands of documents and source code related to Swan's mining operations for 2040 Energy in the days leading up to their resignations[4] and hosted several videoconferences to coordinate and finalize the execution of their plan.  Virtually every step in the co-conspirators scheme is evident from contemporaneous Swan records evidencing their coordinated misdeeds.

22.    For example, on August 8, the day of the mass resignations, Zagury led Google Meet calls beginning at 4:10 a.m. (PDT) and running through 10:20 a.m. in which the various other Swan consultants and employees who resigned joined and left, with several using their Swan Google accounts to do so, leaving a log for Swan to discover:

---

[4]   For the avoidance of doubt, the claims that Swan brings against Zagury here are not based upon Zagury's and/or his co-conspirators' downloading of documents and source code that belong to 2040 Energy.  Any allegations relating to Zagury's and/or his co-conspirators' downloading of such documents and source code are included as context to Zagury's overall course of wrongdoing.

11



23.    After Zagury and his co-conspirators Alex Holmes and San Naidoo executed their coordinated resignations on August 8, Holmes sent an email to the other Swan consultants and employees—Thomas Furlong, Rafael Dias Monteleone, Enrique Romualdez, Lucas Vasconcelos, Brett Hiley, Kartheek Sola, Aleksander Dozic, Maxwell Berg, and Tyler Effertz—inviting them to join Holmes, Zagury, and Naidoo at the new entities they were arranging.  These messages of course were simply falsified cover to make it seem as if Zagury and his co-conspirators had not already all violated the non-competition and non-solicitation provisions of their Confidentiality Agreements.

| From: | Alex Holmes <Alex@fadtech.io> |
|---|---|
| Sent: | Thur 8/8/2024 6:01:06 PM (UTC-07:00) |
| To: | "Bitelementusa@gmail.com" <Bitelementusa@gmail.com>, "lucasvm8@gmail.com" <lucasvm8@gmail.com>, "rafaeldiasmonteleone@gmail.com" <rafaeldiasmonteleone@gmail.com>, "enriqueromualdez@gmail.com" <enriqueromualdez@gmail.com>, "brett.hiley@gmail.com" <brett.hiley@gmail.com>, "2reachtyler@gmail.com" <2reachtyler@gmail.com>, "tom@leeuwinestate.com.au" <tom@leeuwinestate.com.au>, "aleksandardozic14@gmail.com" <aleksandardozic14@gmail.com>, Maxwell Berg <max@maxberglaw.com>, Bill Belitsky <bb@jmavlegal.com>, "bill@swanbitcoin.com" <bill@swanbitcoin.com> |
| Subject: | Future Plans |

Team,

I made the decision to terminate my agreement with Swan, effective as of ~two hours ago. If you are on this email, it means that I want you to continue the incredible work we have accomplished together over the last 13 months. Arrangements are under way and I don't expect us to skip a beat. I let Rapha and San know my decision one hour ago and they will be joining me. If you have any questions please reach out to me directly.

Alex

24.    Tellingly, Tether exhibited no surprise at these sudden and chaotic events at its business partner, instead wasting no time in replacing Swan with Proton as the manager and operator of 2040 Energy and making clear to Swan that the 2140 Energy deal was dead.  Zagury and his co-conspirators resigned starting on the evening of August 8 and ending the morning of August 9, a Friday.  On Monday, August 12, Tether replaced Swan with Proton.

25.    Swan initially sued Proton and several of Zagury's co-conspirators in federal court. Not long after Swan initiated that suit, Tether sought legal action against Swan in the United Kingdom (the "legal cover" Zagury referenced in his "rain and hellfire" note).  The federal court action has been stayed pending arbitration, and the United Kingdom action is ongoing.  As has become clear through data in Swan's own IT systems and discovery in the United Kingdom action,[5] Zagury was the key figure in formulating this plot in violation of his contractual and

---

[5]  Pursuant to the Order of The Honourable Mr. Justice Henshaw dated September 9, 2025, the English court has given permission for this discovery to be used for purposes other than the United Kingdom action (thus including this arbitration).

fiduciary duties to Swan. Swan commences this arbitration to hold Zagury to account for his willful and unlawful misconduct including breach of contract, tortious interference with contractual relations, and breach of his fiduciary duties. Swan seeks damages as compensation for the significant harm that Zagury has caused.

## PARTIES

26. Claimant Swan is an industry-leading Bitcoin wealth platform that helps individuals and businesses purchase, save, and invest in Bitcoin through its platform as well as protect those investments. Further, the platform educates users on Bitcoin by providing up-to-date research on Bitcoin and access to virtual and in-person events with the most knowledgeable people in Bitcoin. Swan is a Delaware corporation with its headquarters located at 26565 W. Agoura Road, Suite 200, Calabasas, California 91302.

27. Respondent Raphael Zagury is Swan's former Chief Investment Officer and Head of Mining. He is the current CEO of Proton and a director at Tether-backed public company "XXI," as well as an executive of at least one Elektron entity. On information and belief, Respondent is domiciled at 999 SW 1st Ave. Apt. 1417 Miami, FL 33130. On January 16, 2026, Zagury filed an "Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida" on behalf of Elektron Enterprises LLC of Delaware. Zagury identified himself as the manager of Elektron Enterprises. He also attached a January 16, 2026 State of Delaware Certificate of Existence for the parent entity, Elektron Enterprises LLC, which under Florida law explicitly identifies him as a control person of the Delaware entity. Counsel to Zagury has previously asserted that "Proton does not have a formal relationship with any other Elektron entity, however several individuals provide services to both Proton and Elektron Enterprises LLC."

14

## BASIS FOR ARBITRATION

28. On November 6, 2023, Zagury entered into a binding Confidentiality Agreement (Ex. A) and an "Alternative Dispute Resolution (ADR) Policy and Agreement" ("ADR Agreement") with Swan (Ex. B).

29. Claimant's claims arise from and relate to Mr. Zagury's employment with Swan and the cessation thereof. Thus, these claims are subject to arbitration pursuant to Mr. Zagury's Confidentiality Agreement. Section 8.1 of the Agreement reads as follows:

> I agree that any and all claims or disputes arising from or relating to this Agreement, shall be subject to and be resolved by binding arbitration in accordance with the Company's Alternative Dispute Resolution (ADR) Policy and Agreement, a copy of which I executed in connection with my acceptance of the offer of employment provided by the Company.

Ex. A, Confidentiality Agreement § 8.1.

30. Section 1.3 of the ADR Agreement reads as follows:

> Employment disputes arising out of or related to termination of employment or alleged unlawful discrimination, including retaliation or sexual or other unlawful harassment, shall include, but not be limited to, the following: alleged violations of federal, state and/or local constitutions, statutes or regulations; claims based on any purported breach of contractual obligation, including breach of the covenant of good faith and fair dealing; and claims based on any purported breach of duty arising in tort, including violations of public policy. Disputes related to workers' compensation and unemployment insurance are not arbitrable hereunder. Claims for benefits covered by a separate benefit plan that provides for arbitration are not covered by this ADR Agreement. Also, nothing in Company's offer letter to Employee (the "Offer Letter") or in the ADR Policy shall be construed as precluding Employee from filing a charge with the Equal Employment Opportunity Commission (EEOC), the National Labor Relations Board (NLRB) or other federal, state or local agencies, seeking administrative assistance in resolving claims. However, any claim that cannot be resolved administratively through such an agency shall be subject to the Offer Letter and this ADR Policy and Agreement. Section 1.1 of the Company's Alternative Dispute Resolution Policy and Agreement ("ADR Agreement") states that "[i]n the even that any employment dispute arises" the parties shall "first resolve any such dispute through an informal process," but that should those "informal attempts at resolution fail *and* if the dispute arises out of or is related to Employee's employment, the termination of Employee's employment, or alleged unlawful discrimination . . . the Company and

15

> Employee will submit the dispute to final and binding arbitration in the county where the Employee is located in Florida." ADR Agreement § 1.1.

Ex. B, ADR Agreement § 1.3.

31.    Pursuant to Section 1.4 of the ADR Agreement, the Agreement "is subject to and governed by the Federal Arbitration Act," which means "that the FAA governs, among other things, the interpretation and enforcement of this Agreement and all of its provisions." *Id.* § 1.4.

32.    Further, pursuant to Sections 2.6 and 2.7 of the ADR Agreement, arbitration in this action shall proceed in accordance with the JAMS Employment Arbitration Rules and Procedures, with a hearing "at a location mutually agreed upon by the parties, or as determined by the Arbitrator in the absence of an agreement." *Id.* §§ 2.6, 2.7.  The ADR Agreement additionally provides that "[t]he applicable substantive law shall be the law of the State of Florida or federal law." *Id.* § 2.7.

33.    Section 2.1 of the ADR Agreement requires the parties to attempt to mediate the dispute, "[p]rior to submission of any dispute to arbitration." *Id.* § 2.1.  Swan and Zagury held a mediation before the Hon. Michael Hanzman in Miami on April 2, 2025, which did not successfully resolve the dispute.

## STATEMENT OF FACTS

### A.  Swan's Founding And The Launch Of Its Mining Operations

34.    Swan was founded by Cory Klippsten in June 2019.  Together with co-founder Yan Pritzker, Klippsten built the company into an industry-leading Bitcoin wealth platform that allows individuals and businesses to purchase, save, invest in, protect, and be educated on Bitcoin.  Over the years, more than ▮▮▮▮ worth of Bitcoin has been purchased through Swan's platform. Swan now has over ▮▮▮▮▮▮▮▮▮▮▮ and additionally has about ▮▮▮▮ assets on platform ("AOP").

16

35.     As Swan's success continued to grow, Klippsten and Pritzker became interested in and began exploring opportunities in the Bitcoin mining space. Bitcoin mining—the energy-intensive process of verifying transactions on the Bitcoin network in exchange for Bitcoin rewards—can be extremely lucrative when operated at scale by management with technical expertise.

36.     In January of 2023, after years of monitoring the industry and expanding its outreach to Bitcoin mining connections, Klippsten and Pritzker created a new division of Swan focused on developing financial services for investors and operators within the Bitcoin mining industry.

37.     In June 2023, Klippsten reached out to Giancarlo Devasini at Tether to discuss the creation of a funding arrangement by which Swan could expand and manage its mining operations.

38.     Through Tether's subsidiary Zettahash Inc., Swan and Tether entered into a joint venture funding vehicle known as 2040 Energy through which Tether would provide most of the funding for the activities of 2040 Energy while Swan would provide the sweat equity of managing and operating Bitcoin mining sites. The arrangement was memorialized in a Shareholders Agreement ("SHA") on July 28, 2023.

39.     Following execution of the SHA, Swan began rapidly expanding mining operations, purchasing Bitcoin mining machines and contracting with host sites. To make Swan's mining operation a success, Klippsten and Pritzker worked to build a team of experienced and talented professionals.

**B.  Zagury Joins the Swan Team And Takes A Leading Role On The Mining Team**

40.     In December 2022, following a long prior career on Wall Street as an investment banker, Raphael Zagury was hired to expand Swan's Bitcoin offerings to institutional investors .

17

41. In November of 2023, Zagury officially took on the roles of Swan's CIO and Head of Mining.

42. Upon taking these roles, Zagury signed and agreed to be bound by a Confidentiality and Proprietary Information Agreement ("Confidentiality Agreement"), which contained non-competition, non-solicitation, and confidentiality provisions. See Ex. A, Confidentiality Agreement §§ 5.1-5.2.  The non-competition and non-solicitation clause provides as follows:

> I hereby covenant and agree that, at any and all times during my Service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company in furtherance of the Company Business. With respect to this covenant restricting my behavior during the term of my Service only, prohibited acts of competition include, without limitation, the following: (i) performing any services for a Competing Business; (ii) soliciting or recruiting any customer or prospective customer of the Company or any affiliate of the Company on behalf of a Competing Business; (iii) selling competitive products or services to any customer or prospective customer of the Company on behalf of a Competing Business; (iv) hiring, recruiting or soliciting any employee of the Company; and/or (v) disclosing, misappropriating or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business. In addition to the foregoing, I shall disclose, in writing, any outside business activity to the Company's Chief Executive Officer and secure permission from the Company's Chief Executive Officer before engaging in such activity so that the Company may evaluate whether such activity either conflicts with the best interests of the Company and/or may impair my ability to perform my Service on behalf of the Company.

Ex. A, Confidentiality Agreement § 5.1.

43. Zagury additionally agreed under the Confidentiality Agreement to refrain from soliciting Swan employees for a period of 12-months following his termination from Swan:

> I covenant and agree that, for a period of twelve months following the termination of my Service, I will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business.

*Id.* § 5.2.

18

44.    Further, the Confidentiality Agreement  included a provision calling for the return

of all Swan materials upon Zagury's termination of employment from Swan:

> Upon termination of my Service or upon Company's request at any other time, I will deliver to Company all of Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information of Company, excepting only (i) my  personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copies of my agreements with the Company. I agree that I will not copy, delete, or alter any Confidential Information contained upon my Company computer immediately before I return it to Company.

*Id.* § 6.

45.    Finally, the Confidentiality Agreement contained the following provision, under

which Zagury covenanted not to use or disclose Swan's confidential and proprietary information

during or after his term of employment with Swan:

> I recognize the interest of the Company and its affiliates in maintaining the confidential nature of its Confidential Information. Accordingly, I covenant and agree that I will not, at any time, other than in the performance of my Service for the Company or any affiliate, both during and after my Service with the Company, communicate or disclose to any person or entity, or use for my benefit, or for the benefit of any other person or entity, either directly or indirectly, any Trade Secrets and/or Proprietary Information. For the purposes of this Agreement, the prohibition against the disclosure of Proprietary Information is prohibited until the information becomes publicly available through no direct or indirect fault or act of my own, or otherwise no longer qualifies as a Trade Secret. I understand that misappropriation of a trade secret of the Company in breach of this Agreement may subject me to liability under the Defend Trade Secrets Act of 2016 (the "*DTSA*"), entitle the Company to injunctive relief and require me to pay compensatory damages, double damages and attorneys' fees. Nothing in the foregoing covenant shall in any way limit or impair any of the rights of the Company or any affiliate with respect to any trade secret information, including, without limitation, any information that qualifies as a trade secret under the DTSA. Notwithstanding any other provision of this letter agreement, I understand that I will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, in each case solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. I further understand that if I file a lawsuit for retaliation by the Company for reporting a suspected violation of law, I may disclose the trade secrets of the

19

Company to my attorney and use the trade secret information in the court proceeding if I file any document containing the trade secret under seal and do not disclose the trade secret except pursuant to court order.

*Id.* § 2.1.

46.    Swan envisioned that as CIO Zagury would help Swan to grow its investment into and management of Bitcoin mining sites.  As CIO and Head of Mining, Zagury was directly involved in the expansion of Swan Mining's operations.

47.    Following Zagury's assumption of the roles of CIO and Head of Mining, Swan grew its mining team from five to twelve dedicated employees and consultants—eventually including the following individuals who became Zagury's co-conspirators in the plot to usurp Swan Mining's operations: Vice President of Institutional Operations & Research, Brett Hiley; Financial Controller, Tyler Effertz; Technical Researcher, Kartheek Sola; Staff Accountant, Aleksander Dozic; Investment Director, Thomas Patrick Furlong; Special Situations Analyst, Santhiran Naidoo; Investment Analyst, Rafael Dias Monteleone; Junior Investment Analyst, Enrique Romualdez; and Software Engineer, Lucas Vasconcelos.  The mining team additionally included Alex Holmes, Swan's Head of Business Development for Swan Mining (whom Swan compensated through Holmes's personal company, Ilios Corp., at Holmes's request); Maxwell Berg, Swan's external Associate General Counsel; and Swan's then-General Counsel, Bill Belitsky.

48.    The Swan mining team developed methods and practices that allowed the team to investigate and identify potential mining sites, run them more efficiently than other mining companies, and negotiate mining related contracts that were crucial to the growth of the mining sites.

49. These methods and techniques made Swan Mining's operations for 2040 Energy extremely successful. In the first half of 2024, Swan Mining generated over ███████████ in revenue from those mining operations.

50. By the summer of 2024, Swan had expanded mining operations to ██ mining sites worldwide. Zagury estimated that *Swan's share* of the mining operations alone was valued at over ██████████. In fact, Zagury even suggested that the ██████████ valuation was "low."

51. Zagury's role on the Swan mining team was essential not only to growing the investments Swan and Tether had already made in the mining sites through 2040 Energy but also to bringing in new investors that could assist Swan in further expanding Bitcoin mining operations. In April 2024, Swan began holding meetings to raise investments through its Series C fundraising round, with Tether as a potential lead investor. Zagury's role meant that he engaged directly with potential investors, including Tether.

## C. The Negotiation of 2140 Energy

52. In early 2024 it became clear that the 2040 Energy joint venture structure did not align with the realities of the business. Under the 2040 Energy arrangement, Tether (acting through Zettahash) would provide all of the funding for 2040 Energy's activities and, in return, would become the majority shareholder of 2040 Energy. Swan received a minority stake in 2040 in return for operating and managing 2040 Energy's activities. However, the 2040 Energy arrangement did not provide for ████████████████████████████████████████████ ██████████████. As the size of the 2040 Energy mining operation grew to a team of 19 Swan employees and consultants—including receiving direct oversight from Swan's legal and financial departments as well as Swan executives, who devoted substantial time to overseeing and managing those operations—and 2040 Energy invested in and launched more and more new mining sites,

21

this structure made increasingly less sense because Swan was not receiving dividends or distributions for its efforts.

53.    As such, Tether proposed the creation of a new joint venture, 2140 Energy, which would replace 2040 Energy.

54.    By March 2024, documentation had been prepared for the new venture and an agreement had been reached in principle.  Under the 2140 Energy structure, Swan would receive ███ of cash flow prior to the repayment of Tether's investment.  After Tether was repaid, cash flow would be split ███—a significantly more favorable arrangement for Swan.

**D.  Zagury's Plan to Undermine Swan and Steal Swan Mining's Operations**

55.    However, despite Tether's continued negotiation with Swan in the first half of 2024 regarding the terms of 2140 Energy, the parties had not yet signed a formal written agreement. Tether claimed that its delay in finalizing the agreement was driven by the need to hammer out logistical details that would allow Tether to optimize tax treatment for the planned new offshore mining deployments.  At this point, Zagury saw an opportunity to undermine these negotiations and take the mining operation for himself.

56.    Starting in June 2024 and potentially earlier, Zagury began to undermine Swan's efforts to formalize and finalize the 2140 Energy arrangement, and instead undertook, alongside Zachary Lyons and Giancarlo Devasini, to cut Swan out of the mining business entirely and to replace it with a new entity that would solely benefit Zagury and his co-conspirators.

57.    During that same time period, Swan had begun the process of raising additional investment through a Series C fundraising round, which Tether had agreed to lead with a $25 million investment that would value Swan's operation at $1 billion.  As Swan's CIO, Zagury was directly involved in these efforts.

58.    In late June 2024, Zagury met with Tether's outside counsel at the East Miami hotel. On information and belief, during this meeting Zagury engaged with Tether on a plan to form a new mining company separate from Swan.

59.    On July 2, 2024, Zagury relayed to Swan's then-President, Guilhereme Gomes, a summary of a discussion Zagury had with Lyons, in which he relayed Lyons' beliefs that the prospects for Swan's Bitcoin mining operations were very favorable and that it should be spun off as an independent entity.  Zagury then floated his true plan to double-cross Swan—he discussed with Gomes the possibility of forming a new company that would replace Swan as the operator of 2040 Energy.  Zagury would be the new company's CEO, Swan's then-Investment Director Naidoo would be the COO, and Holmes would be the Head of Operations and Procurement.

60.    On July 11, 2024, Zagury and co-conspirator Naidoo met with Lyons to plot an "unwind" of Swan's involvement in 2040 Energy.  That group discussed the possibility of certain Swan employees and consultants leaving Swan and going to Tether or to another operator to "[k]eep doing what [they're] doing."  Lyons told Zagury and Naidoo that Klippsten "has to realize they [Tether] can take away [Swan Mining's operations] tomorrow."

61.    On July 14, 2024, Giancarlo Devasini relayed a verbal commitment to Klippsten for a $15 million bridge round of funding to Swan until Tether's funding of the Series C could be finalized pending a conversation with Zach Lyons.  The very next day, on July 15, 2024, Zagury spoke with Lyons, during which Lyons suggested suing Swan.  During the meeting, Zagury relayed notes from the conversation to Gomes.  Zagury and Gomes then discussed forcing a wind down of Swan's business, forcing Klippsten to resign as CEO of Swan, and turning over mining operations to Tether.

62.    On July 19, 2024, Zagury created a Telegram "group" entitled "Project NxT" with Lyons and Devasini where they could "discuss items related to the mining project."  Zagury circulated a "draft business plan" that he had created "and potential next steps for discussion," emphasizing that the discussion should be kept within their "circle."

63.    The "draft business plan" that Zagury was referencing was in fact a 12-page pitch by which Zagury would "unbundle Swan Mining into a new independent entity" called "MiningTeamCo."

64.    The goal of the new entity was to usurp the mining operation, cutting Swan out completely from the business it had built.  The executive summary explicitly stated that the reason for the creation of the new entity was to "maximize value . . . while minimizing any associated challenges with remaining under Swan," all while acknowledging that "Swan Mining ha[d] grown to become the most significant part of Swan's business."

65.    Zagury's pitch used information he possessed regarding Swan's agreed terms for 2140 Energy to undercut Swan and offer Tether a more lucrative arrangement, explicitly referencing "the proposed 2140 structure." Under Zagury's proposed equity structure, the "Mining Team" would receive substantial equity in the new business, with Tether projected to see between a 4.4x and 6.46x return. Swan would receive nothing.

66.    Critically, Zagury's July 19 presentation indicated he had already obtained "verbal agreements to contract" with Swan employees. The presentation stated that all key Swan individuals who had "significantly contributed across various functions in the mining business" had confirmed their willingness and enthusiasm to transition to NewMiningCo, and noted that "The cap table and long-term incentive structure within NewMiningCo have been presented to and accepted by the team."

67.    When breaking out the proposed new roles, Zagury put himself at the top—he would be the new CEO of NewMiningCo.

68.    Over the next several days, Zagury met and messaged with Tether executives, including Lyons and Devasini, to discuss various aspects of their scheme, including Tether's legal department's review of Swan documents for "risks/completeness."  In these messages, Zagury and Lyons continued to plot how to replace Klippsten as director of 2040, with Lyons suggesting that Tether could "push 2040 into default and replace him."

69.    Zagury also contacted members of Swan's Board of Directors and recommended that they agree to sell Swan Mining's operations to Tether at a significantly lower valuation than the one Tether had proposed weeks earlier.

70.    On July 22, 2024, Zagury sent Lyons and Devasini a lengthy message identifying key points they needed to cover when "proposing the spin off to Swan." Zagury emphasized the importance of convincing Swan to release Zagury and other Swan personnel from liability under their respective non-compete and non-solicitation agreements.

71.    On July 24, 2024, Klippsten—acting as CEO of 2040 Energy, under pressure from Tether, and in the dark about Zagury's betrayal and scheme—approved a resolution signed by Devasini and Ludovicus Jan van der Velde, Tether's two controlling board members of 2040 Energy, █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████  ██████████████████████████████████████████████████████████ ██████████████████████████████████████

72.    On July 29, 2024, Proton, through an agent, filed a document in the British Virgin Islands seeking to reserve the name "Proton Management" for a new corporation.

25

73.     On July 30, 2024, Zagury sent Lyons an updated business plan. The next day, he flew to London to discuss it with the Tether team.  In the updated plan, "NewCo" became "Elektron"—one of the entities ultimately created by Zagury to manage what had been Swan Mining's operations.  The plan espoused the false narrative that Swan's mining team had "always operated independently from Swan" and that "[s]pinning-off mining" was "inevitable."  It contemplated that Elektron would replace 2040 Energy, holding "all assets, equity interests, hosting agreements, etc."  Proton Management Ltd. would replace Swan as the operating and management company.

74.     On August 2, 2024, Proton—through an agent, SHRM Trustees (BVI) Limited ("SHRM")—filed a Certificate of Incorporation in the British Virgin Islands, after Zagury's co-conspirator Naidoo had gathered the documentation required for SHRM to appoint Naidoo as the first director of the new entity.

75.     On August 6, 2024, Zagury took notes from a call with Bill Belitsky, Alex Holmes, Max Berg, and San Naidoo.  Zagury's notes laid out his "rain and hellfire" plot in full. The notes make clear that by this time, the conspirators' plans had shifted from seeking Swan's cooperation to planning a "staged walk out" that would "bring the heat."

76.     The August 6, 2024 "rain and hellfire" email even gamed out how Zagury would cover up his solicitation of Swan employees.  In the email, Zagury explained that his co-conspirator Holmes would resign first, followed by an email "to invite everyone" to a "[n]ew opportunity," such that Holmes was the "[o]nly one inviting others."



From: raphael@swanbitcoin.com
Subject: Call with Bill, Max, Alex, San
Date: To: August 6, 2024 at 03:08

—————
Better together or Alex leaves first?
. Send list of points
. Post - termination
. Walks away together - no solicitation? Resign en masse. Makes it easier for Alex.
. Alex sends the e-mail. Terminates agreement.
. Alex sends e-mails to invite everyone. New opportunity - join us. Only one inviting others.
. Over non-solicit; non-compete.
. Confidentiality and IP - we would be exposed. Something in writing. If we do this staged walk out. Legal cover from Tether.
. Call a meeting and appoint Proton Management
. Alex send e-mail out. Announcing Proton Management is the management company.
. Then Alex sends out e-mail to team. Join Proton.
. No leverage to include releases.
Tether needs to send default notice.
——
Team is getting to a point where is getting untenable. Bill is being put at risk. Dangerous to team to stay around. Team resignation and move with Tether needs to be on tandem.
Fortress is looming.
Last week you said you'd unleash hell on this guy.
. Alex leaves
. Breach
. Proton is assigned manager of 2040 assets
. All communications go to new management company
. ROFR gone if Alex resigns
. Written communications. Alex terminated his agreement. We don't need a board resolution.
. Bring the heat
. Giancarlo side convs, ?
Bill took himself out of Fortress situation. Cory interrogating him now. Trying to ruin Rapha's reputation. Sling a lot of shit. 10% will stick.
They cannot go and say we didn't do it by the book.
Rain and hell fire needs to start. Needs to be an exit, not a nice transaction.
████████ is moot when Alex leaves. Already moot now. Double covered the second Alex leaves.
Bill interrogated if anyone asked him to join mining.
————————
> 10% deposit to Taras
Status of Proton - update - formed, formalizing docs.

77.    The email even indicated that as of August 6, 2024, prior to Zagury's resignation from Swan, Proton, the entity Zagury had planned to replace and compete with his employer, had been "formed.":

27

Company Number _____

TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE BVI BUSINESS COMPANIES ACT
(NO. 16 OF 2004)

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

Proton Management Ltd

Incorporated the 2nd day of August 2024

### E.  Zagury's Solicitation of Swan Employees

78.    At the same time he was plotting with Tether to usurp Swan Mining's operations, Zagury worked to solicit and recruit Swan's employees and consultants to abandon their jobs at Swan and take up new positions with Elektron and Proton.  Zagury knew that this was prohibited by the Confidentiality Agreement, so he sought legal cover for himself for these solicitations and endeavored to conceal these solicitations by communicating with the Swan employees and consultants over the ephemeral messaging application, Signal, an encrypted platform that allows users to have messages automatically delete or disappear.

79.    But as set forth in his presentations to Tether in July 2024, Zagury had not only been actively working to recruit and solicit Swan's team but had done so successfully.

80.     By July 21, 2024, Swan consultant San Naidoo had been included on a messaging chain with Zagury and Tether personnel where they discussed downloading documents related to Swan Mining and replacing Klippsten on the board of 2040 Energy.

81.     On July 22, 2024, both Naidoo and Swan consultant Alex Holmes had joined that messaging chain with Zagury and Tether, and the parties had discussed plans for the "NewCo" and avoiding "future legal claims from Swan."  These messages even suggested providing to Swan "a list of employees moving to NewCo" and convincing Swan to release the "team members joining NewCo" from liability under their non-compete and non-solicitation agreements.

82.     Zagury's July 30, 2024 updated business plan also explained that the process of soliciting Swan's mining personnel was well underway.  Zagury reported that on the subject of "Employee contracting" he had "[v]erbal agreements to contract with Proton," and listed nearly all of Swan's mining consultants and employees as having roles in Proton.



83.     Indeed, Zagury's presentation boasted that all of the key Swan individuals who had "significantly contributed across various functions in the mining business" had "confirmed their

willingness and enthusiasm to transition to NewMiningCo." This included Swan's General Counsel, Belitsky, whom Zagury had solicited to assist in the formation of this competing entity. Zagury went on to note that "[t]he cap table and long-term incentive structure within NewMiningCo ha[d] been presented to and accepted by the team."

### F. Zagury And The Co-Conspirators Enact Their "Rain and Hellfire" Plot

84. On the morning of August 8, 2024, Zagury and his co-conspirators held two videoconferences, the first starting at 4:10 a.m. (PDT) and lasting until 7:55 a.m., with the second starting at 8:40 a.m. and ending at 10:20 a.m. Nearly all of the Swan employees and consultants that would resign later that day joined the calls.

85. Then at 3:32 p.m., Holmes submitted his resignation to Swan. In an attempt to cover up the premediated nature of their plot, Holmes immediately followed his resignation with an email to Zagury and Naidoo explaining that he had just resigned and inviting them to join him as he was "making arrangements to manage the fleet that we have built together." This falsified paper trail is belied not only by the dozens of messages and emails the three exchanged plotting the scheme, but also by the fact that Zagury had already begun drafting his resignation by the time Holmes sent his "invitation" email.[6]

86. After emailing Zagury and Naidoo, Holmes sent messages to 10 Swan employees and consultants—Thomas Furlong, Aleksander Dozic, Rafael Dias Monteleone, Enrique Romualdez, Lucas Vasconcelos, Bill Belitsky, Max Berg, Tyler Effertz, Brett Hiley, and Kar Sola— purportedly informing them of his resignation, noting that "arrangements [were] under

---

[6]  Swan has evidence of not only the emails plotting this scheme but also of the point in time at which Zagury began drafting this email, which were retained in Swan's corporate email log.

way" for a new entity that Zagury and Naidoo would be joining, and stating that Holmes did not expect the team "to skip a beat."

87.    Between 5:25 p.m. on August 8 until 8:14 a.m. on August 9, Zagury and each of the Swan employees and consultants that he solicited sent in their resignations.  On information and belief Zagury and each of the former Swan employees and consultants are presently employed by or provide services to Proton and Elektron.

### G.  Theft and Retention Of Confidential Materials and Mining Documents

88.    In addition to soliciting Swan's personnel and usurping of Swan Mining's operations, Zagury additionally downloaded and retained documents related to Swan Mining's operations for 2040 Energy.

89.    Swan's records show Zagury downloaded thousands of documents from Swan's systems in the first week of August.  For example, Zagury downloaded a set of materials from Swan's "Notion" platform, an internal tool for recording business and operational data. Zagury also cloned source code that the Swan mining team was using to manage 2040 Energy's Bitcoin mining operations. Zagury additionally downloaded approximately 1,750 files from Swan's computer systems and stored that information on an external hard drive named "G Tech External HDD."

90.    Further, after Zagury resigned from his employment with Swan, Zagury failed to return his Swan-issued laptop.  He has refused to return it to date, even though and likely because it contains the cache of stolen documents.

### H.  The Aftermath of Zagury's Coup

91.    In the days following the mass resignation, Tether carried out its portion of the plan. On August 9, 2024, Tether's counsel—indeed the same lawyer who met with Zagury in June 2024

to form the new mining company—sent an unprompted email to Swan stating: "I understand most or all of the Swan Mining employees have resigned this morning. I have spoken with Tether and confirmed that these former employees were not encouraged to resign and have no existing arrangements with Tether."

92.     That same day, Tether served a ███████████ on Swan, baselessly claiming

███████████████████████████ because Klippsten had ████████████████



██████████████████████████████████████—assurances that of course, would have been unnecessary but for the co-conspirators' scheme.

93.     That same day, ████████████████████████████████. Tether later revealed on September 13 that Zagury would serve as Proton's CEO—just as he had planned in July.

94.     With that, Zagury's coup was complete. Proton, with Zagury as CEO, had successfully undermined Swan Mining's operations, induced Swan's mining team to leave, taken over Swan's role in 2040 Energy's Bitcoin mining operations, and taken thousands of documents related to those operations.

95.     On August 12, 2024, ███████████████████████



96.     Zagury's brazen and continuing breaches of his fiduciary and contractual obligations to Swan have damaged and will continue to damage Swan.

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**Confidentiality and Proprietary Information and Inventions Agreement**

97.     Swan repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     In connection with his employment, Zagury entered into a valid, enforceable, and binding Confidentiality Agreement with Swan, dated November 6, 2023.

99.     Swan has acted in good faith and fulfilled its obligations under the Confidentiality Agreement.   Zagury received valid consideration for the Confidentiality Agreement, including remuneration and access to Swan's proprietary and confidential information.

100.    Under Section 5.1 of the Confidentiality agreement, Zagury agreed that:

> . . . at any and all times during my Service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company in furtherance of the Company Business. With respect to this covenant restricting my behavior during the term of my Service only, prohibited acts of competition include, without limitation, the following: (i) performing any services for a Competing Business; (ii) soliciting or recruiting any customer or prospective customer of the Company or any affiliate of the Company on behalf of a Competing Business; (iii) selling competitive products or services to any customer or prospective customer of the Company on behalf of a Competing Business; (iv) hiring, recruiting or soliciting any employee of the Company; and/or (v) disclosing, misappropriating or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business. In addition to the foregoing, I shall disclose, in writing, any outside business activity to the Company's Chief Executive Officer and secure permission from the Company's Chief Executive Officer before engaging in such activity so that the Company may evaluate whether such activity either conflicts with the best interests of the Company and/or may impair my ability to perform my Service on behalf of the Company.

Ex. A, Confidentiality Agreement § 5.1.

101.    Zagury has materially breached his contractual obligation to Swan under Section 5.1 of the Confidentiality Agreement by, while employed with Swan, (i) diverting his business

33

time and attention to conspiring to, forming, and incorporating Proton, a competing business; (ii) providing services to that business while employed by Swan; (iii) providing competitive services to Swan Mining's customers on behalf of the competing business; and (iv) usurping the mining operations that Swan managed for 2040 Energy. Zagury's actions with Elektron and Proton constitute competition with Swan, because Elektron and Proton were designed to and do perform the exact same services that Swan's mining team performed for 2040 Energy.

102. Zagury has further materially breached his contractual obligations to Swan under the Confidentiality Agreement by, during his employment with Swan, soliciting, enticing, encouraging, causing, and/or recruiting Thomas Furlong, Alex Holmes, San Naidoo, Rafael Dias Monteleone, Enrique Romualdez, Lucas Vasconcelos, Bill Belitsky, Max Berg, Tyler Effertz, Brett Hiley, Aleksander Dozic, and Kar Sola to terminate their employment with or contracting services for Swan.

103. Zagury never disclosed, in writing, "any outside business activity" to Klippsten nor did Zagury "secure permission" from Klippsten "before engaging in such activity."

104. Additionally, the Confidentiality Agreement, to which Zagury agreed to be bound, bars the solicitation of Swan employees after Zagury's departure from Swan. Under Section 5.2 of the Confidentiality agreement, Zagury agreed that:

> . . . for a period of twelve months following the termination of my Service, I will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business.

Ex. A, Confidentiality Agreement § 5.2.

105. Zagury has materially breached his contractual obligations to Swan under the Confidentiality Agreement by, within 12-months of terminating his employment with Swan, soliciting, enticing, encouraging, causing, and/or recruiting Thomas Furlong, Alex Holmes, San

34

Naidoo, Rafael Dias Monteleone, Enrique Romualdez, Lucas Vasconcelos, Bill Belitsky, Max Berg, Tyler Effertz, Brett Hiley, Aleksander Dozic, and Kar Sola to terminate their employment with Swan.

106.    Further, the Confidentiality Agreement, to which Zagury agreed to be bound by, requires the return of all Swan equipment and documents upon Zagury's departure from Swan. Under Section 6 of the Confidentiality Agreement, Zagury agreed that:

> Upon termination of my Service or upon Company's request at any other time, I will deliver to Company all of Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information of Company, excepting only (i) my  personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copies of my agreements with the Company. I agree that I will not copy, delete, or alter any Confidential Information contained upon my Company computer immediately before I return it to Company. I further agree that any property situated on Company's premises and owned by Company is subject to inspection by Company personnel at any time with or without notice.

Ex. A, Confidentiality Agreement § 6.

107.    Zagury has materially breached his contractual obligation to Swan under Section 6 of the Confidentiality Agreement by failing to deliver to Swan all of Swan's "property, equipment, and documents," including by failing to return to Swan his Swan-issued laptop or any Swan confidential documents and proprietary information he took prior to his departure.

108.    Section 2.1 of the Confidentiality Agreement expressly provides that Zagury's obligations to safeguard the confidential information of Swan would continue after the termination of his employment.

109.    Zagury materially breached the confidentiality provision of his Confidentiality Agreement by using and disclosing Swan's confidential and proprietary information—related to Swan's negotiations of 2140 Energy with Tether—for his own benefit.  Zagury has further refused

35

to return his Swan laptop, which on information and belief, contains Swan's confidential and proprietary information.

110. As a direct and proximate result of Zagury's breach of the Confidentiality Agreement, Swan has suffered damages in an amount to be determined by the Arbitrator.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

111. Swan repeats and realleges each and every allegation contained above as if fully set forth herein.

112. As one of Swan's most senior officers, Zagury owed Swan fiduciary duties, including but not limited to duties of absolute candor, good faith, and to avoid self-dealing and conflicts of interest while serving as Swan's CIO.

113. Zagury breached these duties to Swan at least by acting in bad faith to harm Swan and Cory Klippsten's reputation and business operations, including but not limited to disparaging Swan and Cory Klippsten in conversations with third parties and Swan business partners (such as Tether) and working to undercut Swan's negotiation of the 2140 Energy agreement with Tether.

114. Zagury further breached his fiduciary duties by hiding his activities from Swan, including having multiple conversations with Swan business partners that he did not disclose to CEO Cory Klippsten.

115. Zagury further breached his fiduciary duties by contacting members of Swan's Board of Directors and recommending that they agree to give Swan Mining's operations to Tether at a significantly lower valuation than a valuation Tether had proposed weeks earlier.

116. Zagury additionally owed Swan a fiduciary duty not to use or disclose confidential or proprietary information to Swan's competitive disadvantage while serving as Swan's CIO, and pursuant to a duty of loyalty.

36

117.    Zagury breached his duty of loyalty to Swan by using Swan's confidential information to undercut Swan's negotiation of the 2140 Energy agreement with Tether.

118.    Zagury breached his duty of loyalty to Swan by forming a competing company designed to replace Swan as the manager of 2040 Energy's Bitcoin mining operations, of which he became CEO, to Swan's competitive disadvantage during the term of his employment as Swan's CIO.

119.    Zagury breached his duty of loyalty to Swan by soliciting other Swan employees and consultants, including Thomas Furlong, Alex Holmes, San Naidoo, Rafael Dias Monteleone, Enrique Romualdez, Lucas Vasconcelos, Bill Belitsky, Max Berg, Tyler Effertz, Brett Hiley, Aleksander Dozic, and Kar Sola, to terminate their employment with Swan and to work with Zagury at a competing company, during his term of employment as Swan's CIO.

120.    As a direct and proximate result of Zagury's breach of his fiduciary duties, Swan has suffered actual damages in an amount to be determined by the Arbitrator.

## THIRD CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty

121.    Swan repeats and realleges each and every allegation contained above as if fully set forth herein.

122.    As Swan's General Counsel, Belitsky owed Swan fiduciary duties, including but not limited to duties of absolute candor, good faith, and to avoid self-dealing and conflicts of interest.

123.    Belitsky owed Swan a fiduciary duty not to use or disclose confidential or proprietary information to Swan's competitive disadvantage while serving as Swan's General Counsel, and pursuant to a duty of loyalty.

124.    Belitsky breached his duty of loyalty to Swan by assisting in the formation of a competing company designed to replace Swan as the manager of 2040 Energy's Bitcoin mining operations, of which Zagury became CEO, to Swan's competitive disadvantage during the term of his employment as Swan's General Counsel.

125.    Belitsky breached his duty of loyalty to Swan by planning, coordinating, and conspiring with Zagury, Dozic, Effertz, Hiley, Naidoo, Vasconcelos, Holmes, Romualdez, Monteleone, and Furlong to unlawfully compete with Swan.

126.    Zagury was aware of Belitsky's role as General Counsel and of the fiduciary duties that Belistky owed to Swan.

127.    Zagury substantially assisted Belitsky in his breach of his fiduciary duty by bringing Belitsky into the scheme to undermine and replace Swan as the manager of 2040 Energy's Business mining operations and concealing Belitsky's participation in this scheme.

**FOURTH CAUSE OF ACTION**
**Tortious Interference with a Business Relationship**

128.    Swan repeats and realleges each and every allegation contained above as if fully set forth herein.

129.    Swan had a valid business expectancy in its negotiation of a final agreement for the creation of 2140 Energy with Tether.

130.    Zagury was aware of Swan's negotiation for the creation of 2140 Energy with Tether.  As Swan's CIO, Zagury was actively involved in the negotiation of this agreement.

131.    Despite Zagury's knowledge of the ongoing business expectancies between Swan and Tether, Zagury intentionally and unjustifiably interfered with these business expectancies, including by negotiating to undercut Swan and forming a competing corporation with Tether.

132.    Zagury's interference has injured and interfered with Swan's relationship with Tether by preventing the finalization of the 2140 Energy agreement, and by leading to the formation of a competing company that replaced Swan in its planned role as manager of 2140 Energy's mining operations.

133.    But for Zagury's interference, Swan and Tether would have finalized the 2140 Energy arrangement, which Zagury was aware that the parties had finalized the terms for as early as February 28, 2024.

134.    Zagury is now employed at and paid by a competing company that replaced Swan in its role as manager of the mining operation that would have been encompassed by the 2140 Energy agreement.  Zagury thus knowingly and intentionally enjoys the economic benefits of his interference with Swan's business expectancies for his own self-enrichment.

135.    As a direct and proximate result of the wrongful conduct and interference by Zagury, Swan has suffered and continues to suffer damages in an amount to be determined by the Arbitrator.  Because Zagury's tortious interference was willful, wanton, malicious, and egregious, Swan is also entitled to punitive damages for that misconduct.

### FIFTH CAUSE OF ACTION
**Tortious Interference with Contractual Relationships**

136.    Swan repeats and realleges each and every allegation contained above as if fully set forth herein.

137.    Dozic, Sola, Effertz, Hiley, and Belitsky all served as Swan employees.  As part of their employment and for valid consideration, including compensation from Swan, each signed Confidentiality Agreements with Swan.  The Confidentiality Agreements contained the same non-compete and non-solicitation provisions as contained in Zagury's Confidentiality Agreement.

138.    On information and belief, Dozic, Effertz, Hiley, Sola, and Belitsky breached the Noncompete provision in Section 5.1 of their Confidentiality Agreements by spending part of their business time and attention communicating with and conspiring with Zagury and other co-conspirators to breach their duties and obligations to Swan; harming Swan by resigning *en masse*; and forming a company, Proton, to compete with Swan for 2040 Energy's mining business.

139.    Swan fully performed its obligations under the Confidentiality Agreements and Consulting Agreements.  Swan had a contractual expectancy that Dozic, Effertz, Hiley, Sola, and Belitsky would abide by the Confidentiality Agreements.

140.    Zagury had knowledge of Swan's contractual relationship with Dozic, Effertz, Hiley, Sola, and Belitsky at all relevant times.

141.    Zagury intentionally and unjustifiably interfered with the Confidentiality and Consulting Agreements by planning, coordinating, and conspiring with Dozic, Effertz, Hiley, Sola, and Belitsky to unlawfully compete with Swan.

142.    As a result of Zagury's interference with the Confidentiality Agreements, Swan has had its contractual relationships and expectancies regarding Dozic, Effertz, Hiley, Sola, and Belitsky damaged.

143.    As a direct and proximate result of the wrongful conduct and interference by Zagury, Swan has suffered and continues to suffer damages in an amount to be determined by the Arbitrator.  Because Zagury's tortious interference was willful, wanton, malicious, and egregious, Swan is also entitled to punitive damages for that misconduct.

## **REMEDIES SOUGHT**

144.    For the reasons set forth above, Swan seeks an award from the Arbitrator as follows:

    a.    Entering judgment in favor of Swan on each of Swan's causes of action;

40

b.  Entering a declaratory judgment in Swan's favor that the restrictive covenants contained in the Confidentiality Agreement are valid and enforceable;

c.  Entering temporary and permanent injunctive relief requiring that Zagury return any and all of Swan's property including his Swan issued laptop;[7]

d.  Awarding Swan actual and compensatory damages in an amount to be determined by the Arbitrator;

e.  Awarding Swan punitive damages in an amount to be determined by the Arbitrator;

f.  Awarding Swan pre-judgment and post-judgment interest at the maximum rate allowable by law;

g.  Awarding Swan reasonable attorneys' fees and costs, including costs of arbitration; and

h.  Awarding Swan such other and further relief as the Arbitrator deems just and proper under the circumstances.

---

[7]  For the avoidance of doubt, Swan does not seek the return of any information that qualifies as Business Assets within the meaning of the proceedings in the United Kingdom.

41

DATED: March 10, 2026                     Respectfully submitted,


                                          By:*/s/ Stacylyn M. Doore*

                                          **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
                                          Stacylyn M. Doore
                                          Ryan P. Gorman
                                          Jenna Rose Stevens
                                          111 Huntington Ave., Suite 520
                                          Boston Ma, 02199
                                          (617) 712-7100
                                          stacylyndoore@quinnemanuel.com
                                          ryangorman@quinnemanuel.com
                                          jennastevens@quinnemanuel.com


                                          **BRODSKY FOTIU-WOJTOWICZ**
                                          Benjamin H. Brodsky
                                          44 W. Flagler Street
                                          Suite 2200
                                          Miami, Florida 33130
                                          (305) 503-5054
                                          bbrodsky@bfwlegal.com


                                          *Attorneys for Claimant*

# EXHIBIT A

**OFFER LETTER**

November 6, 2023

Raphael Zagury
951 Brickell Avenue, Apt 2006
Miami, FL 33131

raphael@zagury.com

**Re: Offer of Employment**

Dear Rapha:

On behalf of Electric Solidus, Inc., a Delaware corporation (the *"Company"*), I am pleased to offer you employment with the Company on the terms described below. As explained in more detail below, your employment is contingent upon your assent to the terms and conditions set forth in this letter and the attachments hereto.

1. <u>Position</u>. You will start in a full-time position as the Chief Investment Officer reporting to the Company's President. Your primary duties and responsibilities will be to:

   ☐ Lead and develop the Company's Institutional client platform, providing a variety of Bitcoin related financial services to high-net-worth individuals and investors.

   ☐ Create network effects for the Company in the Bitcoin financial services ecosystem.

   ☐ Support Company fund raising and other strategic initiatives.

   You shall perform, observe and conform to such duties and to such other duties and instructions as from time to time are lawfully assigned or communicated to you by the Company. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company.

2. <u>Compensation</u>.

   a. <u>Salary</u>. The Company will pay you a starting salary at the rate of $180,000 per year (*"Base Salary"*), payable in accordance with the Company's standard payroll schedule. This salary will be subject to adjustment pursuant to the Company's employee compensation policies in effect from time to time. All reasonable business and travel expenses that are documented by you and incurred in the ordinary course of business and approved in advance will be reimbursed in accordance with the Company's standard policies and procedures.

   b. <u>Vacation, Holidays and Sick-Leave</u>. As a full-time employee, you will accrue vacation in accordance with the Company's standard policies and procedures. Holidays and sick-leave will likewise be provided in accordance with the Company's standard policies and procedures and in accordance with applicable law.

   c. <u>Benefits</u>. As a full-time employee, you will be eligible to participate in and to receive the following standard benefits of the Company: health, dental, and vision insurance. Details

400857073.1

about these benefit plans are available for your review. The eligibility criteria and amount and extent of benefits to which you are entitled shall be governed by the specific benefit plan as it may be amended from time to time; and the Company may change benefits from time to time in its discretion.

    d.   <u>Equity</u>. As additional compensation for your role, the Company has previously granted you an option to purchase 240,000 shares of Common Stock of the Company. Vesting shall continue as documented in the Option Agreement.

3.   <u>Devotion of Time and Description of Duties</u>. You shall devote your entire business time and attention to the performance of your job duties. The Company reserves the right to reassign and or redefine the scope of your duties and responsibilities as the business of the Company dictates.

4.   <u>Background Checks and Immigration Documentation</u>. This offer is subject to satisfactory completion of required background checks, I-9 forms and other normal hiring practices of the Company.

5.   <u>At-Will Employment</u>. Your employment with the Company is "at-will." "At-will" employment means that your employment with the Company is not for a specific term, and can be terminated by yourself or by the Company at any time for any reason or no reason, with or without cause and with or without notice. Any contrary representations which may have been made to you are superseded by this offer. Your "at-will" status may only be changed by an express written agreement that is signed by you and by the Company's Chief Executive Officer.

6.   <u>Taxes, Withholding and Required Deductions</u>. All forms of compensation are subject to all applicable taxes, withholding and any other deductions required by applicable law.

7.   <u>Confidentiality and Proprietary Information and Inventions Agreement</u>. Your acceptance of this offer is contingent upon your execution of the Company's Confidentiality and Proprietary Information and Inventions Agreement, a copy of which is attached hereto as <u>Exhibit A</u> for your execution.

8.   <u>Conflict with Outside Activities</u>. As more fully set forth in the Company's Confidentiality and Proprietary Information and Inventions Agreement, you agree that, while serving as a full-time employee of the Company, you will inform the Company of any activity of yours which is competitive with the business of the Company or which requires a significant time commitment from you. In addition, you shall not, without the CEO's prior written consent, render to others services of any kind for compensation, or engage in any other business activity that would materially interfere with the performance of your duties as an employee of the Company. By signing below, you hereby represent to the Company that you have no other outstanding commitments inconsistent with any of the terms of this offer or the services to be rendered under it.

9.   <u>Arbitration</u>. Your acceptance of this offer is contingent upon your execution of the Company's Alternative Dispute Resolution (ADR) Policy and Agreement, a copy of which is attached hereto as <u>Exhibit B</u> for your execution. As more fully set forth in the Alternative Dispute Resolution (ADR) Policy and Agreement, both you and the Company agree that any controversy, claim or dispute arising out of, concerning or relating in any way to your employment with the Company or the termination thereof shall be submitted exclusively to final and binding arbitration.

10. Company Rules. As an employee of the Company, you will be expected to abide by the Company's rules and regulations. From time to time, you may be required to sign an acknowledgment that you have read and understand the Company rules of conduct as provided in the Company's Employee Handbook or otherwise, which the Company has or will distribute.

11. Entire Agreement. This letter and its attachments set forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

12. Severability. If this offer is accepted, and any term herein is held to be invalid, void or unenforceable, the remainder of the terms herein shall remain in full force and effect and shall in no way be affected; and, the parties shall use their best efforts to find an alternative way to achieve the same result.

13. Governing Law. The validity, interpretation, construction and performance of this letter, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of State of Florida, without giving effect to principles of conflicts of law.

14. Counterparts. This letter may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of an electronic copy will have the same force and effect as execution of an original, and an electronic signature will be deemed an original and valid signature.

15. Other Legal Provisions. This letter, upon acceptance, will be legally binding on you, the Company, and yours and its respective successors, heirs, administrators, and assigns. This offer and your rights and obligations may not be assigned by you. This letter can only be amended by a writing signed by the Company and you. You acknowledge that (i) this letter has been prepared by the Company's legal counsel, (ii) you have had sufficient time to review this letter thoroughly, (iii) you have read and understood the terms of this letter, and (iv) you have been given the opportunity to obtain independent legal advice concerning the interpretation and effect of this letter prior to its acceptance.

16. Electronic Delivery. The Company may, in its sole discretion, decide to deliver any documents or notices related to this letter, securities of the Company or any of its affiliates or any other matter, including documents and/or notices required to be delivered to you by applicable securities law or any other law or the Company's Bylaws by email or any other electronic means. You hereby consent to (i) conduct business electronically, (ii) receive such documents and notices by such electronic delivery, and (iii) sign documents electronically and agree to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

400857073.1

If you wish to accept this offer, please sign and date this letter and the enclosed attachments upon your providing legal proof of your identity and authorization to work in the United States.

We look forward to your favorable reply and to a productive and exciting work relationship.

Very truly yours,

**ELECTRIC SOLIDUS, INC.**

By: cory klippsten (Nov 7, 2023 08:38 PST)

Cory Klippsten

**ACCEPTED AND AGREED:**

Raphael Zagury (Nov 10, 2023 19:59 GMT-3)

Raphael Zagury

Anticipated Start Date: Immediately

**Exhibit A** – Confidentiality and Proprietary Information and Inventions Agreement

**Schedule I** – Inventions

**Exhibit B** – Alternative Dispute Resolution (ADR) Policy and Agreement

400857073.1

**EXHIBIT A**

Confidentiality and Proprietary Information and Inventions Agreement

[*see attached.*]

400857073.1

## ELECTRIC SOLIDUS, INC.

### CONFIDENTIALITY AND PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

In consideration of my Service (as defined herein) with Electric Solidus, Inc., and the compensation now and later paid to me, I hereby agree as follows:

1. **DEFINITIONS.**

    1.1.    **Company.** As used in this Agreement, the "*Company*" refers to Electric Solidus, Inc. and each of its subsidiaries or affiliated companies. I recognize and agree that my obligations under this Agreement and all terms of this Agreement apply to me regardless of whether I am engaged by, employed by, or work for the Company or any other subsidiary or affiliated company of the Company. Furthermore, I understand and agree that the terms of this Agreement will continue to apply to me even if my Service is transferred at some time from one subsidiary or affiliate of the Company to another.

    1.2.    **Company Business.** As used in this Agreement, "*Company Business*" shall mean: (i) the design, development, sale and marketing of products and services; and (ii) any other business in which the Company engages during my Services with the Company.

    1.3.    **Competing Business.** As used in this Agreement, "*Competing Business*" shall mean any person or entity that engages in a commercial business that is the same or substantially similar to the Company Business, and only that portion of the business that is in competition with the Company Business.

    1.4.    **Confidential Information.** As used in this Agreement, "*Confidential Information*" shall mean, collectively, all "Proprietary Information" and "Trade Secrets" of the Company and/or any affiliate of the Company.

    1.5.    **Intellectual Property Rights.** As used in this Agreement, the term "*Intellectual Property Rights*" means all trade secrets, copyrights, trademarks, mask work rights, moral rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country.

    1.6.    **Invention.** As used in this Agreement, the term "*Invention*" means any ideas, concepts, information, materials, processes, data, programs, know-how, improvements, discoveries, developments, designs, artwork, formulae, other copyrightable works, and techniques and all Intellectual Property Rights therein.

    1.7.    **Proprietary Information.** As used in this Agreement, "*Proprietary Information*" shall include, without limitation, all technical and non-technical data, compilations, programs and methods, techniques, drawings, processes, financial data, actual and prospective customer lists, customer route books and materials, documents containing names and addresses of current or former customers that includes their past or present buying patterns or habits, sales reports, service reports, price lists and discount lists, methods and/or procedures regarding pricing, product cost and profit strategies or structures, product formulae, methods and/or procedures related to sales or services, methods and/or procedures of operation, special training of sales representatives, continuous market updates and merchandising strategies relating to the Company, any affiliate of the Company, and the Company Business, which is communicated to, supplied to or observed by me, either directly or indirectly, at any time during the Service relationship, whether or not received from the Company, any affiliate of the Company, or from any actual or potential customer of the Company or any affiliate of the Company, or from any person with a business relationship, whether contractual or otherwise, with the Company or any affiliate of the Company. The term "Proprietary Information" shall not include any information that I can prove: (i) was known or independently developed by me prior to the time of receipt from the Company or any affiliate, as long as such information was not acquired, either directly or indirectly, from the Company or any affiliate; (ii) is or becomes publicly known through no direct or indirect act, fault or omission of my own; (iii) is or becomes part of the public domain through no direct or indirect act, fault or omission of my own; or (iv) was received by me from a third party having the legal right to transmit the same without restriction as to use and disclosure and such receipt was not in connection with any business relationship or prospective business relationship with the Company or any affiliate; provided, however, that a combination of features shall not be deemed to be within the foregoing exceptions merely because individual features are in the public domain or otherwise within such exceptions, as previously described, unless the combination itself is in the public domain or otherwise entirely within any one such exception.

    1.8.    **Trade Secrets.** As used in this Agreement, "*Trade Secrets*" shall mean information not generally known about the Company's business which is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality and from which the Company and/or any affiliate derives economic value from the fact that the information is not generally known to other persons who can obtain economic value from its disclosure or use, and shall include any and all Proprietary Information which may be protected as a trade secret under any applicable law, even if not specifically designated as such. Unless told otherwise, I shall treat all Proprietary Information as Trade Secrets.

1

**1.9. Service.** As used in this Agreement, "*Service*" means any responsibility, duty or authority consistent with the role of an employee, consultant, advisor, officer or director of the Company, including any other responsibility, duty or authority assigned from time to time by the Company.

**1.10. Work Product.** As used in this Agreement, "*Work Product*" shall mean all discoveries, improvements, techniques, designs, artwork, trade secrets, Confidential Information, trademarks, data, analyses, materials, formulas, strategic plans, acquisition strategies, research, documentation, computer programs, information technology systems, communication systems, manufacturing systems, system designs, inventions (whether or not patentable), copyrightable subject matter, works of authorship, and other confidential or proprietary information or work product (including all worldwide Intellectual Property Rights therein), whether or not patentable, and in whatever form, which I have made or conceived, or may make or conceive, either solely or jointly with others, while providing Services to the Company or any affiliate, or with the use of the time, material, resources, or facilities of the Company or any affiliate or relating to any actual or anticipated Business of the Company, or suggested by or resulting from any task assigned to me or work performed by me for or on behalf of the Company or any affiliate.

**2.    CONFIDENTIALITY.**

**2.1. Protection of Confidential Information.** I recognize the interest of the Company and its affiliates in maintaining the confidential nature of its Confidential Information. Accordingly, I covenant and agree that I will not, at any time, other than in the performance of my Service for the Company or any affiliate, both during and after my Service with the Company, communicate or disclose to any person or entity, or use for my benefit, or for the benefit of any other person or entity, either directly or indirectly, any Trade Secrets and/or Proprietary Information. For the purposes of this Agreement, the prohibition against the disclosure of Proprietary Information is prohibited until the information becomes publicly available through no direct or indirect fault or act of my own, or otherwise no longer qualifies as a Trade Secret. I understand that misappropriation of a trade secret of the Company in breach of this Agreement may subject me to liability under the Defend Trade Secrets Act of 2016 (the "*DTSA*"), entitle the Company to injunctive relief and require me to pay compensatory damages, double damages and attorneys' fees. Nothing in the foregoing covenant shall in any way limit or impair any of the rights of the Company or any affiliate with respect to any trade secret information, including, without limitation, any information that qualifies as a trade secret under the DTSA. Notwithstanding any other provision of this letter agreement, I understand that I

will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, in each case solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. I further understand that if I file a lawsuit for retaliation by the Company for reporting a suspected violation of law, I may disclose the trade secrets of the Company to my attorney and use the trade secret information in the court proceeding if I file any document containing the trade secret under seal and do not disclose the trade secret except pursuant to court order.

**2.2. Third Party Information.** I understand, in addition, that Company has received and in the future will receive from third parties confidential or proprietary information ("*Third Party Information*") subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my Service and thereafter, I will hold Third Party Information in strict confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use, except in connection with my work for Company, Third Party Information, unless expressly authorized by an officer of the Company in writing.

**2.3. No Improper Use of Information of Prior Employers and Others.** I represent that my Service with Company does not and will not breach any agreement with any former employer or other third party, including any non-compete agreement or any agreement to keep in confidence information acquired by me in confidence or trust prior to my Service with Company. I further represent that I have not entered into, and will not enter into, any agreement, either written or oral, in conflict herewith. During my Service with Company, I will not improperly use or disclose any confidential information or trade secrets of any former employer or other third party to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company or use any unpublished documents or any property belonging to any former employer or other third party to whom I have an obligation of confidentiality, unless consented to in writing by that former employer or person. I will use in the performance of my duties only information that is generally known and used by persons with training and experience comparable to my own, is common knowledge in the industry or otherwise legally in the public domain, or is otherwise provided or developed by Company.

400857073.1

3.    **WORK PRODUCT AND INVENTIONS.**

**3.1. Protection of Work Product.** I acknowledge and agree that all Work Product produced by me during my Service with the Company or any affiliate shall be considered "work for hire" as such term is defined in 17 U.S.C. § 101 *et seq.* I hereby assign to the Company and all affiliates all right, title and interest whatsoever in and to any and all Work Product, including all worldwide Intellectual Property Rights therein. If, for any reason, any of the Work Product does not constitute a "work made for hire," I hereby irrevocably assign to the Company, in each case without additional consideration, all right, title and interest throughout the world in and to such Work Product, including all Intellectual Property Rights therein. I agree to promptly disclose any and all such Work Product to the Company and any affiliate, as requested, and to perform, during or after the termination of my Service and without requiring the Company or any affiliate to provide any further consideration, such further acts as may be necessary or desirable to transfer, perfect, and defend the Company's ownership (or any affiliate's ownership) of the Work Product as requested by the Company or any affiliate, including, without limitation the execution of such patent applications (including continuations and related materials), confirmatory assignments, instruments and documents as the Company or any affiliate deems necessary or desirable in order to effect such assignment and to protect and enforce such rights. The Company and all affiliates shall have the right to obtain and hold in its and their own name copyrights, patents, registrations, and any other protection available in the Work Product. My obligation to execute materials to effect assignment of Work Product shall survive the termination of my Service with the Company of any affiliate.

**3.2. Prior Inventions.** I agree that I will not incorporate, or permit to be incorporated, Prior Inventions (defined below) in any Company Inventions (defined below) without Company's prior written consent. In addition, I agree that I will not incorporate into any Company software or otherwise deliver to Company any software code licensed under the GNU GPL or LGPL or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company. I have disclosed on **Schedule I** a complete list of all Inventions that I have, or I have caused to be, alone or jointly with others, conceived, developed, or reduced to practice prior to the commencement of my Service with Company, in which I have an ownership interest or which I have a license to use, and that I wish to have excluded from the scope of this Agreement (collectively referred to as "*Prior Inventions*"). If no Prior Inventions are listed in **Schedule I**, I warrant that there are no Prior Inventions. If, in the course of my Service with Company, I incorporate a

Prior Invention into a Company process, machine or other work, I hereby grant Company a non-exclusive, perpetual, fully-paid and royalty-free, irrevocable and worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Prior Invention.

**3.3. Assignment of Company Inventions.** Subject to the section titled "Government or Third Party" and except for any Inventions I have set forth in **Schedule I**, I hereby assign and agree to assign in the future (when any such Inventions or Intellectual Property Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, in the course of my Service with the Company. Inventions assigned to Company or Inventions assigned to a third party as directed by Company pursuant to the section titled "Government or Third Party" are referred to in this Agreement as "*Company Inventions.*"

**3.4. Obligation to Keep Company Informed.** During the period of my Service and for one (1) year thereafter, I will promptly and fully disclose to Company in writing (a) all Inventions or Work Product authored, conceived, or reduced to practice by me, either alone or with others, and (b) all patent applications filed by me or in which I am named as an inventor or co-inventor, if any.

**3.5. Government or Third Party.** I also agree to assign all my right, title, and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by Company.

**3.6. Enforcement of Intellectual Property Rights and Assistance.** During the period of my Service and thereafter, I will assist Company in every proper way to obtain and enforce United States and foreign Intellectual Property Rights relating to Company Inventions in all countries. In the event Company is unable to secure my signature on any document needed in connection with such purposes, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act on my behalf to execute and file any such documents and to do all other lawfully permitted acts to further such purposes with the same legal force and effect as if executed by me.

4.    **RECORDS.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all

400857073.1

Inventions or Work Product made by me during the period of my Service with Company, if any, which records shall be available to, and remain the sole property of, Company at all times.

5.    ADDITIONAL ACTIVITIES.

    5.1.    **During Service.** I hereby covenant and agree that, at any and all times during my Service with the Company, I will not engage in any acts of competition against the interests of the Company and/or any of its affiliates, regardless of the capacity in which I am acting on behalf of any Competing Business, and instead shall devote my full-time and attention only to the interests of the Company in furtherance of the Company Business. With respect to this covenant restricting my behavior during the term of my Service only, prohibited acts of competition include, without limitation, the following: (i) performing any services for a Competing Business; (ii) soliciting or recruiting any customer or prospective customer of the Company or any affiliate of the Company on behalf of a Competing Business; (iii) selling competitive products or services to any customer or prospective customer of the Company on behalf of a Competing Business; (iv) hiring, recruiting or soliciting any employee of the Company; and/or (v) disclosing, misappropriating or using any property of the Company or any affiliate, including, without limitation, any form of Confidential Information, Proprietary Information or Trade Secret, other than in furtherance of the Company Business. In addition to the foregoing, I shall disclose, in writing, any outside business activity to the Company's Chief Executive Officer and secure permission from the Company's Chief Executive Officer before engaging in such activity so that the Company may evaluate whether such activity either conflicts with the best interests of the Company and/or may impair my ability to perform my Service on behalf of the Company.

    5.2.    **Non-Solicitation of Employees.** I covenant and agree that, for a period of twelve months following the termination of my Service, I will not, either directly or indirectly, solicit, entice, encourage, cause, or recruit any person employed by the Company or any affiliate to leave such person's employment with the Company or any affiliate to join a Competing Business.

    5.3.    **Acknowledgements & Agreements.** I acknowledge and agree (i) that by virtue of my position with the Company, I will have regular access to and use of Confidential Information and will have knowledge of and access to the Company's substantial relationships with customers and clients and prospective customers and clients; (ii) the Company has a legitimate interest in protecting these and other legitimate interests of the Company and the Company has additional legitimate interests in requiring me to agree to be bound by the

restrictions contained in this Section 5; and (iii) legal remedies are inadequate to fully protect the Confidential Information, business interests and goodwill of the Company. Any breach by me of this Section 5 shall toll the time period specified in that provision to the fullest extent permitted by law so that the Company obtains the full benefit of a continuous and uninterrupted protection for the time period specified.

6.    **RETURN OF COMPANY PROPERTY.** Upon termination of my Service or upon Company's request at any other time, I will deliver to Company all of Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Confidential Information of Company, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copies of my agreements with the Company. I agree that I will not copy, delete, or alter any Confidential Information contained upon my Company computer immediately before I return it to Company. I further agree that any property situated on Company's premises and owned by Company is subject to inspection by Company personnel at any time with or without notice.

7.    **NOTIFICATION OF NEW EMPLOYER.** In the event that my Service with the Company terminates, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement, by Company's providing a copy of this Agreement or otherwise.

8.    **GENERAL PROVISIONS.**

    **8.1. Binding Arbitration.** I agree that any and all claims or disputes arising from or relating to this Agreement, shall be subject to and be resolved by binding arbitration in accordance with the Company's Alternative Dispute Resolution (ADR) Policy and Agreement, a copy of which I executed in connection with my acceptance of the offer of employment provided by the Company.

    **8.2. Severability.** If any provision of this Agreement is, for any reason, held to be invalid or unenforceable, the other provisions of this Agreement will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law.

    **8.3. Survival.** This Agreement shall survive the termination of my Service and the assignment of this Agreement by Company to any successor-in-interest or other assignee and be binding upon my heirs and legal representatives.

    **8.4. Continuation of Service.** I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of Service with Company,

400857073.1

nor shall it interfere in any way with my right or Company's right to terminate my Service at any time, with or without cause and with or without advance notice.

**8.5. Notices.** Each party must deliver all notices or other communications required or permitted under this Agreement in writing to the other party at the address listed on the signature page, by courier, by certified or registered mail (postage prepaid and return receipt requested), or by a nationally-recognized express mail service. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, any such notice will be considered to have been given five (5) business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, any such notice shall be considered to have been given on the delivery date reflected by the courier or express mail service receipt. Each party may change its address for receipt of notice by giving notice of such change to the other party.

**8.6. Legal Remedies.** I acknowledge and agree that the Company and its affiliates, as applicable, will suffer irreparable loss and damage if I breach or violate any of the restrictions and agreements contained in this Agreement. I therefore agree that, in addition to any other remedies available, the Company and its affiliates, as applicable, shall be entitled to a temporary restraining order, preliminary injunction and/or permanent injunction, without any bond or other security being required, to prevent a breach or contemplated breach by me and by any person or entity to whom I provide or propose to provide any services in violation of any of the covenants or agreements contained in this Agreement. Any rights created by this Agreement shall be in addition to, and not in lieu of, any other remedies that may exist under any applicable law or in equity.

**8.7. Waiver.** Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

**8.8. Export.** I agree not to export, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, to countries outside the United States, because such export could be in violation of the United States export laws or regulations.

**8.9. Entire Agreement.** The obligations pursuant to sections of this Agreement titled "Confidentiality" and "Work Product and Inventions" shall apply to any time during which I was previously employed, or am in the future employed, by Company as an independent contractor if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matters hereof and supersedes and merges all prior communications between us with respect to such matters. No modification of or amendment to this Agreement, or any waiver of any rights under this Agreement, will be effective unless in writing and signed by me and a duly authorized officer of the Company. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

*[Remainder of Page Intentionally Left Blank]*

400857073.1

This Agreement shall be effective as of the first day of my Service with the Company.

**I HAVE READ, UNDERSTAND, AND ACCEPT THIS AGREEMENT AND HAVE BEEN GIVEN THE OPPORTUNITY TO REVIEW IT WITH INDEPENDENT LEGAL COUNSEL.**

_____
Raphael Zagury (Nov 10, 2023 19:59 GMT-3)
Raphael Zagury

November 6, 2023

**ACCEPTED AND AGREED TO:**

**ELECTRIC SOLIDUS, INC.,** a Delaware corporation

By: _____
cory klippsten (Nov 7, 2023 08:38 PST)
Cory Klippsten

November 6, 2023

**Signature Page to Confidentiality and Proprietary Information and Inventions Agreement**
400857073.1

## SCHEDULE I

### INVENTIONS

1.    **Prior Inventions Disclosure.** The following is a complete list of all Prior Inventions:

☒    None

☐    See immediately below:

_____

_____

_____

_____

_____

400857073.1

## EXHIBIT B

### Alternative Dispute Resolution (ADR) Policy and Agreement

1. Agreement to Arbitrate.

   1.1. In the event that any employment dispute arises between Electric Solidus, Inc. ("**Company**") and the undersigned ("**Employee**"), the parties involved will make all efforts to first resolve any such dispute through an informal process whereby the complaining party shall serve the responding party with a demand detailing all alleged claims and engage in negotiations for a period of 30 days following the demand. If these informal attempts at resolution fail *and* if the dispute arises out of or is related to Employee's employment, the termination of Employee's employment or alleged unlawful discrimination, including but not limited to unlawful harassment, the Company and Employee will submit the dispute to final and binding arbitration in the county where the Employee is located in Florida.

   1.2. The parties expressly understand and agree that arbitration is the exclusive remedy for all such disputes; with respect to such disputes, no other action may be brought in court or any other forum (except actions to compel arbitration hereunder). **THIS ALTERNATIVE DISPUTE RESOLUTION ("ADR") POLICY AND AGREEMENT (THIS "ADR AGREEMENT") IS A WAIVER OF THE PARTIES' RIGHTS TO A CIVIL COURT ACTION FOR A DISPUTE RELATING TO THE EMPLOYEE'S EMPLOYMENT, TERMINATION OF THAT EMPLOYMENT OR ALLEGED UNLAWFUL DISCRIMINATION, WHICH INCLUDES RETALIATION OR SEXUAL OR OTHER UNLAWFUL HARASSMENT; ONLY AN ARBITRATOR, NOT A JUDGE OR JURY, WILL DECIDE THE DISPUTE.**

   1.3. Employment disputes arising out of or related to termination of employment or alleged unlawful discrimination, including retaliation or sexual or other unlawful harassment, shall include, but not be limited to, the following: alleged violations of federal, state and/or local constitutions, statutes or regulations; claims based on any purported breach of contractual obligation, including breach of the covenant of good faith and fair dealing; and claims based on any purported breach of duty arising in tort, including violations of public policy. Disputes related to workers' compensation and unemployment insurance are not arbitrable hereunder. Claims for benefits covered by a separate benefit plan that provides for arbitration are not covered by this ADR Agreement. Also, nothing in Company's offer letter to Employee (the "**Offer Letter**") or in the ADR Policy shall be construed as precluding Employee from filing a charge with the Equal Employment Opportunity Commission (EEOC), the National Labor Relations Board (NLRB) or other federal, state or local agencies, seeking administrative assistance in resolving claims. However, any claim that cannot be resolved administratively through such an agency shall be subject to the Offer Letter and this ADR Policy and Agreement.

   1.4. This Agreement to arbitrate is subject to and governed by the Federal Arbitration Act, 9 U.S.C. §1 et seq. ("FAA"). This means that the FAA governs, among other things, the interpretation and enforcement of this Agreement and all of its provisions, including, without limitation, the enforceability of the class action waiver set forth herein. State arbitration laws do not apply or govern this Agreement in any respect unless specifically referenced herein.

2. Request for Arbitration.

   2.1. Attempt at Informal Resolution of Disputes. Prior to submission of any dispute to arbitration, Employee and the Company will attempt to resolve the dispute informally as follows: Employee and the Company will select a mediator from a list provided by Judicial Arbitration and Mediation Services, Inc. ("**JAMS**") or other similar dispute resolution service provider who will

assist the parties in attempting to reach a settlement of the dispute. The mediator may make settlement suggestions to the parties but shall not have the power to impose a settlement upon them. If the dispute is resolved in mediation, the matter shall be deemed closed. If the dispute is not resolved in mediation and goes to the next step (binding arbitration), any proposals or compromises suggested by either of the parties or the mediator shall not be referred to in or have any bearing on the arbitration procedure. The mediator cannot also serve as the arbitrator in any subsequent proceeding unless all parties expressly agree in writing.

2.2.    Arbitration Procedures.  The party desiring arbitration, whether Employee or the Company, must submit a "Request For Arbitration" in writing to the other party within the time period required by the law that applies to the claim under the applicable statute of limitations.  If the "Request for Arbitration" is not submitted in accordance with the aforementioned time limitations, the party failing to do so will not be able to bring that party's claims to this or any other forum. The "Request for Arbitration" form must, unless otherwise required by law, clearly state "Request for Arbitration" at the beginning of the first page and include the following information:

(a)    A factual description of the dispute in sufficient detail to advise the other party of the nature of the dispute;

(b)    The date on which the dispute first arose;

(c)    The names, work locations and telephone numbers of any individuals, including employees or supervisors, with knowledge of the dispute; and

(d)    The relief requested by the requesting party.

The responding party may submit counterclaim(s) in like manner in accordance with applicable law.

2.3.    Selection of Arbitrator.  All disputes will be resolved by a single Arbitrator, who will be mutually selected by the Company and Employee. If the parties cannot agree on an Arbitrator, then a list of five arbitrators, experienced in employment matters, shall be provided by JAMS. The Arbitrator will be selected by the parties who will alternately strike names from the list. The last name remaining on the list will be the Arbitrator selected to resolve the dispute. Upon selection, the Arbitrator shall set an appropriate time, date and place for the arbitration, after conferring with the parties to the dispute.

2.4.    The Arbitrator's Authority.  The Arbitrator shall have the following powers:

(a)    To rule on motions regarding discovery, procedural, and evidentiary issues arising during the arbitration.

(b)    To rule on motions to dismiss and/or motions for summary judgment applying the standards governing such motions under the Federal Rules of Civil Procedure.

(c)    To issue protective orders on the motion of any party or third-party witness. Such protective orders may include, but are not limited to, sealing the record of the arbitration, in whole or in part (including discovery proceedings and motions, transcripts, and the decision and award), to protect the privacy or other constitutional or statutory rights of parties and/or witnesses.

(d)    To determine only the issue(s) submitted to him/her. The issue(s) must be identifiable in the "Request for Arbitration" or counterclaim(s). Except as required by law, any issue(s) not identifiable in those documents is outside the scope of the Arbitrator's jurisdiction and any award involving such issue(s), upon motion by a party, shall be vacated.

2.5.    Discovery.  The discovery process shall proceed and be governed, consistent with the standards of the Federal Rules of Civil Procedure, as follows:

(a)    Unless otherwise required by law, the parties may obtain discovery by any of the methods allowed under the Federal Rules of Civil Procedure.

(b)    To the extent permitted by the Federal Arbitration Act or applicable Florida law, each party shall have the right to subpoena witnesses and documents during discovery and for the arbitration.

(c)    All discovery requests shall be submitted no less than sixty (60) days before the hearing date.

(d)    The scope of discoverable evidence shall be in accordance with Federal Rule of Civil Procedure 26(b)(1).

(e)    The Arbitrator shall have the power to enforce the aforementioned discovery rights and obligations by the imposition of the same terms, conditions, consequences, liabilities, sanctions and penalties as can or may be imposed in like circumstances in a civil action by a federal court under the Federal Rules of Civil Procedure, except the power to order the arrest or imprisonment of a person.

2.6.   Hearing Procedure. The hearing shall be held at a location mutually agreed upon by the parties, or as determined by the Arbitrator in the absence of an agreement, and shall proceed according to the JAMS for the resolution of employment disputes. A copy of the JAMS Employment Arbitration Rules and Procedures may be found on JAMS' website at: http://www.jamsadr.com/rules-employment-arbitration in effect at the time of the arbitration, with the following amendments:

(a)    The Arbitrator shall rule at the outset of the arbitration on procedural issues that bear on whether the arbitration is allowed to proceed.

(b)    Each party has the burden of proving each element of its claims or counterclaims, and each party has the burden of proving any of its affirmative defenses.

(c)    In addition to, or in lieu of, closing argument, either party shall have the right to present a post-hearing brief, and the deadline for exchanging any post-hearing briefs shall be mutually agreed on by the parties and the Arbitrator, or determined by the Arbitrator in the absence of agreement.

2.7.   Substantive Law.

(a)    The parties agree that they will be afforded the identical legal, equitable, and statutory remedies as would be afforded them were they to bring an action in a court of competent jurisdiction.

(b)    The applicable substantive law shall be the law of the State of Florida or federal law. Choice of substantive law in no way affects the procedural aspects of the arbitration, which are exclusively governed by the JAMS rules referenced above and the provisions of this ADR Agreement.

2.8.   Opinion and Award. The Arbitrator shall issue a written opinion and award, in conformance with the following requirements:

(a)    The opinion and award must be signed and dated by the Arbitrator.

(b)    The Arbitrator's opinion and award shall decide all issues submitted.

(c)    The Arbitrator's opinion and award shall set forth the legal principles supporting each part of the opinion.

(d)    The Arbitrator shall have the same authority to award remedies, damages and costs as provided to a judge and/or jury under parallel circumstances.

2.9.    Enforcement of Arbitrator's Award.  Following the issuance of the Arbitrator's decision, any party may petition a court to confirm, enforce, correct or vacate the Arbitrator's opinion and award under the Federal Arbitration Act, and/or applicable Florida law.

2.10.    Fees and Costs.  Fees and costs shall be allocated in accordance with the JAMS Employment Arbitration Rules and Procedures.

2.11.    Waiver of Right to Maintain or Participate in Class Action.  I understand that, to the full extent permitted under the law, by signing this Agreement, I am giving up any right I may have to be a plaintiff or class member in any purported class or representative proceeding, on all claims I may have against the Company, as described in Paragraph 1.

3.    Severability. Each term, clause and provision of this ADR Agreement is separate and independent, and should any term, clause or provision of this ADR Agreement be found to be invalid or unenforceable, the validity of the remaining terms, clauses, and provisions shall not be affected. As to those terms, clauses and provisions found to be invalid or unenforceable, they shall be replaced with valid and enforceable terms, clauses or provisions or shall be modified, in order to achieve, to the fullest extent possible, the economic, business and other purposes of the invalid or unenforceable terms, clauses or provisions.

EMPLOYEE:                                    ELECTRIC SOLIDUS, INC., a Delaware corporation

_____             _____
Raphael Zagury (Nov 10, 2023 19:59 GMT-3)    By: cory klippsten (Nov 7, 2023 08:38 PST)
Raphael Zagury                                   Cory Klippsten
November 6, 2023                                 November 6, 2023

400857073.1

# Electric Solidus - Form of Offer Letter - Rapha Zagury (FL)

Final Audit Report                                          2023-11-10

| | |
|---|---|
| Created: | 2023-11-07 |
| By: | Ashley Marchetta (ashley@swanbitcoin.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAArbwCB-ptK6jGT1zOtmdaMzoUUZ4NWG5L |

## "Electric Solidus - Form of Offer Letter -  Rapha Zagury (FL)" History

📄 Document created by Ashley Marchetta (ashley@swanbitcoin.com)
2023-11-07 - 4:19:53 PM GMT

✉ Document emailed to cory klippsten (cory@swan.com) for signature
2023-11-07 - 4:20:50 PM GMT

📄 Email viewed by cory klippsten (cory@swan.com)
2023-11-07 - 4:37:49 PM GMT

✍ Document e-signed by cory klippsten (cory@swan.com)
Signature Date: 2023-11-07 - 4:38:01 PM GMT - Time Source: server

✉ Document emailed to raphael@zagury.com for signature
2023-11-07 - 4:38:02 PM GMT

📄 Email viewed by raphael@zagury.com
2023-11-10 - 10:53:29 PM GMT

✍ Signer raphael@zagury.com entered name at signing as Raphael Zagury
2023-11-10 - 10:59:47 PM GMT

✍ Document e-signed by Raphael Zagury (raphael@zagury.com)
Signature Date: 2023-11-10 - 10:59:49 PM GMT - Time Source: server

✅ Agreement completed.
2023-11-10 - 10:59:49 PM GMT

**Adobe Acrobat Sign**